1                   UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

2

3                                .   Chapter 11
   IN RE:                        .

4                                .   Case No. 20-11177 (KBO)
   AKORN, INC., *et al.*,         .

5                              .   Courtroom No. 1
                              .   824 North Market Street

6                              .   Wilmington, Delaware 19801
                            .

7                   Debtors.    .   September 1, 2020
   . . . . . . . . . . . . . . . . . .  10:00 A.M.

8

9                     TRANSCRIPT OF HEARING

10           BEFORE THE HONORABLE KAREN B. OWENS
                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12

13   For the Debtors:         Pat Nash, Esquire
                           Christopher Hayes, Esquire

14                        William Arnault, Esquire
                           KIRLAND & ELLIS LLP

15                        300 North LaSalle Street
                         Chicago, Illinois 60654

16   Audio Operator:         Al Lugano

17   Transcription Company:   Reliable
                         1007 N. Orange Street

18                         Wilmington, Delaware 19801
                         (302)654-8080

19                         Email:  gmatthews@reliable-co.com

20   Proceedings recorded by electronic sound recording;

21   transcript produced by transcription service.

22

23

24

25

```
 1  APPEARANCES (Continued):

 2  For Ad Hoc Term          Scott Greenberg, Esquire
    Lender Group:            GIBSON DUNN CRUTCHER
 3                           200 Park Avenue
                             New York, New York 10166
 4
    For AFSCME District      Edmond George, Esquire
 5  Council 47:              OBERMAYER REBMANN MAXWELL & HIPPEL
                             1617 John F. Kennedy Blvd. #19
 6                           Philadelphia, Pennsylvania 19103

 7
    For Official Committee   Catherine Steege, Esquire
 8  Of Unsecured Creditors:  JENNER & BLOCK
                             353 North Clark Street
 9                           Chicago, Illinois 60654

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

<u>INDEX</u>

2   #1) Debtors' Motion Seeking Entry of an Order (A) Approving
    Bidding Procedures, (B) Scheduling an Auction and Sale
3   Hearing, (C) Approving the Form and Manner of Notice Thereof,
    (D) Establishing Procedures for the Assumption and Assignment
4   of Certain Executory Contracts and Leases, and (E) Granting
    Related Relief [Docket No. 18 – filed May 21, 2020].
5
    **Ruling: 222**
6
7   #2) Modified Joint Chapter 11 Plan of Akorn, Inc. and Its
    Debtor Affiliates [Docket No. 547 – filed August 25, 2020].
8
    **Ruling: ..**
9
10  #3) Motion of Fresenius Kabi AG to Reclassify Claims Pursuant
    to Bankruptcy Rule 3013 [Docket No. 379 – filed July 24,
    2020].
11
    **Ruling: ..**
12
13  #4) Motion of 1199SEIU Benefit Funds, DC47 Fund and SBA Fund
    for Leave to File Objection (DI #553) to the Debtors' Motion
    to Sell (DI #18) and Confirmation of the Debtors' Plan
14  (DI#258) Under Seal [Docket No. 601 – filed August 28, 2020].

15  **Ruling: ..**

16

17  DEBTORS' WITNESS(s)

18  **MARK BUSCHMANN**

19       Direct Examination by Mr. Arnault       8

20       Cross Examination by Mr. George        70

21

22

23

24

25

| EXHIBITS | | I.D. | REC'D |
|---|---|---|---|
| D-24 | | | 149 |
| D-25 | | | 149 |
| D-26 | Calculation of overbid price | | 47 |
| D-27 | | | 67 |
| D-44 | Asset purchase agreement | | 45 |
| D-48 | Original loan agreement | | 15 |
| D-49 | Incremental facility for original term loan | | 15 |
| D-50 | Supplement to original loan agreement | | 16 |
| D-51 | Standstill agreement | | 22 |
| D-52 | Executed version of extension | | 34 |
| D-53 | Second amen my team | | 38 |
| D-55 | Agreement related to term loan | | 17 |
| MDL-32 | | | 102 |
| MDL-23 | | | 108 |
| MDL-43 | | | 120 |
| MDL-33 | | | 138 |
| MDL-5 | | | 138 |
| MDL-8 | | | 138 |
| MDL-34 | | | 139 |
| MDL-38 | | | 142 |
| MDL-42 | | | 146 |
| MDL-15 | | | 158 |
| MDL-9 | | | 178 |
| MDL-1 | | | 178 |

1           (Proceedings commenced at 10:03 a.m.)

2           THE COURT:  Good morning, counsel.  This is Judge

3    Owens.  We're here today for the Akorn sale hearing and plan

4    confirmation proceedings.

5           Why don't I turn the podium over to debtors'

6    counsel and you can walk us through the sale hearing today

7    and give me an update on where things stand.

8           MR. HAYES:  Certainly.  Good morning, Your Honor.

9           For the record, Christopher Hayes of Kirkland &

10   Ellis on behalf of the debtors and debtors-in-possession.  We

11   have a busy agenda today and I want to be mindful of the

12   Court's time, so I would propose jumping into the evidentiary

13   portion of the hearing.

14          But first, I thought I'd just provide a quick

15   roadmap of today's hearing, and I would note also at the

16   outset with me is my partner Pat Nash and also on the line is

17   my partner, Bill Arnault, who will be handling the

18   evidentiary portion.

19          As Your Honor saw from the agenda, the debtors

20   received approximately 28 objections to the proposed sale.

21   The bulk of these related to the proposed is assumption and

22   assignment of certain contracts that first went to the sale.

23          I'm pleased to report that the debtors have

24   resolved a significant number of these objections both, prior

25   to since filing their sale-related pleadings on Friday

1  afternoon.  And while we haven't resolved all of them, we are

2  continuing to resolve those and expect to the extent that

3  they haven't been resolved by the conclusion of today's

4  hearing, that we would turn the balance of those cure-related

5  objections to a future hearing date.

6         So that really leaves us with just one party that

7  is still opposing approval of the sale and that is what I

8  will refer to as the Benefit Fund plaintiffs in the MGL

9  litigation.  And I think their objection really boils down to

10  two issues; one, that the sale was not negotiated or proposed

11  in good faith and, two, that the debtors' estates are not

12  receiving adequate consideration for the sale.

13         However, as I think the evidence will show, this

14  transaction was negotiated with the utmost good faith and

15  provides more than adequate consideration for the sale.

16  Indeed, it's the only sale transaction that is currently

17  before the Court and the only option before the Court that

18  will preserve the debtors' operations, save thousands of

19  jobs, pay substantially all of its administrative and

20  priority claims, and pay substantially all of the debtors'

21  undisputed unsecured claims.

22         And with that, Your Honor, I would propose turning

23  the virtual podium over to my colleague, Bill Arnault, to

24  begin the evidentiary portion of the record and to the extent

25  Your Honor would like further argument following the

1    conclusion of the evidence, we can do that at that time.

2              THE COURT:  Okay.  Thank you, Mr. Hayes.

3              Before we begin with the evidentiary portion of

4    today's hearing, I note that there's a slurry of activity

5    prior to today's hearing including a filing of another

6    amended agenda which noted that there was going to be a cure,

7    I guess, evidentiary hearing today.

8              Is that, in fact, the intention of the parties,

9    that we're going to have a cure evidentiary hearing and a

10   cure objection today, because I'm a little unclear why we

11   would be doing that.

12             MR. HAYES:  Sorry.  Your Honor, if I may --

13   apologies -- if I may just comment on that one.

14             Your Honor, to the extent that that would go

15   forward today, I don't believe that that would require any

16   evidence; it would be legal argument as to whether or not the

17   debtors are permitted to assume and assign that, absent the

18   third-party's consent; however, I will note that the

19   parties -- the business principles remain in active

20   discussions regarding a resolution of that cure objection and

21   we hope to make progress over this hearing and, perhaps, we

22   can further update the Court later on in the proceedings and

23   hopefully we'll have good news that during the course of the

24   day, the parties were able to reach a resolution.

25             THE COURT:  Okay.  That sounds like a fine

1  approach.  We'll take it as it comes.

2         Okay.  Mr. Arnault?

3         MR. ARNAULT:  Good morning, Your Honor.  Bill

4  Arnault from Kirkland & Ellis, on behalf of the debtors.  And

5  so, as Mr. Hayes mentioned, we'd like to launch right into

6  our evidence and witnesses and for our first witness today,

7  we'll like to call Mr. Mark Buschmann.

8         THE COURT:  Okay.  Mr. Buschmann, are you with us?

9  Oh, there you are.

10         MR. BUSCHMANN:  I am.

11         THE COURT:  Okay.  I can see you.

12         Okay.  Mr. Lugano, can you please swear in Mr.

13  Buschmann.

14         THE COURT RECORDER:  Yes, Your Honor.

15      (Oath administered)

16       MARK BUSCHMANN, DEBTORS' WITNESS, AFFIRMED

17         THE WITNESS:  I do.

18         THE COURT RECORDER:  Please state your full name

19  for the record and spell your last.

20         THE WITNESS:  Sure.  Mark Buschmann.  Last name is

21  spelled B, as in boy, U-S-C-H-M-A-N-N.

22         THE COURT RECORDER:  Thank you, sir.

23                      DIRECT EXAMINATION

24  BY MR. ARNAULT:

25  Q    Good morning, Mr. Buschmann.

1  A      Good morning.

2  Q      Can you please tell the Court how you are currently

3  employed.

4  A      Sure, I'm a partner at PJT Partners.

5  Q      And what is the connection of PJT Partners to the

6  debtors in this case?

7  A      Sure.  We are the investment banker for Akorn.

8  Q      All right.  So, for purposes of today's hearing, I'd

9  like to walk through all the work that PJT and you have done

10  for the debtors since 2019, including the sale motion and the

11  transaction that's at issue here today.

12      But before we do that, I'd just like to briefly discuss

13  your background for the Court.  So, to begin, can you tell

14  the Court where you went to college.

15  A      Sure.  I went to Dartmouth College.

16  Q      What was your degree in at Dartmouth?

17  A      Economics and German literature.

18  Q      And do you have any post-graduate degrees?

19  A      I received my MBA with a concentration in finance and

20  analytical finance from Northwestern, which is the Kellogg

21  Graduate School of Nashville.

22  Q      And if we turn now to your professional experience,

23  what was your first job in the corporate world after you

24  graduated from Dartmouth?

25  A      Sure.  I joined the investment bank of Smith Barney,

1  which in my three years there, ended up becoming Citigroup.

2  Q    And what type of work did you do at Smith Barney?

3  A    I was there for three years, so the first year was

4  focused on financing, primarily, and then I joined the M&A

5  practice on financial institution side for the following two

6  years.

7  Q    And where did you go after Smith Barney?

8  A    That's when I left the banking world and went to

9  Chicago to Northwestern to get my MBA.

10 Q    And what was your first job in the corporate world

11 coming out of the Kellogg School?

12 A    I joined the Blackstone Group both, as a summer

13 associate in the summer of 2000 and then full time in 2001.

14 Q    What type of work did you do at the Blackstone Group?

15 A    I was hired directly into their restructuring practice,

16 so basically the same work I'm still doing today.

17 Q    And what type of work did that entail in the

18 restructuring group there?

19 A    Sure.  The Blackstone Restructuring Group, as well as

20 PJT, and my practice, in particular, focuses on advising

21 debtors, creditors in restructurings both, in court and out

22 of the court.  We focused on distressed M&A and obviously

23 financings that are, what I would say, is not the regular way

24 M&A -- it's not the regular way financing processes like you

25 would have.

1  Q      How long were you at Blackstone Group?

2  A      So, again, full time 2001 and I went to form PJT

3  Partners.  It was our group and the other advisory businesses

4  actually merged with a boutique that was called PJT.  That

5  was around 2015.

6  Q      So, you've been at PJT or working for PJT around seven

7  years, does that sound about right?

8  A      That would be five years at PJT.

9  Q      Okay.  Don't ask me to do math.

10        And what type of work have you done at PJT?

11 A      Again, it is the same work; advising debtors and

12 creditors in restructurings.

13 Q      And overall, then, how many years of experience do you

14 have advising companies in connection with restructuring

15 transactions in Chapter 11 cases?

16 A      That would make 19 years of restructuring and 22 years,

17 including my prior experience in M&A and financing, as well.

18 Q      And over those 19 years of experience, how many

19 companies would you say that you've advised that have either

20 been in financial distress or filed for Chapter 11?

21 A      I would say around 50, give and take.

22 Q      And can you just give the Court some examples of some

23 of the, your prior restructuring and financial advisory

24 engagements.

25 A      Sure, I was involved in the restructuring and filing

1  for Chapter 11 of Delta Airlines.  We sold the Dodgers a few

2  years ago.  I sold Westinghouse Electric, that was, again, a

3  couple years ago.

4       More recently before involved in the Chapter 11 and

5  sale of Acido (phonetic), which is both a pharmaceutical and

6  chemical company.

7  Q    And in addition to the companies that you just listed,

8  have you represented or been involved in any other

9  pharmaceutical companies?

10  A    Yes.  Yes, I have.

11  Q    Okay.  And of your many engagements, how many of those

12  have involved sales processes?

13  A    Overall -- again, not including the years as a young

14  analyst -- you know, it would be around 20.

15  Q    And what experience, if any, do you have providing

16  testimony in support of the marketing and sales processes

17  have you've been involved in, including by declaration?

18  A    It's been dozens of times.

19  Q    All right.  Well, at this point in time, let's turn now

20  to your work for the debtors.  And while we are certainly

21  going to get into the post-petition sale process, before we

22  do, I would like to begin with the work that you and PJT

23  performed for the company prepetition --

24       MR. GEORGE:  Your Honor, excuse me.  I'm sorry,

25  but is this gentleman being proffered as an expert, because

1   I'd like a short voir dire of him, if I could, Judge, before

2   we get into his testimony.

3            THE COURT:  Mr. Arnault, are you proffering him as

4   an expert witness?  I didn't think you were.

5            MR. ARNAULT:  No, I'm not.  He's purely a fact

6   witness.

7            MR. GEORGE:  Thank you, Your Honor.

8            THE COURT:  You're welcome.

9            You can continue.

10  BY MR. ARNAULT:

11  Q    And so, can you just tell the Court, Mr. Buschmann,

12  when PJT was first retained by the debtors.

13  A    We were retained in January of 2019.

14  Q    And what was your role on this engagement?

15  A    I'm one of the partners leading the transaction.

16  Q    And at the time that PJT was retained, what were the

17  debtors' funded debt obligations?

18  A    It's a simple capital structure, the same as it is

19  today, roughly.  There was a term loan that was around

20  $850 million outstanding.

21  Q    And as part of your engagement and your work for the

22  debtors, did you familiarize yourself with those obligations?

23  A    Yes, we did.

24  Q    And are you familiar with the documents related to

25  those obligations?

1    A    Yes, I am.

2    Q    Okay.  So before we get into the substance of all the

3    work that you've done, let's just do some housekeeping up

4    front and get those foundational documents into evidence.

5         So, if you could turn -- you should have a binder --

6    and I'm hopeful that the judge has a binder as well -- and if

7    you could turn in that binder to the document marked for

8    identification as Debtors' Exhibit 48.

9    A    I'm there.

10   Q    And have you seen this document before?

11   A    Yes, I have.

12   Q    And what is it?

13   A    This is the original loan agreement for the term loan.

14        MR. ARNAULT:  And at this point, Your Honor, I'd

15   move for the admission into evidence Debtors' Exhibit 48.

16        And just as I'm doing that, I'll note for the

17   record that Mr. George and I have stipulated to the

18   admissibility of all of our respective exhibits just in an

19   effort to try and streamline these proceedings.

20        THE COURT:  Okay.  Thank you.

21        MR. GEORGE:  And, Your Honor, I'm fine if

22   Mr. Arnault wants to skip moving them in.  We can acknowledge

23   them in now so that we can streamline this if he has no issue

24   with that.  I have no problem with any of the documents that

25   he provided being part of the evidentiary record.

1          THE COURT:  That's fine.  There may be other

2   parties in interest, perhaps, that may object, so why don't

3   we just move them as we go along.

4          MR. GEORGE:  Thank you, Your Honor.

5          THE COURT:  Let me ask for the record, does anyone

6   object to the admission of Debtors' Exhibit 48?

7       (No verbal response)

8          THE COURT:  Okay.  It's admitted.

9       (Debtors' Exhibit 48 received in evidence)

10  BY MR. ARNAULT:

11  Q    And then if we could just turn in your binder,

12  Mr. Buschmann, to the document marked for identification as

13  Debtors' Exhibit 49.

14  A    I'm there again.

15  Q    And what is this document?

16  A    This is the incremental facility for the original term

17  loan.

18         MR. ARNAULT:  Okay.  So, I'd like to move for the

19  admission into evidence of Debtors' Exhibit 49.

20         THE COURT:  Okay.  Any objection?

21      (No verbal response)

22         THE COURT:  It's admitted.

23      (Debtors' Exhibit 49 received in evidence)

24  BY MR. ARNAULT:

25  Q    And then if you could turn in your binder to the

1   document marked for identification as Debtors' Exhibit 50.

2   A     Yep, I'm there.

3   Q     And what is this document?

4   A     Again, this is just a supplement to the original loan

5   agreements, again, combining basically the incremental, as

6   well as the original term loan.

7           MR. ARNAULT:  And, Your Honor, I'd move for the

8   admission into evidence of Debtors' Exhibit 50.

9           THE COURT:  Any objection?

10      (No verbal response)

11          THE COURT:  It's admitted.

12      (Debtors' Exhibit 50 received in evidence)

13  BY MR. ARNAULT:

14  Q     And, finally, Mr. Buschmann, if you could turn in your

15  binder to what's been marked for identification as Debtors'

16  Exhibit 55, and we have sent that electronically to you.

17  A     Yep.

18  Q     Okay.  And what is this document?

19  A     This is a (indiscernible) agreement, again, relating to

20  the term loan.

21          MR. ARNAULT:  Okay.  And, Your Honor, I'd move

22  into evidence Debtors' Exhibit 55.

23          THE COURT:  Any objection?

24      (No verbal response)

25          THE COURT:  It's admitted.

1              (Debtors' Exhibit 55 received in evidence)

2   BY MR. ARNAULT:

3   Q     All right.  And turning now back to your work for the

4   company, Mr. Buschmann, what was the state of play when PJT

5   arrived on the scene in January 2019?

6   A     Sure.  At that point, the company had just received a

7   number of letters from its secured lenders, who had formed an

8   ad hoc group.  That ad hoc group was being represented by, at

9   the time, the law firm of Jones Day, to which the partners

10  there subsequently left and joined Gibson Dunn, so

11  (indiscernible) what I'll call the Gibson Dunn lawyers.

12         There was a letter that they had received that alleged

13  that based upon the <u>Fresenius</u> decision of Judge Lasseter,

14  that there were arguments for an event of default under the

15  existing credit agreement.

16         The company was also after, frankly, having spent a

17  long time on the <u>Fresenius</u> litigation in what we would sort

18  of call a turnaround position, frankly, quite weak, in that

19  they were just having a new CEO join the firm.  This was Doug

20  Boothe who joined Akorn, I believe, on January 1st of 2019

21  and was bringing in additional members to the team to start

22  the turnaround for the business.

23         The company was very much engaged in addressing some of

24  the issues that the FDA had raised at the facilities, so as

25  we actually were doing our work, some of the facilities were

1   shut down and were completing some of the work.

2        So, from a financial perspective, the company was, you

3   know, in a state of poor, very poor financial performance,

4   was facing numerous (indiscernible) supply penalties, and was

5   really trying to turn itself around with the addition of this

6   team.

7   Q    Okay.  And so, with respect to the two letters that you

8   mentioned, when were those letters sent?

9   A    Again, before my time, but I believe they were dated in

10  November and December of 2018.

11  Q    And what was the general tone (indiscernible) in those

12  letters?

13  A    As letters from your creditors usually are, they are

14  very direct and did point out the opinion written by the

15  judge gave them, I believe, that there could be cause for an

16  event of default under the term.

17  Q    And as you were surveying the scene with the company,

18  what were the options that you were analyzing with them on

19  how to proceed with this ad hoc group?

20  A    Sure.  When we were hired, you know, we, frankly,

21  quickly engaged with the management team, but also had a lot

22  of interaction with the board.  I would say we probably had

23  the most number of board meetings in this case that I've ever

24  had in my career.

25       But what we did was look at our options, which was do

1   we just ignore the letters and sort of enter into a letter-

2   writing campaign?  Do we engage with the lenders and see if

3   there was a deal that we could strike with them to, frankly,

4   avoid any kind of litigation that's going?  Or in, obviously,

5   a worst-case scenario, you know, what would be our fallback

6   plan, meaning, if they call an event of default, you know,

7   then we would obviously have to prepare ourselves also for a

8   what I'd call a premature Chapter 11.

9   Q    And in light of those options, how did the company

10  decide to proceed?

11  A    So, we engaged with the financial advisors who, for

12  their ad hoc group of lenders, which at this point now is the

13  (indiscernible) group and Gibson Dunn and we talked about the

14  contours of what we would call (indiscernible) agreements to

15  avoid, again, litigation and them calling an event of

16  default.

17       You know, at this point, the more we spoke with them,

18  the more we became convinced that their parties were, in

19  fact, ready, willing, and able to call an event of default.

20  And so, looking at the options and the cost of litigation of

21  a potential loss in litigation, which, again, was obviously

22  the worst possible outcome, and seeking a truce, if you will,

23  and a time to give the company breathing room, we decided to

24  engage with the advisors to see if we could strike a

25  standstill that would let the company actually operate and

1   yank it out of its (indiscernible) financial position.

2   Q     And you mentioned some the meeting with the Board that

3   you had as part of this process, but can you just put a

4   little bit more detail around it, the deliberative process

5   that the company engaged in to arrive at this decision.

6   A     Yeah.  Again, we, I believe we almost had weekly

7   meetings, if not, you know, every two weeks, but, certainly,

8   we laid out for them all of the options.  We laid out for

9   them what we thought the costs were and based upon counsel's

10  view of the litigation that was, frankly, going to be alleged

11  or the default being alleged and the resulting litigation,

12  our success of -- our likelihood of success in that

13  litigation and based upon that, the Board, with the

14  management team, and our advice, decided to, you know, pursue

15  the standstill, instead.

16  Q     Okay.  So, having made that decision to engage with the

17  lenders, how did the company then proceed?

18  A     Well, we did just that.  So, we engaged with the term

19  loan advisors.  We had our view of what a quote, unquote, a

20  standstill would look like.  They had a different view.

21        And so, we, over what really was a multiple-month

22  period and countless proposals back and forth, negotiated

23  with them what we, you know, entered into, which was the

24  standstill agreement.

25  Q     How would you characterize the negotiations?

1 A     Bruising is probably one word that I would use.  You

2 know, the lenders and their advisors did their job, you know,

3 their loan was trading well below par.  They viewed

4 themselves as having an event of default.  They viewed

5 themselves as incurring incremental risks every day as the

6 company was burning cash.  They viewed themselves as being,

7 you know, the equity in the company and equity, obviously,

8 has equity risks.

9        And so, they were pushing for a, what I would say a

10 very quick quote, unquote, comprehensive amendment, which,

11 again, obviously (indiscernible) term, but submit everything

12 from a Chapter 11 to a debt-for-equity slot to amending the

13 document all, you know, based upon diligence that they were

14 going to do as part of the standstill.

15        We, of course, wanted to extend the time as long as

16 possible.

17 Q     And did the company ultimately reach agreement with the

18 ad hoc group on a standstill agreement?

19 A     Yeah, so I think our first discussions probably were

20 with them in the end of February or so.  I think we got into

21 an agreement with the term loan parties I want to say early

22 to middle of May.

23 Q     Okay.  And if you could turn now in your binder to the

24 document marked for identification as Debtors' Exhibit 51.

25 A     I am there.

1  Q     And have you seen this document before, Mr. Buschmann?

2  A     Oh, yes, I have.

3  Q     Okay.  What is it?

4  A     This is the standstill agreement, the first one.

5         MR. ARNAULT:  And, Your Honor, at this point, I'd

6  move for the admission of Debtors' Exhibit 51.

7         THE COURT:  Any objection?

8      (No verbal response)

9         THE COURT:  It's admitted.

10     (Debtors' Exhibit 51 received in evidence)

11  BY MR. ARNAULT:

12  Q     And what were the key terms of this standstill

13  agreement, Mr. Buschmann?

14  A     So, really, the -- I'll put it in three buckets, one of

15  which was, I would say, easy; the other two were very

16  difficult.  So, one, obviously, was that the lenders being on

17  the outside in and having just read the opinion, were very

18  keen to do their own diligence to understand the financial

19  footing of the company, the FDA process, really, you know,

20  what was going on with their collateral.  So, there were a

21  lot of provisions in here in regards to information-sharing,

22  calls with the advisors, calls with the lender group,

23  consultants, (indiscernible).

24      The other two points really -- and the main point was

25  the length of the agreement and what the agreement would end

1   up.  And so, you know, initially our thoughts were well,

2   let's just enter into a shorted time frame with no fee where,

3   you know, you can do some diligence and isn't that really

4   what you're looking for?

5        The alternative that the lenders obviously were focused

6   on was the short period of time ending up in, again, this

7   comprehensive-amendment construct which, in our mind, you

8   know, the initial goal was somewhere I think in the May-June

9   time frame of 2019, which did not give the company enough

10  time to let Doug and his team really focus on the operations,

11  on the (indiscernible) mediation and effectively turn the

12  business around.  And so, there was not enough time for us,

13  which we needed to show enough good results to be

14  refinanceable.

15       So, we negotiated very hard as to the length of the

16  agreement.  We wanted to push it out, frankly, to 2020.  The

17  eventual compromise was after, again, I think at least 10

18  rounds back and forth, was the date of December 13th that we

19  would enter into a comprehensive amendment.

20       The third piece, which, again, was very hard-fought

21  over were the economics; again, everything from resetting

22  this coupon to (indiscernible) for the standstill.  Those

23  were things that we negotiated very hard.

24       Again, as you can imagine, the lenders wanted more.  We

25  wanted, frankly, none of it and had to compromise at a number

1   that we felt comfortable with, given our alternative, and the

2   business disruption that would cause.

3   Q     And what, if anything, did you and your team do to

4   evaluate the cost to the company of the economic terms you

5   just mentioned?

6   A     Yes.  I believe it was for the Board or for the

7   management team, certainly, we laid out, you know, what each

8   path in our mind would result in.  So, the standstill had a

9   certain cost and, obviously, gave us important breathing room

10  to operate the business and to turn it around.  There was the

11  cost of litigation, which as we all know, it can be very

12  costly very quickly.  And then there's the business

13  disruption, which, itself, again, the company just came off

14  of a very bruising decision from the judge in the fight with

15  Fresenius, so that's an ongoing litigation that's going on

16  there.  So to enter into, yet, another piece of litigation,

17  which was expensive, you know, had its own costs, but also

18  was really going to impact the company's operations and,

19  frankly, management's focus, which now was able to turn back

20  to the business as opposed to the fight with Fresenius.

21  Q     So, what was the company's reaction to the terms of the

22  sale?

23  A     Well, they were -- they hated it certainly in terms of

24  the costs, but, you know, over the, again, 10-plus turns, you

25  know, we got to a point where it was painful but it was, by

1  far, the best alternative that we had at that time, given the

2  risks of litigation or the loss in litigation, and so we

3  entered into it in May because, frankly, that was our best

4  alternative.

5  Q    All right.  So, with this standstill in place, how did

6  the company then proceed?

7  A    Well, the management team was able to, you know,

8  putting set aside, obviously, all of the diligence and the

9  monitoring that we were, that really PJT and at that point

10  Crevasse (phonetic), and the subsequent of Nash (phonetic)

11  were doing with the ad hoc group, the company, overall, was

12  turning its attention to returning Akorn and, frankly, I

13  would say running new Akorn, which, again, was trying to put

14  in place, you know, its corrective measures on the FDA front,

15  engage with the FDA to ensure that they were understanding

16  what the company was doing and how they were progressing on

17  their path forward, and also on the financial front, you

18  know, really addressing some of the financial issues the

19  company was facing and operating, you know, properly it was

20  run.

21  Q    And then for purposes of your testimony today, did you

22  prepare some demonstrative exhibits?

23  A    We did, yes.

24  Q    Okay.  And do you believe that those are demonstratives

25  would assist you in your testimony?

1    A       (Indiscernible.)

2    Q       Do you believe that those demonstratives would assist

3    you in your testimony here today?

4    A       Yes, they would.

5    Q       All right.  Can you turn to the demonstratives your

6    witness binder, please.

7    A       Under which -- where are they exactly in the binder --

8    of the binders?

9    Q       They should be at the back.  If you have -- or I think

10   we sent you electronic versions of them as well.

11   A       Yeah, I have them.

12   Q       You should have them.

13   A       Okay.  Let me get the electronic version.

14   Q       Sure.

15   A       Okay.  I have it.

16   Q       And what do these demonstrative exhibits show,

17   Mr. Buschmann?

18   A       Sure.  The first one, which is titled, Financing

19   Process Summary, outlines what was our process starting in

20   late August after the company had shown real progress under

21   the (indiscernible) mediation steps that they had laid out,

22   the corrective actions that they were undertaking, as well as

23   on the financial front.  The company, through the measures

24   that the marketing team, the sales team had undertaken was

25   really improving its operations.

1    We had this date of 12/13 that was out there.  We

2  thought the easiest way to address a comprehensive amendment

3  was that as the company was showing better and better

4  results, that we would try to refinance out the $850 million

5  of term loan and, thereby, take this entire issue of default

6  off the table by refinancing the (indiscernible) altogether.

7  Q    And so, let's focus on this refinancing process.  And I

8  apologize if you mentioned this, but when did you kick off

9  this refinancing or financing process?

10  A    It was at the end of summer.  It was around the end of

11  August, like, really, it's you get in the full swing of it

12  right after Labor Day.

13  Q    Okay.  And what steps did you initially take in

14  connection with this process.

15  A    So, we were facing the term loan of $850 million and so

16  we went out to, and really formed a list of parties that we

17  put into two buckets.  One, I would say on the credit-world

18  side, we looked at -- and let's just call them what they

19  are -- hedge funds, large high-yield funds that are

20  alternative investors that are deep-pocketed, well-versed in

21  the pharma space and could move quickly to address the $850

22  million facility.  That was one bucket of folks we went out

23  to.

24    The other -- and, again, these are all well-known

25  institutions in our world and we have very close

1  relationships across the board with them -- the other parties

2  were -- I'll put them into the sponsor world so, that really

3  means private equity.  And these are private equity funds

4  that we believed were well-versed in pharma, had done deals

5  in this space before, and were interested in providing what I

6  would describe as an equity-lent security, something that is,

7  you know, junior in the capital structure, but the proceeds

8  of which could be used to pay down part of the $850 million,

9  which would either let us then enter into an amendment with

10 the existing group because (indiscernible) or just refinance

11 the (indiscernible) out with the regular way of financing.

12 Q    And how many prospective investors did you contact in

13 connection with this financing process?

14 A    As the stacked bar chart shows, it was 32 parties, 14

15 of which, again we -- it says equity; that really is private

16 equity, meaning sponsors -- and 18 that are, you know, for

17 credit funds.

18 Q    And of those 32 prospective investors, how many

19 ultimately executed NDAs?

20 A    Twenty-two executed NDAs.

21 Q    And then what type of information was provided to the

22 parties that executed an NDA?

23 A    Sure.  Just like every other financing process we run,

24 which is, frankly, very similar to an M&A process, the

25 parties are provided what is a -- again, I'll use the

1  (indiscernible) in a second -- but it's called a confidential

2  information memorandum.  So, the short form of that is called

3  a CIM.  The CIM is kind of the book of, you know,

4  information.

5       We provided them a CIM and then access to a data room.

6  The data room usually would have backup materials that were,

7  you know, we viewed as being very important for the parties

8  to understand, usually backup to projections and the like

9  that are in the CIM.  And so those two key items would be

10  made available when you signed an NDA in sort of what I would

11  call round one.

12  Q    And then what does it take, then, to advance to round

13  two after you have provided this information and the parties

14  have signed NDAs?

15  A    Well, we asked for a proposal and the proposal has to

16  be one that was, you know, attractive to the company and one

17  that the sale was going to be actionable.  And so, we had an

18  intermediate step whereby we asked party to provide proposals

19  to the company.

20  Q    How many parties provided proposals?

21  A    That would be five parties.

22  Q    And then what does round two then entail once you had

23  these five proposals in hand?

24  A    So, round two, then, allows each of the parties to

25  really dig deep into diligence, which means access to

1   management, access to -- I don't mean just the senior

2   management team -- you start to actually access functional

3   teams based upon the diligence that they're seeking.

4         They, on their end, would start to also spend real

5   money with lawyers and in this case, the generics will

6   usually have consultants because the products are very

7   important, the market is important, and in this case,

8   understanding the FDA was very important.  So, it is a much

9   deeper dive of diligence and, frankly, you know, we would

10  request any kind of questions or topics they needed answers

11  on and, you know, we would provide those.

12        I think we had hundreds and hundreds of requests of

13  documents and answers, which we then put into the data room

14  for all parties to see.

15  Q     What was the result of this second round process?

16  A     The result was that unfortunately we learned that the

17  credit funds did not have an interest in this financing, so

18  the credit funds dropped out.  We learned that even some of

19  the more aggressive credit funds did not have an appetite in

20  this situation to refinance the full $850 million of debt

21  and, frankly, even the junior capital versions of that,

22  meaning putting in a second lien or something like that,

23  proved to be unattractive to them, given what they viewed as

24  risk.

25        When you think about lenders, you look at historical

1   EBITDA.  You look at things that they can tangibly hold and

2   still feel good about.

3        They just thought there was too much risk around $850

4   re-fied.  We did, though, have two private equity funds that

5   were very interested and, again, private equity looks, I

6   would say, more forward in the process, meaning what is the

7   company's potential.  Again, this company is positioned in a

8   part of generics that is attractive to build a platform off

9   of, which is, you know, complex manufactured goods.

10       In this case, they put forth proposals that, again,

11  would convert a piece of debt, in effect, that's preferred

12  or, you know, into a large chunk of the equity.  So, they

13  would get equity-like returns being protected in the interim

14  on a more senior basis and so they put forth two proposals

15  that -- we had asked for binding, fully committed proposals.

16       We didn't get that.  We got two proposals that sort of

17  said they would continue to work and try to get there, but

18  that there were certain issues that existed that they, you

19  know, needed some answers to.

20  Q    And so with no binding bids by the end of this process,

21  how, then, did the company decide to proceed?

22  A    So, we obviously could not address the comprehensive

23  amendments via a financing and certainly not by 12/13, and so

24  we asked for an extension of the standstill.  With a

25  discussion and at least the interest you saw on these two

1  private equity parties, we felt that we were in a good

2  position at that point.

3      While they were not able to get to a binding financing

4  proposal, that maybe if we, in effect, sold the whole

5  company, that we could, frankly, garner a lot of attention

6  that way, meaning more interest from private equity and also

7  to be added in to the group of strategic buyers out there in

8  the universe, that we would have the ability or a better

9  ability to address the $850 million of debt.

10      So, instead of going through financing transactions,

11 you know, we felt that an M&A transaction was the best way to

12 maximize value here.  If you remember, the company had a

13 decent market cap throughout this process so we were very

14 much focused on trying to protect, you know, the existing

15 market cap and felt this was the best way to maximize value.

16 Q   And what did the pivot from the financing process to

17 the sale process, what implications did that have for the

18 standstill agreement with the lenders?

19 A   Well, we had to enter into an extension.  We wanted to

20 enter into what I would say, a shorter-term extension.

21      Again, the lenders (indiscernible), as well, it looks

22 like the debt is not financeable, so any long-term extension

23 you guys want would, again, have us take on a lot of risk

24 here, which, again, and the word "risk" equates to dollars.

25 And so we felt it was best that we actually pivot to a short-

1    term extension of the standstill and prove out to the lenders

2    through the first round of the M&A process that there were a

3    lot of parties who would be willing to pay, you know, above

4    the debt and, therefore, you know, minimize the cost of any

5    further extension.

6    Q      And just so we're clear on timing, when did the

7    discussions with the lenders begin around an extension to the

8    standstill agreement?

9    A      So I believe the deadline was December 13th for the

10   standstill; again, we had broached an extension initially in

11   November, but in earnest, these discussions and the pivot

12   and, frankly, again, a number of proposals back-and-forth,

13   back-and-forth on this topic, really happened in the, I would

14   say the week prior to the 13th and with quick successions of

15   proposals going back-and-forth.

16   Q      And same question as before, how would you characterize

17   the negotiations with the ad hoc group of lenders over this

18   amendment to the standstill agreement?

19   A      Again, they did their job.  We did our job, which means

20   that they had a lot of direct dialogue, I guess I would call

21   it.  So, I used the word "bruising" before; it was not any

22   less bruising the second time around.

23   Q      So, what was the end result of the company's

24   negotiations with the lenders on an amendment to the

25   standstill agreement?

1   A     Again, we got an extension into I believe it was early

2   February, but more importantly, we had started the discussion

3   around the process of an M&A process and the timelines

4   associated with that, which was going to be a culmination,

5   and the end result of that was going to be the comprehensive

6   amendment.

7   Q     And if you could turn now to the document in your

8   binder marked for identification as Debtors' Exhibit 52.

9   A     I am there.

10  Q     And what is this document, Mr. Buschmann?

11  A     So, this is the, again, executed version of the

12  extension.  So, I guess what I would call this is sort of

13  being the second standstill, because it's obviously just

14  amending the first standstill.

15          MR. ARNAULT:  And at this point, Your Honor, we'd

16  move for the admission into evidence of Debtors' Exhibit 52.

17          THE COURT:  Any objection?

18      (No verbal response)

19          THE COURT:  It's admitted.

20      (Debtors' Exhibit 52 received in evidence)

21  BY MR. ARNAULT:

22  Q     And what were -- I think you mentioned this before, but

23  I just want to make sure I'm clear -- what were the terms of

24  this first amendment to the standstill agreement?

25  A     Again, it relates to economics.  So, the date by which

1    how long the term of the standstill would go and, obviously,

2    the costs associated with that standstill.

3    Q     And you mentioned before the deadline or the timeline

4    in this first amendment was February 2020.

5    Why choose that date as the extension date?

6    A     So, we were trying to really balance two competing

7    issues that we've had with the lenders which, again, we had

8    just proven to them that we could not refinance their debt,

9    so, certainly, to the outside world they would say, we are

10   equity, so we want -- you know, our loan is, in fact, at

11   risk.  We would like to have an economic adjustment to our

12   terms that is commensurate with the fact that we are the

13   equity (audio interference).

14         The longer you have that extension, the more expensive

15   it actually gets, so what we wanted to do was get the

16   cheapest extension that would get us to a point that we felt

17   that we could prove to the lenders that, in fact, they should

18   not worry that they were money-good [sic] and that would be

19   at the end of the first round of diligence, whereby, you

20   know, we could prove to them that there are bids above the

21   debt, therefore, you know, the (indiscernible) amendment

22   would be a cheaper form of financing, so form of

23   (indiscernible).

24   Q     All right.  And at that point in time, why not just

25   file for bankruptcy, rather than bear these additional

1   economic costs?

2   A    Well, filing for bankruptcy has its own economic costs

3   and, again, we (indiscernible) that.  Again, we would have

4   had to enter into various agreements with the lenders,

5   including cash collateral and the like, which have their own

6   expensive costs.  So, in some ways, the costs that we were

7   paying for the standstill are cost (indiscernible) if paid

8   irrespective, and moreover, again, we were really trying to

9   get to a point where we didn't have to file for a Chapter 11.

10       We were still holding out hope that we could get,

11  whether it's the guys who were doing the finance proposals

12  or, frankly, M&A deals that were such that could be done

13  potentially out of court.  We were fully aware that in court

14  was obviously a real option here, but we also wanted the

15  company effectively to continue to operate and show good

16  result, because the more they did that, the more to the

17  value, in our minds, that the business would go up and the

18  ability to refinance out the parties, you know, would also go

19  up.

20       So, in some ways it's an option, but it was an option

21  in our mind that was cheap, given the alternative, would have

22  been a rush to Chapter 11 without any clear path out would

23  have been, in effect, a freefall and one where we would have

24  had to negotiate cash collateral and the like and

25  potentially, eventually a DIP with folks that would have had

1  costs just the same.

2  Q     And then were there any other further amendments to

3  this first standstill agreement?

4  A     Well, it then culminated in what, again, I'll call a

5  comprehensive amendment, which really was the timeline to

6  complete the M&A process.  And, again, this was, we felt, our

7  best option of keeping the costs down was -- and, again, our

8  really goal here was to do a deal that, frankly, potentially

9  could have been out of court, was to say as long as we

10 continue to have bids above the level of debt, you know, we

11 would, in effect, have a cheap extension here.

12       But there was a toggle event built in which said any

13 time that you know longer had bids that were above the level

14 of the debt, that at that point, you know, we would engage

15 with the lenders.  We would, in effect, pay higher fees and

16 the fees for the M&A process and they're encouraging us to

17 get them out as quickly as possible because, again, we wanted

18 to not incur a long period of risk to get these lenders, who

19 are part of the Fresenius process, to some degree, so there

20 were fees associated with that and fees pushed to the very

21 end to incentivize us to get a deal done as quickly as

22 possible.

23 Q     And if you could turn in your binder now to the

24 document marked for identification as Debtors' Exhibit 53.

25 A     I'm there.

1   Q      Okay.  And have you seen this document before?

2   A      Yes, I have.

3   Q      And what is it?

4   A      This is the second amendment to the standstill.

5          MR. ARNAULT:  Okay.  And at this point, Your

6   Honor, I'd like to move into evidence Debtors' Exhibit 53.

7          THE COURT:  Any objection?

8      (No verbal response)

9          THE COURT:  It's admitted.

10     (Debtors' Exhibit 53 received in evidence)

11  BY MR. ARNAULT:

12  Q      And at this point, Mr. Buschmann, I'd like to turn back

13  to the prepetition sale process that you had briefly

14  referenced.

15         So, to begin, when did this process begin to kick off?

16  A      So, in some ways, it kicked off in December, but I

17  would say formally kicked off in January.  We obviously were

18  in close contact with a number of the parties that were

19  involved in the financing process, a number of whom, you

20  know, said, listen, we can't refinance this, but we love the

21  company and so we kept them up to date and told them that

22  there would be a pivot.

23  A      formal pivot to kick off of the financing -- of the M&A

24  process early January, so post-New Year's.  Obviously, you

25  don't kick off an M&A process during the holidays.  That

1   tends to be a dead time, so it was in early January that we

2   went out (indiscernible).

3   Q      And a basic question, but what was the goal of this

4   prepetition sale process?

5   A      Maximize value to the estate, get the highest price

6   possible and first and foremost, pay off our term loan

7   lenders, but get the highest price.

8   Q      And do your demonstratives address this process?

9   A      They do.  They do.

10  Q      Okay.  Why don't you turn to the second page of your

11  demonstratives.

12  A      Okay.  I'm on the page that's titled, Prepetition M&A

13  Process Summary.

14  Q      Okay.  Perfect.

15  And so, what steps did you initially take as part of this

16  prepetition sale process?

17  A      So, the universe obviously had to be expanded now and

18  this was, where before we were -- it was a very broad

19  financing process, but an M&A process can be made even

20  broader, by which as you look in the very first bar we have

21  here in parties contacted, we have two colors there; one,

22  obviously, we called sponsors, who were the financial buyers,

23  many of whom were in the financing process, but we extended

24  the group of sponsors even more broadly to those that we

25  knew, you know, are just looking for an acquisition of a

1   company versus investing in a company.

2        And then we made the decision to include strategics,

3   which, of course, were not part of the financing process.

4   Strategics here, you know, are very important and obviously

5   added a whole incremental buyer universe into our grouping

6   here and one that we felt like we had to include, as far as

7   process.

8   Q    Okay.  What role did the lenders or the ad hoc group

9   play in this process?

10  A    Sure.  I believe we were required to, but we would have

11  anyway, because, frankly, our goals were aligned, which was

12  to pay off their debt.  We asked them for their buyer lists,

13  anybody they thought would be interested as well.  We would

14  be more than happy to add them into our outreach so that we

15  would really -- if for some reason we missed somebody, which,

16  again, given the size here, we don't think we could in

17  working with our industry colleagues at PJT; we thought we

18  had the universe nailed down -- but we took any and all

19  incremental needs from the term loan lenders, as well,

20  because there was no reason not to.

21  Q    And of the 72 parties that you initially reached out

22  to, how many of those parties ended up signing NDAs?

23  A    Thirty-seven did.

24  Q    And what information was then provided to the parties

25  that signed the NDAs?

 1  A      So, again, they got access to the CIM, as I mentioned

 2  before, access to basic data room, and, again, were asked to

 3  use that to come to an indication of interest, which then we

 4  would use as the means to put the folks into the second round

 5  of deeper diligence.

 6  Q      And how many parties provided indications of interests

 7  that allowed you to proceed to round number two?

 8  A      Seven.

 9  Q      And why did you select those seven bidders?

10  A      They were -- frankly, we wanted to keep the number as,

11  I would say, manage the number as high as possible and still

12  be able to do all the diligence for them.  So, again, the

13  management team, at this point, has really been put through

14  its paces, given that we had just finished a financing

15  process, obviously we had the history of having done this

16  prior M&A process with Fresenius, and now they were engaging

17  in full-blown diligence with seven parties there.  But,

18  again, we wanted to maximize our ability to get bids above

19  the debt and so we put seven parties through, all of whom

20  were reputable parties that we thought could get there.

21  Q      And what type of information was actually provided to

22  the bidders during the second round of the sale process?

23  A      So, this was the part which, you know, was quite

24  painful because, again, you really, at this point in, in this

25  case, opening the kimono, really doing deep diligence.

1       Again, parties on the buyer's side are spending real

2  money on consultants and lawyers and bankers and financing

3  the parties, and so you're facing diligence requests from

4  obviously not just the bidders, but also their professionals.

5       So, it's just a very deep dive.  You know, management

6  was available for numerous calls to help them help the

7  bidders, you know, get their answers, understand the

8  direction of the company.

9       For the strategics, who were obviously very important,

10 just given the kind of incremental value that they can, you

11 know, bid with here, they were given as much information that

12 we could give them without, you know, frankly, giving away

13 some sensitive items.  We asked them to enter into what are

14 call clean-room arrangements, whereby a subset of their team

15 would receive information -- not the full team -- that would

16 allow them to accurately assess the business.

17 Q    And at that point in time, what steps are you taking in

18 order to obtain a topping bid?

19 A    Again, it's entirely focused on diligence and getting

20 them to what I would say is a binding, actionable bid that

21 gets us, you know, and, frankly, pays off the term loan.  So,

22 whatever they needed, we (indiscernible).

23 Q    Okay.  And how did you then proceed with those seven

24 parties from round two to round three?

25 A    Well, we, frankly, had five of the seven drop out.  We

1   only had two parties that, at that point, were still

2   interested, unfortunately.  One was strategic that was, you

3   know, bidding through well below the debt.  One was a

4   financial party, a private equity party whose bid was also

5   dropping, unfortunately, the more diligence that they did.

6          So, we ended up with two parties that we invited to the

7   final round and this was really meant to be a race to

8   documentation and to see who can get to a true binding bid

9   that we can use to pay off the term loan.

10  Q    And same question as before, what type of information

11  did you provide during this final round of bidding?

12  A    Yeah, at this point, really, it's any and anything they

13  want.  This was, I think, to everyone's dismay, this is the

14  most frantic of all the diligence periods because everything

15  is urgent and everything needs to be provided in a lot of

16  detail to make sure that these parties can get to a binding

17  bid.

18  Q    And then what types of bids did the debtors receive

19  coming out of this final round of the process?

20  A    We received no bids that were above the debt and,

21  frankly, no bids that were binding.  No one got to a position

22  to give us a bid that was actionable.

23  Q    And in light of the failure to receive any actionable

24  bids, what did the debtors, then, decide to do?

25  A    Well, as part of the comprehensive amendment, we had

1    built in the toggle.  Again, we had hoped to never use the

2    toggle, but the toggle meant that and only had our financing

3    process shown that the company could not refinance 850, we

4    had now shown that based upon a market check, the value of

5    the company was below the term loan.

6         And so, we engaged with the advisors of the term loan

7    first.  We got the term loans under NDA, as well, or at least

8    a subset that were the key drivers in the group, and got them

9    to do their own diligence to see how they wanted to proceed.

10   Q    And how would you characterize the negotiations around

11   with the lenders at this point in time?

12   A    Well, at this point, we -- you know, it was really a

13   question of what they wanted to do, and so we -- you know,

14   there were a number of paths they could have taken.  They

15   could have said, you know, let's finish off with these other

16   guys and we'll take a bid, you know, well below our debt.

17        That was not what they wanted to and so they decided to

18   credit bid.  And so, as part of the credit bid, we entered

19   into a negotiation around all the things that you had as a

20   stalking horse, which is an APA, so the asset purchase

21   agreement.  Again, we obviously had something (indiscernible)

22   with the other parties, but also the bidding procedures and

23   the court documents because now it was clear that it was

24   heading towards a Chapter 11.

25   Q    And what was the ultimate result of those negotiations?

