1                    UNITED STATES BANKRUPTCY COURT
2                        DISTRICT OF DELAWARE

3                                      .   Chapter 11
     IN RE:                            .
4                                      .   Case No. 20-11177 (KBO)
     AKORN, INC., *et al.,*            .
5                                      .   Courtroom No. 1
                                       .   824 North Market Street
6                                      .   Wilmington, Delaware 19801
                                       .
7                    Debtors.          .   September 2, 2020
     . . . . . . . . . . . . . . . .   .   9:00 A.M.
8

9                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE KAREN B. OWENS
10               UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtors:          Pat Nash, Esquire
13                             Christopher Hayes, Esquire
                               William Arnault, Esquire
14                             KIRLAND & ELLIS LLP
                               300 North LaSalle Street
15                             Chicago, Illinois 60654

16   Audio Operator:          Al Lugano

17   Transcription Company:   Reliable
                              1007 N. Orange Street
18                            Wilmington, Delaware 19801
                              (302)654-8080
19                            Email:  gmatthews@reliable-co.com

20   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
21

22

23

24

25

```
 1   APPEARANCES (Continued):

 2   For Ad Hoc Term          Scott Greenberg, Esquire
     Lender Group:            GIBSON DUNN CRUTCHER
 3                            200 Park Avenue
                              New York, New York 10166
 4
 5   For AFSCME District      Edmond George, Esquire
     Council 47:              OBERMAYER REBMANN MAXWELL & HIPPEL
 6                            1617 John F. Kennedy Blvd. #19
                              Philadelphia, Pennsylvania 19103
 7
     For Official Committee   Catherine Steege, Esquire
 8   Of Unsecured Creditors:  JENNER & BLOCK
                              353 North Clark Street
 9                            Chicago, Illinois 60654

10   For Fresenius Kabi:      Kelley Cornish, Esquire
                              PAUL WEISS RIFKIND WHARTON GARRISON
11                            1285 Avenue of the Americas
                              New York, New York 10019
12
13   For Provepharm:          William Bowden, Esquire
                              ASHBY & GEDDES
14                            500 Delaware Avenue
                              Wilmington, Delaware 19801
15
                              – and –
16
                              Michael Parker, Esquire
17                            NORTON ROSE FULBRIGHT
                              111 W. Houston Street
18                            San Antonio, Texas 78205

19

20

21

22

23

24

25
```

1 <u>INDEX</u>

2

3 #2) Modified Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates [Docket No. 547 – filed August 25, 2020].

4 **Ruling: ..**

5 #3) Motion of Fresenius Kabi AG to Reclassify Claims Pursuant to Bankruptcy Rule 3013 [Docket No. 379 – filed July 24, 2020].

6

7 **Ruling: ..**

8 #4) Motion of 1199SEIU Benefit Funds, DC47 Fund and SBA Fund for Leave to File Objection (DI #553) to the Debtors' Motion to Sell (DI #18) and Confirmation of the Debtors' Plan (DI#258) Under Seal [Docket No. 601 – filed August 28, 2020].

9

10

11 **Ruling: ..**

12

13 DEBTORS' WITNESS(s)

14 **JOSEPH BONACCORSI**

15      Direct Examination by Mr. Arnault    7

16      Cross Examination by Mr. George    65

17      Cross Examination by Mr. Parker   126

18      Cross Examination by Ms. Cornish  146

19      Redirect Examination by Mr. Arnault  163

20      Recross Examination by Mr. George  170

21

22

23

24

25

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| D-5   Complaint by Mary Kogut (3/2016) | | 15 |
| D-6   Amended Complaint by Ms. Kogut | | 17 |
| D-7   Amended Complaint | | 18 |
| D-4   Stipulation and Agreement of Settlement | | 20 |
| D-8   Court Order against Akorn (officers/directors) | | 21 |
| D-33  Order for Voluntary Dismissal with Prejudice Pulchinski vs. Akorn | | 23 |
| D-32  Order for Voluntary Dismissal with Prejudice The Boothe Family Trust against Akorn | | 23 |
| D-34  Stipulation and Order of Dismissal (Judge Stark) | | 24 |
| D-36  Second Amended Class Action Complaint | | 25 |
| D-37  Stipulation and Agreement of Settlement | | 27 |
| D-35  Order/Final Judgement (Class Action Settlement) | | 29 |
| D-20  Policy issued by XL Specialty Insurance Company | | 35 |
| D-3   Form 10-K/A | | 37 |
| D-9   Akorn Primary D&O XL | | 77 |
| D-10  Akorn D&O 1st Excess | | 77 |
| D-11  Akorn D&O 2nd Excess | | 78 |
| D-12  Akorn D&O 3rd Excess | | 79 |
| D-13  Akorn D&O Side A XL Policy | | 79 |
| D-14  Akorn D&O Excess Side A AIG Policy | | 80 |
| D-15 Akorn Crime, Fiduciary Chubb Policy | | 90 |
| D-16  Akorn D&O 1st Excess | | 81 |
| D-17  Akorn D&O 2nd Excess | | 82 |
| D-18  Akorn D&O - 3rd Excess Illinois | | 82 |

D-19  Akorn D&O CNA 4th Excess                    83

D-21  Akorn D&O - Illinois                        83

D-22  Akorn D&O Illinois                          84

D-23  Akorn D&O - Illinois                        84

Provepharm Exhibit P-1                           169

MDL-17                                           177

MDL-44, 45                                       178

```
 1            (Proceedings commenced at 9:17 a.m.)
 2            THE COURT:  Good morning, parties.  This is Judge
 3  Owens.  We're back on the record this morning for the
 4  confirmation hearing in Akorn.
 5            Last night, we talked about just going right into
 6  the evidence, so if that's still the game plan then, Mr.
 7  Arnault, why don't you call the first witness.
 8            MR. ARNAULT:  Thank you, Your Honor.  Good
 9  morning.  This is Bill Arnault from Kirkland & Ellis on
10  behalf of the debtors.
11            For our first witness, the debtors call Mr. Joe
12  Bonaccorsi.
13            THE COURT:  Okay.  Mr. Bonaccorsi, please stand
14  by.
15            Mr. Lugano, can you please swear in the witness.
16            THE CLERK:  Yes, Your Honor.
17        JOSEPH BONACCORSI, DEBTORS' WITNESS, AFFIRMED
18            THE WITNESS:  Yes.
19            THE CLERK:  Please state your full name for the
20  record and spell your last?
21            THE WITNESS:  Joseph Bonaccorsi; B-O-N-A-C-C-O-R-
22  S-I.
23            THE CLERK:  Thank you, sir.
24                      DIRECT EXAMINATION
25  BY MR. ARNAULT:
```

1  Q    Good morning, Mr. Bonaccorsi.

2  A    Good morning.

3  Q    Please tell the court how you are currently employed?

4  A    I am the executive vice president, general counsel and

5  corporate secretary at Akorn.

6  Q    And how long have you held those positions?

7  A    I've been general counsel at the company since May

8  2009, as well as the corporate secretary for that same

9  period.  My EVP title was given to me about three years ago

10  in 2016 or '17.  Prior to that, I was a senior vice

11  president.

12  Q    And as part of your testimony here today, I'd like to

13  focus on certain events leading up to the debtors'

14  bankruptcy, as well as certain events within the bankruptcy.

15  But before we get into that, I'd just like to quickly walk

16  through your background.  And so, to begin, can you describe

17  for the court your educational background?

18  A    Sure.  I graduated from Northwestern University in

19  Evanston, Illinois.  From there, I attended the Loyola

20  University School of Law in Chicago.  Upon graduating from

21  law school, I worked in two different law firms in Chicago as

22  an associate and capital partner before being recruited to

23  serve as the general counsel of a publicly traded company

24  called Option Care where I served as the general counsel, a

25  senior vice president and the corporate compliance officer.

1       I served in those roles until we sold the company to

2   Walgreen Co about seven years after my start date.  I worked

3   for Walgreen Co as head of the homecare division MNA team.  I

4   stayed in that position for about a year and a half

5   fulfilling my obligation under an employment agreement before

6   joining Akorn as its first general counsel.

7       When I joined the company, it did not have a legal

8   department nor did it have an in-house corporate compliance

9   department.  And when I joined the company, I took those

10  roles.

11  Q    Okay. And let's turn now to your time at Akorn and your

12  responsibilities in the various positions that you've

13  mentioned, and lets just start with general counsel.  What

14  have been your responsibilities as general counsel for Akorn?

15  A    As I said when I first came to the company, it didn't

16  have a legal department, so I built out that department in

17  that role.  Since I started, I have had overall

18  responsibilities for all legal matters that affect the

19  company.

20      In my corporate -- I'm sorry.  Go ahead.

21  Q    You anticipated my next question.  What are your

22  responsibilities as corporate secretary for Akorn?

23  A    I keep and maintain all the corporate records.  I work

24  with the executive management team, as well as the board to

25  schedule, coordinate our meetings.  I serve in a role from

1 the corporate governance perspective to help guide the

2 executive team, as well as the board as far as proper

3 governance within the company.  I work with not only the

4 board, but each committee of the board to ensure that they've

5 fulfilled their responsibilities as they executive their

6 duties, their fiduciary duties to the company.  I also have

7 responsibility -- yeah and I also have responsibility for

8 some of the SEC filings that we make to make sure that we're

9 legally compliant.

10 Q      Now let's turn now to the Akorn board of directors and

11 can you please describe for the court the composition of that

12 board?

13 A      We currently have eight board members, all but two are

14 independent.  It's a relatively diverse group in terms of

15 background and experience.  We have former Pharma executive.

16 We have an accountant from the hospital industry.  We have an

17 international controller from a large international

18 healthcare company who is now a CFO of a private company.  We

19 have a former investment banker and financial analyst.  Who

20 am I forgetting here?  And then as far as the non-independent

21 board members, Doug Boothe serves as a board member rounding

22 out the eight board members.

23 Q      And what affiliation, if any, do any members of the

24 board of directors have with Akorn secured lenders or the

25 stalking horse purchaser here?

1  A     None.

2  Q     And how frequently does the Akorn board of directors

3  have meetings?

4  A     Our governance documents and charters require that not

5  only the board but most of the committee's meet, at least,

6  four times per year.  Both the board and any committee has

7  the ability to schedule any special meeting at any time with

8  proper notice which regularly occurs.

9        So, it can vary.  It has never been only four meetings.

10 The board has always been active in executing their

11 governance responsibilities and regularly call special

12 meetings to address matters at hand.

13 Q     And how has the frequency of the board meetings, if at

14 all, over the past years as they've been going through these

15 various refinancing, sale processes and now the bankruptcy?

16 A     They've increased dramatically, just let me start with

17 that.  In my last count, the board alone met nearly 70 times

18 since our negotiation with the lender group began in late

19 2018.  So, and then in addition to that, each of the

20 committees has had their regular meetings, as well as special

21 meetings and that would probably add on an estimated 40 to 50

22 meetings on top of the close to 70 that the board has engaged

23 in.

24 Q     Okay.  And now you've mentioned these committees a few

25 times, can you just describe for the court the various

1 committees that the Akorn board of directors has?

2 A    Yes.  We have an audit committee.  We have a

3 compensation committee.  We have a quality committee and we

4 have a nominating and governance committee.

5 Q    And, briefly, what are the responsibilities of those

6 various committees?

7 A    Audit committee oversees the financials of the company,

8 the financial performance, the financial reporting, engaged

9 in reviewing and guiding any public disclosures and public

10 filings we make.

11    Compensation committee, by the nature of its name, has

12 governance responsibilities relating to compensation programs

13 that the company adopts in compensating its executive

14 officers, the executive management team, and the company at

15 large.

16    The quality committee oversees the quality activities

17 at the company.  That committee was not a standing committing

18 with a charter until after the Fresenius litigation.  That

19 committee meets regularly with the quality team and the

20 executive management team to ensure our FDA quality

21 compliance.

22    And then, finally, the nominating governance committee

23 has overall governance responsibility for the board in order

24 to ensure that we have qualified board members best suited to

25 represent the interest of the shareholders of the company.

1   Q      And now, you mentioned that as general counsel one of

2   your responsibilities is overseeing all of the litigation in

3   which Akorn is involved. And, at this point, I actually want

4   to turn to and walk through some of those matters in which

5   Akorn has been involved and that you have overseen.

6        And so, first of all, you just mentioned this, I'd like

7   to cover the Fresenius litigation.  And so, if you could,

8   just to begin, could you describe for the court how that

9   litigation came about?

10  A     Sure.  It's rather lengthy story.  I'll give a short of

11  a version as I can to put it into context.

12       In late 2015, Fresenius and Akorn's investment banker

13  engaged in a discussion around the possible acquisition by

14  Fresenius of the entirety of the Akorn organization.  Those

15  discussions developed and we entered into a non-disclosure

16  agreement, engaged in due diligence, management presentation

17  that eventually led to the signing of a merger agreement

18  between the two parties in April of 2017.

19       Following the execution of that merger agreement,

20  Akorn, as well as the industry, but Akorn, as part of that,

21  did experience a substantial financial performance decline,

22  both due to the industry headwinds, as well as to Akorn's

23  specific business who is increased competition with one or

24  two products that led to a substantial financial decline and

25  performance.

1     As we moved through the summer months and were engaged

2  in our integration planning, Fresenius claimed to have

3  received two anonymous letters reporting FDA non-compliance,

4  primarily in our R&D facility located in Vernon Hills.

5     Following some negotiation and -- Fresenius led an

6  investigation that revealed compliance issues that they

7  raised concerns about and then in February of 2018, they

8  publicly disclosed the investigation and the impact it could

9  have on the announced transaction and putting that in

10  jeopardy.

11     They eventually then directed a letter to Akorn

12  indicating that they were terminating the agreement and we

13  filed suit in the Chancery Court in the state of Delaware for

14  an expedited litigation and trial concerning the enforcement

15  of the merger agreement.

16     We did go through trial. Vice Chancery Laster found in

17  favor of Fresenius, giving them the right to terminate the

18  agreement. We took an appeal. The appellate court affirmed

19  the order of the lower court.  So our deal was terminated and

20  following those developments, Akorn moved on to try to

21  rebuild after the sale transaction.

22  Q     Okay. And what is the current status of the Fresenius

23  litigation today?

24  A     It is still pending.  There is one claim that remains

25  outstanding that has been stayed by Judge Laster, Vice

1  Chancery Laster and that relates to Fresenius' claim for

2  damages relating to its expenses from the sale transaction

3  that it incurred.

4  Q    And, at this point in time, I'd like to turn to some of

5  the other litigation matters, including a few that resulted

6  from the failed merger with Fresenius.  And I'd actually like

7  to start with the litigation that we haven't heard about from

8  many of the objecting parties which is the Kogut derivative

9  litigation.  And do you know what I'm referring to the Koga

10 derivative litigation?

11 A    Yes, I do.

12 Q    Okay.  How did this litigation first come about?

13 A    This was a shareholder demand.  As I recall, the first

14 indication of the demand was a letter that shareholder Kogut

15 directed to the company through her counsel making claims on

16 behalf of the shareholders against the company.  That letter

17 was directed to us, I believe, in 2015 or 2016.  The claims

18 at that time related to the company's need to make a -- file

19 restated financials with the SEC.

20       That matter was fully investigated by the audit

21 committee and they retained outside counsel for that.

22 Resulting from that, we filed a motion to dismiss.  And while

23 that motion's dismiss was pending, Ms. Kogut amended her

24 complaint to include allegations reflecting the outcome and

25 findings in the Fresenius litigation.

1   Q     Okay.  And we'll get there.  I need to get to some of

2   these documents into evidence, so let's take it step by step.

3   And so, if you could, at this point, could you please turn to

4   what's been marked for identification in your binder as

5   Debtors' Exhibit 5.

6   A     By the way, can you hear me okay?

7   Q     Yes.

8   A     Okay.  I'm at Exhibit 5.

9   Q     And what is this document?

10  A     This is the complaint filed by Mary Kogut in March

11  2016.

12  Q     Okay.  And have you seen this document before?

13  A     Yes, I have.

14        MR. ARNAULT:  And, Your Honor, at this time, we

15  move for the admission of Debtors' Exhibit 5.

16        THE COURT:  Any objection?

17     (No verbal response)

18        THE COURT:  It's admitted.

19     (Debtors' Exhibit 5, received into evidence)

20  BY MR. ARNAULT:

21  Q     And I think you mentioned this but just to be clear

22  because you had mentioned another complaint, what were the

23  nature of the allegations in this first complaint in Debtors'

24  Exhibit 5?

25  A     These claims had to do with claims of fiduciary duties

1   by the Akorn board and various executive officers of the

2   company for failing to file proper SEC required financials.

3   Q      Okay.  And then, if we move along, what was the next

4   step then that Ms. Kogut took with respect to Akorn with

5   respect to Akorn and its board of directors as far as

6   litigation?

7   A      Ms. Kogut filed an amended complaint, as I mentioned,

8   her motion to dismiss, against -- this complaint was pending,

9   had been pending for a long time.  She amended the complaint

10  to add allegations reflecting her claims stemming from the

11  Fresenius litigation and findings in that case.

12  Q      Okay. And, at this point in time, can you turn to

13  what's been marked in your binder for identification as

14  Debtors' Exhibit 6?

15  A      Yes, I see.

16  Q      And have you seen this document before, Mr. Bonaccorsi?

17  A      Yes, I have.

18  Q      What is it?

19  A      This is the amended complaint that I was referring to

20  that was filed on behalf of Ms. Kogut against directors and

21  officers of the company alleging breaches of fiduciary

22  responsibility.

23           MR. ARNAULT:  At this point, Your Honor, I'd move

24  for the admission of Debtors' Exhibit 6.

25           THE COURT:  Any objection?

1          (No verbal response)

2               THE COURT:  Okay.  It's admitted.

3          (Debtors' Exhibit 6, received into evidence)

4    BY MR. ARNAULT:

5    Q     And at this point in time, Mr. Bonaccorsi, and in this

6    complaint, was Ms. Kogut asserting direct claims or

7    derivative claims?

8    A     These are derivative claims against the directors and

9    officers of the company.

10   Q     And you mentioned this before, but just so we're

11   keeping our timeline straight, how did Akorn and the other

12   named defendants respond to the second amended complaint and

13   the derivative claims filed by Ms. Kogut?

14   A     We challenged the allegations through a motion to

15   dismiss.  That motion to dismiss was fully briefed and argued

16   in Louisiana.

17   Q     What was then the result of that motion to dismiss?

18   A     The motion to dismiss was granted on all counts against

19   all individuals except one person, Marcel de Groot.  So the

20   case against him remains pending and we were -- an amended

21   complaint was filed that we continue to litigate.

22   Q     Okay.  And let's get to that amended complaint which

23   has been marked for identification, Debtors' Exhibit 7, so if

24   we can turn to that now, please, in your binder.

25   A     Yes.  Okay.  I'm there.

1  Q      And, just for the record, what is this document?

2  A      This is the amended complaint that I was referring to

3  that was filed after the motion to dismiss was largely

4  granted in Akorn's favor in Akorn and the directors and

5  officer's favor.

6              MR. ARNAULT:  At this point, Your Honor, I'd move

7  for the admission of Debtors' Exhibit 7.

8              THE COURT:  Any objection?

9        (No verbal response)

10             THE COURT:  It's admitted.

11       (Debtors' Exhibit 7, received into evidence)

12 BY MR. ARNAULT:

13 Q      And what were the nature of the claims and allegations

14 in this third amended and restated addition?

15 A      Again, these are derivative claims made against the

16 officers and directors of the company claiming breaches of

17 fiduciary duties to the shareholders.

18 Q      And how would, if at all, did this third amended and

19 restated petition incorporate the rulings or the findings

20 from the Delaware Chancery Court in the Fresenius litigation?

21 A      It did very much mimic many of the things -- not mimic

22 but say too many of the findings made in Judge Laster's

23 order.

24 Q      So what then happened with the derivative litigation

25 after this third amended and restated petition was filed?

1  A     As we continued to litigate this matter, an effort was

2  made to resolve the case through settlement negotiations and

3  we retained the support of a third-party mediator to

4  facilitate those discussions.

5  Q     And how long or over what period of time did that

6  mediation and those settlement discussions take place?

7  A     It was months.  It's difficult for me to put an exact

8  timeframe on it, but it was months.  There were some

9  complicated issues and they were being litigated and finding

10 ways to resolve it, given the length of the pending case, it

11 was several months.

12 Q     And, ultimately, what was the result of this mediation

13 and this month-long settlement process?

14 A     We did reach settlement which included payment of

15 attorney's fees, as well as the company's adopting many

16 recommended changes motivated by the litigation as raised by

17 shareholder Kogut and we did resolve it and the resolution

18 was recorded and documented in a settlement agreement.  And,

19 yeah, the matter was eventually dismissed.

20 Q     Okay.  And let's just get those documents into the

21 record as well, so we have a full record.

22        So if you could turn in your binder to what's been

23 marked for identification, Debtors' Exhibit 4.

24 A     Yes, I'm there.

25 Q     And what is this document?

1   A      This is the stipulation and agreement of settlement

2   that I was just referring to with documents the resolution

3   and the terms of the settlement with the derivative claim,

4   Mary Kogut.

5           MR. ARNAULT:  And, Your Honor, we move for the

6   admission of Debtors' Exhibit 4.

7           THE COURT:  Any objection?

8       (No verbal response)

9           THE COURT:  It's admitted.

10      (Debtors' Exhibit 4, received into evidence)

11  BY MR. ARNAULT:

12  Q      And are you familiar with this settlement and its

13  terms, Mr. Bonaccorsi?

14  A      Yes, I am.

15  Q      And can you please explain to the court your

16  understanding of what claims or action being released

17  pursuant to this settlement?

18  A      All derivative claims against the officers and

19  directors of the company stemming from the matter requiring

20  the restatement of our financials, as well as the issues

21  giving rise to the failed Fresenius transaction.

22  Q      And I think you mentioned it, but just so it's clear

23  who is being released under this settlement?

24  A      All directors and officers of the company.

25  Q      And you mention that the court ultimately ruled on the

1   proposed settlement in this derivative litigation, and let's

2   just get that order into evidence as well.  So if you could

3   turn now to the document marked for identification as

4   Debtors' Exhibit 8.

5   A     Sure.  Bill, if I could clarify one statement.  There

6   is one matter that's accepted from this settlement agreement.

7   I said all.  There is one that is accepted that is notify --

8   that's referenced here, and that is a matter called Akorn vs.

9   Takla.

10  Q     And just to be clear that's a claim that Akorn has

11  against this individual, is that right?

12  A     That's right, yes.

13  Q     Okay.  And so, let's turn then to Debtors' Exhibit 8,

14  please?

15  A     Yes.

16  Q     And what is this document?

17  A     This is the court order approving the settlement of the

18  Mary Kogut claims against the company, its officers and

19  directors.

20            MR. ARNAULT:  And, Your Honor, we move for the

21  admission of Debtors' Exhibit 8, at this point.

22            THE COURT:  Any objection?

23        (No verbal response)

24            THE COURT:  It's admitted.

25        (Debtors' Exhibit 8, received into evidence)

1  BY MR. ARNAULT:

2  Q     Now, Mr. Bonaccorsi, in addition to the Kogut

3  derivative action, what additional derivative action, if any,

4  were filed against Akorn that related to the issues

5  identified by the court in the Fresenius litigation?

6  A     There were several, as I recall, if I can remember all

7  the names.  I think there was a Boothe family trust, a

8  Dessauer (ph) family trust and maybe a third that were filed

9  in the state of Illinois, both in the Chancery Court, as well

10 as in the federal courts in the Northern District of

11 Illinois, Eastern division.

12 Q     Okay.  And let's just quickly go through for each of

13 those and understand the status of them.  So, if you could

14 turn to the document marked for identification, Debtors'

15 Exhibit 33?

16 A     Yes.

17 Q     And what is this document?

18 A     This is the order for voluntary dismissal with

19 prejudice of the Pulchinski -- it's P-U-L-C-H-I-N-S-K-I --

20 vs. the Akorn directors and officers entered by Judge

21 Mitchell in January of 2020.

22          MR. ARNAULT:  And, Your Honor, we move for the

23 admission of Debtors' Exhibit 33.

24          THE COURT:  Any objection?

25      (No verbal response)

```
 1              THE COURT:  It's admitted.

 2         (Debtors' Exhibit 33, received into evidence)

 3  BY MR. ARNAULT:

 4  Q    And, again, what was the nature of this litigation?

 5  A    This was a derivative action filed against the officers

 6  and directors of the company stemming from the failed

 7  Fresenius transaction and the findings made in Vice

 8  Chancellor Laster's order.

 9  Q    And if you can now turn to the document marked for

10  identification as Debtors' Exhibit 32.

11  A    Yes, I'm there.

12  Q    What is this document, Mr. Bonaccorsi?

13  A    This is the order of Voluntary Dismissal with Prejudice

14  of the matter entitled or captioned, "The Boothe Family Trust

15  against Akorn and the officers and directors of Akorn."

16              MR. ARNAULT:  And, Your Honor, we move for the

17  admission of Debtors' Exhibit 32.

18              THE COURT:  Any objection?

19         (No verbal response)

20              THE COURT:  It's admitted.

21         (Debtors' Exhibit 32, received into evidence)

22  BY MR. ARNAULT:

23  Q    And, again, same question what was the nature of this

24  litigation, Mr. Bonaccorsi?

25  A    These were derivative claims brought by shareholder,
```

1   the Boothe Family Trust against the company for breaches of

2   fiduciary duties and responsibilities of the board and the

3   officers of the company that led to the failed Fresenius

4   transaction and the findings made by -- and Vice Chancellor's

5   Laster order and opinion.

6   Q      And, finally, last one of these, if you could turn to

7   the document marked for identification, Debtors' Exhibit 34?

