```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                             .  Chapter 11
         IN RE:               .
                             .  Case No. 20-11177(KBO)
         AKORN, INC., et al,  .
                             .
                             .  824 Market Street
                             .  Wilmington, Delaware 19801
                     Debtors. .
         . . . . . . . . . . . . . . .  Thursday, September 3, 2020

              TRANSCRIPT OF CONTINUED CONFIRMATION HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
                  UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES VIA TELEPHONE:

```
For the Debtors:          Paul N. Heath, Esq.
                          Amanda R. Steele, Esq.
                          Brett M. Haywood, Esq.
                          Sarah Silveira, Esq.
                          RICHARDS, LAYTON & FINGER, PA

                          Patrick J. Nash, Jr., Esq.
                          Christopher M. Hayes, Esq.
                          William E. Arnault, Esq.
                          Justin Barker, Esq.
                          KIRKLAND & ELLIS, LLP

For the U.S. Trustee:     Jane Leamy, Esq.
                          OFFICE OF THE U.S. TRUSTEE
```

(Appearances Continued)

```
Audio Operator:           Electronically Recorded
                          by CourtSmart and Al Lugano, ECRO

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
               APPEARANCES VIA TELEPHONE:  (Continued)

               For the Official Committee
               of Unsecured Creditors:     Mark Minuti, Esq.
                                           SAUL, EWING, ARNSTEIN & LEHR, LLP

                                           Landon Raiford, Esq.
                                           JENNER & BLOCK, LLP

               For ProvePharm:             William Bowden, Esq.
                                           ASHBY & GEDDES

                                           Michael M. Parker, Esq.
                                           NORTON ROSE FULBRIGHT US, LLP

               For the Ad Hoc Term
               Lender Group:               Robert S. Brady, Esq.
                                           Robert Poppiti, Esq.
                                           YOUNG, CONAWAY, STARGATT
                                            & TAYLOR, LLP

                                           Steven A. Domanowski, Esq.
                                           Jeremy D. Evans, Esq.
                                           Scott J. Greenberg, Esq.
                                           James Hallowell, Esq.
                                           Mitchell Karlan, Esq.
                                           Brad Schoenfeldt, Esq.
                                           GIBSON, DUNN & CRUTCHER, LLP

               For Leadiant Biosciences:   Michael Busenkell, Esq.
                                           GELLERT, SCALI, BUSENKELL
                                            & BROWN, LLC

                                           Fernando Menendez, Esq.
                                           SEQUOR LAW, PA

               For Fresenius Kabi AG:      L. Katherine Good, Esq.
                                           POTTER, ANDERSON & CORROON, LLP

                                           Kelly A. Cornish, Esq.
                                           Claudia Tobler, Esq.
                                           PAUL, WEISS, RIFKIND, WHARTON
                                            & GARRISON

               For the Gabelli Entities:   Brian E. Farnan, Esq.
                                           FARNAN, LLP

                                           Andrew J. Entwistle, Esq.
                                           ENTWISTLE & CAPPUCCI, LLP

               (Appearances Continued)
```

```
          APPEARANCES VIA TELEPHONE:   (Continued)

     For Ronald Johnson:        Jennifer Feldsher, Esq.
                                MORGAN, LEWIS & BOCKIUS, LLP

     For AFSCME District Council
     47 Health & Welfare Fund,
     et al:                     Edmond M. George, Esq.
                                OBERMAYER, REBMANN, MAXWELL
                                 & HIPPEL, LLP

     For Opt Out:               Wojciech F. Jung, Esq.
                                LOWENSTEIN SANDLER, LLP

                                Lawrence Rolnick, Esq.
                                ROLNICK, KRAMER & SADIGHI

     For Wilmington Savings
     Fund Society:              Benjamin Loveland, Esq.
                                WILMER HALE, LLP

     For the United States:     Ellen W. Slights, Esq.
                                U.S. DEPARTMENT OF JUSTICE

     Also Appearing:            Joseph Bonaccorsi
                                Duane Portwood
                                AKORN, INC.

                                Mark Buschmann
                                PJT PARTNERS

                                David Hartie
                                Leanne V.R. Scott
                                KURTZMAN CARSON CONSULTANTS

