EXECUTION VERSION

## TERM LOAN PLEDGE AGREEMENT

THIS TERM LOAN PLEDGE AGREEMENT (as it may be amended, restated, supplemented or otherwise modified from time to time, this "<u>Security Agreement</u>") is entered into as of November 15, 2019 by and between Akorn, Inc., a Louisiana corporation (the "<u>Borrower</u>"), the other Loan Parties listed on the signature pages hereto (together with the Borrower, each a "<u>Grantor</u>", and collectively, the "<u>Grantors</u>"), and JPMorgan Chase Bank, N.A., in its capacity as administrative agent (the "<u>Administrative Agent</u>") for the Secured Parties (as defined in the Term Loan Agreement referred to below).

PRELIMINARY STATEMENT

The Initial Grantors, the other Loan Parties party thereto from time to time, the Administrative Agent and the Lenders have entered into a Term Loan Agreement dated as of April 17, 2014 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Term Loan Agreement</u>").  Each Grantor is entering into this Security Agreement pursuant to the terms of that certain Standstill Agreement dated as of May 6, 2019 by and between the Borrower, an ad hoc group of Lenders, certain other Lenders and the Administrative Agent (as it may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Standstill Agreement</u>"), to secure the Secured Obligations (including with respect to any guarantee pursuant to Article X of the Term Loan Agreement).

ACCORDINGLY, the Grantors and the Administrative Agent, on behalf of the Secured Parties, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    <u>Terms Defined in Term Loan Agreement.</u>  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Term Loan Agreement.

1.2.    <u>Terms Defined in UCC.</u>  Terms defined in the UCC which are not otherwise defined in this Security Agreement are used herein as defined in the UCC.

1.3.    <u>Definitions of Certain Terms Used Herein.</u>  As used in this Security Agreement, in addition to the terms defined in the first paragraph hereof and in the Preliminary Statement, the following terms shall have the following meanings:

"<u>Article</u>" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"<u>Collateral</u>" shall have the meaning set forth in Article II.

"<u>Control</u>" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Event of Default</u>" means an event described in Section 5.1.

"<u>Excluded Payments</u>" shall have the meaning set forth in <u>Section 4.6(d)</u>.

"<u>Exhibit</u>" refers to a specific exhibit to this Security Agreement, unless another document is specifically referenced.

"<u>Instruments</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Investment Property</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Pledged Collateral</u>" means all Instruments, Securities and other Investment Property of the Grantors identified on Exhibit G hereto, together with proceeds (including Stock Rights) of the foregoing.

"<u>Section</u>" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"<u>Security</u>" shall have the meaning set forth in Article 8 of the UCC.

"<u>Stock Rights</u>" means all dividends, instruments or other distributions and any other right or property which the Grantors shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Grantors now have or hereafter acquire any right, issued by an issuer of such Equity Interest.

"<u>UCC</u>" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Administrative Agent's or any other Secured Party's Lien on any Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II
## GRANT OF SECURITY INTEREST

Each Grantor hereby pledges, assigns and grants to the Administrative Agent, on behalf of and for the ratable benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all Pledged Collateral, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or

2

leased from or to, such Grantor, and regardless of where located (all of which will be collectively referred to as the "Collateral"), to secure the prompt and complete payment and performance of the Secured Obligations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each of the Initial Grantors represents and warrants to the Administrative Agent and the Secured Parties, that:

3.1.  <u>Title, Authorization, Validity, Enforceability, Perfection and Priority.</u> Such Grantor has good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under Section 4.1(e), and has full power and authority to grant to the Administrative Agent the security interest in the Collateral pursuant hereto.  The execution and delivery by such Grantor of this Security Agreement has been duly authorized by all necessary organizational actions, and, if required, actions by equity holders of such Grantor, and this Security Agreement constitutes a legal valid and binding obligation of such Grantor and creates a security interest which is enforceable against such Grantor in all Collateral it now owns or hereafter acquires, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. When UCC financing statements have been filed in the appropriate offices against such Grantor in the locations listed on <u>Exhibit H</u>, the Administrative Agent will have a fully perfected first priority security interest in that Collateral of such Grantor in which a security interest may be perfected by making such filings, subject only to Liens permitted under Section 4.1(e).

3.2.  <u>Type and Jurisdiction of Organization, Organizational and Identification Numbers.</u>  The type of entity of such Grantor, its state of organization, the organizational number issued to it by its state of organization and its federal employer identification number are set forth on <u>Exhibit A</u>.

