EAST BATON ROUGE PARISH C-646174
Filed Sep 21, 2018 1:16 PM .24
Deputy Clerk of Court

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 646,174

DIVISION "I" SECTION 24

MERRY A. KOGUT,
Individually and on Behalf of Defendant Akorn, Inc.,
Plaintiff,

v.

AKORN, INC., JOHN KAPOOR, KENNETH S. ABRAMOWITZ, RONALD M. JOHNSON, STEVEN J. MEYER, ADRIENNE GRAVES, TERRY RAPPUHN, BRIAN TAMBI, ALAN WEINSTEIN, RAJAT RAI, TIMOTHY DICK, JOSEPH BONACCORSI, DAVID HEBEDA, BRUCE KUTINSKY, STEVEN LICHTER, DUANE A. PORTWOOD, and MARK SILVERBERG,

Defendants.

FILED: ______________

______________
DEPUTY CLERK

**VERIFIED SECOND AMENDED AND RESTATED COMPLAINT**

Plaintiff Merry A. Kogut ("Plaintiff"), by the undersigned attorneys, submits this Verified Second Amended and Restated Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. In her original complaint in this action (the "Original Complaint"), Plaintiff asserted class action claims against the defendants named therein to, among other things, compel them to publish complete and accurate financial statements of nominal defendant Akorn, Inc. ("Akorn" or the "Company") and hold an annual meeting of Akorn's stockholders. Defendants mooted Plaintiff's claims by filing with the United States Securities and Exchange Commission ("SEC") Akorn's overdue financial statements and disseminating a proxy statement for an annual meeting of the Company's stockholders to be held on July 1, 2016. In addition to Plaintiff's now-moot class action claims, Plaintiff also has derivative claims against defendants on behalf of Akorn, which she asserts herein.

2. Plaintiff brings this action on behalf of nominal defendant Akorn seeking to remedy breaches of fiduciary duties by certain current and former members of Akorn's Board of Directors (the "Board") and executive officers (collectively, the "Individual Defendants") who have, *inter alia*, knowingly abdicated their responsibility to make a good faith effort to oversee the Company's accounting and financial reporting practices and compliance with U.S. Food and Drug Administration ("FDA") data integrity requirements. Certain of the Individual Defendants further breached their fiduciary duties by knowingly causing and/or allowing the Company to report financial results that were materially misleading, and knowingly utilizing (or knowingly permitting others to utilize) material non-public information about the Company's misstated financial statements and lack of internal controls over financial reporting for their own pecuniary gain.

3. Akorn is a Louisiana corporation headquartered in Lake Forest, Illinois. The Company describes itself in its public filings as a "generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals and branded as well as private-label over-the-counter consumer health products and animal health pharmaceuticals."

4. The Company has a long history of problems with its internal controls over accounting and financial reporting ("ICFR").[1] Indeed, for fiscal years 2012 through 2015, Akorn

[1] The SEC defines "internal controls over financial reporting" as:

> A process designed by, or under the supervision of, [a company's] principal executive and principal financial officers, or persons performing similar functions, and effected by [a company's] board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in

management and the Board's Audit Committee determined that the Company's ICFR were ineffective and suffered from material weaknesses.[2] These material weaknesses resulted in the identification of an accounting error relating to the Company's acquisition of Kilitch Drugs (India) Limited and a corresponding restatement of the Company's historical financial statements to correct this error.

5. Akorn purportedly developed a plan in 2012 to remediate the Company's deficient internal control environment. According to the Company's public filings, Akorn management and the Audit Committee closely monitored the implementation of this plan. The entire Board was also aware of the Company's issues with ICFR.

6. By 2014, however, Akorn had failed to implement procedures necessary to remediate the Company's deficient internal control environment. Despite the existence of numerous, unremedied material weaknesses in the Company's ICFR (including those relating to business combinations), the Board and Akorn management pressed forward with two massive acquisitions that year. *First*, on April 17, 2014, Akorn completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") for a total purchase price of approximately $640.0 million (the "Hi-Tech Acquisition"). *Second*, on August 12, 2014, the Company completed its acquisition of VersaPharm Incorporated ("VersaPharm") for a total purchase price of approximately $440.0 million (the "VersaPharm Acquisition," and together with the Hi-Tech Acquisition, the "Acquisitions"). Akorn management and the Board were aware at the time they entered into the

---

> accordance with authorizations of management and directors of the registrant; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the registrant's assets that could have a material effect on the financial statements.

SEC, "Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports," 17 CFR Parts 210, 228, 229, 240, 270 and 274.

[2] The SEC defines a "material weakness" as "a deficiency, or a combination of deficiencies, in internal control over financial reporting . . . such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." SEC, "Final Rule: Amendments to Rules Regarding Management's Report on Internal Control Over Financial Reporting", 17 CFR Parts 210, 228, 229 and 240.

Acquisitions thatAkorn was ill-suited to integrate these acquired entities into the Company's still-deficient ICFR.

7.     Unsurprisingly, the Acquisitions resulted in the identification of additional accounting errors and another restatement of the Company's previously issued financial statements (the "Restatement"). On March 17, 2015, Akorn filed with the SEC a Form 10-K in which the Company disclosed that it had to restate its previously issued second and third quarter 2014 financial statements because "an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech Pharmacal Co., Inc." Thereafter, on April 24, 2015, Akorn reported that it would make additional financial restatements, this time to correct the previously issued financial statements for the second and third quarters of 2014 (again), as well as for the fourth quarter and full year of fiscal year 2014 (ended December 31, 2014).

8.     On May 10, 2016, Akorn announced that it had completed the Restatement. In connection therewith, Akorn revealed that it had overstated its net income for 2014 by $38 million, or almost 7%, and income from continuing operations by $34 million, or 136%.

9.     During the second, third and fourth quarters of fiscal year 2014, when the Company's financial statements were inaccurate and misstated, a majority of the members of the Board and several of Akorn's executive officers engaged in the suspicious sale or disposition of Akorn common stock at inflated prices. In total, these dispositions garnered over $111 million in gross proceeds for Company insiders. At the time of each of these dispositions, each of the Akorn insiders who executed these sales was in possession of material nonpublic information regarding the true state of the Company's financial statements and its deficient internal controls over financial reporting.

10.     In addition to issues with its ICFR, Akorn has for several years suffered from pervasive and widespread violations of FDA data integrity requirements relating to the development of its products. These issues were known or recklessly disregarded by Akorn management and the Board.

11.     As discussed herein, Akorn management and Board members received internal and external audit reports documenting the Company's myriad and pervasive data integrity failures. For example, Akorn's internal audit mechanism, Global Quality Compliance ("GQC"), reported in April 2016 that the Company suffered from "unmitigated compliance risks associated with Data Integrity." These issues were corroborated by a renowned third-party consultant retained by Akorn in 2016, who observed the "failure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn[.]" These failures were so substantial that this third-party consultant warned Akorn senior management that they could face criminal liability as a result of their misconduct. By November 11, 2016, Defendant Rajat Rai ("Rai"), the Company's Chief Executive Officer ("CEO"), conceded that he and the Board were "aware of significant and repeat problems that Akorn was having in its quality function."

12.     Akorn senior management was also aware of and/or actively participated in the submission of falsified data to the FDA. Specifically, Defendant Mark Silverberg ("Silverberg")—the Company's former Executive Vice President for Quality Assurance who was the head of Akorn's data integrity processes and reported directly to Defendant Rai—was responsible for the knowing submission to the FDA of fraudulent (or, at a minimum, questionable) data in connection with the Company's abbreviated new drug application ("ANDA") for an antibiotic drug called azithromycin. This scheme began almost six years ago, in October 2012, when a senior quality control employee at the Company's Somerset facility fabricated test results for azithromycin that were included in the ANDA Akorn submitted to the FDA in December 2012. Over the course of the next five years, Akorn continued to submit fabricated test results to the FDA. In early January 2017, Akorn senior management received an employee survey which expressly warned that Defendant Silverberg "provided misleading information to regulatory bodies including the US FDA."

13.     Despite their knowledge of pervasive data integrity issues at the Company, the Akorn management and the Board failed to make a good faith effort to remediate these issues. These individuals further failed to act in good faith by (1) issuing false and misleading

statements that Akorn maintained an adequate data integrity program and complied with FDA regulations, and (2) otherwise self-interestedly concealing the Company's data integrity and compliance failures from its shareholders and third-parties.

14.     The Individual Defendants' failure to ensure that the Company implemented and maintained adequate internal controls, including accounting, financial reporting and compliance practices, and their knowledge of and/or participation in the Company's misconduct, constituted a breach of their fiduciary duties to the Company.  Certain of the Individual Defendants further breached their fiduciary duties in connection with the Restatement by knowingly causing and/or allowing the Company to report financial results that were materially misleading, and knowingly utilizing (or knowingly permitting others to utilize) material non-public information about the Company's misstated financial statements and lack of internal controls for their own pecuniary gain.  As a direct and proximate result of the foregoing violations of law by the Individual Defendants, the Company has sustained and will continue to sustain damages.  Furthermore, the proceeds received from the sales executed by Company insiders based on their knowledge of material nonpublic information should be disgorged to the Company.

## PARTIES

15.     Plaintiff is a shareholder of Akorn and has been a shareholder of Akorn continuously since 2011.  Plaintiff's ownership of Akorn common stock covers the entire period of the wrongdoing alleged herein.  Plaintiff will fairly and adequately represent the interests of the corporation in enforcing the rights of the corporation.  Plaintiff has complied with the notice requirements of La.R.S. § 12:1-742.  Plaintiff therefore meets the standing requirements set forth in La.R.S. § 12:1-742-1.

16.     Defendant AKORN is incorporated in Louisiana and maintains its principal executive offices at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.  Akorn common stock trades on The NASDAQ Global Select Market under the ticker symbol "AKRX."

17.     Defendant JOHN KAPOOR ("Kapoor"), in his official capacity as the former Chairman of the Board of Akorn, served as the Chairman of the Board and Akorn director from 1990 until October 30, 2017.  Kapoor served as Akorn's interim CEO from March 2001 to May

2002 and as CEO from May 2002 to December 2002. Kapoor is the President of EJ Financial Enterprises, Inc. ("EJ Financial") a healthcare consulting and investment company. Kapoor was the chairman of the board of directors, President and CEO of Insys Therapeutics, Inc. ("Insys"), a publicly held drug development company focused on pain and oncology. Kapoor served as chairman of the board of directors of Insys from its inception in 1990 to 2017, and from 2006 to October 29, 2017. Prior to NeoPharm, Inc.'s ("NeoPharm") merger with Insys, Kapoor was the chairman of NeoPharm's board of directors. Kapoor has also served as the chairman of the board of directors of Option Care, Inc. ("Option Care"), a provider of home infusion pharmacy and specialty pharmacy services, which was acquired by Walgreen Co. in August 2007. On October 26, 2017, Kapoor was arrested and charged with leading a nationwide conspiracy at Insys to profit by using bribes and fraud to cause the illegal distribution of a Fentanyl spray intended for cancer patients experiencing breakthrough pain.

18.     Defendant KENNETH ABRAMOWITZ ("Abramowitz"), in his official capacity as a director of Akorn, has served as a director of Akorn since 2010. Abramowitz was, at all relevant times, a member of the Board's Audit Committee of the Board (the "Audit Committee"). Abramowitz previously served as a director of Option Care.

19.     Defendant RONALD JOHNSON ("Johnson"), in his official capacity as a director of Akorn, has served as a director of Akorn since 2003. Johnson was, at all relevant times, a member of the Audit Committee. Johnson was also, at all relevant times, a member of the Board of Directors Quality Oversight Committee ("QOC"), which oversaw the Company's quality and compliance departments, including the GQC.

20.     Defendant STEVEN MEYER ("Meyer"), in his official capacity as a director of Akorn, has served as a director of Akorn since 2009. Meyer was, at all relevant times, a member of the Audit Committee. Meyer has been a member of the board of directors of Insys since November 2010 and became chairman of the board in January 2017. Prior to that, he served as a director of Insys Pharma from August 2007 until November 2010.

21.     Defendant ADRIENNE GRAVES ("Graves"), in her official capacity as a director of Akorn, has served as a director of Akorn since 2012. Graves was President and CEO

of Santen Inc. ("Santen"), the U.S. subsidiary of Santen Pharmaceutical Co., Ltd. from 2002 until 2010 and prior to that she was Vice President of Clinical Affairs. Prior to joining Santen, Graves held various leadership roles at Alcon Laboratories, Inc. She currently serves on the boards of directors of Nicox SA and Envisia Therapeutics.

22.     Defendant TERRY RAPPUHN ("Rappuhn"), in her official capacity as a director of Akorn, has served as a director of Akorn since April 2015 and as a member of the Audit Committee since 2016. Rappuhn was a director of Span-America Medical Systems, Inc., a manufacturer of beds and pressure management products for the medical market, from early 2016 until it was acquired by Savaria Corporation in 2017. Rappuhn served as the audit committee chairperson for Genesis HealthCare Corporation, an operator of skilled nursing and assisted living centers, from 2003 to 2007 and for AGA Medical Holdings, Inc., a medical device company, from 2006 to 2010. Prior to that she served in various executive positions at Quorum Health Group, Inc., an owner and operator of acute care hospitals.

23.     Defendant BRIAN TAMBI ("Tambi"), in his official capacity as a director of Akorn, has served as a director of Akorn since 2009. Tambi has served as a member of the board of directors of Insys from November 2010 until May 10, 2018 and as a director of Insys Pharma from August 2007 to November 2010. Pursuant to a Modification, Warrant and Investor Rights Agreement dated April 13, 2009, EJ Funds, L.P. ("EJ Funds"), a company controlled by Kapoor, is entitled to nominate two persons to serve on the Board. EJ Funds nominated Mr. Tambi to serve on the Board for this purpose (the other seat remains vacant). At all relevant times, Tambi was a member of the Board's QOC.

24.     Defendant ALAN WEINSTEIN ("Weinstein"), in his official capacity as Chairman of the Board, has served as Chairman since Kapoor resigned effective October 30, 2017. Prior to that Weinstein served as a director of Akorn from 2009 until he was selected as Chairman. Before joining Akorn Weinstein founded and served as President of Premier, Inc., a national GPO providing services for hospitals nationwide and served as a director of Vascular Pathways, Inc., Precyse, SutureExpress and Sterilmed, Inc. Currently he serves as a director on the board of OpenMarkets, a services and technology platform for purchasing healthcare

equipment, and on the board of trustees of the Rosalind Franklin University of Medicine and Science. At all relevant times, Weinstein was a member of the QOC.

25. Defendant Rai, in his official capacity as an executive officer at Akorn, has served as the CEO of the Company since May 2010, and had previously served as Interim CEO since June 2009. Prior to joining Akorn, Rai served as President and CEO of Option Care. At all relevant times, Rai was a member of the QOC.

26. Defendant TIMOTHY DICK ("Dick"), in his official capacity as a former executive officer of Akorn, served as the Company's Chief Financial Officer ("CFO") from June 2009 until his resignation on August 3, 2015. Prior to joining Akorn, Dick served as a Vice President of Operations Improvement and Analysis at Walgreens-Option Care, Inc. ("Walgreens-Option Care"). Dick had previously held various leadership positions at Option Care since 2001.

27. Defendant JOSEPH BONACCORSI ("Bonaccorsi"), in his official capacity as an executive officer of Akorn, has served as the Company's Senior Vice President, Secretary, and General Counsel since 2009. Prior to joining Akorn, Bonaccorsi served as Senior Vice President Mergers & Acquisitions and Counsel for the Walgreen-Option Care Home Care division. Prior to that time, Bonaccorsi served as Senior Vice President, General Counsel, Secretary and Corporate Compliance Officer at Option Care from 2002 through 2007.

28. Defendant DAVID HEBEDA ("Hebeda"), in his capacity as an executive officer of Akorn, served as Akorn's Controller from May 2012 until May 2015 and remained employed by Akorn until August 2016.

29. Defendant BRUCE KUTINSKY ("Kutinsky"), in his capacity as an executive officer of Akorn, has served as Chief Operating Officer of Akorn since September 2012. Prior to that he served as Senior Vice President of Corporate Strategy from late 2009 until he was named President, Consumer Health Division following the Company's acquisition of Advanced Vision Research, Inc. in May 2011. Before joining Akorn Kutinsky served as Vice President – Strategic Solutions for Walgreens and as Executive Vice President, Specialty Pharmacy at Option Care.

30. Defendant STEVEN LICHTER ("Lichter"), in his capacity as a former executive officer of Akorn, served as Akorn's Executive Vice President, Pharmaceutical Operations from early 2015 until May 4, 2018.

31. Defendant DUANE A. PORTWOOD ("Portwood"), in his capacity as an executive officer of Akorn, has served as CFO of Akorn since October 30, 2015.

32. Defendant Silverberg, in his official capacity as a former executive officer of Akorn, served as the Company's Executive Vice President for Global Quality Assurance until February 2018. Silverberg joined Akorn in April 2005. At all relevant times, Silverberg was a member of the QOC.

33. The defendants identified in ¶¶17-32 are collectively referred to herein as the "Individual Defendants."

34. Defendant Akorn and the Individual Defendants are collectively referred to herein as the "Defendants."

35. Defendants Kapoor, Abramowitz, Johnson, Meyer, Graves, Rappuhn, Tambi, Weinstein, Rai, Dick, Hebeda, Bonaccorsi and Silverberg are hereinafter referred to as the "Restatement Defendants."

36. Defendants Kapoor, Abramowitz, Johnson, Meyer, Graves, Rappuhn, Tambi, Weinstein, Rai, Dick, Hebeda, Bonaccorsi, Kutinsky, Lichter, Portwood and Silverberg are hereinafter referred to as the "Data Integrity Defendants."

37. Defendants Kapoor, Johnson, Tambi, Graves, Weinstein, Rai, Dick, Bonaccorsi, and Silverberg are hereinafter referred to as the "Insider Trading Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

38. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its

stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

    (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c)    Exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading; and

    (d)    Refrain from wasting the Company's assets or unduly benefiting themselves and other Company insiders.

41.    Moreover, the Individual Defendants are governed by the Akorn, Inc. Code of Ethics (the "Code") applicable to each Akorn employee and Board member. Pursuant to the Code, the Individual Defendants are required to certify that they: (i) read and understand the guidelines contained therein; (ii) will comply with the Code; and (iii) are unaware of any situation that is or was a violation of the strictures contained in the Code.

42.    Under the section titled "Business and Accounting Practices," the Code states:

Internal Controls

You should ensure that:

- Transactions are executed in accordance with the management authority;
- **Transactions are recorded in sufficient detail to maintain and keep proper accounting systems.**

SEC Reporting

**If you assist with preparation of reports to be filed with the Securities and Exchange Commission or with preparation of information to be included in such reports you must strive to provide full, fair, accurate, timely, and understandable disclosure.**

(Emphasis added).

