NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 646,174                                         DIVISION "I"  SECTION 24

MERRY A. KOGUT,
Individually and on Behalf of Defendant Akorn, Inc.,
Plaintiff,

v.

AKORN, INC., RAJAT RAI, BRUCE KUTINSKY, STEVEN LICHTER,
and MARK SILVERBERG,
Defendants.

FILED: _____                    _____
                                              DEPUTY CLERK

**VERIFIED THIRD AMENDED AND RESTATED PETITION**

Plaintiff Merry A. Kogut ("Plaintiff"), by the undersigned attorneys, submits this Verified

Third Amended and Restated Petition (the "Petition") against the defendants named herein, and

alleges upon personal knowledge with respect to herself, and upon information and belief based

upon, *inter alia*, a review of public filings, press releases and reports, and an investigation

undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

**PROCEDURAL BACKGROUND**

1.      Plaintiff initiated this action by way of a Class Action Complaint for Equitable and

Injunctive Relief filed on March 8, 2016.  Plaintiff later filed a Verified Amended Complaint on

June 10, 2016, and a Verified Second Amended and Restated Complaint on September 21, 2018

(the "SAC").  Following the filing of the SAC, the defendants named therein filed motions to

dismiss and exceptions to the SAC (the "Dispositive Motions").  On March 6, 2019, a Special

Master was appointed by the Court and asked to recommend to the Court an appropriate disposition

of the Dispositive Motions.  On May 13, 2019, the Special Master submitted a Written Report and

Recommendation of the Special Master in connection with the Dispositive Motions.

2.      As of the filing of this Petition, no judgment has been entered by the Court and no

answer has been filed by any of the defendants to this action.  Accordingly, pursuant to La. C. C.

P. Art. 1151, leave of the Court is not required to file this Petition.

3.     Plaintiff brings this action on behalf of nominal defendant Akorn, Inc. ("Akorn" or the "Company") seeking to remedy breaches of fiduciary duties and unjust enrichment by certain of Akorn's former executive officers (collectively, the "Individual Defendants") who intentionally inflicted harm on the Company and intentionally violated criminal law by deliberately taking action to prevent Akorn from complying with U.S. Food and Drug Administration ("FDA") data integrity requirements and actively thwarting and discouraging remediation of Akorn's non-compliance, which was pervasive and well known to the Individual Defendants.

**NATURE OF THE ACTION**

4.     Plaintiff brings this action on behalf of nominal defendant Akorn seeking to remedy breaches of fiduciary duties and unjust enrichment by certain of Akorn's former executive officers (collectively, the "Individual Defendants") who intentionally inflicted harm on the Company and intentionally violated criminal law by deliberately taking action to prevent Akorn from complying with FDA data integrity requirements and actively thwarting and discouraging remediation of Akorn's non-compliance, which was pervasive and well known to the Individual Defendants.

5.     Akorn is a Louisiana corporation headquartered in Lake Forest, Illinois.   The Company describes itself in its public filings as a "generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals and branded as well as private-label over-the-counter consumer health products and animal health pharmaceuticals."

6.     At the time of the events alleged herein, Akorn's senior management consisted of, among others, Chief Executive Officer ("CEO") Rajat Rai ("Rai"); Chief Operating Officer ("COO") Bruce Kutinsky ("Kutinsky"); Executive Vice President, Pharmaceutical Operations Steven Lichter ("Lichter"); and Executive Vice President, Global Quality Assurance Mark Silverberg ("Silverberg").

7.     One the most important duties and responsibilities of these senior Akorn officers was to ensure that the Company complied with FDA data integrity requirements.  Failure to do so is a crime punishable by up to one year in prison.

8.     As alleged in detail herein, Defendants Rai, Kutinsky, Lichter, and Silverberg intentionally inflicted harm on Akorn and intentionally violated criminal law by, among other

things, deliberately declining to investigate and remediate known data integrity violations that called into question all of the Company's testing data; actively impeding efforts to detect and address Akorn's data integrity deficiencies, including required audits and assessments designed to uncover further deficiencies; and/or knowingly submitting to the FDA fabricated testing data.

9.       As a direct and proximate result of the misconduct committed by Defendants Rai, Kutinsky, Lichter, and Silverberg, Akorn has sustained and will continue to sustain substantial damages, which through this action Plaintiff seeks to recover for the benefit of the Company.

## PARTIES

10.       Plaintiff is a shareholder of Akorn and has been a shareholder of Akorn continuously since 2011.  Plaintiff's ownership of Akorn common stock covers the entire period of the wrongdoing alleged herein.  Plaintiff will fairly and adequately represent the interests of Akorn in enforcing the rights of the Company.  Plaintiff has complied with the notice requirements of La. R.S. § 12:1-742.  Plaintiff therefore meets the standing requirements set forth in La. R.S. § 12:1-741.

