# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| IN RE AKORN, INC. DATA INTEGRITY SECURITIES LITIGATION | Civ. A. No. 1:18-cv-01713<br><br>Hon. Matthew F. Kennelly |

# SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 2

II. JURISDICTION AND VENUE ......................................................................... 8

III. PARTIES ........................................................................................................... 8

    A.  Plaintiffs ................................................................................................ 8

    B.  The Corporate Defendant........................................................................ 9

    C.  The Executive Defendants .................................................................... 10

    D.  The Board Defendants .......................................................................... 11

    E.  Relevant Non-Party Silverberg ........................................................... 12

IV. FACTUAL BACKGROUND .......................................................................... 13

    A.  The FDA's cGMP and Data Integrity Regulations.............................. 13

    B.  Akorn's Product Pipeline ..................................................................... 17

    C.  Akorn's History of Submitting False Data to the FDA ....................... 19

    D.  Akorn Identified Systemic Data Integrity Problems in 2016.............. 22

    E.  Akorn Begins to Explore a Sale in Early 2016 ................................... 25

    F.  Akorn Reassures the Market About its Data Integrity Compliance .... 26

    G.  Akorn Continues to Hide its Widespread Data Integrity Violations
        While Seeking a Sale ........................................................................... 29

    H.  Akorn's Experts Identify Critical Failures at Akorn's Decatur Site.... 31

    I.  Akorn and its Board Finalize a Sale Amid its Ongoing Data
        Integrity Crisis .................................................................................... 36

    J.  After Announcing the Transaction, Akorn Receives Another
        Damning Report Detailing the Company's Pervasive Data Integrity
        Violations ............................................................................................ 39

    K.  Akorn Issues a False and Misleading Proxy Statement ....................... 40

    L.  Akorn Conceals the Truth to Try to Close the Merger ........................ 41

    M.  The Truth About Akorn's Profound Failure to Comply with cGMP
        Begins to Be Revealed as Fresenius Announces That It is

Investigating Akorn's "Alleged Breaches of FDA Data Integrity Requirements"............................................................................................ 45

N.     Akorn Misleads the FDA About its Data Integrity Problems and Continues to Fail to Remediate Them ................................................. 46

O.     Akorn's Serious Data Integrity Violations Are Further Revealed as Fresenius Publicly Accuses Akorn of Such Violations and Terminates the Merger Agreement as a Result....................................... 48

P.     The Delaware Litigation ................................................................. 49

Q.     Additional Data Integrity Problems Are Identified ............................ 50

R.     The Delaware Litigation and FDA Further Reveal the Extent of Defendants' Fraud............................................................................ 56

V.     DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMMISSIONS OF MATERIAL FACT ................................................... 59

A.     Defendants' False and Misleading Statements During the Fourth Quarter of 2016 ........................................................................... 60

B.     Defendants' False and Misleading Statements During the First Quarter of 2017 ........................................................................... 64

C.     Defendants' False and Misleading Statements During the Second Quarter of 2017 ........................................................................... 70

D.     Defendants' False and Misleading Statements During the Third Quarter of 2017 ........................................................................... 74

E.     Defendants' False and Misleading Statements During the Fourth Quarter of 2017 ........................................................................... 76

F.     Defendants' False and Misleading Statements During the First Quarter of 2018 ........................................................................... 78

G.     Defendants' False and Misleading Statements During the Second Quarter of 2018 ........................................................................... 80

H.     Defendants' False and Misleading Statements During the Third Quarter of 2018 ........................................................................... 81

I.     Defendants' False and Misleading Statements Published on Akorn's Website Throughout the Class Period ................................... 81

VI.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 83

A.     Defendant Rai ........................................................................... 90

B.     Defendant Portwood ................................................................. 99

C.     Defendants Weinstein, Johnson and Tambi................................... 100

VII.   LOSS CAUSATION ...................................................................................... 102

VIII.  PRESUMPTION OF RELIANCE .................................................................. 104

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
       BESPEAKS CAUTION DOCTRINE ............................................................ 105

X.     CLASS ACTION ALLEGATIONS ............................................................... 106

XI.    COUNTS ........................................................................................................ 108

COUNT I For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
       Against All Defendants ................................................................................. 108

COUNT II For Violations Of Section 20(a) Of The Exchange Act Against The
       Executive Defendants And The Board Defendants ....................................... 110

XII.   PRAYER FOR RELIEF ................................................................................ 111

XIII.  JURY DEMAND ........................................................................................... 111

Court-appointed lead plaintiffs Gabelli & Co. Investment Advisors, Inc. and Gabelli Funds, LLC (collectively, "Plaintiffs") bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all other persons or entities who purchased or otherwise acquired the common stock of defendant Akorn, Inc. ("Akorn" or the "Company") during the period from November 3, 2016 through January 8, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class").

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based upon an ongoing independent investigation by Plaintiffs' undersigned counsel, which includes, among other things, review and analyses of: (i) Akorn's public documents, conference calls and other public statements; (ii) the Company's filings with the United States Securities and Exchange Commission ("SEC") and the United States Food and Drug Administration ("FDA"); (iii) wire and press releases published by and regarding the Company; (iv) analyst reports and other market information about the Company; and (v) the verified pleadings, trial transcript and exhibits, pre- and post-trial briefing, and the court's findings filed in *Akorn, Inc. v. Fresenius Kabi AG*, No. 2018-0300-JTL (Del. Ch.) (the "Delaware Litigation").

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by defendants or are exclusively within defendants' custody or control.

Plaintiffs believe that substantial additional evidence supporting the allegations set forth herein will be uncovered during discovery.

## I.    INTRODUCTION

1.      After the close of the market on February 26, 2018, Fresenius Kabi AG ("Fresenius"), a German health care giant (and member of the Global 500) that had entered into an April 24, 2017 Agreement and Plan of Merger (the "Merger Agreement") to acquire Akorn for $34.00 per share (the "Merger"), announced it was "conducting an independent investigation, using external experts, into alleged breaches of FDA data integrity requirements relating to product development at Akorn, Inc." The announcement further stated that "consummation of the [Merger] may be affected if the closing conditions under the merger agreement are not met."

2.      In response, Akorn issued a press release differently characterizing the inquiry into its data integrity as a "joint investigation," and claiming the investigation had not uncovered any facts that would affect the Company's operations or the closing of the Merger:

> Akorn and Fresenius Kabi AG, with the assistance of outside consultants, are investigating alleged breaches of FDA data integrity requirements relating to product development at the Company. To date, the Company's investigation has not found any facts that would result in a material impact on Akorn's operations and the Company does not believe this investigation should affect the closing of the [merger] with Fresenius.

3.      As described herein, for a pharmaceutical company such as Akorn, compliance with FDA data integrity requirements is a cornerstone of its business. Indeed, such compliance is required to gain FDA approval of new products in its pipeline, without which the business cannot survive. Accordingly, despite Akorn's denial, the market reacted immediately and decisively to Fresenius' announcement of potential data integrity problems at Akorn. On February 27, 2018, Akorn's common stock price dropped 38.4%, costing non-insider shareholders more than $1.07 billion in value. On February 28, 2018, Akorn's common stock price fell an additional 9.1%, costing non-insider shareholders another $157.6 million in value.

-2-

4. This case arises because Akorn and certain of its senior executives and board members knew or recklessly disregarded widespread institutional data integrity problems at Akorn's manufacturing and research and development facilities, while at the same time making or causing Akorn to make contrary misleading statements and omissions of material fact concerning the Company's data integrity at these facilities in order to attempt to market and sell Akorn.

5. As described herein, before and during the Class Period, Akorn's senior executives and certain board members received multiple internal audit reports and reports from third-party consultants cataloguing the Company's egregious data integrity failures and, remarkably, were even aware of instances where Akorn submitted falsified data to the FDA. For instance, Akorn's internal audit function Global Quality Control ("GQC") found in April 2016 that Akorn had "unmitigated compliance risks associated with Data Integrity." Defendant Rajat Rai, who was Akorn's Chief Executive Officer throughout the Class Period, likewise has conceded that by no later than November 2016 he and members of the Akorn Board of Directors ("Board") were "aware of significant and repeat problems that Akorn was having in its quality function."

6. These "significant and repeat problems" were not isolated. One of the principals at a third-party consultant hired to audit Akorn's compliance prior to the beginning of the Class Period testified in the Delaware Litigation (which, as described below, was litigated in the Delaware Court of Chancery and Delaware Supreme Court between Akorn and Fresenius concerning the Merger Agreement) that Akorn was among the top "two [or] three" worst drug companies among more than 120 he had audited in his career, and that he would not expect to see such egregious data integrity violations "at a company that made Styrofoam cups," let alone sterile pharmaceutical products. Reports issued by this consultant detailing the profound and pervasive

data integrity violations it observed were distributed to Akorn's most senior executives, including

CEO Rajat Rai and the former Head of Quality at Akorn, Mark Silverberg.

7.     Moreover, on January 12, 2017, Akorn's senior executives, including senior

executives Rai, Silverberg and CFO Duane Portwood (the "Executive Defendants"), received the

results of a 2016 employee survey, which included quotes from an employee based in Akorn's

Lake Forest headquarters stating that Silverberg "provided misleading information to regulatory

bodies including the US FDA."  The Lake Forest employee also wrote that Akorn's Head of

Quality "counselled his staff to not speak to Global Quality Compliance staff and . . . not [to]

share information with GQC."

8.     Nevertheless, no later than the beginning of the Class Period on November 3, 2016

– and including in the May 2017 proxy materials for the Merger – Akorn, the Executive Defendants

and certain board members repeatedly caused the Company to issue false and misleading

statements or omissions of material fact, including statements and omissions:

(1)     Falsely representing that Akorn substantially complied with applicable FDA
regulations governing the testing and manufacturing of its drugs, when in
fact senior executives and certain board members knew of or recklessly
disregarded Akorn's systemic data integrity failures; and

(2)     Misleadingly touting Akorn's putatively lucrative drug product pipeline,
while failing to disclose that the Company's pervasive and egregious data
integrity failures, which included the submission of fraudulent data to the
FDA, posed a serious risk to the Company's ability to seek approval for,
and ultimately market, those pipeline drugs.

9.     For example, on a November 3, 2016 earnings call with investors, Rai falsely

assuaged market concern about Akorn's compliance with FDA regulations, repeatedly assuring

investors that Akorn's key facility in Decatur was "ready for [an FDA] reinspection" and that "no

remediation" of regulatory deficiencies was required.  In truth, as Rai admitted under oath, both

he and members of the Board were "aware of significant and repeat problems that Akorn was having in its quality function."

10.     Likewise, on December 12, 2016, Akorn filed a Form 8-K with the SEC – signed by Defendant Portwood – concerning the results of the FDA's inspection of the Company's manufacturing facility in Decatur, Illinois.  Akorn touted the fact that the FDA inspectors did not report any objectionable conditions with the respect to the manufacturing or storage of the Company's drugs.  However, Defendants knew that Akorn's third-party consultant had issued a report to Defendants *just days earlier* revealing that Decatur's data integrity controls were "insufficient to support compliance with current data integrity expectations" – citing seven "critical" and seven "major" data integrity deficiencies – and, "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk."

11.     Similarly, during a March 1, 2017 earnings call, Defendant Rai touted the FDA's recent approval of an Abbreviated New Drug Application (known in industry parlance as an "ANDA") from the Decatur facility as demonstrating the Company's ability to obtain approval for its pipeline drugs:  "we have received . . . our first ANDA approval from the Decatur facility since the reinspection.  This implies that we should now expect to receive approvals for other filings . . . from our Decatur facility that was delayed due to the compliance status."  However, Defendants knew that, notwithstanding the FDA investigators' failure to observe non-compliant conditions, the Decatur facility was rife with violations, Akorn had submitted false and manipulated data to the FDA, and that the Company's consultant had reported seven "critical" and seven "major" data integrity deficiencies at Decatur alone.

12.     Notably, on May 22, 2017 Akorn filed its Proxy Statement on Schedule 14A in connection with the shareholder vote on the proposed Merger (the "Vote").  This Proxy Statement

– which caused investors to acquire common stock of the Company and shareholders to vote to approve the Merger – itself contained and incorporated by reference Akorn documents that contained misleading statements and omissions of material facts, including statements in the Merger Agreement. In these statements, for example, Defendants assured investors that Akorn was materially compliant with FDA regulations, particularly data integrity requirements, and that Akorn's FDA filings contained no material misstatements or omissions. These representations were utterly false.

13.     Defendants' misleading statements and omissions of material facts concealing Akorn's abysmal data integrity practices had the intended effect. Defendants were able to market the Company and ultimately enter the Merger Agreement at a price per share which would have, had Fresenius not later uncovered Akorn's data integrity problems, netted the Executive Defendants and Board Defendants more than $1 billion in Merger proceeds.

14.     Unfortunately, as set forth in extensive factual detail herein, and as characterized in Fresenius' Answer, Defenses, and Verified Counterclaim in the Delaware Litigation, Fresenius' investigation uncovered "blatant fraud at the very top level of Akorn's executive team, stunning evidence of blatant and pervasive data integrity violations, outrageous attempts by and on behalf of Akorn to cover up those violations and misrepresentations made both to Fresenius and the FDA." Indeed, Fresenius' investigation revealed that "Akorn has repeatedly *failed to comply with even the most basic data integrity requirements*."[1]

15.     Consequently, on Sunday, April 22, 2018, Fresenius announced it was terminating the Merger based on, among other factors, "material breaches of FDA data integrity requirements

---

[1] Unless otherwise noted, emphasis in quoted materials herein is added.

relating to Akorn's operations found during Fresenius' independent investigation."  Fresenius stated that it "offered to delay its decision in order to allow Akorn additional opportunity to complete its own investigation and present any information it wished Fresenius to consider, but Akorn [ ] declined that offer."

16.     The next trading day, April 23, 2018, Akorn's common stock price dropped an additional 33.7%, costing non-insider shareholders another $613.1 million in value.

17.     On October 1, 2018, the Delaware Court of Chancery ruled in favor of Fresenius. In the court's 246-page Memorandum and Opinion, which explicitly cited hundreds of non-public trial exhibits and referred to hundreds more which were admitted into evidence as well as fifty-four deposition transcripts lodged with the Court, the Court of Chancery concluded, among other things, that "Akorn has gone from representing itself as an FDA-compliant company with accurate and reliable submissions from compliant testing practices to a company in persistent, serious violation of FDA requirements with a disastrous culture of noncompliance."

18.     The revelations in the court's finding of facts caused Akorn's stock price to fall 58.7%, from $12.98 per share at close on September 28, 2018 to $5.36 per share at close on October 1, 2018.

19.     On January 9, 2019, Akorn disclosed that it received a warning letter, dated January 4, from the FDA related to an inspection of Akorn's Decatur, Illinois manufacturing facility in April and May of 2018.  Among other things, the warning letter stated that Akorn's "methods, facilities, or controls for manufacturing, process, packing, or holding do not conform to CMGP" regulations.

20.     The revelation of the warning letter caused Akorn's stock price to fall 11.6%, from $3.94 per share at close on January 8, 2019 to $3.48 per share at close on January 9, 2019.

21.     Significantly, Plaintiffs do not bring this class action on behalf of investors solely because of the failure of the Merger. Although the Merger and Fresenius' investigation were the catalysts to revealing Defendants' fraudulent conduct, before the Merger was even announced Defendants concealed the underlying data integrity violations that remain a factor in Akorn's depressed stock price even compared to the price pre-Merger announcement. Indeed, on April 18, 2019, Akorn's stock price closed at $2.77 per share, 90% below its $25.22 per share closing price on April 6, 2017, the day *before* Bloomberg reported that Fresenius was "in talks" to buy Akorn.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Defendant Akorn conducts business and is headquartered in this District and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts and statements that omitted material facts necessary to make the statements not misleading occurred in this district.

24.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.     Plaintiffs

25.     Plaintiff Gabelli & Co. Investment Advisors, Inc. ("GCIA") is an investment management company located in Rye, New York. GCIA offers portfolio management, financial

planning and investment advisory services to clients worldwide. For purposes of Claims I and II, as set forth in the attached certification, GCIA purchased Akorn common stock during the Class Period and was damaged thereby.

26. Plaintiff Gabelli Funds, LLC ("GFLLC") is an investment manager located in Rye, New York. GFLLC provides services to investment companies and pooled investment vehicles, and manages equity, fixed income, and balanced mutual funds. For purposes of Claims I and II, as set forth in the attached certification, GFLLC purchased Akorn common stock during the Class Period and was damaged thereby.

27. GCIA and GFLLC are Plaintiffs for both Claims I and II under Sections 10(b) and 20(a) of the Exchange Act on behalf of common stock purchasers .

**B.    The Corporate Defendant**

28. Defendant Akorn, Inc. is a Louisiana corporation with its headquarters located in Lake Forest, Illinois. Akorn is a pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals as well as animal and consumer health products. Akorn claims to specialize in difficult-to-manufacture sterile and non-sterile dosage forms including: ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.

29. Akorn operates manufacturing facilities in Decatur, IL; Somerset, NJ; Amityville, NY; Hettlingen, Switzerland and has recently opened a manufacturing facility in Paonta Sahib, India. The Company also has research and development facilities in Vernon Hills, IL; Cranbury, NJ and Copiague, NY.

30. Akorn securities trade on the NASDAQ under the ticker symbol "AKRX." As of

September 28, 2018, there were over 125 million shares of Akorn common stock outstanding.

31.     Akorn is named in Count I for violations of Section 10(b) of the Exchange Act.

**C.      The Executive Defendants**

32.     Defendant Rajat Rai ("Rai") was Akorn's Chief Executive Officer ("CEO"), a position he held from May 2010 through December 2018.  During the Class Period, Defendant Rai signed filings Akorn made with the SEC that included untrue statements of material fact and/or omitted material facts necessary to make statements in the filings not misleading, as well as certifications attesting to the accuracy of the filings.  Defendant Rai also made untrue statements of material fact and/or omitted material facts necessary to make statements not misleading during Akorn earnings calls and investor presentations.  Defendant Rai was, at all relevant times, a control person of Akorn.  Rai also signed the false and misleading Proxy Statement and Proxy Supplement described herein that is the basis for the Proxy Claims.

33.     Defendant Duane A. Portwood ("Portwood") is Akorn's Chief Financial Officer ("CFO"), a position he has held since October 2015.  During the Class Period, Defendant Portwood signed filings Akorn made with the SEC that included untrue statements of material fact and/or omitted material facts necessary to make statements in the filings not misleading, as well as certifications attesting to the accuracy of the filings.  Defendant Portwood also made untrue statements of material fact and/or omitted material facts necessary to make statements not misleading during Akorn earnings calls and investor presentations.  Defendant Portwood was, at all relevant times, a control person of Akorn.

34.     Defendants Rai and Portwood, are sometimes referred to herein as the "Executive Defendants."

35.     The Executive Defendants are named in Count I for violations of Section 10(b) of the Exchange Act and in Count II for violations of Section 20(a) of the Exchange Act.

### D.    The Board Defendants

36.    Defendant Alan Weinstein ("Weinstein") has been a member of Akorn's Board since 2009, currently serves as Chairman of the Board, and signed Akorn's annual reports on SEC Form 10-K that were filed or incorporated by reference in Akorn's other filings during the Class Period, which contained misleading statements or omissions of material fact.  Defendant Weinstein was at all relevant times a member of Akorn's Board of Directors Quality Oversight Committee (the "Quality Oversight Committee") and, as set forth herein, in that capacity and in his capacity as a Board member received reports and other information concerning Akorn's data integrity failures.  Defendant Weinstein was also a member of the Board at the time the Proxy Statement and Supplement were issued and at the time of the Vote.   As a member of the Board, Weinstein issued the Proxy Statement and Proxy Supplement.  Indeed, the Proxy Statement and Proxy Supplement stated that they were issued "By Order of the Board of Directors" of Akorn and "as part of the solicitation of proxies by the Company's board of directors."

37.    Defendant Ronald M. Johnson ("Johnson") has been a member of the Board since 2003, and signed Akorn's annual reports on SEC Form 10-K that were filed or incorporated by reference in Akorn's other filings during the Class Period, which contained misleading statements or omissions of material fact.  Defendant Johnson was at all relevant times a member of the Quality Oversight Committee and, as set forth herein, in that capacity and in his capacity as a Board member received reports and other information concerning Akorn's data integrity failures.  Defendant Johnson was also a member of the Board at the time the Proxy Statement and Supplement were issued and at the time of the Vote.   As a member of the Board, Johnson issued the Proxy Statement and Proxy Supplement.  Indeed, the Proxy Statement and Proxy Supplement stated that they were issued "By Order of the Board of Directors" of Akorn and "as part of the solicitation of proxies by the Company's board of directors."

38.     Defendant Brian Tambi ("Tambi") has been a member of the Board since 2009, and signed Akorn's annual reports on SEC Form 10-K that were filed or incorporated by reference in Akorn's other filings during the Class Period, which contained misleading statements or omissions of material fact. Defendant Johnson was at all relevant times a member of the Quality Oversight Committee and, as set forth herein, in that capacity and in his capacity as a Board member received reports and other information concerning Akorn's data integrity failures. Defendant Johnson was also a member of the Board at the time the Proxy Statement and Supplement were issued and at the time of the Vote. As a member of the Board, Johnson issued the Proxy Statement and Proxy Supplement. Indeed, the Proxy Statement and Proxy Supplement stated that they were issued "By Order of the Board of Directors" of Akorn and "as part of the solicitation of proxies by the Company's board of directors."

39.     Defendants Weinstein, Johnson, and Tambi are referred to herein as the "Board Defendants" and are named in Count I for violations of Section 10(b) of the Exchange Act and Count II for violations of Section 20(a) of the Exchange Act.

40.     Akorn, the Executive Defendants, and the Board Defendants are collectively referred to herein as the "Defendants."

**E.     Relevant Non-Party Silverberg**

41.     Mark M. Silverberg ("Silverberg") joined Akorn in April 2005 and – from May 2006 until his demotion on March 1, 2018 – served as the Company's Executive Vice President of Global Quality Assurance. In this role, Mr. Silverberg was the most senior quality official at Akorn, reported directly to Mr. Rai and oversaw more than 500 employees at the Company. Silverberg was a control person of Akorn while he served as its most senior quality official at Akorn. Silverberg is not named as a defendant in this Second Consolidated Amended Class Action Complaint.

## IV.    FACTUAL BACKGROUND

### A.    The FDA's cGMP and Data Integrity Regulations

42.    Akorn represents itself to be a niche pharmaceutical company that develops, manufactures and markets generic prescription pharmaceuticals, purportedly specializing in difficult-to-manufacture and high-margin sterile and non-sterile dosage forms.

43.    As a generic pharmaceutical company, Akorn is closely regulated by the Food and Drug Administration.  Akorn must submit an application to the FDA for approval of its drugs, called an Abbreviated New Drug Application, which, among other things, adequately demonstrates its generic drug is equivalent to the original "branded" drug (known as the "reference listed drug"). This testing is critical, as Akorn must prove to the FDA that it can manufacture a safe and effective product.  Many of Akorn's drugs are used to treat serious medical conditions, and patient health would be jeopardized if Akorn's products are not safe and effective for their intended use.  Indeed, many of Akorn's drugs are injectables that the FDA considers to be especially high-risk.

44.    Akorn must file its testing data with the FDA in an ANDA when seeking approval for a new product, and that filing must be supported by laboratory notebooks and electronic records.  Companies have an affirmative duty to ensure data submitted to the FDA is accurate.  The FDA's ANDA form specifically requires a "responsible official" to certify that the "data and information in this submission have been reviewed and, to the best of my knowledge, are certified to be true and accurate."  The ANDA form warns that false statements in an ANDA can lead to felony criminal liability.  Compliance with specific quality-control requirements concerning the development and manufacturing of drug products, called current Good Manufacturing Practices ("cGMP"), which include data integrity requirements, is necessary for a pharmaceutical company to receive approvals for its new products.

-13-

45.     Likewise, cGMP requires drug companies to routinely test and monitor the quality of manufactured products and the integrity of the manufacturing process, even after a drug has been approved.  If a company fails to comply with cGMP, the FDA may prevent it from manufacturing approved products until any deficiencies are remediated.

46.     The FDA must necessarily rely on data generated and provided by Akorn and other pharmaceutical companies in making important public health decisions about both proposed new drugs and drugs currently on the market.  As a result, the FDA mandates that Akorn and other companies follow cGMP.  The cGMP regulations set forth "the minimum current good manufacturing practice for methods to be used in . . . the manufacture, processing, packing, or holding of a drug."  21 C.F.R. § 210.1(a).  These requirements are codified, in part, at 21 C.F.R. Pt. 11, 21 C.F.R. Pt. 211, and in additional FDA guidance, including its April 2016 "Data Integrity and Compliance with cGMP" draft guidance.

47.     "Data integrity" requirements are a key element of the FDA's cGMP regulations. The FDA's data integrity requirements are designed to ensure that the testing data is complete, consistent, accurate and free from fraudulent or improper manipulation.  These data integrity requirements include, for example, implementing procedures to retain testing data in a methodical and retrievable manner; ensuring that data cannot be modified, deleted or lost (including by restricting users' access to computer systems so that they cannot modify or delete data); and recording and periodically reviewing logs of individual users' actions on computer systems ("audit trails").

48.     FDA guidance uses the acronym "ALCOA" to summarize proper data integrity practices.  In accordance with the acronym, companies must ensure data is:

-14-

o      **A**ttributable – Attributable data is data clearly linked to a specific subject, and to the individuals who recorded, analyzed, or otherwise modified the data;

o      **L**egible – Legible data is that which is readable by humans throughout the period of its retention;

o      **C**ontemporaneous – Contemporaneous data is data that is recorded at the time it is generated or observed;

o      **O**riginal – Original data refers to the original observation, or certified or true copy of that observation; and

o      **A**ccurate – Accurate data is data that is correct.

49.      More recently, the FDA has expanded the acronym to "ALCOA Plus", which adds the additional requirements that data be complete (meaning all data is available), consistent (the data is recorded chronologically), enduring (the data is accessible for an extended period of time) and available (the data is available through the lifetime of the product).

50.      The FDA insists on rigorous data integrity requirements because data integrity is essential to ensure that testing data is neither lost nor manipulated, and, as a result, data integrity is required to ensure product safety and efficacy.  The FDA has emphasized that "ensuring data integrity is an important component of [the pharmaceutical industry's] responsibility to ensure the safety, efficacy, and quality of drugs, and FDA's ability to protect the public health." (FDA, Draft Guidance for Industry, Data Integrity and Compliance with CGMP (2016), at 1).  If companies violate data integrity requirements, there can be no assurance that their testing data is complete, consistent, accurate and free from fraudulent or improper manipulation.

51.      The FDA has emphasized that companies that violate data integrity requirements face severe sanctions.  Indeed, in draft guidance issued before the start of the Class Period, the FDA noted that "data integrity-related CGMP violations have led to numerous regulatory actions, including warning letters, import alerts, and consent decrees."  In particular, the FDA has noted

that it "rel[ies] on firms to do the right thing when [the] FDA is not present," and data integrity problems "break trust" between an agency and a regulated entity.[2]

52.     In the Delaware Litigation, former FDA Director David Chesney testified that a firm's "corporate culture" is a "hot topic" in regulatory compliance circles and that the FDA "attaches a great deal of significance" to a firm's quality culture, especially the leadership of a firm's senior management.  Chesney testified that when senior executives are involved in data integrity violations, it can "infect the entire organization" and lead to stiffer sanctions from the FDA.

53.     The FDA regularly inspects companies' manufacturing and R&D sites to ensure compliance with cGMP and other regulatory requirements.  The FDA investigator will issue a Form 483 to a company at the conclusion of an inspection when the investigator has observed conditions that may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related acts or regulations.  Companies must provide the FDA with written responses to Form 483 observations within 15 working days setting forth proposed corrective actions.  If the FDA determines that the Form 483 response is inadequate, the agency may issue a formal Warning Letter noting possible enforcement actions.

54.     When the FDA concludes an inspection, it reports one of three things:  Official Action Indicated (OAI), Voluntary Action Indicated (VAI), or No Action Indicated (NAI).  The most serious of these findings is OAI status, which, as Akorn's Kim Wasserkrug (VP of Quality Operations) testified in the Delaware Litigation, "means FDA has some concerns with the

---

[2] Capt. Sharon K. Pederson (Thoma), PharmD, National Expert of Pharmaceutical Inspections, FDA, Medical Products and Tobacco Program Operations Branch, Data Integrity Issues & Concerns (Feb. 6, 2017).

conditions that they found during inspection. And it typically means that you will not get product approvals during that time frame."

55.     If the FDA uncovers pervasive or egregious data integrity violations, it may impose even more serious sanctions. In particular, FDA regulations provide that where the agency uncovers "a pattern or practice of wrongful conduct that raises a significant question about the reliability of data," the agency may invoke its "Application Integrity Policy" ("AIP"), which requires a third-party monitor to oversee all activity at the violator's sites and facilities. Regaining the FDA's trust and remediating data integrity violations is invariably a difficult, time-consuming and expensive process. Thus, a failure to adhere to the FDA's data integrity requirement can have serious, potentially crippling, effects on a company's ability to get its drugs approved and marketed.

**B.     Akorn's Product Pipeline**

56.     Akorn has consistently emphasized to the market and potential acquirers the importance to its business of the pipeline of new products it is developing and for which it is seeking manufacturing and marketing approval from the FDA through ANDAs. Receiving timely approvals from the FDA is necessary for Akorn to convert its pipeline into marketed products that generate revenues and earnings.

57.     Defendant Rai has spoken repeatedly about the importance of pipeline products to Akorn's business. For example, during an earnings call in August 2016, Rai explained: "New product approvals and launches are going – and the execution of that is going to be very critical going forward, and that's where our focus is." In Akorn's November 2016 earnings call, Rai reiterated that "product pipeline opportunities [] can potentially offset the expected converted market dynamics for our marketed products."

58.     Akorn's presentations to investors have also regularly emphasized its product pipeline.  For example, in Akorn's June 9, 2016 presentation at the Jefferies Healthcare Conference, Akorn touted its "large pipeline of pending ANDAs and planned launches" and advertised its "commitment to growth through research & development."  The Company repeated these exact statements at its presentation at the William Blair 36th Annual Growth Stock Conference and at its January 2017 presentation at the J.P. Morgan 35th Annual Healthcare Conference.  At the J.P. Morgan Conference, Akorn also explained that it had 92 filings pending with the FDA with a potential market value of $9.5 billion.

59.     Market analysts have similarly concluded that the viability of Akorn's product pipeline is essential to the Company's value.  For example, an August 2016 Jefferies research report observed that "monetizing the pipeline is absolutely critical for AKRX to be able to show meaningful revenue growth in 2017."  In January 2017, Jefferies reiterated that, given the declining sales of Akorn's existing products, "[n]ew product flow is now even more critical to AKRX's 2017 outlook and share price."

60.     On an earnings call in March 2017, less than a month before the Merger Agreement was signed, Rai again predicted that sales for some of Akorn's top existing products would decrease, and as a result "we will try to sort of reverse course in terms of the declines in revenues.  And that is all, in my opinion, going to come from these launches of new products.  So I think you will see a bit of an impact of the new product approvals and launches going into 2018."

61.     Akorn's product pipeline is directly contingent on receiving timely marketing approvals from the FDA (and, by extension, compliance with the FDA regulations and guidelines).  The first generic drug manufacturer to market is typically awarded 180 days of statutory marketing exclusivity for a product before other competitors can begin distributing their version of the

product.  This 180-day exclusivity period allows the manufacturer to sell the drug at increased margins and to establish market share.  At some point, after a number of generic manufacturers are already present, the market is no longer viable for new entrants.