```
 1   A     Again, after a difficult time of getting everything
 2   from cash collateral, bidding procedures, and the APA agreed
 3   to -- again, this was not easy negotiations -- we got them
 4   locked in with a credit bid and we were ready to file for
 5   Chapter 11.
 6   Q     And if you could turn now in your binder to Debtors'
 7   Exhibit 44.
 8   A     I'm there.
 9   Q     And what is this document?
10   A     So, this is the APA that was negotiated with the, what
11   I'll call the ad hoc group of term loan lenders.
12             MR. ARNAULT:  At this point, Your Honor, I'd move
13   for the admission into evidence of Debtors' Exhibit 44.
14             THE COURT:  Any objection?
15        (No verbal response)
16             THE COURT:  It's admitted.
17        (Debtors' Exhibit 44 received in evidence)
18   BY MR. ARNAULT:
19   Q     And with respect to the stalking horse bid, Mr.
20   Buschmann, what bid protections, if any, were included?
21   A     So, we obviously -- usually with a stalking horse, we
22   have three forms of, you know, typical bid protections.
23        There's a break-up fee, there's an expense
24   reimbursement, and then there's (indiscernible) to make an
25   auction (indiscernible) more effectively an overbid amount.
```

1    So, those are the three typical, sort of financial

2  amounts here.

3    For the stalking horse bid there's no break-up fee,

4  there's no expense reimbursement.  But we had an overbid

5  amount that we obviously agreed to, to a very, frankly, low

6  amount.  Usually, you try to, for a size of this deal, you

7  can make it a bit bigger so if you ever have an auction, you

8  can move along quicker.

9  Q    And what in your mind were the benefits to the debtors

10  of having a stalking horse bid?

11  A    Well, again, we were filing Chapter 11 and the goal was

12  to get in and out of Chapter 11 as quickly as possible.  You

13  don't want to have a freefall bankruptcy and then, you know,

14  and, frankly, not have an outcome here.

15    So, we had a bid locked in and knew that someone was

16  obligated to buy the company.  We had a price, obviously, and

17  the amount of the credit bid and the incremental amounts that

18  they were funding and now we could use that and continue to

19  market the company post-petition and have folks have a very

20  clear sense of what it was that they had to beat post-

21  petition in a bid to win the company.

22  Q    Okay.  And I'd like to actually get into that right

23  now, because I think you know the amount of the credit bid

24  and the overbid is one of the concerns that has been raised

25  here, and so what I would actually like to do with you is

1   walk through how that overbid amount was arrived at.

2       And to do so, if you could first turn to what's been

3   marked for identification as Debtors' Exhibit 26 in your

4   binder, and have you seen this document before?

5   A    Yes, I have.

6   Q    And what is it?

7   A    This was a calculation of the required overbid that was

8   prepared by my team.

9           MR. ARNAULT:  Okay.  And this point, Your Honor,

10  I'd like to move into evidence Debtors' Exhibit 26.

11          THE COURT:  Any objection?

12      (No verbal response)

13          THE COURT:  It's admitted.

14      (Debtors' Exhibit 26 received in evidence)

15  BY MR. ARNAULT:

16  Q    And before we get into the line items on this document,

17  which I would like to do, what is the purpose of putting

18  together a document like this that identifies the required

19  cash overbid?

20  A    Sure.  It is an effort -- we do this in every 363

21  auction.  At the end of the day, the bid that comes in versus

22  the lender's has to provide more value to the estate.  And so

23  you have to look at all the pieces these lenders are

24  providing in terms of the obligations of the past you paid

25  off, as well as what they are assuming in their deal and

1  providing as incremental value and then to ensure that the

2  effects of the bid are such that it's higher in the nature.

3       So, I would sort of categorize this page as really

4  coming into three buckets.  The first sort of being what are

5  all the obligations that you just have to pay off, because

6  these parties are senior and are owed them, what incremental

7  item is the credit bid, plus -- well, the credit bid and

8  lenders incrementally providing us value or (audio

9  interference), and then lastly how do you adjust for a

10 transaction that is not a credit bid by creditors to an

11 overbid, because there are some consequences -- in our case,

12 it's taxes being the biggest -- that have to be adjusted for

13 to ensure that you had an apples-to-apples comparison and,

14 therefore a bid by a third party that would be higher in

15 value to the estate.

16 Q    And so let's actually go through the line items on this

17 document to make sure we're all on the same page as to why

18 they were included.  And we can start with the first four

19 lines.

20      What do these lines and amounts represent?

21 A    Sure.  So, we had to pick a point in time, which -- for

22 analysis.  So some of these obviously are estimates and some

23 are just based upon the debt at that point in time.

24      So, principal amount of the eight-hundred-and-fifty-

25 million-dollar loan was roughly eight fifty-seven, at the

1  time of, we picked August 31st as beginning the point in time

2  to focus on.  Because it's August 31st and the fact that the

3  term loan pays interest quarterly, it's a mid-quarter time

4  frame, so there'd be some interest that would have been

5  accrued and is owed to the lenders that would have to be paid

6  to be quote, unquote, paid in full, right.  So, that is the

7  $10 million of accrued interest.

8       The next two item are fees that we had previously

9  negotiated with the lenders as part of the standstill.  What

10 these were, were to avoid us having the larger cash outflow

11 in the beginning of our -- of a case, but really in the

12 history of our involvement with the lenders.  There are a

13 number of fees that were added, packed on toward the back to

14 minimize the cash impact.  These, again, are fees that are

15 owed.  They're obligations from the term loan arrangement and

16 so these, again, are now really part of the term loan and

17 what has to be paid off and be paid in full.

18 Q    Okay.  And then if we could turn to the, moving down to

19 the DIP balance and the DIP-accrued interest at 8/31/20, what

20 do those two lines represent?

21 A    Yeah, so the company actually had been experiencing

22 more cash burn than we had anticipated, you know, a few

23 months ago.  It was clear for us to get through a sale around

24 8/31, that the company would need incremental financing;

25 again, the generic pharma space is one where it's very

1  difficult to forecast receipts because of the relationship

2  with the wholesalers and their ability to pass along what's

3  called chargebacks, and so the company has high fluctuations

4  in cash and we were starting to really see the cash balance

5  drop.

6       So, we asked our term loan lenders to, on top of their

7  existing term loan, to provide incremental liquidity to the

8  company to ensure that there was a smooth process through

9  Chapter 11.  That was the thirty-million-dollar DIP that was

10  previously approved by this Court.

11  Q    And then what type of collateral package did the

12  debtors provide in connection with this DIP loan and the DIP

13  financing you just mentioned?

14  A    Sure.  Like all DIPs, you know, they get, basically,

15  everything that, you know, would have been unencumbered.

16  They get, so, again, top of the -- it's top of the capital

17  structure, superpriority, and obviously has a lien on

18  everything.  I believe the term loan, quite frankly, already

19  had everything, except *de minimis* items and the DIP, you

20  know, sort of cleaned up any incremental pieces that would

21  have been unencumbered.

22  Q    And just to put a fine point on that, why include the

23  DIP balance in the overbid amount?

24  A    Because it's an obligation that has to be paid off,

25  again, as part offer the bankruptcy process.  Frankly, you

1   probably should have put the DIP down at the very top because

2   it's the senior, most-important thing that has to be

3   addressed.

4        And so, in this case, the lenders are actually

5   addressing the DIP through exit financing, as well, so it's

6   something that they're addressing and any third party would

7   have to address as well.

8   Q    Now, let's move down to the next four lines that have

9   assumed liabilities, cure costs, wind-down budget, and

10  projected cash balance.

11       What do those four lines represent?

12  A    These are incremental item that the term loan lenders

13  were providing to the estate, which, frankly, boost

14  recoveries across the board, as part of the transaction.

15       None of these were obligations of theirs to take on,

16  but in an effort to easy both, the smooth operations of the

17  business and also to address the wind-down of the estate,

18  they did the following.  They assumed certain liabilities,

19  which is $107 million.  But, really, these are what were

20  liquidated, operating-type liabilities, meaning these tables,

21  right.  So, this is the relationship of the vendors and the

22  like, so they're picking up $107 million of all that.

23       We also had an estimate of cure costs under the

24  contracts they were assuming.  Again, they could have left

25  this back in the estate and had the estate deal with it, but

1   they actually took on that cost and will pay it out of their

2   exit financing and that's an incremental $8 million of value

3   they provided.

4        They then, at our request, and through a budget

5   prepared by AlixPartners, are providing the estate $35

6   million or leaving behind $35 million of cash.  What that

7   means is that the estate has plenty of cash to continue to

8   pay professionals and the like to wind-down whatever

9   remaining issues exist post the sale.

10       And then the last piece is they were assuming the cash

11  in their bid, so we, to be fair, said well, you're flying

12  [sic] cash for cash, so we took that out of the items they

13  were assuming, because some of it was just from the cash on

14  the company's balance sheet.

15  Q    Got it.

16       And then, as we move down, we've got credit bid

17  purchase price, and what does that line represent?

18  A    Yeah, I think that actually heads back to the APA if I

19  remember correctly, but, really, what I would say is it's the

20  credit bid plus incremental items that they are paying for,

21  that is the purchase price.

22  Q    Then we move down the next three lines, what do those

23  represent?

24  A    Now we're getting into the construct of how do we make

25  a third-party acquisition, apples-to-apples with a credit

1   bid?

2       And the biggest piece of this is that the creditors

3   were taking advantage of what's called a G-reorg under the

4   statute on taxes, so the tax impact to the estate was

5   minimized.  The third party doesn't have that benefit and so

6   the estate would, in effect, have to pay at a purchase price

7   of, in this case, around a billion fifty-one, the estate

8   would have to get a tax bill of what we thought based upon

9   the Grant Thornton's analysis of $46 million.

10      So, for us to be apples-to-apples even, someone had to

11  pay that tax bill.  If the estate paid it, then that bid

12  wouldn't be as good because we would be lower by $46 million.

13  So, the buyer has to pick that up.

14      Just to be clear, on the debtor basis, they get a

15  higher -- they get to establish a basis so they pay more in

16  taxes today, but get the benefit of a higher basis going

17  forward.  So, it's sort of a -- they get the benefit of it

18  later on.

19  Q   And then what about other incremental expenses, what do

20  those entail?

21  A   These are professional fees that were -- that would

22  have been higher based upon a third party bidding against the

23  credit bid and relating to the professional letters that are

24  out there.

25  Q   And why do you have a "TBD" around incremental cash to

1  fund business until regulatory approval?

2  A     Yeah, this was really one we focused on at the time

3  that the strategic -- if the strategic was bidding on the

4  business, had been the topping bid, there was a very high

5  likelihood that a number of things could have happened.  One,

6  just a longer period of approval for the government for

7  antitrust and the like.  But also, there could have been a

8  process of having to divest certain products, maybe, if it

9  was the close competitor, they would get approval if, you

10 know, Company X, you know, divested products A, B, C.

11      And so, all those things were adding on potential

12 periods of time to us being able to consummate the sale.  And

13 as I mentioned before, the company was burning cash, which is

14 why we had to have the DIP and so it's (indiscernible) here,

15 depending upon who the buyer was going to be, but we would

16 have had to potentially adjust these numbers and add more

17 value into it or raise the price if the company was going to

18 continue to burn cash because, again, going back to the point

19 of assuming the cash and what you're leaving behind, getting

20 to the same place on a bid basis, if we had all our cash

21 burned in this scenario, we would have had to, frankly, raise

22 the bid by $27 million, right.

23      So, this was a way for us to see, you know, based upon

24 time, how to make these bids really apples-to-apples.

25 Q     Okay.  And then if we move down to the next line, this

1  one is total required break-even price, and what does that

2  line represent?

3  A     Are you on the total required break-even or the

4  required cash break-even?

5  Q     Total required break-even, just above it.

6  A     That is the number that we viewed as being cash and

7  non-cash equivalent, the equivalent bid that had to be bid by

8  a third party to equate to the credit bid for the lenders,

9  which, again, is what we're trying to do here, getting

10  apples-to-apples.

11  Q     Okay.  And then widen that out from the total required

12  break-even price of the assumed liabilities to then get to

13  the required cash break-even price.

14  A     Well, in this analysis, we made the assumption, which

15  does not have to actually come to be true, to be honest, that

16  another bidder would take the same logic as the term loan

17  lenders and say, well, listen, I don't want to burn bridges

18  with your existing vendors and relationships, so I'll assume

19  the same $107 million of working capital payables, so as not

20  to hurt the business.

21     That didn't have to be true.  I know the bidder

22  obviously could have assumed less, which then, you know,

23  would have changed how much we had to bid, obviously.

24     So, we are, in this case, saying, listen, if you assume

25  the same thing as the credit bid is assuming in terms of the

1  liabilities, then, really, the cash that gets you to a break-
2  even point is one billion zero zero one.
3  Q     And then, finally, how do we get to the required cash
4  overbid price?
5  A     Then, as (indiscernible) before, it's protection.
6        Again, it's a protection that's really also just an
7  administrative thing to minimize the brain damage in an
8  auction of going up by one cent each bid.  We put in a
9  minimum-bid increment of $5 million so that the next bid up
10 has to be higher by $5 million.
11       And so the billion zero zero one naturally becomes one
12 billion zero zero six.
13 Q     And now one of the objecting parties here has argued
14 that the overbid analysis that we just walked through does
15 not include any additional consideration for the purchase of
16 unencumbered debtor assets.
17       Now, let me ask you, what's your understanding, Mr.
18 Buschmann, of the additional consideration, if any, that the
19 purchaser is providing here?
20 A     Well, the additional consideration is when I walk
21 through really, these four items that are below, you know,
22 the total debt, par plus accrued, the nine twenty-seven down
23 to a billion fifty-one, again, assuming the liabilities will
24 be assumed, which was really the vast majority of them and,
25 subsequently, obviously, they have come to a deal with the

1  UCC, which adds another $5 million on top of that which

2  really addresses, at this point, all of the liquidated, you

3  know, payables, unsecured claims, the cure costs, when,

4  again, some bidders keep in the estate, some don't.  Here,

5  they're paying it in cash out of the exit financing.  The

6  wind-down budget, you know, all of that obviously being

7  offset by the cash on hand.

8       And, of course, they're also paying off the DIP, which

9  is also being paid off, not by the estate, cash being left

10 behind; it's really by their exit financing that it's paid

11 off.

12 Q    And what if anything, did the lenders or the ad hoc

13 group give up as a result of credit bidding here?

14 A    Well, again, I would say that what they gave up is, you

15 know, the ability to bid, frankly, a lower amount and then

16 became an unsecured claim and, obviously, they've kind of put

17 everything, I would say everything that we've asked for,

18 meaning, addressing the unsecured claims, as well as, you

19 know, subsequently coming to a deal with the UCC of the five

20 million bucks, they've basically addressed the very vastness

21 of all of the liquidated, unsecured claims here.

22 Q    At this point, I would like to turn to the post-

23 petition sale-and-marketing process.  And so, to begin, when

24 did you actually start or commence the post-petition sale of

25 the marketing process?

1  A     Well, even though it's a post-petition process, I guess

2  I would say we kind of started it as prepetition, meaning

3  that as we were negotiating the APA for the credit bid and

4  coming to that view, we were still very much in dialogue with

5  the parties that had been involved in this case for quite a

6  long time; in fact, the private equity firm that, you know,

7  went through the entire prepetition process and was one of

8  the final two bidders had been with us through these

9  processes, frankly, since August of 2019.

10        And so, we had direct dialogues and knew where they

11  were going.  Obviously, once we were able to enter into the

12  bidding procedures, they got approved, and had the APA and,

13  we made it public to the Court, we continued to have dialogue

14  with them.  So, they knew what it was that they had to top in

15  terms of a bid.

16        But then, also, we obviously as part of just the

17  bidding procedures that really kicks off the process for

18  others through notices and the like, and let's, you know,

19  parties reach out to us at any point in time.

20  Q     And do your demonstratives address this process as

21  well?

22  A     Yes.  Again, labeled, Post-Petition M&A Process, was

23  two sets of our terms.

24  Q     And as part of this post-petition M&A process, what

25  assets of the company were you actually marketing?

1   A       Well, we were, frankly, marketing any and all, meaning,

2   you know, we had a bid in hand for the whole company and so

3   we were not wed to the idea are that the company had to be

4   sold in part.  I mean, we obviously felt that was a value-

5   maximizing proposition, but if for some reason, two parties

6   showed up and said, I will take half the business and you

7   take half the business and we will pay more than a billion

8   zero zero six, by definition under the rules here, we have to

9   consider that, and that can be a topping bid.

10          And so, we basically solicited interests for the whole

11  company, as well as for the pieces in an effort to see if we

12  can piece together a bunch of, let's say, partial bids into a

13  whole company bid.

14  Q       And how many potential bidders expressed interest in

15  either a whole company or asset acquisition?

16  A       So, there were 18 for the whole company and 27, you

17  know, I would say inquirees [sic] in regards to assets.

18  Anything from, you know, leftover equipment from liquidators

19  to, you know, a business line.

20  Q       And this question is going to sound familiar, but what

21  did (indiscernible) do to advance the process after you had

22  these interested parties?

23  A       Well, by this point our data room was really good

24  because we've now had a very long history of providing

25  information.  So, we, again, once you signed NDAs, you know,

1   gave them access to that data room with a lot of information.

2        For those who were looking at pieces of the business,

3   and you'll sort of see there's a pretty big drop-off between

4   interest and those (indiscernible) NDAs, you know, we gave

5   them information related to the assets, you know, they were

6   wanting to buy.

7   Q    And what steps did you then take with these parties who

8   signed an NDA to get them to a point where they would submit

9   an indication of interest or some type of bid?

10  A    Well, again, we moved heaven and earth.  You know, our

11  management team did an admirable job with, you know, what now

12  would have been the third process with PJT of trying to

13  provide information to parties that were showing up to see if

14  they can top this bid.

15       So, it's everything from, you know, diligence calls to,

16  again, fielding every diligence request and, you know, trying

17  to address it.

18  Q    And after the parties submitted NDAs, how many

19  ultimately submitted indications of interest?

20  A    So, we have on the whole company, we have two that

21  (indiscernible) indications of interest.  I will say the one

22  that's in gray, the strategic, was not one that, frankly, had

23  the financial wherewithal (indiscernible) many times bigger

24  than they were and once they, I think, realized that, they

25  dropped out.

1        The other party is one that, you know, we'll refer to
2   as the equity group, which appeared sort of very late in the
3   M&A process and was proposing a rival plan.  So, that was a
4   different bidder altogether.
5   Q     And how did you work with the equity group to see if
6   they would be able to put forward an actual bid?
7   A     Yeah, so through the equity group, again, you know, as
8   the Court remembers, we received a request for an equity
9   committee very early on.  That group had morphed and instead
10  of seeking to continue to get standing as an equity
11  committee, some very large institutions that, frankly, were
12  not in the equity, but were very deep-pocketed, joined them
13  in an effort to propose the acquisition of the company and to
14  do that there a -- it had a plan process set up.

15        And so, once this equity group, which, again, came to
16  the table rather late, we, again, really moved heaven and
17  earth because we felt like they were proposing what was
18  certainly going to be the best bid out there.  You know, the
19  management team, advisors, everybody did, you know, all they
20  could to get them to the finish line, even extending, with
21  the help of the ad hoc group of lenders, extending the sales,
22  hearing, and plan confirmation dates.  If you remember, I
23  believe they were still (indiscernible) in around the 20th.

24        The equity group then requested more time to get to a
25  binding bid and everybody felt like that was the best outcome

1  here, and so incremental time was provided to let them finish

2  their diligence and get to that bid.

3  Q     And, ultimately, what happened with this potential bid

4  by the equity group?

5  A     Sadly, like others in the process, the more diligence

6  they did, eventually, they came to the view that they could

7  not take out the term loan and they dropped out of the

8  process.

9  Q     After this group dropped out, where does that leave the

10 company as far as remaining qualified, binding bids?

11 A     We sit here today with one bid that's qualified, that's

12 actionable, and that can be done in the time frame where

13 liquidity, again, is getting tight, and that is the term loan

14 credit bid.

15 Q     And you've touched on this a bit, but can you just

16 explain to the Court how throughout this 20-month process,

17 the role that the debtors' officers and directors have played

18 here.

19 A     Yes.  Obviously, this was (indiscernible) two years

20 that I think were tacked on to probably even tougher prior

21 couple of years, starting with the Fresenius merger and the

22 dissolution of that.  You know, as I mentioned, we had asked

23 them to, in effect, run three different processes.  Luckily

24 we didn't ask them all at once; they just subsequently

25 happened one after another.

1   But the entire management team, on top of having to run the

2   company and, frankly, address and continue its action plan

3   for the FDA and turnaround the company financially, was

4   engaged in really nonstop interaction with, you know, the

5   financial sponsor world, the credit sponsor world in

6   addressing these various processes, whether it's financing or

7   M&A.

8        On the board front, again, I mentioned before, I've

9   never had a case where I've had as many board meetings.  The

10  board here is very much involved and wants to understand, you

11  know, all the options, where people are, and to really be

12  fully aware of every twist and turn that occurred.  So, we

13  had for a long period of time, you know, weekly calls.  There

14  were times when they were every two weeks if there was

15  nothing to report.  But we had a very active board

16  throughout, frankly, our engagement starting back in January

17  of 2019.

18  Q    And, similarly, how would you characterize the actions

19  of the lenders and the stalking horse purchaser throughout

20  the 20-month process that you just described?

21  A    Yeah, I can't say we always got along.  They did their

22  job.  We did our job.  But at the end of the day, you know,

23  they came to us with a concern that their debt was impaired,

24  but they, in fact, were the equity of the company based upon

25  the financial performance of the business, its cash burn, and

1   obviously some of the issues.  The company is still facing

2   getting FDA clearance on two of its sites.

3        We did our best to negotiate with them in a period of

4   time to let us, you know, operate our business plan, to

5   minimize the costs, but in the end, frankly, they were proven

6   correct.  We sit here today with their bid being the only bid

7   and no one is going to bid above and beyond their bid.  So,

8   sadly, I have to admit that the lenders were correct in this

9   scenario.

10        So, we negotiated every single document, I would say,

11   to the fullest and to be clear, the lenders were very much

12   motivated throughout this process to find someone to credit

13   bid -- I'm sorry -- to cash bid and top their credit bid to

14   kick them out.  That's why they were very amenable at the

15   very end to give the equity group incremental, you know,

16   roughly almost two weeks, to get to a plan of confirmation

17   with a proposal that (indiscernible).

18   Q    And do you believe that the purchaser had the ability

19   to perform under the existing contracts that it has assumed?

20   A    Yes, they do.

21   Q    And, finally, at this point, I just want to switch

22   gears a bit and discuss PJT's interactions with the UCC here.

23   And can you just describe for the Court what have been PJT's

24   interactions with the UCC during the course of this

25   bankruptcy case.

1   A     Sure.  Obviously, an important part of our engagement,

2   when it comes to a Chapter 11 is always our view to be,

3   frankly, as open and as communicative with the UCC as we can.

4        And so we quickly established a rhythm or

5   (indiscernible) weekly call with them to let them know all

6   about whatever issues that they were having, whether it was

7   with the DIP, with the sales process.  We gave them, again,

8   full information.  We were very open with all their requests.

9        And we made ourselves available to them, as they were

10  going through their usual process of, you know, investigating

11  the transactions that have occurred to date, particularly,

12  the standstill and just generally some of the settlements.

13  One of my colleagues, Harold Kim, who's a managing director,

14  who works under me, I believe, made himself available for

15  what I heard was a five-hour interview to address all these

16  issues.

17       So, at every turn we've tried to be -- and I guess I'll

18  speak for Kirkland as well -- tried to be as open with them

19  to provide whatever they needed to get to, you know, their

20  view, if you will.

21  Q    And to that end, are you aware of the results of the

22  UCC's investigation into whether there are any potential

23  claims and causes of action that the debtors may have against

24  the lenders and others?

25  A     Yeah, as I referenced before, the UCC --

1        MR. GEORGE:  Your Honor -- excuse me -- Your

2   Honor, I object to the extent he's going to testify about

3   what somebody else told him.  It's clearly hearsay.

4   He's not here as an expert, so he can't rely on hearsay.

5             THE COURT:  Mr. Arnault?

6             MR. ARNAULT:  Mr. Buschmann would simply be

7   testifying as to the results of the UCC's investigation, so

8   it doesn't qualify as hearsay because it's not an out-of-

9   court statement and he's simply testifying as to what the UCC

10  concluded.

11            MR. GEORGE:  Well, that's still hearsay, Judge.

12            THE COURT:  I think it's just a fact --

13            MR. GEORGE:  It's still hearsay.

14            THE COURT:  I'll allow it.

15            Mr. Buschmann, you may answer.

16            THE WITNESS:  Thank you, Your Honor.

17            The UCC entered into a settlement with the company

18  and the lenders for an incremental $5 million of payments

19  that would go to liquidated payables.  I mentioned this prior

20  on the overbid and the incremental consideration being paid.

21            Again, this was to ensure that, frankly, all of

22  the liquidated payables/unsecured claims that we had would be

23  paid in full.

24  BY MR. ARNAULT:

25  Q     If you could turn in your binder to the document marked

1  for identification as Debtors' Exhibit 27.

2  A      I'm there.

3  Q      And what is this document?

4  A      This is the UCC's, I guess I'll call it, motion or the

5  statement in support of the sale process and plan.

6          MR. ARNAULT:  And, Your Honor, I'd move for the

7  admission of Debtors' Exhibit 27.

8          THE COURT:  I don't think we need to move that

9  into evidence, but are there any objections?

10          MR. ARNAULT:  Okay.

11          THE COURT:  To the extent we need it in evidence,

12  it's admitted.

13      (Debtors' Exhibit 27 received in evidence)

14          MR. ARNAULT:  Fair enough.

15  BY MR. ARNAULT:

16  Q      And, finally, Mr. Buschmann, it's been alleged that the

17  sale here is the culmination of a process of intentionally

18  increasing the secured debt to effect a friendly sale that

19  would allow the debtors to escape all liability.

20      And based on your involvement in this process, how

21  would you respond to that allegation?

22  A      Well, I would view it as wholly untrue.  We spent the

23  last two years in negotiating vigorously with the term loan

24  lenders and to allow the company to turn itself around in an

25  effort to maximize the value here.  Again, this is not the

1  outcome we, frankly, expected or hoped for; we, frankly,

2  wanted to refinance the debt and let the company continue on

3  its way or sell the company at a very high price and, again,

4  move along that way.

5       That did not happen and, frankly, we wanted to hand the

6  company over to the term loan lenders I think in January of

7  2019 (indiscernible), quite frankly, and saved ourselves two

8  years of effort.

9            MR. ARNAULT:  Well, thank you, Mr. Buschmann.  I

10 have no further questions for you.

11           And, Your Honor, I'm ready to pass the witness,

12 but before I do so I just want to make sure as a housekeeping

13 matter -- and I know we talked about them, but I just want to

14 make sure that Debtors' Exhibits 48 through 53 and 55 were in

15 evidence or were actually admitted.

16           THE COURT:  I think they were, but any objections,

17 just in case?

18      (No verbal response)

19           THE COURT:  Okay.  They're admitted.

20           MR. ARNAULT:  All right.  Thank you, Your Honor.

21           THE COURT:  Okay.  Thank you, Mr. Arnault.

22           Before we move on to cross-examination, let me ask

23 for the record, who seeks to cross-examine Mr. Buschmann?

24           MR. GEORGE:  I do, Your Honor, Edmond George.

25           THE COURT:  Okay.  Anyone else?

1        (No verbal response)

2            THE COURT:  Okay.  Mr. George, what's the

3    estimated time of your cross-examination to the extent that

4    you know?

5            MR. GEORGE:  Your Honor, I would assume it's

6    likely to be as long as the direct case, so I guess

7    potentially a couple hours.

8            THE COURT:  Okay.  So, this is a logical stopping

9    point for us to have a break for lunch.  Given the amount

10   that we need to accomplish and my limited schedule, let's

11   just take half an hour if that's acceptable to the parties,

12   unless you feel like you need more time.

13           MR. GEORGE:  That's fine.

14           THE COURT:  Okay.  So, that's fine.

15           Okay.  So, why don't we come back at 12:20 and you

16   can just mute your phones, as well as your video, during this

17   time.

18           And, Mr. Buschmann, I have to remind you that

19   you're under oath during this break, so you're not allowed to

20   speak to anyone about the substance of your testimony,

21   although, given where you're located and your isolation, you

22   probably wouldn't have the opportunity to do that anyone.

23           But nonetheless, I must advise you to not do so

24   during this break.

25           And with that, we'll adjourn for half an hour and

1          I'll see you at 12:20.  Thank you, all.

2          COUNSEL:  Thank you, Your Honor.

3      (Recess taken at 11:46 a.m.)

4      (Proceedings resume at 12:21 p.m.)

5          THE COURT:  Back on the record.  Mr. George, are

6  you ready to proceed with the cross-examination of Mr.

7  Buschmann?

8          MR. GEORGE:  Yes, Your Honor, I am.

9          THE COURT:  Okay.  And, Mr. Arnault, your team is

10  ready to go:

11          MR. ARNAULT:  Yes, Your Honor.

12          THE COURT:  Okay.  Okay.  Mr. George, please

13  proceed.

14          MR. GEORGE:  Thank you.

15                    CROSS-EXAMINATION

16  BY MR. GEORGE:

17  Q     Good afternoon, Mr. Buschmann.

18  A     Good afternoon.

19  Q     Can you tell me before you sold -- you mentioned that

20  you had sold a pharmaceutical company in the past.  How many

21  pharmaceutical companies have you actually personally been

22  involved with the sale of?

23  A     In regards to the sale, that would be Keto (phonetic),

24  Taro Pharmaceuticals, and Akorn, there would be three.

25  Q     That would be three.  When was the last time you sold a

1   pharmaceutical company?

2   A     A year ago.

3   Q     And was that pharmaceutical company facing the same

4   kind of issues that Akorn is facing here today?

5   A     I mean more or less.  It's the same generic issues

6   meaning they had seller supply issues in regards to their

7   chain of operations.  Obviously, every generic company is

8   under pressure with regards to pricing from their

9   wholesalers.  In this case, they had an issue with their bank

10   group and a sale was cited as being a way to address that

11   result.

12   Q     Were they facing litigation related to potential

13   antitrust violations?

14   A     I'm not aware that they were, although the party that

15   was the generic pharmaceutical company is Rising.  And I

16   noticed in one of the filings that they were mentioned as

17   having had that.  I was not aware of that.

18   Q     And Rising is a successor to an NDL defendant whose

19   principals pled guilty to antitrust violations, isn't that

20   right?

21   A     I saw some of the pleadings there.  I'll have to take

22   your word on that.  That was not part of my work.

23   Q     Okay.  And is Rising on the committee in this case?

24   A     They are.

25   Q     And at the time that you were retained, were you aware

1  that there were allegations that Mr. Portwood made

2  misrepresentations to investors in the company and it caused

3  the debtor and the investors damage?

4  A    Is your question in reference to what action, I guess?

5  Q    I'm asking you at the time that you were retained, did

6  you have an understanding that investors in the company had

7  made allegations but Mr. Portwood had made misrepresentations

8  in violation of SEC rules?

9  A    I was not.  (indiscernible) my attention, no.

10  Q    And at the time that you were retained, were you aware

11  that the defendants or that Akorn was a defendant in certain