8   A      Yes, I'm there.

9   Q      And what is this document, Mr. Bonaccorsi?

10  A      This is this stipulation and order of dismissal in the

11  shareholder derivative litigation that was filed -- that I

12  referenced, that was filed in the United States District

13  Court for the Northern District of Illinois, the Eastern

14  Division, entered, signed by Judge Stark.

15           MR. ARNAULT:  And, Your Honor, we move for the

16  admission of Debtors' Exhibit 34.

17           THE COURT:  Any objection?

18        (No verbal response)

19           THE COURT:  It's admitted.

20        (Debtors' Exhibit 34, received into evidence)

21  BY MR. ARNAULT:

22  Q      And at this point in time, what derivative, if any, are

23  currently pending against Akorn's former or current directors

24  or officers?

25  A      There is none.

1   Q      And now, having discussed those two pieces of

2   litigation, I'd like to turn to the shareholder class action

3   litigation against Akorn and its current and former directors

4   and officers.  And are you familiar with that litigation?

5   A      Yes, I am.

6   Q      All right, so let's turn then to debtors or what's been

7   marked for identification, Debtors' Exhibit 36 in your

8   binder.

9   A      Yes, I'm there.

10  Q      And have you seen this document before?

11  A      Yes, I have.

12  Q      What is it?

13  A      This is the second amended class action complaint filed

14  against the directors and officers of the company stemming

15  from the failed transaction and the stock drop and losses to

16  the shareholders of the company.

17          MR. ARNAULT:  And, Your Honor, at this point in

18  time, we move for the admission into evidence of Debtors'

19  Exhibit 36.

20          THE COURT:  Any objection?

21      (No verbal response)

22          THE COURT:  It's admitted.

23      (Debtors' Exhibit 36, received into evidence)

24  BY MR. ARNAULT:

25  Q      Did this complaint, to your understanding, assert

1   direct or derivative claims against Akorn and its former and

2   current directors and officers?

3   A     These are direct claims against the officers and

4   directors of the company.

5   Q     And what is the current status of the shareholder class

6   action litigation?

7   A     This case has been wholly settled; a settlement has

8   been approved resolving all issues in the case.

9   Q     Let's talk about the settlement and negotiations

10  surrounding this litigation.

11        Can you just describe for the court the process by

12  which the parties were able to reach a settlement in this

13  matter?

14  A     Yes.  Shortly after the pleadings were made and some

15  discovery was taken, the parties agreed to engage in

16  settlement negotiations and for that purpose, we, again,

17  relied on support from a third-party mediator, Layn Phillips.

18  The parties came together in person on, at least, two

19  occasions and spent months and months negotiating resolution

20  of this litigation.

21        We were eventually able to come to terms on, as I

22  mentioned.  We did enter into a settlement agreement that was

23  approved by the court.

24  Q     Okay.  And let's turn to Debtors' Exhibit 37 and we can

25  talk about some of the terms of that settlement.

1    A    Okay.

2    Q    And what is Debtors' Exhibit 37?

3    A    This is the stipulation and agreement of settlement

4    entered into between the parties.

5            MR. ARNAULT:  And, Your Honor, we move for the

6    admission into evidence of Debtors' Exhibit 37.

7            THE COURT:  Any objection?

8        (No verbal response)

9            THE COURT:  It's admitted.

10        (Debtors' Exhibit 37, received into evidence)

11   BY MR. ARNAULT:

12   Q    For purposes of this settlement, Mr. Bonaccorsi, what

13   consideration was provided by Akorn and its former and

14   current directors and officers in order to settle it?

15   A    Akorn, through it's -- we paid cash.  There are really

16   three components of it.  Cash that we secured from our

17   insurance policy, or D&O insurance policy; contingent value

18   rights and; equity in Akorn, all available shares from the

19   point of settlement forward were contributed to the class

20   plaintiffs.

21   Q    And as far as where this consideration currently sits,

22   what is the current status of the three buckets of settlement

23   consideration you just mentioned?

24   A    All consideration has been paid by the company.

25   Q    And from the perspective then of the debtors, what

1    remains to be done under this settlement agreement?

2    A     Nothing from my perspective.  We're done.

3    Q     And as far as the claims here, what claims were being

4    released, pursuant to this settlement to your understanding?

5    A     All the -- claims against directors and officers for

6    failing to properly do our jobs as executive officers and

7    directors of the company that led to the claim stock drop and

8    damage to the shareholders.

9    Q     Who are the releasing parties, pursuant to this

10   settlement?

11   A     The releasing parties are the all participating class

12   plaintiffs who participated in the lawsuit.

13   Q     And what claims, if any, did Akorn, or its affiliated

14   released pursuant to this settlement agreement?

15   A     I know we released our insurance carrier so that they

16   could release the funds to fund the settlement, the cash

17   settlement portion.

18   Q     Okay.  But no claims at Akorn or its affiliates were

19   released, correct?

20   A     Correct; that's correct.

21   Q     Okay.  And how did the court ultimately rule with

22   respect to final approval of this settlement?

23   A     This settlement was approved by the courts.

24   Q     Okay.  And if we could turn now in your binder to the

25   document marked for identification, Debtors' Exhibit 35.

1   A     Yes, I'm there.

2   Q     And what is this document?

3   A     This is the order and final judgment approving the

4   class action entered by Judge Seeger in March of 2020.

5             MR. ARNAULT:  And, Your Honor, we move for the

6   admission into evidence of Debtors' Exhibit 35.

7             THE COURT:  Any objection?

8        (No verbal response)

9             THE COURT:  It's admitted.

10       (Debtors' Exhibit 35, received into evidence)

11  BY MR. ARNAULT:

12  Q     In addition to the shareholder class action plaintiff

13  gets settled were there any class members or, I guess, other

14  plaintiffs who did not opt into that settlement?

15  A     Yes.  There is still pending litigation by the parties

16  who we call the opt-out plaintiffs, the opt-out plaintiffs,

17  yes.

18  Q     And I won't take us through each of the complaints and

19  for the opt-out plaintiffs that were filed, but what is your

20  understanding as to the nature of the claims that the opt-out

21  plaintiffs are asserting?

22  A     The claims are identical to those made by the class

23  action plaintiffs who were settled and resolved.

24  Q     And just to put a fine point on it, are the claims that

25  the opt-out plaintiffs are asserting direct claims or

1   derivative claims?

2   A    Their direct claims against the officers and directors

3   of the company.

4   Q    So at this point, Mr. Bonaccorsi, I'd like to switch

5   gears and address the allegations and some of the objections,

6   as well as what we heard yesterday that Akorn's former and

7   current directors and officers engaged in criminal

8   misconduct.

9        And we start first with the issues relating to what was

10  identified by the Delaware Chancery Court.  What governmental

11  agencies, if any, have investigated those issues?

12  A    The SEC opened an investigation against the company

13  following the Delaware Court's order.

14  Q    And how, if at all, did the debtors participate in the

15  SEC investigation?

16  A    We received a demand for information and documents as

17  part of their investigation.  We fully complied with that

18  demand for documents.  And eventually made a presentation,

19  met with -- made a presentation to the enforcement lawyer at

20  the SEC in Chicago.  That was followed by a letter from the

21  enforcement office informing us that they were recommending

22  taking no enforcement action the company.

23              MR. GEORGE:  Objection, Your Honor.

24              Your Honor, I object.  That's a hearsay statement.

25  It's an out-of-court statement by declarant that's not

 1   available and it's being asserted for the truth of the

 2   matter, it's hearsay.

 3           THE COURT:  Mr. Arnault?

 4           MR. ARNAULT:  Your Honor, he's simply testifying

 5   here to the results of the investigation, so he's simply

 6   saying that the SEC did not decide to commence an

 7   investigation.  So it's not being offered for the -- well, I

 8   guess, it's simply stating the results of that investigation,

 9   knot an out-of-court statement in that sense.

10           MR. GEORGE:  Well, Your Honor, it isn't and the

11   best evidence of what happened is the actual documents that

12   were produced, rather than this witness' characterization and

13   interpretation of it.  It's an out-of-court statement.  He's

14   testifying about what is in that letter, and that's hearsay.

15           THE COURT:  I agree.  You can testify as to

16   whether or not there was an enforcement, but not the reasons

17   underlying the SEC's decision to do so.

18           MR. ARNAULT:  Fair enough.

19   BY MR. ARNAULT:

20   Q     Let me ask it this way then to get to the decision as

21   to whether or not there was enforcements.

22         What was the result of the SEC investigation?

23   A     I'm sorry; could you repeat it?  I didn't hear the

24   first couple of words.

25   Q     Sure.  What was the result of the SEC investigation?

1   A     It was closed.

2   Q     And were any charges or indictments issued by the SEC

3   relating to the issues that were identified by the Delaware

4   Chancery Court?

5   A     No, there was no action taken against the company or

6   the officers and directors of the company.

7   Q     And if we turn now to the allegations in the antitrust

8   MDL, what governmental agencies, if any, investigated those

9   issues?

10  A     Primarily, the Department of Justice out of Washington,

11  D.C.

12  Q     And, again, how -- and, again, how, if at all, did the

13  debtors participate in that investigation?

14  A     We received subpoenas and demands for documents and

15  information relating to our drug sales and pricing.  We fully

16  complied with every request that was made.  We met in-person

17  several times with the DOJ staff in Washington, D.C. and

18  there has not been -- as a result of that, result of our

19  participation and their investigation, there has been no

20  actions against the company or any employees of the company,

21  whether they're offices or directors or lower level employees

22  at the company.

23  Q     Okay. And despite no governmental agency ever indicting

24  Akorn or its employees or asserting any criminal charges

25  against them, what steps, if any, have the debtors taken to

1  address the issues that were identified by the Delaware

2  Chancery Court?

3  A      There were many and I'll summarize it this way.  There

4  was a change in leadership.  We did bring in -- the board

5  hired Doug Boothe to serve as the CEO.  Doug has a long

6  history in the pharma industry and with him and his

7  leadership and sort of a refreshing of the company, in light

8  of not growing the way we were able to prior to the Fresenius

9  transaction because of the operating covenants in the

10  agreement, we needed an operational turnaround, business

11  turnaround so that we could, again, focus on growing the

12  company.

13       After Doug started several top leadership changes were

14  made.  We brought in a new COO and a new head of quality.

15  Focusing on quality for a moment.  Because of the findings

16  and issues that were made and litigated in the Fresenius

17  litigation was especially important for us to bring a sense

18  of urgency to that position, and we did hire a new head of

19  quality, Dandy Dorado, who has developed really worked hard

20  to improve that department, both in terms of the practices

21  and programs that he has adopted and is seeing through and

22  making changes within the department, to make sure that we

23  have the best talent available to address the issues that

24  caused the problems that we had in the Fresenius transaction

25  and as found in the Delaware Court.

1  Q     And how, if at all, has this remediation work continued

2  throughout the bankruptcy proceeding?

3  A     Oh, it has.  I mean it's ongoing.  It's an ongoing

4  effort.  It's a priority in the organization and it's a

5  priority with our board.  Our executive management team meets

6  regularly to discuss the progress that we have made, not only

7  in terms of our ongoing compliance, but also with a main

8  focus of resolving the outstanding issues we have with the

9  FDA as documented in the warning letters.

10       We have made commitments to the FDA against their

11  findings to make those improvements and we are well on our

12  way to completing all of those at the two sites subject to

13  the warning letters in Decatur and in Somerset.  And I

14  understand that we are prepared for the next step DA

15  inspection when they're ready to embark on those activities

16  again.

17  Q     And now, again, jumping around a little bit, I want to

18  go back to the insurance policies because previously you

19  mentioned that part of the class action shareholder

20  consideration was these insurance proceeds.

21       And are you familiar with the policies at issue in the

22  class action shareholder settlement?

23  A     Yes, I am.

24  Q     Okay.  And if you could turn in your binder to the

25  document marked for identification as Debtors' Exhibit 20.

1   A     Okay.

2   Q     And what is this document?

3   A     This is the D&O policy issued by XL Specialty Insurance

4   Company.

5   Q     Was this the policy under which the insurance proceeds

6   or was this the applicable insurance policy for the class

7   action shareholder settlement?

8   A     Yes, this is the policy covered by that action.

9   Q     Okay.

10             MR. ARNAULT:  And, Your Honor, we move for the

11   admission into evidence of Debtors' Exhibit 20

12             THE COURT:  Any objection?

13         (No verbal response)

14             THE COURT:  It's admitted.

15         (Debtors' Exhibit 20, received into evidence)

16   BY MR. ARNAULT:

17   Q     And, Mr. Bonaccorsi, are you familiar with how this

18   policy works?

19   A     Yes, generally speaking, yes.

20   Q     And in an effort to spare everyone the details to walk

21   through these policy definitions, can you just explain for

22   the court your understanding of how proceeds from this policy

23   may be used?

24   A     Yes.  The proceeds can be used to address any

25   liabilities, exposure or planning made and defense fees and

1   costs made against the company and the company's officers and

2   directors for securities violation, like securities

3   violations or breaches of fiduciary duty.

4   Q     And as a result of the Kogut settlement, what claims,

5   if any, are you aware of that could be asserted by the

6   debtors based on the issue identified by the Delaware

7   Chancery Court?

8   A     None.

9   Q     And just to be clear, because previously you had

10  mentioned that you had entered into a release of the

11  insurers. When we're talking about the consideration, is it

12  your understanding the insurance carriers here paid directly

13  to the class on behalf of the D&O's?

14  A     They did.  The money did not flow through the company.

15  Q     And, at this point, Mr. Bonaccorsi, I'd like to switch

16  topics again and discuss executive compensation.

17       And here, I want to begin by addressing allegations in

18  some of the objections that the debtors intentionally failed

19  to comply with their disclosure obligations relating to the

20  executive compensation payments that were made in 2019 to

21  2020.

22       And so, first question, how, if at all, were the

23  particulars of the debtors' executive compensation payments

24  publicly disclosed prior to the bankruptcy filing?

25  A     We disclosed those in our required SEC filings.

1  Q     And were those filings made prior to the bankruptcy
2  filing?
3  A     Yes, they were.
4  Q     So if you could turn in your binder to what's been
5  marked for identification Debtors' Exhibit 3.
6  A     Okay.
7  Q     And can you identify this document for the court,
8  please?
9  A     Yes, this is our 10-K/A that we filed with the SEC.
10 Q     Were you involved in the review of this SEC filing?
11 A     Yes, I was.
12 Q     Do you believe that everything contained in Debtors'
13 Exhibit 3 is true and accurate?
14 A     Yes.
15 Q     And is Akorn regularly prepare and make SEC filings as
16 part of its business activities?
17 A     Yes, that's normal course.
18 Q     Okay.
19        MR. ARNAULT:  And, Your Honor, we move for the
20 admission into evidence of Debtors' Exhibit 3.
21        THE COURT:  Any objection?
22     (No verbal response)
23        THE COURT:  It's admitted.
24     (Debtors' Exhibit 3, received into evidence)
25 BY MR. ARNAULT:

1  Q     Now if you could turn to pages 19 and 20 of Debtors'

2  Exhibit 3 and I want to point you to a heading at the bottom

3  of page 19 entitled, "2019 Performance Based Annual Incentive

4  Award."

5  A     Okay.

6  Q     And what do those, I guess, the paragraphs under

7  performance based annual incentive award actually disclose?

8  A     This discloses the details of the performance awards

9  that were paid related to our 2019 performance.

10 Q     And how were these performance-based awards developed,

11 based on your understanding?

12 A     These are developed by the compensation committee of

13 our board with input from our head of HR who also used the

14 support of an outside compensation consultant, Willis Towers

15 Watson.

16 Q     And what, if anything, had the executives done to earn

17 these awards?

18 A     We met or exceeded all the performance measures for the

19 year that were included in the compensation program as

20 approved by the compensation committee and the board.

21 Q     And when are these bonuses paid?

22 A     They were paid in late December 2019.

23 Q     When are -- and how dos that compare to when bonuses

24 are typically paid?

25 A     Bonuses are typically paid within the first quarter,

1    usually within the first couple of months of the following

2    year, given the end of the year activities.

3    Q     So why pay these bonuses in December?

4    A     One, they were -- we far exceeded all the measures and

5    so, there was no question that they were earned.  And given

6    sort of the activities of rough waters that were swimming in

7    for the entirety of the year, it was important for our board

8    and compensation committee to get these earned awards out as

9    soon as possible to recognize the fine performance of the

10   employees of the company.

11   Q     By accelerating these payments what, if anything, then

12   prevented the executive team from quitting after they

13   received their bonuses?

14   A     Well there was a deterrence put in place.  We did

15   receive letter agreements from -- by the compensation

16   committee that came from our head of HR that indicated that

17   should any person who is receiving a bonus in part, on their

18   own they would be required to pay the funds back, if they

19   left prior to the normal time when a bonus would have been

20   made.

21        As I said earlier, bonuses are normally made within the

22   first quarter of Q1 of the following year.  And so, we did

23   have clawback provisions, so to speak, put in place so that

24   if someone left, they would have to return those funds.

25   Q     And if we turn now to the 2020 compensation payments,

1    and I'll have you turn to page 23 where you'll see a heading

2    entitled, "Subsequent Developments."

3    A    Yes.

4    Q    And what are the two paragraphs under this heading

5    disclose?

6    A    These paragraphs explain essentially the rationale and

7    some detail around retention payments that were approved by

8    our board and made to the officers and directors here or

9    officers, I should say here.

10   Q    And when were these payments made?

11   A    They were made, as I recall, I think it was in the

12   first quarter of 2020.

13   Q    And why did the company adopt --

14           THE COURT:  I'm sorry; what page are we on?

15           I'm sorry.  I have to interrupt.  What page are

16   you on?

17           MR. ARNAULT:  Sorry, Your Honor; page 23.

18           THE COURT:  Okay.  Thank you.

19           I apologize.  Please continue.

20           MR. ARNAULT:  No problem.

21   BY MR. ARNAULT:

22   Q    And what's your understanding, Mr. Bonaccorsi, as to

23   why the company adopted a retention program?

24   A    Well, again, with -- a couple of things were in play

25   here.  One, we were -- HR had and compensation committee were

1  working with an outside consultant.  And with their input and

2  in light of what was happening within the company that the

3  company was up for sale, given the operational improvement

4  that had been occurring and were in process, the board was

5  very concerned that the executives would leave the company.

6      Not knowing what their futures would hold at Akorn,

7  this was a way to maintain stability in the company, pay the

8  retention awards, as a motivator, to stay to continue working

9  on all the operational and sales, the commercial improvements

10  that we had started under Doug Boothe to put in place, to

11  make us as appealing as we could to possible new money or a

12  new buyer for the company.

13  Q    And what risk, if any, did the compensation committee

14  or the board see as to retention, to your understanding?

15  A    I'm sorry.  I don't know that I understood the

16  question.  Could you repeat it?

17  Q    Oh, I'm sorry.  You mentioned that the board and the

18  compensation committee believed that there was a risk of

19  retaining these executives.  What was driving those concerns?

20  A    Well there was a risk of these people leaving.  There

21  was talk about filing for bankruptcy and I know that sort of

22  individuals were greatly concerned about what that would do

23  to their careers and their reputations, at this point in

24  time.

25      And in early 2020, pre-pandemic.  The economy was

1   pretty robust and there was some concern that it would be

2   relatively easy given the progress at the executive officers

3   and the other management team members made, the impact that

4   they had at Akorn would be appealing for competitors or

5   others in the industry, so there was some fear that there

6   would be some flight in light of the uncertain waters that we

7   were treading in at the time. And this was a way to retain

8   these important people and leadership roles.

9   Q    And what makes up the payments then that were made as

10  part of this retention program?

11  A    So these numbers were developed by -- with input from

12  the compensation consultant.  They were measured against

13  market.  And it's my understanding that these numbers are

14  squarely within the range of 50 percent to make them more

15  fair then they had been.  The company did not pay bonuses to

16  the executives -- didn't pay bonuses, period, to the

17  management team at certain levels for the prior two years.

18  Q     And then what conditions or what types of conditions,

19  if any, were imposed on these retention payments?

20  A     These payments also were accompanied by a clawback

21  agreement whereby if an individual were to voluntarily depart

22  prior to the consummation of a transaction for the assets or

23  equity of the company that those payments made under this

24  bonus program would have to be returned to the company.

25  Q     And what is then the impact of the retention payments?

1  A     There has been no movement.  The entire management and

2  executive team remains in place.

3  Q     And what role, if any, did the lenders have in this

4  retention program?

5  A     They claim no (indiscernible).

6  Q     At this point, Mr. Bonaccorsi, I want to turn to the

7  processes that led to where we are today.  And I'm mindful of

8  not duplicating Mr. Buschmann rather extensive prior

9  testimony on this topic.  And so, to that end, can you just

10 simply describe for the court your involvement in the pre-

11 and post-petition processes that Mr. Buschmann discussed?

12 A     Sure.  My involvement began even before Mr. Buschmann.

13 Once the lender group sent us the letters in late 2018, I

14 worked with mainly Duane Portwood and outside legal advisors

15 in order to make sense of the content of those letters and

16 the risk they posed to the company.

17        Following some very deliberate adversarial

18 conversations with the lender group represented by Jones Day

19 at the time, we did retain PJT.  You heard about PJT's

20 involvement yesterday.  We engaged in meaningful difficult

21 discussions with the lender group in order to negotiate a

22 standstill agreement which, over the course of time, was

23 modified.  But we went through different processes, first, to

24 refinance the debt.  Then to try to get new equity in, try to

25 sell the company; all of that unsuccessfully.

1    That led us then to the decision to toggle, was the

2  word, into a Chapter 11 and a stalking horse bid made by the

3  lender group.  My involvement, all along, with support of my

4  team, has been to guide those discussions, the presentation,

5  the refinancing presentations and diligence.  We negotiated

6  something like, you know, at least fifty NDAs during the

7  course of those months with financial sponsors, strategic

8  entities, and banks, all in an effort to, you know, secure

9  financing, refinance the company, and then, ultimately, sell

10 the company.

11   We then leading up in details of the number of

12 presentations we made and participated in the presentations

13 we created, all the while maintaining our appropriate SEC

14 status by making all required findings with the SEC,

15 reflecting our activities, meeting with the lenders, in the

16 meantime, to provide them with operational and performance

17 updates on how the company was doing.

18   We eventually, next, negotiated, participated with our

19 legal advisors in negotiating the APA that we eventually

20 entered into with the lender group.  And then, again,

21 participated in the marketing of the company to post-petition

22 to continue our sales efforts of the company to find as much

23 value, maximize the value of our situation for the benefit of

24 the shareholders.  Again, that was around-the-clock,

25 literally around-the-clock, due diligence requests and

1  compliance, preparation of and for management presentations

2  throughout that entire duration that we've been in Chapter

3  11.  And, here we are.

4  Q    And based on your involvement in the pre- and post-

5  petition processes that you discussed, in your view, how

6  would you characterize the negotiations both with the lenders

7  and the stalking horse purchaser?

8  A    Adversarial, arm's length, professional, challenging.

9  I think we were under a great deal of pressure given the

10  difficulty we were finding ourselves in trying to sell the

11  company, so it was cooperative, I would say.  I think that's

12  the word I'm looking for.  It was cooperative; yet,

13  adversarial.  There was a lot of pressure, has been a lot of

14  pressure applied by the ad hoc group, the stalking horse

15  bidders to get to the best result possible, not only for us,

16  but our stakeholders.

17       But, you know, I think the word bruising was thrown

18  around and that was the first time I heard that, but that's

19  one I would borrow for my description of the relationship and

20  activities.

21  Q    And as far as the plan, why are the debtors standing up

22  in court today supporting confirmation of that plan?

23  A    After all the work we did, after receiving the best and

24  only bid that we have, the company and its advisors have

25  taken great strides to do what we can, given the limitations

1  that are on the company, to be as far as to many

2  stakeholders, including the creditors and the various classes

3  of creditors, as is possible.  The negotiations to sell the

4  company have been arm's length, have been in good faith, very

5  challenging and I think we maximize the value for that

6  purpose.

7  Q    And now let's now talk about the plan that the debtors

8  are seeking to confirm.  And here I just want to walk through

9  some of the sections, 1129 elements, I don't think really are

10 in dispute, but, at least, I want to have the evidence in the

11 record on these.

12       And so, if we start with the classification

13 requirements, does the plan specify the classification of

14 claims in interest?

15 A    Yes, it does.

16 Q    And are claims and interest in each class substantially

17 similar to other claims and interest in that class?

18 A    Yes, they are.

19 Q    And what factors, if any, did the debtors consider in

20 classifying claims and interest under the plan?

21 A    The legal interest and rights, the capital structure

22 that was available and the collateral that was available.

23 Q    Does the plan specify whether classes of claims and

24 interests are impaired or unimpaired the plan?

25 A    Yes, it does.

1 Q     Does the plan specify the treatment of the impaired and

2 unimpaired classes of claims and interests under the plan?

3 A     Yes, it does.

4 Q     How may intercompany claims and interests be treated

5 under the plan?

6 A     I'm sorry; I don't know.

7 Q     Yeah is it treated under plan intercompany claims and

8 interests maybe treated unimpaired?

9 A     Yes, that's right.

10 Q     And why is that with respect to these intercompanies?

11 A     Those are -- it's our cash system at the company.

12 There are intercompany transfers for operational efficiencies

13 within the company and our subsidiaries.  It's just our cash

14 management program that we have in place.

15 Q     And how, if at all, does the treatment of those

16 intercompanies effect the economic substance of the plan or

17 any recoveries to the debtors' creditors?

18 A     It doesn't.  That's Akorn money that stays with Akorn

19 and its subsidiaries.

20 Q     Does the plan provide adequate means for its

21 implementation?

22 A     Yes, it does.

23 Q     Does the plan provide for the dissolution of the

24 existing boards of directors or managers of the debtors and

25 the appointment of a plan administrator?

1  A     Yes, it does.

2  Q     And are these provisions, in your opinion, consistent

3  with the interest of creditors and equity security holders,

4  as well as public policy?

5  A     Yes.

6  Q     Are these provisions, in your opinion, consistent with

7  applicable state law and the Bankruptcy Code?