                                William Kocovski
                                ALIXPARTNERS, LLC

                                Loren Lehnen
                                WILLIS TOWERS WATSON

                                Dipesh Patel
                                RISING PHARMA HOLDINGS, INC.
```

<u>INDEX</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTORS | | | | |
| WILLIAM KOCOVSKI | 8 | 19 | | |
| FOR THE MDL OBJECTORS | | | | |
| DUANE PORTWOOD | 43 | | | |

| EXHIBIT | | IDENT. | EVID. |
|---|---|---|---|
| Debtors' 28 | Voting Declaration | | 42 |
| Debtors' 42 | Liquidation Analysis | | 19 |
| Debtors' 47 | Affidavit of Solicitation | | 42 |
| MDL 46 | SOFAs and Schedules | | 55 |
| Transcriptionist's Certificate | | | 163 |

1          (Proceedings commence at 9:17 a.m.)

2                    THE OPERATOR:  Recording has begun.  We are now

3      live.

4                    THE COURT:  Good morning, parties.  This is Judge

5      Owens.  We're back on the record, Day 3 of the plan and

6      confirmation hearing.  I think we're going to go right into

7      the next witness, I believe, but I'll defer to the parties.

8                    MR. NASH:  Good morning, Your Honor.  Pat Nash from

9      Kirkland & Ellis for the debtors.  Just a few housekeeping

10     matters, if it's okay with the Judge.

11                   THE COURT:  Perfect.

12                   MR. NASH:  So, Your Honor, the good news is all the

13     parties are aligned and agree that we can and will finish

14     today.

15                   As you heard yesterday, we have one witness, with

16     whom we -- for whom we have a very short direct.  I think, by

17     definition of the scope of the direct, the cross of that

18     witness shouldn't take too long.  And appreciate my partner

19     Mr. Arnault had a conversation with Mr. George last night,

20     and I appreciate the report that I got from that conversation

21     was that everybody is going to try to be -- Mr. George,

22     specifically, I think is going to try to be as efficient and

23     targeted as possible, in terms of his cross-examination of

24     Mr. Portwood.  I don't intend for that to be proscriptive; it

25     will be what it will be, but I do appreciate that everybody

1    is focused on finishing up today.

2         In that vein, Your Honor, I can also report that

3    Ms. Cornish and I have agreed, the parties have agreed, that

4    in terms of the Fresenius classification motion, argument

5    with respect to that motion can and probably most

6    appropriately can be handled just in terms of our argument as

7    it relates to plan confirmation.  There's clearly overlap in

8    terms of those two arguments.

9         Ms. Cornish would like -- and the debtors are fine

10   with Your Honor, nonetheless, you know, making a standalone

11   ruling as it relates to that reclassification motion.  But in

12   terms of efficiency, from our perspective, we can do that in

13   one argument.

14        Lastly, in terms of housekeeping matters, Your

15   Honor, last night, we filed an amended confirmation order

16   that I'm pleased to report resolves all of the various

17   objections to the plan that were filed, other than the

18   objections from Fresenius, the MDL plaintiffs, and

19   ProvePharm.

20        Also, Your Honor, as a housekeeping matter, with

21   respect to the opt out objection and the opt out litigation,

22   heading -- leading into these proceedings this week and

23   during these proceedings this week, the D&O carrier, the Side

24   A carrier, has been in discussions with the opt out

25   plaintiffs and the individual D&O defendants.  The debtors

1    are told that they've reached a settlement that would involve

2    the payout of those Side A D&O proceeds, doesn't involve any

3    proceeds being paid out by the debtors; the debtors aren't

4    contributing anything to that settlement.

5           Most importantly, Your Honor, with respect to

6    parties-in-interest in the cases, that settlement -- and I

7    don't specifically know much more about it than what I've

8    said, Your Honor, because I have not been involved in those

9    discussions and it doesn't involve the estates paying out any

10   proceeds.  But nonetheless, we're going to be bringing that

11   to the Court on notice to all parties-in-interest.  And

12   everybody in the case, even parties that didn't object to

13   confirmation, everybody will get notice of that, will have an

14   opportunity to object to that or not, and you know, we'll

15   deal with that on standalone motion, on notice to all

16   parties.

17          With that, Your Honor, I'd be prepared to hand over

18   the virtual podium to my partner Bill Arnault, and we'll jump

19   right into the evidence.

20          THE COURT:  Sounds good.  Thank you.

21          Mr. Arnault.

22          MR. ARNAULT:  Good morning, Your Honor.  Bill

23   Arnault from Kirkland & Ellis on behalf of the debtors.

24          For our first and final witness today, the debtors

25   call Mr. Bill Kocovski.

Kocovski - Direct                                    8

1         THE COURT:  Good morning, Mr. Kocovski.

2         THE WITNESS:  Good morning, Your Honor.

3         THE COURT:  Mr. Lugano is going to swear you in.

4         THE ECRO:  Yes, Your Honor.

5    WILLIAM KOCOVSKI, WITNESS FOR THE DEBTORS, AFFIRMED

6         THE ECRO:  Please state your full name for the

7    record and spell your last.

8         THE WITNESS:  William Kocovski, last name K-o-c-o-

9    v, as in Victor, s-k-i.

10        THE ECRO:  Thank you, sire.

11                     DIRECT EXAMINATION

12   BY MR. ARNAULT:

13   Q    All right.  Good morning, Mr. Kocovski.

14   A    Good morning.

15   Q    Can you please tell the Court where you are currently

16   employed?

17   A    Sure.  I'm a Director at AlixPartners.

18   Q    And what role has AlixPartners played for the debtors in

19   this case?

20   A    We've served as financial advisor to the debtors.

21   Q    And when was AlixPartners retained by the debtors?

22   A    January or February of 2019.

23   Q    Okay.  And before we get into the work that you've

24   performed for the debtors, let's just briefly discuss your

25   background.

1    So, to begin, where did you go to college, Mr. Kocovski?

2    A    I went to the University of Michigan Dearborn, graduated

3    with a Bachelor's Degree in Accounting.

4    Q    And do you have any other certifications?

5    A    I did obtain a CPA certification; however, I'm no longer

6    active.

7    Q    And can you give the Court just a brief thumbnail sketch

8    of your professional experience since graduating from the

9    University of Michigan Dearborn, up until the time that you

10   joined AlixPartners?

11   A    Sure.  I started off my career in public accounting,

12   working at Plante Moran as an auditor, spent just under three

13   years there.  Then I moved on to General Motors, working in

14   the finance department for about a year and a half or so.

15   then, in 2001, I came to AlixPartners, and I've been here

16   ever since.

17   Q    And you mentioned that you're currently a Director at

18   AlixPartners.  Could you describe for the Court your typical

19   responsibilities as a Director?

20   A    Yeah, typically, I primarily work in restructuring

21   situations, both in court, out of court.  You know, typical

22   areas of focus would be cash forecasting, financing

23   projections, business plans, facilitating and responding to

24   diligence requests from stakeholders and various other

25   financial analyses, including, you know, liquidation

1    analysis, as well.  And not -- and not only that, even, at

2    times, even actually executing liquidations of certain

3    assets.

4    Q    And in your almost 20 years of providing restructuring

5    advice to companies, what are some of the matters that you've

6    worked on over the years?

7    A    Yeah.  Most recently, in addition to Akorn, Aeromexico,

8    Westinghouse Electric Company.  I also worked on the General

9    Motors bankruptcy.  And then, even going back as far as 2002,

10   I worked on the Federal-Mogul bankruptcy, where, you know, my

11   role in that situation was actually to prepare the

12   liquidation analysis.

13   Q    Okay.  And this may be repetitive of what I just asked

14   you.  But what type of work then have you done for those

15   types of companies that you just mentioned?

16   A    Well, similar to, you know, what I described, you know,

17   not always, you know, the full scope, but cash forecasting,

18   business planning, financial projections, liquidation

19   analyses, responding to and facilitating diligence by the

20   various stakeholders, helping with execution of sale

21   processes, wind-down of assets, liquidation of assets.

22   Q    And you mentioned that you've been actually involved in

23   the liquidation of assets.  What experience -- can you go

24   into a bit more detail around that experience?

25   A    Yeah.  One specific example in the Chapter 11 context

1    was the Metaldyne Chapter 11, where, in addition to actually

2    preparing a liquidation analysis, one of my other

3    responsibilities was to wind down and oversee the liquidation

4    of some of the assets that were not being acquired;

5    specifically, manufacturing facilities, multiple

6    manufacturing facilities and liquidating equipment.

7    Q      Okay.  And if we turn now to your work for the debtors,

8    can you just describe for the Court the nature of the work

9    that you have performed since Alix was retained in January

10   2019?

11   A      Sure.  You know, as soon as we came on board, we

12   initially started -- well, helping the company developed a

13   thirteen-week cash forecast.  And we've been working closely

14   with the company in that regard, really ever since, both in

15   terms of forecasts, being -- tracking variances, and really

16   just general cash management.

17          Additionally, we've also assisted the debtors in

18   preparing various business plans, financial projections, you

19   know many of the projections that were used throughout the

20   sale process.

21          Finally -- well, also, we -- we did assist with some of

22   the filings related to the Chapter 11 case administration,

23   and even helped the company respond to diligence requests

24   from the various stakeholders throughout, you know, the sale

25   process, refinancing, and just general requests from the UCC

1    and other parties.

2    Q    And it sounds like you've been spending a lot of time

3    working closely with management and the employees of the

4    debtors.  Can you just describe for the Court how the

5    debtors' management team has been involved in the work that

6    you've been performing?

7    A    Yeah.  Really, everything we've done has been very

8    collaborative with the debtors' management team.  As a matter

9    of fact, you know, prior to COVID, we were physically on site

10   at the debtors' headquarters on a weekly basis.  So, whether

11   it's, you know, liquidity, business planning, financial

12   projections, diligence responses, everything is -- we -- you

13   know, we've more or less been an extension of the debtors'

14   team.

15   Q    And at this point, Mr. Kocovski, I want to turn to the

16   liquidation analysis that you performed.  And as we get into

17   that, have you prepared a set of demonstrative exhibits

18   relating to that liquidation analysis?

19   A    Yes, I have.

20   Q    And would those demonstrative exhibits assist you in

21   your testimony here today?

22   A    Yes, I think they would.

23   Q    Okay.  And you -- could you turn to your demonstratives,

24   please?

25   A    Yep.

1   Q     Okay.  And can you just describe at a high level what

2   these demonstrative exhibits show?

3   A     Sure.  There are two pages, the first one titled "Assets

4   Available for Distribution to Creditors."  Really, this is an

5   estimate of the cash proceeds that a Chapter 7 Trustee would

6   generate from liquidating the debtors' assets.  And the

7   second page, entitled -- titled "Recovery Waterfall,"

8   estimates the distribution that each class of claims would

9   receive from the liquidation proceeds following the priority

10  rules under the Bankruptcy Code.

11  Q     Okay.  And let's walk through that, in a bit more

12  detail, what you actually did for purposes of this

13  liquidation analysis.  And turn to look -- at a high level,

14  what, at the end of the day, was the purpose of this

15  liquidation analysis?

16  A     Well, this is a hypothetical analysis, which basically

17  is an estimate of what the various stakeholders would receive

18  if the debtors' assets were liquidated under a Chapter 7.

19  Q     And to perform your liquidation analysis, how did you

20  start?

21  A     Well, the first step is really identifying debtors'

22  assets.  And you're focusing on the first page, assets

23  available for distribution to creditors.  Essentially, that's

24  the first column of numbers, net book value.  Generally, you

25  know, we -- we start with the balance sheet, in terms of

1   identifying the assets.  So this column would show a net book

2   value of these various assets.

3   Q    And then how do you get to the point where you're

4   estimating the cash proceeds that would be generated from the

5   sale of these assets?

6   A    Yeah.  So the following columns to the right, the

7   recovery percentage and the recovery dollars, are those

8   estimates.  And basically, you know, each -- each category of

9   assets is handled differently, whether, you know, we're

10  performing some analysis, relying on analyses that have been

11  performed by others, and/or discussions with management.  You

12  know, we, you know, essentially talk through the approach for

13  each of these asset categories with the management team, and

14  then determine, you know, a reasonable course of action, in

15  terms of estimating the recoveries.

16  Q    And can you -- we don't have to walk through them --

17  each of them line by line.  But can you just give us a few

18  examples of how you assess what the cash recovery would be --

19  or sorry, what the cash proceeds would be for a few of the

20  items?

21  A    Okay.  So, just starting from the top, the cash balance

22  is obviously already cash, but that cash balance itself is

23  the forecasted cash balanced as of September 15th, which is

24  the assumed conversion date, and that comes from our weekly

25  cash forecast.

1    The next line, accounts receivable, for this one, we

2    leveraged the exit ABL proposal, which had an implied

3    eligible A/R percentage of 57 percent, and we used that for

4    the low end of the recovery.  And we assumed a more generous

5    80 percent recovery on the high -- on the high side.

6        And then inventory, again, is another one where we had

7    third-party inventory appraisals that estimated 81 percent

8    were a liquidation value for the inventory, so we used that

9    for the high and 50 percent of that for the low.

10   Q    And at the end of the day, what were the total

11   liquidation proceeds that you estimated?

12   A    So, you know, going back to this schedule, it would be

13   the line called total -- or "Total Assets of the U.S.

14   Debtors."  And the recovery columns, the recovery dollars,

15   the low and the high, the gross proceeds -- actually, the

16   total liquidation proceeds, I'm sorry -- the low end of the

17   range was 341 million, and the high end of the range was 98

18   million.

19   Q    And if we move down in your demonstrative to the Chapter

20   7 administrative costs, what do those line items below that

21   represent?

22   A    So those represent the estimated costs that would

23   incurred, in order to avert the debtors' assets into cash

24   proceeds.  Starting at the top, the U.S. Trustee fees are the

25   statutory fees.  Then we have estimated commissions for

Kocovski - Direct                              16

1   liquidators to, you know, liquidate the physical assets.   We

2   have an assumption for professional fees, as well as

3   corporate wind-down costs.  That would be, essentially, the

4   debtors' internal payroll and preparing assets for sale.

5   Q    Sure.  And basic question:  Why include these in your

6   liquidation analysis?

7   A    Well, in order to convert assets to cash proceeds, it

8   takes time and effort and cost.  So this is the -- this is

9   the estimate of what it would take to convert these assets

10  into cash proceeds.

11  Q    And what were the total Chapter 7 administrative costs?

12  A    Forty-two million on the low end and fifty-six million

13  on the high end.

14  Q    And then the next line down identifies the net proceeds

15  available for distribution.  How did you arrive at that

16  number?

17  A    Yeah.  So that is simply the total liquidation proceeds

18  less the total Chapter 7 administrative costs.  So the low

19  end -- the low end is 299 million and the high end is 542

20  million.

21  Q    And so now, once you've determined the net proceeds that

22  are available for distribution, what did you do next as far

23  as the liquidation analysis?

24  A    Yeah.  So, next, we move on to the next page, the

25  recovery waterfall.  So, essentially, here we identify the

1    value of claims, you know, whether it's administrative claims

2    -- you know, leveraging the company's balance sheet, unpaid

3    professional fees -- or filed claims, per the claims

4    register.  And the -- this would be liquidated claims that

5    were filed.  So the first column is the estimated value of

6    the various claims, categorized according to the priority in

7    which they would be -- they would receive proceeds.

8    Q    How do you then determine what the classes of each of

9    the claims that you've identified here would recover under

10   this liquidation analysis?

11   A    Yeah.  So, quite simply, we start with the net proceeds

12   available for distribution from the prior page and work our

13   way down this schedule.  We start with the superpriority

14   claims, which include the DIP loan, the unpaid Chapter 11

15   professional fees, as well as the U.S. Trustee fees.

16        And to the extent there are -- so the claim -- the total

17   claim value for this category, starting with the first

18   column, is 41 million.  And then you can see the recovery

19   percentages are a 100 percent, and the recovery dollars would

20   be 41 million, both in the low and the high.  That means

21   there are enough proceeds to pay out this class of claims at

22   100 percent.

23   Q    And then, just so we have it in the record, what were

24   the -- what recoveries did the various classes of claims that

25   you identified receive under this liquidation analysis?

1   A    The -- the superpriority claims receive 100 percent

2   recovery, both in the low and the high; the secured claims

3   receive 29 recovery in the low and 56 percent recovery in the

4   high; the administrative claims receive zero percent

5   recovery; the priority claims receive zero percent recovery;

6   the unsecured claims receive zero percent recovery, the

7   510(b) claims receive zero percent recovery; and equity

8   claims receive zero percent recovery.  And the percentages

9   I'm referring to are the recovery percentage columns, the low

10  and the high.

11  Q    And then, finally, Mr. Kocovski, I want to very, just

12  briefly touch on feasibility.  And I'm not even sure it's

13  really in dispute, but let's just make sure that we have it

14  in the record.

15       And so, to that end, can you describe for the Court what

16  type of analysis, if any, you have performed as to whether

17  the debtors would be able to meet their obligations under the

18  plan?

19  A    Yeah.  So, to that end, basically, we estimated what the

20  unpaid Chapter 11 professional fees would be at the end of

21  the case, as well as any remaining administrative or priority

22  claims, and that was the basis for developing the wind-down

23  budget.

24  Q    Okay.  And is it your understanding that the debtors

25  will be able to meet their obligations under the plan through

1    this wind-down budget?

2    A    Yes.

3              MR. ARNAULT:  And thank you very much, Mr.

4    Kocovski; I have no further questions for you.

5              And Your Honor, sorry.  Just as a matter of

6    housekeeping, could I move into evidence Debtors' Exhibit 42,

7    which is simply the full liquidation analysis that was

8    performed by Mr. Kocovski?

9              THE COURT:  Any objection?

10        (No verbal response)

11             THE COURT:  It's admitted.

12        (Debtors' Exhibit 42 received in evidence)

13             MR. ARNAULT:  Thank you, Your Honor.  I pass the

14   witness.

15             THE COURT:  Okay.  Thank you.

16             All right.  Mr. George, do you have questions for

17   Mr. Kocovski?  Mr. George, do you have --

18             MR. GEORGE:  Yes.

19             THE COURT:  -- questions for --

20             MR. GEORGE:  Yes, I --

21             THE COURT:  -- Mr. Kocovski?

22             MR. GEORGE:  I -- yes, I do, Judge.  I was pushing

23   the mute button off.  I'm sorry.

24             THE COURT:  That's okay.

25                            CROSS-EXAMINATION

Kocovski - Cross                              20

1   BY MR. GEORGE:

2   Q    Good morning, sir.  Can you help me walk through this

3   document, please?  You said you picked a date as of September

4   15th.  Why did you choose September 15th?

5   A    Well, because that was the estimated closing date for

6   the sale transaction, so the alternative would be either the

7   sale closing or the -- that the debtor would convert to

8   Chapter 7 and liquidate.

9   Q    Okay.  So, in here, you have included a deficiency claim

10  for the bank.  Do you know of anything under the plan that

11  allows the bank to retain a deficiency?

12  A    No.  But the plan also doesn't call for a Chapter 7

13  liquidation.

14  Q    Understood.

15       So did you ever try to value any of the potential causes

16  of action that the debtor had on the petition date?

17  A    No, we didn't.  You know, essentially, what this

18  analysis assumes is that any remaining causes of action would

19  really be the same in a Chapter 11 or a Chapter 7.

20  Additionally, and probably more importantly, I think, you

21  know, we look to the work that the UCC did.  And you know, it

22  appears they didn't determine that those actions were worth

23  pursuing, so we didn't do anything further on that front.

24  Q    Okay.  And you are not comparing what's coming under the

25  plan to the Chapter 7 liquidation, are you, in this document?

1    A    Sorry.  Could you repeat that question?

2    Q    You're not preparing what is proposed under the plan

3    with the Chapter 7 liquidation, are you?

4    A    No, this is not a comparison.  It is simply --

5    Q    Okay.

6    A    -- an estimate of what would occur in a Chapter 7.

7    Q    Okay.  Now did you make any effort to determine what

8    would happen if, on the petition date, a trustee was

9    appointed, abandoned the assets, and pursued any of these

10   causes of action that were transferred pursuant to the sale

11   order?

12   A    No, I did not.

13   Q    And are you aware, under the sale order, that, as soon

14   as the sale order is entered, that the bank is entitled to

15   take possession of the purchased assets without any further

16   order of the Bankruptcy Court?

17   A    Yeah, I'm generally aware of that construct.

18   Q    And you have on this assets available, net book value --

19   did you make adjustments to book value in order to --

20   A    Yeah.

21   Q    -- get to this --

22   A    (Indiscernible)

23   Q    -- net number?

24   A    Yes.

25   Q    Do you have those documents with you?  I'm sorry, sir.

1    Do you have those --

2    A    No, I can --

3    Q    -- documents?

4    A    I can tell you.  For the cash balance, we -- so,

5    generally -- so, generally, we used the July balance sheet as

6    being representative.  However, for the cash balance, we

7    relied on our cash forecast, the forecasted cash balance as

8    of the assumed conversion date.

9         Then the product portfolio, we do not have a value there

10   because not all of the company's (indiscernible) having

11   balance sheet value, so only purchased intellectual property

12   has a value on the balance sheet.  So we didn't think that

13   would be representative of the entire pool of assets in that

14   case.

15   Q    So how much did --

16   A    (Indiscernible)

17   Q    -- you reduce -- how much did you reduce that from its

18   original book value?

19   A    There -- there -- well, the original book value is --

20   was only for, I think, purchased intellectual property.  I

21   don't recall --

22   Q    Fair enough.

23   A    -- (indiscernible)

24   Q    I'm asking about the number, sir.  Just can you tell me

25   --

1   A    Oh.

2   Q    -- the numbers, the original numbers, and now the net

3   numbers?  That's what I'm asking you about.  Or do you not

4   have those in front of you?

5   A    No.  The net numbers are the original numbers, except

6   for those two cases that I just referenced:  Cash and the

7   product portfolio.  Those are the balance sheet numbers for

8   the debtors.

9   Q    Okay.  You're aware that there's 28 million in cash,

10  right?

11  A    Right.  But as I mentioned, cash was an area where we

12  relied on the forecasted cash balance, since we had --

13  theoretically, we would use forecasted asset values as -- as

14  of the conversion date.  We're using the July balance sheet

15  as a proxy for the forecasted book values.  And quite

16  frankly, it's not the book value that drives the recovery

17  percentage; it's what we think the assets would be worth in a

18  --

19  Q    Fair enough.

20  A    -- liquidation.

21  Q    Right.  But you'd agree that it's fair for me to ask

22  whether those numbers were booked and how you got to the net

23  numbers, right?

24  A    Yeah.  It's a fair question, yeah.

25  Q    Now did the company have any good will at the filing

1   date?

2   A    You know, I -- I don't know.  I'd have to -- I don't

3   remember --

4   Q    Well, did you --

5   A    -- (indiscernible) impaired, written off.

6   Q    Right.  And that's what --

7   A    (Indiscernible)

8   Q    -- I'm trying to get to.  The debtor wrote off

9   substantial good will, right?

10  A    Presumably.

11  Q    Through pre-petition adjustments or post-petition

12  adjustments?

13  A    Honestly, I don't even know.  It's -- it's really, from

14  our (indiscernible) on an asset that, you know, could be

15  monetized.  So it's just not an area that we would focus on.

16  It's more of (indiscernible) question.

17  Q    Well, if you -- we talk about the Fresenius purchase for

18  $4 billion, right?

19  A    Right.

20  Q    There's a component of it that's the value of the

21  assets, based on book or net book or however the debtor keeps

22  its books.  But there's another component, the difference

23  between, purportedly, the billion dollars in hard assets and

24  the purchase price, right?

25  A    Well, that -- so, yeah, if you view it that way.  I mean

1    --

2    Q    Okay.

3    A    I mean, I think --

4    Q    And in that event, that other thing, that thing that

5    makes up the difference between the billion and the 4 billion

6    is likely good will, isn't it?

7    A    If that deal had closed --

8    Q    Okay.

9    A    -- potentially, it would have --

10   Q    No, no, no.

11   A    -- (indiscernible)

12   Q    Right.

13              MR. ARNAULT:  Your Honor, can --

14   Q    And so --

15              THE COURT:  Mister --

16              MR. ARNAULT:  -- (indiscernible)

17              THE COURT:  Mr. George, I just have to interrupt.

18   Please let the witness finish.  I can't hear any of his

19   responses because you're --

20              MR. GEORGE:  Oh, I (indiscernible)

21              THE COURT:  -- interrupting him.  So allow Mr.

22   Kocovski to finish, so -- and then you can ask your next

23   question.  It's just difficult --

24              MR. GEORGE:  I'm sorry.

25              THE COURT:  -- through Zoom.  I -- and I --

Kocovski - Cross                                26

1          MR. GEORGE:  I'm --

2          THE COURT:  -- completely understand.

3          MR. GEORGE:  I apologize, Judge.  I'm sorry.  This

4     is --

5          THE COURT:  Okay.

6          MR. GEORGE:  -- a new world for me.

7          THE COURT:  Okay.  Mr. Kocovski, can you just -- if

8     you recall what your answer was, can you just answer again?

9     Because I didn't under -- I didn't hear your answer.

10         THE WITNESS:  I'm just saying, you know, what would

11    have -- the difference between the purchase price and the

12    book value of assets, if that deal had been closed, you know,

13    potentially, you know, Fresenius may have recorded it as good

14    will or some other intangible asset, but not -- not clear.

15    It doesn't mean it's an asset of Akorn.

16         MR. GEORGE:  Fair enough.

17    BY MR. GEORGE:

18    Q    Sir, did you make any effort to try to determine whether

19    there was a -- did you ever make an effort to try to

20    determine a going concern value for this company?

21    A    No, that was the purpose of (indiscernible)

22    Q    At the petition date, the company was a going concern,

23    right?

24    A    That's right.

25    Q    And it's still operating as a going concern, isn't it?

1   A    Yes.

2   Q    Except now, pursuant to the credit purchase transaction

3   and the sale order, the lenders are in control and possession

4   of the debtor, right?

5   A    That's correct.

6   Q    Did you ever try to value the company as a going

7   concern, taking into account the fact that there were a

8   number of governmental investigations going on with respect

9   Akorn, both pre- and post-petition?

10  A    No.  Like -- like I said, we didn't do a going concern

11  valuation.  That was the purpose of the sale process, to

12  determine what the going concern value of this business is.

13  Q    Well, the sale process determines the value for purposes

14  of determining the propriety of the purchase price, but that

15  doesn't necessarily mean that's the actual value of the

16  assets going over with respect to the confirmation of the

17  plan, does it?

18  A    So, if I were to try to determine a going concern value,

19  I would rely on what the -- I would rely on the sale process

20  and what the ultimate purchase price was, if there was a

21  price that exceeded the value of the term loans.

22  Q    Okay.  But again, there was never any effort to try to

23  compare that to the actual going concern value, right?

24  A    No, I would say that is actual, that market test was the

25  actual going concern value.

1    Q    And did -- and I think I asked you this, and I apologize

2    if I asked you before.  Did you make any assessment of what

3    would happen if the debtor filed and immediately was

4    converted to Chapter 7?

5    A    No, we did not.

6    Q    And in marketing the assets, did you -- were involved in

7    any way in marketing the assets?

8    A    I was involved in preparing some of the underlying

9    financial projections and responding to diligence requests.

10   Q    You -- did you say responding to due diligence requests?

11   A    That's right, yeah.

12   Q    And in the course of that due diligence investigation,

13   do you feel like you were armed with all of the information