3.3.  <u>Principal Location.</u>  Such Grantor's mailing address, which shall be its address for notices and other communications provided for herein, and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), are disclosed in <u>Exhibit A</u>; such Grantor has no other places of business except those set forth in <u>Exhibit A</u>.

3.4.  [Intentionally Omitted].

3.5.  [Intentionally Omitted].

3.6.  <u>Exact Names.</u>  Such Grantor's name in which it has executed this Security Agreement is the exact name as it appears in such Grantor's organizational documents, as amended, as filed with such Grantor's jurisdiction of organization.  Such Grantor has not,

3

during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition.

3.7.    [Intentionally Omitted].

3.8.    [Intentionally Omitted].

3.9.    [Intentionally Omitted].

3.10.    [Intentionally Omitted].

3.11.    [Intentionally Omitted].

3.12.    <u>No Financing Statements, Security Agreements.</u>    No UCC financing statement or security agreement describing all or any portion of the Collateral which has not lapsed or been terminated (by a filing authorized by the secured party in respect thereof) naming such Grantor as debtor has been filed or is of record in any jurisdiction except (a) for UCC financing statements or security agreements naming the Administrative Agent on behalf of the Secured Parties as the secured party and (b) as permitted by <u>Section 4.1(e)</u>; <u>provided</u>, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Administrative Agent under the Loan Documents to any Liens otherwise permitted under <u>Section 4.1(e)</u>.

3.13.    <u>Pledged Collateral.</u>

(a)    <u>Exhibit G</u> sets forth a complete and accurate list of all Pledged Collateral owned by such Grantor. Such Grantor is the direct, sole beneficial owner and sole holder of record of the Pledged Collateral listed on <u>Exhibit G</u> as being owned by it, free and clear of any Liens, except for any Liens permitted by Section 4.1(e). Such Grantor further represents and warrants that (i) all Pledged Collateral owned by it constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized, validly issued, are fully paid and non-assessable and (ii) with respect to any certificates delivered to the Administrative Agent representing an Equity Interest, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, such Grantor has so informed the Administrative Agent so that the Administrative Agent may take steps to perfect its security interest therein as a General Intangible.

(b)    In addition, (i) none of the Pledged Collateral owned by it has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) no options, warrants, calls or commitments of any character whatsoever (A) exist relating to such Pledged Collateral or (B) obligate the issuer of any Equity Interest included in the Pledged Collateral to issue additional Equity Interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Authority or any other Person is required for the pledge by such Grantor of such Pledged Collateral pursuant to this Security Agreement, subject to any local law requirements, or

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL

for the execution, delivery and performance of this Security Agreement by such Grantor, or for the exercise by the Administrative Agent of the voting or other rights provided for in this Security Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Security Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(c)     Except as set forth in Exhibit G, such Grantor owns 100% of the issued and outstanding Equity Interests which constitute Pledged Collateral owned by it.

**ARTICLE IV**
**COVENANTS**

From the date of this Security Agreement and thereafter until this Security Agreement is terminated, each of the Initial Grantors agrees:

4.1.    General.

(a)     Collateral Records.   Such Grantor will maintain complete and accurate books and records with respect to the Collateral owned by it, and furnish to the Administrative Agent, with sufficient copies for each of the Lenders, such reports relating to such Collateral as the Administrative Agent shall from time to time request.

(b)     Authorization to File Financing Statements; Ratification.   Such Grantor hereby authorizes the Administrative Agent to file, and if requested will deliver to the Administrative Agent, all UCC financing statements and other documents and take such other actions as may from time to time be requested by the Administrative Agent in order to maintain a first priority perfected security interest in and, if applicable, Control of, the Collateral owned by such Grantor, in each case pursuant to the terms of this Security Agreement and subject to Liens permitted by Section 4.1(e).   Any UCC financing statement filed by the Administrative Agent may be filed in any filing office in any UCC jurisdiction and may (i) indicate such Grantor's Collateral by a description which reasonably approximates the description contained in this Security Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any UCC financing statement or amendment, including whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor.   Such Grantor also agrees to furnish any such information described in the foregoing sentence to the Administrative Agent promptly upon request.   Such Grantor also ratifies its authorization for the Administrative Agent to have filed in any UCC jurisdiction any initial UCC financing statements or amendments thereto if filed prior to the date hereof.

(c)     Further Assurances.   Such Grantor will, if so requested by the Administrative Agent, furnish to the Administrative Agent, as often as the Administrative Agent requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and information in connection with its Collateral as the Administrative Agent may reasonably request, all in such detail as the Administrative Agent may specify.   Such Grantor also agrees to take any and all actions necessary to

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

defend title to the Collateral against all persons and to defend the security interest of the Administrative Agent in its Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(d)     Disposition of Collateral.     Such Grantor will not sell, lease or otherwise dispose of the Collateral owned by it except for dispositions specifically permitted pursuant to Section 6.05 of the Term Loan Agreement.