43. Furthermore, defendants Abramowitz, Johnson and Meyer, as members of the Audit Committee, were required to comply with the Akorn, Inc. Audit Committee Charter (the "Audit Committee Charter").

44. Under the section titled "Purpose," the Audit Committee Charter states that:

> The primary function of the Audit Committee (the "Audit Committee") of Akorn, Inc. (the "Company") is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by reviewing: the financial reports and other financial information provided by the Company to designated regulatory bodies or the public; the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics that management has established; and the Company's auditing, accounting and financial reporting processes.

(Emphasis in original).

45. The Audit Committee establishes the responsibilities of the Audit Committee, which include, *inter alia*, the duties to:

***Internal Audit, Internal Controls & Risk Management***

13. Evaluate whether management is setting the appropriate "tone at the top" by communicating the importance of the Company's ethical and business practice standards, including the importance of internal accounting controls.

14. Serve as an independent and objective party to monitor the Company's financial reporting process and [the Company's internal controls over financial reporting ("ICFR")].

15. Review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures and safeguard the Company's assets.

> 16. Review and discuss with management, the internal audit department and the independent auditor: (a) the adequacy and effectiveness of the Company's ICFR (including any significant deficiencies and significant changes in ICFR reported to the Audit Committee by the independent auditor or management; (b) the Company's internal audit procedures; and (c) the adequacy and effectiveness of the Company's disclosure controls and procedures, and management reports thereon.
>
> 17. Review and discuss with management and the independent auditor various topics and events that may have significant financial impact on the Company or that are the subject of discussions between management and the independent auditor.
>
> * * *
>
> ***Financial Reporting***
>
> 22. Review and discuss with management and the independent auditor (a) the Company's audited financial statements and quarterly financial statements (including the related notes); (b) the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") included in the Company's annual and quarterly reports to be filed with the SEC; (c) the form of any audit opinion to be issued by the independent auditor on the financial statements; and, (d) if deemed appropriate, recommend to the Board that the applicable audited financial statements and MD&A be included in the Annual Report on Form 10-K.

46. The Company has long-recognized the important role management and the Board play in maintaining effective compliance with applicable financial reporting requirements. For example, the Company has recognized in its public filings that:

> As a public company, we are subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). These requirements are extensive. The Exchange Act requires that we file annual, quarterly and current reports with respect to our business and financial condition. The Sarbanes-Oxley Act requires that we maintain effective disclosure controls and procedures and internal controls over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, significant resources and management oversight is required.

47. Additionally, the Company's data integrity program and general FDA compliance are matters committed to the oversight of the Data Integrity Defendants. The Company's Quality Policy states that "[i]t is Akorn's policy to preserve and improve patient health by

consistently delivering high quality, safe and effective specialty pharmaceutical products, that meet or exceed customer expectations." That policy's mission statement specifically provides that the Company's "management" is "committed to successfully deploying [the] Quality Policy to all aspects of [the Company] . . . ." According to the mission statement, "[t]his commitment will be maintained through having the right people doing the right things, the first time, every time." This includes, among other things, "[s]tate of the art technology, which develops and commercializes safe pharmaceutical products that enhance the quality of life," and "[a] management team that is accountable for effective review and support of quality, through the prioritization, resourcing, and timely execution of quality-conscious decision-making."

48. The FDA compliance responsibilities of the Data Integrity Defendants are also detailed in the Company's most recent annual proxy statement, which provides in pertinent part:

> We [the Board] accept the premise that with innovation and progress we must also confront various risks. We also recognize that risk can be predicted, evaluated, avoided and/or managed. Further, the Board acknowledges that inappropriate risk avoidance and management could damage Company assets as well as shareholder value. **Given these principles, senior management is responsible for assessing and managing the Company's various exposures to risk on a day-to-day basis, including the creation of appropriate risk management and compliance programs and policies. . . . The Board is responsible for overseeing management in the execution of its responsibilities and for assessing the Company's approach to risk management. The Board's role in risk oversight of the Company is consistent with the Company's leadership structure, with the CEO and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board providing guidance in these areas.**
>
> (Emphasis added).

49. Furthermore, the members of the Board and Audit Committee are or should be aware of the importance of FDA and regulatory compliance by virtue of their backgrounds in the pharmaceutical and healthcare industries.[3]

---

[3] For example, the Company's public filings tout the experience of Johnson, a member of the Audit Committee, "in managing regulatory and compliance requirements of the FDA, particularly in pharmaceutical[s] . . . as well as a deep knowledge and understanding of FDA policies and procedures regarding cGMP compliance, quality control processes and outcomes reporting gained from his years of providing specialized consulting services to governments, pharmaceutical companies and healthcare institutions and working at the FDA." The Company's

50. Accordingly, the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Akorn's Longstanding Issues With Its Internal Controls Over Financial Reporting

51. According to its public filings, Akorn is "a specialty generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals and branded as well as private-label over-the-counter consumer health products and animal health pharmaceuticals." The Company focuses on "difficult-to-manufacture sterile and non-sterile dosage forms including, but not limited to, ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays."

52. Since at least 2012, Akorn has encountered myriad issues relating to its internal controls over financial reporting. All Restatement Defendants (except for Rappuhn, who joined the Company in 2015) were on notice of these failures and were therefore aware of the corresponding need to ensure adequate oversight of Akorn's internal controls in the future. As detailed herein, the Restatement Defendants, in breach of their fiduciary duties to the Company, knowingly abdicated these responsibilities.

53. On August 7, 2012, Akorn filed with the SEC a Form 8-K disclosing that it would need to restate its previously issued financial statements as a result of certain accounting errors committed by the Company in connection with its acquisition of Kilitch Drugs (India) Limited. Specifically, the Form 8-K stated:

> On August 7, 2012, Akorn issued a press release announcing that, on August 3, 2012, the Audit Committee of Akorn's Board of Directors ("Audit Committee"), upon the recommendation of management, concluded that the previously issued financial statements contained in Akorn's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2012 should not be relied upon because of errors in those financial statements and that those financial statements would be restated to make the necessary accounting adjustments. The previously disclosed $66.7 million purchase price for the acquisition of certain assets of Kilitch Drugs

---

public filings also tout that Tambi "brings to Akorn's Board extensive pharmaceutical industry experience particularly FDA knowledge and drug development and commercialization expertise."

> (India) Limited was originally recorded in the first quarter of 2012. During the second quarter of 2012, the Company determined that its preliminary accounting for the acquisition of certain assets of Kilitch Drugs (India) Limited needed to be corrected, as certain items that had been previously capitalized as purchase price needed to be expensed as either compensation earned from the achievement of acquisition related milestones or other acquisition costs. As a result of the restatement Akorn will re-characterize approximately $8.3 million of originally recorded purchase price as additional expense for the quarter ended March 31, 2012.
>
> In addition, the Company's consolidated statement of cash flows for the three months ended March 31, 2012 and 2011 have been adjusted to correct a classification error. The error resulted in an understatement of net cash provided by operating activities of $1.4 million, with a corresponding understatement of net cash used in investing activities for the three months ended March 31, 2012 and an overstatement of net cash provided by operating activities of $0.5 million, with a corresponding overstatement of net cash used in investing activities for the three month period ended March 31, 2011.
>
> * * *
>
> In connection with this matter, the Company has re-evaluated its conclusions regarding the effectiveness of its internal control over financial reporting for the affected periods and determined that a material weakness existed as of March 31, 2012. The Company had previously concluded in its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2012 that its controls were effective as of March 31, 2012. As a result of the material weakness, the Company has now concluded that such controls were ineffective. Accordingly, the Company will restate its disclosures as of March 31, 2012 to include the identification of a material weakness related to its restatement. The Company is actively engaged in remediating the material weakness.

54. In a Form 10-Q/A filed by the Company with the SEC on August 14, 2012, the Company more succinctly disclosed that "the primary factor contributing to the material weakness . . . was the ***Company's accounting for business combinations***." (Emphasis added).[4]

55. On March 1, 2013, the Company filed with the SEC a Form 10-K for fiscal year 2012 which provided an evaluation of this material weakness.[5] Specifically, the Form 10-K stated:

> The primary factors contributing to the material weakness, which relates to our financial statement close process, were:

---

[4] The Form 10-Q/A was signed by Dick.

[5] The Form 10-K was signed by Rai, Dick, Kapoor, Abromowitz, Graves, Johnson, Meyer, Tambi and Weinstein.

> - *We did not maintain financial close process and procedures that were adequately designed, documented and executed to support the accurate and timely reporting of our financial results.* As a result, we made a number of manual post-close adjustments necessary in order to prepare the financial statements included in this Form 10-K.
>
> - *We did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed, reviewed and approved.* While these activities should be performed in the ordinary course of our preparing our financial statements, we instead needed to undertake significant efforts to complete reconciliations and investigate items identified in those reconciliations during the course of the audit of our financial statements.
>
> (Emphasis in original).

56. The Form 10-K expressly noted that this evaluation was conducted by "[Akorn's] management, with the participation of [the Company's] Chief Executive Officer and . . . Chief Financial Officer" and assured Akorn's stockholders that "[w]ith the oversight of senior management and [the] audit committee, [Akorn] ha[d] begun taking steps and plan[ned] to take additional measures to remediate the underlying causes of the material weakness[.]"

57. On March 28, 2013, the Company filed with the SEC a Form 8-K disclosing that after conducting a "competitive process" and engaging in "careful deliberation," the Audit Committee had approved the dismissal of Ernst & Young LLP ("E & Y") as the Company's independent registered public accounting firm. The Form 8-K noted that the Company's March 1, 2013 Form 10-K contained an adverse opinion from E & Y regarding the "Company's internal control over financial reporting due to the effect of a material weakness related to the financial statement close process [,]" and disclosed that KPMG LLP ("KPMG") had replaced E & Y as the Company's independent registered public accounting firm.

**Akorn Touts the Benefits of its Aggressive Acquisition Strategy While Falsely Assuring Its Stockholders That Its Financial Statements Are Accurate**

58. Unfortunately for the Company and its stockholders, the promise in the March 1, 2013 10-K that Akorn management and the Board would take appropriate remedial action was hollow. Instead, the Restatement Defendants knowingly permitted the deficiencies to continue unabated, and as a result of their deliberate inaction, Akorn would once again find itself restating

its financial statements due to improprieties in its accounting for business combinations – the identical problem that caused the 2012 restatement.

59. On March 3, 2014, one year after promising to "remediate the underlying causes of the material weakness," the Company filed with the SEC a Form 12b-25 Notification of Late Filing disclosing that Akorn was "unable to file its Annual Report on Form 10-K [for fiscal year 2013] within the prescribed time period" because the Company had identified additional material weaknesses in its internal controls over financial reporting:

> The Company has not completed its testing and assessment of the effectiveness of its internal control over financial reporting due in part to identified control deficiencies related to completeness and accuracy of underlying data used in the determination of certain significant estimates and accounting transactions as well as the existence of inadequate segregation of duties. The Company believes that these deficiencies, or combination of deficiencies, represent material weaknesses in its internal control over financial reporting.

60. On March 14, 2014, Akorn filed with the SEC its Form 10-K for fiscal year 2013, which disclosed greater detail about the Company's material weaknesses:

> [O]ur management concluded that, as of December 31, 2013, our internal control over financial reporting was not effective because of the identification of material weaknesses described as follows:
>
> • *We did not have controls designed to validate the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions.* As a result, errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross to net revenue adjustments, inventory reserves and the determination of useful lives of acquired intangible assets. Although the errors were not material, we believe we have a material weakness because there is a reasonable possibility that a material misstatement to the interim or annual financial statements would not be prevented or detected on a timely basis.
>
> • *We did not have an adequate process in place to support the accurate and timely reporting of our financial results and disclosures in our Form 10-K. As a result, errors were identified primarily related to accounts payable and inventory balances at year end. Additionally, we did not have an adequate process in place to complete our testing and assessment of the design and effectiveness of internal controls over financial reporting in a timely manner.* Although the errors to accounts payable and inventory balances were not material, we believe we have a material weakness because there is a reasonable possibility that a

material misstatement to the interim or annual financial statements would not be prevented or detected on a timely basis.

- *We did not have sufficient segregation of duties over information system access such that employees had the ability to inappropriately initiate and record transactions, and there were no compensating, preventative or detective controls.* Although no inappropriate transactions were identified based on our review, we believe we have a material weakness because there is a reasonable possibility that a material misstatement to the interim or annual financial statements would not be prevented or detected on a timely basis.

(Emphasis in original).

61. Despite the existence of numerous, unremedied material weaknesses in the Company's ICFR (including those relating to business combinations), the Board and Akorn management caused the Company to complete two large acquisitions in 2014. On April 17, 2014, the Company filed with the SEC a Form 8-K and issued a press release announcing the completion of the first of the Company's major transactions that year, the Hi-Tech Acquisition, for $640 million in cash. The press release touted the Hi-Tech Acquisition as one which would "transform the Company into a larger, more diversified generic player" and "bring[] critical mass and scale Akorn's business[.]" Akorn anticipated that the Hi-Tech Acquisition would contribute "$15-20 million in annual run-rate synergies within 12 months post-close." In the press release, Rai stated that the Company's priority was "executing on our integration plan [with Hi-Tech]" and that Akorn "***expect[ed] that the acquisition will be immediately accretive to non-GAAP earnings.***" (Emphasis added).

62. On May 9, 2014, the Company filed with the SEC a Form 8-K and issued a press release announcing that Akorn had entered into a definitive agreement regarding the second of its key transactions that year, the VersaPharm Acquisition, in which it would acquire VPI Holdings Corp., the parent company of VersaPharm, for $440 million in cash. The press release stated that the Company intended to fund the VersaPharm Acquisition through roughly $445 million in loans. In the press release, defendant Rai noted the rapid growth and product diversification spurred by the Company's recent acquisitions: "This [VersaPharm] [A]cquisition is a highly strategic fit with the recently acquired Hi-Tech platform . . . . ***Our acquisition strategy will have***

***resulted in doubling our revenues and product portfolio in a short period of time.***" (Emphasis added).

63. On May 12, 2014, the Company filed with the SEC a Form 10-Q disclosing its financial results for the first quarter ended March 31, 2014.[6] As it related to the Company's internal controls, the Form 10-Q stated:

> With the oversight of senior management and our audit committee, we have begun taken steps and plan to take additional measures to remediate the underlying causes of the material weaknesses. With respect to completeness and accuracy concerns, management intends to add additional accounting and internal audit personnel and design, document, and test controls that are intended to validate the completeness and accuracy of the data used in our significant estimates and accounting transactions. With respect to timely and accurate filing of our financial results, management intends to add additional accounting personnel, and to design, document, and test controls that are intended to ensure timely filing. With respect to segregation of duties, management intends to implement information technology tools to identify and assess segregation of duties issues, and to design, document and test controls to either eliminate or mitigate potential segregation of duties concerns. While the Company believes it will remediate the material weaknesses prior to filing its Form 10-K for the period ending December 31, 2014, the Company can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.
>
> ***Notwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this Quarterly Report on Form 10-Q fairly represent in all material respects our financial condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP.***
>
> (Emphasis added).

64. On August 11, 2014, the Company filed with the SEC a Form 10-Q disclosing its financial results for the second quarter ended June 30, 2014.[7] As it related to the Company's internal controls, the Form 10-Q contained the same representations as expressed in the first quarter 2014 Form 10-Q.

---

[6] The Form 10-Q was signed by Dick and included certifications under the Sarbanes-Oxley Act of 2002 ("SOX") signed by Rai and Dick, attesting that the financial information contained in the Form 10-Q was accurate and properly disclosed any material changes to Akorn's internal controls over financial reporting.

[7] The Form 10-Q was signed by Dick and included certifications under SOX signed by Rai and Dick, again attesting that the financial information contained in the Form 10-Q was accurate and properly disclosed any material changes to Akorn's internal controls over financial reporting.

65. On August 12, 2014, Akorn filed with the SEC a Form 8-K and issued a press release announcing the completion of the VersaPharm Acquisition for $440 million. The press release stated that the VersaPharm Acquisition was "expected to add $90 to $100 million in annual revenues and $0.10 to $0.12 in earnings per share, excluding new pipeline launches, deal amortization and acquisition-related expenses."

66. As noted in ¶ 60, the VersaPharm Acquisition was funded entirely by loans. Concurrent with the completion of this transaction, the Company entered into a $445.0 million term loan with certain lenders, with JPMorgan acting as the administrative agent (the "Incremental Term Loan").

67. On November 6, 2014, the Company filed with the SEC a Form 8-K and issued a press release announcing its financial results for the third quarter ended September 30, 2014. In the press release, defendant Rai again championed the rapid growth and increased earnings spurred by the Acquisitions:

> Our strong business momentum continued this quarter, with double digit organic growth and strong performance from the acquisitions that were completed over the last 12 months. Our strategic initiatives to diversify our portfolio of products have allowed us to reinvent the business, which has opened numerous new market opportunities and has positioned Akorn as a much broader provider of specialty generics. Our current portfolio of marketed and pipeline products operate in strong markets with favorable competitive dynamics, which will provide us with sustainable growth opportunities as we move forward. ***We expect to close 2014 with record sales and earnings, which will set us firmly on the path to achieve over $1 billion in annual sales in the future.***
>
> (Emphasis added).

68. On November 10, 2014, the Company filed with the SEC a Form 10-Q disclosing its financial results for the third quarter ended September 30, 2014.[8] As it related to the Company's internal controls, the Form 10-Q contained the same representations as those expressed in the first and second quarter 2014 Form 10-Qs.

69. On February 26, 2015, the Company filed with the SEC a Form 8-K and issued a press release disclosing the Company's financial and operational results for the fourth quarter

[8] The Form 10-Q was signed by Dick and included certifications under SOX signed by Rai and Dick, attesting that the financial information contained in the Form 10-Q was accurate and properly disclosed any material changes to Akorn's internal controls over financial reporting.

and year ended December 31, 2014. In the press release, defendant Rai again touted the Company's business combinations in 2014:

> 2014 was a transformative and rewarding year for Akorn . . . . ***In a short period of time we have built a robust and well-diversified specialty generics platform that will provide future growth opportunities through a growing pipeline of products and a reliable acquisition strategy.*** I remain confident in the long term prospects of our business.
>
> (Emphasis added).

**Akorn Finally Admits That its Financial Statements Were Inaccurate and Had to Be Restated and That Its Internal Controls Continued to Be Inadequate**

70. While the Company publicly touted the benefits of the Acquisitions, Akorn failed to disclose to its stockholders that the Restatement Defendants had abdicated their fiduciary duties to the Company by, *inter alia*, failing to ensure the proper integration of the acquired businesses into the Company's accounting department and accounting systems and the overall adequacy of Akorn's internal controls over financial reporting.