11.       Defendant Akorn is incorporated in Louisiana and maintains its principal executive offices at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.  Akorn common stock trades on The NASDAQ Global Select Market under the ticker symbol "AKRX."

12.       Defendant Rai, in his official capacity as an executive officer at Akorn, served as CEO of the Company from May 2010 until his retirement in December 2018, and had previously served as Interim CEO since June 2009.

13.       Defendant Kutinsky, in his official capacity as an executive officer of Akorn, served as COO of Akorn from September 2012 until December 2018.  He previously served as Akorn's Senior Vice President of Corporate Strategy from late 2009 until he was named President, Consumer Health Division following the Company's acquisition of Advanced Vision Research, Inc. in May 2011.

14.       Defendant Lichter , in his official capacity as an executive officer of Akorn, served as Akorn's Executive Vice President, Pharmaceutical Operations from January 2015 until May 2018.

3

15.     Defendant Silverberg, in his official capacity as an executive officer of Akorn, served as the Company's Executive Vice President, Global Quality until February 2018. Silverberg joined Akorn in April 2005.

16.     The defendants identified in ¶¶ 9-12 are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17.     By reason of their positions as officers of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

18.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

19.     The Company's Quality Policy states that "[i]t is Akorn's policy to preserve and improve patient health by consistently delivering high quality, safe and effective specialty pharmaceutical products, that meet or exceed customer expectations."  That policy's mission statement specifically provides that the Company's "management" is "committed to successfully deploying [the] Quality Policy to all aspects of [the Company] . . . ."  According to the mission statement, "[t]his commitment will be maintained through having the right people doing the right things, the first time, every time."  This includes, among other things, "[s]tate of the art technology, which develops and commercializes safe pharmaceutical products that enhance the quality of life," and "[a] management team that is accountable for effective review and support of quality, through the prioritization, resourcing, and timely execution of quality-conscious decision-making."

## SUBSTANTIVE ALLEGATIONS

### Background of Akorn and the Regulatory Requirements Applicable to the Company

20.     Akorn is a specialty generic pharmaceuticals company organized under the laws of the State of Louisiana and headquartered in Lake Forest, Illinois.  Akorn's business model focuses

on selectively targeting products with complex manufacturing processes or that are deliverable in alternative dose forms, such as injectables, eye drops, oral liquids, inhalants, and nasal sprays. Akorn has manufacturing facilities in Decatur, Illinois; Somerset, New Jersey; Amityville, New York; Hettlingen, Switzerland; and Paonta Sahib, India. Akorn has research and development centers in Vernon Hills, Illinois, and Cranbury, New Jersey.

21.     Akorn's primary regulator is the FDA. Akorn's quality operations function is responsible for ensuring that Akorn's plants and R&D centers meet FDA requirements. To carry out this function, Akorn's Global Quality Compliance ("GQC") team conducts periodic audits. Akorn also retains consultants who evaluate its sites and processes.

22.     Akorn's quality operations function is also responsible for ensuring that Akorn complies with FDA requirements when making submissions to the FDA, such as when filing an Abbreviated New Drug Application ("ANDA") to seek approval for a new generic drug. When reviewing an ANDA, the FDA relies on data submitted by the applicant. To ensure that data is reliable, the FDA imposes rigorous data integrity requirements on pharmaceutical companies.

23.     The FDA's data integrity requirements place the burden on the pharmaceutical company to prove the origin, transmission, and content of the company's data and that data is what it is purported to be. A properly designed and managed data integrity program strives to mitigate the risk of purposeful data manipulation or fraud by putting controls in place that limit to the greatest extent possible the opportunities to manipulate data. To minimize those risks, the FDA's data integrity requirements impose strict requirements that data regarding testing and manufacturing be Attributable, Legible, Contemporaneously recorded, Original or a true copy, and Accurate ("ALCOA"), as well as complete, consistent, enduring, and available.

24.     The FDA's data integrity requirements are part of its current Good Manufacturing Practices ("cGMP"), which are designed to ensure the systematic safety, quality, and reliability of drug products. These requirements are set out in federal regulations and clarified by FDA guidance.

25.     A critical component of a modern data integrity system is the company's information technology ("IT") infrastructure. The FDA requires that computer systems have

adequate "access controls" that restrict who may access electronic data, as well as "change controls" designed to ensure that no unnecessary changes are made, that all changes are documented, and that the possible effect of a change is evaluated prior to its implementation." The FDA also requires that lab equipment have "audit trails" to document who uses the equipment, when, and for what purpose.

26.     Data integrity also requires ensuring the authenticity of entries in laboratory notebooks.  Notebooks contain original source data that should be contemporaneously recorded by chemists.  Notebooks must be preserved, and missing notebooks are an important data integrity issue because that data is no longer available and cannot be verified.  At Akorn, each notebook is assigned to a particular individual; making unsigned entries in another analyst's notebook violates fundamental principles of data integrity.