62.     Unbeknownst to investors, Akorn was rife with data integrity failures that qualified for serious penalties under FDA regulations, and, therefore, profoundly imperiled the Company's financial well-being.  As discussed in greater detail below, by no later than November 2016, Akorn's senior management became aware of – and in some instances were directly involved in – systemic and egregious data integrity failures throughout Akorn's manufacturing and R&D sites. These widespread data integrity problems, including knowingly submitting fraudulent data to the FDA and Company-wide noncompliance with numerous FDA regulations, directly put Akorn's new product pipeline at risk.

### C.     Akorn's History of Submitting False Data to the FDA

63.     Even before the start of the Class Period, Defendants knew that Akorn was rife with numerous severe, repeat, and pervasive data integrity violations.  For example, Akorn discovered by mid-2016 that on several occasions since 2012 the Company had submitted false data to the FDA.

64.     In December 2012, Akorn submitted fraudulent test results to the FDA in an ANDA for an antibiotic named azithromycin.  The lab supervisor at Akorn's Somerset facility, Jim Burkert, forged the purported results for azithromycin tests in the lab notebook of a colleague. Indeed, Akorn's Somerset facility did not even have the technology necessary to conduct the purported tests.  This fabricated test data was submitted to the FDA in an ANDA on December 21, 2012.

65.     Also in 2012, Akorn submitted manipulated testing data in connection with its ANDA for an eye medication, olopatadine.  The FDA's data integrity regulations require drug

-19-

companies to record all results of drug testing, whatever the outcome, and to investigate any failing results. The FDA specifically prohibits "testing into compliance" – the practice of successively testing a drug until a passing result is achieved and reporting only that passing result, while disregarding the failing results. Akorn engaged in the proscribed practice of "testing into compliance" during the testing for olopatadine at Akorn's Cranbury facility, running successive "stability tests" – tests that measure the drug's integrity under various temporal and environmental conditions – until it achieved positive results. Akorn then submitted those positive results, but did not disclose the corresponding out-of-specification results, in its ANDA.

66.     As explained in Fresenius' pre-trial brief (quoting non-public joint trial exhibits), at Akorn's Vernon Hills facility in 2013 an employee made a "deliberate change" in a testing procedure "to force a passing result" for data related to another eye drop product, cyclopentolate. In this regard, Akorn's Kim Wasserkrug testified in the Delaware Litigation that the employee improperly "manipulat[ed] the integration to get a passing result." This is a third instance, at a third separate Akorn facility, of Akorn fabricating data that was submitted to the FDA. This pattern of data *fraud* involving multiple sites and multiple employees underscores the pervasiveness and repetitiveness of Akorn's profound data integrity failures.

67.     In January 2015, Akorn received from the FDA a Complete Response Letter ("CRL") – a communication identifying issues that must be addressed before the FDA can approve an application – concerning its azithromycin ANDA. Among other things, the FDA's CRL asked Akorn to provide additional azithromycin test data to facilitate approval of the ANDA.

68.     While drafting its response to the CRL, Akorn senior executives learned that the Company had submitted fraudulent data to the FDA in 2012. As Akorn attorney and partner at Cravath Swaine & Moore LLP ("Cravath") David Stuart testified in the Delaware Litigation, in

July 2016, Silverberg (who reported directly to Akorn CEO Defendant Rai) went to the Company's Somerset site in connection with preparing Akorn's response to the CRL, and spoke with the chemist whose notebook contained the fraudulent azithromycin data. The chemist identified numerous entries in her notebook that were not made by her in connection with both azithromycin and six other products. Indeed, as noted above, the forged azithromycin entries reported positive results for a test that not only was not performed, but **could not have been performed** at the Somerset site because the site lacked the required equipment to run it. The chemist also reported that two of her lab notebooks were missing.

69. Despite learning of the falsified data in July 2016, Mr. Silverberg, who was Akorn's most senior quality official for over 10 years and oversaw more than 500 employees at the Company, failed to report these clear violations of data integrity requirements to the FDA or to direct the withdrawal of any of the fraudulent ANDAs. As discussed further below, rather than report the fraudulent submission or withdraw the fraudulent ANDA, Silverberg instructed employees at the Somerset facility **not** to open an investigation, knowing such an investigation would jeopardize the closing of the Merger. At her deposition in the Delaware Litigation, Akorn's Head of Quality at Somerset, Misbah Sherwani, testified, "[W]hen I had pushed for an investigation on this issue, [Silverberg] had told me no."

70. Instead, in August of 2017, Akorn responded to the FDA's CRL purporting to provide the additional data requested by the FDA. Akorn's response resubmitted the fabricated 2012 test results, and also included **new, additional** fabricated test results. In advance of submitting the response, both the Somerset General Manager, Michael Stehn, and Sherwani, repeatedly urged Silverberg to withdraw the ANDA because it contained fabricated data, and pointedly warned him that the CRL response also contained additional fabricated data – to no avail.

-21-

Indeed, in an August 28, 2017 email, Sherwani asked Silverberg, "[a]re you allowing Regulatory Affairs to continue to submit inaccurate information?"

71.     Nevertheless, in August 2017, while Sherwani was on vacation, Silverberg personally signed off on the azithromycin CRL response, which he knew contained multiple sets of fabricated data.  As Akorn conceded in its post-trial brief in the Delaware Litigation, its counsel, Cravath, "determined that Silverberg had failed to discharge his responsibilities appropriately" and "should not have allowed a CRL response to be submitted," as well as that Silverberg "had no satisfactory explanation for allowing a CRL response to be submitted while knowing that the underlying ANDA likely contained false data."  Indeed, Cravath wrote a memo memorializing a February 1, 2018 call with Akorn's General Counsel Joe Bonaccorsi in which they stated that "there's a high likelihood . . . given the document trail that [FDA will] conclude [Silverberg] did act with intent."

### D.     Akorn Identified Systemic Data Integrity Problems in 2016

72.     In addition to Akorn's multiple fraudulent submissions to the FDA, by no later than the start of the Class Period, Defendants were also aware of numerous other egregious and pervasive data integrity violations.  During 2016, Akorn's internal audit function, Global Quality Compliance ("GQC"), identified serious and widespread data integrity problems throughout the Company.  All of GQC's audit reports detailing these widespread integrity problems were distributed broadly to senior management, including Silverberg and Defendant Rai.  Moreover, the Company's quality and compliance departments, including GQC, were overseen by a committee of Akorn's Board, called the Quality Oversight Committee.  Members of the Committee included Defendant Rai; Silverberg; Akorn's COO; Board Defendants Weinstein, Johnson and Tambi; and other top Akorn executives.

73. In April 2016, GQC's audit of Akorn's Lake Forest site found Akorn staff members had unauthorized "system access allowances" that allowed them to modify and manipulate data as well as to delete audit trails. Moreover, among other things, GQC found that audit trails at Lake Forest were not being reviewed for even basic data issues. As a result, GQC concluded that the Lake Forest site had "*unmitigated compliance risks associated with Data Integrity*."

74. In June 2016, GQC's audit of Akorn's Vernon Hills research and development facility identified a critical data integrity issue involving Akorn's failure to implement proper controls for its computer systems. Specifically, Akorn had failed "to assure that only authorized personnel make changes in master product and control records." Likewise, the site was "unable to record audit trails" and could not identify the users performing certain tests. Current Akorn VP of Quality Operations Kim Wasserkrug testified in the Delaware Litigation that these are "*problem[s] that violate[] FDA guidelines*." Notably, Akorn has *still* failed to address these critical issues. A September 2017 GQC audit found *the same violations*, reporting that the corrective actions had "been halted and remain incomplete" and that the failure to remediate the violations "*presents undue risk to the site's ongoing operations*." Moreover, in the Delaware Litigation, Wasserkrug testified that Vernon Hills still lacks *any* data integrity compliance plan.

75. GQC also found numerous problems in an October 2016 audit of the Company's Amityville, NY manufacturing site. In GQC's final report, dated December 28, 2016, GQC observed that Akorn did not comply with 21 CFR 211.68(b), which states that "appropriate controls shall be exercised over computer or related systems to assure those changes in master production and control records or other records are instituted only by authorized personnel." GQC found that in connection with certainty viscosity tools, multiple users had administrator access, data files had been overwritten, two unsaved tests were executed and several notebook entries were missing.

Moreover, there was no instrument use log to record testing activity and no data backups had been performed on certain instruments. GQC marked this observation as "critical," and also reported four additional "major" violations.

76.    Notably, the equipment issues identified by GQC were directly related to issues the FDA identified during an inspection in July 2015, more than a year prior to the GQC audit. Thus, in its 2016 audit at the start of the Class Period, GQC found that, over 14 months after the FDA's inspection, Akorn had *still* failed to remediate these critical data integrity problems.

77.    As discussed above, Akorn's Board of Directors was intimately aware of GQC's internal audit findings. For example, in June 2016 Board Defendant Ron Johnson (who was a member of the Quality Oversight Committee) wrote to Mark Silverberg that he continues "to be concerned that our position always seems to be that the FDA got it wrong and we are just fine. I do not think we are fine. I think there are signals that we are missing. As the leader of the quality function, I do not understand how you can tolerate the *continued non-compliance by employees, supervisors and quality assurance staff*. We have dogged [sic] a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures. Why do we not see an effort to do this?"

78.    Defendant Rai himself has admitted that from the very start of the Class Period, knowledge of Akorn's severe and pervasive data integrity violations was widespread at the highest levels of the Company. Rai testified in the Delaware Litigation that by November of 2016, the start of the Class Period, he and the other Quality Oversight Committee members were "*aware of significant and repeat problems that Akorn was having in its quality function*."

79.    Indeed, just weeks before the start of the Class Period, senior management made its reckless disregard for data integrity abundantly clear. In October 2016, third-party consultant

Cerulean, which had been hired to audit cGMP compliance at Akorn's sites, conducted a data integrity training specifically organized for senior management. However, not a single member of senior management – including Rai – bothered to attend. At the same time, Akorn fraudulently recorded an implausibly large number of trainings at sites in an effort to create the appearance of compliance with the FDA's cGMP training requirements. Cerulean noted that the "Akorn Decatur site alone averages 7,000 trainings a month. Assuming each individual works 7 days a week, with no vacations or sick leave, that's *232 trainings a day*."

  **E.  Akorn Begins to Explore a Sale in Early 2016**

  80.  While aware of the ongoing data integrity crisis at the Company, Akorn executives and its Board started to explore a sale of the Company. At a Board of Directors meeting on February 17, 2016, Akorn's Board decided that it would be in the "best interest of the Company and its shareholders to explore strategic alternatives that could potentially increase shareholder value."

  81.  Akorn's senior management and Board of Directors had an enormous stake in the Company through their ownership of Akorn common stock and stock options. As of May 11, 2017, Silverberg and Executive Defendants Rai and Portwood respectively stood to gain over $9 million, $14 million, and $2.5 million from the Merger. In total, as of June 9, 2017, Akorn's Directors and Executive Officers (as defined in the Proxy) beneficially owned 32,557,918 Akorn common shares (approximately 25.9% of the Company's outstanding shares). These shares were worth over *$1.1 billion* at the $34 merger price – more than a $285 million premium over the shares' value at the $25.22 per share closing price on April 6, 2017, the day before *Bloomberg* reported that Fresenius was "in talks" to buy Akorn and Akorn issued a press releasing confirming the discussions with Fresenius.

82.    Notably, Dr. John Kapoor – the former chairman of Akorn's Board who resigned in October 2017 after being criminally charged with leading a national conspiracy to bribe doctors to overprescribe opioid pain medications – beneficially owned and controlled 22.8% of Akorn's common stock and was entitled to nominate up to three persons to serve on Akorn's Board of Directors.

83.    Dr. Kapoor has a history of being affiliated with companies alleged to have submitted false data to the FDA.  Following Fujisawa USA's ("Fujisawa") 1989 acquisition of Dr. Kapoor's generic company Lyphomed, Fujisawa sued Dr. Kapoor alleging that his company – like Akorn – knowingly submitted false data and failed to report certain adverse test results to the FDA in advance of the Fuijsawa-Lyphomed merger.  Indeed, in 1991 the FDA investigated Lyphomed, which eventually resulted in the withdrawal of a number of Lyphomed's drugs from the market and a temporary ban on the submission of new ANDAs by the company.

84.    Akorn increased its pursuit of a sale in the spring and early summer of 2016.  These efforts included meeting with representatives of several potential strategic merger partners, including an international biopharmaceutical company, a U.S. pharmaceutical distribution company and a diversified U.S. healthcare company.  On July 27, 2016, Akorn's Board approved management's recommendation to commence "a process to solicit proposals to acquire the Company from potential strategic and financial counterparties."

**F.    Akorn Reassures the Market About its Data Integrity Compliance**

85.    By the start of the Class Period in November 2016, investors were deeply concerned about, and intensely focused on, Akorn's cGMP compliance.  On the Company's August 4, 2016 earnings call, just a few months prior to the start of the Class Period, Rai told investors that FDA inspectors issued a Form 483 – a document listing significant cGMP deficiencies observed by the

inspector – to Akorn in connection with a June inspection of the Company's Decatur, Illinois facility (the "Decatur 483").

86.     Investors were particularly concerned by Rai's announcement because the Decatur facility was Akorn's largest manufacturing site, originated an outsized portion – approximately 35% – of the ANDAs for the Company's all-important drug pipeline, and was the principal manufacturing site for Akorn's high-margin injectable drugs.  Moreover, Decatur was also the site at which Akorn manufactured its most lucrative and important new drug, ephedrine sulfate, which accounted for approximately 21% of Akorn's second quarter 2016 net revenue and approximately 23% of Akorn's third quarter 2016 net revenue.  Thus, it would have been devastating to Akorn's business if the marketability or approvability of drugs originating from the Decatur site were jeopardized by regulatory noncompliance.

87.     However, when asked on the August 4, 2016 earnings call about the implications of the Form 483 on Akorn's business, Rai downplayed its significance.  Rai told investors that the FDA's inspection resulted in only "a handful of observations," and that "the observations that we got were routine."  Rai further told investors that, in the wake of the inspection, its "business as usual for us," and that he was "very hopeful and confident that we'll get through our response, the review with the FDA . . . I don't expect any issues at this point."  Further, when asked about the timing of the reinspection, Rai calmed fears, stating that "there's no reinspection.  It is just our responses are under review the FDA at this point."

88.     Rai's assurances comforted investors.  For instance, in an August 5, 2016 report, JPMorgan analysts reiterated their "overweight" rating for Akorn common stock, stating that their investment "thesis unchanged post 2Q" earnings call.  Noting that "Akorn described [the FDA's observations] as routine" and that management "does not believe a re-inspection is needed at this

point," these analysts concluded, "we do not expect the 483 observations to impact Akorn's business."

89.    On November 3, 2016, the first day of the Class Period, Akorn held its third quarter 2016 earnings call and announced that, in fact, the FDA did intend to re-inspect the all-important Decatur facility. In response to this news, analysts specifically pressed Defendants about the state of Akorn's regulatory compliance and its readiness for re-inspection. To allay investors' concerns, Defendants issued a number of false and misleading statements, assuring the market that Akorn's facilities complied with applicable regulations governing the testing and manufacturing of its drugs, despite knowing, as Rai testified, "of ***significant and repeat problems that Akorn was having in its quality function***," and that Cerulean had already concluded an audit of Akorn's cGMP compliance at the Decatur site, which, as described below, found deeply serious data integrity failures.

90.    Specifically, on Akorn's third quarter 2016 earnings call, in response to analyst questions asking whether Akorn "was ready for a re-inspection today or is there still more work to be done," Rai assured investors that the Decatur facility was in regulatory compliance, stating that Akorn was "ready for the inspection." Likewise, in response to another analyst's question about the number of employees hired to address cGMP deficiencies at the Decatur facility, Rai assured investors that there were no meaningful cGMP deficiencies at the site and that "no remediation" needed to done. Specifically, Rai responded, "I'm not sure what you mean by the hiring new employees for remediation. I mean there is no remediation per se that we have to do in our Decatur site if that's what you were referring to."

91.    Defendants again calmed worries about Akorn's compliance with cGMP and its readiness for the Decatur re-inspection during a November 29, 2016 presentation at the Piper

Jaffray Healthcare Conference. At that conference, Portwood responded to repeated analyst questions about Akorn's cGMP compliance by stating that Akorn "was ready for [the FDA] whenever they do show up," that "there's nothing really more for us to do" in terms of cGMP-related remediation, and that the "work" of "operat[ing] under cGMP type standards . . . *has been done*."

92.     Defendants' statements soothed the market. For instance, in a November 3, 2016 report, Piper Jaffray analysis reiterated their "overweight rating," stating that they "would not be overly anxious about the Decatur inspection" because "management's commentary on this front suggests to us that this will not turn into a long-term issue" and that "[m]anagement noted that it . . . is ready/prepared for the reinspection." Similarly, in a November 7, 2016 report Deutsche Bank analysts upgraded Akorn stock to a buy in the wake of Defendants' statements: "*Given management's confidence that clearing Decatur is a when not an if, we like the set up for the stock from here, and are moving to a Buy rating (our PT remains $28)*."

93.     As discussed further below, Defendants continued to issue false and misleading statements assuring investors that Akorn substantially complied with cGMP regulations throughout the Class Period. Moreover, Defendants misleadingly touted Akorn's lucrative drug pipeline, while failing to disclose that the Company's pervasive and egregious data integrity failures, which included the submission of fraudulent data to the FDA, posed a serious risk to the Company's ability to seek approval for, and ultimately market, those pipeline drugs.

### G.     Akorn Continues to Hide its Widespread Data Integrity Violations While Seeking a Sale

94.     At approximately the same time Defendants were calming fears about the Decatur 483, Akorn's senior management and Board increased their efforts to sell the Company.

95.     On August 23, 2016 Akorn met with Alexander Dettmer, Head of Corporate Business Development / M&A at Fresenius.  Mr. Dettmer informed Akorn's financial advisor, J.P. Morgan, that Fresenius believed that the Company could potentially be a good strategic fit for Fresenius.  This was the first of several meetings between Fresenius and Akorn throughout the fall of 2016.  Akorn also met with and entered into confidentiality agreements with several potential financial sponsor buyers during the fall of 2016.

96.     On November 23, 2016, Fresenius submitted a non-binding indication of interest proposing to acquire Akorn for a price of $30.00 per Akorn common share and a contingent value right ("CVR") to receive up to $5.00 per Company common share in cash based on sales of the Company's ephedrine sulfate product over the following three years.  The next week, a financial sponsor ("Financial Sponsor C") submitted a non-binding indication of interest proposing to acquire Akorn for a price between $30.00 and $33.00 per Company common share.

97.     While shopping the Company, Akorn tried to hide its data integrity problems with the hope that they would not be identified during due diligence.  Despite the critical nature of its data integrity problems, many of which were likely to directly impact the safety and effectiveness of its products, Akorn instructed employees to not perform data integrity related remediation while the Merger was pending.  For example, in a December 2016 email, an Akorn IT employee wrote to her manager:  "So I hear loud and clear that we are not to work on any Data Integrity improvements at today's meeting . . . ."   As part of this effort, Akorn employees were also instructed to elevate follow-up requests regarding data integrity related requests to more senior IT personnel so that they could be rejected.  One IT employee contacted senior IT staff, writing "Per your instructions this morning to escalate any pressure from the business regarding IT working on data integrity remediation tasks . . . ."

98.     At a December 2, 2016 Board meeting, shortly after a discussion concerning "the FDA's re-inspection of the Company's Decatur manufacturing facility," the Board authorized the Company's management to "formally engage J.P. Morgan as the Company's financial advisor . . . in connection with a potential transaction." The Company also instructed J.P. Morgan to reach out to additional potential bidders.

### H.     Akorn's Experts Identify Critical Failures at Akorn's Decatur Site

99.     Despite Executive Defendant Rai's frequent claims that Akorn was "ready" for the reinspection at Decatur, Akorn's consultant Cerulean found the exact opposite. In a report dated December 5, 2016, which was provided to Akorn's quality team including Silverberg, Cerulean detailed the numerous ongoing data integrity problems at Decatur. Cerulean is a well-respected industry consultant, which Akorn had retained following a specific recommendation from Health Canada (Canada's FDA-equivalent regulator).

100.     Cerulean's December 5, 2016 Compliance Gap Analysis Summary and Recommendation Report (the "Cerulean Decatur Report"), reported seven critical findings at Akorn's Decatur Site. Cerulean defined "critical findings" as those where nonconformity is "***reasonably likely to directly impact the regulatory compliance status of the organization and/or product safety, efficacy or quality***." The Cerulean report analyzed Akorn's practices under "FDA 21 CFR 211 Current Good Manufacturing Practices for Finished Pharmaceuticals (cGMP), FDA 21 CFR 314 Applications for FDA Approval to Market a New Drug, and both the ICH Q9 Quality Risk Management and the ICH Q10 Pharmaceutical Quality System harmonized guidelines that FDA enforces as regulations."

101.     The first critical finding identified by the Cerulean Decatur Report was Akorn's "failure to exercise sufficient controls to prevent data loss." Among other things, the Cerulean Decatur Report found that over 200,000 files of raw data used to verify sterile container closure

acceptance for products produced since May 2015 have been destroyed, in direct violation of multiple regulatory recordkeeping regulations. The assessment also discovered that original batch record source data for TheraTears sterilization was recorded onto thermal paper that was no longer legible and that PDFs of Certificates of Analysis and Certificates of Conformance for certain released components were missing from a "secured" network file folder.

102.    Cerulean's second critical finding was that Akorn had "insufficient data integrity controls (both procedural and technical) to prevent unauthorized changes to electronic data." Related to this finding, Cerulean found that several of Akorn's computer systems did not have required audit trail capabilities, certain computer systems had audit trails turned off, data was not properly backed up, and that the Company did not have required written policies concerning data integrity compliance and the retention of raw laboratory data. Akorn's computer systems also had insufficient controls, allowing anyone with Akorn network access to add, delete, or change data used in the production and testing of drug products.

103.    In describing the scope of this problem, Cerulean principal John Avellanet testified in his deposition in the Delaware Litigation that "Everyone at Akorn, and when I mean – I don't mean everyone in Decatur, I mean everyone. If you were an Akorn employee or contractor with a network access login, summer intern, CEO, et cetera, *you could add, delete, do anything you wanted into any of the data within that folder with no ability for anybody to know what you have done*." When asked how many times he had seen such a deficiency before, Avellanet answered, "For everyone in the entire corporation to make these changes and willy-nilly with no traceability or accountability, *never*." Even Akorn's own regulatory compliance expert, Zena Kaufman, admitted in her testimony in the Delaware Litigation that this issue was "*incredibly serious*."

Notably, this same issue existed across Akorn's sites, including at Vernon Hills and its headquarters in Lake Forest.

104.    The third critical finding identified by Cerulean was that Akorn had "insufficient regulated record archival controls and retention for records involved in drug product manufacture, testing and release, and quality records." The facts supporting this finding included that Akorn did not adequately retain backup tapes (in direct conflict with federal regulations), had insufficient data backup procedures and systems, did not have periodic or routine verifications of backups and had a "woefully out-of-date" collection of archived paper records.

105.    Cerulean's fourth critical finding was that Akorn had a "failure to have sufficient controls over computerized equipment used in regulated processes and used to create, manipulate, edit, store, et al regulated data for drug product safety and quality testing and release." Among other things, Cerulean found that users had "uncontrolled access" to modify or delete data and could adjust the date and time on computerized systems. Moreover, Akorn's computer systems were not properly audited or reviewed to verify user access and the data showed that multiple user accounts had been deleted on the Akorn network, leaving the Company unable to account for regulated data. These issues showed that the Akorn Decatur data center "does not meet minimum industry standards for a simple Tier 1 data center, much less regulatory guidance expectations and IT industry best practices." As Avellanet testified in connection with the Delaware Litigation, these problems were unprecedented and "***call[] into question all of the test data, all of the production data, all of the raw material specifications***" at Akorn.

106.    Cerulean's fifth critical finding was that Akorn had "inadequate validation of computerized systems to ensure the ongoing suitability of systems for Akorn processes, data, and personnel." In support of this finding, Cerulean noted that Akorn personnel did not understand the

difference between basic data integrity terminology, validations did not test or verify basic data integrity controls and that the Company did not track, inventory or validate various computerized systems.

107.    The sixth critical finding reported by Cerulean was that Akorn had "inadequate control over approved specifications for drug product and raw materials, and failure to ensure that product testing data is derived from compliance with established specifications and standards." Specifically, Cerulean found that all Akorn personnel with network access could modify, add, or delete data in shared network folders, calling into "*serious question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products*."  This practice was in direct conflict with multiple federal regulations.

108.    Cerulean's seventh critical finding was that Akorn had "inadequate corrective action and preventative action and out-of-specification investigations, explanations, and corrective actions."  In support of this finding, Cerulean found that all internal audit findings and external audit or inspectional findings were not properly tracked and that Akorn's investigation and corrective action programs fail to prevent re-occurrence of failures.  Even more troubling, Cerulean found that 58% of out-of-specification investigations referenced "personnel" as the root cause of the problem, significantly higher than the industry average of 15-18% of problems having personnel as the root cause.

109.    In addition to the critical findings, the Cerulean Decatur Report also identified seven major findings and several minor findings.  Major findings are those where nonconformity has the likely potential to indirectly impact risks to product safety, efficacy, quality and/or the regulatory compliance of the organization.  Minor findings are those that pose an increased risk because they are indicators that an organization did not take adequate corrective actions, and thus

may not take its responsibilities as seriously as appropriate. Akorn's major deficiencies included, "inadequate training processes and training effectiveness" and an "inadequate and insufficient internal audit program." The Cerulean Decatur Report specifically pointed out that the latter was a "repeat violation," which "*pose[s] increased risk because they are indicators that an organization did not take adequate corrective actions and thus may not take its responsibilities as seriously as appropriate*."

110.    In sum, the Cerulean Decatur Report concluded that "*the data integrity controls at . . . Akorn's Decatur, Illinois site . . . are insufficient to support compliance with current data integrity expectations and US Food and Drug Administration (FDA) regulatory requirements. As a result, Akorn currently shoulders significant regulatory and negative public perception risk.*"

111.    Indeed, Avellanet testified in the Delaware Litigation that Akorn was among the top "two [or] three" worst drug companies in terms of data integrity out of the more than 120 he had audited over the course of his career, and that he would not expect to see data integrity violations as egregious as those he observed at Akorn "at a company that made Styrofoam cups," let alone sterile injectable drugs. In assessing the gravity of Cerulean's conclusions, it is critical to note that, as Akorn's expert witness Kaufman testified in the Delaware Litigation, Cerulean is brought in only when companies have problems to begin with. Thus, to rank among the worst of the companies Cerulean had ever audited speaks volumes about the depth and seriousness of the cGMP violations at issue.

112.    On December 7, 2016, just two days after Akorn received the Cerulean Decatur Report, the Akorn Board of Directors Quality Oversight Committee held a meeting where they discussed, among other things, ongoing audits and the FDA's re-inspection of Akorn's Decatur

facility – the same Akorn facility where Cerulean had just identified and reported over a dozen critical and major deficiencies.

113.     At the meeting, which was attended by Defendant Rai, certain Board Defendants expressed concern about the ongoing data integrity issues at the Company.  For example, Board Defendant Ron Johnson asked "why risk assessments are not completed in a timely manner for suppliers."  Mr. Johnson also "expressed his concern around the repetitiveness of issues between sites and across sites identified during audits & external inspections."

114.     The Board also discussed Akorn's failure to timely remediate previously identified problems.  For instance, Board Defendant Brian Tambi "stated that it appears that the implementation of corrective actions is lacking or not timely."  Similarly, the Quality Oversight Committee found that internal audit "metrics [do] not clearly show[] if the corrective actions were actually implemented in a timely manner or not."

115.     Incredibly, despite Cerulean's detailed account of Decatur's systemic data integrity failures, and despite the Board's significant concerns about Akorn's lack of cGMP compliance, just days later, Defendants continued to mislead investors.  On December 12, 2016, Akorn filed a Form 8-K announcing that "the U.S. Food and Drug Administration (FDA) conducted a re-inspection of its Decatur, Illinois manufacturing facility from December 5, 2016 to December 9, 2016, with no Form 483 observations," despite knowing that, notwithstanding the FDA inspector's failure to issue a Form 483, the Decatur facility was actually rife with cGMP violations.

**I.     Akorn and its Board Finalize a Sale Amid its Ongoing Data Integrity Crisis**

116.     Shortly after the Quality Oversight Committee's discussion of the alarming data integrity problems, the full Board of Directors met on January 5, 2017.  At this meeting, the Board – who along with Akorn's executive officers stood to receive ***nearly $1 billion*** from Fresenius'

latest $30.00 per share offer – determined that it would be in the "best interest of the Company and its shareholders" to continue pursuing a possible transaction with Fresenius.

117.    A few days later, on January 12, 2017, Akorn's senior executives, including Executive Defendant Rai, Silverberg, Executive Defendant Portwood, Akorn COO Bruce Kutinsky and Akorn General Counsel Joe Bonaccorsi, received a summary of the results of the Company's 2016 annual employee survey.  This summary included quotes from an Akorn employee based at Akorn's Lake Forest headquarters, who wrote that Silverberg "*provided misleading information to regulatory bodies including the US FDA.*"  The employee also wrote that Silverberg "*counselled his staff to not speak to Global Quality Compliance staff and . . . not [to] share information with GQC.*"  The employee survey summary provided to Akorn's senior management contained these exact quotes regarding Silverberg.

118.    After proceeding with additional due diligence, on February 3, 2017, Fresenius submitted a revised non-binding indication of interest proposing to acquire the Company for a price of $32.00 per Akorn common share and a CVR to receive $4.00 per Company common share in cash in early 2019 if the Company's sales in calendar year 2018 exceeded a specified threshold. Following further due diligence and numerous meetings with management, on March 23, 2017 Fresenius increased its offer to $33.00 per share.

119.    On April 7, 2017, *Bloomberg* reported that Fresenius was "in talks" to buy Akorn. Later that day, Akorn published a press release confirming that Akorn was currently in discussions with Fresenius concerning a potential acquisition of Akorn.

120.    On April 24, 2017, Akorn's Board accepted Fresenius' further-increased offer to acquire all outstanding Akorn shares for $34.00 per share and executed an Agreement and Plan of Merger (the "Merger Agreement").  The Company and Fresenius issued a joint press release

-37-

announcing the transaction after the close of trading on April 24, 2017. The Merger Agreement was publicly disclosed as an exhibit to a Form 8-K filed by Akorn.

121.    As described in further detail below, in the Merger Agreement Defendants falsely represented that Akorn was, and had been, materially compliant with FDA regulations, including cGMP, and FDA data integrity requirements; and that Akorn had conducted all trials and studies in accordance with standard medical and scientific practices and Good Clinical Practices requirements. Defendants further falsely represented in the Merger Agreement that Akorn's FDA filings contained no material misstatements or omissions.

122.    Fresenius stressed that Akorn's product pipeline was critical to its rationale for acquiring Akorn. In its press release announcing the transaction, CEO of Fresenius Kabi USA John Ducker touted Akorn's new products, stating the Company's "pipeline is [] impressive, with approximately 85 ANDAs filed and pending with the FDA and dozens more in development." The release also stated that "Akorn's current product pipeline of pending ANDAs [] has a total addressable IMS market value of US $9.3 billion." Similarly, in its investor conference call announcing the transaction, Fresenius SE & Co. KGaA CEO Stephen Sturm ("Sturm") explained that Akorn is a "Great company with a broad product portfolio and pipeline" and later stated Akorn's "substantial pipeline will strengthen our existing IV generics franchise."