12  antitrust litigation that were brought by various funds and

13  purchasers who alleged that there was antitrust price fixing

14  with generic drugs?

15  A    In January of 2019, I was not aware (indiscernible).

16  Q    You weren't aware of that.  Were you aware that that --

17  are you aware now that that litigation had been ongoing since

18  2015?

19  A    I understand it has been ongoing.  I don't know what

20  date it started, but I know it's ongoing.

21  Q    So at the time that you were first retained, management

22  never told you that they were in the middle of a piece of

23  antitrust litigation where the allegations were that the

24  officers of this company price fixed the prices of generic

25  drugs causing funds and other purchasers damage, you weren't

1  aware of that?

2  A     At the time of my retention, it was not a topic that

3  had come up, no.

4  Q     Well when you get retained this other company don't you

5  do an initial review of the management of the company to

6  determine whether they're the right people to take the

7  company forward?

8  A     There was nothing in our -- that we understand as being

9  an issue with management.

10  Q     That's not what I asked you, sir.  I asked you as part

11  of your job in reviewing the company for purposes of

12  preparing it for sale, do you do a competence of management

13  review?

14  A     We certainly look at the biographies of the management

15  team and we let the parties that are actually buying the

16  business determine what they want to do with the management

17  team.

18  Q     So whether these people are antitrust criminals, you

19  didn't invest that at all, did you?

20  A     I'm not aware of Mr. Portwood being an antitrust

21  criminal.

22  Q     And if he was an alleged securities fraud, did you

23  check into any of those allegations?  You didn't learn of

24  them until after you were retained, right?

25  A     It was quite long after we were retained.

1  Q     I'm sorry; I didn't -- you broke up there.

2  A     Well after we were retained.

3  Q     Well after?

4  A     Yep.

5  Q     Early on in your negotiations with the officers of this

6  company you said one of the outcomes of not perpetuating to a

7  request by the lenders for a meeting was that they would

8  start to scrutinize management decisions, do you remember

9  telling him that?

10 A     I don't think I said they were scrutinizing management

11 decisions.  I said they were setting the (indiscernible) for

12 fault.

13 Q     Okay. Well we'll get to that document in a few minutes.

14       Are you now sitting here today, aware of the

15 allegations that have been made by the MDLs?

16 A     I'm aware there are allegations by the MDL, yes.

17 Q     Would you agree with the public disclosures of the

18 claims of security fraud hurt the enterprise value of Akorn?

19 A     To be honest, in the discussions with the buyers the

20 MDL litigation is not a major topic.

21 Q     I didn't say the MDL, sir.  I said the antitrust or I

22 mean the securities fraud -- I'm sorry.

23 A     Securities fraud.  It was an ongoing topic that the

24 parties were looking into, yes.

25 Q     Do you know whether the company ever investigated or

1  launched an investigation to determine whether there was any

2  truth to the allegations that someone provided false

3  documents to the SEC?

4  A    I don't know.

5  Q    Do you know whether the company ever did any

6  investigation to determine whether any of the officers of the

7  company were actually involved in anti-competitive price

8  fixing behavior?

9  A    I do not know.

10  Q    What was the price of the sale of under Fresenius'

11  deal?

12  A    It was roughly, I believe, 4 million dollars, give or

13  take.

14  Q    And would you agree that that was a fair price for the

15  company when Fresenius offered it?

16  A    I was not part of that transaction.  I don't -- I was

17  not involved in it.

18  Q    Well, I'm asking you whether you thought it was fair or

19  not?  You've been looking at this company now for over two

20  years, and I'm asking you whether you think that offer was

21  fair based on what you know about the company?

22       Did you know what the EBITDA when Fresenius made the

23  offer?

24  A    I did not, no.

25  Q    Under the sale, do you know whether any of these

1  officers are going to have employment with the debtor going

2  forward?

3  A    Certainly, I have not heard (indiscernible) do not.

4  They are being assumed, but their ultimate future, I think,

5  is going to be up to the term loan lenders.

6  Q    When you say they're ultimately assumed, are you saying

7  that these individuals have contracts that are subject to the

8  $107 million dollar assumption payment?

9  A    I believe the $107 million dollars refers to the

10  payables in the company.

11  Q    Well what assumptions are you talking about?  You said

12  those are to be assumed.  What assumption -- employment

13  contract?

14  A    My assumption is that the existing management team will

15  continue to be the existing management team under Newco up

16  until the new board decides if they do or don't want to keep

17  them.

18  Q    Is the board going to be entirely reconstituted or will

19  there be existing stockholders that retain board positions?

20  A    Again, that is a question for the term loan lenders,

21  but in usual cases, it's entirely reconstituted.

22  Q    Does the bank meet FDA approval to buy these loans or

23  to buy these assets?

24  A    I'm sorry; does who?

25  Q    Does the bank -- the purchaser, the TLB, the term loan

1   bank that's buying, do they need FDA approval?

2   A      Not in my understanding, no.

3   Q      So basically all of the debtors' FDA licensure or

4   approvals are moving over with this purchase to the bank

5   purchaser, right?

6   A      That's my understanding, yes.

7   Q      And all the employees are moving through with the

8   purchaser, right?

9   A      That's correct.

10  Q      And under the APA if the Judge enters the order today,

11  the term lenders can simply take possession of the company,

12  right?

13  A      That's correct.

14  Q      Now the $107 million dollars that you mentioned, you

15  assumed that a purchaser would also assume those liabilities.

16  Wouldn't it be fair to say that if the purchaser was a

17  pharmaceutical company that they might have their own vendors

18  and suppliers?

19  A      Absolutely, which is why I said we would have to

20  readjust that assumption if another party comes along.  So

21  this sheet that we walked through is, frankly, a model for

22  each party that were to make changes to the APA and how they

23  were treating the deal, you would make adjustments to that

24  schedule as well to reflect if, in fact, their bid was apples

25  to apples.

1   Q     Well if I were to tell you that I didn't read anything

2   in the bid procedures that said that people could bid

3   different than what the bank purchaser was bidding, would you

4   be surprised to hear that?  And if you are surprised, maybe

5   you can show me in the bid procedures where it says that the

6   debtor is going to take that $107 million dollars and take it

7   off the table as part of the bid for anybody who doesn't want

8   to assume those debts.

9   A     In my experience every party that bids is going to

10  markup an APA and will have to address that APA as is.

11  Q     That's right, sir, but I'm asking you where in the

12  documents -- can you find anywhere in the documents where

13  bidders are told that?

14  A     I don't have the documents in front of me.

15  Q     Okay.  Now in this number that you have on your Exhibit

16  Number, I guess, I'm sorry, 26, estimated required overbid.

17  You have in there $12 million dollars under the credit bid

18  purchase price --

19  A     Let me get it; let me get it.

20  Q     Oh, I'm sorry.

21  A     Okay.  I'm there now.

22  Q     Okay.  What is the $12 million dollars again?

23  A     The $12 million dollars refers to an incremental

24  professional fee.  Actually --

25  Q     Whose?

 1  A      Ours.

 2  Q      Oh, I'm sorry.  Whose?

 3  A      PJT's.

 4  Q      Oh this should be your $12 million dollars?

 5  A      Exactly, yep.

 6  Q      And those are additional expenses?

 7  A      Additional expenses, correct.

 8  Q      And when did those get incurred?

 9  A      Those are incurred as part of our engagement letter and

10  as part of the transaction.

11  Q      Is that your fee?

12  A      That's an incremental fee, correct.

13  Q      Well is any part or fee in the $35 million?

14  A      No.

15  Q      It's up above under the wind-down budget.

16  A      No, we have regular, the backend fee that's included.

17  I don't know if that's part of the wind-down budget or not.

18  We have a backend fee that will be paid for.  And this would

19  be an incremental fee.

20  Q      Now with respect to the allegation that gave rise to

21  the FDA issues of falsification of information to the FDA, do

22  you know whether the company ever launched an investigation

23  to determine whether there were any officers of the company

24  or senior management who might have been responsible for that

25  data breach -- I mean for that falsification?

1  A     I do not.

2  Q     Do you know of a company called Cerulean?

3  A     I've heard the name, yes.

4  Q     Well were you aware whether they were involved at all

5  with the Akorn entity?

6  A     I believe they may have been one of the consultants

7  that were involved, but I don't know much more of that.

8  Q     Are you aware whether one of the officers of Akorn may

9  have terminated Cerulean's investigation into the FDA

10 falsification?

11 A     I'm unaware of that.

12 Q     Do you know that Judge Laster, in his opinion,

13 mentioned that Mr. Bonaccorsi ended that early investigation,

14 early and he induced Cerulean removed from that report

15 allegations that the officers of this company may have been

16 engaged in criminal conduct?

17 A     That's before my time.  I read the opinion.  I don't

18 remember that part of it.

19 Q     Well, do you want to look at it?  I'll get it for you

20 if you want to read, it's on page 25, if you have it there.

21 A     I'll take your word for it.

22 Q     Okay.  Do any of these things, sir, concern you about

23 the integrity of management that's been operating the debtor

24 up to this point?

25 A     It's my experience with them having worked with them

1    for over two years, I found no issues in integrity.

2    Q    Well if they were going to commit a securities fraud, I

3    don't think they'd share that with you, would you, sir?

4    A    Well, again --

5    Q    Do you think they would share that with you?

6    A    To you question, you asked me if I had any concerns.  I

7    said from my experience with them, that's all I have, I don't

8    have any concerns.

9    Q    Well but you didn't know that there was a potential

10   securities fraud that was an officer or director, right?

11   A    I'm sorry?

12   Q    You didn't know at that time, sir, that there was a

13   potential security fraud who was an officer or director, at

14   least an allegation that there was one, did you at the time

15   that you got retained?

16           MR. ARNAULT:  Your Honor, I'm just going to

17   interpose an objection here.  The questions are alleging,

18   criminal misconduct and securities fraud, and there's never

19   been any proven allegations of criminal fraud or securities

20   misconduct.  And to the extent that these questions are

21   asked, they are mischaracterizing any evidence and facts that

22   are not in evidence.

23           And so, if it's purported, if it's alleged, that's

24   fine, but these objections are misstating evidence or, I'm

25   sorry, these questions are misstating the evidence.

1          MR. GEORGE:  Your Honor, I'm not sure that's an

2    objection.  I don't think I have misstated anything.  Judge

3    Laster's opinion speaks for itself. The lawsuit that was

4    filed by the security holders in this case make allegations

5    of fraud by Mr. Portwood.

6          I'm not suggesting they're true.  I'm just

7    suggesting that this witness doesn't really have an

8    understanding of who the real officers are or who they

9    potentially are, and that's fair for cross-examination,

10   Judge.

11         I'd like to continue with discussion with the

12   witness if I could.

13         THE COURT:  That's fine.  And to your point, Mr.

14   Arnault, I know what has been determined and what has not

15   been determined.  So I'll take it for what I think this is

16   worth.

17         MR. GEORGE:  Thank you, Your Honor.

18         THE COURT:  Go ahead, Mr. George.

19         MR. GEORGE:  Thank you, Judge.

20   BY MR. GEORGE:

21   Q    Now prior to entering into this process of finding a

22   buyer for the debtor, did you ever try to perform a TEV for

23   this company?  And you know what I say a TEV?

24   A    Yeah, that's total enterprise value, is that what

25   you're saying?

1  Q     Yes.  Did you do that?

2  A     We did not do a valuation.  We let the market speak for

3  the company.

4  Q     Well wouldn't that have been another way to determine

5  whether somebody was getting these assets for less than what

6  they were really worth to perform a TEV?

7  A     The better way of doing it is let the market speak.

8  Q     Well you sold this company or you attempted to sell

9  this company during a pandemic, right?  You started in

10 January and you're doing it now.  We've been in a pandemic

11 almost the entire time.  Is that the ideal time to sell a

12 company during a pandemic?

13 A     First of all you said the entire time since January and

14 January we were not in a pandemic.

15 Q     Fair enough.

16 A     And the company was well underway and well already

17 seeing the results of its sale process by the time of the

18 pandemic.

19 Q     And so are the results of the sales process that you

20 can identify for us, other than the purchaser?  Were there

21 any other real offers that were made to buy?

22 A     I think I walked through in a lot of detail.  In fact,

23 there were offers, but none of them ended up being binding or

24 high enough in value to take out the term loan debt.

25 Q     When you first were retained, you told the company, did

1   you not, that there was a very high likelihood that this

2   company would end up in a Chapter 11.

3   A     I don't remember ever saying that, no.

4   Q     Okay.  Did the bank have liens on real estate

5   prepetition?

6   A     Yes, my understanding is that it did, unless they were

7   de minimis amounts.

8   Q     Unless what?

9   A     Unless they were de minimis.

10          MR. GEORGE:  Judge, I didn't hear that word that

11   he said at the end?

12          THE WITNESS:  Latin, de minimis.

13          MR. GEORGE:  Oh, de minimis.

14          THE COURT:  Mr. Buschmann, why don't you try --

15   one minute, Mr. George.

16          MR. GEORGE:  I'm sorry, Judge.

17          THE COURT:  One minute.  Okay.

18          Mr. Buschmann, why don't you try to get a little

19   closer to your speaker because you are fading in and out.

20          THE WITNESS:  Let me try to move my phone, Your

21   Honor.

22          THE COURT:  Okay.  That would be great.

23          MR. GEORGE:  At first, I thought it was just my

24   bad ears, Judge, which you all can see I have.  I didn't

25   think that bad.

1          THE COURT:  I have poor hearing as well.

2          THE WITNESS:  Let me rearrange my desk, one

3   second.

4          MR. GEORGE:  No problem.

5          THE WITNESS:  Hopefully, that's better now.

6          MR. GEORGE:  I think that's a lot better. Thank

7   you, sir.

8   BY MR. GEORGE:

9   Q     Has anyone, to your knowledge, ever provided a

10  valuation of any of the Akorn affiliates?

11  A     Not to my knowledge, no.

12  Q     So your approach to the sale was a holistic sale of the

13  company without looking at whether any individual asset may

14  not have had claims against it in a particular affiliate?

15  You only looked at this entity in a holistic way, right?

16  A     Well we looked at it holistically and then, as I

17  mentioned before, as part of the Chapter 11 process.  We

18  allowed parties who did not have an interest in the holistic

19  set of the company to put in bids for parts of the company.

20  Of course, we would have to match those up to get to a

21  holistic bid because, of course, the credit bid is,

22  obviously, for the whole company.

23  Q     Okay.  So take us through that process of how, if

24  someone made a bid, for part of the assets, you would

25  determine whether the value was appropriate without having

1  valued any of those individual assets?

2  A    It was simply looking at the credit bid and comparing

3  it to either the (indiscernible) bid, if it was higher or

4  not, or if it was for the assets, we would then look at it

5  and say are there enough bidders to pick up all the assets,

6  right.  Again, we're selling all of the company.  And does

7  the combination of these partial bidders add up to be a

8  higher bid in total.  Just like every other Chapter 11

9  bankruptcy option.

10  Q    Now there were offers to purchase that had less cash

11  upfront but more in funding, isn't that true?

12  A    Can you explain that?  I'm not sure --

13  Q    Yeah.  Wasn't there one bid for almost 450 or $500

14  million with a billion dollars in credit line?

15  A    Again, a credit line is just the way you fund the

16  purchase price.  It doesn't mean that --

17  Q    That's fine.

18  A    Yes, I'll take your word it's there, but it's not -- it

19  doesn't mean it's available to Akorn.  It means that the

20  buyer has an adequate funding line.

21  Q    Well if it didn't pay off all of the debt, that billion

22  dollars could have serviced the remaining part of the debt,

23  right?

24  A    That's not what this bid was contemplating.  It was

25  taking part of the assets and, again, we have to pay off the

1  entire part of the entire part of the term loan.  And there

2  was no other proceeds coming in to do that.

3  Q     Right.  And so, you're saying is -- what you're saying

4  is because it didn't pay the bid loan in full, they were

5  rejected out of hand, right?

6  A     Our goal was to pay off the term loan in full.  That

7  was the --

8  Q     Sir, can you answer --

9        I appreciate that, but could you answer the question

10 that I asked you which is the fact that it didn't pay off the

11 term loan caused you to dismiss it out of hand?

12 A     No, the fact that there was no other party that we

13 could partner them with that then would pay off the term loan

14 and be a whole company bid made us reject (indiscernible).

15 Q     But, sir, what I was proposing to you the potential for

16 paying half of the bank debt, giving a billion-dollar line

17 and servicing it and why would that have been terrible for

18 the debtor?

19 A     The lenders want to be paid off in full.  They were not

20 (indiscernible) in part.  And so, the billion-dollar line is

21 irrelevant.

22 Q     Would you agree that this is a company that's on the

23 verge of substantially improved EBITDA?

24 A     We hope so, yes.

25 Q     In fact, I think there's a projection that by 2024 this

1  company will have over $300 million dollars in EBITDA, right?

2  A     Assuming that -- yes, new products come out and meet

3  that business plan.  That was one of the business plans that

4  we had for the sale, yes.

5  Q     And have you been involved with the projections that

6  are included in the project Wood summary that are provided as

7  evidence?

8  A     Yes.

9  Q     You are?

10  A     Yes.

11  Q     And did you perform those EBITDA summaries that are

12  included in the project Wood documentation?

13  A     It would have been my team under my direction.

14  Q     I meant -- I didn't mean you personally.  I meant PJT?

15  A     We would have been involved with AlixPartners as well,

16  the other consultants work on the projections.

17  Q     And the debtors actually done a pretty good job of

18  projecting EBITDA during the course of this case, haven't

19  they?

20  A     They have.  It fluctuates month to month, but, again,

21  as all management teams try to do and generic is very

22  difficult, they've done a good job historically since we got

23  involved of meeting their plan.

24  Q     And so, Akorn is trending upward based on your

25  understanding, right?

1  A     Akorn still has a lot to do to hit this projection.

2  Q     And the point of this bankruptcy, as you state in your

3  project Wood documents, is to deleverage, right?

4  A     It's to address the term loan and I to deleverage, yes,

5  correct.

6  Q     And you'd agree that there's two ways to deleverage,

7  right?  You could pay down your bank debt or you can make

8  more EBITDA, right?

9  A     That's correct.

10  Q     And would you agree that at the beginning of this case

11  that the leverage was in excess of 5.8 times EBITDA?

12  A     Yeah, correct.

13  Q     And by the end of 2020, you projected it's only going

14  to be 2.2 right?

15  A     (indiscernible) to the document how you get to that,

16  yeah.

17  Q     Okay.  Can you look at MDL Exhibit Number 32, please?

18  A     Sure.

19  Q     Now, sir, before we get to Exhibit Number 32, I'm going

20  to ask you to go back to Debtors' Exhibit Numbers 24 and 25,

21  I believe it was, the letters from the lenders.

22          THE COURT:  Mr. George, what's the exhibit number?

23          MR. GEORGE:  I believe it's Number 24 and 25.

24  BY MR. GEORGE:

25  A     Okay.  I'm at Exhibit 24.

1    Q      Okay.  Now, sir, in your direct testimony said that the

2    lenders were alleging a default, you recall saying that?

3    A      Yes.

4    Q      Could you look at the second paragraph of that document

5    and read it out loud where it starts with, "Akorn has

6    disregarded its regulatory obligations in numerous respects,"

7    after that word, that sentence starts.  Could you read that?

8    A      You mean starting with the term lender group?

9    Q      Yes, sir.

10   A      "The term lender group believes that the court rulings

11   may have significant implications under the terms of the loan

12   agreement and the other loan documents, including without

13   limitation Section 501, 502, 503, and 507, as well as Article

14   7 and all rights and remedies under the loan documents are

15   expressly reserved in that respect."

16   Q      Now look at the footnote below, you see that?

17   A      I see footnote 1.

18   Q      Yeah and it says, "The company shareholder filed a

19   derivative action in the North District of Illinois on behalf

20   of Akorn against certain of the company's officers and

21   directors for multiple breaches of fiduciary duty arising out

22   of the same fact that the court focused on in Fresenius to

23   terminate the merger," do you see that?

24   A      Yes, sir.

25   Q      Now where in there does that say that the bank is

1    calling a default?

2    A    I did not say they were calling a default.  I said that

3    in the arguments that they list out here, that there are

4    significant implications under the term of the loan agreement

5    and other loan documents.  They're listing out sections that

6    they think may have been violated such opinion.

7    Q    Well that was just saber rattling, wasn't it?  It

8    wasn't a threat of a default, was it?

9    A    Again, saber rattling and (indiscernible) of default,

10   you know, you have to take them seriously.

11   Q    So you were asked whether the debtor could have

12   immediately filed bankruptcy, clearly could have, right?

13   A    They could have.  Again, this is not the point.  We

14   were obviously hired in January.  This is in November.  To

15   your point, you know, we, obviously, would have wanted to

16   engage with the term loan lender before taking any action

17   like preemptively filing Chapter 11.

18   Q    So now if we could turn to Exhibit 32, sir?

19   A    Okay.

20   Q    Now you didn't say or you clarified in your testimony

21   that you said there wasn't a default, but could you look at

22   Number 32 and make reference to the bottom where it says

23   debtors' prod -- I think it means production -- 0053432.

24   A    I'm sorry.  Your MDL exhibits?

25   Q    Yeah, right, MDL Number 32 and the document is called,

1   "Project Wood Discussion Material."

2   A     Yes, yes.

3   Q     Okay.

4   A     Number 32, March 21st, 2019, correct?

5   Q     Yes, sir.

6         And could you go to the second page of that document?

7   A     I'm there.

8   Q     And what is the first sentence of your document say?

9   A     In the (indiscernible) fax or in the bold?

10  Q     The one -- not in the bold. The first -- not in the box

11  but below, while the company.

12  A     "While the company's advisors have been engaged since

13  the end of January 2019, ad hoc group lenders have been

14  actively monitoring the company's situation for longer and

15  alleged an event of default occurred in November 2018.

16  Q     Well that's not true, is it, sir?  There was no event

17  of default called in November 2018.

18  A     I did not see if there was an event of default called

19  in 2018.

20  Q     Where they allege a default occurred in that letter?

21  A     They pointed out sections in the term loan that they

22  felt the Judge's opinion could lead to violation of.

23  Q     (indiscernible) says, "Allege and event of default

24  occurred."  Did they allege an event of default occurred in

25  those letters?

1  A      Not in the letter that you just read to me.

2  Q      Okay. And were you present during the 341 hearing?

3  A      Which hearing?  Sorry, sir, couldn't hear you.

4  Q      The 341 hearing that was held in the bankruptcy court?

5  A      No, I was not present.

6  Q      Are you aware that the debtors' professionals had a

7  difference of opinion about whether those events could stand

8  as an event of default under the loan documents?

9  A      I'd be surprised if there was a different point of

10 view, but. . .

11 Q      Did you know that there was a choice of law issue that

12 was being bantered back and forth between the debtors'

13 professionals about what law action would be applied and

14 whether it would or wouldn't be under particular states laws?

15 A      Yes.  I'm aware of that.  There was a lot of discussion

16 on that.  There was discussion with our counsel as well as to

17 the likelihood of success if there was a default called.

18 There was also a discussion that we had which is even if we

19 were to win, you know, would you, in fact, lose because of

20 the bit of disruption and the cost in the interim.  All those

21 things are being take into consideration as we discussed with

22 management and the board.

23 Q      Now can you go to page 53433 of that document?

24 A      You mean page 3 in our PDF?

25 Q      On the bottom it says, debtors' production 00053433.

1   We're in the same document. We're just --

2   A    Yeah, I'm there.  Yep, I'm there.

3   Q    And you ere presenting to the company reasons why the

4   lenders might call a default or might not call a default,

5   right?

6   A    Correct.

7   Q    And why the lenders would call a default you list as

8   the lenders believed that the value of the company -- sorry.

9   Lenders believe in underlying value of the company and that

10   any disruption of value decline will be temporary.

11       So what you're basically saying here, sir, isn't it

12   that the banks thought that they could call a default and

13   there would be a potential upside for them that they might do

14   so in order to take advantage of the turn in the company that

15   was being projected later on and which you confirmed in your

16   testimony?

17   A    Well, again, this is one of the points that we are

18   laying out that could be possible reasons.

19   Q    Understood.

20   A    And, unfortunately, if their belief had been throughout

21   the beginning of the case and to the very end that there

22   absolutely was a risk to the company to be able to refinance

23   the debt of their own debt and, therefore, their value was

24   actually below the amount of term loan.

25       So, again, if you're going to take ownership of the

1  company, I guess, the assumption for the term lenders it that

2  at some point there's a reason to do that and it's not going

3  to continue to decline into infinity which is, obviously,

4  what they're not hoping for.

5  Q    And I think what you were trying to express, and tell

6  me if I've got this wrong, was that the bank might be in a

7  position to call a default if they thought they could grab

8  the assets.  And after they grabbed those assets, the value

9  of the company would go up.

10 A    I would say it differently which is --

11 Q    How would you say it?

12 A    I would say it this way.  The lenders were concerned

13 about the company's cash flow and continue to operate.  They

14 wanted to have oversight into what was actually happening

15 with the company and were concerned about, obviously, its

16 work with the FDA. And so, they wanted to get under the tent

17 to the standstill to better understand the value of the

18 company and, frankly, more importantly, where the company was

19 headed at this point.

20 Q    Now, sir, on the first page, I'm sorry to make you go

21 back.  There's a reference to a Decatur warning letter; do

22 you know what that is?

23 A    Yes.  It was as we say one of our -- there was actually

24 two facilities that had warning letters, but here got a

25 warning letter from the FDA regarding some of its practices.

1   Q     About -- I'm sorry, what the last --

2   A     Some of the practices, production practices.

3   Q     Now are you aware specifically about what those

4   production practices were?

5   A     There was a number of them.  Again, I read the warning

6   letter, but don't remember all of the allegations.

7   Q     Well would it be fair to say that a lot of those

8   allegations related to the purity of the pharmaceuticals that

9   were being created and shortcomings in the processes that

10  allowed those pharmaceuticals to actually be produced?

11  A     Again, it's either multiply 42 -- usually referred to

12  manufacturing processes to ensure the highest quality and

13  they can meet certain manufacturing problems. Correct.

14  Q     And you said that's a 483 notice?  I think I saw that

15  before.  Is that the reference you're making?

16  A     482, yes.

17  Q     Did it concern you at all that you're trying to sell a

18  company that may have been in a position where previously it

19  had sold on an adulterated prescription drugs to people like

20  my client?

21  A     Again, the -- what we were focusing on was, you know,

22  was the company -- and, again, this is part of the reason for

23  the standstill to begin with -- was with the new management

24  team.  They were putting into place the action plan to

25  address the issues that both the FDA had laid out for Decatur

1  and for Somerset.

2      So what we were doing was letting new management,

3  particular Doug Boothe and he had manufacturing and was head

4  of quality control come in and work with the management team

5  to address those issues and get to a proper standing with the

6  FDA.

7  Q    Which officers of the company are you aware of that

8  were responsible for the review of the Decatur warning or

9  corrective actions that would be taken after that?

10 A    Well, again, the corrective actions were the document

11 that was prepared by the TM management team and it was

12 something --

13 Q    And who would that be?

14 A    Well Doug Boothe being the CEO; Doug Boothe, the CEO.

15 Q    Now on the last line of 53432, the last heading, could

16 you read that for us?

17 A    Again in bold, starting with ad hoc, is that the one?

18 Q    Yes, sir.

19 A    Okay.

20      "Ad hoc group lenders feel (indiscernible) to exert

21 leverage today given their confidence in winning litigation

22 and to protect the positions against what they see as

23 continued collateral deterioration, i.e., cash burn."

24 Q    So would you agree, sir, that the allegations that

25 ended up resulting in the shareholder litigation was used by

1   the lenders in order to exert leverage against the debtors?

2   A     I actually think the shareholder litigation, obviously,

3   was outstanding.  I think the bigger concern to the lenders

4   which is why they also focused so much in regards to their

5   diligence and the standstill was to understand exactly what

6   were the allegations and how was the company addressing

7   those.

8        So that was their main concern was with their own

9   pharma specialist to understand were there corrective actions

10  in place and how would the company address those.

11            MR. GEORGE:  I'm sorry, Your Honor, just a moment.

12  BY MR. GEORGE:

13  Q     Did the bank force the retention of certain advisors?

14  A     Did the bank for retention of certain advisors.  And,

15  again you see a bank.  It's really an ad hoc group of

16  lenders, right, so it's not one (indiscernible) more

17  entities.  It's a number of funds.

18  Q     I'm just shortening it, sir.  I'm sorry.

19  A     Yeah, so we'll just call them the funds.

20        The funds themselves mentioned before retained

21  Greenhill and Gibson Dunn.  And I believe they may have also

22  asked the company to retain professionals as well.

23  Q     And what professionals did they ask the company to

24  retain?

25  A     My understanding was they asked the company to retain

1  professionals so the company went out and interviewed

2  professionals.

3  Q      What kind of professionals?

4  A      Like ourselves, investment bankers and then, obviously,

5  counsel was already in place for that at the time, so I

6  believe they meant for that as well.

7  Q      Has your company, PJT, ever worked with any of the

8  individual members of the ad hoc group?

9  A      We do a fair amount of creditor work, so the funds that

10 are in the ad hoc group are ones that we certainly -- whether

11 it was myself, but my colleagues have worked for in the past.

12 Q      Which members of the ad hoc group have the debtor

13 professionals previously worked for?  I mean PJT.

14 A      Yeah, again, I can't remember off the top of my head.

15 But I think about some of the larger ones.  Again, Eaton

16 Vance is certainly someone that we've worked for in the past.

17 But, again, there's a long list of lenders and I'm sure we've

18 worked for a number of them.

19 Q      And when you filed your application in this case, did

20 you list any of those ad hoc groups that you represented?

21 A      If they were part of the PII's which they were, it

22 would have been flagged in our retention app.

23 Q      You have any ongoing business with the ad hoc members?

24 A      I honestly don't know at the current time we do.

25 Q      So it's possible that you do but you just don't know

1  about it?

2  A     Correct.  Correct, sir.

3  Q     All right.

4  A     Just not to my knowledge, but. . .

5  Q     Are you aware of the bonus payments that were made to

6  management prior to the bankruptcy basically on the eve of

7  the bankruptcy?

8  A     I'm aware of compensation being paid, yes.

9  Q     And how about bonuses?

10 A     There were retention payments that were paid before the

11 bankruptcy in 2020 and they were bonuses in 2019 as part of

12 the or in the bonus plan for 2019, they were paid.

13 Q     If I were to tell you there was approximately between

14 $5- and $6 million dollars paid to senior management by way

15 of bonuses, would that shock you?

16 A     You broke up with the number.  Can you say it again,

17 please?

18 Q     Five to $6 million.

19 A     That would not shock me, no.

20 Q     Are you aware that when the debtor paid those amounts

21 that it caused it a default in its liquidity covenants with

22 the ad hoc group?

23 A     I'm not aware of that.

24 Q     Would you have advised the debtor to make a payment if

25 it were to cause a default under its loan documents for its

1  liquidity covenants?

2  A    Again, I'm not aware there actually was a liquidity

3  covenant issue.

4  Q    Okay.  I'm asking you.  If you were in a situation and

5  one of your clients asked to pay bonuses would you do it if

6  the result of that would be a breach of liquidity covenant?

7  A    Again if bonuses which were paid, I think I would just

8  talk to the parties that had the liquidity covenant and

9  address those head on.

10  Q    Upfront, before you paid it, right?

11  A    Sure.

12  Q    And if the debtors did do that, if they did pay those

13  bonuses in violation of their liquidity covenant would that

14  give you any pause at all?

15  A    Again, I was not part of those decisions to make those

16  payments.  But, again, I would -- the pause I would have

17  would be to ensure that the parties that, in this case, the

18  term lender, were made aware of where those payments were

19  going to and why.

20  Q    Did the bank call a default when the liquidity covenant

21  was violated?

22  A    I'm not aware they did.

23  Q    So maybe the bank wanted those officers to get those

24  bonuses and that's why they didn't call a default in light of

25  the liquidity covenant, right?