8           MR. GEORGE:  Objection, Your Honor.  That calls

9  for a legal conclusion, Judge, I think.

10          THE COURT:  Sustained.

11          MR. ARNAULT:  Your Honor, that's why I phrased it

12  in your opinion.

13          THE COURT:  Well, he's not an expert witness.

14          MR. GEORGE:  He's not an expert.

15          MR. ARNAULT:  Okay. Fair enough.

16  BY MR. ARNAULT:

17  Q     Is it your understanding then that these provisions are

18  consistent with applicable state law and the Bankruptcy Code

19  as explained to you?

20  A     Yes, as far as I understand, yes.

21  Q     Are you aware that the court approved the disclosure

22  statement?

23  A     Yes, I am.

24  Q     To your knowledge did the debtors comply with the

25  solicitation requirement of Section 1125 of the Bankruptcy

1   Code?

2   A      Yes.

3   Q      Does the plan provide for the satisfaction of monetary

4   default under each executory contract and unexpired lease to

5   be assumed or assumed and assigned by payment of the cure

6   amount, if any?

7   A      Yes.

8   Q      Does the plan provide as to professional fee claims and

9   corresponding payments, subject to prior court approval and

10  compliance with the Bankruptcy Code?

11  A      That's correct.

12  Q      Does the plan provide for each holder of an allowed

13  administrative claim to receive cash equal to the amount of

14  such allowed administrative claim on the effective date or as

15  soon as reasonably practicable thereafter?

16  A      Yes.

17  Q      Does the plan provide for each holder of allowed

18  priority tax claims to be treated in accordance with the

19  terms set forth in Section 1129 of the Bankruptcy Code?

20  A      Yes.

21  Q      Does the plan provide for the payment of all fees under

22  28 U.S.C. Section 1930 including U.S. Trustee fees?

23  A      Yes.

24  Q      Is the purpose of the plan to avoid taxes?

25  A      No.

1   Q     Is the purpose of the plan to avoid the application the

2   Securities Act of 1933?

3   A     No.

4   Q     And I want to turn to the UCC's investigation of

5   potential claims and causes of action that the debtors may

6   possess.  And to start, are you familiar with that

7   investigation?

8   A     Yes, I am.

9   Q     What involvement did the debtors have in that

10  investigation?

11  A     We received requests for information, documents, and

12  interviews with various Akorn employees and advisors. We were

13  responsible for complying with those requests which we did.

14  We produced six or seven individuals which included employees

15  and directors and advisors of the company.  We produced tens

16  of thousands of pages of documents out of Akorn. And millions

17  of pages of material and information out of stemming from the

18  litigation in Delaware.

19  Q     Did the debtors conduct their own formal investigation

20  into these issues?

21  A     No, we did not.

22  Q     Why not?

23  A     The issues were heavily litigated.  They were resolved

24  in terms of the derivative action that were filed and demands

25  made, those were all settled, resolved, and releases put in

1  place.  And the UCC was, from what I understand, doing its

2  job to investigate any possible additional third-party

3  claims.

4  Q    And, finally, I want to turn to the release and

5  exculpation provision in the plan.  And I want to start,

6  first, with the debtor release provision in the plan.

7       Are you familiar with that provision, Mr. Bonaccorsi?

8  A    Yes, I just lost you off the screen.  Hold on.  Give me

9  one second.

10 Q    No problem.

11 A    Okay.  I'm back, sir.

12 Q    Okay.  Let me ask it again.

13      Are you familiar with the debtor release provision in

14 the plan?

15 A    Yes, I am; generally speaking, yes.

16 Q    And are you generally familiar with the reasons why the

17 debtors included this provision in the plan?

18 A    Yes, I am.

19 Q    And to your understanding what claims are being

20 released pursuant to the debtor release provision in the

21 plan?

22 A    The fiduciaries of the company will be released, given

23 their, you know, of all claims given their participation in

24 the governance of the company, the operation of the company

25 which is something that they knew because we were understood

1  to be true that if they participated in this process in good

2  faith, engaged in the activities with others at an arm's

3  length basis with the wellbeing and interest of the

4  stakeholders, the lenders, the shareholders, and the

5  creditors in mind and did so properly that they would be

6  exculpated.

7  Q    Okay.  And I just want to focus on the releases right

8  now and we'll get to the exculpation.

9       So let's just focus on the releases and start by

10 discussing the grounds for providing the debtor releases to

11 the debtors' officers.

12      And, first of all, could you just identify for the

13 court who are the debtors' officers here?

14 A    Doug Boothe is our CEO; Duane Portwood is our CFO.  I

15 serve as the corporate secretary.  Chris Young is the chief

16 operating officer.  John Kafer is a commercial officer and

17 Randy Pollard is our controller.

18 Q    And is Mr. Dorado an officer as well?

19 A    He is.  He is head of quality, quality compliance.

20 Q    I actually want to get to specifics here and understand

21 how each of these individuals supported the plan process and

22 what contributions they made to the plan itself.

23      So we start with yourself.  How have you been involved

24 in supporting the plan process and the debtors'

25 restructuring?

1   A      Well, I think I spent a few minutes and probably more

2   than a few minutes describing my activities as they relate to

3   the prepetition and post-petition processes, so I'm not going

4   to recite all of that again here, except to add to that

5   that's all been in addition to my normal duties and

6   responsibilities as the general counsel and corporate

7   secretary at the company.  So it was more or less an added

8   responsibility that I do and responsibilities and

9   (indiscernible) that I described earlier.

10  Q      And how about Mr. Boothe?  How has he been involved in

11  supporting the plan process and the debtors' restructuring?

12  A      Sure.  I would say something similar to how I described

13  my own activities.  He was in the midst of commencing a

14  turnaround for the company when his attention was divided to

15  and required for the ongoing negotiation with the lenders,

16  the various presentations that we made, not only to the

17  lenders, but also during the M&A -- the refinancing process

18  and the possible sale process, as well as ongoing

19  negotiations with the lender group as we moved into the sale

20  of the company to the stalking horse.

21         All the while maintaining his normal day job as the CEO

22  of the company, keeping his team and others engaged in the

23  priorities of operating the company.  He made himself

24  available, and I know this because I was called on to calls

25  with him, to speak with our legal advisors, our financial

1   advisors, and other parties as we were engaged in due

2   diligence and management presentations.

3   Q     All right and what about Mr. Portwood, how specifically

4   has he been involved in supporting the plan process and the

5   debtors' restructuring?

6   A     Likewise.  He too, in addition to executing his normal

7   duties and responsibilities as the company's CFO and

8   responsibility for the financials of the company and filing

9   the required financial statements with the SEC, he has been

10  heavily involved in forecasting the analytics of our

11  financial performance at the forefront of interacting and

12  negotiating with the lenders, both with respect to the

13  standstill agreement, negotiating potential terms for the

14  refinancing of the company, as well as the eventual sale of

15  the company.

16        It has taken on almost -- it's been almost a complete

17  and separate job for him to guide the company from his

18  perspective through this process.

19  Q     And what role has Mr. Portwood played with respect to

20  the due diligence that the various interested parties have

21  requested?

22  A     He has been involved in all of the presentations.  He

23  and his team have been involved in the development of

24  forecasting models.  He has been fully cooperative and

25  available to all participants in the process.

1   Q     How about Mr. Dorado?  How has he been involved in

2   supporting the plan process and the debtors' restructuring?

3   A     Well as I alluded to earlier, given the focus that the

4   entire industry and world has had on the Akorn quality

5   systems and quality programs, he has not only, since he's

6   come into the company, revamped the program to be more

7   inclusive and more efficient so that we can remain compliant

8   with the FDA's requirements and get our two facilities out

9   from under the warning letters.  That has led to a high

10  degree of scrutiny by the lender group and the various

11  participants in the refinancing and sale efforts on quality.

12        So he typically right after is one of the first members

13  of the management team to speak about the improvements that

14  he has made and the status of the quality systems at Akorn

15  and FDA compliance.  So he has, again, been at the forefront

16  of this process while also maintaining the company to make it

17  as appealing as possible throughout the process through

18  possible interested parties to refinance and to sell to.  So

19  he was heavily involved.

20  Q     And how about Mr. Kapoor then?  How has he been

21  involved in supporting the plan process and the debtors'

22  restructuring?

23  A     Like the rest of us, he too has been keeping his day

24  job and what is turning out to be just a horrendously

25  difficult year in light of the virus in maintaining and

1  growing sales as best he can and working with this team to do

2  that while, as you can imagine, given the nature of the

3  interested parties in endeavor to refinance and sell the

4  company, to focus on future growth of the company.  So he has

5  spent an inordinate amount of time working with the

6  management team, as well as his own team and the finance team

7  to develop appropriate forecast models that are sustainable,

8  credible and also appealing to any interested parties in the

9  process.

10 Q     And then, finally, with respect to Mr. Young, how has

11 he been involved in supporting the plan process and the

12 debtors' restructuring?

13 A     Well he too, like Dandy and Doug, were relatively new

14 to the company and he was highly focused, when he came on,

15 before we knew what our future held here, when he came on, he

16 was focused on improving operations at each and every site.

17 Made substantial changes in not only the operations, but the

18 operations leadership and has done that very successfully.

19      Again, placing the company in a very good place

20 operationally with the operational improvements that he's

21 made, but then has to maintain and continue to make more

22 effective and, again, appealing to the possible interested

23 parties throughout this process.

24      He, like the rest of the leadership team, has been

25 engaged in participating in the management presentations;

1   again, whether it's to lenders, banks, financial sponsors,

2   strategics, as well as supporting all of us when we have had

3   to put our best foot forward and explain what we're doing

4   operationally, all the while -- and he did purchase paid, if

5   I didn't say it.

6       He has purchase paid it all along in the management

7   presentations and we call on him to participate in the

8   negotiating of the documents, as we do all the leaders in the

9   organization in negotiating the APA.  So, again, heavily,

10  heavily involved in the process.

11  Q    And if we turn now to the directors and don't need to

12  do those individually. But could you just describe how the

13  directors have been involved in supporting the plan process

14  and the debtors' restructuring?

15  A    Sure.  I think earlier in my testimony I talked about

16  what their normal or what the rules, the various charters

17  state about how often they should meet on a regular basis

18  throughout the year which is quarterly.  Since November, our

19  board has met approximately 70 times; sometimes weekly,

20  sometimes biweekly, constantly with our legal advisors, with

21  our financial advisor guiding, testing, asking questions,

22  fully engaged in this process every step of the way, again

23  well before we knew where we were headed.  They have been

24  involved in executing good governance and being themselves

25  engaged in making sure that each of the leadership members

1   was engaged.

2   Q      And, in your view, were each of the debtors, directors

3   and officers have supported the plan and the restructuring,

4   absent the debtor releases?

5   A      No.  Given the amount of work and, as I said earlier,

6   it's been days where it is around the clock, given the amount

7   of work, the dedication, hard work that went into not only

8   improving the operational and financial performance of the

9   company, but also to do that correctly, to make the company

10  appealing to others who would be interested taking an

11  interest in the company or acquiring the company, as well as

12  for, you know, obviously, the outcome of all of the

13  stakeholders in the company and outside the company who rely

14  on Akorn.

15  Q      Let me ask you this.  If both you and the UCC are

16  correct and any potential claims out there have been released

17  or their (indiscernible) or they're barred by the challenge

18  period, why are the debtors seeking these releases?

19  A      Again, given the hard work that we put into this effort

20  to maximize the value of the company, we succeeded here.

21  We've done, worked our hardest to achieve what we've done

22  which is elicit a bid from the lender group and in exchange

23  for our group and given that we understood it at the outset

24  of this process that doing so this would be, you know, the

25  return or the consideration for our efforts.  That

1    expectation was certainly (indiscernible).  I think the

2    objective was met by selling the company and getting us

3    through this process.

4    Q     If we turn now to the lenders and the DIP lenders, what

5    contribution, if any, have they made to the debtors'

6    restructuring efforts?

7    A     Well, I think you heard yesterday, financially they

8    provided $30 million dollars of DIP.  They're providing $35

9    million dollars in a wind-down, and I'm aware that they did

10   reach settlement with the creditors contributing $5 million

11   dollars to that.

12         Separately from the pure financial effort or gestures

13   that they made and contributed, they wanted this process to

14   succeed while protecting their own interest.  And as

15   adversarial the discussions and the relationship has been, it

16   was also highly productive.  They are at a place where they

17   not only get the benefit of the risk that they put forth when

18   they originally invested in the company, but helping us by

19   submitting the stalking horse bid will enable us to get out

20   of the situation and continue to make improvements at the

21   facility, continue to operate, continue to employ our

22   employees and manufacture and sell drugs, all which ought to

23   benefit the stakeholders here, as well as them.  So, I expect

24   that they, you know, rightfully are supporting the plan.

25   Q     And, finally, Mr. Bonaccorsi, I want to briefly discuss

1   the exculpation provision in the plan which you had mentioned

2   previously.  Are you familiar with that provision?

3   A     I am generally, yes.

4   Q     And I think we can streamline this because we've

5   discussed the party's substantial contributions here. But can

6   you briefly explain to the court your understanding of how

7   the exculpation provision facilitated plan negotiations?

8   A     As I -- yes, as I mentioned, it was going into this

9   process, it was an investment and we knew it was going to

10  take an investment of time and care and energy to make sure

11  that we guided this process appropriately.  And we all had

12  the expectation that if we were willing to make that

13  investment of time and devote our best efforts, use good

14  judgment, act in good faith, act with the other parties at

15  arm's length to get through this process as successfully as

16  possible for the benefit of the shareholders and

17  stakeholders, that expectation would be had.

18         And that was very clear at the outset.  I think it was

19  evidenced by the amount of participation provided by all the

20  fiduciaries here through the number of board meetings, but

21  also the extent of the participation and care that was given

22  by the board, as well as the executives and officers at the

23  company to see this process through as successfully as

24  possible, not for ourselves, but for the stakeholders.

25              MR. ARNAULT:  Thank you very much, Mr. Bonaccorsi.

1  That is all the questions from me at this point.

2            Your Honor, I would pass the witness at this point

3  in time.

4            THE COURT:  Okay.  Let me ask for the record

5  before we proceed with cross-examination.  Who intends to

6  cross-examine Mr. Bonaccorsi?

7            Mr. George?

8            MR. GEORGE:  I do, Your Honor.

9            THE COURT:  Okay.  Is there anyone -- and

10  approximately how long do you expect your cross-examination

11  to go?

12            MR. GEORGE:  Your Honor, probably as long as the

13  direct.

14            THE COURT:  Okay.  All right is there anyone else

15  that seeks to cross-examine Mr. Bonaccorsi?

16            MR. GEORGE:  Your Honor, before we start, can we

17  have a five-minute break and maybe an idea?  Do you intend to

18  go to 3:30 today, Your Honor?

19            THE COURT:  Certainly.  So we are going to take a

20  break.  We're going to go until 3:30 and based on the amount

21  of time the various parties wish to cross-examine Mr.

22  Bonaccorsi, I'll direct who can go first after the break

23  because it might make sense if someone has a shorter cross-

24  examination that they go first and finish their cross of Mr.

25  Bonaccorsi before we take a lunch break.

1          So, let me ask, who else wants to cross-examine

2    Mr. Bonaccorsi?

3          I see Mr. Parker.  I see Ms. Cornish. Are you

4    interested in cross-examining?  I see a few other people that

5    turned on their screens, so I just need a yes or a no.

6          MR. PARKER:  Your Honor, Michael Parker.  I do

7    intend to cross-examine Mr. Bonaccorsi not nearly as long as

8    Mr. George, but the advantage of having Mr. George go first

9    is he might well eliminate my need to do some of my cross and

10   so, I'd actually prefer Mr. George to go first.

11         THE COURT:  Okay.  All right that's fine.

12         Ms. Cornish, did you intend to cross-examine Mr.

13   Bonaccorsi?  I'm sorry; you're on mute.

14         MR. ARNAULT:  Can't hear a thing.

15         THE COURT:  Okay.  Ms. Cornish dropped off.  Let

16   me ask --

17         MS. CORNISH:  No --

18         THE COURT:  Oh, okay.

19         MS. CORNISH:  I apologize.  I was having technical

20   difficulty but I've recovered.

21         I was going to say the same thing as Mr. Parker.

22   I'm quite confident Mr. George will cover the areas that I

23   would like to be so I'd like to reserve the ability to cross

24   if he does not do that.

25         THE COURT:  Okay.  That's fine.  Mr. Bowden, you

1   unmuted your video.  Are you intending to cross-examine Mr.

2   George?

3            MR. BOWDEN:  Your Honor, I'm working with Mr.

4   Parker on this matter, so unless Mr. Parker asks me to ask

5   questions, I do not intend to ask questions.  Thank you.

6            THE COURT:  Okay.  All right.  And Ms. Tobler,

7   looks like you unmuted your video as well, so you intend to

8   cross-examine Mr. Bonaccorsi?

9            MS. TOBLER:  No, Your Honor.  I'm with Ms.

10  Cornish, so.

11           THE COURT:  Oh, okay.  My apologies.  I can't keep

12  everyone straight.  And it doesn't help that I never -- this

13  is the first time I'm seeing everybody in person at these

14  couple of hearings, so let's take a ten-minute break and

15  then, Mr. George, seems like there's a collective agreement

16  that you should go first.  So, we'll just go right into the

17  cross-examination.

18           Let's try to intend to take a lunch break at noon

19  and we'll take, perhaps a half an hour lunch break, similar

20  to yesterday.  So, okay, let's come back at eleven o'clock

21  and we'll start the cross-examination.

22           Mr. Bonaccorsi, during this break you're under

23  oath.  Just remind you that you're not permitted to speak to

24  anyone about the substance of your testimony during the

25  break.

1              All right, thank you, all.  See you back at

2    eleven.

3              MR. ARNAULT:  Thank you, Judge.

4              THE WITNESS:  Understood.

5         (Recess at 10:52 a.m.)

6         (Proceedings resumed at 11:03 a.m.)

7              THE COURT:  Okay, everyone.  This is Judge Owens.

8    We're back on the record.

9              Before we begin with cross examination let me just

10   ask the parties to the extent you are not asking questions of

11   the witness and/or defending the witness I'd like you to shut

12   your video screens off.  It is extremely distracting at times

13   and allows me to see the witnesses much clearer when only the

14   relevant parties are on my screen.

15             So, if you wouldn't mind doing that, I would

16   appreciate it.  And to the extent you can't figure it out we

17   can certainly do it for you.  Okay.

18             All right.  Mr. George, do you want to -- you may

19   begin your cross examination of Mr. Bonaccorsi when you're

20   ready.

21             MR. GEORGE:  Thank you, Your Honor.  Just one

22   second.  Thank you.

23        (Pause in record)

24             MR. GEORGE:  I'm ready, Your Honor.  Thank you.

25             THE COURT:  You're welcome.

```
 1                       CROSS EXAMINATION

 2   BY MR. GEORGE:

 3   Q      Mr. Bonaccorsi, good morning, sir.

 4   A      Hello.

 5   Q      Mr. Bonaccorsi, you said you are general counsel to the

 6   entity?

 7   A      For the what?  I'm sorry.

 8   Q      You're general counsel to the Akorn entity?

 9   A      Yes.

10   Q      And you mentioned that you handle all legal matters, is

11   that true?

12   A      I have responsibility for all legal matters that touch

13   the company, yes.

14   Q      Are the directors of Akorn paid directors?

15   A      They receive compensation for their services, yes.

16   Q      And what are the director's fees that are paid to

17   directors?

18   A      They are all disclosed in our public filings.  I don't

19   know off the top of my head.

20   Q      Is it 10,000, 40,000, 20,000?  You can't even ball park

21   it?

22   A      It's none of those numbers.  I would say in the range

23   of $100,000 per year.

24   Q      And that each of the directors?

25   A      That's correct.
```

1  Q     And have they been receiving those payments over the

2  past, say, four years in that amount?

3  A     Approximately.  I think the amounts have varied

4  depending upon their committee participation, but, yes,

5  generally.

6  Q     And you mentioned Mr. Boothe.  Where did you get Mr.

7  Boothe?

8  A     I don't know how to answer that question.

9  Q     What company did he come from to Akorn?

10 A     He came from -- he has a number of companies in his

11 experience.  He's been -- Paragon among them, but he came to

12 us through a recruiter.

13 Q     And are you aware whether Mr. Boothe is a defendant in

14 any kind of anti-trust litigation particularly in the state

15 of Connecticut?

16 A     Yes, I am.

17 Q     And when did you become aware of the fact that Mr.

18 Boothe is a defendant in this Connecticut litigation?

19 A     On or about the time that the amended complaint was

20 filed.

21 Q     And when was the complaint filed?

22 A     It was earlier this year, two or three months ago.

23 That is my best estimate.

24 Q     Two to three months ago, so during the pendency of the

25 bankruptcy?

1   A     Sorry, again, it could be.  I don't know the exact

2   dates.

3   Q     Well, I'm just asking when you learned of it.  Do you

4   know whether you learned of it during the course of the

5   bankruptcy?

6   A     I don't recall.

7   Q     Has the company investigated any of the allegations

8   that are made against Mr. Boothe in that piece of litigation

9   in the District Court in Connecticut?

10  A     No.  The allegations don't relate to Akorn's business.

11  Q     But you're not concerned about the fact that Mr. Boothe

12  is an alleged anti-trust violator?

13  A     Those aren't my words.

14  Q     Well, are you concerned about it?

15  A     I am to the extent that in the future his attention may

16  be diverted from activities at Akorn in order to comply with

17  discovery and a possible deposition.

18  Q     And that is your only concern?

19  A     As I sit here today, yes.

20  Q     Now you were asked about whether there was ever any

21  investigation into the SEC violations that were alleged by

22  various shareholders in the case.  Do you recall talking

23  about that?

24  A     Yes.

25  Q     And you said that because those claims were resolved

1   the company never investigated whether there was any actual

2   fault on the part of the officers or directors involved in

3   that, right?

4   A      Those were not my words.

5   Q      Well tell us what your words were again, sir?  What

6   were the reasons why the company never investigated?  It

7   sounded like your testimony was, well, they all ended

8   favorably in some fashion and, therefore, there was no

9   investigation.  But I don't want to paraphrase what you said,

10  so why don't you tell us why the company never investigated

11  those allegations.

12  A      Okay.  You're mixing apples and oranges here, so I'm

13  having difficulty understanding the question and having

14  difficulty answering the question.

15         My testimony previously was that the SEC opened and

16  closed an investigation without any findings or enforcement

17  action against the company.  There were other securities

18  cases filed and those have been -- the class action case was

19  fully litigated and resolved.  We still have the pending opt-

20  out cases which we continue to litigate.

21  Q      Okay.  And you were involved, were you not, in the

22  Fresenius litigation?

23  A      I was -- yes, I was involved.

24  Q      Were you advising the company at that time about the

25  Fresenius litigation?

1   A      In my role as general counsel, yes.

2   Q      And have you ever read Judge Laster's opinion about the

3   Fresenius litigation?

4   A      Yes, I have.

5   Q      Are you aware that Judge Laster found that the only

6   interest that Akorn executives showed in the Cerulean report

7   was a request by Joseph Bonaccorsi, Akorn's executive vice

8   president, general counsel, and corporate secretary that

9   Cerulean removed the reference to potential criminal

10  liability for Akorn's executives.

11        Did you ask for the board's approval when you requested

12  that (indiscernible) remove the reference to criminal

13  activity?

14  A      No, I did not.

15  Q      And why is that?

16  A      For several reasons:

17        One, it didn't -- there is no governance requirement

18  that would have caused me to do that.  When I was speaking to

19  the gentleman at Cerulean I asked him why he noted the

20  statutory criminal violations that could stem from ongoing

21  compliance violations. And when he explained to me why he

22  added those provisions in his draft report I asked him to

23  remove those.

24  Q      Now, sir --

25              THE COURT:  I just want to interrupt, Mr. George.

1    I am not in the habit of interrupting cross examinations, but

2    this happened a little bit yesterday so I thought it would be

3    helpful.  There were a lot of questions being asked yesterday

4    and perhaps we're going to go into today that I don't have a

5    foundation for.  We have had very few limited hearings in

6    these cases.  Of course, I haven't read the exhibits before

7    today.

8             So, it would be helpful to me to the extent that

9    this has not been explored on direct that you lay a

10   foundation for some of these questions because without a

11   context they have no meaning for me.  So, for instance, I

12   don't know who Cerulean is.  I don't know anything about what

13   the context is.

14            MR. GEORGE:  Fair enough, Judge.

15            THE COURT:  I just want to make sure that I

16   understand the meaning of the question so I can give it the

17   weight that it deserves.  So, I just don't want to be lost.

18            MR. GEORGE:  Fair comment, Judge.  I was just

19   trying to move along through it because I know we have a lot

20   of ground to cover.  I apologize.

21            THE COURT:  No, that's fine.  Like I said, you can

22   put on whatever case you wish, but just know that I don't

23   have an extensive background as all of you have.  You have

24   been living and breathing this for years.  So, I need you to

25   hold my hand through this.

```
 1              MR. GEORGE:  Thank you, Judge.
 2   BY MR. GEORGE:
 3   Q     Mr. Bonaccorsi, who was Avellanet?
 4   A     He was the sole proprietor of a quality compliance
 5   consulting company.
 6   Q     And was he retained by Akorn?
 7   A     He was, yes.
 8   Q     And what was the purpose of retaining Avellanet?
 9   A     As part of our normal quality compliance program at the
10   time he was asked to come onto our manufacturing sites,
11   conduct a consultant style audit to identify areas for
12   improvement to help us maintain and comply with -- to
13   maintain an appropriate FDA compliance quality program.
14   Q     And, sir, he testified in the Fresenius litigation, did
15   he not?
16   A     I did, yes.
17   Q     And is it fair to say his testimony was that Akorn was
18   among one of the worst company's he'd ever seen with respect
19   to its data management and data integrity issues?
20   A     I'm sorry, Mr. George, I thought you asked me if I
21   testified in Fresenius.
22   Q     No.  I'm asking whether Avellanet testified.
23   A     Yes, he did.
24   Q     And are you aware that he testified that Akorn's data
25   integrity system was in the top three of over 123 companies
```

1   that he reviewed as one of the top three worst data integrity

2   programs?