14   you needed to tell the purchasers about this company?

15            MR. ARNAULT:  Your Honor --

16   A    (Indiscernible)

17            MR. ARNAULT:  -- I'm going to object here.  Sorry.

18   I'm going to interpose an objection.  I'm not sure this --

19   how this is relevant to the liquidation analysis, and

20   particularly in light of Your Honor's ruling on Tuesday with

21   respect to the sale motion.

22            THE COURT:  It certainly seems outside the scope of

23   the direct.  Mr. George, is there something that I'm missing

24   regarding that, the scope of the direct?

25            MR. GEORGE:  Your Honor -- I'll withdraw the

1    question, Judge.

2              THE COURT:   Okay.

3              MR. GEORGE:   Thank you.

4         (Pause in proceedings)

5    BY MR. GEORGE:

6    Q    Now, Mr. Kocovski, isn't it true that -- in 2018, that

7    the debtors spent almost $500 million in equipment

8    acquisitions?

9    A    (Indiscernible)

10   Q    Are you aware of that?  I'm sorry.

11   A    Over what time period?

12   Q    In the year 2018.

13   A    I'm not familiar with that.

14   Q    How did you value the product portfolio?  You put "N/A"

15   down there.

16   A    Well --

17   Q    Are you saying --

18   A    -- N/A (indiscernible)

19   Q    -- it has no value?

20   A    No.  The value is in the columns to the right, the

21   recovery value; that's the value.

22   Q    And so why did you put "N/A" there?  What does -- what

23   are you trying to show with the "N/A"?

24   A    Because -- because there isn't a representative book

25   value on the balance sheet for the entire product portfolio,

1    so we didn't want to short change that value, effectively.

2    And it was not -- the balance sheet was not a determinant for

3    what we would estimate as the recovery.

4    Q    So how did you use -- what -- how did you arrive at the

5    seventy-six- and the one-hundred-and-fifty-three- --

6    A    So --

7    Q    -- million-dollar numbers?

8    A    -- what -- what we did was we looked at the forecasted

9    annual revenue for the products, and we made an assumption

10   that products with annual revenue of $15 million or more

11   would be attractive to the potential buyer.  Then, for each

12   of those products, we deducted $2 million as an estimate of -

13   - for tech transfer costs, which -- which would be the

14   estimated cost to transfer the products to another company's

15   facilities and to re-qualify -- to qualify those facilities

16   to produce these products, qualify them with the FDA.

17          In total, there were about ten products that had the

18   revenue of over $15 million, four of which we excluded for

19   various reasons; one being that Akorn didn't own the

20   (indiscernible), one was discontinued so no future revenues,

21   and another one that was a new -- an expected new competitor

22   entrant, and then one of them was produced at (indiscernible)

23   which we valued separately.  So --

24   Q    And what are the --

25   A    -- we --

1   Q     I'm sorry.

2   A     We, basically -- so, in order to determine the value, we

3   -- for the high -- for the high end of the range, we used one

4   times annual revenue; and, for the low end of the range, we

5   used 0.5 times annual revenue.  So the one time annual

6   revenue is probably more in line with a going concern value,

7   which I think would be a fairly generous valuation, you know,

8   for these products, in -- in a liquidation --

9   Q     So --

10  A     -- scenario.

11  Q     So those assets you say you did value on a going

12  concern?

13  A     No.  No.  We used -- I said we used a one times revenue

14  multiple for the liquidation value of these assets.

15  Q     And you're saying that the one-time multiple is more

16  akin to what you would use in a going concern calculation?

17  A     It -- it would be -- it could be in the range of a going

18  concern calculation.  It's --

19  Q     Have you ever seen any of the debtors' books and records

20  with respect to adjustments to good will?

21  A     Not something I focused on.

22  Q     But I asked you if you had ever seen anything like that.

23  A     Have my eyes ever crossed a balance sheet that had a

24  line called "good will" on it?  Probably, but not anything

25  that I can recall with specificity.

1   Q     And so you're unaware of what the delta is of what the

2   debtor has on its books and records for good will, or had on

3   its records for good will at the petition date?

4   A     That's right, yeah.

5   Q     And in here, you have other assets.  What are the other

6   assets?

7   A     Primarily prepaid insurance and other miscellaneous

8   deposits.

9   Q     And so --

10  A     And those (indiscernible)

11  Q     -- (indiscernible) I'm sorry.

12  A     I don't think we could get much.

13            MR. GEORGE:  Your Honor, can I ask the witness just

14  to repeat that?  The audio broke up on it and I'm -- it came

15  through --

16            THE WITNESS:  Yeah, that's fine.

17            MR. GEORGE:  -- garbled here.

18            THE WITNESS:  Sorry.  As you can see, we don't have

19  significant recovery on those assets.

20  BY MR. GEORGE:

21  Q     And what are those, prepaid what?

22  A     I think prepaid insurance would be the largest

23  component.

24  Q     Now, in this calculation, did you include the hundred-

25  million-dollar tax refund that the debtor applied for?

Kocovski - Cross                                    33

1   A    Yes.  Well, it's not a hundred.  I mean, we -- do you

2   mean the thirty-four-million-dollar tax refund?

3   Q    Well, the NOL is a hundred; the tax attribute that

4   results from it is thirty-right?

5   A    Yeah.  So, under prepaid expenses, you see the low end

6   of the recovery is 36 million.  That's basically the tax

7   refund is about 34 million of that.  So we assume, even in

8   the low end of the recovery, we'd get 100 percent of that tax

9   refund.

10  Q    And does that assume a liquidation of the company with

11  the liquidation of its corporate shell, or just a liquidation

12  of the hard assets?

13  A    Liquidation of assets.

14  Q    And so how would the debtor, if it didn't sell its

15  shell, generate any money from that NOL?

16  A    Well, it would generate the tax returns.  It's -- that's

17  the tax refund here, the 34 million.

18  Q    Okay.  And where is the $7 million that was upstreamed

19  from the (indiscernible) sale?

20  A    That's in the -- in the cash balance.

21  Q    And so now we go through Akorn AG, Hettlingen,

22  Switzerland.  Can you just walk us through that documentation

23  of --

24  A    Yeah, so that --

25  Q    -- the asset book value?

1    A    Yeah, so the column on the left, the net book value,

2    represents the net book value of the Akorn AG balance sheet,

3    essentially the equity value.  And we assumed a recovery

4    range of 25 to 50 percent of the book value.

5    Q    And why did you do that?

6    A    Well, one, we did not have an explicit going concern

7    valuation for this -- for this entity.  Two, this -- this is

8    essentially just a contract manufacturer on behalf of Akorn.

9    So in a Chapter 7 liquidation -- which we have an assumed

10   time frame of six months to liquidate all the assets -- we're

11   essentially assuming that we sell the assets.

12        And one thing I will point out, I think even the values

13   that we have here are at considerable risk because, if we

14   just sold the assets, there could even potentially -- and the

15   purchaser didn't take the employees along with it, there

16   could be considerable severance costs related to exiting,

17   really monetizing these assets and repatriating the proceeds.

18   Q    So you didn't include Akorn AG Hettlingen at a going

19   concern value.  But do you have any reason to believe that

20   that entity is not operating in Switzerland?

21   A    It's operating, but it's operating to produce the

22   products of the debtors, so this --

23   Q    Understood.

24   A    This is a hypothetical liquidation under Chapter 7, not

25   a going concern sale.

1   Q    And as far as that, you calculated that over 50 percent

2   of value could potentially be lost.

3   A    That's right, yeah.

4   Q    And that's 50 percent of the net asset value, not the

5   going concern value.

6   A    Well, the going concern value isn't known.

7   Q    I'm sorry?

8   A    There is no going concern value to refer to.

9   Q    So Hettlingen -- so the Akorn AG, Hettlingen,

10  Switzerland, there's no going concern value?

11  A    Yeah, that -- that value hasn't been determined, is my

12  point.

13  Q    Oh, okay.

14  A    And not only that, again, I said this is a liquidation.

15  It's not a going concern sale.

16  Q    Understood.

17       Did you try to value any of the debtors' interests in

18  any of its affiliates?

19  A    Well, this -- this is the -- the estimated valuation of

20  the debtors' interests in Akorn AG.

21  Q    Yes, I --

22  A    This is (indiscernible)

23  Q    Fair enough, sir.

24       How about an of the other affiliates or subsidiaries;

25  did you try to value their interests in any of those?

1   A    We didn't think there was a value in any other

2   interests.

3   Q    But you didn't list them and put zeros; you just didn't

4   put anything, right?

5   A    Well, the India -- India has already been sold, so those

6   proceeds are already included in the cash balance.

7   Q    That -- sir, that wasn't --

8   A    (Indiscernible)

9   Q    I don't think that was the question that -- I'm sorry.

10  A    Yeah.

11  Q    I didn't mean to interrupt you; I thought you were done.

12       But sir, that wasn't the question --

13  A    The --

14  Q    -- I asked you.  I asked you whether you actually tried

15  to value any of those affiliates, not whether there was any

16  value.  Did you try to value any of those affiliates?

17  A    No.

18       MR. GEORGE:  Just a moment, Your Honor, if I could

19  just have three minutes.

20       THE COURT:  Certainly.

21   (Off the record.  Back on the record)

22       MR. GEORGE:  Thank you, Your Honor.  Your Honor, I

23  think I only have a couple of more questions.

24  BY MR. GEORGE:

25  Q    Did you ever attempt to value any of the avoidance

Kocovski - Cross                                    37

1    claims?

2    A    No.  I think I already mentioned that.  No, we did not.

3    Q    All right.  And did you ever try to assess the effect of

4    any potential governmental investigation on the value of

5    these assets?

6    A    No, didn't think it was applicable for this purpose.

7    Q    Were you aware of the pending DOJ criminal

8    investigation?

9    A    I'm not even sure, to be honest.

10         MR. GEORGE:  Okay.  I don't have anything further,

11   Your Honor.

12         THE COURT:  Okay.  Thank you, Mr. George.

13         Is there anyone else who would like to cross-

14   examine the witness?

15         MR. PARKER:  Your Honor, Michael Parker on behalf

16   of ProvePharm.  I'm trying to get my screen up here.  There

17   we go.

18         THE COURT:  Okay, Mr. Parker.  There you are.

19   Okay.  Go ahead, sir.

20                    CROSS-EXAMINATION

21   BY MR. PARKER:

22   Q    Good morning, Mr. Kocovski.  My name is Michael Parker,

23   I'm counsel for ProvePharm.  Just a couple of questions here,

24   I believe.

25         First off, exhibit -- Debtors' Exhibit 42, the

1    liquidation analysis.  When did you prepare that?

2    A    We finalized it last week.

3    Q    Okay.  So it was filed on 8/28, so it was sometime last

4    week.  Okay.

5    A    Yep.

6    Q    And the demonstrative that was shown this morning, which

7    is very similar to the liquidation analysis, when did you

8    prepare that?

9    A    A couple of days ago.  I mean, it's -- it's just an

10   extract of the liquidation analysis.

11   Q    Okay.  Did either of the -- either the demonstrative or

12   the liquidation analysis take into account the fact that the

13   Court filed a sale order on Wednesday morning?

14   A    No.

15   Q    Okay.  I'll point you to Exhibit 42, Page 2, to your

16   assumptions under the liquidation analysis.  It looks like

17   it's four lines down.  If you'll take a look at that and read

18   the line starting "the liquidation analysis," please.

19   A    Page 2 of 7, "the liquidation analysis presents" -- I'm

20   sorry.

21   Q    "A hypothetical liquidation analysis on the document

22   filed."  Maybe I'm looking at a different document.  Well,

23   I've got the liquidation analysis.  The hypothetical

24   liquidation analysis, the very beginning of it, about four

25   lines down.

1    A    The very beginning?

2    Q    Yes, sir.

3    A    Four lines down, where it says "this liquidation

4    analysis"?

5    Q    Correct.

6    A    Okay.

7             "This liquidation analysis, one, estimates the cash

8    proceeds that a Chapter 7 Trustee would generate if the

9    debtors' Chapter 11 cases were converted to a Chapter 7 case

10   on the closing date, and the assets of the debtors' estate

11   were liquidated in a forced sale scenario; and, two" --

12   Q    Okay.

13   A         -- "estimates that" --

14   Q    I'm sorry.  That first assumption, if we can, please.

15   A    I'm sorry (indiscernible)

16   Q    (Indiscernible)

17   A    Can you repeat the question?  You broke up a little bit.

18   Q    Yeah.  Let's focus on just what you read there, just

19   that first assumption, if we could, please.

20   A    Okay.

21   Q    So do you believe it more likely than not that the

22   closing of the sale is now going to occur, given that a sale

23   order has been entered?

24   A    That would be my assumption.

25   Q    So why would it -- why would it be fair to assume that

Kocovski - Cross                          40

1   there will be no closing date and these assets are projected

2   as of no closing date?

3   A    Well, if there's a -- there can only be a liquidation if

4   there's not a sale closing.

5   Q    All right.  Let me come at this a different way.  On

6   your spreadsheet for the -- we can go either the

7   demonstrative or the liquidation analysis, under the assets

8   available for distribution.  Is it fair to say that, under

9   the -- I'm sorry.  I'll let you get to it first.

10  A    Yeah, I'm there.

11  Q    Okay.  Under the assets of the U.S. debtor entities that

12  are available for distribution, is it fair to say that the

13  cash, the accounts receivable, the inventory, the prepaid,

14  all of those assets, those were pretty much purchased by the

15  term loan lenders in the sale?

16  A    Yes.

17  Q    Okay.  And under the recovery waterfall, where it says

18  secured claims of the pre-petition term lenders at $892

19  million, isn't it fair to say that that obligation goes away,

20  now that the sale has been approved?

21  A    It -- it's (indiscernible) yeah, I mean, I -- yeah, I

22  guess the -- they would receive assets of the debtors, in

23  lieu of this --

24  Q    Okay.

25  A    -- obligation.

1          MR. PARKER:  Okay.  Your Honor, that's all I have.

2          THE COURT:  Okay.  Thank you, Mr. Parker.

3          Is there anyone else who wishes to cross-examine

4    the witness?

5        (No verbal response)

6          THE COURT:  Okay.  I'm not hearing anyone.

7          So, Mr. Arnault, do you have any redirect for the

8    witness?

9          MR. ARNAULT:  No redirect, Your Honor.

10          THE COURT:  Okay.  Mr. Kocovski, thank you very

11    much for your time and energy this morning, appreciate your

12    efforts today.  You are released from the virtual witness

13    box.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  Thank you.  Have a nice day.

16        (Witness excused)

17          THE COURT:  Okay.  Mr. Arnault?

18          MR. ARNAULT:  Yes, Your Honor.  Before the debtors

19    rest, one final matter of housekeeping, and again, just so we

20    have it in the record.  We would seek to move into evidence

21    both the voting declaration and the affidavit of

22    solicitation, which are Debtors' Exhibits 28 and 47,

23    respectively.

24          THE COURT:  Any objection to the admission of these

25    declarations?

1          (No verbal response)

2              THE COURT:  Okay.  I hear none.  They're admitted.

3          (Debtors' Exhibit 28 received in evidence)

4          (Debtors' Exhibit 47 received in evidence)

5              THE COURT:  And does anyone wish to cross-examine

6      those witnesses?

7          (No verbal response)

8              THE COURT:  Okay.  Thank you all very much.

9              MR. ARNAULT:  All right.  Thank you, Your Honor.

10     And with that, the debtors rest.

11             THE COURT:  Okay.  Thank you, Mr. Arnault.

12             Mr. George, I understand that you're going to be

13     calling Mr. Portwood to the stand.  Is that correct?

14             MR. GEORGE:  Yes, Your Honor, just for a handful of

15     questions.

16             THE COURT:  Okay.  And are you ready to do so now?

17             MR. GEORGE:  I am.

18             THE COURT:  Okay.  Mr. Portwood, are you on Zoom,

19     sir?

20             THE WITNESS:  I am.

21             THE COURT:  Okay.  Can you turn your video on,

22     please?  Okay.  There you are, we see you now.  Welcome.  Mr.

23     Lugano is going to swear you in, and then Mr. George can

24     begin his questioning.

25     DUANE PORTWOOD, WITNESS FOR THE MDL OBJECTORS, AFFIRMED

1          THE ECRO:  Please state your full name for the

2     record and spell your last.

3          THE WITNESS:  My full name is Duane Andrew

4     Portwood, the last name is spelled P, as in Paul, o-r-t-w-o-

5     o-d.

6          THE ECRO:  Thank you, sir.

7          THE WITNESS:  Thank you.

8                    DIRECT EXAMINATION

9     BY MR. GEORGE:

10    Q    Good morning, sir.

11    A    Good morning.

12    Q    Can you tell me what your position is with the debtor?

13    A    I'm the Executive Vice President and Chief Financial

14    Officer for Akorn.

15    Q    And are you responsible, or were you responsible for the

16    creation of the debtors' statement of financial affairs and

17    the schedules of assets and liabilities?

18    A    Yes, sir, with the -- I supervised a team that put that

19    together, correct.

20    Q    Okay.  And when you signed the schedules and statements

21    of affairs, you understand you signed those under oath that

22    they were true and accurate, right?

23    A    Yes, sir.

24    Q    And were you aware of a subpoena that was issued to

25    Akorn in connection with a criminal investigation being

1   conducted by the Department of Justice when you filled out

2   those schedules and statements of affairs?

3   A    I'm aware of the -- of the investigation that is

4   covering most of the generics industry, yes.

5   Q    I'm asking:  Were you aware at the time that you

6   executed these documents under oath and said that they were

7   true and correct under penalty of perjury?

8   A    Yes, sir.

9   Q    Did you know that?

10       Can you go to --

11  A    Yes.

12  Q    -- I think it's Page 375 of Exhibit Number 46, which is

13  the statement of financial affairs?

14  A    Is this in our exhibits or yours?

15  Q    It's in our exhibits, in MDL Exhibit Number 46.  It may

16  be a single document.  I don't know whether Mr. Arnault

17  provided it --

18  A    Oh --

19  Q    -- to you or not, if -- it may not be in --

20  A    No.  Is this the one you sent today?

21  Q    Yes, sir.

22            MR. ARNAULT:  Duane, this is the one -- sorry.

23  Duane, this is the one that came in this morning, that's

24  right.

25            THE WITNESS:  Okay.

1          MR. ARNAULT:  So it should be electronic.

2          THE WITNESS:  (Indiscernible) let me -- okay.  Let

3     me call up the document.

4          THE COURT:  Mr. George, what page?

5          MR. GEORGE:  Your Honor, I think it's Page 375.

6          (Pause in proceedings)

7     BY MR. GEORGE:

8     Q    I believe it's Question 7, sir, "Legal Action"

9     (indiscernible)

10    A    That's correct.  I'm scrolling.  Hold on.

11    Q    Now you listed here, in 7.7, an investigation by the FBI

12    regarding the New Jersey Division data breach.  Did the

13    company receive a subpoena for that?

14         THE COURT:  Let's make sure Mr. Portwood is at that

15    particular page first, before we begin the questioning.

16         MR. GEORGE:  Okay.

17         THE COURT:  Are you there, sir?

18         THE WITNESS:  I am, Your Honor.

19         THE COURT:  Okay.  Great.

20    BY MR. GEORGE:

21    Q    7.7, sir, I'm speaking about specifically.

22    A    Yes.

23    Q    Did the company receive a subpoena in connection with

24    that investigation?

25    A    I'm not sure.

Portwood - Direct                                    46

1    Q    Well, why did you list this; what did you know about

2    that investigation?

3    A    That there was -- I think, as Joe talked about

4    yesterday, this has to do with the employees and a potential

5    data breach and (indiscernible) legal items --

6              MR. GEORGE:  Your Honor --

7    A    -- surrounding that.

8              MR. GEORGE:  Can you hear him?  I can't really hear

9    him, Judge.

10             THE COURT:  I agree.  Mr. Portwood, I think you're

11   a little bit muffled, sir.  It might be the -- it might be

12   the headphones, I'm not sure.  But maybe you could bring up

13   the --

14             MR. GEORGE:  (Indiscernible)

15             THE COURT:  -- microphone a little closer, that

16   would maybe clear it up.

17             THE WITNESS:  Can you hear me now?

18             THE COURT:  Yes, that's a little -- that's much

19   clearer.

20             THE WITNESS:  Okay.

21             MR. GEORGE:  Yes, that's much better, sir.

22             THE WITNESS:  Sorry about that.

23             MR. GEORGE:  Thank you.

24             THE COURT:  And if you wouldn't mind repeating your

25   answer, I missed some of that.

Portwood - Direct                              47

1          THE WITNESS:  Yes, Your Honor.  So I don't know the

2    particulars of that investigation.  I know -- I know that

3    there's -- that has to do with a matter that Joe talked about

4    yesterday, related to an employee and a potential data breach

5    at -- at our New Jersey facilities.

6    BY MR. GEORGE:

7    Q    Now did you receive a subpoena from the Government in

8    connection with an antitrust investigation at Akorn?

9    A    I believe so.

10   Q    And why didn't you list that here under proceedings that

11   were pending?

12   A    I'm -- I'm not -- I'm not sure.  I -- I -- I'm aware

13   that we listed the -- all that we knew about, as far as

14   (indiscernible) I'm not sure.

15   Q    Well, you're aware that this is a document, right, sir,

16   that creditors are supposed to be able to rely on, so that,

17   when you're questioned at the 341 meeting, they can ask you

18   about all of these kind of claims?

19   A    Yes, sir.

20   Q    And you'd agree, wouldn't you, that, if the company was

21   under a pending and continuing criminal investigation, that

22   might be something that creditors might be interested in

23   asking you about?

24   A    Yes, sir.

25   Q    So what was the reason for not including that?  Were you

Portwood - Direct

48

1   trying to protect someone inside of the company?

2   A    No.  If it's not included, it was an oversight.

3   Q    It was an oversight.  A pending criminal investigation

4   by the Department of Justice that was both pre- and post-

5   petition, that was an oversight.  That's your testimony?

6   A    Yes, sir.

7   Q    Did you tell anybody about it, anybody in this case who

8   wasn't your own lawyers?

9   A    This is the first time I've been asked about it in this

10   -- in this form.

11   Q    Well, I didn't ask whether anybody asked you.  I asked

12   whether you had volunteered any of that information?

13   A    No.  All the information that we -- that was entered is,

14   I think, part of the record, and the plan and other

15   documents.

16   Q    Sir, that's not what I asked you.  I asked you:  Did you

17   tell any single person, other than potentially your lawyers,

18   about this Department of Justice investigation?  Did you tell

19   the United States Trustee's Office?

20   A    I have not.

21   Q    Were you interviewed when the Department of Justice set

22   up the Official Committee of Unsecured Creditors?

23   A    No.

24   Q    Did anybody at the company reveal to the Office of the

25   United States Trustee that Rising Sun, one of the committee

 1    members, paid a hundred-and-sixty-nine-million-dollar fine in

 2    connection with antitrust activity?  Did you know that or

 3    volunteer that information to the United States Trustee?

 4              MR. ARNAULT:  Your Honor, I'm going to object.

 5    Again, this mischaracterizes the evidence and is inconsistent

 6    with what Ms. Steege stated on the record with respect to

 7    Rising Pharmaceuticals, that it's just not the case.  And

 8    this is a misleading line of questioning, and again, it

 9    assumes facts that aren't in evidence.

10              MR. GEORGE:  Fair enough.

11    BY MR. GEORGE:

12    Q    Were you aware --

13              THE COURT:  Sustained.  You can rephrase the

14    question, if you want, Mr. George.

15              MR. GEORGE:  Yes, Judge.

16    BY MR. GEORGE:

17    Q    Were you aware that Rising Sun Pharmaceutical, a

18    committee member, was the subject of an antitrust inquiry?

19    A    No.

20              MR. ARNAULT:  And I'm going to object -- sorry,

21    Your Honor.  Well, it's fine, he answered.  But again, this

22    is also irrelevant.  These are questions for the U.S. Trustee

23    or the UCC, not the CFO of the company.

24              MR. GEORGE:  Your Honor, I beg to differ.  I think

25    it's completely relevant when you have someone who's supposed

1    to be the Chief Financial Officer of this company that knows

2    that there's a criminal investigation of the activities of

3    this company and didn't disclose it.  I think it's fair for

4    me to ask him about what other information he didn't disclose

5    that he may have known about.

6              THE COURT:  And what is the --

7              MR. GEORGE:  It's absolutely --

8              THE COURT:  And what does that go to, exactly, with

9    respect to your objection to the plan?

10             MR. GEORGE:  It goes to the good faith, Judge, of

11   what was -- what this debtor is doing here, that this debtor

12   is taking actions in bad faith.  They're concealing

13   information from creditors, significant information that

14   could have impacted the outcome of this proceeding from early

15   on.

16             And we're going to argue, Judge, that, if the U.S.

17   Trustee saw this pending criminal investigation, a very

18   chance at least an examiner, potentially a Chapter 7 Trustee

19   -- these are people accused of bad acts, Judge, and they're

20   all in management.  And I don't think I have to go too far to

21   refresh everyone's recollection about the testimony that came

22   out in this case about why this company is where it is today.

23   And that's the reason why I think this is relevant.

24             THE COURT:  Well, why don't we keep --

25             MR. ARNAULT:  And Your Honor --

1          THE COURT:  -- it on a short leash, Mr. George.

2          MR. GEORGE:  Fair enough, Judge.

3          MR. ARNAULT:  And just -- sorry, Your Honor.  Just

4    to make the point that this information was disclosed in the

5    disclosure statement, with respect to the MDL litigation,

6    which was then approved by the Court.  So, to the extent that

7    there are any objections relating to disclosure statements,

8    those two are moot and irrelevant to what we're trying to

9    accomplish here.

10          THE COURT:  I understand.

11          MR. GEORGE:  Well, Your Honor, I disagree --

12          THE COURT:  I understand, and this isn't the time

13   to make closings.  Okay?

14          MR. GEORGE:  Understood, Judge.

15          THE COURT:  Let's go forward and get Mr. Portwood

16   finished here.

17   BY MR. GEORGE:

18   Q    Were you aware that Mr. Boothe was the subject of a

19   lawsuit in Connecticut, where he was named as a defendant in

20   antitrust litigation?  Were you aware of that?

21   A    Yeah, I became aware of it at some point last year or

22   some point this year.

23   Q    When was it, last year or this year?

24   A    Actually, I -- I don't recall exactly the time.

25   Q    Do you know -- was the potential exposure to the claims

1    of the MDL litigants or the antitrust litigation, was that

2    one of the principal factors for the filing of the Chapter

3    11?

4    A    Not in my opinion, no.

5    Q    Was there a reason, in the initial disclosure statement,

6    you never mentioned the MDL litigation?

7    A    I'm not aware of any reason.  Apparently, it's been

8    disclosed subsequent to this.  But the -- in the original,

9    no, I don't know.

10   Q    Well, did you authorize the filing of the initial

11   disclosure statement?

12   A    Yes.

13   Q    Was the potential exposure to the MDL claims or the

14   antitrust litigation being brought by the MDL plaintiffs, was

15   that discussed as one of the reasons for the filing?

16   A    I -- well, because we went through the sales process

17   that's been discussed, the litigation items were -- were

18   oftentimes discussed in the due diligence.  Sometimes that

19   was part of those; sometimes that wasn't.  But

20   (indiscernible) pieces of litigation are really discussed

21   with the shareholder litigation, as well as the Fresenius

22   litigation.

23   Q    Was the subpoena from the Government in the data room,

24   the subpoena from the Government on the antitrust

25   investigation, was that in the data room for purchasers?

1   A    I'm -- I'm not sure.

2   Q    Do you know that would have been something that

3   purchasers would have wanted to see?

4   A    I don't know what they would want to see.

5   Q    Well, do you think purchasers would be interested, if

6   they were buying the company as a going concern, that there

7   was a pending antitrust litigation against it?

8   A    (Indiscernible) there was (indiscernible) due diligence

9   done in every aspect of the company, so I imagine it was

10  discussed in the legal due diligence meetings that, like I

11  said, I wasn't involved with most of those.

12          MR. GEORGE:  Your Honor, can you ask Mr. Portwood

13  to lean up again?  He was doing pretty good there, and now

14  he's back to that kind of muffled -- and I don't know if it's

15  just my --

16          THE WITNESS:  I'm sorry.  Sir, I can -- I can

17  repeat.

18          THE COURT:  That would be great.

19          THE WITNESS:  My answer was the -- everybody that

20  did diligence on us did -- did significant diligence on us.

21  I wasn't involved with other particular meetings,

22  particularly on the legal side.  Whether or not the MDL was

23  discussed there or -- or not, I -- I can't say.  But given -

24  - given the velocity at which diligence was performed, it

25  wouldn't -- I'd imagine that it was.

1  BY MR. GEORGE:

2  Q    Have the term lenders begun to take possession of the

3  company?

4  A    We haven't closed the transaction yet, so no.

5  Q    Have they sent anybody over to the company to monitor

6  its operations between now and the closing?

7  A    Not to my knowledge, no.

8  Q    Is that something intended to be done any time soon?