(e)     Liens.     Such Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by it except (i) the security interest created by this Security Agreement, and (ii) Liens permitted by Section 6.02 of the Term Loan Agreement.

(f)     Other Financing Statements.     Such Grantor will not authorize the filing of any UCC financing statement naming it as debtor covering all or any portion of the Collateral owned by it, except as permitted by Section 4.1(e).     Such Grantor acknowledges that it is not authorized to file any UCC financing statement or amendment or termination statement with respect to any UCC financing statement without the prior written consent of the Administrative Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

(g)     [Intentionally Omitted].

(h)     Compliance with Terms.     Such Grantor will perform and comply with all obligations in respect of the Collateral owned by it and all agreements to which it is a party or by which it is bound relating to such Collateral.

4.2.     [Intentionally Omitted].

4.3.     [Intentionally Omitted].

4.4.     Delivery of Securities.     Such Grantor will (a) deliver to the Administrative Agent within 30 days after execution of this Security Agreement (or such longer period as agreed to by the Administrative Agent) the originals of all Securities constituting Collateral owned by it (if any then exist) and (b) hold in trust for the Administrative Agent upon receipt and within 30 days thereafter (or such longer period as agreed to by the Administrative Agent) deliver to the Administrative Agent any such Securities constituting Collateral.

4.5.     Uncertificated Pledged Collateral.     Such Grantor will permit the Administrative Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Pledged Collateral owned by it not represented by certificates to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Collateral not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Administrative Agent granted pursuant to this Security Agreement.     With respect to any Pledged Collateral owned by it, such Grantor will take any actions necessary to cause the issuers of uncertificated securities which are Pledged Collateral to cause the Administrative Agent to have and retain

6

Control over such Pledged Collateral.  Without limiting the foregoing and at any time during the occurrence and continuance of an Event of Default, such Grantor will, with respect to any such Pledged Collateral held with a securities intermediary (including in connection with a Securities Account), cause such securities intermediary to enter into a control agreement with the Administrative Agent, in form and substance satisfactory to the Administrative Agent, giving the Administrative Agent Control.

4.6.    Pledged Collateral.

(a)    Changes in Capital Structure of Issuers.  Such Grantor will not (i) permit or suffer any issuer of an Equity Interest constituting Pledged Collateral owned by it to dissolve, merge, liquidate, retire any of its Equity Interests or other Instruments or Securities evidencing ownership, reduce its capital, sell or encumber all or substantially all of its assets (except for Liens permitted pursuant to Section 4.1(e) and sales of assets permitted pursuant to Section 4.1(d)) or merge or consolidate with any other entity, or (ii) vote any such Pledged Collateral in favor of any of the foregoing.

(b)    Issuance of Additional Securities.  Such Grantor will not permit or suffer the issuer of an Equity Interest constituting Pledged Collateral owned by it to issue additional Equity Interests, any right to receive the same or any right to receive earnings, except to such Grantor.

(c)    Registration of Pledged Collateral.  Such Grantor will permit any registerable Pledged Collateral owned by it to be registered in the name of the Administrative Agent or its nominee at any time at the option of the Administrative Agent.

(d)    Exercise of Rights in Pledged Collateral.

(i)    Without in any way limiting the foregoing and subject to clause (ii) below, such Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral owned by it for all purposes not inconsistent with this Security Agreement, the Term Loan Agreement or any other Loan Document; *provided however*, *that* no vote or other right shall be exercised or action taken which would have the effect of impairing the rights of the Administrative Agent in respect of such Pledged Collateral.

(ii)    Such Grantor will permit the Administrative Agent or its nominee at any time after the occurrence of an Event of Default, without notice, to exercise all voting rights or other rights relating to the Pledged Collateral owned by it, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Collateral as if it were the absolute owner thereof.

(iii)    Such Grantor shall be entitled to collect and receive for its own use all cash dividends and interest paid in respect of the Pledged Collateral owned by it to the extent not in violation of the Term Loan Agreement and the proceeds of any disposition of Pledged Collateral to the extent not in violation of the Term

7

Loan Agreement <u>other than</u> any of the following distributions and payments (collectively referred to as the "<u>Excluded Payments</u>"): (A) dividends and interest paid or payable other than in cash in respect of such Pledged Collateral, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral; (B) dividends and other distributions paid or payable in cash in respect of such Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in capital of an issuer (other than a sale not in violation of the Term Loan Agreement); and (C) cash paid, payable or otherwise distributed, in respect of principal of, or in redemption of, or in exchange for, such Pledged Collateral (other than a sale not in violation of the Term Loan Agreement); *provided however, that* until actually paid, all rights to such distributions shall remain subject to the Lien created by this Security Agreement.