71. Indeed, by the end of the 2014, Akorn management and the Audit Committee had failed to meaningfully implement the remediation plan or otherwise correct the Company's many material weaknesses and deficient internal control environment. The adverse consequences of failing to implement the remediation plan were only exacerbated by the decision by Akorn management and the Board to complete the Acquisitions and embark on the appurtenant task of integrating Hi-Tech and Versapharm into the Company's already-weakened ICFR.

72. On March 2, 2015, the Company filed with the SEC a Form 12b-25 Notification of Late Filing and issued a press release disclosing that it needed an extension of time to file its Form 10-K for fiscal year 2014. Specifically, Akorn disclosed that:

> On April 17, 2014, the Company completed its acquisition of Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") and on August 12, 2014, the Company completed its acquisition of VersaPharm Incorporated ("VersaPharm" and together with Hi-Tech, the "Acquired Entities"). ***The Acquired Entities are consolidated entities whose total assets and total revenues each individually represent significant portions of the related consolidated financial statement amounts of the Company as of and for the year ended December 31, 2014. Due to the scale of the Acquired Entities, the extensive and complex nature of the actions required to consummate each transaction and the subsequent process of integration of the Acquired Entities into the business and***

> ***financial systems of the Company, significant management time and resources were diverted from the Company's normal process of reviewing and completing financial and other information in the Form 10-K. Furthermore, the Company has experienced unforeseen delays in collecting and compiling certain financial and other related data that would be included in the Form 10-K regarding the Acquired Entities.*** The Company could not have obtained this information in a more timely fashion without unreasonable effort and expense.
>
> Management is in the process of completing the Form 10-K. The finalization of financial information related to the Acquired Entities and the Company as a whole is not expected to result in any material change to previously reported financial statements or the financial results reported in our earnings release on February 26, 2015. Except for accounting for the change in our year to year revenues and earnings due to the acquisitions described above and the resulting growth of our business, as reported in our February 26, 2015 earnings release, our management believes there will not be any significant change in results of operations from the corresponding period for the 2013 fiscal year.
>
> In addition, the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2014 due to the aforementioned factors. The Company believes that material weaknesses exist as of December 31, 2014 relating to the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions and accurate and timely reporting of its financial results and disclosures in its Form 10-K. There is a possibility that upon completion of its assessment, the Company may determine that there are additional material weaknesses as of December 31, 2014.
>
> (Emphasis added).

73. On March 17, 2015, Akorn filed with the SEC a Form 10-K which disclosed that the Company's previously issued financial statements for the second and third quarters of fiscal year 2014 were inaccurate and had to be restated. In a Form 8-K filed concurrently with the Form 10-K, Akorn disclosed that it had "concluded there were certain material weaknesses in internal control over financial reporting, including an additional material weakness that it had inadequate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries," and that its "disclosure controls and procedures were not effective as of December 31, 2014, due to these material weaknesses in its internal control over financial reporting." Based on the above, the Audit Committee concluded that the Company's previously

issued second and third quarter 2014 financial statements "should not be relied upon" and needed
to be restated.

74.    At the time the Form 10-K was filed, the Company reported that it had to restate
its previously issued second and third quarter 2014 financial statements because "an error was
identified in the fair value allocation of assets acquired and liabilities assumed in connection with
the acquisition of Hi-Tech Pharmacal Co., Inc." At that time, the Company categorized the error
as an "overstatement in the chargeback reserve" caused by "a manual error made in preparing the
data related to the chargeback reserve whereby there was a duplication of inventory units held by
one customer utilized in the calculation of the reserve amount for Hi-Tech products at the
acquisition date." Correction of the error "resulted in a reduction of previously reported revenue
by approximately $8.9 million, a reduction of previously reported pre-tax income by
approximately $8.9 million and a reduction of previously reported net income, goodwill and
retained earnings by approximately $5.6 million, for the Company's three and six month periods
ended June 30, 2014."

75.    On April 24, 2015, Akorn reported that it would make additional financial
restatements, this time to correct the previously issued financial statements for the second and
third quarters of 2014 (again), as well as for the fourth quarter and full year of fiscal year 2014
(ended December 31, 2014). At that time, the Company reported that "based on management's
preliminary assessment, the errors related to the understatements of rebates and other sales
allowances are estimated to have resulted in an overstatement to net revenue and pretax income
from continuing operations of $20 million to $35 million for the year ended December 31,
2014," but that the "estimated impact of the errors could materially change based on further
review and analysis of the affected periods, including due to potential identification of other
errors." The Company further announced that the Audit Committee would be "conducting an
independent investigation into the circumstances surrounding the errors that resulted in the
misstatements, which will involve retaining outside advisors to assist in the investigation."

76.    Also on April 24, 2015, the Company reported that the Audit Committee had
concluded that the Company's previously issued financial statements for the identified periods

should no longer be relied upon, and that "management's report on the effectiveness of internal control over financial reporting as of December 31, 2014 should no longer be relied upon." Additionally, Akorn informed its shareholders that the opinion of its "independent registered public accounting firm, KPMG LLP ('KPMG') on the consolidated financial statements for the year ended December 31, 2014, as well as KPMG's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should no longer be relied upon."

77.    Following the April 24, 2015 disclosures, the price of Akorn's common stock declined nearly 22% the following trading day.  On that same day, financial analysts questioned, among other things, management's credibility.  For example, on April 27, 2015, *Investor's Business Daily* published an article entitled "Akorn Downgraded, Stock Falls on 'Credibility Gap'" stating:

> Top-rated drug maker Akorn (AKRX) was down 20% in morning trading Monday as analysts weighed in on Friday evening's news that it would again restate its 2014 earnings. Early Monday the company also announced a series of new executive appointments.
>
> The Street had assumed that the accounting problem, first revealed when the company filed for an extension of its 10-K report on March 2, had been resolved when Akorn issued a modest downward revision on March 17. But Friday's statement revealed that the investigation had revealed further problems, which had resulted in an overstatement of pretax income to the tune of $20 million to $35 million. Also, the firm said, Q1 results will not be issued "in a timely manner."
>
> Piper Jaffray analyst David Amsellem ran out of patience and downgraded the stock to neutral.
>
> "Though management does not believe the accounting issues will impact 1Q15 results, and it is sticking with its 2015 guidance, there is in our view far too large of a credibility gap to simply take those statements at face value," he wrote in a research note Sunday. "We believe that significant management changes will be needed to restore Akorn's credibility and further find it difficult to envision how these missteps will not result in a change in the CFO position."

78.    Meanwhile, *The Wall Street Journal* questioned the haste with which Akorn entered into the Acquisitions.  In an article published on April 27, 2015 entitled "Akorn's Restatement Drives Investors Nuts," *The Wall Street Journal* noted:

> Accounting issues are never good news for investors. Especially troubling is that Akorn blamed recent acquisitions, of Hi-Tech Pharmacal and VersaPharm, for 'a substantial majority' of its woes. But those deals are precisely what had caused Akorn's stock to germinate. Before any restatements, total assets increased more than fourfold last year, to $1.9 billion.

79. A chart included in *The Wall Street Journal* article illuminated the exponential – and as detailed herein, unmanageable – asset increase triggered by the Acquisitions:

80. *The Wall Street Journal* article also highlighted a perverse "silver lining" stemming from the Restatement: "Since nearly every pharmaceutical company seems to be hunting for acquisitions at the moment, the blood from a selloff – even due to accounting issues – might perversely have the benefit of drawing in deal sharks." In other words, the Restatement transformed the Company from "hunter" to the "hunted" in the pharmaceutical mergers and acquisitions landscape.

81. The Restatement also caused certain modifications to the terms of the Incremental Term Loan and Existing Term Loan. On May 20, 2015, the Company modified these loans to remedy certain covenant defaults related to the Restatement by incurring charges through a temporary interest rate increase and upfront payment.

82. On November 4, 2015, Akorn published a "Business and Financial Guidance Update" (the "Update") advising that it expected to file with the SEC its restated 2014 quarterly

and annual financial statements "by the end of the first quarter of 2016." The Company indicated that its "estimate of the errors related to the understatements of rebates and other sales allowances, as disclosed on August 10, 2015, is estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations slightly above the upper end of the $20 million to $35 million range initially estimated." The Update also disclosed that the Chicago Regional Office of the SEC "is conducting an investigation regarding the previously disclosed restatement, internal controls and other related matters," and that the U.S. Attorney's Office for the Southern District of New York "has requested information regarding these matters."

83.     Shortly thereafter, on November 13, 2015, the Company again modified the terms of the Incremental Term Loan and Existing Term Loan to remedy certain remaining covenant defaults related to the Restatement by incurring additional charges through yet another temporary interest rate increase and upfront payment.

84.     On January 14, 2016, Akorn issued a press release providing additional "material updates." The press release reported that the Company had engaged BDO USA, LLP ("BDO") as its independent auditors and that BDO "will be auditing the Company's financial statements for the two years ended December 31, 2015, including the restatement for 2014." BDO was thus the Company's third independent auditor in three years. Akorn also reported that it "believes that restated 2014 financials will be filed concurrently with delinquent 2015 financial reports" and that the Company "maintains its previously stated goal of regaining compliance with timely financial reporting requirements by May 9, 2016." With respect to the ongoing financial restatement, the press release reported:

> In light of the Audit Committee's findings, Akorn's management continues to evaluate the nature and scope of the company's ongoing restatements to its 2014 financial results as well as possible amendments to its disclosures. Akorn's estimate of the errors is estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of approximately $35 million for the year ended December 31, 2014. These estimates are based on management's ongoing assessments and are subject to the completion of the restatement and the audit of the restated financial statements for the year ended December 31, 2014.
>
> Akorn's management is considering the company's prior conclusions of the adequacy of its internal control over financial

> reporting and disclosure controls and procedures, and related material weaknesses in such controls. Akorn intends to amend certain prior disclosures pertaining to its evaluation of such controls and procedures, and material weaknesses, as appropriate in connection with any amended filings, and will consider whether any further remedial measures may be advisable.

85. On January 14, 2016, Akorn filed with the SEC a Form 8-K reporting that (i) the Audit Committee had dismissed KPMG as the Company's registered public accountant, and (ii) that the Company had significantly modified the "risk factors" of owning the Company's securities. The Form 8-K also disclosed that KPMG had advised the Company:

> [T]hat information had come to its attention, that if further investigated may: (i) materially impact the fairness or reliability of either: a previously issued audit report or the underlying financial statements; or the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that may prevent it from rendering an unqualified audit report on those financial statements), or (ii) cause it to be unwilling to rely on management's representations or be associated with the registrant's financial statements. KPMG also advised us that, in addition to the Audit Committee's conclusion that our audited consolidated financial statements for the year ended December 31, 2014 and our unaudited condensed consolidated financial statements for the quarters ended June 30, 2014 and September 30, 2014 and the disclosures and related communications for each of these periods should not be relied, ***information has come to its attention, that if further investigated may significantly impact our unaudited condensed consolidated financial statements for the quarter ended March 31, 2014 and our audited consolidated financial statements for the year ended December 31, 2013.***
>
> Due to the dismissal, KPMG advised us that it did not have the opportunity to expand the scope of its audit, conduct further procedures, evaluate the investigation ... or complete its process. KPMG further advised us that, at the time of its dismissal, KPMG has not had an opportunity to conduct its procedures or conclude that it was satisfied with the investigation or that any remediation has taken place.
>
> (Emphasis added)

86. Less than two weeks later, KPMG filed with the SEC its own Form 8-K/A containing "clarifications" to the Company's January 14, 2016 Form 8-K statements. Among other things, KPMG's January 27, 2016 Form 8-K/A "clarified" for stockholders the following:

> The information referenced by the Company ... that had come to our attention relates to errors identified by the Company related to understatements of rebates and other sales allowances which have

> resulted in an overstatement to net revenue and pretax income from continuing operations for the year ended December 31, 2014, and two additional accounting matters identified by the Company's investigation that warranted further investigation and review: (i) customer payment term modifications and related revenue recognition practices, timing and disclosures for 2013 through 2015, and (ii) returns processing delays in 2015. ***We advised the Company that this information necessitated a significant expansion of the scope of our audits***, and that information discovered in the Company's investigation or in our expanded audit procedures may: (i) materially impact the fairness or reliability of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2014 and consolidated financial statements as of and for the year ended December 31, 2013 or (ii) cause us to be unwilling to rely on management's representations or to be associated with the Company's financial statements, including the previously audited financial statements as of and for the year ended December 31, 2013.
>
> (Emphasis added).

87. Exhibit 99.1 (the "Exhibit") to the Company's January 14, 2016 Form 8-K also substantially expanded the risk factors of owning the Company's securities. Among many other newly added risk factors, the Exhibit specifically reported the following two new risk factors:

> We announced that we intend to restate our consolidated financial statements and replace our registered independent public accounting firm. Such restatement and change in accounting firms requires a thorough review of our financial statements, which could result in the identification of additional errors and require the correction of additional items, which could be material.
>
> * * *
>
> Our failure to timely file our periodic reports with the SEC has, among other things, ***resulted in a default under our convertible note, a breach of covenants under our loan agreements and could further impact our credit rating***, each of which could materially and adversely affect our financial condition and/or results of operations.
>
> (Emphasis added)

88. The Exhibit also detailed some of the damages sustained by the Company as a result of its prior publication of false and misleading financial statements, including the downgrading of one of the Company's credit ratings in November 2015, and that:

> Our management may be required to devote significant time and attention to [shareholder and regulatory investigation] matters, and these and additional matters that arise from the restatement could have a material adverse impact on our results of operations,

> financial condition, liquidity and cash flows. While we cannot predict the outcome of these matters or estimate the potential exposure at this time, ***we have already expended significant resources investigating the claims underlying and defending these matters and expect to continue to expend significant resources defending these matters.***
>
> * * *
>
> As previously disclosed, we are currently in the process of restating previously filed financial statements, remediating our previously existing material weaknesses, and evaluating if further remedial action is appropriate. ***These restatements, and the review of the misstatements that necessitated our review of our financial statements, have been time consuming, expensive and could expose us to a number of additional risks***, which could materially adversely affect our financial position, results of operations, and cash flows.
>
> In particular, ***we have incurred significant expense, including significant audit, legal, consulting, and other professional fees, and lender and noteholder consent fees***, in connection with the restatement of our previously issued financial statements and the ongoing remediation of material weaknesses in our internal control over financial reporting.
>
> (Emphasis added).

89. On March 22, 2016, Akorn filed with the SEC a Form 8-K and issued a press release providing an update on the restatement process. The press release stated that it was the Company's "goal to file its restated 2014 financial information and delinquent 2015 financial results with the [SEC] by May 9, 2016. Both the restated 2014 and delinquent 2015 financial results are expected to be filed with the SEC in one comprehensive Form 10-K." The Form 8-K reiterated that the overstatement to fiscal year 2014 net revenue was anticipated to be approximately $35 million. This estimate was subject to completion of the audit of the Company's 2014 restated financial statements.

90. On May 6, 2016, Akorn filed with the SEC a Form 8-K and issued a press release entitled "Akorn Outlines Timeline for 2015 Form 10-K Filing, First Quarter 2016 Form 10-Q Filing and Investor Conference Calls." The press release stated:

> On Monday, May 9, 2016 after market close, the Company plans to file a comprehensive Annual Report on Form 10-K for the year ended December 31, 2015. The comprehensive Form 10-K will contain the consolidated financial statements for the year ended December 31, 2015 and consolidated restated financial statements for the year ended December 31, 2014. In addition, the Company

> plans to issue a press release with the audited 2015 and audited and restated 2014 results, and non-GAAP financial measures.
>
> With respect to its Form 10-Q for the first quarter ended March 31, 2016, the Company plans to file for the automatic extension afforded by Form 12b-25 on May 11, 2016. Subsequently, after market close on Monday, May 16, 2016 and within the aforementioned automatic extension period, the Company plans to file the Form 10-Q for the first quarter ended March 31, 2016. In addition, the Company plans to issue a press release outlining the quarterly results and non-GAAP financial measures and providing a business update.

**Akorn Finally Files Its Much-Belated Form 10-K and Schedules Its Long-Overdue Annual Meeting of Stockholders**

91. On May 10, 2016, Akorn filed with the SEC a Form 8-K and issued a press release disclosing that the Company finally intended to hold, for the first time in almost two years, an annual meeting of its stockholders. The Form 8-K disclosed, *inter alia*, that on May 8, 2016, the Board approved July 1, 2016 as the date of the Company's 2016 annual meeting of shareholders to be held at the Company's headquarters in Lake Forest, Illinois. Meanwhile, the press release disclosed that the Company had filed a Form 10-K containing "consolidated financial statements for the year ended December 31, 2015, and unaudited quarterly financial information for the quarters in 2015; and . . . consolidated restated financial statements for the year ended December 31, 2014 and unaudited restated quarterly financial information for the quarters in 2014."

92. The Form 10-K filed concurrently with the Form 8-K disclosed the breadth of the Restatement. Specifically, the Form 10-K noted:

> The following errors were identified by the Audit Committee and the Company and are corrected through the restatement of the three months ended March 31, 2014, three and six months ended June 30, 2014, the three and nine months ended September 30, 2014 and the year ended December 31, 2014:
>
> (a) The Company understated the rebate reserve estimate related to inventory in the wholesale channel (the "pipeline reserve"). Historically, the Company estimated the downstream rebate obligation related to inventory on hand with wholesalers at period end based on contractual rebate rates applied to quantity and value of reported inventory on hand at wholesalers. This allowed for the appropriate recognition of net revenue as the downstream liabilities were recorded in the same period as the sale. In 2014, the pipeline reserve calculated by the Company reflected most

> fees owed to wholesalers, but it did not accurately take into account the entire population of potential downstream rebate obligations, which significantly changed subsequent to the acquisitions completed in the year, and general consolidation in the industry during that period. The Company subsequently revised its pipeline reserve calculation to include the entire population of potential downstream rebate obligations. The Company's revised calculation resulted in an increased pipeline reserve, increasing rebates and contractual allowances and decreasing net revenue. These pipeline reserve errors resulted in a reduction of net revenues of $1.4 million in the three month period ended June 30, 2014, $8.1 million and $9.5 million in the three and nine month period ended September 30, 2014 and $1.0 million and $10.5 million in the three and twelve month period ended December 31, 2014, respectively.
>
> (b) The Company identified errors in its estimates and year-end cutoff related to certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties and other contractual adjustments. It is the Company's policy to recognize liabilities such as those discussed above when probable and estimable in accordance with US GAAP. The items were determined to be errors as the information necessary to record the reserves for these items was generally known or knowable as of the financial statement dates. The recognition of these gross to net revenue reserves resulted in an increased rebate and contractual allowance reserves and decreased net revenue. These estimates and cut-off errors resulted in a reduction of net revenues of $1.7 million in the three month period ended June 30, 2014, $2.9 million and $4.6 million in the three and nine month period ended September 30, 2014 and $16.5 million and $21.0 million in the three and twelve month period ended December 31, 2014, respectively. In addition, for a portion of a transaction with a single customer, revenue was recognized despite a lack of sufficient evidence on which to properly recognize such revenue in accordance with ASC 605 — "Revenue Recognition," which error resulted in a reduction of net revenues of $2.9 million in the three and twelve month period ended December 31, 2014.