27.     The FDA's data integrity rules require that all test data—both failing results and passing ones—be properly recorded.  The FDA forbids the practice of "testing into compliance," or running tests again and again until passing results are secured and recording only the passing results.

28.     FDA regulations require that potential data integrity violations be promptly investigated and remediated. FDA guidance calls for potential data falsification to be fully investigated by the firm's quality system to determine the effect of the event on patient safety, product quality, and data reliability; to determine the root cause; and to ensure the necessary corrective actions are taken.

29.     Data integrity violations are particularly serious because they "break trust" between the offending company and the FDA.  The FDA may require the withdrawal of an ANDA if the FDA finds that it contains an untrue statement of material fact.  In cases of repeated, intentional submission of inaccurate data, the FDA may invoke its Application Integrity Policy ("AIP"), which halts all ongoing scientific review of pending applications to the agency until specific milestones are accomplished by the company.  Exiting from the AIP is a time-consuming and expensive process that involves an independent investigation, corrective action plan, recall or retesting of products, and withdrawal and resubmission of applications.  If systemic issues remain uncorrected,

the FDA may seek a court-enforced permanent injunction, bar a company from making submissions, exclude it from other federal programs, or refer matters for criminal prosecution.

### The Individual Defendants Were Well Aware of Pervasive and Catastrophic Deficiencies in Akorn's Compliance With Data Integrity Requirements

30.     At all relevant times Defendant Silverberg was the head of Akorn's quality function, holding the title of Executive Vice President, Global Quality Assurance. As of 2017, Silverberg had been Akorn's most senior quality official for over ten years. In that role, he reported directly to Defendant Rai, Akorn's CEO.

31.     According to one former Akorn employee, during Silverberg's ten years heading up the quality compliance function, Silverberg placed "a lot of pressure" on employees "to just get things done and get products out [the] door." In an employee survey conducted in January 2016 that went to Rai and other members of senior management, a whistleblower submitted the following comment:

> Our current Executive Vice President of Quality Assurance is not fostering a willingness to change the current Akorn culture. Instead of acknowledging and embracing our compliance gaps and working collaboratively with other groups to change and mature our quality systems, he actively works to prevent collaboration and transparency. He has actually counselled his staff to not speak to Global Quality Compliance staff and to not share information with GQC. This is not in line with our new mission and values statement. He has also provided misleading information to regulatory bodies including the US FDA.

32.     In June 2016, Ron Johnson ("Johnson"), a member of Akorn's Board of Directors ("Board") with FDA experience, wrote to Silverberg to express concerns about Akorn's state of compliance:

> I continue to be concerned that our position always seems to be that FDA got it wrong and we are just fine. I do not think we are fine, I think there are signals that we are missing. As the leader of the quality function, I do not understand how you can tolerate the continued non-compliance by employees, supervisors and quality assurance staff.... We have do[d]ged a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures. Why do we not see an effort to do this?

33.     In December 2016, during a meeting of the Board's Quality Oversight Committee, Johnson again expressed his concern "around the repetitiveness of issues between sites and across sites identified during audits & external inspections."

34.     Also in December 2016, Defendants Rai, Kutinsky, Lichter, and Silverberg received a "Compliance Gap Analysis Summary and Recommendation Report" for Akorn's Decatur facility from John Avellanet ("Avellanet") of Cerulean Associates LLC ("Cerulean"), who had inspected the facility during a four-day visit in September 2016.   The report was blunt: "Overall, the review found that the data integrity controls at ... Akorn's Decatur, Illinois site ... are insufficient to support compliance with current data integrity expectations and [FDA] regulatory requirements."   The report warned that "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk."

35.     Cerulean identified seven "critical," seven "major," and at least five "minor" nonconformities at the Decatur site.   The report defined a "critical" nonconformity as one that is "reasonably likely to directly impact (*e.g.*, either immediately cause, enable, or be a non-compliance) the regulatory compliance status of the organization."   The report warned that "[h]istorically, these findings have consistently resulted in public enforcement actions (*e.g.*, FDA Warning Letter, product recall, etc.) and have been significant factors in product liability litigation."   The report also warned that "[r]epeat non-conformities ... pose an increased risk because they are indicators that an organization did not take adequate corrective actions and thus may not treat its responsibilities as seriously as appropriate."

36.     The seven "critical" findings were:

(i)      "Failure to exercise sufficient controls to prevent data loss."

(ii)      "Insufficient data integrity controls (both procedural and technical) to prevent unauthorized changes to electronic data."

(iii)      "Insufficient registered record archival controls and retention for records involved in drug product manufacture, testing and release, and quality records."

(iv)   "Failure to have sufficient controls over computerized equipment used in regulated processes and used to create, manipulate, edit, [and] store ... regulated data for drug product safety and quality testing and release."

(v)   "Inadequate validation of computerized systems to ensure the ongoing suitability of systems for Akorn processes, data, and personnel."