123.    Fresenius also reiterated the importance of Akorn's product pipeline in the months following the announcement of the Merger. For instance, on its May 3, 2017 first quarter earnings call, Fresenius CEO Sturm stressed the "pipeline at Akorn . . . is going to add 85 products to us." This line of statements continued through at least Fresenius' January 8, 2018 presentation at the J.P. Morgan Healthcare Conference, where Fresenius' investor presentation highlighted that

Akorn's "complementary product portfolio and pipeline diversifies Fresenius Kabi's IV generics offering."

124.    Analysts also noted that a primary benefit of the transaction for Fresenius was Akorn's new product pipeline.  For example, one analyst noted the transaction "gives Fresenius access to a solid pipeline as highlighted by the 85 pipeline candidates (versus 55 for Fresenius)."

**J.     After Announcing the Transaction, Akorn Receives Another Damning Report Detailing the Company's Pervasive Data Integrity Violations**

125.    Cerulean audited Akorn's Somerset site in early 2017.  Cerulean's report, issued on May 31, 2017, found three critical deficiencies and three major deficiencies.  Like at Akorn's Decatur site, Cerulean concluded that Akorn's Somerset site failed to have sufficient controls over its computer systems, which Avellanet testified "***literally calls into question every released product they've done for however many years it's been this way.***"  Specifically, Cerulean cited as a "critical" cGMP violation the "[f]ailure of the Akorn IT department, as a core component of a 21st century quality control management structure, to ensure reliability of the controls around data used to make, test, release, and surveil sterile drug product."  Cerulean noted that this deficiency "***raises serious questions about the reliability of any data integrity controls and thus the trustworthiness of any electronic information used through Akorn to make safety, efficacy and quality decisions.***"

126.    Cerulean also found that a critical deficiency at Somerset was the "[f]ailure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn."

127.    Cerulean's findings were so troubling that Cerulean warned Akorn management that the Company's deficiencies could expose management to potential criminal liability under the *Park* doctrine (*see United States v. Park*, 421 U.S. 658 (1975)).

### K.  Akorn Issues a False and Misleading Proxy Statement

128.    On May 22, 2017 Akorn filed its Proxy Statement on Schedule 14A in connection with the proposed Fresenius acquisition.  The Proxy Statement was signed by Defendant Rai and specifically stated that it was issued "By Order of the Board of Directors" of Akorn.

129.    Akorn's Proxy Statement attached the Merger Agreement, and specifically instructed shareholders to "carefully read the accompanying proxy statement and the copy of the merger agreement attached as Annex A thereto."  The Proxy Statement informed investors that they were required to approve the Merger Agreement in order for the Merger to occur.  As discussed above, and detailed further in Section V below, the Merger Agreement included Defendants' false representations that Akorn was, and had been, materially compliant with FDA regulations, including cGMP, and particularly data integrity requirements; that Akorn had conducted all trials and studies in accordance with standard medical and scientific practices and Good Clinical Practices requirements; and that Akorn's FDA filings contained no material misstatements or omissions.

130.    At the time Defendants published these statements as part of the Proxy Statement (or within days thereof) – and well before the shareholder vote – they had already received *two* reports from Cerulean, and numerous internal GQC reports, demonstrating that Akorn's facilities were actually rife with serious cGMP violations and that the Company's data integrity controls were "insufficient to support compliance with current data integrity expectations."  Defendants also knew that Akorn had submitted false and manipulated trial data to the FDA.  Indeed, well before Akorn's Board "order[ed]" the publication of the Proxy Statement, that same Board had already expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

131.     On July 19, 2017, Akorn held a special meeting of the Company's shareholders. Pursuant to the Proxy Statement, the Company's shareholders approved the Merger Agreement, with 83.9% of the Company common shares outstanding and entitled to vote at the meeting voting to approve the agreement.

### L.     Akorn Conceals the Truth to Try to Close the Merger

132.     While receiving additional troubling internal and external audit findings throughout 2017, Akorn and its senior management made a deliberate effort to hide its problems from Fresenius and Akorn investors in an effort to close the pending Merger – a transaction that would enrich them.

133.     Incredibly, despite the severity of the problems and warnings of potential criminal liability in the deeply troubling 2017 Cerulean Somerset report distributed to Akorn's senior management, Wasserkrug testified at the Delaware Litigation that "no actions were taken in response" to the report until March 2018.  Similarly, a GQC report of a February 19-23, 2018 audit of Decatur, which was distributed to Akorn senior management including Defendant Rai, found that Akorn "failed to appropriately investigate and remediate in a timely manner previously identified Data Integrity non-compliances" and had only "completed 32% of the corrective actions thus far."  Remarkably, in June 2017 Akorn suspended the meetings of its Board of Directors Quality Oversight Committee, the body charged with overseeing compliance and remediation issues.

134.     Akorn also did not work to remediate the systemic data integrity problems at its other sites.  For example, confidential non-public documents quoted in Fresenius' Verified Counterclaim state that in August 2017 a Quality Compliance manager at Akorn informed a Data Integrity employee that senior management had decided that "data integrity changes are not actionable in 2017."  The manager stated that the "[a]ddition of any responsibilities cannot be

absorbed by the currently taxed IT department and hiring of additional resources to support new responsibilities is not approved."

135.    Akorn was clearly hoping that, rather than fixing any of these serious issues in good faith, the issue would be concealed until after the acquisition closed.  Confidential trial exhibits cited by Fresenius' post-trial brief in the Delaware Litigation show that in August 2017, a senior leader in Akorn's IT Department wrote that the IT Department was not remediating data integrity issues because "Fresenius Kabi Quality [and] IT Leaders will drive any actions in this area" after the Merger.  Also in August 2017, Somerset's head of quality, Misbah Sherwani, told Silverberg that she "fully underst[ood] that we are on the cusp of the FK" merger, but that Somerset was "in a state of jeopardy as it relates to data integrity" and yet IT had determined that a serious system access problem did "not warrant" a review.  A few months later, in December 2017, Akorn employees wrote that "data integrity is not a 2017 approved project" and that "DI remediation activities are not something that we are resourced to address at the moment."

136.    Not only did Akorn not take any action to fix its problems, the Company took affirmative steps to hide its mushrooming problems until the Merger closed.  For example, following the announcement of the Merger, Akorn's internal audit function GQC replaced its standard internal audits with "verification audits."  As Akorn admitted in its post-trial brief in the Delaware Litigation, verification audits were meant to only "verify that the corrective actions that the site had committed to have actually been completed and are effective."  In other words, Akorn stopped attempting to identify new data integrity problems while the Merger was pending.

137.    While GQC's "verification" audits were not designed to identify new problems, the audits did confirm that Akorn had failed to remediate its pressing data integrity crisis.  For example, in an April 2017 verification audit at Akorn's Somerset site GQC found "ongoing

unmitigated compliance risks associated with Data Integrity." GQC's report also noted that one of its findings regarding audit trials directly violated a commitment to remediate the issue made to the FDA following a 2016 inspection.

138.    As discussed above, in an audit report dated September 11, 2017, GQC confirmed the data integrity problems persisted at Akorn's Vernon Hills facility. GQC's report stated that all remediation "items have been halted and remain incomplete" and that these *"ongoing delay[s] in resolving the data integrity items presents undue risk to the site's ongoing operations."* Similarly, GQC found in December 2017 that Akorn had not addressed the problems it had previously identified in April 2016 at Akorn's Lake Forest site.

139.    Akorn employees also tried to cover up the Company's submission of false data to the FDA. As discussed above, in August 2017, Silverberg knowingly authorized the submission of false and fabricated data in response to a CRL issued by the FDA seeking additional information in connection with the azithromycin ANDA. Silverberg actively attempted to conceal his fraud, by, among other things, instructing Somerset head of quality Sherwani not to open a formal investigation. Ultimately, however, Fresenius' receipt of whistleblower letters describing serious data integrity violations, described in greater detail below, finally forced Akorn to open an investigation into the Company's submission of fraudulent data, conducted by its litigation counsel, Cravath.

140.    In December 2017, while Cravath was conducting interviews at Somerset pursuant to this investigation, Silverberg approached Sherwani about covering up his involvement in the submission of fraudulent azithromycin data, including the destruction of documentary evidence of that involvement. Specifically, Sherwani testified in connection with the Delaware Litigation that Silverberg told her "clearly this investigation is focused on the three of us," *i.e.* Silverberg,

Sherwani, and Michael Stehn, general manager of Akorn's Somerset site.  Silverberg discussed with Sherwani "how we can document this issue [of submitting fraudulent data to the FDA]" that they will have to "wordsmith" it, and that "we would never discuss it with legal."  Silverberg further stated that "if anything came of it, he might, you know, *take the paper and eat it*" – *i.e.* destroy evidence – "*if he had to*."

141.    Sherwani reported this incident to Cravath.  A December 2017 email between Cravath lawyers memorializes that report.  The email notes that Sherwani reported Silverberg was "telling her to do things with respect to opening a trackwise investigation that she is seriously concerned about (including inaccurate justifications for why an investigation was not opened earlier and telling her he will 'eat' the drafts of the language about that)."

142.    In addition to threatening to destroy evidence, Silverberg also avoided documenting crucial evidence and contributed to Akorn's culture of noncompliance.  For example, in a September 5, 2017 email, sent just days after he told Sherwani he would destroy evidence concerning his submission of fraudulent data to the FDA, Silverberg instructed Hans-Herwig Bauer, the quality director of Akorn's Swiss facility, who informed Silverberg about potential data integrity issues relating to another drug, to "not put FDA sensitive subjects into emails."  Additionally, Tom Yajcaji, a former Quality Director at Somerset told Cravath during its investigation that "there was a lot of pressure from Mark S. [Silverberg] to just get things done and get products out [the] door."

143.    Despite being involved in a host of potentially criminal conduct, as of the date of the trial in the Delaware Litigation, Silverberg remains employed by Akorn as a "quality consultant" at an annual salary of $250,000.

144.    Akorn's remediation efforts were so non-existent that its Data Integrity Quality Manager at Decatur, Patty Franke, stated in a November 30, 2017 email to Cerulean CEO Avellanet that she has been "*making 0 progress on our DI remediation efforts*.  I have found a ton more issues and we have to put a handful of controls in place to improve data going forward, but they are superficial at best, in my honest opinion."  Franke attributed these failures to "the culture and the message from management."  Franke further explained in December 2017, according to a confidential trial exhibit quoted in Fresenius' post-trial brief, that "DI remediation activities are not something that we are resourced to address at the moment."

## M.    The Truth About Akorn's Profound Failure to Comply with cGMP Begins to Be Revealed as Fresenius Announces That It is Investigating Akorn's "Alleged Breaches of FDA Data Integrity Requirements"

145.    In October and November 2017, Fresenius received two anonymous whistleblower letters raising questions about Akorn's data integrity compliance.  The first letter in October 2017, which Fresenius disregarded because of its lack of detail, alleged that Akorn's research and development activities were significantly "[f]lawed and . . . mostly corrupted or incomplete."

146.    The second anonymous letter, received by Fresenius in early November 2017, provided more detail.  This second letter alleged that Akorn's senior executives, including Rai, pressured Akorn employees to "manipulate or modify" data "using pressure tactics and employee threats."  These actions led to "multiple data manipulations" at Akorn's Decatur, Somerset and Vernon Hills sites.  On November 16, 2017, Fresenius sent Akorn a letter regarding the anonymous allegations and informed Akorn that it intended to investigate the complaints.

147.    In mid-November Fresenius started its investigation of the anonymous allegations. Fresenius retained Lachman Consultants ("Lachman"), Ernst & Young and Sidley Austin LLP ("Sidley") to lead its investigation.  At the same time, Akorn retained Cravath and consulting firm NSF Health Sciences ("NSF") to investigate the allegations.

148.   On January 9, 2018, Fresenius received an additional whistleblower letter alleging that Akorn had "instructed [its] team not to cooperate with any [Fresenius] officers or provide any information to [Fresenius]."

149.   Fresenius publicly disclosed its investigation on February 26, 2018, when, after the close of the market, Fresenius announced:

> Fresenius is conducting an independent investigation, using external experts, into alleged breaches of FDA data integrity requirements relating to the product development at Akorn, Inc.
>
> The Management and Supervisory Boards of Fresenius will assess the findings of that investigation. The consummation of the transaction may be affected if the closing conditions under the merger agreement are not met.

150.   On the same day, Akorn released its own statement regarding the investigation, disclosing the investigation but denying the existence and seriousness of its widespread data integrity issues:

> Akorn and Fresenius Kabi AG, with the assistance of outside consultants, are investigating alleged breaches of FDA data integrity requirements relating to product development at the Company. **To date, the Company's investigation has not found any facts that would result in a material impact on Akorn's operations** and the Company does not believe this investigation should affect the closing of the transaction with Fresenius.

151.   The February 26, 2018 announcements caused Akorn's stock price to plummet 38.4%, from $30.28 per share at close on February 26, 2018 to $18.65 per share at close on February 27, 2018.  The next day, Akorn's common stock price dropped an additional 9.1% to $16.94 per share.

**N.   Akorn Misleads the FDA About its Data Integrity Problems and Continues to Fail to Remediate Them**

152.   On March 16, 2018 Akorn met with the FDA about the azithromycin issue.  Even though Akorn and its counsel at Cravath admitted to Fresenius' counsel that Silverberg's

explanations regarding azithromycin were "not satisfactory" and did not "hang together," Akorn and Cravath subsequently misled the FDA by stating that when Silverberg authorized Akorn's CRL response he did not know that it contained fabricated data. Specifically, under the heading "Investigative Findings," Akorn's presentation to the FDA stated: "Silverberg authorized submission of AET data [in the CRL response] without knowing stability table containing particulate matter data would be submitted because stability table not attached to CRL response authorized for submission." As Cravath partner David Stuart testified in the Delaware Litigation, Cravath had previously told Fresenius' lawyers that this explanation was not credible and that they would not "use [this] explanation in an attempt to defend the company before the FDA." Yet, that is precisely what Cravath did.

153.     Indeed, a Cravath lawyer's internal notes of a February 1, 2018 call make clear that Cravath lawyers acknowledged that the record did not support the explanation they presented to the FDA and that, in fact, "there's a high likelihood . . . given the document trail that [the FDA will] conclude [Silverberg] ***did act with intent***." However, Cravath failed to share this incriminating document trail with the FDA, even as it presented innocent explanations for Silverberg's heinous conduct that it knew were not credible.

154.     Akorn's presentation to the FDA made additional misrepresentations about Silverberg's role at Akorn. For instance, Akorn also claimed that it had "removed" Silverberg. However, as noted, Akorn continues to retain Silverberg as a "quality consultant" at a $250,000 annual salary.

155.     Akorn's March 16, 2018 presentation to the FDA also misled the FDA about Akorn's data integrity compliance program. For instance, Akorn told the FDA between 2016 and 2017 it added "39 dedicated data reviewers" who were "dedicated to performing audit trail and

data review." In fact, as both GQC and Cerulean audits had determined, numerous Akorn computer systems did not have required audit trail capabilities, while others had their audit trail capabilities inactive during this period.

156. Akorn also told the FDA at the March 16, 2018 meeting that it had uncovered "no evidence of trial runs" – *i.e.* an instance of "testing into compliance" whereby a drug is tested in an unreported "practice" trial to ensure it passes before an official recorded test is performed – at its facilities. In truth, Akorn's third-party auditor, NSF, issued a report flagging "thousands and thousands" of trial runs as occurring at the Company's facilities prior to the FDA meeting.

157. Even Akorn's own expert witness Zena Kaufman admitted under oath in the Delaware Litigation that Akorn's March 16, 2018 presentation to the FDA was "not fully transparent."

**O. Akorn's Serious Data Integrity Violations Are Further Revealed as Fresenius Publicly Accuses Akorn of Such Violations and Terminates the Merger Agreement as a Result**

158. On Sunday, April 22, 2018, Fresenius issued a press release announcing that it was terminating the Merger Agreement. In its press release, Fresenius stated that its "decision is based on, among other factors, material breaches of FDA data integrity requirements relating to Akorn's operations found during Fresenius' independent investigation." Accordingly, Fresenius' announcement revealed that Fresenius's investigation had uncovered strong evidence that Akorn was materially noncompliant with FDA data integrity requirements, and, indeed, that these violations were so severe that Fresenius believed that termination of the Merger Agreement was warranted.

159. On April 23, 2018, the next trading day, Akorn's share price dropped further on the news, falling 33.8% from $19.70 per share at close on April 20, 2018 to $13.05 per share at close on April 23, 2018.

### P.    The Delaware Litigation

160.    On April 23, 2018, Akorn filed a Verified Complaint against Fresenius in the Delaware Court of Chancery.  Akorn alleged that Fresenius breached the Merger Agreement and sought specific performance on the Merger.

161.    On May 1, 2018, Fresenius filed a Verified Counterclaim against Akorn.  Fresenius claimed that it had four grounds to terminate the Merger Agreement, as Akorn:  i) materially breached its covenant to operate its business in the ordinary course; ii) breached its representations and warranties that, among other things, it was in compliance with laws, including FDA regulations, adhered to cGMP standards, and submitted truthful and accurate information the FDA; iii) materially breached its covenant to provide Fresenius with reasonable access to information; and iv) Akorn's post-Merger Agreement financial collapse amounted to a Material Adverse Event. Among other things, Fresenius' Verified Counterclaim revealed that its investigation uncovered "blatant fraud at the very top level of Akorn's executive team, stunning evidence of blatant and pervasive data integrity violations, outrageous attempts by and on behalf of Akorn to cover up those violations and misrepresentations made both to Fresenius and the FDA."  Indeed, Fresenius' investigation revealed "Akorn ha[d] repeatedly failed to comply with even the most basic data integrity requirements."

162.    On May 14, 2018, Akorn filed a redacted answer to Fresenius's counterclaim, denying substantially all of Fresenius's factual allegations to the effect that Akorn did not adhere to cGMP standards and that Akorn had pervasive data integrity violations, and that these issues impacted the FDA's ability and willingness to trust Akorn's submissions going forward.  For example, Akorn denied in full the following allegation: "Fresenius has also discovered egregious, longstanding and widespread violations of FDA data integrity requirements, showing that the azithromycin fraud was only the tip of the iceberg. Akorn has repeatedly failed to comply with

even the most basic data integrity requirements, as documented in a litany of highly critical audit reports—reports which Akorn attempted to suppress until after Fresenius had begun its investigation. Because of these violations, neither Akorn nor the FDA can trust the accuracy or integrity of Akorn's data." [Answer at ¶ 39]

163.    The Delaware Litigation was conducted on an expedited basis, sealed pre-trial briefs and exhibits were submitted, and a trial took place in the Court of Chancery on July 9, 2018 through July 13, 2018.  The parties submitted sealed post-trial briefs in the Delaware Litigation and post-trial argument was held on August 23, 2018.

### Q.    Additional Data Integrity Problems Are Identified

164.    While the Delaware Litigation was contemplated, and while it was pending in the Court of Chancery, investigations conducted by Fresenius and Akorn through their respective consultants and law firms revealed additional details regarding the expansive data integrity crisis at Akorn.

165.    Fresenius' consultant, Lachman, performed five assessments at three Akorn sites from December 2017 through March 2018.  According to the expert report of Lachman Director Ron George submitted in connection with the Delaware Litigation, Lachman found that Akorn had "major, systemic data integrity gaps" at all three sites.  Mr. George, who has more than 40 years of experience in the pharmaceutical industry, concluded that Akorn's "systemic compliance gaps . . . represent one of the poorest states of compliance that I have encountered."

166.    Lachman Director George's report confirmed many of the issues previously identified by Cerulean and Akorn's internal audits.  For example, Lachman found that "data were not documented contemporaneously" and that Akorn's computer systems and lab software were "not secure from unauthorized change."  Moreover, Lachman found discrepancies between the data used to support ANDAs and the underlying lab notebooks, that "electronic records were not

traceable to a corresponding notebook entry", and evidence of "backdating [] records." George found that Akorn's "cGMP compliance deficiencies . . . calls into serious question the reliability of [Akorn's] test data . . . the accuracy of Akorn's regulatory submissions, and thus the safety and efficacy of Akorn's products."

167. Akorn's own consultant, NSF, conducted audits at all Akorn sites. According to testimony in the Delaware Litigation by Akorn's expert Zena Kauffman, at the time of the trial NSF had identified 34 "Major" findings. NSF's audit report of Akorn's Vernon Hills site, dated April 13, 2018, defines "Major" findings as those that reflect "a systemic failure of a regulatory requirement, correlate[] to product defects, and/or represent[] uncorrected repeat findings cited by the FDA in previous inspections." These are deficiencies that would "appear on a Form FDA 483 and may provide the basis for further enforcement action."

168. NSF's findings also corroborate the findings by Lachman, Cerulean and GQC. Notably, NSF's review of Akorn's Vernon Hills facility, documented in its report dated April 13, 2018, found that "[i]n a large number of instances in every notebook reviewed, the date of the technician's work in the notebooks is a week or more later than the date that the HPLC sequences were run." NSF also found that "user access levels are not appropriate to protect data from deletion or further manipulation" at Akorn's Vernon Hills site.

169. Fresenius' post-trial brief, quoting confidential non-public trial exhibits, describes NSF's findings at Akorn's Cranbury and Amityville sites. At Cranbury, NSF has found that laboratory notebooks were "lacking in traceability, legibility, [and] authenticity" while at Amityville NSF found that Akorn analysts were able to "delete or modify" data on "[a]ll stand-alone instruments," and that many instruments did not have audit trails.

170. NSF also performed audits of all ANDAs filed from Akorn's Somerset facility since

2006. According to Wasserkrug's testimony in the Delaware Litigation, NSF had found that three of the nine ANDAs it had reviewed contained manipulated or fraudulent data. In Akorn's ANDA for olopatadine, NSF has found (and Akorn has admitted) that an employee at its Cranbury facility generated positive stability testing results through inappropriate "testing into compliance." In Akorn's ANDA for cyclopentolate, NSF found that an employee at its Vernon Hills facility engaged in the "deliberate manipulation" of data "to make failing results meet specification" and this data was then submitted to the FDA.

171.    NSF also discovered widespread evidence of inappropriate trial injections. As discussed above, a "trial injection" is a form of "testing into compliance" whereby a drug is tested in an unreported "practice" trial to ensure it passes. As such, "trial injections" represent a clear case of data manipulation and are explicitly proscribed by the FDA. At Akorn's Vernon Hills site, NSF's audit discovered approximately 5,000 potentially problematic trial injections, which involved up to 20 analysts and at least 16 different products. At Somerset, improper trial injections were found involving between 20 and 30 analysts. Akorn has since retained an additional consulting firm, PQE, to perform a detail review of the Company's use of trial injections. Indeed, talking points prepared by Akorn's counsel reflect that counsel informed the Board Defendants on April 20, 2018, that Akorn, despite the FDA's specific warning to "stop performing . . . trial samples," had continued to conduct "many that are the type of problematic, unreported trial injections FDA has warned of."

172.    NSF's work and evaluation continued through the trial in the Chancery Court. As noted in an April 19, 2018 Cravath email quoted in Fresenius' post-trial brief, "the longer NSF is on site, the more likely it is that employees are going to raise issues."

173.     As predicted, NSF has identified additional critical findings since the Delaware Trial.  As Akorn stated on August 3, 2018, in its mandatory monthly report to the FDA, NSF recently identified six **additional** instances where Akorn's Vernon Hills manager "manipulated" data.  NSF has found that this manipulation, which occurred as recently as July 2017, was "systemic in nature" and requires a "further compressive assessment of the [manager's] work and work produced by the Vernon Hills facility in support of GMP activities" to determine "potential impact to marketed product, regulatory findings, and submission supporting data."

174.     Meanwhile, the FDA continued to uncover even more violations.  On May 16, 2018, the FDA issued a 24-page Form 483 identifying thirteen categories of deficiencies at Akorn's Decatur Facility, informally placed the Decatur facility on OAI status and stopped approving new products from the Decatur site – Akorn's largest manufacturing site., The FDA has since explicitly denied at least two pending ANDAs, citing quality issues at Decatur and has formally confirmed the Decatur Facility's  OAI status in a letter to Akorn dated August 9, 2018.  Moreover, on July 23, 2018, the FDA initiated an unexpected inspection at Akorn's Somerset site.  As Akorn conceded during the Delaware Litigation, the "frequency" of inspections is often a direct indication of the FDA's concern with a Company's operations.  The FDA's placement of Decatur on OAI status and the increased inspections at Akorn's other facilities indicates that the FDA has become concerned with Akorn's operations.  This scrutiny put Akorn's product pipeline, and the Merger, at a significant risk.

175.     Akorn's internal audit function GQC has also continued reviewing Akorn's data integrity compliance.  Although these reviews have been limited "verification" audits, Akorn's GQC department concluded that Cerulean's critical findings were valid and legitimate findings.

GQC also found that the Akorn had only completed 32% of the corrective actions planned following Cerulean's December 2016 Decatur Gap Analysis.

176.    Fresenius also investigated the scope of the remediation efforts required to fix Akorn's data integrity problems.  According to Fresenius, Akorn must halt the release of certain products, restructure its R&D department including bringing in new employees, and fix its IT systems.  As a result of those steps, Akorn's new product pipeline will be harmed for at least three years.  Notably, at the Delaware Trial, Akorn's new VP of Quality Operations Wasserkrug did not dispute that it would take three years to remediate the problems and also conceded that Akorn would need to pull certain products off the market.

177.    Akorn's data integrity failures, including its extended failure to investigate and remediate those failures, severely impact the Company's business and financial position.  Fresenius' internal planning documents presented to its Supervisory Board demonstrate what must be done in order to adequately remediate Akorn's data integrity issues.  First, as Fresenius Kabi Chairman Mats Henriksson testified in the Delaware Litigation, there must be a temporary halt on the release of products until independent safety measures can be instituted.  Second, as Henriksson further explained in his testimony, Akorn's R&D department must be comprehensively restructured to bring in new employees and "build a culture of [] compliance," IT systems with proper controls must be established, and personnel must be retrained.  These initial steps can be expected to take one year.  Then, Akorn will need to redevelop its ANDAs with reliable data and obtain approval for those ANDAs – a process expected to take at least three years.  All the while, Akorn will be unable to market currently approved drugs or obtain approval for drugs currently in its pipeline.  In total, Fresenius estimates that it will cost more than $250 million in direct financial investment to remediate Akorn's problems.  This financial investment and related product impact

of Akorn's data integrity violations is estimated to reduce Akorn's enterprise value by almost $2 billion.

178.     Fresenius' analysis was based on its comprehensive review of Akorn's operations, and, in particular, the magnitude of its data integrity issues as assessed by numerous third party consultants including Cerulean, Lachman, and NSF.  Moreover, as Henriksson testified in the Delaware Litigation, Fresenius' analysis benefitted from input from its attorneys and consultants, who conducted a detailed investigation of Akorn's data integrity compliance.

179.     After years of neglecting to fix its data integrity problems, in April 2018 Akorn finally launched a "Data Integrity Remediation Project" ("DIRP").  However, this long overdue effort has resulted in minimal changes.  As senior Akorn executives, including Rai, testified during the Delaware Trial, as of July 2018 the project had not completed any meaningful steps to remediate the problems and no timetable is set for essential remediation items.

180.     DIRP also barely scratches the surface of the work required to "fix" Akorn.  As experts for both parties acknowledged at the Delaware Litigation, many of the data integrity issues identified by Akorn require the Company to do "retrospective reviews" to demonstrate that its historical data is reliable and accurate.  This enormous process will cripple Akorn's business because as Akorn's consultants have concluded, the data integrity problems call into question "every" product at the Company.  Akorn's years of hiding its problems have exacerbated the crisis, as each product the Company has released in the last year (at least) will also have to be reviewed.

181.     Since the trial in the Delaware Litigation, the FDA has increased its scrutiny of Akorn's data integrity practices.  According to Akorn documents, in August 2018 the FDA inspected Akorn's Decatur site and found that the site is out of compliance:

> **FDA has determined that the inspection classification of this facility is "official action indicated" ("OAI").** Based on this

inspection, this facility is considered to be in **an unacceptable state of compliance** with regards to current good manufacturing practice (CGMP). This facility may be subject to a CGMP regulatory or enforcement action based on this inspection[.]

182.    On August 22, during the later stages of the FDA's investigation, Akorn learned that the database for a high accuracy liquid particle counter at Akorn's Somerset Facility had been deleted along with the local backup file and the associated electronic security logs. These databases contained all of Somerset's data for the relevant testing, which is designed to ensure that sterile intravenous products do not contain excessive amounts of undisclosed solids. Akorn's preliminary investigation suggested that the files were deleted intentionally using an electronic shredding utility. On information and belief, and as the Chancery Court inferred may be the case, the perpetrator was trying to hide information from the FDA, or from personnel who would follow up on the deficiencies that the FDA identified in its Form 483.

183.    Indeed, on August 30, 2018, the FDA inspector issued a twenty-two page Form 483 detailing serious regulatory deficiencies it observed during the Somerset inspection.  Among the eleven observations, the inspector found that Akorn failed to exercise "[appropriate controls . . . over computers or related systems," that Akorn was distributing batches of adulterated sterile eye drops that failed four separate stability tests, and that Akorn conducted trial injections as a "widespread practice."  As a result of Akorn's widespread use of trial injections, the FDA inspector concluded that "there is limited assurance in the reliability of data submitted to the Agency and generated for commercial batches."

### R.    The Delaware Litigation and FDA Further Reveal the Extent of Defendants' Fraud

184.    On October 1, 2018, the Delaware Court of Chancery ruled in favor of Fresenius and against Akorn, and issued a post-trial Memorandum and Opinion and found, among other things, that "Fresenius validly terminated the Merger Agreement because Akorn's

representations regarding its compliance with regulatory requirements [in the Merger Agreement] were not true and correct, and the magnitude of the inaccuracies would reasonably be expected to result in a Material Adverse Effect [under the Merger Agreement]" and that "Fresenius validly terminated because Akorn materially breached its obligation to continue operating in the ordinary course of business between signing and closing."

185.     The Court's 246-page Memorandum and Opinion, which explicitly cited hundreds of non-public trial exhibits and referred to hundreds more which were admitted into evidence as well as fifty-four deposition transcripts lodged with the Court, the Court of Chancery revealed that, in fact and contrary to Akorn's denials:

- Akorn has pervasive data integrity and compliance problems that prevent Akorn from being able to meet FDA standards [Opinion at 164];

- Akorn has gone from representing itself as an FDA-compliant company with accurate and reliable submissions from compliant testing practices to a company in persistent, serious violation of FDA requirements with a disastrous culture of noncompliance.  [Opinion at 178];

- Akorn's own internal audit reports concluded that its products and facilities do not comply with cGMP and FDA requirements.  [Opinion at 178];

- In addition to these reports, the factual record contains extensive evidence of other, widespread quality problems at Akorn [Opinion at 168];

- Akorn's regulatory situation with respect to its lack of credibility with the FDA and its resultant inability to support its data, if called upon to do so by the FDA, had grown even worse since the July trial [Opinion at 112];

- A responsible remediation plan would include a complete review, which is highly likely to  ncover more problems with data integrity that will call ANDAs and products into question and push out the timing of Akorn's pipeline [Opinion at 182-183]; and

- these problems will have a financial impact on Akorn of approximately $900 million [Opinion at 184].