```
 1              MR. ARNAULT:  Objection, Your Honor.  Again, he's

 2   not said there was a liquidity default. This is assuming

 3   facts that are not in evidence.

 4              THE COURT:  Sustained.

 5   BY MR. GEORGE:

 6   Q    Can you go to the MDL Exhibit Number 23?

 7              THE COURT:  Before we move on, Mr. George, should

 8   we admit MDL Exhibit 32?

 9              MR. GEORGE:  I'm sorry, Judge?

10              THE COURT:  Should we admit Exhibit 32?

11              MR. GEORGE:  Yes, Your Honor.  I would move for

12   the admission of Number 32.

13              THE COURT:  Okay. Any objections?

14              MR. ARNAULT:  No objection, Your Honor.

15              THE COURT:  All right, it's admitted.

16         (MDL Exhibit Number 32, received into evidence)

17              MR. GEORGE:  I'm sorry, Judge, I should have done

18   that.

19              THE COURT:  That's okay.  All right so which one

20   are we moving onto now?

21              THE WITNESS:  Mr. George, is that 23?

22              MR. GEORGE:  Twenty-three.

23              THE WITNESS:  Twenty-three.

24   BY MR. GEORGE:

25   Q    I'm sorry for thumbing around, sir.  Give me a moment.
```

1   A      I was thumbing too.

2   Q      Have you ever seen this document that's marked as

3   Number 23?

4   A      Just to confirm, it starts with Policy Holder Notice?

5   Q      No, you're on the debtors' exhibits, sir.  I need you

6   to look at the MDL exhibits.

7   A      Sorry.

8   Q      No problem.

9   A      Too many binders.

10  Q      No problem.

11  A      Mr. George, I'm on number 23.

12  Q      So did you ever have any discussions with AlixPartners

13  about the liquidity covenant?

14  A      I'm sure whether myself or team would have had multiple

15  discussions with AlixPartners on the (indiscernible) forecast

16  and covenants and the like.

17  Q      Did you ever recall seeing this email between Mr. John

18  Balusi (ph) and Mark Buschmann, says on the bottom there?

19  You see it says cc Mark Buschmann, that's you, right?

20  A      That is me.

21  Q      And there's an allegation in here, a statement in here

22  that there is an issue with the liquidity covenant.  And if

23  you turn the page, there's another email and it's an exchange

24  and it says, "John, thanks for sending.  Could you please

25  help us better understand how much of the liquidity misses

1  are driven by and can you tell us what those three are?

2  A     Yeah, there's three items listed. The first DA which is

3  dehydrated alcohol.  The second is the KERP. And the third is

4  the accelerated 2020 bonus payment.

5  Q     So you'd agree that of the three things there included

6  in the discussion of whether there has, in fact, been a

7  liquidity violation, a violation of that covenant, that one

8  of the things that was discussed was the acceleration of

9  those 2020 bonus payments, right?

10  A     Again, sir, I'm not --

11         MR. ARNAULT:  Objection.  Same objection, Your

12  Honor.  This is -- it's mischaracterizing the documents as

13  liquidity misses and Mr. George keeps saying liquidity

14  violations or covenant defaults.  It's not what the document

15  says.

16         MR. GEORGE:  Your Honor, can he still answer the

17  question?

18         THE COURT:  I will overrule the objection to the

19  extent that you can answer the question, Mr. Buschmann, go

20  ahead and do so.

21  BY MR. GEORGE:

22  A     Sure.  So this email is getting to, again, we have a

23  thirteen-week cash flow forecast.  And, obviously, as we get

24  actuals, we compare that to it.  What this email is asking is

25  why is the company underperformed in a number of -- well in

1   the overall (indiscernible) forecast.  And the email that was

2   referenced in Mr. George's question was one from, I believe,

3   it was Matt Gill over at Greenhill.  And you wanted to

4   understand if how much of the various, the misses in the

5   forecast had to do with three items in the forecast.

6         And, again, so the first was dehydrated alcohol which

7   is a product that is very lumpy in terms of the payments that

8   we received.  We initially, you know, had hoped for more

9   proceeds up front but they ended up being deferred.  And then

10  how much of the (indiscernible) related to the KERP and the

11  bonus payments of 2020.

12  Q    Now, sir, if you look at the bottom email chain that

13  starts May 15, 2020 from John Balusi to you, it says, "Please

14  find an updated analysis attached."

15        This document was produced to us, but there was no

16  analysis.  Is there an analysis?

17  A    I don't remember if there was, in fact, an analysis.  I

18  just see how he addressed the question.

19  Q    Well, it says please find an updated analysis attached

20  or do you think he's referring to those two paragraphs

21  afterwards?

22  A    I'm taking the words as they're written which must

23  there must have been something attached, but I don't remember

24  seeing anything that was attached.

25  Q    And he appears to be saying can you -- as a result of

1   these payments that you're facing violations of a liquidity

2   covenant in the periods 4/5 to 4/12 and the second and third

3   weeks of that period.  Do you see that?

4           MR. ARNAULT:  Same objection, Your Honor.

5   Mischaracterizes.  Sorry, it mischaracterizes the evidence.

6   There's nothing about a liquidity violation.  Clearly, its in

7   the context of the DIP negotiations.

8           MR. GEORGE:  But, Your Honor, this is cross-

9   examination and the sentence says, looking both the receipts

10  and minimum liquidity analysis, our main problem.

11  BY MR. GEORGE:

12  Q    What problem was that, sir?

13  A    The main problem is you keep on reading is that there

14  is a trough that's coming up in the weeks of April 5th and

15  April 12th.  And the party, the Greenhill Group, was trying

16  to understand how much DIP would be needed and wanted to

17  understand these items better.

18       If you continue to read up the email you also see that

19  another issue that, again, that we had is just on the receipt

20  side, it's very hard to figure out when exactly you are

21  getting your receipts in the generic business because of the

22  chargebacks.

23       So basically, this whole chain of emails is going

24  through, them trying to figure out what is happening in the

25  cash and then how much cash is needed as part of the DIP,

1  part of the go forward rejection which then obviously could

2  be used for a DIP budget.  And, again, there's sort of four

3  things that were pointed out.  They want to understand better

4  how much the payments are that were as part of the KERP and

5  bonus payments.   They want to understand what is happening

6  with (indiscernible) alcohol. Again, they explain it in the

7  liquidity.

8      And then we also pointed out to folks that we continue

9  to have a gross net issue, like all generics, which is it's

10 very hard to figure out when exactly you get your receipts

11 based upon what the wholesalers do with their chargebacks.

12 Q    Okay.  So now at the bottom on paragraph two it says

13 and three KERP and accelerated bonus payments.  If you look

14 at that last line, it says our 1/17 and 1/31 forecast did not

15 reflect these updated plans but all forecast subsequently

16 did.  Why were they not included initially in the initial

17 forecast?

18 A    Again, we're not part of the production of the

19 forecast, but based upon the timing of these I would assume

20 that at that point in time, they were not yet agreed to or

21 there was no action being taken on them.  And then as soon as

22 they were, what he's pointing out is that, in fact, these

23 bonus payments had been in the forecast every week since. So

24 when they're asking about this in May, it is quite clear that

25 they had the answer already.

1  Q    When you say they, you're talking about the ad hoc

2  group?

3  A    I'm talking about the ad hoc group financial advisors,

4  just to be fully clear.

5  Q    Did the debtor as part of the standstill get a waiver

6  of the liquidity covenant?

7  A    The standstill, so there was -- I'm not aware of a

8  liquidity covenant that we're talking about here that was

9  part of the standstill.

10         MR. GEORGE:  Your Honor, I move for admission of

11  this document, 23, MDL-23.

12            THE COURT:  Any objection?

13            MR. ARNAULT:  No objection, Your Honor.

14            THE COURT:  Okay.  It's admitted.

15       (MDL's Exhibit Number 23, received into evidence)

16            MR. GEORGE:  Thank you, Judge.

17  BY MR. GEORGE:

18  Q    So, Mr. Buschmann, you understand that as soon as this

19  transaction gets consummated, that all the debtors' potential

20  claims against these officers and directors get transferred

21  to the bank to basically be killed, you understand that?

22  A    Again, what I understand is that the employees are

23  being moved over into the new company and that new Akorn will

24  continue going on at that point in time.

25  Q    Well that doesn't answer my question, sir.  Let me ask

1  it to you again.  Try harder to listen to what I'm asking

2  you.

3        You understand, don't you, that pursuant to the APA as

4  soon as this transaction closes, the bank gets the assignment

5  of all the claims against any of the debtors' senior

6  management who may have engaged in wrongdoing and they

7  basically satisfy them or kill them, right?

8  A    Again, they may be part of the assumption, again, the

9  satisfying killing to them, obviously.

10  Q    Well what do you mean part of the assumption?  That's

11  the second time you've used that phrase.  Are you suggesting

12  that these people have employment contracts that are being

13  assumed?

14  A    What I'm saying is that the employees are assumed to be

15  employees of the go forward Akorn.  I'm not using them in the

16  legal bankruptcy sense.  I'm using it in what I am assuming.

17  Q    So you have an understanding about whether the bank

18  intends to prosecute those claims?

19  A    I'm not aware of that.

20          MR. GEORGE:  One second, Your Honor.  I'm sorry.

21          THE COURT:  Take your time, Mr. George.

22  BY MR. GEORGE:

23  Q    When you suggested in Exhibit 32 that if the debtor

24  didn't reach an agreement that it might take an aggressive

25  posture towards management, what kind of posture do you think

1    they could have taken?

2    A      You said 32 again?

3    Q      Yes.

4    A      Again, I'm sorry; where are you on this page?

5    Q      The same sentence we were talking about before in

6    53434, on the left where it says Risk of not reaching an

7    agreement.  I assume that means with the ad hoc group, right?

8    A      You're at 53434?

9    Q      Yes, sir.

10   A      We haven't been to this page yet, sir. Sorry.

11   Q      MDL-32.

12   A      I get that.  We haven't been to this page.  So page 4.

13   Where are you on this page?

14   Q      On the top left.  I asked you, what kind of aggressive

15   postures did you envision that the bank might take if

16   management didn't agree to this standstill?

17   A      Again, this is, obviously, when if they were to call a

18   default and we were, a trial to have occurred. Again, as you

19   can imagine at that point in time, the lenders will have

20   viewed that, you know, have, in fact, say waste resources and

21   the like instead of entering into a standstill.  And so,

22   obviously, their view of management, the board and the like

23   was a negative because, again, they chose to litigate versus

24   come to a standstill which really meant to see if you have

25   information and to provide an answer for the term loan guys.

1  Q      And you understand that the borrower is Akorn, not he

2  officers, right?

3  A      Of course.

4  Q      And you understand that as a corporation that an entity

5  can only take actions for its officers, right?

6  A      Correct.

7  Q      And wouldn't one of the aggressive (indiscernible) be

8  that the bank could ask the debtor to remove officers?

9  A      I guess I would say it differently, perhaps that if the

10 bank could take control of the company, through a Chapter 11,

11 and then decide what it wants to do, vis-à-vis, the officers.

12 Q      In other words, (indiscernible) management from

13 operation?

14 A      That's still there.  Their option today as well.

15 Q      And if at the time you had known that the officers were

16 the subject of allegations of security fraud, of antitrust

17 Lanham Act violations by anti-competitive behavior, would

18 that have influenced your decision to have a discussion with

19 this board about whether they should make decisions about who

20 operates the company then?

21 A      Again, just to be clear, a lot of those things you have

22 mentioned are not litigated.  They're not -- you're assuming

23 these are all factual statements.  They're not. And remember

24 that a lot of the management team here was actually not even

25 there at the company at the time of some of those

1   (indiscernible).

2   Q     And when you say a lot of the management team, isn't it

3   true that only Mr. Boothe wasn't there?

4   A     Well Mr. Boothe and then he brought in a number of

5   gentlemen below him to help with the operation.

6   Q     But are they officers?

7   A     They should be, yes.

8   Q     And how many people did he bring with him?

9   A     If I remember correctly, there were two senior members

10  in regards to quality control and operations.

11  Q     Now when you were conducting the sale, did you take any

12  efforts to make sure that if individuals at the company got

13  contacts from potential purchasers or investors that they

14  were all funneled through you?

15  A     Yes, that was the instruction they received.

16  Q     Do you know a gentleman at the company --

17              MR. GEORGE:  Sorry, Your Honor.

18  BY MR. GEORGE:

19  Q     Named Brett Novak?

20  A     I'm sorry; repeat that again, please?

21  Q     Brett Novak?

22  A     No, I do not.

23              MR. GEORGE:  Your Honor, can we hand the -- we

24  received the document early this morning which we delivered

25  to chambers.  It has been marked, but we'll mark it as MDL-

1  43.  It's a rebuttal document.

2          THE COURT:  Give me a minute to find it.

3  BY MR. GEORGE:

4  Q    You have that, sir, in front of you, that recent

5  document?

6  A    Yes, let me get it.

7          THE COURT:  Mr. George, I don't have the document,

8  so give me a moment to see if it's come into chambers.

9          MR. GEORGE:  Oh, I'm sorry, George.

10          THE COURT:  Give me one minute.

11      (Pause)

12  BY MR. GEORGE:

13  A    This was emails earlier, is that the document?

14  Q    Hold on a second.  Hold on a second.

15          THE COURT:  Mr. George, I do not have a copy of

16  the document.  How was it sent?

17          MR. GEORGE:  Can we email it to you right now,

18  Judge.  I'm sorry.  I thought we had sent it this morning.

19          THE COURT:  Sure, you can email it to my courtroom

20  deputy.

21          MR. GEORGE:  Okay.

22          THE COURT:  Can we move on and come back to this

23  or do you want to take a break?

24          MR. GEORGE:  Your Honor, could we take a five-

25  minute break?