3   A     That's consistent with my recollection, yes.

4   Q     And why did you feel it was necessary to filter this

5   professional who was retained to investigate potential wrong

6   doing rather than allow his opinion to come out unfiltered?

7   A     I disagree with your characterization of what I was

8   doing, and thinking, and what my actions actually were.  If

9   you would like to know about the conversation I had with Mr.

10  Avellanet and my rational I'm happy to explain that, but what

11  you just was -- it doesn't make sense to me because that's

12  not what happened.

13  Q     Okay.  Well I'm not making that allegation, sir.  I'm

14  just reading to you from what Judge Laster said in his

15  opinion. He said that your only interest was removing the

16  reference to criminal conduct.  That's a final order, it's

17  not been appealed and I think your bound by that.

18        So, I am only asking you why did you feel it was

19  important for you to take Mr. Avellanet's report and remove

20  the allegations of potential criminal conduct.

21  A     First of all, my knowledge is not limited by Vice

22  Chancellor Laster's opinion, okay.  He was not present for my

23  conversation with Mr. Avellanet to start with.

24        Secondly, that wasn't my only interest and you've

25  mischaracterized it because you don't know what the purpose

1  was of my having a conversation with him.  So, I don't know

2  how to answer that.

3          MR. GEORGE:  Your Honor, I move to strike that as

4  unresponsive.

5          MR. ARNAULT:  No, it's not.

6          MR. GEORGE:  It certainly is not responsive,

7  Judge.  There is a ruling that a judge made, that ruling is

8  final.  They're not my words.  I'm asking him about decisions

9  he made.  He wants to try to mince what Judge Laster said.

10 He said what he said, he stuck with it and he can try to

11 wiggle and jiggle if he wants, but there's a question pending

12 which was why did he decide to remove that reference to

13 criminal conduct from the report; that's all.

14         THE COURT:  Okay.  Mr. Bonaccorsi, to the best of

15 your ability you answer that question.

16         THE WITNESS:  I can answer that question and its

17 different then every question that you've tried to ask.

18         THE COURT:  I agree.

19         THE WITNESS:  I was interested in Mr. Avellanet

20 removing that reference because he put it in not pursuant to

21 his good faith work for the company, but he did it in an

22 attempt and at the request of a management team member who

23 was trying to motivate the Somerset office at the time and

24 the IT department at the time to provide the support that Mr.

25 Avellanet would need to conduct the audit there.

1          In light of other priorities that were occurring

2 at the site and with the IT group, the operations and IT were

3 not prepared to support the audit that was going on.  And

4 when Mr. Avellanet explained that to me, I clarified with him

5 that, in fact, and he clarified with me that, in fact, there

6 were no violations. He was simply citing to the regulation

7 there and the potential for violations and liability if in

8 the event the actions that he was complaining about, which

9 was the lack of IT support and IT systems, failed.

10          When I asked him whether that would be included in

11 his final report, which this was not, the one that we were

12 talking about was a draft report, he agreed that he would

13 remove it. He laughed, said it was a bit of an --

14          MR. GEORGE:  Your Honor, objection; hearsay.  Your

15 Honor, I object.  That is hearsay.

16          MR. ARNAULT:  Your Honor, Mr. George's questions

17 have elicited the very testimony that Mr. Bonaccorsi is now

18 providing.

19          MR. GEORGE:  That doesn't make hearsay

20 permissible, Mr. Arnault.

21          THE COURT:  This is the basis for his belief.

22 It's not being entered for the truth of the matter.  You

23 asked him why he did and what was his belief regarding it.

24          You may continue.

25          MR. GEORGE:  Understood.

1          THE COURT:  And let's just be clear, let's not

2   interrupt the witness when he is answering the question.

3          Mr. Bonaccorsi, you may continue.  I believe your

4   last word that you said is "he laughed," and then there was a

5   little bit more that you were going to say.

6          THE WITNESS:  Yeah.  He laughed and agreed that he

7   would do that, that it was an over-reach on his part and he

8   did it to motivate our team to provide the support that he

9   would need to complete his consulting work at the site.

10  BY MR. GEORGE:

11  Q     Sir, could you go to the debtor's exhibit book that

12  includes 21?  The book that has 9 through 26 in it.  I guess

13  there's two books.  So, there's two books, sir, with the

14  debtor's exhibits on it.

15  A     Yes.

16  Q     I'm going to be talking about Exhibits 9 through 24.

17  A     Okay.

18  Q     Do you have the book with Exhibit 9 in it, sir?  Take

19  your time.

20  A     I'm sorry, I don't.  My book goes from 1 through 8 and

21  then it jumps to, it looks like, Exhibit 20.

22  Q     Do you have the debtor's exhibits, sir, in front of

23  you?

24  A     I have my exhibits.  I'm sorry.

25  Q     When you say your exhibits are you -- do you have

1   documents there in front of you?  I'm sorry.

2            UNIDENTIFIED SPEAKER:  Mr. George, I think the

3   issue is that he has his witness binder as opposed to the

4   debtor.

5            THE WITNESS:  Yes.  I'm sorry.  I had my witness –

6   – yes, that's exactly right.

7            Sorry, Bill.  Sorry, Mr. George.

8            MR. GEORGE:  I'm sorry. I just didn't hear what he

9   said.

10           THE COURT:  He said he has his witness binders in

11  front of him. He just needed to grab the aggregate set of

12  debtor's exhibits.

13           MR. GEORGE:  Understood.

14           THE COURT:  A lot of binders here.

15           THE WITNESS:  Okay. And you said Exhibit 9, right?

16           MR. GEORGE:  Yes.  If you could, please.

17           THE WITNESS:  Yes.

18  BY MR. GEORGE:

19  Q     Have you ever seen this document before?

20  A     Yes.  This -- yes.

21  Q     And do you know what this is?

22  A     This is the -- it appears to be the XL Insurance

23  policy.  This is an XL policy that has a policy period from

24  September 2019 to September 2021.

25  Q     And is this a policy that is implicated by any of the

1  settlements, the shareholder settlements.  Do you know?

2  A    I don't believe so.  This looks like this is a policy

3  that covers a subsequent period.

4  Q    And could you go -- Your Honor, could we admit No. 9

5  please.

6              THE COURT:  Any objection?

7              MR. ARNAULT:  No objection, Your Honor.

8              THE COURT:  All right.  It's admitted.

9         (Debtor's Exhibit 9, received into evidence)

10 BY MR. GEORGE:

11 Q    How about No. 10, sir.  Can you turn to that?

12 A    Yes.

13 Q    And could you go to the second page of that document?

14 Mine is copied on both sides of the page.  So, I guess,

15 technically, it's Page 3 of the exhibit, but it's the second

16 piece of paper.

17 A    Yes.

18 Q    And who is the insured under this policy?

19 A    Akorn, Inc.

20             MR. GEORGE:  Your Honor, I'd move to admit No. 10.

21             THE COURT:  Any objection?

22             MR. ARNAULT:  No objection.

23             THE COURT:  It's admitted.

24        (Debtor's Exhibit 10, received into evidence)

25        (Phone interruption)

```
 1              THE COURT:  Okay.  To the extent that you're on

 2    the line and you are not addressing the court please mute

 3    your phone.  Thank you.

 4    BY MR. GEORGE:

 5    Q     Can you go to Exhibit 11, sir?

 6    A     Yes.

 7    Q     And have you ever seen this policy before?

 8    A     Yes.

 9    Q     And this is an excess insurance policy for management

10    liability, right?

11    A     Yes, it is.

12    Q     And the named insured is?

13    A     Akorn, Inc.

14              MR. GEORGE:  Your Honor, I'd move No. 11 into the

15    record.

16              THE COURT:  Any objection to the admission of No.

17    11?

18              MR. ARNAULT:  No objection, Your Honor.

19              THE COURT:  All right.  It's admitted.

20          (Debtor's Exhibit No. 11, received into evidence)

21    BY MR. GEORGE:

22    Q     And could you go to No. 12?

23    A     Yes, I'm there.

24    Q     Have you ever seen this policy before?

25    A     Yes.
```

1   Q     And who is the insured under this policy?

2   A     Its Akorn.  We're identified as Akorn Pharmaceuticals

3   which is a DBA, but it is Akorn.

4           MR. GEORGE:  Your Honor, I would move No. 12 into

5   evidence.

6           THE COURT:  Any objection?

7           MR. ARNAULT:  No objection, Your Honor.

8           THE COURT:  It's admitted.

9       (Debtor's Exhibit No. 12, received into evidence)

10  BY MR. GEORGE:

11  Q     Can you go to No. 13, sir?

12  A     Yes.

13  Q     And what is this policy?

14  A     It looks to be a Side A policy from XL.

15          MR. GEORGE:  Okay.  Your Honor, I would move 13

16  into the record.

17          THE COURT:  Any objection?

18          MR. ARNAULT:  No objection, Your Honor.

19          THE COURT:  It's admitted.

20      (Debtor's Exhibit No. 13, received into evidence)

21  BY MR. GEORGE:

22  Q     We can go to 14 if you will, sir.  Do you see 14?

23  A     Yes, I do.

24  Q     And can you tell me who is the insured under this

25  policy?

```
 1   A      Akorn, Inc.

 2          MR. GEORGE:  Your Honor, I would move 14 into

 3   evidence.

 4          THE COURT:  Any objection?

 5          MR. ARNAULT:  No objection, Your Honor.

 6          THE COURT:  It's admitted.

 7      (Debtor's Exhibit No. 14, received into evidence)

 8   BY MR. GEORGE:

 9   Q      No. 15, sir, can you go to that?

10   A      Yes.

11   Q      Have you see that document before?

12   A      I believe so, yes.

13   Q      And what is that?

14   A      It look like it's a D&O policy.

15          MR. GEORGE:  Okay.  Your Honor, I'd move 15 into

16   the record.

17          THE COURT:  Any objection?

18          MR. ARNAULT:  No objection, Your Honor.

19          THE COURT:  It's admitted.

20      (Debtor's Exhibit No. 15, received into evidence)

21   BY MR. GEORGE:

22   Q      Could you go to 16, sir?

23   A      Okay.

24   Q      And what is this policy?

25   A      It looks like an excess D&O policy in the amount of $10
```

1   million dollars issued to Akorn, Inc.

2          MR. GEORGE:  I would move No. 16 into the record,

3   Your Honor.

4          THE COURT:  Any objection?

5          MR. ARNAULT:  No objection, Your Honor.

6          THE COURT:  All right.  It's admitted.

7      (Debtor's Exhibit No. 16, received into evidence)

8   BY MR. GEORGE:

9   Q    Could you go to No. 17, sir?

10  A    Yes.

11  Q    Can you tell me what that document is?

12  A    It's an endurance policy issued to Akorn, Inc.,

13  covering policy period June 1, 2017 to June 1, 2018 with

14  limits of liability of $10 million dollars.

15  Q    And this is an excess management liability policy?

16  A    Yes, it is.

17  Q    And if you look down at Item 7 it makes reference to

18  the policies that is the secondary coverage for, the excess

19  coverage?

20  A    Yes, that's right.

21         MR. GEORGE:  I would move to admit No. 17, Your

22  Honor.

23         THE COURT:  Any objection?

24         MR. ARNAULT:  No objection, Your Honor.

25         THE COURT:  It's admitted.

```
 1            (Debtor's Exhibit No. 17, received into evidence)
 2    BY MR. GEORGE:
 3    Q    No, 18, sir.  Have you ever seen that document?
 4    A    Yes, I have.
 5    Q    And what is that document?
 6    A    It looks like its excess policy issued by AIG to Akorn.
 7            MR. GEORGE:  I would move No. 18 into the record,
 8    Your Honor.
 9            THE COURT:  Any objection?
10            MR. ARNAULT:  No objection, Your Honor.
11            THE COURT:  It's admitted.
12            (Debtor's Exhibit No. 18, received into evidence)
13    BY MR. GEORGE:
14    Q    No. 19, sir.
15    A    Yes.
16    Q    And can you tell me what 19 is?
17    A    It's an excess policy issued by CAN Insurance Company
18    to Akorn, Inc.
19    Q    And do you know how much that policy is?
20    A    It is a $10 million dollar limit.
21    Q    And who is the insured?
22    A    The insured is Akorn, Inc.
23            MR. GEORGE:  I would move 19 into the record, Your
24    Honor.
25            THE COURT:  Okay.  Any objection?
```

1          MR. ARNAULT:  No objection, Your Honor.

2          THE COURT:  It's admitted.

3      (Debtor's Exhibit No. 19, received into evidence)

4  BY MR. GEORGE:

5  Q    No. 20, sir, could you take a look at that?

6      Oh, 20 is in, Your Honor. I'm sorry.

7          THE COURT:  Okay.

8  BY MR. GEORGE:

9  Q    We need to go to the next book, sir, 21 through 46.

10 A    Give me a moment, please.

11 Q    No problem.

12 A    Okay.  I have the second book.

13 Q    Okay.  Sir, could you go to Exhibit No. 21?

14 A    Yes.

15 Q    And do you know what this document is?

16 A    Only just by reading it.  A reinstatement addendum is

17 what it says.

18 Q    And what is the amount of the coverage for this policy?

19 A    $10 million dollars.

20         MR. GEORGE:  I would move No. 21 into the record,

21 Your Honor.

22         THE COURT:  Any objection?

23         MR. ARNAULT:  No objection, Your Honor.

24         THE COURT:  Okay.  It's admitted.

25     (Debtor's Exhibit No. 21, received into evidence)

1   BY MR. GEORGE:

2   Q     Could you go to No. 22, sir?

3   A     Yes.

4   Q     And can you tell me what that document is?

5   A     Yes.  It's titled endorsement No. 15 issued by Illinois

6   National Insurance Company.  It appears to extend insurance

7   coverage.

8          MR. GEORGE:  Okay.  Your Honor, I would move to

9   admit No. 22.

10          THE COURT:  Any objection?

11          MR. ARNAULT:  No objection, Your Honor.

12          THE COURT:  All right.  It's admitted.

13      (Debtor's Exhibit No. 22, received into evidence)

14  BY MR. GEORGE:

15  Q     And then No. 23.  What is No. 23, sir?

16  A     It is an AIG policy of insurance with, it looks like,

17  excess -- I'm sorry, it's a Side A policy issued by AIG

18  covering Akorn, Inc., with a $10 million dollar limit.

19          MR. GEORGE:  Your Honor, I would move No. 23 into

20  the record.

21          THE COURT:  Any objection?

22          MR. ARNAULT:  No objection, Your Honor.

23          THE COURT:  It's admitted.

24      (Debtor's Exhibit No. 23, received into evidence)

25  BY MR. GEORGE:

1   Q      Did any employee in the upper management of Akorn lose

2   its job as a result of the FDA data integrity investigation?

3   A      When you say FDA data integrity investigation can you

4   explain what you're talking about because I can't answer the

5   question otherwise?

6   Q      Let me ask it a different way.  Did any of the upper

7   management of Akorn lose its job as a result of the

8   allegations of material misstatements to the FDA?

9   A      I will -- if I understand your question, I will say

10  that Mark Silverberg was removed from his position as the

11  head of quality in 2018 for failure to properly executive his

12  duties and responsibilities as the quality head at Akorn.

13  That stemmed from an Akorn driven investigation into what we

14  believe to be fabricated data included that was directed to

15  the FDA not by Mr. Silverberg, but someone at A Plant.

16  Q      Someone at what?

17  A      At A Plant, the Somerset plant.

18  Q      Oh, at A point.  I thought you were talking about a

19  company.

20         And the FDA has contacted Akorn and Akorn has been

21  tasked with certain remediation actions required by the FDA.

22  Is that true?

23  A      Again, that is a really broad question.  It relates to

24  what.  We were in regular communication with the FDA and as

25  part of ongoing FDA compliance program and theirs they

1   regularly inspect our facilities.

2   Q     Right. Is there a remediation program that the FDA is

3   insisting that Akorn comply with?

4   A     No.  There is a remediation program that we initiated,

5   and put in place, and made commitments to the FDA against

6   which we are making progress and complying.

7   Q     And did it cause you concern that there were these data

8   integrity issues that were raised as to the purity or the

9   quality of any of the drugs that Akorn has been producing?

10  A     Yes.

11  Q     And has Akorn done anything to look into any of the

12  prior drugs that were produced while Mr. Silverberg was in

13  control that may also have had some data integrity issues

14  connected to them?

15  A     Yes.

16  Q     And has there been an outcome of that investigation?

17  A     Yes.

18  Q     And what was the outcome of that investigation?

19  A     I don't remember the details. And from what I do recall

20  is that there were no marketed products that were affected.

21  We did confirm, as part of the investigation that we did,

22  that there was a document that we believed to have been

23  fabricated in approximately 2005 or 2006.  We withdrew that

24  and it wasn't an approved product and we withdrew

25  (indiscernible) from the FDA upon identifying that

1   deficiency.

2   Q     Have there also been issues raised about the sanity, or

3   the cleanliness, or the protocols that are used for making

4   drugs at Akorn by the FDA?

5   A     Yes.  There were some findings regarding the

6   sanitation, I think is the word you were using, and those are

7   recorded in the observations and the warning letter issued by

8   the FDA.

9   Q     And some of those findings were, for example, that

10  people had gloves that may have had contaminants on them and

11  things like that.  Do you recall that?

12  A     That sounds right.  That is consistent with my

13  understanding, yes.

14  Q     And there are other allegations that certain components

15  of pharmaceuticals were shaken when they weren't supposed to

16  be shaken or distilled when they weren't supposed to be

17  distilled.  Do you recall those kinds of things?

18  A     Yes, I do.

19  Q     And who is now head of quality control now that Mr.

20  Silverberg is gone?

21  A     Dandy Dorado.

22  Q     And when was he hired?

23  A     He was hired early in 2019.

24  Q     And when was Mr. Silverberg fired or let go?

25  A     If I'm thinking about this right it was February of

1  2018.

2  Q     And you said that the new head of quality control was

3  hired in when of 2019?

4  A     February.

5  Q     So, Mr. Silverberg left in February 2018 and the new

6  head started in February of 2019?

7  A     Correct.

8  Q     So, who handled quality control in that year period in

9  between?

10  A     The position is quality compliance and for that

11  duration we elevated Kim Locercrug [phonetic].

12  Q     You mentioned that the securities class action

13  litigations were motivated by the allegations in the Chancery

14  Court?

15  A     Yes.  I don't know if that was my exact word, but yes.

16  Q     Do you think they were more likely motivated by the

17  findings of the Chancery Court as opposed to the allegations

18  in the Chancery Court action?

19  A     I don't know.  I didn't write the complaint, but, yes,

20  the findings were incorporated into the complaint.

21  Q     Who was John Kapoor?

22  A     Who is -- excuse me --

23  Q     Well, I'm sure he's still alive.  I meant who was he to

24  Akorn?

25  A     He was the former chairman of the board, I think, for

1  some period of time.  He served as the CEO.  And he acquired

2  the company back in the 90's, I believe, and took it public

3  at that time.  He is a former board member of Akorn.

4  Q    Mr. Buschmann seemed to think that he was never an

5  officer.  Is your testimony that he was an officer at some

6  point?

7  A    I don't think that's what Mr. Buschmann testified to.

8  At some point in time I believe he was an officer, but that

9  was before I was at the company.

10 Q    And do you know why he left?

11 A    Yes.  He left Akorn in October 2017 related to

12 activities at another company at which he was on the board

13 and I think a majority shareholder that led to criminal

14 charges against him and others.  He resigned from our board

15 knowing that his attention was required elsewhere and he

16 wouldn't have the time to dedicate what was required for

17 continuing to govern Akorn.

18 Q    Did those criminal charges have anything to do with

19 anticompetitive behavior?

20 A    I have no idea. It didn't involve Akorn.

21 Q    Well I assume that when he left there was some

22 discussion about it, right?

23 A    Of course.

24 Q    And you never heard what the nature of the criminal

25 charges are?

1  A      I didn't say that.

2  Q      Okay.  Well what did you hear were the nature of the

3  criminal charges?

4  A      I understood them to be insurance fraud.  I know there

5  was a RICO charge for selling, for over-promoting the over-

6  selling and use of a prescription drug, a narcotic.

7            MR. GEORGE:  I'm sorry, Your Honor.  I'm working.

8  Just one second, Your Honor. I have to find the document.

9       (Pause in record)

10 BY MR. GEORGE:

11 Q      Sir, could you go to the Debtor's Exhibit No. 37 for a

12 moment?

13 A      Yes.

14 Q      Were you involved in the negotiation of the settlement?

15 A      Yes.

16 Q      Can you explain to us what a CVR is?

17 A      Contingent value right.

18 Q      And is there a component of the settlement that

19 includes a contingent value right?

20 A      Yes.

21 Q      And explain to the court how that contingent value

22 right would work with respect to a shareholder holding a

23 claim under the securities litigation?

24 A      Well, it was intended to be, essentially, a security

25 offered to the security class participants whereby based on

1  successful performance by the company, financial performance

2  by the company in the future.  There were specific parameters

3  set, metrics and measurements put in place that would allow

4  for substantial earnings to the company that could be shared

5  with shareholders that those participants would have a right,

6  and the company agreed, to compensate the holders of the

7  CVR's based on the successful performance at the company, the

8  financial performance of the company, and to share in the

9  earnings of the company.

10  Q     Now were the settling shareholders aware of Akorn's

11  intention to file bankruptcy?

12  A     We didn't have an intention to file bankruptcy when we

13  negotiated this.  So, the answer would be no because nobody

14  knew.

15  Q     In March of 2020 nobody knew about a bankruptcy filing?

16  A     You're putting a date out there that isn't relevant to

17  negotiating this agreement. In March 2020, yes, I would say

18  that at that point in time we understood that there would

19  likely be a bankruptcy filing.

20  Q     And was the court that was approving this class action

21  settlement, were they informed of Akorn's intention to file

22  bankruptcy before they entered this order on March 13th of

23  2020?

24  A     I don't remember exactly. I don't think I participated

25  in that hearing.  I don't know the answer to your question.

1   Q      So, these CVR's are they rights to acquire interest in

2   the reconstituted Akorn, the Akorn that had been purchased,

3   as of yesterday, by the ad hoc group?

4   A      No.

5   Q      So, what are the CVR's related to; the performance old

6   Akorn, the one that doesn't have any assets anymore?

7   A      Well we do, but yes.

8   Q      Prior to settling this litigation Mr. Portwood was

9   still an individual defendant in this lawsuit, wasn't he?

10  A      Yes.  I believe that he was, yes.

11  Q      Is any consideration being provided to these

12  shareholders with respect to the entity that moved over to

13  the ad hoc committee after the purchase was agreed yesterday?

14  Are those shareholders getting anything out of that, the

15  entity that the committee is now going to be operating?

16  A      No.

17  Q      Do you know whether Akorn needs FDA approval to

18  consummate the transaction with the ad hoc lenders that the

19  court approved yesterday?

20  A      Those are not the words that I would use to describe

21  the process of registering with the FDA.  You could call it

22  an approval, but it is the transfer of our registrations from

23  one entity to the other which would be required in order for

24  the new company to operate out of our facilities and under

25  the product approvals that we rely upon to manufacture and

1  sell products.

2  Q    And how long do you expect that it will take that FDA

3  approval?

4  A    That process we're working on it now.  We are working

5  on it as we prepare to close the transaction and hope to have

6  that completed by the time we close the transaction or

7  immediately following.

8  Q    And if you don't have those by the time you close that

9  transaction then the ad hoc committee will continue to

10  operate using the debtor's FDA licensure, for lack of a

11  better word?

12  A    I don't know the mechanics behind that yet.  We will

13  figure that out.

14  Q    Well, fair enough.

15      Let's say that between the time of regulatory approval

16  and today there's a drug that comes out and it causes damage

17  to somebody, will Akorn, the debtors' estate, have any

18  liability for that if their numbers are being used to produce

19  that drug?

20  A    We haven't closed the transaction here.  So, I don't

21  know. It's a hypothetical that I just haven't thought

22  through.  I don't know the answer.

23  Q    Is there any kind of indemnity that's coming back to

24  the debtor by virtue of the ad hoc committee's potential use

25  of the FDA registration that belongs to the debtor?

1  A     I don't remember.  The agreement was heavily

2  negotiated, written and signed.  We could refer to that, but

3  off the top of my head I don't remember the specifics

4  sufficiently to talk about it right now.

5  Q     Okay.  With respect to the bonus program that was

6  adopted for senior management in this case I think you

7  mentioned that one of the reasons why it was paid in December

8  was the expectation that they would remain and insisting they

9  plan negotiation and reorganization process.  Do you remember

10  that?

11  A     Yes.

12  Q     That was one of the main reasons for providing that

13  bonus, wasn't it?  The expectation that they would provide

14  meaningful support to the debtor in the process of getting

15  through the negotiation with the ad hoc committee, the

16  stalking horse, and stalking horse bid, and ultimately the

17  sale and closing under the sale provisions?

18  A     I think that was more related to the bonus that was

19  paid in 2020.  I don't remember my words specifically, but

20  that was the main purpose behind the second retention award

21  that was made.  The first was based on our accomplishments

22  during the 2019 year as shown by our operational financial

23  performance.

24  Q     Has Akorn ever generated in excess of $1 billion

25  dollars' worth of revenue in any particular year that you

1   have been involved?

2   A     We did for a twelve-month period.  I don't recall

3   whether it was our fiscal year or just a twelve-month period,

4   but the answer would be yes.  Within a twelve-month period we

5   did.

6   Q     And how about in 2018.  Do you know what the total

7   revenue was?

8   A     Not off the top of my head.

9   Q     How about in 2019.  Do you know what the total revenue

10  was?