9  A    I -- well, my understanding is now we'll finish the --

10  we'll finalize the asset purchase agreement, sign it, and at

11  that point, then they'll -- they'll own the company.  In the

12  meantime, we -- we are -- we've been in contact with -- with

13  the lender group advisors for over a year and a half now, so

14  they're -- they're well aware of what's -- what's happening

15  from an operational perspective.

16  Q    So were the term lenders aware of the subpoena that was

17  received from the Government, to your knowledge?

18  A    I don't -- I don't know.

19  Q    Did you ever tell them?

20  A    No, I -- I never personally discussed, really, any legal

21  matters.  That's not my -- that's not my area of expertise.

22          MR. GEORGE:  Your Honor, we'd move in MDL 46.

23          THE COURT:  Okay.  Any objection?

24          MR. ARNAULT:  No objection, Your Honor.

25          THE COURT:  Okay.  It's admitted.

1        (MDL Exhibit 46 received in evidence)

2               MR. GEORGE:  I don't have anything further for this

3    witness, Judge.

4               THE COURT:  Okay.  Thank you, Mr. George.

5               Mr. Arnault, any questions?

6               MR. ARNAULT:  No questions, Your Honor.  Thank you.

7               THE COURT:  Okay.  Anyone else?

8         (No verbal response)

9               THE COURT:  Okay.  Thank you, Mr. Portwood,

10   appreciate your time and energy today.  You are released from

11   the witness stand, and you can go about your day as you see

12   fit.

13              THE WITNESS:  Thank you, Your Honor.

14        (Witness excused)

15              THE COURT:  Okay.  Any other witnesses?

16        (No verbal response)

17              THE COURT:  Any other evidence?

18        (No verbal response)

19              THE COURT:  Okay.  So this closes the evidentiary

20   portion of the confirmation proceedings.

21              How would we like to move forward?  Should we take

22   a -- can we take a quick break and then we'll go into

23   argument?

24              MR. ARNAULT:  We're ready when you are, Your Honor.

25              THE COURT:  Okay.  I need to take a quick break.

1    So let's come back on in five minutes, just a short break.

2              MR. ARNAULT:  Thank you, Judge.

3              THE COURT:  So I'll see you all at 10:30.  Okay.

4    Thank you.

5         (Recess taken at 10:25 a.m.)

6         (Proceedings resumed at 10:30 a.m.)

7              THE COURT:  Apologies for the delay.

8              Mr. Nash, why don't we go right into your argument

9    if you're ready to proceed.

10        (No verbal response)

11             THE COURT:  Mr. Nash, you are on mute or you

12   dropped off of CourtCall.  Okay.  There you go.  I can hear

13   you.

14             MR. NASH:  Okay.  Good.  Thank you, Judge.

15             Your Honor, I think I'm going to be pretty brief.

16   I want to -- you know, this plan that we seek confirmation of

17   today its relevant to think about the plan in the context of

18   when we filed it.  We started these cases with a stalking

19   horse, you know, sale and procedures motion and a day or two

20   after we filed the cases we filed the liquidating plan and

21   we've been pursuing confirmation of the liquidating plan on a

22   parallel path.

23             I think it's relevant, Your Honor, you know, as we

24   were leading up to the petition date it took a fair amount of

25   discussion and negotiation with the term loan lenders to

1    allow a portion of their DIP financing to be used to pursue

2    on a parallel path a liquidating plan.  The term loan lender

3    initial bias was, clearly, we don't want to do that, we don't

4    need to do that, we've got a stalking horse bid, we want to

5    do this under a 363 process.  What you do with the end of the

6    363 process is up to you, but it's not our issue as impaired

7    term loan lenders.

8         We prevailed, Your Honor, upon the stalking horse

9    purchaser to allow us to pursue a liquidating path on a

10    parallel track because, you know, we wanted to be in a

11    position -- and I know the court, Your Honor, and courts

12    generally, you know, favor confirming plans and not getting

13    to the end of a 363 sale process where everybody looks around

14    the room and says what do we do now.

15         The good news is that one way or another we are at

16    the end of these cases.  And when we filed the plan that we

17    filed, Your Honor, it's a pretty garden variety plan.  It has

18    eight classes of creditors.  I won't, you know, list them off

19    now, but what we filed was a waterfall plan and we had every

20    hope and depending on which debtor advisor you talked to we

21    had varying degrees of expectation about the possibility that

22    there would be an overbid and we'd be sitting here this week

23    with a pot of cash that we would, you know, above and beyond

24    what the term loan is, and we would have a pot of cash to

25    distribute under that plan in that scenario.

1          That is what we were hoping for.  That is what we

2     worked for.  And as Your Honor heard voluminous evidence

3     about, you know, the prepetition process and all the efforts

4     that were made to, in the first instance, refinance the term

5     loan, in the second interest perhaps sell the company outside

6     of Bankruptcy Court, and the whole lead up to where we got

7     too.  And Your Honor heard a lot about, you know, the efforts

8     post-petition to continue to market the assets.

9          As Your Honor knows there was, you know, an ad hoc

10    equity group that formed, sought official status. I can't

11    recall, Your Honor, if the debtor's letter to the U.S.

12    Trustee in response to that request was filed or not, but I

13    can tell Your Honor that the gist and the substance of our

14    response to the U.S. Trustees Office was that an official

15    equity committee wasn't necessary because these debtors were

16    committed to doing everything that we can to maximize value.

17         If there was an equity group that wanted to work

18    with us within the bidding procedures or outside of the

19    bidding procedures they had our commitment that we were going

20    to do everything we could to try to get them over the finish

21    line.  And as Your Honor knows and heard testimony about,

22    there was a group that formed and they were advancing a

23    proposal that would have seen existing equity survive these

24    cases and be part of the reorganized capital structure.

25         They made a lot of progress. And the only reason

1    they made a lot of progress is because this board, this

2    management team, these debtor advisors worked strenuously

3    with them and our term loan lenders, Your Honor, were very

4    accommodating; far from this being some scheme for the term

5    loan lenders to, you know, own this company out from under

6    any particular stakeholder.

7         The record is very clear that there were extensive

8    efforts made to try to avoid this result.  It's also the

9    case, Your Honor, that we're dealing with a widely syndicated

10   term loan, the holders of which -- many of the holders of

11   which are CLO's.  This is not, never was some loan to own

12   strategy.

13        As we were in the month of August, Your Honor, and

14   making progress with that ad hoc equity group it was clear to

15   the debtors that they needed a little more time, and we

16   reached out to our term loan lenders.  We were originally

17   scheduled to be in front of Your Honor on August 20th.  As

18   Your Honor, the reason we moved the confirmation date to

19   September 1st with the term loan lender's consent and

20   blessing, and they would have been happy to have been taken

21   out, we did that, Your Honor, in order to truly run out, you

22   know, that last leg of that ground ball as it relates to the

23   other potential overbid.

24        Your Honor can take judicial notice of the fact

25   that you haven't heard from anybody in these proceedings from

1    that group objecting to the process.  Your Honor is very used

2    to -- you would not have been surprised, I would submit, Your

3    Honor, had you heard from anybody in that group about how

4    close they came or some aspect of something being unfair.

5    And Your Honor didn't hear any of that because we did

6    everything that we could to try to get that bid over the

7    finish line.

8         That bid, Your Honor, would have resulted,

9    necessarily, with existing equity surviving. It would have

10   necessarily resulted in a recovery, probably would have had

11   to have been by agreement, but it would have resulted in a

12   recovery for the three remaining plan objectors that we have.

13   Of course, Fresenius, the MDL plaintiffs and Provepharm.

14        Your Honor, another point that I want to highlight

15   is, you know, when we started these cases we didn't know what

16   the pool of unsecured creditors would be when we got to the

17   end of these cases.  We didn't know if the term loan lenders

18   were going to be the winning bidder or not.  The term loan

19   lenders on the petition date had no idea which contracts they

20   wanted to assume as opposed to which contracts they didn't

21   want to assume.

22        Our working assumption, Your Honor, when, you know,

23   these cases started and in my first conversation with Ms.

24   Steege -- you know, very experienced, long time bankruptcy

25   professional, counsel to the UCC.   My initial conversation

1    with Ms. Steege, I told her that my best sense was that when

2    we got to the end of this sale process there would be about

3    $11 million dollars of what I will call un-assumed, make, you

4    know, leftover regular way trade claims.

5         As we moved through the process where we were

6    trying to see if there was something higher and better then

7    the term loan lender bid, as we got closer to the end of the

8    process, when we then had greater visibility into which

9    contracts were being assumed, et cetera, you know, we started

10   to zero in on a, what I'll call, regular way, non-disputed

11   unsecured claim denominator of something more than four,

12   something less than $5 million dollars.

13        And then, you know, in terms of Ms. Steege

14   negotiating with the term loan lenders about how to best

15   handle, you know, where we were at and how to cut a deal with

16   the UCC I would submit that from the perspective of the --

17   and I want to be very transparent, Your Honor, about what

18   we're doing and not doing because I think it's obvious from

19   the record, and we're certainly not trying to obfuscate

20   anything.

21        I think from the perspective of the term loan

22   lenders they would have been very comfortable just providing

23   a pot of money and, you know, letting the unsecured creditors

24   fight over that pot of money.  But when we really started to

25   focus on who our existing unsecured creditors are, who is

1      that universe, who makes up that pool of creditors, we have a

2      very, you know, relatively speaking, small, you know, regular

3      way unsecured claims denominator pool.

4            Then we have Fresenius who the debtors, you know,

5      take the view in front of the Vice Chancellor that their

6      claim is zero. The debtors take the view that they exercised

7      termination right and that that is, you know, all they are

8      entitled to as it relates to that contract.  Fresenius, of

9      course, takes a different view.  The think they've got a

10     damages claim of as much as $74 million dollars.

11           As Your Honor knows it's also the debtor's view

12     that that is a subordinated claim.  So, you know, that isn't

13     the kind of claim that we were going to be able to deal with

14     as part of our negotiations with the UCC and the term loan

15     lenders.  Then you have Mr. George's clients, you know.

16           We keep talking about, Your Honor, the MDL

17     plaintiffs.  The reality is that there are many MDL

18     plaintiffs.  I believe Mr. George represents three benefit

19     funds.  He represents a small subset of the universe of MDL

20     plaintiffs.  None of the other MDL plaintiffs are here

21     objecting to our plan.  Mr. George is, of course, entitled

22     and has had his day in court.

23           You know, as Your Honor knows from everything Mr.

24     George has filed and from what you have seen over the last

25     couple of days he believes that he is entitled to hundreds,

63

1    if not billions of dollars of damages.  Mr. George has the

2    courage of his conviction, that's clear.  But there wasn't a

3    lot that we could do with that, Judge.  It wasn't an issue of

4    bad faith.  That is a disputed claim.

5         There are many, many defendants.  I think, Your

6    Honor, the universe of generic pharmaceutical manufacturers

7    are caught-up in that.  Mr. George, in his presentation, I

8    submit misleadingly, would cross-examine witnesses about a

9    DOJ investigation and subpoenas.  The only thing in the

10   record, Your Honor, is that, yes, we fully admitted Mr.

11   Bonaccorsi.  There was a DOJ investigation.

12        Your Honor also heard that nothing has come of that

13   DOJ investigation.  This, despite the fact as Mr. George

14   said, there have been guilty pleas, indictments, you know,

15   charges filed.  I'm not specifically aware of against whom,

16   but the fact of the matter is that none of that stuff has

17   been filed against Akorn.

18        So, there wasn't a lot, Your Honor, that we could

19   do with the MDL plaintiffs.  Again, I shouldn't say the MDL

20   plaintiffs because only a small subset of them, you know,

21   actually objected to the plan.

22        Then you're left with Provepharm, Your Honor, who

23   filed a proof of claim in excess of $100 million dollars.

24   You know, they also have the courage of their conviction.  I

25   don't say this for the truth of the matter asserted, but, you

1   know, by way of argument the fact is that Akorn thinks that

2   on their very best day they maybe have a $2.8 million dollar

3   claim and, of course, Akorn has counterclaims back against

4   Provepharm.  So, there wasn't a lot.

5         When we got to the end of our process and we were

6   trying to figure out how to deal with and handle the

7   unsecured creditors in this case we dealt with, Your Honor,

8   and we handled the unsecured creditors that we could handle,

9   and that we could address, and that we could pay.

10        And when you think about where we're at now in that

11  respect, Your Honor, there is, as it relates to the plan, the

12  Class 4 -- the purchaser assumed claims are not recovering

13  under Class 4 of the plan, the general unsecured claim

14  category.  General unsecured claims under the plan, those who

15  are left, are not recovering anything under this plan.  That

16  is not the result of bad faith.  That is not the result of

17  anything under-handed.  In fact, that is unfortunate and it

18  is despite everybody's best interest to get that overbid over

19  the line which by definition would have involved a recovery

20  to those creditors.

21        As Your Honor knows, there is plenty of legal

22  authority that Your Honor can, you know, look to and rest on

23  in terms of the appropriateness of purchasers assuming what

24  it is purchasers want to assume.  And to be clear, if Your

25  Honor were to have a problem with the purchaser, you know,

1    assuming the claims of the unsecured creditors the term loan

2    lenders would be perfectly happy to take their assets

3    pursuant to, you know, your sale order and not have to pay

4    for those, but that wouldn't be fair to the customers and the

5    other, you know, what I will call, regular way creditors of

6    Akorn.

7          In terms of, you know, do we have an impaired

8    accepting class I submit that we do, Your Honor.  You know,

9    the standard under the code is that you are impaired.  Any

10   alteration in your legal or contractual rights, even the

11   smallest alteration results in your being impaired.  And

12   there has been some argument by certain of the objectors that

13   a term loan lender who credit bids is somehow not impaired.

14         Number one, I don't think that that's correct

15   legally.  Their contractual entitlement was to be paid in

16   full in cash.  Number two, Your Honor, from a public policy

17   perspective and what it is that we are trying to accomplish

18   when it relates to Chapter 11 it can't be the case that a

19   term loan -- you know, I read every research alert, I read

20   everything that comes over and Your Honor and many other

21   judges around the country are dealing with cases where

22   secured creditors are trying to credit bid for their

23   collateral and do it in a way that leaves estates in peril;

24   in peril of administrative insolvency, et cetera.

25         It can't be the case that when you have a term loan

1   lender who from the petition date agrees to fund a $35

2   million dollar administrative and priority claim and other

3   expense wind-down, and who, you know, cooperates and allows

4   the debtor on a parallel path to pursue a plan of liquidation

5   and funds that, and through the case assumes over $100

6   million dollars of unsecured claims.  You know, there is no

7   legal requirement for these lenders to providing the very

8   material additional consideration that they're providing.

9           Clearly, in our view, they are an impaired

10  accepting class and were there to be a ruling to the

11  contrary, Your Honor,  it would certainly hamstring my and

12  other debtor professionals' ability in the next case to lien

13  upon term loan lenders to do all the things that the term

14  loan lenders did here.

15          If this term loan lender group isn't an impaired

16  accepting class what term loan lender group, you know, would

17  be an impaired accepting class and what incentive would term

18  loan lenders in the next case in front of Your Honor have to

19  fund a liquidating plan if they are not going to be an

20  impaired accepting class despite all of the consideration

21  that a term loan lender group, if they act similarly to this

22  one, would be bringing to, you know, that kind of a

23  situation.

24          THE COURT:  Mr. Nash, one point of clarification on

25  that point. I know that the entry of the sale order is a

1    condition to the confirmation and effectiveness of the plan.

2    I assume the confirmation order is a condition to the

3    consummation of the sale.

4             MR. NASH:  I don't want to misspeak, Your Honor.

5    It's not, Your Honor.  It's not.

6             THE COURT:  Okay.

7             MR. NASH:  I didn't think it was.  I wanted to

8    confirm that.  I will kind of hit on confirmation and where

9    we're at.  As I said at the outset here in terms of my

10   interest in being transparent.

11            Next, Your Honor, we get to the releases.  A lot of

12   confusion, in my view, in the cross examination and the

13   argument about, you know, what is and isn't being released.

14   Obviously, direct causes of action are not being released.

15   This is an opt-out plan.  Other than the term loan lenders,

16   perhaps.  I am not aware of anybody who, you know, gave a

17   release.  Whatever peoples claims are, whatever claims they

18   have against individual D's & O's they're going to have those

19   claims notwithstanding confirmation of this plan.

20            When it comes to the debtor's business judgment to

21   include a debtor release in this plan I want to be very --

22   you know, what exactly are we releasing.  Your Honor heard

23   evidence and testimony and can take judicial notice of the

24   fact that there were derivative claims that were filed

25   relating to the issues around the Fresenius litigation and

1      the Vice Chancellor's opinion.

2              It is a matter of record, Your Honor, that those

3      derivative claims were settled and released in a settlement

4      that was approved by a Federal Court in Louisiana.  There is

5      record in the evidence, Your Honor, that other pending

6      litigation that asserted, essentially, the same claims was

7      dismissed with prejudice on the basis of the Louisiana

8      litigation.

9              So, I would submit, Your Honor, that, you know, on

10     some level do these D's & O's, you know, truly need a

11     release.  I think that all of the relevant claims have

12     already been released and in the unfortunate circumstance

13     where Your Honor doesn't confirm the plan I will be on the

14     phone with the officers and directors of this company

15     explaining that I couldn't get them a debtor release, but

16     it's not the end of the world.  All relevant claims and

17     causes of action have already been asserted and settled.  I

18     will probably have to talk to them about what the full faith

19     and credit clause of the constitution means.

20             So, I am not trying to make more out of this debtor

21     release then it is.  Your Honor, when you think about, again,

22     the type of behavior that we want to encourage and what the

23     record reflects here we have a public company board that

24     pursuant to their, you know, organizational documents is

25     required to meet quarterly.

1          Your Honor heard testimony that his board met

2     sixty-eight times between November 2019 and August 2020.

3     Clearly, Your Honor, again, if we want to encourage -- and

4     every one of these directors, Your Honor, has other jobs,

5     other responsibilities and yet we met sixty-eight times.  And

6     they did that because, you know, they wanted to see this

7     process through.

8          It was very important to them that the ad hoc

9     equity group have every opportunity to get their bid over the

10    finish line.  Everything that these debtor professionals did

11    was done at the direction of the officers and directors of

12    this company and, you know, if you put yourself in their

13    shoes, Your Honor, if meeting sixty-eight times over an eight

14    or twenty month period, you know, doesn't qualify as a

15    sufficient contribution to the case that you get the benefit

16    of a debtor release I don't know how incentivized, you know,

17    those directors will be in the next, you know, Chapter 11

18    circumstance to see this case -- to see, you know, some other

19    case through to conclusion.

20         These officers, these directors were very diligent.

21    The process was diligent.  This was a process that was set-up

22    and designed to provide as much value to as many stakeholders

23    as possible.

24         I think, Judge, before I ask you if you have any

25    questions, you know, I will wrap up.

1          So, where are we and where do we go from here if we

2    don't confirm the plan and how does this relate, for example,

3    to the Fresenius motion to have its claim reclassified.

4          One thing I will note, Your Honor, is that

5    Bankruptcy Rule 3013, you know, is a mechanism or provides an

6    ability for stakeholders to file a motion to have their claim

7    reclassified for -- I'm going to quote from Rule 3013, Judge.

8    For the purposes of the plan and its acceptance the court

9    may, you know, on motion reclassify a claim.

10         The fact of the matter is, Your Honor, given where

11   we sit Mr. George's three benefit funds sit in Class 4.

12   Provepharm sits in Class 4.  They're not getting a recovery

13   under this plan.  The Fresenius claim at the moment, Your

14   Honor, sits in Class 7, the 510(b) subordinated claims.  That

15   claim, that class of claims is not getting a recovery under

16   this plan.

17         I'm not so sure, Your Honor, that I really care

18   whether the Fresenius claim is reclassified as a Class 4

19   claim. I don't think it matters.  In terms of the legal

20   appropriateness of where we classified it I'd be prepared to

21   rest on our papers and, of course, refer Your Honor to the

22   papers that the UCC filed on that point.

23         So where do we go from here, Judge. If Your Honor

24   doesn't confirm this plan I think our next move would be to

25   structurally move for a structured dismissal of the cases.  I

1    mean there's nothing left for us to do.  We have, as Your

2    Honor knows and as Your Honor has approved, the sale of the

3    company. The sale of the company has been approved.

4    Presumably that sale is going to close.  The assumed

5    unsecured claims, Your Honor, and this is why I want to,

6    again, be very up front about what is and isn't happening

7    here as we talk about plan confirmation.

8          The unsecured claims that are being assumed as part

9    of the sale are going to be assumed under the APA and

10   pursuant to the sale regardless of what happens with respect

11   to plan confirmation.  So, you know, if Your Honor were to

12   deny plan confirmation we will be in the very same place that

13   we are right here, right now with respect to Fresenius, the

14   three benefit funds Mr. George represents and Provepharm not

15   getting a recovery.

16         We will not have an approved debtor release.  I

17   will be explaining to certain D's & O's that it's not the end

18   of the world.  I think we will be moving for a structured

19   dismissal.  I certainly don't k now what else we would be

20   doing in front of Your Honor, but none of that, Your Honor,

21   makes it any less important that we confirm this plan.

22         Again, this was a plan -- I will just wrap up.

23   This is a plan that was filed at the outset of the cases to

24   run on a parallel path with a good faith sale process that we

25   did not know the outcome of.  And if there was a pot of money

1    available for unsecured creditors everybody would have been

2    very pleased.  It would be very important that we had filed

3    this plan because we would have a plan on file with which we

4    could deal with those sale proceeds.

5         When it became apparent that we weren't going to

6    have that overbid we had a good faith discussion and

7    negotiation with the UCC about how to, you know, provide as

8    much value to the unsecured creditors as possible.  And as

9    Your Honor can probably appreciate give, you know, what's

10   gone on over the last few days the term loan lenders were not

11   going to assume, you know, these litigation claims.  We did

12   everything we could and it's unfortunate.

13        In the next case, you know, that's in front of Your

14   Honor clearly we want to incentive term loan lenders

15   providing for the administrative solvency and unsecured

16   creditor, and unsecured recovery, you know, for stakeholders

17   separate and apart from a credit bid.  I do think that it's

18   important that officers and directors know that if they meet

19   sixty-eight times over an eighteen month period and authorize

20   the filing and supervise the prosecution of a plan process in

21   good faith they ought to get the benefit of a debtor release.

22        With that I will pause and see if Your Honor has

23   any questions; otherwise, I am through my remarks.

24        THE COURT:  Okay.  Thank you, Mr. Nash.

25        Just a couple points of clarification.  I just want

1    to make sure I understand, because I'm going to hear a lot at

2    the closings and I want to make sure I understand the MDL as

3    it currently stands.

4           I believe the testimony was that the allegations

5    in the MDL litigation are direct claims, that there are no

6    derivative claims. Is that a correct understanding?

7           MR. NASH:  Yes, Your Honor.

8           THE COURT:  Okay.  And then I believe that there is

9    one question that I asked with respect to, and I'm going to

10   mispronounce this gentleman's name, but there was reference

11   to a suite against one of the former --

12          MR. NASH:  Amir Takla.

13          THE COURT:  Yes.  Is it Takla?  Am I pronouncing

14   that correctly?

15          MR. NASH:  You are, Judge.  That's a retained cause

16   of action and a transferred -- it's retained under the plan

17   and transferred under the APA.  It is exempted from the

18   debtor release because there is a carve-out for fraud and

19   willful misconduct.

20          THE COURT:  Okay.  Good.  And let me just ask you a

21   philosophical question with respect to the releases because

22   we're saying, you know, that the directors and officers met

23   sixty times and, you know, that equates to a substantial

24   contribution.  That may be true, but, quite frankly, it's a

25   business judgment standard.  The factors that have been

1   developed under Genesis and other cases are factors that go

2   to whether I should find that proper business judgment has

3   been upheld and made.  But they're certainly not the sole

4   factors that I have to consider, and not the only factors I

5   should consider.

6          So, quite frankly, I mean isn't enough that there

7   just simply are no claims that exist.  So, why can't I just

8   grant the debtor release on that?  Why do I need more?  I

9   just don't want directors and officers to feel that they have

10  to meet sixty-eight times to make a substantial contribution

11  to a case.

12         MR. NASH:  Agreed, Your Honor.

13         THE COURT:  Okay.  All right.  I don't think I

14  really have any other questions.

15         Thank you, Mr. Nash.

16         MR. NASH:  Thank you very much, Your Honor.  I

17  really -- and thank you for your patience and all the time

18  that you have given us.  I really appreciate it, Judge.

19         THE COURT:  Happy to do so.  That's my job.  As

20  Judge Shannon often says that's what we get paid for and

21  we're happy to do it.

22         So, who wants to go first? I see Mr. George popped

23  up on the screen, but let me ask for the record before we go

24  into folks that are not in support of the plan, why don't I

25  ask for the record are there any parties that wish to make

1    any statements in support of confirmation of a plan?

2          MR. RAIFORD:  Good morning, Your Honor.  Landon

3    Raiford, Jenner & Block, for the creditor's committee.  I'd

4    like a few moments to address our support for the plan if I

5    may.

6          THE COURT:  Yes.  Please go ahead, sir.

7          MR. RAIFORD:  Sadly, I think I have to begin by

8    addressing the continued attacks on one of our committee

9    members, Rising Pharma.  And I am, of course, very much aware

10   that that is irrelevant to plan confirmation, but feel

11   compelled to, at least, take a few moments to address the

12   statements against one of our members.

13         To be perfectly clear, our committee member is not

14   the same entity Mr. George keeps bringing up.  Our committee

15   member is the successor in interest to an antitrust defendant

16   that our committee member purchased through a 363 sale in

17   bankruptcy in the discussion.  Now today I heard Mr. George

18   bring up Sun Pharma and that entity's alleged misdeeds.  I

19   have no idea who that is.  I just know that Rising Pharma has

20   literally no connection whatsoever to Sun Pharma.  They are

21   completely different entities.

22         So, while we can move on from this sideshow, the

23   fact that we keep hearing plainly inaccurate accusations of

24   this committee member I think can inform the court as to the

25   way the court should deal with these objections.