(iv)     All Excluded Payments and all other distributions in respect of any Pledged Collateral owned by such Grantor, whenever paid or made, shall be delivered to the Administrative Agent to hold as Pledged Collateral and shall, if received by such Grantor, be received in trust for the benefit of the Administrative Agent, be segregated from the other property or funds of such Grantor, and be forthwith delivered to the Administrative Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

4.7.     [Intentionally Omitted].

4.8.     [Intentionally Omitted].

4.9.     [Intentionally Omitted].

4.10.     [Intentionally Omitted].

4.11.     <u>No Interference.</u>  Such Grantor agrees that it will not interfere with any right, power and remedy of the Administrative Agent provided for in this Security Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Administrative Agent of any one or more of such rights, powers or remedies.

4.12.     [Intentionally Omitted].

4.13.     [Intentionally Omitted].

4.14.     [Intentionally Omitted].

4.15.     <u>Change of Name or Location; Change of Fiscal Year.</u>  Such Grantor shall not (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral as set forth in this Security

[[5252415]]

Agreement, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization, in each case, unless the Administrative Agent shall have received at least thirty (30) days prior written notice of such change and the Administrative Agent shall have acknowledged in writing that either (1) such change will not adversely affect the validity, perfection or priority of the Administrative Agent's security interest in the Collateral, or (2) any reasonable action requested by the Administrative Agent in connection therewith has been completed or taken (including any action to continue the perfection of any Liens in favor of the Administrative Agent, on behalf of the Secured Parties, in any Collateral), *provided that*, any new location shall be in the continental U.S.

## ARTICLE V
## EVENTS OF DEFAULT AND REMEDIES

5.1.    <u>Events of Default.</u>  The occurrence of any one or more of the following events shall constitute an Event of Default hereunder:

(a)    Any representation or warranty made by or on behalf of any Grantor under or in connection with this Security Agreement shall be materially false as of the date on which made.

(b)    Any Grantor shall fail to observe or perform any of the terms or provisions of <u>Article IV</u> or <u>Article VII</u>.

(c)    Any Grantor shall fail to observe or perform any of the terms or provisions of this Security Agreement (other than a breach which constitutes an Event of Default under any other Section of this Article V) and such failure shall continue unremedied for a period of ten (10) days after the earlier of knowledge of such breach or notice thereof from the Administrative Agent.

(d)    The occurrence of any "Event of Default" under, and as defined in, the Term Loan Agreement.

(e)    Any Equity Interest which is included within the Collateral shall at any time constitute a Security or the issuer of any such Equity Interest shall take any action to have such interests treated as a Security unless all certificates or other documents constituting such Security have been delivered to the Administrative Agent and such Security is properly defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise.

5.2.    <u>Remedies.</u>

(a)    Upon the occurrence of an Event of Default, the Administrative Agent may, or at the direction of the Required Lenders shall, exercise any or all of the following rights and remedies:

[[5252415]]

(i)      those rights and remedies provided in this Security Agreement, the Term Loan Agreement, or any other Loan Document; *provided that*, this Section 5.2(a) shall not be understood to limit any rights or remedies available to the Administrative Agent and the other Secured Parties prior to an Event of Default;

(ii)     those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(iii)    give notice of sole control or any other instruction under any Deposit Account Control Agreement or any other control agreement with any securities intermediary and take any action therein with respect to such Collateral;

(iv)     without notice (except as specifically provided in Section 8.1 or elsewhere herein), demand or advertisement of any kind to any Grantor or any other Person, enter the premises of any Grantor where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at any Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable; and

(v)      concurrently with written notice to the applicable Grantor, transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, exercise the voting and all other rights as a holder with respect thereto, collect and receive all cash dividends, interest, principal and other distributions made thereon and otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof.

(b)      The Administrative Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)      The Administrative Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Administrative Agent and the other Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption the Grantor hereby expressly releases.

[[5252415]]

(d)     Until the Administrative Agent is able to effect a sale, lease, or other disposition of Collateral, the Administrative Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent.   The Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and the other Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

(e)     If, after the Term Loan Agreement has terminated by its terms and all of the Secured Obligations have been paid in full, there remain Swap Agreement Obligations or Banking Services Obligations outstanding, the Secured Parties holding in the aggregate at least a majority of the aggregate net early termination payments and all other amounts then due and unpaid under outstanding Swap Agreements and Banking Services Agreements may exercise the remedies provided in this Section 5.2 upon the occurrence of any event which would allow or require the termination or acceleration of any Swap Agreement Obligations pursuant to the terms of the Swap Agreement or any Banking Services Obligations pursuant to the terms of any Banking Services Agreement.