93. The Form 10-K revealed, *inter alia*, that (1) previously reported net revenue of $593 million for 2014 was overstated by $38 million, and (1) previously reported income from continuing operations before income taxes of $59 million for 2014 was overstated by $34 million.

94. The Form 10-K contained a report from BDO to the Board and the Company's shareholders outlining the breadth and severity of the circumstances necessitating the

Restatement as determined in BDO's audit (the "BDO Audit Report"). The BDO Audit Report found, *inter alia*, the following deficiencies in the Company's internal controls:

i. Control Environment

- The Company did not maintain an effective control environment to allow for the accurate and timely filing of its financial statements primarily attributable to the following factors:
  - Not appropriately remediating existing material weaknesses on a timely basis.
  - Not having a sufficient complement of accounting and financial reporting personnel with an appropriate level of knowledge, US GAAP proficiency, experience and training commensurate with the Company's financial reporting requirements.
  - Not having systems, processes or policies in place to enable timely financial analysis and accounting review.
- These deficiencies in the control environment resulted in certain instances of incorrect accounting decisions and contributed to the following material weaknesses:
  - Not having controls designed to validate the completeness and accuracy of underlying data used in account reconciliations and in the determination of significant estimates and accounting transactions and, as a result, errors which were later identified in the underlying data used to support significant estimates and accounting transactions, particularly with respect to gross to net revenue adjustments.
  - Not having an adequate process or appropriate controls in place to support the accurate and timely reporting of the Company's financial results and disclosures on its Form 10-K.

ii. Risk Assessment

- The Company did not effectively design controls in response to the risks of material misstatement. This control deficiency contributed to the following additional material weakness:
  - Not having an adequate process or appropriate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries. As a result, errors were identified primarily related to gross to net revenue adjustments, expenses, inventory and accrued liabilities in the financial statements at the acquisition dates, the interim

periods as of and for the periods ended June 30, 2014 and September 30, 2014, and as of and for the year ended December 31, 2014. One of the aforementioned errors related to the chargeback reserve of Hi-Tech, recognized at the acquisition date and required the restatement of the Company's condensed consolidated financial statements for the three and six month periods ended June 30, 2014 and the nine month period ended September 30, 2014, as disclosed in the Company's Form 8-K dated March 17, 2015.

iii. Information and Communication

- The Company did not maintain effective controls over information and communication. Specifically, the Company did not have an adequate process for internally communicating information between the accounting department and other operating departments necessary to support the proper function of internal controls. This control deficiency led to the aforementioned material weaknesses related to the determination of significant estimates and detection of material errors in the financial statements of acquired subsidiaries.

95. The Form 10-K also disclosed greater detail about the damages to the Company caused by the Restatement. For example, in comparing results of the Company's operations between fiscal years 2015 and 2014, Akorn noted that: "Selling, general and administrative ('SG&A') expenses were $162.2 million in 2015, an increase of $69.3 million, or 74.5%, over the prior year expense of $93.0 million. Significant increases in SG&A expenses in comparison to the prior year included ***$27.4 million of costs associated with the restatement and remediation efforts incurred in the year*** [.]" (Emphasis added).

96. As the Company previously acknowledged, the Restatement also resulted in significant fees to cure the breach of certain conditions underlying the Incremental Term Loan and Existing Term Loan. For example, in comparing the Company's cash flows between fiscal years 2015 and 2014, Akorn noted that the Company had incurred $8.5 million in deferred financing costs paid during fiscal year 2015 as a result of the May 2015 and November 2015 loan modifications entered into due to the Restatement.

97. The Form 10-K also detailed the fees paid to BDO, the Company's new independent registered public accounting firm, as a result of the Restatement. The Form 10-K noted that, as of the date of filing, "BDO's Audit Fees totaled $5.4 million for its services to

audit the Company's annual consolidated financial statements for fiscal years 2015, 2014 and 2013, review interim condensed consolidated financial statements and audit our internal controls over financial reporting." The Form 10-K added a caveat that, "although difficult to provide an estimate of the total fees, an estimated additional $1.2 million is expected to be billed for BDO's audit services for these periods." Notably, these fees are in excess of those paid to KPMG, the Company's prior independent registered public accounting firm in connection with the Restatement.

98. The investigations conducted by the Chicago Regional Office of the SEC and the United States Attorneys' Office for the Southern District of New York resulted in the filing of a complaint by the SEC alleging that Akorn, Dick and Hebeda violated Sections 13(a) (financial reporting provisions), 13(b)(2)(A) (books and records provisions) and 13(b)(2)(B) (internal accounting controls provisions) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder. The SEC simultaneously filed a motion for entry of final judgments against Akorn, Dick and Hebeda. Akorn consented to the entry of an order permanently enjoining it from violations of these provisions of the Exchange Act.

99. The Restatement significantly diminished shareholder value. Since closing at a two-year high of $55.24 per share on April 24, 2015 (an appreciation of over 75% since the start of 2014), the price of Akorn common stock plummeted almost 60% to a close of $22.73 per share as of the close of trading on May 9, 2016.

**Certain Directors and Officers of the Company Sold Over $111 Million of Akorn Common Stock at Inflated Prices**

100. During the second, third and fourth quarters of fiscal year 2014, when the Company's financial statements were inaccurate and misstated and while the Company's stock price was artificially inflated, a majority of the members of the Company's Board engaged in the suspicious sale or disposition of Akorn common stock.

101. Defendant Kapoor sold a total of 100,000 shares of Akorn stock between August 2014 and December 2014 for proceeds of $4.0 million. Although those stock sales were not a significant percentage of Kapoor's stockholdings, they are suspiciously timed because Kapoor

had not sold a single share of Akorn common stock since 2012. Kapoor's stock sales during the relevant period are as follows:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* |
|---|---|---|---|---|
| 8/26/2014 | 50,000 | 31,032,237 | $38.99 | $1,949,500 |
| 12/10/2014 | 17,700 | 31,014,537 | $41.22 | $729,594 |
| 12/11/2014 | 32,300 | 30,982,237 | $41.47 | $1,339,481 |

102. Defendant Johnson sold a total of 51,593 shares of Akorn stock between September 2014 and February 2015 for proceeds of $2.1 million. Prior thereto, Johnson had not sold shares of Akorn common stock since 2004. Certain (but not all) of Johnson's trades were reportedly made pursuant to a Rule 10b5-1 trading plan entered into on November 17, 2014, during the time the Company's financial statements were misstated. Johnson's suspicious sales of Akorn common stock are as follows:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/4/2014 | 2,947 | 148,610 | $38.51 | $113,489 | 2% |
| 1/2/2015 | 14,300 | 134,310 | $36.12 | $516,516 | 10% |
| 1/9/2015 | 17,173 | 117,137 | $40.46 | $694,820 | 13% |
| 2/10/2015 | 17,173 | 99,964 | $46.44 | $797,514 | 15% |

103. Other members of the Company's Board also engaged in suspicious stock sales during the time the Company's financial statements were misstated but before that information was made public. For example, defendant Tambi sold 13,800 shares of Akorn stock (28% of his Akorn stockholdings) on September 12, 2014 for proceeds of $524,400, and an additional 1,200 shares of stock on December 15, 2014 for proceeds of $50,232. Prior thereto, he had not sold shares of Akorn common stock since 2009.

104. Defendant Graves sold 9,557 shares of Akorn stock (100% of her Akorn stockholdings) on December 12, 2014 for proceeds of $392,697. Prior thereto, she had not sold shares of Akorn common stock since 2012.

105. Defendant Weinstein sold 5,000 shares of Akorn stock (8% of his Akorn stockholdings) on September 4, 2014 for proceeds of $192,450. Prior thereto, he had not sold shares of Akorn common stock since December 2013.

106. Several of the Company's executive officers, including its CEO and CFO, also engaged in suspicious sales or dispositions of Akorn common stock during the period in which the Company's financial statements were misstated but before that information was disclosed to stockholders. For example, prior to his August 15, 2015 resignation as the Company's CFO, defendant Dick realized proceeds of over $19.7 million from his sale of Akorn common stock. Specifically, after entering into a Rule 10b5-1 trading plan on August 15, 2014, during the time the Company's financial statements were misstated, the following trades were made on Dick's behalf:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/2/2014 | 122,222 | 27,978 | $38.78 | $4,739,769 | 81% |
| 9/8/2014 | 45,000 | 122,988 | $37.61 | $1,692,450 | 27% |
| 10/1/2014 | 122,222 | 122,988 | $35.24 | $4,307,103 | 50% |
| 11/3/2014 | 122,222 | 122,988 | $44.08 | $5,387,546 | 50% |
| 12/1/2014 | 30,875 | 153,224 | $39.23 | $1,211,226 | 17% |
| 1/2/2015 | 30,150 | 185,200 | $36.03 | $1,086,305 | 14% |
| 2/1/2015 | 30,750 | 215,561 | $42.19 | $1,297,343 | 12% |

107. Defendant Rai, the Company's CEO, also engaged in the suspicious sale of Akorn common stock during the time the Company's financial statements were misstated. Specifically, Rai engaged in the following transactions between August 2014 and September 2014:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 8/7/2014 | 903,659 | 1,127,612 | $33.62 | $30,381,016 | 44% |
| 9/8/2014 | 147,000 | 1,329,205 | $36.78 | $5,406,660 | 10% |

108. Following the above sales, Rai entered into a Rule 10b5-1 trading plan on December 16, 2014, which permitted the following additional trades to be made on his behalf:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 1/22/2015 | 269,954 | 1,694,598 | $41.26 | $11,138,302 | 14% |
| 1/22/2015 | 70,656 | 1,409,564 | $41.26 | $2,915,267 | 5% |
| 1/23/2015 | 97,446 | 1,972,424 | $42.10 | $4,102,477 | 5% |
| 1/23/2015 | 216,929 | 1,874,858 | $42.10 | $9,132,711 | 10% |
| 1/26/2015 | 219,000 | 2,156,235 | $42.55 | $9,318,450 | 9% |

109. Other senior executives also engaged in suspicious dispositions of Akorn common stock while the Company's financial statements were misstated. For example, defendant Bonaccorsi realized proceeds of $6.3 million by engaging in the following sales of Akorn common stock:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/11/2014 | 116,800 | 310,674 | $37.89 | $4,425,552 | 27% |
| 2/18/2015 | 40,827 | 370,862 | $47.33 | $1,932,342 | 10% |

110. Similarly, defendant Silverberg realized proceeds of $7.1 million by engaging in the sale of Akorn common stock, all while the Company's financial statements were misstated. Certain (but not all) of Silverberg's trades were reportedly made pursuant to a Rule 10b5-1 trading plan entered into on September 12, 2014, during the time the Company's financial statements were misstated. Silverberg's suspicious sales of Akorn common stock are as follows:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 10/21/2014 | 72,491 | 207,420 | $40.00 | $2,899,640 | 26% |
| 11/3/2014 | 24,311 | 183,109 | $42.27 | $1,027,626 | 12% |
| 1/12/2015 | 38,602 | 225,522 | $41.00 | $1,582,682 | 15% |
| 4/21/2015 | 29,000 | 256,522 | $55.00 | $1,595,000 | 10% |

111. Cumulatively, the above detailed stock dispositions by the Insider Trading Defendants totaled over $111 million. At the time of each of the above-detailed stock dispositions the Company's financial statements were false and misleading, each of the identified Company insiders who sold or disposed of their personally held or controlled Akorn securities were in possession of material nonpublic information about the true state of the Company's financial statements and its deficient internal controls over financial reporting, and each of them sold or disposed of their Akorn stock because of their knowledge of the Company's accounting and financial reporting deficiencies.

**Certain of the Individual Defendants' Knowing Failure to Adequately Oversee the Company's Data Integrity and FDA Compliance**

112. In addition to failing to oversee the Company's ICFR, the Data Integrity Defendants, as members of Akorn senior management and/or the Board, have knowingly or recklessly failed to adequately oversee the Company's data integrity and FDA compliance processes, thereby resulting in substantial damages to the Company.

113. The Company's product pipeline is a key driver of Akorn's value. The value of that pipeline is contingent on the Company's ability to consistently and timely obtain approval from the FDA for ANDAs for Akorn's generic pharmaceutical products.

114. The FDA's regulatory regime requires Akorn to strictly follow the agency's current Good Manufacturing Practices ("cGMP"), which are designed to ensure the safety and efficacy of the Company's products. A critical component of the cGMP is its "data integrity" requirements, which mandate that the testing data provided by Akorn to the FDA in connection with its ANDAs is accurate and reliable. The FDA has made clear that data integrity "is an important component of [a pharmaceutical company's] responsibility to ensure the safety,

efficacy and quality of drugs, and of [the] FDA's ability to protect the public health." FDA, Draft Guidance for Industry, Data Integrity and Compliance with CGMP 1 (2016). Failure to comply with the FDA's data integrity requirements can result in significant sanctions and a breach of trust between the Company and the FDA that can imperil Akorn's ability to obtain timely regulatory approval for its products.

115.   On April 24, 2017, Akorn announced that it had entered into a merger agreement with Fresenius Kabi AG and its affiliates ("Fresenius") whereby Fresenius would acquire the Company in a transaction valued at approximately $4.3 billion, or $34.00 per share of Akorn common stock (the "Merger").

116.   The Merger is now in peril as a result of Fresenius' decision to withdraw from that transaction over concerns about Akorn's data integrity and compliance processes, as well as the Company's submission of fraudulent data to the FDA.

117.   In October 2017, Fresenius received the first of what would ultimately be three anonymous letters alleging that Akorn's product development processes were "flawed and . . . mostly corrupted or incomplete." The next month, Fresenius received a second letter containing more specific allegations about Akorn's data integrity practices. That second letter described how the Company's senior management encouraged Akorn's quality assurance and manufacturing departments to manipulate data and alleged that, as a result of this misconduct, multiple data manipulations occurred at the Company's Decatur, Somerset and Vernon Hills facilities.[9]  After receiving the second letter, Fresenius sent both letters to Akorn and requested that the Company investigate the matters raised therein.  Fresenius and Akorn commenced separate internal investigations later that month.[10]

118.   The investigations have revealed pervasive and systemic issues at the Company relating to its data integrity program, as well as the commission of a potential fraud on the FDA by Akorn senior management.  These investigations revealed that defendant Silverberg—the

---

[9] Decatur and Somerset comprise two of the Company's three American manufacturing facilities, and five manufacturing facilities globally. Decatur is by far Akorn's largest and most profitable site. Vernon Hills comprises one of Akorn's two research and development centers.

[10] Fresenius received a third anonymous letter in January 2018, which it also provided to Akorn.

Company's former Executive Vice President for Quality Assurance who was the head of Akorn's data integrity program and a key member of the Company's executive management who reported directly to defendant Rai—was responsible for the submission of falsified data to the FDA in connection with the Company's ANDA for an antibiotic drug called azithromycin. The submission of falsified data began almost six years ago, in October 2012, when a senior quality control employee at the Somerset facility fabricated test results for azithromycin that were included in the ANDA Akorn submitted to the FDA in December 2012. Over the course of the next five years, Akorn continued to submit fabricated test results to the FDA.

119. According to testimony from David Stuart (Akorn attorney and partner at Cravath Swaine & Moore LLP ("Cravath")) in a pending lawsuit between Akorn and Fresnius regarding the Merger (the "Merger Litigation"), Silverberg first became aware of this issue in July 2016. However, Silverberg did not report this problem to the FDA or withdraw the falsified data that was submitted to the agency. According to deposition testimony in the Merger Litigation from Misbah Sherwani (Akorn's Head of Quality at Somerset), Silverberg specifically declined to investigate the issue.

120. Silverberg ultimately provided final sign-off on the data submitted to the FDA in August 2017 which he knew was falsified. As Akorn has acknowledged in the Merger Litigation, the Company's counsel at Cravath "determined that Silverberg had failed to discharge his responsibilities appropriately" and "should not have allowed a [falsified] response to be submitted," and that Silverberg "had no satisfactory explanation for [doing so] while knowing that the underlying ANDA likely contained false data." In a memorandum memorializing its February 1, 2018 call with Akorn's General Counsel, Defendant Bonaccorsi, Cravath wrote that ***"there's a high likelihood . . . given the document trail that [the FDA will] conclude [Silverberg] did act with intent."*** (Emphasis added).[11]

---

[11] According to documents filed in the Merger Litigation, Akorn submitted falsified data for at least five other Akorn products. Akorn has conceded in the Merger Litigation that a former employee at the Company's Somerset facility had "likely falsified a data point in another chemist's lab notebooks during the development process of azithromycin," that "the same employee may have also made entries in the lab notebooks of another chemist for five other drug products."

121. The fraudulent notebook scheme was not an isolated incident. The Company also acknowledged that there have been "certain instances of trial injections[12] being conducted at Akorn's Vernon Hills, Somerset and Decatur facilities." Despite the FDA's standing objection to the practice of "trial injections," Akorn admits that it has "uncovered numerous test sequences labeled 'trial' on certain servers and equipment at Akorn's Vernon Hills, Somerset and Decatur facilities," and that among these test sequences, has conclusively identified instances of improper trial injections. In 2015, the FDA identified this problem and specifically told Akorn to "stop performing [High Performance Liquid Chromography] trial sample runs at the beginning of the injection sequence." Improper trial injections were utilized in FDA submissions over a five year period from 2012 through 2016, and affect at least sixteen different Akorn products and approximately twenty analysts.

122. Akorn management was specifically aware of defendant Silverberg's misconduct and/or the submission of falsified or manipulated data to the FDA. Specifically, on January 12, 2017, Akorn senior management—including defendants Rai, Portwood, Kutinsky, Bonaccorsi and Silverberg himself—received results from the Company's 2016 annual employee survey. That survey contained a quote from an employee at the Company's Lake Forest facility stating that defendant Silverberg "provided misleading information to regulatory bodies including the US FDA," and that he "counselled [sic] his staff to not speak to Global Quality Compliance staff and . . . not [to] share information with GQC." Shortly thereafter, Silverberg was tasked with developing "an overall roadmap for data integrity approval." Unsurprisingly, no such roadmap ever materialized.

[12] "Trial injections" are defined as the injection and testing of a substance as a "trial" run, i.e., for a purpose other than officially testing a drug product to generate data in support of a drug product application submitted to the FDA or to justify the release of product manufactured for commercial distribution. Trial injections are strongly disfavored because they may be used to achieve a specific result or to overcome an unacceptable result (a practice referred to as "testing into compliance").