(vi)   "Inadequate control over approved specifications for drug product and raw materials, and failure to ensure that product testing data is derived from compliance with established specifications and standards."

(vii)   "Inadequate corrective action and preventative action and out-of-specification investigations, explanations, and corrective actions."

37.   Specific deficiencies included that *any* Akorn employee could add, delete, or modify electronic data, which undermined "all of the test data [and] all of the production data" at the Decatur site, thereby "call[ing] into serious question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products." Cerulean also found that Akorn had failed to use an "audit trail" function that would have enabled Akorn to determine whether employees had exploited their unlimited access, which also "rais[ed] questions over the integrity of the laboratory's data since initial usage of the instruments."

38.   Avellanet also found that Akorn was claiming a clearly fraudulent number of hours for training on quality issues, noting "[t]he Akorn Decatur site alone averages 7,000 trainings a month. Assuming each individual works 7 days a week, with no vacations or sick leave, that's 232 trainings a day."

39.   In January 2017, Cerulean conducted a similar assessment at the Somerset site, but Cerulean was not able to complete its inspection because of inadequate IT support. In May 2017, Cerulean provided Defendants Rai, Kutinsky, Lichter, and Silverberg with a preliminary report on the Somerset facility, which identified three additional "critical" findings and three "major" findings. This time, Avellanet warned that some of the violations were so severe that Akorn's senior management should be concerned about potential criminal liability under the *Park* doctrine.[1]

---

[1] *See United States v. Park*, 421 U.S. 658 (1975).

Among other things, Cerulean found that senior management had failed "to ensure an effective quality system" and that the IT department failed to "ensure the reliability of the controls around data used to make, test, [and] release" sterile drug products.  As at Decatur, Cerulean determined that the latter deficiency raised "serious questions about the reliability of any data integrity controls and thus the trustworthiness of any electronic information used throughout Akorn to make safety, efficacy and quality decisions."  Cerulean also identified additional "critical" computer access and audit trail deficiencies at Somerset similar to those it found at Decatur.

### The Proposed Merger With Fresenius Brings to Light Akorn's Disastrous Data Integrity and Compliance Failings

40.     On April 24, 2017, Akorn announced that it had entered into a merger agreement with Fresenius Kabi AG and its affiliates (collectively, "Fresenius") whereby Fresenius would acquire the Company in a transaction valued at approximately $4.3 billion, or $34.00 per share of Akorn common stock (the "Merger").

41.     In October 2017, Fresenius received the first of what would ultimately be three anonymous letters alleging that Akorn's product development processes were "flawed and . . . mostly corrupted or incomplete."  The next month, Fresenius received a second letter containing more specific allegations about Akorn's data integrity practices.  That second letter described how the Company's senior management encouraged Akorn's quality assurance and manufacturing departments to manipulate data and alleged that, as a result of this misconduct, multiple data manipulations occurred at the Company's Decatur, Somerset and Vernon Hills facilities.  After receiving the second letter, Fresenius sent both letters to Akorn and requested that the Company investigate the matters raised therein.  Fresenius and Akorn commenced separate internal investigations later that month.  In January 2018, Fresenius received a third anonymous letter, which it also provided to Akorn.

42.     The investigations revealed that Defendants Rai, Kutinsky, Lichter, and Silverberg, who comprised Akorn's senior management, took actions that deliberately and systematically prevented Akorn from complying with FDA data integrity requirements and actively thwarted and discouraged remediation of Akorn's non-compliance, which was pervasive and well known to the Individual Defendants.

43.     The misconduct of the Individual Defendants (among others) caused Fresenius to terminate the Merger, which in turn led to litigation between Fresenius and Akorn in the Delaware Court of Chancery in an action captioned *Akorn, Inc. v. Fresenius Kabi AG, et al.*, C.A. No. 2018-0300-JTL (the "Merger Litigation").

44.     After three months of discovery, which included production of millions of pages of documents and depositions of more than four dozen witnesses, including Defendants Rai, Kutinsky, and Silverberg, and a five-day trial at which the court heard testimony from nine fact witnesses and seven expert witnesses, on October 1, 2018, Vice Chancellor J. Travis Laster issued a 246-page Memorandum Opinion (the "Opinion") that (i) described in detail the misconduct of Akorn's senior management and (ii) concluded that Fresenius was entitled to terminate the Merger.[2]

45.     In the Merger Litigation, Avellanet testified that Akorn's data integrity issues were among the "top three worst" of the 120+ pharmaceutical companies that he has assessed, a notorious status given that his practice only involves companies that "have problems." Avellanet testified that some of Akorn's data integrity failures were so fundamental that he would not even expect to see them "at a company that made Styrofoam cups," let alone a pharmaceutical company manufacturing sterile injectable drugs. He believed that the "FDA would get extremely upset" about Akorn's lack of data integrity "because this literally calls into question every released product [Akorn has] done for however many years it's been this way."