186.    The Memorandum and Opinion also included specific findings of fact that directly contradicted the denials in Akorn's May 14, 2018 verified answer.  For example:

| Fresenius's Allegation | Akorn's Public Verified Response | October 1 Finding |
|---|---|---|
| In November 2014, Akorn learned that an employee had written fraudulent data into the laboratory notebook of another employee who was an Akorn QC chemist. Akorn also learned that a laboratory notebook containing testing data for numerous products was missing. [¶ 69] | Counterclaim Defendant denies the allegations | In fall 2014, [a chemist] noticed other entries in the same notebook and in two other notebooks that were not in her handwriting. She reported it to [lab supervisor] Burkert, who did not ask any questions or follow up. The chemist next brought the issue to the attention of a quality manager who instructed all scientists to review their notebooks. The review discovered numerous instances of altered and missing data. In addition, two of Burkert's notebooks were missing. |
| [T]he April 2016 Lake Forest internal audit found that (as at Somerset) Akorn was failing in many respects to meet requirements for the periodic review of audit trails. As of the December 2017 audit, 20 months later, Akorn was still failing to do that. [¶60] | Counterclaim Defendant denies the allegations | At Lake Forest, in April 2016, GQC found that audit trails were not being reviewed for even "minimum criteria," including "data deletion" and "data manipulation." GQC also found that "multiple Akorn staff members" had unauthorized "system access allowances" that enabled them to modify data and to delete audit trails. When GQC visited Lake Forest again in December 2017, the problems had not been remediated |
| Akorn's data shows that it has conducted *tens of thousands* of trial injections, even just at its Vernon Hills, Somerset and Decatur sites. [¶79] | Counterclaim Defendant denies the allegations | The FDA reported to Akorn in an August 30, 2018 letter that "Akorn conducted trial injections as a "widespread practice" dating back to 2015, and "[n]o corrective measures to prevent this practice were implemented until" May 2018." |

187.    The October 1, 2018 revelations caused Akorn's stock price to fall 58.7%, from $12.98 per share at close on September 28, 2018 to $5.36 per share at close on October 1, 2018.

188.    On December 7, 2018, the Delaware Supreme Court affirmed the decision of the Chancery Court.

189.     On January 9, 2019, Akorn disclosed that it received a FDA Warning Letter dated January 4, 2019 in connection with the FDA's inspection of its Decatur facility in April and May 2018.  The Warning Letter cites the FDA's concerns with Akorn's cGMP and data integrity practices.  Specifically, the FDA states that Akorn's "quality system does not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs you manufacture."

190.     The revelation of the warning letter caused Akorn's stock price to fall 11.6%, from $3.94 per share at close on January 8, 2019 to $3.48 per share at close on January 9, 2019.

## V.     DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMMISSIONS OF MATERIAL FACT

191.     During the Class Period, Defendants made a host of materially false and misleading statements and omissions during Akorn's conference calls with investors and in the Company's SEC filings, press releases, and investor presentations.  Defendants' false statements and omissions generally fall into two related categories: (1) statements falsely representing that Akorn substantially complied with applicable regulations governing the testing and manufacturing of its drugs; and (2) statements that misleadingly touted Akorn's lucrative drug pipeline, while failing to disclose that the Company's pervasive and egregious data integrity failures, which included the submission of fraudulent data to the FDA, posed a highly serious risk to the Company's ability to seek approval for, and ultimately market, those pipeline drugs.

192.     In addition, Akorn's periodic SEC filings were misleading because they failed to disclose material information required to be disclosed by Item 303 of Regulation S-K (17 C.F.R. § 229.303).  Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Akorn's SEC periodic filings were

misleading because, in contravention of Item 303, those filings failed to disclose that Akorn's facilities were rife with serious repeat cGMP violations, which exposed Akorn to "significant regulatory and negative public perception risk" and jeopardized the Company's ability to obtain approval for, and successfully market, its drugs.

### A. Defendants' False and Misleading Statements During the Fourth Quarter of 2016

193.    The Class Period begins on November 3, 2016, by which time the Quality Oversight Committee of the Board chaired by Defendant Rai was "***aware of significant and repeat problems that Akorn was having in its quality function***," as Rai admitted under oath.  On that day, Akorn held a call with investors, led by Defendants Rai and Portwood, to discuss the Company's third quarter 2016 financial results, and, in particular, update the market on the status of the Form 483 that had been issued to Akorn in connection with its Decatur facility.  As discussed above, in August of 2016, Rai acknowledged that an FDA pre-approval inspection of Akorn's Decatur facility resulted in "a handful of observations" (*i.e.*, a Form 483), but stated that the FDA had not expressed any intent to conduct a re-inspection of the facility.  On the Company's November 3, 2016 earnings call, Rai announced, for the first time, that the FDA had, in fact, "concluded that a re-inspection is necessary to determine if corrective and preventative actions have been put in place and to determine if they're effective" in assuring Akorn's compliance with cGMP.

194.    In light of this announcement, investors had a heightened focus on Akorn's cGMP compliance from the very beginning of the Class Period.  On the November 3 earnings call, a JPMorgan securities analyst asked Defendants about the state of the Company's cGMP compliance at its Decatur facility.  Specifically, the analyst asked whether Akorn was "ready for a re-inspection today or is there still more work to be done on that front?"  Rai assured investors that the facility was in regulatory compliance, stating, "***[W]e're ready for a reinspection as we speak right now***."

Again, in response to an RBC Capital Markets analyst's question about the Decatur Form 483, Rai stated, "*we are ready for the reinspection . . . from [a] preparedness standpoint, we are ready for the reinspection*."

195.    On that same November 3, 2016 earnings call, a Guggenheim Securities analyst asked, "how many full-time employees have been hired to remediate the deficiency [at the Decatur facility] and have you retained a quality consulting firm such as Lachman to do that?"  Rai stated in response, "*I'm not sure what you mean by the hiring new employees for remediation.  I mean there is no remediation per se that we have we have to do at our Decatur site if that's what you're referring to.  We don't have any outside consult amounts that are deployed*."

196.    On the November 3, 2016 earnings call, a BofA Merrill Lynch analyst also asked Rai, "Are there any parallels that you can draw between this 483 and other 483s that Akorn may have received and how you handled those?"  Rai assured investors that there were no facts to suggest that Akorn would be unable to demonstrate cGMP compliance to the FDA, as it had in past inspections, stating, "I don't see [the Decatur 483 as] any different than what we have gone through in the past."

197.    Defendants' statements were materially false and misleading when made.  Contrary to Defendants' statements that "there is no remediation" of cGMP compliance that Akorn had to do at its Decatur site and that Akorn was "ready for" an FDA "reinspection," Akorn's facilities, including the Decatur site, were rife with "significant and repeat" cGMP violations, as detailed above.

198.    Also on November 3, 2016, Akorn filed its third quarter financial results on Form 10-Q with the SEC.  In that Form 10-Q, Akorn incorporated by reference the following statement appearing in its most recent Form 10-K:  "We are subject to extensive government regulations

which *if* they change or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities."

199.     Defendants' statements were materially false and misleading when made.  It was materially misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively *not* in compliance with those regulations.

200.     Further, as discussed above, Akorn's Form 10-Q was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

201.     On November 29, 2016, Portwood, among others, attended the Piper Jaffray Healthcare Conference on behalf of Akorn.  At that conference, a Piper Jaffray analyst asked:

> Now, one topic that has been *top of mind* for investors is the FDA observations, the Form 483 observations, at your Decatur, Illinois facility where you make primarily injectable products . . . . So just give us an update on where things stand with the reinspection.

Portwood responded, "*[W]e are ready for them [the FDA] whenever they do show up* . . . . You're always ready for them, *and that's where we stand right now*."

202.     Underscoring investor concern about Akorn's cGMP compliance, the Piper Jaffray analyst pressed Portwood on his reassuring statements on the subject.  Portwood confirmed that "there's nothing really more for us to do" in terms of GMP-related remediation, and the "work" of "operat[ing] under cGMP type standards . . . *has been done*."  Specifically, the Piper Jaffray analyst asked:

> Now, one more question on Decatur.  So, *I understand <u>there's no remediation activity that's needed</u>* . . . . But I just want to drill down on, Duane [Portwood], your comments about being ready for reinspection.  Does that mean that you believe you have addressed all of the observations or believe you've addressed them

adequately?  Is that how I should interpret that comment about being ready.

Portwood responded, "***Yes, I think that's a fair interpretation of that comment . . . . So yes, there's nothing really more for us to do*** other than just operate under cGMP type standards and *. . . that work has been done*."

203.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that there "was nothing really more for" Akorn to do to bring the Decatur site into compliance with FDA regulations, that the "work" of "operating under cGMP type standards" has already "been done," and that Akorn was "ready for" the FDA "whenever they do show up" because Akorn's facilities, including the Decatur site, were rife with "significant and repeat" cGMP violations, as detailed above.

204.    On December 12, 2016, Akorn filed a Form 8-K with the SEC trumpeting the results of the FDA's reinspection of its Decatur facility.  Akorn stated, "the U.S. Food and Drug Administration (FDA) conducted a re-inspection of its Decatur, Illinois manufacturing facility from December 5, 2016 to December 9, 2016, with no Form 483 observations."

205.    Defendants' statement was materially false and misleading when made.  It was misleading for Defendants to state that the FDA inspector issued "no Form 483 observations," when Defendants knew that, notwithstanding the FDA inspector's failure to issue a Form 483, the Decatur facility was actually rife with cGMP violations.   Indeed, Cerulean had reported to Defendants just days earlier that Decatur's data integrity controls were "insufficient to support compliance with current data integrity expectations" – citing seven "critical" and seven "major" data integrity deficiencies – and, "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk."  Even members of Akorn's Board had expressed "concern

-63-

around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

206.    Defendants' statements soothed investors' concerns about the state of Akorn's cGMP compliance.   For instance, in a November 3, 2016 report, William Blair analysts "maintain[ed] our Outperform rating as we believe the issues with the Decatur manufacturing site are a question of 'when' not 'if' they will be resolved."  Likewise, Craig-Hallum analysts noted in a November 4, 2016 report that "additional delays regarding resolution of the Decatur 483s is not ideal . . .  eventually (potentially soon), the remediation will be signed off on and the backlog of injectable ANDA/NDA will start to bear fruit."  Similarly, in a November 7, 2016 report Deutsche Bank analysts upgraded Akorn stock to a "buy" in the wake of Defendants' statements:  "***Given management's confidence that clearing Decatur is a when not an if, we like the set up for the stock from here, and are moving to a Buy rating (our PT remains $28)***."

207.    Again, in a December 12, 2016 report, Deutsche Bank analysts stated, "While management had expressed confidence that it had implemented sufficient corrective actions to address FDA's concerns raised in the prior Form 483 (received in June) and that a re-inspection could occur 'sooner than later' on the 3Q call, the timing of the re-inspection was quicker than we had expected and removes a key overhang for the stock."  In another December 12 report, Jeffries analysts noted that the "quick turnaround" on resolution of the Decatur Form 483 "is consistent with mgt's commentary that the infractions were not serious rather than more onerous violations that some had postulated."

**B.    Defendants' False and Misleading Statements During the First Quarter of 2017**

208.    On January 10, 2017, Defendant Portwood attended the JPMorgan Healthcare Conference on behalf of Akorn.  At that investor conference, Portwood touted Akorn's valuable

drug pipeline, stating, "[W]e have a large pipeline of pending ANDAs and planned launches . . . . As of the end of 2016, our pending ANDA count stood at 92 filings, which represent a total addressable IMS market value of approximately $9.5 billion . . . . We are starting to see a steady stream of product launches from our deep ANDA pipeline."

209.    Likewise, in its presentation to investors at that JPMorgan Healthcare Conference, Defendants touted Akorn's "large pipeline of pending ANDAs and planned launches," with "92 filings pending with the FDA with a total addressable IMS market value of $9.5B" and "[o]ver 75 additional ANDAs in various stages of development."

210.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Akorn's "large" and "deep" "pipeline of pending ANDAs," and to state that the pipeline had a market value of "$9.5 billion," with "[o]ver 75 additional ANDAs in various stages of development," while failing to disclose that the Company's pervasive and egregious data integrity failures, which included the submission of fraudulent data to the FDA, posed a material risk to the Company's ability to seek approval for, and ultimately market, those pipeline products.

211.    On March 1, 2017, Akorn held a call with investors, led by Rai and Portwood, to discuss the Company's fourth quarter and full-year 2016 financial results.  On that call, Rai highlighted that the FDA's reinspection of the Decatur facility had resulted in a favorable "No Action Indication" inspection classification.  Rai stated, "As we indicated in our December 12, 2016 press release, the FDA completed their reinspection of our Decatur facility on December 9 and had no Form 483 observations.  This resulted in achieving an NAI, or no action indicated, status for our Decatur facility."

212.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that the FDA inspector had failed to identify any cGMP violations at the Decatur facility, and to tout that the Company had "achiev[ed] an NAI, or no action indicated, status for our Decatur facility," when Defendants knew that, notwithstanding the FDA's failure to issue a Form 483, (i) the Decatur facility was actually rife with cGMP violations, (ii) Akorn had submitted false and manipulated data to the FDA, (iii) Cerulean had reported to Defendants that Decatur's data integrity controls were "insufficient to support compliance with current data integrity expectations" – citing seven "critical" and seven "major" data integrity deficiencies – and, "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk," and (iv)  even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

213.   On that same March 1, 2017 earnings call, Rai touted the FDA's recent approval of an ANDA coming out of the Decatur facility as demonstrating the Company's ability to obtain approval for its pipeline drugs.  Rai stated, "As we announced yesterday, we have received the approval of Mycophenolate, our first ANDA approval from the Decatur facility since the reinspection.  This implies that we should now expect to receive approvals for other filings, including ephedrine, from our Decatur facility that was delayed due to the compliance status."

214.   Likewise, in response to a question from a JPMorgan analyst, Rai further assured investors that Akorn would be "getting our products approved this year more than ever," given the FDA's positive feedback on Akorn's regulatory compliance.  Rai stated:

> [I]n terms of the feedback that we receive from the FDA on our filings and the type of questions employees have been receiving, we feel very comfortable that we can get through getting our products approved this year more than ever. And in fact, we got an approval

yesterday which, while the press release was (inaudible) injection, and subsequent to us filing the press release, we got another product approved for Decatur. So I think we are very optimistic and feel good about the prospects there.

215.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout ANDA approvals as demonstrating that "we should now expect to receive approvals for other filings" from the Decatur facility and to state that Akorn would be "getting our products approved this year more than ever" given the FDA's positive feedback on Akorn's regulatory compliance, when Defendants knew that, notwithstanding the FDA inspector's failure to issue a Form 483, (i) the Decatur facility was actually rife with cGMP violations, (ii) Akorn had submitted false and manipulated data to the FDA, (iii) Cerulean had reported to Defendants that Decatur's data integrity controls were "insufficient to support compliance with current data integrity expectations" – citing seven "critical" and seven "major" data integrity deficiencies – and, "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk," and (iv) even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

216.    Also on March 1, 2017, Akorn filed its fourth quarter and full-year 2016 financial results on Form 10-K with the SEC.  In Akorn's Form 10-K, Defendants stated that Akorn's "research and development expertise" and its "manufacturing expertise" were two of its five "competitive strengths."

217.    Likewise, Akorn's Form 10-K also repeatedly highlighted FDA approvals of its facilities, conveying the impression that those sites were materially compliant with applicable regulations.  Defendants stated that "[f]our of our five manufacturing facilities are Food and Drug Administration ("FDA") approved," specifically citing the Decatur, Somerset, Amityville and

Hettlingen facilities. Defendants further stated that in 2016 "***all of our FDA approved facilities were inspected and ultimately received satisfactory status from the FDA***."

218. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout the Company's supposed "research and development" and "manufacturing expertise" as giving Akorn a competitive advantage, when, in truth, the Company's R&D and manufacturing were in shambles, failed to meet basic regulatory requirements, and were rife with serious cGMP violations which, far from providing the Company with a competitive advantage, exposed Akorn to "significant regulatory and negative public perception risk."

219. Likewise, it was misleading for Defendants to tout that Akorn's facilities were FDA "approved," had been "inspected and ultimately received satisfactory status," that the Decatur facility in particular received the "the highest [FDA inspection] status level available," and to highlight the positive impact Akorn's facilities were having on the Company's product pipeline, when Defendants knew that (i) Akorn's facilities, including the Decatur facility, were actually rife with serious cGMP violations, (ii) Akorn had submitted false and manipulated data to the FDA, (iii) Cerulean had reported to Defendants that the Company's data integrity controls were "insufficient to support compliance with current data integrity expectations," and (iv) even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

220. Akorn's Form 10-K also stated "We are subject to extensive government regulations which ***if*** they change or we are not in compliance with, could increase our costs, subject us to various obligations and fine, or prevent us from selling our products or operating our facilities."

221.     Defendants' statements were materially false and misleading when made.  It was materially misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively ***not*** in compliance with those regulations.

222.     Further, as discussed above, Akorn's Form 10-K was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

223.     Finally, on March 1, 2017, Akorn also issued a press release, and filed that press release on Form 8-K with the SEC.  In that press release, Defendants stated that Akorn "[r]eceived FDA NAI status (No Action Indicated), the highest status level available, for the Company's Decatur facility, following the December 2016 re-inspection.  The Company's three other FDA approved manufacturing sites are in good standing following 2016 FDA inspections."

224.     Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout that the Company had "[r]eceived FDA NAI status (No Action Indicated), the highest status level available, for the Company's Decatur facility" and to state that the "Company's three other FDA approved manufacturing sites are in good standing following 2016 FDA inspections," when Defendants knew that, notwithstanding the FDA inspector's failure to issue Form 483s, (i) Akorn's facilities, including the Decatur facility, were actually rife with serious cGMP violations, (ii) Akorn had submitted false and manipulated data to the FDA, (iii) Cerulean had reported to Defendants that the Company's data integrity controls were "insufficient to support compliance with current data integrity expectations," and (iv) even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

-69-

225.     Again, Defendants' statements soothed the market's concerns about Akorn's regulatory compliance and the state of its facilities.  For instance, in a March 1, 2017 report, William Blair analysts rated Akorn stock "Outperform," and flagged for investors that "***the company noted that all of its FDA approved manufacturing sites are in good condition following 2016 inspections***."  In that same report, the analysts highlighted "the company's pipeline," repeating Defendants' claims that the pipeline "represent[ed] $9.5 billion in total market value."  Likewise, on March 6, 2017 Deutsche Bank analysts reported that "the Decatur facility issues [were] behind the company," and highlighted Akorn's "large number of [pending] ANDAs (generic applications) at the FDA."

### C.     Defendants' False and Misleading Statements During the Second Quarter of 2017

226.     On April 24, 2017, Akorn filed a Form 8-K announcing that it had entered into the Merger Agreement with Fresenius Kabi AG to be acquired for $34.00 in cash per share.  In its Form 8-K, Akorn stated that it would "operate its business in the ordinary course of business in all material respects . . . prior to the consummation of the Merger."

227.     Defendants' statement was materially false and misleading when made.  Contrary to Defendants' statement that Akorn would "operate its business in the ordinary course of business in all material respects," Akorn failed to investigate and remediate its pervasive and egregious data integrity violations, and, in fact, actively impeded the investigation of those violations by, among other things, dramatically curtailing the scope of the Company's compliance audits.

228.     Akorn's Form 8-K attached the Merger Agreement as Exhibit No. 2.1.  In the Merger Agreement, Defendants represented that Akorn was, and had been, compliant with FDA regulations.  Defendants stated,

> The Company and its Subsidiaries are, and to the Knowledge of the Company, since July 1, 2013 . . . ***have been in compliance with . . .***

*all applicable Laws (including all rules, regulations, guidance and policies) relating to or promulgated by the U.S. Food and Drug Administration.*

229.  Further, Defendants represented in the Merger Agreement that Akorn was, and had since 2013 been, in material compliance with cGMP, *particularly data integrity requirements*, and had conducted all trials and studies in accordance with standard medical and scientific practices and Good Clinical Practices requirements.

> The Company and its Subsidiaries are and have been, since July 1, 2013, *in compliance with current good manufacturing practices and have maintained appropriate mechanisms, policies, procedures and practices to ensure the prompt collection and reporting of adverse event or any other safety or efficacy data*, notifications, corrections, recalls and other actions required by Law related to their products, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

> Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since July 1, 2013 (i) *all preclinical and clinical studies or tests sponsored by the Company and its Subsidiaries have been conducted in compliance with standard medical and scientific research procedures and applicable Law (including Good Clinical Practices requirements)*.

230.  Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Akorn was, and had been, materially compliant with FDA regulations, including cGMP, and particularly with data integrity requirements, and that Akorn had conducted all trials and studies in accordance with standard medical and scientific practices and Good Clinical Practices requirements, when Defendants knew that (i) Akorn's facilities were actually rife with serious cGMP violations, (ii) Akorn had submitted false and manipulated trial data to the FDA, (iii) Cerulean had reported to Defendants that the Company's data integrity controls were "insufficient to support compliance with current data integrity expectations," and

(iv) even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

231.    In the Merger Agreement filed with Akorn's Form 8-K, Defendants further stated that the Company's FDA filings contained no material misstatements or omissions.  Defendants stated:

> All material reports, documents, claims and notices required or requested to be filed, maintained, or furnished to any Healthcare Regulatory Authority by the Company and its Subsidiaries since July 1, 2013, have been so filed, maintained or furnished and, to the Knowledge of the Company, **were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing)**, except where the failure to do so (or the failure to be complete and correct) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.
>
> *            *            *
>
> Since July 1, 2013, neither the Company nor any of its Subsidiaries (i) have made **an untrue statement of a material fact or fraudulent statement to the FDA or any other Governmental Authority, (ii) have failed to disclose a material fact required to be disclosed to the FDA or other Governmental Authority, (iii) have committed any other act, made any statement or failed to make any statement, that (in any such case) establishes a reasonable basis for the FDA to invoke its Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities Final Policy**.

232.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Akorn's FDA filings, including those it "maintained," contained no material misstatements or omissions, when Defendants knew that Akorn had submitted false and manipulated trial data to the FDA on multiple occasions and that Cerulean had reported to Defendants that the Company's data integrity controls were "insufficient to support compliance with current data integrity expectations."

233.    On May 4, 2017, Akorn filed its first quarter 2017 financial results on Form 10-Q with the SEC.  In the Form 10-Q, Defendants stated, "We are subject to extensive government regulations which *if* they change or we are not in compliance with, could increase our costs, subject us to various obligations and fine, or prevent us from selling our products or operating our facilities."

234.    It was materially misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively ***not*** in compliance with those regulations.

235.    Further, Akorn's first quarter 2017 Form 10-Q discussed the Merger Agreement, and stated that the Company would "operate its business in the ordinary course of business in all material respects . . . prior to the consummation of the Merger."

236.    Defendants' statement was materially false and misleading when made.  Contrary to Defendants' statement that Akorn would "operate its business in the ordinary course of business in all material respects," Akorn failed to investigate and remediate its pervasive and egregious data integrity violations, and, in fact, actively impeded the investigation of those violations by, among other things, dramatically curtailing the scope of the Company's compliance audits.

237.    Akorn's first quarter 2017 Form 10-Q also incorporated by reference the Merger Agreement, including the statements described in paragraphs 226, 228, 229 and 231, above.  These statements were materially false and misleading when made for the reasons discussed in paragraphs 227, 230 and 232, above.

238.     In addition, as discussed above, Akorn's Form 10-Q was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

239.     On May 22, 2017, Akorn filed its Proxy Statement on Schedule 14A in connection with the proposed Fresenius acquisition.  Akorn's Proxy Statement instructed shareholders, "***your careful consideration of, and vote on, the merger agreement is important*** . . . . The merger cannot be completed unless the merger agreement is approved by shareholders."  In the Proxy Statement, Defendants specifically told shareholders, "***We encourage you to carefully read the accompanying proxy statement and the copy of the merger agreement attached as Annex A thereto***."  Akorn's Proxy Statement included the Merger Agreement, including the statements described in paragraphs 226, 228, 229 and 231, above.  These statements were materially false and misleading when made for the reasons discussed in paragraphs 227, 230 and 232, above.

240.     In addition, Akorn's Proxy Statement incorporated by reference Akorn's 2016 Form 10-K, including the statements described in paragraphs 216, 217, 220 and 222, above.  These statements were materially false and misleading when made for the reasons discussed in paragraphs 218, 219 and 221, above.

241.     Finally, Akorn's Proxy Statement also incorporated by reference Akorn's first quarter 2017 Form 10-Q, including the statements described in paragraphs 233 and 235, above.  These statements were materially false and misleading when made for the reasons discussed in in paragraph 234 and 236, above.

**D.     Defendants' False and Misleading Statements During the Third Quarter of 2017**

242.     On July 31, 2017, Akorn filed its second quarter 2017 financial results on Form 10-Q with the SEC.  In the Form 10-Q, Defendants stated that the Company would "operate its

business in the ordinary course of business in all material respects . . . prior to the consummation of the Merger."

243.    Defendants' statement was materially false and misleading when made.  Contrary to Defendants' statement that Akorn would "operate its business in the ordinary course of business in all material respects," Akorn failed to investigate and remediate its pervasive and egregious data integrity violations, and, in fact, actively impeded the investigation of those violations by, among other things, dramatically curtailing the scope of the Company's internal audits.

244.    Defendants also stated in Akorn's second quarter 2017 Form 10-Q, "We are subject to extensive government regulations which *if* they change or we are not in compliance with, could increase our costs, subject us to various obligations and fine, or prevent us from selling our products or operating our facilities."

245.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively ***not*** in compliance with those regulations, that Akorn's facilities were actually rife with serious cGMP violations, and that Akorn had submitted false and manipulated trial data to the FDA.

246.    Defendants further stated in the Form 10-Q that there was only "[t]he ***possibility*** that any or all of the various conditions to the consummation of the merger may not be satisfied or waived."  Similarly, Defendants stated in the Form 10-Q that the "occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement, including in circumstances which would require Akorn to pay a termination fee or other expenses" could affect the Company's results.

247. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that there was only a "*possibility*" that the terms of the Merger Agreement "*may* not be satisfied," and to discuss the contingent "occurrence of [an] event [or] change" that "*could* give rise to the termination of the Merger Agreement," when at the time these statements were made, Defendants were well aware that Akorn was affirmatively *not* in compliance with FDA regulations, that Akorn's facilities were actually rife with serious cGMP violations, that Akorn had submitted false and manipulated trial data to the FDA, and that the terms of the Merger Agreement were, as a matter of historical fact (rather than speculative possibility), *not* satisfied and that circumstances under which the Merger Agreement could be terminated had already occurred.

248. In addition, as discussed above, Akorn's Form 10-Q was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

### E. Defendants' False and Misleading Statements During the Fourth Quarter of 2017

249. On November 1, 2017, Akorn filed its third quarter 2017 financial results on Form 10-Q with the SEC. In the Form 10-Q, Defendants stated that the Company would "operate its business in the ordinary course of business in all material respects . . . prior to the consummation of the Merger."

250. Defendants' statement was materially false and misleading when made. Contrary to Defendants' statement that Akorn would "operate its business in the ordinary course of business in all material respects," Akorn failed to investigate and remediate its pervasive and egregious data integrity violations, and, in fact, actively impeded the investigation of those violations by, among other things, dramatically curtailing the scope of the Company's compliance audits.

251.    Defendants also stated in Akorn's third quarter 2017 Form 10-Q, "We are subject to extensive government regulations which *if* they change or we are not in compliance with, could increase our costs, subject us to various obligations and fine, or prevent us from selling our products or operating our facilities."

252.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively *not* in compliance with those regulations, that Akorn's facilities were actually rife with serious cGMP violations, and that Akorn had submitted false and manipulated trial data to the FDA.

253.    Defendants further stated in the Form 10-Q that there was only "[t]he *possibility* that any or all of the various conditions to the consummation of the merger may not be satisfied or waived."  Similarly, Defendants stated in the Form 10-Q that the "occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement, including in circumstances which would require Akorn to pay a termination fee or other expenses" could affect the Company's results.

254.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that there was only a "*possibility*" that the terms of the Merger Agreement "*may* not be satisfied," and to discuss the contingent "occurrence of [an] event [or] change" that "*could* give rise to the termination of the Merger Agreement," when at the time these statements were made, Defendants were well aware that Akorn was affirmatively *not* in compliance with FDA regulations, that Akorn's facilities were actually rife with serious cGMP violations, that Akorn had submitted false and manipulated trial data to the FDA, and that the terms

of the Merger Agreement were, as a matter of historical fact (rather than speculative possibility), *not* satisfied and that circumstances under which the agreement could be terminated had already occurred.

255. In addition, as discussed above, Akorn's Form 10-Q was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

### F.   Defendants' False and Misleading Statements During the First Quarter of 2018

256. On February 26, 2018, Akorn issued a press release concerning the Merger with Fresenius. In that press release, Defendants stated in part:

> Akorn and Fresenius Kabi AG, with the assistance of outside consultants, are investigating alleged breaches of FDA data integrity requirements relating to product development at the Company. ***To date, the Company's investigation has not found any facts that would result in a material impact on Akorn's operations and the Company does not believe this investigation should affect the closing of the transaction with Fresenius***.

257. Defendants' statement was materially false and misleading when made. It was misleading for Defendants to state that Akorn's "investigation has not found any facts that would result in a material impact on Akorn's operations" and that "investigation should [not] affect the closing of the transaction with Fresenius," when, in truth, Defendants' audits and investigations had demonstrated that Akorn's facilities were rife with serious cGMP violations, had uncovered hundreds of repeat, systemic data integrity deficiencies (including numerous "critical" and "major" deficiencies), that Akorn's most senior quality executive had intentionally submitted false trial data to the FDA, that the Company had manipulated trial data by, among other things, conducting trial injections despite explicit FDA warnings against the practice, and that Akorn had curtailed,

prematurely terminated, or actively impeded these investigations in order to conceal evidence of wrongdoing.

258.    On February 28, 2018, Akorn filed its fourth quarter and full-year 2017 financial results on Form 10-K with the SEC.  In Akorn's Form 10-K, Defendants stated that Akorn's "research and development expertise" and its "manufacturing expertise" were two of its five "competitive strengths."

259.    Likewise, Akorn's Form 10-K also repeatedly highlighted the FDA's approval of its facilities, conveying the impression that those sites were materially compliant with applicable regulations.  Defendants stated that "four of our five manufacturing facilities are Food and Drug Administration ("FDA") approved," specifically citing the Decatur, Somerset, Amityville and Hettlingen facilities.  Moreover, after enumerating the FDA regulations to which Akorn was subject, Defendants specifically stated that in 2017, "*all of our FDA approved facilities were inspected and ultimately received satisfactory status from the FDA*."

260.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout the Company's supposed "research and development" and "manufacturing expertise" as giving Akorn a competitive advantage, when in truth the Company's R&D and manufacturing were in shambles, failed to meet basic regulatory requirements, and were rife with serious cGMP violations which, far from providing the Company with a competitive advantage, exposed Akorn to "significant regulatory and negative public perception risk."