```
 1              THE COURT:  Sure.  Okay.  We'll take a five-minute
 2   break.  Thank you.
 3              MR. GEORGE:  Thank you, Judge.
 4        (Recess at 1:29 p.m.)
 5        (Proceedings resume at 1:36 p.m.)
 6              THE COURT:  Great.  Thank you.
 7              Mr. George, I did receive the document so why
 8   don't we proceed.
 9              MR. GEORGE:  Thank you, Your Honor.
10              We'll mark this as MDL-43.
11   BY MR. GEORGE:
12   Q    Mr. Buschmann, have you ever seen this document?
13   A    I saw it when Mr. Arnault sent it to me this morning.
14   Q    And I asked you who Brett Novak is.  You don't know who
15   that is?
16   A    I see from the bottom here that he is a senior vice
17   president in commercial operations, but I've never meant him.
18   Q    You've never met him before?
19   A    No, never met him.
20   Q    And do you know is he one of the people that came over
21   with Mr. Boothe?
22   A    I do not know.
23   Q    If you look at the bottom of this letter, he apparently
24   has gotten a contact from someone about asset divestiture, do
25   you see that?
```

1    A      Yes, sir, I do.

2    Q      And so it would be fair to say if you never met Mr.

3    Novak he didn't reveal to you that this Mr. Rosenthal that

4    inquired about an opportunity to potentially buy the company

5    or assets from the company, right?

6    A      Again, I'm not aware of Mr. Novak and email so it would

7    not have been sent to me.  I don't know if it was sent to

8    anybody on my team, but it's not one that I am aware of.

9    Q      And would it be fair to say that the ad hoc group is

10   identified as a buyer by June 17, 2020?

11   A      Yes.

12   Q      And so, Mr. Novak if he was referring to the identified

13   buyer he's talking about the ad hoc group, right?

14   A      Let me just read it one second.

15          Yeah that would be my assumption as well.

16   Q      And you had no idea who Mr. Rosenthal was or whether he

17   would have been in a position to bid, right?

18   A      I've never heard of Mr. Rosenthal.

19   Q      And at the end, he says if anything changes, I'll let

20   you know which, to you, doesn't that sound like he's saying

21   this thing is already done.  Why bother?

22   A      Again, I don't know Mr. Novak.  I don't know what he's

23   getting in his email.  I can see the words on the page.  It

24   sounds like he is he's communicating with Mr. Rosenthal about

25   the sale.

1   Q     And that's directly in violation of what you said were

2   your instructions to the company that all of these offers be

3   vetted through you, right?

4   A     Again we have bidding procedures, so people know who

5   they should be reaching out to which is us and we had asked

6   and the company had, you know, every inquirer they got

7   they've been forwarding it to us.  Again, I cannot say Mr.

8   Novak's conservations with Mr. Rosenthal made it to our team

9   or not.  I don't know.

10  Q     But you're clear that your expressions to the debtors'

11  management was that if they got an offer it was to give it to

12  you?

13  A     Again, everybody has been incentivized to maximize

14  value and so we were trying to run down all potential leads

15  which is why we have the bidding procedures in place to do

16  exactly that.  Get folks to come to a (indiscernible).

17  Q     Did Mr. Portwood ever mention to you that anybody in

18  his management team was contacted by Mr. Rosenthal?

19  A     I'm sorry.  You turned your head when you were

20  speaking.  Mr. who?

21  Q     Oh I'm sorry, sir.  I'm sorry.

22        Did Mr. Portwood ever tell you that anybody by the name

23  of Mr. Rosenthal reached out to him?

24  A     Again, I'm unaware of this email so --

25  Q     That's not what I'm asking you, sir.  I'm asking you

1    whether --

2    A     No.  Yeah, I've never been contacted by anybody from

3    management in regards to this email.

4    Q     Now, the releases that are being provided by the bank

5    to the officers and directors, did anybody ever take an

6    effort to value those claims?

7              THE COURT:  Hold on, before you answer the

8    question.  Mr. George, can you be more specific?  Are you

9    talking about the releases under the plan?

10             MR. GEORGE:  I'm sorry, Your Honor.

11             THE COURT:  Just so I can follow along, the

12   testimony.  What releases are you referring to?  Those under

13   the plan?

14             MR. GEORGE:  Yes, Judge.  The releases that

15   happened pursuant to the sale because once the sale happens,

16   the bank is releasing those claims.

17             THE COURT:  Okay. So we're talking about the --

18             MR. GEORGE:  There's a separate release under the

19   plan.

20             THE COURT:  And so, is your question directed to

21   the plan releases or was your question directed about the

22   transferred causes of action?

23             MR. GEORGE:  It's really about causes of action,

24   Judge.

25             THE COURT:  The transferred causes of action to

1   the purchaser?

2          MR. GEORGE:  Yes, Judge.

3          THE COURT:  Okay.

4          MR. GEORGE:  I'm sorry.  I wasn't articulating.  I

5   apologize.

6          THE COURT:  That's okay. So, I'm sorry.  Could you

7   say your question again?

8   BY MR. GEORGE:

9   Q    The causes of actions that are being transferred

10  pursuant to this sale, did anybody ever take any effort to

11  value them?

12  A    Yes.  PJT did not.  We did not value those.  Obviously,

13  there's value being provided by the creditor, by the lenders,

14  above and beyond the credit bid, but there was no independent

15  valuation of those actions by us.

16  Q    Do you recall any discussions with the bank where the

17  bank sat down and said that if they didn't get those

18  transferred claims, they wouldn't buy?

19  A    I don't recall any such conversation.

20  Q    So there was never a discussion between the ad hoc

21  group and the debtor to the effect that if these transferred

22  claims didn't get assigned over to them, there was no deal,

23  was there?

24  A    Again, not that to my recollection that I was involved

25  with. Again, there's, obviously, many parties involved in

1   this deal between the lawyers but that was never referenced

2   to me by the Greenhill Group.

3   Q      Okay.  Who was the first one to discuss or propose the

4   potential to transfer those causes of action, the debtor or

5   the bank?

6   A      I actually don't recall.

7   Q      Do you ever recall sitting in a meeting with the bank

8   where these claims came up?

9   A      I do not.

10  Q      How was it that that provision came to the existence in

11  the APA?  You said you didn't negotiate it.  Who did?

12  A      I don't know.

13  Q      Did Mr. Portwood and Mr. Gamcorto, did they have their

14  own attorneys during this time, do you know?

15  A      I do not know if they do or not.

16  Q      Do you ever recall sitting in any meetings with the

17  attorneys for any of the individual officers, directors or

18  upper management where those releases were discussed?

19  A      I do not --

20  Q      I'm sorry; where those transfer causes were discussed?

21  A      Yes, same answer.  I do not.

22  Q      And you said you didn't value those transfer causes of

23  action.  Do you know that anybody else did?

24  A      Well yeah, I would say this in terms of the overall

25  plan, obviously, the UCC goes into their discovery mode, if

1  you will, and investigates all causes of action.  Again, they

2  came to a settlement of $5 million dollars, so presumably as

3  part of their work they looked at, you know, all those, as

4  part of the plan really, all causes of action.

5  Q    Sir, I wasn't asking whether the UCC reviewed the

6  viability of them.  I'm asking whether anybody valued them.

7  In other words, a potential claim, for example, sir, excuse

8  me.  A potential claim, for example, sir, against one of the

9  directors by virtue of the fact that you may have committed

10  or alleged to have commit an antitrust act.  Did anybody

11  invest whether that claim had value?

12  A    I'm not aware of that.

13  Q    And do you know of any other professional in the case

14  on the debtors' side who valued that potential claim?

15  A    I'm not aware of that.

16          MR. GEORGE:  Your Honor, could we move the

17  admission of MDL-43?

18          THE COURT:  Are there any objections to its

19  admission?

20          MR. ARNAULT:  No objection, Your Honor.

21          THE COURT:  Okay. It's admitted.

22      (MDL's Exhibit Number 43, received into evidence)

23          MR. GEORGE:  Thank you, Judge

24          THE COURT:  You're welcome.

25  BY MR. GEORGE:

1  Q      Can you go to MDL Number 8, please?

2  A      Eight?

3  Q      Yes, sir.  You have that, sir?

4  A      One second.

5  Q      Take your time.

6  A      MDL Number 8, titled, Overview Presentation?

7  Q      Yes, sir.

8         Were you involved at all in the creation of this

9  document?

10 A      Yes, this is, as I mentioned before, the confidential

11 information memorandum. Again, it was prepared by my team,

12 but certainly I reviewed it and was part of the overall

13 creation.

14 Q      Okay.  Sir, could you go to page 16 of that document?

15 A      I'm there, yep.

16 Q      Okay.  It says, Where Akorn is Going, across the top;

17 do you see that?

18 A      Yes, sir, I do.

19 Q      And can you explain this EBITDA calculation, how it was

20 performed?

21 A      Sure.  It's really an output of the company's business

22 plan, so what you're seeing, what really is the dots as

23 opposed to the bar is the company's projected level of EBITDA

24 at the beginning of really toward the end of 2019.  And,

25 again, this is obviously the traditional definition of

1  EBITDA, plus adding back what we would consider to be one

2  time adjustments related to the FDA investigation and I

3  believe the India operations which we're undergoing the sale

4  process (indiscernible).

5  Q     And you agree that as of 2020F, I guess is the fiscal

6  year?

7  A     Yes. The F actually means forecast where E is

8  estimated, so this was prepared at a time when 2019 was not

9  yet complete and 2020 was a forecasted year.

10 Q     And as for 2020, is the debtor on track to meet those

11 projected revenue and EBITDA numbers?

12 A     No, sadly, we are not.

13 Q     How far off was the debtor from this forecast?

14 A     The last we created a four-plus (indiscernible), which

15 is some months of actual eight months of projected.  At that

16 point in time, I believe the EBITDA had dropped down to 133.

17 And then given poor performance over the last two, three

18 months it will be below 133.  It's still being worked on by

19 management, a revised version of this, but our expectation is

20 it will be below 133.

21 Q     And can you tell the court what is the projected

22 revenue for 2024?

23 A     For 2024, the projected revenue is $939 million.

24 Q     And in this document, it makes reference to thirty-four

25 pending ANDA pharmaceuticals. Do you know what an ANDA

1  pharmaceutical is?

2  A     Yes, I do.

3  Q     Would it be fair to say that that's a pharmaceutical

4  that doesn't have to go through the extensive FDA testing

5  procedures that these provide some kind of shortened FDA

6  approval process?

7  A     It is the FDA approval process for a generic drug.

8  Q     All generic drugs go under that ANDA FDA --

9  A     Yeah, it's abbreviated ANDA, so that's the drug that we

10 bring out are primarily under these ANDAs.

11 Q     And what does the company have with respect to pending

12 ANDAs and explain to the court how much combined addressable

13 market value that creates for this entity?  They fund these

14 pending ANDAs that they had at the time that you did this

15 document?

16 A     Again, I don't have the backup behind me, maybe in this

17 file or different one, but the company --

18 Q     Go to page 11.

19 A     Okay.  Page 11.  Okay.  I'm on page 11.

20 Q     And do you see it says strong product pipeline and R&D

21 capabilities, do you see that?

22 A     Yes, I do.

23 Q     And can you explain what you meant by those particular

24 entries?  First read them, so that we can understand what

25 they say and mean and then we'll go through each one.

1   A     Sure.  So the first bullet says, focused pipeline

2   consisting of 34 files pending ANDAs with over $5 billion

3   dollar of combined addressable market value.

4       The second bullet says, 24 drugs in development with

5   approximately $3.5 billion of combined addressable market

6   value.

7   Q     What does that mean addressable market value?

8   A     So that means that the, the generic drugs. So they

9   replaced branded drugs. So, today, the branded drugs that

10  we're looking a would have an overall market value, meaning

11  the revenues in the market of roughly, I guess, it's $5

12  billion dollars or $3.5 billion dollars for all those thirty-

13  four.  Again, that's as the brand.  Obviously, when it gets

14  genericized the value of the market gets (indiscernible)

15  rated meaningfully because it's obviously a cheaper drug

16  that's being provided.

17  Q     So what you're saying is, there's 34 ANDAs with $5

18  million in market share, right? And there's twenty-four drugs

19  in development with $3.5 billion in market share.

20  A     Not quite correct.  There's thirty-four ANDAs where the

21  existing brand drug, existing brand drug, not our drug, but

22  the existing brand drug it has the $5 billion dollar

23  addressable market value.  When it becomes genericized that

24  gets (indiscernible) down materially and also depends on if

25  you're the first to file, the second to file; from that point

1   on the amount of revenue decrease depending upon what you can

2   get in the market.

3   Q      So what you're basically saying is that there's a $5

4   billion dollar market that these pending ANDA drugs fit into?

5   A      Correct which then gets converted into revenues for us

6   based upon management's view of what the genericized market

7   would be actually worth which is materially less than the $5

8   billion (indiscernible).

9   Q      Can you go to the next page, 12?

10  A      Sure.

11  Q      Based on this next page, sir, that you have page 12,

12  you have a number of boxes across the top, 2012 to 2016 gross

13  days, 2017 to '18 business headwinds; you see that?   What

14  happens in 2019?

15  A      2019 the box is called stabilization which was --

16  Q      And how about 2020 and how about 2020 going forward?

17  A      The future of the company 2020 plus, the company is

18  trying to transform itself and return to growth.

19  Q      Are you aware that the debtors made a CARES Act

20  application?

21  A      Yes, sir, I am.

22  Q      And are you aware that the debtors requested the

23  potential approval of $100 million dollar NOL?

24  A      Yeah, I am or approximately $34 million dollars of

25  proceeds, yes.

1  Q     And that's going to the purchaser, right?

2  A     So that is going to go into the estate.  Again, it is

3  something that is related the old NOLs and it goes into the

4  estate.  It's cash that we have that is going to be part of

5  the cash balance that we have.

6  Q     Are you aware there are more than one refund right, are

7  you talking about the CARES Act refund?

8  A     I'm talking about the CARES Act tax refund.

9  Q     And you're saying that that stays with the bankruptcy

10 estate?

11 A     I'm saying that that goes into our cash balance that,

12 again, is part of what can be addressed in terms of the DIP

13 and everything else.  I think we're trying to leave behind

14 the $35 million dollars.  And as I mentioned before, when we

15 look at the various components of this that CARES Act amount

16 is what is in effect, you know, going to be a part of the

17 cash balance.

18 Q     Right. So, I'm talking the cash that's in the bank

19 account today which I think is about $28 million dollars as

20 of July 31st.  They get this $34 million dollar refund,

21 right?

22 A     Yep.

23 Q     And they also get $10 million dollars that the debtor

24 just upstreamed from its sale of the (indiscernible)

25 location, right?

1    A       I thought $7 million dollars, but correct.

2    Q       Seven million.  Okay.

3            Did the debtor ever consider trying to sell that NOL

4    with the shell, just sell the assets?

5    A       Again that was not part of this transaction with the

6    (indiscernible), so it was. . .

7    Q       So the answer is no?

8    A       Correct.

9    Q       Okay.  Can you go to MDL Exhibit Number 5?

10   A       Title, Transmission log?

11   Q       I'm really, that's public document was received by us.

12   I'm really looking at the -- that's the right page, sir.  I'm

13   sorry.  I wasn't trying to be --

14   A       Yeah.  Just make sure I'm at the right place.

15   Q       I'm really trying to look at the second document.  The

16   first appears to be a transmission by the debtor to the

17   Internal Revenue Service of this CARES Act NOL.  Were you

18   involved with creating the document underlying this request?

19   In other words, the form that's attached, the 1139?

20   A       No, sir.  We were not.

21   Q       Have you ever seen this document before?  You mentioned

22   $30 million dollars so I assume you have, right?

23   A       I have not seen this document.  I have in the cash flow

24   forecast seen an estimate of $34 million dollars coming in.

25   Q       Why does it matter to the debtors whether these

1  officers or directors get these causes of actions transferred

2  to the ad hoc group and satisfied?

3  A     Could you repeat the question, please?

4  Q     Yeah what benefit is there to the debtor by having

5  these causes of actions transferred to the ad hoc group and

6  satisfied?

7  A     Well I think the real question is for the ad hoc group.

8  They want to make sure they have a management team and so,

9  the management is going over to run Newco.  So it's really a

10 -- it's a question for them to make sure that they have a

11 management team to run the company.

12 Q     So it's really only a benefit to the purchaser?

13 A     It certainly is a benefit to the purchaser.

14 Q     And what I'm asking you is what benefit is there to the

15 debtor?

16 A     Again, the purchaser is paying a lot for this company

17 and part of it is having a management team to run it properly

18 to actually recoup that they have into it.

19 Q     Do you acknowledge, sir, that the potential claims

20 against these officers and directors raises a potential

21 conflict of interest between them and the debtor?

22 A     I'm not aware of that, no.

23 Q     No.  Did the debtor every try to hire a conflict

24 counselor to try to determine whether there are issues

25 between it and the officers, to your knowledge?

1   A      Not to my knowledge, no.

2   Q      Was there any ever -- was there any effort to try to

3   sell the individual Akorn components in a non-consolidated

4   way?

5   A      Again as part of the Chapter 11 process, we were open

6   to bids for the parts and, hopefully, you know, we would have

7   gotten bids for the parts that could been lumped together to

8   buy all the assets.

9   Q      Right, sir, I'm asking you whether you made any attempt

10  to actually market them separately as opposed to only

11  marketing them holistically on a consolidated basis?

12  A      Well, again, people saw the various pieces of the

13  business and they came to us and said we are willing to parts

14  of it.  So the bidding, quite clear, that we are open to bids

15  for all or parts.

16           MR. GEORGE:  One moment, Your Honor.  I'm sorry.

17  BY MR. GEORGE:

18  Q      Sir, could you go to MDL Number 33?

19           (Interruption by AT&T message)

20           THE COURT:  Okay.  To the extent that you are on

21  CourtCall can you please mute your phone if you're not

22  addressing the court?  Thank you.

23           Okay. Exhibit 33?

24           MR. GEORGE:  Yes, Judge.

25           THE COURT:  Okay.

1  BY MR. GEORGE:

2  A     I'm there as well.

3  Q     Can you tell us what this document was?

4  A     This appears to be a document from May 2019 whereby we

5  walked other management or the board or both through a number

6  of strategic alternatives.  If you remember, we started the

7  financing process in August.  This was before that to talk

8  about, one, potentially refinancing our existing ABL that at

9  the time was expiring, go through some of the initial

10 outreach there and go through some considerations on the

11 (indiscernible) process.

12 Q     So if you go to page 2 of your document.

13 A     I'm there.

14 Q     At this time, you had a belief that the company had

15 sufficient liquidity to make it through the entire time of

16 the brief financing process needed for the term loan, right,

17 without requiring you to draw on the ABL.

18 A     That's correct, sir.

19 Q     And did that turn out to be the case?

20 A     It ended up that before filing, we did need a DIP to

21 get through the filing.

22 Q     You got a DIP after you filed, right?

23 A     As part of the filing, but we were running low on cash

24 heading into the Chapter 11 which required us to get a DIP as

25 part of the filing.  So, we made it through up until that

1  point and needed some financing to finish it up.

2  Q     And are you aware that as of the end of June that the

3  debtor had $58 million dollars in its bank account?

4  A     I've not looked at the June balance, but we know that

5  they've had -- yeah, they had cash certainly that's been

6  declining ever since, but yes, they had a decent amount of

7  cash.

8  Q     And you'd agree, wouldn't you, that Akorn is the

9  predominant revenue producer in what you're considering

10  consolidated entity?

11  A     Yes, I mean Akorn is the -- Akorn as the whole is the

12  party that is the business, if you will.

13  Q     Okay.  When you go to the bottom of number 2, at the

14  bottom it says, well M&A is not the primary path.  The

15  company and its advisors will continue to evaluate

16  transactions that provide opportunities for deleverage.  See

17  that?

18  A     Yes.

19  Q     And so, why was M&A not the primary path back in 2019

20  when you -- I'm sorry.

21  A     Yes, at this point -- yes, sorry. At this point, we

22  felt like the first transaction to pursue was the financing

23  transaction that would leave existing equity in place and as

24  we sort of say here, refinance is their existing term loan.

25  Q     Now there's a statement in here that there are dormant

1   ANDAs that will continue to be considered as a way to

2   delever, do you see that?

3   A      I do.

4   Q      And are those dormant ANDAs that are separate from the

5   fifty that you referenced earlier in your testimony?

6   A      You mean the fifty some odd that we talked about as

7   being the future of the business?

8   Q      Yes, sir.

9   A      These are dormant so they're not actively being used as

10  part of the revenue.

11  Q      Okay. So they're not part of the ones that you

12  mentioned in your earlier testimony?

13  A      Correct. Correct.

14  Q      But what you're saying here is that these ANDAs can

15  somehow be restarted, right in order to generate revenue to

16  delever the company, right?

17  A      What we're saying here is that the company was looking

18  at ways to look at the portfolio of ANDAs and see if there

19  are any incremental dollars achieved from them.

20  Q      Can we go to page 8 of that document, sir?

21  A      I'm there.

22  Q      What does the term leakage mean?

23  A      Leakage where you seeing that?

24  Q      Well there's a couple places there, but I would start

25  with the Fresenius and securities litigation.

1   A       I see it there.  Perfect.

2           So the (indiscernible) that says, the company limited

3   by standstill, liquidity in willingness to pay leakage to

4   junior creditors as part of the standstill. Again, the term

5   loan lenders are the top of the capital structure, right; the

6   only capital structure has a lien on assets.  As part of the

7   standstill and certainly just generally the lenders were

8   concerned that there would be value going to parties that

9   were junior in the order of the absolute priority to them.

10  Obviously, the cash that goes out, the cash that they were

11  hoping would be used to refinance them.

12  Q    And the debtors consider any payment to Fresenius prove

13  of form and the NDLs to be leakage, right?

14  A    I would say that any payments that were made that are

15  junior to the term loan would be considered by a lender to be

16  leakage.

17  Q    Right.  And so, at the onset of this discussion, the

18  May 31, 2019 had the ad hoc lenders indicated to you that

19  they would be insisting on these leakage provisions to make

20  sure that nobody junior to them got a nickel out of it?

21  A    I don't know.  Maybe they did. Certainly, not.  But

22  part of the standstill, we were buttoning down a number of

23  baskets and the like things that could be used in the

24  collateral package. And I do believe there was one provision,

25  the standstill, that talked about these litigation items.

1    Again, these are things that we were constantly keeping

2  in contact with the term loan lenders that (indiscernible)

3  on.  And had there been a settlement or the like, certainly

4  it would have been something we would have discussed with

5  them because it would have been payments that would go out

6  below them to ensure that they were comfortable with that.

7  Q    And so what did the debtor and the ad hoc committee do

8  in order to ensure there was no leakage?

9  A    Well, again, this really never came to pass meaning on

10 the Fresenius side there were conversations that were ongoing

11 which did not include PJT, never amounted to a settlement or

12 a judgment by anybody.  So, (indiscernible) Fresenius, there

13 really was nothing that could amount to leakage during this

14 time.

15 Q    Sir, with all due respect that's not the question I

16 asked you.  Would you like me to repeat it?

17 A    Could you repeat the question then?

18 Q    Yes.  This term leakage that you have used in this

19 document, I'm trying to ask you a pointed question.

20    Let me rephrase it.

21 A    That would be great.

22 Q    In this document you say that the lenders would insist

23 on guardrails to avoid leakage, right?

24 A    Correct.

25 Q    Then your last answer was, well, leakage never occurred

1  because these things never happened.  That wasn't the

2  question that I was trying to ask you.

3       What I'm asking you is what steps did the debtor and

4  the ad hoc group take in order to ensure that there was no

5  leakage?

6  A    Again, it was part of the standstill.  There was a

7  general tightening down of baskets that was demanded that

8  could result in (indiscernible).

9  Q    Hid money going to anybody other than the bank?

10 A    The sheer amounts of dollars that were going to parties

11 that were junior, correct.

12 Q    And as part of the standstill agreement there was a

13 firm-up of the bank liens, right?

14 A    Correct.

15 Q    And two pieces of real estate that the debtor lists

16 that in its schedules are potentially worth $5 million

17 dollars each then became part of the bank's collateral,

18 right?

19 A    I believe that was viewed as being less than $5 million

20 dollars.

21 Q    What?  I'm sorry, sir.

22 A    Less than $5 million dollars.

23 Q    Less than 5 million.  So, somewhere between zero and 5

24 million?

25 A    Correct.

1    Q      Can you go to Page 10?

2    A      I am there.

3    Q      And you have an understanding of what median peer

4    leverage is for the debtor and the industry group that it's a

5    part of, right?

6    A      Correct.  Correct.  I think (indiscernible), but, yes,

7    I do.

8    Q      And the median peer leverage is 4.0, right?

9    A      Let me make sure I reacquaint myself with the document.

10   One second please.

11   Q      Go to Page 10.

12   A      I'm there.  Just a second.

13          Okay.  Correct.  I'm there.

14   Q      Okay.  And what do you project would be the leverage in

15   2020 based on this document?

16   A      In 2020 it would be 2.4 times.

17   Q      Which is almost half of what the industry average or

18   median is for the debtor's peers, right?

19   A      Correct.  I wish we had achieved that.

20   Q      So, let's go to the next page, Page 11.

21   A      Okay.

22   Q      And you see there at the bottom you have net leverage?

23   A      Yes.

24   Q      And in 2019 the leverage was 9.5?

25   A      Correct.

1   Q      And the year of --

2   A      You're in the third quarter, right?  Third quarter

3   2019.

4   Q      Oh, I'm sorry. And at the end of 2019 it falls to 5.5,

5   right?

6   A      Correct.

7   Q      And do you know what it ended up being on an annualized

8   basis for 2019?

9   A      The actual EBITDA was roughly 118 million.  So, it

10  would have been slightly below this.  It depends on the cash,

11  but we're not far off from the 127 here.

12  Q      And how about on the quarter four annualized?

13  A      I don't remember the exact fourth quarter annualized

14  EBITDA.

15  Q      But you're projecting at the end of the year, fiscal

16  year 2020, the leverage will be reduced at 2.8, right?

17  A      That was the projection as of May.  It did not come to

18  pass.

19  Q      Okay.  Do you know what the net leverage is today?

20  A      I don't because we're in the process of adjusting our

21  business plan.  So, I don't know where 2020 is going to be.

22          MR. GEORGE:  Your Honor, I would like to move in

23  Exhibit No. 33, 5 and 8, Your Honor.

24          THE COURT:  Okay.  Any objection?

25          MR. ARNAULT:  No objection, Your Honor.