11  A     It was under a billion dollars?

12  Q     If I told you 700 million would that refresh your

13  recollection if you ever had one?

14  A     That sounds about right and I did.

15  Q     And you're aware, aren't you, that the compensation

16  professional that you retained she used companies with total

17  revenue between $500 and $1.7 billion dollars, right?

18  A     Yes.

19  Q     Akorn was never a $1.7 billion dollar company, right?

20  A     We came awfully close to that, as we just discussed and

21  I don't know the exact metrics, and comparators, and factors

22  that the consultant used, but nor were we ever, you know,

23  within the last several years at the lower end of that dial

24  either.

25  Q     Now do you know whether any of the companies that she

1  looked at were companies that were contemplating a Chapter 11

2  filing?

3  A     I don't know.  I am not familiar enough with the

4  metrics and the data that were relied upon by the consultant,

5  HR, and the committee to make those decisions.  I'm sure its

6  document and the information that the board and the committee

7  considered.

8  Q     I'm sure you understand, sir, right, that finding a

9  median in a group of numbers, really, is a subset function of

10 the size of the sample?

11 A     That sounds right.

12 Q     And you were asked about it, I think, but to the extent

13 I missed it, I apologize for asking again, were these bonuses

14 discussed with the ad hoc group the bonuses in 2020?

15 A     They were not.

16 Q     They were not?  And why is that?

17 A     This was our business.  Our board wanted to make sure

18 that the appropriate protections and retentions were put in

19 place to make this a successful transaction.  We didn't, as I

20 remember, specifically require consent from the ad hoc group

21 to make those awards.  Our interests were aligned, so to

22 speak, because they were working with us and pressuring us to

23 maximize the value of the company and this is a way that our

24 board thought we could do that by incentivizing or, I should

25 say, retaining the effective team that was in place to see

1  through the improvements that it started earlier and to see

2  them through to make the process as appealing to interested

3  parties as possible.

4          MR. GEORGE:  Your Honor, before I start getting

5  into the plan its twelve o'clock.  It maybe seems like a good

6  place to break for a half an hour if that's all right with

7  Your Honor.

8          THE COURT:  I think that that's a great

9  suggestion.  So, let's take a half an hour break, come back

10  at 12:30 and resume the cross examination.

11          Again, Mr. Bonaccorsi, you are under oath and not

12  permitted to talk to anyone during the break regarding the

13  substance of your testimony.

14          THE WITNESS:  I understand.

15          THE COURT:  Great.  See you all at 12:30. Thank

16  you.

17      (Recess taken at 12:00 p.m.)

18      (Proceedings resumed at 12:34 p.m.)

19      (Audio picks up in the middle of speaking)

20          . . .Your Honor could take judicial notice of it,

21  but we're asking that it be part of the record.

22          THE COURT:  Okay.  Any objection?

23          MR. ARNAULT:  No objection, Your Honor.

24          THE COURT:  Okay.  It's admitted.

25          MR. GEORGE:  Thank you, Judge.

1    BY MR. GEORGE:

2    Q    Mr. Bonaccorsi, you mentioned that after the sale the

3    debtor still has assets.  What assets does the retain

4    following the closing on the sales to the ad hoc group?

5    A    Excuse me, Mr. George, if I could just for a moment

6    and, Your Honor, I have a point of clarification from my

7    testimony that I recalled when I was getting a glass of

8    water.  So, I don't know if this is the appropriate time to

9    supplement an answer I gave earlier or not.  If not, I will

10   hold it over and I'll take this question on.

11           THE COURT:  Okay. Let's take it on redirect.

12           THE WITNESS:  Okay.

13           THE COURT:  Mr. George, why don't you re-ask your

14   question?

15           MR. GEORGE:  Sure.

16   BY MR. GEORGE:

17   Q    Before the break I asked you about the closing.  And I

18   made the statement that after the closing the debtor would

19   have no assets and your retort was the debtor does have

20   assets after the closing.  I wanted to go through with you

21   what assets you believe the debtor will retain after the

22   closing.

23   A    I believe that that was neither your question nor my

24   answer.  I was speaking present tense prior to closing.  So,

25   we do have assets as we sit here today.

1   Q     How about after -- sorry, I thought you were done.

2   A     Yeah, I'm done.

3   Q     Okay.  After the closing will the debtor have any

4   assets?

5   A     No.  Essentially none.

6   Q     And the wind-down budget was that approved by the

7   lender?

8   A     Yes, it was.

9   Q     And who participates in the wind-down budget?

10  (Indiscernible).

11              THE COURT:  What was that, Mr. George?

12  BY MR. GEORGE:

13  Q     I'm sorry.  What claimants get paid out of the wind-

14  down budget?

15  A     I don't know that claimants will be paid.  These are

16  the professionals and others who are required to initiate and

17  see through the wind-down of the organization.

18  Q     So, that wind-down budget doesn't trickle down for

19  payments to unsecured creditors under the plan, right?

20  A     That's my understanding, yes.

21  Q     Earlier you talked about a DOJ investigation.  Can you

22  tell us a little bit more about that DOJ investigation, what

23  the nature of it is?

24  A     Sure.  I think I can generally.  And I would have to

25  think about whether there are any confidentiality or

1   privilege issues that could be triggered here that I need to

2   be mindful of.  So, I will speak generally and in a way that

3   I'm comfortable.  Okay. So, please keep that in mind.

4        There is a broad and has been a broad DOJ investigation

5   into price fixing involving many, many generic pharmaceutical

6   companies and individuals.  And it's my understanding as part

7   of that larger investigation we at Akorn received the

8   subpoenas and demands for information and documents.  That

9   all relates to their investigation of price fixing in the

10  industry.

11  Q    I see.  And that investigation, you said, is still

12  ongoing, right?

13  A    It is ongoing, yes.

14  Q    And has any of the Akorn employees received subpoenas

15  from DOJ?

16  A    I think some former employees have received subpoenas.

17  I'm struggling to recall whether any current employees have,

18  but I think not.

19  Q    Do you know who the former employees are that were

20  subpoenaed?

21  A    I know who they are, yes.

22  Q    Who are they?

23  A    I know one is John Sibotts [phonetic].  I know them.

24  If you say their names, I will recognize them, but they are

25  people I know.

1   Q      Is John Sibotts a former employee?

2   A      Yes, he is.

3   Q      What was his position at the company?

4   A      He had sales responsibilities.  He was senior vice

5   president for a period of time.

6   Q      He had what?  I'm sorry.

7   A      He was the senior vice president of sales.

8   Q      Oh, of sales.

9          Who sets prices at Akorn today?

10  A      We have a pricing committee at the company that

11  includes members of the management team as well as the legal

12  staff, and compliance, and the sales team.

13  Q      Who are those specific individuals?

14         MR. ARNAULT:  Your Honor, I'm going to interpose

15  an objection here on relevance grounds.  Obviously, we're not

16  here today to litigate the MDL claim and those allegations.

17  I have allowed a few questions, but it seems like this is the

18  path we are going down.  I'm not entirely sure why it's

19  relevant to plan confirmation here.

20         MR. GEORGE:  Well, Your Honor, it absolutely is

21  relevant because -- I'm sorry, Judge.

22         THE COURT:  I'd just ask you to elaborate on the

23  relevancy here.

24         MR. GEORGE:  Your Honor, this goes to the good

25  faith efforts of the debtor and whether the debtor is moving

1  forward in good faith.  I don't intend to go at all into the

2  MDL.  I am just trying to understand who is in control of the

3  company while this government investigation started and

4  whether they're still there.

5          THE COURT:  Okay.  Well then, we will see how the

6  questioning progresses then.  I will allow it.

7          MR. GEORGE:  Thank you, Your Honor.

8  BY MR. GEORGE:

9  Q    So, who are the names of those individuals that are on

10  the pricing committee?

11  A    Jon Kafer who leads sales.  April Poliakoff who is one

12  of the lawyers in the legal team.  Sarah Iles, who is our

13  corporate compliance officer.  Then there are a couple of

14  others who are in the contracts group or the pricing group.

15  Q    And you're understanding is that the investigation

16  relates to price fixing in the generic drug industry?

17  A    Yes.  And to elaborate on my first question.  I don't

18  want my answer that I just gave to be limiting.  There may be

19  others.  I'm just not recalling all their names as we're

20  sitting here now.

21      To answer your question, yes, that is the

22  investigation.  It relates to generic price fixing.

23  Q    Are those employees moving over to Akorn when Akorn's

24  closing occurs?

25  A    I have no idea.

1  Q      Were those the same people that were in that same

2  capacity since, let's say, 2016 to the present?

3  A      I would say not.  Some may have been, others not.  For

4  example, I know that Sarah Iles is a relatively recent

5  employee who wasn't here in 2016.  Jon Kafer, I believe, was

6  on board in 2016 and is still a member of management and a

7  member of that committee.  April Poliakoff, who is one of my

8  team members in legal, is on the committee and she has been

9  at Hi-Tech and Akorn for her entire career.  The others I

10 can't say.

11 Q      And your understanding is that that's a criminal

12 investigation, right?

13 A      Correct.  By the anti-trust division and the DOJ.

14 Q      And was that criminal investigation by the DOJ, was

15 that in the debtor's disclosure statement anywhere?

16 A      I don't recall whether it's included there or not.  I

17 don't recall.

18 Q      So, sir, you understand, right, that the disclosure is

19 supposed to be almost like a protector for the estate.  It's

20 supposed to give as much information as an investor might

21 need to decide whether to vote for or against the plan.  Do

22 you understand that that is the purpose of the disclosure

23 statement?

24 A      Yes.

25 Q      And if management of the company were subject to

1  criminal investigations do you think that is something

2  relevant that creditors should know about when voting on the

3  plan?

4  A    I don't think that if that were the case then it's

5  possible, but I don't know that it would be required and

6  certainly it wasn't required; otherwise, we would have

7  considered adding it or maybe we did and decided not to.  If

8  it's not there based on the scope of the investigation and

9  the status of the investigation.  And there has not been any

10  action taken against the company or any individuals.  So, I

11  would think not.  It's merely an investigation.  We are

12  complying with subpoenas.

13      So, again, without knowing specifically whether it is

14  included, I am assuming by your question that it's not.

15  There is a rationale for not including.  That is because it

16  wasn't sufficiently material, that it would, otherwise,

17  require that we disclose it.

18  Q    Is Mr. Boothe on the pricing committee?

19  A    I can't remember if he is on that.  I don't think he is

20  on the pricing committee, no.

21  Q    What's his involvement with pricing?

22  A    He'll have input and the committee will keep him

23  informed of pricing movements, but I don't think that he

24  actually sits on the committee himself.

25  Q    But he is an advisor on pricing?

1  A     Yes.  He is the CEO of the company and provides his

2  input, and recommendations, and thoughts as he does on many

3  matters.

4  Q     And are you aware that one of the allegations in the

5  Connecticut litigation is that when he left his former job

6  that he got together with other executives to price fix?

7  A     I understand generally that that is an allegation.

8  Without specifics that is contained in the complaint.

9  Q     Okay.

10          THE COURT:  Mr. George, just one question.  Is the

11  "Connecticut Litigation" the MDL litigation?

12          MR. GEORGE:  It's not, Judge.  It's the same kind

13  of litigation.  We're not sure whether it's actually been

14  consolidated into the MDL yet or not, but it's the identical

15  litigation.  The claims are identical, but I don't believe

16  that it's been joined into the MDL, but it likely will be in

17  the figure.

18          THE COURT:  Okay.  Thank you.

19          MR. GEORGE:  Thank you, Judge.

20          Your Honor, just a point of clarification.  I'm

21  reminded by one of my partners that this is the state

22  attorney general versus these various defendants.  I just

23  wanted to make that clarification.

24          THE COURT:  Okay.  Thank you.

25          MR. GEORGE:  Thank you, Your Honor.

1   BY MR. GEORGE:

2   Q     Mr. Bonaccorsi, the insurance companies paid defense

3   costs in connection with these various securities litigation

4   claims, didn't they?

5   A     Yes, they did.  Let me think about that.

6   Q     Well there's defense cost coverage, right?

7   A     There is.  And I am not sure whether they have or not.

8   I'd have to -- boy, I don't believe they did. I think our

9   deductible was substantially high enough that we paid that

10  out of pocket in order to use the funds form the insurance

11  proceeds to fund the settlement.

12  Q     So, you're saying that though you think that there is

13  defense costs coverage that the debtor actually paid those

14  defense costs itself?

15  A     That is possible.

16  Q     Who would actually know the answer to that question,

17  sir?  Mr. Portwood?

18  A     He may.  He may.  Between the two of us, he or I with a

19  chance to investigate it would be able to provide that

20  answer.

21  Q     Under the debtor's bylaws are the officers and

22  directors entitled to indemnification and defense?

23  A     Yes, we are.

24  Q     Who paid for the defense of the officers?

25  A     In that case that goes with what I just told you.  I

1  think the company paid it on a going -- paid it in such a way

2  as to not erode the policy that would be offered to the

3  shareholders.  That is my best recollection as I sit here

4  today.

5  Q    And has the debtor ever sought or is it the debtor's

6  intention to seek reimbursement of those defense costs?

7  A    From the insurer, no because we've used the full --

8  we've capped out the policy so there are no funds available

9  under the policy because those funds are paid to the class

10  action plaintiffs, the shareholders.

11  Q    Now when you entered into and had the court approve the

12  shareholder settlement you said that at that point the debtor

13  already agreed to file bankruptcy, but that you have never

14  informed the court approving the settlement agreement of that

15  fact.  Is that correct?

16  A    That's not correct.

17  Q    Okay.  Did the debtor inform the court approving the

18  shareholder settlement of its intention to file bankruptcy?

19  A    As I said before, I don't know the answer to that

20  question because I was not participating in those hearings

21  nor did I read the transcript.

22      My understanding is that the court was aware that

23  bankruptcy was a possibility, but I don't -- I was certainly

24  not the one who said that to the court and I didn't hear it

25  said in court.  That is my understanding.

1  Q     And who did you get that understanding from?

2  A     From our outside counsel.

3  Q     And who was that?

4  A     It probably came from the firm of Cravath, Swaine &

5  Moore or it could have been our local counsel.

6  Q     Do you know whether the board is aware of the lawsuit

7  that was filed against Mr. Boothe?

8  A     Yes, they are.

9  Q     Has it been discussed in the board meetings?

10 A     Yes, it has.

11 Q     Has anyone on the board suggested an investigation into

12 whether there was any truth to the allegations with respect

13 to Mr. Boothe?

14 A     We covered this earlier.  My testimony -- the answer to

15 that was no.  I can supplement my earlier answer based on the

16 questions you just asked that both Doug Boothe and I spoke

17 with the board, both together and then Mr. Boothe dropped off

18 the line and I had a separate conversation with the board, as

19 well as their counsel, the board's counsel that is concerning

20 the allegations, but there was no specific investigation

21 conducted as a result of the allegations that are contained

22 in the Connecticut complaint.

23 Q     Okay.

24 A     As they did not relate to Akorn.

25 Q     Mr. Bonaccorsi, under the plan the payments to the

1   assumed vendor creditors and the $5 million dollars as part

2   of the settlement with the UCC those funds are coming from

3   the ad hoc committee, right?

4   A     Yes, that's right.

5   Q     Are there any unsecured creditors other than the

6   assumed liabilities and the creditors that are being paid

7   under the UCC settlement?  Are there any other unsecured

8   creditors?

9   A     I don't know the specific answer to that question.  I

10  don't know will be my best answer as I sit here now.

11  Q     Well you would agree that the MDL's are an unsecured

12  creditor, right?

13  A     I would.

14  Q     Both contingent, disputed and unliquidated?

15  A     Correct.

16  Q     And Fresenius a shareholder or is Fresenius an

17  unsecured creditor?

18  A     Yes, they are.

19  Q     Is (indiscernible) an unsecured creditor?

20  A     Yes, they are.

21  Q     Would you agree that the nature of these claims are,

22  essentially, litigation claims?

23  A     I agree.

24  Q     And would you agree that every one of those lawsuits

25  relate to either illegal or anti-competitive behavior by the

1   officers and directors of the debtor?

2   A     No.

3   Q     Well in the Fresenius litigation the allegation is that

4   Mr. Portwood mislead people, right?

5   A     I don't believe so, no.

6   Q     Well isn't' the allegation that he signed an 8-K or a

7   10-K and that the 10-K was false?

8   A     That's in the Fresenius case?  I am not sure. I mean if

9   you have the complaint, we could pull it up and read it.  I

10  don't remember that specific allegation against Mr. Portwood

11  and him being part of the Fresenius litigation.  It may have

12  been, I just -- we can just pull it up and see whether it is

13  or not.

14  Q     I apologize.  I apologize, sir.  I misspoke.

15        In the shareholder litigation there's an allegation

16  that Mr. Portwood made a misleading statement in one of the

17  SEC filed documents, right?

18  A     Correct.

19  Q     And the proof of form allegation the allegation is that

20  members of upper management engaged in anti-competitive

21  behavior by making false representations under the Lanham Act

22  as to their drugs, right?

23  A     That's what the litigation is about, yes.  I don't

24  recall specifically the allegations in the complaint.

25  Q     And the MDL litigation is allegations that senior

1  members of the Akorn staff along with members of the upper

2  management and many other companies in the country engaged in

3  price fixing in violation of the Sherman Antitrust Act,

4  right?

5  A    Generally speaking, yes, that's correct.

6  Q    So, that's a common thread between these three

7  remaining unsecured creditors, at least the litigation-based

8  ones, right?

9  A    Yes.  I agree with that.

10  Q    And are there any other unsecured creditors in this

11  case other than those three entities?

12  A    I don't know.  I'd have to see.  I don't know.

13  Q    Off the top of your head you don't know of any other?

14  A    Correct.

15  Q    And would you agree that the claims of those three

16  entities are the same in nature with respect to whether

17  they're secured or unsecured as against the debtor?

18  A    Yes.  I think I understand your question is are they

19  similarly situated in their classification and the answer to

20  that -- if that is your question I would say yes, they're

21  being similarly situated.

22  Q    And are they being similarly treated to the

23  shareholders in this case, in the shareholder litigation?

24  A    No. I think the shareholder -- I'm sorry, there's been

25  so much back and forth on this I just can't remember as I'm

1  sitting here now where we came out on that. I'm sorry.

2  Q     You can't remember whether the shareholders are being

3  treated differently than the unsecured creditors in the case?

4  A     That's what I just said.  I believe that they are in a

5  higher class, but I don't want to say that with 100 percent

6  certainty.

7  Q     Well that's one of the questions --

8  A     I think I'm undermining myself.

9  Q     Now yesterday Mr. Buschmann testified extensively about

10  the efforts that he performed on behalf of Akorn and it

11  appears he did a yeoman's job creating projections and

12  documentation as part of his project summaries.  Would you

13  agree that Mr. Buschmann did a good job?

14  A     Yes.

15         MR. GEORGE:  Just a second, Your Honor.  I'm

16  sorry.

17         THE COURT:  Take your time.

18         MR. GEORGE:  I'm sorry, Your Honor.  I just need a

19  moment.  I'm thinking.  I'm sorry.

20         THE COURT:  That's fine.  Take as much time as you

21  need.

22  BY MR. GEORGE:

23  Q     And do you recall, sir, Mr. Buschmann's testimony about

24  his view that shareholder claims would be treated *pari passu*

25  with equity?

1  A      Yes.

2  Q      And yet when the debtor filed its plan of

3  reorganization the debtor didn't subordinate those claims to

4  general unsecured creditors, did it?

5  A      No.

6  Q      And when other parties in interest objected to the fact

7  that it was listed in that way did you have the debtor's

8  lawyers file a response in support of that classification?

9  A      Yes.

10 Q      And what are the debtor's business reasons for its view

11 that those claims of those shareholders should not be

12 subordinated to unsecured creditors?

13          MR. ARNAULT:  Your Honor, I'm going to object.

14 This actually mischaracterizes the plan and it assumes facts

15 that aren't in evidence given that there was an amended plan

16 that was filed that put the shareholders in a different class

17 then general unsecured creditors and put the CVR's in the

18 510(b) claims. So, it's actually a misleading line of

19 questioning.

20          THE COURT:  Well I agree, that's not the current

21 factual circumstances that have been presented to the court.

22 So, Mr. George, you are certainly entitled to explore why it

23 was originally classified the way it is, but let's be clear

24 that that's not the way that it's classified currently.

25          MR. GEORGE:  Understood, Judge.

```
 1                THE COURT:  Okay.

 2                MR. GEORGE:  I'm asking about -- and that's a fair

 3   comment by counsel.  Thank you.

 4   BY MR. GEORGE:

 5   Q    Mr. Bonaccorsi, I'm asking about why the debtor

 6   initially scheduled them that way?

 7   A    I don't recall.  I honestly don't recall.

 8   Q    Mr. Bonaccorsi, you're understanding is that the

 9   secured creditors will receive no payment under this plan,

10   right?

11   A    Again, I'd have to look at the details of the plan.  As

12   I'm sitting here right now with as much information as I have

13   absorbed.  I'm getting a little loose on some of the details

14   here.

15   Q    Do you have Debtor 1 in front of you?

16   A    Yes.

17                THE COURT:  Mr. George, I think you're on mute.

18                MR. GEORGE:  I'm sorry, Judge.

19   BY MR. GEORGE:

20   Q    Do you have that, sir, Page 17?

21                THE COURT:  So, we're looking at the modified

22   plan, Exhibit 1, Page 17.  Is that right?

23                MR. GEORGE:  Yes, Judge.

24                THE COURT:  Okay.  Thank you.

25                THE WITNESS:  Yes.
```

1  BY MR. GEORGE:

2  Q     What is your understanding reading this about what the

3  secured creditor gets under this plan?

4  A     Secured claims, classification two consists of all

5  other secured claims, treatment, except to the extent that a

6  holder of allowed other secured claim agrees to less

7  favorable treatment in full and final satisfaction and

8  compromised settlement, release in exchange for each of the

9  allowed other secured claims.  Each holder of an allowed

10  other secured claim shall receive, at the election of the

11  debtors, in consultation with the required consenting term

12  lenders -- I mean I can read it or --

13  Q     Yeah.  I'm actually on the following provision, term

14  three, for the term loan claims.  Those are the ad hoc

15  lenders, right?

16  A     Yes.

17  Q     So, in the event of a sale, if it's a term loan sale

18  they credit bid, and they get the property, and any waterfall

19  recovery, but there is no waterfall recovery, right?

20  A     There is none, correct.

21  Q     And they have waived their deficiency claim, right, to

22  the extent there is one?

23  A     Correct.

24  Q     And so what they're really receiving on the event of

25  the credit bid is the assets in satisfaction of their claims,

1  right?

2  A      That's right.

3  Q      And did the debtor comply with the standstill agreement

4  in (indiscernible)?  In other words, to your knowledge, did

5  the debtor ever breach the first standstill agreement?

6  A      There was no material breach of the standstill

7  agreement.

8  Q      And how about the second standstill agreement?  Was

9  there ever a material breach of the standstill agreement?

10  A      There was no material breach of the second.

11  Q      And as to the third standstill agreement did the debtor

12  provide to the ad hoc group all of the benefits that were

13  supposed to go to the ad hoc group pursuant to that third

14  standstill agreement?

15  A      All the material benefits, yes.

16  Q      And you don't view that there was ever any breach under

17  the third standstill agreement?

18  A      Correct.

19  Q      And at least thus far in the case, in your view, has

20  the debtor complied with all of its obligations under the

21  APA?

22  A      Materially complied, yes.

23  Q      Has the lenders ever indicated or have they indicated

24  since yesterday that there has been any shortcoming or

25  failure on the debtor in its obligations to perform under the

1  APA?

2  A      No.

3  Q      Now, sir, your position is chief counsel, correct?

4  A      General counsel is the title.

5  Q      General counsel.

6         Is there anyone in the legal department above you?

7  A      No, there is not.

8  Q      Who do you answer to at the company besides the board

9  of directors overall?

10 A      I report into the CEO and I have reporting obligations

11 to the board of directors.

12 Q      Now consistent with your obligation to report to the

13 board of directors do you think that it is an obligation of

14 yours to report an instance where a professional retained by

15 the company makes an allegation of potential criminal conduct

16 by members of the board of members of senior management?

17 A      Could you repeat the question?  Who shared the

18 information?  Sorry, please repeat the question.

19 Q      As part of your duty to report to the board do you feel

20 that you feel you have a duty to report to the board when you

21 uncover information from someone retained as a professional

22 by the company of the potential existence of criminality?

23 A      It may or may not trigger that obligation.

24 Q      Under what circumstances would you learn of criminality

25 and feel that it was inappropriate or unnecessary to tell the

1  board?

2  A     I don't believe that's ever happened.

3  Q     I'm asking you.  You said there are circumstances under

4  which and I'm asking what are the circumstances under which?

5  A     You asked me a general question which I answered.  The

6  answer would depend upon the circumstances and then you asked

7  me a specific question, you know, in which cases has that

8  happened or instances and I said none.

9  Q     No.  I didn't ask you in which instances it's happened.

10 I wasn't asking for specifics.  I'm asking for under what

11 circumstances would you feel obliged to tell the board?  I'm

12 not asking you to get anecdotal with me.  I'm just asking

13 under what circumstances would you feel that your duty to

14 report to the board would be triggered.

15 A     Sorry.  I wasn't getting anecdotal.  I'm just trying to

16 understand the question so I can answer it the best I can.

17       It could depend upon the credibility of the report, or

18 the credibility of the reporter, or the gravity of the act

19 that is being reported.  It could be any of those things.  I

20 would evaluate those separately and, in the aggregate, and

21 use my best judgment.  And, if necessary, I would rely on my

22 team members in the legal department for their input and, in

23 fact, would have our corporate compliance officer available

24 as well as outside counsel.

25       So, I think that would be the process, but, you know,

1   without a specific example I think its best of me to say that

2   those are the various factors and priorities that I would

3   consider in evaluating my reporting obligation.