1          So now moving onto what kind of what brings us all

2   here today which is the plan.  A lot has happened, but I

3   think the thrust of the objections is that the plan properly

4   releases valuable claims against current and former D's & O's

5   for no value.  In the course of our investigation the

6   committee looked into all these claims.  We looked into the

7   value and how they be treated under the plan.  And we

8   conclude that with respect to estate causes of action the

9   recovery achieved simply did not justify rejecting the plan

10   and litigating for years for an uncertain recovery.

11          The committee stated in its statement in support of

12   the sale and the plan where the interest of creditors are

13   viewed as a whole, so we're talking about not only the

14   employees, but the hundreds of suppliers and those ongoing

15   contractual relationships with the debtor, all of whom will

16   be made whole, the answer to whether the court should confirm

17   the plan is an easy one.

18          The alternative, a liquidation where lawsuits are

19   filed, and years of time, and ungodly expense to achieve an

20   uncertain outcome makes little to no sense.  For the same

21   reasons that approving the sale was the only viable option

22   here confirming the plan is the only viable option.  And as

23   the debtors have argued, the plan clearly satisfies the

24   elements of 1129(a) and (b).  The committee, therefore, urges

25   the court to confirm the plan.

1    My final note here is that the committee also

2    thinks it's important to note that the vast majority of

3    claims that the court has heard about over the course of the

4    past couple of days, the direct claims of creditors, as Mr.

5    Nash points out, are not released under the plan.  Likewise,

6    the plan does not release current and former officers and

7    directors for fraudulent conduct or willful misconduct.

8    So any claims pertaining to, for example, the

9    conduct Ms. Cornish explored yesterday that is the subject of

10   the Delaware Chancery Court opinion also would not be

11   released.

12   Ensuring that litigation creditors would not have

13   their claims -- I mean its non-debtor parties released was

14   important to us.  We urged the debtors to remove the

15   non-consensual third-party releases from the original plan

16   when the disclosure statement was considered and the debtors

17   did so.

18   To the extent that the objectors argue that they

19   are being left out in the cold with no recourse that argument

20   is proven by the plan itself.  They can continue to pursue

21   their own direct claims.  In sum, for non-litigation

22   creditors the so order and plan provides for their payment in

23   full with the committee's agreement with the purchaser and

24   now as part of the approved sale.

25   For the objectors with disputed direct litigation

1   claims the plan allows those creditors to have their day in

2   court and continue to pursue their claims.  This is a

3   fundamentally fair result and the plan should be approved.

4          I will also follow Mr. Nash's lead on the

5   Fresenius motion.  I tend to agree.  I think at this point it

6   probably doesn't matter how the court rules on that.  It

7   doesn't make a material difference in the plan.  We also

8   stand on our papers we believe the subordination is proper,

9   that unless your court wants to hear argument I am willing to

10  waive oral argument on that point.

11         Thank you.

12         THE COURT:  Okay.  Thank you.

13         I read the papers.  So, I don't need any argument

14  on the reclassification if you don't want to make any.  That

15  is beyond the scope of those papers.  So, don't feel the need

16  to do so just for my account.

17         Thank you.

18         I see Mr. Evans popped on.  Did you want to make

19  argument in support of the plan, sir?

20         MR. EVANS:  Yes, Your Honor, very briefly.  Jeremey

21  Evans from Gibson Dunn & Crutcher on behalf of the term

22  lenders and the DIP lenders here.

23         Your Honor, I know it's been a long few days for

24  everybody and a lot of evidence has come across before the

25  court.  So, I will try and be as brief as possible.  I really

1    just want to touch on two points.

2         First is this concept that we are somehow

3    unimpaired because we credit bid the face amount of our

4    claim.  And in a second I just want to touch on good faith

5    because there have been a lot of allegations raised with

6    respect to both the debtor's conduct during this process as

7    well as the term lenders particularly by the MDL plaintiffs.

8         Your Honor, turning to impairment.  Impairment

9    under the code is a very broad concept and it really, if you

10   look to the Third Circuit case law on this, you're looking to

11   something that entirely un-alters our rights under the

12   prepetition credit agreement.

13        I think it's also important that the Third Circuit

14   speaks to impairment as a presumption in that we are presumed

15   to be impaired under the plan.  That is under the PPA

16   Enterprise case.  It's not our obligation to show that we are

17   impaired.  It's actually the objecting party's obligation to

18   show that we are not.

19        I would proffer that through the evidence presented

20   to Your Honor in this court the MDL plaintiffs who are the

21   only objector raising this argument of impairment they

22   presented to evidence that we are unimpaired.  If anything,

23   Mr. Buschmann's testimony is uncontroverted and makes it very

24   clear that there was a prepetition marketing process, there

25   was a post-petition marketing process.  The end result of

1     that process showed that nobody was willing to bid more than

2     the face amount of our claim and that as a result of that we

3     are necessarily impaired.

4          Aside from that pure evaluation point established

5     through the marketing process we're also giving up rights by

6     availing ourselves both to Your Honor's jurisdiction, and to

7     the Bankruptcy Court, and the bankruptcy code.

8          Outside of bankruptcy we had a plethora of

9     different rights and remedies that we could have exercised.

10    We could have proceed against out collateral.  We could have

11    done one of many things, but most importantly we are entitled

12    to payment in full of our claim.  A credit bid is not payment

13    in full of our claim.  It is a mechanism that were provided

14    for under the prepetition credit agreement and under the

15    bankruptcy code that allows us to take the assets, but that

16    doesn't mean that we are not impaired.

17         You know, I do want to touch on a couple of points.

18    The MDL objection speaks to the fact that the standstill

19    agreement, itself, gave us the ability to credit bid and

20    because we proceeded down that path that we are unimpaired.

21    The standstill agreement supplemented our rights under the

22    prepetition credit agreement.  It did not replace them.  It

23    was a loan document when we entered into it, but to say that

24    because we exercised a path that was drawn out in that

25    standstill agreement that we somehow were satisfied under the

1    prepetition credit agreements simply has no basis in the

2    facts of this case or under the law.

3            Your Honor, I do believe that we're also impaired

4    by the fact that we're providing the use of our cash

5    collateral.  The Bankruptcy Court in the District of

6    Connecticut has spoken to this fact that, you know, allowing

7    the debtors to utilize our cash collateral, even in the

8    credit bid context, is evidence of impairment.

9            So, I do believe that the facts in the record are

10   very clear that we are impaired here, we did vote to accept

11   the plan, and because of that, you know, the debtors have met

12   all the requirements of 1129.

13           Turning briefly to the good faith, I don't think I

14   need to go too far into this because I think Your Honor's

15   findings with respect to the sale process are abundantly

16   clear.

17           This wasn't some contrived effort between the

18   debtors and the term lenders to, you know, silently pass over

19   these assets.  As Mr. Greenberg spoke on Tuesday most of my

20   clients are par buyers.  They have been in this debt for

21   years.  They would like nothing more than to get paid in full

22   in cash.  Everything that we have done since we initially

23   reached out to the company, you know, almost two years ago at

24   this point was towards that goal to find some type of

25   process, whether it be through a refinancing process, whether

1    it be through a prepetition marketing process or a

2    post-petition marketing process to get paid in full in cash

3    so that we didn't have to take these assets.

4           Unfortunately, at the end of the day, nothing bore

5    fruit, nothing came of it.  We are an owner of last resort,

6    as Mr. Greenberg said on Tuesday.  And having exhausted all

7    options possible to try and find a way to get us paid at par,

8    to allow some type of value to go to the unsecured creditors.

9    At the end of the day nothing materialized and we are where

10   we are.  And we have done everything that we can to reach a

11   different conclusion.

12          Your Honor, based on these facts and the evidence

13   before Your Honor I do believe that this plan should be

14   confirmed.  I do believe the debtors have carried their

15   burden.  I do believe that we are impaired.  And I think that

16   the question of our good faith and the debtor's good faith

17   during this process really can't be controverted.

18          With that, unless you have any questions, I have

19   nothing more to add.

20          THE COURT:  I have no questions.  Thank you, Mr.

21   Evans.

22          MR. EVANS:  Thank you, Your Honor.

23          THE COURT:  Anyone else in support of the plan?

24          MR. JUNG:  Your Honor, this is Wojciech Jung from

25   Lowenstein Sandler on behalf of the opt out plaintiffs.  I

1    believe my video has been disabled.

2              THE COURT:  Give me one moment.  There you are.

3              MR. JUNG:  Thank you, Your Honor.

4              Your Honor, I know Mr. Nash eluded to this during

5    his part of the hearing today, but I just wanted to make this

6    part of the confirmation hearing.  Mr. Nash is correct that

7    our limited objection to the plan has been resolved.

8              Your Honor, I have seen in Paragraph 135 of the

9    proposed confirmation certain rights have been reserved with

10   respect to the opt out litigation.  During the last couple of

11   days we have had a number of discussions with various parties

12   and we have resolved the remaining portion of our objections.

13             So, Your Honor, the debtors and the D&O defendants,

14   and the opt out plaintiffs, opt out litigations pending in

15   the District Court in Illinois have reached an agreement in

16   principal subject to limitation and the court's approval to

17   resolve that litigation asserting the direct claims which in

18   terms of a fair result obtained through the limited objection

19   to confirmation or the proposed plan.

20             The settlement that Mr. Nash mentioned does not

21   include any monetary contribution by the debtors.  Instead

22   payment to the opt out plaintiffs will be made by and from an

23   insurance policy maintained for the sole benefit of the D's &

24   O's.  The debtors, Your Honor, have committed to work with

25   the opt-out plaintiffs, the D&O defendants and the carrier to

1   prepare and seek court approval of the settlement under

2   Bankruptcy Rule 9019 which will include a board order in

3   favor of the carrier.  The (indiscernible) Your Honor

4   envisioned to file such a motion by the end of the month on

5   notice to parties in interest.

6               Thank you, Your Honor.

7               THE COURT:  Thank you very much, Mr. Jung.  I

8   appreciate your comments.

9               Okay.  Anyone else in support of the plan?

10          (No verbal response)

11              THE COURT:  Okay.  All right.  Well then why don't

12  I turn the virtual podium over to the objecting parties.

13              Mr. Jung, if you don't mind, if you're not

14  addressing the court if you wouldn't mind turning off your

15  video I would appreciate it.  Okay.  Thank you very much.

16              Mr. George, you get to go first.

17              MR. GEORGE:  Yes, Judge.  Thank you.

18              Your Honor, I want to address Mr. Nash's comments

19  and the comments of the term lender's counsel.  Then I want

20  to try to go through a very detailed discussion of where this

21  plan doesn't comply with the bankruptcy code.

22              Your Honor, the initial arrangement that was

23  reached between the ad hoc lenders and the debtor which

24  resulted in what I call these lockdown agreement and the

25  prepackaged plan and disclosure fixed everybody's rights,

1    Judge.  The material part of this and the part that I have

2    issues with that I've argued about was if Mr. Nash's comment

3    about having open kimono, and I think that was his statement,

4    then the lockup agreement may have dealt with the terms for

5    the liquidation of the assets, but the issue of the issuance

6    of releases would have effectively and more appropriately

7    been included in the plan processes.  That wasn't done.

8           I will note, Judge, that not a single person other

9    than the secured term lenders voted in favor of this loan.

10   Not one creditor.  And, in fact, Judge, if we look at what

11   this case now looks like the only creditors that are really

12   left in the case are these three objectors.  The secured

13   creditor is satisfied because the direct terms of the plan

14   under Class 3 provides that in the event of the sale the

15   purchaser basically takes possession without any court order.

16          There is not a single recitation, Judge, of the

17   retention of claims of the deficiency, of a right to come

18   back to the Bankruptcy Court, none of those things are

19   included because it's very clear, and the testimony was clear

20   yesterday, that the idea was that if the term lenders were

21   the purchasers they'd simply take the assets.  That is what

22   has happened here.

23          So, they can't have it both ways to say we've done

24   this thing and it's in good faith.  We have been paid in full,

25   but at the same time we're impaired.  They're just simply not

1    impaired, Judge, because impairment relates only to

2    prepetition impairment.   The amounts that they claim are part

3    of their bid, the 110 million, and the 5 million, and the 11

4    million that they put up.   Throughout the debtor's argument

5    they argue that those were gifts that they were gifts that

6    were made by the secured creditor.

7         I assure you, Judge, that all of those advances

8    have now become part of the balance sheet of Akorn II, or

9    Akorn Topco, whatever that company is.   Every single claim

10   that the term lenders have, have now moved over to the

11   debtor.   The debtor corporate shell moved with all of those

12   assets, Judge.   So, there has been no discharge to those

13   assets.   All those claims continue to exist against the

14   corporate shell.

15        This bankruptcy is not the debtor's shell.   This

16   bankruptcy is a series of assets that are left over after

17   that shell and all the attributes, and all of the tax

18   attributes move over at the end of that sale.

19        So, what's left in this case, Judge?   By virtue of

20   the actions of those lockdown agreements and the releases

21   that were provided in it, and the sale order that you entered

22   there's nothing in it.   So then we have to ask what is the

23   purpose of this plan.

24        There is no money to go to unsecured creditors.

25   The creditors that they wanted to see get paid and there's

1    been an argument about the policies not being assets of the

2    estate.   Absolutely not true and I think if you look at the

3    face of the policies you will see that.   I think that the

4    testimony was that money that was supposed to be paid for

5    defense was actually used to make a settlement.   So, the

6    debtor clearly had an interest in those monies because monies

7    that they would have been entitled to recover as defense they

8    used to pay those claims.

9         To suggest somehow that the debtor's estate had no

10   interest in it it's belied by the facts and it's belied by

11   the policies.   It is --

12        THE COURT:   And what is the relevancy of that

13   argument?   I'm having trouble, what is the relevancy of that

14   argument to your plan confirmation objection?

15        MR. GEORGE:   Which part of it, Judge?   I'm sorry.

16        THE COURT:   The fact about the D&O policies.   What

17   is the argument there because I'm just going to make one

18   general observation?

19        MR. GEORGE:   Yes.

20        THE COURT:   The objections that have been filed by

21   the objecting parties included a lot of arguments, but it

22   didn't walk me through how those arguments correlate to the

23   Section 1129 factors and why this plan is un-confirmable.

24        So, I'm just telling you that because I want it

25   addressed, if you can, in closing argument because I want to

1    be able to connect the dots.  And the objections were not

2    connecting the dots on the legality or the case law.

3            So, I am not swayed by a narrative.  I'm swayed by

4    facts and I'm swayed by the law.  So, I just need you to

5    hand-hold me through.

6            So, your position is that there are policies that

7    are debtor assets.  So, what is the logical connection there?

8            MR. GEORGE:  Where that ties into, Judge, is the

9    unfair discrimination because creditors that were subordinate

10   to us shareholders got debtor assets before our creditors in

11   Class 4 got paid a nickel.  That violates absolute priority.

12   That is not fair and equitable.  And it shows that the debtor

13   has bad faith in trying to prosecute that as part of its plan

14   of reorganization.

15           You can't have creditors similarly situated pick

16   and choose which ones you want to pay with debtor assets ad

17   that is why the argument of whether those policies belong to

18   the estate isn't something we can gloss over as part of this

19   argument.  The fact that there is absolutely testimony that

20   money that the debtor would have been entitled to receive is

21   reimbursement under those policies.  So, debtor assets were

22   used to satisfy shareholder claims.

23           By the way, Your Honor, I was a little surprised to

24   hear that now there is a further action where the same

25   interest and potentially the same monies where the debtors

1    had interest in them are being used to settle the opt out

2    shareholders.  Well those people are all subordinate to the

3    debtor, Judge; all of them.  And they're receiving money

4    before the unsecured creditors and that's unfair.  It is

5    unfair discrimination to pick and choose which creditors you

6    want to pay with debtor assets.

7              THE COURT:  But you would agree with me that those

8    settlements were done outside the scope of the plan, correct?

9              MR. GEORGE:  They were, Judge.  That is part of my

10   point, Judge, that these lockup agreements and these

11   prepetition settlements were all in order to make sure that

12   this plan was fait accompli.

13             That is why I'm arguing to you so strenuously about

14   all of these settlements would have been -- if we were really

15   talking about open kimono would have been dealt with in the

16   context of the plan.  So, they've done it.  It's improper and

17   they have assigned those rights over to somebody else so they

18   can never really be contested as of yesterday and that's not

19   good faith.  Its bad faith and its discriminatory.

20             THE COURT:  Okay.  Thank you.

21             MR. GEORGE:  Your Honor, Mr. Nash spent a lot of

22   time arguing, and I don't even know what the relevance of any

23   of this argument was, well what happens the next time.  Well

24   that is not the concern for today.  And if it is the concern

25   for today the bigger concern should be that there are people

1    who are injured by antitrust activities and that we don't

2    want to embolden people to go create lockup agreements that

3    close out people were injured by them, and provide them  no

4    benefit, and provide benefit to people whose interests are

5    subordinated.

6          It's not our job as bankruptcy lawyers or the court

7    to protect future transactions for term lenders to decide to

8    do things.  There is a social and moral obligation here for

9    the court and that is to ensure that this process isn't used

10    to foreclose people with legitimate claims from payment, to

11    foreclose investigation into bad acts by management.

12          I think I can make the argument that had the U.S.

13    Trustees Office known that Mr. Boothe was under investigation

14    for antitrust activity, and that there was a pending DOJ

15    investigation maybe there would have been an examiner in this

16    case, and maybe there would have been a trustee in this case.

17    There could have been a lot of other options had there been

18    fair and open kimono disclosure of the issues that were going

19    on in connection with this debtor.

20          Your Honor, if you look at the plan and you look at

21    the plan language it's pretty clear that there is nothing

22    remaining for the term lender.  They have no claim.  All of

23    that claim followed the bid into Akorn II or Akorn Topco.

24    That is why they don't care about any of these claims that

25    are left behind.

1          And so, Your Honor, if you dismiss this case today

2     or if you decided not to confirm the case let's talk about

3     for a second what would happen, exactly what happens when you

4     confirm the case.  The term lenders would take the property.

5     The opting out and opting in shareholders would take the

6     policies.  Any claims against them have been discharged.  No

7     one else would get anything, but those officers would get a

8     release.

9          So, where was the reorganizational process here?

10    What is the reorganization for us to talk about today when

11    classes of creditors -- the real creditors are supposed to be

12    protected in this case.  The unsecured creditors really get

13    nothing.  And it's very nice that the committee was able to

14    get certain people paid.  If the committee was really doing

15    its job, and I understand they're not happy with me, but to

16    be fair I'm not happy with them.  They could have recovered

17    money for us.

18         The debtors made a lot of noise about what they

19    could have done.  Why couldn't they have had a discussion

20    with the MDL defendants to -- plaintiffs to try to resolve

21    this thing.  There wasn't a single discussion between the

22    debtor and us in order to try to do that.  I thought a plan

23    was supposed to be part of a deliberative process where we

24    try to reach consensus, but the idea was from the onset

25    leakage.

1          I don't think it was fair when they entered into

2    that agreement to agree that they would make every effort to

3    make sure that creditors like my clients didn't get paid.

4    Mr. Nash's allegation that I only represent a few is,

5    technically, correct.  There is a class action party, Judge,

6    and all of the parties in that class action would be entitled

7    to any kind of recovery that comes out of this case.  So,

8    even though I don't represent them directly I'm arguing for

9    recovery of the entire class, not just for my clients.

10         Judge, if you look at why we're here and you read

11   Judge Laster's opinion -- when I read it I have to tell you

12   something, I was shocked at the allegations that were made by

13   Fresenius and the court's findings which are final and

14   haven't been appealed.  What they reveal here, Judge, is that

15   while why we're sitting here today is because of bad

16   management.

17         Let me just go over a few things that actually came

18   into the record here.  There wasn't even a quality control

19   problem -- quality control component to the debtor's

20   operations until Mr. Bonaccorsi was hired ten years ago.

21         This company has been selling drugs, as I

22   understand it, since the 70's or 80's and there was never any

23   quality control.  The things that happened with respect to

24   Fresenius it is very telling.  Judge Laster basically found

25   that people concealed information from them just so they

1    could get to the finish line and get Fresenius's money.

2         If you read Judge Laster's opinion that is what he

3    found they did, that they concealed information, they hid

4    information.  And we're not talking about low lying level

5    people, Judge.  We're talking about Mr. Bonaccorsi who had an

6    obligation only to the board to tell them about what that

7    report said and to not filter it or ask someone to take out

8    the reference to criminal conduct.

9         We have the gentleman who left the company who is

10   subject to an antitrust review.  He was in control of that

11   company for many, many years.  So, we are here, Judge,

12   because of the debtor's mismanagement and fraud, not because

13   of anything the MDL plaintiffs did.  Candidly, as much as

14   they're not much my friends in this case not anything that

15   the term lenders did initially.

16        The upper management of this company destroyed it

17   through fraud, and artifice, and mismanagement.  They have

18   never managed the FDA processes. Its allowed that process to

19   run amuck so much so that when I read the reports about the

20   (indiscernible) people were making chemicals that were

21   supposed to be sold to people who were buying generics and

22   they weren't wearing gloves that would insulate those

23   chemicals from contamination.

24        So, this is a poorly run company, Judge.  I don't

25   think there is any question about that.  I don't even think

1    the term lenders would deny that.

2            So, what are we doing with this bankruptcy other

3    than emboldening people with potential liabilities for

4    antitrust misbehavior?  To use this as a process, and that's

5    why I'm hooking on Mr. Nash's last statement.  We don't want

6    bankruptcies to be used in this way.  I don't think we do.

7    And I don't think Your Honor would want a bankruptcy that

8    emboldens people to go out and commit unlawful acts and then

9    negotiate with their term lenders so that nobody else ever

10   has to peel back the onion to see what they really did.  That

11   is not a good reason for a bankruptcy.

12           And so if you didn't approve this bankruptcy and

13   you didn't confirm it nothing bad would happen and I think

14   that we heard that from Mr. Nash.  But as I said to you, Your

15   Honor, in the closing on the sale, and I know that Your Honor

16   was tested by my examination in there, but because Mr.

17   Buschmann was a witness both in that case and in this case I

18   felt that I had to use that time to try to uncover the facts

19   that were really related not just to that, but to the fact

20   that he was going to be used in the case in chief on

21   confirmation of the plan.

22           And in an effort to try to streamline things and

23   not call him back I may have, you know, tested Your Honor's

24   patience with where I was going with it, but I think that you

25   now understand what I was trying to do was create a story for

1    Your Honor that went beyond the sale motion. So, to the

2    extent, Your Honor, that was difficult for you I apologize

3    for that.

4         And so, Judge, if you don't approve this case

5    everybody gets what they get.  So there is really no

6    necessary reason to do it.  Your Honor, there is not a single

7    case in Delaware that says that the use of cash collateral is

8    an impairment.  There may be something in Connecticut, but we

9    didn't research that.  I did expect the Kirkland & Ellis

10   folks to show-up with some case law to support the recitation

11   that they made and there is none because the fact of the

12   matter is its only prepetition rights that we look at for the

13   purposes of impairment.

14        With respect to those prepetition rights, as the

15   testimony was very clear, the lender got everything they were

16   supposed to get under the standstill agreements, the first,

17   second and third.  Everything that they were supposed to get

18   they got.  By virtue of the sale agreement they got

19   everything they were supposed to get.  We put testimony into

20   the record that the value of those assets on book were

21   substantially more than the value of the term lenders credit

22   bid.

23        We put in evidence, Judge, that if you took out the

24   $79 million dollars and liabilities subject to compromise

25   there was $87 million dollars in shareholder equity.  If you

1   add those two numbers together, I'm not a mathematician, but

2   we're talking in excess of $140 million dollars.  Mr. Nash is

3   groaning about the money that was put up, $110 million

4   dollars.  Well, (A), they got it back, its part of their

5   prepetition debt.  And the assets that they got were worth

6   more.

7           When we talk about the liquidation analysis, Judge,

8   let's go through it, no effort to try to value the causes of

9   action as of the petition date.  As my co-counsel pointed

10  out, he's valuing it as if the sale never occurred, but the

11  fact of the matter is under this plan there is zero coming

12  down.

13          So, that whole assessment of what happened or would

14  happen it's all irrelevant because there are no assets in

15  this plan, nothing for creditors.  And the term lenders could

16  have very easily said to the debtor, guess what, here's the

17  32 million.  If we don't get this done we're just going to

18  take it back.  They could have handed the keys back to the

19  bank, the bank would have had to give them credit for

20  whatever the value was.

21          Chapter 7 Trustee could have come in and a Chapter

22  7 Trustee doesn't have to shut those businesses or sell them

23  on a liquidation basis. Under the bankruptcy code the Chapter

24  7 Trustee or any trustee has a right to come in and ask for

25  permission to operate this facility and run them.

1          So, the notion that this was the only way to go

2     it's just not true because if they had just handed the keys

3     back and let a Chapter 7 Trustee come in he would have

4     analyzed all of those claims and he would have brought them,

5     and he would have paid them in a waterfall.  And it's my

6     estimation that in light of those circumstances there would

7     have been money to unsecured creditors, but no one in this

8     case ever did that.  There is no liquidation analysis to show

9     that under this plan we're doing better in a Chapter 7

10    liquidation.

11          THE COURT:  What claims would the trustee -- I'm

12    just having trouble.  What claims would the trustee be

13    analyzing for value?

14          MR. GEORGE:  Right.  Judge, if that lockdown