(f)     Notwithstanding the foregoing, neither the Administrative Agent nor any other Secured Party shall be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, any Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of its rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(g)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof in accordance with clause (a) above.  Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit any Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the applicable Grantor and the issuer would agree to do so.

5.3.   <u>Grantor's Obligations Upon Default.</u>   Upon the request of the Administrative Agent after the occurrence of a Default, each Grantor will:

[[5252415]]

Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

(a)  assemble and make available to the Administrative Agent the Collateral and all books and records relating thereto at any place or places specified by the Administrative Agent, whether at such Grantor's premises or elsewhere;

(b)  permit the Administrative Agent, by the Administrative Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy;

(c)  prepare and file, or cause an issuer of Pledged Collateral to prepare and file, with the Securities and Exchange Commission or any other applicable government agency, registration statements, a prospectus and such other documentation in connection with the Pledged Collateral as the Administrative Agent may request, all in form and substance satisfactory to the Administrative Agent, and furnish to the Administrative Agent, or cause an issuer of Pledged Collateral to furnish to the Administrative Agent, any information regarding the Pledged Collateral in such detail as the Administrative Agent may specify; and

(d)  take, or cause an issuer of Pledged Collateral to take, any and all actions necessary to register or qualify the Pledged Collateral to enable the Administrative Agent to consummate a public sale or other disposition of the Pledged Collateral.

## ARTICLE VI
## ATTORNEY IN FACT; PROXY

6.1.  [Intentionally Omitted].

6.2.  <u>Authorization for Administrative Agent to Take Certain Action.</u>

(a)  Each Grantor irrevocably authorizes the Administrative Agent at any time and from time to time in the sole discretion of the Administrative Agent and appoints the Administrative Agent as its attorney in fact (i) to execute on behalf of such Grantor as debtor and to file UCC financing statements necessary or desirable in the Administrative Agent's sole discretion to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (ii) to endorse and collect any cash proceeds of the Collateral, (iii) to file a carbon, photographic or other reproduction of this Security Agreement or any UCC financing statement with respect to the Collateral as a UCC financing statement and to file any other UCC financing statement or amendment of a UCC financing statement (which does not add new collateral or add a debtor) in such offices as the Administrative Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (iv) during the occurrence and continuance of an Event of Default, to contact and enter into one or more

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

agreements with the issuers of uncertificated securities which are Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral, (v) to apply the proceeds of any Collateral received by the Administrative Agent to the Secured Obligations as provided in Section 7.3, (vi) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens that are permitted by Section 4.1(e)), (vii) to prepare, file and sign such Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Grantor, and (viii) to do all other acts and things necessary to carry out this Security Agreement; and such Grantor agrees to reimburse the Administrative Agent on demand for any payment made or any expense incurred by the Administrative Agent in connection with any of the foregoing; *provided that,* this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement or under the Term Loan Agreement.

(b)     All acts of said attorney or designee are hereby ratified and approved.  The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, under this Section 6.2 are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent or any other Secured Party to exercise any such powers.  The Administrative Agent agrees that, except for the powers granted in Section 6.2(a)(i)-(vi) and Section 6.2(a)(viii), it shall not exercise any power or authority granted to it unless an Event of Default has occurred and is continuing.

6.3.   Proxy.  EACH GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.2 ABOVE) WITH RESPECT TO ITS PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO.   IN ADDITION TO THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF ANY OF THE PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS).   SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY OF THE PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), UPON THE OCCURRENCE OF A DEFAULT.

6.4.   Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE VI IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 8.14.   NOTWITHSTANDING ANYTHING

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

[[5252415]]

CONTAINED HEREIN, NONE OF THE ADMINISTRATIVE AGENT, ANY OTHER SECURED PARTY OR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

## ARTICLE VII
### [Intentionally Omitted].

## ARTICLE VIII
### GENERAL PROVISIONS

8.1.    <u>Waivers.</u>  Each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantors, addressed as set forth in Article IX, at least ten days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.  The Administrative Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  To the maximum extent permitted by applicable law, each Grantor waives all claims, damages, and demands against the Administrative Agent or any other Secured Party arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence or willful misconduct of the Administrative Agent or such other Secured Party as finally determined by a court of competent jurisdiction.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any other Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