123. Moreover, Akorn has routinely ignored numerous internal audits conducted by its internal audit mechanism, GQC,[13] revealing pervasive and systemic data integrity failures at the Company. These audit findings include, among others:

- An April 2016 Lake Forest site audit which found "unmitigated compliance risks associated with data integrity" due to Akorn employees possessing unauthorized "system access allowances" which allowed for the modification and manipulation of data and deletion of audit trails.

- A June 2016 Vernon Hills site audit which found that Akorn failed "to assure that only authorized personnel make changes in master product and control records," and that the site was "unable to record audit trails" or even identify the individuals performing certain tests. Akorn Vice President of Quality Operations Kim Wasserkrug ("Wasserkrug") testified in the Merger Litigation that these "problem[s] . . . violate[] FDA guidelines." A September 2017 audit of this site found that Akorn had failed to remediate these issues as they had "been halted and remain incomplete," and that the failure to do so "presents undue risk to the site's ongoing operations." Wasserkrug testified in the Merger Litigation that the Vernon Hills site lacks a data integrity compliance plan.

- An October 2016 Amityville site audit which identified equipment issues that related to those identified during a July 2015 inspection.

- An April 2017 Somerset site audit which found critical and "unmitigated" data integrity risks, including the failure to conduct reviews of audit trails for High Performance Liquid Chromography systems. Akorn's internal procedures mandate that the Company conduct regular review of audit trails to ensure that any changes to testing data were "instituted only by authorized personnel." The FDA requires companies to retain their audit trail reviews, which Akorn failed to do. Akorn has no approved data integrity plan for this facility.

124. Akorn's management and the Board were acutely aware of the GQC's findings. Indeed, the findings made by the GQC team were disseminated to Akorn management (including the Company's CEO, defendant Rai, as well as defendant Silverberg), and were discussed at QOC meetings that were also attended by Rai and Silverberg. In June 2016, Defendant Johnson sent an email to Defendant Silverberg stating that:

> I continue to be concerned that our position always seems to be that the FDA got it wrong and we are just fine. I do not think we are fine. I think there are signals that we are missing. As the leader of the quality function, I do not understand how you can tolerate the continued non-compliance by employees, *supervisors and quality assurance staff*. We have dogged [sic] a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures. Why do we not see an effort to do this?"

[13] The purpose of GQC is to review FDA regulations and ensure that Akorn's facilities meet those requirements.

125.   Defendant Rai's testimony in the Merger Litigation acknowledges that, by November 2016, he and the other QOC members were "aware of significant and repeated probems that Akorn was having in its quality function."

126.   Nonetheless, these issues continued unabated.   Indeed, Rai took no action in response to these concerns and has admitted in the Merger Litigation that he has never read the GQC's audit reports in the first instance:

> Q: And, in fact, when Akorn's internal audit people circulate internal audits, you personally are on the circulation list; right?
>
> A: Yes.
>
> Q: But you don't read them, correct?
>
> A: No.

127.   In addition, Akorn's executive officers and certain members of the Board were notified of the Company's improper data integrity and FDA compliance processes through findings made by its external consultants.   In 2016, Cerulean Associates LLC ("Cerulean"), a niche FDA compliance consulting firm retained by Akorn, found that the Company's data integrity failures at its Decatur and Somerset sites were numerous, critical and likely to lead to severe regulatory action.   Indeed, Cerulean Managing Director and Principal John Avellanet ("Avellanet") testified in the Merger Litigation that his review of Akorn was one of the "top three worst" he has performed, and that the Company's failures were so rudimentary as to not be expected "at a company that made Styrofoam cups."   Cerulean's reports were disseminated to Akorn's quality team (which included Defendant Silverberg), as well as certain members of the Board.   Defendant Weinstein described the Cerulean reports as "very damning."

128.   With regard to the Decatur site, Cerulean's final report from early December 2016 (the "Decatur Report") found that the Company's "data integrity controls . . . are insufficient to support compliance with current data integrity expectations and [FDA] regulatory requirements."   The Decatur Report concluded that "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk."   The Decatur Report contained seven "critical" findings which "have consistently resulted in public enforcement," and seven additional "major" findings.   Among other things, the Decatur Report noted:

- The Company's "insufficient data integrity controls (both procedural and technical) to prevent unauthorized changes to electronic data" and "[f]ailure to have sufficient controls over computerized equipment used in regulated processes . . . for drug product safety and quality testing and release." As Avellanet testified in the Merger Litigation, "you could add, delete, do anything you wanted into any of the data within that folder with no ability for anybody to know what you have done." Akorn's regulatory compliance expert in the Merger Litigation admitted that this problem was "incredibly serious."

- Akorn's information technology staffing was "seriously negligent for a highly regulated site actively using computerized systems for drug production, testing and release" and "raise[d] questions about the validity of the data in use throughout Akorn to make drug product safety, efficacy, and quality decisions."

- Akorn's "failure to ensure that product testing data is derived from compliance with established specifications and standards" and that a practice by which Company employees could modify data "call[ed] into question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products."

- Akorn's "inadequate control over approved specifications for drug product and raw materials, and failure to ensure that product testing data is derived from compliance with established specifications and standards." Cerulean further found that all Akorn employees with network access could add, delete or modify data, thereby calling into "serious question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products."

129.   In addition, Akorn has received from the FDA Form 483s[14] which should have put the Data Integrity Defendants on notice of potential FDA compliance issues at the Decatur facility. In mid-2016, it was revealed that Akorn received a Form 483 for its Decatur facility in which the FDA made half a dozen observations indicating that Akorn was in possible violation of federal law. Among other things, the Form 483 noted that some processes were not overseen by quality control personnel and that certain work performed was not properly documented. One year later, in May 2017, Akorn received another Form 483 for its Decatur facility which related to issues raised in the prior Form 483.

130.   Just two days after receiving the Decatur Report in early December 2016, the QOC held a meeting to discuss the GQC's internal audits, Cerulean's audits, and a planned reinspection of the Decatur facility by the FDA. At that meeting, defendant Johnson inquired "why risk assessments are not completed in a timely manner for suppliers," and "expressed his concern around the repetitiveness of issues between sites and across sites identified during audits

---

[14] According to the FDA's website, "[a]n FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."

& external inspections." Meanwhile, defendant Tambi "stated that it appears that the implementation of corrective actions is lacking or not timely." Generally, the QOC found that the internal audits "metrics [do] not clearly show[] if the corrective actions were actually implemented in a timely manner or not."

131. Cerulean's assessment of the Somerset facility, issued shortly after the Company's entry into the Merger Agreement, was worse. With regard to the Somerset facility, Cerulean's final report from May 2017 (the "Somerset Report") found that the data integrity failures at this site implicated potential criminal liability for Akorn's management. Indeed, one of the critical findings from the Somerset Report concerned the "failure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn[.]" The Somerset Report expressly warned:

> Officers of Akorn Pharmaceuticals, Inc. should be aware that they are legally liable and accountable for non-compliance by any person(s) within Akorn, irrespective of whether the officers knew of the non-compliance or not.

132. The Somerset Report also noted the failure of Akorn's information technology department "as a core component of a 21st century quality control management structure, to ensure the reliability of the controls around data used to make, test, release, and surveil sterile drug product." The Somerset Report noted:

> The unwillingness of IT to see itself as a fundamental, active and ongoing part of a 21st century pharmaceutical quality management structure raises serious questions about the reliability of any data integrity controls and thus the trustworthiness of any electronic information used throughout Akorn to make safety, efficacy and quality decisions.

133. The Data Integrity Defendants failed to make a good faith effort to correct these issues while the Merger was pending. For example, in the Merger Litigation, Wasserkrug testified that "no actions were taken in response" to the Somerset Report until March 2018. Wasserkrug's testimony is corroborated by a March 18, 2018 assessment conducted by Akorn's GQC which found that the Somerset facility took essentially no action in the ten months since it received Cerulean's initial report. Similarly, this GQC assessment found that Decatur

management had "failed to appropriately investigate and remediate" Cerulean's findings, and had only "completed 32% of the corrective actions thus far."

134.   Defendant Rai has only very recently stated through testimony in the Merger Litigation that he would "ask for the timetable [to address Cerulean's findings] now that I've seen that some of these things have . . . not been addressed for a while[.]"  And as with GQC reports, Rai admitted in the Merger Litigation that he never read Cerulean's reports:

> Q: But isn't it true that after all of that activity, you've actually never read the Cerulean reports?
>
> A: That is correct.

135.   Aside from failing to correct these problems, Akorn took steps to actively conceal them from Fresenius and the Company's shareholders.  Among other things, GQC replaced its traditional internal audits with abbreviated "verification audits" which Akorn admitted in the Merger Litigation were only intended to "verify that the corrective actions that the site had committed to have actually been completed and are effective," and thus did not probe additional data integrity failures.  In addition, the Merger Litigation reveals that defendant Silverberg sought to destroy evidence relating to the submission of false data to the FDA.  Furthermore, the QOC suspended its meetings in their entirety from June 2017 (i.e., one month after receiving the Somerset Report) to March 2018, thereby foreclosing any meaningful Board-level oversight of these issues during that time period and otherwise demonstrating the Data Integrity Defendants' disregard for these critically important problems.

136.   Tellingly, Akorn only began to investigate data integrity issues *after* consummation of the Merger was cast into doubt by Fresenius' receipt of the anonymous letters. According to defendant Weinstein's testimony in the Merger Litigation, the Board found the anonymous letters "very worrisome" not due to the data integrity issues raised therein, but rather because the letters "would totally turn upside down" and "throw a wrench in" the consummation of the Merger.  Defendant Weinstein's statement demonstrates that it is highly unlikely that the Data Integrity Defendants would have ever engaged in an investigation of Akorn's widespread data integrity issues had those issues not threatened to scuttle the Merger (as well as the $1 billion the Data Integrity Defendants stood to gain in the event that transaction was

consummated). As of June 9, 2017, the Data Integrity Defendants as a group held over 32 million shares of Akorn stock, thereby entitling them to over $1 billion in proceeds upon completion of the Merger. In addition to their Akorn shareholdings, as of June 15, 2017, defendants Rai, Portwood, Bonaccorsi, Kutinsky and Lichter were slated to receive over $25 million in change-in-control payments connection with the consummation of the Merger.

137. In addition to failing to make a good faith effort to remediate the Company's data integrity and FDA compliance issues, the Data Integrity Defendants were responsible for disseminating numerous false and misleading statements. In particular, the Data Integrity Defendants knowingly caused or allowed the Company to:

(a) repeatedly assure Akorn's stockholders that the Company complied with the FDA's data integrity requirements when, in fact, the Data Integrity Defendants knew or recklessly disregarded that was not true; and

(b) tout the Company's profitable drug pipeline while failing to disclose the Company's myriad data integrity failures which threatened Akorn's ability to obtain FDA approval for said pipeline drugs.

The Data Integrity Defendants knowingly caused or allowed the Company to publish the foregoing false and misleading statement in press releases, Form 8-Ks, Form 10-Qs, Form 10-Ks, Proxy Statements on Schedule 14A, conference calls and investor presentations from at least November 3, 2016 to April 20, 2018.

138. For example, on June 15, 2017, Akorn filed with the SEC a Definitive Proxy Statement on Schedule 14A in connection with the Merger (the "Proxy Supplement"). The Proxy Supplement was signed by defendant Rai and was issued "By Order of the Board of Directors" and "as part of the solicitation of proxies by the Company's board of directors." Among other things, the Proxy Statement falsely and misleadingly represented that:

> The Company and its Subsidiaries are and have been, since July 1, 2013, ***in compliance with current good manufacturing practices and have maintained appropriate mechanisms, policies, procedures and practices to ensure the prompt collection and reporting of adverse event or any other safety or efficacy data***, notifications, corrections, recalls and other actions required by Law related to their products, except where the failure to do so would not,
>
> individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.
>
> Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since July 1, 2013 ***(i) all preclinical and clinical***

> ***studies or tests sponsored by the Company and its Subsidiaries have been conducted in compliance with standard medical and scientific research procedures and applicable Law (including Good Clinical Practices requirements).***

(Emphasis added).

139. Akorn's deficient data integrity and FDA compliance program has significantly harmed the Company. Akorn has incurred substantial costs in connection with its pending investigations into these matters, as well in connection with the now-imperiled Merger which Fresenius formally terminated on April 22, 2018.

140. In addition, Akorn has incurred and likely will continue to incur significant costs remediating the Company's myriad data integrity problems. Indeed, the Company anticipates that it will incur costs of at least $44 million in connection with the implementation of a remediation plan that was belatedly launched in April 2018—less than one month after meeting with the FDA to discuss the Company's data integrity failures and years after many of these issues first surfaced.

141. The number of data integrity and FDA compliance issues at the Company continues to grow. A consultant retained by Akorn in connection with its internal investigation conducted an audit of all Akorn sites in April 2018 which uncovered thirty-four "major findings," which are defined as those which reflect "a systematic failure of a regulatory requirement, correlate[] to product defects, and/or represent[] uncorrected repeat findings cited by the FDA in previous inspections." These failures are expected to "appear on a Form FDA 483 and may provide the basis for further enforcement action." NSF also found evidence of, among other things, (1) discrepancies in laboratory notebooks, (2) improper trial injections, and (3) manipulated or falsified data in three of the nine ANDAs it reviewed.

142. The Data Integrity Defendants' misconduct has also imperiled the approval of many of the Company's pipeline products, and more generally, Akorn's relationship with the FDA. In February 2018, Akorn withdrew the ANDA for azithromycin. More recently, in August 2018, the FDA inspected the Decatur site and found that "the inspection classification of this facility is 'official action indicated' ("OAI")," and "in an unacceptable state of compliance with regards to [cGMP]." Wasserkrug testified in the Merger Litigation that an OAI "means that

FDA has some concerns with the conditions that they found during their inspection. And it typically means that you will not get product approvals during that time frame." True to Wasserkrug's words, the FDA has stopped approving products from the Decatur site.

143. Notwithstanding Akorn management's utter failure to implement and oversee a proper data integrity program, the Board's Compensation Committee has routinely rewarded these individuals. For example, the Company's Annual Proxy Statement for 2017 announced that one of Rai's "achievements" which entitled him to an incentive bonus in 2016 was that he purportedly "ensured that ***all*** of the Company's operations maintained regulatory compliance . . . ." (Emphasis added). The Compensation Committee made a similar determination with regard to Defendant Lichter, whom the Compensation Committee found "ensured that ***all*** manufacturing facilities maintained their regulatory compliance to operate." (Emphasis added). These findings are patently false. The pervasive data integrity issues at the Company, including the fraud committed by Silverberg (who reported directly to Rai and worked closely with Lichter), demonstrate that Rai and Lichter critically failed in their oversight responsibilities and should not have received incentive bonuses.

144. Similarly, the Compensation Committee has awarded each Board member hundreds of thousands of dollars per annum in compensation despite the utter failure by the Board and, in particular, the QOC, to exercise adequate oversight over this critical aspect of the Company's business.

145. Moreover, despite his failure to oversee the Company's data integrity and FDA compliance programs and his submission of falsified data to the FDA, defendant Silverberg remains at Akorn. While Akorn removed Silverberg from his position as Global Head of Quality in February 2018, he remains at the Company as a "quality consultant" making $250,000 per year.

146. The Data Integrity Defendants' failure to adequately oversee the Company's compliance with FDA regulations has also resulted in a significant decline in Akorn's stock price. After closing at a price of $30.28 per share on February 26, 2018, shares of Akorn common stock plummeted by over 38% the following day after it was revealed that Fresenius

was conducting an investigation into alleged breaches of FDA data integrity requirements at the Company. Akorn common stock fell again in late April 2018 on the news that Fresenius was terminating the pending Merger. Indeed, after closing at a price of $19.70 per share on Friday, April 20, 2018, Akorn common stock fell approximately 33% to close at a price of $13.05 on April 23, 2018—the following trading day and one day after Fresenius announced its intention to terminate the Merger. To date, Akorn common stock has lost over 65% of its value since Akorn first announced the Restatement in March 2015.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY

147. During the relevant period, the Restatement Defendants were well aware of the problems with the Company's internal controls and its deficient accounting and financial reporting practices, procedures, and systems. Through their attendance at Board, Audit Committee, and/or management meetings, their review of the Company's financial statements, and conversations with the Company's management, auditors, and consultants, the Restatement Defendants knew Akorn lacked adequate accounting and financial reporting systems and suffered from myriad material weaknesses, yet failed to correct these issues. Instead, the Restatement Defendants moved forward with the Acquisitions, knowing full well that doing so would further compromise the Company's already weakened internal control system. In breach of their fiduciary duties of loyalty and good faith, the Restatement Defendants willfully ignored the deficiencies in the Company's accounting and financial reporting systems and failed to make a good faith effort to address them.

148. The Data Integrity Defendants were also aware of the Company's issues with its data integrity and FDA compliance program. Through their attendance at Board, QOC, and/or management meetings, their receipt and/or review of audit report and other findings, and conversations with the Company's management and consultants, the Data Integrity Defendants knew Akorn's data integrity and FDA compliance program was totally ineffective and inadequate, yet they failed to take appropriate steps to rectify these issues. In breach of their fiduciary duties of loyalty and good faith, the Data Integrity Defendants willfully ignored the deficiencies in the Company's data integrity and FDA compliance program and failed to make a

good faith effort to address them. The Data Integrity Defendants further failed to act in good faith by (1) issuing false and misleading statements that Akorn maintained an adequate data integrity program and complied with FDA regulations, and (2) otherwise self-interestedly concealing the Company's data integrity and compliance failures from its shareholders and third-parties.

149. As a direct and proximate result of the misconduct alleged herein, the Company has suffered harm, as alleged herein.

**DERIVATIVE AND DEMAND ALLEGATIONS**

150. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

152. Plaintiff will adequately and fairly represent the interests of Akorn and its stockholders in enforcing and prosecuting its rights.

153. Plaintiff is an owner of Akorn common stock and was an owner of Akorn stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

***Plaintiff's Initial Demand***

154. On February 23, 2016, Plaintiff made her first demand on the Board to take action against certain of the Individual Defendants to remedy the breaches of fiduciary duties and other violations of law committed in connection with the Restatement (the "First Demand"). A copy of the First Demand is attached as Exhibit A.

155. On March 29, 2016, counsel for Plaintiff received a "form" acknowledgement letter from Michael J. Diver of the law firm of Katten Muchin Rosenman LLP ("Katten Muchin") advising that "a Special Committee . . . of the [Board] is conducting an inquiry into [the First Demand] in accordance with the Louisiana Business Corporation Act." The letter further advised that the Special Committee had retained Katten Muchin to assist with the inquiry into the First Demand, and that the Special Committee would respond to the First Demand

"promptly upon [the inquiry's] conclusion." A copy of the March 29, 2016 letter is attached hereto as Exhibit B.