### The Individual Defendants' Intentional Infliction of Harm on Akorn and Intentional Violation of Criminal Law

46.     The evidence presented at trial in the Merger Litigation demonstrates that Defendants Rai, Kutinsky, Lichter, and Silverberg intentionally inflicted harm on Akorn and intentionally violated criminal law by, among other things, deliberately declining to investigate and remediate known data integrity violations that called into question all of the Company's testing data; actively impeding efforts to detect and address Akorn's data integrity deficiencies, including

---

[2] A true and correct copy of the Opinion is attached hereto as Exhibit A and is incorporated herein by reference.

required audits and assessments designed to uncover further deficiencies; and/or knowingly submitting to the FDA fabricated testing data in connection with the azithromycin ANDA.

47.     Despite Cerulean's damning assessments of the Decatur and Somerset facilities, Defendants Rai, Kutinsky, Lichter, and Silverberg deliberately chose not to take remedial action to correct Akorn's data integrity deficiencies, which were so severe that they threatened to bring down the entire Company.  On the contrary, the Individual Defendants actively blocked Akorn and its consultants from conducting remedial and investigative activity.

48.     As noted in paragraph 36 above, Cerulean was unable to complete its early 2017 inspection of the Somerset facility because of inadequate IT support.  According to a document introduced at the trial of the Merger Litigation, in May 2017 "executive leadership," *i.e.*, Defendants Rai, Kutinsky, Lichter, and Silverberg, directed "that IT resources would not be engaged in the third party data integrity audit [Cerulean]," and thus deliberately prevented Cerulean from completing its inspection of the Somerset facility.

49.     At the time Cerulean conducted its aborted inspection of the Somerset facility in early 2017, Cerulean was also scheduled to inspect and issue an assessment of Akorn's Amityville facility.   After announcing the Merger, however, Defendants Rai, Kutinsky, Lichter, and Silverberg canceled the scheduled inspection of the Amityville facility, and likewise blocked Cerulean from completing its assessment of the Somerset facility.  In the Opinion, Vice Chancellor Laster found that Akorn's senior management "did not want Cerulean to identify any more data integrity gaps that could jeopardize their efforts to sell the Company.  The only interest that Akorn's executives showed in the Cerulean report was a request by Joseph Bonaccorsi, Akorn's Executive Vice President, General Counsel, and Corporate Secretary, that Cerulean remove the reference to potential criminal liability for Akorn's executives."

50.     In late 2017, Akorn's Data Integrity Quality Manager told Avellanet that Akorn was "making 0 progress on our DI remediation efforts," which she attributed to "the culture and the message from management."

51.     In June 2016, GQC identified a "critical" failure to establish appropriate computer access controls and audit trails at Akorn's Vernon Hills facility.  As a result, and consistent with

Cerulean's findings at Decatur and Somerset, unauthorized personnel could "make changes in master production and control records."  GQC also found that laboratory equipment was "unable to record audit trails" and could not identify the users performing tests.  At the trial of the Merger Litigation, Akorn's head of quality acknowledged that these are "problem[s] that violate[] FDA guidelines."  Yet fifteen months later, in September 2017, GQC reported that corrective actions at Vernon Hills had "been halted and remain incomplete," and noted that Akorn's failure to remediate these deficiencies "presents undue risk to the site's ongoing operations."  Defendants Rai, Kutinsky, Lichter, and Silverberg deliberately chose to halt remedial action and risk the complete shutdown of the Vernon Hills facility.

52.     After the Merger was announced in April 2017, Defendants Rai, Kutinsky, Lichter, and Silverberg directed Akorn's internal quality and compliance auditors to replace regular internal audits scheduled for the end of 2017 with "verification" audits that would only assess Akorn's progress in addressing prior audit findings.  Akorn's head of quality testified that the shift to "verification" audits "meant we were just going to look at the previous audits and the corrective actions that were applied from those previous audits," and there would be no effort to determine whether any new problems had arisen.  Defendant Rai testified that regular complete audits were canceled "deliberately" and concocted a false narrative that Akorn switched to "verification" audits for the purpose of compiling and providing "a simple document to Fresenius to say this is where we stand" with internal audit findings.  In reality, no draft of any such document was ever created.

53.     After the Merger was announced in April 2017, Defendants Rai, Kutinsky, Lichter, and Silverberg directed Akorn's IT staff not to authorize or work on IT projects related to data integrity.  Documents introduced at the trial of the Merger Litigation established that "executive leadership," *i.e.*, Defendants Rai, Kutinsky, Lichter, and Silverberg, directed that "IT resources would not be engaged in the third party data integrity audit [Cerulean]," and "have discussed and aligned that data integrity changes are not actionable in 2017."  For example, Akorn's Executive Director of R&D and Quality Compliance Systems wrote in a December 2017 document that "[b]ased on a previous executive leadership directive, data integrity is not a 2017 approved project

for cross functional teams [such as IT]," and in February 2018 reminded a member of the IT staff to draft an email from "executive leadership ... to align all sites that we are not launching data integrity remediation initiatives at the sites at this time."