261.    Likewise, it was misleading for Defendants to tout that Akorn's facilities were FDA "approved," had been "inspected and ultimately received satisfactory status," that the Decatur facility in particular received the "the highest [FDA inspection] status level available," when Defendants knew that (i) Akorn's facilities, including the Decatur facility, were rife with serious

cGMP violations, (ii) Akorn had submitted false and manipulated data to the FDA, (iii) audits and investigations of Akorn's compliance had uncovered hundreds of repeat, systemic data integrity deficiencies (including numerous "critical" and "major" deficiencies), and (iv) even members of Akorn's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

262.    Akorn's Form 10-K also stated, "We are subject to extensive government regulations which **if** they change or we are not in compliance with, could increase our costs, subject us to various obligations and fine, or prevent us from selling our products or operating our facilities."

263.    Defendants' statements were materially false and misleading when made.  It was materially misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively **not** in compliance with those regulations.

264.    Further, as discussed above, Akorn's Form 10-K was materially misleading because it failed to disclose the Company's pervasive cGMP violations and regulatory noncompliance in violation of Item 303.

### G.    Defendants' False and Misleading Statements During the Second Quarter of 2018

265.    On May 2, 2018, Akorn filed its first quarter 2018 financial results on Form 10-Q with the SEC.  Defendants stated in that Form 10-Q, "We are subject to extensive government regulations which **if** they change or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities."

266.     Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively *not* in compliance with those regulations, that Akorn's facilities were actually rife with serious cGMP violations, and that Akorn had submitted false and manipulated trial data to the FDA.

### H.     Defendants' False and Misleading Statements During the Third Quarter of 2018

267.     On August 1, 2018, Akorn filed its second quarter 2018 financial results on Form 10-Q with the SEC.  Defendants stated in that Form 10-Q, "We are subject to extensive government regulations which *if* they change or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities."

268.     Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state merely that "if" Akorn is out of compliance with FDA regulations there would be consequences, when, at the time the statement was made, Defendants knew that Akorn was affirmatively *not* in compliance with those regulations, that Akorn's facilities were actually rife with serious cGMP violations, and that Akorn had submitted false and manipulated trial data to the FDA.

### I.     Defendants' False and Misleading Statements Published on Akorn's Website Throughout the Class Period

269.     Throughout the Class Period, Defendants published on Akorn's website a California Compliance Policy and Declaration.  In this Declaration, Defendants stated that Akorn had "designated a Compliance Officer to implement and oversee the Compliance Program as a priority of the Company's commitment to lawful conduct of its businesses."  Defendants stated

that the Compliance Officer "will ensure that good faith reports of unlawful conduct relating to the Company's operations or practices are duly investigated" and that "if evidence of a violation exists, the Compliance Offer will recommend an appropriate course of action to management. The Compliance Officer will relate the outcome of investigations and actions taken to the Board of Directors."

270. Defendants further assured investors that Akorn strictly enforced legal and regulatory compliance, stating that "it is the policy of the Company that the standards of conduct and procedures for compliance with the laws and regulation applicable to the Company's business set forth in the Compliance Program shall be consistently enforced through appropriate disciplinary mechanisms."

271. At the conclusion of Akorn's Declaration, Defendants affirmed that the statements therein reflected the current state of Akorn's business: "to our knowledge as of the date of this declaration, Akorn is in compliance with our Comprehensive Compliance Program, as described here, and with California Health & Safety Code sections 119400 and 119402."

272. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that "commitment to lawful conduct of its businesses" was a "priority" for Akorn, that Akorn's Compliance Officer "will ensure," and to Defendants' knowledge had ensured, that reports of misconduct would be investigated, that the Compliance Officer would, and had, "recommend[ed] an appropriate course of action to management" when evidence of a violation was uncovered, and that the Company's "standards of conduct and procedures for compliance with the laws and regulation" were "consistently enforced through appropriate disciplinary mechanisms." Contrary to these statements, Akorn was not "committed" to conducting its business lawfully, but rather pervasively, repeatedly, and egregiously violated

-82-

FDA regulations, and rather than investigate and penalize wrongdoers, Akorn actively impeded

investigations of fraud and data manipulation involving its most senior executives.

273.     Also throughout the Class Period, Defendants stated on Akorn's website:

> Our management and employee workforce are committed to
> successfully deploying our company's Quality Policy to all aspects
> of our firm - assuring continued high quality, safe and effective
> Akorn products for our customers. This commitment **will be**
> maintained through having the right people ***doing the right things,***
> ***the first time, every time***. This includes . . . A management team that
> is accountable for effective review and support of quality, through
> the prioritization, resourcing, and timely execution of ***quality-***
> ***conscious decision-making***.

274.     Defendants' statements were materially false and misleading when made.

Defendants' statements that Akorn "will" maintain its commitment to quality by "doing the right

things, the first time, every time" and that the Company's management team was "accountable"

for "support of quality" through "the prioritization, resourcing, and timely execution of quality-

conscious decision-making" when, in truth, Akorn was not "committed" to doing the right things,

the first time, every time," but rather pervasively, repeatedly, and egregiously violated FDA

regulations, and rather than hold management "accountable" for supporting critical quality

requirements, Akorn actively allowed its senior executives to engage in fraud and data

manipulation and attempted to shield them from investigation.

## VI.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

275.     All Section 10(b) Defendants acted with scienter in that they knew, or recklessly

disregarded, that their statements were false and misleading when made.  While the facts set forth

above sufficiently demonstrate these Defendants' scienter, additional facts further demonstrating

scienter are set forth below.

276.     Defendants knew that, contrary to their various and repeated public statements, that

Akorn was not, and had not been, materially compliant with FDA regulations, including cGMP,

and particularly data integrity requirements, and that Akorn had not conducted all trials and studies
in accordance with standard medical and scientific practices and Good Clinical Practices
requirements.  In truth, Akorn's facilities were actually rife with serious cGMP violations.  As
discussed in internal audit reports prepared by GQC in April 2016, June 2016, October 2016, and
December 2016, and in audit reports prepared for Akorn by Akorn's third-party auditor, Cerulean,
Akorn was riddled with severe, pervasive, and repeat violations of FDA data integrity
requirements, which Akorn's auditors noted exposed the Company to "significant regulatory and
negative public perception risk."  Akorn's severe data integrity violations, which were documented
in audit and investigative reports that were provided to Defendants, include the following:

(a)     Akorn submitted false, fraudulent, and manipulated data to the FDA with
        respect to at least three ANDAs, including the ANDA for azithromycin,
        which was pending at the time of the Vote.  Specifically, with respect to the
        azithromycin ANDA, Akorn submitted data showing the drug passed a test
        that was never performed.  With respect to Akorn's ANDA for olopatadine,
        Akorn engaged in the prohibited practice of "testing into compliance,"
        running successive tests for the drug until a passing result was achieved.
        With respect to Akorn's ANDA for cyclopentolate made a deliberate change
        in a testing procedure to force a passing result;

(b)     As Akorn's third party auditor NSF Health Sciences reported, Akorn
        engaged in the improper practice of running "trial injections" – a form of
        "testing into compliance" whereby a drug is tested in an unreported
        "practice" trial to ensure it passes – on a massive scale between 2012 and
        2016.  As NSF found, Akorn performed tens of thousands of improper trial
        injections with respect to dozens of products, at multiple sites, and
        numerous different employees.  Notably, Akorn continued to engage in this
        improper practice even after being warned by the FDA to desist;

(c)     As GQC's April 2016 audit of Akorn's Lake Forest site found, Akorn staff
        members had unauthorized "system access allowances" that allowed them
        to modify and manipulate data as well as to delete audit trails.  Moreover,
        among other things, GQC found that audit trails at Lake Forest were not
        being reviewed for even basic data issues.  As a result, GQC concluded that
        the Lake Forest site had "*unmitigated compliance risks associated with
        Data Integrity*";

(d)     As GQC's June 2016 audit of Akorn's Vernon Hills facility found, there were critical data integrity issues involving Akorn's failure to implement proper controls for its computer systems. Specifically, Akorn had failed "to assure that only authorized personnel make changes in master product and control records." Likewise, the site was "unable to record audit trails" and could not identify the users performing certain tests. Current Akorn VP of Quality Operations Kim Wasserkrug testified in the Delaware Litigation that these are "***problem[s] that violate[] FDA guidelines***";

(e)     The Quality Oversight Committee of Akorn's Board, which included Executive Defendants Rai and Silverberg and Board Defendants Johnson, Weinstein, and Tambi and others (including Chief Operating Officer Bruce Kutsinky, Executive Vice President of Pharmaceutical Operations Steven Lichter, Executive Vice President of Global Quality Compliance Jaspreet Gill and Akorn Chief Human Resources Officer Greg Lawless), was regularly briefed on and discussed Akorn's data integrity and cGMP deficiencies. As Johnson stated in a June 2016 email to Akorn's head of quality, Mark Silverberg, there was "continued non-compliance by employees, supervisors and quality assurance staff" throughout Akorn. Specifically, Johnson wrote to Silverberg that Johnson continued "to be concerned that our position always seems to be that the FDA got it wrong and we are just fine. I do not think we are fine. I think there are signals that we are missing. As the leader of the quality function, I do not understand how you can tolerate the ***continued non-compliance by employees, supervisors and quality assurance staff***. We have dogged [sic] a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures. Why do we not see an effort to do this?";

(f)     As GQC's October 2016 audit of Akorn's Amityville site found, Akorn did not comply with 21 CFR 211.68(b), which states that "appropriate controls shall be exercised over computer or related systems to assure those changes in master production and control records or other records are instituted only by authorized personnel." GQC found that in connection with certainty viscosity tools, multiple users had administrator access, data files had been overwritten, two unsaved tests were executed and several notebook entries were missing. Moreover, there was no instrument use log to record testing activity and no data backups had been performed on certain instruments;

(g)     As Rai testified in the Delaware Litigation, by November of 2016, the start of the Class Period, he and the other Quality Oversight Committee members were "***aware of significant and repeat problems that Akorn was having in its quality function***";

(h)     As Cerulean reported in a reported issued to Akorn on December 5, 2016, the Company's Decatur site was riddled with severe cGMP violations. The

Decatur facility was Akorn's largest manufacturing site, originated an outsized portion – approximately 35% – of the ANDAs for the Company's all-important drug pipeline, and was the principal manufacturing site for Akorn's high-margin injectable drugs. Moreover, Decatur was also the site at which Akorn manufactured its most lucrative and important new drug, ephedrine sulfate, which accounted for approximately 21% of Akorn's second quarter 2016 net revenue and approximately 23% of Akorn's third quarter 2016 net revenue. Thus, it would have been devastating to Akorn's business if the marketability or approvability of drugs originating from the Decatur site were jeopardized by regulatory noncompliance;

(i)     As Cerulean reported in December 2016, Akorn "fail[ed] to exercise sufficient controls to prevent data loss." Among other things, the Cerulean report found that over 200,000 files of raw data used to verify sterile container closure acceptance for products produced since May 2015 have been destroyed, in direct violation of multiple regulatory recordkeeping regulations. Akorn also had "insufficient data integrity controls (both procedural and technical) to prevent unauthorized changes to electronic data." Among other things, several of Akorn's computer systems did not have required audit trail capabilities, certain computer systems had audit trails turned off, data was not properly backed up, and that the Company did not have required written policies concerning data integrity compliance and the retention of raw laboratory data. Akorn's computer systems also had insufficient controls, allowing anyone with Akorn network access to add, delete, or change data used in the production and testing of drug products;

(j)     As Cerulean reported in December 2016, Akorn had "insufficient regulated record archival controls and retention for records involved in drug product manufacture, testing and release, and quality records." Among other things, Akorn did not adequately retain backup tapes (in direct conflict with federal regulations), had insufficient data backup procedures and systems, did not have periodic or routine verifications of backups and, as Cerulean explained, had a "woefully out-of-date" collection of archived paper records;

(k)     As Cerulean reported in December 2016, Akorn "fail[ed] to have sufficient controls over computerized equipment used in regulated processes and used to create, manipulate, edit, store, et al regulated data for drug product safety and quality testing and release." Among other things, Cerulean found that users had "uncontrolled access" to modify or delete data and could adjust the date and time on computerized systems. Moreover, Akorn's computer systems were not properly audited or reviewed to verity user access and the data showed that multiple user accounts had been deleted on the Akorn network, leaving the Company unable to accounted for regulated data. Cerulean principal John Avellanet testified in the Delaware Litigation that these deficiencies showed that the Akorn Decatur data center "does not meet

minimum industry standards for a simple Tier 1 data center, much less regulatory guidance expectations and IT industry best practices." Avellanet further testified that these problems were unprecedented and "call[] into question all of the test data, all of the production data, all of the view material specifications" of Akorn;

(l)     As Cerulean reported in December 2016, Akorn had "inadequate validation of computerized systems to ensure the ongoing suitability of systems for Akorn processes, data, and personnel";

(m)     As Cerulean reported in December 2016, Akorn had "inadequate control over approved specifications for drug product and raw materials, and failure to ensure that product testing data is derived from compliance with established specifications and standards." Among other things, as Cerulean found, all Akorn personnel with network access had modify, add, delete, permissions to shared network folders, calling into "serious question the identity, strength, quality, safety, purity, and sterility of Akorn's drug products." This practice was in direct conflict with multiple federal regulations;

(n)     As Cerulean reported in December 2016, Akorn had "inadequate corrective action and preventative action and out-of-specification investigations, explanations, and corrective actions." Among other things, internal audit findings and external audit or inspectional findings were not properly tracked and that Akorn's investigation and corrective action programs fail to prevent re-occurrence of failures. Even more troubling, Cerulean found that 58% of out-of-specification investigations referenced "personnel" as the root cause of the problem, significant highly than the industry average of 15-18% as personnel as root cause;

(o)     As Cerulean reported in December 2016, Akorn has "inadequate training processes and training effectiveness";

(p)     As Cerulean reported in December 2016, Akorn had an "inadequate and insufficient internal audit program";

(q)     Cerulean also audited cGMP compliance at Akorn's Somerset site, and issued its report on that facility in May 2017. As Cerulean reported in May 2017, Akorn had a "[f]ailure of the Akorn IT department, as a core component of a 21st century quality control management structure, to ensure reliability of the controls around data used to make, test, release, and surveil sterile drug product." Cerulean noted that this deficiency "*raises serious questions about the reliability of any data integrity controls and thus the trustworthiness of any electronic information used through Akorn to make safety, efficacy and quality decisions*";

(r)     As Cerulean reported in May 2017, Akorn had a "[f]ailure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn." In particular, as Cerulean explained, this deficiency was so severe that it could expose management to potential criminal liability under the *Park* doctrine (*see United States v. Park*, 421 U.S. 658 (1975)); and

(s)     As third party data integrity auditor Lachman Consultants (which was retained by Fresenius to audit Akorn's data integrity compliance) reported (as memorialized in a June 10, 2018 report issued by Lachman Director Ron George), "data was not documented contemporaneously" within Akorn, "electronic records were not traceable to a corresponding notebook entry," indicating "backdating [] records," "calling into serious question" Akorn's data and "thus the safety and efficacy of Akorn's products." Lachman's audit examined three different Akorn sites: Vernon Hills, Somerset, and Decatur.

277.    Additionally, Defendants knew through Silverberg, Akorn's most senior Quality Assurance officer at Akorn who oversaw more than 500 employees, reported directly to the CEO and communicated directly with Board members, that Akorn was rife with serious cGMP violations. For example:

(a)     As discussed above, Akorn admits that Silverberg "was fired" for his culpable participation in violating data integrity regulations, including, as Wasserkrug testified in the Delaware Litigation, failing to "direct the withdrawal of an ANDA submitted to the FDA for the drug azithromycin after being told that submission contained likely false or fabricated data." Among other things, as discussed above, Silverberg personally authorized the submission of data he knew was false to the FDA, and then attempted to conceal his fraud from regulators. For example:

(b)     Silverberg was aware of numerous serious deficiencies in Akorn's cGMP even before the start of the Class Period. For instance, in June 2016, Ron Johnson, an Akorn Board member with FDA experienced, wrote to Silverberg:

> As the leader of the quality function, I do not understand how you can tolerate the continued non-compliance by employees supervisors and quality assurance staff . . . . We have dogged [sic] a bullet a number of times, but at some point our number will be up unless we, once and for all, fix the underlying reasons why our people do not

adhere to procedures.  Why do we not see an
effort to do this?

(c)    In July of 2016, Silverberg learned that false test data had been used to
support the azithromycin ANDA submitted to the FDA in 2012.
Specifically, a chemist reported forged entries in her lab notebook reporting
positive results from tests that she did not, and, in fact, could not, have
performed.  Silverberg failed to direct that the ANDA be withdrawn.  The
chemist also identified entries for six additional products that were not made
by her, and reported that two of her lab notebooks were missing – clear
violations of data integrity requirements.  Silverberg failed to report any of
these violations to the FDA.

(d)    By November 2016, the beginning of the Class Period, even Akorn's Board
was "aware of significant and repeat problems that Akorn was having in its
quality function," the function headed by Silverberg.

(e)    In August 2017, Sherwani, Somerset's head of quality, told Silverberg that
she "fully underst[ood] that we are on the cusp of the [Fresenius]" merger,
but Somerset was "***in a state of jeopardy as it relates to data integrity***," yet
IT had refused to address the issue.

(f)    Also in August 2017, as discussed above, Silverberg knowingly authorized
the submission of additional false and fabricated data in response to a CRL
issued by the FDA seeking additional information in connection with the
azithromycin ANDA.  Silverberg knew that the submission included the
false and fabricated data that had been submitted with the original ANDA
in 2012, along with new fabricated data that had not been previously
submitted to the FDA.

(g)    That same month, Sherwani, along with Somerset's general manager,
repeatedly urged Silverberg to withdraw the ANDA because it contained
fabricated data.  In an August 28, 2017 email, Sherwani asked Silverberg,
"Are you allowing Regulatory Affairs to continue to submit inaccurate
information?"

(h)    As discussed above, Silverberg actively attempted to conceal his fraud.
Silverberg instructed Somerset not to open a formal investigation.  Then,
once whistleblower letters forced Akorn to finally open an investigation,
Silverberg told Sherwani "clearly this investigation is focused on the three
of us," *i.e.* Silverberg, Sherwani, and the Somerset general manager Michael
Stehn.  Silverberg told Sherwani that "he would never discuss [the
submission of fraudulent data] with legal," and "if anything came of it, he
might, you know, ***take the paper and eat it if he had to***."    .

(i)    Silverberg also received each of the audit reports detailing Akorn's
widespread cGMP violations described above, including reports issued by

GQC, Cerulean, and NSF both before and during the Class Period. Indeed, in early 2017, Silverberg was tasked with developing "an overall roadmap for data integrity approval," which included implementing the remedial actions identified by Cerulean. Thus, Silverberg was not only aware of data integrity deficiencies identified in these audits, he was personally tasked with addressing them. Predictably, however, Akorn failed to actually develop any such roadmap.

(j) Again, while Silverberg's knowledge of Akorn's widespread data integrity failures demonstrates his scienter by itself, like Rai, Silverberg also had a significant financial motive to misrepresent the true state of affairs at Akorn as a result of the pending merger with Fresenius. Silverberg stood to receive more than $9 million in compensation if the Merger was consummated. Silverberg knew that, in order to ensure that a merger was consummated at a high price, it was essential that Akorn keep its pervasive data integrity problems under wraps because disclosure of those problems would jeopardize FDA approval of Akorn's valuable pipeline drugs, and would scare away any merger partner due to (1) the risk that the FDA might delay approval of (or even deny approval to) those drugs, (2) the risk that the FDA might impose additional sanctions on Akorn, and (3) the severe costs associated with remediating Akorn's widespread data integrity failures. Indeed, Wasserkrug's testimony makes clear that Silverberg and other members of Akorn management canceled further Cerulean audits after receiving the firm's highly critical assessments of the Decatur and Somerset facilities "*because of the merger*."

## A. Defendant Rai

278. Defendant Rai has admitted in his testimony during the Delaware Litigation that he personally received a steady stream of audit reports (and was aware of and had easy access to many others) that listed pervasive critical data integrity failures across Akorn's sites, and catalogued Akorn's persistent refusal to remediate them. Astonishingly, however, Rai testified that he never bothered to read these reports, while repeatedly assuring investors that Akorn was in compliance with cGMP and data integrity regulations. Such conduct exemplifies his conscious disregard of the truth and extreme recklessness, at minimum. Rai testified at trial:

> Q: And, in fact, when Akorn's internal audit people circulate internal audits, you personally are on the circulation list; right?
>
> A: Yes.

Q:      But you don't read them, correct?

A:      No

279.    Had Rai bothered to read the audit reports that he received and which were otherwise available to him – a duty which he plainly had as a member of the Quality Oversight Committee, the Company's CEO, and its public spokesperson to investors – he would have read the following third party audit reports:

o   <u>Cerulean's assessments of Akorn's regulatory violations</u>.  In 2016, Cerulean was hired to audit Akorn's compliance with federal regulations in its Decatur and Somerset facilities.  Cerulean's principal, John Avellanet, testified that Akorn was one of the "top three worst" of the more than 120 pharmaceutical companies he has assessed—an especially notable fact given that Cerulean only reviews companies that are troubled to begin with. Avellanet testified that certain of Akorn's data integrity failures were so fundamental that he would not expect to see them "at a company that made Styrofoam cups." An Akorn Board member described them as "very damning."

o   Cerulean's GAP assessment of Akorn's Decatur facility was issued to Akorn on December 5, 2016.  Cerulean concluded that Akorn's data integrity controls were "insufficient to support compliance with current data integrity expectations and US Food and Drug Administration (FDA) regulatory requirements," and, "[a]s a result, Akorn currently shoulders significant regulatory and negative public perception risk."  Cerulean's Decatur assessment identified seven "critical" and seven "major" data integrity deficiencies, as set forth in more detail above.

o   Cerulean's assessment of Akorn's Somerset facility was issued to Akorn on May 31, 2017, and found several additional critical and major findings. Cerulean's first critical finding was directly aimed at executive leadership, and involved the "failure of senior management with executive responsibility to ensure an effective quality system is implemented and maintained throughout Akorn[.]"  The second critical finding involved the Company's IT department, which Cerulean found was "unwilling" to be part of the quality structure. Cerulean found that the IT department's refusal to assist with quality controls and data integrity was "deeply troubling," and "raises serious questions about the reliability of any data integrity controls and thus the trustworthiness of any

electronic information used throughout Akorn to make safety, efficacy and quality decisions," as explained above. Indeed, these finding were so severe and pervasive that Cerulean directly warned Akorn's senior management that it was exposed to potential criminal liability.

280.     Despite his knowledge that these extraordinary reports existed, Rai testified in the Delaware Litigation that, even as of July 10, 2018, he still had not bothered to read them—a failure which can only be characterized (at minimum) as the height of severe recklessness for a CEO who repeatedly spoke to investors on subjects related to the reports:

> Q:     But isn't it true that after all of that activity, you've actually never read the Cerulean reports?
>
> A:     That is correct.

281.     Rai also received numerous internal audit reports showing that the Company's severe data integrity violations persisted unabated—because Rai and other senior Akorn executives disregarded those violations. For example, as noted above, in a June 2016 report, GQC identified a critical data integrity failure at the Vernon Hills site related to unauthorized computer access, as well as the inability of laboratory equipment to record audit trails, both of which violate FDA guidance. Yet Akorn did nothing. In September 2017, another GQC audit found the same violations, reporting that the corrective actions had "been halted and remain incomplete" and that the failure to remediate the violations "presents undue risk to the site's ongoing operations."

o     In an April 2016 report, GQC found that audit trails were not being reviewed at Lake Forest, even for "data manipulation," and that multiple Akorn employees had unauthorized "system access allowances," permitting them to modify or manipulate data and delete audit trails. When GQC audited Lake Forest again in December 2017, the same problems persisted.

o     In an April 2017 report, GQC identified similar problems at Somerset involving improper access and lack of audit trail reviews. Yet again, by December 2017, these problems had not been remediated.

      o      GQC conducted a verification audit of Somerset in December 2017, and issued its report on this audit in February 2018. The report listed 22 open items dating back to GQC's prior 2014 audit of Somerset, including significant items showing that the HPLC was not recording audit trails.

      o      In other reports issued during 2017, GQC found 27 data integrity deficiencies at Hettlingen, 15 at Cranbury, five at Amityville and five at Lake Forest.

282.    Defendant Rai's knowledge of and access to these reports, by itself, is sufficient to demonstrate his scienter.

283.    Further, Defendant Rai repeatedly discussed the troubling findings in these reports with other senior Akorn executives during meetings of the Quality Oversight Committee. As discussed above, Rai, Silverberg (Executive Vice President of Global Quality Assurance), Jaspreet Gill (Executive Vice President of Global Quality Compliance), and several other executives and Board Defendants were on Akorn's Quality Oversight Committee. They all had direct knowledge of Akorn's pervasive data integrity violations because those violations were regularly reported up to and discussed by the committee. Quality Oversight Committee members received and routinely discussed all the audit reports discussed above showing repeat, pervasive data integrity failures and violations of FDA regulations across numerous Akorn sites as well as the Company's failure to timely address those failures.

284.    By no later than June 2016, Quality Oversight Committee members were discussing their serious concern about Akorn's persistent and systemic data integrity failures. Specifically, in June 2016, Board Defendant Ron Johnson – another committee member – wrote an email to Mark Silverberg stating that, "I continue to be concerned that our position always seems to be that the FDA got it wrong and we are just fine. I do not think we are fine, I think there are signals that we are missing. As the leader of the quality function, I do not understand how you can tolerate the continued non-compliance by employees, supervisors and quality assurance staff. We have

dogged [sic] a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures. Why do we not see an effort to do this?"

285. Similarly, in the Delaware Action, Rai testified that he knew of Akorn's "significant and repeated problems" because it was discussed at Quality Oversight Committee meetings:

> Q.    [Y]ou were on a Board committee at the time [November 11, 2016] that was aware of significant and repeated problems that Akorn was having in its quality function; isn't that right?
>
> A:    Yes.

286. Further, minutes of a December 7, 2016 Quality Oversight Committee meeting reflect that Rai, Johnson, Silverberg, Gill and other committee members again discussed concerns that Akorn's internal and external audits had identified repeated quality failures between and across the Company's sites. The minutes list the individuals noted above as attendees, among several other senior Akorn executives, and state, "Ron [Johnson] then expressed his concern around the repetitiveness of issues between sites and across sites identified during audits and external inspections."

287. Despite the fact that committee members were discussing serious concerns about Akorn's pervasive data integrity problems with Rai and Silverberg, the Quality Oversight Committee stopped meeting in June 2017. The committee did not meet again until March 2018— after Akorn was forced to notify the FDA that Silverberg had submitted false data to the agency. The fact that Rai did not take proactive steps to repair the pervasive data integrity problems of which he (along with other committee members) was aware is further evidence of Rai's complete disregard for those problems.

288.     Indeed, despite the fact that Rai was well aware of these repeated quality failures and data integrity violations, and that committee members repeatedly discussed very serious concerns with Rai about these problems, Rai took no meaningful steps to remediate the violations for years.  In fact, Akorn's pervasive data integrity deficiencies continued to exist until the end of the Class Period, as Rai knew.

289.     For example, on March 18, 2018, GQC issued an internal audit report setting forth its assessment of "the current state of actions taken by the respective sites [Decatur and Somerset] in response to the 3rd Party Data Integrity Audits that were conducted by Cerulean Associates LLC."  The audit reported noted that Akorn had done nothing to remediate the deficiencies at Somerset since receiving the May 31, 2017 Cerulean report.  As to Decatur, the GQC report stated that Akorn had "failed to appropriately investigate and remediate" Cerulean's findings from December 2016, and had completed only "32% of corrective actions."

290.     Rai's failure to implement any significant corrective measures persisted even after he was appointed to serve as the Chairman of the Executive Steering Committee of the DIRP, a project that was put in place in April 2018 after Fresenius discovered Akorn's pervasive data integrity violations and terminated the merger agreement.  An internal Akorn report dated June 7, 2018 and titled "Data Integrity Remediation Project – ESC Update" listed no fewer than 402 data integrity violations – including scores that had existed for multiple years, such as those at Decatur and Somerset.  Yet even as late as Rai's testimony given in the Delaware Litigation on July 11, 2018, Rai admitted that the Data Integrity Remediation Project had no plan for remediating the Company's hundreds of data integrity violations, and had no timeline for when it will actually remediate the data integrity violations – even though many of the findings, he admitted, "are years old":

Q:    Mr. Rai, you've been working on this data remediation project going back looking at findings that are years old. The project doesn't yet have a timetable; right?

A:    No.

Q:    Is that right? No, meaning it does not have a timetable; correct?

A:    We're still assessing that, yes.

Q:    You're still assessing your timetable; is that right?

A:    Yes.

291.   There can be no doubt that Akorn's years-long pattern of disregard for its data integrity failures comes from the very top of the Company. In a November 30, 2017 email to Avellanet, Patty Franke, who was Akorn's Data Integrity Quality Manager, stated that the Company's persistent disregard of its responsibility to remediate was part of a Company-wide "culture" that "management" had created. Franke wrote:

"I am in charge of data integrity, along with my other 4 jobs. … I am working 70+ hours a week and making 0 progress on our DI [data integrity] remediation efforts. I have found a ton more issues and we have put a handful of controls in place to improve data going forward, but they are superficial at best, in my honest opinion. We have a culture issue that I am struggling to overcome. We have a knee jerk-jerk fire anyone involved in any sort of data integrity concerns, but don't question why we have so many people involved in such issues. It isn't the individual—it is the culture and the message from management."

292.   In addition to all the above, Rai also personally received the 2016 employee survey stating that Silverberg was: (1) instructing employees not to cooperate with GQC, the unit that performed Akorn's internal audits, and (2) had submitted misleading information to the FDA. Specifically, on January 12, 2017, Defendants Rai and Portwood, , and several other senior executives including Silverberg were emailed the survey by Bethany Anderson, who wrote, "All, thank you for spending some time this morning to go through the Akorn 2016 Employee Survey Results. I have attached the presentation that we walked through as well as company-wide

comments." In that survey, an employee wrote that Silverberg "has actually counseled his staff to not speak to Global Quality Compliance staff and to not share information with GQC . . . . He has also provided misleading information to regulatory bodies including the US FDA."

293.    Rai's scienter is also demonstrated by the fact that, after Silverberg was terminated from his position as Executive Vice President, he personally decided that Silverberg would continue to be employed by Akorn as a "quality consultant." Notably, Rai decided to retain Silverberg—at a salary of $250,000—even <u>after</u> Rai knew that Silverberg had submitted false data to the FDA, and had told another Akorn executive that he would destroy drafts of materials related to the Company's internal investigation into that fraudulent submission. Rai testified as follows in the Delaware Action:

> Q.    And you did say that Mr. Silverberg had been fired; right?
>
> A.    Yes.
>
> Q.    But, of course, he's still being paid by the company; right?
>
> A.    Yes.
>
> Q.    And he used to be paid – before the fraudulent submission, he was paid at the rate of $318,000 per year.
>
> A.    That's correct.
>
> Q.    And you made the personal decision that you would reduce his salary to $250,000 a year; correct?
>
> A.    Correct.
>
> Q.    And he's now quality consultant or advisor?
>
> A.    Yes.
>
> Q.    And his only job is to assist Akorn in litigation; yes?
>
> A.    Correct.

294. An executive and company that were truly trying to "do the right thing" would have immediately severed all ties with Silverberg after they learned he had submitted fraudulent data to the FDA. Yet Rai decided to keep Silverberg employed by Akorn, at a handsome salary – and as a "quality consultant" nonetheless – supposedly to gain a litigation advantage.