```
 1              THE COURT:  Okay.  Those documents are admitted.
 2         (MDL Exhibits 33, 5, and 8, admitted)
 3              MR. GEORGE:  Thank you, Judge.
 4              THE COURT:  You're welcome.
 5         (Pause in record)
 6   BY MR. GEORGE:
 7   Q     Sir, could you move to MDL No. 34?
 8   A     Yes.  Dated September 2nd?
 9   Q     Yes, 2019.
10   A     Yes.
11   Q     Did you create this document?
12   A     Again, it was created by my team under my supervision.
13   Q     So, in this document you have a number of probabilities
14   on the right hand side.  Do you see that on Page 3 of
15   Document MDL 34?
16   A     Yes, correct.
17   Q     At debtor's production 0005900.
18   A     Yes, I'm there.
19   Q     And what were you projecting as the possibility of a
20   Chapter 11 filing under this cumulated probability document?
21   A     It was somewhere in the range north of 90 percent.
22   Q     So, when I asked you earlier whether you thought that
23   there was a high likelihood at the beginning of your
24   engagement of a Chapter 11 filing at least of December 9th,
25   2019 you thought that it was almost certain, right?
```

1  A     That's a year after we started after our engagement.

2  We started in January.

3  Q     Understood.  Understood.  But certainly, as of that

4  date?

5  A     As of that date this was, as I mentioned before, the

6  pivot for moving to a sales process.  We were still hoping,

7  frankly, that we could do an out-of-court sale, but it all

8  depended upon some of the litigation that was out there, but

9  the likelihood here, as you see, was that we would end up in

10 an M&A process and would be using Chapter 11.

11             MR. GEORGE:  Your Honor, I'd move to admit MDL 34.

12             THE COURT:  Any objection?

13             MR. ARNAULT:  No objection, Your Honor.

14             THE COURT:  It's admitted.

15        (MDL Exhibit 34, admitted)

16 BY MR. GEORGE:

17 Q     Did the debtor ever have any discussions with the ad

18 hoc group about them providing junior capital?

19 A     Junior capital in what sense?

20 Q     Either an ABL or an investment, you know, in the

21 company?

22 A     They were owed $850 million dollars and were trying to

23 get paid off.  They were not trying to put more money into

24 it.

25 Q     Okay.  Was there ever a discussion with the company

1   about the bank potentially turning its debt into equity?

2   A    It was always a possibility that we had laid out which

3   was if it was impossible to sell the company to a third-party

4   or do a refinancing that there would be a balance sheet

5   restructuring which is, basically, a conversion of the term

6   loan into new debt and new equity.

7   Q    Were some of the lenders concerned about the continuing

8   FDA investigation?

9   A    Again, we spoke with the advisors.  So, I can't speak

10  for the lenders.

11  Q    You don't know?

12  A    I don't know what each of the lenders were thinking.

13  Q    Was Mr. Kapoor one of the persons that was accused of

14  the FDA irregularity failures at Akorn?

15  A    No.  I believe Mr. Kapoor was a shareholder who had

16  issues in regards to another company that he was -- he only

17  was a shareholder in Akorn.  He was -- he ran a company

18  called Insys.

19  Q    What were the issues with Mr. Kapoor?

20  A    I don't remember exactly, but he was investigated in

21  regards to his actions at Insys.

22  Q    And what position did Mr. Kapoor have at the company?

23  A    He did not.  He was a shareholder.

24         MR. GEORGE:  I'm sorry, Your Honor.  I'm moving

25  here.

1  BY MR. GEORGE:

2  Q    Could you go to MDL No. 38, sir?

3  A    I'm there.

4  Q    Did you have anything to do with the creation of this
5  document?

6  A    No, I did not.

7  Q    Have you ever seen it before?

8  A    I have seen MOR's in the past.  I don't know if I've
9  seen the one that is of this date.

10  Q    Well there has only been two filed.  So, you probably
11  have a 50/50 chance.

12  A    Probably.

13  Q    Can you look at Page 12 of 17?

14  A    Yup.

15  Q    And did you see this document before?

16  A    Again, I don't recollect seeing this balance sheet, no.

17  Q    You're looking at it sitting here today.  Do you have
18  any reason to believe that there is anything on here that's
19  inaccurate or false?

20  A    No, sir.  I don't.

21  Q    And what is the number that is shown there for
22  shareholder equity?

23  A    Shareholder equity this has a book value of $80.8
24  million dollars?

25  Q    $80 million dollars?

1  A      81, roughly, correct.  Book value.

2            MR. GEORGE:  Your Honor, I would move MDL No. 38

3  into evidence.

4            THE COURT:  Any objection?

5            MR. ARNAULT:  No objection, Your Honor.

6            THE COURT:  It's admitted.

7       (MDL Exhibit 38, admitted)

8  BY MR. GEORGE:

9  Q      Sir, could you go to MDL No. 42?

10 A      I am there.

11 Q      And this is an operating report between July 1st and

12 July 31st.  Have you seen this one?  I think you said you saw

13 one of them.  If you didn't see that one you probably saw

14 this one, right?

15 A      Yeah.  I think by deduction I would have had to have

16 seen this one.

17 Q      So, can you go to Page 3 of 12 of the MOR?

18 A      You said Page 3?

19 Q      Yeah, Page 3 of 12 of the MOR.  It's 3 of 12 on the

20 docket number up on top too if you look at the top.

21 A      Okay.  I'm there, sir.

22 Q      Okay.  In here there's a thing called "royalties."  Do

23 you see that?

24 A      Yes.

25 Q      Does the debtor pay royalties?

1   A       According to this document it must.

2   Q       Are you aware of that?

3   A       It's not uncommon in the generic space, but I'm not

4   sure which royalty this relates to.

5   Q       Well, it says -- if you look at the top it says "Hi-

6   Tech Pharmaceutical Company, Inc."  Do you see that?

7   A       Correct.  That is the entity at Akorn that made the

8   payment.  It doesn't say who it is going to.  At the top it

9   says the debtor entity names, so those are all the

10  fiduciaries.

11  Q       Yes.

12  A       It says that Hi-Tech made a payment of $313,000 dollars

13  as a royalty, but I don't know who that was to.

14  Q       Now on the left-hand side under Akorn, Inc., do you see

15  that?

16  A       I do.

17  Q       It says intercompany trade 5,200,000?

18  A       Yup.  I see that.

19  Q       So, on this month Akorn, Inc., paid $5.2 million

20  dollars of its subsidiary or its affiliates' obligations,

21  right?

22  A       That it moved that Akorn, Inc., paid on behalf of its

23  subsidiaries an intercompany transfer on the basis of trade

24  of $5.2 million dollars.

25  Q       Do you know why Akorn, Inc., pays the debtors of the

1   subsidiaries?

2   A     I assume, like many other companies, cash is moved

3   between entities and this would be one of those intercompany

4   transfers.

5   Q     Are you aware that the debtor, when it filed its

6   scheduled, didn't disclose any of these intercompany

7   transactions in detail?

8   A     I was not involved in the schedules.

9   Q     You'd agree if they weren't disclosed it would be

10  pretty hard for people like me to track or try to determine

11  whether any of those payments are in the ordinary course or

12  whether there was any consideration for them?  You would

13  agree with that, wouldn't you, if the details of those

14  transactions weren't disclosed?

15  A     Yeah, again, MOR's don't give you a lot of details into

16  why things are made, payments are made.

17  Q     Well I was asking you about the schedules, sir, not the

18  MOR's.

19  A     Again, the schedules are a different timeframe. So, I'm

20  not sure the two really --

21  Q     Sir, listen to the question I'm asking you.  Would you

22  agree that if the debtor filed its schedules and it didn't

23  disclose transactions of this type, which apparently have

24  been going on for some time, that it would be difficult for

25  someone like me to review those transactions that determine

1   the propriety of them?

2   A     Again, they're a different point in time.  I was not

3   part of the schedules. I wasn't part of this document.  So,

4   if before they didn't have those transfers, I don't know how

5   you're jumping to this being somehow something you can look

6   into.  Its two different documents at different timeframes.

7   Q     Well, you understand that the schedules are filed at a

8   particular point in time, right?

9   A     Exactly.

10  Q     And those schedules are supposed to disclose insider

11  transactions going back a year, right?

12  A     Correct.

13  Q     So, it doesn't matter when they were incurred in the

14  year before.  That's irrelevant.  The question is don't you

15  agree that if they are not disclosed that it's impossible for

16  people to review them.  It's a very simple question?

17  A     If you want me to posit that something that is not

18  disclosed being hard to look into then the answer is yes.

19  What I am getting at is that the $5.2 million dollars refers

20  to a timeframe of July 1st and July 31st which would not have

21  been part of the schedules.

22  Q     Understood.  And I wasn't asking you about the MOR at

23  that point, sir.  I was asking you about the schedules, but

24  thank you.

25              MR. GEORGE:  Your Honor, I would move for the

1  admission of MDL No. 42.

2          THE COURT:  Any objection?

3          MR. ARNAULT:  No objection, Your Honor.

4          THE COURT:  Okay.  It's admitted.

5      (MDL Exhibit 42, admitted)

6  BY MR. GEORGE:

7  Q    So, can we go to Page 8 of 12 of 42?

8  A    3 of 12 again, correct?

9  Q    No.  8 of 12, sir, I'm sorry.  And this is a document

10 as of July 31st, 2020, right?

11 A    Correct.

12 Q    And it shows there an intercompany loan to H-E-T-T of

13 1,800,000?

14 A    Correct.

15 Q    Now if we go down to liabilities 74 million 867, do you

16 know what those are?

17 A    Well, again, those are liabilities which are

18 compromised which, again, could be (indiscernible) instead of

19 unsecured and prepetition.

20 Q    So, these are all claims that pursuant to the

21 bankruptcy it would either be paid or discharged, right?

22 A    Or according to the APA would be assumed depending on

23 what they are.

24 Q    Or assumed, right.

25          And do you know what this accrued compensation is $14

1  million dollars?

2  A     Again, I did not prepare this, but in accounting you

3  obviously accrue payments to your employees over time as they

4  earn it and before they're paid out.  So, there is always a

5  level of accrued compensation that you have.

6  Q     And do you think that any of the officers or directors

7  are included in that number of 14 million?

8  A     Again, I was not part of the creation of this page.  I

9  have no basis to know.

10 Q     And what does this document show as shareholder equity?

11 A     Again, book value.  For an accounting basis its $62

12 million dollars.

13 Q     Have you ever done an insolvency analysis for this

14 entity?

15 A     What do you mean by insolvency?  What do you mean by

16 that?

17 Q     Have you ever tried to determine whether the market

18 value of these assets is less than the debt against them?

19 A     Again, that's what the financing process and the sales

20 process were meant to establish.

21 Q     Those were the only efforts, right, to determine

22 whether it was insolvent or not what the bank would pay?

23 A     That is the best effort because that's the market

24 speaking.

25 Q     Fair enough.

1          MR. GEORGE:  Just a second, Your Honor.  I'm

2    looking for a document.

3          THE WITNESS:  At some point I bio break.

4          MR. GEORGE:  I'm sorry.

5          THE WITNESS:  At some point I will need a bio

6    break, please.

7          MR. GEORGE:  Oh, can we take it now, Judge, while

8    I'm fumbling?

9          THE COURT:  That would be fine.  So, a five minute

10   break.

11         Is that okay, Mr. Buschmann?

12         THE WITNESS:  That should be plenty.  Thank you.

13         THE COURT:  Okay.  We will take a five-minute

14   break.  Thank you all.

15         MR. GEORGE:  Your Honor, I just want to give the

16   witness a directive that he's not permitted to talk to --

17   never mind, he's gone.

18      (Laughter)

19         UNIDENTIFIED SPEAKER:  (Indiscernible) going to be

20   a --

21      (Laughter)

22      (Recess taken at 2:32 p.m.)

23      (Proceedings resume at 2:39 p.m.)

24         THE COURT:  Okay.  Continue, Mr. George, if you're

25   ready.

1          MR. GEORGE:  Thank you, Your Honor.

2          Your Honor, first I want to move in the exhibit of

3    the two operating reports which are exhibits.

4          UNIDENTIFIED SPEAKER:  (Indiscernible).

5          MR. GEORGE:  Oh, I'm sorry, Judge.

6          THE COURT:  That's okay.  I think they were

7    already admitted.  Exhibits 38 and 42.

8          MR. GEORGE:  Okay.  And I also want to admit the

9    two letters from the lenders --

10          UNIDENTIFIED SPEAKER:  Debtor's 24 and 25.

11          MR. GEORGE:  -- which are the debtor's 24 and 25.

12          THE COURT:  Okay.  Any objection to the admission

13   of 24 and 25?

14          MR. ARNAULT:  No objection, Your Honor.

15          THE COURT:  Okay.  They're admitted.

16      (Debtor's Exhibits 24 and 25, admitted)

17          MR. GEORGE:  Thank you, Judge.

18   BY MR. GEORGE:

19   Q    Mr. Buschmann, could you turn to MDL Exhibit No. 15?

20          THE COURT:  Let me interject for one minute before

21   we begin cross examination.  I will note that a few of the

22   exhibits, Mr. George, that you referenced were included in my

23   binder under seal.  So, I will leave it to the debtors to

24   address any issues that may arise based on the questioning of

25   these exhibits.

1          I assume that the parties discussed it in advance

2    and that, Mr. George, you are well aware of the

3    confidentiality concerns.  So, I will keep my nose out of it

4    and I will allow the debtors to chime-in if there is anything

5    that is being discussed.

6          MR. GEORGE:  Absolutely, Your Honor.  Mr. Arnault

7    and my office have discussed it and, certainly, I will go

8    over it with Mr. Arnault.  We will seal whatever is subject

9    to being sealed and we'll make sure that is taken care of.

10         THE COURT:  Okay.  Well, just so you know --

11         MR. GEORGE:  I think we have a standing motion

12   with respect to that.

13         THE COURT:  That is certainly fine.  I just mean

14   this is a public record.  There are many people that are on

15   the phone including press.  So, to the extent that we're

16   getting into issues that are truly confidential, Mr. Arnault,

17   I'm going to depend on you to chime-in and I expect that you

18   would.

19         MR. ARNAULT:  Thank you, Your Honor.  Understood.

20         THE COURT:  Okay.  Great.

21   BY MR. GEORGE:

22   Q    Sir, if you would go to 15.  This is a document that

23   you created?

24   A    Again, this is a document that my team created under my

25   supervision.

1   Q      And what was this document intended to provide to the

2   debtor?

3   A      Again, this was an update to the board and it primarily

4   was to provide an update of the financing process and then,

5   again, various potential outcomes that the company was facing

6   based upon that financing process.

7   Q      Okay.  Now earlier in your testimony I asked you if

8   anybody had ever conducted a TEV for this company and I think

9   your testimony was that no one ever had, correct?

10  A      Correct.

11  Q      And this document appears to make reference to an

12  implied TEV as of today which I assume is the date of this

13  document in August of 2019.  Do you see that?

14  A      What page are you on?

15  Q      I'm sorry.

16  A      What page are you on?

17  Q      If you go to Page 3 its debtor's production 00058036.

18  A      Correct.  What you are seeing there is a series of

19  illustrative enterprise values.  So, the numbers are picked

20  and they're in a large range.  There is -- no one else was

21  behind it, they were just picked in terms of size, that's why

22  you see such a wide range. Then if you're referring to

23  Footnote 2 that is an assumption based upon, at that point in

24  time where the debt was trading and where the cash balance is

25  at.

1  Q     I wasn't actually looking at Footnote 2.  I was asking

2  you about whether this was -- this TEV was something

3  performed by your office or not?

4  A     It was picked as -- it was a range that was picked

5  randomly as (indiscernible).

6  Q     By your office?

7  A     Yeah.  We put it in the document as range of TEV's of a

8  very large range.

9  Q     Okay.  And when was this document delivered to the

10 debtors?

11 A     When was it delivered to the debtors?

12 Q     Yeah.  December 2019?

13 A     It says August 16th on --

14 Q     Oh, I'm sorry.  I'm sorry, August 16th.  August of

15 2019, right?

16 A     Correct.

17 Q     And could you read the second bold that's in that

18 document.  It starts with "while."

19 A     "While junior claimants appear to receive a value

20 recovery at higher valuations, including the implied TEV

21 today based on the current market share, their approach will

22 be driven by views of the term loan lenders' expected views

23 on valuation and desire to take ownership of the company."

24 Q     In August of 2019 the ad hoc group had expressed a

25 desire to take over the company?

1  A    They did not express a desire to take over the company,

2  no.

3  Q    Well, those are your words.  What did you mean by that?

4  A    Again, this was -- they never said this to us, but,

5  again, what we're talking about here is -- let me just read

6  it again.

7  Q    Yeah. It says,

8        "And desire to take ownership of the company."

9        You said you never said that.  Its written right there.

10 A    Yeah.  Again, they never told us they had a desire to

11 take ownership of the company.

12 Q    Well, then how did you conclude that?

13 A    Again, since it's their approach will be driven by the

14 use of the term loan lenders' expected views of value and

15 their desire to take ownership of the company.  So, again,

16 it's not saying that they have a desire.  It says that the

17 approach will be driven by a desire whether high, or low, or

18 what, but they (indiscernible).

19 Q    Right.  And then you --

20        (Phone interference)

21        THE COURT:  Hold on one second. I think Mr.

22 Arnault has been cut-off from CourtCall.

23        MR. GEORGE:  I think he has.

24        THE COURT:  Okay.  Let's give him one moment.

25        MR. GEORGE:  And, Your Honor, he may have been

 1  objecting.  So, I --

 2          THE COURT:  Let's just give him a few minutes.  It

 3  will only take maybe a minute to get back on.

 4      (Pause in record)

 5          MR. ARNAULT:  Can folks hear me now?

 6          THE COURT:  Yes.  We can hear you.

 7          MR. ARNAULT:  My apologies to everyone.

 8          THE COURT:  That's okay, Mr. Arnault. I think we

 9  can admit that this is going a lot better than our last

10  confirmation trial we had together.

11          MR. ARNAULT:  That is correct and hopefully I

12  don't turn into the new Kim Conroy throughout this one.

13      (Laughter)

14          THE COURT:  Okay.  I'm sorry, were you lodging an

15  objection to one of the questions that Mr. George had?

16          MR. ARNAULT:  No.  I was just lodging an objection

17  to not being able to hear anything.

18      (Laughter)

19          MR. GEORGE:  I assure you, it's very boring.

20          THE COURT:  Okay.  So, Mr. George and Mr.

21  Buschmann, I must admit I cannot recall where we were in the

22  questioning or the answers.  So, maybe it's best to repeat

23  your last question.

24          MR. GEORGE:  That's fine, Judge.

25  BY MR. GEORGE:

1   Q     Sir, I was asking you about this document in the

2   waterfall and you're saying that the waterfall that you

3   provided was in lieu of the market test?

4   A     This is before the market test.  This is an

5   illustration of a wide range of values as to what each

6   potential party from the very top of the capital structure to

7   the very bottom to equity what they would be receiving under

8   an illustrative waterfall.  It's not taking the view of value

9   at all.  It's just a range of values.

10  Q     Just a range of values.  Is that what you said?

11  A     That's what I said.

12  Q     And can you tell me, at this time, do you recall how

13  much the bank debt was to the ad hoc group?

14  A     It would have been around 850 million, probably with a

15  little bit of PIC interest a little bit higher, but still

16  roughly around 850 million.

17  Q     And an enterprise value of 995 million what do you show

18  as distributable to equity and litigants?

19  A     At 995 you said?

20  Q     Yeah.

21  A     Based upon these assumptions 135 million would have

22  flowed down to the equity and litigants.

23  Q     And how about at a billion dollars?

24  A     At a billion dollars it would have been $5 million

25  dollars higher to 140 million.

1  Q     Okay.  And at a million two-fifty 390 million?

2  A     I will stipulate 390 at a billion five six-forty.

3  Q     I appreciate that.  I didn't mean it to be a math test.

4  A     Thank God.

5  Q     For me.

6        Mr. Buschmann, are you aware that the -- have you ever

7  told the debtor that the claim for Fresenius would likely be

8  subordinated to general unsecured creditors?

9  A     There is a series of footnotes in our documents that

10 talk about the potential for claims to be subordinated if

11 they're treated in a certain manner.

12 Q     And if you look at Page 2 of that document that we're

13 talking about right now, which is MDL No. 15, if you go to

14 Page 2 of that document, which is debtor production 00058035,

15 on the left-hand side.

16 A     I'm there.  Correct.

17 Q     You also told the debtor that you thought their

18 shareholder claims would likely be treated *pari passu* with

19 equity, right?

20 A     Correct.  In this case the -- again, obviously, not

21 being a lawyer, this was our view that a claim could

22 potentially be treated as being *pari passu* with equity.

23 Q     Now when the sale takes place are any of the existing

24 shareholders or stockholders going to be owners along with

25 the ad hoc group?

1  A      Under the existing deal and only deal, no, they will

2  not.

3  Q      Well is there discussion with them in order to become

4  owners?

5  A      Well we had a discussion, but sadly it did not

6  (indiscernible) actual plan.  So, no, at this point there is

7  no path for them.

8  Q      So with respect to the second standstill agreement can

9  you tell me how long a period that second standstill

10 agreement lasted?

11 A      It would have lasted from, roughly, the second week or

12 so of December to early February of 2019.

13 Q      Can you say that again, please?

14 A      Yes.  From the middle -- so second week or so of

15 December 2019 to February of 2020, and I believe it was in

16 the middle, early part of February 2020.

17 Q      So, would it be fair to say that that was about eleven

18 weeks?

19 A      It would be fair to say that that's the math.  That

20 would be correct.

21 Q      And what did the debtor pay for that standstill?

22 A      I don't know the exact number, but I believe the cost

23 was somewhere around $30 million dollars.

24 Q      $30 million dollars for eleven weeks, right?

25 A      $30 million dollars for -- I wouldn't characterize it

1  that way.  $30 million dollars was paid to get us through the

2  first round at which point we, one, would have had a view

3  from the market as to the value of the company and, two, it

4  would have sent the remaining eleven weeks that we're talking

5  about entering into a comprehensive amendment which would

6  have been the path forward to get the company through a sale

7  process, or to a third-party, or if we failed to get them to

8  a deal with the lenders.

9           MR. GEORGE:  I would move in MDL 15.

10          THE COURT:  Any objection?

11          MR. ARNAULT:  No objection, Your HONOR.

12          THE COURT:  All right. It's admitted.

13       (MDL Exhibit 15, admitted)

14          MR. GEORGE:  Thank you, Judge.

15  BY MR. GEORGE:

16  Q    On 0058035, on the right-hand side, you have a list of

17  concerns.

18  A    I'm sorry, is that the -- is that still 15?

19  Q    Yeah.  We're still in 15, yes.

20  A    These are not our concerns.  These are the

21  stakeholder's concerns that we are talking about.

22  Q    No.  I didn't say they were yours. I just said the

23  heading is concerned.

24       To the right-hand side there you have some comments

25  about the term lenders.  Can you tell us what the concerns

1  were that were listed there?

2  A    Yeah, sure.  So, the term loan lenders, again,

3  obviously wanting to protect their collateral, would have, in

4  our mind -- again, these are our assumed concerns for them

5  is, one, that a whole lot of value that goes to junior

6  creditors below them. Again, they do have liens on the assets

7  and are trying to protect their collateral.  That just,

8  generally, the FDA remediation process does not go well

9  despite, you know, the company's efforts and that could

10  materially reduce the value of their collateral.  So, that's

11  that.

12        Impairment in a bankruptcy scenario --

13  Q    What does that mean?

14  A    Well, that's they're not worth that their claim -- the

15  value of the company is not worth the collateral meaning that

16  they are an impaired class in bankruptcy which, you know,

17  this is actually where we are today.

18        Then the sub bullet there says we will seek to limit

19  funding and allow a short-term case to minimize burn and

20  admin expenses.  What this is saying is they certainly would

21  not want a case where they are materially impaired and the

22  company is continuing to burn a material amount of cash that

23  continues to burn off their collateral.  So, they would not

24  like that.

25  Q    Okay.

1  A    Then the last point only care about themselves, getting

2  paid in full which, again, that's what they care about.  They

3  want to be refinanced and taken out.  Do not care about

4  impact on equity and other junior stakeholders.  Again, that

5  goes back to, you know, they want to be paid for their

6  collateral.  They're at the top of the food chain and they're

7  left with concerns about junior creditors getting value if

8  they're not paid in full.

9  Q    Okay.  And as to those concerns, you'd agree that the

10  debtor is entering into the standstill agreement and a

11  confirmatory pledge of its assets dealt with the issue of

12  leakage for the secured creditor, right?

13  A    Yeah.  Again, as part of the requirements for the

14  standstill, I think there were a few baskets and the like,

15  and also a request to review, I believe, to ensure there were

16  no unencumbered assets.  So, that standard for entering into

17  such an agreement with lenders and --

18  Q    I'm not asking you to justify for it.  I'm just asking

19  you to tell me whether it was dealt with by virtue of that

20  (indiscernible).

21  A    Yes.

22  Q    The FDA remediation, has that been completed or is in

23  the process?

24  A    Sadly, it's not been completed.  The company has done

25  great efforts to address their concerns.  Unfortunately, that

1   kind of a process is never complete until the FDA shows up

2   and re-investigates, re-visits the sites, if you will.  There

3   are two sites. So, those visits have not yet occurred.

4   Q     And the impairment in the bankruptcy scenario, you said

5   they're impaired, but they're basically getting the assets

6   for the bank debt, right?  They're getting par, aren't they?

7   A     They're bidding their full claim; however, the M&A

8   process has shown that in the market, you know, no one was

9   willing to pay above that.  So, in my mind it's proven that

10  they, in fact, were not -- that their claim was not worth the

11  full billion dollars.

12  Q     What I was asking you, sir, they're getting par, right?

13  A     They are not getting -- they're getting the value of

14  the company.  The company is one that we have proven is not

15  above or equal to their bid.

16  Q     Is what?

17  A     Just to be very clear, we ran a process to see if

18  someone was willing to pay above and beyond their credit bid.

19  No one did that.  So, again, their credit bidding their full

20  claim, as they're allowed to do, but in the market, we have

21  shown that no one was willing to actually pay that amount.

22  Q     Sir, all I asked you is are they getting par on their

23  loan?  That was the question.

24  A     I'm telling you that they're not.

25  Q     And how are they not?

1   A     Because no one in the market was willing to pay a

2   billion dollars for the assets.  So, while they're taking the

3   company, they're not able to credit bid the full amount,

4   there is no justification to say they can, today, turn around

5   and sell the business for a billion dollars.  We just did

6   that and it failed.

7   Q     And you expect that the term loan purchasers are going

8   to keep the corporate shell, right?

9   A     You said keep the corporate shell?

10  Q     Right.  All of the FDA licensures and everything are in

11  the corporate shell, right?

12  A     That will be transferred over into their newco.

13  Q     And is FDA approval required for that?

14  A     Not to my knowledge.

15  Q     Is the FDA aware of its sale?

16  A     I have not been in contact with the FDA.

17  Q     Do you know if they have gotten notice of this sale?

18  A     I am -- again, I haven't been part of that process.

19  Q     Now on the next page of that document that we're

20  referring to right now on 00058036 --

21  A     Okay.

22  Q     -- you have a Footnote No. 6.  Do you see that?

23  A     Yes.

24  Q     And what does that say?

25  A     Footnote 6 says.

1    "Includes Fresenius and shareholder litigants

2   (including potential opt-outs) whose claims are likely to be

3   treated *pari passu* with equity."

4   Q    And do you have an understanding of the claims of the

5   MDL in (indiscernible) at this point in the case?

6   A    We did not.

7   Q    In August of 2019?

8   A    No.

9   Q    Do you know whether the public knowledge of Akorn being

10  a defendant in the MDL litigation may have suppressed value

11  to people willing to buy the assets for it?

12  A    It was not a major topic of diligence that we had seen.

13  Q    You said major topic, but was it a topic?

14  A    I can't talk to every single question that was out

15  there.  I don't know if it was asked or not, but it was not a

16  reason given that we received for people dropping out of the

17  sales process.

18  Q    And what were the kinds of issues that were raised by

19  people who raised the MDL litigation?

20  A    I'm sorry, repeat the question again.

21  Q    Yeah.  What were the issues that people raised with

22  respect to the MDL litigation during the sales process?

23  A    Again, I am not aware of any issues raised with the

24  MDL.

25  Q    Well you mentioned that you said it wasn't a major

1   topic of discussion, but --

2   A      Yeah, I --

3   Q      -- which implies that it was some kind of discussion,

4   but maybe not major, and now you're saying it was never

5   discussed.   Which one is the accurate answer?

6   A      (Indiscernible) you're taking my words out of context.

7   Q      Oh, I'm sorry.

8   A      What I'm saying was it was not a topic that was raised

9   as someone wanting to drop out of the sales process.   I also

10  said that it was potentially a topic that was raised.   Again,

11  not one that was raised to me personally as being a big issue

12  for the buyers.

13         Now could someone have raised it on a legal call with

14  Kirkland and as part of our diligence; absolutely, it could

15  have been raised.   I'm just telling you that the reason

16  people dropped out, the reasons given, had nothing to do with

17  the MDL.

18  Q      I see.

19         And the issues that were discussed that you have a

20  person knowledge of with respect to the MDL what were they?

21  A      Again, I did not have much insight into the MDL.

22  Q      I didn't say much.   I'm asking you about any.   I'm not

23  asking you to quantify, sir, I'm talking about any.

24  A      I have very little knowledge of the MDL.

25  Q      When did you first learn of the existence of the MDL?

1   A     It was pretty late in my engagement to be honest.

2   Q     It was pretty late?

3   A     Late in our engagement.

4   Q     Well when you say late in the engagement would it be

5   fair to say that the first time that you knew about it was

6   when I filed the objection to the disclosure statement?

7   A     No.  That's not accurate.

8   Q     Well, I'm trying to get a timeline, sir. When you say

9   late in the engagement, I mean it's kind of like saying late

10  in the month.  There's a lot of days that could fit in there.

11  A     No.  It would have been around the time of the equity

12  group getting involved.

13  Q     So post-petition, right?

14  A     Correct.

15  Q     When the equity group was having discussions with the

16  MDL which was during the time period when the original motion

17  to approve the sale was adjourned, right?

18  A     I don't know about the timing of the adjournment of the

19  sale, but it was while they were involved in the diligence.

20  Q     So, the first time you ever learned about the MDL,

21  despite the fact it was pending since 2015, was after your

22  engagement, after the original stalking horse offer was made

23  and there was discussions by a third-party to become

24  involved?

25  A     Correct.

1  Q     Are you bothered by that at all, sir, not knowing that

2  fact?

3  A     No.  We, obviously, discussed it with the company and

4  the view was that, again, it's an unliquidated damage.  It's

5  a case that's out there and it's not one that, frankly, under

6  my understanding from the company that they, frankly, felt

7  was a very strong issue for them.

8  Q     Right.  So, the moral and social consequences of

9  conveying assets with all of the officers in place who were

10  accused of anti-trust violations didn't cause you any pause?

11  A     You're assuming an assumption of guilt.  I am not.  I

12  am saying --

13  Q     I didn't say they were guilty, sir. I said with

14  allegations.

15  A     Again, it did not at all affect me.  No.

16          THE COURT:  Mr. George, I just want to do a time

17  check for you.  What do you think in terms of your time?

18          MR. GEORGE:  Maybe another forty minutes.  Too

19  long?

20          THE COURT:  Is Mr. Buschmann the only -- is he

21  your only witness for today, Mr. Arnault?

22          MR. ARNAULT:  That's correct, Your Honor.  He's

23  the only witness in connection with the sale.

24          THE COURT:  Okay.  Let's try to wrap this up in

25  about forty minutes.

1        MR. GEORGE:  I'm going to try to wrap it up.  We

2    will, Judge.

3    BY MR. GEORGE:

4    Q    Now did you understand that the reason for this

5    bankruptcy filing was to deleverage?

6    A    It was the inability to pay off the existing term loan.

7    So, that is the issue.

8    Q    You're testifying about what caused it.  I am asking

9    what the intention was when the bankruptcy was filed.  Was it

10   to deleverage?

11   A    Certainly the company will be deleveraged going

12   forward, absolutely.  It cannot pay the existing amount of

13   debt.

14   Q    And are you aware that the debtor stated that the

15   purpose for the filing of the bankruptcy and the disclosure

16   statement was to deal with litigation overhang?

17   A    Yup.

18   Q    Well is deleveraging and litigation overhang different

19   things?

20   A    In my mind they can be viewed as the same, but its two

21   different issues to be honest.  So, one, is the existing term

22   loan debt which, again, we cannot obtain the support.  There

23   is also ongoing litigation that the company is going to have

24   to deal with.

25   Q    Right.  So, these standstill arrangements with the bank

1  would it be fair to say cost close to $100 million dollars?

2  A    I think in terms of overall fees and the like, yes,

3  that's correct.

4  Q    And your fees so far have been?

5  A    Again, to date we have received about 150,000 a month

6  since January of last year.

7  Q    And how much were you paid prepetition?

8  A    That was, again, I'm saying from January of last year.

9  So, from every month from January of 2019 forward 150,000 a

10  month.

11  Q    150,000 a month since 2019?

12  A    January --

13  Q    That's harder math then I can do.  So, that will take a

14  second.

15      And how much are you standing to earn as a success fee

16  on the successful sale of the company?

17  A    There's a $10 million dollar backend fee for the credit

18  bid and there's also -- we are raising financing right now

19  which is (indiscernible) for newco and we'll get one percent

20  of that amount.

21  Q    One percent of -- your testimony broke up, sir.  I'm

22  sorry.  One percent of what amount?

23  A    Of the amount that we're raising in the ABL which right

24  now is $150 million dollars.  So, it would be one and a half

25  million dollars.

1 Q      So, you basically have received $2.25 million dollars

2 for the prepetition work, right?  150 times two years.

3 A      If that's the math, correct.

4 Q      And you're going to receive another 10 million if the

5 transaction closes, and another 500,000 on top of that if you

6 close the ABL loan?

7 A      Actually 1.5 million.

8 Q      1.5 million, I'm sorry.

9 A      And we do have crediting of monthlies after, I believe,

10 six months that will reduce that amount, but you are in the

11 ball park.

12 Q      So you stand to make overall over $13 million dollars

13 in this transaction?

14 A      Again, if that's the math give or take, yes.

15 Q      Okay.  And do you know how much Kirkland & Ellis has

16 charged so far for their work in the case?

17 A      I have no idea.

18 Q      So, you know that, at least, the debtor is going to be

19 spending $122 million dollars in order to get this

20 transaction approved, right?

21 A      Again, if you're including -- are you including the

22 standstill dollars?  You're adding the standstill dollars --

23 Q      I'm talking about to get to this point.

24 A      Sure.  Yes.

25 Q      And you're suggesting that if the debtor filed

1   immediately it would have incurred that $122 million dollars?

2   A     What I was saying was had the debtor filed immediately

3   back in January of 2019 the outcome would have been such that

4   the company was in a very weak state and certainly we would

5   not have had the same amount of interest in the company in a

6   refinancing and in a sales process.

7   Q     Well, you're speculating about that.  You don't know

8   any of that for sure.

9   A     We didn't run it, but the company would have had

10  materially worse facts in terms of where they were on their

11  FDA remediation and worse facts in regards to their progress

12  on their business plan which are, obviously, two very

13  important points for any buyer to consider.

14  Q     But after the standstill agreement was executed there

15  was never really an option of proceeding other than with the

16  banks or with the ad hoc group's offer as the stalking horse

17  bid, right?

18  A     Again, you're talking about the first standstill or the

19  second standstill?

20  Q     I'm saying at the end of the standstill agreement was

21  there ever any intention other than to proceed with an offer

22  from the bank?

23  A     Of course there was throughout the entire process.

24  That is why we ran two years of financing M&A processes.  It

25  was --

1    Q     Well, you realize -- I'm sorry.  I didn't mean to

2    interrupt you, sir.

3    A     Let me finish.  The whole point of the standstill was

4    for us to be able to go to the market and to be able to

5    refinance the term loan either through a financing process or

6    a sales process.

7    Q     I'm saying how would your filing immediately have

8    precluded you from doing that.  You did it in the bankruptcy

9    anyway and that is what you are testifying about, isn't it,

10   the efforts you made to take the stalking horse bid out and

11   get a better bid?

12   A     Hindsight is 20/20.  Again, during the last years we

13   were trying to actually get value above and beyond the term

14   loan.  We thought, frankly, we were going to.  It did not

15   come to pass unfortunately.

16   Q     And, of course, if you would have filed immediately

17   that would have prevented the bank from putting you in a