4   Q    Did you do that after your discussion with Mr.

5   Avellanet, any of those things?

6   A    Okay.  First of all, as I explained there were no

7   allegations of criminal conduct.  So, I don't like the way

8   that you asked that question.  So, let me be clear about

9   that.

10       Secondly, after I told to Avellanet and he described

11  exactly what he meant and the purpose of his words I was not

12  compelled to report allegations of misconduct.  Nonetheless,

13  I did speak to our board about the Cerulean report and the

14  contents of the report and what I had done in seeking that he

15  remove -- that I asked him to remove those notations and his

16  commentary which were used not for the purpose of truly his

17  consulting work, but it was, instead used to motivate the

18  various Akorn team members to provide to him the resources

19  necessary for him to complete his consulting service at the

20  company.

21  Q    Why did the deb tor file its matrix under seal?  Do you

22  know?

23  A    File the what?  I'm sorry.

24  Q    The matrix, the creditor matrix.

25  A    I don't know the answer to that question.

1  Q      Are all of the creditors on the list of creditors that

2  are owed money by Akorn, are those all confidential?

3  A      All of the creditors, I don't know.  I don't know the

4  answer to that question.

5  Q      Are you aware that the MDL litigation wasn't mentioned

6  until the debtor filed its schedules after the date of the

7  hearing on the disclosure statement?

8  A      It wasn't mentioned -- I'm sorry, I don't understand

9  the question.

10 Q      You're aware that there was a disclosure statement that

11 was filed in connection with this case?

12 A      Correct.

13 Q      And at the time that initial disclosure statement was

14 filed the schedules hadn't been filed?

15 A      Correct.

16 Q      And are you aware that in the initial documentation,

17 the initial disclosure statement there wasn't a single

18 mention of the MDL litigation?

19 A      That's possible, yes.

20 Q      And do you think that --

21 A      I'll take your word for it.

22 Q      Okay.  Thank you.

23 A      I'm sorry.  I don't have it in front of me to refresh

24 my recollection, but it sounds like it's there.  So, I will

25 assume that to be true.  Again, I'm not trying to be smart

1   here.  I'm just trying to give you the best answer I can

2   Q      I appreciate it.

3          (Phone interruption)

4              MR. GEORGE:  I hear music, Judge.

5              THE COURT:  It usually stops after a few seconds.

6          (Laughter)

7              THE COURT:  All right.  It stopped.

8              MR. GEORGE:  Just one moment, Your Honor.  I'm

9   trying to find a document.

10             THE COURT:  Okay.

11         (Pause in record)

12             MR. GEORGE:  I'm sorry, Judge.  I'm coming right

13  with you.  I'm just looking for a document.

14             THE COURT:  Okay.

15  BY MR. GEORGE:

16  Q      Sir, could you go to MDL Exhibit No. 33?

17  A      Okay.

18  Q      Could you turn to Page 16 of that document?  On the

19  bottom it says debtor's production 00015481.

20  A      Okay.

21  Q      Take a moment and take a look at that document.  Have

22  you ever seen that document before?

23  A      Yes.  I recall seeing this.  I don't have a specific

24  independent recollection of it, but it looks like something I

25  would have received and reviewed.

1  Q     And do you recall ever discussing this with Mr.

2  Buschmann?

3  A     I don't, no.

4  Q     And you see here he talks about December 10th, 2018

5  reported the 2016 antitrust lawsuit alleging price fixing now

6  involves at least sixteen companies and 300 drugs.  Do you

7  see that?

8  A     Yes, I do.

9  Q     Now do you know whether any of the drugs that Akorn

10 sells are drugs that are listed as part of the listed drugs

11 for which consumers were price fixing?

12 A     Allegedly?

13 Q     Allegedly.

14 A     I know there --

15 Q     There have been any number of convictions, sir, and

16 guilty pleas by drug companies with respect to that.  So,

17 those aren't alleged.  Those are convictions where companies

18 pled guilty to price fixing.  And I'm asking you are any of

19 the drugs that Akorn sells drugs that have been listed in the

20 MDL drugs that are subject to price fixing activities?

21 A     I respect your question.  I respect the context of it.

22 What I was trying to clarify is that they're allegations

23 against Akorn.  They are not convictions.

24       So, with that being said I am not trying to discount

25 the meaning of your question.  In fact, I took it as meaning

1  implicating Akorn here with convictions and charges, and that

2  has not happened. Okay.

3  Q     That was not my (indiscernible), sir.

4  A     So, we have to -- I mean you know we are a party in the

5  litigation because manufacture and sell products that are

6  subject to that litigation.

7  Q     And would it be fair to say that part of the reason of

8  the collapse of the value of pharmaceutical companies engaged

9  in generic drugs is a result of Hilary Clinton's announcement

10 about the acknowledge of price gouging especially drug

11 markets?

12 A     That's my opinion.  I haven't -- I've read articles

13 that suggest that and I do have -- yes, that is my opinion.

14 Q     Sir, could you go to Debtor's Exhibit No. 1?  Do you

15 have that there in front of you, sir?

16 A     I'm getting there.  Yes, the modified joint plan?

17 Q     Yes.  Page 34 and its heading (e) under releases by the

18 debtors.

19 A     Yes.

20 Q     Does this provision, in your view, release the officers

21 and directors, employees, and managers of the debtor from any

22 liability with respect to the MDL litigation?

23 A     Yes.

24 Q     And in light of the fact that Akorn, the estate, it's

25 going to be an estate with no assets and the assets are going

1  to be owned by the ad hoc lenders.  What benefit is provided

2  to the debtor by virtue of this release?

3  A    Well it allows the assets of the company to be acquired

4  so that it can continue its operation as a pharmaceutical

5  manufacturer which includes the employment of 1,900

6  employees.  That would not, otherwise, be possible as we

7  assert in our plan and the history of what caused us to be

8  where we are with this type of litigation overhang.  So, the

9  consideration is that this is left behind so that the company

10  can start fresh on a going forward basis.

11  Q    And it's your understanding with respect to the other

12  releases, the third party releases, that the debtor's

13  officers, directors, senior management, employees would not

14  be released with respect to MDL liability to the extent that

15  the MDL plaintiffs had claims directly against those people

16  and did not opt into the release, right?

17  A    That's my understanding, yes.

18  Q    Was the debtor in default to any of its vendor

19  creditors on the petition date?

20  A    I believe that we were -- specifically, legally I can't

21  answer that question because I don't have the knowledge.  I

22  know that we were in ongoing negotiations trying to manage

23  the vendors who were seeking payment from the company.  So,

24  those discussions were ongoing.

25        As far as whether we were technically or materially in

1  default I don't know that answer with 100 percent certainty.

2  Q    Okay.  Did any of the officers of the company have

3  their own lawyers in connection with the negotiation of the

4  releases provided by the debtor?

5  A    As contained here I don't believe so, no.

6            MR. GEORGE:  Your Honor, I think that's all I have

7  for this witness.

8            THE COURT:  Okay.  Thank you, Mr. George.

9            I know there's other parties that may wish to

10 cross-examine you.

11           Mr. Bonaccorsi, how are you doing?  Do you need a

12 break?

13           THE WITNESS:  It depends, if I could five or ten

14 minutes that would be great.

15           THE COURT:  Okay.  So, let's just take a ten-

16 minute break and then we will resume and the parties left

17 that wish to cross-examine you may do so.  So, let's come

18 back on the record at 1:40.

19           Thank you, all.

20      (Recess taken at 1:28 p.m.)

21      (Proceedings resumed at 1:42 p.m.)

22           THE COURT:  Why don't we continue with the cross-

23 examination if everyone is ready.  It looks like Mr. Parker

24 is ready to go.

25           So, Mr. Parker, do you have questions for

1    Mr. Bonaccorsi or did Mr. George cover it?

2              MR. PARKER:  I do have questions, Your Honor.

3              THE COURT:  Okay.

4              MR. PARKER:  And I've talked with -- I've spoken

5    with Ms. Cornish and she's okay with me going next.

6              THE COURT:  Perfect.  Thank you for the

7    coordination.

8              When you're ready, let's begin.

9                        CROSS-EXAMINATION

10   BY MR. PARKER:

11   Q    Mr. Bonaccorsi, my name is Michael Parker.

12        Can you hear me okay?

13   A    I can.

14        Nice to meet you.

15   Q    Okay.  Nice to meet you, too.

16        Just for context, a little bit of foundation, I'm going

17   to try and go through a little bit about Provepharm and our

18   relationship with Akorn.

19        Isn't it true, Mr. Bonaccorsi, that Provepharm claimed

20   that Akorn lied to the FDA about the availability of

21   methylene blue?

22        Provepharm is the only other party that makes that --

23   I'm sorry -- the only other party that makes a USP-compliant

24   version of that, but Provepharm claims Akorn lined to the FDA

25   about methylene blue so it could persuade the FDA to allow

1   Akorn to continue to manufacture and sell its non-USP

2   compliant methylene blue product?

3   A     Yes, those are generally the allegations that are at

4   issue in the litigation, as well as our counterclaim, which

5   you did not mention.

6         Okay.

7   A     But, yes, we are in litigation with you all.

8   Q     Okay.  And Provepharm also claimed that Akorn sold that

9   methylene -- that non-UST compliant methylene blue product

10  another two and a half years, even though the FDA only gave

11  them six months, according to allegations?

12  A     That's my understanding, yes.

13  Q     And for the Court's edification, what does "USP-

14  compliant" mean?

15  A     Manufactured to appropriate pharmaceutical standards.

16  Q     Okay.  So, USP is a standards company that sets the

17  standard for how drugs how big manufactured; is that fair?

18  A     Yes.

19  Q     Okay.  All right.  So, Mr. Bonaccorsi, do you have any

20  prior bankruptcy experience?  Have you been with another

21  company that has filed another Chapter 11 proceeding?

22  A     No.

23  Q     Okay.  And in your legal career, I didn't hear it

24  mentioned before, have you ever practiced bankruptcy law?

25  A     I haven't.  Earlier in my career, I did try an

1  adversarial case in a bankruptcy matter, but I was far

2  outside my area of expertise, but that was my only

3  experience.

4  Q    Okay.  Fair enough.

5       So, would you agree with Mr. Buschmann's statement from

6  yesterday that by sometime in December of 2019, that Akorn

7  was about 90 percent certain that Akorn was going to have to

8  file a Chapter 11 proceeding to effectuate a proceeding of

9  Akorn's assets?

10 A    At that point, I don't think -- I mean, it was his

11 statement.  I don't agree with that and didn't agree with

12 that perspective at that point in time.

13 Q    Okay.  So in cross-examination earlier you said by

14 March of 2020, Akorn definitely knew?

15 A    That's right.

16 Q    You when did Akorn know between December of 2019 and

17 March of 2020?

18 A    I think it was a gradual process, honestly.  We -- it

19 was an on -- due to the ongoing work, ongoing progress of the

20 various negotiations that we were in and it's hard for me to

21 pinpoint it.  I know that would be reflected in the various

22 board minutes that we were keeping and the PJT documentation

23 that we have, but it's hard for me to pinpoint, you know, an

24 exact date.

25 Q    Okay.

1  A      But I would say there was probably the -- you know, I
2  think we were calling -- yeah, so, that's the best I can
3  answer as I sit here now.
4  Q      Okay.  In your earlier testimony this morning, several
5  times you indicated that you were trying to maximize the
6  value of assets for the benefit of shareholders.
7         Do you recall those statements?
8  A      Yes.  They were saying stakeholders.  Stakeholders.
9  Q      Okay.  You said shareholders and then later in your
10 testimony you started to say stakeholders.
11        And what do you mean by stakeholders?
12 A      Stakeholders is a broader group which would include not
13 only shareholders.  It would include that group, but also
14 employees who may or may not hold shares.  If there are
15 vendors, the marketplace, hospitals, physicians, everyone who
16 benefits from the work that we do at Akorn and --
17 Q      It would include the --
18 A      -- whose lifestyle we positively --
19 Q      I'm sorry.  Please continue.
20 A      Sure.
21        -- and whose lives we positively impact.
22 Q      That would include the unsecured creditors, right?
23 A      It could.  We try, yes.  Yes.
24 Q      Okay.  Have you ever heard the phrase "zone of
25 insolvency"?

1  A      That doesn't sound familiar to me.

2  Q      Okay.  The phrase in bankruptcy parlance refers to the

3  period of time when a corporation enters an understanding

4  that the value of the corporation is not enough to ever reach

5  the equity holders and only enough to pay the unsecured

6  creditors.

7         Under that definition, when did you believe Akorn

8  reached the zone of insolvency?

9  A      I don't know.  I'm not a financial expert.  I'm not a

10 bankruptcy expert.  It's hard for me to know and I think when

11 the -- and we are dealing with a hand we were dealt as a

12 result of the process and we didn't know what that was until

13 about a week ago when the last group of equity holders, the

14 ad hoc group exited the discussions to acquire the company.

15        So, you know, up until that point, not knowing, only

16 having one bid in hand, that's probably what fits within the

17 realm of what you're asking, but I just don't know because

18 I'm not familiar with the term.

19 Q      When did the board of directors begin discussing the

20 zone of insolvency?

21 A      Again, I don't know.  I'm not familiar with the term

22 zone of insolvency.  If it's a term that's used in the board

23 decks then it would -- I'm sure that those are properly dated

24 and it would be contained in those presentations.

25 Q      Okay.  Let me dispense with the term "zone," then.

1      When did the Board start discussing what to do to

2  maximize value for its creditors, as opposed to its

3  shareholders?

4  A    Again, those discussions are documented in our board

5  minutes.  I mean it's been an ongoing discussion in

6  evaluating whether Chapter 11 was the right way to proceed or

7  the appropriate way to proceed and what the risks and

8  benefits would be for all stakeholders; again, I can't

9  pinpoint any particular discussion or meeting when that

10  occurred or was decided, but it would be reflected in board

11  minutes and presentations that have been part of the record

12  here.

13  Q    Okay.  It would have occurred certainly before March of

14  2020, correct?

15  A    It sounds like it and, you know, again, we're throwing

16  out March 2020 as a general date, you know, so please don't

17  hold me to a specific date based on, you know, a general

18  comment about when things were happening, but that sounds

19  about right.  But, again, I would defer in relying more

20  heavily for credibility on my answer and the answer to that

21  question on the documentation that was created and maintained

22  consistent with and at the time that these discussions were

23  happening.

24  Q    Provepharm only has one exhibit -- I'll ask you to try

25  to find that -- that's P-1.

1   A      Where would it be, is it in a binder?

2   Q      I'm assuming Mr. Arnault sent it to you or do I need to

3   send it to you?

4             MR. ARNAULT:  You know what, Joe?  That one came

5   in late.  I can email it to you right now.

6             THE WITNESS:  Okay.  I'm going to have to go off-

7   screen to read it, I think.  Well, I won't see you.  I guess

8   you'll see reading, but I'll wait for it to come over.

9   BY MR. PARKER:

10  Q      Let me -- wait.  I'm going to move on.  I'll get to P-1

11  in a minute unless you can get it.

12          Have you got a computer up right there?

13  A      I do.

14             MR. ARNAULT:  I just sent it, Joe.

15             THE WITNESS:  Okay.  If you'd like, I can log on

16  now and see if I can find it.

17  BY MR. PARKER:

18  Q      So, Exhibit P-1 is the 10-K.  It's Akorn's 10-K for the

19  fiscal period ending December 31s, 2019.

20          The 10-K(a), which was in debtors' exhibits earlier, I

21  think it was Exhibit 3, is different from --

22  A      Yes.

23  Q      -- the P-1 10-K, and the P-1 10-K has, I'll say a lot

24  more information, but I'm just going to focus you on a couple

25  of things here.

1    A      Sure.

2    Q      Have you got it up?

3    A      Yes.

4    Q      Okay.  First off, would you confirm for me that this

5    was filed February 26, 2020.  Those are the signature dates

6    at the very bottom.

7    A      Yes, that looks right.  Yes.

8    Q      Okay.  And then jump for notes, note 19, which is, I

9    think page 150-something, maybe 155.

10            THE COURT:  Mr. Parker, did you say note 19?

11            THE WITNESS:  It's a PDF --

12            MR. PARKER:  I'm sorry, Your Honor.  I said

13   note 19, which loading up.  I've got it.  It's the note

14   regarding litigation, Akorn's litigation and it's on

15   page 150 --

16            THE COURT:  I see it on page 151 if that's

17   helpful.

18            THE WITNESS:  151, okay.

19            MR. PARKER:  That's correct, Your Honor.

20   BY MR. PARKER:

21   Q      151 of 191.

22   A      Okay.  Thank you.

23            Yes, I am here.

24   Q      Mr. Bonaccorsi, did you prepare these notes to the SEC

25   10-K filing?

1   A      I participated in the preparation and reviewed the

2   notes, yes.

3   Q      Okay.

4   A      I wasn't solely responsible and I don't remember

5   whether I took pen to paper, so to speak, but, yes, I

6   participated in the preparation.

7   Q      Okay.  But as general counsel, I assume you gave final

8   approval of these notes, right?

9   A      Correct, yes.

10  Q      So, this -- I'm going to provide a little bit of

11  foundation before I ask the question.  So, keep that out for

12  a minute, please.

13         But there were two settlements that you talked about

14  earlier in your testimony; one, I'll call the Data Integrity

15  shareholder settlement.

16         Do you recall that one?

17  A      Yes.

18  Q      Okay.  On Exhibit 37, Debtors' Exhibit 37, I show that

19  the Data Integrity shareholder litigation, which debtors'

20  search only involves direct claims made by entities against

21  or entities, was entered.  That order was entered on

22  March 13th, 2020.

23         Does that sound right to you?

24  A      Yes, I think that's right.  Yes, just about then, yes.

25  Q      Okay.

1   A      I reviewed that earlier.

2   Q      You did.  You did.

3          And the Kogut litigation settlement, which debtors

4   assert only involves derivative claims, was not entered until

5   January 23rd, 2020.  That's Exhibit 8.

6          Does that sound correct?

7   A      Yes, I think that's consistent with my testimony

8   earlier.  Yes.

9   Q      Okay.  So, as of the time of the filing of this 10-K,

10  the Data Integrity shareholder litigation had not yet been

11  resolved and the Kogut litigation, the order had been entered

12  resolving that litigation; is that correct?

13  A      Yeah, I'll take your word for it.  I wasn't writing

14  down the dates, nor do I have them all listed in front of me,

15  but yes, I'm assuming you're giving the correct dates and --

16  Q      The 10-K was filed February 26th and the Data Integrity

17  resolution didn't happen until March 13th and the Kogut

18  litigation resolution happened sometime in January,

19  January 23rd, I think.

20         Does that sound right?

21  A      Yes.

22  Q      Okay.  So, in that context, let me point you to

23  page 155 of Exhibit P-1.

24  A      Okay.

25  Q      Go down to the sixth and seventh paragraphs, the ones

1   starting on July 10 -- no, I'm sorry, the one starting on

2   July 30th.

3   A     Okay.  All right.  I'm there.

4   Q     Would you take a minute and read that and confirm that

5   you believe everything in there is correct.

6   A     Yes, that looks accurate, yes, and correct.

7   Q     And so when the parties have been talking about the CVR

8   rights or the contingent value rights that were awarded in

9   the Data Integrity shareholder settlement, these are the CVR

10  rights described in this paragraph of this note of the 10-K?

11  A     Correct.

12  Q     Okay.  And under the debtor's plan, currently, the

13  debtor -- under the debtors' amended plan, the debtor has

14  decided to now subordinate those CVR rights to the equity

15  class; is that correct?

16  A     Yes, that is.

17  Q     Okay.  Would you jump in the same document, P-1, the

18  10-K, would you jump to note 21, which I show starts

19  page 170.

20  A     Okay.  I'm at 170.

21  Q     Okay.  And this is the second amended standstill

22  agreement and does this -- I'm assuming this accurately

23  describes the second amended standstill agreement as of the

24  date the 10-K was filed?

25  A     So, you're starting at the bottom of 170 going on

1  to 171?

2  Q     No.

3  A     Yes.  Well, now I'm at 172.

4  Q     Yeah, 172.

5  A     Yeah, give me a minute.  Let me just take a look.  Yes.

6  Yes.  That is correct.

7  Q     It looks like the fourth primary bullet point down it

8  talks about a toggle event.

9        Do you see that?

10  A     Yes.  Yes.  I'm here.  Got it.

11  Q     And that toggle event -- hold on -- actually, right

12  above that toggle event paragraph is the bullet point that

13  talks about the sales process and it says the sales process

14  will be consummated on either an out-of-court or an in-court

15  basis, potentially through the filing of a Chapter 11 case.

16  A     Yes, that's right.

17  Q     Do you see that?

18  A     Yes.

19  Q     Okay.  Is it fair to say that by this date, on

20  February 26th, 2020, Mr. Bonaccorsio (phonetic) --

21  Mr. Bonaccorsi -- forgive me -- that Akorn was clearly

22  contemplating a bankruptcy filing?

23  A     Yeah, it was possible.  It was a possible outcome of

24  the process, which is why we built in the toggle event

25  because there was pressure on us by the lender group to and

1  in our effort to maximize value to move as quickly as we

2  could in an effort to sell the company and they -- you know,

3  essentially, we negotiated a deadline, which is the toggle

4  event by when we would determine whether we were able to have

5  an out-of-court solution here or would have to proceed with a

6  Chapter 11.

7       And I believe it's consistent with my earlier answer

8  when I was saying that the various --

9  Q    Thank you, Mr. Bonaccorsi.  Thank you.  Understood.

10             MR. ARNAULT:  Your Honor, Mr. Bonaccorsi --

11             THE COURT:  Mr. Bonaccorsi, you can complete your

12  answer, please.

13             THE WITNESS:  Sure.

14             I testified earlier that there were ongoing

15  discussions and considerations being had among the advisors,

16  the board of management from throughout 2020 and efforts were

17  made to maximize the value and pursue a possible sale of the

18  company, but with the pressure that was put on us realizing

19  that we may not be successful in that endeavor, we -- the

20  toggle event was added, such that if we were not successful

21  in that effort, that we would then file and proceed with a

22  stalking horse option.

23  BY MR. PARKER:

24  Q    I'm sorry, my computer just crashed.  I'm trying to

25  bring back up my exhibit.

```
 1        All right.  Mr. Bonaccorsi, if we may, please, I'd like
 2   to move to the debtors' plan exhibit, which I think is 1 --
 3   there it is -- page 34.  We're talking about the plan
 4   releases.
 5   A    Okay.  I'm at page 34, paragraph E.
 6   Q    So, let me start with -- forgive me -- let me start
 7   with generally talking about the releases and that is now
 8   that the Court has entered an order approving the sale of all
 9   of the assets to the term loan lenders, what is the point of
10   the releases being provided to the directors and officers of
11   the company?
12   A    To release them of any claims that could be had against
13   them in their roles at the company and, specifically, with
14   respect to this bankruptcy process and sale of the company's
15   assets to the holders of the term loan debt.
16   Q    But the sale has already occurred, right?
17   A    No.  The deal hasn't closed.
18   Q    Okay.  The deal hasn't closed, but it's been approved
19   by the Court; it just hasn't gone effective yet, right?
20   A    Yes.  Fair enough.
21   Q    Okay.  Here it is, I've got it highlighted.
22        Didn't the -- I'm certain that the term loan lenders
23   got or the ad hoc group got releases in the sale agreement,
24   didn't they?
25   A    Yes.
```

1    Q      Okay.  So, adding the releases in the plan, why is that

2    necessary?

3    A      I would have to defer to bankruptcy counsel to provide

4    that opinion, which is what I did; I did rely on them in the

5    preparation of the plan and, specifically, this paragraph.

6    Q      Okay.  Let me find it here.

7           I'm sorry, I'm going to move you to the same exhibit,

8    still the plan, but the definition of -- and I had all this

9    up before my thing crashed -- the definition of released

10   parties.  It looks like it's page -- item 110, page 9 of the

11   plan.  If you go to page 9 of the plan, item 110.

12   A      Okay.  What was the paragraph number again, sorry.

13   Q      Paragraph 102 on page 9.

14   A      Yes, released parties.

15   Q      If you go about -- hold on -- I'm going three lines

16   down and it talks about releasing not only the entities

17   current, but also former subsidiaries, officers, directors,

18   managers, principals, members, employees, agents, adversary

19   board members, financial advisors, partners, attorneys,

20   accountants, investment consultants, representatives, and

21   other professionals.

22          So, tell me what's the purpose of releasing former

23   officers.

24   A      Well, they contributed to, you know, the status of the

25   company as an ongoing operating entity.  They helped build

1   the company and even after they left the company, they were

2   under cooperation agreements and did provide consulting

3   services and support during the transitions, for example, of

4   our CEO and COO, always making themselves available.

5        They are the ones with me beginning in 2009 and before

6   that who built this company to make it as successful as it

7   was that led to the signed merger with Fresenius and,

8   unfortunately, that didn't close, but the company still

9   exists.  We grew both, in terms of the size and revenues and

10  facilities and manufacturing capabilities and that was

11  support that they provided not only during their employment,

12  but they also supplemented that after they left with being

13  available for consultation, as needed.

14  Q    So, in Mr. George's examination earlier this morning,

15  you talked about several employees that left or officers or

16  directors -- this also purports to release officers and

17  directors, not just employees, isn't that correct --

18  A    Correct.

19  Q    -- former officers and directors and employees.

20       This morning, Mr. George talked about several that

21  either left of their own volition, I think of Mr. Kapoor,

22  because of an investigation that he was trying to deal with,

23  some antitrust investigation that he was trying to deal with.

24       I'm trying to understand what's the purpose of trying

25  to release people like Mr. Kapoor or what -- I'm sorry -- let

1   me give you a single question, right.

2        You've indicated that they helped you build the

3   company.  Do you think that that's a valuable consideration

4   for a release in this plan?  Is that the company's statement,

5   you, as company representative?