15    agreement wasn't entered into, if the ability to, on the

16    closing of the sale, discharge and kill those claims, if on

17    the petition date the trustee -- the debtor would have said

18    here's the keys, not entered into any agreement to have the

19    purchaser be the term loan lenders and simply converted the

20    case the trustee would have investigated the shareholder

21    settlement, whether assets were being used to it.

22          He would have investigated any of the claims

23    against the officers and directors and determined whether

24    those derivative claims actually have value and could they

25    produce something for this bankruptcy estate.  He would have

1   looked at the Fresenius litigation and determine whether

2   those claims should be subordinated to everybody else.

3        And a Chapter 7 Trustee, I submit, would have done

4   this more effectively, more quickly and with the open kimono

5   that Mr. Nash keeps talking about.  Judge, that lockup

6   agreement, those standstill agreements prevented anything

7   here from becoming an open kimono.

8        So, Your Honor, I'd like to go through 1129

9   specifically with you and just try to address some of the

10  issues.

11       Your Honor, in order to confirm a plan we have to

12  conform our behavior and our plan to both 1122 and 1129.  So,

13  1122 requires that the plan doesn't misclassify claims.  And,

14  Your Honor, if you look at how this plan was originally filed

15  it was filed to put the consenting shareholders in a position

16  where they could cover the class.  There was no bankruptcy

17  justification for that decision.  It was clearly

18  gerrymandering.  Again, this goes to the good faith of the

19  plan that the debtor attempted to put people in a class that

20  they knew.  Even their non-lawyer professionals knew that it

21  was inappropriate to put them in the class.

22       The debtors did that because they thought because

23  our claims, the MDL claims were unliquidated and we were in

24  that pot we would only be able to vote a dollar and they

25  would carry the class.  Well, that's bad faith and it's

1    inappropriate.  They knew it was wrong and they did it

2    anyway.

3          In effect, the plan proposes to general unsecured

4    creditors, Judge, to receive nothing other than those that

5    are picked and chosen by the ad hoc committee to pay.  It

6    proposes that treatment, Judge, in a straight-forward way

7    because it shows what the unjustified nature of that

8    classification really is.

9          There was a great deal of testimony about the

10   classification analysis and that the nature of the claims

11   held by both the shareholders and by the MDL creditors were

12   in the same class, but should have been subordinated.  And

13   the debtor cannot and did not show fairness with respect to

14   that separate classification.

15         The plan originally classified 5 million in claims

16   as general un-secured's in the same pot of the MDL creditors,

17   but after the UCC settlement it reclassified these claims by

18   removing the general unsecured claims altogether in a yet to

19   be approved settlement.

20         And you have heard statements by the UCC that only

21   the litigation creditors are left behind.  In actuality,

22   Judge, there is no genera, unsecured creditors classified in

23   the plan getting anything because the creditors that the term

24   lenders decided to favor are no longer here.  The 11 million

25   of assumed contracts those people aren't creditors.  And now

1        $5 million dollars more of creditor's contracts are being

2        assumed.  They're not creditors.

3               And if the UCC was able to recover $5 million

4        dollars it should have gone into a general pot for all the

5        unsecured creditors.  It shouldn't have been money that is

6        paid directly over to certain classes of creditors and that

7        treatment in and of itself is unfair and discriminatory and

8        violates the UCC's duties to the EPP constituency.

9               So, the plan doesn't comply with 1123(a)(4) which

10       requires equal treatment to all claims in a particular class.

11       All of those vendors in the UCC should really be part of the

12       pot that we're in and those monies that were used to favor

13       them should have gone into the pot for all the general

14       unsecured creditors.

15              Your Honor, even more concerning is the fact that

16       these prepetition agreements formalize the prepetition

17       preferential treatment of the settling shareholders.  And I

18       think it is important to note that no one has ever really had

19       an analysis and although the committee has said, well, $5

20       million dollars means that anything else would be

21       speculative. I don't that that is the nature of the inquiry

22       that we should be conducting today because we shouldn't allow

23       term lenders to come buy support of an unsecured creditors

24       committee by picking and choosing the creditors that they

25       choose to pay.

1          Its, in fact, very disturbing, Judge, that the

2     unsecured creditor's committee would decide that there are

3     certain creditors that they felt to favor and other creditors

4     that they felt weren't entitled to their largesse.  That is

5     not something that we can count in this or any other case.

6          Allowing those settling shareholders and now we

7     understand even the opt out settling shareholders are going

8     to get money, it violates the absolute priority rule because

9     it allows them to retain property on account of their claims

10    before unsecured creditors either consent or are paid in

11    full.

12         Your Honor, under 1107 the debtor has a duty to

13    maximize the value of the estate.  And our position is it's

14    the lockup agreements, the prepetition standstill agreements

15    and the prepackaged plan that was filed fails in a material

16    regard with respect to that and in particular because the

17    debtor and the term loan lenders were very specific and very

18    careful about how they wanted assets to be allocated.

19         From the very onset of this case, Judge, the

20    intention was to prevent leakage.  Well, if unsecured

21    creditors are entitled to something under a waterfall plan

22    how can the intention to take any action to make sure that

23    they receive nothing be considered in good faith.

24         First, Judge, those claims were derivative of the

25    debtor.  The debtor had a right to bring them.  So any

1    recovery would have clearly been property of the estate.

2         Second, the shareholder settlement was funded by

3    transfers of Akorn stock held by the debtor and that stock

4    clearly would have been property of the estate.

5         Third, the debtors haven't addressed the extensive

6    case law, Judge, that  holds that director side A coverage

7    (indiscernible) are estate property if the payment protects

8    assets from depletion.  There was extensive testimony

9    yesterday about how those funds were used and I won't repeat

10   that again.

11        So, instead of analyzing the potential

12   (indiscernible) of the estate and comparing it with

13   litigation risk, Judge, they basically made the shareholder's

14   arguments for them.  The debtor won't pursue these claims.

15   They're going to go over with the sale and they're going to

16   be killed.  Instead of the debtor maximizing the potential

17   recovery to the estates by filing a plan that has those

18   claims funneled into a litigation trust for prosecution for

19   the benefit of all the unsecured creditors.

20        Judge, this behavior simply cannot fulfill the

21   debtor's duty to maximize the value of the estate for its

22   various constituencies.

23        Subjective bad faith, Judge, exists in this case;

24   objective and subjective.  Mr. Portwood had no explanation

25   for why he didn't disclose that pending department of justice

investigation and the subpoenas received.  He disclosed the

subpoenas received by the SEC.  He disclosed the other

investigative matters, but he never disclosed investigation

into the price fixing.

I think it's interesting, Judge, and to the extent

that Mr. Nash or anybody would argue that this is just

wishful thinking on my part.  When Mr. Bonaccorsi was on the

stand I showed you a chart created by the JRT parties.  And

you can see there, Judge, that what really has effected this

business was the announcement of price gouging.

Mr. Bonaccorsi very clearly pointed out that when

Hilary Clinton mentioned it that there was price fixing in

the generic drug industry and then subsequently when their

investigations were started ironically it's in the period

between 2015 and 2016 when the MDL litigation was started and

as I understand when the antitrust defendant that left the

firm was in control of the debtor.

So, it is subjectively bad faith, Judge, when the

debtor fails to show things on its schedules that would be

detrimental to the principals or the officer's retention of

their position as management of the case.

The courts heard testimony, Judge, that the MDL

litigation wasn't even disclosed to PJT.  And when we're

looking at the valuation of assets we don't know whether

purchasers knew about it and the debtors own financial

1    advisors didn't.  We don't know whether any of the

2    information about that investigation was in the data room.

3         So, what do people know who are looking into the

4    data room?  When they look in the data room, Judge, what they

5    see is that the debtor here had a $4 billion dollar sale and

6    that its assets are now worth whatever they're worth.

7    They're being bid on by the term loan creditors.

8         In the industry I would imagine, Judge, that

9    knowledge of the Fresenius litigation has gotten well around

10   the pharmaceutical world.  And so we don't know the effect

11   that this pending investigation may be known to other

12   pharmaceutical companies, but not known to the U.S. Trustee,

13   to the court, to the creditors.  We don't know whether the

14   information that relates to this MDL litigation or the

15   antitrust investigations influenced the purchase prices.

16        The fact of the matter is, Judge, we'll never know

17   because it wasn't appropriately disclosed.  The debtors paid

18   out excessive bonuses.  They disclosed them in the SEC

19   filings, but admitted them in the disclosure statement.  We

20   saw from testimony yesterday that directors got double

21   payments.  It's supposed to be 103,000 a year.

22        One director in the course of three months got over

23   $250,000 dollars.  And the explanation by Mr. Bonaccorsi was,

24   well, we may have called it a director's fee, but it was

25   something else.  Well, Judge, that is very disturbing and

1    that's another indication that the debtor hasn't been candid

2    with any of the creditors or the court about what is going on

3    in these cases.

4         The plan is not fair and equitable, Judge.  Only

5    the secured creditors being paid by virtue of its retention

6    of the assets subject to which it has liens.  And the secured

7    creditor is not impaired.  It gifted money.  That money --

8    that gifted part of the money is in the credit bid.  They

9    recovered it when they recovered the assets.

10        As I argued earlier all of the financial

11   attributes, including the tax attributes went with the

12   corporate shell and the assets over to the term purchaser.  I

13   wonder, Your Honor, whether the UCC would have responded

14   differently had they known that the pending investigation or

15   had they had known that Mr. Kapoor left the company because

16   he, himself, was an antitrust defendant.  We will never know

17   whether that information would have influenced it because it

18   was never disclosed.

19        THE COURT:  What is the evidence in the record that

20   that information wasn't disclosed to the committee?

21        MR. GEORGE:  I'm sorry, Your Honor.

22        THE COURT:  What is the evidence in the record that

23   that information wasn't disclosed to the committee?

24        MR. GEORGE:  Well, I don't think there was any

25   evidence that was disclosed to the committee, Your Honor.  If

1    I misspoke -- the point of the matter was the first time we

2    learned about it was during the trial in this case.

3              THE COURT:  Okay.

4              MR. GEORGE:  Your Honor, with respect to the best

5    interest of the creditors the plan has to treat each creditor

6    better than it would be receiving in the course of a

7    liquidation unless that creditor agrees otherwise.  The

8    market value of that package, Judge is worth way more than

9    the debt based on the debtor's MOR's and they are in evidence

10   in this case.

11             We know, Judge, that that is not necessarily the

12   value of what they actually received.  It may have been --

13   the value of the credit bid may have been value for purposes

14   of determining whether the debtor maximized value in the

15   context of a liquidation sale.  So, it doesn't mean that

16   those are the book value of the assets that they received.

17   And I think I talked about that earlier.

18             And in the best interest test, Judge, in a

19   hypothetical liquidation, as I mentioned, the trustee could

20   have simply turned the keys back over to the secured creditor

21   or run the company for a period of time in order to liquidate

22   it and retain the claims.  Administrative expenses in the 11

23   would have been very low and so would the expenses in the 7.

24             Your Honor, under 1124(a), in order to be impaired,

25   it must (indiscernible) legal or equitable right with respect

1    to prepetition obligations.  And in this case, Judge, what

2    did the secured lender get, we have a petition, we have a

3    standstill, it got the right to engage in a stalking horse

4    credit bid and Mr. Bonaccorsi testified there were no

5    defaults under any of the standstill agreements and there is

6    no default today.

7         All other impaired classes in the plan received

8    nothing, Your Honor, and, therefore, concludes the need to

9    reject.  So, there are no impaired classes voting in favor of

10   this plan.

11        Your Honor, this plan violates the absolute

12   priority rule because it allows the shareholders who received

13   debtor money to retain that money before unsecured creditors

14   like my clients received any money and that's not fair to my

15   client and it's not fair and equitable.  Its bad faith and it

16   shows the extent to which the debtor used all of its

17   prepetition time to try to make sure that my clients received

18   no money.

19        Therefore, with respect to this plan, Judge, it

20   violates the absolute priority rule.  And, Judge, that

21   liquidation analysis isn't a liquidation analysis at all.  It

22   didn't try to value the company in any way.  It assumed that

23   the company was being sold as part of the plan process

24   instead of valuing the assets that were actually being

25   provided under the plan.

1          It does not demonstrate that creditors receiving

2     more here than they would in a Chapter 7 liquidation unless

3     the Chapter 7 liquidation assumes that the lockdown

4     agreements and the shareholder settlements were all valid and

5     enforceable.  That is an assumption we can't make under these

6     circumstances.

7          So, Your Honor, in closing, I would say that this

8     plan is not confirmable.  There is no accepting class.  It

9     was proffered in bad faith.  In an effort to try to make sure

10    that my creditor class received no money.  And, Your Honor, I

11    want to make clear that our intention is to make sure that we

12    pursue every single part, whether it's an officer, whether

13    it's a director, whether it's a bankrupt, whether its anybody

14    who maybe conspired with the bankrupt to try to make these

15    funds whole, these funds that take care of the elderly and

16    infirm, and who are beleaguered by excessive prices for

17    consumer drugs.  We're going to protect them by pursuing

18    everybody to the full extent of the law and if that means

19    pursuing them in the bankruptcy court that is what we're

20    going to do.

21          So, Judge, I urge you not to confirm this plan.

22    And I urge you to find that the debtor has not met its burden

23    and deny confirmation.

24          Thank you, Judge.

25          THE COURT:  Thank you, Mr. George.  I appreciate

1    you tying some of those points together for me.  I have no

2    questions.  I appreciate your time.

3           All right.  Is there anyone else in opposition of

4    the plan?

5           Mr. Parker, I see you came on our video screen.

6    Please go ahead.

7           THE COURT:  All right.  Is there anyone else in

8    opposition of the plan?

9           Mr. Parker, I see you came on our video screen.

10   Please go ahead.

11          MR. PARKER:  Yes, Your Honor.  Good morning or

12   perhaps afternoon -- we're almost there.  I'm going to try

13   and be as concise as I can.  I'd like to talk about three

14   things for the Court in general.  The first one is the best

15   interests on the creditors test; the second one would be

16   unfair discrimination; and then third, I'm going to talk

17   about the breadth of the releases and the extension

18   provisions.  And those last ones really come into play only

19   if the Court decides to confirm a plan, obviously, but let me

20   start with kind of where I see us at right now.

21          And that is we're in a new world, given that the

22   Court has already approved the sale of the business and the

23   debtors in their legal memorandum made a lot of the fact

24   that, you know, we wanted to make sure that the business was

25   preserved as a going concern and employees got to continue to

1    go on, and all of these things that are important in the eyes

2    of a normal reorganization, that's going to happen in the

3    context of a sale order.  That's happened.  That's all

4    happened, right.  That's in the past.

5         Now, what we're talking about is the best vehicle

6    -- and Mr. Nash alluded to this -- we're talking about the

7    best vehicle to liquidate the remaining assets, right, and in

8    my view, that can be either the plan or a Chapter 7 Trustee.

9    I'm not sure about a structured dismissal, but I understand

10   why Mr. Nash might bring that up.  That gives him a little

11   more control over what's happening, but I view those as kind

12   of the options.

13        And I think the Court needs to consider the votes

14   under this plan, right.  All of the creditor classes, except

15   the term loan lenders, who now have their sale, who now have

16   their ongoing business in place, everybody else rejected the

17   plan.  Everybody else rejected the plan.

18        What we're asking for and what we're after is an

19   opportunity to get something that the plan wouldn't.  I think

20   the Court asked a question briefly a minute ago of Mr. George

21   and that is, What's left?  Right.

22        We would argue, Your Honor -- and I know Mr. Nash

23   has argued otherwise -- that there are causes of action that

24   the debtors still have and are retained.  And it's not clear

25   -- I can't establish absolutely, but those things can be

1    pursued by a Chapter 7 Trustee, an independent fiduciary to

2    the estate could certainly look at those and investigate

3    those.

4           We know under these shareholder settlements that

5    we've been complaining about that there's money in escrow,

6    $27.5 million.  Whether that can be retained or not, I can't

7    absolutely say that to the Court today, but if the Court

8    approves the plan, that goes away.  There are other assets.

9    This proposed settlement that they're bringing in to try and

10   resolve with the other creditors.

11          What the unsecured creditors are looking for is an

12   opportunity to have an argument that we're entitled to those

13   asset before the shareholders get those assets and if the

14   Court confirms this plan, that opportunity goes away.

15          So, we believe the chief comparison the Court needs

16   to make now is between confirmation of a plan and a Chapter 7

17   and what a Chapter 7 Trustee might do.  Nothing as -- and I

18   don't intend anything to -- nothing stands in the way of the

19   sale -- that's in the past -- and the term loan lenders got

20   what they bargained for.

21          So, under the best interests of the creditors test,

22   as the Court knows, we look at exactly that issue.  What's

23   the -- that are for an individual creditor in this case, look

24   at those creditors that currently right now are getting

25   nothing under the plan -- Provepharm, Mr. George's clients,

1    and Fresenius -- all of those parties are getting nothing

2    under the plan.

3           So, what is there for us to lose in having a

4    Chapter 11 Trustee come in and look at these potential causes

5    of action and look at the potential that we might actually

6    get something brought back into the estate?

7           We would argue, Your Honor, that the liquidation

8    analysis -- and I was brief in my assessment of it -- the

9    liquidation analysis doesn't apply.  What Mr. Kocovski -- and

10   I've already forgotten AlixPartners' partner's name --

11   Kocovski, what he argued all was based upon an assumption

12   that doesn't apply, doesn't currently apply, and that

13   assumption is that the assets haven't already been sold, that

14   that has already been put in the past, right.

15          And once you take away that assumption, once you

16   look at a balance sheet without that, all of the hurdles, if

17   you will, and the liquidation analysis to the creditors

18   getting some recovery, goes away because the term loan lender

19   is the hurdle under that liquidation analysis to anything and

20   the waterfall going down to creditors below that term loan

21   lender.  And so as a result, because the sale is now in

22   place, we believe there's opportunity for us, just like the

23   shareholders are seeing opportunity in those policies, we

24   believe there's opportunity for us to try and recover some

25   money from the estate.

1            A Chapter 7 Trustee, we believe, would not be

2    providing the releases that are in the plan, would not be

3    providing any releases in the plan.

4            And Mr. Nash argues that all of those causes of

5    action have already gone away, you know, he's certainly

6    entitled to that view.  That doesn't mean that in all of

7    those D&O policies that we say, that there's not something

8    there for the unsecured creditors.

9            We believe a Chapter 7 Trustee would investigate

10   and potentially challenge the shareholders' settlement,

11   potentially, pursue causes of action under the D&O policies.

12           Let me move briefly on to the unfair discrimination

13   point, Your Honor.  And this one changed a little bit.  In my

14   initial objection, once the debtors subordinated the class

15   with the Bella funds, once they subordinated them, I

16   understand that was a portion of my unfair discrimination

17   argument, but there's still some remaining and what Mr.

18   George has indicated, at least in part, I think also applies,

19   and that's while I realize the shareholders are being paid

20   outside the plan, the only opportunity for us to challenge

21   that under the absolute priority rule or something else is to

22   have an independent fiduciary come in and give us the

23   opportunity to challenge that right now.

24           Because currently, as it exists, Mr. Nash will

25   argue, well, those payments are being made outside the plan

1    and so, they're not unfair discrimination because those are

2    not being made within the plan itself.  The problem is we --

3    the plan, itself, prohibits us from trying to challenge

4    those, from going after those on its own.

5            And so, we would argue, effectively, it is unfair

6    discrimination under the plan because it cuts off or

7    opportunity to ever go after or challenge those settlements

8    or ever go after or seek recompense from those D&O policies.

9            And this is going to take a little bit longer, Your

10   Honor.  On the releases, we believe the releases, as crafted,

11   are much too broad and violate Delaware law; in particular,

12   we can go through the Zenith factors that I know Delaware

13   Courts apply and lots of courts apply.  And under the Zenith

14   factors, as I understand them, Your Honor, the first one

15   being an identity of interests between the debtors and the

16   nondebtors such that a suit against the nondebtor will

17   deplete the estate's resources, we don't believe there's

18   evidence in the record that shows an identity of interest for

19   all of the parties that the debtors seek a release for.

20           In particular, we made the arguments -- well, both

21   the argument and in cross-examination revealed that when

22   debtors were seeking releases for former employees, former

23   directors and officers, any number of former entities that

24   may well be pursuable by a Chapter 7 Trustee.  So, we think

25   the releases don't identify an identity of interest between

1   those parties.

2           Second, under the Zenith factors, those who are

3   getting a release have to show a substantial contribution to

4   the plan.  There's been no substantial contribution to the

5   plan.  The term loan lenders, they credit bid and they got

6   their bargain, right; they got those assets back.

7           But the releases requested by everyone else by

8   former officers and directors -- I'm alluding to Mr.

9   Bonaccorsi's testimony yesterday that somehow because someone

10  worked for the company before or helped found the company,

11  that would serve as consideration, I just I can't see any

12  Court ever approving that as a form of consideration, Your

13  Honor.  And we don't believe that there was any consideration

14  shown by former employees, former officers and directors and

15  all of those parties.

16          I would also note here that the real creditors in

17  interest here -- and I'm not categorization aspersions at the

18  creditors committee -- but the noted in my objection that

19  realized the members of the creditors committee, four of

20  those were trade creditors whose contracts were going to be

21  assumed, right, and so they're going to get paid.  And then

22  the other one was the Gavella funds, who has now been

23  subordinated, but in terms of real parties in interest under

24  the plan, that's all these creditors that are not getting

25  anything under this and as a result, you know, what do we get

1    from a non-consideration release to former entities, former

2    directors, former officers?

3         Third Zenith factor, necessity of the release to

4    the reorganization.  Again, if we're post-sale, and we are,

5    the reorganization now is just a vehicle to liquidate the

6    remaining assets.  This is a shutting-down.  This is a

7    going-forward and we don't see them, the releases,

8    themselves, as in any way being necessary to a reorganization

9    of the proceedings.  This is a full-on liquidation and we

10   believe the best vehicle would be a Chapter 7.

11        The fourth one is easy and that's overwhelming

12   acceptance of the plan and release by creditors and interest

13   holders.  We already know that there was an overwhelming

14   rejection of the plan by everyone, except the term loan

15   lenders and the term loan lenders now have what they want.

16   Those votes were all taken before the sale, but the term loan

17   lenders now have the benefit of their bargain.

18        Lastly is the fifth Zenith factor is the payment of

19   all or substantially all of the claims of the creditors and

20   interest holders under the plan.  The plan does not provide

21   any meaningful recovery under the circumstances.  Akorn wants

22   to, obviously, have it cake and eat it, too.

23        Creditors whose claims are getting assumed by the

24   purchaser in the sale occurring before plan confirmation are

25   not getting recoveries pursuant to the plan.  So, I

1    understand that they're getting recoveries -- and I'm not

2    saying that's a bad thing; that's obviously a good thing --

3    but the fifth Zenith factor looks at recoveries pursuant to

4    the plan and there are no recoveries pursuant to the plan

5    under that fifth Zenith factor.

6           Mr. Nash made reference to 68 times for a board

7    meeting and we have certainly some evidence to that effect.

8    That might apply to existing directors.  That certainly

9    wouldn't apply to former officers, employees, or directors,

10   and so the release, itself, would be way too broad in that

11   instance.

12          Next, Your Honor, I'm going to talk about the

13   exculpation provision and my arguments there are very simple.

14   The law, I believe, in Delaware is that those exculpation

15   provisions should only apply to fiduciaries and I understand

16   the reason for that and I'm not opposing an exculpation

17   provision if the Court should confirm the plan.  But the

18   extent of this exculpation provision, I think, goes beyond

19   the pale.  It applies to many more entities than the

20   fiduciaries, themselves.  It attempts to apply to the term

21   loan lenders and everything that they've already gotten.

22          They got their release as part of their bargain.  I

23   get it and I'm not trying to go after them, I'm just saying

24   the exculpation provision is too broad.  And then, finally,

25   it appears to apply -- I'm sorry.

1          THE COURT:  Mr. Parker, let me just interrupt you

2    for one second because I'm confused on this point as well,

3    because the defending of exculpated party in the current

4    version of the plan that I have says, A, the debtors -- the

5    exculpated parties are the debtors and the committees and

6    then they're related parties.

7          So, am I missing -- and anyone can chime in here --

8    I thought the exculpation provision was scaled back and does

9    not apply to non-estate fiduciaries.

10         MR. PARKER:  Maybe I missed a version, Your Honor,

11   but let me double-check on that.

12         And Ms. Cornish, if you're looking at that, please

13   advise.

14         THE COURT:  Okay.  And, quite frankly, the brief in

15   support of the plan seemed to indicate that it was larger

16   than just non-estate fiduciaries.

17         So, Mr. Nash, I see that you -- I'm not here for

18   argument, but topics that you can confirm that it's just

19   estate fiduciaries, that would be helpful.

20         MR. NASH:  Just estate fiduciaries, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         MR. PARKER:  If that's true, then I'll move past

23   that, Your Honor.

24         THE COURT:  Okay.  I appreciate that.  I had that

25   on my list of questions and I forgot to ask Mr. Nash, so

1    thank you, Mr. Parker, for bringing that up.

2            Thank you, Mr. Nash.

3            MR. PARKER:  Your Honor, I think that is all I

4    have.  I'll let Ms. Cornish follow-up.

5            THE COURT:  Let me just ask you one question, Mr.

6    Parker, and this goes to the best interests test.  I

7    certainly understand your position that I think the wind-down