8.2.    <u>Limitation on Administrative Agent's and Other Secured Parties' Duty with Respect to the Collateral.</u>  The Administrative Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  The Administrative Agent and each other Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control.  Neither the Administrative Agent nor any other Secured

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

Party shall have any other duty as to any Collateral in its possession or control or in possession or control of any agent or nominee of the Administrative Agent or such other Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is commercially reasonable for the Administrative Agent (i) to fail to incur expenses deemed significant by the Administrative Agent to prepare Collateral for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to remove Liens on or any adverse claims against Collateral, (iv) [Intentionally Omitted.], (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as such Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section 8.2 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 8.2.  Without limitation upon the foregoing, nothing contained in this Section 8.2 shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 8.2.

8.3.     [Intentionally Omitted].

8.4.     Secured Party Performance of Debtor Obligations.  Without having any obligation to do so, the Administrative Agent may perform or pay any obligation which any Grantor has agreed to perform or pay in this Security Agreement and the Grantors shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 8.4.  The Grantors' obligation to reimburse the Administrative Agent pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

[[5252415]]

8.5.   Specific Performance of Certain Covenants.   Each Grantor acknowledges and agrees that a breach of any of the covenants contained in Sections 4.1(d), 4.1(e), 4.4, 4.5, 4.6, 4.15, 5.3, or 8.7 will cause irreparable injury to the Administrative Agent and the other Secured Parties, that the Administrative Agent and the other Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Administrative Agent or the other Secured Parties to seek and obtain specific performance of other obligations of the Grantors contained in this Security Agreement, that the covenants of the Grantors contained in the Sections referred to in this Section 8.5 shall be specifically enforceable against the Grantors.

8.6.   Dispositions Not Authorized.   No Grantor is authorized to sell or otherwise dispose of the Collateral except as set forth in Section 4.1(d) and notwithstanding any course of dealing between any Grantor and the Administrative Agent or other conduct of the Administrative Agent, no authorization to sell or otherwise dispose of the Collateral (except as set forth in Section 4.1(d)) shall be binding upon the Administrative Agent or the other Secured Parties unless such authorization is in writing signed by the Administrative Agent with the consent or at the direction of the Required Lenders.

8.7.   No Waiver; Amendments; Cumulative Remedies.   No delay or omission of the Administrative Agent or any other Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.   Subject to compliance with the Intercreditor Agreement, no waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Administrative Agent with the concurrence or at the direction of the Lenders required under Section 9.02 of the Term Loan Agreement and then only to the extent in such writing specifically set forth.   All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to the Administrative Agent and the other Secured Parties until the Secured Obligations have been paid in full.

8.8.   Limitation by Law; Severability of Provisions.   All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.   Any provision in this Security Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Security Agreement are declared to be severable.

16

8.9.   <u>Reinstatement.</u>  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof (including a payment effected through exercise of a right of setoff), is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), all as though such payment or performance had not been made.  In the event that any payment, or any part thereof (including a payment effected through exercise of a right of setoff), is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

8.10.   <u>Benefit of Agreement.</u>   The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Administrative Agent and the other Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Security Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein, without the prior written consent of the Administrative Agent.  No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, hereunder.

8.11.   <u>Survival of Representations.</u>   All representations and warranties of the Grantors contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

8.12.   <u>Taxes and Expenses.</u>  Any taxes (including income taxes) payable or ruled payable by Federal or State authority in respect of this Security Agreement shall be paid by the Grantors, together with interest and penalties, if any.  The Grantors shall reimburse the Administrative Agent for any and all out-of-pocket expenses and internal charges (including reasonable attorneys', auditors' and accountants' fees and reasonable time charges of attorneys, paralegals, auditors and accountants who may be employees of the Administrative Agent) paid or incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral).  Any and all costs and expenses incurred by the Grantors in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantors.

[[5252415]]

8.13.  <u>Headings.</u>  The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

8.14.  <u>Termination.</u>

(a)     This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (i) the Term Loan Agreement has terminated pursuant to its express terms and (ii) the termination of all the Commitments, payment and satisfaction in full in cash of all Secured Obligations (other than Unliquidated Obligations), and the cash collateralization of all Unliquidated Obligations in a manner reasonably satisfactory to each affected Lender.

(b)     Liens on the Collateral will be released in accordance with Section 9.02(c) of the Term Loan Agreement and Section 4.2 of the Intercreditor Agreement.

8.15.  <u>Entire Agreement.</u>  This Security Agreement together with the other Loan Documents embodies the entire agreement and understanding between the Grantors and the Administrative Agent relating to the Collateral and supersedes all prior agreements and understandings among the Grantors and the Administrative Agent relating to the Collateral.