156. On June 10, 2016, after failing to receive a definitive response to the Demand in over ninety days from her First Demand, Plaintiff properly exercised her statutory rights by amending her Original Complaint to incorporate the allegations and claims asserted in the First Demand.

157. On June 30, 2016, the parties consented to a motion to stay this action until September 1, 2016 to provide the Special Committee with additional time to complete its investigation.

158. By letter dated August 29, 2016, Plaintiff was advised that the Special Committee "concluded that it would not be in the best interests of the Company to pursue litigation based on any of the allegations in [the First Demand]" (the "Demand Refusal Letter"). The Demand Refusal Letter stated that the Board approved the Special Committee's findings and recommendation on August 15, 2016. A copy of the Demand Refusal Letter is attached hereto as Exhibit C.

159. On September 23, 2016, Akorn filed a motion to dismiss this action pursuant to La.R.S. § 12:1-744 (the "Motion to Dismiss").

160. The Board, however, failed to comply with La.R.S. § 12:1-744. As noted in ¶¶98-103 above, a majority of the members of the Company's Board engaged in the sale or disposition of Akorn common stock during the second, third, and fourth quarters of fiscal year 2014, when the Company's financial statements were inaccurate and misstated and while the Company's stock price was artificially inflated. These directors included, *inter alia*, a majority of the members of the Special Committee (i.e., defendants Graves and Weinstein). Accordingly, none of these individuals are "qualified directors" under La.R.S. § 12:1-143, and the Board's refusal of the First Demand failed to comply with La.R.S. § 12:1-744(B).

161. Because the Board failed to comply with Section 12:1-744 (B), Plaintiff is entitled to prosecute the claims asserted in her First Demand.

***Plaintiff's Second Demand***

162. On May 22, 2018, Plaintiff submitted to the Board her second demand to take action against certain of the Individual Defendants to remedy breaches of fiduciary duties and other violations of law committed in connection with the Company's FDA compliance issues discussed herein (the "Second Demand"). A copy of the Second Demand is attached as Exhibit D.

163. As of the filing of this Second Amended Complaint, Plaintiff has received no response to the Second Demand.

164. Because more than ninety (90) days have passed since the submission of the Second Demand, Plaintiff is entitled to proceed with the prosecution of the claims asserted herein. *See* La. R.S. § 1-742.

**FIRST CAUSE OF ACTION**

**Against the Individual Defendants for Breach of Fiduciary Duties**

165. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

166. As alleged herein, the Individual Defendants owed the Company the fiduciary duties of loyalty and good faith to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

167. As alleged herein, the Individual Defendants breached their fiduciary duties of loyalty and good faith by: (i) knowingly abdicating their responsibility to make a good faith effort to oversee the Company's accounting and financial reporting practices and compliance with FDA regulations; (ii) knowingly causing and/or allowing the Company to report financial results that were materially misleading, and/or (iii) knowingly utilizing (or knowingly permitting others to utilize) material non-public information about the Company's misstated financial statements and lack of internal controls over financial reporting for their own pecuniary gain.

168. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## SECOND CAUSE OF ACTION

### Against the Insider Trading Defendants for Breach of Fiduciary Duties

169. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

170. As alleged herein, the Individual Defendants owed the Company the fiduciary duties of loyalty and good faith to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

171. As alleged herein, the Insider Trading Defendants breached their fiduciary duties of loyalty and good faith by selling over $111 million of Akorn common stock at inflated prices and receiving improper proceeds from said sales based on their knowledge of the true state of the Company's financial statements and its deficient internal controls over financial reporting.

172. To remedy the Insider Trading Defendants' breaches of fiduciary duties, the Court should enter an order compelling them to disgorge the Company the proceeds they have received from the sale of Akorn common stock at inflated prices.

## THIRD CAUSE OF ACTION

### Against the Data Integrity Defendants for Unjust Enrichment

173. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

174. Despite their knowledge that the Company suffered from myriad and pervasive data integrity and FDA compliance issues, the Data Integrity Defendants received substantial compensation and remuneration from the Company that was based, at least in part, on the false premise that their oversight of these critical functions was adequate. These defendants are thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

175. To remedy these defendants' unjust enrichment, the Court should enter an order compelling them to disgorge the Company the compensation and other remuneration they have received from Akorn.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties;

B. Ordering the Insider Trading Defendants to disgorge to the Company the proceeds they received from their sale of Akorn common stock at inflated prices;

C. Ordering the Individual Defendants to disgorge to the Company the compensation and other remuneration they received while failing to ensure that the Company maintained adequate compliance practices, internal controls, and accounting and financial reporting practices;

D. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

E. Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

Dated: September 21, 2018

By: [signature]

TARCZA & ASSOCIATES, LLC
Robert E. Tarcza (LA Bar #12655)
1310 Whitney Building
228 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 525-6696
Fax: (504) 525-6701

Of Counsel:

KESSLER TOPAZ MELTZER & CHECK, LLP
Eric L. Zagar (PA Bar # 76596)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

***Counsel for Plaintiff***

**SERVICE INSTRUCTIONS:**

***Please hold service.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing pleading has been served upon all counsel of record via overnight courier and electronic mail this 21 day of Sept, 2018.

Robert E. Tarcza

EAST BATON ROUGE PARISH C-646174
Filed Sep 21, 2018 1:15 PM 24
Deputy Clerk of Court

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 646,174 DIVISION "I" SECTION 24

MERRY A. KOGUT,
Individually and on Behalf of Defendant Akorn, Inc.,
Plaintiff,

v.

AKORN, INC., JOHN KAPOOR, KENNETH S. ABRAMOWITZ, RONALD M. JOHNSON, STEVEN J. MEYER, ADRIENNE GRAVES, TERRY RAPPUHN, BRIAN TAMBI, ALAN WEINSTEIN, RAJAT RAI, TIMOTHY DICK, JOSEPH BONACCORSI, DAVID HEBEDA, BRUCE KUTINSKY, STEVEN LICHTER, DUANE A. PORTWOOD, and MARK SILVERBERG,

Defendants.

FILED: ______________

______________
DEPUTY CLERK

**VERIFICATION OF COUNSEL**

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned authority, a Notary Public duly commissioned in and for the aforesaid Parish and State

PERSONALLY CAME AND APPEARED:

ROBERT E. TARCZA

("Affiant") who, being duly sworn did depose and state:

1. That Affiant is counsel of record for plaintiff in the above captioned matter;
2. That Affiant has read the allegations of the Verified Second Amended and Restated Complaint;
3. That the allegations of fact set forth therein are true and correct to the best of Affiant's knowledge, information and belief and are based on Affiant's personal knowledge; and
4. That the requirements of La.R.S. 12:1-742 have been met.

______________
ROBERT E. TARCZA ("Affiant")

Sworn to and subscribed before me, Notary, this 21st day of September, 2018.

______________
NOTARY PUBLIC

EMMA J. SHORT
Attorney/Notary Public
BAR NO. 37871
PARISH OF ORLEANS, LOUISIANA
MY COMMISSION IS FOR LIFE

EAST BATON ROUGE PARISH   C-646174
Filed Sep 21, 2018 1:15 PM       24
Deputy Clerk of Court

# *Exhibit A*



KESSLERTOPAZ
MELTZERCHECK LLP
ATTORNEYS AT LAW

Direct Dial: 610-822-2209
E-Mail: ezagar@ktmc.com
*Please reply to the Radnor Office*

February 23, 2016

**VIA FEDEX**
John N. Kapoor, Ph.D.
Chairman of the Board of Directors
Akorn, Inc.
1925 W. Field Court, Suite 300
Lake Forest, Illinois 60045

**Re: Shareholder Demand**

Dear Dr. Kapoor:

This firm represents Merry A. Kogut (the "Stockholder"), a holder of shares of common stock of Akorn, Inc. ("Akorn" or the "Company") since 2011. I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current directors and officers of the Company, as described herein.

As you are aware, by reason of their positions as directors and/or officers of the Company and because of their ability to control its business and corporate affairs, the directors and officers owe the Company and its shareholders the fiduciary obligations of loyalty and good faith. The Stockholder believes that the following current directors and/or officers of the Company violated these core fiduciary principles, causing the Company to suffer damages: Chief Executive Officer ("CEO") Raj Rai ("Rai"), Chief Financial Officer ("CFO") Timothy Dick ("Dick"), General Counsel and Secretary Joseph Bonaccorsi ("Bonaccorsi"), and Executive Vice President Mark Silverberg ("Silverberg") (collectively, the "Executive Officers"); Chairman of the Board John N. Kapoor ("Kapoor"); directors and members of the Audit Committee of the Board (the "Audit Committee") Kenneth Abramowitz ("Abramowitz"), Ronald Johnson ("Johnson") and Steven J. Meyer; and directors Adrienne L. Graves ("Graves"), Terry A. Rappuhn, Brian Tambi ("Tambi") and Alan Weinstein ("Weinstein") (collectively with the Executive Officers, the "Directors and Officers").

The Stockholder contends that the Directors and Officers have breached their fiduciary duties by, among other things, knowingly abdicating their responsibility to make a good faith effort to oversee the Company's operations, internal controls, and accounting and financial reporting practices. The Directors and Officers further breached their fiduciary duties by

280 King of Prussia Road, Radnor, Pennsylvania 19087 T. 610-667-7706 F. 610-667-7056 info@ktmc.com
One Sansome Street, Suite 1850, San Francisco, California 94104 T. 415-400-3000 F. 415-400-3001 info@ktmc.com
WWW.KTMC.COM



knowingly causing and/or allowing the Company to report financial results that were materially misleading, and utilizing (or permitting others to utilize) material nonpublic information about the Company's misstated financial statements and lack of internal controls over financial reporting for their own pecuniary gain.

As you know, on March 17, 2015, Akorn filed with the Securities and Exchange Commission ("SEC") a Form 10-K which disclosed that the Company's previously issued financial statements for the second and third quarters of fiscal year 2014 were inaccurate and had to be restated. In a Form 8-K filed concurrently with the Form 10-K, Akorn disclosed that it had "concluded there were certain material weaknesses in internal control over financial reporting, including an additional material weakness that it had inadequate controls in place to prevent or detect material errors in the financial statements of acquired subsidiaries," and that the Company's "disclosure controls and procedures were not effective as of December 31, 2014, due to these material weaknesses in its internal control over financial reporting." Based on the above, the Audit Committee concluded that the Company's previously issued second and third quarter 2014 financial statements "should not be relied upon" and needed to be restated.

More specifically, at the time the Form 10-K was filed the Company reported that it had to restate its previously issued second and third quarter 2014 financial statements because "an error was identified in the fair value allocation of assets acquired and liabilities assumed in connection with the acquisition of Hi-Tech Pharmacal Co., Inc." At that time the Company categorized the error as an "overstatement in the chargeback reserve" caused by "a manual error made in preparing the data related to the chargeback reserve whereby there was a duplication of inventory units held by one customer utilized in the calculation of the reserve amount for Hi-Tech products at the acquisition date." Akorn quantified the monetary amount of the error as "an overstatement of chargeback reserves by approximately $8.9 million for the opening balance sheet of Hi-Tech as of April 17, 2014." Correction of the error thus "resulted in a reduction of previously reported revenue by approximately $8.9 million, a reduction of previously reported pre-tax income by approximately $8.9 million and a reduction of previously reported net income, goodwill and retained earnings by approximately $5.6 million, for the Company's three and six month periods ended June 30, 2014."

However, on April 24, 2015, Akorn reported that it would have to make additional financial restatements, this time to correct the previously issued financial statements for the second and third quarters of 2014 (again), as well as for the fourth quarter and full year of fiscal year 2014 (ended December 31, 2014). At that time, the Company reported that "based on management's preliminary assessment, the errors related to the understatements of rebates and other sales allowances are estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of $20 million to $35 million for the year ended December 31, 2014," but that the "estimated impact of the errors could materially change based on further review and analysis of the affected periods, including due to potential identification of other errors." The Company further announced that the Audit Committee would be "conducting an independent investigation into the circumstances surrounding the errors that resulted in the misstatements, which will involve retaining outside advisors to assist in the investigation."

Also on April 24, 2015, the Company reported that the Audit Committee concluded that the previously issued financial statements for the identified periods should no longer be relied upon, and that "management's report on the effectiveness of internal control over financial reporting as of December 31, 2014 should no longer be relied upon." Additionally, Akorn informed its shareholders that the opinion of its "independent registered public accounting firm, KPMG LLP ('KPMG') on the consolidated financial statements for the year ended December 31, 2014, as well as KPMG's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should no longer be relied upon."

As you know, following the April 24, 2015 disclosures, the price of Akorn's common stock declined nearly 22% the next trading day. On that same day, financial analysts questioned, among other things, management's credibility. For example, *Investor's Business Daily* published an article entitled "Akorn Downgraded, Stock Falls on 'Credibility Gap'" stating:[1]

> Top-rated drug maker Akorn (AKRX) was down 20% in morning trading Monday as analysts weighed in on Friday evening's news that it would again restate its 2014 earnings. Early Monday the company also announced a series of new executive appointments.
>
> The Street had assumed that the accounting problem, first revealed when the company filed for an extension of its 10-K report on March 2, had been resolved when Akorn issued a modest downward revision on March 17. But Friday's statement revealed that the investigation had revealed further problems, which had resulted in an overstatement of pretax income to the tune of $20 million to $35 million. Also, the firm said, Q1 results will not be issued "in a timely manner."
>
> Piper Jaffray analyst David Amsellem ran out of patience and downgraded the stock to neutral.
>
> "Though management does not believe the accounting issues will impact 1Q15 results, and it is sticking with its 2015 guidance, there is in our view far too large of a credibility gap to simply take those statements at face value," he wrote in a research note Sunday. "We believe that significant management changes will be needed to restore Akorn's credibility and further find it difficult to envision how these missteps will not result in a change in the CFO position."

[1] http://news.investors.com/technology/042715-749700-akrx-stock-falls-on-2014-restatement.htm?ref=HPLNews.



On November 4, 2015, Akorn provided a "Business and Financial Guidance Update" advising that it expected to file its restated 2014 quarterly and annual financial statements with the SEC "by the end of the first quarter of 2016." The Company indicated that its "estimate of the errors related to the understatements of rebates and other sales allowances, as disclosed on August 10, 2015, is estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations ***slightly above the upper end of the $20 million to $35 million range initially estimated***" (emphasis added). In the same communication, Akorn also reported that "the previously disclosed independent investigation commissioned by the Audit Committee of the company's Board of Directors will be completed by the end of 2015," and further disclosed the following:

> The Chicago Regional Office of the Securities and Exchange Commission (SEC) is conducting an investigation regarding the previously disclosed restatement, internal controls and other related matters. Additionally, the United States Attorney's Office for the Southern District of New York (USAO) has requested information regarding these matters. Akorn has been furnishing requested information and is fully cooperating with the SEC and USAO.

On January 14, 2016, Akorn issued a press release providing additional "material updates." The press release reported that the Company had engaged BDO USA, LLP ("BDO") as its new independent auditors, and that BDO "will be auditing the Company's financial statements for the two years ended December 31, 2015, including the restatement for 2014." Akorn also reported that it "believes that restated 2014 financials will be filed concurrently with delinquent 2015 financial reports," and that the Company "maintains its previously stated goal of regaining compliance with timely financial reporting requirements by May 9, 2016." With respect to the ongoing financial restatement, the press release reported:

> In light of the Audit Committee's findings, Akorn's management continues to evaluate the nature and scope of the company's ongoing restatements to its 2014 financial results as well as possible amendments to its disclosures. Akorn's estimate of the errors is estimated to have resulted in an overstatement to net revenue and pretax income from continuing operations of approximately $35 million for the year ended December 31, 2014. These estimates are based on management's ongoing assessments and are subject to the completion of the restatement and the audit of the restated financial statements for the year ended December 31, 2014.
>
> Akorn's management is considering the company's prior conclusions of the adequacy of its internal control over financial reporting and disclosure controls and procedures, and related material weaknesses in such controls. Akorn intends to amend



> certain prior disclosures pertaining to its evaluation of such controls and procedures, and material weaknesses, as appropriate in connection with any amended filings, and will consider whether any further remedial measures may be advisable.

Most recently, on January 14, 2016, Akorn filed with the SEC a Form 8-K reporting that (i) the Audit Committee had dismissed KPMG as the Company's independent auditors, and (ii) the Company had significantly modified the "risk factors" of owning the Company's securities, as described below. The Form 8-K also disclosed that KPMG had advised the Company:

> [T]hat information had come to its attention, that if further investigated may: (i) materially impact the fairness or reliability of either: a previously issued audit report or the underlying financial statements; or the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that may prevent it from rendering an unqualified audit report on those financial statements), or (ii) cause it to be unwilling to rely on management's representations or be associated with the registrant's financial statements. KPMG also advised us that, in addition to the Audit Committee's conclusion that our audited consolidated financial statements for the year ended December 31, 2014 and our unaudited condensed consolidated financial statements for the quarters ended June 30, 2014 and September 30, 2014 and the disclosures and related communications for each of these periods should not be relied, ***information has come to its attention, that if further investigated may significantly impact our unaudited condensed consolidated financial statements for the quarter ended March 31, 2014 and our audited consolidated financial statements for the year ended December 31, 2013.***
>
> Due to the dismissal, KPMG advised us that it did not have the opportunity to expand the scope of its audit, conduct further procedures, evaluate the investigation ... or complete its process. KPMG further advised us that, at the time of its dismissal, KPMG has not had an opportunity to conduct its procedures or conclude that it was satisfied with the investigation or that any remediation has taken place.
>
> (Emphasis added)



KESSLERTOPAZ
MELTZERCHECK LLP
ATTORNEYS AT LAW

Less than two weeks later, KPMG filed with the SEC its own Form 8-K/A which contained "clarifications" to the Company's January 14, 2016 Form 8-K statements. Specifically, KPMG's January 27, 2016 Form 8-K/A clarified for stockholders the following:

> The information referenced by the Company ... that had come to our attention relates to errors identified by the Company related to understatements of rebates and other sales allowances which have resulted in an overstatement to net revenue and pretax income from continuing operations for the year ended December 31, 2014, and two additional accounting matters identified by the Company's investigation that warranted further investigation and review: (i) customer payment term modifications and related revenue recognition practices, timing and disclosures for 2013 through 2015, and (ii) returns processing delays in 2015. ***We advised the Company that this information necessitated a significant expansion of the scope of our audits***, and that information discovered in the Company's investigation or in our expanded audit procedures may: (i) materially impact the fairness or reliability of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2014 and consolidated financial statements as of and for the year ended December 31, 2013 or (ii) cause us to be unwilling to rely on management's representations or to be associated with the Company's financial statements, including the previously audited financial statements as of and for the year ended December 31, 2013.
>
> (Emphasis added)

Exhibit 99.1 (the "Exhibit") to the Company's January 14, 2016 Form 8-K substantially expanded the risk factors of owning the Company's securities. Among many other newly added risk factors, the Exhibit specifically reported the following:

> We announced that we intend to restate our consolidated financial statements and replace our registered independent public accounting firm. Such restatement and change in accounting firms requires a thorough review of our financial statements, which could result in the identification of additional errors and require the correction of additional items, which could be material.
>
> * * *
>
> Our failure to timely file our periodic reports with the SEC has, among other things, ***resulted in a default under our convertible note, a breach of covenants under our loan agreements and***



> ***could further impact our credit rating***, each of which could materially and adversely affect our financial condition and/or results of operations.
>
> (Emphasis added)

The Exhibit also detailed some of the damages sustained by the Company as a result of its prior publication of false and misleading financial statements, including the downgrading of one of the Company's credit ratings in November 2015, and that:

> Our management may be required to devote significant time and attention to [shareholder and regulatory investigation] matters, and these and additional matters that arise from the restatement could have a material adverse impact on our results of operations, financial condition, liquidity and cash flows. While we cannot predict the outcome of these matters or estimate the potential exposure at this time, ***we have already expended significant resources investigating the claims underlying and defending these matters and expect to continue to expend significant resources defending these matters.***
>
> * * *
>
> As previously disclosed, we are currently in the process of restating previously filed financial statements, remediating our previously existing material weaknesses, and evaluating if further remedial action is appropriate. ***These restatements, and the review of the misstatements that necessitated our review of our financial statements, have been time consuming, expensive and could expose us to a number of additional risks***, which could materially adversely affect our financial position, results of operations, and cash flows.
>
> In particular, ***we have incurred significant expense, including significant audit, legal, consulting, and other professional fees, and lender and noteholder consent fees***, in connection with the restatement of our previously issued financial statements and the ongoing remediation of material weaknesses in our internal control over financial reporting.
>
> (Emphasis added)



As of the date of this letter, Akorn has yet to file the restated financial statements for fiscal year 2014, nor has it filed any quarterly financial statements for fiscal year 2015 – a total period of more than 20 months.