54.     Also in 2017 after the Merger was announced, Silverberg instructed the head of quality at Akorn's Swiss site not to open an investigation into a quality issue he reported, not to put Silverberg's response in any file relating to the matter, and not to put FDA-sensitive subjects in emails.

55.     Silverberg facilitated the preparation of a data integrity plan for Decatur in August 2017, but he made clear in his contemporaneous communications that it was just so Akorn would have a document to show the FDA. When Akorn's IT department opposed the plan, Silverberg reassured them that it was not meant to be implemented. In his jargon, it "serves to represent to outside authorities our cognizance of the subject, without committing IT to any near term work or responsibility."

**Silverberg Knowingly Submits False Data to the FDA**

56.     In 2012, Akorn began developing a topical ophthalmic form of azithromycin, a prescription antibiotic, at its Somerset facility, but could not perform particulate matter stability testing due to the viscosity of the liquid.

57.     In September 2012, an Akorn lab supervisor at Somerset named Jim Burkert entered fabricated stability testing data into the lab notebook of an Akorn chemist.

58.     In December 2012, Akorn submitted to the FDA an ANDA for azithromycin that included the phony data.

59.     In 2017, Akorn received from the FDA a "Complete Response Letter" requesting detailed information in connection with the azithromycin ANDA.

60.     In August 2017, during the process of preparing a response to the azithromycin Complete Response Letter, Misbah Sherwani ("Sherwani"), the head of quality at Somerset, told Silverberg that it was highly likely that there was false or fabricated data in the initial ANDA submitted to the FDA and, therefore, Akorn would have to withdraw the ANDA.

61.     Silverberg declined to withdraw the ANDA and instructed Sherwani to respond to the Complete Response Letter, not to ask for an extension of Akorn's time to respond, and not to open an investigation into the data issues.

62.     In an email to Silverberg, Sherwani disagreed with Silverberg and refused to sign a response to the Complete Response Letter.  Silverberg responded "No more emails," and signed the response to the Complete Response Letter himself.

63.     By signing the response to the Complete Response Letter, Silverberg validated the data to be attached to the response, which included both the fabricated test data submitted with the original ANDA in 2012 and additional fabricated data purporting to show that Akorn's product had passed tests conducted by an independent laboratory when in fact the product had failed those tests.  Sherwani told Silverberg both sets of data to be submitted with the response to the Complete Response Letter were phony, but Silverberg was undeterred and proceeded to submit the false data to the FDA.

64.     On December 18, 2017, Akorn's counsel commenced an investigation of the Company's data integrity issues.  Two days later, on December 20, 2017, Silverberg approached Sherwani in an attempt to coordinate their stories, discussing "how we can document this issue" and saying he "would never discuss it with legal."  Silverberg added that "if anything came of it, he might just, you know, take the paper and eat it if he had to."

65.     Sherwani immediately called Akorn's counsel, telling them she was "uncomfortable being in the same room with Mark right now" because he was telling her "to do things with respect to opening a [T]rackwise investigation" that she was "seriously concerned about."

66.     In the Opinion, Vice Chancellor Laster found that Silverberg's comments to Sherwani were an attempt at "coordinating stories, documenting the coordinated story in Trackwise, the software Akorn uses to track quality issues and investigations, then concealing the evidence of the coordination.  This is exactly how Sherwani understood it.  She said Silverberg told her that they should agree on a description of the investigation and then Silverberg would 'get rid of' what they had drafted."

67.     As Akorn acknowledged in the Merger Litigation, the Company's counsel "determined that Silverberg had failed to discharge his responsibilities appropriately" and "should not have allowed a [falsified] response to be submitted," and that Silverberg "had no satisfactory explanation for [doing so] while knowing that the underlying ANDA likely contained false data." In a memorandum memorializing a February 1, 2018 call with Akorn's General Counsel, Akorn's outside counsel wrote that "***there's a high likelihood . . . given the document trail that [the FDA will] conclude [Silverberg] did act with intent.***" (Emphasis added).

68.     According to documents filed in the Merger Litigation, Akorn submitted falsified data for at least five other Akorn products. Akorn has conceded in the Merger Litigation that a former employee at the Company's Somerset facility had "likely falsified a data point in another chemist's lab notebooks during the development process of azithromycin," that "the same employee may have also made entries in the lab notebooks of another chemist for five other drug products."