295. Rai's scienter is also demonstrated by the fact that Silverberg reported directly to Rai throughout the Class Period. Another one of Rai's direct reports was Jaspreet Gill, Executive Vice President of Global Quality Compliance for Akorn. Thus, Rai had ultimate responsibility for data integrity, and regular, direct communication with the executives responsible for it "on the ground" in a day-to-day capacity. As explained above, Akorn's data integrity violations were extremely serious, pervasive, repeated across numerous sites, and allowed to go unremediated for years. Such blatant and systemic violations could not have gone unnoticed by the executive whose direct reports included Silverberg and Gill.

296. While Rai's knowledge of Akorn's widespread data integrity failures demonstrates his scienter by itself, Rai also had a significant financial motive to misrepresent the true state of affairs at Akorn. As set forth above, in the first quarter of 2016, the Company decided to pursue merger possibilities. Rai had enormous financial incentives in ensuring that an acquisition of Akorn was consummated at a high price. Rai stood to receive more than $14 million in compensation if the Merger with Fresenius was consummated. Rai also knew that, in order to accomplish his goal of ensuring that a merger was consummated at a high price, it was essential that Akorn keep its pervasive data integrity problems under wraps because disclosure of those facts would jeopardize FDA approval of Akorn's valuable pipeline drugs, and would scare away any merger partner due to (1) the risk that the FDA might delay approval of (or even deny approval to) those drugs, (2) the risk that the FDA might impose additional sanctions on Akorn, and (3) the

severe costs associated with remediating Akorn's widespread data integrity failures. This is, in fact, precisely what has occurred with Fresenius.

### B. Defendant Portwood

297. Defendant Portwood knew of, or recklessly disregarded, Akorn's pervasive and egregious cGMP violations, including serious violations of data integrity requirements. As discussed above data integrity was a critical issue facing Akorn during the Class Period and received outsized attention from analysts and investors. As such, Portwood personally made numerous materially misleading statements affirming Akorn's cGMP compliance, many directly in response to analyst questions on the subject. At the time he made those false and misleading statements, Portwood had ready access to numerous reports laying bare Akorn's egregious cGMP violation discussed above. Indeed, knowledge of Akorn's profound cGMP failures was widely known inside Akorn, and even the Company's Board had expressed "concern around the repetitiveness of the issues between sites and across sites identified during audits & external inspections."

298. Portwood was personally alerted to some of the most egregious and alarming of Akorn's numerous data integrity violations. For instance, Portwood received the January 12, 2017 Akorn employee survey, in which an employee at the Company's corporate headquarters reported that Silverberg "has actually counseled his staff to not speak to Global Quality Compliance staff and to not share information with GQC . . . He has also provided misleading information to regulatory bodies including the US FDA." The employee further reported, "The same type of behavior is occurring within the Vernon Hills R&D function." Other employees also reported failures to implement and enforce data integrity requirements: "Data integrity should not be made an issue creating fear among the employees of l[o]sing the job."

299.     While Portwood's knowledge of Akorn's widespread data integrity failures demonstrates his scienter by itself, like Rai, Portwood also had a significant financial motive to misrepresent the true state of affairs at Akorn as a result of the pending merger with Fresenius. Portwood stood to receive more than $4 million in compensation if that Merger was consummated. Like Rai, Portwood also knew that, in order to ensure that a merger was consummated at a high price, it was essential that Akorn conceal its pervasive data integrity problems because disclosure of those facts would jeopardize FDA approval of ANDAs for Akorn's valuable pipeline drugs, and would scare away any merger partner due to (1) the risk that the FDA might delay approval of (or even deny approval to) those drug applications, (2) the risk that the FDA might impose additional sanctions on Akorn, and (3) the severe costs associated with remediating Akorn's widespread data integrity failures.  This is, in fact, is precisely what has occurred with Fresenius.

### C.     Defendants Weinstein, Johnson and Tambi

300.     Defendants Johnson, Weinstein and Tambi were at all relevant times members of the Quality Oversight Committee that was responsible for overseeing Akorn's FDA compliance efforts.  The committee regularly received Akorn's troubling internal audit reports and was well aware of the ongoing data integrity crisis at Akorn.  Indeed, in June 2016, Defendant Johnson expressed his concerns to Silverberg, writing "I continue to be concerned that our position always seems to be that the FDA got it wrong and we are just fine.  I do not think we are fine, I think there are signals that we are missing.  As the leader of the quality function, I do not understand how you can tolerate the continued non-compliance by employees, supervisors and quality assurance staff. We have dogged [sic] a bullet a number of times, but at some point, our number will be up unless we, once and for all, fix the underlying reasons why our people do not adhere to procedures.  Why do we not see an effort to do this?"

301.    Further, as detailed above, Rai testified in the Delaware Litigation that by November of 2016 the members of the Quality Oversight Committee were "aware of significant and repeat problems that Akorn was having in its quality function."  Likewise, minutes of the December 6, 2016 Quality Oversight Committee meeting, which was attended by Defendants Johnson, Weinstein and Tambi, reflect the committees concern Akorn's failure to remediate its ongoing data integrity problems.  For example, Defendant Tambi himself "stated that it appears that the implementation of corrective actions is lacking or not timely."  Similarly, Defendant Johnson "expressed his concern around the repetitiveness of issues between sites and across sites identified during audits & external inspections."

302.    Notably, these Defendants knew or recklessly disregarded the seriousness of Akorn's data integrity problems, and at least Defendants Johnson and Tambi knew better.  Indeed, Akorn's annual shareholder proxy statement for 2017 (and Company website) specifically tout Defendant Johnson's and Defendant Tambi's expertise with respect to FDA compliance matters.  For example, the proxy and website state that:

> Mr. Johnson brings to Akorn's Board extensive experience in managing regulatory and compliance requirements of the FDA, particularly in pharmaceutical, medical device, biologic and biotechnology industries, as well as a deep knowledge and understanding of FDA policies and procedures regarding cGMP compliance, quality control processes and outcomes reporting gained from his years of providing specialized consulting services to governments, pharmaceutical companies and healthcare institutions and working at the FDA.

303.    Likewise, the proxy and website state that Defendant Tambi "brings to Akorn's Board extensive pharmaceutical industry experience, particularly FDA knowledge and drug development and commercialization expertise."

304. As of March 20, 2017, Board Defendants Johnson, Weinstein and Tambi respectively stood to receive Merger proceeds of over $4.8 million, $3.1 million, and $2.3 million.

## VII.    LOSS CAUSATION

305. Defendants' misrepresentations and omissions of material fact alleged above in Section V artificially inflated the price of Akorn securities during the Class Period.

306. The artificial inflation created by Defendants' alleged misrepresentations and omissions was removed from the prices of Akorn common stock in direct response to information revealed in the disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

307. On February 26, 2018, after the NASDAQ closed for trading, Fresenius and Akorn released statements regarding the ongoing data integrity investigations at Akorn. Fresenius announced that:

> Fresenius is conducting an independent investigation, using external experts, into alleged breaches of FDA data integrity requirements relating to the product development at Akorn, Inc. The Management and Supervisory Boards of Fresenius will assess the findings of that investigation. The consummation of the transaction may be affected if the closing conditions under the merger agreement are not met.

308. Following this revelation, the price of Akorn common stock tumbled despite Akorn's releasing its own statement *denying* its data integrity problems:

> Akorn and Fresenius Kabi AG, with the assistance of outside consultants, are investigating alleged breaches of FDA data integrity requirements relating to product development at the Company. ***To date, the Company's investigation has not found any facts that would result in a material impact on Akorn's operations and the Company does not believe this investigation should affect the closing of the transaction with Fresenius.***

309.     The February 26, 2018 announcements caused Akorn's stock price to plummet 38%, from $30.28 per share at close on February 26, 2018 to $18.65 per share at close on February 27, 2018.  Akorn's common stock fell another 9.1% on February 28, 2018, to close at $16.94 per share.

310.     Although Akorn had stated that the investigation had "not found any facts that would result in a material impact on Akorn's operations and the Company does not believe this investigation should affect the closing of the transaction with Fresenius," on Sunday April 22, 2018, Fresenius publicly stated that it was indeed terminating the Merger Agreement due to Akorn's widespread data integrity failures and violations of FDA regulations.  Akorn's share price dropped further on the news, falling 33.8% from $19.70 per share at close on April 20, 2018 to $13.05 per share at close on April 23, 2018.

311.     On October 1, 2018, the Delaware Chancery Court further revealed the extent of Akorn's data integrity failures and rejected Akorn's denials, after a review of hundreds of exhibits not previously made available to the public.  The October 1, 2018 announcement caused Akorn's stock price to decline 58.7%, from $12.98 per share at close on September 28, 2018 to $5.36 per share at close on October 1, 2018.

312.     On January 9, 2019, Akorn disclosed that it received a warning letter, dated January 4, from the FDA related to an inspection of Akorn's Decatur, Illinois manufacturing facility in April and May of 2018.  Among other things, the warning letter stated that FDA found Akorn's "methods, facilities, or controls for manufacturing, process, packing, or holding do not conform to CMGP" regulations.  The revelation of the warning letter caused Akorn's stock price to fall 11.6%, from $3.94 per share at close on January 8, 2019 to $3.48 per share at close on January 9, 2019.

313.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.  Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Akorn securities, or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Akorn securities and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Akorn securities to decline.

314.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities, when the truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.  As a result of the previously misrepresented and concealed material information and risks that were disclosed on February 26, 2018 and April 22, 2018, and the corresponding substantial declines in the price of Akorn common stock as the market absorbed this information, Plaintiffs and other Class members have suffered economic loss.

## VIII.  PRESUMPTION OF RELIANCE

315.     At all relevant times, the market for Akorn's common stock was efficient for the following reasons, among others:

  (a)      Akorn's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

  (b)      As a regulated issuer, Akorn filed periodic reports with the SEC and the NASDAQ;

(c)     Akorn regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Akorn was followed by numerous securities analysts employed by major brokerage firms, including Deutsche Bank, Royal Bank of Canada and Piper Jaffray, and who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

316.    As a result of the foregoing, the market for Akorn's common stock reasonably promptly digested current information regarding Akorn from all publicly available sources and reflected such information in the price of Akorn's common stock. All purchasers of Akorn common stock during the Class Period suffered similar injury through their purchase of Akorn common stock at artificially inflated prices, and a presumption of reliance applies.

317.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

318.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current

facts and conditions at the time the statements were made, including statements about Akorn's compliance with FDA regulations.

319.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Akorn's data integrity compliance.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Akorn were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

320.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Akorn who knew that the statement was false when made.

## X.     CLASS ACTION ALLEGATIONS

321.     This securities class action is brought on behalf of persons and entities that purchased Akorn common stock between November 3, 2016 and January 8, 2019, inclusive and were damaged thereby.  Excluded from the Class are Defendants and other directors and officers of Akorn, their families and affiliates, and any investment funds, companies or trusts controlled by or benefitting these individuals.

322.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Akorn has more than 125 million shares of common stock outstanding, owned by hundreds or thousands of investors.

323. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a)    Whether Defendants violated the Exchange Act;

    b)    Whether Defendants misrepresented material facts;

    c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    e)    Whether the prices of Akorn's securities were artificially inflated;

    f)    Whether Defendants' conduct caused the members of the Class to sustain damages;

    g)    Whether the 20(a) Defendants were "control persons;" and

    h)    The extent of damage sustained by Class members and the appropriate measure of damages.

324. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

325. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

326. A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## XI.    COUNTS

327.    The claims in Counts I and II below are brought under Sections 10(b) and 20(a) of the Exchange Act against variously Akorn, the Executive Defendants (Defendants Rai and Portwood) and the Board Defendants (Weinstein, Johnson and Tambi).

328.    Plaintiffs assert these claims on behalf of themselves and all persons or entities who purchased or otherwise acquired Akorn common stock during the Class Period from November 3, 2016 through January 8, 2019, inclusive.

**COUNT I**
**For Violations Of Section 10(b) Of The Exchange Act And**
**Rule 10b-5 Against All Defendants**

329.    Plaintiffs repeat and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

330.    During the Class Period, Defendants Akorn, Rai, Portwood, Weinstein, Johnson and Tambi carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Akorn securities at artificially inflated prices.

331.    Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Akorn's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

332.    Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

333.    During the Class Period, Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

334.    Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi engaged in this misconduct to conceal Akorn's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

335.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Akorn's securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Akorn's securities had been artificially inflated by the fraudulent course of conduct by Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi.

336.    As a direct and proximate result of wrongful conduct by Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's

securities during the Class Period as the prior artificial inflation in the price of Akorn's securities was removed over time.

337.    By virtue of the foregoing, Akorn and Defendants Rai, Portwood, Weinstein, Johnson and Tambi violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations Of Section 20(a) Of The**
**Exchange Act Against The Executive Defendants And The Board Defendants**

338.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

339.    As alleged above, Akorn, the Executive Defendants, and Defendants Weinstein, Johnson and Tambi each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

340.    The Executive Defendants and Defendants Weinstein, Johnson and Tambi acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Akorn during the Class Period, the Executive Defendants and Defendants Weinstein, Johnson and Tambi had the power and ability to control the actions of Akorn and its employees.  By reason of such conduct, the Executive Defendants and Defendants Weinstein, Johnson and Tambi are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief (including, but not limited to, rescission) as the Court may deem just and proper.

## XIII.    JURY DEMAND

341.    Plaintiffs hereby demand a trial by jury.

DATED: April 22, 2019                          Respectfully Submitted,


                                               /s/ Andrew J. Entwistle
                                               Andrew J. Entwistle
Avi Josefson                                   **ENTWISTLE & CAPPUCCI LLP**
**BERNSTEIN LITOWITZ BERGER**                  500 W. 2nd Street, Suite 1900-16
  **& GROSSMANN LLP**                          Austin, Texas 78701
875 North Michigan Avenue                      Telephone: (512) 710-5960
Suite 3100                                     aentwistle@entwistle-law.com
Chicago, Illinois 60611
Telephone:  (312) 373-3880
Facsimile:  (312) 794-7801                     Joshua K. Porter (*admitted pro hac vice*)
avi@blbglaw.com                                Brendan Brodeur (*admitted pro hac vice*)
                                               Andrew M. Sher (*admitted pro hac vice*)
                                               **ENTWISTLE & CAPPUCCI LLP**
 -and-                                         299 Park Avenue, 20th Floor
                                               New York, New York 10017
                                               Telephone:  (212) 894-7200
John Rizio-Hamilton (*admitted pro hac vice*)  Facsimile:  (212) 894-7272
Abe Alexander (*admitted pro hac vice*)        jporter@entwistle-law.com
**BERNSTEIN LITOWITZ BERGER**                  bbrodeur@entwistle-law.com
  **& GROSSMANN LLP**                          asher@entwistle-law.com
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 554-1400                     *Lead Counsel for the Class*
Facsimile:  (212) 554-1444
johnr@blbglaw.com
abe.alexander@blbglaw.com


*Liaison Counsel for the Class*

# EXHIBIT 1

## CERTIFICATION

I, Douglas R. Jamieson, on behalf of Gabelli & Co. Investment Advisors, Inc. ("GCIA"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am President of GCIA and am authorized to execute this Certification on behalf of GCIA. GCIA has authorized the filing of this Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws.

2. GCIA did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. GCIA is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. GCIA fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. GCIA's transactions through its managed accounts in Akorn, Inc. common stock that are the subject of this action are set forth in the chart attached hereto as Schedule A.

5. GCIA has not sought to serve as a lead plaintiff or representative party on behalf of a class in any other action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. GCIA will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of April, 2019.

Douglas R. Jamieson
President
Gabelli & Co. Investment Advisors, Inc.