18   position where you prevented any leakage from out from under

19   its security agreement, right?

20   A     If we filed immediately we, again, would have had to

21   seek cash collateral from the banks and prove to them that

22   there was value above and beyond their claim.  Quite frankly,

23   we were in a very weak position.  So, that would have been, I

24   think, the worst outcome certainly for our equity.  Again, at

25   that point in time we had a market cap of, I think, north of

1  $400 million dollars that we were trying to see if we could

2  actually maximize here.

3  Q     And you're saying it was terrible for the equity.  How

4  are the equity doing under this sale?

5  A     Again, sir, hindsight is 20/20.

6  Q     Agreed.

7  A     So, our plan does not give them anything.  Having said

8  that we spent two years proving out the market and let the

9  company do its best to, as we looked at one of the pages,

10 stabilize and build for growth.  Sadly, that did not end up

11 in the valuation of the company that would take up the term

12 loan.  That is 20/20 hindsight.

13 Q     Did the company ever resist any effort to prevent

14 leakage?

15 A     Did the company resist to prevent leakage?

16 Q     Right.  Did the company ever say, well, we'd rather

17 have a proposal or we'd rather be in a situation where we can

18 deal with these obligations and try to resolve them rather

19 then put them in a position where they get nothing?

20 A     So, again, the company has throughout this process,

21 one, dealt with a standstill to, obviously, let them have

22 time to address the issues with the term loan, but then, two,

23 has been trying to engage with both the shareholders and,

24 again, I was not involved in any of this, but was trying to

25 have time to get to a decision or settlement on Fresenius.

1  Again, those were the two key aspects that we were focused

2  on.

3        We actually did reach an agreement last year with opt-

4  in shareholder litigants.  So, the company certainly has

5  tried to address that.  Unfortunately, there were opt-outs

6  and there was no decision on Fresenius.

7             MR. GEORGE:  Just a couple minutes, Your Honor. I

8  may be able to --

9  BY MR. GEORGE:

10  Q     Could you look at MDL Exhibit No. 1?

11  A     Okay.  I'm there.

12  Q     You have it?  I'll represent to you that this is Mr.

13  Portwood's testimony from the 341 hearing.  I want to ask you

14  to go to Page 10 of that document where Mr. Portwood is

15  talking about the bonuses paid in December.  Specifically, I

16  guess, Pages 10 and 11 if you could read them.

17  A     You said Line 10 and 11 on Page --

18  Q     No, Pages 10 and 11.  It starts at Line 16.

19  A     Okay.

20  Q     Do you see that, sir?  Did you get a chance to read it?

21  A     I'm still reading it, but, yes, I see it.

22  Q     Okay.  Go ahead.  Take your time. I don't mean to rush

23  you.

24  A     Okay.  I've read it.

25  Q     You read the testimony about the bonuses.  Is that

1  consistent with your understanding of how the bonus and

2  retention payments were made?

3  A      Again, we were not part of the bonus discussions;

4  however, the payments to our recollection, again, in December

5  of 2019 while it was, in fact, the company had earned the

6  bonuses for that year and had chosen to pay it out in

7  advance.  So, the 2019 bonus paid in --

8  Q      Mr. Buschmann, can you go to MDL Exhibit No. 9?

9  A      I'm there.

10  Q      Okay.  Did you create this document?

11  A      Again, this was a revised business plan where we were

12  involved, it was also the management team and AlixPartners.

13  Q      Okay.  Can you go to Page 8 of that document?

14  A      Sure.  I'm there.

15  Q      And when was this document created?

16  A      It was created, my guess would have been, around June

17  of 2020.

18  Q      So, it was within the last sixty days, right?

19  A      It would have been, yes.  Reflecting the last -- yes,

20  in June of this year.

21  Q      And what do you show as unleveraged free cash flows

22  from operations that you are projecting for the fourth

23  quarter of 2020?

24  A      For the fourth quarter the unleveraged free cash flow

25  from ops is $36 million dollars.

1   Q      And how about as of the year end?

2   A      About the same, $38 million dollars.

3   Q      And you're reflecting $701 million dollars in revenue

4   and that's about 30 percent better than the debtor did in

5   2019, right?

6   A      It's certainly above what we did in 2019.

7   Q      You don't know the delta?

8   A      Not the exact.  I know it was 600 something in 2019.

9   And, again, as I mentioned before, this forecast is being

10  updated as we speak.

11  Q      It is?

12  A      Yes.

13  Q      Well is that document around anywhere?  You're saying

14  its being -- we got this, we didn't get another one.  Is

15  there one that's being drafted right now?

16  A      It doesn't exist yet.  I have not seen it.

17  Q      Well, does it exist or you have not seen it?  Which one

18  is it?

19  A      I have not seen it.  If it existed, I would see it.

20  Q      So, could you go to Page 13 of this document?

21  A      I'm there.

22  Q      What does this document portend to reflect?

23  A      This was, at the time of June, what the new capital

24  structure, again according what we have been told by

25  Greenhill, at that time was going to entail.  Both the ABL as

1  well as the new take back debt.

2  Q    I see.  So, this is all based on the stalking horse

3  credit bid, right?

4  A    And what at that time we had been told by Greenhill as

5  of June of that timeframe.

6  Q    That what, I'm sorry?

7  A    As of June what Greenhill had told us was going to be

8  the capital structure.

9  Q    Okay.  And once the bank buys these assets it's

10  immediately going to extinguish its free petition loan and

11  put a loan on the amount of $425 million dollars, right?

12  A    No. I would say differently.  The company is taking --

13  sorry, the lenders are taking their claim and taking that

14  claim in the form of two considerations; take back

15  consideration which at this time was around $425 million

16  dollars, I believe it has been reduced since, and new equity

17  in the company.  So every holder of the term loan is getting

18  a piece of debt and a piece of equity, again, because the

19  company cannot possibly support $150 million dollar debt.

20       They're also seeking, again because of all the things

21  that they are paying for in their bid, needing to raise an

22  ABL which we're doing for them to fund the exit and to have

23  the liquidity going forward to operate the business.  That is

24  the ABL revolver.

25  Q    So, based on the stalking horse bid and information

1  that you received from Greenhill you understand that the

2  prepetition term loan is being extinguished and replaced by a

3  $425 million dollar term loan?

4  A    At this point in time.  It's changed since.

5  Q    And how has it changed since?

6  A    I believe the lenders are considering a lower amount.

7  Again, it's not been finalized, but we have been told that

8  they're considering a lower amount.

9  Q    A lower amount of what, the note or the term loan?

10 A    The take back debt because, again, I want to make sure

11 they can support the take back debt.

12 Q    And do you know how much lower they're projecting the

13 425 to be?

14 A    I don't know if it's been finalized. The last numbers

15 we heard were around 375 million, but that is for them to

16 tell you.

17 Q    Did the debtor ever reach any negotiations with the

18 bank where they said we'll give you 425, let's go refinance

19 it and we'll find a loan in order to fund operations?  I mean

20 that's where it's sending up, right?  The bank is taking the

21 assets, reducing its debt --

22 A    It's not new money.  Sir, it's not new money.  No.

23 They're taking their claim and just converting it into two

24 pieces of paper; the new equity and the debt.  There's no new

25 money coming in.  The only new money is the ABL to finance

1   all the things incrementally that they have to pay for to

2   (indiscernible) Chapter 11.

3   Q    Okay.  Understood.

4          MR. GEORGE:  Your Honor, I want to move Exhibits 9

5   and 1 into the record.

6          THE COURT:  Okay.  Any objection?

7          MR. ARNAULT:  No objection, Your Honor.

8          THE COURT:  Okay.  They're admitted.

9       (MDL Exhibits 9 and 1, admitted)

10         MR. GEORGE:  And then I just have a few more

11  questions, Judge.  I think I can head this off.

12  BY MR. GEORGE:

13  Q    Mr. Buschmann, can you look at Exhibit No. MDL 11?

14  A    11?

15  Q    Yes.

16  A    Yes.  I'm there.

17  Q    And is this a fair summary of what the total fees that

18  were incurred by the debtor in connection with the standstill

19  agreement?

20  A    Yes.  That is correct.

21         MR. GEORGE:  Your Honor, I'd move that exhibit

22  into evidence and I think I'm done with this witness.

23         THE COURT:  Does anyone object to the admission of

24  Exhibit 11?

25         MR. ARNAULT:  No objection.

1          THE COURT:  Its admitted.

2       (MDL Exhibit 11, admitted)

3          THE COURT:  Mr. George, did you say you were

4  finished?

5          MR. GEORGE:  Yes, Judge.  I'm through.

6          THE COURT:  Mr. Arnault, do you want to any --

7  well, let me ask for the record is there any other party that

8  wishes to cross-examine Mr. Buschmann?

9       (No verbal response)

10         THE COURT:  Okay.  Mr. Arnault, any redirect?

11         MR. ARNAULT:  No redirect, Your Honor.

12         THE COURT:  Okay.  Mr. Buschmann, thank you very

13  much for your time and efforts today.  Your testimony helpful

14  to the court today.  You are considered released from the

15  virtual witness box.  Thank you very much.

16         THE WITNESS:  Thank you.

17         MR. ARNAULT:  Your Honor, just to be clear, and

18  I've discussed this with the objecting parties and Mr.

19  George, what we would like to do to streamline the case and

20  consistent with the bifurcation approach that we discussed

21  last week is we'll move into the record for plan confirmation

22  Mr. Buschmann's direct, and cross, and the exhibits so that

23  he doesn't have to go through this again.  Then provide

24  parties with the opportunity to cross-examine him so that

25  they have an opportunity to prepare and heard what he has had

1    to say.

2             In light of the fact that that probably means that

3    he's still technically on the stand he's agreed to follow the

4    same instructions or remain on the stand overnight.  So,

5    until he finishes his cross examination, he won't be talking

6    to anyone about his testimony or anything of the like.

7             THE COURT:  Okay.  Great.  And will you be

8    eliciting further direct from Mr. Buschmann?

9             MR. ARNAULT:  I do not think so, but not to be

10   cagy I just don't want to commit to anything right now.  My

11   current plan is not to elicit any further direct.

12            THE COURT:  Okay.  All right.  Well, Mr.

13   Buschmann, you are now considered released from the virtual

14   witness box, but you heard -- you understand what the

15   proceedings are.  So, I just ask you not to speak to anyone

16   about the substance of your testimony before you retake the

17   stand tomorrow in support of the plan.  So, thank you very

18   much.

19        (Witness excused)

20            THE COURT:  Okay.  So, is that the close of the

21   evidentiary record today in support of the plan -- excuse me,

22   in support of the sale?

23            MR. ARNAULT:  Correct, Your Honor.  The debtors

24   rest at this point.

25            THE COURT:  Okay.  Would you like a break or

1    should we just go right into argument?

2           MR. ARNAULT:  Your Honor, could we take five

3    minutes?

4           THE COURT:  That's fine.  Mr. Arnault, do you need

5    anymore?

6           MR. ARNAULT:  I will not be handling the argument

7    and so Mr. Hayes or Mr. Nash, if they're on the phone.  I

8    guess now is the time to chime-in to see if you guys would

9    like any additional time.

10           UNIDENTIFIED SPEAKER:  No.

11           THE COURT:  Well let's just do this, let's come

12    back at quarter of to give everyone a couple more minutes.

13           MR. GEORGE:  Thank you, Your Honor.

14           THE COURT:  Okay.  Great.  Thank you.  All right.

15        (Recess taken at 3:35 p.m.)

16        (Proceedings resumed at 3:45 p.m.)

17           MR. HAYES:  Thank you, Your Honor.  Good

18    afternoon.  Again, for the record, Christopher Hayes of

19    Kirkland & Ellis on behalf of the debtors and debtors-in-

20    possession.

21           Your Honor, we filed a lot of papers in support of

22    the sale and as you heard lengthy testimony from Mr.

23    Buschmann today in support of the sale which we believe amply

24    justified the debtor's business judgment in determining to

25    proceed with the sale of the stalking horse.  So, I will try

1   to keep my opening remarks brief; although, of course, I'd

2   like to reserve the right to address any other statements

3   that are made by other parties during their remarks.

4            Significantly, Your Honor, you know, I would draw

5   your attention, first, to just a few things.

6            First, I think the level of support for the sale

7   or rather the absence of objection to approval of the sale by

8   key stakeholders, notably the unsecured creditor's committee,

9   as well as the U.S. Trustee.  And I think it's equally

10  significant that, in fact, only one stakeholder currently

11  objects to approval of the sale at all.

12           Second, I would draw your attention to the

13  alternatives to approval of the sale, namely there are none.

14  There are no, as Mr. Buschmann testified, after a

15  comprehensive and fulsome pre- and post-petition marketing

16  process including an extension of the court approved or the

17  milestones rather in the DIP financing facility in order to

18  accommodate a last-minute alternative transaction proposal by

19  potential new money investors.  No other higher or better

20  bids came to fruition.  The MDL plaintiffs have suggested

21  none.

22           Finally, the benefits of approving the sale which

23  are the continuation of the debtor's operations as a going

24  concern, preservation of merely 2,000 jobs and the payment

25  of, at least, $150 million dollars in administrative priority

1  and unsecured claims whether through assumption of

2  liabilities under the sale or through funds that will be left

3  down in the wind-down budget to ensure an administratively

4  solvent wind-down of the debtor's bankruptcy estates.

5      Your Honor, under Section 363 the debtors may sell

6  property of the estate once a sound business purpose has been

7  articulated.  And I think the debtors and the record

8  demonstrate that they have done so.  Again, the sale is the

9  best and only option on the table.  As you heard from Mr.

10  Buschmann it was the product of an extensive pre- and post-

11  petition marketing process undertaken in good faith, and

12  marked with hard-fought negotiations among the relevant

13  stakeholders.

14      Although the debtors would have loved to find a

15  transaction that provided for payment in full of all their

16  creditors including their existing equity the market has

17  spoken and unfortunately that is not the position that we

18  find ourselves in.

19      Contrary to what the benefit from plaintiffs have

20  asserted, there is nothing in the record that suggests there

21  was any sort of collusion, or bad faith, or any motive to

22  inflate the value of the credit bid.  And I don't believe

23  that any credible evidence in the record exists to suggest

24  otherwise.

25      What the record does demonstrate is a thorough

1   deliberate process whereby the debtors fully exercise their

2   business judgement in determining that it was in the best

3   interest of their estate to consummate the sale.

4        The (indiscernible) funds have made sweeping

5   statements about the transfer of valuable unencumbered

6   property for no consideration while general unsecureds are

7   paid nothing.  As demonstrated through Mr. Buschmann's

8   testimony that is not entirely true as most general unsecured

9   claims as well as administrative and priority claims would be

10  paid pursuant to the sale transaction as Judge Walsh first

11  noted nearly twenty years in the Trans World Airlines case.

12  There is nothing improper about a purchaser just determining

13  which claims and liabilities it will assume pursuant to a

14  sale.

15        Moreover, the lenders are providing more than

16  adequate consideration through the transaction.  And as Mr.

17  Buschmann testified it was an appropriate exercise of the

18  debtor's business judgement to determine to include, among

19  other things, avoidance actions related to acquired

20  liabilities against the company's trade creditors as part of

21  a sale that also pays substantially all of those creditors

22  because, among other things, it avoids the risk of disruption

23  and useless litigation against the company's go forward

24  business parties, business partners by a third-party that has

25  no interest in the ongoing enterprise.

1         Moreover, this analysis was supported by the

2    conclusions of the UCC's own independent investigation which

3    resulted in further additional consideration for the debtors'

4    estates and their creditors through the additional assumption

5    of or through the assumption of up to $5 million dollars in

6    unsecured claims that, otherwise, would not have been

7    satisfied under the initial stalking horse bid.

8         Now through his testimony Mr. George also produced

9    evidence related to potential claims related to compensation

10   payments that were made to the debtors, officers, and

11   employees, you know, that lead up to the bankruptcy.  And I

12   just wanted to clarify that, notably, the purchaser is not

13   acquiring avoidance actions related to any of those employees

14   or directors, nor is it acquiring any direct claims that any

15   other parties, such as the MDL plaintiffs, may have against

16   directors, officers and employees.

17        The provision that I believe Mr. George was

18   referring to under the APA referred to what is a fairly

19   customary provision in APA's referring to the acquisition of

20   claims related to transfer employees.  In other words, the

21   employees who will be transferred as part of the sale

22   process.  This is really intended to ensure that the future

23   employer, i.e. the purchaser, can enforce claims against

24   acquired employees related to, among things, breach of

25   employment agreements or confidentiality agreements or non-

1  compete agreements or for infringement of company

2  intellectual property.

3       As Mr. Buschmann testified transferring such

4  claims does provide a benefit to the estate because it

5  facilities a sale transaction that pays or provides for the

6  payment of the overwhelming majority of claims against the

7  debtors.

8       And I also just wanted to correct another

9  statement that came out through Mr. George's cross

10 examination where he suggested, without any evidence, that

11 the payment of these compensation -- these bonuses prior to

12 the filing somehow led to a breach of a liquidity covenant

13 and a standstill; however, no such liquidity covenant

14 existed.  Instead, as I think Mr. Buschmann ably testified to

15 the email chain that Mr. George referred to was really just a

16 course of negotiation among advisors to the debtors and the

17 term loan lenders regarding the appropriate amount of DIP

18 financing and a related variance testing that may be included

19 as part of the definitive documentation for that DIP

20 financing.

21      So, in short, the debtors did not willfully breach

22 a liquidity covenant to pay any bonuses and I don't think

23 anything in the record suggests otherwise.

24      I believe the (indiscernible) also point to

25 multiple sources of unencumbered value that is apparently

1  being transferred for no consideration.  Again, as the record

2  demonstrates there is above and beyond the credit bid for the

3  face amount of the term loan debt. There is also in excess of

4  $150 million dollars of assumed liabilities through the sale.

5          And if I could just address as well, Your Honor,

6  the point that Mr. George made about the tax refunds under

7  the CARES Act and where he suggested that perhaps the NOL

8  could have been marketed separately.  Simply put that just is

9  not possible.  You can't just pluck and NOL out of a company

10 like you can a piece of machinery or equipment and sell it to

11 a third-party.

12         In short, these are tax attributes that would have

13 followed the company under the sale.  And pursuant to the

14 CARES Act regulation they would have been -- or absent the

15 CARES Act they would have been subject to significant

16 reductions and limitations under the tax code and also the

17 new company's go forward use of those tax attributes would

18 have been at a lower effective tax rate.  In other words,

19 would not have received as much economic value were it not

20 for the refund.

21         MR. GEORGE:  Your Honor, excuse me.

22         Counsel is testifying about what regulations say.

23 None of this is in the record.  I tried to hold my tongue,

24 but he is really going beyond the pale now.

25         THE COURT:  Well, Mr. George, I know. I heard what

1  was in the record.  So, I appreciate your points, but I

2  understand.

3          Mr. Hayes, you may continue.

4          MR. HAYES:  Certainly.  So, I will just wrap-up on

5  that, Your Honor, and I will note that the proceeds related

6  to any of the refunds are also not only acquired, as Mr.

7  Buschmann testified, assets under the APA, but they are also

8  subject to prepetition liens of the term loan lenders as well

9  as the DIP liens.

10         Finally, Your Honor, I -- sorry, to wrap-up, Your

11 Honor, I would just like to address that debtors do believe

12 that they have maximized value for their estates, as I

13 indicated above.  And although certain contingent litigation

14 claims have been left behind, I do not believe that that

15 means that the debtors have not maximized value.  I believe

16 that the record amply supports that.

17         Your Honor, I think I will just pause there.  You

18 know, to the extent Your Honor has specific questions for me

19 I'm happy to address them at the end after other parties have

20 argued as well as walk through certain other changes to the

21 order that have been made over the course of the day.

22         THE COURT:  Okay.  I don't think I have any

23 specific questions, Mr. Hayes, maybe just a clarifying point.

24         MR. HAYES:  Sure.

25         THE COURT:  With respect to the alleged avoidance

1   actions related to the bonus and compensation payments that

2   have been highlighted in the papers I just want to be clear

3   that those types of claims are being transferred to the

4   purchaser.  Is that correct?

5          MR. HAYES:  Yeah. I'm sorry.  Can you say that

6   again, Your Honor?  The avoidance actions.

7          THE COURT:  Right.  The claims and causes of

8   action related to the directors and officer's compensation

9   payments and retention payments made in 2019 and 2020.  I

10   want to be clear those are "transferred" causes of action

11   that will be purchased by the purchaser in the sale

12   transaction?

13          MR. HAYES:  Yes.

14          THE COURT:  Okay.  That's what I thought, but I

15   just wanted to make clear for myself.

16          Okay.  Well, I have no questions with respect to

17   your presentation.  Why don't I ask if there's any other

18   parties in support of the sale that would like to make any

19   statements before we turn the podium over to the objecting

20   parties.

21          MS. STEEGE:  Your Honor, this is Catherine Steege.

22   I represent the official unsecured creditors committee.

23          The committee's position is that the proposed sale

24   is in the best interest of all stakeholders as a whole in

25   this case and we would ask the court to approve it.

1          The proposed sale is going to allow Akorn, if it's

2     approved, to continue to operate.  It's going to save the

3     jobs of its employees and significantly, unlike so many other

4     cases that are being filed right now in this pandemic, this

5     is going to result in most unsecured creditors, those holding

6     undisputed non-litigation claims being paid in full.

7          For the handful of unsecured creditors that are

8     not being paid in full, the objectors, the MDL plaintiffs,

9     it's important to note that they hold unliquidated, very

10    hotly contested and disputed contingent claims of uncertain

11    value that may never turn into claims of actual dollar value

12    depending on how that litigation proceeds.  They also have

13    many other parties that they have sued that they can collect

14    from.

15         It's simply not in the best interest of the vast

16    majority of stakeholders in this case to reject this sale on

17    the basis that maybe someday in the future, after

18    considerable expense, these highly disputed claims might

19    recover more by advancing speculative litigation against the

20    lenders, or the debtor's management, or by waiting around for

21    another buyer who may never come forward.

22         It's important that Akorn emerge from bankruptcy

23    now to stop the cost of this Chapter 11, to return it to the

24    operation of just its business and not managing a bankruptcy

25    case, and allowing all of these other creditors to be paid in

1  full and to go on with their businesses.  For this reason,

2  the committee supports the sale.

3          Turning to the objector's specific arguments the

4  argument that they make in their brief is that the debtor

5  isn't acting in good faith because the sales process,

6  essentially their argument is, didn't produce a buyer that

7  will pay every claim in full including their disputed claims

8  or allow them to continue litigation that the term lenders

9  wish to purchase, but that really isn't the (indiscernible).

10          Here, the evidence shows that the debtors engaged

11  in two sales processes.  They did a sales process pre-

12  bankruptcy and then they did a second sales process post-

13  bankruptcy.  And as the evidence shows this marketing process

14  necessarily was robust because as a result of that marketing

15  process another group of buyers came forward and there was a

16  substantial amount of time and effort spent working with that

17  other group of buyers and the lenders agreed to continued

18  dates, they changed deadlines within their debtor-in-

19  possession financing order to allow all parties to explore

20  that alternative transaction.

21          While it's unfortunate that it didn't go through

22  the fact is that the existence of that, and the evidence

23  about all of that, and the lenders cooperation with allowing

24  the parties to explore that transaction demonstrates that the

25  debtors were acting in good faith and that the lenders in

1    their capacity as creditors rather than purchasers were

2    acting in good faith.  And as purchasers by deferring and

3    allowing that to occur they also acted in good faith.

4            So, to the extent that there is some argument here

5    that this sale should not be approved because somebody didn't

6    act in good faith the court should overrule that.

7            The objectors also attempt to paint the sale as a

8    giveaway to the lenders.  That the debtor is, essentially,

9    just turning this company over for no consideration.  The

10   fact is that there is a close to a million-dollar loan that

11   will be satisfied as a result of the term lenders bidding in

12   their debt and the lenders are also assuming substantial

13   liabilities.

14           From the get go they had agreed to assume

15   liabilities for a whole host of executory contracts,

16   suppliers, vendors, parties, and they increased that as a

17   result of negotiations to basically cover everybody who

18   doesn't have a litigation contested disputed claim.

19           So, to paint this sale as one where the lenders

20   are just coming in and steeling the company in a way where

21   there is other viable alternatives is really not a fair

22   characterization of the sale and it ignores the economic

23   realities of what the lenders are paying in terms of bidding

24   in their debt and the assumption of liabilities which are

25   estimated to be over $150 million dollars.  No one has

1  contested that number.  The objectors put forth no evidence

2  to suggest that that's not a valid number.

3          The objectors also asked a lot of questions today

4  about potential causes of action and the committee, Your

5  Honor, asked all of those same questions over the course of

6  the two and a half months, three months I guess now that the

7  committee has been in existence.  We've interviewed

8  management.  We looked at, you know, thousands of pages of

9  documents to try to determine whether or not litigation might

10  be preferable to the sale.  Ultimately, the committee's view

11  was that litigation was going to be speculative.

12          The lenders had asserted certain liens upon that

13  litigation and so you would have to have if the objector want

14  to really argue that those causes of action shouldn't be sold

15  to the lenders.  They should have put on evidence of what the

16  value of that was and why it was greater than the amount of

17  the lender's claims such that it should be left behind in the

18  estate and there was none of that evidence here today.  They

19  presented nothing to suggest that those claims have any real

20  significant value.

21          So, we would reject the argument that there is

22  some great pot of litigation claims that could be realized

23  here that are sufficient to overturn a sale that pays the

24  lion's share of debt in this case.

25          One final note, Your Honor, is that in their

1   objection the objectors take a swipe at a particular

2   committee member, Rising Pharma, and they claim that they

3   should have been on this committee that somehow, they were

4   prevented from participating and that Rising Pharma shouldn't

5   have been on the committee.

6           I will note that what they say about Rising Pharma

7   is not accurate.  Rising Pharma, itself, went through a

8   bankruptcy, a 363 sale.  The current owners and management of

9   that company have really nothing to do with what happened

10  under the prior management.  And it's the U.S. Trustee that

11  selects the committee.  They chose, in their discretion, to

12  put Rising Pharma on.

13          The MDL plaintiffs indicated they asked to be on

14  the committee.  They chose not to avail themselves of

15  remedies that would have been available to them to seek the

16  court's intervention to put them on the committee and that

17  ought to be the end of that.  That's really a side show,

18  casting stones at the committee.

19          We would also point out to the court that we spoke

20  with counsel for these objectors and many of the other

21  parties who have filed objections to confirmation of the plan

22  throughout this case to get their views and to get an

23  understanding of where they were coming from, but at the end

24  of the day the committee, in the exercise of its judgment,

25  determined that the best interest of this estate and

1  stakeholders is best served if this court approves the sale.

2          The sale provides tremendous value and, in fact,

3  payment in full to the vast majority of general unsecured

4  creditors following two efforts to market this company.  The

5  alternative is a liquidation which promises the destruction

6  of the debtor as a going concern followed by years of

7  protracted, expensive and uncertain litigation of an unknown

8  value.  There is no plausible argument for taking these cases

9  down that path.  For that reason, the committee urges the

10 court to approve the sale.

11         THE COURT:  Thank you, Ms. Steege.  I appreciate

12 the committee's comments.

13         Okay.  Is there anyone else in support of the sale

14 that would like to make any comments?

15         MR. GREENBERG:  Yes, Your Honor.  Its Scott

16 Greenberg from Gibson Dunn on behalf of the ad hoc group and

17 the DIP lenders.

18         THE COURT:  Yes.  Please go ahead.

19         MR. GREENBERG:  Thank you, Your Honor.

20         First, I just want to express our appreciation.

21 Obviously, we have been going for a while today.  And I know

22 we still have a road to how as in terms of the confirmation.

23 So, I will try to be brief.

24         And I would also really like to express a thank

25 you to the UCC not only, obviously, for working with the

1  lenders to get to a resolution of our differences, but more

2  importantly just for their constructive and pragmatic

3  approach to these cases as a whole.

4          Your Honor, it's been, as Your Honor knows from

5  overseeing the cases, a relatively quiet and smooth case. So,

6  I guess it's only fitting that we have a little bit of

7  fireworks at the end here.

8          Your Honor, more specifically, as we turn to the

9  sale today since we bifurcated, you know, the plan from the

10  sale we want to deal with the one objection and we agree with

11  Mr. Hayes putting the cure objections to the side because

12  those will either be resolved consensually and many of them

13  already have been or we'll work to do that.  We only really

14  have one subset of objections to the sale and that's the MDL

15  plaintiff's objection which we've heard about today.

16          Your Honor, it's our position, as you've seen from

17  our pleading, that their objection should be overruled and,

18  obviously, the sale transaction should be approved.  The MDL

19  plaintiffs both in their pleadings and through the testimony

20  they tried to elicit from Mr. Buschmann today has leveled a

21  lot of accusations that both the debtors and the secured

22  lenders, but they suffer from one fatal flaw in our position.

23  They're just not simply supported by the facts of the case.

24  And, candidly, they contradict a lot of the direct testimony

25  that we heard from Mr. Buschmann today.

1          There are basically two themes that came out in

2     the papers and through their cross examination today.

3          The first of which is that the sale transaction

4     was the culmination of years of careful collusion between the

5     debtors and the prepetition term loan lenders to artificially

6     inflate the amount of our claims and to ensure a friendly

7     turnover of the assets of the estate to our clients, the

8     prepetition secured lenders.

9          Secondly, that the prepetition secured lenders we

10    are a stalking horse bid are not entitled to certain

11    unencumbered assets including avoidance actions on account of

12    our bid.

13         I am going to address both of these points in

14    turn.  And just a little bit of procedural history, not to,

15    you know, prolong the record, but I think it's important when

16    we talk about some of the good faith allegations that have

17    been alleged by the objecting parties.

18         As Your Honor heard from Mr. Buschmann, since

19    November of 2018, we've been at this for a while, the

20    prepetition term loan lenders have been in contentious --

21    sorry, continuous good faith and often contentious

22    discussions about potential paths forward with the company.

23    I think Mr. Buschmann at certain points in his testimony

24    described those negotiations as bruising. And having lived

25    through them myself I came to agree with his description.

1          As Your Honor knows, after our initial standstill

2 agreement the debtors launched a comprehensive refinancing

3 process in August of 2019.  That culminated in late November

4 of 2019.  And as Your Honor knows, because we're here before

5 you today, that did not result in the refinancing of the term

6 loan lenders despite the best efforts of the debtors and

7 their investment banker.

8          After that refinancing fell down the prepetition

9 term loan lenders decided to extend the standstill agreement

10 as the debtors needed time to explore other avenues that

11 would pay back the prepetition term loan lenders in full.

12 That included an adequate sale process which was launched in

13 December of 2019.

14          As you heard through Mr. Buschmann's testimony and

15 as part of the evidentiary record today they reached out to

16 over seventy-two potential purchasers, thirty-two of which

17 signed NDA's.  A pretty robust process. And unfortunately,

18 just like our refinancing process, despite the best efforts

19 of the debtor and their bankers that sale process also failed

20 to produce a purchaser willing to pay off our clients.

21          Your Honor, you have the history of a failed

22 (indiscernible).  You then have an attempt to sell this asset

23 out of court.  You have a failed process and it was only at

24 that point in time, I think Mr. Buschmann referred to it as

25 the toggle, that we all collectively toggled to an in court

1  sale process, again, once again trying to market the company

2  to come up with a bid to take our clients out in full.

3       Your Honor, I would submit despite the various

4  allegations in the pleadings that were submitted by the MDL

5  plaintiffs that spending several months first trying to re-

6  buy us out and then another nine months between prepetition

7  and post-petition trying to find a buyer other than my client

8  for this asset does not exactly equate to scheme somehow

9  between the debtors and the lenders to hand over the keys.

10      It illustrates a process, though, that was

11  designed, first and foremost, to pay back our clients in

12  full.  That has always been the goal and you heard it a lot

13  from Mr. Buschmann today. I don't think our clients at any

14  point in time have hidden their agenda which was they wanted

15  to have their loan paid back in full in cash.

16      And you saw that, Your Honor, even though the

17  post-petition processes as Mr. Hayes pointed out.  You know,

18  just recently, several weeks ago, despite the fact that

19  August 3rd came and went and we didn't have a qualified bid

20  pursuant to the bid procedures, despite the fact that the

21  debtors had canceled the auction on August 7th, when a third-

22  party materialized with a potential bid having missed all the

23  bid procedures deadlines we quickly caucused with both the

24  debtors and the UCC and agreed to extend the milestones both

25  under our DIP and under the RSA to allow that to be

1   materialized.

2           It's always been our intent to try to get paid out

3   in cash and despite everyone's best efforts we just didn't

4   get there.  So, Your Honor, I would submit we actually stand

5   before you today as an owner of last resort.  Many of the

6   prepetition term loan lenders in our group, Your Honor, are

7   par lenders that have owned this loan since it was originally

8   syndicated.

9           These lenders have wanted nothing more now for

10  almost two years then to be taken out in full and we've made

11  every effort to accommodate to make this happen.  And despite

12  everyone's best efforts and despite the record that Mr.

13  Buschmann set forth before Your Honor today in great detail

14  that hasn't come to pass I think through no fault of the

15  debtors or the other parties in interest.

16          Your Honor, just a couple other points I want to

17  hit quickly because I think they relate to our credit bid

18  specifically.  So, I feel there's something that, you know,

19  we should cover as the secured lender.

20          One is the unencumbered assets argument in the

21  papers.  Your Honor, under Section 363(k), obviously, the

22  prepetition term loan lenders are entitled to credit bid up

23  until the full amount of their claim.  That's also picked up

24  in the final DIP order at Paragraph 26.  Nothing surprising

25  there, that's just the law.

1           To be clear, Your Honor, we didn't dispute, and I

2    think we said this in our papers, the contention that

3    somehow, we can credit bid against unencumbered assets that's

4    clearly not our position.  I think the problem is the MDL

5    plaintiffs have skipped a couple very important facts when we

6    talk about what assets are out there and what truly is

7    unencumbered.

8           The first is as part of our prepetition credit