6   A    It is my statement and opinion that had they not

7   participated in growing and acquiring the company, building

8   the company, we wouldn't be here talking about any of this.

9   They offered a lot of good things to the company that led to

10  it success in what could have been a successful deal with

11  Fresenius.  They continued to lend the support when called

12  upon or asked to do so.  I think that is fair value in

13  exchange for the release.

14  Q    For this plan that's not paying anything to unsecured

15  creditors, your statement is, on behalf of the company -- and

16  you're testifying as company representative today, correct?

17  A    Correct, I am a company representative.

18  Q    On behalf of the company, you're saying that that is

19  fair consideration for this release?

20  A    That is my opinion, yes.

21  Q    Okay.  Let me move on to the Data Integrity shareholder

22  settlement agreement.  I think that was debtors' exhibit --

23  well, the final approval was Debtors' Exhibit 37 in the

24  Northern District of Illinois Eastern Division.

25        With respect to that settlement agreement, Mr.

1  Bonaccorsi, are you familiar with that settlement agreement?

2  A     Yes, I am.

3        Do you want me to look at it because I don't have it up

4  yet.

5  Q     No, I don't think you need to have it up.  I think most

6  of these questions you're going to be able to answer without

7  having it up.  If we need to have it up, we can, but I think

8  you might be able to answer without it.

9        Do debtors have any further duties under that

10 shareholder settlement agreement?

11 A     No, none that I'm aware of, no.

12 Q     Okay.  Pursuant to that shareholder settlement

13 agreement, some of which we saw in the 10-K exhibit from

14 Provepharm's P-1, I believe there's $27.5 million in D&O

15 proceeds that went into an escrow account pursuant to that

16 settlement agreement.

17       Do you recall that?

18 A     Yes.

19 Q     And to your knowledge, nothing has been done with that

20 money, correct?

21 A     I don't know.  I don't have an understanding of where

22 that money is.

23 Q     To your knowledge, just to your knowledge, nothing has

24 been done with that money?

25 A     Correct.  I don't know one way or the other.

1    Q      Okay.  And pursuant to that settlement agreement, CVRs

2    and Akorn stock were also not to be delivered to

3    shareholders, but were to be delivered to an escrow account.

4    A      Yeah.

5    Q      To your knowledge, nothing has been done with those

6    documents either?

7    A      That's correct.

8    Q      Okay.  Do you know what the triggers are for the

9    release of those escrowed funds?

10   A      No, I don't.

11   Q      Okay.  Did Akorn, as debtor-in-possession, investigate

12   whether the settlement could be unwound for the benefit of

13   these Chapter 11 estates?

14   A      There was no specific investigation done to explore

15   whether it could be unwound.  The money is gone; it's out of

16   our hands.

17   Q      Okay.  Also, what specific consideration was given to

18   Akorn in exchange for the releases that Akorn gave to the

19   insurance carriers who funded that 27.5-million-dollar

20   settlement?

21   A      There was a release agreement that was entered into and

22   it was essentially a settlement of the claim, you know, our

23   claim to the funds to pay the settlement and they were giving

24   up their right to any challenges or reservations of rights

25   that they may have had or could have, as best I recall.  I

1  know that there was a written document, documenting that

2  release between us and the insurance company.

3  Q     Okay.  Any monetary consideration in anything else?

4  A     No -- that we paid to the insurers, no.

5  Q     Correct.  Okay.

6        You've answered that already.

7        The liquidation analysis, have you had anything to do

8  with the liquidation analysis?

9  A     None, other than I heard one was being prepared, but

10 that's all I know.  Nothing else.

11 Q     Okay.  Thank you.  That's fine.

12       I'm assuming AlixPartners is going to get up and talk

13 about that.  I just wanted to see if you had any knowledge of

14 that.

15       And with that, Your Honor, I think that's the extent of

16 my questions.

17            THE COURT:  Okay.  Thank you, Mr. Parker.

18            MR. PARKER:  I reserve for redirect if counsel

19 does redirect, but beyond that, I'm done.

20            THE COURT:  Okay.  I understand.

21            Okay.  Ms. Cornish, do you have any further

22 questions for this witness?

23            MS. CORNISH:  I do, Your Honor.  I will say that

24 Mr. Parker narrowed the scope of my examination, which is

25 helpful.

```
 1                      CROSS-EXAMINATION

 2   BY MS. CORNISH:

 3   Q      Good afternoon, Mr. Bonaccorsi.

 4          I'm Kelley Cornish from Paul Weiss Rifkind Wharton &

 5   Garrison, counsel for Fresenius.

 6   A      Nice to meet you.

 7   Q      I just wanted to follow-up a little bit on some of the

 8   questions about -- beginning with Mr. Silverberg -- folks

 9   that may have left the employment of Akorn as a result of or,

10   you know, predicated on the Fresenius litigation and the

11   findings in that litigation.

12          And so, you did mention Mr. Silverberg in your answer

13   to Mr. George's question on cross that he was someone who

14   lost his job or left his employment as a result of that

15   litigation, correct?

16   A      That's not correct.

17          What I said was that he was removed from his position

18   following an Akorn investigation into activities that led to

19   a fabricated data in ANDA back in 2005 that was not fully

20   resolved until we discovered the existence of it at or about

21   the time of the Fresenius litigation.

22   Q      Okay.

23   A      But it wasn't as a result of the litigation; it was our

24   own internal investigation.

25   Q      Okay.  I see.
```

Well, let's take a look at -- you're familiar with Vice Chancellor Lasseter's 246-page memorandum opinion from the Fresenius litigation, aren't you?

A Yes, I am.

Q And I believe if you want to just pull it in front of you, I think it's Exhibit 1, Fresenius Exhibit 1, if you could put your hands on it.

A I don't know that I have that exhibit in front of me.

MR. ARNAULT: Yeah, Joe. That was another one that came in late. Let me forward that to you right now.

(Pause)

THE WITNESS: Is there a problem with putting it up on the monitor so I could see both things at once?

(No verbal response)

BY MS. CORNISH:

Q Do you have the document, sir?

A I have it here. I haven't yet opened it. Sorry.

Q Okay.

(Pause)

THE WITNESS: Okay. I have it here.

BY MS. CORNISH:

Q Okay. And just as foundation, Mr. Bonaccorsi, do you recognize this document?

A Yes, I do.

Q And what is this?

1  A      This is the memorandum opinion that stemmed -- authored

2  by Vice Chancellor Lasseter in the Akorn v Fresenius

3  litigation.

4  Q      Okay.  And I believe I asked you this, but you've

5  reviewed this maybe multiple times in the past, have you not?

6  A      I have reviewed it in the past, yes.

7  Q      Yeah.  I'm going to be directing you to the section of

8  the opinion that begins on page 7 called, Factual Background.

9  A      Okay.

10  Q      And in the first sentence of the third paragraph, Vice

11  Chancellor Lasseter explains, quote, "My task is to make

12  factual findings based on the record the parties generated."

13          Do you see that?

14  A      I do.

15  Q      Yeah.  So, specifically, Mr. Bonaccorsi, there are

16  quite a number of scathing findings throughout this opinion

17  relating to conduct or, you know, lack of action by

18  Mr. Silverberg, are there not?

19  A      There are.  I agree with that.

20  Q      Yeah.  And in particular, just really to give the judge

21  some foundation here, let's just flip over to page 19 --

22          (Audio interference)

23              THE COURT:  All right.  Let's continue.

24  BY MS. CORNISH:

25  Q      Okay.  Are you on page 19, sir?

1  A      Are you using page numbers in the PDF or in the

2  document, itself?

3  Q      I'm reading from the document, itself, page 19.

4         Is that -- can you do that?

5  A      Okay.

6  Q      I think it's page 21 of the PDF, if I'm not mistaken.

7  A      Yes.  Yes, I have that page open.

8  Q      Yeah.  Vice Chancellor Lasseter finds the Akorn took

9  employment actions against Silverberg only after learning

10  that in August of 2017, during the period between signing and

11  closing, Silverberg submitted a response to a CRL that he had

12  been told, and I believe knew, would result in the submission

13  of fabricated data to the FDA.

14        If he had not signed off on the CRL, Akorn would have

15  had to the ANDA, which would have been a red flag for

16  Fresenius that could have put the merger in jeopardy.  In my

17  judgment, Silverberg submitted the false CRL in an effort to

18  avoid inviting in scrutiny of Akorn's Data Integrity

19  deficiencies until after the merger closed when it would be

20  Fresenius' problem.

21        Akorn ultimately withdrew the ANDA in March of 2018,

22  but for an investigation that Fresenius was conducting into

23  two whistleblower letters it received, Akorn would not have

24  withdrawn the ANDA or taken any action against Silverberg.

25        After constructively firing Silverberg, Akorn did not

1    use the opportunity to deliver any type of message to its

2    employees about the importance of Data Integrity or its

3    intolerance for inaccurate submissions to the FDA.

4         Do you see those findings by Vice Chancellor Lasseter,

5    sir?

6    A    Yes.

7    Q    Does that change your view in any way or refresh your

8    recollection as to whether the findings that came out of the

9    Fresenius litigation led in any way to Mr. Silverberg's

10   separation from Akorn?

11   A    Yeah, maybe we're just talking in different levels

12   here.  This opinion came out after we discovered the problem

13   with the ANDA and we took action against Mr. Silverberg prior

14   to the trial, so those things -- and before the litigation

15   was commenced -- so, while they're related and covered by

16   Judge Lasseter's opinion, it wasn't a consequence of the

17   litigation.  It actually preceded the litigation.

18   Q    Okay.  But Vice Chancellor Lasseter basically states

19   that Akorn constructively fired Mr. Silverberg, right?

20   A    Yes, that's right, and I testified to that, too,

21   earlier, yes.

22   Q    Okay.  Let's talk about a few others.  I believe

23   there's a gentleman named Jim Burghart (phonetic) that works

24   for Akorn?

25   A    Yes.

1   Q      Yeah.

2   A      He did, yeah.

3   Q      Yeah.  Was Mr. Burghart separated from the company as a

4   result of action or inactions taken that came to light

5   through the FDA investigation or the investigations relating

6   to the Fresenius litigation?

7   A      If I'm remembering right, I think he left on his own

8   volition well before these things were discovered is my

9   recollection.

10  Q      Okay.  Well, let take a look at pages 78 and 79 of the

11  opinion.  I'm beginning at the bottom of 78, this paragraph

12  that, "Cravath's investigation took approximately four weeks

13  and resulting records supports the following findings ... "

14         And so, we have a findings here, again, by Vice

15  Chancellor Lasseter in connection with the Fresenius

16  litigation, obviously.

17         And page 79 had a number of bullet points.

18  A      Okay.

19  Q      Yeah.  Are you with me?

20  A      Yes, I am.

21  Q      The second bullet:  In September 2012, an Akorn lab

22  supervisor at Somerset named Jim Burghart entered stability

23  testing data into the lab notebook of an Akorn chemist.

24         There's no evidence that he had the data.  He seems to

25  have made it up.

1        Next bullet:  In December 2012, Akorn submitted to the

2   FDA, an ANDA for a drug I can't pronounce, which included the

3   false data.

4        Next bullet:  In fall 2014, the stability testing issue

5   came up again and the chemist discovered the entry in her

6   notebook.  She also noticed other entries in the same

7   notebook and into other notebooks that were not in her

8   handwriting.  She reported it to Burghart, who did not ask

9   any questions or follow up.

10       The chemist next brought the issue to the attention of

11  a quality manager, who instructed all scientists to review

12  their notebooks.  The review discovered numerous instances of

13  altered and missing data; in addition, two of Mr. Burghart's

14  notebooks were missing.  On December 30, 2014, Burghart

15  resigned voluntarily.

16       Do you see that?

17  A    Uh-huh, yes.

18  Q    So, this does put in the sequence or the chronology in

19  order, but these are findings that are part of the Fresenius

20  trial record, correct?

21  A    That's right.

22       And as this reflects Burghart left voluntarily, well

23  before prior interactions with Fresenius and the Delaware

24  Court.

25       I think that was your question earlier, so this is

1    consistent with that finding.

2    Q      Right.  Okay.  Let's talk about Raj Rai, the CEO, I

3    believe, of the company that you made reference to.  He left

4    the company at some point in time?

5    A      Yes, he did.

6    Q      And when did he leave?

7    A      It was December 2018.

8    Q      And was his departure motivated in any way by findings

9    that came out of the Fresenius litigation?

10   A      I wouldn't say the findings.  I would say the results

11   of the litigation more than the findings of the litigation.

12   Q      And, again, let's just take a look at some of the

13   findings, page 30 of the opinion, if you could flip to

14   page 30.  And towards the bottom of the page, it's actually

15   the third line from the bottom in the text, not the

16   footnotes, it says:

17          "Rai made claims about quality, but having considered

18   his answers and evaluated his demeanor while he was being

19   cross-examined about his commitment to quality, I am forced

20   to conclude that he does not regarding it as a priority."

21          And then there's a footnote, number 112 that said:

22          "Another plausible and more alarming inference is that

23   Rai consciously disregards Akorn's quality issues, including

24   its Data Integrity problems."

25          And then it goes on to point out that Rai is the chair

1    of Akorn's quality oversight committee and its executive

2    steering committee on Data Integrity remediation and it goes

3    on.

4         So, do you see that?

5    A    Yes, that's correct.

6    Q    And, again, Mr. Rai left -- this decision was issued --

7    I don't have the date.  Hold on a second.

8         Do you know when this was issued?  I don't have the

9    front cover.  Do you have it there?

10   A    I do.

11        It was October.

12   Q    October.

13        And then Mr. Rai departed from the company in December;

14   is that correct?

15   A    That is correct.

16   Q    Let's talk about Don Kapoor.  I think we've heard about

17   him already.  And let go over to page 33 -- or, sorry --

18   page 61, I apologize.

19   A    No problem.

20        I have to say, I think I prefer paper to this digital

21   stuff to be honest with you.

22   Q    I feel the same way.

23   A    What page did you say?

24   Q    I feel the same way.  I'm working with paper.

25   Page 61.

1  A      Okay.

2  Q      And, Judge Lasseter here or Vice Chancellor Lasseter --

3  I keep making that error -- finds that on October 31, 2017,

4  Akorn informed Fresenius that Kapoor had resigned from the

5  Akorn board.  Five days earlier, federal law enforcement had

6  arrested Kapoor and charged him with fraud in connection with

7  his leadership at another pharmaceutical company.  And then

8  we see in footnote 285, it's actually the company Insys is

9  identified below.

10      So, this is consistent, I believe, is it not, with your

11  recollection that Mr. Kapoor left the company following

12  this -- it's clear he was arrested in connection with

13  activities at another company; is that correct?

14  A      That's right, yes.

15  Q      Okay.  Let move over to a gentleman named Ron Johnson.

16  A      Uh-huh.

17  Q      I believe he was a director of Akorn.

18  A      That's right.

19  Q      Is Mr. Johnson currently a member of the board?

20  A      No, he's not.

21  Q      When did Mr. Johnson leave the board?

22  A      He resigned in October, so it would have been nine

23  months ago, 10 months ago.

24  Q      And what was his reason for leaving the company?

25  A      It was personal in nature.  -REDACTED-

1  ------------------------------------------------------------

2  ------------------------------------------------------------

3  ------------------------------------------------------------

4  ------------------------------------------------------------

5  ------------------------------------------------------------

6  ------------------------------------------------------------

7  ---------------------------- -- he decided to resign from the

8  board.

9  Q     Okay.  If you would look at page 21 of Vice Chancellor

10 Lasseter's opinion.

11 A     Okay.

12 Q     In the first full paragraph it reads:

13       "On Silverberg's watch, Akorn did very little to

14 address the Data Integrity issues.  In June 2016, Ron

15 Johnson, an Akorn board member with FDA experience, wrote to

16 Silverberg to express concerns about Akorn's state of

17 compliance.

18       I continue to be concerned that our position always

19 seems to be that FDA got it wrong and we are just fine.  I do

20 not think we are fine.  I think there are signals that we are

21 missing.

22       As the leader of the quality function, I do not

23 understand how you can tolerate the continued non-compliance

24 by employees, supervisors, and quality-assurance staff.  We

25 have dogged -- dodged, I think -- a bullet a number of times,

1    but at some point our number will be up unless we, once and

2    for all, fix the underlying reasons why our people do not

3    adhere to procedures.

4        Why do we not see an effort to do this?"

5        Silverberg's initial response was, "I think we should

6    communicate live on the phone."

7        In December 2016 during a meeting of the board of

8    directors quality oversight committee, Johnson, again,

9    expressed his concern around the repetitiveness of issues

10   between sites and the cross-sites identified during audits

11   and external inspections.

12       So, again, just so we get the chronologies right, these

13   concerns are being voiced by Mr. Johnson in June of 2016,

14   correct?

15   A    Yes, that's what it looks like, yes.

16   Q    And the Fresenius litigation is in 2018, correct?

17   A    Correct.

18   Q    Okay.  One last employee -- and there's many others,

19   many, many others who are, you know, identified in the

20   opinion and you folks can read it -- let's just talk about

21   Amir Takla --

22   A    Sure.

23   Q    -- T-A    -K-L-A    .

24       Are you familiar with Mr. Takla?

25   A    Yes, I am.

1   Q      And is he with the company any longer?

2   A      No, he's not.

3   Q      And when did he leave the company?

4   A      He left approximately one year ago.  I believe it was

5   June or July of 2019.

6   Q      And what was the reason for his separation from the

7   company, to your knowledge?

8   A      His -- we -- the reason he gave -- or let me put it

9   this way, the reason his wife gave for the two of them

10  leaving the employ of Akorn was that they were pursuing other

11  opportunities that better fit their lifestyles and pay scale

12  needs.

13  Q      Is the company currently suing Mr. Takla?

14  A      Yes, we are.

15  Q      And what's the gist of that lawsuit, sir?

16  A      We allege that in August of 2018, Amir Takla,

17  presumably motivated with the help of others, intentionally

18  deleted FDA-required data off of our computer system and

19  computer equipment in the Somerset facility.  He did so while

20  we were in the midst of our trial with Fresenius.

21         After the trial ended and during the post-trial

22  briefing, we discovered that material that is required for

23  our FDA-compliant records was intentionally deleted from our

24  system.  So, we have sued him civilly for those acting.

25         They became part of the Fresenius litigation record

1    because we notified Fresenius, through counsel, we notified

2    the judge, and we notified law enforcement, who has been

3    investigating the matter and has an investigation ongoing.

4    Q    So, turn to page 109 of Vice Chancellor Lasseter's

5    opinion, if you would, the first full paragraph after the

6    bullets on that page.

7         Are you with me?

8    A    Hold on.  109?

9    Q    Yeah.

10   A    I am.  I see the bullets.  Yeah.

11   Q    Yeah.  So, below the bullets there's a paragraph that

12   begins:

13        "By letter dated September 3, 2018, Akorn reported to

14   the Court that on August 22nd, during the later stages of

15   FDA's investigation, the database for a high-accuracy,

16   liquid-particle counter had been deleted, along with the

17   local backup file and associated electronic security logs.

18        These databases contained all of Somerset's data for

19   the relevant testing, which is designed to ensure that

20   sterile, intravenous products do not contain excessive

21   amounts of undisclosed solids.

22        Akorn's preliminary investigations suggested that the

23   files were deleted intentionally using an electronic

24   shredding utility.  Given the timing of the deletion, it is

25   reasonable to infer that the perpetrator may have been trying

1   to hide information from the FDA or from personnel who would

2   follow-up on the deficiencies that the FDA identified in its

3   Form 483."

4       Do you see that?

5   A   I do.

6   Q   And, sir, does that -- do those findings relate to the

7   activities that you described Mr. Takla had engaged in?

8   A   They were --

9   Q   Is this talking about Mr. Takla?

10  A   It is, but there are many incorrect statements in what

11  you just read.

12  Q   But they're the judge's findings, correct?

13  A   They are his findings and there are several findings

14  that are incorrect.

15  Q   Okay.  The vice chancellor goes on in the next

16  paragraph a couple of sentences in to say:

17      "In light of the record presented at trial, including

18  my evaluation of the credibility of Akorn's witnesses, it is

19  difficult to put much faith in Akorn's claims about its

20  commitment to quality.  Having seen the divergence between

21  Akorn's representations to the FDA during the March 2018

22  meeting and what Akorn's internal documents and witness

23  testimony showed, it is equally difficult to have confidence

24  that Akorn is being transparent in describing the corrective

25  actions that it has taken or will take."

1      Do you see those findings?

2  A    Yes.

3  Q    And obviously when Vice Chancellor Lasseter refers to

4  witness testimony in that series of sentences, he is

5  referring to the witnesses who testified during these

6  proceedings, correct, the Fresenius litigation?

7  A    That is correct.

8  Q    Yeah.  And approximately how many -- do you have a

9  sense of how many Fresenius -- excuse me -- Akorn employees

10 testified during that trial?

11 A    There were a handful of us.  Off the top of my head I

12 would say if you find or six employees.

13 Q    And you testified?

14 A    I did.

15 Q    Okay.  Sir, so all the folks that we just talked about

16 are no longer with the company, correct?

17 A    I'm sorry, did you say --

18 Q    (Indiscernible) --

19 A    Right.  Right.  Yes.

20 Q    Mr. Silverberg, Mister -- yeah, all of those -- they're

21 no longer with the company, correct?

22 A    That's correct.

23 Q    But they are all getting releases under Akorn's plan,

24 correct?

25 A    Correct.

1   Q      And are you aware -- there's no carve-outs in the

2   releases even for Mr. Takla, who you're suing, right?

3   A      That's an ongoing piece of litigation that is not

4   subject to a stay.  I think you're right about that, but that

5   is an action that will stay with Akorn that we'll continue to

6   pursue until post-closing.

7   Q      But he's getting a release under the plan, right?

8   A      Yes, I think he would under the -- yeah, I think you're

9   right, based on my recollection of the language, yes.

10  Q      And Mr. Silverberg is getting one?

11  A      Yes.

12  Q      Mr. Burghart --

13  A      Yes.

14  Q      Yeah, all of them.

15         Are you aware of any specific deliberations that took

16  place at the Akorn board level as to whether, you know, all

17  former directors and officers, employees, including the

18  people that we just discussed, should get releases under

19  Akorn's plan, any specific discussions of specific

20  individuals, are you aware of any such deliberations?

21  A      No, I'm not.

22              MS. CORNISH:  I have nothing further.  Thanks.

23              THE COURT:  Thank you, Ms. Cornish.

24              Any redirect, Mr. Arnault?

25              Well, let me ask, actually, for the record, I

1    think I concluded the number of parties that wish to cross-

2    examine the witness, but let me ask for the record, is there

3    anyone else?

4            (No verbal response)

5            THE COURT:  Okay.  Mr. Arnault, do you have

6    redirect?

7            MR. ARNAULT:  Yeah, just a brief redirect, Your

8    Honor.  Thank you.

9                    REDIRECT EXAMINATION

10   BY MR. ARNAULT:

11   Q    So, let just cover before we both forget the point of

12   clarification that you had mentioned, Mr. Bonaccorsi, coming

13   out of the lunch break.  I actually don't know the question

14   to ask, so why don't you give the point of clarification.

15   A    Yes, and actually as we progressed through the

16   afternoon there were some other points.  I think I have two

17   points to make.

18           One had to do early on in the day related to our board

19   compensation and the question was asked, am I familiar with

20   the compensation that the board receives for their services

21   and I limited my answer unintentionally to cash compensation

22   when I gave the range of approximately $100,000 a year.  That

23   did not -- my answer did not include the traditional equity

24   awards that were also part of the compensation program for

25   the board members and all of that is contained in our public

1   filings, of course, so I do want to clarify that.

2        And then the second thing that occurred to me during

3   the course of the afternoon were questions around the defense

4   (indiscernible) payments and how they were covered in

5   connection with the securities litigation and it occurred to

6   me that these funds paid by the insurer into escrow as part

7   of the cash compensation for the shareholders amounted to

8   $27.5 million.

9        The remainder $2.5 million was paid to the company for

10  purpose of defense costs and expenses, and in addition, we

11  used 2 million of that 2.5 million to settle the Kogut

12  derivative action.  So, when asked -- and so we would have

13  $500,000 remaining that we would apply toward the defense

14  costs associated or any other expenses that were beginning to

15  arise from those claims.

16       So, that's how that matter was settled.  That's how the

17  payment was distributed; 2.5 to us and 2.5 went directly into

18  the escrow accounts.  And I apologize for missing those two

19  points during the cross-exam earlier today.

20  Q    Okay.  Thank you for that clarification.

21       And I just want to spend briefly some time going

22  through some of the questions that you were asked in the

23  cross-examination and mainly they relate to the plan, which

24  obviously speaks for itself, but I just want to make sure

25  that we have a clear record on this stuff.

1      And so, first of all, do you recall answering some

2  questions around how claims were classified under the plan?

3  A      Yes.  Yes.

4  Q      And earlier in your direct, you had mentioned that the

5  insurer had directly paid to the shareholder class action

6  plaintiffs, the settlement proceeds.

7      Do you remember that testimony?

8  A      Yes, that's right.

9  Q      Okay.  And so under the plan -- and let's talk about

10  the amended plan, so as not to cause any confusion -- but

11  under the plan, then, what recovery, if any, are Akorn

12  shareholders receiving?

13  A      Likely nothing.

14  Q      Okay.  And then based on the second amended plan -- I

15  think this got clarified for the record -- how was that

16  changed, with respect to the contingent failure rights that

17  we discussed?

18  A      It provided a thirty-million-dollar bankruptcy claim to

19  the class plaintiffs.

20  Q      Right.  But as far as the second -- and we talked about

21  the second amended plan that was then subordinated as an

22  510(b) claim, correct?

23  A      Yes, that is right.  Yes.

24  Q      And then sticking with the unsecured creditors, what,

25  if anything, are all of the unsecured creditors receiving --

1   and I want to talk about the ones that are not being assumed

2   by the purchaser under the plan.