8    budget pays admin claims.  I think the evidence is clear on

9    that, that the wind-down budget that's currently sitting in

10   the plan is going to pay for the admin claims.

11           So, I think your argument is that if there was a

12   cause of action that it should inure to our benefit as

13   general unsecured claimants and that's more than what we're

14   receiving here.  I should say a cause of action that's not

15   being released in the context of a Chapter 7 that's currently

16   being released today, if there's a recovery on that claim, it

17   would inure to our benefit.

18           I think your understood the debtors' position that

19   there's nothing to pursue.

20           MR. PARKER:  Yes, Your Honor.

21           THE COURT:  And your position is, well, maybe there

22   is something to pursue, but I have evidence that there's

23   nothing to pursue.

24           So, isn't today the time that we would need to

25   debate that?

1          MR. PARKER:  Well, what Your Honor has is evidence

2     that two lawsuits were settled and argument that those two

3     lawsuits resolved any and all direct or derivative claims

4     that might occur, and I would argue, Your Honor, that those

5     two lawsuits do not in and of themselves proceed to foreclose

6     any sort of cause of action that might be brought under the

7     D&O policies, all of which are in evidence.

8          THE COURT:  But what are those alleged claims and

9     causes of action?

10          MR. PARKER:  Well, Your Honor, the cause of action

11     under the D&O policy would be similar to what the

12     shareholders, I guess, are alleging or what the shareholders

13     have alleged and that is fraud and mismanagement by the

14     debtor in the past, right.  It would be obviously a

15     prepetition-type claim, but it would be a claim that we could

16     potentially assert.

17          And confirmation of the plan forecloses any sort of

18     claim, forecloses any sort of or full-on investigation of

19     those claims.

20          THE COURT:  So, and I just want to be clear because

21     there's been a lot of confusion, so is it your position that

22     there are claims beyond those claims that have been released

23     in the Kogut settlement, related to the Fresenius litigation

24     that exists and are viable things of action that can be

25     pursued against the directors and officers that are not

1    currently carved out in the fraud-and-willful misconduct

2    carve-out in the debtor releases?

3              MR. PARKER:  We believe so, Your Honor.

4              THE COURT:  Okay.  And what are those?  Where in

5    the evidence do I look to an actual viable cause of action?

6              Because I think this is an important point.  I

7    mean, we're relying on the evidence.  So, where is it?  Where

8    can I look?

9              Because I'm struggling, because I am empathetic to

10   your argument.  And it is a very interesting concept that

11   you're alleging and we have testimony from Mr. Nash who's

12   saying, you know, it doesn't even really matter if we don't

13   confirm this plan because things are just going to stay the

14   same and, you know, it will just proceed.  It's really

15   effectuating nothing.  It doesn't have an effect at all.

16             So, I need to understand what is the effect?  What

17   is the actual effect that this plan is doing to injury your

18   clients?

19             And I'm struggling with that, so I'm giving you the

20   opportunity to give me something specific here if you can.

21   And I know I'm putting you on the spot, but I want to give

22   you an opportunity to address that.

23             MR. PARKER:  I (indiscernible) identify

24   specifically something, I need to take a minute to try and

25   look back at the record or defer to Ms. Cornish, who I

1    noticed has jumped on here --

2              THE COURT:  Okay.

3              MR. PARKER:  -- if she's got something

4    specifically, Your Honor.

5              THE COURT:  Okay.  Well, Ms. Cornish can address me

6    during her closing and if she can address that answer, I

7    would be glad to hear that, because, again, I am sympathetic

8    and if there is something that can be identified, maybe

9    that's something that we can all think about, but to date, in

10   the argument, I haven't yet heard anything that has been

11   identified with specifics, so I'm struggling with that.

12             And I think your argument is that we should have

13   someone investigate that.  Maybe there is something, right,

14   maybe there is and we're foreclosing that, and please give us

15   the opportunity to try to find some money for our creditors

16   here, but I have real testimony in the record that there is

17   nothing and I have testimony from a committee who says they

18   did an investigation.  So, I think that I'll certainly give

19   you an opportunity to highlight or point something out and

20   I'll give Ms. Cornish the opportunity to do so, but that, I

21   just wanted to give you the benefit that that's that I'm

22   struggling with.  So, to the extent that you can, at some

23   point identify that, that would be very helpful, okay.

24             MR. PARKER:  Okay.

25             THE COURT:  Thank you.  And that really was my only

1    question, so I'll give you time to think about that and come

2    back, if you're able to (indiscernible) --

3              MR. PARKER:  Okay.  Thank you.

4              THE COURT:  Thank you.  And I interrupted you, Mr.

5    Parker, so I'll allow you to conclude if there's anything

6    more.

7              MR. PARKER:  Actually, I think I had concluded and

8    you just had a couple questions, Your Honor, so I'm ready to

9    pass to Ms. Cornish.

10             THE COURT:  All right.  Thank you.

11             All right.  Ms. Cornish?

12             (No verbal response)

13             THE COURT:  Ms. Cornish, you are on mute or you may

14   have dropped off from CourtCall.

15             MS. CORNISH:  No, I can't get the phone and the

16   video straight.  I apologize, Your Honor.

17             THE COURT:  That's okay.

18             MS. CORNISH:  Just a quick question, are we

19   planning on taking a lunch break?  And the reason I ask is, I

20   would like an opportunity to circle to our client to just

21   confirm his view as to whether he wants the Court in view of

22   comments, in particular, that Mr. Nash has made, in his

23   closing presentation, if our client would like us to go to a

24   ruling on the subordination issue.

25             And then also, I will have -- so, that, I may or

1    may not be making that presentation and, secondly, I will

2    have a closing that will take me some period of time, for

3    sure, including, Your Honor, I am planning on specifically

4    identifying potential causes of action and addressing -- it's

5    really not evidence; it's Mr. Nash's arguments that there are

6    no such causes of action.  It's not evidence, but anyway,

7    I'll get there.

8              THE COURT:  No, that's very helpful.

9              I do think we should give a break, given, it sounds

10   like you have significant closing argument and then the

11   debtors, of course would probably want some redirect, and I

12   get very grumpy if I don't eat lunch, so I'd like to take a

13   break until 1:00.  So, let's take a break until 1:00 and

14   we'll come back and we'll hear the remainder of the

15   arguments, all right.  So, thank you all very much.

16             MS. CORNISH:  Thank you, Judge.

17             (Recess taken at 12:20 p.m.)

18             (Proceedings resumed at 1:10 p.m.)

19             THE COURT:  I'm sorry for the delay.  I appreciate

20   your patience.  Why don't we go back into argument, unless,

21   Mr. Nash, did you have something that was a housekeeping

22   item?

23             MR. NASH:  No, I didn't, Judge.  Sorry.  I'll go

24   back off the video.

25             THE COURT:  Oh, that's okay.  That's fine.

1          Okay.  Ms. Cornish, the floor is yours.

2          MS. CORNISH:  Thank you.

3          Good afternoon, Your Honor.  Kelley Cornish from

4    Paul Weiss on behalf of Fresenius Kabi in these proceedings.

5          Your Honor, first, I appreciate the break and I

6    think it was very constructive with respect to the 3013

7    motion.  In the interests of efficiency here, we would be

8    willing to withdraw the motion without prejudice.

9          And we spoke to counsel for the MDL plaintiffs, as

10   well as Provepharm, and they are fine with putting something

11   in the confirmation order which essentially provides that if

12   we ever get to a point, if Your Honor confirms the plan,

13   obviously, and we have a confirmation order that -- and if

14   there's ever a point in time where there are asset and

15   recoveries to be distributed and there's a claims process, et

16   cetera, at that we could raise the issue of subordination at

17   that point in time, but that we really are almost just

18   kicking the can down the road, because if Your Honor confirms

19   the plan, it is highly unlikely, as Mr. Nash pointed out at

20   the beginning of the proceedings, it may very well not be an

21   issue.

22         THE COURT:  Okay.  Well, that seems like a

23   practical solution to that motion.

24         Mr. Nash, I assume you would be -- would that be

25   acceptable to your client?

1          MR. NASH:  I haven't had an opportunity to ask him,

2     but I'd assume it is, Judge, yes.

3          THE COURT:  Oh, okay.

4          All right.  Well, thank you, Ms. Cornish, I

5     appreciate that.  Then why don't we address your client's

6     plan concerns, then.

7          MS. CORNISH:  I'd be happy to, Your Honor.

8          Your Honor, one of the fundamental requirements of

9     Chapter 11 is maximizing value for stakeholders.  Mr. George

10    noted that in a number of the requirements that he covered

11    and that's been realized, Your Honor, in these cases for

12    every constituency except one, the unsecured litigation

13    claimants.

14         As Your Honor found on Wednesday in approving the

15    sale of the company, the term lenders are receiving their

16    maximum recovery available under the circumstances after the

17    company's marketing process through their credit bid purchase

18    of the company as a going-concern.  Similarly, employees and

19    business partners of the debtors will have their claims paid

20    in full and their contracts cured and assumed through the

21    sale.  And, Your Honor, remarkably, through the eleventh hour

22    UCC settlement, even the unsecured creditors that are not

23    going to have an ongoing business relationship with the

24    buyer, that is folks that have had their contracts rejected

25    or their claims unpaid who should be, otherwise, pari passu

1    with the unsecured litigation claimants, they will also be

2    paid in full.

3        And, finally, Your Honor, even the shareholders, as

4    you've heard, who should be subordinates of the litigation

5    claimants have received substantial recoveries here through

6    prepetition settlements that have funneled essentially all of

7    the D&O insurance proceeds available, otherwise, to the

8    debtors to them in exchange for releases.  And those

9    settlements were done, Your Honor, and the evidence shows

10   that they were done at a time when Akorn knew that it would

11   be filing Chapter 11.  All of these stakeholders have truly

12   maximized value here, but, again, Your Honor, this narrow

13   band of creditors, the unsecured litigation claimants stand

14   to receive nothing in this plan is confirmed.

15       Your Honor, the going-concern sale has been

16   approved, it's behind us, it was bifurcated from the issue

17   that's before the Court today and that's whether to confirm

18   the liquidating plan.  And as Your Honor, I think, clarified

19   through Mr. Nash in his opening, the sale is not conditioned

20   on confirmation of this plan.

21       Your Honor, as a result of all that, the term

22   lenders, the non-litigation unsecured creditors and the

23   shareholders really have no stake whatsoever in the plan

24   that's before you.  They already have their recoveries,

25   either through settlements that were outside of the plan or

128

1     the sale.

2              And by contrast, the only constituency having a

3     stake at this point in time are the litigation claimants.

4     And as others have already pointed out, all the creditor

5     classes, except the term lenders, have voted against the

6     plan; nobody supports it.

7              I think that the counsel before me have identified

8     two alternatives -- what do we do if the plan is not

9     confirmed? -- and those are pretty obvious.  It would be some

10    sort of structured dismissal or conversion to a Chapter 7.

11    And so, we ask ourselves as, frankly, the parties that are

12    the parties in interest right now with this plan, what would

13    be the best way for the litigation claimants, like everybody

14    else in these cases, to have a chance to maximize recovery

15    here to something greater than zero?

16             Your Honor, when these cases were filed, it seemed

17    like there might be, at a minimum, valuable estate causes of

18    action to pursue.  We saw when we reviewed the sale motion

19    and the plan that we kind of assumed, particularly in the

20    COVID environment, that the chance that there was going to be

21    a sale, which paid out the term lenders in full was probably

22    very highly unlikely and, in fact, that's what ended up

23    happening.

24             But we did think that there might be valuable

25    estate causes of action to pursue and, Your Honor, I really

1    want to emphasize at the outset the reason, in particular,

2    that we had that sense is because these cases really are

3    truly extraordinary and unique in terms of what has happened

4    over the last several years.  We have a 250-page opinion of a

5    Delaware Chancery Court chronicling wide-ranging misconduct

6    involving gross regulatory noncompliance leading to the

7    Court-approved termination by Fresenius of its

8    four-billion-dollar acquisition of Akorn, which, in turn,

9    sadly, led to the complete financial collapse of Akorn, which

10   has resulted in tremendous damage to many, many parties.

11        Your Honor, I took some time yesterday, as you

12   know, highlighting some, just some examples of that alarming

13   conduct yesterday in the course of Mr. Bonaccorsi's

14   cross-examination and I would just note, also, that the folks

15   that I covered are all former officers, directors, and

16   employees of the company and I know Mr. Parker has already

17   covered this, but I'll also note that those folks -- I get

18   the carve-out for fraud-and-willful misconduct -- but there's

19   lots of causes of action that can be brought against folks

20   engaging in this kind of conduct, including just not paying

21   attention or not doing anything, typical breaches of

22   fiduciary duties, and Mr. Parker has already covered those

23   issues.

24        So, Your Honor, it seemed apparent to us and,

25   obviously, Paul Weiss is intimately familiar with all of the

1  facts here, that those claims, those estate claims really,

2  probably weren't going to be the typical nuisance claims that

3  are often conjured up in Chapter 11 cases out of

4  (indiscernible) by out-of-the-money creditors to exert

5  leverage on senior classes to provide some recovery.  This is

6  a very, very different circumstance.

7        Unfortunately, Your Honor, the debtors have

8  admitted that they did not investigate those claims and their

9  plan grants sleeping releases to every conceivable party

10  here, including the directors, officers -- the former

11  directors, officers, and employees that are responsible -- I

12  guess some current, too -- that are responsible for the

13  collapse of the company.

14        So, Your Honor, a UCC was appointed and undertook

15  an investigation at the outset of these cases and, Your

16  Honor, we spoke regularly and actually provided a great deal

17  of assistance to their counsel over the course of a couple

18  months, who actually reported, I think it was a couple of

19  weeks before the plan confirmation objection deadline, that

20  they were actually pretty much done and they were in the

21  course of preparing draft complaints and standing motions to

22  pursue estate claims.

23        They also talked about possibly suing term loan

24  lenders, but they specifically said, you know, estate claims

25  relating to all of the Fresenius litigation, bad acts, for

1    lack of a better description.

2         Your Honor, after a week of radio silence, however,

3    we learned a couple of days after a number of unreturned

4    phone calls that about a five-million-dollar settlement was

5    reached, which was to pay all of the non-litigation unsecured

6    claimants and leave the litigation claimants out to dry, and

7    sure enough, two hours before then plan confirmation

8    objections were due -- I think they were due at noon on a

9    Wednesday -- we got an amended plan at about 10:00 or 10:30,

10   which reflected that settlement.

11        Your Honor, there has been -- there's a lot of talk

12   about the UCC's investigation, in fact, Your Honor made

13   reference to it before the break, and all I'll say is no one

14   knows any of the details of that investigation.  No one knows

15   what claims were investigated.  No one knows what findings

16   were made.  No one knows what merits or lack of merit

17   existed, the risks, et cetera.  There's a lot of very

18   sweeping statements made -- the costs of litigation, the

19   risks of litigations, it's speculative and it's all that --

20   but we sure don't have a 9019 motion, for example, anywhere,

21   that lays out that this is what was identified to look into.

22   You get the gist, Your Honor, and resulted in a

23   five-million-dollar settlement.

24        We have heard a number of times that the if you

25   five-million-dollar settlement was justified because people

1    didn't want to update the sale.  So, we'll settle everything

2    for $5 million.

3           Well, Your Honor, that makes absolutely no sense.

4    The unsecured creditors committee may have done a

5    broad-ranging investigation, including potential claims

6    against the term lenders, but they were not required to sue

7    the term lenders at the end of the day.  They could have left

8    the term lenders and the sale alone and I understand why they

9    would want to do that:  reserve the going-concern, employees,

10   jobs, everything we've talked about.

11          They could have, rather, just focused on other

12   valuable estate claims that were tied to the facts that were

13   found by Vice Chancellor Lasseter in his decision, and we

14   believe, Judge, there's a pretty good chance that those

15   claims, if they were properly pursued would be worth a lot

16   more than $5 million.

17          And I've already noted this, Your Honor, but I'll

18   just state it again, that this nominal settle, what we

19   believe to be a very nominal settlement that we get, we don't

20   even get the benefit of; it goes all to pari passu creditors,

21   and that's the disparate treatment part of this from a

22   technical view.  It was not subjected to Rule 9019 scrutiny,

23   so we will never know the details of that investigation and

24   what's been settled.

25          The only parties, Your Honor, who are left to be

1   affected by the liquidating plan, as I've mentioned, believe

2   that there should be a true estate fiduciary in the clear

3   light of day put in charge of investigating and pursuing

4   these claims.

5         And I want to emphasize, again, Your Honor, this is

6   an unusual case in terms of the record that's out there.  The

7   shareholders have, obviously, done quite well riding on the

8   coat-tails of, in terms of emptying out all the D&O proceeds

9   with respect to those potential causes of action and the

10  facts that underlie them.

11        Your Honor, the debtors have gone a very long way

12  in these hearings and I would say it's almost by way of

13  argument.  I really want to make that distinction -- not by

14  evidence -- to make a record that their prepetition

15  settlement of a series of shareholder direct and derivative

16  claims are not available, really, for two reasons.  One, they

17  say that those settlements preclude any estate claims being

18  brought in bankruptcy as a matter of law, and, two, in any

19  event, they argue that the D&O insurance proceeds that are

20  being used to pay those settlements, oh, they're not in the

21  debtors' estate, they don't belong to the debtors, and

22  they're beyond -- in any event, they're beyond everyone's

23  reach.  They're sitting in an escrow or they're gone.

24        Your Honor, we certainly do not know -- and I think

25  this is one of the reasons that my colleague, Mr. Parker, was

1   hesitating somewhat in answering some of your questions -- we

2   don't know all the facts here.  We weren't doing an

3   investigation during these cases; that was the UCC's job.

4          But, Your Honor, we challenge both of those

5   premises.  First, Your Honor, the prepetition settlement of

6   those shareholder actions, the Kogut action and the other

7   actions, do not operate as *res judicata* for estate claims

8   that would be brought by an estate fiduciary.  Contrary to

9   that assertion, Your Honor, *res judicata* only forecloses a

10  party from bringing a claim where that claim is:

11         "Based on the same cause of action after a judgment

12  has been entered in a prior suit involving the same parties

13  or parties in privity with those parties."

14         And that's a quote from a Delaware case.  It's

15  called <u>Betts v Townsends</u>, 765 A.2d 531,534.  It's a 2000

16  Delaware decision.

17         Your Honor, for purposes of *res judicata* , parties

18  are in privity when their interests are identical or closely

19  aligned, such that they are actively and adequately

20  represented in the prior suit, and that principle is

21  reflected I think in many places, but in a case called <u>RBC</u>

22  <u>Capital Markets</u>, 87 A.3d 632, 643, Delaware 2014, and it's

23  quoting a prior Delaware decision called <u>LaPointe</u>.

24         Your Honor, in the bankruptcy context, the Third

25  Circuit has held that a trustee is not necessarily in privity

1  with a prepetition debtor of the company prepetition because

2  the trustee or the debtor-in-possession represents the

3  interests of all creditors, all creditors of the bankruptcy

4  estate.  And that's a quote from In re Montgomery Ward, 634

5  F.3d 732, 738.  It's a Third Circuit decision, Your Honor,

6  from 2011.

7       And in that case, the Third Circuit found that *res*

8  *judicata* did not bar a bankruptcy trustee from asserting a

9  claim that challenged a prepetition lease.  The Court

10 reasoned that although the prepetition debtor could have

11 asserted such a claim, the debtors' incentives were not

12 aligned with that of the trustee and the Court stated:

13       "The legal relationship between the trustee and the

14 pre-bankruptcy debtor is incomplete, given the reality that

15 the trustee represents the general creditors' interests."

16       And the Court noted that this is especially the

17 case when the interests of the creditors diverge from those

18 of the debtor.  There are District Court rulings, Your Honor,

19 in the Third Circuit that have made similar holdings.  I'll

20 just give a couple cites.  I won't go into the details.

21       There's one called -- I can't pronounce it --

22 Tzanides -- I think that was pretty good -- T-Z-A-N-I-D-E-S,

23 and it's 574 B.R. 489, 522.  It's a bankruptcy, District of

24 New Jersey decision in 2017.  And then there's another

25 District of New Jersey case called Good Time Charlie's, 54

1      B.R. 157, 160.

2              Your Honor, the Eighth Circuit has extended this

3      principle to apply where even where one creditor was party to

4      a prepetition action, saying that the trustee is not

5      precluded from relitigating the very same issue on behalf of

6      all the creditors, because the trustee represents all

7      creditors of the estate, and that's called <u>Williams</u>, 267 F.3d

8      749, 753 (8th Cir. 2001).

9              Your Honor, here it is clear that an estate

10     fiduciary would not be in privity with the prepetition

11     company Akorn and, therefore, *res judicata*   should not

12     operate and we think would not operate to preclude a trustee

13     or an estate fiduciary from asserting claims on behalf of all

14     the creditors that were purportedly released in the Kogut

15     settlement or any of the other settlements for that matter.

16             First, Your Honor, none of the unsecured creditors

17     were party to the Kogut suit, none of them -- there were

18     shareholder suits -- and so the only interests that were

19     being protected and advocated for and settled for were

20     shareholder interests.  Obviously, the interests of creditors

21     goes -- you know, in that scenario, creditors are paid in

22     full when the company is solvent.  Creditors are paid in

23     full, so no creditor interests were being taken into account.

24

25             The claims were released by the company and its

1    shareholders, not but any unsecured creditors.  Relatedly,

2    the interests of unsecured creditors were not even considered

3    by counsel for Kogut derivative, plaintiffs, much less, the

4    debtors.

5              Second, if a trustee were to bring a claim

6    purportedly released as part of the Kogut settlement, that

7    claim, as I mentioned, would be brought on behalf of both the

8    debtors and all the unsecured creditors on behalf of the

9    estate.  The mere fact that the debtor was a party to the

10   prior suit creates no more than an incomplete legal

11   relationship for purposes of *res judicata*  analysis under

12   <u>Montgomery Ward</u> and, otherwise, and, again, I think I've said

13   this, but, finally, it's clear that none of the unsecured

14   creditors are in privity with any of the parties that were

15   parties to those suits.

16             So, again, Your Honor, we really challenge the

17   argument.  It's not evidence.  Mr. Bonaccorsi, I know he

18   testified that these are all precluded.  He's not a -- he

19   wasn't on the witness [sic] as a legal expert.  The argument

20   that an estate representative would be precluded from bring

21   derivative claims, based on the same facts that the

22   shareholders were riding the coat-tails of the Fresenius

23   litigation and recovered all the proceeds, we believe, could

24   be brought if given the opportunity.

25             Second, as I mentioned, the debtors apparently take

1   the position that any otherwise available D&O insurance

2   proceeds are out of reach because the shareholders'

3   settlements have been fully consummated.  You know, we just

4   don't know the facts, once again.  We didn't do this

5   investigation.  We didn't think that we had to.

6           But it does appear that, at least with respect to

7   the March 2020 class-action settlement, that $27.5 million in

8   proceeds sitting in escrow, and we sure think that a trustee

9   should have the opportunity to consider whether, you know,

10  that settlement should be undone.

11          And, you know, what I'd say about that, Your Honor,

12  is I get it that the company made a settlement prior to a

13  bankruptcy filing, although, I would point out they knew they

14  were going to file for bankruptcy and, you know, I think they

15  filed within two months; nonetheless, once the bankruptcy is

16  filed there, is an obligation, again, to maximize proceeds

17  for creditors in accordance with absolute priority, in

18  accordance with the Bankruptcy Code.

19          And we asked the debtors within a week of the

20  beginning of the case, are you guys going to look at that

21  settlement?  Are you going to see whether there's some way to

22  undo it so that you can take those proceeds that are being

23  funneled to shareholders now that you are in bankruptcy and

24  there's an absolute priority rule?

25          And what we got was, we're going to look at it.

1    We're going to look at it.

2              And, unfortunately, Mr. Bonaccorsi testified,

3    because I asked him yesterday, that the debtors did not

4    consider it, whether that settlement should be unwound.  They

5    did not consider that so that the proceeds could be freed up;

6    in fact, there's a footnote, I believe, in the disclosure

7    statement -- I think it's on page 27 (indiscernible) the page

8    34 -- it's the section of the disclosure statement that the

9    claims are on.  Yeah, here it is.  It's page 26.  I hope I

10   have it right.  That's the original -- it's page -- I'm not

11   going to -- anyway, let me not interrupt myself -- here it

12   is, I've got it.  Page 34, footnote 27 of the disclosure

13   statement basically says that the debtors actually were

14   thinking about filing a motion seeking authorization to

15   actually consummate that settlement and they didn't do that

16   either.

17             And so, it just kind of sits there and, you know,

18   we suggest that the notion that there aren't D&O proceeds

19   that could satisfy what we think are valuable claims is some

20   reason why we shouldn't just be dismissed out of

21   (indiscernible).

22             The last thing I will note, Your Honor, with

23   respect to the policies, themselves, you heard the reference

24   to Side A coverage, I think, with respect to this most recent

25   settlement that we just heard about this morning, that that

140

1    was going to be funneled through Side A.

2         And I am not an insurance policy expert by any

3    structure, but I can tell you that at least with respect to

4    the policy that covers -- and these are policies are all in

5    the record, Your Honor -- the policy that covers the class

6    action that was settled in March has, in addition to Side A

7    coverage, which is D&O coverage, it has Side B and Side C

8    coverage, which are both coverages that deal in various

9    circumstances which provide coverage to the company.

10        And so, we think there's certainly an argument that

11   a trustee could raise that those proceeds under some

12   circumstances, particularly once the bankruptcy has been

13   filed and those proceeds have not yet been distributed,

14   they're assets of the estate.

15        So, I hope that addresses, you know, your question

16   about, you know, what are the claims.  I mean, the

17   shareholders that pursued the claims, maybe the trustee could

18   do even better.  Maybe the UCC has some ideas based on their

19   investigation, but we think it's pretty apparent what the

20   claims would be.  We think that there's D&O coverage that

21   covers the company that should be available.  We hope it's

22   not all been dissipated and paid out.  And, finally, this *res

23   judicata*  argument is just -- it just doesn't work.

24        So, in sum, Your Honor, the plan should not be

25   confirmed.  All of the relevant classes have voted to reject

1    it and nobody supports it.  Your Honor, I do not, and my

2    client does not take this position lightly at all; in fact, I