**8.16.  <u>CHOICE OF LAW.</u>  THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.**

**8.17.  <u>CONSENT TO JURISDICTION.</u>  EACH GRANTOR HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AND EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY OTHER SECURED PARTY TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION.**

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

**8.18.**  <u>**WAIVER OF JURY TRIAL.**</u>  **EACH GRANTOR, THE ADMINISTRATIVE AGENT AND EACH OTHER SECURED PARTY HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

8.19.  <u>Indemnity.</u>  Each Grantor hereby, jointly with the other Grantors and severally, agrees to indemnify the Administrative Agent and the other Secured Parties, and their respective successors, assigns, agents and employees, from and against any and all liabilities, damages, penalties, suits, fees, costs, and expenses of any kind and nature (including, without limitation, all expenses of litigation or preparation therefor whether or not the Administrative Agent or any other Secured Party is a party thereto) imposed on, incurred by or asserted against the Administrative Agent or the other Secured Parties, or their respective successors, assigns, agents and employees, in any way relating to or arising out of this Security Agreement, or any other Loan Document, or the manufacture, purchase, acceptance, rejection, ownership, delivery, lease, possession, use, operation, condition, sale, return or other disposition of any Collateral (including, without limitation, latent and other defects, whether or not discoverable by the Administrative Agent or the other Secured Parties or any Grantor).

8.20.  <u>Counterparts.</u>  This Security Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Security Agreement by signing any such counterpart. Delivery of an executed counterpart of a signature page of this Security Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Security Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Security Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

8.21.  <u>Subordination of Intercompany Indebtedness.</u>  Each Grantor agrees that any and all claims of such Grantor against any other Grantor (each an "<u>Obligor</u>") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Secured Obligations, or against any of its properties shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Secured Obligations, provided that, and not in contravention of the foregoing, so long as no Default or Event of Default has occurred

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

and is continuing, such Grantor may make loans to and receive payments in the ordinary course of business with respect to such Intercompany Indebtedness from each such Obligor to the extent not prohibited by the terms of this Security Agreement and the other Loan Documents.  Notwithstanding any right of any Grantor to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Grantor, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of the Secured Parties and the Administrative Agent in those assets.  No Grantor shall have any right to possession of any such asset or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until this Security Agreement has terminated in accordance with Section 8.14.  If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event (such events being herein referred to as an "Insolvency Event"), any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Grantor ("Intercompany Indebtedness") shall be paid or delivered directly to the Administrative Agent for application on any of the Secured Obligations, due or to become due, until such Secured Obligations (other than contingent indemnity obligations) shall have first been fully paid and satisfied (in cash).  Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Grantor upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the termination of this Security Agreement in accordance with Section 8.14, such Grantor shall receive and hold the same in trust, as trustee, for the benefit of the Secured Parties and shall forthwith deliver the same to the Administrative Agent, for the benefit of the Secured Parties, in precisely the form received (except for the endorsement or assignment of the Grantor where necessary), for, subject to the Intercreditor Agreement (for so long as the Intercreditor Agreement is in effect), application to any of the Secured Obligations, due or not due, and, until so delivered, the same shall be held in trust by the Grantor as the property of the Secured Parties.  If any such Grantor fails to make any such endorsement or assignment to the Administrative Agent, the Administrative Agent or any of its officers or employees is irrevocably authorized to make the same.  Each Grantor agrees that until the termination of this Security Agreement in accordance with Section 8.14, no Grantor will assign or transfer to any Person (other than the Administrative Agent or the Borrower or another Grantor) any claim any such Grantor has or may have against any Obligor.

**ARTICLE IX**
**NOTICES**

9.1.    Sending Notices.  Any notice required or permitted to be given under this Security Agreement shall be sent in accordance with Section 9.01 of the Term Loan Agreement; provided that notices to the Grantors shall be sent to the Grantors at their respective mailing addresses set forth in Exhibit A hereto.

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

Turner Falk
obermayer.com
Aug 05, 2020 14:29

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

[[5252415]]

9.2.    <u>Change in Address for Notices.</u>  Each of the Grantors, the Administrative Agent and the Lenders may change the address for service of notice upon it by a notice in writing to the other parties.

**ARTICLE X**
**THE ADMINISTRATIVE AGENT**

JPMorgan Chase Bank, N.A. has been appointed Administrative Agent for the other Secured Parties hereunder pursuant to Article VIII of the Term Loan Agreement.  It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Secured Parties to the Administrative Agent pursuant to the Term Loan Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article VIII of the Term Loan Agreement.  Any successor Administrative Agent appointed pursuant to Article VIII of the Term Loan Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder.