Furthermore, during the second, third and fourth quarters of fiscal year 2014, when the Company's financial statements were inaccurate and misstated, a majority of the members of the Company's Board engaged in suspicious sales or dispositions of Akorn common stock.

Johnson sold a total of 51,593 shares of Akorn stock between September 2014 and February 2015 for proceeds of $2.1 million.[2] Prior thereto, Johnson had not sold shares of Akorn common stock since 2004. Johnson's suspicious sales of Akorn common stock are as follows:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/4/2014 | 2,947 | 148,610 | $38.51 | $113,489 | 2% |
| 1/2/2015 | 14,300 | 134,310 | $36.12 | $516,516 | 10% |
| 1/9/2015 | 17,173 | 117,137 | $40.46 | $694,820 | 13% |
| 2/10/2015 | 17,173 | 99,964 | $46.44 | $797,514 | 15% |

Chairman Kapoor also sold a total of 100,000 shares of Akorn stock between August 2014 and December 2014 for proceeds of $4.0 million. Although those stock sales were not a significant percentage of Kapoor's stockholdings, they are suspiciously timed because Kapoor had not sold a single share of Akorn common stock since 2012. Kapoor's stock sales during the relevant period are as follows:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 8/26/2014 | 50,000 | 31,032,237 | $38.99 | $1,949,500 | 0% |
| 12/10/2014 | 17,700 | 31,014,537 | $41.22 | $729,594 | 0% |
| 12/11/2014 | 32,300 | 30,982,237 | $41.47 | $1,339,481 | 0% |

[2] The Stockholder notes that certain (but not all) of Johnson's trades were reportedly made pursuant to a 10b5-1 plan, entered into on November 17, 2014 (during the time the Company's financial statements were misstated).



Other members of the Company's Board also engaged in suspicious stock sales during the time that the Company's financial statements were misstated but before that information was made public, including Tambi (proceeds of $574,632), Graves (proceeds of $392,697) and Weinstein (proceeds of $192,450).[3]

Several of the Company's executive officers, including its CEO and CFO, also engaged in suspicious sales or dispositions of Akorn common stock during the period in which the Company's financial statements were misstated but before that information was disclosed to stockholders. For example, prior to his August 15, 2015 resignation as the Company's CFO, Dick realized proceeds of over $19.7 million from his sale of Akorn common stock. Specifically, after entering into a 10b5-1 trading plan on August 15, 2014 (notably, during the time the Company's financial statements were misstated), the following trades were made on Dick's behalf:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/2/2014 | 122,222 | 27,978 | $38.78 | $4,739,769 | 81% |
| 9/8/2014 | 45,000 | 122,988 | $37.61 | $1,692,450 | 27% |
| 10/1/2014 | 122,222 | 122,988 | $35.24 | $4,307,103 | 50% |
| 11/3/2014 | 122,222 | 122,988 | $44.08 | $5,387,546 | 50% |
| 12/1/2014 | 30,875 | 153,224 | $39.23 | $1,211,226 | 17% |
| 1/2/2015 | 30,150 | 185,200 | $36.03 | $1,086,305 | 14% |
| 2/1/2015 | 30,750 | 215,561 | $42.19 | $1,297,343 | 12% |

Rai, the Company's CEO, also engaged in the suspicious sale of Akorn common stock during the time that the Company's financial statements were misstated. Specifically, Rai engaged in the following transactions between August 2014 and September 2014:

[3] Tambi sold 13,800 shares of Akorn stock (28% of his Akorn stockholdings) on September 12, 2014 for proceeds of $524,400, and an additional 1,200 shares of stock on December 15, 2014 for proceeds of $50,232. Prior thereto, he had not sold shares of Akorn common stock since 2009.

Graves sold 9,557 shares of Akorn stock (100% of her Akorn stockholdings) on December 12, 2014 for proceeds of $392,697. Prior thereto, she had not sold shares of Akorn common stock since 2012.

Weinstein sold 5,000 shares of Akorn stock (8% of his Akorn stockholdings) on September 4, 2014 for proceeds of $192,450. Prior thereto, he had not sold shares of Akorn common stock since December 2013.



| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 8/7/2014 | 903,659 | 1,127,612 | $33.62 | $30,381,016 | 44% |
| 9/8/2014 | 147,000 | 1,329,205 | $36.78 | $5,406,660 | 10% |

Following the above sales, Rai entered into a 10b5-1 trading plan on December 16, 2014, which permitted the following additional trades to be made on his behalf:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 1/22/2015 | 269,954 | 1,694,598 | $41.26 | $11,138,302 | 14% |
| 1/22/2015 | 70,656 | 1,409,564 | $41.26 | $2,915,267 | 5% |
| 1/23/2015 | 97,446 | 1,972,424 | $42.10 | $4,102,477 | 5% |
| 1/23/2015 | 216,929 | 1,874,858 | $42.10 | $9,132,711 | 10% |
| 1/26/2015 | 219,000 | 2,156,235 | $42.55 | $9,318,450 | 9% |

Other senior executives also engaged in suspicious dispositions of Akorn common stock while the Company's financial statements were misstated. For example, Bonaccorsi (Senior Vice President, General Counsel and Secretary) realized proceeds of $6.3 million by engaging in the following sales of Akorn common stock:

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 9/11/2014 | 116,800 | 310,674 | $37.89 | $4,425,552 | 27% |
| 2/18/2015 | 40,827 | 370,862 | $47.33 | $1,932,342 | 10% |



Similarly, Silverberg (Executive Vice President, Operations, Global Quality Assurance & Technical Services) realized proceeds of $7.1 million by engaging in the sale of Akorn common stock, all while the Company's financial statements were misstated, as follows:[4]

| *Date of sale* | *# of shares sold* | *# shares remaining post-sale* | *Price per share* | *Gross Proceeds* | *% of holdings sold* |
|---|---|---|---|---|---|
| 10/21/2014 | 72,491 | 207,420 | $40.00 | $2,899,640 | 26% |
| 11/3/2014 | 24,311 | 183,109 | $42.27 | $1,027,626 | 12% |
| 1/12/2015 | 38,602 | 225,522 | $41.00 | $1,582,682 | 15% |
| 4/21/2015 | 29,000 | 256,522 | $55.00 | $1,595,000 | 10% |

Cumulatively, the above detailed stock dispositions by the identified Directors and Officers totaled over $111 million. At the time of each of the above detailed stock dispositions the Company's financial statements were false and misleading, and each of the identified Company insiders who sold or disposed of their personally held or controlled Akorn securities were in possession of material nonpublic information about the true state of the Company's financial statements and its deficient internal controls over financial reporting.

The Stockholder maintains that each of the Directors and Officers breached their fiduciary duties of loyalty and good faith by knowingly: (i) disseminating and filing financial statements that were materially false and misleading; (ii) failing to implement necessary internal and financial controls; and (iii) misrepresenting that the Company maintained effective controls. With regard to certain of the Directors and Officers, the Stockholder contends that they used their knowledge of material nonpublic information to unjustly enrich themselves via the improper disposition of Akorn common stock, as alleged above.

As a direct and proximate result of the foregoing breaches of fiduciary duties, the Company has sustained and will continue to sustain damages, including, but not limited to: (i) the "significant expense, including significant audit, legal, consulting, and other professional fees, and lender and noteholder consent fees" incurred in connection with the restatement of the Company's financial statements and the ongoing remediation of material weaknesses in its internal controls over financial reporting; (ii) the costs and expenses incurred in connection with the ongoing investigations by the SEC and U.S. Attorney's Office; and (iii) credit rating downgrades.

---

[4] The Stockholder notes that certain (but not all) of Silverberg's trades were reportedly made pursuant to a 10b5-1 plan, entered into on September 12, 2014 (during the time the Company's financial statements were misstated).

On behalf of the Stockholder, I hereby demand that the Board take action against each of the Directors and Officers to recover the damages Akorn has sustained as a result of the Directors' and Officers' breaches of fiduciary duties, correct the deficiencies in the Company's internal controls that allowed the misconduct to occur, and recover from the Directors and Officers the proceeds of their illicit sales and dispositions of Akorn stock.

If within a reasonable period after receipt of this letter, the Board has not taken the action demanded herein, or in the event that the Board refuses to take the action demanded herein, the Stockholder will commence a shareholder derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

KESSLER TOPAZ
MELTZER & CHECK, LLP

Eric L. Zagar

ELZ/sk

# *Exhibit B*



525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200 tel
www.kattenlaw.com

MICHAEL J. DIVER
michael.diver@kattenlaw.com
312.902.5671 direct
312.902.1061 fax

March 29, 2016

**Via Electronic Mail**

Eric L. Zagar, Esq.
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

**Re: Merry A. Kogut Shareholder Demand**

Dear Mr. Zagar:

This letter is to inform you that a Special Committee (the "Committee") of the Board of Directors of Akorn, Inc. is conducting an inquiry into Merry A. Kogut's demand allegations in accordance with the Louisiana Business Corporation Act. The Committee has retained Katten Muchin Rosenman LLP to assist with the inquiry, and will respond to your client's demands promptly upon its conclusion. Please do not hesitate to contact me with any questions regarding this matter.

Very truly yours,

Michael J. Diver

cc: Gil M. Soffer, Katten Muchin Rosenman LLP

# *Exhibit C*



Katten
KattenMuchinRosenman LLP

525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200 tel
www.kattenlaw.com

MICHAEL J. DIVER
michael.diver@kattenlaw.com
312.902.5671 direct
312.902.1061 fax

August 29, 2016

**Via Electronic Mail**

Mr. Eric L. Zagar
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

**Re: Conclusion of Inquiry Conducted by a Special Committee of the Board of Directors of Akorn, Inc.**

Dear Counsel:

A Special Committee (the "Committee") of the Board of Directors (the "Board") of Akorn, Inc. (the "Company" or "Akorn") has concluded an inquiry into the allegations asserted in derivative complaints and certain demand letters of putative shareholders of the Company (collectively, the "Demands"). Among other things, the Demands include allegations that certain current and former directors and officers of Akorn breached their fiduciary duties to the Company by taking action, or failing to act, in such a way as to cause material errors in the Company's financial statements. Those errors were first disclosed by Akorn on March 17, 2015 and April 24, 2015, and resulted in restatements of the Company's historical consolidated financial statements. The Company reported its restated financial statements in an Annual Report on Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") on May 10, 2016.

The Demands include four primary allegations: (A) that one or more directors or officers breached their fiduciary duties to the Company by engaging in misconduct relating to Akorn's financial restatements and/or failing to implement an adequate system of internal control over financial reporting ("ICFR") to prevent the restatements; (B) that certain directors and officers engaged in illegal or improper insider trading during a period when the price of the Company's common stock was artificially inflated, and that the Company failed to maintain adequate controls surrounding insider trading compliance; (C) that one or more directors or officers breached their fiduciary duties by dismissing KPMG LLP as the Company's independent registered public accounting firm in January 2016; and (D) that one or more directors or officers breached their fiduciary duties by failing to implement adequate information technology controls, which inaction resulted in a "cyber-breach" in June 2015.


In response to the initial and all subsequently received Demands, the Board resolved to form the Committee on July 30, 2015. The Board's resolution followed the procedure set forth in Section 1-744 of the Louisiana Business Corporation Act (the "LBCA"), which empowers the board, or a properly constituted committee of the board, of a Louisiana corporation that receives a shareholder demand letter to conduct a "reasonable inquiry" to determine, "in good faith," whether maintaining a derivative proceeding would be "in the best interests of the corporation." LA. REV. STAT. ANN. §§ 12:1-744(A) (2015), amended by 2016 La. Sess. Law Serv. Act 442 (H.B. 714). After consultation with counsel, the Board appointed three of its members to the Committee, each of whom was considered to be qualified under the standards set forth in Section 1-143 of the LBCA. The Committee was charged with reporting its conclusions and recommendations to the Board, which retained full authority to act on the relevant matters, subject to its consideration of the conclusions and recommendations of the Committee. Upon its formation, the Committee engaged Katten Muchin Rosenman LLP to serve as its legal counsel.

The Committee, with the assistance of Katten, conducted a detailed inquiry over the course of the past year into the issues identified in the Demands. The Committee held 18 formal meetings and convened many additional phone calls to discuss relevant issues as they arose over the course of the inquiry. At the direction of the Committee, Katten collected in excess of 325,000 pages of documents concerning the allegations in the Demands. Committee members reviewed a substantial number of these documents throughout the course of the inquiry. At the direction of the Committee, Katten also conducted over 30 witness interviews, including interviews of directors, current and former officers and other employees of the Company who were deemed to have knowledge of the relevant issues. Committee members participated in a significant number of those interview sessions. Katten also conducted extensive legal research and analysis, and the Committee considered various legal issues throughout the course of the inquiry. Finally, the Committee engaged experts from FTI Consulting, Inc. ("FTI") to assist in its evaluation of the Company's current internal control remediation plan.

After thoroughly analyzing the allegations in the Demands and the applicable legal standards, the Committee concluded that it would not be in the best interests of the Company to pursue litigation based on any of the allegations in the Demands. The Committee's determination rested in part on the relatively high evidentiary standard that would need to be satisfied to sustain a claim for money damages against a director or officer of the Company for a breach of fiduciary duty. As you may know, the applicable law, together with the Company's Articles of Incorporation, limits the potential monetary liability of directors and officers to breaches of the duty of loyalty, bad faith actions, intentional misconduct or knowing violations of law, receipt of unlawful distributions, or transactions involving the receipt of improper personal benefits. Although the Committee found significant shortcomings in Akorn's accounting function during the relevant time period, it did not find sufficient evidence to support a finding that a director or officer engaged in actionable conduct under the preceding standards.



Specifically, the Committee made findings related to each of the four primary allegations. First, the Committee concluded Akorn does not have a viable claim for money damages against any Akorn officer for misconduct with respect to the Company's historical financial reporting or due to the Company's previously disclosed material weaknesses in ICFR. The Committee did not find evidence to support a finding that any of the accounting entries that gave rise to the Company's financial restatements were caused by actionable conduct on the part of management. Moreover, the Committee found ample evidence that Akorn's management team attempted in good faith to remediate the material weaknesses over the relevant time period and otherwise made efforts to strengthen Akorn's accounting function. Those efforts were impacted by a number of factors in 2014 and 2015, including Akorn's sizable acquisitions. Even if there were delays in remediation progress, a lack of adequate staffing and resources to match the significant growth and complexity of Akorn's business, and a lack of sufficient awareness of remediation requirements, under those circumstances, the Committee concluded there was insufficient evidence to prove a claim for damages against any of Akorn's officers. The Committee also noted that management included specific disclosures concerning the Company's material weaknesses and the effectiveness of its ICFR in Akorn's periodic and annual reports filed with the SEC during the relevant time period.

The Committee also found that a potential claim against Akorn directors based on the Company's internal control shortcomings would fare no better. The Committee did not identify any evidence demonstrating the wholesale abdication of responsibility by the Board or the Audit Committee necessary for a finding of liability. Rather, both the Board and the Audit Committee received regular briefings from management and the Company's auditors regarding the material weaknesses and management's ICFR remediation plans and their progress to achieve remediation. The Audit Committee chairman communicated regularly with management, and Board members frequently communicated with each other outside of quarterly meetings regarding the Company, its performance and its management. The Committee concluded that these well-documented oversight activities would defeat a claim for a breach of fiduciary duty against any of the directors.

Second, the Committee concluded that there is no basis to pursue a claim with respect to the Company's insider trading compliance controls. The Company maintained significant insider trading compliance controls throughout the relevant time period, which the Committee found were reasonably designed to prevent insider trading by individuals when they are aware of material, non-public information. During the relevant period, the Committee did not identify any evidence of material deviations from the Company's Policy on Insider Trading of Securities that would reflect a conscious disregard of any officer's or director's obligations to implement controls over insider trading. The Committee also examined the circumstances surrounding each of the trades identified in the Demands and concluded that none of the insiders who effected the trades was aware of material, non-public information about the financial restatements at the time



of the trades (or at the time he or she entered into Rule 10b5-1 plans to facilitate future trading activity). Accordingly, the Committee concluded that the Company has no viable claim against these individuals premised upon a breach of fiduciary duty.

Third, in the Committee's judgment, there is no basis to pursue a breach of fiduciary duty claim based on the Audit Committee's decision to dismiss KPMG LLP as Akorn's independent registered public accounting firm. There is no evidence that the decision to dismiss KPMG was intended to conceal any information that might have been embarrassing or harmful to the Board or management, or for any other improper purpose. To the contrary, everyone whom the Committee interviewed, and all of the relevant documents it reviewed, confirmed that the decision to dismiss KPMG was motivated by a desire to work with an audit firm that was willing and able to complete the re-audit of Akorn's 2014 financial statements and the audit of its 2015 financial statements within certain deadlines established by NASDAQ. Indeed, history has borne out the propriety of that decision, as the Company's current independent registered public accounting firm was able to conclude its audit of the Company's financial statements within the prescribed deadline. The Committee also noted that the scope of the new firm's audit encompassed the matters discussed in KPMG's letter to the Securities and Exchange Commission of January 25, 2016, and no revisions to the Company's historical financial statements were deemed required as a result of the matters raised by KPMG.