69.     The fraudulent notebook scheme was not an isolated incident. The Company also acknowledged that there have been "certain instances of trial injections[3] being conducted at Akorn's Vernon Hills, Somerset and Decatur facilities." Despite the FDA's standing objection to the practice of "trial injections," Akorn admits that it has "uncovered numerous test sequences labeled 'trial' on certain servers and equipment at Akorn's Vernon Hills, Somerset and Decatur facilities," and that among these test sequences, has conclusively identified instances of improper trial injections. In 2015, the FDA identified this problem and specifically told Akorn to "stop performing [High Performance Liquid Chromography] trial sample runs at the beginning of the injection sequence." Improper trial injections were utilized in FDA submissions over a five year period from 2012 through 2016, and affect at least sixteen different Akorn products and approximately twenty analysts.

---

[3] "Trial injections" are defined as the injection and testing of a substance as a "trial" run, *i.e.*, for a purpose other than officially testing a drug product to generate data in support of a drug product application submitted to the FDA or to justify the release of product manufactured for commercial distribution. Trial injections are strongly disfavored because they may be used to achieve a specific result or to overcome an unacceptable result (a practice referred to as "testing into compliance").

**Harm to Akorn and Unjust Enrichment of the Individual Defendants**

70.     As a direct and proximate result of Defendants Rai, Kutinsky, Lichter, and Silverberg's intentional infliction of harm on the Company, Akorn has suffered significant damages, including, but not limited to, costs and expenses incurred in connection with the Merger Litigation; liability to Fresenius for damages Akorn caused Fresenius to suffer; costs and expenses incurred in connection with various internal and external investigations of Akorn's data integrity and compliance deficiencies; and costs and expenses incurred and to be incurred in connection with remediation of Akorn's data integrity and compliance deficiencies.

71.     Defendants Rai, Kutinsky, Lichter, and Silverberg's misconduct also imperiled the approval of many of the Company's pipeline products, and more generally, Akorn's relationship with the FDA.

72.     The FDA inspected Akorn's Decatur facility in April and May 2018, and on May 16, 2018, issued a twenty-four page Form 483 for that facility which identified thirteen categories of deficiencies.  Two of the categories addressed the types of data integrity problems that Fresenius had cited: one identified a "[f]ailure to maintain complete data derived from all testing and to ensure compliance with established specifications and standards pertaining to data retention and management;" another identified a failure "to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications, whether or not the batch has already been distributed."  The former category included five specific deficiencies; the latter included ten specific deficiencies, including "[r]epeat observation[s] from 11/2004, 9/2006, 8/2007, 6/2009, 5/2013, 6/2016."  This was not the only instance of repeat observations that the Form 483 raised.  Another category of deficiencies identified "[r]epeat observations from 11/2004, 9/2006, 8/2007, 6/2009 & 2017."  Still another identified a "[r]epeat observation from 11/2004."

73.     In August 2018, the FDA again inspected the Decatur site and found that "the inspection classification of this facility is 'official action indicated' ("OAI")," and "in an unacceptable state of compliance with regards to [cGMP]."  Akorn's head of quality testified in the Merger Litigation that an OAI "means that FDA has some concerns with the conditions that

17

they found during their inspection.  And it typically means that you will not get product approvals during that time frame."

74.     On January 3, 2019, the FDA issued a warning letter to Akorn regarding the Decatur facility "summariz[ing] significant violations of [CGMP] regulations for finished pharmaceuticals."  The warning letter also noted that the Company's "quality systems are inadequate," and that the "FDA has concerns regarding the accuracy of intervention, sanitization, and other records produced at this facility.  Your quality system does not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs you manufacture."

75.     The FDA also inspected the Company's Somerset facility between July and August 2018, and on August 30, 2018, issued a twenty-two page Form 483 for the Somerset site that detailed serious regulatory deficiencies, many of which echoed the evidence presented at trial in the Merger Litigation.[4]  On June 13, 2019, the FDA issued a warning letter to Akorn regarding the Somerset facility which also "summarize[d] significant violations of [CGMP] regulations for finished pharmaceuticals."  The warning letter stated that Akorn's "quality systems are inadequate," and "do[] not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs you manufacture."

76.     The Somerset warning letter also admonished Akorn for its pattern of repeated failures across multiple sites.  Specifically, the warning letter stated:

> FDA cited similar CGMP violations at other facilities in your company's network. On January 4, 2019, Akorn, Inc. (FEI 1450114) was issued a Warning Letter, for among other violations, inadequate controls for manufacturing sterile drugs.
>
> These repeated failures at multiple sites demonstrate that management oversight and control over the manufacture of drugs are inadequate. Your executive management remains responsible for fully resolving all deficiencies and ensuring ongoing CGMP compliance. You should immediately and comprehensively assess your company's global manufacturing operations to ensure that

---

[4] By letter dated September 3, 2018, Akorn reported in the Merger Litigation that on August 22, 2018, during the later stages of the FDA's investigation, someone had erased the database at Somerset for a high accuracy liquid particle counter along with the local backup file and the associated electronic security logs.

systems, processes, and the products you manufacture conform to
FDA requirements. [5]