**Schedule A**

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/10/2017 | 600 | $ 32.41 |
| Purchase | 4/10/2017 | 1,000 | $ 32.41 |
| Purchase | 4/10/2017 | 1,400 | $ 32.41 |
| Purchase | 4/10/2017 | 1,500 | $ 32.41 |
| Purchase | 4/10/2017 | 1,800 | $ 32.41 |
| Purchase | 4/13/2017 | 300 | $ 32.53 |
| Purchase | 4/13/2017 | 400 | $ 32.53 |
| Purchase | 4/13/2017 | 600 | $ 32.53 |
| Purchase | 4/13/2017 | 700 | $ 32.53 |
| Purchase | 4/13/2017 | 900 | $ 32.53 |
| Purchase | 4/17/2017 | 200 | $ 32.00 |
| Purchase | 4/17/2017 | 300 | $ 32.00 |
| Purchase | 4/17/2017 | 500 | $ 32.00 |
| Purchase | 4/17/2017 | 500 | $ 32.00 |
| Purchase | 4/17/2017 | 600 | $ 32.00 |
| Purchase | 4/24/2017 | 100 | $ 32.38 |
| Purchase | 4/24/2017 | 200 | $ 32.38 |
| Purchase | 4/24/2017 | 300 | $ 32.38 |
| Purchase | 4/24/2017 | 300 | $ 32.38 |
| Purchase | 4/24/2017 | 400 | $ 32.38 |
| Purchase | 4/25/2017 | 4,300 | $ 32.82 |
| Purchase | 4/25/2017 | 6,800 | $ 32.82 |
| Purchase | 4/25/2017 | 9,800 | $ 32.82 |
| Purchase | 4/25/2017 | 10,600 | $ 32.82 |
| Purchase | 4/25/2017 | 12,800 | $ 32.82 |
| Purchase | 4/25/2017 | 4,900 | $ 32.85 |
| Purchase | 4/25/2017 | 7,500 | $ 32.85 |
| Purchase | 4/25/2017 | 10,700 | $ 32.85 |
| Purchase | 4/25/2017 | 11,700 | $ 32.85 |
| Purchase | 4/25/2017 | 14,300 | $ 32.85 |
| Purchase | 4/25/2017 | 1,500 | $ 32.88 |
| Purchase | 4/25/2017 | 2,500 | $ 32.88 |
| Purchase | 4/25/2017 | 3,500 | $ 32.88 |
| Purchase | 4/25/2017 | 3,900 | $ 32.88 |
| Purchase | 4/25/2017 | 4,600 | $ 32.88 |
| Purchase | 4/27/2017 | 5,800 | $ 33.29 |
| Purchase | 4/27/2017 | 9,100 | $ 33.29 |
| Purchase | 4/27/2017 | 13,101 | $ 33.29 |
| Purchase | 4/27/2017 | 14,200 | $ 33.29 |
| Purchase | 4/27/2017 | 17,300 | $ 33.29 |
| Purchase | 5/1/2017 | 500 | $ 33.32 |
| Purchase | 5/1/2017 | 2,500 | $ 33.32 |
| Purchase | 5/1/2017 | 6,000 | $ 33.32 |
| Purchase | 5/1/2017 | 6,000 | $ 33.32 |
| Purchase | 5/1/2017 | 7,300 | $ 33.32 |
| Purchase | 5/3/2017 | 200 | $ 33.20 |
| Purchase | 5/3/2017 | 400 | $ 33.20 |
| Purchase | 5/3/2017 | 700 | $ 33.20 |
| Purchase | 5/3/2017 | 800 | $ 33.20 |
| Purchase | 5/3/2017 | 900 | $ 33.20 |
| Purchase | 5/4/2017 | 100 | $ 33.10 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---:|---:|
| Purchase | 5/4/2017 | 300 | $ 33.10 |
| Purchase | 5/4/2017 | 300 | $ 33.10 |
| Purchase | 5/4/2017 | 464 | $ 33.10 |
| Purchase | 5/4/2017 | 500 | $ 33.10 |
| Purchase | 5/8/2017 | 700 | $ 33.02 |
| Purchase | 5/8/2017 | 800 | $ 33.02 |
| Purchase | 5/8/2017 | 1,500 | $ 33.02 |
| Purchase | 5/8/2017 | 1,600 | $ 33.02 |
| Purchase | 5/8/2017 | 1,900 | $ 33.02 |
| Purchase | 5/11/2017 | 200 | $ 33.04 |
| Purchase | 5/11/2017 | 300 | $ 33.04 |
| Purchase | 5/11/2017 | 300 | $ 33.04 |
| Purchase | 5/11/2017 | 311 | $ 33.04 |
| Purchase | 5/11/2017 | 600 | $ 33.04 |
| Purchase | 5/17/2017 | 500 | $ 33.16 |
| Purchase | 5/17/2017 | 800 | $ 33.16 |
| Purchase | 5/17/2017 | 1,100 | $ 33.16 |
| Purchase | 5/17/2017 | 1,300 | $ 33.16 |
| Purchase | 5/17/2017 | 1,500 | $ 33.16 |
| Purchase | 5/18/2017 | 1,700 | $ 33.05 |
| Purchase | 5/18/2017 | 2,200 | $ 33.05 |
| Purchase | 5/18/2017 | 3,600 | $ 33.05 |
| Purchase | 5/18/2017 | 4,000 | $ 33.05 |
| Purchase | 5/18/2017 | 4,700 | $ 33.05 |
| Purchase | 5/22/2017 | 100 | $ 33.12 |
| Purchase | 5/22/2017 | 300 | $ 33.12 |
| Purchase | 5/22/2017 | 500 | $ 33.12 |
| Purchase | 5/22/2017 | 500 | $ 33.12 |
| Purchase | 5/22/2017 | 800 | $ 33.12 |
| Purchase | 5/23/2017 | 1,200 | $ 33.19 |
| Purchase | 5/23/2017 | 1,900 | $ 33.19 |
| Purchase | 5/23/2017 | 2,700 | $ 33.19 |
| Purchase | 5/23/2017 | 3,300 | $ 33.19 |
| Purchase | 5/23/2017 | 3,550 | $ 33.19 |
| Purchase | 6/5/2017 | 600 | $ 33.21 |
| Purchase | 6/5/2017 | 1,100 | $ 33.21 |
| Purchase | 6/5/2017 | 1,900 | $ 33.21 |
| Purchase | 6/5/2017 | 2,600 | $ 33.21 |
| Purchase | 6/5/2017 | 3,200 | $ 33.21 |
| Purchase | 6/7/2017 | 1,300 | $ 33.30 |
| Purchase | 6/9/2017 | 300 | $ 33.17 |
| Purchase | 6/9/2017 | 400 | $ 33.17 |
| Purchase | 6/9/2017 | 700 | $ 33.17 |
| Purchase | 6/9/2017 | 800 | $ 33.17 |
| Purchase | 6/9/2017 | 1,000 | $ 33.17 |
| Purchase | 6/15/2017 | 200 | $ 33.40 |
| Purchase | 6/15/2017 | 400 | $ 33.40 |
| Purchase | 6/15/2017 | 500 | $ 33.40 |
| Purchase | 6/15/2017 | 700 | $ 33.40 |
| Purchase | 6/15/2017 | 700 | $ 33.40 |
| Purchase | 6/27/2017 | 800 | $ 33.50 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 6/27/2017 | 1,200 | $ | 33.50 |
| Purchase | 6/27/2017 | 2,000 | $ | 33.50 |
| Purchase | 6/27/2017 | 2,100 | $ | 33.50 |
| Purchase | 6/27/2017 | 2,500 | $ | 33.50 |
| Purchase | 6/29/2017 | 1,000 | $ | 33.44 |
| Purchase | 6/29/2017 | 1,200 | $ | 33.44 |
| Purchase | 6/29/2017 | 2,200 | $ | 33.44 |
| Purchase | 6/29/2017 | 2,300 | $ | 33.44 |
| Purchase | 6/29/2017 | 2,800 | $ | 33.44 |
| Purchase | 7/3/2017 | 100 | $ | 33.46 |
| Purchase | 7/3/2017 | 700 | $ | 33.46 |
| Purchase | 7/3/2017 | 1,000 | $ | 33.46 |
| Purchase | 7/3/2017 | 1,100 | $ | 33.46 |
| Purchase | 7/3/2017 | 1,535 | $ | 33.46 |
| Purchase | 7/6/2017 | 200 | $ | 33.48 |
| Purchase | 7/6/2017 | 500 | $ | 33.48 |
| Purchase | 7/6/2017 | 700 | $ | 33.48 |
| Purchase | 7/6/2017 | 900 | $ | 33.48 |
| Purchase | 7/6/2017 | 900 | $ | 33.48 |
| Purchase | 7/12/2017 | 400 | $ | 33.55 |
| Purchase | 7/12/2017 | 400 | $ | 33.55 |
| Purchase | 7/12/2017 | 600 | $ | 33.55 |
| Purchase | 7/12/2017 | 700 | $ | 33.55 |
| Purchase | 7/12/2017 | 900 | $ | 33.55 |
| Purchase | 7/18/2017 | 500 | $ | 33.69 |
| Purchase | 7/18/2017 | 700 | $ | 33.69 |
| Purchase | 7/18/2017 | 1,300 | $ | 33.69 |
| Purchase | 7/18/2017 | 1,400 | $ | 33.69 |
| Purchase | 7/18/2017 | 1,650 | $ | 33.69 |
| Purchase | 7/19/2017 | 5,000 | $ | 33.54 |
| Purchase | 7/19/2017 | 7,000 | $ | 33.54 |
| Purchase | 7/19/2017 | 11,600 | $ | 33.54 |
| Purchase | 7/19/2017 | 12,400 | $ | 33.54 |
| Purchase | 7/19/2017 | 15,000 | $ | 33.54 |
| Purchase | 8/1/2017 | 1,900 | $ | 33.57 |
| Purchase | 8/1/2017 | 3,600 | $ | 33.57 |
| Purchase | 8/1/2017 | 6,500 | $ | 33.57 |
| Purchase | 8/1/2017 | 6,900 | $ | 33.57 |
| Purchase | 8/1/2017 | 8,500 | $ | 33.57 |
| Purchase | 8/1/2017 | 500 | $ | 33.51 |
| Purchase | 8/1/2017 | 500 | $ | 33.51 |
| Purchase | 8/1/2017 | 600 | $ | 33.51 |
| Purchase | 8/2/2017 | 2,000 | $ | 33.50 |
| Purchase | 8/2/2017 | 2,900 | $ | 33.50 |
| Purchase | 8/2/2017 | 5,003 | $ | 33.50 |
| Purchase | 8/2/2017 | 5,200 | $ | 33.50 |
| Purchase | 8/2/2017 | 6,300 | $ | 33.50 |
| Purchase | 8/3/2017 | 1,300 | $ | 33.48 |
| Purchase | 8/3/2017 | 1,700 | $ | 33.48 |
| Purchase | 8/3/2017 | 2,900 | $ | 33.48 |
| Purchase | 8/3/2017 | 2,900 | $ | 33.48 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 8/3/2017 | 3,700 | $ 33.48 |
| Purchase | 8/4/2017 | 900 | $ 33.42 |
| Purchase | 8/4/2017 | 1,200 | $ 33.42 |
| Purchase | 8/4/2017 | 2,000 | $ 33.42 |
| Purchase | 8/4/2017 | 2,200 | $ 33.42 |
| Purchase | 8/4/2017 | 2,809 | $ 33.42 |
| Purchase | 8/9/2017 | 900 | $ 33.38 |
| Purchase | 8/9/2017 | 1,400 | $ 33.38 |
| Purchase | 8/9/2017 | 2,400 | $ 33.38 |
| Purchase | 8/9/2017 | 2,400 | $ 33.38 |
| Purchase | 8/9/2017 | 3,000 | $ 33.38 |
| Purchase | 8/10/2017 | 1,000 | $ 33.35 |
| Purchase | 8/10/2017 | 1,300 | $ 33.35 |
| Purchase | 8/10/2017 | 2,200 | $ 33.35 |
| Purchase | 8/10/2017 | 2,300 | $ 33.35 |
| Purchase | 8/10/2017 | 2,700 | $ 33.35 |
| Purchase | 8/11/2017 | 300 | $ 33.32 |
| Purchase | 8/11/2017 | 400 | $ 33.32 |
| Purchase | 8/11/2017 | 700 | $ 33.32 |
| Purchase | 8/11/2017 | 900 | $ 33.32 |
| Purchase | 8/11/2017 | 1,043 | $ 33.32 |
| Purchase | 8/16/2017 | 100 | $ 33.25 |
| Purchase | 8/16/2017 | 200 | $ 33.25 |
| Purchase | 8/16/2017 | 200 | $ 33.25 |
| Purchase | 8/16/2017 | 300 | $ 33.25 |
| Purchase | 8/16/2017 | 300 | $ 33.25 |
| Purchase | 8/17/2017 | 1,600 | $ 32.89 |
| Purchase | 8/17/2017 | 2,200 | $ 32.89 |
| Purchase | 8/17/2017 | 3,800 | $ 32.89 |
| Purchase | 8/17/2017 | 4,000 | $ 32.89 |
| Purchase | 8/17/2017 | 4,900 | $ 32.89 |
| Purchase | 8/18/2017 | 1,400 | $ 32.07 |
| Purchase | 8/18/2017 | 2,000 | $ 32.07 |
| Purchase | 8/18/2017 | 3,300 | $ 32.07 |
| Purchase | 8/18/2017 | 3,400 | $ 32.07 |
| Purchase | 8/18/2017 | 4,300 | $ 32.07 |
| Purchase | 8/21/2017 | 100 | $ 32.21 |
| Purchase | 8/21/2017 | 100 | $ 32.21 |
| Purchase | 8/21/2017 | 300 | $ 32.21 |
| Purchase | 8/21/2017 | 350 | $ 32.21 |
| Purchase | 8/21/2017 | 400 | $ 32.21 |
| Purchase | 8/22/2017 | 200 | $ 32.37 |
| Purchase | 8/22/2017 | 300 | $ 32.37 |
| Purchase | 8/22/2017 | 400 | $ 32.37 |
| Purchase | 8/22/2017 | 500 | $ 32.37 |
| Purchase | 8/22/2017 | 600 | $ 32.37 |
| Purchase | 8/23/2017 | 1,200 | $ 32.40 |
| Purchase | 8/23/2017 | 1,700 | $ 32.40 |
| Purchase | 8/23/2017 | 2,700 | $ 32.40 |
| Purchase | 8/23/2017 | 2,900 | $ 32.40 |
| Purchase | 8/23/2017 | 3,500 | $ 32.40 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 8/28/2017 | 500 | $ | 32.49 |
| Purchase | 8/28/2017 | 700 | $ | 32.49 |
| Purchase | 8/28/2017 | 1,400 | $ | 32.49 |
| Purchase | 8/28/2017 | 1,400 | $ | 32.49 |
| Purchase | 8/28/2017 | 1,825 | $ | 32.49 |
| Purchase | 8/29/2017 | 300 | $ | 32.50 |
| Purchase | 8/29/2017 | 500 | $ | 32.50 |
| Purchase | 8/29/2017 | 800 | $ | 32.50 |
| Purchase | 8/29/2017 | 800 | $ | 32.50 |
| Purchase | 8/29/2017 | 900 | $ | 32.50 |
| Purchase | 8/31/2017 | 200 | $ | 32.85 |
| Purchase | 8/31/2017 | 650 | $ | 32.85 |
| Purchase | 8/31/2017 | 650 | $ | 32.85 |
| Purchase | 8/31/2017 | 700 | $ | 32.85 |
| Purchase | 8/31/2017 | 3,800 | $ | 32.85 |
| Purchase | 9/5/2017 | 600 | $ | 32.94 |
| Purchase | 9/5/2017 | 900 | $ | 32.94 |
| Purchase | 9/5/2017 | 1,500 | $ | 32.94 |
| Purchase | 9/5/2017 | 1,700 | $ | 32.94 |
| Purchase | 9/5/2017 | 1,800 | $ | 32.94 |
| Purchase | 9/6/2017 | 400 | $ | 32.97 |
| Purchase | 9/6/2017 | 600 | $ | 32.97 |
| Purchase | 9/6/2017 | 1,000 | $ | 32.97 |
| Purchase | 9/6/2017 | 1,100 | $ | 32.97 |
| Purchase | 9/6/2017 | 1,300 | $ | 32.97 |
| Purchase | 9/12/2017 | 2,500 | $ | 33.25 |
| Purchase | 9/12/2017 | 3,500 | $ | 33.25 |
| Purchase | 9/12/2017 | 6,100 | $ | 33.25 |
| Purchase | 9/12/2017 | 6,200 | $ | 33.25 |
| Purchase | 9/12/2017 | 7,700 | $ | 33.25 |
| Purchase | 9/13/2017 | 500 | $ | 33.16 |
| Purchase | 9/13/2017 | 800 | $ | 33.16 |
| Purchase | 9/13/2017 | 1,200 | $ | 33.16 |
| Purchase | 9/13/2017 | 1,200 | $ | 33.16 |
| Purchase | 9/13/2017 | 1,600 | $ | 33.16 |
| Purchase | 9/14/2017 | 1,200 | $ | 33.06 |
| Purchase | 9/14/2017 | 1,700 | $ | 33.06 |
| Purchase | 9/14/2017 | 2,900 | $ | 33.06 |
| Purchase | 9/14/2017 | 3,100 | $ | 33.06 |
| Purchase | 9/14/2017 | 3,600 | $ | 33.06 |
| Purchase | 9/18/2017 | 100 | $ | 33.02 |
| Purchase | 9/18/2017 | 100 | $ | 33.02 |
| Purchase | 9/18/2017 | 300 | $ | 33.02 |
| Purchase | 9/18/2017 | 400 | $ | 33.02 |
| Purchase | 9/21/2017 | 500 | $ | 33.13 |
| Purchase | 9/21/2017 | 700 | $ | 33.13 |
| Purchase | 9/21/2017 | 1,200 | $ | 33.13 |
| Purchase | 9/21/2017 | 1,278 | $ | 33.13 |
| Purchase | 9/21/2017 | 1,500 | $ | 33.13 |
| Purchase | 9/22/2017 | 500 | $ | 33.06 |
| Purchase | 10/5/2017 | 200 | $ | 32.73 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---:|---|
| Purchase | 10/5/2017 | 600 | $ 32.73 |
| Purchase | 10/5/2017 | 1,200 | $ 32.73 |
| Purchase | 10/5/2017 | 1,200 | $ 32.73 |
| Purchase | 10/6/2017 | 400 | $ 32.70 |
| Purchase | 10/6/2017 | 500 | $ 32.70 |
| Purchase | 10/6/2017 | 600 | $ 32.70 |
| Purchase | 10/6/2017 | 700 | $ 32.70 |
| Purchase | 10/10/2017 | 400 | $ 32.95 |
| Purchase | 10/10/2017 | 700 | $ 32.95 |
| Purchase | 10/10/2017 | 1,300 | $ 32.95 |
| Purchase | 10/10/2017 | 1,400 | $ 32.95 |
| Purchase | 10/10/2017 | 1,600 | $ 32.95 |
| Purchase | 10/26/2017 | 400 | $ 32.53 |
| Purchase | 10/26/2017 | 700 | $ 32.53 |
| Purchase | 10/26/2017 | 1,100 | $ 32.53 |
| Purchase | 10/26/2017 | 1,200 | $ 32.53 |
| Purchase | 10/26/2017 | 1,500 | $ 32.53 |
| Purchase | 10/31/2017 | 15,000 | $ 32.56 |
| Purchase | 11/2/2017 | 300 | $ 33.23 |
| Purchase | 11/2/2017 | 500 | $ 33.23 |
| Purchase | 11/2/2017 | 700 | $ 33.23 |
| Purchase | 11/3/2017 | 300 | $ 33.14 |
| Purchase | 11/3/2017 | 300 | $ 33.14 |
| Purchase | 11/3/2017 | 800 | $ 33.14 |
| Purchase | 11/3/2017 | 800 | $ 33.14 |
| Purchase | 11/3/2017 | 800 | $ 33.14 |
| Purchase | 11/21/2017 | 600 | $ 32.43 |
| Purchase | 11/21/2017 | 1,100 | $ 32.43 |
| Purchase | 11/21/2017 | 1,500 | $ 32.43 |
| Purchase | 11/21/2017 | 2,100 | $ 32.43 |
| Purchase | 11/21/2017 | 2,300 | $ 32.43 |
| Purchase | 12/6/2017 | 2,500 | $ 32.71 |
| Purchase | 12/7/2017 | 1,000 | $ 32.45 |
| Purchase | 12/7/2017 | 1,300 | $ 32.45 |
| Purchase | 12/7/2017 | 1,300 | $ 32.45 |
| Purchase | 12/12/2017 | 100 | $ 32.23 |
| Purchase | 12/12/2017 | 400 | $ 32.23 |
| Purchase | 12/12/2017 | 500 | $ 32.23 |
| Purchase | 12/12/2017 | 500 | $ 32.23 |
| Purchase | 12/13/2017 | 200 | $ 32.12 |
| Purchase | 12/13/2017 | 200 | $ 32.12 |
| Purchase | 12/13/2017 | 200 | $ 32.12 |
| Purchase | 12/13/2017 | 200 | $ 32.12 |
| Purchase | 12/15/2017 | 100 | $ 32.17 |
| Purchase | 12/15/2017 | 200 | $ 32.17 |
| Purchase | 12/15/2017 | 300 | $ 32.17 |
| Purchase | 12/15/2017 | 400 | $ 32.17 |
| Purchase | 12/19/2017 | 3,000 | $ 32.33 |
| Purchase | 12/21/2017 | 100 | $ 32.19 |
| Purchase | 12/21/2017 | 100 | $ 32.19 |
| Purchase | 12/21/2017 | 100 | $ 32.19 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/21/2017 | 100 | $ 32.19 |
| Purchase | 1/4/2018 | 300 | $ 32.49 |
| Purchase | 1/4/2018 | 2,200 | $ 32.49 |
| Purchase | 1/8/2018 | 2,700 | $ 32.47 |
| Purchase | 1/8/2018 | 2,900 | $ 32.47 |
| Purchase | 1/17/2018 | 500 | $ 33.06 |
| Purchase | 1/17/2018 | 1,800 | $ 33.06 |
| Purchase | 1/17/2018 | 2,300 | $ 33.06 |
| Purchase | 1/25/2018 | 1,200 | $ 32.69 |
| Purchase | 2/7/2018 | 200 | $ 31.68 |
| Purchase | 2/7/2018 | 200 | $ 31.68 |
| Purchase | 2/7/2018 | 200 | $ 31.68 |
| Purchase | 2/7/2018 | 700 | $ 31.68 |
| Purchase | 2/7/2018 | 900 | $ 31.68 |
| Purchase | 2/27/2018 | 300 | $ 20.51 |
| Purchase | 2/27/2018 | 700 | $ 20.51 |
| Purchase | 2/27/2018 | 700 | $ 20.51 |
| Purchase | 3/1/2018 | 900 | $ 17.51 |
| Purchase | 3/1/2018 | 1,000 | $ 17.51 |
| Purchase | 3/1/2018 | 2,200 | $ 17.51 |
| Purchase | 3/1/2018 | 2,300 | $ 17.51 |
| Purchase | 3/1/2018 | 2,500 | $ 17.51 |
| Purchase | 3/8/2018 | 200 | $ 18.48 |
| Purchase | 3/8/2018 | 300 | $ 18.48 |
| Purchase | 3/8/2018 | 600 | $ 18.48 |
| Purchase | 3/8/2018 | 700 | $ 18.48 |
| Purchase | 3/8/2018 | 800 | $ 18.48 |
| Purchase | 3/15/2018 | 100 | $ 18.52 |
| Purchase | 3/15/2018 | 400 | $ 18.52 |
| Purchase | 3/15/2018 | 400 | $ 18.52 |
| Purchase | 3/15/2018 | 600 | $ 18.52 |
| Purchase | 3/16/2018 | 100 | $ 18.66 |
| Purchase | 3/16/2018 | 200 | $ 18.66 |
| Purchase | 3/16/2018 | 200 | $ 18.66 |
| Purchase | 3/16/2018 | 300 | $ 18.66 |
| Purchase | 3/19/2018 | 200 | $ 18.45 |
| Purchase | 3/19/2018 | 500 | $ 18.45 |
| Purchase | 3/19/2018 | 500 | $ 18.45 |
| Purchase | 3/19/2018 | 500 | $ 18.45 |
| Purchase | 3/20/2018 | 700 | $ 18.78 |
| Purchase | 3/20/2018 | 1,200 | $ 18.78 |
| Purchase | 3/20/2018 | 2,300 | $ 18.78 |
| Purchase | 3/20/2018 | 2,500 | $ 18.78 |
| Purchase | 3/20/2018 | 2,700 | $ 18.78 |
| Purchase | 3/29/2018 | 1,700 | $ 18.53 |
| Purchase | 4/24/2018 | 2,600 | $ 13.33 |
| Purchase | 4/24/2018 | 3,000 | $ 13.33 |
| Purchase | 4/24/2018 | 4,700 | $ 13.33 |
| Purchase | 4/24/2018 | 7,400 | $ 13.33 |
| Purchase | 4/24/2018 | 10,600 | $ 13.33 |
| Purchase | 4/30/2018 | 200 | $ 14.55 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 4/30/2018 | 400 | $ | 14.55 |
| Purchase | 4/30/2018 | 500 | $ | 14.55 |
| Purchase | 4/30/2018 | 1,000 | $ | 14.55 |
| Purchase | 4/30/2018 | 6,900 | $ | 14.55 |
| Purchase | 5/4/2018 | 200 | $ | 11.82 |
| Purchase | 5/4/2018 | 300 | $ | 11.82 |
| Purchase | 5/4/2018 | 600 | $ | 11.82 |
| Purchase | 5/4/2018 | 700 | $ | 11.82 |
| Purchase | 5/4/2018 | 700 | $ | 11.82 |
| Purchase | 5/7/2018 | 200 | $ | 11.72 |
| Purchase | 5/7/2018 | 300 | $ | 11.72 |
| Purchase | 5/7/2018 | 600 | $ | 11.72 |
| Purchase | 5/7/2018 | 700 | $ | 11.72 |
| Purchase | 5/7/2018 | 700 | $ | 11.72 |
| Purchase | 5/8/2018 | 400 | $ | 12.46 |
| Purchase | 5/8/2018 | 400 | $ | 12.46 |
| Purchase | 5/8/2018 | 700 | $ | 12.46 |
| Purchase | 5/8/2018 | 1,100 | $ | 12.46 |
| Purchase | 5/8/2018 | 1,227 | $ | 12.46 |
| Purchase | 5/10/2018 | 300 | $ | 13.12 |
| Purchase | 5/10/2018 | 400 | $ | 13.12 |
| Purchase | 5/10/2018 | 600 | $ | 13.12 |
| Purchase | 5/10/2018 | 700 | $ | 13.12 |
| Purchase | 5/10/2018 | 800 | $ | 13.12 |
| Purchase | 5/15/2018 | 200 | $ | 14.16 |
| Purchase | 5/15/2018 | 200 | $ | 14.16 |
| Purchase | 5/15/2018 | 500 | $ | 14.16 |
| Purchase | 5/15/2018 | 700 | $ | 14.16 |
| Purchase | 5/15/2018 | 700 | $ | 14.16 |
| Purchase | 10/1/2018 | 7,200 | $ | 5.85 |
| Purchase | 10/1/2018 | 8,800 | $ | 5.85 |
| Purchase | 10/1/2018 | 20,000 | $ | 5.85 |
| Purchase | 10/1/2018 | 20,200 | $ | 5.85 |
| Purchase | 10/1/2018 | 23,500 | $ | 5.85 |
| Sale | 11/7/2016 | 15,741 | $ | 19.89 |
| Sale | 12/9/2016 | 4,000 | $ | 18.58 |
| Sale | 12/19/2016 | 26,321 | $ | 21.02 |
| Sale | 12/29/2016 | 1,000 | $ | 21.08 |
| Sale | 10/26/2017 | 100 | $ | 33.06 |
| Sale | 10/26/2017 | 300 | $ | 33.06 |
| Sale | 10/26/2017 | 300 | $ | 33.06 |
| Sale | 10/26/2017 | 400 | $ | 33.06 |
| Sale | 1/2/2018 | 2,800 | $ | 32.46 |
| Sale | 1/2/2018 | 7,283 | $ | 32.46 |
| Sale | 1/9/2018 | 1,900 | $ | 33.29 |
| Sale | 1/9/2018 | 3,100 | $ | 33.29 |
| Sale | 2/6/2018 | 700 | $ | 32.42 |
| Sale | 2/6/2018 | 700 | $ | 32.42 |
| Sale | 2/6/2018 | 1,300 | $ | 32.42 |
| Sale | 2/6/2018 | 2,100 | $ | 32.42 |
| Sale | 2/6/2018 | 2,100 | $ | 32.42 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 2/9/2018 | 3,200 | $ | 31.97 |
| Sale | 2/9/2018 | 3,900 | $ | 31.97 |
| Sale | 2/9/2018 | 8,200 | $ | 31.97 |
| Sale | 2/9/2018 | 9,200 | $ | 31.97 |
| Sale | 2/9/2018 | 9,700 | $ | 31.97 |
| Sale | 2/13/2018 | 700 | $ | 31.50 |
| Sale | 2/13/2018 | 800 | $ | 31.50 |
| Sale | 2/13/2018 | 2,000 | $ | 31.50 |
| Sale | 2/13/2018 | 2,100 | $ | 31.50 |
| Sale | 2/13/2018 | 2,300 | $ | 31.50 |
| Sale | 2/15/2018 | 1,700 | $ | 32.09 |
| Sale | 2/15/2018 | 2,200 | $ | 32.09 |
| Sale | 2/15/2018 | 4,400 | $ | 32.09 |
| Sale | 2/15/2018 | 4,900 | $ | 32.09 |
| Sale | 2/15/2018 | 5,000 | $ | 32.09 |
| Sale | 2/16/2018 | 1,300 | $ | 31.88 |
| Sale | 2/16/2018 | 1,400 | $ | 31.88 |
| Sale | 2/16/2018 | 3,300 | $ | 31.88 |
| Sale | 2/16/2018 | 3,615 | $ | 31.88 |
| Sale | 2/16/2018 | 3,800 | $ | 31.88 |
| Sale | 2/22/2018 | 400 | $ | 30.71 |
| Sale | 2/22/2018 | 600 | $ | 30.71 |
| Sale | 2/22/2018 | 1,100 | $ | 30.71 |
| Sale | 2/22/2018 | 1,100 | $ | 30.71 |
| Sale | 2/22/2018 | 1,300 | $ | 30.71 |
| Sale | 2/26/2018 | 600 | $ | 19.47 |
| Sale | 2/26/2018 | 800 | $ | 19.47 |
| Sale | 2/26/2018 | 1,500 | $ | 19.47 |
| Sale | 2/26/2018 | 1,800 | $ | 19.47 |
| Sale | 2/26/2018 | 1,800 | $ | 19.47 |
| Sale | 2/26/2018 | 1,500 | $ | 18.99 |
| Sale | 2/26/2018 | 1,900 | $ | 18.99 |
| Sale | 2/26/2018 | 4,100 | $ | 18.99 |
| Sale | 2/26/2018 | 4,500 | $ | 18.99 |
| Sale | 2/26/2018 | 4,800 | $ | 18.99 |
| Sale | 2/27/2018 | 400 | $ | 21.29 |
| Sale | 2/27/2018 | 400 | $ | 21.29 |
| Sale | 2/28/2018 | 6,900 | $ | 17.54 |
| Sale | 2/28/2018 | 9,500 | $ | 17.54 |
| Sale | 2/28/2018 | 20,100 | $ | 17.54 |
| Sale | 2/28/2018 | 23,500 | $ | 17.54 |
| Sale | 2/28/2018 | 24,700 | $ | 17.54 |
| Sale | 3/6/2018 | 600 | $ | 18.06 |
| Sale | 3/6/2018 | 700 | $ | 18.06 |
| Sale | 3/6/2018 | 1,700 | $ | 18.06 |
| Sale | 3/6/2018 | 1,700 | $ | 18.06 |
| Sale | 3/6/2018 | 2,300 | $ | 18.06 |
| Sale | 5/1/2018 | 100 | $ | 14.84 |
| Sale | 5/1/2018 | 100 | $ | 14.84 |
| Sale | 5/1/2018 | 100 | $ | 14.84 |
| Sale | 5/3/2018 | 2,800 | $ | 11.44 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 5/3/2018 | 3,500 | $ | 11.44 |
| Sale | 5/3/2018 | 7,300 | $ | 11.44 |
| Sale | 5/3/2018 | 8,500 | $ | 11.44 |
| Sale | 5/3/2018 | 8,700 | $ | 11.44 |
| Sale | 7/5/2018 | 200 | $ | 17.31 |
| Sale | 7/5/2018 | 300 | $ | 17.31 |
| Sale | 7/5/2018 | 400 | $ | 17.31 |
| Sale | 7/5/2018 | 700 | $ | 17.31 |
| Sale | 7/5/2018 | 2,400 | $ | 17.31 |
| Sale | 7/6/2018 | 100 | $ | 17.90 |
| Sale | 7/6/2018 | 200 | $ | 17.90 |
| Sale | 7/6/2018 | 500 | $ | 17.90 |
| Sale | 7/6/2018 | 600 | $ | 17.90 |
| Sale | 7/6/2018 | 600 | $ | 17.90 |
| Sale | 7/9/2018 | 200 | $ | 18.66 |
| Sale | 7/9/2018 | 400 | $ | 18.66 |
| Sale | 7/9/2018 | 600 | $ | 18.66 |
| Sale | 7/9/2018 | 700 | $ | 18.66 |
| Sale | 7/9/2018 | 800 | $ | 18.66 |
| Sale | 7/10/2018 | 500 | $ | 18.10 |
| Sale | 7/10/2018 | 500 | $ | 18.10 |
| Sale | 7/10/2018 | 1,200 | $ | 18.10 |
| Sale | 7/10/2018 | 1,400 | $ | 18.10 |
| Sale | 7/10/2018 | 1,400 | $ | 18.10 |
| Sale | 7/11/2018 | 100 | $ | 18.18 |
| Sale | 7/11/2018 | 100 | $ | 18.18 |
| Sale | 7/11/2018 | 300 | $ | 18.18 |
| Sale | 7/11/2018 | 400 | $ | 18.18 |
| Sale | 7/11/2018 | 500 | $ | 18.18 |
| Sale | 7/12/2018 | 4,100 | $ | 18.14 |
| Sale | 7/12/2018 | 4,900 | $ | 18.14 |
| Sale | 7/12/2018 | 10,300 | $ | 18.14 |
| Sale | 7/12/2018 | 11,900 | $ | 18.14 |
| Sale | 7/12/2018 | 12,000 | $ | 18.14 |
| Sale | 7/13/2018 | 5,700 | $ | 18.39 |
| Sale | 7/13/2018 | 6,800 | $ | 18.39 |
| Sale | 7/13/2018 | 14,600 | $ | 18.39 |
| Sale | 7/13/2018 | 16,500 | $ | 18.39 |
| Sale | 7/13/2018 | 16,802 | $ | 18.39 |
| Sale | 7/16/2018 | 1,100 | $ | 17.42 |
| Sale | 7/16/2018 | 1,400 | $ | 17.42 |
| Sale | 7/16/2018 | 3,312 | $ | 17.42 |
| Sale | 7/16/2018 | 3,500 | $ | 17.42 |
| Sale | 7/16/2018 | 3,853 | $ | 17.42 |
| Sale | 7/24/2018 | 200 | $ | 17.23 |
| Sale | 7/24/2018 | 200 | $ | 17.23 |
| Sale | 7/24/2018 | 400 | $ | 17.23 |
| Sale | 7/24/2018 | 500 | $ | 17.23 |
| Sale | 7/24/2018 | 600 | $ | 17.23 |
| Sale | 7/25/2018 | 400 | $ | 17.83 |
| Sale | 7/25/2018 | 650 | $ | 17.83 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---:|---|---:|
| Sale | 7/25/2018 | 900 | $ | 17.83 |
| Sale | 7/25/2018 | 1,100 | $ | 17.83 |
| Sale | 7/25/2018 | 1,200 | $ | 17.83 |
| Sale | 7/27/2018 | 1,100 | $ | 18.10 |
| Sale | 7/27/2018 | 1,200 | $ | 18.10 |
| Sale | 7/27/2018 | 2,700 | $ | 18.10 |
| Sale | 7/27/2018 | 3,000 | $ | 18.10 |
| Sale | 7/27/2018 | 3,100 | $ | 18.10 |
| Sale | 7/31/2018 | 100 | $ | 18.59 |
| Sale | 7/31/2018 | 200 | $ | 18.59 |
| Sale | 7/31/2018 | 300 | $ | 18.59 |
| Sale | 7/31/2018 | 400 | $ | 18.59 |
| Sale | 7/31/2018 | 400 | $ | 18.59 |
| Sale | 8/1/2018 | 400 | $ | 18.48 |
| Sale | 8/1/2018 | 500 | $ | 18.48 |
| Sale | 8/1/2018 | 1,300 | $ | 18.48 |
| Sale | 8/1/2018 | 1,400 | $ | 18.48 |
| Sale | 8/1/2018 | 2,600 | $ | 18.48 |
| Sale | 8/6/2018 | 600 | $ | 19.00 |
| Sale | 8/6/2018 | 600 | $ | 19.00 |
| Sale | 8/6/2018 | 1,500 | $ | 19.00 |
| Sale | 8/6/2018 | 1,500 | $ | 19.00 |
| Sale | 8/6/2018 | 1,600 | $ | 19.00 |
| Sale | 8/7/2018 | 400 | $ | 19.40 |
| Sale | 8/7/2018 | 600 | $ | 19.40 |
| Sale | 8/7/2018 | 1,100 | $ | 19.40 |
| Sale | 8/7/2018 | 1,100 | $ | 19.40 |
| Sale | 8/7/2018 | 1,300 | $ | 19.40 |
| Sale | 8/15/2018 | 1,300 | $ | 19.31 |
| Sale | 8/15/2018 | 1,500 | $ | 19.31 |
| Sale | 8/15/2018 | 3,300 | $ | 19.31 |
| Sale | 8/15/2018 | 3,800 | $ | 19.31 |
| Sale | 8/15/2018 | 4,000 | $ | 19.31 |
| Sale | 8/17/2018 | 4,900 | $ | 19.15 |
| Sale | 8/17/2018 | 5,915 | $ | 19.15 |
| Sale | 8/17/2018 | 12,705 | $ | 19.15 |
| Sale | 8/17/2018 | 14,385 | $ | 19.15 |
| Sale | 8/17/2018 | 14,455 | $ | 19.15 |
| Sale | 8/20/2018 | 2,100 | $ | 19.32 |
| Sale | 8/20/2018 | 2,450 | $ | 19.32 |
| Sale | 8/20/2018 | 5,075 | $ | 19.32 |
| Sale | 8/20/2018 | 5,600 | $ | 19.32 |
| Sale | 8/20/2018 | 5,950 | $ | 19.32 |
| Sale | 8/28/2018 | 3,500 | $ | 14.28 |
| Sale | 10/1/2018 | 800 | $ | 9.01 |
| Sale | 10/2/2018 | 4,000 | $ | 5.54 |
| Sale | 10/2/2018 | 4,500 | $ | 5.54 |
| Sale | 10/2/2018 | 10,100 | $ | 5.54 |
| Sale | 10/2/2018 | 11,200 | $ | 5.54 |
| Sale | 10/2/2018 | 11,700 | $ | 5.54 |
| Sale | 10/3/2018 | 600 | $ | 5.61 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 10/3/2018 | 900 | $ 5.61 |
| Sale | 10/3/2018 | 1,900 | $ 5.61 |
| Sale | 10/3/2018 | 2,100 | $ 5.61 |
| Sale | 10/3/2018 | 2,400 | $ 5.61 |
| Sale | 10/4/2018 | 800 | $ 5.85 |
| Sale | 10/4/2018 | 900 | $ 5.85 |
| Sale | 10/4/2018 | 2,200 | $ 5.85 |
| Sale | 10/4/2018 | 2,300 | $ 5.85 |
| Sale | 10/4/2018 | 2,300 | $ 5.85 |
| Sale | 10/5/2018 | 200 | $ 6.13 |
| Sale | 10/5/2018 | 400 | $ 6.13 |
| Sale | 10/5/2018 | 600 | $ 6.13 |
| Sale | 10/5/2018 | 800 | $ 6.13 |
| Sale | 10/5/2018 | 800 | $ 6.13 |
| Sale | 10/8/2018 | 600 | $ 6.37 |
| Sale | 10/8/2018 | 600 | $ 6.37 |
| Sale | 10/8/2018 | 1,400 | $ 6.37 |
| Sale | 10/8/2018 | 1,500 | $ 6.37 |
| Sale | 10/8/2018 | 1,500 | $ 6.37 |
| Sale | 11/6/2018 | 4,800 | $ 7.44 |
| Sale | 11/21/2018 | 2,000 | $ 6.81 |
| Sale | 11/21/2018 | 500 | $ 7.08 |
| Sale | 11/21/2018 | 600 | $ 7.08 |
| Sale | 11/21/2018 | 1,400 | $ 7.08 |
| Sale | 11/21/2018 | 1,500 | $ 7.08 |
| Sale | 11/21/2018 | 1,600 | $ 7.08 |
| Sale | 11/23/2018 | 4,200 | $ 7.19 |
| Sale | 11/27/2018 | 300 | $ 7.12 |
| Sale | 11/27/2018 | 400 | $ 7.12 |
| Sale | 11/27/2018 | 500 | $ 7.12 |
| Sale | 11/27/2018 | 1,000 | $ 7.12 |
| Sale | 12/3/2018 | 600 | $ 6.82 |
| Sale | 12/3/2018 | 800 | $ 6.82 |
| Sale | 12/3/2018 | 1,400 | $ 6.82 |
| Sale | 12/3/2018 | 3,000 | $ 6.82 |
| Sale | 12/3/2018 | 3,700 | $ 6.82 |
| Sale | 12/4/2018 | 300 | $ 6.78 |
| Sale | 12/4/2018 | 300 | $ 6.78 |
| Sale | 12/4/2018 | 700 | $ 6.78 |
| Sale | 12/4/2018 | 800 | $ 6.78 |
| Sale | 12/4/2018 | 800 | $ 6.78 |
| Sale | 12/6/2018 | 1,400 | $ 5.41 |
| Sale | 12/6/2018 | 1,800 | $ 5.41 |
| Sale | 12/6/2018 | 3,600 | $ 5.41 |
| Sale | 12/6/2018 | 3,800 | $ 5.41 |
| Sale | 12/6/2018 | 4,100 | $ 5.41 |
| Sale | 12/11/2018 | 400 | $ 4.36 |
| Sale | 12/11/2018 | 400 | $ 4.36 |
| Sale | 12/11/2018 | 900 | $ 4.36 |
| Sale | 12/11/2018 | 900 | $ 4.36 |
| Sale | 12/11/2018 | 900 | $ 4.36 |

**Gabelli & Co. Investment Advisors, Inc.**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---:|---|---:|
| Sale | 12/12/2018 | 500 | $ | 4.43 |
| Sale | 12/12/2018 | 700 | $ | 4.43 |
| Sale | 12/12/2018 | 1,400 | $ | 4.43 |
| Sale | 12/12/2018 | 1,500 | $ | 4.43 |
| Sale | 12/12/2018 | 1,600 | $ | 4.43 |
| Sale | 12/13/2018 | 600 | $ | 4.55 |
| Sale | 12/13/2018 | 600 | $ | 4.55 |
| Sale | 12/13/2018 | 1,400 | $ | 4.55 |
| Sale | 12/13/2018 | 1,500 | $ | 4.55 |
| Sale | 12/13/2018 | 1,600 | $ | 4.55 |
| Sale | 12/14/2018 | 300 | $ | 4.61 |
| Sale | 12/14/2018 | 400 | $ | 4.61 |
| Sale | 12/14/2018 | 600 | $ | 4.61 |
| Sale | 12/14/2018 | 700 | $ | 4.61 |
| Sale | 12/14/2018 | 800 | $ | 4.61 |
| Sale | 12/20/2018 | 2,000 | $ | 3.82 |
| Sale | 12/20/2018 | 5,900 | $ | 3.82 |
| Sale | 12/24/2018 | 3,700 | $ | 3.55 |
| Sale | 12/24/2018 | 10,400 | $ | 3.55 |
| Sale | 12/26/2018 | 4,800 | $ | 3.63 |
| Sale | 12/26/2018 | 14,000 | $ | 3.63 |
| Sale | 12/28/2018 | 2,400 | $ | 3.43 |
| Sale | 12/28/2018 | 7,000 | $ | 3.43 |
| Sale | 12/31/2018 | 3,200 | $ | 3.35 |
| Sale | 12/31/2018 | 9,327 | $ | 3.35 |
| Sale | 12/31/2018 | 2,000 | $ | 3.20 |

# EXHIBIT 2

## CERTIFICATION

I, Agnes Mullady, on behalf of Gabelli Funds, LLC (the "Gabelli Funds"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am President & COO – Fund Division of the Gabelli Funds and am authorized to execute this Certification on behalf of the Gabelli Funds. The Gabelli Funds have authorized the filing of this Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws.

2.  The Gabelli Funds did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  The Gabelli Funds are willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. The Gabelli Funds fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  The Gabelli Funds' transactions in Akorn, Inc. common stock that are the subject of this action are set forth in the chart attached hereto as Schedule A.

5.  The Gabelli Funds have not sought to serve as a lead plaintiff or representative party on behalf of a class in any other action under the federal securities laws filed during the three-year period preceding the date of this Certification, except: *In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-cv-3428 (NFA) (U.S. Dist. Ct., S.D. Texas).

6.  The Gabelli Funds will not accept any payment for serving as a representative party on behalf of the Class beyond the Gabelli Funds' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of April 2019.