9    agreement the lenders have a lien on substantially all of the

10   debtor's assets.  Those documents are now part of the record.

11   I believe they came in from Mr. Buschmann's testimony this

12   morning.  They're Exhibits 48 through 50.

13          In November of 2019, as part of the standstill

14   process and the amendments that we were negotiating

15   prepetition there was a pledge as part of one of those

16   negotiations of 100 percent of the debtor's top tier foreign

17   subsidiaries that increase the collateral package.  And as

18   often the case as a secured lender cleaned up any holes in

19   their collateral package.

20          Finally, Your Honor, by the time we got to the

21   filing of these cases before Your Honor we, obviously, put in

22   a $30 million dollar DIP facility and as Mr. Buschmann

23   testified that DIP facility, and as specifically set forth in

24   the final DIP order at Paragraph 7(a), picked up any

25   unencumbered assets.

1          In addition, and I don't think we need the

2    addition, we also have adequate protection liens under the

3    DIP order as the final DIP order (indiscernible), that would

4    also grab unencumbered assets.

5          In addition to our lien and our collateral

6    package, which, Your Honor, our strong view and I think the

7    debtor shares this view is it covers the universe.  As Mr.

8    Hayes pointed out it's not just the credit bid that our

9    clients are putting forward, right.  There's also additional

10   consideration as part of this credit bid and sale today and

11   that's approximately $150 million dollars give or take.

12         One is the assumed liabilities which is

13   approximately $115 million dollars.  Then there is a wind-

14   down budget of $35 million dollars which importantly, Your

15   Honor, you know, for purposes of this case, are there to

16   ensure that when this sale closes we're not leaving behind an

17   administratively insolvent estate which I think we have all

18   wrestled with in other cases and there's something that the

19   debtors were steadfast in pushing the lenders to make sure it

20   didn't occur here.  The lenders conceded that point and were

21   willing to leave these dollars behind.

22         So, to be clear, Your Honor, it's the debtors and

23   the lenders understanding that there are no unencumbered

24   assets beyond the reach of our DIP liens, but even

25   hypothetically if there were, for argument sake, we have $100

1  million dollars of incremental value that's part of the

2  consideration to close this sale that we think would more

3  then cover anything that's out there which, again, we don't

4  think is this.

5         Last point, Your Honor, and I will try to be

6  brief, are the avoidance actions because the MDL spent a good

7  amount of time in their papers focusing on supposedly

8  valuable avoidance actions that are being acquired by the

9  prepetition term loan lenders.  Again, in perfect candor with

10  the court and Your Honor it is true, as part of our

11  negotiation with the UCC, that we, in fact, did not take a

12  lien as part of the DIP on the avoidance actions in the final

13  DIP order.  So, that is accurate, but that does not mean,

14  however, that we can't acquire those assets through the sale

15  process.

16         As I've already explained there's $150 million

17  dollars of incremental value coming in.  And both the

18  debtors, in their papers, and I think the UCC in their papers

19  have done what they always do, like they do their analysis to

20  figure out what they think those avoidance actions are worth

21  and whether or not they really were, you know, pursuing and

22  holding onto.

23         I think they both reached the conclusion that they

24  weren't, but there's intrinsic value if you think about it

25  from a purchasers standpoint, not that we think there's

1  dollar value in those avoidance actions, but as the new owner

2  of the asset just from a commercial standpoint you don't want

3  a third-party who's got no skin in the game coming after

4  employees, coming after contract parties, coming after your

5  vendors.  It undermines our ability as the new owners to

6  operate the assets and that's really the value of their

7  avoidance action from our perspective, not that there's some

8  hidden great dollar value we think exists.

9       Your Honor, my last point is just good faith

10 because, again, it's been hit on.  363(m), Your Honor, as you

11 know, protects an asset purchaser pursuant to a 363 sale from

12 the risk of losing its interest in acquired assets to the

13 extent that a sale is reversed on appeal so long as it was

14 conducted in good faith.

15      Your Honor, it's our strong position, and I think

16 the record today supports, that the prepetition term loan

17 lenders have been the epitome of acting in good faith

18 throughout these cases.  Look, it's been contentious at

19 times; there's no question about it.  I don't think Mr.

20 Buschmann would disagree or his testimony.  Again, I use the

21 word bruising, but that's different from not acting in good

22 faith, Your Honor.

23      Multiple occasions for a pre- and post-petition

24 we've shown our flexibility with these debtors and we've

25 given them more time, first, to run a (indiscernible) process

1   then to run a sale process, to run an in-court sale process.

2   You know, from our position as it related to November of

3   2018, you know, we could have taken a very different approach

4   and we didn't. We worked with them to allow them as the

5   debtors and the board in their business judgment to

6   facilitate what they felt would be a maximizing transaction

7   for the benefit of all stakeholders.

8          Your Honor, in closing I would just say as much as

9   we would have liked to see an alternative transaction arise

10  when they would have paid us off and we thought we were there

11  a couple weeks ago, here we stand today and, you know,

12  fortunately or unfortunately this transaction is the only and

13  best path forward for the debtors.

14         We've stepped up at each stage of these cases

15  first to funding a DIP, then through committing to a wind-

16  down budget to assure administrative solvency, assuming large

17  amounts of liabilities and, finally, broker with the UCC to,

18  essentially, pay-off, as you heard from Ms. Steege, all non-

19  litigation and contested claims that are being assumed.

20         So, I think, Your Honor, the last point I'll make

21  is I think time is of the essence.  You heard from Mr.

22  Buschmann that cash is getting tight as we get to the end of

23  September.  You know, these DIP proceeds were only meant to

24  last for so long and I think this debtor, for the better part

25  of the last two years, has overturned every stone it could to

1  try to find an alternative transaction and here we stand.

2          So, I would ask Your Honor to overrule the

3  objection before you and allow these debtors to close the

4  sale process and continue as a going concern.

5          Thank you, Your Honor.

6          THE COURT:  Thank you very much.

7          All right.  Is there anyone else that would like

8  to speak in support of the sale?

9      (No verbal response)

10          THE COURT:  Okay.  Then I will turn it over to the

11 objecting parties.

12          Mr. George, the podium is yours.

13      (No verbal response)

14          THE COURT:  I'm sorry.  Mr. George, your phone may

15 be on mute.

16          MR. GEORGE:  I got it, Judge.  Thank you.

17          Your Honor, we certainly don't contest the

18 debtor's business judgment in seeking a sale; however, I want

19 to try to narrow the issues for Your Honor which are the

20 debtor's approach to the valuation of this company in a

21 holistic way without really taking any effort to try to

22 determine what the component parts could be worth.

23          Now there was a lot of time spent saying that this

24 market approach really tested the value of the property, but

25 we see that there were TED's that were created for this

1   entity that showed creditors being paid. So, this was a

2   conscience choice that the debtor made to go down this line

3   of this sale with the stalking horse bidder.

4           Judge, I don't think it can be understated when,

5   you know, the debtor had an opportunity to file bankruptcy

6   immediately.  Instead it spent $200 million dollars to get to

7   a place where it could avoid playing MDL creditors.  And I

8   think when we talk about good faith, we have to talk about

9   everybody's good faith in the case.

10          Do we want to approve sales where officers and

11  directors who were alleged to have engaged in illegal

12  criminal and anti-competitive behavior are benefited by the

13  sale of assets without any commensurate value coming back to

14  the debtor's estate.  There are no liens on the Chapter 5

15  claims.  There has been no attempt to value them.  To say

16  that they're speculative is something you could say about

17  every single litigation claim.  They're all speculative.

18  Everybody starts with the intention, but when somebody wins

19  and somebody loses.  But to say that they are without merit

20  is a whole different thing.

21          Speculative is a whole continuum of things.  And,

22  you know, that doesn't mean that that the claims don't have

23  value, but there was no effort to try to value them at all,

24  Judge, so that we could try to determine whether anybody is

25  paying value for them.  I don't see any evidence of $100

1   million dollars in incremental value coming back in.  All of

2   those numbers are built into the credit bid.

3            So, I don't believe that the debtor is acting in

4   good faith.  Listen to the evidence that was presented about

5   the professionals not even knowing about the existence of the

6   MDL litigation.  Judge, we're talking about funds, elderly

7   people, (indiscernible) people who were gouged on prices.

8   These aren't just regular tort claims.  These are serious

9   claims that go right to the heart and the integrity of the

10  management of this company.

11           What is happening by virtue of the sale is those

12  individuals are getting scape.  They're getting off this

13  liability and they're going over and unabashedly going to run

14  this company again in Akorn II.  Do we want to incentive

15  people who are accused of this kind of behavior to enter into

16  negotiations with a bank that protects them?  Do we want

17  debtors-in-possession entering into arrangements to favor

18  themselves with executive compensation prior to the

19  bankruptcy so much so that it causes issues with respect to

20  their liquidity.  There are no liens on those Chapter 5

21  claims.  And there has been no valuation of them.  They can't

22  be swept up in a credit bid.  They just can't.  There is no

23  lien on them.

24           As for the tax refund --

25           THE COURT:  Mr. George, let me ask you this.  You

1  said there's no valuation of the Chapter 5 causes of action

2  that are being transferred to the purchaser, but they were

3  marketed.

4          Doesn't that speak volumes --

5          MR. GEORGE:  Right, Judge.

6          THE COURT:  But doesn't that speak volumes as to

7  the value of those if there's no topping bid?

8          MR. GEORGE:  Well, Your Honor, that suggests that

9  somebody would have been in a position to just buy the claims

10 or that someone that was buying the company would be

11 interested in those claims.  I can't imagine somebody buying

12 that company and wanting to pursue claims against the

13 existing officers, and that's all the more reason why they

14 should have been left behind.

15         But they weren't left behind, solely to protect

16 the officers and directors of this company.  Every bad thing

17 that happened to this company, there's some officer or

18 director that's responsible, whether it's the fraud that was

19 perpetrated on the FDA, whether it's the anti-competitive

20 land and act violations that were involved with Provepharm or

21 whether it was the price-fixing that we allege occurred with

22 respect to our clients, the MDL defendants.  All of them

23 relate to bad acts, not just negligence -- bad acts --

24 intentional torts, violations of law, potentially criminal

25 acts.  And I think that changes completely the dynamic of the

1  nature of the releases that are being granted in this case.

2          These causes of action are being transferred and

3  killed.  The causes of action that relate to their breaches

4  of duty are being transferred and killed.  And there's no

5  value coming back to the bankruptcy estate.  Any value is

6  value to the purchaser, but it's not value to the bankruptcy

7  estate.

8          And the same thing I would say, with respect to

9  the assumed liabilities.  There's no value coming into the

10 bankruptcy estate by the bank picking vendors to assume

11 because if they didn't do, that they'd be in a pot, the same

12 pot that we're in, and there'd be nothing to pay them.  So,

13 it may be a benefit that's provided to those vendors, but

14 it's not a benefit at all to the bankruptcy estate.

15         And, Judge, with respect to the tax refund, this

16 tax refund was fought for post-petition.  It's not part of

17 the bank's collateral.  It's not a proceed of the bank's

18 collateral, so if the bank had a lien on it, on those kinds

19 of things prepetition, this arose post-petition, as a result

20 of a post-petition request, so the bank does not have a lien

21 on that tax return or that tax refund.  And so, I don't think

22 there's any evidence that they do in this case.

23         So, Judge, when you look at this transaction, this

24 transaction is distressing maybe not so much from the

25 valuation standpoint, but from what's moving over and from

1   what these officers and directors, who are wholly responsible

2   for the loss in value of this entity, from a four-billion-

3   dollar entity that would have been sold to Fresenius to

4   something that a year later is being sold for the bank debt,

5   all of those things happened because of the officers,

6   directors, and the senior management of this company, not

7   because of the MDL defendants' litigation, not because of the

8   Fresenius litigation, not because of the Provepharm

9   litigation.  All of these injuries took place because of the

10  bad acts of these officers and it's not good faith for the

11  debtor to allow those transactions to go over and favor those

12  insiders and favor those officers and directors, the same

13  officers and directors that they loaded up with bonuses on

14  the eve of the bankruptcy.  It's not fair to unsecured

15  creditors and it's not liened.

16          And so, Your Honor, we have a real problem with

17  the way that this transaction has been structured, not so

18  much for the sale in the sense that there were no bidders.

19  There were no bidders.  But it was certainly set up to make

20  sure that the bank was a bidder and it foreclosed all other

21  options for the sale of this company.

22          And I didn't hear anything from Mr. Buschmann why

23  the debtor couldn't immediately file and then make the deal

24  with the bank going forward as to how it would handle.  The

25  bank, at that point, was likely oversecured, and so, I have

1   very few times, have seen a debtor go into bankruptcy in an

2   oversecured position and see the lender pushing them around

3   too terribly.

4            So, you know, this company has deleveraged itself,

5   Your Honor.  By the passage of time, it's gone from having

6   over nine times of leverage to down around three or four.

7   Well, that's significant.  And just as virtue of the

8   bankruptcy, it didn't happen as a result of the sale.  It

9   didn't happen as a result of (indiscernible) of any of these

10  claims.  It happened as the passage of the time.

11  And this debtor chose to sell its business when it was in a

12  trough of revenue.  Its revenue was in a low point and that's

13  why it made that decision to sell.

14           If they would have decided to file immediately,

15  you could have run this company for a couple of years and I

16  think they would have easily gotten a DIP based on these

17  finances and the cash flow, but that didn't happen in this

18  case.

19           Your Honor, the bad faith, I think, of these

20  officers is one of the major issues that we have here.  That

21  these benefits that are being provided to them by killing

22  these claims is unfair to the creditors.

23           Now, Your Honor, there's a lot of comment about

24  the creditors committee.  I reached out to Ms. Steege four

25  times, never had a response from her.  We didn't hear that we

1    weren't getting on this committee until a week ago.

2              We had requested that we be put on in the first

3    week of this case and we raised all these issues about the

4    constituency of this case and it wasn't until last week that

5    Ms. Leamy finally told us we weren't going to be on.  So, I

6    guess we could have filed a motion to reconstitute while the

7    U.S. Trustee was considering it.

8              The fact of the matter is we have relied on the

9    people in the government to do their job to make sure that

10   the right people are on that committee and in our view,

11   they've failed.

12             Rising Sun is an entity that was an MDL defendant,

13   a successor to it.  There are people on the committee that

14   are recipients of the largesse of this transaction and in our

15   view, they weren't in a position to help us out in this case

16   or to deal with us and I think it's telling that all the

17   debtor had to do was go to the committee and say, Well, we'll

18   assume the rest of the vendor debt as long as the MDL and

19   Fresenius and Provepharm get nothing, we'll pay these

20   vendors, and the committee considers that a success.

21             Well, Judge, we're a constituency, a committee, as

22   well, and so is Provepharm and we don't see how the committee

23   spent any time trying to benefit a class of creditors where

24   we, if we end up being adjudicated to have claims against the

25   other MDL defendants, we would have likely been the largest

1   creditor in this bankruptcy case because the elephantine size

2   of the claims that come about as a result of these claims.

3            The debtor spent $20 million on professionals

4   getting to this standstill, $100 million on fees and charges

5   to the bank in this case.  And that's a lot of money, Judge,

6   and our view is that that could have been better spent.

7            But getting directly to the issues, Judge, we are

8   focusing on the Chapter 5 transaction, the tax refunds, and

9   the efforts to favor the officers and directors.  We don't

10  think those were appropriately valued.  We don't think that

11  the bank has liens on these claims and we don't think that

12  they should be approved as part of the sale.

13           And, Your Honor, I think you could approve the

14  sale without those claims going along.  I don't think it

15  changes the finances of this matter in any material way and I

16  don't think there was any real testimony to that effect.  I

17  heard counsel for the ad hoc committee argue it, but there's

18  no evidence of that in this case.

19           So, Your Honor, had this debtor valued this entity

20  using a TEV, which it had an opportunity to do, maybe this

21  case would have come out differently.  I'm not quite sure

22  because the debtor made every effort not to do that, and

23  that's a concern of ours about whether the debtor acted in

24  good faith in this case and whether the debtor, under the

25  control of these officers, who are so happy to have

1  themselves get off with their liability that they didn't

2  care, and so that's a big concern for us in this case, Your

3  Honor.

4         Judge Lasseter's opinion, Judge, it's quite

5  shocking if you have an opportunity to read it.  It's very

6  long, but in the first 20 pages, he regales you with the

7  efforts that the debtor made to express that there was no

8  material adverse change, but in the interim, he mentions

9  things like Mr. Bonaccorda (phonetic) killing an

10  investigation into the bad acts that resulted into the FDA

11  proceeding.

12        He mentions Mr. Bonaccorda asked that Cerulean

13  remove from the document any reference to potential criminal

14  activity by the officers, directors, and senior management of

15  this company.  So, Mr. Bonaccorda is supposed to be looking

16  out for the company, not for the principals, and the fact of

17  the matter is, Judge, all of these bad acts are because of

18  the management of this company and if you approve this sale

19  and allow that those transactions move over to the purchaser,

20  then you'll be creating a bellwether case for cases like this

21  where banks go in and they see exposure and they make a deal

22  with management to get them releases and people that are

23  injured by these kinds of MDL behaviors will never get a

24  recovery, and that's our concern.

25        And we know that there are other bankruptcies

1   pending for other pharmaceutical companies that are going to

2   be looking to Your Honor to make the decision here that will

3   allow them to continue to go on.  And there's a multiple

4   overarching issue, Judge.  They raised the issue about

5   employees.  You know, I think there are many bankruptcy cases

6   that say that retention of jobs is not a concern for this

7   Court and I know that we're all here and we're all humans and

8   it all matters, but that doesn't provide any benefit to this

9   estate.

10          What we should really be concerned about, Judge,

11   is officers and directors engaging in unlawful, criminal

12   behavior and then having the bank come n because the bank had

13   some need for them or maybe it wants them to go along with

14   the transaction, and then lubricate the efforts to do that by

15   allowing bonuses to be paid, even when they violate liquidity

16   covenants, and taking transactions when they were questioned

17   and moving them over to the bank without any evaluation and

18   without any determination of whether those are valid claims.

19          And I'm not satisfied by the committee's statement

20   that they're speculative, because I think every piece of

21   litigation that starts is speculative, and so I'm not, in any

22   way swayed by the notion that the committee has done its job

23   here, because it hasn't.  Because there are millions and

24   millions and millions of dollars where the creditors are

25   going to get no recovery in this case.

1          So, Your Honor, I think there has been a

2    demonstration of bad faith by the officers and directors,

3    including officers and directors who received interest about

4    this company and never delivered it to Mr. Buschmann after

5    Mr. Buschmann made the express representation that he had a

6    discussion with the debtors and he told them that anybody

7    that comes through should be (indiscernible) to them and then

8    we see someone who makes an offer or who is interested in

9    making an offer and one of the senior VPs says, No, we're all

10   done.  We got it done, because the bid -- the stalking horse

11   deal was done -- and we'll let you know if it doesn't work

12   out, we're closing it in the third quarter.

13          Well, we don't know, Judge, whether Mr. -- whether

14   that gentleman would have been a bidder in the case.  That's

15   bad faith.  And so, as a consequence, I don't think that this

16   sale went forward in a way that Your Honor contemplated and I

17   don't think the objectives that it's seeking to obtain are

18   appropriate under the circumstances.

19          Thank you, Judge.

20          THE COURT:  Thank you, Mr. George.

21          Is there anyone else who wishes to speak in

22   opposition to the sale today?

23       (No verbal response)

24          THE COURT:  Okay.  I'm not hearing anyone.

25          Why don't I turn the podium back over to counsel

218

1   for the debtors, who saved some time for rebuttal.  And I'll

2   allow you, the looks like -- is it Mr. Nash that subbed in

3   for Mr. Hayes? -- am I getting the faces correct?

4           MR. NASH:  Good afternoon, Your Honor.  Pat Nash

5   from Kirkland & Ellis, on behalf of the debtors.

6           Your Honor, I just want to speak, you know, we

7   have press on the phone and we have been very patiently

8   listening to this, but there is nothing in the record about

9   criminal conduct and the various allegations that Mr. George

10  is making are totally unsupported by the evidence.  There's

11  no criminal investigations related to this company or

12  anything of the sort.

13          And Your Honor heard, you know, the closing

14  argument of Ms. Steege and the investigation that they did

15  and the record couldn't be more clear, Judge, that we turned

16  over every rock to maximize value.  To the extent that we

17  have confirmation issues, we can deal with them later this

18  week, but in terms of maximizing value and whether the term

19  loan lender credit bid represents the highest and best and,

20  frankly, only available transaction for this company is

21  simply beyond dispute.

22          There are approximately 2,000 people that work for

23  Akorn that are going to keep their jobs on account of this

24  transaction and Mr. George actually gives some small detail

25  that these lenders are assuming $150 million of unsecured

1  claims and providing a thirty-five-million-dollar wind-down

2  budget.

3          Your Honor, we're administratively solvent

4  standing on our heads because of how cooperative these term

5  loan lenders were in terms of the back-and-forth that we went

6  through prepetition with these folks.  We filed, Your Honor,

7  with a thirty-five-million-dollar wind-down budget in the

8  stalking horse APA and it's going to be sufficient.

9          And so, some idea that this is some, you know,

10  underhanded, bad, or negative result for the company is

11  totally unsupported by the evidence, as is at least 99

12  percent of what Mr. George has been saying in his argument

13  and, you know, we have press listening and I just couldn't

14  resist speaking, Your Honor.  Thank you.

15          THE COURT:  Okay.  Thank you, Mr. Nash, I

16  appreciate it.

17          Just one point of clarification and I'm just

18  confused as to what's going over to the purchaser in terms of

19  acquired causes of action against the directors and officers.

20          I've read all the pleadings submitted in this case

21  and to me it seems as if the estate causes of action against

22  directors and officers related to the litigation that Mr.

23  George keeps referring to is not causes of action that are

24  being purchased by the term loan lenders.

25          Is that -- am I mistaken on that?

1          Why don't you walk me through.

2          MR. HAYES:  You're not, Judge.

3          THE COURT:  Okay.  So, that is not being acquired;

4    it's just simply the --

5          MR. HAYES:  Potential fraudulent transfer claims

6    that someone cough brought for what I would tell you are

7    garden-variety bonus payments, Your Honor, that Ms. Steege

8    looked into and, you know, determined are not worth pursuing.

9    Those claims and causes of action are being transferred to

10   the purchaser.

11         To the extent that Mr. George's clients have their

12   own claims against, you know, the directors, none of those

13   are being impacted by this transaction.  As Your Honor knows,

14   we have an opt-in plan.  There are no nonconsensual, third-

15   party releases of any kind.

16         THE COURT:  Any estate causes of action against

17   the directors and officers for those matters to the extent

18   that they still exist are being addressed in the plan, not in

19   this sale that's being proposed to me currently.

20         MR. HAYES:  Correct.

21         THE COURT:  Okay.

22         MR. HAYES:  Thank you, Judge.

23         THE COURT:  Thank you for that point of

24   clarification.

25         Okay.  Is there any other party that wishes to

1   make any brief replies?

2          (No verbal response)

3               THE COURT:  Okay.  Let's take a 10-minute break.

4               I want to -- actually, before we take a break,

5   what is the status -- I believe you were going to report back

6   to me regarding the status of the one open cure objection

7   that hopefully was going to be resolved and, if not, perhaps

8   adjourned to another time.

9               Mr. Hayes, you were going to give me an update on

10  that?

11              MR. HAYES:  Yes.  Thank you, Your Honor.

12              For the record, Christopher Hayes of Kirkland &

13  Ellis on behalf of the debtors.

14              We are not quite resolved, but we have agreed to

15  adjourn that to a future hearing date and I believe there's

16  proposed language in a further revised form of the sale order

17  that I believe was sent over to your chambers very recently

18  to that effect.  So, it is not going forward.

19              THE COURT:  Okay.  Great.

20              Okay.  Let's take a 10-minute break.  I want to

21  gather my thoughts and we'll come back at 4:55 and I will go

22  ahead and rule on the sale.  Thank you all very much.

23              COUNSEL:  Thank you, Your Honor.

24          (Recess taken at 4:41 p.m.)

25          (Proceedings resumed at 4:58 p.m.)

1          THE COURT:  A thorough presentation today with

2    respect to the proposed sale and the few moments you gave me

3    to assemble my thought on the issues.

4          The evidence, which is overwhelming and

5    uncontroverted indicates that the proposed sale to the

6    stalking horse is based on a sound exercise of the debtors'

7    business judgment, predicated on what has been described

8    correctly as a "deliberative process" that arose following

9    the Fresenius Chancery Court ruling and the resulting lender

10   rights and remedies that were triggered under the prepetition

11   credit agreement.

12         The record also reveals that the proposed sale

13   represents a fair price and has occurred in good faith and

14   that there was a fair and adequate notice to parties in

15   interest in the proceedings so that they could come and

16   participate.  There simply has been no evidence presented to

17   counter these findings to challenge the debtors' business

18   judgment and to support the alternative narrative that has

19   been posited by the MDL objectors.

20         The record revealed nothing unusual about the

21   actions and efforts taken to date by the lenders and the

22   debtors; moreover, the MDL objectors may believe that the

23   assets being transferred to the stalking horse are worth more

24   than the purchase price, but such position ignores the

25   economic realities, as played out by the extensive financing

1   and sales processes run by the debtors and their

2   professionals, pre- and post-petition, which yielded no

3   binding topping bid.

4          As noted multiple times by the parties in support

5   of the sale, the market has spoken with respect to the value

6   of the debtors' assets that were marketed pursuant to the bid

7   procedures and included in the stalking horse APA.  These

8   assets included the avoidance actions related to the acquired

9   employees and any CARES Act-related refund.

10         The result of the Court-approved process is the

11  best indicator of value and, importantly, there's no other

12  offer on the table and also no other competent evidence

13  challenging the value being provided by the stalking horse to

14  these estates.

15         The current offer is the best and only actionable

16  transaction supported by most parties in interest and it

17  yields significant value to these estates in the form of,

18  among other things, the continued businesses of the debtors',

19  the preservation of jobs, and trade and other contractual

20  relationships with other third parties that I do not discount

21  in any way, the assumption of a significant amount of the

22  liabilities, the payment of the vast majority of general

23  unsecured claims, and the provision of a wind-down budget to

24  finalize these cases.

25         All of this will be lost if the sale is not

1   approved and, quite frankly, to not do so on this record

2   would be a complete failure of these proceedings and the

3   efforts made to date by the various stakeholders in these

4   cases.

5           Accordingly, for these reasons, I am going to

6   approve the sale, as proposed and I will overrule the one

7   objection of the MDL objectors.

8           Mr. Hayes, I think you mentioned you had a revised

9   proposed form of order.  I think it makes sense to walk

10  through it on the record so parties in interest can

11  understand what the most recent revisions to the order are.

12          MR. HAYES:  Sure, Your Honor.

13          So, again, just to make sure I'm walking through

14  the correct version, this was the version that I believe was

15  emailed to your chambers shortly ago.

16          THE COURT:  Okay.  I have a second-revised

17  proposed sale order that was sent around 4:45; is that right?

18          MR. GEORGE:  Your Honor, is it possible for us --

19  I don't think it was sent to us.

20          THE COURT:  Okay.  Can someone from debtors' side

21  send Mr. George a copy of the current proposed form of order.

22          MR. GEORGE:  Send it to Turner Faulk (phonetic) if

23  you can.

24          MR. ARNAULT:  Would you like me to start walking

25  through it, Your Honor.  I believe I can tick through them

1    relatively quickly.

2              THE COURT:  Why don't we give it a few moments

3    just to see if Mr. George can get a copy of it.

4              I'll note that there are very few changes and it

5    looks like the changes are directed at specific parties, but

6    let's give it a few minutes.

7         (Pause)

8              MR. GEORGE:  Chris, do you mind if I ask you, I

9    got a copy from another attorney -- Turner can you pull that

10   down so I can get the docket -- would it be Docket

11   Number 643-1?

12             MR. HAYES:  No, this is the further revised that

13   was based on conversations with the various contract

14   counterparties over the course of the day.  I believe if it

15   hasn't already hit your inbox, it should momentarily.

16        (Pause)

17             THE COURT:  Mr. Hayes, while we're waiting, can we

18   just talk about tomorrow.  I think we're slated to begin at

19   ten o'clock.  We obviously have a lot of ground that we need

20   to cover, not a lot of time to do it.

21             So, we could we start the proceedings at 9:15

22   tomorrow?  Is that a workable solution or workable --

23             MR. HAYES:  How long do you have?  Do you have all

24   day, Judge?

25             THE COURT:  I do not; however, I'm in the process

1  of moving a few things around.

2        So, I think we have you scheduled from 10:00 to

3  noon right now.  If we could start at 9:15, we'll plan to end

4  at noon, but there's a chance that I could go until 3:30 and

5  push off one of the hearings that I have so it starts at

6  4:00.

7        So, that's in the works.  We have reached out to

8  parties in interest on that matter and we're waiting to hear

9  back.  Unfortunately, we don't have an answer as we sit here

10  today, so I'll have to let you know that tomorrow.

11        I certainly understand that changes things with

12  respect to the witnesses, so I defer to the parties on the

13  end time, but I think they need you to confirm, I guess,

14  whether we can start at 9:15 tomorrow.

15        MR. HAYES:  No issues from the debtors'

16  perspective, Your Honor.

17        THE COURT:  Okay.

18        Mr. George, I assume that's okay with you?

19        MR. GEORGE:  Oh, sure, Judge.

20        THE COURT:  Okay.  Great.

21        And if there's any other parties on the line, you

22  can chime in if you think that's going to be a material

23  problem for you.

24        Okay.  Mr. George, were you able to get a copy of

25  the order?

1              MR. GEORGE:  I don't think so, Judge.  Let's just

2    go through it.

3              THE COURT:  Okay.

4              All right.  Mr. Hayes, why don't you walk us

5    through the revisions, please.

6              MR. HAYES:  Sure.  And as Your Honor previewed,

7    these are revisions primarily intended to resolve specific

8    counterparty objections in connection with the assumption of

9    contracts.

10             The first change is in Paragraph 27,

11   Subparagraph 14, it's just a clarifying edit in the last

12   sentence to change "shall honor" to "shall pay any

13   outstanding amounts with respect to the (indiscernible)

14   contracts."

15         The next edit, Your Honor, is in Paragraph 15 or

16   Subparagraph 15, with respect to the assumption of contracts

17   with leading bioscientists and this just -- this language

18   just clarifies that the parties still have not yet reached a

19   resolution with respect to the cure amounts in connection

20   with the assumption and assignment and that they are

21   reserving their rights with respect to the assumption and

22   assignment of their agreements to the continued hearing date

23   for all of these matters.

24             Similarly, the new language in Subparagraph 16 is

25   with respect to the assumption of certain contracts with

1  Excella PharmaSciences, LLC (phonetic), similarly clarifying

2  the rights and that each parties' rights and that there will

3  be no assumption or assignment pending further order of this

4  Court or submission under certification of counsel by the

5  parties that they have resolved Excella's issues with the

6  assumption and assignment of their agreements.

7           Finally, the last addition is Subparagraph 17,

8  with respect to the assumption and assignment of a contract

9  with Simple Science, LLC -- this is the party that we

10 discussed at the beginning of the hearing -- again, this

11 language just clarifying that pending further order of the

12 Court or resolution submitted under certification of counsel

13 among the debtors, the purchaser, and Simple Science, that

14 all of their objections to assumption and assignment of their

15 contracts are fully preserved.

16          THE COURT:  Okay.  Well, I see no issues with

17 these changes and I had no issues with the form of order that

18 was filed on the docket or the most-recent form.  So, I would

19 just ask you to go ahead and submit this order under

20 certification of counsel with the redlines so parties in

21 interest see it and make sure it is sent over to me or once I

22 see it, I'll go ahead and get it entered on the docket.

23          MR. HAYES:  Thank you, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          I would ask, as well, that you file a notice of

1  amended agenda so you can alert parties in interest that may

2  have stopped participating today that the hearing tomorrow

3  will begin at 9:15.  If you could do that tonight, I would

4  appreciate that.

5           And then what is the plan for tomorrow, are we

6  going right into the evidence or is there -- are there going

7  to be opening arguments?  What's the plan of attack?

8           MR. HAYES:  You know, Your Honor, I think what we

9  would propose is just jumping straight into the evidentiary

10  portion of the hearing.  I think we have a lot of ground to

11  cover and ideally, we could cover that tomorrow with our

12  first witness.

13           THE COURT:  Okay.  All right.

14           Well, then, we'll do that.  So, I will see you

15  all, unless there's anything else we need to discuss in

16  anticipation of tomorrow -- well, let me ask, is there

17  anything else that we need to discuss in anticipation for

18  tomorrow?

19       (No verbal response)

20           THE COURT:  Okay.  I'm not hearing anything.

21           All right.  So, I will see you all tomorrow at

22  9:15.

23           I hope everyone has a nice evening and I'll speak

24  to you and see you then.  Thank you all very much.

25           We'll consider the hearing adjourned.

1          COUNSEL:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3       (Proceedings concluded at 5:09 p.m.)

4

5

6                      CERTIFICATE

7

8      I certify that the foregoing is a correct transcript

9   from the electronic sound recording of the proceedings in the

10   above-entitled matter.

11
   /s/Mary Zajaczkowski              September 3, 2020
12   Mary Zajaczkowski, CET**D-531

13
   /s/William J. Garling             September 3, 2020
14   William J. Garling, CE/T 543

15

16

17

18

19

20

21

22

23

24

25