3   A    Boy, I don't know if I didn't hear you question all the

4   way, but I'm just not understanding it.  Sorry.

5   Q    No --

6   A    And it might just be fatigue here.  Sorry.

7   Q    We threw a lot at you over these -- with all the paper

8   that we sent to you.

9        Let's just, then -- and the plan says what it says, so

10  there's no need to belabor the point -- let's just

11  (indiscernible) now, I just want to hit on a theme that we

12  discussed during direct and that's this notion, and I think

13  it's come out here that there's this profound

14  misunderstanding of direct versus derivative claims and what

15  derivative claims actually still exist.

16       And so, with respect to the Provepharm claims, are

17  those direct or derivative claims?

18  A    Those are direct claims.

19  Q    And with respect to the claims that are being asserted

20  in the MDL litigation, are those direct or derivative claims?

21  A    Those are direct claims.

22  Q    Okay.  And is it your understanding that these direct

23  claims are now being released under the plan, pursuant to the

24  third-party release?

25  A    Yes, that's correct.

```
 1   Q     Okay.  And instead, what's being released under the

 2   plan is any potential derivative claims, correct?

 3   A     That's right.  That's right.

 4   Q     And I know we discussed this earlier, but what, if any,

 5   derivative claims, are you aware of that have been asserted

 6   against the company?

 7   A     There is no outstanding derivative claim.

 8   Q     And then, finally, is it your understanding that under

 9   the -- and this goes to the questions around Mr. Takla --

10   that there is a carve-out for fraud and willful misconduct?

11   A     Yes, there is.

12   Yes, thanks for that clarification.  Yeah, that is right.

13   Q     Okay.  And there are certain retained causes of action

14   under the plan supplement; isn't that right?

15   A     Yes, that's right.

16          MR. ARNAULT:  Well, thank you very much for your

17   time today, Mr. Bonaccorsi.

18          That is all the questions that I have, Your Honor.

19          THE WITNESS:  Thank you.

20          THE COURT:  I just have one follow-up question.

21          The action that the debtors are pursuing against

22   Mr. -- is it Takla?

23          THE WITNESS:  Takla.

24          THE COURT:  I don't know how to pronounce his name

25   and I apologize.
```

1          Is that a, quote, retained cause of action under

2   the plan to the best of your knowledge?

3          THE WITNESS:  I'm sorry, is it a what?

4          THE COURT:  To the extent that you know, is the

5   action that the debtor is pursuing against Mr. Takla a

6   retained cause of action under the plan?

7          UNIDENTIFIED:  It's not listed.

8          THE WITNESS:  No, I don't believe it is.  I

9   think --

10          UNIDENTIFIED:  Don't bring it up

11   (indiscernible) --

12          THE COURT:  Hold on one moment.

13          To the extent that you're speaking right now and

14   you're not addressing the Court, please have your phones on

15   mute.  Thank you.

16          Okay.  Mr. Bonaccorsi, I apologize.

17          Do you know whether that action is a retained

18   cause of action under the plan?

19          THE WITNESS:  My belief is that it goes with the

20   assets of the company to the lender group.

21          THE COURT:  Okay.

22          THE WITNESS:  We view it as an asset of the

23   company that will go to -- as part of the transaction to the

24   lender group.

25          THE COURT:  Okay.  Mr. Arnault, if you have any

1  follow-up questions based on my questions, you're welcome to

2  ask that.

3          MR. ARNAULT:  Actually, Your Honor, I'm pulling up

4  the plan supplement right now because I want to make sure

5  we're crystal clear on this point.

6          Your Honor, we'll let you know if that's

7  incorrect.  I'm just trying to search right now, but --

8          THE COURT:  Okay.  Well, why don't we address

9  it -- we can address it at another time in the documents

10 speak for themselves.

11         MR. ARNAULT:  Yeah, that's kind of -- at the end

12 of the day, the documents say what they're going to say, so

13 we'll clarify if anything needs to be clarified.

14         THE COURT:  Okay.  Thank you.

15         MR. PARKER:  Your Honor, Michael Parker on behalf

16 of Provepharm.  I have just a housekeeping matter.

17         I think I neglected to move for the admission of

18 P-1 and would like to move for the admission of P-1.

19         THE COURT:  Okay.  Any objection to the admission

20 of P-1?

21         MR. ARNAULT:  No, Your Honor.

22         THE COURT:  It's admitted.

23     (Provepharm Exhibit P-1 received into evidence)

24         THE COURT:  Okay.

25         MR. PARKER:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          And that was obviously a short redirect, but I

3  guess I would ask for the record, is there anyone that has

4  any further questions for this witness, based on the

5  redirect?

6          MR. GEORGE:  Yes, Your Honor.  This is Edmond

7  George.  Just a couple short ones because that testimony

8  about the compensation was different than the answers that I

9  asked about the same issues, so I'd just like to probe that

10  for a few minutes.

11          THE COURT:  Okay.  That is fine.  I'm just trying

12  to turn -- can you turn on your video screen, please.

13          MR. GEORGE:  Okay.  I tried before, but I guess

14  you saw, I'm not going to be leaning back in my chair, so ...

15          THE COURT:  I turned you back on.

16          MR. GEORGE:  Thank you, Judge.

17                    RECROSS-EXAMINATION

18  BY MR. GEORGE:

19  Q     So, Mr. Bonaccorsi, could you turn your attention to

20  what we marked as MDL Exhibit 17.  Do you have that document?

21  A     I'm getting there.

22  Q     Okay.  Take your time.

23  A     Yes, Exhibit 17.  Yes.

24  Q     So, if you could go to -- these -- let me see if they

25  have page numbers on them -- it's basically page 24 of that

1    document and it starts with the description of compensation

2    to the directors and the chairman of the board.  Can you find

3    that.

4           I guess it's maybe -- hold on a second.  These pages

5    aren't numbered, so I think it's nine or ten pages from the

6    back.

7    A    Okay.

8    Q    Do you see that Alan Weinstein is listed there?

9    A    Yes.

10   Q    And if you go to the very next page at the end of

11   Mr. Weinstein's list of payments, let's just go over what he

12   received in 2020 as a way of board fees.

13          On 2/20/2020, he was paid $106,000.  Do you see that?

14   A    Yes.

15   Q    And what was that for, a board fee?

16   A    Yes.

17   Q    And then two months later -- less than two months

18   later -- actually 45 or 50 days later, he got another

19   $106,250, right?

20   A    Yes.

21   Q    And why would he have received $212,500 in 2020, when I

22   think your testimony was that he got about $100,000?

23   A    Yes, that was my testimony.

24          This may have accounted for the other fees the

25   compensation package, which would be a cash equivalent for

1  the equity that would normally have been offered.  I'm making

2  a bit of an assumption there.

3      If I could, you know, get the minutes to actually view

4  why this happened, I'd be able to -- obviously, I'd be able

5  to do that with more certainty, but my recollection is that

6  it was payment for the 2020 compensation paid at the

7  beginning of the year for the forthcoming year and it may

8  have included -- a piece of that may have been the equivalent

9  of what normally would have been paid in equity in cash.

10 Q      Well, you're just guessing, aren't you, sir?

11 A      I said that.  I said that based on my recollection, but

12 I think I'm making an assumption and that it would be

13 reflected in our corporate documents for greater certainty.

14 Q      Because his payments are designated on this document as

15 board fees.

16      Do you see that?

17 A      I do.

18 Q      And he also got thirty-seven five hundred a month

19 before February for more board fees.  So, in the course of

20 between January and April, this gentleman received over

21 $250,000 in board fees, right?

22 A      Yes, that's right.

23      That thirty-seven-thousand number was a quarterly fee

24 paid for the last quarter of 2019, then what I was trying to

25 say was the subsequent payments of $106,000, I believe -- and

1   this would be reflected in the compensation committee minutes

2   that were in our public filings -- that would represent the

3   compensation for the 2020 year, half of which is cash, half

4   of which is equity.  The company was missing equity and

5   converted that to cash.

6   Q     So, you think he may have been entitled to equity and

7   the board paid it out in cash and called it a board fee,

8   right?

9   A     I don't -- yeah, I think I didn't clearly hear the

10  first part of your question, but I think you repeated what I

11  said.

12  Q     Okay.  Now, it looks like earlier in the year that they

13  were receiving $30,000 in board fees.

14        Does that refresh your recollection of what the board

15  fees were in 2017, '18, and '19?

16  A     Yes, as I said, they were earning approximately

17  $100,000, depending on their position and in their role on

18  the board and participation in committees and what their --

19  and whether they held a chair position and then also they

20  were paid quarterly.  Previously, they were paid quarterly,

21  not on an annual basis, except for equity; equity was granted

22  at one time each year.

23  Q     So, you're saying, instead of paying them when they

24  earned them, quarterly during the board meetings, you

25  accelerated the payment and paid up front?

1  A      In 2020, yes, we did.  We paid them up front.

2  Q      And what is the -- what is an RUS?  Do you know what

3  that is?

4  A      RSU?

5  Q      RSU, I'm sorry.

6  A      A restriction stock unit, which is equity.

7  Q      You don't have any reason to dispute the accuracy of

8  these recorded payments, do you?

9  A      No, I didn't prepare this, but they look consistent

10  with my recollection of the compensation program.

11  Q      And when Mr. Boothe took his job, did the company pay

12  him $150,000 to move?

13  A      I think that's the amount, yes.  We called it a moving

14  expense or something along those lines, but that's correct.

15  Q      Where did he move from?

16  A      New Jersey.  He has a home in New Jersey.

17  Q      And did he move to Illinois?

18  A      He rents an apartment in Illinois.

19  Q      And is the $150,000 to pay for the rent or to pay for

20  the move?

21  A      I think it was used for -- I think either of those.  It

22  was more of a relocation -- I don't have the document in

23  front of me to know, but it was intended for his move and

24  working at Akorn in Illinois.

25  Q      When did the practice of providing cash in lieu of the

1   value of shares begin?

2   A       I can't remember --

3            MR. ARNAULT:  And, Your Honor, I'm going to

4   interpose an objection.  At this point, I think we actually

5   started to go outside the scope of the redirect and what

6   Mr. Bonaccorsi actually clarified in the record.  So, I would

7   object on the grounds of the scope.

8            MR. GEORGE:  Your Honor, the only reason I'm going

9   into this is the fact that he testified inconsistent with

10  this testimony, this very testimony when I asked him on my

11  cross.  He said it was $100,000 and we see that it wasn't

12  $100,000 a year because this gentleman was paid $225,000, and

13  I think it's fair for me on my recross to ask him about the

14  details of this.

15           I don't have much more, Judge, but --

16           THE COURT:  All right.  Well, why don't we tread

17  lightly, because I'm not even really sure of what the

18  relevancy of any of this is, so maybe you could elucidate

19  that for me.  Given the rulings I made yesterday at the sale

20  hearing, what is the relevancy of what -- this line of

21  questioning?

22           MR. GEORGE:  Well, Your Honor, we've consistently

23  taken the position that these expenditures of money to the

24  board and the acceleration of payments were inappropriate and

25  I think it goes to the good faith of the plan that seeks to

1  pay creditors nothing, while the debtors' principals engage

2  in efforts to try to pull more money out than what they're

3  entitled to.

4         THE COURT:  Well, the issue with respect to any

5  viability of avoidance actions against the directors and

6  officers for insider payments within a year of the petition

7  date has been sold to the purchaser, as of my rulings

8  yesterday.

9         MR. GEORGE:  Understood.

10         THE COURT:  So, I would just ask that we wrap this

11  up, given that I have another hearing that's going to begin

12  shortly.

13         MR. GEORGE:  That's fine, Judge.

14         THE WITNESS:  I have an answer to your question if

15  you'd -- the way it was asked, I have an answer.

16         MR. GEORGE:  I withdraw it, Judge.

17         THE WITNESS:  Okay.

18         MR. GEORGE:  I'll withdraw the question.

19         THE COURT:  Okay.

20  BY MR. GEORGE:

21  Q    Do any of the existing board members have a right to

22  participate in the shareholder settlement, by virtue of

23  holding any of these RUS rights?

24  A    No, they're precluded.

25         MR. GEORGE:  I don't have anything further, Judge.

1              THE COURT:  Okay.  Any further redirect on that

2    recross?

3              MR. ARNAULT:  No, Your Honor.

4              THE COURT:  Okay.  Great.

5              Mr. Bonaccorsi, thank you so much for your time

6    and your efforts today.  I really appreciate them.

7              You can consider yourself released from the

8    virtual witness box and go about your day as you see fit.

9         (Witness excused)

10             THE WITNESS:  Your Honor, thank you.

11             MR. GEORGE:  And, Your Honor, can I move in MDL

12   Number 17, please.

13             THE COURT:  Any objections?

14             MR. ARNAULT:  No objections, Your Honor.

15             THE COURT:  Okay.  It's admitted.

16        (MDL Exhibit 17 received into evidence)

17             THE COURT:  And then I'll note, Mr. George, I did

18   receive an email from Mr. Faulk saying that you had two more

19   proposed exhibits.

20             MR. GEORGE:  Yes, Judge.  That is -- thank you,

21   Your Honor.  That matter was transferred to the MDL.  We

22   wanted you to see the complaint and the order connected to

23   it.

24             So, those are the two documents.  We sent them to

25   Mr. Arnault, as well.  You can take judicial notice of them.

1   We'd like them admitted in case -- as our exhibits, MDL 44

2   and 45.

3              THE COURT:  Okay.  Any objection to their

4   admission?

5              MR. ARNAULT:  No objection, Your Honor.

6              THE COURT:  Okay.  They're admitted.

7          (MDL Exhibits 44 and 45 received into evidence)

8              MR. GEORGE:  Thank you, Your Honor.

9              THE COURT:  Okay.  Well, it doesn't seem like it

10   makes sense to call your next witness, Mr. Arnault, so let's

11   talk about tomorrow.  Can we start at 9:15 tomorrow, is that

12   possible?

13              MR. ARNAULT:  Yes, Your Honor.

14              THE COURT:  Okay.  Let's start at --

15              MR. GEORGE:  I have a prepaid vacation, Judge.

16              I've already missed since last Saturday of that

17   vacation and my plan was to try to at least get a day or two

18   with my family during this prepaid vacation.  My hope was

19   that I could get out of here.

20              I mean, if I can't, I can't, but it was my hope

21   that my next proceeding wouldn't be in Family Court.

22          (Laughter)

23              THE COURT:  I already had it scheduled on my

24   calendar that we were starting at 10:00 and going all day,

25   except for half an hour break.

1          MR. GEORGE:  All right, Judge.

2          THE COURT:  You know, unfortunately, it's on my

3   calendar.  We scheduled it --

4          MR. GEORGE:  All right.  Judge, I'll be here.

5          THE COURT:  I apologize for that inconvenience.

6          MR. GEORGE:  No problem, Your Honor.

7          MR. ARNAULT:  And, Your Honor, for planning

8   purposes, just so everyone is on the same page, tomorrow

9   morning we'll start with Mr. Buschmann and to streamline

10  things, we will move into the record his direct, his cross,

11  and all the exhibits, and then to the extent that objecting

12  parties to the plan would like to cross-examine him, he will

13  be available for cross-examination.

14          At that point, after his cross-examination is

15  complete, we will have a very brief direct examination from

16  AlixPartners, from one of the representatives at

17  AlixPartners, and then that will be it for our witnesses.

18          Mr. George has asked that Mr. Portwood, the

19  company's CFO, be available for questioning, even though we

20  weren't going to call him, and we agreed to do that, and my

21  understanding is that, at least as of a few days ago,

22  Mr. George had a few hours of questioning for him.  I'm not

23  sure if that's still the case, but that should be all the

24  witnesses tomorrow.

25          MR. GEORGE:  Yes.

```
 1              THE COURT:  Okay.  So, are we going to get to
 2   Mr. Portwood tomorrow, do we think?  What is the scope --
 3   well, let me ask you this, is there any objection to moving
 4   in the testimony and the record from Mr. Buschmann from
 5   Tuesday?
 6              MR. GEORGE:  No, Judge.
 7              THE COURT:  Okay.  So, what is the extent --
 8   what's the estimated time that we have for, I guess, further
 9   cross-examination of Mr. Buschmann?
10              MR. GEORGE:  I'm not sure what his direct will be,
11   Judge, with us moving all the --
12              THE COURT:  So, the direct will be the direct
13   testimony that he provided in support of the sale.
14              Do you have any further cross-examination of Mr.
15   Buschmann?
16              MR. GEORGE:  I don't think so, Judge.
17              THE COURT:  Okay.  Does any other party have any
18   further cross-examination of Mr. Buschmann?
19         (No verbal response)
20              THE COURT:  Okay.  So, that's going to be quick.
21              All right.  With respect to AlixPartners, what is
22   the estimate of cross-examination of AlixPartners, what do we
23   think?
24              MR. GEORGE:  I would just reserve the amount of
25   time that the debtor has on direct.
```

1          THE COURT:  Okay.  I just want to be clear.  We

2    have very limited time and we're hopeful that we're going to

3    get through this as soon as possible, so I would like you to

4    give me an estimate.  I assume you know the extent of the

5    questioning, perhaps, or I guess he didn't file a

6    declaration, did he?

7          MR. GEORGE:  Yes, Judge.  An hour.

8          THE COURT:  Okay.  And is there any other party

9    that intends to cross-examine the witness from AlixPartners?

10          UNIDENTIFIED:  Yes, Your Honor, I do.  And I will

11    not be that long.  My guess is half an hour, maybe.

12          THE COURT:  Okay.

13          All right.  And with respect to Mr. Portwood, what

14    is the estimate for direct, Mr. George?

15          MR. GEORGE:  I would say an hour and a half, Your

16    Honor, because I may be calling him on cross, so ...

17          THE COURT:  The reason why I'm asking these

18    questions is do we think that we could wrap this up this week

19    if I gave you time on Friday?

20          Is there any other evidence after Mr. Portwood?

21          MR. GEORGE:  Not from the MDL, Judge.

22          MR. HAYES:  (Indiscernible), Your Honor.

23          THE COURT:  Oh, I'm sorry.  Someone is chiming in.

24          Mr. Hayes?

25          MR. HAYES:  Yes.  I apologize, Your Honor.  I

1    didn't mean to interrupt.

2            For the record, Christopher Hayes of Kirkland &

3    Ellis on behalf of the debtors.

4            Yes, Your Honor, if you gave us time on Friday, I

5    think we would all endeavor to complete the testimony and

6    argument by the end of this week, which we think is, just

7    like yesterday, would be -- is critical to the debtors'

8    efforts to wrap these cases up.

9            THE COURT:  Okay.

10           MR. HAYES:  And, Your Honor, we only have the

11   AlixPartners' declarant for a very short direct remaining as

12   part of our case-in-chief.

13           THE COURT:  Okay.  How long do we think for a

14   closing?

15           MS. CORNISH:  Your Honor, Kelley Cornish from Paul

16   Weiss.

17           I also want to mention that we have our motion,

18   our 3013 motion, right, and so when I had discussed this as a

19   process matter, I mean we want that decided.  You know, we're

20   not going to rise and fall as the plan rises and falls; we

21   want a decision as to whether we're, you know, subordinated

22   or not.

23           I'm happy to sort of argue that motion as part of

24   my closing.  I don't know how you want to proceed on that.

25           THE COURT:  What is the -- there was reference to

1  having evidence in connection with that, with those motions.

2  I think the Fund mentioned that they had upwards of 50

3  exhibits or something like that.  What is the extent of

4  evidence that we need on those motions or are we just going

5  to argument?

6           MR. GEORGE:  Your Honor, I have no -- I'm sorry,

7  Judge.  I thought you were talking to me when you said the

8  Fund.

9           THE COURT:  Oh, no, I'm sorry.

10          Debellee (phonetic) I thought, mentioned --

11          MR. GEORGE:  Yeah, I don't have anything.

12          UNIDENTIFIED:  I don't have any evidence, Your

13  Honor.

14          THE COURT:  Okay.

15          UNIDENTIFIED:  Your Honor, this -- so, we don't

16  have any additional exhibits, other than what was appended to

17  our motion, and that was just our CVR agreement and the

18  policy.  The policy is already in evidence at Exhibit 20, I

19  believe the Debtors' Exhibit 20, and the CVR agreement was

20  appended, and unless anyone has an objection, I'd just move

21  it now.  You'll have it in evidence and we're fine, I think.

22          You know, I think, of course, as one of the

23  debtors' witnesses, but I've already discussed with

24  Mr. Arnault, he's got no objection to it coming in as a

25  business record.

1          MR. GEORGE:  Your Honor, I think we could finish

2    the evidence tomorrow, it sounds like, if AlixPartners is

3    short.

4          I mean, Your Honor, I didn't take any discovery

5    here, so I'm a little flat-footed on what people's direct

6    case would be and I'm not trying to be cagey by reserving the

7    amount of time the debtor uses, I just don't want to be

8    prejudiced.

9          So, if it's short testimony -- and that, in part,

10   is why I asked for somebody to just give me an estimate, you

11   know, some kind of statement as to what people are going to

12   be called in connection with.

13         I think we can get the evidentiary piece done

14   tomorrow and then if we need to argue on Friday, I'm happy to

15   do that.  I'm happy to finish evidence and then have, at

16   least overnight, to be able to put our arguments together,

17   because there has been a lot of information exchanged.  And

18   so, I'll promise to do my level best to get all the evidence

19   that I need to get in tomorrow, and I don't have a direct

20   case beyond my cross of the debtors' witnesses.

21         So, I think it's definitely manageable and I'll

22   work towards making sure that that happens.

23         THE COURT:  Okay.  And I don't mean to hold

24   anybody to this.  I'm just -- was not intending to be in the

25   office past ten o'clock on Friday, so I have to juggle a few

1   things to free up time and I wanted to make sure that it was

2   worth it, quite frankly, to do that.

3           So, it sounds like it would be worth it and we

4   should get this done.  So, let's plan on doing what we can

5   tomorrow, starting at 9:15, and Friday, let's shoot to have

6   arguments on Friday starting at 11:00 a.m. and we'll go for,

7   you know, one or two -- I don't know -- two hours, three

8   hours.  So, we'll see how that goes.

9           I absolutely cannot -- cannot be on the bench any

10  longer than two o'clock.  So, at that point, I will literally

11  need to stand up and leave.  But let's try to get it done.

12          All right.  With that, I'll see you all at 9:15

13  tomorrow morning.

14          Oh, it's Mr. Nash and then Ms. Cornish.

15          And Mr. Nash, you're on mute.

16          MS. CORNISH:  Your Honor, for efficiency, should I

17  ask my question?

18          THE COURT:  Yeah.  While Mr. Nash tries to

19  reconnect, why don't you ask your question, Ms. Cornish.

20          MS. CORNISH:  Happy to.

21          So, just so we're clear, argument will be Friday

22  and, including, we will argue the 3013 motion on Friday?

23          THE COURT:  Yeah, that would be great.  And if we

24  run out of time, I don't want to prejudice anyone, so we'll

25  find more time to complete the arguments if we need more

1    time, okay.

2              MS. CORNISH:  Okay.  But we're not going to get to

3    that tomorrow.  I just wanted to make sure we were good.

4              THE COURT:  I don't think it makes sense to get to

5    it tomorrow.

6              MS. CORNISH:  Thank you, Your Honor.

7              THE COURT:  I think we should just try to conclude

8    the evidence tomorrow and then break and we'll do closings on

9    Friday.

10             MS. CORNISH:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             MR. GEORGE:  Are we adjourned, Your Honor?

13             THE COURT:  No, I think we're waiting for Mr. Nash

14   to get reconnected on CourtCall.

15             I apologize for not letting the parties know.

16             MR. NASH:  Your Honor, can you hear me?

17             THE COURT:  I can.  Yes, we can hear you.

18             MR. NASH:  Thank you, Judge.  I really apologize.

19   Somehow, we got disconnected.  I don't know how that

20   happened.

21             THE COURT:  That's okay.

22             MR. NASH:  The only point I wanted to make, Your

23   Honor, with Mr. Buschmann not needing to be crossed, he's

24   done.  We're going to put a representative of AlixPartners up

25   for a very short direct.  If Mr. George limits his cross-

1  examination to the length of the direct, that's not going to

2  take very long at all.

3          I have no idea what Mr. George expects to spend an

4  hour and a half, you know, cross-examining Mr. Portwood on,

5  but that's his prerogative.

6          In terms of closing arguments, Your Honor, I

7  assure you that I'm going to be very brief.  I think the

8  record largely speaks for itself.  We'll probably talk about

9  what is and isn't actually being proposed to be released,

10 because there seems to be -- under the plan -- because there

11 seems to be a lot of confusion about what, you know, is not

12 being released, frankly.

13         And I'll probably talk a little bit, to the extent

14 necessary, about my view that a credit bidding lender who

15 picks up $150 million of unsecured claims and provides a

16 thirty-five-million-dollar wind-down budget probably

17 qualifies as an impaired accepting class.

18         But, beyond that, Your Honor, I really would

19 expect to speak, you know, 10, 15 minutes at most.  I don't

20 expect much of a barn-burner of a closing argument from me.

21         THE COURT:  Okay.  Well, it sounds like we could

22 then get quite far in closings.

23         So, let's do this.  I would like you all to just

24 talk among yourselves tonight, okay, about whether you -- it

25 seems to me that we could finish quite early tomorrow and so

1    I don't want to postpone closings to Friday just to postpone

2    closings to Friday if parties can make argument.

3           We could certainly probably make argument on the

4    re-classification --

5       (Audio concluded at 3:24 p.m.)

6

7                         CERTIFICATE

8

9       We certify that the foregoing is a correct transcript

10   from the electronic sound recording of the proceedings in the

11   above-entitled matter.

12

13   /s/Mary Zajaczkowski                September 4, 2020
     Mary Zajaczkowski, CET**D-531

14

15   /s/William J. Garling               September 4, 2020
     William J. Garling, CE/T 543

16

17

18

19

20

21

22

23

24

25