3    personally don't remember ever taking this position in a

4    case, but I really do think these cases are unique.  They are

5    very unique in that the factual record, you know, that

6    exists, and the fact that here we are with that factual

7    record, here we are.

8              Today, there's been no investigation by an estate

9    fiduciary that we know anything about and we're getting

10   nothing and everyone is being released.  So, Your Honor, we

11   do think that a Chapter 7 Trustee should be given the

12   opportunity to use the wind-down budget to properly wind-down

13   the estate, including to investigate and pursue any valuable

14   causes of action that might exist so that the litigation

15   claimants here, like every other constituency, has a chance

16   of maximizing their recoveries to something that's greater

17   than zero.

18             Thank you.

19             THE COURT:  Thank you.

20             I guess my question to you is how do we get there?

21   So, I'm just trying to think of the many steps I think that

22   we would have to go through.  It seems to me there's a lot of

23   steps that we'd have to go through to get there to get value.

24   So, walk me through the steps.

25             So, I wouldn't confirm the plan and then what

1   happens?

2           We have the money that's sitting, because

3   presumably the sale was consummated, so then there's a

4   wind-down --

5           MS. CORNISH:  The sale gets consummated.  I mean,

6   look, I think that somebody would have to file a motion to

7   convert, I think, and so I think -- and I believe, if I

8   recall the statute, any party in interest can do that for

9   cause -- so there would have to be a motion and that would

10  have to be heard.

11          And I understand that, you know, folks may argue,

12  you know, there's no assets for that trustee to operate the

13  7.  I think what we have to look at is that wind-down budget,

14  what's in there.  And I know a lot of it is to pay admin

15  claims -- I understand that -- and I'm not suggesting that

16  admin claims should not be paid, but I do believe that there

17  is some, whether it's hundreds of thousands of dollars, but

18  there's some money in there for legal counsel and, otherwise,

19  and perhaps, you know, the trustee could use that.

20          And as we've seen in many of these cases, they find

21  contingency lawyers to do these investigations on a

22  contingency basis.  But I think we have to work through it.

23          THE COURT:  Okay.  Thank you.

24          I appreciate your comments and I certainly

25  appreciate you addressing the value here and how it could

1    flow to the estate.  It's certainly interesting.

2              Okay.  I don't have any further questions.  Okay.

3    Thank you.

4              MS. CORNISH:  Thank you, Your Honor.  I appreciate

5    being heard.

6              THE COURT:  Thank you.

7              Okay.  I believe -- is it Entwistle -- is that how

8    you pronounce your last name, Mr. Entwistle?

9              MR. ENTWISTLE:  Yes, it is, Your Honor.  Perfect.

10   That's perfect.

11             THE COURT:  Why don't you go ahead.

12             MR. ENTWISTLE:  Good afternoon.

13             THE COURT:  Good afternoon.

14             MR. ENTWISTLE:  Thank you.

15             And I know we're pretty much at the end here.  You

16   know, I don't know if there's anyone else, you know, who's an

17   objector, obviously.  I'm going to start, if I may, not with

18   the very limited objection that we filed, which I think can

19   be dealt with very briefly, but I'm going to pick up sort of

20   where Ms. Cornish left off on this issue related to the

21   (indiscernible), so it's really in support of our response

22   and I'll try and be very brief about it.

23             First of all, Your Honor made a very apt

24   observation when you noted that the settlement of the class

25   action is outside the estate.  It certainly is.  It was

1    initially approved by a Federal Court in Illinois well

2    before, you know, where we are now, certainly well before the

3    petition.  That settlement actually had about nine months

4    before the petition, as the Court is aware, from the papers.

5    There's no dispute about any of that.

6              There also, I don't believe, is any dispute that

7    that settlement is fully consummated at this point.  The

8    carriers paid the proceeds from the insurance directly on

9    behalf of the Ds & Os.  That money went into escrow with the

10   class and it never touched the estate and there's no debate

11   about that.

12             And so, to the extent that anyone argued that, in

13   any way, those were executory contracts or not final, you

14   know, et cetera, all of that I think has all been disposed of

15   in the evidence that's in the record.

16             Your Honor asked a very important question.  Mr.

17   Parker and Ms. Cornish proposed to answer it, but clearly

18   didn't.  You asked what claims, if any, are left that could

19   be asserted on behalf of the estate against the Ds & Os

20   arising from the Fresenius settlement?

21             The answer has to be none.  You know, the

22   derivative -- it's not an issue of *res judicata* , as Ms.

23   Cornish suggested; it is, in fact, simply a function of the

24   releases that are in the derivative cases.  All of those

25   settlements, all of those releases are actually in the record

1    and so it's not just an issue of argument; you have them

2    before you.  But they, in fact, released all of the claims

3    that shareholders who were bringing derivative claims on

4    behalf of Akorn, prepetition, had not only against Fresenius,

5    but also with regard to a raft of other prepetition conduct

6    that was part of those derivative actions before they were

7    amended to include claims against the directors and officers

8    that were otherwise part of or similar to those that we

9    brought in the class action case.

10        And so, but even if those don't function in the way

11   that they seem clear on their face, there is actually

12   insurance that would be available if there were new claims.

13   There's no question, by the way, that the 2017-2019 policies

14   that funded the payments on behalf of the directors and

15   officers in the class case, that those policies are now

16   exhausted.  They were exhausted by the settlements.  There's

17   no question about that, as Mr. Bonaccorsi testified to.

18        However, all of those policies were renewed, either

19   directly renewed or new policies were put into place in the

20   2019-2021 tower, which is reflected in Debtors' Exhibits 9,

21   10, 11, 12, 13, 14, and 15.  And so, to the extent that there

22   are claims, if there are any claims, those claims would

23   necessarily have to be brought under those policies.

24        Several people have sort of, you know, blithely

25   noted that, well, we could bring those claims against the

1    other policies or they could be asserted against the 2017

2    policies, but those are all claims-made policies and as Your

3    Honor knows, as claims-made policies, you've got to bring

4    them within the policy period or an extended period.  All of

5    those policies ended by extension in 2019.

6              So, there's a new set of sort of D&O insurance that

7    would apply to any claims that could be made, if some could

8    be made, against Akorn or its directors and officers.

9              One other point about the policies themselves or

10   two.  First, under the insuring agreements, we're talking

11   about D&O policies.  If we're talking about claims against

12   Akorn itself, we're talking about securities claims.  The D&O

13   coverage obviously extends more broadly to breach of

14   fiduciary duty claims, et cetera, but those, as we've already

15   discussed, were part of the resolution of the derivative

16   cases.

17             But, again, you do have the fraud exception.  On

18   the one hand, you have, you know, these other policies, and

19   if there was anything out there that could be brought, you

20   know, those claims could, in theory, be asserted, though I

21   haven't heard anything or seen anything in the record that

22   suggests that there's any reason to disturb the business

23   judgment of the committee who did a very, very thorough

24   investigation on those issues, as Mr. Langford mentioned, and

25   as you know, we were part of the committee throughout that

1       process.

2               But let talk a little bit more about the policies,

3       themselves, and then I'll switch gears.  These policies are

4       simply not -- could not be property of the estate and we're

5       talking, again, about the 2017-2019 policies.

6               Under World Health, which I think really is the

7       operative case for these purposes, you know, we're going to

8       look at, you know, one, what do the policies themselves say?

9               Well, here, obviously there's a priority of payment

10      provision at -- you know, which is, you know, way back at

11      probably the thirtieth page of Debtors' Exhibit 20.  You

12      know, as is typical, there are a number of endorsements, et

13      cetera, before we ever get to those things.  It's one of the

14      last endorsements before we get to the policy itself, but

15      these policies provide insurance under insuring agreement A

16      for the directors and officers.  Those claims, which were

17      claims that were brought by the class, have priority of

18      payment over all other potential claims or all other

19      claimants and as Mr. Bonaccorsi indicated, those claims were

20      -- that policy was exhausted by the payment of those claims.

21              So, in terms of the D&O policies, there's no

22      argument that they're property of the estate here, in terms

23      of the proceeds because those proceeds were properly paid

24      directly by the carriers on behalf of the Ds & Os under the

25      priority of payment provisions to the class in a settlement

1    that, as we noted, that is long since done.

2         And then one last point, and this just goes to Your

3    Honor's question about how do we get there, because I don't

4    think the question is only how do we get there in terms of,

5    well, how do we get to a Chapter 7 Trustee or motions, you

6    know, et cetera.  The issue is how do we ever get to the

7    point of unwinding the settlement and what happens if we were

8    to unwind it, if it could be done, which we don't believe it

9    can, and no one has proposed any authority or the proposition

10   that we would unwind the settlement, but if we unwind the

11   settlement, those proceeds go back to the carriers.  They

12   don't come to the estate, because at that point, the carriers

13   will not have paid on any claim and the proceeds necessarily

14   have to go back to the carriers and the class is back in the

15   position it was when we started.

16        And as I've noted, no one in all of the argument or

17   submissions has suggested that any claim that could actually

18   be brought on the issues or under those policies, because the

19   only claims that were timely made related to those policies

20   are the shareholder claims.  Any new claims that get asserted

21   would have to be brought under the 2019-2021 (indiscernible).

22        So, all we would end up doing essentially creating

23   a situation where we would then have to come back into the

24   district court in Illinois and in that case, come back before

25   Your Honor, so we'd have to do the approval twice or redo the

1    approval twice, and end up with the same settlement because

2    there is no one else, as we've mentioned, who can attach

3    those proceeds in any way to any claim, because even if a

4    claim were asserted, it would necessarily have to be made

5    against the 2019-2021 policies.

6           Unless you have questions on the insurance piece,

7    Your Honor, I'd just like to speak for two minutes or three

8    minutes about the CVRs, if I might?

9           THE COURT:  Okay.  So I have no questions just on

10   what you just presented.

11          With respect to your -- are you still seeking a

12   ruling on the classification issue?

13          MR. ENTWISTLE:  Your Honor, I think in the context

14   of confirmation, Your Honor can, you know, reclassify and

15   should reclassify.  Again, with regard to the -- we don't

16   need -- and I think it's very simple, I mean, as a practical

17   matter, as Mr. Nash has noted, there may not be anything

18   there and it may be moot in that sense, obviously.  We

19   recognize that.

20          But we do note that this re-classification which

21   sort of occurred at the eleventh hour, really is not

22   supported under any of the case law and we sort of discussed

23   that.  But there's no -- there hasn't been any

24   (indiscernible) -- the debtors don't contest at all that the

25   CVRs were a deferred DIP financing device.  They're not

1    equity.   They provide on their face they're not equity.

2            This is a simply contract claim and unlike all

3    these litigation claims you've been hearing about for three

4    or four days here, it is, by its terms, an unsecured claim

5    and the debtors don't dispute that it's an unsecured claim.

6            The only question is whether it should be

7    subordinated under 510(b) and that question is a relatively

8    straightforward one, we think.   Everyone has cited Telegroup,

9    at length for the notion that because under the theory that

10   because this originated with an exchange of equity claims for

11   this debt instrument, that somehow lineage, if you will, is

12   enough to subordinate it under 510(b).

13           Telegroup and Direct TV and Mobile Tool that we've

14   cited to Court are clear that that inquiry is not the right

15   inquiry.   The right inquiry is under Telegroup, you need to

16   look at the instrument itself and you need to look at what it

17   really means.

18           And here, that's a debt instrument that was

19   exchanged for an equity claim, but that doesn't make it a

20   claim that was properly subordinated.

21           I'm not going to go on any further unless you have

22   questions, Your Honor.   I think we went through this in a

23   good amount of detail on the papers and I can leave it there

24   unless you have any further questions.

25           THE COURT:   No, I've read the papers and the cases,

1   so I think I can make a decision to the extent it sounds like

2   you want one.  So, I will make a decision and I have no new

3   questions.

4               MR. ENTWISTLE:  Thank you, Your Honor.

5               And we very much appreciate all your time and I'm

6   sorry to lengthen the arguments here by being the last one to

7   go.

8               THE COURT:  No apologies necessary.  It's all very,

9   very helpful to contextualize the evidence.

10              Okay.  Thank you all.  Thank you very much.

11              Why don't I turn the podium back over to Mr. Nash,

12  unless there's any other party that would like to make an

13  argument in opposition to the confirmation of the plan?

14          (No verbal response)

15              THE COURT:  Okay.  I'm not hearing anyone, so Mr.

16  Nash, the floor is yours.

17              MR. NASH:  Thank you, Your Honor.

18              Before I respond briefly to the argument, if you

19  would indulge me, I believe Mr. George said a number of times

20  in his closing argument that I used the phrase "open kimono"

21  in my argument.  That is a phrase that I have intentionally

22  not used for a number of years, and although my closing

23  argument was admittedly unscripted, I don't think I used that

24  phrase.  So, I just wanted to make that note.

25              Thank you, Your Honor.

1          THE COURT:  No, I appreciate that.  I know that you

2     did not make it, because I take note when people use that

3     phrase, because I think it's a little out of fashioned, quite

4     frankly, but it is used a lot.  So, I appreciate the

5     clarification.

6          All right.  Why don't you continue.

7          MR. NASH:  So, Your Honor, just briefly, by way of

8     response, you know, before the break Your Honor asked the

9     objecting party if they could bring to Your Honor's attention

10    any specific claims that would be released, you know, some

11    citation to the record or I don't even know if you limited it

12    necessarily to the record or just asked them to bring to your

13    attention some relevant claims that might still be extant,

14    you know, notwithstanding the Kogut settlement, and I didn't

15    hear any of those claims brought to Your Honor's attention.

16         And although my original argument may have been

17    unscripted, if I could be scripted here -- and I'm looking at

18    -- it's in the record -- and there was testimony or argument

19    from Ms. Cornish about how there's nothing in the record and

20    it's, you know, my testimony.

21         I think the record is very clear, Your Honor, as it

22    relates to the prepetition litigation and judgments that have

23    been entered in a litigation.  For one thing, Your Honor, a

24    lot of focus is being spent on March 2020 as it relates to

25    the shareholder litigation.  The fact of the matter is that

153

1    the class action shareholder litigation was approved on a

2    preliminary basis in August of 2019, pursuant to rules that

3    I'm not perfectly facile with in terms of how class-action

4    settlements progress from preliminary approval to final

5    approval, that preliminary approval went out on notice and it

6    was finally approved in March of 2020.

7            I'm not sure that has anything to do with, you

8    know, anything that's in front of Your Honor, because the

9    confirmation order, Judge, doesn't ask you, and you are doing

10   nothing in the confirmation order, as it relates to that

11   settlement.  So, it's not something that we have put in front

12   of Your Honor.

13           And as it relates to the Kogut settlement, you

14   know, that is a matter of the record.  That's a matter of the

15   evidence that's in front of Your Honor, and it just couldn't

16   be more clear if the third amended complaint in the Kogut

17   litigation referenced and adopted, you know, any number of

18   Judge Lasseter's findings and effectively incorporated the

19   conduct that was at issue in the Fresenius litigation, that

20   litigation was settled and that settlement agreement, that

21   Federal Court order says, Plaintiff, open paren, acting on

22   her own behalf and derivatively on behalf of Akorn ...

23           And since it's part of the record, I won't keep

24   reading, but it then goes into the litany of the types of

25   claims and causes of action and related causes of action that

1    are dismissed through that settlement and through that court

2    order.

3         And now I'm looking at Paragraph 56, Your Honor, of

4    our confirmation brief and this is part of the record, the

5    Kogut judgment provides that the Louisiana Court, quote, Has

6    jurisdiction over the subject matter of the Kogut case and

7    the released persons may file the stipulation and/or judgment

8    in any action that may be brought against them in order to

9    support a defense or counterclaim based on principles of *res*

10   *judicata*  , collateral estoppel, full faith and credit,

11   release, a good faith settlement, judgment, bar or reduction

12   or any other theory of claim preclusion or issue preclusion

13   or similar defense or counterclaim.

14        So, I'm not an expert, Judge, in what is and isn't

15   barred by *res judicata*  , but I'm pretty confident that if

16   something brings a lawsuit against somebody related to, you

17   know the Fresenius litigation, this Louisiana judgment is

18   going to be waived in that plaintiff's face.

19        And as Your Honor knows, and it's part of the

20   record, there was other litigation in the Illinois Federal

21   Court that was dismissed with prejudice and those were not

22   the same plaintiffs as who were at issue in the Kogut

23   litigation and that litigation was dismissed.

24        There was also, Your Honor, commentary from the

25   objectors seeking to discredit, I guess, the UCC's

1   investigation.  The fact of the matter is that the objecting

2   parties didn't serve any discovery on the debtors.  They

3   could have.  They didn't.  They could have deposed anybody

4   they wanted to depose.  They didn't.

5        And the evidence, Your Honor, I think is clear, and

6   to just suggest that it would somehow be appropriate to

7   casually, cavalierly, perhaps, convert these cases to Chapter

8   7 and put administrative creditors, by definition, at risk

9   because maybe there's some cause of action that somehow has

10  survived and wouldn't be, you know, barred by the Kogut

11  settlement, borders on irresponsible, frankly, Your Honor,

12  from my perspective.

13       And, you know, I was able to speak unscripted, Your

14  Honor, because in case it's not obvious, I think that we've

15  done a very good and full job here in terms of bending over

16  backwards to try to maximize the value of this estate for

17  everybody and, you know, we are where we are.

18       And the term loan, and, again, like it's a small

19  detail, the term loan lenders, by definition, have paid for

20  the last two days of these proceedings because they

21  acquiesced to our pursuing a liquidating plan on a parallel

22  path and had they not and had we just been pursuing a naked

23  sale and term loan lender credit bid, we probably would have

24  gotten that approved on Tuesday, as we did, and then we'd be

25  sitting around all looking at each other, like so many of

1    Your Honor's other cases saying, Well, what do we do now?

2    Where do we go from here?

3              And I think it's a terrific thing that we haven't

4    been put in that box and, thankfully, you know, we are where

5    we are and we're at the conclusion of these cases, and unless

6    Your Honor has any questions for me, that's probably all I

7    have.

8              THE COURT:  I have no questions for you.  Thank

9    you.

10             MR. RAIFORD:  Your Honor, if I may, Landon Raiford

11   for the committee, again.

12             I'll piggyback a little bit off of Mr. Nash and,

13   Your Honor, I think when we started the process, you know, we

14   began with the end in mind and the idea was (indiscernible)

15   where do we go from here, which may be a question for all of

16   2020.

17             But the amount of steps that would have to be

18   taken, and these are the steps that we were faced with, as

19   well; one, deny the plan -- okay, easy enough, you could do

20   that today; convert the cases -- fine; all right, now you've

21   got to find claims and you've got to pursue these claims and

22   you've got to identify these claims that so far no one has

23   been able to identify, but let's say you do that.

24             Now you have to fund this litigation, which is

25   going to be incredibly expensive and incredibly

1    time-consuming, and with what money?  The wind-down budget?

2    Well, what portion of that?  After you do all the things you

3    have to do to fund a bankruptcy case, how much of that money

4    is actually going to be left to fund litigation that's going

5    to go on for years?

6              Let's say you do all that and you actually win and

7    not just win on the merits, but you can defeat *res judicata*

8    arguments, you can defeat the settlements, you can defeat the

9    releases -- great.  Well, what do you collect from?

10             And Mr. Entwistle pointed out, some of these

11   arguments would require you to be able to pursue a second

12   round of litigation, unwind the settlement with the settling

13   shareholders, which by the way, to do that, you're going to

14   have one heck of a battle over whether it's property of the

15   estate.  We looked into that extensively and it is tricky and

16   thorny and a nasty area of law.

17             You would have to do all those things to, at the

18   end of the day, collect some money.

19             Now, can I say with a physical certainty that you

20   can't possibly do that?

21             No, of course.  But I think what Your Honor can

22   take some comfort in is that we performed kind of a

23   quasi-trustee role here and we walked away confident that the

24   plan was not pouring significant litigation value down the

25   drain.  I just wanted to kind of make that final point, at

1    least from our perspective.  Thank you.

2             THE COURT:  Well, let me ask you this, why do you

3    -- and I don't say this flippantly -- but why do you care at

4    this point?  Is there -- what's the benefit that the

5    creditors are obtaining under this plan when I confirm it

6    that would not oh that the creditors would not receive if I

7    didn't confirm the plan?

8             MR. RAIFORD:  Well, I actually think there's the

9    risk to the creditor body, to everyone, in general.  This

10   isn't just a (indiscernible) litigation, go knock yourself

11   out.  There is risk and there's expense to the estate,

12   including -- and that would negative affect all parties, if

13   what you end up with is an administratively insolvent estate

14   because we decided, you know, what, let just roll the dice

15   and see what happens.

16            I get your point.  We obviously are -- our

17   perspective has shifted a little because when we were doing

18   this before the sale was confirmed, we were standing with a

19   different position, but I don't think that just because the

20   sale has been confirmed that the committee just kind of

21   throws its hands up and says, whatever happens, happens.

22            I think there is a significant downside to this

23   cases if Your Honor were to convert and see where the chips

24   fall where they may and, in particular, when we're kind of

25   being attacked for our job, too.  And I would stress we did a

1    thorough and one heck of a job and took our job very

2    seriously and are confident with the conclusions that we came

3    to.

4              THE COURT:  Okay.  Thank you.  I appreciate your

5    comments.

6              Okay.  It looks like Mr. Evans -- go ahead.

7              MR. EVANS:  Your Honor, just very briefly.  I'm not

8    going to belabor any of the points being made.  I just want

9    to clarify a couple of comments that Ms. Cornish made in her

10   closing.

11             The first, with respect to the UCC settlement and

12   the investigation, I just want to clarify for the record --

13   and if we're talking about anything that survives these

14   cases, we're talking purely about those D&O claims and claims

15   that don't relate to the prepetition lenders and the DIP

16   lenders.  Those were released pursuant to the expiration of

17   the challenge period under the DIP order, as well as the

18   releases that were included.  I actually don't want there to

19   be any misconception about that point.

20             And then the second, and kind of conclusion or

21   response to one of your questions, there was mention that,

22   well, maybe a Chapter 7 Trustee could (indiscernible)

23   wind-down budget to find ways to fund litigation for a long

24   period of time.  That budget is exactly that.  It was

25   negotiated.  It had specific line items that go to specific

1    things and that's what makes up that $35 million.

2         The term lenders were happy to fund that wind-down

3    budget pursuant to this plan to make sure that these cases

4    were administratively solvent.  That budget is not pots of

5    cash to fund, you know, what we would see as nuisance value

6    and problematic litigation against, you know, our current

7    officers and directors over a prolonged period of time.

8         So, to the extent that Ms. Cornish believes that

9    that money is available for a Chapter 7 Trustee, it just

10   simply isn't.

11        Other than that, Your Honor, that's all I had to

12   add.

13        THE COURT:  Well, I actually have a question on

14   your impairment.

15        MR. EVANS:  Of course.

16        THE COURT:  I assume that until the sale is

17   consummated, you still have all of your term loan claims,

18   correct?

19        MR. EVANS:  That's correct, Your Honor.

20        THE COURT:  And do you have claims under your APA

21   against the estate to the extent that the sale is

22   consummated?

23        MR. EVANS:  To the extent that it is or is not

24   consummated?

25        THE COURT:  If it is consummated, are there claims

1  that you hold against the debtors under that APA?

2          MR. EVANS:  I don't believe so, not once it's

3  consummated.  I would say that we have an entitlement to

4  whatever is the excess of the wind-down budget, to the extent

5  that it's not utilized pursuant to the agreement with the

6  debtors, but otherwise, you know, I don't believe that we

7  would have active claims against the estate.  That's

8  certainly not the intent of the APA.

9          THE COURT:  Okay.  I appreciate that, thank you.

10          Okay.  Well, thank you all very much.  This has

11  been very helpful.

12          Mr. George, typically I don't allow another round

13  of argument, so I think everybody had their opportunity to

14  speak here and I appreciate all the arguments that have been

15  made.  I think the ball is now in my court to make a

16  decision.

17          I want to think about things a little bit longer

18  and so I would ask that the parties come back at 11:30

19  tomorrow, at which time I will render my decision on the

20  plan.  It doesn't have to be telephonic -- excuse me -- it

21  doesn't have to be by Zoom; we'll just a telephonic, okay.

22          Unless there's any questions, we will -- Mr. Nash,

23  any questions?

24          MR. NASH:  I just wanted to say thank you, Judge.

25          THE COURT:  Thank you.

1          Thank you to all the parties and I appreciate your

2    patience and your professionalism.  It's always difficult to

3    have complicated evidentiary hearings by Zoom, especially

4    with as many exhibits as you presented and you all did a

5    great job, so thank you all very much for that and I

6    appreciate your efforts.

7          So, with that, let's adjourn the hearing and I will

8    see you all at 11:30 -- or I will not see you all tomorrow at

9    11:30 -- I will hear you all tomorrow at 11:30, via

10    CourtCall.  So, thank you all very much.

11          And Mr. Nash, if you and your colleagues could file

12    and agenda just to let people know what the start of the

13    hearing time is tomorrow, I would greatly appreciate it.

14          MR. NASH:  We'll do that.

15          THE COURT:  All right.  Great.

16          Thank you all very much.  We'll consider the

17    hearing adjourned.  Thank you all very much.

18          COUNSEL:  Thank you, Your Honor.

19      (Proceedings concluded at 2:05 p.m.)

20

21

22

23

1                              CERTIFICATION

2               I certify that the foregoing is a correct

3       transcript from the electronic sound recording of the

4       proceedings in the above-entitled matter to the best of my

5       knowledge and ability.

6

7       /s/ William J. Garling                    September 5, 2020

8       William J. Garling, CET**D-543

9       Certified Court Transcriptionist

10      For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25