[Signature Page Follows]

[[5252415]]

IN WITNESS WHEREOF, the Grantors and the Administrative Agent have executed this Security Agreement as of the date first above written.

GRANTORS:

AKORN, INC.

By: _____
Name:  Joseph Bonaccorsi
Title:  Sr. Vice President and Secretary

OAK PHARMACEUTICALS, INC.

By: _____
Name:  Joseph Bonaccorsi
Title:  Secretary

ACKNOWLEDGED AND AGREED:

JPMORGAN CHASE BANK, N.A.,
as the Administrative Agent

By: _____
Name: _____
Title: _____

Signature Page to Term Loan Pledge Agreement

[[5252415]]

IN WITNESS WHEREOF, the Grantors and the Administrative Agent have executed this Security Agreement as of the date first above written.

GRANTORS:

AKORN, INC.,

By: _____

Name:  Joseph Bonaccorsi
Title:  Sr. Vice President and Secretary

OAK PHARMACEUTICALS, INC.

By: _____

Name:  Joseph Bonaccorsi
Title:  Secretary

ACKNOWLEDGED AND AGREED:

JPMORGAN CHASE BANK, N.A.,
as the Administrative Agent

By: _____

Name:  _John Murthy_

Title:  _Authorized Officer_

Signature Page to Term Loan Pledge Agreement

[[5252415]]

**EXHIBIT A**

(See Sections 3.2, 3.3 and 9.1 of Security Agreement)

NOTICE ADDRESS FOR ALL GRANTORS

Akorn, Inc.
1925 West Field Court, Suite 300
Lake Forest, IL 60045
Attention:  Joseph Bonaccorsi
Facsimile:  866.468.0750

**(1)  INFORMATION OF Akorn, Inc.**

I.     **Name of Grantor**:  Akorn, Inc.
       **Trade Names**:  Akorn Pharmaceuticals; Taylor Pharmaceuticals

II.    **State of Incorporation or Organization**:  Louisiana

III.   **Type of Entity**:  corporation

IV.    **Organizational Number assigned by State of Incorporation or Organization**:
       29305330D

V.     **Federal Identification Number**:  72-0717400

VI.    **Place of Business** (if it has only one) or **Chief Executive Office** (if more than
       one place of business) and **Mailing Address**:

       1925 West Field Court, Suite 300
       Lake Forest, IL 60045
       Attention:  Joseph Bonaccorsi

1

**(2)  INFORMATION OF Oak Pharmaceuticals, Inc.**

I.    **Name of Grantor**:  Oak Pharmaceuticals, Inc.

II.   **State of Incorporation or Organization**:  Delaware

III.  **Type of Entity**:  corporation

IV.   **Organizational Number assigned by State of Incorporation or Organization**: 5011666

V.    **Federal Identification Number**:  45-2776647

VI.   **Place of Business** (if it has only one) **or Chief Executive Office** (if more than one place of business) **and Mailing Address**:

1925 West Field Court, Suite 300
Lake Forest, IL 60045
Attention:  Joseph Bonaccorsi

2

[[5252415]]

**EXHIBIT G**

(See Section 3.13 of Security Agreement and Definition of "Pledged Collateral")

LIST OF PLEDGED COLLATERAL, SECURITIES AND OTHER INVESTMENT PROPERTY

STOCKS

| Pledgor | Issuer | Class of Equity | Certificate No(s). | Number of Shares/Units | % of Outstanding Equity |
|---|---|---|---|---|---|
| Akorn, Inc. | Akorn Canada, Inc. | Common Stock | C-1 | 1,000 | 100% |
| Akorn, Inc. | Akorn India Private Limited | Equity Shares | 2 | 1000 | 0.02% |
| Akorn, Inc. | WorldAkorn Pharma Mauritius | Ordinary Shares | 7-22 | 162,375,180 | 100% |
| Oak Pharmaceuticals, Inc. | Akorn International S.a.r.l. | Normal Shares | N/A | 20,001 | 100% |

1

[[5252415]]

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

**EXHIBIT H**

(See Section 3.1 of Security Agreement)

## OFFICES IN WHICH FINANCING STATEMENTS HAVE BEEN FILED

| Name | Jurisdiction |
|------|--------------|
| Akorn, Inc. | Louisiana |
| Oak Pharmaceuticals, Inc. | Delaware |

HIGHLY CONFIDENTIAL
Turner Falk
obermayer.com
Aug 05, 2020 14:29

[[5252415]]