Finally, in the Committee's judgment, there is no basis to pursue a breach of fiduciary duty claim based on the June 2015 "cyber-breach." The Committee did not find any evidence of culpable conduct with respect to the breach. The Company had developed a reasonable system of IT security before the incident, and continued to improve its security afterward. And the Committee did not identify evidence that any personally identifiable information or personal health information was actually revealed as a result of the incidents or that the Company suffered any measurable harm.

The Committee presented its findings and recommendation to the Board over the course of two meetings. After careful consideration, the Board voted to adopt the Committee's findings and recommendation at a meeting on August 15, 2016.

As the Committee's inquiry has concluded, please direct all future communications about these matters to Daniel Slifkin or David Stuart at Cravath, Swaine & Moore LLP, lead counsel for the Company and its directors and officers in connection with the Demands. Mr. Slifkin can be reached at 212-474-1438 or dslifkin@cravath.com. Mr. Stuart can be reached at 212-474-1519 or dstuart@cravath.com.



Sincerely,

Michael J. Diver

cc: The Board of Directors of Akorn, Inc.
The Special Committee of the Board of Directors of Akorn, Inc.
David M. Stuart, Cravath, Swaine & Moore LLP
Daniel Slifkin, Cravath, Swaine & Moore LLP
Antony L. Ryan, Cravath, Swaine & Moore LLP
Timothy A. Duffy, Kirkland & Ellis LLP
Gil M. Soffer, Katten Muchin Rosenman LLP

# *Exhibit D*



KESSLERTOPAZ
MELTZERCHECK LLP
ATTORNEYS AT LAW

Writer's Direct Dial: 610-822-2209
E-Mail: ezagar@ktmc.com
*Please reply to the Radnor Office*

May 22, 2018

**VIA FEDEX**
Alan Weinstein
Chairman of the Board of Directors
Akorn, Inc.
1925 W. Field Court, Suite 300
Lake Forest, Illinois 60045

**Re: *Shareholder Demand***

Dear Mr. Weinstein:

This firm represents Merry Kogut (the "Stockholder"), a holder of shares of common stock of Akorn, Inc. ("Akorn" or the "Company") since 2011. I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current directors and officers of the Company, as described herein.

As you are aware, by reason of their positions as directors and/or officers of the Company and because of their ability to control its business and corporate affairs, the directors and officers owe the Company and its shareholders the fiduciary obligations of loyalty and good faith. The Stockholder believes that the following current and former directors and/or officers violated these core fiduciary principles causing the Company to suffer damages: Chief Executive Officer ("CEO") Rajat Rai ("Rai"), Chief Financial Officer Duane A. Portwood, Chief Operating Officer Bruce Kutinsky, former Executive Vice President, Pharmaceutical Operations Steve Lichter ("Lichter"), Chairman of the Board Alan Weinstein, and directors Kenneth S. Abramowitz, Adrienne L. Graves, Ronald M. Johnson ("Johnson"), Steven J. Meyer, Terry A. Rappuhn and Brian Tambi (collectively, the "Officers and Directors").

The Stockholder contends that the Directors and Officers have breached their fiduciary duties by, among other things, (i) knowingly abdicating their responsibility to make a good faith effort to oversee the Company's operations, internal controls, and Food and Drug Administration ("FDA") data integrity and compliance processes, and/or (ii) participating in or knowingly permitting the Company to engage in fraudulent and illegal conduct that has damaged the Company.

As you are aware, the Company's product pipeline is a key driver of Akorn's value. The value of that pipeline is contingent on the Company's ability to consistently and timely obtain approval from the FDA for the Abbreviated New Drug Applications ("ANDAs") for Akorn's

280 King of Prussia Road, Radnor, Pennsylvania 19087 T. 610-667-7706 F. 610-667-7056 info@ktmc.com
One Sansome Street, Suite 1850, San Francisco, California 94104 T. 415-400-3000 F. 415-400-3001 info@ktmc.com
WWW.KTMC.COM



generic pharmaceutical products. The FDA's regulatory regime requires Akorn to strictly follow the agency's current Good Manufacturing Practices ("cGMP") which are designed to ensure the safety and efficacy of the Company's products. A critical component of the cGMP is its "data integrity" requirements, which mandate that the testing data provided by Akorn to the FDA in connection with its ANDAs is accurate and reliable. The FDA has made clear that data integrity "is an important component of [a pharmaceutical company's] responsibility to ensure the safety, efficacy and quality of drugs, and of [the] FDA's ability to protect the public health." FDA, Draft Guidance for Industry, Data Integrity and Compliance with CGMP 1 (2016). Failure to comply with the FDA's data integrity requirements can result in significant sanctions and a breach of trust between the Company and the FDA that can imperil Akorn's ability to obtain timely regulatory approval for its products.

On April 24, 2017, Akorn announced that it had entered into a merger agreement with Fresenius Kabi AG and its affiliates ("Fresenius") whereby Fresenius would acquire the Company in a transaction valued at approximately $4.3 billion, or $34.00 per share of Akorn common stock (the "Merger"). In October of that year, Fresenius received the first of what would ultimately be three anonymous letters alleging that Akorn's product development processes were "flawed and . . . mostly corrupted or incomplete." The next month, Fresenius received a second letter containing more specific allegations about Akorn's data integrity practices. That second letter described how the Company's senior management encouraged Akorn's quality assurance and manufacturing departments to manipulate data and alleged that, as a result of this misconduct, multiple data manipulations occurred at the Company's Decatur, Somerset and Vernon Hills facilities.[1] After receiving the second letter, Fresenius sent both letters to Akorn and requested that the Company investigate the matters raised therein. Fresenius and Akorn commenced separate internal investigations later that month.[2]

Presently, neither investigation has been completed. However, the investigations conducted to date have revealed pervasive and systemic issues at the Company relating to its data integrity program, as well as potential fraud. These investigations revealed that the Company's Executive Vice President for Quality Assurance (the "Former Executive"), who was the head of Akorn's data integrity processes and a key member of the Company's executive management that reported directly to CEO Rai, was responsible for the submission of fraudulent data to the FDA in connection with the Company's ANDA for an antibiotic drug called azithromycin. This fraudulent scheme began almost six years ago, in October 2012, when a senior quality control employee at the Somerset facility fabricated test results for azithromycin that were included in the ANDA Akorn submitted to the FDA in December 2012. Over the course of the next five years, Akorn continued to submit fabricated test results to the FDA. By late 2017, a senior manager of quality assurance and quality control raised the issue of the fraudulent data with the Former Executive and

---

1 Decatur and Somerset comprise two of the Company's three American manufacturing facilities, and five manufacturing facilities globally. Vernon Hills comprises one of Akorn's two research and development centers.

2 Fresenius received a third anonymous letter in January 2018, which it also provided to Akorn.



reiterated her concerns on multiple occasions. The Former Executive, however, took no action to address these concerns and provided final sign-off on the fraudulent data submitted to the FDA.[3]

This fraudulent data scheme reportedly involves as least five other Akorn products. Akorn recently conceded that a former employee at the Company's Somerset facility had "likely falsified a data point in another chemist's lab notebooks during the development process of azithromycin," that "the same employee may have made entries in the lab notebooks of another chemist for five other drug products" and that "two of the . . . chemist's own notebooks could not be located." Akorn was made aware of the falsified notebooks as early as November 2014. Since that time, numerous employees raised this issue with the Former Executive and even the Company's head of human resources. Despite Akorn management's awareness of this fraud, the Company does not appear to have conducted any meaningful investigation into the extent of the fraud, nor did it notify the FDA of the conduct.[4] The falsification of lab book data—a blatant fraud—clearly illustrates the Company's inability or unwillingness to ensure the integrity of its data.

The fraudulent notebook scheme was not an isolated incident. The Company also acknowledged that there have been "certain instances of trial injections[5] being conducted at Akorn's Vernon Hills, Somerset and Decatur facilities." Despite the FDA's standing objection to the practice of "trial injections," Akorn admits that it has "uncovered numerous test sequences labeled 'trial' on certain servers and equipment at Akorn's Vernon Hills, Somerset and Decatur facilities," and that among these test sequences, has conclusively identified instances of improper trial injections. In 2015, the FDA identified this problem and specifically told Akorn to "stop performing [High Performance Liquid Chromography] trial sample runs at the beginning of the injection sequence." In addition, Akorn is accused of widespread data irregularities regarding data that was aborted, invalidated or otherwise unreported and not reviewed or identified in the Company's data systems. While the issue of manipulated data was again raised with the Former Executive, no meaningful action appears to have been taken to remedy this data integrity failure.

Moreover, Akorn has routinely ignored numerous internal audits indicating pervasive and systemic data integrity failures at the Company. These audit findings include:

- An April 2017 Somerset site audit which found critical and "unmitigated" data integrity risks, including the failure to conduct reviews of audit trails for High

---

[3] This individual engaged in other troubling conduct, such as warning Akorn employees that they should "not put FDA sensitive subjects into emails."

[4] Critically, the falsified data of four of those six products was submitted to the FDA, and one of those four products received regulatory approval. In other words, the Company caused the FDA to approve a drug based upon the submission of falsified data.

[5] "Trial injections" are defined as the injection and testing of a substance as a "trial" run, *i.e.*, for a purpose other than officially testing a drug product to generate data in support of a drug product application submitted to the FDA or to justify the release of product manufactured for commercial distribution. Trial injections are strongly disfavored because they may be used to achieve a specific result or to overcome an unacceptable result (a practice referred to as "testing into compliance").



Performance Liquid Chromography systems. Akorn's internal procedures mandate that the Company conduct regular review of audit trails to ensure that any changes to testing data were "instituted only by authorized personnel." The FDA requires companies to retain their audit trail reviews, which Akorn failed to do.

- A September 2017 Vernon Hills audit which found the "most significant areas of risk" centered on data integrity and testing controls.
- A December 2017 Lake Forest audit which found that Akorn had not addressed issues raised in prior audits from 2015 and 2016.

In addition, Akorn's executive officers were specifically notified of potential civil and criminal liability as a result of the Company's improper data integrity and FDA compliance processes. As early as late 2016, Cerulean Associates LLC ("Cerulean"), a niche FDA compliance consulting firm, found that Akorn's data integrity failures at its Decatur and Somerset sites were numerous, critical and likely to lead to severe regulatory action. With regard to the Decatur site, Cerulean's final report from early December 2016 (the "Decatur Report") found that the Company's "data integrity controls . . . are insufficient to support compliance with current data integrity expectations and [FDA] regulatory requirements." The Decatur Report concluded that "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk." The Decatur Report contained seven "critical" findings which "have consistently resulted in public enforcement," and seven additional "major" findings. Among other things, the Decatur Report noted:

- The Company's "insufficient data integrity controls (both procedural and technical) to prevent unauthorized changes to electronic data" and "[f]ailure to have sufficient controls over computerized equipment used in regulated processes . . . for drug product safety and quality testing and release."
- Akorn's information technology staffing was "seriously negligent for a highly regulated site actively using computerized systems for drug production, testing and release" and "raise[d] questions about the validity of the data in use throughout Akorn to make drug product safety, efficacy, and quality decisions."
- Akorn's "failure to ensure that product testing data is derived from compliance with established specifications and standards" and that a practice by which Company employees could modify data "call[ed] into question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products."[6]

---

[6] In addition, Akorn has received Form 483s from the FDA which should have put the Officers and Directors on notice of potential FDA compliance issues at the Decatur facility. In mid 2016, it was revealed that Akorn received a Form 483 for its Decatur facility in which the FDA made almost a dozen observations indicating that Akorn was in possible violation of federal law. Among other things, the Form 483 noted that some processes were not overseen by quality control personnel and that certain work performed was not properly documented. One year later, in May

Cerulean's assessment of the Somerset facility was worse. With regard to the Somerset facility, Cerulean's final report from May 2017 (the "Somerset Report") found that the data integrity failures at this site implicated potential criminal liability for Akorn's management. Indeed, one of the critical findings from the Somerset Report concerned the "failure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn[.]" The Somerset Report expressly warned:

> Officers of Akorn Pharmaceuticals, Inc. should be aware that they are legally liable and accountable for non-compliance by any person(s) within Akorn, irrespective of whether the officers knew of the non-compliance or not.

The Somerset Report also noted the failure of Akorn's information technology department "as a core component of a 21st century quality control management structure, to ensure the reliability of the controls around data used to make, test, release, and surveil sterile drug product." The Somerset Report noted:

> The unwillingness of IT to see itself as a fundamental, active and ongoing part of a 21st century pharmaceutical quality management structure raises serious questions about the reliability of any data integrity controls and thus the trustworthiness of any electronic information used throughout Akorn to make safety, efficacy and quality decisions.

Akorn management postponed Cerulean's Somerset assessment. In total, the Company has completed only three of the seventeen action items recommended by Cerulean. The Company's deficient response to the action items identified by Cerulean indicates a lack of good faith by the Company in responding to issues implicating widespread fraud and misconduct at Akorn.

The Company's data integrity program and general FDA compliance are matters committed to the oversight of the Officers and Directors. The Company's Quality Policy states that "[i]t is Akorn's policy to preserve and improve patient health by consistently delivering high quality, safe and effective specialty pharmaceutical products, that meet or exceed customer expectations." That policy's mission statement specifically provides that the Company's "management" is "committed to successfully deploying [the] Quality Policy to all aspects of [the Company]." According to the mission statement, "[t]his commitment will be maintained through having the right people doing the right things, the first time, every time." This includes, among other things, "[s]tate of the art technology, which develops and commercializes safe pharmaceutical products that enhance the quality of life," and "[a] management team that is accountable for effective review and support of quality, through the prioritization, resourcing, and timely execution of quality-conscious decision-making."

The oversight responsibilities of the Officers and Directors are also detailed in the Company's most recent annual proxy statement, which provides in pertinent part:

---

2017, Akorn received another Form 483 for its Decatur facility which related to issues raised in the prior Form 483.

KESSLERTOPAZ
MELTZERCHECK LLP
ATTORNEYS AT LAW

> We [the Board] accept the premise that with innovation and progress we must also confront various risks. We also recognize that risk can be predicted, evaluated, avoided and/or managed. Further, the Board acknowledges that inappropriate risk avoidance and management could damage Company assets as well as shareholder value. *Given these principles, senior management is responsible for assessing and managing the Company's various exposures to risk on a day-to-day basis, including the creation of appropriate risk management and compliance programs and policies. . . . The Board is responsible for overseeing management in the execution of its responsibilities and for assessing the Company's approach to risk management. The Board's role in risk oversight of the Company is consistent with the Company's leadership structure, with the CEO and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board providing guidance in these areas.*

Akorn, Definitive Proxy Statement, (Schedule 14A), at 2 (Mar. 20, 2017) (the "2017 Proxy"). In addition, the Akorn, Inc. Audit Committee Charter provides that the "primary function" of the Board's Audit Committee "is to assist the Board . . . in fulfilling its oversight responsibilities by reviewing . . . the Company's systems of internal controls regarding . . . legal compliance . . . . that management has established . . . ." Such responsibilities include "[e]valuat[ing] whether management is setting the appropriate 'tone at the top' by communicating the importance of the Company's ethical and business practice standards : . . ." Furthermore, the members of the Board and Audit Committee are or should be aware of the importance of FDA and regulatory compliance by virtue of their backgrounds in the pharmaceutical and healthcare industries.[7]

Notwithstanding the Officers' utter failure to implement and oversee a proper data integrity program, the Board's Compensation Committee has routinely rewarded these individuals for their misconduct. For example, the Company's Annual Proxy Statement for 2017 announced that one of Rai's "achievements" which entitled him to an incentive bonus in 2016 was that he purportedly "ensured that all of the Company's operations maintained regulatory compliance . . . ." The Compensation Committee made a similar determination with regard to Lichter, whom the Compensation Committee found "ensured that all manufacturing facilities maintained their regulatory compliance to operate." The pervasive data integrity issues at the Company, including the fraud committed by the Former Executive who reported directly to Rai and presumably worked closely with Lichter, indicate that Rai and Lichter critically failed in their oversight responsibilities and should not have received incentive bonuses.

---

[7] For example, the 2017 Proxy touts the experience of Johnson, a member of the Audit Committee, "in managing regulatory and compliance requirements of the FDA, particularly in pharmaceutical[s] . . . as well as a deep knowledge and understanding of FDA policies and procedures regarding cGMP compliance, quality control processes and outcomes reporting gained from his years of providing specialized consulting services to governments, pharmaceutical companies and healthcare institutions and working at the FDA." 2017 Proxy at 13.



KESSLERTOPAZ
MELTZERCHECK LLP
ATTORNEYS AT LAW

The Stockholder maintains that each of the Directors and Officers breached their fiduciary duties of loyalty and good faith by, among other things, (i) knowingly abdicating their responsibility to make a good faith effort to oversee the Company's operations, internal controls, and FDA data integrity and compliance processes, and/or (ii) participating in or knowingly permitting the Company to engage in fraudulent and illegal conduct that has damaged the Company. At best, the Directors and Officers have engaged in a pattern of conscious inaction. Although confronted with innumerable "red flags" illustrating the breadth and scope of Akorn's shortcomings with respect to data integrity, the Board nevertheless failed to take any meaningful steps or implement any changes necessary to remedy the Company's glaring deficiencies.

As a direct proximate result of the foregoing breaches of fiduciary duties, the Company has sustained and will continue to sustain damages, including, but not limited to: (i) the legal expense associated with the Merger and the litigation with Fresenius in connection therewith; (ii) the costs and expenses incurred with any investigations by the FDA; (iii) the long term damage to the Company's reputation, a critical factor in obtaining the regulatory approval necessary for the Company's products; and (iv) excessive incentive compensation Akorn awarded to its executive officers relating to their purported compliance "achievements."

On behalf of the Stockholder, I hereby demand that the Board take action against each of the Directors and Officers to recover the damages Akorn has sustained as a result of the Directors' and Officers' breaches of fiduciary duties, correct the deficiencies in the Company's data integrity and FDA compliance processes that allowed the misconduct to occur, and recover from the relevant Officers the incentive bonus compensation they wrongfully received.

If within a reasonable period after receipt of this letter the Board has not taken the action demanded herein, or in the event that the Board refuses to take the action demanded herein, the Stockholder will commence a shareholder derivative action on behalf of the Company for appropriate relief.

Very truly yours,

KESSLER TOPAZ
MELTZER & CHECK, LLP

Eric L. Zagar

ELZ/cw