77.     While Defendants Rai, Kutinsky, Lichter, and Silverberg were intentionally inflicting harm on Akorn and intentionally violating criminal law, these individuals were able to profit handsomely through their receipt of millions of dollars in unwarranted compensation and remuneration from the Company.  For example, for fiscal year 2016, the Company awarded Defendant Rai an incentive bonus of approximately $1.2 million for, among other things, "ensur[ing] that all of the Company's operations maintained regulatory compliance[.]" Defendant Kutinsky received an incentive award of approximately $350,000 for "provid[ing] leadership across a broad range of functions to include Pharmaceutical Operations, Sales & Marketing, Regulatory Affairs and Information Technology," which included overseeing "130 responses to regulatory inquiries and 130 other governmental submissions handled by the Company during 2016 to support the review of the Company's product filings with the FDA."  Defendant Lichter received approximately $176,000 in an incentive award for "ensur[ing] that all manufacturing facilities maintained their regulatory compliance to operate."

78.     The incentive awards received by Defendants Rai, Kutinsky and Lichter are in addition to millions of dollars in other compensation and remuneration they have received while serving as faithless fiduciaries to the Company.

79.     Upon information and belief, Silverberg has received significant amounts of unwarranted compensation from Akorn.  For fiscal year 2013, the last year for which the Company reported Defendant Silverberg's compensation, he received approximately $280,000 in salary and approximately $155,000 in other remuneration.  Defendant Silverberg's salary at the time of his termination from the Company was $318,000.

80.     Defendant Silverberg continued to be compensated handsomely after his termination.  After belatedly determining that Defendant Silverberg should no longer head the Company's quality function, effective March 1, 2018, Akorn placed him in the new role of "Quality Advisor."  His new position paid $250,000 per year, a reduction from his prior salary of

---

[5] In addition, on February 28, 2019, the FDA issued a Form 483 for the Company's Amityville facility identifying four regulatory deficiencies.

$318,000.  The initial placement was for ninety days or until the Merger closed.  As of the trial in the Merger Litigation, Defendant Silverberg remained in this role.

## DERIVATIVE AND DEMAND ALLEGATIONS

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

83.     Plaintiff will adequately and fairly represent the interests of Akorn and its stockholders in enforcing and prosecuting its rights.

84.     Plaintiff is an owner of Akorn common stock and was an owner of Akorn stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

85.     On May 22, 2018, Plaintiff submitted to the Board a demand to take action against the Individual Defendants and others to remedy breaches of fiduciary duties and other violations of law committed in connection with the Company's FDA compliance issues discussed herein (the "May 2018 Demand").[6]

86.     As of the filing of this Petition, Plaintiff has received no response to the May 2018 Demand.

87.     Because more than ninety (90) days have passed since the submission of the May 2018, Plaintiff is entitled to proceed with the prosecution of the claims asserted herein.  *See* La. R.S. § 1-742.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duties

88.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

---

[6] A true and correct copy of the May 2018 Demand is attached hereto as Exhibit B and incorporated herein by reference.

89.    As alleged herein, the Individual Defendants owed the Company the fiduciary duties of loyalty and good faith to, among other things, act in furtherance of the best interests of the Company and its stockholders.

90.    As alleged herein, Defendants Rai, Kutinsky, Lichter, and Silverberg breached their fiduciary duties, intentionally inflicted harm on Akorn, and intentionally violated criminal law.

91.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

92.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

93.    While serving as faithless fiduciaries to the Company, the Individual Defendants received substantial compensation and remuneration from the Company that was based, at least in part, on the false premises that Akorn was in compliance with FDA regulations and that these individuals were properly exercising their fiduciary obligations to the Company. Moreover, Defendant Silverberg continued to receive substantial compensation in his role as a "Quality Advisor" following his demotion from the position of Executive Vice President, Global Quality. These defendants are thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

94.    To remedy these defendants' unjust enrichment, the Court should enter an order compelling them to disgorge to the Company the compensation and other remuneration they have received from Akorn.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.    Ordering the Individual Defendants to disgorge to the Company the compensation and other remuneration they received from Akorn;

D.   Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: July 10, 2019                      By: _____

TARCZA & ASSOCIATES, LLC
Robert E. Tarcza (LA Bar #12655)
330 Carondelet Street, Suite 300
New Orleans, LA 70130
Telephone: (504) 525-6696
Fax: (504) 525-6701

Of Counsel:

KESSLER TOPAZ MELTZER & CHECK, LLP
Eric L. Zagar (PA Bar # 76596)
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Fax:  (267) 948-2512

*Counsel for Plaintiff*

SERVICE INSTRUCTIONS:

*Please hold service.  Petition will be served by counsel for Plaintiff via electronic mail.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing pleading has been served upon all counsel of record via electronic mail this 16th day of July, 2019.

_____
Robert E. Tarcza