Agnes Mullady
President & COO – Fund Division
Gabelli Funds, LLC

# Schedule A

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 11/3/2016 | 2,000 | $ | 21.85 |
| Purchase | 11/3/2016 | 2,000 | $ | 20.96 |
| Purchase | 11/10/2016 | 35,000 | $ | 22.00 |
| Purchase | 11/11/2016 | 14,576 | $ | 21.58 |
| Purchase | 12/20/2016 | 16,098 | $ | 21.10 |
| Purchase | 12/23/2016 | 5,000 | $ | 21.62 |
| Purchase | 12/27/2016 | 1,000 | $ | 21.76 |
| Purchase | 12/28/2016 | 5,000 | $ | 21.55 |
| Purchase | 12/29/2016 | 10,000 | $ | 21.17 |
| Purchase | 12/30/2016 | 3,517 | $ | 21.36 |
| Purchase | 12/30/2016 | 10,000 | $ | 21.79 |
| Purchase | 12/30/2016 | 5,000 | $ | 21.83 |
| Purchase | 1/3/2017 | 5,000 | $ | 22.25 |
| Purchase | 1/3/2017 | 6,483 | $ | 22.16 |
| Purchase | 1/3/2017 | 5,000 | $ | 22.04 |
| Purchase | 1/4/2017 | 500 | $ | 23.37 |
| Purchase | 1/4/2017 | 5,000 | $ | 22.25 |
| Purchase | 1/4/2017 | 1,500 | $ | 22.99 |
| Purchase | 1/4/2017 | 2,000 | $ | 22.51 |
| Purchase | 1/4/2017 | 5,000 | $ | 23.15 |
| Purchase | 1/5/2017 | 5,000 | $ | 23.63 |
| Purchase | 1/5/2017 | 5,000 | $ | 23.32 |
| Purchase | 1/6/2017 | 5,000 | $ | 22.92 |
| Purchase | 1/6/2017 | 5,000 | $ | 22.93 |
| Purchase | 1/12/2017 | 5,000 | $ | 21.91 |
| Purchase | 1/13/2017 | 5,000 | $ | 22.23 |
| Purchase | 1/17/2017 | 3,000 | $ | 21.81 |
| Purchase | 1/17/2017 | 5,000 | $ | 21.28 |
| Purchase | 1/20/2017 | 500 | $ | 20.71 |
| Purchase | 1/30/2017 | 1,500 | $ | 18.43 |
| Purchase | 1/31/2017 | 5,000 | $ | 18.31 |
| Purchase | 2/8/2017 | 4,000 | $ | 20.52 |
| Purchase | 2/17/2017 | 5,000 | $ | 21.65 |
| Purchase | 2/27/2017 | 1,000 | $ | 21.74 |
| Purchase | 3/28/2017 | 2,000 | $ | 24.54 |
| Purchase | 4/7/2017 | 5,000 | $ | 29.87 |
| Purchase | 4/10/2017 | 2,600 | $ | 32.41 |
| Purchase | 4/13/2017 | 1,000 | $ | 32.53 |
| Purchase | 4/17/2017 | 900 | $ | 32.00 |
| Purchase | 4/24/2017 | 3,000 | $ | 32.66 |
| Purchase | 4/24/2017 | 10,000 | $ | 32.75 |
| Purchase | 4/24/2017 | 700 | $ | 32.38 |
| Purchase | 4/25/2017 | 200 | $ | 32.86 |
| Purchase | 4/25/2017 | 1,000 | $ | 32.86 |
| Purchase | 4/25/2017 | 3,500 | $ | 32.86 |
| Purchase | 4/25/2017 | 7,000 | $ | 32.86 |
| Purchase | 4/25/2017 | 30,800 | $ | 32.86 |
| Purchase | 4/25/2017 | 18,100 | $ | 32.82 |
| Purchase | 4/25/2017 | 19,900 | $ | 32.85 |
| Purchase | 4/25/2017 | 6,300 | $ | 32.88 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/27/2017 | 24,491 | $ 33.29 |
| Purchase | 4/27/2017 | 33,000 | $ 33.21 |
| Purchase | 5/1/2017 | 3,500 | $ 33.32 |
| Purchase | 5/2/2017 | 400 | $ 33.31 |
| Purchase | 5/3/2017 | 1,900 | $ 33.20 |
| Purchase | 5/4/2017 | 536 | $ 33.10 |
| Purchase | 5/8/2017 | 2,900 | $ 33.02 |
| Purchase | 5/11/2017 | 589 | $ 33.04 |
| Purchase | 5/16/2017 | 19,200 | $ 33.20 |
| Purchase | 5/16/2017 | 26,500 | $ 33.23 |
| Purchase | 5/17/2017 | 2,300 | $ 33.16 |
| Purchase | 5/17/2017 | 4,000 | $ 33.20 |
| Purchase | 5/17/2017 | 10,000 | $ 33.17 |
| Purchase | 5/18/2017 | 6,300 | $ 33.05 |
| Purchase | 5/18/2017 | 3,282 | $ 33.04 |
| Purchase | 5/22/2017 | 200 | $ 33.12 |
| Purchase | 5/23/2017 | 6,600 | $ 33.19 |
| Purchase | 5/26/2017 | 4,718 | $ 33.25 |
| Purchase | 5/30/2017 | 30,000 | $ 33.22 |
| Purchase | 6/1/2017 | 4,000 | $ 33.30 |
| Purchase | 6/5/2017 | 4,200 | $ 33.21 |
| Purchase | 6/6/2017 | 20,000 | $ 33.28 |
| Purchase | 6/7/2017 | 50,000 | $ 33.40 |
| Purchase | 6/8/2017 | 1,892 | $ 33.21 |
| Purchase | 6/9/2017 | 1,700 | $ 33.17 |
| Purchase | 6/15/2017 | 5,000 | $ 33.40 |
| Purchase | 6/15/2017 | 10,000 | $ 33.36 |
| Purchase | 6/27/2017 | 10,900 | $ 33.50 |
| Purchase | 6/29/2017 | 5,000 | $ 33.44 |
| Purchase | 7/3/2017 | 2,500 | $ 33.46 |
| Purchase | 7/5/2017 | 2,700 | $ 33.51 |
| Purchase | 7/6/2017 | 1,500 | $ 33.48 |
| Purchase | 7/12/2017 | 4,100 | $ 33.55 |
| Purchase | 7/18/2017 | 4,300 | $ 33.69 |
| Purchase | 7/19/2017 | 23,600 | $ 33.54 |
| Purchase | 7/20/2017 | 22,500 | $ 33.65 |
| Purchase | 7/21/2017 | 5,200 | $ 33.60 |
| Purchase | 7/24/2017 | 2,425 | $ 33.59 |
| Purchase | 7/26/2017 | 5,000 | $ 33.64 |
| Purchase | 8/1/2017 | 900 | $ 33.57 |
| Purchase | 8/1/2017 | 14,100 | $ 33.57 |
| Purchase | 8/1/2017 | 8,400 | $ 33.51 |
| Purchase | 8/1/2017 | 15,000 | $ 33.51 |
| Purchase | 8/1/2017 | 25,000 | $ 33.54 |
| Purchase | 8/2/2017 | 2,500 | $ 33.50 |
| Purchase | 8/2/2017 | 10,625 | $ 33.50 |
| Purchase | 8/3/2017 | 1,530 | $ 33.48 |
| Purchase | 8/3/2017 | 7,371 | $ 33.48 |
| Purchase | 8/3/2017 | 4,000 | $ 33.42 |
| Purchase | 8/4/2017 | 1,255 | $ 33.42 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 8/4/2017 | 6,500 | $ | 33.42 |
| Purchase | 8/9/2017 | 1,202 | $ | 33.38 |
| Purchase | 8/9/2017 | 5,340 | $ | 33.38 |
| Purchase | 8/10/2017 | 950 | $ | 33.35 |
| Purchase | 8/10/2017 | 8,900 | $ | 33.35 |
| Purchase | 8/11/2017 | 525 | $ | 33.32 |
| Purchase | 8/11/2017 | 3,200 | $ | 33.32 |
| Purchase | 8/16/2017 | 1,400 | $ | 33.25 |
| Purchase | 8/16/2017 | 15,000 | $ | 33.34 |
| Purchase | 8/17/2017 | 2,060 | $ | 32.89 |
| Purchase | 8/17/2017 | 8,526 | $ | 32.89 |
| Purchase | 8/18/2017 | 1,834 | $ | 32.07 |
| Purchase | 8/18/2017 | 7,650 | $ | 32.07 |
| Purchase | 8/21/2017 | 250 | $ | 32.21 |
| Purchase | 8/21/2017 | 900 | $ | 32.21 |
| Purchase | 8/22/2017 | 181 | $ | 32.37 |
| Purchase | 8/22/2017 | 1,019 | $ | 32.37 |
| Purchase | 8/23/2017 | 1,412 | $ | 32.40 |
| Purchase | 8/23/2017 | 6,804 | $ | 32.40 |
| Purchase | 8/28/2017 | 675 | $ | 32.49 |
| Purchase | 8/28/2017 | 5,500 | $ | 32.49 |
| Purchase | 8/29/2017 | 400 | $ | 32.50 |
| Purchase | 8/29/2017 | 1,000 | $ | 32.50 |
| Purchase | 8/31/2017 | 500 | $ | 32.85 |
| Purchase | 8/31/2017 | 1,000 | $ | 32.85 |
| Purchase | 9/1/2017 | 200 | $ | 32.97 |
| Purchase | 9/5/2017 | 3,450 | $ | 32.94 |
| Purchase | 9/6/2017 | 1,000 | $ | 32.97 |
| Purchase | 9/6/2017 | 2,100 | $ | 32.97 |
| Purchase | 9/7/2017 | 2,200 | $ | 32.97 |
| Purchase | 9/8/2017 | 2,829 | $ | 33.05 |
| Purchase | 9/11/2017 | 1,000 | $ | 33.13 |
| Purchase | 9/11/2017 | 3,900 | $ | 33.13 |
| Purchase | 9/12/2017 | 1,000 | $ | 33.25 |
| Purchase | 9/12/2017 | 13,600 | $ | 33.25 |
| Purchase | 9/13/2017 | 4,400 | $ | 33.16 |
| Purchase | 9/14/2017 | 2,500 | $ | 33.06 |
| Purchase | 9/14/2017 | 6,325 | $ | 33.06 |
| Purchase | 9/18/2017 | 1,600 | $ | 33.02 |
| Purchase | 9/21/2017 | 2,921 | $ | 33.13 |
| Purchase | 9/21/2017 | 5,000 | $ | 33.13 |
| Purchase | 9/22/2017 | 7,000 | $ | 33.06 |
| Purchase | 9/27/2017 | 5,000 | $ | 33.11 |
| Purchase | 9/28/2017 | 2,500 | $ | 33.13 |
| Purchase | 9/29/2017 | 2,500 | $ | 33.16 |
| Purchase | 10/3/2017 | 5,000 | $ | 32.71 |
| Purchase | 10/5/2017 | 1,200 | $ | 32.73 |
| Purchase | 10/6/2017 | 1,662 | $ | 32.70 |
| Purchase | 10/10/2017 | 1,000 | $ | 32.95 |
| Purchase | 10/10/2017 | 3,400 | $ | 32.95 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 11/2/2017 | 1,000 | $ | 33.23 |
| Purchase | 11/3/2017 | 1,800 | $ | 33.14 |
| Purchase | 11/21/2017 | 4,400 | $ | 32.43 |
| Purchase | 12/7/2017 | 500 | $ | 32.45 |
| Purchase | 12/12/2017 | 500 | $ | 32.23 |
| Purchase | 12/13/2017 | 500 | $ | 32.12 |
| Purchase | 12/14/2017 | 4,000 | $ | 32.24 |
| Purchase | 12/20/2017 | 2,000 | $ | 32.32 |
| Purchase | 12/21/2017 | 500 | $ | 32.19 |
| Purchase | 12/21/2017 | 1,100 | $ | 32.19 |
| Purchase | 1/8/2018 | 2,600 | $ | 32.47 |
| Purchase | 1/25/2018 | 5,000 | $ | 32.62 |
| Purchase | 2/5/2018 | 7,500 | $ | 32.08 |
| Purchase | 2/6/2018 | 2,500 | $ | 32.02 |
| Purchase | 2/12/2018 | 10,000 | $ | 31.96 |
| Purchase | 2/27/2018 | 1,400 | $ | 20.51 |
| Purchase | 2/27/2018 | 1,000 | $ | 19.01 |
| Purchase | 2/27/2018 | 1,000 | $ | 21.07 |
| Purchase | 2/28/2018 | 1,000 | $ | 17.81 |
| Purchase | 3/1/2018 | 1,000 | $ | 17.51 |
| Purchase | 3/1/2018 | 4,500 | $ | 17.51 |
| Purchase | 3/1/2018 | 1,000 | $ | 17.67 |
| Purchase | 3/8/2018 | 1,000 | $ | 18.48 |
| Purchase | 3/8/2018 | 2,400 | $ | 18.48 |
| Purchase | 3/8/2018 | 500 | $ | 18.28 |
| Purchase | 3/9/2018 | 1,500 | $ | 18.89 |
| Purchase | 3/15/2018 | 1,800 | $ | 18.52 |
| Purchase | 3/16/2018 | 1,500 | $ | 18.66 |
| Purchase | 3/19/2018 | 800 | $ | 18.45 |
| Purchase | 3/19/2018 | 1,000 | $ | 18.66 |
| Purchase | 3/20/2018 | 5,000 | $ | 18.86 |
| Purchase | 3/20/2018 | 1,000 | $ | 18.78 |
| Purchase | 3/20/2018 | 5,805 | $ | 18.78 |
| Purchase | 3/29/2018 | 800 | $ | 18.53 |
| Purchase | 4/2/2018 | 1,000 | $ | 18.47 |
| Purchase | 4/5/2018 | 2,000 | $ | 18.99 |
| Purchase | 4/6/2018 | 2,000 | $ | 18.34 |
| Purchase | 4/17/2018 | 500 | $ | 18.99 |
| Purchase | 4/23/2018 | 1,000 | $ | 13.01 |
| Purchase | 4/23/2018 | 1,000 | $ | 12.77 |
| Purchase | 4/23/2018 | 15,000 | $ | 12.73 |
| Purchase | 4/24/2018 | 1,000 | $ | 13.33 |
| Purchase | 4/24/2018 | 20,000 | $ | 13.33 |
| Purchase | 4/24/2018 | 12,000 | $ | 13.05 |
| Purchase | 4/25/2018 | 5,000 | $ | 13.43 |
| Purchase | 4/26/2018 | 5,000 | $ | 13.55 |
| Purchase | 4/27/2018 | 10,000 | $ | 14.16 |
| Purchase | 5/2/2018 | 2,000 | $ | 13.12 |
| Purchase | 5/3/2018 | 1,000 | $ | 11.21 |
| Purchase | 5/4/2018 | 2,300 | $ | 11.82 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/7/2018 | 500 | $ 11.72 |
| Purchase | 5/7/2018 | 1,800 | $ 11.72 |
| Purchase | 5/8/2018 | 2,874 | $ 12.46 |
| Purchase | 5/10/2018 | 500 | $ 13.12 |
| Purchase | 5/10/2018 | 1,500 | $ 13.12 |
| Purchase | 5/18/2018 | 2,500 | $ 13.94 |
| Purchase | 5/22/2018 | 1,000 | $ 13.88 |
| Purchase | 6/5/2018 | 200 | $ 14.00 |
| Purchase | 6/12/2018 | 3,000 | $ 14.77 |
| Purchase | 6/22/2018 | 1,000 | $ 15.78 |
| Purchase | 7/6/2018 | 80,000 | $ 18.04 |
| Purchase | 7/19/2018 | 2,000 | $ 17.09 |
| Purchase | 7/26/2018 | 8,035 | $ 17.41 |
| Purchase | 8/1/2018 | 6,965 | $ 18.31 |
| Purchase | 8/2/2018 | 15,000 | $ 18.01 |
| Purchase | 8/21/2018 | 5,000 | $ 18.25 |
| Purchase | 9/10/2018 | 1,000 | $ 14.01 |
| Purchase | 9/11/2018 | 500 | $ 13.51 |
| Purchase | 10/1/2018 | 7,500 | $ 5.69 |
| Purchase | 10/1/2018 | 35,000 | $ 6.00 |
| Purchase | 10/1/2018 | 40,000 | $ 6.01 |
| Purchase | 10/1/2018 | 40,000 | $ 5.95 |
| Purchase | 10/1/2018 | 45,000 | $ 5.63 |
| Purchase | 10/1/2018 | 7,000 | $ 5.85 |
| Purchase | 10/1/2018 | 48,750 | $ 5.85 |
| Purchase | 10/2/2018 | 7,500 | $ 5.54 |
| Purchase | 10/2/2018 | 23,000 | $ 5.42 |
| Purchase | 10/31/2018 | 2,000 | $ 6.57 |
| Purchase | 11/8/2018 | 25,000 | $ 6.85 |
| Purchase | 11/13/2018 | 4,000 | $ 6.74 |
| Purchase | 12/7/2018 | 5,000 | $ 3.91 |
| Purchase | 12/12/2018 | 3,000 | $ 4.24 |
| Purchase | 12/17/2018 | 7,000 | $ 4.24 |
| Purchase | 12/28/2018 | 40,000 | $ 3.42 |
| Purchase | 1/2/2019 | 10,000 | $ 3.37 |
| Purchase | 1/4/2019 | 10,000 | $ 3.64 |
| Sale | 12/8/2016 | 2,000 | $ 18.33 |
| Sale | 1/5/2017 | 24,576 | $ 23.39 |
| Sale | 3/1/2017 | 35,000 | $ 21.83 |
| Sale | 3/2/2017 | 25,000 | $ 23.21 |
| Sale | 3/3/2017 | 15,000 | $ 23.73 |
| Sale | 3/22/2017 | 18,618 | $ 22.31 |
| Sale | 3/27/2017 | 40,000 | $ 23.40 |
| Sale | 3/30/2017 | 16,382 | $ 24.36 |
| Sale | 4/5/2017 | 15,000 | $ 24.45 |
| Sale | 4/7/2017 | 3,579 | $ 30.02 |
| Sale | 4/7/2017 | 10,000 | $ 28.17 |
| Sale | 4/18/2017 | 10,000 | $ 33.01 |
| Sale | 4/25/2017 | 15,000 | $ 33.16 |
| Sale | 4/25/2017 | 75,000 | $ 32.98 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 4/25/2017 | 20,000 | $ | 32.91 |
| Sale | 5/23/2017 | 5,000 | $ | 33.15 |
| Sale | 6/7/2017 | 25,000 | $ | 33.37 |
| Sale | 6/9/2017 | 5,000 | $ | 33.28 |
| Sale | 6/14/2017 | 8,000 | $ | 33.37 |
| Sale | 7/11/2017 | 5,000 | $ | 33.56 |
| Sale | 8/17/2017 | 6,000 | $ | 32.58 |
| Sale | 8/21/2017 | 10,000 | $ | 32.26 |
| Sale | 8/21/2017 | 10,000 | $ | 32.35 |
| Sale | 8/21/2017 | 10,000 | $ | 32.21 |
| Sale | 8/22/2017 | 4,000 | $ | 32.30 |
| Sale | 8/22/2017 | 8,000 | $ | 32.38 |
| Sale | 8/24/2017 | 2,000 | $ | 32.38 |
| Sale | 8/24/2017 | 3,892 | $ | 32.39 |
| Sale | 8/25/2017 | 3,000 | $ | 32.47 |
| Sale | 8/28/2017 | 6,000 | $ | 32.47 |
| Sale | 8/28/2017 | 15,000 | $ | 32.47 |
| Sale | 8/28/2017 | 27,519 | $ | 32.47 |
| Sale | 8/29/2017 | 4,000 | $ | 32.52 |
| Sale | 8/30/2017 | 2,000 | $ | 32.75 |
| Sale | 8/31/2017 | 30,500 | $ | 32.87 |
| Sale | 9/1/2017 | 14,500 | $ | 32.91 |
| Sale | 9/13/2017 | 35,000 | $ | 33.17 |
| Sale | 9/15/2017 | 4,000 | $ | 33.01 |
| Sale | 9/15/2017 | 9,000 | $ | 33.05 |
| Sale | 10/18/2017 | 2,308 | $ | 33.28 |
| Sale | 10/23/2017 | 5,000 | $ | 33.26 |
| Sale | 10/26/2017 | 2,000 | $ | 33.06 |
| Sale | 10/26/2017 | 5,000 | $ | 32.75 |
| Sale | 10/26/2017 | 5,000 | $ | 32.87 |
| Sale | 11/6/2017 | 20,000 | $ | 33.22 |
| Sale | 11/20/2017 | 5,000 | $ | 33.37 |
| Sale | 12/4/2017 | 5,000 | $ | 32.78 |
| Sale | 12/4/2017 | 2,000 | $ | 32.78 |
| Sale | 12/12/2017 | 5,000 | $ | 32.44 |
| Sale | 12/19/2017 | 20,000 | $ | 32.39 |
| Sale | 12/20/2017 | 5,000 | $ | 32.29 |
| Sale | 12/22/2017 | 5,000 | $ | 32.04 |
| Sale | 1/2/2018 | 917 | $ | 32.46 |
| Sale | 1/2/2018 | 5,000 | $ | 32.55 |
| Sale | 1/12/2018 | 200 | $ | 33.55 |
| Sale | 2/6/2018 | 1,000 | $ | 32.42 |
| Sale | 2/9/2018 | 5,000 | $ | 31.97 |
| Sale | 2/9/2018 | 20,400 | $ | 31.97 |
| Sale | 2/13/2018 | 1,000 | $ | 31.50 |
| Sale | 2/15/2018 | 2,000 | $ | 32.09 |
| Sale | 2/15/2018 | 3,500 | $ | 32.09 |
| Sale | 2/16/2018 | 2,500 | $ | 31.88 |
| Sale | 2/16/2018 | 7,250 | $ | 31.88 |
| Sale | 2/21/2018 | 973 | $ | 31.62 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 2/22/2018 | 2,800 | $ | 30.71 |
| Sale | 2/26/2018 | 1,250 | $ | 19.47 |
| Sale | 2/26/2018 | 15,000 | $ | 19.47 |
| Sale | 2/26/2018 | 1,250 | $ | 18.99 |
| Sale | 2/26/2018 | 9,700 | $ | 18.99 |
| Sale | 2/26/2018 | 1,000 | $ | 30.28 |
| Sale | 2/26/2018 | 4,000 | $ | 30.28 |
| Sale | 2/27/2018 | 700 | $ | 21.29 |
| Sale | 2/27/2018 | 1,000 | $ | 21.29 |
| Sale | 2/28/2018 | 20,000 | $ | 17.00 |
| Sale | 2/28/2018 | 11,000 | $ | 17.54 |
| Sale | 2/28/2018 | 48,800 | $ | 17.54 |
| Sale | 3/1/2018 | 25,000 | $ | 17.74 |
| Sale | 3/2/2018 | 10,000 | $ | 18.23 |
| Sale | 3/2/2018 | 5,000 | $ | 19.03 |
| Sale | 3/6/2018 | 3,000 | $ | 18.06 |
| Sale | 3/6/2018 | 7,400 | $ | 18.06 |
| Sale | 3/6/2018 | 5,000 | $ | 17.82 |
| Sale | 3/8/2018 | 5,000 | $ | 18.47 |
| Sale | 3/9/2018 | 5,000 | $ | 18.87 |
| Sale | 3/12/2018 | 10,000 | $ | 19.04 |
| Sale | 3/13/2018 | 5,000 | $ | 19.12 |
| Sale | 3/13/2018 | 10,000 | $ | 19.09 |
| Sale | 4/20/2018 | 500 | $ | 19.18 |
| Sale | 4/23/2018 | 2,000 | $ | 13.18 |
| Sale | 4/25/2018 | 5,000 | $ | 13.74 |
| Sale | 5/1/2018 | 1,000 | $ | 14.84 |
| Sale | 5/1/2018 | 1,000 | $ | 14.84 |
| Sale | 5/3/2018 | 2,500 | $ | 11.44 |
| Sale | 5/3/2018 | 19,700 | $ | 11.44 |
| Sale | 5/11/2018 | 500 | $ | 13.88 |
| Sale | 5/14/2018 | 4,000 | $ | 14.24 |
| Sale | 5/15/2018 | 1,000 | $ | 13.99 |
| Sale | 5/23/2018 | 4,000 | $ | 13.97 |
| Sale | 5/25/2018 | 15,000 | $ | 13.97 |
| Sale | 5/29/2018 | 500 | $ | 14.19 |
| Sale | 6/12/2018 | 1,200 | $ | 14.51 |
| Sale | 7/5/2018 | 600 | $ | 17.31 |
| Sale | 7/5/2018 | 1,000 | $ | 17.31 |
| Sale | 7/6/2018 | 1,500 | $ | 17.90 |
| Sale | 7/6/2018 | 1,500 | $ | 17.90 |
| Sale | 7/9/2018 | 500 | $ | 18.66 |
| Sale | 7/9/2018 | 1,700 | $ | 18.66 |
| Sale | 7/10/2018 | 700 | $ | 18.10 |
| Sale | 7/10/2018 | 3,100 | $ | 18.10 |
| Sale | 7/11/2018 | 1,000 | $ | 18.18 |
| Sale | 7/12/2018 | 5,250 | $ | 18.14 |
| Sale | 7/12/2018 | 29,050 | $ | 18.14 |
| Sale | 7/12/2018 | 4,000 | $ | 17.36 |
| Sale | 7/13/2018 | 7,200 | $ | 18.39 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 7/13/2018 | 39,200 | $ | 18.39 |
| Sale | 7/13/2018 | 10,000 | $ | 18.62 |
| Sale | 7/16/2018 | 1,500 | $ | 17.42 |
| Sale | 7/16/2018 | 10,121 | $ | 17.42 |
| Sale | 7/24/2018 | 200 | $ | 17.23 |
| Sale | 7/24/2018 | 300 | $ | 17.23 |
| Sale | 7/24/2018 | 1,000 | $ | 17.05 |
| Sale | 7/25/2018 | 450 | $ | 17.83 |
| Sale | 7/25/2018 | 2,400 | $ | 17.83 |
| Sale | 7/25/2018 | 9,000 | $ | 17.75 |
| Sale | 7/26/2018 | 1,700 | $ | 17.75 |
| Sale | 7/27/2018 | 1,800 | $ | 18.10 |
| Sale | 7/27/2018 | 6,300 | $ | 18.10 |
| Sale | 7/27/2018 | 1,000 | $ | 17.89 |
| Sale | 7/27/2018 | 4,300 | $ | 18.00 |
| Sale | 7/31/2018 | 200 | $ | 18.59 |
| Sale | 7/31/2018 | 900 | $ | 18.59 |
| Sale | 8/1/2018 | 600 | $ | 18.48 |
| Sale | 8/1/2018 | 2,900 | $ | 18.48 |
| Sale | 8/3/2018 | 2,000 | $ | 18.22 |
| Sale | 8/6/2018 | 2,000 | $ | 18.73 |
| Sale | 8/6/2018 | 4,000 | $ | 18.92 |
| Sale | 8/6/2018 | 5,000 | $ | 19.00 |
| Sale | 8/6/2018 | 700 | $ | 19.00 |
| Sale | 8/6/2018 | 3,300 | $ | 19.00 |
| Sale | 8/7/2018 | 2,000 | $ | 19.49 |
| Sale | 8/7/2018 | 1,000 | $ | 19.40 |
| Sale | 8/7/2018 | 6,400 | $ | 19.40 |
| Sale | 8/8/2018 | 4,000 | $ | 18.98 |
| Sale | 8/15/2018 | 1,000 | $ | 19.31 |
| Sale | 8/15/2018 | 4,600 | $ | 19.31 |
| Sale | 8/16/2018 | 1,000 | $ | 19.12 |
| Sale | 8/17/2018 | 32,095 | $ | 19.15 |
| Sale | 8/20/2018 | 12,740 | $ | 19.32 |
| Sale | 8/20/2018 | 5,000 | $ | 19.49 |
| Sale | 8/24/2018 | 3,000 | $ | 15.11 |
| Sale | 8/27/2018 | 3,141 | $ | 14.49 |
| Sale | 8/28/2018 | 5,359 | $ | 14.17 |
| Sale | 8/28/2018 | 20,000 | $ | 14.04 |
| Sale | 8/28/2018 | 20,000 | $ | 14.00 |
| Sale | 8/28/2018 | 20,000 | $ | 14.09 |
| Sale | 8/29/2018 | 20,000 | $ | 14.34 |
| Sale | 8/31/2018 | 10,000 | $ | 15.72 |
| Sale | 9/4/2018 | 5,000 | $ | 16.15 |
| Sale | 10/1/2018 | 1,000 | $ | 9.01 |
| Sale | 10/1/2018 | 4,556 | $ | 9.01 |
| Sale | 10/2/2018 | 4,850 | $ | 5.54 |
| Sale | 10/2/2018 | 25,120 | $ | 5.54 |
| Sale | 10/3/2018 | 1,000 | $ | 5.61 |
| Sale | 10/3/2018 | 4,800 | $ | 5.61 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | | Price |
|---|---|---|---|---|
| Sale | 10/4/2018 | 1,000 | $ | 5.85 |
| Sale | 10/4/2018 | 5,300 | $ | 5.85 |
| Sale | 10/5/2018 | 300 | $ | 6.13 |
| Sale | 10/5/2018 | 1,900 | $ | 6.13 |
| Sale | 10/8/2018 | 650 | $ | 6.37 |
| Sale | 10/8/2018 | 3,550 | $ | 6.37 |
| Sale | 10/10/2018 | 15,000 | $ | 7.01 |
| Sale | 10/17/2018 | 10,000 | $ | 7.04 |
| Sale | 11/2/2018 | 20,000 | $ | 7.25 |
| Sale | 11/2/2018 | 20,000 | $ | 7.24 |
| Sale | 11/2/2018 | 25,000 | $ | 7.26 |
| Sale | 11/6/2018 | 20,000 | $ | 7.39 |
| Sale | 11/6/2018 | 20,000 | $ | 7.39 |
| Sale | 11/6/2018 | 20,000 | $ | 7.44 |
| Sale | 11/8/2018 | 5,000 | $ | 6.90 |
| Sale | 11/8/2018 | 10,000 | $ | 6.94 |
| Sale | 11/21/2018 | 700 | $ | 7.08 |
| Sale | 11/21/2018 | 3,500 | $ | 7.08 |
| Sale | 11/23/2018 | 7,700 | $ | 7.19 |
| Sale | 11/27/2018 | 10,000 | $ | 7.09 |
| Sale | 11/27/2018 | 400 | $ | 7.12 |
| Sale | 11/27/2018 | 2,300 | $ | 7.12 |
| Sale | 12/3/2018 | 700 | $ | 6.82 |
| Sale | 12/3/2018 | 4,600 | $ | 6.82 |
| Sale | 12/4/2018 | 400 | $ | 6.78 |
| Sale | 12/4/2018 | 1,600 | $ | 6.78 |
| Sale | 12/6/2018 | 1,800 | $ | 5.41 |
| Sale | 12/6/2018 | 8,806 | $ | 5.41 |
| Sale | 12/10/2018 | 6,000 | $ | 4.32 |
| Sale | 12/10/2018 | 10,000 | $ | 4.40 |
| Sale | 12/11/2018 | 6,000 | $ | 4.31 |
| Sale | 12/11/2018 | 400 | $ | 4.36 |
| Sale | 12/11/2018 | 1,100 | $ | 4.36 |
| Sale | 12/12/2018 | 750 | $ | 4.43 |
| Sale | 12/12/2018 | 3,350 | $ | 4.43 |
| Sale | 12/12/2018 | 6,000 | $ | 4.37 |
| Sale | 12/12/2018 | 10,000 | $ | 4.49 |
| Sale | 12/12/2018 | 20,000 | $ | 4.49 |
| Sale | 12/13/2018 | 6,000 | $ | 4.50 |
| Sale | 12/13/2018 | 10,000 | $ | 4.50 |
| Sale | 12/13/2018 | 10,000 | $ | 4.51 |
| Sale | 12/13/2018 | 20,000 | $ | 4.50 |
| Sale | 12/13/2018 | 20,000 | $ | 4.49 |
| Sale | 12/13/2018 | 20,000 | $ | 4.50 |
| Sale | 12/13/2018 | 700 | $ | 4.55 |
| Sale | 12/13/2018 | 3,400 | $ | 4.55 |
| Sale | 12/14/2018 | 300 | $ | 4.61 |
| Sale | 12/14/2018 | 1,800 | $ | 4.61 |
| Sale | 12/14/2018 | 10,000 | $ | 4.53 |
| Sale | 12/14/2018 | 12,000 | $ | 4.50 |

**Gabelli Funds, LLC**
**Transactions in Akorn, Inc. ("AKRX")**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 12/14/2018 | 20,000 | $ 4.60 |