UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# Form 10-K

☑ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended December 31, 2019**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
Commission File Number: 001-32360

# AKORN, INC.

(Exact name of registrant as specified in its charter)

| **Louisiana** | **72-0717400** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045**
(Address of principal executive offices and zip code)

**(847) 279-6100**

**Registrant's telephone number, including area code**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, No Par Value | AKRX | The NASDAQ Global Select Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
(None)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company," in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☑ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the voting stock of the registrant held by non-affiliates (affiliates being, for these purposes only, directors, executive officers and holders of more than 5% of the registrant's common stock) of the registrant as of June 30, 2019, was approximately $497.2 million based on the closing market price of $5.15 reported on the NASDAQ Global Select Market.

The number of shares of the registrant's common stock, no par value per share, outstanding as of February 18, 2020 was 126,246,012.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III of this Form 10-K incorporates by reference certain information from the Registrant's definitive proxy statement relating to our 2020 Annual Meeting of Stockholders or an amendment to this Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Form 10-K relates.

### Cautionary Statement Regarding Forward-Looking Statements

Certain statements in this Form 10-K are forward-looking in nature and are intended to be "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These statements relate to future events or future financial performance.  In some cases, you can identify forward-looking statements by terminology such as "may," "should," "will," "would," "could," "expects," "plans," "intends," "anticipates," "believes," "estimates," "predicts," "potential," "continue" or the negative of such terms or other comparable terminology.  Any forward-looking statements, including statements regarding our intent, beliefs or expectations are not guarantees of future performance.

These statements are subject to risks and uncertainties and actual results, levels of activity, performance or achievements and may differ materially from those in the forward-looking statements as a result of various factors, including:

- our ability to continue as a going concern;
- our substantial level of indebtedness and related debt service obligations and restrictions, including those imposed by covenants in the Second Amendment to Standstill Agreement and Third Amendment to Credit Agreement (the "Second Amended Standstill Agreement") to that certain Loan Agreement, dated as of April 17, 2014, among us and certain of our subsidiaries, the lenders thereunder and JPMorgan Chase Bank, N.A., as administrative agent;
- our ability to execute upon the sale process contemplated by the Second Amended Standstill Agreement;
- volatility and recent declines in the price of our common stock, including the potential impact of any delisting of our stock from the NASDAQ Global Select Market if the price of our common stock continues to decline;
- legal proceedings and governmental investigations, any of which may result in substantial losses, government enforcement actions, damage to our business and reputation and place a strain on our internal resources;
- our ability to timely and efficiently develop, launch and market our products;
- our reliance on third parties, including suppliers, manufacturers and wholesalers;
- our ability to attract and retain key personnel;
- significant disruptions or failures in our information technology systems and network infrastructures that could have a material adverse effect on our business;
- ongoing oversight and review of our products and facilities by regulatory and governmental agencies, including periodic audits by the U.S. Food and Drug Administration and the results thereof;
- increased competition;
- our failure to comply with the complex reporting and payment obligations under Medicare, Medicaid and other government programs may result in litigation or sanctions; and
- our ability to protect our patents and proprietary rights and to defend against claims of third parties that we infringe their proprietary rights.

For more detailed information on the risks and uncertainties associated with our business activities, see Item 1A. - "*Risk Factors*". You should not place undue reliance on any forward-looking statements. You should read this report completely with the understanding that our actual results may differ materially from what we expect. Unless required by law, we undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**FORM 10-K TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 16 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Mine Safety Disclosures | 27 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| Item 6. | Selected Financial Data | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 43 |
| Item 8. | Financial Statements and Supplementary Data | 43 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 95 |
| Item 9A. | Controls and Procedures | 95 |
| Item 9B. | Other Information | 96 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 97 |
| Item 11. | Executive Compensation | 97 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 97 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 97 |
| Item 14. | Principal Accounting Fees and Services | 97 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 98 |
| Item 16. | Form 10-K Summary | 98 |
| Signatures | | 103 |

PART I

## Item 1. *Business*

Akorn, Inc., together with its wholly-owned subsidiaries ("Akorn," the "Company," "we," "our" or "us") is a specialty pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals, branded as well as private-label over-the-counter ("OTC") consumer health products and animal health pharmaceuticals. We are an industry leader in the development, manufacturing and marketing of specialized generic pharmaceutical products in alternative dosage forms. We focus on difficult-to-manufacture sterile and non-sterile dosage forms including, but not limited to, ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays.

Akorn, Inc. is a Louisiana corporation founded in 1971 in Abita Springs, Louisiana. In 1997, we relocated our corporate headquarters to the Chicago, Illinois area and currently maintain our principal corporate offices in Lake Forest, Illinois. We have pharmaceutical manufacturing facilities in Decatur, Illinois; Somerset, New Jersey; Amityville, New York; Hettlingen, Switzerland; and Paonta Sahib, Himachal Pradesh, India. We operate a central distribution warehouse in Gurnee, Illinois and additional distribution facilities in Amityville, New York and Decatur, Illinois. Our research and development ("R&D") centers are located in Vernon Hills, Illinois and Cranbury, New Jersey. We maintain other corporate offices in Ann Arbor, Michigan and New Delhi, India.

During the years ended December 31, 2019, 2018 and 2017, the Company reported results for two reportable segments: Prescription Pharmaceuticals and Consumer Health. For further detail concerning our reportable segments please see Note 12 - "*Segment Information*".

## Recent Developments

On May 6, 2019, the Company and an ad hoc group of Lenders (the "Ad Hoc Group") and certain other Lenders (together with the Ad Hoc Group, the "Standstill Lenders") entered into the Original Standstill Agreement to the Company's Term Loan Agreement, among the Company and certain of its subsidiaries (collectively, the "Loan Parties"), the Lenders and the Administrative Agent. Pursuant to the terms of the Original Standstill Agreement, the Company was required to enter into a Comprehensive Amendment. If the Company did not enter into the Comprehensive Amendment by December 13, 2019 or refinance or otherwise address the outstanding loans, an event of default would occur under the Term Loan Agreement. On December 15, 2019, the Loan Parties entered into a First Amendment to Standstill Agreement and Second Amendment to Credit Agreement with certain Standstill Lenders, pursuant to which the maximum duration of the "Standstill Period" was extended from December 13, 2019 to February 7, 2020.

On February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of (i) a default under the loan agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement. Among other things, the Second Amended Standstill Agreement also (i) provides that, during the extended Standstill Period, neither the Administrative Agent nor the Lenders may exercise their default-related rights and remedies with respect to specified events of default under the Term Loan Agreement, and (ii) provides that we will market and conduct a sale process for substantially all of the Company's assets in accordance with certain milestones (the "Sale Process"). The Sale Process may be consummated out-of-court to the extent permitted by the Lenders or on an in-court basis, potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code.

See Note 21 - "*Subsequent Events*", Item 7 - "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Risk Factors*" - "*There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.* " and - "*Our limited liquidity could materially and adversely affect our business operations.*" for more information on the Second Amended Standstill Agreement, the Sale Process, and the risks related thereto. Refer to Note 2 - "*Summary of Significant Accounting Policies*" for further discussion of the Company's ability to continue as a going concern and Note 7 - "*Financing Arrangements*" for further detail of our debt obligations as of and for the year ended December 31, 2019.

Our common shares are traded on The NASDAQ Global Select Market under the ticker symbol AKRX. Our principal corporate office is located at 1925 West Field Court Suite 300, Lake Forest, Illinois 60045, and our telephone number is (847) 279-6100.

**Our Strategy**

Our strategy is focused on the development and marketing of specialized generic and branded pharmaceuticals, OTC drug products and animal health products. We endeavor to maximize shareholder value by quickly adapting to market conditions, patient demands and customer needs.

We strive to improve cash flow and profitability and generate growth through: new product launches resulting from research and development successes, improving operational execution, improving and optimizing our cash flow and leveraging our customer relationships and market leadership. We remain committed to research and development with a focus on our core product areas of ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays.

Additionally, where possible we have historically sought to grow our business through strategic mergers, acquisitions, business development and licensing activities that provide the ability to move into new product areas or to expand our reach in existing product areas. In previous years, the Company completed numerous mergers, acquisitions and product acquisitions that resulted in significant growth.

**Our Competitive Strengths**

In order to successfully execute our strategy, we must continue to capitalize on our core strengths:

*Research and development expertise in alternative dosage forms.* Our R&D efforts are primarily focused on the development of generic products that are in dosage forms other than oral solid dose. We consider dosage forms outside of oral solid dose to be "alternative dosage forms". These products typically have fewer competitors in mature markets, are more difficult to develop and manufacture and can carry higher profitability over time than oral solid dose products. The alternative dosage form products that we focus on are primarily those that we can manufacture, namely: ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays.

*Alternative dosage form manufacturing expertise.* Our manufacturing network specializes in alternative dosage form products. Four of our five manufacturing facilities are U.S. Food and Drug Administration ("FDA") approved, including:

• Decatur, Illinois facility, which specializes in sterile products, primarily injectables;
• Somerset, New Jersey facility, which specializes primarily in sterile ophthalmic products;
• Amityville, New York facility, which specializes in topical creams, gels and ointments, oral liquids, otic liquids, nasal sprays, sterile ophthalmic products and unit dose oral liquid products; and
• Hettlingen, Switzerland facility, which specializes primarily in sterile ophthalmic products.

Our Paonta Sahib, Himachal Pradesh, India manufacturing facility is not FDA approved. The Paonta Sahib facility is a sterile injectable facility with separate areas dedicated to general injectable products, carbapenem injectable products, cephalosporin injectable products and hormonal injectable products. The Company continues to explore strategic alternatives for exiting our Paonta Sahib, Himachal Pradesh, India manufacturing facility.

*Established portfolio of generic, branded, OTC and animal health products.* We market a diverse portfolio of generic prescription pharmaceutical products, branded prescription pharmaceutical products, OTC brands, various private-label OTC pharmaceutical products and a number of prescription animal health products. For our human prescription products, our diverse portfolio of alternative dosage form products allows us to provide a single source of these products for our customers. Our OTC and animal health portfolios are largely complementary to our human prescription products, allowing us to leverage our manufacturing and marketing expertise.

*Targeted sales and marketing infrastructure.* We maintain a targeted sales and marketing infrastructure to promote our branded, generic, OTC and animal health products, primarily in the United States. We leverage our sales and marketing infrastructure to not only promote our branded portfolio, but also to sell our multisource generic products directly into physician offices, hospital systems and group purchasing organizations.

*Significant management expertise.* Our senior management team has a demonstrated track record of building and operating pharmaceutical companies through product development, in-licensing and acquisitions.

**Our Areas of Focus**

*Alternative dosage form generics.* Our core area of focus is generic prescription pharmaceutical products in alternative dosage forms. We market a portfolio of multisource prescription pharmaceutical products in injectable, ophthalmic, topical, oral and inhaled liquid, nasal spray and otic dosage forms. We also market select oral solid dose formulations.

*Specialty brands.* Alongside our generic prescription pharmaceutical products, we market a portfolio of branded prescription pharmaceutical products, primarily in the ophthalmology area. While we continue to focus primarily on generic products, our branded portfolio allows us to leverage our sales and manufacturing infrastructure and deepen our relationships with customers.

*OTC products.* Our Akorn Consumer Health division ("ACH") markets a portfolio of OTC brands and various formulations of private-label OTC pharmaceutical products. Our flagship OTC brand is TheraTears® Therapy for Your Eyes®, which is a family of therapeutic eye care products including dry eye therapy lubricating eye drops, antimicrobial eyelid cleanser and eye nutrition supplements. We also market several specialty OTC products including, Zostrix®, MagOx®, Maginex®, Multi-betic® and Diabetic Tussin®.

*Specialized Animal Health Products.* We market a portfolio of branded and generic, companion animal prescription pharmaceutical products under the Akorn Animal Health label. Our major animal health products include Anased® and VetaKet®, veterinary sedatives; Tolazine® and Yobine®, sedative reversing agents; and Butorphic®, a pain reliever.

**New Product Development**

We seek to continually grow our business by developing new products.  Internal R&D projects are carried out at our R&D facilities located in Vernon Hills, Illinois and Cranbury, New Jersey. The majority of our product development activity takes place at our R&D facilities, while our manufacturing facilities provide support for the later phases of product development and exhibit batch production.  We believe that having our own dedicated R&D facilities allows us to increase the size of our product pipeline and shorten the time between project start and filing with the FDA.

In addition to our internal development work, we strategically partner with drug development and contract manufacturing companies ("CMOs") throughout the world for the development of drug products that we believe will complement our existing product offerings, but for which we may lack the expertise to develop, or the capability, capacity or cost-efficiencies to manufacture.  We may owe payments to these partners from time to time based on their achievement of certain milestones, such as filing and launch of the subject development product.  Our development partners may receive milestone payments or royalties from the sales of the product.

R&D costs are expensed as incurred. Such costs amounted to $37.5 million, $47.3 million and $45.0 million for the years ended December 31, 2019, 2018 and 2017, respectively. This includes internal and external R&D expenses and milestone fees paid to our strategic partners.

During the year ended December 31, 2019, we submitted one new Abbreviated New Drug Application ("ANDA") filing to the FDA. During the year ended December 31, 2018, we submitted two ANDA filings, and during the year ended December 31, 2017, we submitted five ANDA filings to the FDA.

Akorn and its partners received five ANDA product approvals from the FDA in the year ended December 31, 2019; eight ANDA approvals during the year ended December 31, 2018 and twenty-six ANDA approvals and one New Drug Application ("NDA") approval during the year ended December 31, 2017.

As of December 31, 2019, we had 34 ANDA filings under FDA review. We plan to continue to regularly submit additional filings based on perceived market opportunities, as well as review existing filings for commercial viability.

See "Government Regulation" and Item 1A. - "*Risk Factors*" — "*Our growth depends on our ability to timely and efficiently develop and successfully launch and market new pharmaceutical products.*"

**Strategic Mergers and Acquisitions**

We have historically sought to expand, and we may seek to expand in the future, through the acquisition of products and companies in areas that we believe offer attractive opportunities for growth. Below is a summary of recent merger and acquisition activity. See Item 1A. - "*Risk Factors*" for a description of risks that accompany our business and acquisitions.

*Terminated Merger Agreement.* On April 24, 2017, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Fresenius Kabi AG, a German stock corporation ("Parent"), Quercus Acquisition, Inc., a Louisiana corporation

and wholly-owned subsidiary of Parent ("Merger Sub") and, solely for purposes of Article VIII thereof, Fresenius SE & Co. KGaA, a German partnership limited by shares, which Merger Agreement subsequently resulted in litigation and ultimate termination. For a more detailed description of the litigation, please see Note 19 - "*Legal Proceedings.*"

**Akorn AG (formerly Excelvision AG).** To expand our ophthalmic manufacturing capacity and capabilities, our Luxembourg subsidiary, Akorn International S.à r.l., closed a share purchase agreement on January 2, 2015, with Fareva SA to acquire all of the issued and outstanding shares of capital stock of Excelvision AG, a Swiss company ("Excelvision AG"). Excelvision AG was a contract manufacturer located in Hettlingen, Switzerland specializing in ophthalmic products. On April 1, 2016, the name of Excelvision AG was changed to Akorn AG.

**VersaPharm.** On August 12, 2014, we completed the acquisition of VPI Holdings Corp. ("VPI"), the parent company of VersaPharm Incorporated, a Georgia corporation ("VersaPharm") (the "VersaPharm Acquisition"). VersaPharm was a developer and marketer of multisource prescription pharmaceuticals. VersaPharm's product portfolio, pipeline and development capabilities were complementary to the Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") acquisition, described below, through which we acquired manufacturing capabilities needed for several of VersaPharm's marketed and pipeline products.

**Hi-Tech Pharmacal Co., Inc.** On April 17, 2014, we completed the acquisition of Hi-Tech, which developed, manufactured and marketed generic and branded prescription and OTC drug products, and specialized in liquid and semi-solid dosage forms (the "Hi-Tech Acquisition"). Hi-Tech's ECR Pharmaceuticals subsidiary ("ECR"), which marketed branded prescription products, was divested during the year ended December 31, 2014.

The Hi-Tech Acquisition complemented and expanded our manufacturing capabilities and product portfolio by diversifying our offerings to our retail customers beyond ophthalmics to other niche dosage forms such as oral liquids, topical creams and ointments, nasal sprays and otics. The Hi-Tech Acquisition also enhanced our new product pipeline. Further, the Hi-Tech Acquisition added branded OTC products in the categories of cough and cold, nasal sprays and topicals to our TheraTears® brand of eye care products.

## Business Development and Licensing

Supplemental to our strategic mergers and acquisitions strategy, we have also sought to enhance our generic and branded product lines through the acquisition or licensing of on-market or in-development products that expand or complement our current branded and generic product portfolio. Below is a summary of product acquisition and licensing transactions that we made from 2013 to 2019.

**Lloyd Products Acquisition.** To expand our animal health product portfolio, our wholly-owned subsidiary Akorn Animal Health, Inc. entered into a definitive product acquisition agreement on October 2, 2014, with Lloyd, Inc. to acquire certain rights and inventory related to a portfolio of animal health injectable products used in pain management and anesthesia.

**Xopenex Product Acquisition.** To expand our prescription product portfolio of respiratory products, we entered into a definitive product acquisition agreement with Sunovion Pharmaceuticals Inc., on October 1, 2014, to acquire certain rights and inventory related to Xopenex® Inhalation Solution (levalbuterol hydrochloride).

**Zioptan® Product Acquisition.** To expand our branded ophthalmology portfolio, we acquired the rights to the U.S. NDA for Zioptan®, a prescription ophthalmic eye drop indicated for reducing elevated intraocular pressure in patients with open-angle glaucoma or ocular hypertension, from Merck, Sharp and Dohme Corp. ("Merck") on April 1, 2014.

**Betimol Product Acquisition.** To expand our branded ophthalmology portfolio, we acquired the rights to the U.S. NDA for Betimol®, a prescription ophthalmic eye drop indicated for the reduction of eye pressure in glaucoma patients, from Santen Pharmaceutical Co., Ltd., ("Santen") on January 2, 2014.

**Merck Products Acquisition.** On November 15, 2013, we acquired three ophthalmic U.S. NDAs from Merck:

- **AzaSite®** — (azithromycin ophthalmic solution), a prescription sterile eye drop solution used to treat bacterial conjunctivitis;
- **Cosopt®** — (dorzolamide hydrochloride and timolol maleate ophthalmic solution), a prescription sterile eye drop solution that is used to reduce intraocular pressure in patients with open-angle glaucoma or ocular hypertension; and
- **Cosopt® PF** — a preservative free version of Cosopt®, supplied in sterile, single-use containers.

This acquisition expanded our line of prescription ophthalmic products to include additional branded products. The acquisition included our acquisition of a Merck subsidiary corporation, Inspire Pharmaceuticals, Inc. ("Inspire"), which was and continues to be the holder of the product rights to AzaSite®.

**Our Segments**

The Company has identified two reportable segments. These segments are the Prescription Pharmaceuticals Segment and the Consumer Health Segment.

***Prescription Pharmaceuticals Segment.*** Our Prescription Pharmaceuticals segment primarily consists of generic and branded prescription pharmaceuticals in a variety of dosage forms, including sterile ophthalmics, injectables and inhalants and non-sterile oral liquids, topicals, nasal sprays and otics. We also market a number of pain management drugs, including drugs subject to the Controlled Substances Act. The segment represented 88.5% of our net revenue in 2019. See Note 12 - "*Segment Information*" for further detail on the Prescription Pharmaceuticals segment.

While the majority of sales within the Prescription Pharmaceuticals segment are derived from generic products, Akorn markets a line of branded ophthalmic and respiratory products including brands such as Akten®, a topical ocular anesthetic gel, AzaSite®, an antibiotic used to treat bacterial conjunctivitis, Cosopt®, Cosopt® PF, Betimol® and Zioptan®, which are used in the treatment of glaucoma, and Xopenex® Inhalation Solution, used in the treatment or prevention of bronchospasm.

***Consumer Health Segment.*** Our Consumer Health segment primarily consists of branded and private-label OTC products and animal health products dispensed by veterinary professionals. Our branded and private-label OTC products are primarily focused on ophthalmics including a leading dry eye treatment TheraTears® Therapy for Your Eyes®. We also market other OTC consumer health products including Mag-Ox®, a magnesium supplement, and the Diabetic Tussin® line of cough and cold products. Our animal health portfolio is focused on products complementary to our human health prescription portfolio, leveraging our R&D and manufacturing capabilities for alternative dosage form products. Major products within our animal health portfolio include Anased® and VetaKet® veterinary sedatives; Tolazine® and Yobine®, sedative reversing agents; and Butorphic®, a pain reliever. See Note 12 - "*Segment Information*" for further detail on the Consumer Health segment.

**Our Products**

Our major products are listed alphabetically below.

- *AK-FLUOR® (fluorescein injection, USP).* We market our branded fluorescein injection as AK-FLUOR® 10% (100 mg/mL) and 25% (250 mg/mL). AK-FLUOR® is indicated in diagnostic fluorescein angiography or angioscopy of the retina and iris vasculature.

- *Atropine Sulfate Ophthalmic Solution.* We received approval of our NDA for Atropine Sulfate Ophthalmic Solution, USP, 1% in July 2014. We had previously been marketing this product as an unapproved product.

- *Cosopt® PF.* We acquired the rights to the U.S. NDA for Cosopt® PF (2% Dorzolamide Hydrochloride 0.5% and Timolol Maleate supplied in sterile, single-use containers), a preservative-free prescription ophthalmic eye drop indicated for the reduction of elevated intraocular pressure (IOP) in patients with open-angle glaucoma or ocular hypertension who are insufficiently responsive to beta-blockers, through the Merck Products Acquisition on November 15, 2013.

- *Dehydrated Alcohol Injection.* We began marketing Dehydrated Alcohol Injection, USP in 1997. Our Dehydrated Alcohol Injection is not an FDA approved product and in early 2020, we ceased distribution of this unapproved product.

- *Ephedrine Sulfate Injection.* We originally began marketing Ephedrine Sulfate Injection, USP, 50 mg/mL in 1 mL single-dose ampules in 1997 as an unapproved product. In March 2017, we received FDA approval of our NDA for Ephedrine Sulfate Injection.

- *Lidocaine Hydrochloride Jelly, USP 2%.* Lidocaine HCl 2% Jelly is a sterile, aqueous product that contains a local anesthetic agent and is administered topically.

- *Myorisan™ (isotretinoin capsules, USP).* We acquired Myorisan™ isotretinoin capsules, USP, in 10 mg, 20 mg and 40 mg strengths through the VersaPharm Acquisition. We subsequently received approval for the 30 mg strength in 2015.

- *Phenylephrine Hydrochloride Ophthalmic Solution.* We began marketing Phenylephrine Hydrochloride Ophthalmic Solution, USP, 2.5% shortly after FDA approval of our NDA in January 2015.

- *TheraTears® Dry Eye Therapy Lubricant Eye Drops.* TheraTears® is an over-the-counter eye drop that is used as a lubricant to relieve dryness of the eye. TheraTears® unique hypotonic and electrolyte balanced formula replicates healthy tears.

- *Zioptan®.* We acquired the rights to the U.S. NDA for Zioptan® (*tafluprost ophthalmic solution*) 0.0015%, a preservative-free prescription ophthalmic eye drop indicated for reducing elevated intraocular pressure in patients with open-angle glaucoma or ocular hypertension, from Merck, in April 2014.

Several of the products discussed above have generic equivalent competitors. In the year ended December 31, 2019, the Company estimates that none of its products represented 10% or more of total net revenue.

**Sales and Marketing**

We rely on our sales and marketing teams to help us maintain and, where possible, increase market share for our products. Our sales organization is structured as follows:

(1)  field sales teams focused on branded ophthalmology products;
(2)  field sales teams focused on institutional markets;
(3)  inside sales team focused on customers in smaller markets; and
(4)  national accounts sales team focused on wholesalers, distributors, retail pharmacy chain and group purchasing organizations ("GPOs").

Our field sales representatives promote ophthalmic products directly to glaucoma specialists, retinal surgeons and ophthalmologists, and other pharmaceutical products directly to hospitals in order to support contract compliance and pull-through against existing contracts. Our inside sales team augments our outside sales teams to sell products in markets where field sales would not be cost effective. Our national accounts sales team seeks to establish and maintain contracts with wholesalers, distributors, retail pharmacy chains and GPOs. As of the year ended December 31, 2019, we utilized a sales force of 70 field and inside sales representatives to promote our product portfolio. To support our sales efforts, we also have a customer service team and a marketing department focused on promoting and raising awareness about our product offerings.

**Competition**

*Prescription Pharmaceuticals.* The sourcing, marketing and manufacturing of pharmaceutical products is highly competitive, with many established manufacturers, suppliers and distributors actively engaged in all phases of the business. We compete principally on the quality of our products and services, reliability of our supply, breadth of our portfolio, depth of our customer relationships and price. Many of our competitors have substantially greater financial and other resources, including greater sales volume, larger sales forces and greater manufacturing capacity. See Item 1A. - "*Risk Factors*" - "*Sales of our products may be adversely affected by further increases in competition*" for more information.

*Generic Pharmaceuticals.* Companies that compete with our generic pharmaceuticals portfolio include Teva Pharmaceutical Industries Ltd. ("Teva"), Apotex Inc., Fresenius Kabi AG, Hikma Pharmaceuticals plc, Novartis International AG (through their Sandoz subsidiary), Alcon Inc., Perrigo Company plc, Pfizer Inc., Mylan N.V., Amneal Pharmaceuticals, Inc., Taro Pharmaceutical Industries Ltd. and Bausch Health Companies Inc., among others.

*Branded Pharmaceuticals.* Companies that compete with our branded pharmaceuticals portfolio include Allergan plc, Alcon Inc., Pfizer Inc. and Bausch Health Companies Inc., among others. Additionally, potential generic entrants with equivalent products referencing our branded products present an additional competitive threat.

*Consumer Health.* Like our Prescription Pharmaceuticals segment, the sourcing, manufacturing and marketing of Consumer Health products is highly competitive, with many established manufacturers, suppliers and distributors actively engaged in all phases of the business. With the Company's relatively small OTC and animal health product portfolio, many of our competitors have substantially greater financial and other resources, including greater sales volume, larger sales forces and greater manufacturing capacity. Within this market, we compete primarily on product offering, as well as price and service.

The companies that compete with our Consumer Health segment include both generic and name brand companies such as Johnson & Johnson, Perrigo Company plc., Pfizer Inc., and Bausch Health Companies Inc., among others.

**Seasonality**

The majority of our products do not experience significant seasonality.  We do market certain prescription pharmaceutical and consumer health products for the treatment of allergies which typically generate consumer demand in the warmer months as well as cough and cold products which typically generate higher consumer demand in the colder months, but we do not believe these products materially impact our overall sales trends. Additionally, we market antidote products through our Prescription Pharmaceuticals segment, the sales of which are largely timed to the expiration of existing stock held by our customers.

**Major Customers**

For the years ended December 31, 2019, 2018 and 2017, a high percentage of our sales were to the three large wholesale drug distributors noted below. These three wholesale drug distributors account for a significant portion of our gross sales, net revenue and accounts receivable in both of our segments. The three large wholesale drug distributors are:

- AmerisourceBergen Corporation ("Amerisource");
- Cardinal Health, Inc. ("Cardinal"); and
- McKesson Corporation ("McKesson").

On a combined basis, these three wholesale drug distributors accounted for approximately 82.6% of our total gross sales and 60.3% of our net revenue in the year ended December 31, 2019, and 83.4% of our gross accounts receivable as of December 31, 2019. The difference between gross sales and net revenue is that gross sales is calculated before allowances for chargebacks, rebates, administrative fees and others, promotions and product returns (See Note 2 - "*Summary of Significant Accounting Policies*" for more information).

The table below presents the percentages of our total gross sales, net revenue and gross trade accounts receivable attributed to each of these three wholesale drug distributors as of and for the years ended December 31, 2019, 2018 and 2017, respectively:

| | 2019 | | | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Gross Sales | Net Revenue | Gross Accounts Receivable | Gross Sales | Net Revenue | Gross Accounts Receivable | Gross Sales | Net Revenue | Gross Accounts Receivable |
| Amerisource | 20.8% | 20.3% | 22.0% | 20.5% | 20.9% | 17.9% | 23.6% | 19.1% | 26.3% |
| Cardinal | 21.2% | 16.9% | 15.6% | 20.7% | 15.8% | 19.3% | 17.5% | 17.9% | 21.1% |
| McKesson | 40.6% | 23.1% | 45.8% | 41.8% | 25.0% | 48.3% | 39.1% | 26.5% | 38.6% |
| Combined Total | 82.6% | 60.3% | 83.4% | 83.0% | 61.7% | 85.5% | 80.2% | 63.5% | 86.0% |
| Other | 17.4% | 39.7% | 16.6% | 17.0% | 38.3% | 14.5% | 19.8% | 36.5% | 14.0% |
| Combined Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Amerisource, Cardinal and McKesson are key distributors of our products, as well as a broad range of healthcare products for many other companies. None of these distributors is an end user of our products. Generally speaking, if sales to any one of these distributors were to diminish or cease, we believe that the end users of our products would likely find little difficulty obtaining our products from another distributor; however, the loss of one or more of these distributors, together with a delay or inability to secure an alternative distribution source for end users, could have a material negative impact on our revenue, business, financial condition and results of operations.

We consider our business relationships with Amerisource, Cardinal and McKesson to be in good standing and we currently have fee for services contracts with each of them; however, a change in purchasing patterns, a decrease in inventory levels, an increase in returns of our products, delays in purchasing products and delays in payment for products by one or more of these distributors could have a material negative impact on our revenue, business, financial condition and results of operations. See Item 1A. - "*Risk Factors*" — "*We depend on a small number of wholesalers to distribute our products, the loss of any of which could have a material adverse effect on our business*" for more information.

**Backorders**

As of December 31, 2019, we had approximately $4.4 million of products on backorder as compared to approximately $28.2 million of backorders as of December 31, 2018 and $12.2 million as of December 31, 2017.

**Foreign Sales**

During the years ended December 31, 2019, 2018 and 2017, approximately $13.2 million, or 1.9% of net revenue, $16.4 million, or 2.4% of net revenue, and $25.5 million or 3.0% of net revenue, respectively, was related to sales to customers in foreign countries.

Our business is subject to risks of currency fluctuations, governmental actions and other governmental proceedings abroad. We do not regard these risks as a deterrent to conducting our operations abroad or further expansion abroad; however, we closely review our methods of operations and seek to adopt strategies responsive to changing economic and political conditions.

**Suppliers**

We require raw materials and components to manufacture and package pharmaceutical products. The principal components of our products are active and inactive pharmaceutical ingredients and certain packaging materials. Certain of these materials are available from only a single source and, in the case of many of our products, only one supplier of raw materials has been identified and qualified. Because FDA approval of drugs requires manufacturers to specify their proposed suppliers of active ingredients and certain packaging materials in product applications, FDA approval of any new supplier would be required if such materials were no longer available from the specified supplier. The qualification of a new supplier could delay our development and marketing efforts. If for any reason we are unable to obtain sufficient quantities of any of the raw materials or components required to produce and package our products, we may not be able to manufacture our products as planned. In addition, certain of the pharmaceutical products that we market are manufactured by third parties that serve as our only supplier of those products.  Any delays or failure of a contract manufacturing partner to supply finished goods timely or in adequate volume could impede our marketing of those products.

No supplier represented 10% or more of our purchases in the years ended December 31, 2019, 2018 or 2017.  See Item 1A. - "*Risk Factors*" - "*Many of the raw materials and components used in our products come from a single source, the loss of any of which could have a material adverse effect on our business*" and "*A significant portion of our revenues are generated through the sale of products manufactured by third parties, the loss or failure of any of which may have a material adverse effect on our business, financial position and results of operations*" for more information.

**Manufacturing**

We operate manufacturing facilities in Decatur, Illinois; Somerset, New Jersey; Amityville, New York and Hettlingen Switzerland. In addition, we own a manufacturing facility in Paonta Sahib, Himachal Pradesh, India that is not currently manufacturing any products for sale. See Item 2 - "*Properties*", for more information. Through these manufacturing facilities we manufacture a diverse assortment of sterile and non-sterile pharmaceutical products including oral liquids, otics, nasal sprays, liquid injectables, lyophilized injectables, topical gels, creams and ointments; and ophthalmic solutions, suspensions and ointments for both of our reportable segments. By location, these include:

- *Somerset, New Jersey* — sterile ophthalmic solutions and ointments and sterile topical gels;
- *Decatur, Illinois* — sterile liquid and lyophilized injectables and sterile ophthalmic solutions;
- *Amityville, New York* — sterile ophthalmic solutions and suspensions, otic solutions, and non-sterile nasal sprays, topical ointments and creams, oral liquids, and liquid unit dose cups;
- *Hettlingen, Switzerland* — sterile ophthalmic solutions, suspensions, gels and ointments; and
- *Paonta Sahib, Himachal Pradesh, India* — sterile liquid injectables including cephalosporins, carbapenems, hormones and general injectables. The Company continues to explore strategic alternatives for exiting our Paonta Sahib, Himachal Pradesh, India manufacturing facility.

**Patents, Trademarks and Proprietary Property**

We consider the protection of our patents, trademarks and proprietary rights important to maintaining and growing our business.  Through acquisitions, we also acquired rights to the trade names for the branded, prescription ophthalmic products AzaSite®, Betimol®, Cosopt® PF, and Zioptan®, respiratory product Xopenex®, as well as OTC products TheraTears®, Sterilid®, Mag-Ox®, Multi-betic® and Zostrix®. We are committed to maintaining and defending these trade names as they are important in supporting the success and growth of this business. In addition, we maintain and defend trademarks related to a number of internally-developed products, as well as others licensed from third parties.

11

We have sought, and intend to continue to seek, patent protection in the United States and selected foreign countries where deemed appropriate and advantageous to us.

We also rely upon trade secrets, unpatented proprietary know-how and continuing technological innovation to maintain and develop our competitive position. We enter into confidentiality agreements with certain of our employees pursuant to which such employees agree to assign to us any inventions relating to our business made by them while in our employ; however, there can be no assurance that others may not acquire or independently develop similar technology or, if patents are not issued with respect to products arising from research, that we will be able to maintain information pertinent to such research as proprietary technology or trade secrets. For more information, see Item 1A. - "*Risk Factors*" - "*Third parties may claim that we infringe their proprietary rights and may prevent or delay us from manufacturing and selling some of our new products*" and "*Our patents and proprietary rights may be challenged, circumvented or otherwise compromised by competitors, which may result in our protected products losing their market exclusivity and becoming subject to generic competition before their patents expire.*"

## Government Regulation

Pharmaceutical manufacturers and distributors are subject to extensive regulation by government agencies, including the FDA, the Drug Enforcement Administration ("DEA"), the FTC and other federal, state and local agencies, as well as their international equivalents. The development, testing, manufacturing, processing, quality, safety, efficacy, packaging, labeling, recordkeeping, distribution, storage and advertising of our products, and disposal of waste products arising from such activities, are subject to regulation by the FDA, DEA, FTC, the Consumer Product Safety Commission, the Occupational Safety and Health Administration and the Environmental Protection Agency. Similar state and local agencies also have jurisdiction over these activities. Noncompliance with applicable United States and/or state or local regulatory requirements, or their international equivalents, can result in fines, injunctions, penalties, mandatory recalls or seizures, suspensions of production, recommendations by the FDA against governmental contracts and criminal prosecution. In addition, we are subject to oversight from federal and state government benefit programs, healthcare fraud and abuse laws and international regulations in jurisdictions in which we manufacture or sell our pharmaceutical products.

*FDA.* The Federal Food, Drug and Cosmetic Act (the "FDC Act") and other federal statutes and regulations govern or influence the development, testing, manufacture, labeling, storage and promotion of products that we manufacture and market. The FDA inspects drug manufacturers and storage facilities to determine compliance with its current Good Manufacturing Practices ("cGMP") regulations, non-compliance with which can result in fines, recall and seizure of products, total or partial suspension of production, refusal to approve NDAs and ANDAs and criminal prosecution. Under the FDC Act, the federal government has extensive administrative and judicial enforcement authority over the activities of finished drug product manufacturers to ensure compliance with FDA regulations. This authority includes, but is not limited to, the authority to initiate judicial action to seize unapproved or non-complying products, to enjoin non-complying activities, to halt manufacturing operations that are not in compliance with cGMP, to recall products, to seek civil and monetary penalties and to criminally prosecute violators. Other enforcement activities include refusal to approve product applications, withdrawal of previously approved applications or prohibition on marketing of certain unapproved products.

FDA approval is required before any prescription drug products can be marketed. New drugs require the filing of an NDA, including clinical studies demonstrating the safety and efficacy of the drug. Generic drugs, which are therapeutic equivalents of existing brand name drugs, require the filing of an ANDA. An ANDA does not, for the most part, require clinical studies since safety and efficacy have already been demonstrated by the product originator; however, the ANDA must provide data to support the bioequivalence of the generic drug product. The time required by the FDA to review and approve NDAs and ANDAs is variable and, to a large extent, beyond our control.

In 2018, our Decatur, Illinois and Somerset, New Jersey manufacturing facilities were inspected by the FDA and received Official Action Indicated status as an outcome of the inspections. We received warning letters in January and June of 2019 related to the 2018 inspections at our Decatur and Somerset facilities, respectively. The Company submitted comprehensive responses to the warning letters in 2019. Our Amityville, New York facility was inspected by the FDA in 2019 and received Voluntary Action Indicated status as an outcome of the inspections.

*DEA.* We manufacture and distribute several controlled drug substances, the distribution and handling of which are regulated by the DEA, which imposes, among other things, certain licensing, security and record-keeping requirements, as well as quotas for the manufacture, purchase, storage and sale of controlled substances. Failure to comply with DEA regulations (and similar state and international regulations) can result in fines or seizure of product. There have not been any material fines, seizures or interruptions resulting from DEA inspections in any of the years ended December 31, 2019, 2018 and 2017.

We are subject to periodic inspections by the DEA in facilities where we manufacture, process or distribute controlled substances.  In 2019, the DEA inspected our Decatur, Illinois and Amityville, New York facilities with no observations.

See Item 1A. - "*Risk Factors*" - "*Risks Related to Regulations*" category for more information.

**Government Benefit Programs.**  We sell products that can be subject to the statutory and regulatory requirements for Medicaid, Medicare, TRICARE and other government healthcare programs. These regulations govern access and reimbursement levels, including that all pharmaceutical companies pay rebates to individual states based on a percentage of sales arising from Medicaid-reimbursed products. We are also subject to price ceilings for select products sold through the military TRICARE program. U.S. federal and state governments may continue to enact legislation and other measures aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such potential future measures or the impact on our profitability. See Item 1A. - "*Risk Factors*" - "*Any failure to comply with the complex reporting and payment obligations under Medicare, Medicaid and other government programs may result in litigation or sanctions*," for more information.

**Anti-Corruption and Anti-Kickback Laws.**  We are subject to various federal, state and local laws targeting fraud and abuse in the healthcare industry. In the United States, there are various federal and state anti-kickback laws that prohibit payment or receipt of kickbacks, bribes or other remuneration intended to induce the purchase or recommendation of healthcare products and services or reward past purchases or recommendations. Violations of these anti-kickback laws can lead to civil and/or criminal penalties, including fines, imprisonment and exclusion from participation in government healthcare programs. The Company and its employees are subject to the US Foreign Corrupt Practices Act ("FCPA"), as well as other international anti-corruption laws. See Item 1A. - "*Risk Factors*" - "*Failure to comply with the U.S. Foreign Corrupt Practices Act could subject us to, among other things, penalties and legal expenses that could harm our reputation and have a material adverse effect on our business, financial condition and operating results*," for more information.

**Privacy and Data Protection Laws.**  We are subject to the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, as well as various state privacy and data protection laws. We also are subject to privacy laws in Switzerland, where one of our manufacturing facilities is located.

**Other Health Care Laws.** We are also subject to other healthcare laws, notably:

- *Federal Civil False Claims Act.*  We are also subject to the provisions of the federal civil False Claims Act and, in particular, actions brought pursuant to the False Claims Act's whistleblower or *qui tam* provisions. The civil False Claims Act imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. The *qui tam* provisions of the False Claims Act allow a private individual to bring civil actions on behalf of the federal government alleging that the defendant has submitted or caused the submission of a false claim to the federal government, and to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claim laws analogous to the False Claims Act. Many of these state laws apply where a claim is submitted to any third-party payer and not merely a federal healthcare program.

- *Federal Physician Payments Sunshine Act.*  The Federal Physician Payments Sunshine Act mandates annual reporting of various types of payments to physicians and teaching hospitals. Under the regulations, applicable drug, biological, device, and medical supply manufacturers are required to report to CMS payments or other transfers of value made to healthcare professionals and teaching hospitals. Failure to comply with required reporting requirements could subject pharmaceutical manufacturers and others to substantial civil monetary penalties.

**Government Contracts**

We maintain distribution contracts with the U.S. Federal Government, including the U.S. Department of Veterans Affairs, among others. We are subject to federal regulations governing government contractors.

**Employees**

13

As of December 31, 2019, we had a total of 2,227 employees globally, based in the following locations:

| United States of America | 1,731 |
|---|---|
| India | 264 |
| Switzerland | 232 |
| Total | 2,227 |

We believe we have good relations with our employees. Our employees are not represented by collective bargaining agreements.

**Environment**

Our operations are subject to foreign, federal, state and local environmental laws and regulations concerning, among other matters, the generation, handling, storage, transport, treatment and disposal of, or exposure to, prescription drugs and toxic and hazardous substances. Violation of these laws and regulations, which frequently change, can lead to substantial fines and penalties. Some of our operations require environmental permits and controls to prevent and limit pollution. We believe that our facilities are in compliance with applicable environmental laws and regulations and we do not anticipate any material adverse effect from compliance with foreign, federal, state and local provisions that have been enacted or adopted regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment.

**Information about our Executive Officers**

The following table identifies our current executive officers, the positions they hold as of February 13, 2020, and the year in which they became an officer. Our officers are appointed by the Board to hold office until their successors are elected and qualified.

| Name | Position | Age | Year Became Officer |
|---|---|---|---|
| Douglas S. Boothe | President and Chief Executive Officer ("CEO") | 56 | 2019 |
| Duane A. Portwood | Executive Vice President and Chief Financial Officer ("CFO") | 53 | 2015 |
| Joseph Bonaccorsi | Executive Vice President, General Counsel, and Secretary ("General Counsel") | 55 | 2009 |
| Erislandy Dorado-Boladeres | Executive Vice President of Global Quality | 57 | 2019 |
| Randall E. Pollard | Senior Vice President, Finance, and Chief Accounting Officer ("CAO") | 48 | 2015 |
| Jonathan Kafer | Executive Vice President and Chief Commercial Officer | 56 | 2016 |
| Christopher C. Young | Executive Vice President, Global Operations | 48 | 2019 |

*Douglas S. Boothe.*  Mr. Boothe was named President and Chief Executive Officer of Akorn as of January 1, 2019. Prior to joining Akorn, from August 2016 to May 2018, Mr. Boothe most recently served as president of the generics division of publicly held Impax Laboratories, which developed, manufactured and marketed bioequivalent pharmaceuticals and was acquired by Amneal Pharmaceuticals LLC. From January 2013 to July 2016, Mr. Boothe was the executive vice president and general manager, pharmaceuticals of Perrigo Company Plc, with responsibility for the U.S. pharmaceuticals business, which included generics and specialty pharmaceutical products. He also served as the CEO of Actavis Inc., the U.S. manufacturing and marketing division of Actavis Group, 2008 to 2012 and as its executive vice president and chief operating officer from 2006 to 2008. Prior to joining Actavis, Mr. Boothe held senior positions at Alpharma Inc. and Pharmacia Corp. Following Mr. Boothe's time at Impax Laboratories, he served as principal consultant for his own consulting company, Channel Advantage Consulting LLC. Mr. Boothe received his undergraduate degree from Princeton University and his MBA from the Wharton School of Business at the University of Pennsylvania.

*Duane A. Portwood.*  Mr. Portwood joined Akorn in October 2015 as the Executive Vice President and Chief Financial Officer. He previously worked for The Home Depot, Inc., where he was their Vice President & Corporate Controller since 2006. In that role, he was responsible for all of Home Depot's accounting and financial reporting functions, as well as its financial operations and internal controls. Prior to Home Depot, Mr. Portwood served with the Wm. Wrigley Jr. Company from 1999 to 2006 in a number of accounting and finance leadership roles of increasing responsibility, most recently as Corporate Controller. Mr. Portwood began his career with Price Waterhouse LLP, where he held numerous leadership positions in their audit and transaction

support practices. Mr. Portwood, previously a Certified Public Account, holds an M.B.A. with Honors from the University of Chicago Booth School of Business and a B.S. in Business Administration from the University of Montana.

*Joseph Bonaccorsi.*  Mr. Bonaccorsi, Executive Vice President, General Counsel and Secretary, joined Akorn in 2009. Mr. Bonaccorsi came to Akorn from Walgreen Co., where he served as Senior Vice President Mergers & Acquisition and Counsel for the Walgreens-Option Care Home Care division. Mr. Bonaccorsi joined Option Care, Inc. in 2002, where he served as Senior Vice President, General Counsel, Secretary and Corporate Compliance Officer through 2007. Prior to joining Option Care, Inc., he was in private law practice in Chicago, Illinois. He received his B.S. degree from Northwestern University and his Juris Doctorate from Loyola University School of Law, Chicago.

*Erislandy ("Dandy") Dorado-Boladeres.* Mr. Dorado, Executive Vice President of Global Quality, joined Akorn in March 2019. He previously worked for American Regent where he served as Vice President of Quality Affairs at American Regent, on the executive leadership team since September 2018. From August 2016 to March 2018, Mr. Dorado served as Senior Vice President of Global Commercial Quality and Third-Party Quality Operations at Teva, and from March 2015 to August 2016, as Vice President of International Quality Operations at Allergan (previously Actavis Pharmaceuticals). From October 2003 to March 2015, Mr. Dorado served in a variety of roles at Actavis Pharmaceuticals. Prior to his tenure at Actavis, Mr. Dorado held a number of technical operational roles in the pharmaceuticals industry, including at Baxter, Wyeth/Esi Lederlee, and Schering Plough Products. Mr. Dorado graduated with a B.S. in Chemistry from the University of Puerto Rico.

*Randall E. Pollard.*  Mr. Pollard joined Akorn in April 2015 as Vice President, Corporate Controller and is currently serving as Senior Vice President, Finance, and Chief Accounting Officer. Mr. Pollard joined Akorn from Novartis Pharmaceuticals, where he most recently served as the head of accounting and reporting for Novartis' generic division, Sandoz. During his tenure at Novartis, Mr. Pollard also served as Controller of the Sandoz division. Prior to Novartis/Sandoz, he had served in various financial leadership roles at Wyeth Pharmaceutics and Mayne Pharma. Mr. Pollard began his career in public accounting at Arthur Andersen. Mr. Pollard is a Certified Public Accountant and holds a B.S. in Accounting from Pennsylvania State University and an M.B.A. from Fairleigh Dickinson University.

*Jonathan Kafer.* Mr. Kafer joined Akorn in April 2015 as Executive Vice President, Sales and Marketing and was promoted to Chief Commercial Officer effective in December 2018. Mr. Kafer joined Akorn from Allergan, Inc., where he was previously the Vice President, Account Management. At Allergan, Mr. Kafer was responsible for all trade activity within Allergan's wholesale, retail specialty pharmacy, e-Solutions and managed market channels for all of Allergan's business units. Prior to Allergan, Mr. Kafer was the Vice President of Sales and Marketing for Health Systems at Teva. Mr. Kafer has also served in various senior management roles at AAIPharma, Xanodyne Pharmaceuticals, HealthNexis and Novartis. Mr. Kafer holds a B.A. in Organizational Communications from The Ohio State University.

*Christopher C. Young.* Mr. Young was appointed Executive Vice President, Global Operations, in January 2019. Mr. Young brings twenty-five years of pharmaceutical experience to Akorn having most recently been the Executive Vice President of Global Operations for Alvogen, Inc. from April 2013 to February 2018. Prior to Alvogen, Mr. Young was Vice President of Operations in the United States and India for Actavis. Mr. Young received his undergraduate degree from Gettysburg College and his MBA from Rutgers University.

**Available Information**

Our internet address is http://www.akorn.com. The contents of our website are not part of this Annual Report on Form 10-K, and our internet address is included in this document as an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the SEC.

**Item 1A. *Risk Factors.***

*An investment in our common stock involves a high degree of risk. In addition to the other information included in this Annual Report on Form 10-K, you should carefully consider each of the risks described below before purchasing shares of our common stock. The risk factors set forth below are not the only risks that may affect our business. Our business could also be affected by additional risks not currently known to us or that we currently deem to be immaterial. If any of the following risks actually occur, our business, financial condition and results of operations could materially suffer. As a result, the trading price of our common stock could decline, and you may lose all or part of your investment.*

<u>Risks Related to the Second Amended Standstill Agreement, Our Indebtedness and Liquidity.</u>

**There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.**

On February 12, 2020, we entered into the Second Amended Standstill Agreement, which, among other things, provides that, during the extended Standstill Period, neither the Administrative Agent nor the Lenders may exercise their default-related rights and remedies with respect to specified events of default under the Term Loan Agreement. Pursuant to the Second Amended Standstill Agreement, the Company is obligated to progress with the Sale Process in accordance with the timeline and milestones specified therein. The Sale Process may be consummated out-of-court to the extent permitted by the Lenders or on in-court basis, potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code.

Any failure to comply with the Second Amended Standstill Agreement could result in an event of default under the Term Loan Agreement. If an event of default under the Second Amended Standstill Agreement and Term Loan Agreement occurs, the Lenders may accelerate the obligations under the Term Loan Agreement, foreclose upon the collateral securing the debt and exercise other rights and remedies. If the Lenders take this action, we may not be able to repay the obligations under the Term Loan Agreement. If the Company does not have sufficient funds on hand to pay its debt when due, it may be required to seek Chapter 11 protection, refinance the debt, incur additional debt, sell assets, sell additional securities, and/or consummate the Sale Process. There can be no assurance that the Company will be able to consummate any of these transactions on commercially reasonable terms or at all. The failure to repay or refinance the obligations under the Term Loan Agreement when due and the uncertainties relating to the Company's outstanding litigation may have a material adverse impact on the Company's business, financial condition and results of operations.

As described in the audited Consolidated Financial Statements and Notes thereto and elsewhere in this Annual Report on Form 10-K, the Company conducted an evaluation as to whether there were conditions and events, considered in the aggregate, which raised substantial doubt as to the entity's ability to continue as a going concern within one year after the date of the issuance of the financial statements. Specifically, the Company evaluated the impact of entering into the Second Amended Standstill Agreement on its ability to continue as a going concern. The continuation of our business is dependent upon our ability to comply with the terms and conditions under the Second Amended Standstill Agreement and the Term Loan Agreement, including successfully conducting the Sale Process. This, together with the Company's recurring losses from operations and net capital deficiency, creates substantial doubt about the Company's ability to continue as a going concern as such compliance depends, in part, on the Company's ability to obtain the cooperation of outside parties, which is not within the Company's control. Failure to successfully navigate the Sale Process will create substantial doubt about the Company's ability to continue as a going concern.

See Note 21 - "*Subsequent Events*", and Item 7 - "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" for more information on the Second Amended Standstill Agreement, and the Sale Process, and the risks related thereto. Refer to Note 2 - "*Summary of Significant Accounting Policies*" for further discussion of the Company's ability to continue as a going concern and Note 7 - "*Financing Arrangements*" for further detail of our debt obligations as of and for the year ended December 31, 2019.

**Our limited liquidity could materially and adversely affect our business operations.**

We require certain capital resources in order to operate our business and our limited liquidity could materially and adversely affect our business operations. For the year ended and as of December 31, 2019, we had a net loss of $226.8 million and negative net working capital of $505.5 million.  We also have remaining principal balance of $852.0 million under the Term Loan Agreement, collectively the "Term Loans". If an event of default occurs and the Lenders accelerate the obligations under the Term Loan Agreement, the Company may not be able to repay the obligations that become immediately due and it could have a material

negative impact on the Company's liquidity and business. If the Company does not have sufficient funds on hand to pay its debt when due, it may be required to, among other things, seek Chapter 11 protection.

Without sufficient additional capital funding, we may be required to delay, scale back or abandon some or all of our capital projects, product development, manufacturing, acquisition, licensing and marketing initiatives, or operations.

See Item 7 - "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Financial Condition and Liquidity*" for more information on our liquidity, the Second Amended Standstill Agreement and the Sale Process. Refer to Note 7 - "*Financing Arrangements*" in our audited Consolidated Financial Statements for further detail of our debt obligations as of and for the year ended December 31, 2019.

**We may seek the protection of the United States Bankruptcy Court (the "Bankruptcy Court"), which may harm our business, adversely affect our ability to retain key personnel, and result in a loss of value for our stockholders.**

We have engaged financial and legal advisors to assist us in, among other things, analyzing various strategic alternatives to address our liquidity and capital structure and, pursuant to the Second Amended Standstill Agreement, we are obligated to conduct a Sale Process of substantially all of our assets in accordance with certain milestones. The Sale Process may be consummated out-of-court to the extent permitted by the Lenders or on in-court basis, potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code. Seeking Bankruptcy Court protection could have a material adverse effect on our business, financial condition, results of operations and liquidity. So long as the process related to a Chapter 11 proceeding continues, our senior management would be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on our business operations. A lengthy Chapter 11 proceeding would also involve significant additional professional fees and expenses, and create significant liquidity needs for our business. Bankruptcy Court protection also might make it more difficult to retain management and other key personnel necessary for the success and growth of our business. In addition, while we are in a Chapter 11 proceeding, our customers may lose confidence in our businesses and may seek to establish alternative commercial relationships, particularly if the process is prolonged.

Additionally, all of our indebtedness is senior to the existing common stock in our capital structure. As a result, if we seek relief under Chapter 11, our shares of existing common stock might lose value or be impaired, with no or limited recovery for holders of our common stock. Therefore, trading in our securities is highly speculative and poses substantial risks.

**Our suppliers, manufacturers and other business partners' unwillingness to do business with us or to provide acceptable payment terms could negatively impact our liquidity or reduce the availability of products or services we seek to procure.**

We have ongoing discussions concerning our liquidity and financial position with our third-party suppliers, manufacturers and other business partners. The topics discussed have included such areas as pricing, payment terms and ongoing business arrangements. As of the date of this Annual Report on Form 10-K, we have not experienced any significant disruption in our access to materials or services due to such third parties requiring or conditioning manufacture and supply of goods or services on new payment terms or other assurances. However, there can be no assurance that there will not be a future disruption, and such circumstances could have a negative effect on our business, financial condition and results of operations.

**Our indebtedness reduces our financial and operating flexibility.**

We have entered into various credit arrangements to fund certain of our operations and activities, principally acquisitions. As of December 31, 2019, our debt includes the Term Loans, with a remaining principal balance of $852.0 million. (See Note 7 - "*Financing Arrangements*" for definitions and descriptions of our Term Loans and our credit facilities). A high level of indebtedness subjects us to a number of risks. In particular, a significant portion of our current indebtedness has variable interest terms meaning we are subject to the risks associated with higher interest rates, and moreover, a high level of indebtedness may impair our ability to obtain additional financing in the future and increases the risk that we may default on our debt obligations. In addition, our current debt arrangements require that we devote a significant portion of our cash flows to service amounts outstanding under those debt arrangements. Our ability to meet our debt obligations, to comply with all required covenants, and to reduce our level of indebtedness depends on our future performance. General economic conditions and financial, business and other factors affect our operations and our future performance. Many of these factors are beyond our control.

Risks Related to the Termination of the Merger Agreement and the Delaware Opinion.

**There are material uncertainties and risks associated with damage claims from the Fresenius parties' and Akorn's shareholders as a result of the termination of the Merger Agreement.**

On April 24, 2017, we signed the Merger Agreement with the Fresenius parties. On April 22, 2018, the Fresenius parties sent Akorn a notice terminating the Merger Agreement. After expedited litigation, the Delaware Court of Chancery ruled on October 1, 2018, that the termination was valid. That ruling was upheld on appeal by the Delaware Supreme Court on December 7, 2018. On February 20, 2019, the Fresenius parties filed a motion for leave to amend and supplement its counterclaim against Akorn in order to recover damages purportedly incurred in connection with the Merger Agreement. On February 28, 2019, the Court of Chancery denied the Fresenius parties' motion for leave to file an amended and supplemented counterclaim. Proceedings on the proposed damages counterclaim are currently ongoing.

In addition, various purported shareholders of Akorn have filed putative class action and derivative claims against Akorn, its directors and its officers relating to the Merger Agreement, Akorn's regulatory compliance status and/or Akorn's public statements and SEC filings. Proceedings in those cases are ongoing.

Below are material uncertainties and risks associated with the termination of the Merger Agreement, the ongoing litigation with the Fresenius parties and the pending shareholder litigations. If any of the risks develop into actual events, then our business, financial condition, results and ongoing operations, stock price or prospects could be materially adversely affected.

- The litigations may involve significant defense costs and indemnification liabilities and may result in significant monetary judgments against Akorn, which may adversely affect our business, financial condition and results of operations;
- The litigations, whether or not resolved favorably, may damage our long-term reputation, attract adverse media coverage, interfere with our relationships with key stakeholders and/or interfere with our ability to attract and retain employees; and
- The litigations may divert the attention of our employees and management, which may affect our business operations.

Risks Related to Our Business.

**Our growth depends on our ability to timely and efficiently develop and successfully launch and market new pharmaceutical products.**

Our strategy for growth is dependent upon our ability to develop products that can be promoted through current marketing and distribution channels and, when appropriate, the enhancement of such marketing and distribution channels. We may fail to meet our anticipated time schedule for the filing of new applications or may decide not to pursue applications that we have already submitted or had anticipated submitting. Our failure to develop new products or to receive regulatory approval of applications could have a material adverse effect on our business, financial condition and results of operations. Even if approved, we may have technical challenges or capacity constraints that prevent successful launch and marketing of new products. Even if successfully launched, no assurance can be given as to the actual size of the market for any product or the level of profitability and sales of the product.

**Business interruptions at our manufacturing facilities can have a material adverse effect on our business, financial position and results of operations.**

We manufacture drug products at three domestic and one international manufacturing facilities, and we have contracted with a number of third parties to provide other manufacturing, finishing, and packaging services. We face a substantial risk to our business when any one or more of these facilities is shut down or unable to operate at full capacity as a result of business interruptions, governmental or regulatory actions, or natural or man-made catastrophic events. For example, we suspended manufacturing at our facility in Somerset, New Jersey during the latter part of 2018 to facilitate the acceleration of the move to our newly constructed laboratory; personnel and equipment requalification and training; and other various cGMP enhancements. This short-term disruption impaired our ability to produce and ship drug products to the market on a timely basis, which resulted in failure to supply penalties, late fees and other adverse impacts on our business.

**A significant portion of our revenues are generated through the sale of products manufactured by third parties, the loss or failure of any of which may have a material adverse effect on our business, financial position and results of operations.**

Certain of the pharmaceutical products that we market, representing a significant portion of our net revenue, are manufactured by third parties that serve as our only supplier of those products. Any delays or failure of a contract manufacturing partner to supply finished goods timely or in adequate volume could impede our marketing of those products. We expect this risk to become more significant as we receive approvals for new products to be manufactured through our strategic partnerships and to the extent we seek additional growth opportunities beyond the capacity and capabilities of our

current manufacturing facilities.  If we are unable to obtain or retain third-party manufacturers for these products on commercially acceptable terms, we may not be able to distribute such products as planned.  Any delays or difficulties with third-party manufacturers could adversely affect the marketing and distribution of certain of our products, which could have a material adverse effect on our business, financial condition and results of operations.

**We depend on a small number of wholesalers to distribute our products, the loss of any of which could have a material adverse effect on our business.**

A small number of large wholesale drug distributors account for a significant portion of our gross sales, net revenue and accounts receivable. The following three wholesalers — Amerisource, Cardinal and McKesson — accounted for approximately 82.6% of total gross sales and 60.3% of total net revenue in 2019 and constituted 83.4% of gross trade receivables as of December 31, 2019. In addition to acting as distributors of our products, these three companies also distribute a broad range of healthcare products on behalf of many other companies. The loss of our relationship with one or more of these wholesalers, together with a delay or inability to secure an alternative distribution source for our hospital, retail and other customers, could have a material adverse impact on our revenue and results of operations.  A change in purchasing patterns or inventory levels, an increase in returns of our products, delays in purchasing products and delays in payment for products by one or more of these wholesale drug distributors also could have a material adverse impact on our revenue, results of operations and cash flows.

**We may be subject to significant disruptions or failures in our information technology systems and network infrastructures that could have a material adverse effect on our business.**

We rely on the efficient and uninterrupted operation of complex information technology systems and network infrastructures to operate our business. We also hold data in various data center facilities upon which our business depends. Although we have experienced occasional, actual or attempted breaches of our cybersecurity, none of these breaches has had a material effect on our business, operations or reputation.  Any significant disruption, infiltration or failure of our information technology systems or any of our data centers as a result of software or hardware malfunctions, system implementations or upgrades, computer viruses, third-party security breaches, employee error, theft, misuse or malfeasance could cause breaches of data security, loss of intellectual property and critical data and the release and misappropriation of sensitive competitive information. Any of these events could result in the loss of key information, impair our production and supply chain processes, damage our reputation in the marketplace, deter people from purchasing our products, cause us to incur significant costs to remedy any damages, subject us to significant civil and criminal liability and require us to incur significant technical, legal and other expenses, and ultimately materially and adversely affect our business, results of operations, financial condition and price of our common stock.

**We depend on our employees and must continue to attract and retain key personnel in order to be successful, and failure to do so hinders successful execution of our business and development plans.**

Our performance depends, to a large extent, on the continued service of our key personnel, including in R&D and regulatory compliance functions, other technical employees, managers and sales personnel and our ability to continue to attract and retain such personnel. Competition for such personnel is intense, particularly for highly motivated and experienced R&D and other technical personnel, including those involved in ensuring regulatory compliance for pharmaceuticals and controlled substances. We face competition from companies with greater financial resources for such personnel. Additionally, given our current financial position, attracting and retaining highly skilled personnel may become more difficult and may adversely affected our business operations.

**We are involved in legal proceedings and governmental investigations from time to time, any of which may result in substantial losses, government enforcement actions, damage to our business and reputation and place a strain on our internal resources.**

In the ordinary course of our business, we become involved in legal proceedings, as a party or non-party witness, with both private parties and certain government agencies, including the FDA, DEA and SEC. For example, in 2018, several shareholders filed lawsuits and shareholder demands asserting that Akorn and its directors and officers violated Louisiana fiduciary duty law and federal securities laws. Other such matters include receiving and responding to inquiries and subpoenas from the U.S. Department of Justice - Antitrust Division, and U.S. Department of Justice - Civil Division relating to industry drug pricing practices; being named defendants in a multidistrict litigation matter in the Eastern District of Pennsylvania relating to alleged price fixing by generic pharmaceutical manufacturers; and DEA subpoenas. We incur substantial time and expense participating in these types of lawsuits and investigations, which also divert management's attention from ongoing business concerns and normal operations. In addition, these matters and any other substantial litigation may result in verdicts

19

against us or government enforcement actions, which may include significant monetary awards, judgments invalidating certain of our intellectual property rights and preventing the manufacture, marketing and sale of our products. When such disputes are resolved unfavorably, our business, financial condition and results of operations are adversely affected. Any litigation, whether or not successful, may also damage our reputation. See Note 19 - "*Legal Proceedings*".

**Charges to earnings resulting from acquisitions could have a material adverse effect on our business, financial position and results of operations.**

Under accounting principles generally accepted in the United States of America ("GAAP") business acquisition accounting standards, we recognize the identifiable assets acquired, the liabilities assumed, and any non-controlling interests in acquired companies generally at their acquisition date fair values and, in each case, separately from goodwill. Goodwill as of the acquisition date is measured as the excess amount of consideration transferred, which is also generally measured at fair value, and the net of the acquisition date amounts of the identifiable assets acquired and the liabilities assumed. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flow:

- costs incurred to combine the operations of companies we acquire, such as transitional employee expenses and employee retention, redeployment or relocation expenses;
- impairment of goodwill or intangible assets;
- amortization of intangible assets acquired;
- a reduction in the useful lives of intangible assets acquired;
- identification of or changes to assumed contingent liabilities, including, but not limited to, contingent purchase price consideration, income tax contingencies and other non-income tax contingencies, after our final determination of the amounts for these contingencies or the conclusion of the measurement period (generally up to one year from the acquisition date), whichever comes first;
- charges to our operating results to eliminate certain duplicative pre-acquisition activities, to restructure our operations or to reduce our cost structure;
- charges to our operating results resulting from expenses incurred to effect the acquisition;
- changes to contingent consideration liabilities, including accretion and fair value adjustments. A significant portion of these adjustments could be accounted for as expenses that will decrease our net income and earnings per share for the periods in which those costs are incurred.

Such charges could cause a material adverse effect on our business, financial position, results of operations and/or cash flow, and could cause the price of our common stock to decline.

As of December 31, 2019, we had $267.9 million and $215.8 million of Goodwill and Intangible assets, net, respectively, on our consolidated balance sheet. During the first quarter of 2019, as a result of the Company's decision to explore strategic alternatives to exit the India manufacturing facility, the Company performed impairment testing and recorded goodwill impairment of $16.0 million. During 2019 and 2018, we recorded impairments of Intangible assets of $29.5 million and $231.1 million, respectively.

Assessing goodwill for impairment requires management to make assumptions and to apply judgment, including forecasting future sales and expenses, and selecting appropriate discount rates, which can be affected by economic conditions and other factors that can be difficult to predict. Given the continued substantial decline in the Company's share price and the fact that the aforementioned uncertainties may not be resolved satisfactorily in the near-term, there can be no assurance that our estimates and assumptions used in the evaluation of goodwill and identified intangible assets for impairment, as of December 31, 2019, will prove to be accurate predictions of the future. If our assumptions regarding forecasted revenue or gross profit rates are not achieved, we may be required to record additional goodwill impairment charges in future periods relating to any of our reporting units, whether in connection with the next annual impairment testing in the fourth quarter of 2020 or prior to that, if any such change constitutes an interim triggering event. It is not possible to determine if any such future impairment charge would result or, if it does, whether such charge would be material.

**As a result of a jury verdict finding John N. Kapoor, Ph.D., guilty in a federal criminal case, OIG-HHS's permissive exclusion rules could lead to the Company's exclusion from participating in U.S. government healthcare programs, which could have a material adverse effect on our business, financial condition and results of operations.**

The Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG-HHS") has permissive authority to exclude individuals and entities convicted of certain crimes from participation in U.S. government healthcare programs, including Medicare and Medicaid. Under OIG-HHS's permissive exclusion rules, OIG-HHS may exclude an entity from participation in U.S. government healthcare programs if an individual with a direct or indirect ownership or control interest of 5% or more in such entity is convicted of certain criminal offenses.

John N. Kapoor, Ph.D., has been a principal shareholder of the Company. On July 19, 2019, Dr. Kapoor filed an amendment to his Schedule 13D with the SEC indicating that he relinquished voting and investment power over 18,640,445 shares of common stock by resigning his position as trustee of various trusts and as officer and director of certain companies and by granting a proxy that is irrevocable for three years. If such proxy is ultimately revoked, Dr. Kapoor would regain certain of the voting or investment power that he indicated he had previously relinquished. On May 2, 2019, a federal jury found Dr. Kapoor guilty of racketeering conspiracy. Due to the jury verdict finding Dr. Kapoor guilty, OIG-HHS's permissive exclusion rules could lead to the exclusion of the Company from participation in U.S. government healthcare programs, which could have a material adverse effect on our business, financial condition and results of operations. Further, NASDAQ has the discretionary authority to deny continued listing to a company when an individual with a history of regulatory misconduct is associated with a company. As a result of the jury verdict finding Dr. Kapoor guilty, it is possible Dr. Kapoor would be required to divest all or a part of his ownership in the Company in order for the Company to continue to be listed on NASDAQ.

**John N. Kapoor's and Rao Akella's involvement with the Company through their beneficial stock ownership and rights to nominate up to three directors could have an adverse effect on the price of our common stock and have substantial influence over our business strategies and policies.**

John N. Kapoor, Ph.D., has been a principal shareholder of the Company. On July 19, 2019, Dr. Kapoor filed an amendment to his Schedule 13D with the SEC indicating that he relinquished voting and investment power over 18,640,445 shares of common stock by resigning his position as trustee of various trusts and as officer and director of certain companies and by granting a proxy that is irrevocable for three years. If such proxy is ultimately revoked, Dr. Kapoor would regain certain of the voting or investment power that he indicated he had previously relinquished.

Through the Kapoor Trust, Dr. Kapoor is entitled to nominate one person to serve on our Board. As President and sole director of EJ Financial Enterprises, Inc., which is the managing general partner of EJ Funds LP and holder of Dr. Kapoor's proxy as a stockholder of this entity, Rao Akella is entitled to nominate up to two persons to serve on our Board. Mr. Brian Tambi was nominated for these purposes by EJ Funds LP. The other seats for nomination are vacant. Nomination of any directors to our Board or any trading of our common stock or divestments by Dr. Kapoor and his related parties or his proxies could have an adverse effect on the price of our common stock and an adverse effect on our business.

Risks Related to Our Industry.

**Sales of our products may be adversely affected by further increases in competition.**

Competition in the pharmaceutical industry is significant, and trends related to the volume and pace of new applications and approvals of products have increased the level of competition we face. Given the FDA mandate to continue to reduce the cost of prescription drugs by increasing the number of generic drug approvals, we anticipate that this trend will continue. As a result, this may continue to adversely impact the profitability of our current portfolio, and will magnify the need for us to develop and launch new products in order to grow our business.

Additionally, trends toward increased substitution and reimbursement of generics for cost-containment purposes may reduce and limit the sales of our off-patent branded products. For example, our branded product Cosopt® PF and Amicar® faced generic competition in late 2018 and 2019. Increased focus by the FDA on approval of generics may accelerate this trend.

**Many of the raw materials and components used in our products come from a single source, the loss of any of which could have a material adverse effect on our business.**

We require raw materials and components to manufacture and package pharmaceutical products. The principal components of our products are active and inactive pharmaceutical ingredients and certain packaging materials. Many of these materials are available from only a single source and, in the case of many of our products, only one supplier of raw materials has been identified and qualified. Because FDA approval of drugs requires manufacturers to specify their proposed suppliers of active ingredients and certain packaging materials in their applications, FDA approval of any new supplier would be required if such active ingredients or such packaging materials were no longer available from the specified supplier. The qualification of a

new supplier could delay our development and marketing efforts. If for any reason we are unable to obtain sufficient quantities of any of the raw materials or components required to produce and package our products, we may not be able to manufacture our products as planned.

**Sales of our products may be adversely affected by further consolidation of our customer base, which may have a material adverse effect on our business, financial position and results of operations.**

Drug wholesalers, drug retailers, and group purchasing organizations have undergone significant consolidation. Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face. In addition, since such a significant portion of our revenues is derived from relatively few customers, any financial difficulties experienced by a single customer, or any delay in receiving payments from a single customer, could have a material adverse effect on our business, results of operations and financial condition.

**International trade complications could have an adverse impact.**

Product constraints from suppliers could have an adverse impact on our business, as there continues to be uncertainty regarding the impact of the Coronavirus outbreak. Moreover, changes to the law including that of the law regarding the application of country of origin requirements for drug products could adversely impact our business.

**Changes in technology could render our products obsolete.**

The pharmaceutical industry is characterized by rapid technological change. The products that we sell today and their drug delivery methods may be replaced by more effective methods to deliver the same care, rendering our current products obsolete. Further, the technologies that we invest in for future use may not become the preferred method of delivery.

Risks Related to Regulations.

**We are subject to extensive government regulations. When regulations change or we fall out of compliance, we can face increased costs, additional obligations, fines, or halts to our operations.**

New, modified and additional regulations, statutes or legal interpretation, which occur from time to time among other things, require changes to manufacturing methods, expanded or different labeling, recall, replacement or discontinuation of certain products, additional record keeping procedures, expanded documentation of the properties of certain products and additional scientific substantiation. Such changes or new legislation can have a material adverse effect on our business, financial condition and results of operations.  Certain of the regulatory risks that we are subject to are outlined below:

*We, our third-party manufacturers and our suppliers are subject to periodic inspection by the FDA to assure regulatory compliance regarding the manufacturing, distribution, and promotion of pharmaceutical products.*  The FDA imposes stringent mandatory requirements on the manufacture and distribution of pharmaceutical products to ensure their safety and efficacy. The FDA also regulates drug labeling and the advertising of prescription drugs. A finding by a governmental agency or court that we are not in compliance with FDA requirements could have a material adverse effect on our business, financial condition and results of operations.

As previously disclosed in various reports filed with the SEC, the Company, with the assistance of outside consultants, has been investigating alleged breaches of FDA data integrity requirements relating to product development at the Company. The Company has informed the FDA regarding the investigation and will continue to update the FDA as it proceeds. During 2018, we had FDA inspections at our Decatur and Somerset facilities that resulted in Official Action Indicated ("OAI") facility status and we received warning letters in January and June of 2019 related to the 2018 inspections at our Decatur and Somerset facilities, respectively. Significant costs were incurred to address the FDA observations from the inspections of our Decatur and Somerset facilities in 2019 and 2018. If we are unable to adequately address the FDA's concerns in a timely manner, the FDA may take further actions and our pipeline product approvals may be further delayed.

*We must obtain approval from the FDA for each prescription pharmaceutical product that we market and the timing of such approval process is unknown and uncertain.*  The FDA approval process is typically lengthy, and approval is never certain. Our new products could take a significantly longer time than we expect to gain regulatory approval and may never gain approval. Even if the FDA or another regulatory agency approves a product, the approval may limit the indicated uses for a product, may otherwise limit our ability to promote, sell and distribute a product or may require post-marketing studies or impose other post-marketing obligations, which could have a material adverse effect on marketability and profitability of the new products.

*We are subject to recalls and other enforcement actions by the FDA and other regulatory bodies.* The FDA or other government agencies having regulatory authority over pharmaceutical products may request us to voluntarily or involuntarily conduct product recalls due to disputed labeling claims, manufacturing issues, quality defects or for other reasons. Restriction or prohibition on sales, halting of manufacturing operations, recalls of our pharmaceutical products or other enforcement actions could have a material adverse effect on our business, financial condition and results of operations. Further, such actions, in certain circumstances, may constitute an event of default under the terms of our various financing arrangements.

*If the FDA changes its regulatory policies, it could force us to delay or suspend our manufacturing, distribution or sales of certain products.* FDA interpretations of existing or pending regulations and standards may change over time with the advancement of associated technologies, industry trends, or prevailing scientific rationale. If the FDA changes its regulatory policies due to such factors, it could result in delay or suspension of the manufacturing, distribution or sales of certain of our products. In addition, modifications or enhancements of approved products are in many circumstances subject to additional FDA approvals which may or may not be granted and which may be subject to a lengthy application process. Any change in the FDA's enforcement policy or any decision by the FDA to require an approved application for one of our products not currently subject to the approved application requirements or any delay in the FDA approving an application for one of our products could have a material adverse effect on our business, financial condition and results of operations.

*We are subject to extensive DEA regulation, which could result in our being fined or otherwise penalized if we are not in compliance.* The DEA could limit or reduce the amount of controlled substances that we are permitted to manufacture and market or issue fines and penalties against us for non-compliance with DEA regulations, which could have a material adverse effect on our business, financial condition and results of operations.

**Our inability to timely and adequately address FDA warning letters status may adversely affect our business.**

We received warning letters in January and June of 2019 related to the 2018 FDA inspections at our Decatur and Somerset facilities, respectively. If we are unable to adequately address the FDA's concerns in a timely manner, the FDA may take further actions and our pipeline product approvals may be further delayed.

**Changes in healthcare law and policy may adversely affect our business and results of operations.**

The sales of our products depend in part on the availability of reimbursement from third-party payers such as government health administration authorities, private health insurers, health maintenance organizations including Pharmacy Benefit Managers ("PBMs") and other healthcare-related organizations. We expect both federal and state governments in the United States and foreign governments to continue to propose and pass new legislation, rules and regulations designed to contain or reduce the cost of healthcare. Existing regulations that affect the price of pharmaceutical and other medical products may also change. Cost control initiatives could decrease the price that we receive for any product we develop in the future. In addition, PBMs and other third-party payers are increasingly challenging the price and cost-effectiveness of medical products and services. Significant uncertainty exists as to the reimbursement status of newly approved pharmaceutical products. Our products may not be considered cost effective, or adequate third-party reimbursement may not be available to enable us to maintain price levels sufficient to realize a return on our investments. Any such changes in healthcare law or policy may harm our ability to market our products and generate profits.

**The FDA may require us to stop marketing certain unapproved drugs, which could have a material adverse effect on our business, financial position and results of operations.**

We market several generic prescription products that do not have formal FDA approvals. These products are non-application drugs that are manufactured and marketed without formal FDA approval on the basis of their having been marketed by the pharmaceutical industry prior to the 1962 Amendments of the FDC Act. The FDA has increased its efforts to require companies to file and seek FDA approval for unapproved products, and when a product is approved, the FDA has typically increased its effort to remove unapproved products from the market by issuing notices to companies currently manufacturing these products to cease its distribution of said products. We have discontinued marketing of previously unapproved products after receipt such notices from the FDA. During 2019, we marketed six such unapproved products, generating net revenue of approximately $30.4 million.

**Any failure to comply with the complex reporting and payment obligations under Medicare, Medicaid and other government programs may result in litigation or sanctions.**

We are subject to various federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback, false claims, marketing and pricing laws. We are also subject to Medicaid and other government reporting and payment obligations that are highly complex and at times ambiguous. Violations of these laws and reporting obligations are punishable by criminal or civil sanctions and exclusion from participation in federal and state healthcare programs such as Medicare and Medicaid. In 2013, the Attorney General of the State of Louisiana filed a lawsuit against Hi-Tech Pharmacal and numerous other pharmaceutical companies alleging that the defendants violated Louisiana state laws in connection with Medicaid reimbursement for certain vitamins, dietary supplements, and other products that were allegedly ineligible for reimbursement. In 2017, a similar lawsuit was filed by the State of Mississippi against the Company. If our past, present or future operations are found to be in violation of any of the laws described above or other similar governmental regulations, we may be subject to the applicable penalty associated with the violation, which could adversely affect our ability to operate our business and negatively impact our financial results. Further, if there is a change in laws, regulations or administrative or judicial interpretations, we may have to change our business practices or our existing business practices could be challenged as unlawful, which could materially adversely affect our business, financial position and results of operations.

**Failure to comply with the U.S. Foreign Corrupt Practices Act could subject us to, among other things, penalties and legal expenses that could harm our reputation and have a material adverse effect on our business, financial condition and operating results.**

The Company and its employees are subject to the FCPA, which generally prohibits covered entities and their intermediaries from engaging in bribery or making other prohibited payments to foreign officials for the purpose of obtaining or retaining business or other benefits. In addition, the FCPA imposes record keeping standards and requirements on publicly traded U.S. corporations and their foreign affiliates, which are intended to prevent the diversion of corporate funds to the payment of bribes and other improper payments, and to prevent the establishment of "off books" slush funds from which such improper payments can be made. If our employees, third-party sales representatives or other agents are found to have engaged in such practices, we could suffer severe penalties, including criminal and civil penalties, disgorgement and other remedial measures, including further changes or enhancements to our procedures, policies and controls, as well as potential personnel changes and disciplinary actions.

**The FDA may authorize sales of some prescription pharmaceuticals on a non-prescription basis, which may reduce the profitability of our prescription products.**

The FDA may change the designation of some prescription pharmaceuticals we currently sell to non-prescription. If we are unable to gain approval of our product on a non-prescription designation, we may experience an adverse effect on our business.

**State legislatures are increasingly active in regulating the sale and distribution of pharmaceuticals which may have an adverse effect on our business.**

New laws and regulations are imposing fees and reporting obligations on the sale and distribution of our products. Enforcement actions at the state level could impact our operations.

Risks Related to Our Intellectual Property.

**Third parties may claim that we infringe their proprietary rights and may prevent or delay us from manufacturing and selling some of our new products.**

The manufacture, use and sale of new products that are the subject of conflicting patent rights have been the subject of substantial litigation in the pharmaceutical industry. Pharmaceutical companies with patented brand products frequently sue companies that file applications to produce generic equivalents of their patented brand products for alleged patent infringement or other violations of intellectual property rights, which may delay or prevent the entry of such generic products into the market. Generally, a generic drug may not be marketed until the applicable patent(s) on the brand name drug expire or are held to be not infringed, invalid, or unenforceable. When we or our development partners submit a filing to the FDA for approval of a generic drug, we or our development partners must certify: (i) that there is no patent listed by the FDA as covering the relevant brand product, (ii) that any patent listed as covering the brand product has expired, (iii) that the patent listed as covering the brand product will expire prior to the marketing of the generic product, in which case the filing will not be finally approved by the FDA until the expiration of such patent, or (iv) that any patent listed as covering the brand drug is invalid or will not be infringed by the manufacture, sale or use of the generic product for which the filing is submitted.

24

Under any circumstance in which an act of infringement is alleged to occur, there is a risk that a brand pharmaceutical company may sue us for alleged patent infringement or other violations of intellectual property rights. Also, competing pharmaceutical companies may file lawsuits against us or our strategic partners alleging patent infringement or may file declaratory judgment actions of non-infringement, invalidity, or unenforceability against us relating to our own patents. We have been sued for patent infringement related to several of our filings and we anticipate that we may be sued once we file for other products in our pipeline. Such litigation is often costly and time-consuming and could result in a substantial delay in, or prevent the introduction and/or marketing of our products, allow for damages for any at-risk launches, which could have a material adverse effect on our business, financial condition and results of operations.

Even if the parties settle their intellectual property disputes through licensing or similar arrangements, the costs associated with these arrangements may be substantial and could include ongoing royalties, and the necessary licenses might not be available to us on terms we believe to be acceptable.

**Our patents and proprietary rights may be challenged, circumvented or otherwise compromised by competitors, which may result in our protected products losing their market exclusivity and becoming subject to generic competition before their patents expire.**

The patent and proprietary rights position of competitors in the pharmaceutical industry generally is highly uncertain, involves complex legal and factual questions, and is the subject of much litigation. There can be no assurance that any patent applications or other proprietary rights, including licensed rights, relating to our potential products or processes will result in patents being issued or other proprietary rights secured, or that the resulting patents or proprietary rights, if any, will provide protection against competitors who: (i) successfully challenge our patents or proprietary rights; (ii) obtain patents or proprietary rights that may have an adverse effect on our ability to conduct business; or (iii) are able to circumvent our patent or proprietary rights position. It is possible that other parties have conducted or are conducting research and could make discoveries of pharmaceutical formulations or processes that would precede any discoveries made by us, which could prevent us from obtaining patent or other protection for these discoveries or marketing products developed therefrom. Consequently, others could independently develop pharmaceutical products similar to or rendering obsolete those that we are planning to develop, or duplicate any of our products. Our inability to obtain patents for, or other proprietary rights in, our products and processes or the ability of competitors to circumvent or cause to be obsolete our patents or proprietary rights could have a material adverse effect on our business, financial condition and results of operations. Additionally, our inability to successfully defend the existing patents on our products against Paragraph IV challenges by competing drug companies could have a material adverse effect on our business, financial condition and results of operations. For example, the patents that protect Zioptan® faced challenges from two generic competitors. We ultimately reached settlements with both competitors.

Further, the majority of the drug products that we market are generics, with essentially no patent or proprietary rights attached. While this fact allowed us the opportunity to obtain FDA approval to market our generic products, it also allows competing drug companies to do the same. Should multiple additional drug companies choose to develop and market the same generic products that we actively market, our profit margins could decline, which would have a material adverse effect on our business, financial condition and results of operations.

<u>Risks Related to Our Common Stock.</u>

**Continued volatility and declines in the price of our common stock may have a material adverse effect on our business and stockholders, and may jeopardize our ability to comply with NASDAQ's requirements for the continued listing of our common stock on the exchange**

Our stock price decreased from $3.48 per share on January 2, 2019 to $1.50 per share on December 31, 2019, and it could decline further. Such decline could result from a variety of factors, including, among other things, substantial doubt about our ability to continue as a going concern, concerns about our future prospects, uncertainty associated with us potentially filing for Chapter 11 protection, our ability to consummate the Sale Process, actual or anticipated fluctuations in our operating results or financial condition, new laws or regulations or new interpretations of existing laws or regulations impacting our business, broad market fluctuations and general economic conditions and any other factors described in this "Risk Factors" section of this Annual Report on Form 10-K.

Recent volatility and declines in the price of our common stock may cause NASDAQ to delist our stock from the exchange if the price of our common stock continues to decline. Failure to maintain the Company's NASDAQ listing could negatively impact the Company and its stockholders by reducing the willingness of investors to hold the Company's common stock because of the resulting decreased price, liquidity and trading of the Company's common stock, limited availability of price quotations, and reduced news and analyst coverage. Delisting may adversely impact the perception of the Company's financial

condition and cause reputational harm with investors and parties conducting business with the Company. The perceived decreased value of employee equity incentive awards may reduce their effectiveness in encouraging performance and retention.

**The issuance of shares related to the Company's various stock plans may have a substantial dilutive effect on our earnings.**

As of December 31, 2019, holders of unvested restricted stock units and performance share units would receive 5.1 million and 1.2 million shares, respectively, of our common stock should all their awards vest. The vesting of the awards and subsequent issuance of the stock would have a dilutive effect on our common stock. As of December 31, 2019, there were 5.2 million outstanding options of which 1.8 million were exercisable. If the price per share of our common stock at the time of exercise of any stock options is in excess of the various exercise prices of such options, exercise of such options would have a dilutive effect on our common stock.

**We may issue preferred stock and the terms of such preferred stock may reduce the market value of our common stock.**

We are authorized to issue up to a total of 5 million shares of preferred stock in one or more series subject to certain limitations, without further action by holders of our common stock. If we did issue shares of preferred stock, it could affect the rights or reduce the market value of our common stock. In particular, specific rights granted to future holders of preferred stock could be used to restrict our ability to merge with or sell our assets to a third party. These terms may include voting rights, preferences as to dividends and liquidation, conversion and redemption rights and sinking fund provisions.

**Item 1B.** *Unresolved Staff Comments.*

None.

**Item 2.** *Properties.*

Our manufacturing facilities in Decatur, Illinois, Amityville, New York, Somerset, New Jersey and Hettlingen, Switzerland are expected to be adequate to accommodate our current manufacturing needs.

*Owned Locations*

As of December 31, 2019, the Company owns three facilities in Decatur, Illinois.  The Wyckles Road facility, which consists of 105,000 square feet of building space, is used for packaging, warehousing, distribution, and office space. The Company also owns approximately 7 acres of additional currently undeveloped land adjacent to the Wyckles facility.  The Grand Avenue facility is a 123,000 square-foot facility for manufacturing, laboratories and office space. A third facility is a 750 square-foot storage unit. The Decatur facilities support the Prescription Pharmaceuticals and Consumer Health segments.

The Company owns five buildings in Hettlingen, Switzerland which support the Prescription Pharmaceuticals and Consumer Health segments with approximately 50,000 square-feet of manufacturing, office and storage space, and approximately 0.5 acres of additional currently undeveloped land.

The Company owns seven facilities in Amityville and Copiague, New York, with a total of approximately 219,000 square-feet. These facilities support the Prescription Pharmaceuticals and Consumer Health segments.

The Company owns approximately 380,000 square feet of pharmaceutical manufacturing, warehousing and distribution facilities situated on approximately 14 acres of land in Paonta Sahib, Himachal Pradesh, India. The Paonta Sahib facility is not currently manufacturing any products for sale.

*Leased Locations*

The Company leases four facilities in Somerset, New Jersey. One is a 50,000 square-foot facility used for drug manufacturing and administrative activities related to our Prescription Pharmaceuticals segment. The second facility is a 15,000 square foot facility used for a quality laboratory. The third facility is a 6,600 square foot warehouse currently being sublet to a tenant. The fourth facility is a 52,000 square-foot warehouse. The Company leases a facility in Cranbury, New Jersey that is approximately 48,000 square feet used for research and development activities. The Company also leases a 3,000 square-foot laboratory space in Winterthur, Switzerland.

The Company corporate headquarters and administrative offices consist of 70,000 square feet of leased space in two office buildings in Lake Forest, Illinois.  In Gurnee, Illinois, the Company leases approximately 161,000 square feet of space for product warehousing and distribution needs.  In Vernon Hills, Illinois, the Company leases approximately 28,000 square feet of space for research and development activities.

The Company subsidiary, Akorn Consumer Health, maintains corporate offices in a 3,200 square foot leased facility in Ann Arbor, Michigan.

In India, the Company leases approximately 1,000 square feet of office and storage space.

**Item 3.** *Legal Proceedings.*

Legal proceedings which may have a material effect on the Company have been further disclosed in Note 19 - "*Legal Proceedings*" and are herein incorporated by reference.

**Item 4.** *Mine Safety Disclosures.*

Not applicable.


**Item 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.*

From February 7, 2007 to date, our common stock has been listed on the NASDAQ Global Select Market under the symbol "AKRX".

As of February 18, 2020, there were 126,246,012 shares of our common stock outstanding, held by 229 stockholders of record. This number does not include stockholders for which shares are held in a "nominee" or "street" name. The closing price of our common stock on February 18, 2020 was $1.38 per share. Please see "*Risk Factors*" - "*Continued volatility and declines in the price of our common stock may have a material adverse effect on our business and stockholders, and may jeopardize our ability to comply with NASDAQ's requirements for the continued listing of our common stock on the exchange*".

The Company did not pay cash dividends in 2019, 2018 or 2017 and does not expect to pay dividends on its common stock in the foreseeable future. Moreover, we may be restricted or limited from making dividend payments pursuant to the terms of our financing arrangements with certain other financial institutions (see Note 7 - "*Financing Arrangements*").

In July 2016, the Company announced that the Board of Directors authorized a stock repurchase program (the "Stock Repurchase Program") pursuant to which the Company may repurchase up to $200.0 million of the Company's common stock. Companies incorporated under Louisiana law are subject to the Louisiana Business Corporation Act ("LBCA"). Provisions of the LBCA eliminate the concept of treasury stock. As a result, all stock repurchases are presented as a reduction to issued shares of common stock, the stated value of common stock and retained earnings.

The Company has not repurchased any of its common stock since 2016. As of December 31, 2019, the Company had $155.0 million remaining under the repurchase authorization.

28

**PERFORMANCE GRAPH**

*The following Stock Performance Graph and related information shall not be deemed "soliciting material" or "filed" with the Securities and Exchange Commission, nor should such information be incorporated by reference into any future filings under the Securities Act or the Exchange Act, each as amended, except to the extent that we specifically incorporate it by reference in such filing.*

The graph below compares the cumulative shareholder return on our common stock with the NASDAQ Composite Index (ticker symbol: ^IXIC) and the NASDAQ Health Care Index (ticker symbol: ^IXHC) over the last five years through December 31, 2019.  The graph assumes $100 was invested in our common stock, as well as the two indices presented, at the end of December 2014 and that all dividends were reinvested during the subsequent five-year period.



| Total Return Chart | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| NASDAQ Composite Index (^IXIC) | 100 | 106 | 114 | 135 | 140 | 189 |
| NASDAQ Health Care Index (^IXHC) | 100 | 107 | 89 | 108 | 103 | 130 |
| Akorn, Inc. (AKRX) | 100 | 103 | 60 | 89 | 9 | 4 |

**Item 6.** *Selected Financial Data.*

The following table sets forth selected summary historical financial data.  We have prepared this table using our consolidated financial statements for each of the five years ended December 31, 2019, 2018, 2017, 2016 and 2015.  Our consolidated financial statements upon which the selected summary historical financial data is derived were audited by BDO USA, LLP ("BDO"), independent registered public accounting firm, during each of the five years ended December 31, 2019, 2018, 2017, 2016 and 2015. Certain prior-period amounts have been reclassified to conform to current-period presentation including selling, general and administrative expenses and acquisition-related costs on the consolidated statements of comprehensive (loss).  This summary should be read in conjunction with our audited Consolidated Financial Statements and Notes thereto, and Item 7 - "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and other financial information included herein.

| | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | | **2016** | | **2015** |
| *(In thousands, except per share data)* | | | | | | | | | |
| Revenues | $ | 682,429 | $ | 694,018 | $ | 841,045 | $ | 1,116,843 | $ | 985,076 |
| Gross profit | | 252,706 | | 246,016 | | 432,206 | | 673,512 | | 595,243 |
| Operating (loss) income (1) | | (188,061) | | (388,426) | | (22,884) | | 322,858 | | 288,172 |
| Interest expense, net, amortization of deferred financing costs and other non-operating income (expense), net | | (99,717) | | (49,756) | | (36,314) | | (51,558) | | (56,016) |
| (Loss) income before income taxes | | (287,778) | | (438,182) | | (59,198) | | 271,300 | | 232,156 |
| Income tax (benefit) provision from operations | | (61,008) | | (36,273) | | (34,648) | | 87,057 | | 81,358 |
| (Loss) income from operations | $ | (226,770) | $ | (401,909) | $ | (24,550) | $ | 184,243 | $ | 150,798 |
| Weighted average shares outstanding: | | | | | | | | | |
|   Basic | | 125,977 | | 125,383 | | 124,790 | | 122,869 | | 116,980 |
|   Diluted | | 125,977 | | 125,383 | | 124,790 | | 125,801 | | 125,762 |
| PER SHARE: | | | | | | | | | |
| Equity, per diluted share | $ | 1.86 | $ | 3.54 | $ | 6.66 | $ | 6.51 | $ | 4.94 |
| (Loss) income from operations per share: | | | | | | | | | |
|   Basic | $ | (1.80) | $ | (3.21) | $ | (0.20) | $ | 1.50 | $ | 1.29 |
|   Diluted | $ | (1.80) | $ | (3.21) | $ | (0.20) | $ | 1.47 | $ | 1.22 |
| Share Price: High | $ | 5.46 | $ | 33.63 | $ | 34.00 | $ | 39.46 | $ | 57.10 |
|        Low | $ | 1.30 | $ | 3.16 | $ | 17.74 | $ | 17.57 | $ | 19.08 |
| BALANCE SHEET DATA: | | | | | | | | | |
| Current assets | $ | 480,047 | $ | 583,819 | $ | 730,151 | $ | 685,811 | $ | 708,132 |
| Net property, plant & equipment | | 295,533 | | 334,853 | | 313,418 | | 238,404 | | 179,614 |
| Total assets | $ | 1,288,639 | $ | 1,495,257 | $ | 1,909,511 | $ | 1,973,720 | $ | 2,042,545 |
| Current liabilities (2) | $ | 985,587 | $ | 170,823 | $ | 171,089 | $ | 175,555 | $ | 231,376 |
| Long-term obligations, less current installments | | 68,760 | | 880,568 | | 907,177 | | 978,981 | | 1,189,604 |
| Shareholders' equity | $ | 234,292 | $ | 443,866 | $ | 831,245 | $ | 819,184 | $ | 621,565 |
| CASH FLOW DATA: | | | | | | | | | |
| Cash (used in) provided by operating activities | $ | (36,919) | $ | (68,894) | $ | 247,633 | $ | 166,690 | $ | 299,031 |
| Cash (used in) investing activities | $ | (30,402) | $ | (69,131) | $ | (90,555) | $ | (72,922) | $ | (53,718) |
| Cash (used in) provided by financing activities | $ | (12,928) | $ | (5,038) | $ | 7,594 | $ | (240,333) | $ | 31,908 |
| Effect of changes in exchange rates | $ | 62 | $ | (1,032) | $ | 1,183 | $ | 2 | $ | (251) |
| (Decrease)/increase in cash and cash equivalents | $ | (80,187) | $ | (144,095) | $ | 165,855 | $ | (146,563) | $ | 276,970 |

(1) Operating loss for 2019, 2018 and 2017, includes total intangible asset impairment amounts of $29.5 million, $231.1 million and $128.1 million, respectively.

(2) $843.3 million of debt, net of deferred financing costs was classified as short-term due to the execution of the Original Standstill Agreement and the First Amended Standstill Agreement in 2019.

31

**Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations***

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the audited consolidated financial statements and notes thereto included in this Annual Report on Form 10-K.*

**OVERVIEW**

We, together with our wholly-owned subsidiaries, are a specialty generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals, branded and private-label OTC consumer health products and animal health pharmaceuticals. We are an industry leader in the development, manufacturing and marketing of specialized generic pharmaceutical products. As such, we specialize in difficult-to-manufacture sterile and non-sterile dosage forms including, but not limited to, ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays.

We have identified two reportable segments:

- **Prescription Pharmaceuticals**, we manufacture and market generic and branded prescription pharmaceuticals including ophthalmics, injectables, oral liquids, otics, topical, inhalants, and nasal sprays.
- **Consumer Health**, we manufacture and market branded and private-label animal health and OTC products.

For a more detailed description of the products and customers that comprise our reportable segments, see Item 1 - "*Business*".

During the fourth quarter of 2019 and through the filing date of this Annual Report Form 10-K, we made a number of announcements regarding the First Amended Standstill Agreement (as defined below), the Second Amended Standstill Agreement and our obligation to conduct the Sale Process. Additionally, as discussed in our audited Consolidated Financial Statements and Notes thereto and elsewhere in this Annual Report on Form 10-K, the Company conducted an evaluation as to its ability to continue as a going concern. These are addressed in the "*Recent Developments*" section below.

Net Revenue & Gross Profit:

Net revenue was $682.4 million for the year ended December 31, 2019, representing a decrease of $11.6 million, or 1.7%, as compared to net revenue of $694.0 million for the year ended December 31, 2018. The decrease in net revenue in the period was primarily due to $19.4 million and $4.2 million decline in discontinued products revenue and organic revenue (revenue generated by products owned by the Company for at least five quarters), respectively, partially offset by $12.0 million increase in net revenue from new products. The $19.4 million decline in discontinued products was primarily due to the product Methylene Blue. The $4.2 million decline in organic revenue was due to approximately $81.1 million, or 12.2%, in volume declines partially offset by $76.9 million, or 11.6% of favorable price variance primarily due to price increases on certain exclusive products. The volume decline was principally due to the effect of competition on a number of products, including Amicar® Tablets, Fluticasone Rx, Nembutal and Clobetasol Cream as well as supply shortfalls from the continued production ramp-up at our Somerset manufacturing facility.

Gross profit for the year ended December 31, 2019, was $252.7 million, or 37.0% of revenue, compared to $246.0 million, or 35.4% of revenue, for the year ended December 31, 2018. The increase in the gross profit percentage was principally due to favorable price partially offset by unfavorable product mix and increased costs associated with FDA compliance related improvement activities.

Sales Practices:

From time to time we offer incentives, such as discounts, to support the launch of new products. We believe these practices are consistent with industry practice. For all sales under which these incentives were provided during the periods presented in this Management's Discussion & Analysis, revenue received from such sales was properly accounted for in accordance with ASC 606 — "*Revenue Recognition*" and was recognized in the proper applicable accounting period.

Recent Developments:

*Second Amendment to Standstill Agreement and Third Amendment to Credit Agreement*

On May 6, 2019, we entered into a Standstill Agreement and First Amendment (the "Original Standstill Agreement"). Pursuant to the terms of the Original Standstill Agreement, the Company was required to enter into a comprehensive amendment to the Term Loan Agreement (the "Comprehensive Amendment"). If the Company did not enter into the Comprehensive Amendment by December 13, 2019 or refinance or otherwise address the outstanding loans, an event of default would occur under the Term Loan Agreement. On December 15, 2019, we entered into a First Amendment to Standstill Agreement and Second Amendment to Credit Agreement (the "First Amended Standstill Agreement"), pursuant to which the maximum duration of the "Standstill Period" was extended from December 13, 2019 to February 7, 2020.

On February 12, 2020, we entered into the Second Amended Standstill Agreement and Third Amendment to Credit Agreement ("Second Amended Standstill Agreement"). Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of (i) a default under the Term Loan Agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement. For the duration of the extended Standstill Period, neither the Administrative Agent nor the Lenders may exercise their default-related rights and remedies with respect to specified events of default under the Term Loan Agreement.

Pursuant to the Second Amended Standstill Agreement, we will market and conduct the Sale Process for substantially all of our assets, subject to milestones that will depend upon whether the bids submitted and then in effect in connection with the Sale Process are sufficient to pay all obligations under the Term Loan Agreement. The Sale Process may be consummated out-of-court to the extent permitted by the Lenders or on in-court basis, potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code. If at any time during the Sale Process, no third party bids exist that are sufficient to pay all obligations under the Term Loan Agreement (taking into account available cash) there shall be an immediate event of default under the Term Loan Agreement.

During the extended Standstill Period, we have agreed: to deliver certain financial and other information to the Lenders or their advisors, that the Company and our subsidiaries are restricted from consummating certain transactions, and not to make any payments in respect of judgments or settlements of certain ongoing litigation matters without the prior written consent of the Required Lenders (as defined in the Second Amended Standstill Agreement).

Please see "*Financial Condition and Liquidity-Other Liquidity Considerations*" and "*Risk Factors*" - "*There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.*" and - "*Our limited liquidity could materially and adversely affect our business operations*". Refer to Note 7 - "*Financing Arrangements*" for further detail of debt obligations as of and for the year ended December 31, 2019.

*Going Concern*

In connection with the preparation of the financial statements for the year ended December 31, 2019, the Company conducted an evaluation as to whether there were conditions and events, considered in the aggregate, which raised substantial doubt as to the entity's ability to continue as a going concern within one year after the date of the issuance of the financial statements. As of December 31, 2019, the Company had cash and cash equivalents of $144.8 million, working capital deficit of $505.5 million and accumulated deficit of $333.9 million. The Company had a loss from operations of $188.1 million and a net loss of $226.8 million for the year ended December 31, 2019.

As further described in Note 21 - "*Subsequent Events,*" on February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon (i) the occurrence of a default under the loan agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement.

The Company evaluated the impact of entering into a Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders on its ability to continue as a going concern. There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated. Accordingly, the impact of the Second Amended Standstill Agreement and the recurring losses from operations and net capital deficiency create substantial doubt about our ability to continue as a going concern within one year after the date the financial statements are issued.

Please see "*Financial Condition and Liquidity-Other Liquidity Considerations*" and "*Risk Factors*" - "*There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.*" and - "*Our limited liquidity could materially and adversely affect our business operations*". Refer to Note 2 "*Summary of Significant Accounting Policies*" for further discussion of the Company's ability to continue as a going concern and Note 7 - "*Financing Arrangements*" for further detail of our debt obligations as of and for the year ended December 31, 2019.

**RESULTS OF OPERATIONS**

For the years 2019, 2018 and 2017, we have identified and reported operating results for two distinct business segments: Prescription Pharmaceuticals and Consumer Health. Our reported results by segment are based upon various internal financial reports that disaggregate certain operating information. Our Chief Operating Decision Maker ("CODM"), as defined in Accounting Standards Codification ("ASC") Topic 280, *Segment Reporting*, is our Chief Executive Officer ("CEO"). Our CEO oversees operational assessments and resource allocations based upon the results of our reportable segments, all of which have available discrete financial information. (See Note 12 – "*Segment Information*" for further discussion.)

The following table sets forth amounts and percentages of total revenue for certain items from our consolidated statements of comprehensive (loss) and our segment reporting information for the years ended December 31, 2019, 2018 and 2017 (in thousands):

| | 2019 | | 2018 | | 2017 | |
|---|---|---|---|---|---|---|
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue |
| Revenues: | | | | | | |
| Prescription Pharmaceuticals | $ 604,212 | 88.5 % | $ 620,669 | 89.4 % | $ 772,524 | 91.9 % |
| Consumer Health | 78,217 | 11.5 % | 73,349 | 10.6 % | 68,521 | 8.1 % |
| Total revenues | 682,429 | 100.0 % | 694,018 | 100.0 % | 841,045 | 100.0 % |
| Gross profit and gross margin percentage: | | | | | | |
| Prescription Pharmaceuticals | 217,767 | 36.0 % | 213,560 | 34.4 % | 402,082 | 52.0 % |
| Consumer Health | 34,939 | 44.7 % | 32,456 | 44.2 % | 30,124 | 44.0 % |
| Total gross profit | 252,706 | 37.0 % | 246,016 | 35.4 % | 432,206 | 51.4 % |
| Operating expenses: | | | | | | |
| Selling, general & administrative expenses | 273,871 | 40.1 % | 279,749 | 40.3 % | 216,483 | 25.7 % |
| Research and development expenses | 37,500 | 5.5 % | 47,321 | 6.8 % | 44,988 | 5.3 % |
| Amortization of intangibles | 39,765 | 5.8 % | 53,472 | 7.7 % | 61,443 | 7.3 % |
| Impairment of goodwill | 15,955 | 2.3 % | — | — % | — | — % |
| Impairment of intangible assets | 29,497 | 4.3 % | 231,086 | 33.3 % | 128,127 | 15.2 % |
| Litigation rulings, settlements and contingencies | 44,179 | 6.5 % | 22,814 | 3.3 % | 4,049 | 0.5 % |
| Operating (loss) | $ (188,061) | (27.6)% | $ (388,426) | (56.0)% | $ (22,884) | (2.7)% |
| Non-operating expenses: | | | | | | |
| Amortization of deferred financing costs | (31,554) | (4.6)% | (5,216) | (0.8)% | (5,216) | (0.6)% |
| Interest expense, net | (69,353) | (10.2)% | (45,900) | (6.6)% | (38,070) | (4.5)% |
| Other non-operating income, net | 1,190 | 0.2 % | 1,360 | 0.2 % | 6,972 | 0.8 % |
| Total non-operating expenses | (99,717) | (14.6)% | (49,756) | (7.2)% | (36,314) | (4.3)% |
| (Loss) before income taxes | (287,778) | (42.2)% | (438,182) | (63.1)% | (59,198) | (7.0)% |
| Net (loss) | $ (226,770) | (33.2)% | $ (401,909) | (57.9)% | $ (24,550) | (2.9)% |

COMPARISON OF YEARS ENDED DECEMBER 31, 2019 AND 2018

Net revenue was $682.4 million for the year ended December 31, 2019, representing a decrease of $11.6 million, or 1.7%, as compared to net revenue of $694.0 million for the year ended December 31, 2018.  The decrease in net revenue in the period was primarily due to $19.4 million and $4.2 million decline in discontinued products revenue and organic revenue, respectively, partially offset by $12.0 million increase in net revenue from new products. The $19.4 million decline in discontinued products was primarily due to the product Methylene Blue. The $4.2 million decline in organic revenue was due to approximately $81.1 million, or 12.2%, in volume declines mostly offset by $76.9 million, or 11.6% of favorable price variance primarily due to price increases on certain exclusive products. The volume decline was principally due to the effect of competition on a number of products, including Amicar® Tablets, Fluticasone Rx, Nembutal and Clobetasol Cream as well as supply shortfalls from the continued production ramp-up at our Somerset manufacturing facility.

The Prescription Pharmaceuticals segment revenues of $604.2 million for the year ended December 31, 2019 represented a decrease of $16.5 million, or 2.7%, as compared to revenues of $620.7 million for year ended December 31, 2018.

The Consumer Health segment revenues of $78.2 million for the year ended December 31, 2019 represented an increase of $4.9 million, or 6.6%, as compared to revenues of $73.3 million for year ended December 31, 2018.

The net revenue for the year ended December 31, 2019 of $682.4 million was net of adjustments totaling $991.8 million for chargebacks, rebates, administrative fees and others, product returns, discounts and allowances and advertising, promotions and other.  Chargeback expenses for 2019 were $678.2 million, or 40.5% of gross sales, compared to $830.0 million, or 44.0% of gross sales, in 2018.  The $151.8 million decrease in chargeback expense was due to volume declines as well as changes in product and customer mix compared to prior year. Rebates, administrative fees and other expenses for the year ended December 31, 2019 were $241.5 million, or 14.4% of gross sales, compared to $297.8 million, or 15.8% for year ended December 31, 2018. The $56.3 million decrease in rebates, administrative fees and other expenses was primarily due to volume declines and lower failure to supply penalties.  The product returns expense for the year ended December 31, 2019 was $30.7 million, or 1.8% of gross sales, compared to $20.2 million, or 1.1% of gross sales, for year ended December 31, 2018.  The increase in product returns for the year ended December 31, 2019, as compared to the prior year, was primarily due to unfavorable outcome on disputed returns claims. Discounts and allowances were $32.6 million or 1.9% of gross sales for the year ended December 31, 2019, compared to $36.9 million, or 2.0% of gross sales for the year ended December 31, 2018. Advertisement and promotion expenses were $8.8 million or 0.5% of gross sales for the year ended December 31, 2019, compared to $8.9 million, or 0.5% of gross sales for the year ended December 31, 2018.

Gross profit for the year ended December 31, 2019 was $252.7 million, or 37.0% of revenue, compared to $246.0 million, or 35.4% of revenue, for the year ended December 31, 2018.  The increase in the gross profit percentage was principally due to favorable price partially offset by unfavorable product mix and increased costs associated with FDA compliance related improvement activities.

Total operating expenses were $440.8 million for the year ended December 31, 2019, a decrease of $193.6 million, or 30.5%, from the comparative prior year period amount of $634.4 million. The $193.6 million decrease was primarily driven by the following offsetting items: decreases of $201.6 million, $13.7 million, $9.8 million and $5.8 million in impairment of intangibles, amortization of intangibles, research and development expenses ("R&D"), and selling, general and administrative ("SG&A"), respectively and increases of $21.4 million and $16.0 million in litigation rulings, settlements and contingencies and goodwill impairments. The following is a discussion of the main drivers of the decrease:

Impairments of intangible assets were $29.5 million in 2019, a decrease of $201.6 million or 87.2% over the prior year amount of $231.1 million. During the year ended December 31, 2019, the Company recorded Intangible assets impairment expense of $29.3 million on four product licensing rights and $0.2 million on one IPR&D project, compared to $91.6 million on twenty-five product licensing rights and other intangibles and $139.5 million on eighteen IPR&D projects during the comparative prior year period. All but one of our remaining IPR&D assets were fully impaired in 2018 as a result of anticipated market conditions upon launch resulting in lower expected market share and lower average selling price, which reduced the viability for future development.

Amortization of intangible assets were $39.8 million in 2019, a decrease of $13.7 million, or 25.6% over the prior year amount of $53.5 million. The primary driver of the $13.7 million decrease was a lower intangible asset base in 2019 compared to 2018 as a result of impairments.

R&D expenses were $37.5 million in 2019, a decrease of $9.8 million, or 20.7% over the prior year amount of $47.3 million. The $9.8 million decrease was mainly driven by a reduction in project expenses.

SG&A expenses were $273.9 million in 2019, a decrease of $5.8 million, or 2.1%, over the prior year expenses of $279.7 million. The major drivers of the $5.8 million decrease were $30.0 million reduction in legal expenses related to the Delaware Action and Securities Class Action Litigation (each as defined below), $16.4 million reduction in expenses related to the data integrity assessment projects and $11.9 million reduction in marketing and advertising expenses related to the TheraTears® direct-to-consumer ("DTC") advertising campaign, which were partially offset by increases of $37.7 million and $16.4 million related to the India plant assets impairments and legal and financial advisory fees, respectively.

Litigation rulings and settlements were $44.2 million in 2019, an increase of $21.4 million, from the comparative prior year period amount of $22.8 million. The primary drivers of the $21.4 million increase were $43.0 million in shareholder litigation reserve during 2019 partially offset by charges of $21.8 million related other legal matters in 2018 that did not repeat in 2019.

Goodwill Impairments were $16.0 million in 2019, as a result of the Company's decision to explore strategic alternatives to exit the India manufacturing facility.

Non-operating expenses were $99.7 million in 2019, an increase of $49.9 million, or 100.2%, over the prior year expenses of $49.8 million. The $49.9 million increase was primarily driven by $26.3 million increase in amortization of deferred financing costs related to the amortization of the Original Standstill Agreement and First Amended Standstill Agreement fees and the remaining unamortized Term Loan fees during 2019, and $23.5 million increase in interest expense due to higher interest rates associated with the Original Standstill Agreement and First Amended Standstill Agreement and other increases in the interest rates in 2019.

During the year ended December 31, 2019, the Company recorded an income tax benefit of $61.0 million on (loss) before income taxes of $287.8 million, which principally relates to the $63.5 million reserve release for an uncertain tax position as a result of the IRS acceptance of a method change, including related penalties and interest and a release of tax liability due to expiring federal and state statutes of limitation. During the year ended December 31, 2018, the Company recorded income tax benefit of $36.3 million on (loss) before income taxes of $438.2 million.

The Company reported a net loss of $226.8 million for the year ended December 31, 2019, or 33.2% of net revenue, compared to a net loss of $401.9 million, for the year ended December 31, 2018 or 57.9% of net revenue.

**COMPARISON OF YEARS ENDED DECEMBER 31, 2018 AND 2017**

Net revenue was $694.0 million for the year ended December 31, 2018, representing a decrease of $147.0 million, or 17.5%, as compared to net revenue of $841.0 million for the year ended December 31, 2017.  The decrease in net revenue in the period was primarily due to $157.4 million decline in organic revenue that was partially offset by $14.8 million of new product revenue. The $157.4 million decline in organic revenue was due to approximately $117.1 million, or 14.2%, and $40.4 million, or 4.9% in volume and price declines, respectively. The organic revenue decline was principally due to the effect of competition on Ephedrine Sulfate Injection, Nembutal, Lidocaine Ointment and Clobetasol Cream. In addition, the Company experienced lower net revenue as a result of supply shortfalls from extended planned shutdowns at our Decatur and Somerset manufacturing facilities during the year. While the Company received eight new-to-Akorn ANDA product approvals and launched or relaunched four new products during 2018, it was unable to offset the overall net revenue decline through new product launches or new business opportunities.

The Prescription Pharmaceuticals segment revenues of $620.7 million for the year ended December 31, 2018 represented a decrease of $151.8 million, or 19.7%, as compared to revenues of $772.5 million for year ended December 31, 2017.

The Consumer Health segment revenues of $73.3 million for the year ended December 31, 2018 represented an increase of $4.8 million, or 7.0%, as compared to revenues of $68.5 million for year ended December 31, 2017.

The net revenue for the year ended December 31, 2018 of $694.0 million was net of adjustments totaling $1,193.8 million for chargebacks, rebates, administrative fees and others, product returns, discounts and allowances and advertising, promotions and other.  Chargeback expenses for 2018 were $830.0 million, or 44.0% of gross sales, compared to $953.3 million, or 40.5% of gross sales, in 2017.  The $123.3 million decrease in chargeback expense was due to lower gross sales in the current year as compared to prior year. Rebates, administrative fees and other expenses for the year ended December 31, 2018 were $297.8 million, or 15.8% of gross sales, compared to $476.6 million, or 20.3% for year ended December 31, 2017. The $178.8 million decrease in rebates, administrative fees and other expenses was primarily due to volume declines as well as product mix and customer mix. Our product returns provision for the year ended December 31, 2018 was $20.2 million, or 1.1% of gross sales,

compared to $26.9 million, or 1.1% of gross sales, for year ended December 31, 2017.  Discounts and allowances were $36.9 million or 2.0% of gross sales for the year ended December 31, 2018, compared to $45.3 million, or 1.9% of gross sales for the year ended December 31, 2017. Advertisement and promotion expenses were $8.9 million or 0.5% of gross sales for the year ended December 31, 2018, compared to $7.9 million, or 0.3% of gross sales for the year ended December 31, 2017.

Gross profit for the year ended December 31, 2018 was $246.0 million, or 35.4% of revenue, compared to $432.2 million, or 51.4% of revenue, for the year ended December 31, 2017.  The decline in the gross profit percentage was principally due to unfavorable product mix shifts primarily driven by the effect of competition on Ephedrine Sulfate Injection and Nembutal Injection, unfavorable variances due to decreased production resulting from extended planned shutdowns at our Decatur and Somerset manufacturing facilities, as well as increased operating costs associated with FDA compliance related improvement activities.

Total operating expenses were $634.4 million in the year ended December 31, 2018, an increase of $179.4 million, or 39.4%, from the comparative prior year period amount of $455.1 million. The $179.4 million increase was primarily driven by respective increases, $103.0 million, $63.3 million and $18.8 million in Impairment of intangible assets, Selling, general and administrative ("SG&A") expenses and Litigation rulings and settlement expenses that were partially offset by a decrease of $8.0 million in Amortization of intangibles. The following is a discussion of the main drivers of the increase:

Impairments of intangible assets were $231.1 million in 2018, an increase of $103.0 million or 80.4% over the prior year amount of $128.1 million. The $103.0 million increase was primarily as a result of anticipated market conditions upon launch resulting in lower expected market share and lower average selling price, which reduced the viability for future development. As a result, the cost to get these products to market outweighed the benefits resulting in increased IPR&D impairments of $114.9 million that was partially offset by a decrease in Product licensing rights impairments of $11.9 million.

SG&A expenses were $279.6 million in 2018, an increase of $63.3 million, or 29.3%, over the prior year expenses of $216.3 million. The primary drivers of the $63.3 million increase were $36.0 million legal expenses attributed to the Delaware Action and $27.9 million expenses related to the data integrity assessment projects, $6.2 million severance packages for the former executives and $6.1 million of fixed assets impairments. These were partially offset by a decrease of $18.3 million in restatement related expenses.

Litigation rulings and settlements were $22.8 million in 2018, an increase of $18.8 million, from the comparative prior year period amount of $4.0 million. The primary drivers of the $18.8 million increase were $10.5 million related to an intermediate appellate decision for damages in a product liability case, $5.0 million related to a legal settlement accrual, and $3.8 million for an adverse arbitration decision related to a contract dispute in the third quarter of 2018.

Non-operating expenses were $49.8 million in 2018, an increase of $13.5 million, or 37.2%, over the prior year expenses of $36.3 million. The $13.5 million increase was primarily driven by $11.4 million increase in interest expense related to higher interest rates in 2018 compared to the prior year in 2017, and $3.0 million income attributed to receipt and subsequent sale of the Nicox securities that the Company received as a milestone payment in the second quarter of 2017.

Income tax benefit was $36.3 million based on an effective tax provision rate of approximately 8.3% in 2018, compared to an income tax benefit of $34.6 million in 2017 based on an effective tax provision rate of approximately 58.5%. The change in the tax rate experienced by the company was driven principally by a full valuation allowance of $60.6 million recorded against US, India, and Switzerland deferred tax assets and shortfalls and forfeitures related to stock compensation. A $3.0 million benefit also resulted from the re-measurement of U.S. deferred tax assets and liabilities at the lower enacted corporate tax rate included in the Tax Cuts and Jobs Act (the "Tax Act"). In the absence of the changes in the Tax Act, our tax benefit for 2018 would have been $33.2 million, with an effective tax provision rate of approximately 7.6%. The Company's foreign subsidiaries do not have accumulated earnings that they can distribute; therefore, the provisions of the Tax Act that related to the repatriation of foreign earnings are not applicable to the Company at December 31, 2018. The benefit resulting from the re-measurement of U.S. deferred tax assets and liabilities was partially offset by an accrual of $15.7 million of penalties and interest in 2017 and an additional accrual of $7.9 million of penalties and interest in 2018 that could result from adverse results of income tax examinations. Absent the effects of both the reduction in our deferred tax liability and the accrual of the penalties and interest, the income tax rate would have been approximately 9.4%.

The Company reported a net loss of $401.9 million for the year ended December 31, 2018, or 57.9% of net revenue, compared to net loss of $24.6 million, for the year ended December 31, 2017 or 2.9% of net revenue.

**FINANCIAL CONDITION AND LIQUIDITY**

*Overview*

As discussed elsewhere in this Annual Report on Form 10-K, the continuation of our business is dependent upon our ability to comply with the Second Amended Standstill Agreement and the Term Loan Agreement and conduct a successful Sale Process. These factors, together with the Company's recurring losses from operations and net capital deficiency, create substantial doubt about the Company's ability to continue as a going concern.

We require certain capital resources in order to operate our business.  Our primary sources of liquidity have historically been cash generated from operations and borrowings under our Term Loans. On July 16, 2019, the A&R Credit Agreement governing our asset-based revolving credit facility expired pursuant to its terms, and accordingly no longer provides a source of liquidity.

Historically, our principal liquidity requirements have been to maintain and expand our business, pay principal and interest obligations on our Term Loans and other expenses, and for capital expenditures to upgrade, expand and improve our manufacturing facilities. Our future capital expenditures may include substantial projects undertaken to upgrade, expand and improve our manufacturing facilities in the United States and Switzerland. Our cash obligations include the principal and interest payments due on our Term Loans (as described throughout this report). More recently, our liquidity requirements also include expenses related to FDA compliance related enhancements, legal and financial advisory fees under the Standstill Agreement, and the Delaware Action and other litigation matters.

Our Term Loans are scheduled to mature on April 16, 2021. However, pursuant to the terms of the Second Amended Standstill Agreement described below, the continuation of our business is dependent upon our ability to comply with the Second Amended Standstill Agreement and the Term Loan Agreement and conduct the Sale Process.

*Cash and Cash Flows*

*Cash and Cash Equivalents*

As of December 31, 2019, we had cash and cash equivalents of $144.8 million, which is $80.1 million lower than our cash and cash equivalents balance of $224.9 million as of December 31, 2018.  This decrease in 2019 cash and cash equivalents was driven by operating cash outflows of $36.9 million, investing cash outflows of $30.4 million and financing cash outflows of $12.9 million.  Our net working capital was ($505.5) million at December 31, 2019, compared to $413.0 million at December 31, 2018, a decrease of $918.5 million primarily driven by the reclassification of $843.3 million of debt from long term to current as a result of the Original Standstill Agreement.

*Operating Cash Flows*

During 2019, net cash used in operating activities was $36.9 million.  This negative operating cash flow was primarily driven by costs related to FDA compliance-related activities, accelerated annual and retention bonuses, data integrity assessments and legal and financial advisory fees. During 2018, net cash used in operating activities was $68.9 million.  This negative operating cash flow was primarily driven by costs related to the Delaware action and data integrity investigations & assessment. During 2017, net cash generated in operating activities was $247.6 million.  This positive operating cash flow was primarily driven by positive net working capital.

*Investing Cash Flows*

During 2019, 2018 and 2017, we used approximately $30.4 million, $69.1 million and $90.6 million, respectively, of cash to acquire property, plant and equipment. The sequential reduction in cash used in investing activities since 2017, is primarily due to a significant sequential reduction in capital spending related to our efforts to comply with the Federal Drug Supply Chain Security Act ("DSCSA"). Additionally, for 2019, the Company's decision to explore strategic alternatives to exit the India manufacturing facility resulted in relatively lower cash used in investing activities compared to prior years.

*Financing Cash Flows*

During 2019, cash used in financing activities was $12.9 million of which $12.3 million was related to debt financing costs. During 2018, cash used in financing activities was $5.0 million of which $4.8 million was related to payments of

contingent acquisition liabilities. During 2017, we generated cash from financing activities of $7.6 million which was related to net proceeds from exercise of stock options.

***Other Liquidity Considerations***

*Term Loans and Second Amended Standstill Agreement*

We require certain capital resources in order to operate our business and our limited liquidity could materially and adversely affect our business operations. During 2019, the Company incurred significant costs related to consultants assisting with cGMP improvements and our future capital expenditures may include substantial projects undertaken to upgrade, expand and improve our manufacturing facilities in the United States and Switzerland. Our cash obligations include the principal and interest payments due on our Term Loans (as described throughout this report). Also, costs related to ongoing legal matters may be significant (see Note 19 - "Legal Proceedings" for further details).

For the year ended and as of December 31, 2019, we had a net loss of $226.8 million and negative net working capital of $505.5 million. As of December 31, 2019, we also have remaining principal balance of $852.0 million under the Term Loans. As described in greater detail below, the extension of the Standstill Period that prohibits the Administrative Agent and the Lenders from exercising their default-related rights and remedies with respect to specified events of default under the Term Loan Agreement will expire on the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of (i) a default under the Term Loan Agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement. The continuation of our business is dependent upon our ability to comply with the terms and conditions under the Second Amended Standstill Agreement described below.

On May 6, 2019, the Company and an ad hoc group of Lenders (the "Ad Hoc Group") and certain other Lenders (together with the Ad Hoc Group, the "Standstill Lenders") entered into the Original Standstill Agreement to the Company's Term Loan Agreement, among the Company and certain of its subsidiaries (collectively, the "Loan Parties"), the Lenders and the Administrative Agent. Pursuant to the terms of the Original Standstill Agreement, the Company was required to enter into a Comprehensive Amendment. If the Company did not enter into the Comprehensive Amendment by December 13, 2019 or refinance or otherwise address the outstanding loans, an event of default would occur under the Term Loan Agreement. On December 15, 2019, the Loan Parties entered into a First Amendment to Standstill Agreement and Second Amendment to Credit Agreement with certain Standstill Lenders, pursuant to which the maximum duration of the "Standstill Period" was extended from December 13, 2019 to February 7, 2020.

On February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of (i) a default under the loan agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement (the "Standstill Event of Default") described below. Capitalized terms used but not defined in this section have the meanings given to them in the Second Amended Standstill Agreement or the Term Loan Agreement, as applicable.

The Second Amended Standstill Agreement provides that, for the duration of the Extended Standstill Period, among other matters, neither the Administrative Agent nor the Lenders may (i) declare any Event of Default or (ii) otherwise seek to exercise any rights or remedies, in each case of clauses (i) and (ii) above, to the extent directly relating to any alleged Event of Default arising from any alleged breach of any of the covenants contained in Sections 5.01, 5.02, 5.03, 5.06 or 5.07 of the Term Loan Agreement (the "Specified Covenants"), to the extent the facts and circumstances giving rise to any such breach have been (x) publicly disclosed by the Company or (y) disclosed in writing by the Company to private side Lenders or certain advisors to the Ad Hoc Group (collectively, the "Specified Matters").

The Second Amended Standstill Agreement provides, among other matters, that:

- during the Extended Standstill Period:
  - the Company must deliver certain financial and other information to the Lenders or their advisors, including without limitation, monthly financial statements with agreed upon adjustment, monthly operational statistics broken down by facility, pipeline reporting, 13-week cash flow forecasts, weekly variance reports, certain valuation reports, weekly status updates with respect to the Sale Process (as defined below) and certain regulatory information, and participate in various update calls with the Lenders and their advisors (the "Affirmative Covenants and Milestones"); and

- ◦ the Company and its subsidiaries are restricted, among other matters, from (i) consummating certain asset sales and investments, (ii) making certain restricted payments, (iii) engaging in sale and leaseback transactions, (iv) incurring certain liens and indebtedness, (v) reinvesting any proceeds received from certain asset sales and (vi) without the consent of the Required Lenders at such time, (A) designating any Restricted Subsidiary as an Unrestricted Subsidiary, or otherwise creating or forming any Unrestricted Subsidiary, (B) transferring any assets of the Company or any of its Restricted Subsidiaries to any Unrestricted Subsidiary, except as otherwise permitted under the Term Loan Agreement (after giving effect to the Second Amended Standstill Agreement), and/or (C) releasing any existing Loan Guarantors or security interest granted under the Term Loan Agreement outside of the ordinary course of business (collectively, the "Negative Covenants");

- the Company will market and conduct a sale process for substantially all of its assets in accordance with the milestones set forth in the Second Amended Standstill Agreement (the "Sale Process"), which milestones will depend upon whether the bids submitted and then in effect in connection with the Sale Process are sufficient to pay all obligations under the Term Loan Agreement;

- the Sale Process will be consummated on either an out-of-court or in-court basis (potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code in order to effectuate the Sale Process);

- if at any time during the Sale Process, no third party bids exist that are sufficient to pay all obligations under the Loan Agreement (taking into account available cash) there shall be an immediate Event of Default under the Term Loan Agreement (a "Toggle Event");

- the milestones with respect to the Sale Process include:
  - ◦ subject to the alternative milestones described below upon the occurrence of a Toggle Event:
    - ▪ on or before March 27, 2020, binding bids in connection with the Sale Process shall be due;
    - ▪ on or before April 5, 2020, the Company shall select a stalking horse bidder and commence the Chapter 11 cases to effectuate the Sale Process; and
    - ▪ thereafter, certain additional milestones shall be applicable during the Chapter 11 cases;
  - ◦ upon the occurrence of a Toggle Event, the following alternative milestones will apply:
    - ▪ on or before twenty-six (26) days after a Toggle Event, the Company and the Ad Hoc Group Advisors shall reach an agreement in principle with respect to a restructuring support agreement ("RSA") (such agreement not to be unreasonably withheld, conditioned or delayed);
    - ▪ on or before thirty (30) days after a Toggle Event, the Company shall commence the Chapter 11 cases to consummate either (A) a sale transaction pursuant with the Lenders serving as a stalking horse, and entering into a stalking horse asset purchase agreement (the "Credit Bid APA") in order to exercise their rights to credit bid under the Loan Documents or (B) a transaction backstopped by an executed RSA; and
    - ▪ thereafter, certain additional milestones shall be applicable during the Chapter 11 cases;

- To the extent either (i) a Toggle Event exists or (ii) the Company commences the Chapter 11 cases without a stalking horse asset purchase agreement with a bid sufficient to pay all obligations under the Term Loan Agreement (taking into account available cash in the case of cash fee, debt free bids), the Company shall prepay, on a ratable basis, within five (5) days prior to the commencement of the Chapter 11 cases all outstanding Loans under the Term Loan Agreement in an amount that, after giving effect to such prepayment, leaves the Company's pro forma cash balance at an amount not to exceed $87.5 million.

- the following exit payments will be paid in cash to each Lender on a pro rata basis in connection with repayment of the Loans under the Term Loan Agreement:
  - ◦ if the Sale Process is approved by the Bankruptcy Court on or prior to July 15, 2020, then:
    - ▪ if the Sale Process is consummated on or prior to July 15, 2020, 0.50% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 50 basis points); or
    - ▪ if the Sale Process is consummated after July 15, 2020, 0.75% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 75 basis points); and
  - ◦ if the Sale Process is not approved by the Bankruptcy Court on or prior to July 15, 2020, then:
    - ▪ if the Sale Process is consummated on or prior to August 15, 2020, 1.00% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 100 basis points); or
    - ▪ if the Sale Process is consummated after August 15, 2020, 2.00% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 200 basis points);
  - ◦ upon the earlier to occur of (i) entry into the RSA, (ii) entry into the Credit Bid APA, and one day prior to the Company commencing the Chapter 11 Cases without a Stalking Horse APA, 2.50% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 250 basis points);

- if at any time during the Sale Process no third-party bids exist which are sufficient to pay all obligations (net of available cash), then from the occurrence of such date until the date of a Standstill Event of Default, the interest margin payable in cash shall be further increased by 2.5% to LIBOR plus 12.50%.

Subject to a five business day cure period (the "Cure Period"), the Company's failure to comply with the Affirmative Covenants and Milestones (other than perfection of the Lenders' security interests (the "Excluded Milestones")) during the Standstill Period would permit the Required Lenders to terminate the Standstill Period and exercise any rights and remedies under the Term Loan Agreement with respect to the Specified Matters or a Standstill Event of Default. The Company's failure to comply with the Negative Covenants and Excluded Milestones during the Standstill Period would permit the Required Lenders to terminate the Standstill Agreement and constitute an immediate Event of Default under the Term Loan Agreement. The Company's failure to comply with any Affirmative Covenants and Milestones (subject to the Cure Period), the Excluded Milestones, Negative Covenants or other covenants in the Second Amended Standstill Agreement would also result in a further increase of the interest margins payable with respect to outstanding Loans by 0.50%, payable in kind.

In addition, the Company agrees (1) not to make any payments in respect of judgments or settlements of certain ongoing litigation matters without the prior written consent of the Required Lenders and (2) to make payment of fees and expenses to the advisors of Ad Hoc Group (collectively, the "Other Covenants"). The failure to comply with any of the Other Covenants would constitute an immediate Event of Default under the Term Loan Agreement.

If an Event of Default occurs, the Lenders may accelerate the obligations under the Term Loan Agreement, foreclose upon the collateral securing the debt and exercise other rights and remedies. If the Lenders take this action, the Company may not be able to repay the obligations under the Term Loan Agreement. If the Company does not have sufficient funds on hand to pay its debt when due, it may be required to seek Chapter 11 protection, refinance the debt, incur additional debt, sell assets, sell additional securities, and/or consummate the Sale Process. There can be no assurance that the Company will be able to consummate any of these transactions on commercially reasonable terms or at all. The failure to repay or refinance the obligations under the Term Loan Agreement when due and the uncertainties relating to the Company's outstanding litigation may have a material adverse impact on the Company's business, financial condition and results of operations.

Please see "*Financial Condition and Liquidity-Other Liquidity Considerations*" and "*Risk Factors*" - "*There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.*" and - "*Our limited liquidity could materially and adversely affect our business operations*". Refer to Note 21 - "*Subsequent Events*" for further details on our Term Loans and Second Amended Standstill Agreement.

## CONTRACTUAL OBLIGATIONS

In order to support the continued increase in the number of relevant and marketable pharmaceutical products that we market and sell, we will from time to time partner with outside firms for the development of selected products. These development agreements frequently call for the payment of "milestone payments" as various steps in the process are completed in relation to product development and submission to the FDA for approval. The dollar amount of these milestone payments is generally fixed contractually, assuming that the required milestones are achieved; however, the timing of such payments is contingent based on a variety of factors and is therefore subject to change. The amounts disclosed in the below table under the caption "Strategic partners (Milestones) - contingent payments" represents our best estimate of the amount and expected timing of the "milestone payments" and other fees we expect to pay to outside development partners based on our current contractual agreements with them. These milestone payments are accrued as liabilities on our balance sheets once the milestones have been achieved.

As more fully described under Item 2 - "*Properties*", we currently lease the facilities that we occupy in Gurnee, Illinois, Lake Forest, Illinois and Vernon Hills, Illinois, as well as in Ann Arbor, Michigan, Somerset, New Jersey, Cranbury, New Jersey and India. We also lease various pieces of office equipment at these facilities, as well as at our manufacturing facilities in Decatur, Illinois and Amityville, New York. Our remaining obligations under these leases are summarized in the table below.

The following table details our future contractual obligations as of December 31, 2019 (in thousands):

| Description | Total | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 and beyond |
|---|---|---|---|---|---|---|---|
| Principal amount of Term Loans due in 2021 (1) | $ 851,957 | $ 851,957 | $ — | $ — | $ — | $ — | $ — |
| Interest Payable – 11.8% Term Loans (1) | 7,979 | 7,979 | — | — | — | — | — |
| Estimated future pension benefit payments (2) | 16,139 | 1,866 | 1,487 | 1,514 | 1,455 | 1,563 | 8,254 |
| Inventory purchase commitments | 7,320 | 3,922 | 1,440 | 280 | 280 | 280 | 1,118 |
| Leases (3) | 36,655 | 4,596 | 4,775 | 4,520 | 3,862 | 3,557 | 15,345 |
| Strategic partners (Milestones) – contingent payments (4) | 1,697 | 1,151 | 46 | 250 | 250 | — | — |
| Total: | $ 921,747 | $ 871,471 | $ 7,748 | $ 6,564 | $ 5,847 | $ 5,400 | $ 24,717 |

(1) Pursuant to the terms of the First Amended Standstill Agreement, the Company was required to enter into a Comprehensive Amendment to the Term Loan Agreements satisfactory in form and substance to the Lenders by February 7, 2020. On February 12, 2020, the Company and certain of its subsidiaries entered into the Second Amended Standstill Agreement. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of (i) the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of a default under the Term Loan Agreement, or (ii) a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement. Pursuant to the Second Amended Standstill Agreement, we will market and conduct the Sale Process for substantially all of the Company's assets. The Sale Process will be conducted in accordance with certain milestones, which will depend upon whether the bids submitted and then in effect in connection with the Sale Process are sufficient to pay all obligations under the Term Loan Agreement. See Item 7 - "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Risk Factors*" - "*There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated thereby, creating substantial doubt about our ability to continue as a going concern.*" and - "*Our limited liquidity could materially and adversely affect our business operations.*" for more information on the Second Amended Standstill Agreement, the Sale Process, and the risks related thereto. Refer to Note 7 - "*Financing Arrangements*" for further detail of our debt obligations as of and for the year ended December 31, 2019.

(2) The $8.3 million in the 2025 and beyond column represents estimated future pension benefit payments from 2025 through 2029 only.

(3) Includes approximately $11.4 million of reasonably assured renewal option payments.

(4) The strategic partner payments include our best estimates regarding if and when various contingencies and market opportunities will occur in 2020 and beyond.

## OFF BALANCE SHEET ARRANGEMENTS

We have no significant off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to our shareholders.

## CRITICAL ACCOUNTING POLICIES

Our significant accounting policies and critical accounting estimates are described in Note 2 - "*Summary of significant accounting policies*" to the Consolidated Financial Statements and are herein incorporated by reference.

## RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

Recently issued accounting pronouncements which may have an effect on the Company are described in Note 15 - "*Recently issued and adopted accounting pronouncements*" to the Consolidated Financial Statements and are herein incorporated by reference.

**RECENTLY ADOPTED ACCOUNTING PRONOUNCEMENTS**

Recently adopted accounting pronouncements which have had an effect on the Company are described in Note 15 - "*Recently issued and adopted accounting pronouncements*" to the Consolidated Financial Statements and are herein incorporated by reference.

I**tem 7A.** *Quantitative and Qualitative Disclosures about Market Risk*

As of December 31, 2019, our principal debt obligations included the Term Loans with outstanding debt of $852.0 million.

As of the date of the filing of this Form 10-K until (but excluding) the date of a Standstill Event of Default, our spread will be (i) 9.00% per annum for any ABR Loan, and (ii) 10.00% per annum for any Eurodollar Loan irrespective of Ratings Level on such date; provided that 0.75% (i.e., 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date.

Our Swiss subsidiary, Akorn AG, operates a manufacturing facility in Hettlingen, Switzerland.  Accordingly, we are subject to foreign exchange risk based on changes in the exchange rate between U.S. dollars and Swiss Francs.

Our financial instruments include cash and cash equivalents, accounts receivable and accounts payable. The fair values of cash and cash equivalents, accounts receivable and accounts payable approximate book value because of the short maturity of these instruments.

At December 31, 2019, the majority of our cash and cash equivalents balance of $144.8 million was invested in overnight instruments, the interest rates of which may change daily.

**Item 8.** *Financial Statements and Supplementary Data.*

The following financial statements are included in Item 8 of this Form 10-K.

INDEX:

Reports of Independent Registered Public Accounting Firm
Consolidated Balance Sheets as of December 31, 2019 and 2018
Consolidated Statements of Comprehensive (Loss) for the years ended December 31, 2019, 2018 and 2017
Consolidated Statements of Shareholders' Equity for the years ended December 31, 2019, 2018 and 2017
Consolidated Statements of Cash Flows for the years ended December 31, 2019, 2018 and 2017
Notes to Consolidated Financial Statements

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Akorn, Inc.
Lake Forest, Illinois

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Akorn Inc. (the "Company") as of December 31, 2019 and 2018, the related consolidated statements of comprehensive (loss), shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 26, 2020 expressed an unqualified opinion thereon.

**Going Concern Uncertainty**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has suffered recurring losses from operations and has a net working capital deficiency that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Change in Accounting Principle Related to Leases**

As discussed in Notes 2 and 9 to the consolidated financial statements, the Company changed the manner in which it accounts for leases in 2019 due to the adoption of Accounting Standards Codification Topic 842 - Leases.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP
We have served as the Company's auditor since 2016.
Chicago, Illinois
February 26, 2020

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Akorn, Inc.
Lake Forest, Illinois

**Opinion on Internal Control over Financial Reporting**

We have audited Akorn, Inc.'s (the "Company's") internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2019 and 2018, the related consolidated statements of comprehensive loss, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and our report dated February 26, 2020, expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP
Chicago, Illinois
February 26, 2020

**AKORN, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In Thousands, Except Share Data)**

| | December 31, | |
|---|---|---|
| | **2019** | **2018** |
| ASSETS | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 144,804 | $ 224,868 |
| Trade accounts receivable, net | 134,173 | 153,126 |
| Inventories, net | 170,047 | 173,645 |
| Prepaid expenses and other current assets | 31,023 | 32,180 |
| TOTAL CURRENT ASSETS | 480,047 | 583,819 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 295,533 | 334,853 |
| OTHER LONG-TERM ASSETS | | |
| Goodwill | 267,923 | 283,879 |
| Intangible assets, net | 215,801 | 284,976 |
| Right-of-use assets, net - Operating leases | 22,445 | — |
| Other non-current assets | 6,890 | 7,730 |
| TOTAL OTHER LONG-TERM ASSETS | 513,059 | 576,585 |
| TOTAL ASSETS | $ 1,288,639 | $ 1,495,257 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| CURRENT LIABILITIES | | |
| Trade accounts payable | $ 44,958 | $ 39,570 |
| Accrued royalties | 5,956 | 6,786 |
| Accrued compensation | 13,005 | 19,745 |
| Current portion of long-term debt (net of deferred financing costs) | 843,328 | — |
| Accrued administrative fees | 31,725 | 36,767 |
| Current portion of accrued legal fees and contingencies | 23,673 | 52,413 |
| Current portion of lease liability - Operating leases | 2,290 | — |
| Accrued expenses and other liabilities | 20,652 | 15,542 |
| TOTAL CURRENT LIABILITIES | 985,587 | 170,823 |
| LONG-TERM LIABILITIES | | |
| Long-term debt (net of non-current deferred financing costs) | — | 820,411 |
| Deferred tax liability | 225 | 566 |
| Uncertain tax liabilities | 2,633 | 49,990 |
| Long-term lease liability - Operating leases | 22,021 | — |
| Long-term portion of accrued legal fees and contingencies | 33,000 | — |
| Pension obligations and other liabilities | 10,881 | 9,601 |
| TOTAL LONG-TERM LIABILITIES | 68,760 | 880,568 |
| TOTAL LIABILITIES | 1,054,347 | 1,051,391 |
| SHAREHOLDERS' EQUITY | | |
| Preferred stock, $1 par value —5,000,000 shares authorized; no shares issued or outstanding at December 31, 2019 and 2018 | — | — |
| Common stock, no par value — 150,000,000 shares authorized; 126,145,832 and 125,492,373 shares issued and outstanding at December 31, 2019 and 2018 | 595,521 | 574,553 |
| Accumulated deficit | (333,938) | (107,168) |
| Accumulated other comprehensive (loss) | (27,291) | (23,519) |
| TOTAL SHAREHOLDERS' EQUITY | 234,292 | 443,866 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 1,288,639 | $ 1,495,257 |

See notes to the consolidated financial statements.

**AKORN, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS)**
**(In Thousands, Except per Share Data)**

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| REVENUES | $ 682,429 | $ 694,018 | $ 841,045 |
| Cost of sales (exclusive of amortization of intangibles, included within operating expenses below) | 429,723 | 448,002 | 408,839 |
| GROSS PROFIT | 252,706 | 246,016 | 432,206 |
| Selling, general and administrative expenses | 273,871 | 279,749 | 216,483 |
| Research and development expenses | 37,500 | 47,321 | 44,988 |
| Amortization of intangibles | 39,765 | 53,472 | 61,443 |
| Impairment of goodwill | 15,955 | — | — |
| Impairment of intangible assets | 29,497 | 231,086 | 128,127 |
| Litigation rulings, settlements and contingencies | 44,179 | 22,814 | 4,049 |
| TOTAL OPERATING EXPENSES | 440,767 | 634,442 | 455,090 |
| OPERATING (LOSS) | (188,061) | (388,426) | (22,884) |
| Amortization of deferred financing costs | (31,554) | (5,216) | (5,216) |
| Interest expense, net | (69,353) | (45,900) | (38,070) |
| Other non-operating income, net | 1,190 | 1,360 | 6,972 |
| (LOSS) BEFORE INCOME TAXES | (287,778) | (438,182) | (59,198) |
| Income tax (benefit) | (61,008) | (36,273) | (34,648) |
| NET (LOSS) | $ (226,770) | $ (401,909) | $ (24,550) |
| NET (LOSS) PER COMMON SHARE: | | | |
| Net (Loss), basic and diluted | $ (1.80) | $ (3.21) | $ (0.20) |
| SHARES USED IN COMPUTING NET (LOSS) PER COMMON SHARE: | | | |
| WEIGHTED AVERAGE BASIC AND DILUTED | 125,977 | 125,383 | 124,790 |
| COMPREHENSIVE (LOSS): | | | |
| Net (loss) | $ (226,770) | $ (401,909) | $ (24,550) |
| Unrealized holding (loss) gain on available-for-sale securities, net of tax of $1, $6 and ($157) for the years ended December 31, 2019, 2018 and 2017, respectively. | (5) | (21) | 267 |
| Foreign currency translation (loss) gain for the years ended December 31, 2019, 2018 and 2017, respectively. | (667) | (8,001) | 6,150 |
| Pension liability adjustment (loss) gain, net of tax of $787, $389 and ($403) for the year ended December 31, 2019, 2018 and 2017, respectively. | (3,100) | (1,529) | 1,582 |
| COMPREHENSIVE (LOSS) | $ (230,542) | $ (411,460) | $ (16,551) |

See notes to the consolidated financial statements.

**AKORN, INC.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2017, 2018 AND 2019**
**(In Thousands)**

| | Common Stock | | Retained Earnings (Accumulated Deficit) | Other Compre-hensive (Loss) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | Amount | Amount | Amount |
| BALANCES AT DECEMBER 31, 2016 | 124,390 | $ 521,860 | $ 319,291 | $ (21,967) | $ 819,184 |
| Consolidated net (loss) | — | — | (24,550) | — | (24,550) |
| Exercise of stock options | 625 | 9,673 | — | — | 9,673 |
| Compensation and share issuances related to restricted stock awards | 138 | 7,736 | — | — | 7,736 |
| Stock-based compensation expense - stock options | — | 13,282 | — | — | 13,282 |
| Foreign currency translation gain | — | — | — | 6,150 | 6,150 |
| Stock compensation plan withholdings for employee taxes | (62) | (2,079) | — | — | (2,079) |
| Unrealized holding gain on available-for-sale securities | — | — | — | 267 | 267 |
| Akorn AG pension liability adjustment gain | — | — | — | 1,582 | 1,582 |
| BALANCES AT DECEMBER 31, 2017 | 125,091 | $ 550,472 | $ 294,741 | $ (13,968) | $ 831,245 |
| Consolidated net (loss) | — | — | (401,909) | — | (401,909) |
| Exercise of stock options | 22 | 546 | — | — | 546 |
| Employee stock purchase plan expense | 146 | 2,809 | — | — | 2,809 |
| Compensation and share issuances related to restricted stock awards | 288 | 11,673 | — | — | 11,673 |
| Stock-based compensation expense - stock options | — | 9,830 | — | — | 9,830 |
| Foreign currency translation (loss) | — | — | — | (8,001) | (8,001) |
| Stock compensation plan withholdings for employee taxes | (55) | (777) | — | — | (777) |
| Unrealized holding (loss) on available-for-sale securities | — | — | — | (21) | (21) |
| Akorn AG pension liability adjustment (loss) | — | — | — | (1,529) | (1,529) |
| BALANCES AT DECEMBER 31, 2018 | 125,492 | $ 574,553 | $ (107,168) | $ (23,519) | $ 443,866 |
| Consolidated net (loss) | — | — | (226,770) | — | (226,770) |
| Exercise of stock options | | | — | — | |
| Employee stock purchase plan expense | | 1,273 | — | | 1,273 |
| Compensation and share issuances related to restricted stock awards | 751 | 14,751 | — | — | 14,751 |
| Stock-based compensation expense - stock options | — | 5,257 | — | — | 5,257 |
| Foreign currency translation (loss) | — | — | — | (667) | (667) |
| Stock compensation plan withholdings for employee taxes | (97) | (313) | — | — | (313) |
| Unrealized holding (loss) on available-for-sale securities | — | — | — | (5) | (5) |
| Akorn AG pension liability adjustment (loss) | — | — | — | (3,100) | (3,100) |
| BALANCES AT DECEMBER 31, 2019 | 126,146 | $ 595,521 | $ (333,938) | $ (27,291) | $ 234,292 |

See notes to the consolidated financial statements.

48

**AKORN, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In Thousands)**

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| OPERATING ACTIVITIES: | | | |
| Net (loss) | $ (226,770) | $ (401,909) | $ (24,550) |
| Adjustments to reconcile consolidated net (loss) to net cash (used in) provided by operating activities: | | | |
| Depreciation and amortization | 70,300 | 82,805 | 85,173 |
| Impairment of intangible assets | 29,497 | 231,086 | 128,127 |
| Goodwill impairment | 15,955 | — | — |
| Fixed asset impairment and other | 39,894 | 6,135 | — |
| Amortization of debt financing costs | 31,554 | 5,216 | 5,216 |
| Non-cash stock compensation expense | 21,281 | 21,503 | 21,018 |
| Non-cash interest expense | 3,626 | — | — |
| Income from available-for-sale securities | — | — | (3,032) |
| Deferred income taxes, net | (339) | (37,396) | (115,249) |
| Gain on sale of available-for-sale security | — | — | 199 |
| Other | (32) | 421 | (307) |
| Changes in operating assets and liabilities: | | | |
| Trade accounts receivable, net | 18,879 | (11,627) | 141,979 |
| Inventories, net | 3,877 | 9,694 | (8,367) |
| Prepaid expenses and other current assets | (1,075) | 3,847 | (12,232) |
| Other non-current assets | 1,229 | (3,120) | (3,519) |
| Trade accounts payable | 5,490 | (5,002) | (9,223) |
| Accrued legal fees and contingencies | 4,260 | 24,120 | 21,492 |
| Uncertain tax liabilities | (47,357) | 9,690 | 38,999 |
| Accrued expenses and other liabilities | (7,188) | (4,357) | (18,091) |
| NET CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | (36,919) | (68,894) | 247,633 |
| INVESTING ACTIVITIES: | | | |
| Proceeds from disposal of assets | 132 | 30 | 4,815 |
| Payments for intangible assets | (87) | (50) | (200) |
| Purchases of property, plant and equipment | (30,447) | (69,111) | (95,170) |
| NET CASH (USED IN) INVESTING ACTIVITIES | (30,402) | (69,131) | (90,555) |
| FINANCING ACTIVITIES: | | | |
| Proceeds from the exercise of stock options | — | 546 | 9,320 |
| Stock compensation plan withholdings for employee taxes | (313) | (777) | (1,726) |
| Payments of contingent acquisition liabilities | — | (4,793) | — |
| Debt financing costs | (12,263) | — | — |
| Lease Payments | (352) | (14) | — |
| NET CASH (USED IN) PROVIDED BY FINANCING ACTIVITIES | (12,928) | (5,038) | 7,594 |
| Effect of changes in exchange rate changes on cash and cash equivalents | 62 | (1,032) | 1,183 |
| (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | (80,187) | (144,095) | 165,855 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH AT BEGINNING OF YEAR | 225,794 | 369,889 | 204,034 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH AT END OF YEAR | $ 145,607 | $ 225,794 | $ 369,889 |

See notes to the consolidated financial statements.

49

**AKORN, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 — Business and Basis of Presentation**

*Business:* Akorn, Inc., together with its wholly-owned subsidiaries ("Akorn," the "Company," "we," "our" or "us") is a specialty pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals, branded as well as private-label over-the-counter consumer health products and animal health pharmaceuticals. We are an industry leader in the development, manufacturing and marketing of specialized generic pharmaceutical products in alternative dosage forms. We focus on difficult-to-manufacture sterile and non-sterile dosage forms including, but not limited to, ophthalmics, injectables, oral liquids, otics, topicals, inhalants and nasal sprays.

Akorn, Inc. is a Louisiana corporation founded in 1971 in Abita Springs, Louisiana. In 1997, we relocated our corporate headquarters to the Chicago, Illinois area and currently maintain our principal corporate offices in Lake Forest, Illinois. We have pharmaceutical manufacturing facilities in Decatur, Illinois; Somerset, New Jersey; Amityville, New York; Hettlingen, Switzerland; and Paonta Sahib, Himachal Pradesh, India. We operate a central distribution warehouse in Gurnee, Illinois and additional distribution facilities in Amityville, New York and Decatur, Illinois. Our research and development ("R&D") centers are located in Vernon Hills, Illinois and Cranbury, New Jersey. We maintain other corporate offices in Ann Arbor, Michigan and New Delhi, India.

Certain prior-period amounts have been reclassified to conform to current-period presentation including selling, general and administrative expenses and acquisition-related costs on the consolidated statements of comprehensive (loss).

**Note 2 — Summary of Significant Accounting Policies**

*Consolidation*: The accompanying consolidated financial statements include the accounts of Akorn, Inc. and its wholly-owned domestic and foreign subsidiaries.  All inter-company transactions and balances have been eliminated in consolidation, and the financial statements of Akorn India Private Limited ("AIPL") and Akorn AG have been translated from Indian Rupees to U.S. dollars and Swiss Francs to U.S. dollars, respectively, based on the currency translation rates in effect during the period or as of the date of consolidation, as applicable.  The Company is not involved with variable interest entities.

*Use of Estimates*: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ materially from those estimates.

Significant estimates and assumptions for the Company relate to the allowances for chargebacks, rebates, product returns, coupons, promotions and doubtful accounts, as well as the reserve for slow-moving and obsolete inventories, the carrying value and lives of goodwill and intangible assets, the useful lives of fixed assets, impairments of fixed assets, impairments of goodwill and intangible assets, the carrying value of deferred income tax assets and liabilities, the assumptions underlying share-based compensation, and accrued but unreported employee benefit costs and legal settlement accruals.

*Going Concern:* In connection with the preparation of the financial statements for the year ended December 31, 2019, the Company conducted an evaluation as to whether there were conditions and events, considered in the aggregate, which raised substantial doubt as to the entity's ability to continue as a going concern within one year after the date of the issuance of the financial statements. As of December 31, 2019, the Company had cash and cash equivalents of $144.8 million, working capital deficit of $505.5 million and accumulated deficit of $333.9 million. The Company had a loss from operations of $188.1 million and a net loss of $226.8 million for the year ended December 31, 2019.

As further described in Note 21 - "*Subsequent Events,*" on February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of a default under the loan agreement, or a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement.

The Company evaluated the impact of entering into a Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders on its ability to continue as a going concern. There is no assurance that we will be able to comply with the covenants in the Second Amended Standstill Agreement and Term Loan Agreement or successfully execute the Sale Process contemplated. Accordingly, the impact of the Second Amended Standstill Agreement and the recurring losses from operations and net working capital deficiency create substantial doubt about our ability to continue as a going concern within one year after the date the financial statements are filed.

*Revenue Recognition:* Revenue is recognized at a point in time upon the transfer of control of the Company's products, which occurs upon delivery for substantially all of the Company's sales. The promises within the contract that are distinct are primarily the Company's supply of products, which represents a single performance obligation. The consideration the Company receives in exchange for its goods or services is only recognized when it is probable that a significant reversal will not occur. The consideration to which the Company expects to be entitled includes a stated list price, less various forms of variable consideration. The Company makes significant estimates for related variable consideration at the point of sale, including chargebacks, rebates, product returns, other discounts and allowances. All sales taxes are excluded from the transaction price. The Company expenses contract fulfillment costs when incurred since the amortization period would have been less than one year. Payment terms are primarily less than 90 days. See Note 15 – "*Recently Issued and Adopted Accounting Pronouncements*" for the discussion of the adoption of *Accounting Standard Codification ("ASC") Topic 606 Revenue from Contracts with Customers.*

Provision for estimated chargebacks, rebates, discounts, managed care rebates, product returns and doubtful accounts is made at the time of sale and is analyzed and adjusted, if necessary, at each balance sheet date.

*Freight:*  The Company records shipping and handling expense related to product sales as cost of sales.

*Cash and Cash Equivalents:* The Company considers all unrestricted, highly liquid investments with maturity of three months or less when acquired, to be cash and cash equivalents.  At December 31, 2019 and 2018, approximately $0.8 million and $0.9 million, respectively, of cash held by AIPL was restricted, and was reported within *prepaid expenses and other current assets*.

The following table sets forth the components of the Company's cash, cash equivalents, and restricted cash as reported in the consolidated statement of cash flows for the years ended December 31, 2019 and 2018 (in thousands):

| Cash, Cash Equivalents, and Restricted Cash | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2019 | | 2018 |
| Cash and cash equivalents | $ | 144,804 | $ | 224,868 |
| Restricted cash | | 803 | | 926 |
| Total cash, cash equivalents, and restricted cash | $ | 145,607 | $ | 225,794 |

*Accounts Receivable:* Trade accounts receivable are stated at their net realizable value.  The nature of the Company's business involves, in the ordinary course, significant judgments and estimates relating to chargebacks, coupon redemption, product returns, rebates, discounts given to customers and allowances for doubtful accounts.  Certain rebates, chargebacks and other credits are recorded as deductions to the Company's trade accounts receivable where applicable, based on product and customer specific terms.

Unless otherwise noted, the provisions and allowances for the following customer deductions are reflected in the accompanying consolidated financial statements as reductions of revenues and trade accounts receivable, respectively.

*Chargebacks:* The Company enters into contractual agreements with certain third parties such as retailers, hospitals, group-purchasing organizations ("GPOs") and managed care organizations to sell certain products at predetermined prices. Similarly, we maintain an allowance for rebates and discounts related to billbacks, wholesaler fee for service contracts, GPO administrative fees, government programs, prompt payment and other adjustments with certain customers. Most of the parties have elected to have these contracts administered through wholesalers that buy the product from the Company and subsequently sell it to these third parties. As noted elsewhere, these wholesalers represent a significant percentage of the Company's gross sales. When a wholesaler sells products to one of these third parties that are subject to a contractual price agreement, the difference between the price paid to the Company by the wholesaler and the price under the specific contract is charged back to the Company by the wholesaler. It typically takes four to six weeks from the time of sale to the

wholesaler until the processing of the chargeback. The Company tracks sales and submitted chargebacks by product number and contract for each wholesaler. Utilizing this information, the Company estimates a chargeback percentage for each product and records an allowance as a reduction to gross sales when the Company records its sale of the products. The Company reduces the chargeback allowance when a chargeback request from a wholesaler is processed. Actual chargebacks processed by the Company can vary materially from period to period based upon actual sales volume through the wholesalers. However, the Company's provision for chargebacks is fully reserved for at the time revenues are recognized.

Management obtains product inventory reports from certain wholesalers to aid in analyzing the reasonableness of the chargeback allowance and to monitor whether wholesaler inventory levels significantly exceed customer demand. The Company assesses the reasonableness of its chargeback allowance by applying a product chargeback percentage that is based on a combination of historical activity and future price and mix expectations to the quantities of inventory on hand at the wholesalers according to wholesaler inventory reports. In addition, the Company estimates the percent of gross sales generated through direct and indirect sales channels and the percent of contract vs. non-contract revenue in the period, as these each affect the estimated reserve calculation. In accordance with its accounting policy, the Company also estimates the percent of wholesaler inventory that will ultimately be sold to third parties that are subject to contractual price agreements based on a trend of such sales through wholesalers. The Company uses this percentage estimate until historical trends indicate that a revision should be made. On an ongoing basis, the Company evaluates its actual chargeback rate experience, and new trends are factored into its estimates each quarter as market conditions change.

For the year ended December 31, 2019, the Company recorded a chargeback expense of $678.2 million, or 40.5% of gross sales of $1,674.2 million, compared to $830.0 million, or 44.0% of gross sales of $1,887.9 million in the prior year. The dollar and percent decreases from the comparative period were due to volume declines as well as changes in product and customer mix.

The Company ensures that the chargeback rate as a percent of gross sales is reasonable through inspection of contractual obligations, review of historical trends and evaluation of recent activity. Furthermore, other events that could materially alter chargeback rates include: changes in product pricing or contract pricing structures as a result of competitive market dynamics or negotiations with customers, changes in demand for specific products due to external factors such as competitor supply position or consumer preferences and customer shifts in buying patterns from direct to indirect through wholesalers, which could either individually or in aggregate increase or decrease the chargeback rate depending on the direction and velocity of the change(s).

To better understand the impact of changes in the chargeback reserve based on circumstances that are not fully outside of the Company's control, for instance, the ratio of sales subject to chargeback to indirect sales, the Company performs a sensitivity analysis. Holding all other assumptions constant, for a 740 basis point ("BP") change in the ratio of sales subject to chargeback to indirect sales would increase the chargeback reserve by $1.0 million or decrease the chargeback reserve by $2.6 million depending on the change in the direction of the ratio. Fundamentally, the BP change calculation is determined based on the six month trend of the average ratio of sales subject to chargeback to indirect sales. Due to the competitive generic pharmaceutical industry and our experience with wholesalers' strategy and shifts in contracted and non-contracted indirect sales, we believe that the six month trend of the proportion of direct to indirect sales provides a representative basis for sensitivity analysis.

***Rebates, Administrative Fees and Others***: The Company maintains an allowance for rebates, administrative fees and others, related to contracts and other rebate programs that it has in place with certain customers. Rebates, administrative fees and other percentages vary by product and by volume purchased by each eligible customer. The Company tracks sales by product number for each eligible customer and then applies the applicable rebate, administrative fees and other percentage, using both historical trends and actual experience to estimate its rebates, administrative fees and others allowances. The Company reduces gross sales and increases the rebates, administrative fees and others allowance by the estimated rebates, administrative fees and others amounts when the Company sells its products to eligible customers. The Company reduces the rebate allowance when it processes a customer request for a rebate. At each balance sheet date, the Company analyzes the allowance for rebates, administrative fees and others against actual rebates processed and makes adjustments as appropriate. The amount of actual rebates processed can vary materially from period to period as discussed below.

The allowance for rebates, administrative fees and others further takes into consideration price adjustments which are credits issued to reflect increases or decreases in the invoice or contract prices of the Company's products. In the case of a price decrease, a shelf-stock adjustment credit may be given for product remaining in customer's inventories at the time of the price reduction and is reserved at the point of sale. Contractual price protection results in a similar credit when the invoice or contract prices of the Company's products increase, effectively allowing customers to purchase products at previous prices for a

52

specified period of time. Amounts recorded for estimated shelf-stock adjustments and price protection are based upon specified terms with customers, estimated changes in market prices, and estimates of inventory held by customers. The Company regularly monitors these and other factors and evaluates the reserve as additional information becomes available.

Similar to rebates, the reserve for administrative fees and others represents those amounts processed related to contracts and other fee programs which have been in place with certain entities, but they are settled through cash payment to these entities and accordingly are accounted for as a current liability. Otherwise, administrative fees and others operate similarly to rebates.

For the year ended December 31, 2019, the Company recorded rebates, administrative fees and others of $241.5 million, or 14.4% of gross sales of $1,674.2 million, compared to $297.8 million, or 15.8% of gross sales of $1,887.9 million in the prior year. The dollar and percent decreases from the comparative period were primarily due to volume declines and lower failure to supply penalties. The Company ensures that this rate as a percent of gross sales is reasonable through inspection of contractual obligations, review of historical trends and evaluation of recent activity. Furthermore, other events that could materially alter rebates, administrative fees and others rates include: changes in product pricing or contract pricing structures as a result of competitive market dynamics or negotiations with customers, changes in demand for specific products due to external factors such as competitor supply position or consumer preferences and customer shifts in buying patterns from direct to indirect through wholesalers, which could either individually or in aggregate increase or decrease the rebate rate depending on the direction and velocity of the change(s).

To better understand the impact of changes in reserves for rebates, administrative fees and others based on circumstances that are not fully outside the Company's control, for instance, the proportion of direct to indirect sales subject to rebates, administrative fees and others, the Company performs a sensitivity analysis. Holding all other assumptions constant, for a 740 BP change in the ratio of sales subject to rebates, administrative fees and others to indirect sales would increase the reserve for rebates, administrative fees and others by $0.1 million or decrease the same reserve by $0.4 million depending on the direction of the change in the ratio. Fundamentally, the BP change calculation is determined based on the six month trend of the average ratio of sales subject to rebates, administrative fees and others to indirect sales. Due to the competitive generic pharmaceutical industry and our experience with wholesalers' strategy and shifts in contracted and non-contracted indirect sales, we believe the six month trend of the average ratio of sales subject to rebates, administrative fees and others to indirect sales provides a representative basis for sensitivity analysis.

***Sales Returns***: Certain of the Company's products are sold with the customer having the right to return the product within specified periods. Provisions are made at the time of sale based upon historical experience. Historical factors such as recall events as well as pending new developments like comparable product approvals or significant pricing movement that may impact the expected level of returns, are taken into account to determine the appropriate reserve estimate at each balance sheet date. As part of the evaluation of the reserve required, the Company considers actual returns to date that are in process, wholesaler inventory levels and the expected impact of any product recalls to assess the magnitude of unconsumed product that may result in sales returns to the Company in the future. The sales returns level can be impacted by factors such as overall market demand and market competition and availability of substitute products which can increase or decrease the pull through for sales of the Company's products and ultimately impact the level of sales returns.

For the year ended December 31, 2019, the Company recorded a return expense of $30.7 million, or 1.8% of gross sales of $1,674.2 million, compared to $20.2 million, or 1.1% of gross sales of $1,887.9 million in the prior year. The dollar increase in the comparative period was primarily due to unfavorable outcome on disputed returns claims. The Company ensures that this rate as a percent of gross sales is reasonable through inspection of historical trends and evaluation of recent activity.

To better understand the impact of changes in return reserve based on certain circumstances, the Company performs a sensitivity analysis. Holding all other assumptions constant, for an average 0.5 months change in the lag from the time of sale to the time the product return is processed, this change would result in an increase of $0.8 million or a decrease of $0.7 million in the return reserve expense if the lag increases or decreases, respectively. The average 0.5 months change in the lag from the time of sale to the time the product return is processed was determined based on the difference between the high and low lag time for the past six month historical activities. This sensitivity analysis is a change from prior year comparative period which was determined based on the difference between the high and low lag time for the past twelve month historical activity. The prior method was needed to give a measurable variance to calculate a sensitivity. Due to the volume and type of products sold by the Company in the recent past, we have determined that the lag calculation provides a reasonable basis for sensitivity analysis.

***Allowance for Coupons, Advertising, Promotions and Co-Pay Discount Cards:*** The Company issues coupons from time to time that are redeemable against certain of our Consumer Health products. In addition to coupons, from time to time the Company authorizes various retailers to run in-store promotions and co-pay discounts for its products. At the point of sale, the Company records an estimate of the dollar value of coupons expected to be redeemed, the dollar amount owed back to the retailer and co-pay discount as variable consideration since the Company intends to continue to issue coupons, advertising promotions and co-pay discounts. The coupon estimate is based on historical experience and is adjusted as needed based on actual redemptions. Upon receiving confirmation that an advertising promotion was run, the Company adjusts the estimate of the dollar amount expected to be owed back to the retailer as needed. This estimate is then adjusted to actual upon receipt of an invoice from the retailer. Additionally, the Company provides consumer co-pay discount cards, administered through outside agents, to provide discounted products when redeemed. The Company records an estimate of the dollar value of co-pay discounts expected to be utilized based on historical experience and adjusts as needed based on actual experience.

***Doubtful Accounts:*** Provisions for doubtful accounts, which reflect trade receivable balances owed to the Company that are believed to be uncollectible, are recorded as a component of selling, general and administrative ("SG&A") expenses. In estimating the allowance for doubtful accounts, the Company considers its historical experience with collections and write-offs, the credit quality of its customers and any recent or anticipated changes thereto, and the outstanding balances and past due amounts from its customers.  Note that in the ordinary course of business, and consistent with our peers, we may from time to time offer extended payment terms to our customers as an incentive for new product launches or in other circumstances in accordance with standard industry practices. These extended payment terms do not represent a significant risk to the collectability of accounts receivable as of the period-end. Accounts are considered past due when they remain uncollected beyond the due date specified in the applicable contract or on the applicable invoice, whichever is deemed to take precedence.

As of December 31, 2019, the Company had a total of $10.0 million of past due gross accounts receivable and $5.8 million aged over 60 days. The Company performs monthly a detailed analysis of the receivables due from its customers and provides a specific reserve against known uncollectible items. The Company also includes in the allowance for doubtful accounts an amount that it estimates to be uncollectible for all other customers, based on a percentage of the past due receivables. The percentage reserved increases as the age of the receivables increases.  Accounts are written off once all reasonable collection efforts have been exhausted and/or when facts or circumstances regarding the customer (i.e. bankruptcy filing) indicate that the chance of collection is remote.

***Inventories:*** Inventories are stated at the lower of cost and net realizable value ("NRV") (see Note 4 - "*Inventories, Net*"). The Company maintains an allowance for slow-moving and obsolete inventory as well as inventory where the cost is in excess of its NRV. For finished goods inventory, the Company estimates the amount of inventory that may not be sold prior to its expiration or is slow-moving based upon recent sales activity by unit and wholesaler inventory information. The Company also analyzes its raw material and component inventory for slow-moving items and NRV. For the years ended December 31, 2019, 2018 and 2017, the Company recorded a provision for inventory obsolescence and NRV of $28.6 million, $27.3 million, and $21.4 million, respectively. The allowances for inventory obsolescence were $48.6 million and $46.5 million as of December 31, 2019 and 2018, respectively.

The Company capitalizes inventory costs associated with its products prior to regulatory approval when, based on management judgment, future commercialization is considered probable and future economic benefit is expected to be realized. The Company assesses the regulatory approval process and where the product stands in relation to that approval process including any known constraints or impediments to approval. The Company also considers the shelf life of the product in relation to the product timeline for approval.

As of December 31, 2019, the Company had a reserve of $3.1 million related to R&D raw materials that are not expected to be utilized prior to expiration while at the prior year end, the Company had approximately $4.0 million in reserves for R&D raw materials.

***Property, Plant and Equipment:*** Property, plant and equipment is stated at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method in amounts considered sufficient to amortize the cost of the assets to operations over their estimated useful lives. Depreciation expense was $30.5 million, $29.3 million and $23.7 million for the years ended December 31, 2019, 2018 and 2017, respectively.

The following table sets forth the average estimated useful lives at acquisition of the Company's property, plant and equipment, by asset category:

| Asset category | Depreciable Life (years) |
|---|---|
| Buildings | 30 - 50 |
| Building and leasehold improvements | 10 - 20 |
| Furniture and equipment | 7 - 20 |
| Automobiles | 5 - 7 |
| Computer hardware and software | 3 - 5 |

*Intangible Assets:* Intangible assets consist primarily of goodwill, which is carried at its initial value, subject to impairment testing, In-Process Research and Development ("IPR&D"), which is accounted for as an indefinite-lived intangible asset, subject to impairment testing until completion or abandonment of the project, and product licensing rights, trademarks and other such costs, which are capitalized and amortized on a straight-line basis over their useful lives, normally ranging from one year to thirty years.  The Company regularly assesses its amortizable intangible assets for impairment based on several factors, including estimated fair value and anticipated cash flows. If the Company incurs additional costs to renew or extend the life of an intangible asset, such costs are added to the remaining unamortized cost of the asset, if any, and the sum is amortized over the extended remaining life of the asset. Goodwill is tested for impairment annually or more frequently if changes in circumstances or the occurrence of events suggest that impairment may exist. Goodwill impairment assessments are performed at the reporting unit level. The goodwill assessment involves a one-step comparison of the reporting unit's fair value to its carrying value, including goodwill ("Step 1"). If the reporting unit's fair value exceeds its carrying value, no further procedures are required. However, if the reporting unit's fair value is less than the carrying value, an impairment charge is recorded for the difference between the fair value and carrying value of the reporting unit. The Company uses widely accepted valuation techniques to determine the fair value of its reporting units used in its annual goodwill impairment analysis. The Company's valuation is primarily based on qualitative and quantitative assessments regarding the fair value of the reporting unit relative to its carrying value. The Company models the fair value of the reporting unit based on projected earnings and cash flows of the reporting unit. Where available and as appropriate, comparative market multiples are used in conjunction with the results of the discounted cash flows. The Company engages third-party valuation consultants to assist in evaluating the Company's estimated fair value calculations. Impairments are recorded within the impairment of intangible assets line in the consolidated statements of comprehensive (loss).

*Leases:* The Company leases real and personal property in the normal course of business under various operating leases and other insignificant finance leases, including non-cancelable and month-to-month agreements. Our leases have initial lease terms of one to ten years, some of which include options to extend and/or terminate the lease. When deemed reasonably certain of exercise, the renewal options are included in the determination of the lease term and lease payment obligation. The Company's lease agreements do not contain any material variable lease payments, material residual value guarantees or any material restrictive covenants. Certain leases have free rent periods or escalating rent payment provisions. Leases with an initial term of twelve months or less ("Short-term leases") are not recorded on the Consolidated Balance Sheet. We recognize rent expense on a straight-line basis over the lease term. Right-of-use ("ROU") assets, net represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date of the lease based on the present value of lease payments over the lease term. The Company uses the implicit rate in determining the present value of lease payments. When the lease agreement does not provide an implicit rate, the Company uses its incremental borrowing rate based on information available at the lease commencement date, including the lease term. The Company adopted ASC 842 on January 1, 2019, using the modified retrospective method and did not restate comparative periods. See Note 9 – "*Leasing Arrangements*" for more information.

*Earnings per Share:* Basic net (loss) per share is based upon weighted average common shares outstanding. Diluted net (loss) per share is based upon the weighted average number of common shares outstanding, including the dilutive effect, if any, of stock options and restricted stock using the treasury stock method. Anti-dilutive shares excluded from the computation of diluted net (loss) per share for 2019, 2018 and 2017 include 7.0 million, 5.0 million and 3.6 million shares, respectively, related to options and other awards.

*Income Taxes:* Income taxes are accounted for under the asset and liability method.  Deferred income tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities, and net

operating loss and other tax credit carry-forwards. These items are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company records a valuation allowance to reduce the deferred income tax assets to the amount that is more likely than not to be realized. See Note 11 – "*Income Taxes*" for more information.

*Fair Value of Financial Instruments*: The Company applies *ASC 820 - Fair Value Measurement*, which establishes a framework for measuring fair value and clarifies the definition of fair value within that framework. *ASC 820 - Fair Value Measurement* defines fair value as an exit price, which is the price that would be received for an asset or paid to transfer a liability in the Company's principal or most advantageous market in an orderly transaction between market participants on the measurement date. The fair value hierarchy established in *ASC 820 - Fair Value Measurement* generally requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. Observable inputs reflect the assumptions that market participants would use in pricing the asset or liability and are developed based on market data obtained from sources independent of the reporting entity. Unobservable inputs reflect the entity's own assumptions based on market data and the entity's judgments about the assumptions that market participants would use in pricing the asset or liability, and are to be developed based on the best information available in the circumstances.

The valuation hierarchy is composed of three levels. The classification within the valuation hierarchy is based on the lowest level of input that is significant to the fair value measurement. The levels within the valuation hierarchy are described below:

- *Level 1*—Assets and liabilities with unadjusted, quoted prices listed on active market exchanges. Inputs to the fair value measurement are observable inputs, such as quoted prices in active markets for identical assets or liabilities. The carrying value of the Company's cash and cash equivalents are considered Level 1 assets.

- *Level 2*—Inputs to the fair value measurement are determined using prices for recently traded assets and liabilities with similar underlying terms, as well as directly or indirectly observable inputs, such as interest rates and yield curves that are observable at commonly quoted intervals. The Company has no Level 2 assets or liabilities in any of the periods presented.

- *Level 3*—Inputs to the fair value measurement are unobservable inputs, such as estimates, assumptions, and valuation techniques when little or no market data exists for the assets or liabilities.

The following table summarizes the basis used to measure the fair values of the Company's financial instruments (in thousands):

| Description | | December 31, 2019 | | Fair Value Measurements at Reporting Date, Using: | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Quoted Prices in Active Markets for Identical Items (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
| Cash and cash equivalents | $ | 144,804 | $ | | 144,804 | $ | — | $ | — |

| Description | | December 31, 2018 | | Quoted Prices in Active Markets for Identical Items (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ | 224,868 | $ | | 224,868 | $ | — | $ | — |

*Stock-Based Compensation*: Stock-based compensation cost is estimated at grant date based on the fair value of the award, and the cost is recognized as expense ratably over the vesting period. The Company uses the Black-Scholes model for estimating the grant date fair value of stock options. Determining the assumptions to be used in the model is highly subjective and requires judgment. The Company uses an expected volatility that is based on the historical volatility of its common stock. The expected life assumption is based on historical employee exercise patterns and employee post-vesting termination behavior. The risk-free interest rate for the expected term of the option is based on the average market rate on U.S. Treasury securities of similar term in effect during the quarter in which the options were granted. The dividend yield reflects the Company's historical experience as well as future expectations over the expected term of the option. The Company estimates

forfeitures at the time of grant and revises the estimate in subsequent periods, as necessary, if actual forfeitures differ from initial estimates.

The stock-based compensation expense related to performance share units ("PSUs") is estimated at grant date based on the fair value of the award. For PSUs granted with vesting subject to market conditions, the fair value of the award is determined at grant date using the Monte Carlo model, and expense is recognized ratably over the requisite service period regardless of whether or not the market condition is satisfied. For PSUs granted with vesting subject to performance conditions, the fair value of the award is based on the market price of the underlying shares on grant date. Expense from such awards is recognized ratably over the vesting period, but is based upon an ongoing evaluation of the number of shares expected to vest and will be adjusted to reflect those awards that do ultimately vest.

The stock-based compensation expense related to restricted stock unit awards ("RSUs") is based on the fair value of the underlying shares on date of grant. Expense is recognized ratably over the vesting period, reduced by an estimate of future forfeitures.

**Note 3 — Accounts Receivable, Sales and Allowances**

The nature of the Company's business inherently involves, in the ordinary course, significant amounts and substantial volumes of transactions and estimates relating to allowances for product returns, chargebacks, rebates, doubtful accounts and discounts given to customers. This is typical of the pharmaceutical industry and is not necessarily specific to the Company. Depending on the product, the end-user customer, the specific terms of national supply contracts and the particular arrangements with the Company's wholesale customers, certain rebates, chargebacks and other credits are deducted from the Company's accounts receivable. The process of claiming these deductions depends on wholesalers reporting to the Company the amount of deductions that were earned under the terms of the respective agreement with the end-user customer (which in turn depends on the specific end-user customer, each having its own pricing arrangement that entitles it to a particular deduction). This process can lead to partial payments to the Company against outstanding invoices as the wholesalers take the claimed deductions at the time of payment.

With the exception of the provision for doubtful accounts, which is reflected as part of selling, general and administrative expense, the provisions for the following customer reserves are reflected as a reduction of revenues in the accompanying consolidated statements of comprehensive (loss). Additionally, with the exception of administrative fees and others, which is included as a current liability, the ending reserve balances are included in trade accounts receivable, net in the Company's consolidated balance sheets.

Trade accounts receivable, net consists of the following (in thousands):

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | | **2019** | | **2018** |
| Gross accounts receivable (1) | $ | 258,173 | $ | 308,305 |
| Less reserves for: | | | | |
| Chargebacks (2) | | (40,498) | | (55,312) |
| Rebates (3) | | (42,515) | | (55,963) |
| Product returns | | (33,127) | | (35,146) |
| Discounts and allowances | | (5,816) | | (6,561) |
| Advertising and promotions | | (1,508) | | (1,574) |
| Doubtful accounts | | (536) | | (623) |
| Trade accounts receivable, net | $ | 134,173 | $ | 153,126 |

(1) The reduction in the Gross accounts receivable balance as of December 31, 2019 when compared to the December 31, 2018 balance is due to the decline in gross sales in 2019 compared to the prior year.

(2) The decrease in the reserve for chargebacks as of December 31, 2019 compared to December 31, 2018 is primarily due to volume declines and changes in product and customer mix.

(3) The decrease in the reserve for rebates as of December 31, 2019 compared to December 31, 2018 is primarily due to volume declines, lower failure to supply penalties and timing of payments and settlements.

For the years ended December 31, 2019, 2018 and 2017, the Company recorded the following adjustments to gross sales (in thousands):

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Gross sales | $ 1,674,196 | $ 1,887,862 | $ 2,351,071 |
| Less adjustments for: | | | |
| Chargebacks (1) | (678,204) | (830,038) | (953,326) |
| Rebates, administrative fees and others (2) | (241,548) | (297,802) | (476,601) |
| Product returns (3) | (30,699) | (20,162) | (26,874) |
| Discounts and allowances | (32,555) | (36,933) | (45,292) |
| Advertising, promotions, and others | (8,761) | (8,909) | (7,933) |
| Revenues, net | $ 682,429 | $ 694,018 | $ 841,045 |

(1) The decrease in chargeback expense in 2019, compared to 2018 was due to volume declines as well as changes in product and customer mix.

(2) The decrease in rebates, administrative fees and other expenses in 2019, compared to 2018 was primarily due to volume declines and lower failure to supply penalties.

(3) The dollar increase in 2019, compared to 2018 was primarily due to unfavorable outcome on disputed returns claims.

The annual activity in the Company's allowance for customer deductions accounts for the three years ended December 31, 2019, 2018 and 2017 is as follows (in thousands):

| | Chargebacks | Rebates (1) | Returns | Discounts | Doubtful Accounts | Advertising & Promotions | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Balance at December 31, 2016 | $ 80,360 | $ 97,935 | $ 43,689 | $ 12,389 | $ 960 | $ 688 | $ 236,021 |
| Provision | 953,326 | 416,125 | 26,874 | 45,292 | — | 7,933 | 1,449,550 |
| Charges processed | (959,702) | (402,115) | (28,876) | (49,902) | (280) | (7,320) | (1,448,195) |
| Balance at December 31, 2017 | $ 73,984 | $ 111,945 | $ 41,687 | $ 7,779 | $ 680 | $ 1,301 | $ 237,376 |
| Provision | 830,038 | 257,417 | 20,162 | 36,933 | — | 8,909 | 1,153,459 |
| Charges processed | (848,710) | (313,399) | (26,703) | (38,151) | (57) | (8,636) | (1,235,656) |
| Balance at December 31, 2018 | $ 55,312 | $ 55,963 | $ 35,146 | $ 6,561 | $ 623 | $ 1,574 | $ 155,179 |
| Provision | 678,204 | 218,635 | 30,699 | 32,555 | — | 8,761 | 968,854 |
| Charges processed | (693,018) | (232,083) | (32,718) | (33,300) | (87) | (8,827) | (1,000,033) |
| Balance at December 31, 2019 | $ 40,498 | $ 42,515 | $ 33,127 | $ 5,816 | $ 536 | $ 1,508 | $ 124,000 |

(1) As provisions for rebates, administrative fees and others represent both contra-receivables and current liabilities, depending on the method of settlement, the cumulative provision relating to rebates, administrative fees and others is bifurcated as applicable based on the associated consolidated balance sheet classification. Accordingly, for the years ended December 31, 2019, 2018 and 2017, an additional $22.9 million, $40.4 million and $60.5 million, respectively, of provision was associated with administrative fees and others.

Provisions and utilizations of provisions activity in the current period which relate to prior period revenues are not provided because to do so would be impracticable. Our current systems and processes do not capture the chargeback and rebate settlements by the period in which the original sales transaction was recorded. Chargeback and rebate claims are not submitted by customers with sufficient details to link the accrual recorded at the point of sale with the settlement of the accrual. As a result, the Company is unable to reasonably determine the dollar amount of the change in estimate in its gross

to net reporting reflected in its results of operations for each period presented, and, those changes could be significant; however, the Company uses a combination of factors and applications to estimate the dollar amount of reserves for chargebacks and rebates at each balance sheet date. The Company regularly monitors the chargeback reserve based on an analysis of the Company's product sales and most recent claims, wholesaler inventory, current pricing, and anticipated future pricing changes. If claims are different from the estimate due to changes from estimated rates, accrual rate adjustments are considered prospectively when determining provisions in accordance with authoritative GAAP.

**Note 4 — Inventories, Net**

The components of inventories, net of allowances, are as follows (in thousands):

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2019** | | **2018** | |
| Finished goods | $ | 85,700 | $ | 76,981 |
| Work in process | | 10,614 | | 13,870 |
| Raw materials and supplies | | 73,733 | | 82,794 |
| Inventories, net | $ | 170,047 | $ | 173,645 |

The Company maintains an allowance for excess and obsolete inventory, as well as inventory where its cost is in excess of its net realizable value.

The activity in the allowance for excess, obsolete, and net realizable value inventory account for the two years ended December 31, 2019 and 2018, was as follows (in thousands):

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | **2019** | | **2018** | |
| Balance at beginning of year | $ | 46,505 | $ | 34,402 |
| Provision | | 28,593 | | 27,341 |
| Charges processed | | (26,509) | | (15,238) |
| Balance at end of year | $ | 48,589 | $ | 46,505 |

**Note 5 — Goodwill and Other Intangible Assets**

Intangible assets consist primarily of Goodwill, which is carried at its initial value, subject to evaluation for impairment, In-Process Research and Development ("IPR&D"), which is accounted for as an indefinite-lived intangible asset, subject to impairment testing until completion or abandonment of the project, and product licensing rights, trademarks and other such costs, which are capitalized and amortized on a straight-line basis over their useful lives, normally ranging from one to thirty years. Accumulated amortization of intangible assets was $203.1 million and $217.6 million at December 31, 2019 and 2018, respectively. Amortization expense was $39.8 million, $53.5 million and $61.4 million for the years ended December 31, 2019, 2018 and 2017, respectively. The Company regularly assesses its amortizable intangible assets for impairment based on several factors, including estimated fair value and anticipated cash flows.

IPR&D intangible assets represent the value assigned to acquired R&D projects that principally represent rights to develop and sell a product that the Company has acquired which have not yet been completed or approved. These assets are subject to impairment testing until completion or abandonment of each project. Impairment testing requires the development of significant estimates and assumptions involving the determination of estimated net cash flows for each year for each project or product (including net revenue, cost of sales, selling and marketing costs and other costs which may be allocated), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, and competitive trends impacting the asset and each cash flow stream as well as other factors. The major risks and uncertainties associated with the timely and successful completion of the IPR&D projects include legal risk, market risk and regulatory risk. If applicable, upon abandonment of the IPR&D product, the assets are fully impaired.

During 2019, four product licensing rights were impaired due to a change in forecasts as a result of competition, resulting in impairment expenses of $29.3 million, compared to impairments expenses of $91.6 million on twenty-five product licensing rights in 2018, and $103.5 million on ten product licensing rights in 2017. Additionally, during 2019, one IPR&D project was

impaired, while in 2018 and 2017, eighteen and three IPR&D projects were impaired primarily due to anticipated market conditions upon launch, resulting in impairment expenses of $0.2 million, $139.5 million and $24.6 million, respectively.

If the Company incurs additional costs to renew or extend the life of an intangible asset, such costs are added to the remaining unamortized cost of the asset, if any, and the sum is amortized over the extended remaining life of the asset.

As of December 31, 2019 and 2018, the Prescription Pharmaceuticals reporting unit had $251.2 million and $267.2 million of goodwill, respectively and the Consumer Health reporting unit had $16.7 million of goodwill. Goodwill is tested for impairment annually or more frequently if changes in circumstances or the occurrence of events suggest that impairment may exist. In its annual goodwill impairment analysis, the Company uses widely accepted valuation techniques to determine the fair value of its reporting units. The Company's valuation is primarily based on qualitative and quantitative assessments regarding the fair value of the reporting unit relative to its carrying value. The Company also models the fair value of the reporting unit based on projected earnings and cash flows of the reporting unit. Where available and as appropriate, comparative market multiples are used in conjunction with the results of the discounted cash flows. The Company engages third-party valuation consultants to assist in evaluating the Company's estimated fair value calculations. The carrying value of each reporting unit is based on the assets and liabilities associated with the operations of the reporting unit, including allocation of shared or corporate balances among reporting units. Allocations are generally based on sales and gross profit of each reporting unit as a percent of the total company results. During the first quarter of 2019, as a result of the Company's decision to explore strategic alternatives to exit the India manufacturing facility, the Company performed impairment testing and recorded a full goodwill impairment of $16.0 million of its India reporting unit. The Company performed its annual impairment test on October 1, 2019 and assessed qualitative factors, and substantiated with certain quantitative measures, to determine whether it was more-likely- than-not that the fair values of the reporting units were less than their carrying values ("Step 0"). The Company determined it was "more-likely-than-not" that the carrying values of its Prescription Pharmaceutical and Consumer Health reporting units were less than their fair values and, accordingly, the Company did not perform a quantitative analysis.

As a result of a significant deterioration in the price of common stock following the Company's announcement of its exploration of strategic alternatives that included seeking to restructure its indebtedness and/or implement a strategic transaction, including a sale of its assets, with or without the protections of a filing under Chapter 11 of the U.S. Bankruptcy code, the Company performed an additional quantitative impairment test as of December 31, 2019. Due to the uncertainty of the outcome of these scenarios, the Company performed a probability-based approach when determining the weighted average fair value of the reporting units to incorporate into the Company's estimate of all currently known potential outcomes and determined that the fair value of the Prescription Pharmaceutical reporting unit exceeded the carrying value by approximately 7.9% and the Consumer Health reporting unit fair value exceeded the carrying value by approximately 25.5% and, therefore, no goodwill impairment charge was necessary. As of December 31, 2019, the Company's estimated fair value, as determined by the sum of our reporting units' fair value, reconciled within a reasonable range of our market capitalization, which included an assumed control premium of approximately 20.9%. Given the continued downward trend in our share price in recent reporting periods, it is reasonably possible that changes in judgments, assumptions and estimates we made in assessing the fair value of goodwill could cause us to consider some portion or all of the remaining $267.9 million in goodwill of the Company's reporting units to become impaired. If our assumptions regarding forecasted revenue or gross profit rates are not achieved, we may be required to record additional goodwill impairment charges in future periods relating to any of our reporting units, whether in connection with the next annual impairment testing in the fourth quarter of 2020 or prior to that, if any such change constitutes an interim triggering event. It is not possible to determine if any such future impairment charge would result or, if it does, whether such charge would be material. In addition, a continued decline in market conditions and/or changes in our market share could negatively impact the estimated future cash flows and discount rates used in the income approach to determine the fair value of our reporting units and could result in an impairment charge in the foreseeable future.

There are a number of uncertain factors or events that exist which may result in a future triggering event and require an interim impairment analysis with respect to the carrying value of goodwill for the Company-owned reporting unit prior to our annual assessment. These internal and external factors include but are not limited to the following:

- Inability to refinance our debt obligations;
- Impacts on future cash flow estimates from a potential sale process on either an out-of-court or in-court basis potentially including through the filing of Chapter 11 under the U.S. Bankruptcy Code in order to effectuate a sale process;
- Future market earnings multiples deterioration;
- Our financial performance falls short of our projections due to internal operating factors;
- Increased competition;
- Deterioration of industry trends;
- Economic recession; and

- Other factors causing our cash flow to deteriorate.

If the triggering event analysis indicates the fair value of one of the Company's reporting units has potentially deteriorated further, we may be required to perform an updated impairment assessment which may result in a non-cash impairment charge to reduce the carrying value of goodwill. Assessing goodwill for impairment requires management to make assumptions and to apply judgment, including forecasting future sales and expenses, and selecting appropriate discount rates, which can be affected by economic conditions and other factors that can be difficult to predict. Given the continued substantial decline in the Company's share price and the fact that the aforementioned uncertainties may not be resolved satisfactorily in the near-term, there can be no assurance that our estimates and assumptions used in the evaluation of goodwill and identified intangible assets for impairment, as of December 31, 2019, will prove to be accurate predictions of the future.

Changes in goodwill during the two years ended December 31, 2019 and 2018, were as follows (in thousands):

|  | Goodwill |
|---|---|
| December 31, 2017 | $ 285,310 |
| Foreign currency translation | (1,431) |
| December 31, 2018 | $ 283,879 |
| Impairments | (15,955) |
| Foreign currency translation | (1) |
| December 31, 2019 | $ 267,923 |

The following table sets forth the major categories of the Company's intangible assets and the weighted-average remaining amortization period as of December 31, 2019, for those assets that are not already fully amortized (in thousands):

|  | Gross Carrying Amount (2) | Accumulated Amortization | Reclassifications | Impairment (1) | Net Carrying Amount | Weighted Average Remaining Amortization Period (years) |
|---|---|---|---|---|---|---|
| Product licensing rights | $ 472,041 | $ (187,306) | $ — | $ (83,550) | $ 201,185 | 9.5 |
| IPR&D | 4,400 | — | — | (200) | 4,200 | N/A - Indefinite lived |
| Trademarks | 16,000 | (7,231) | — | — | 8,769 | 17.2 |
| Customer relationships | 4,225 | (2,578) | — | — | 1,647 | 6.3 |
| Other intangibles | 6,000 | (6,000) | — | — | — | — |
|  | $ 502,666 | $ (203,115) | $ — | $ (83,750) | $ 215,801 |  |

(1) Impairment of product licensing rights and IPR&D is stated at gross carrying cost of $83.6 million and $0.2 million less accumulated amortization of $54.3 million for product licensing rights as of the impairment dates. IPR&D is not subject to amortization. Accordingly, the total net impairment expense was $29.5 million, of which $29.3 million and $0.2 million, were recognized in product licensing rights and IPR&D respectively, for the year ended December 31, 2019.

(2) Differences in the Gross Amounts between periods are due to the additions during the year.

Changes in intangible assets during the two years ended December 31, 2019 and 2018, were as follows (in thousands):

| | Product licensing rights | | IPR&D | | Trademarks | | Customer relationships | | Other intangibles |
|---|---|---|---|---|---|---|---|---|---|
| December 31, 2017 | $ | 402,340 | $ | 149,161 | $ | 10,624 | $ | 2,167 | $ | 5,192 |
| Acquisitions | | 50 | | — | | — | | — | | — |
| Amortization | | (50,567) | | — | | (928) | | (260) | | (1,717) |
| Impairments | | (88,492) | | (139,461) | | — | | — | | (3,133) |
| Reclassifications | | 5,300 | | (5,300) | | — | | — | | — |
| December 31, 2018 | $ | 268,631 | $ | 4,400 | $ | 9,696 | $ | 1,907 | $ | 342 |
| Acquisitions | | 87 | | — | | — | | — | | — |
| Amortization | | (38,236) | | — | | (927) | | (260) | | (342) |
| Impairments | | (29,297) | | (200) | | — | | — | | |
| December 31, 2019 | $ | 201,185 | $ | 4,200 | $ | 8,769 | $ | 1,647 | $ | — |

The amortization expense of acquired intangible assets for each of the following periods are expected to be as follows (in thousands):

| Year ending December 31, | Amortization Expense |
|---|---|
| 2020 | $ 24,568 |
| 2021 | 24,568 |
| 2022 | 24,568 |
| 2023 | 24,137 |
| 2024 | 22,149 |
| 2025 and thereafter | 91,611 |
| Total | $ 211,601 |

**Note 6 — Property, Plant and Equipment, Net**

Property, plant and equipment, net consist of the following (in thousands):

| | December 31, | |
|---|---|---|
| | **2019** | **2018** |
| Land | $ 17,701 | $ 17,608 |
| Buildings and leasehold improvements | 136,044 | 138,126 |
| Furniture and equipment | 258,933 | 240,080 |
| | 412,678 | 395,814 |
| Accumulated depreciation | (177,312) | (158,824) |
| | 235,366 | 236,990 |
| Construction in progress | 60,167 | 97,863 |
| Property, plant and equipment, net | $ 295,533 | $ 334,853 |

At December 31, 2019 and 2018, property, plant and equipment, net of $72.5 million and $91.9 million, respectively, was located outside the United States.

At December 31, 2019, the Company had $60.2 million of assets under construction which consisted primarily of manufacturing facility expansion and improvement projects. Depreciation will begin on these assets once they are placed into service. The Company assesses its long-lived assets, consisting primarily of property and equipment, for impairment when material events and changes in circumstances indicate that the carrying value may not be recoverable. For the year ended December 31, 2019, the Company recorded impairment losses of $38.7 million compared to $6.1 million for the year ended December 31, 2018. Of the $38.7 million impairment, $37.7 million is a result of the Company's decision to explore strategic alternatives to exit the India manufacturing facility. The remaining net book value of the India manufacturing facility is $25.7 million, of which $20.9 million is related to property, plant and equipment, net. During 2019, the Company capitalized interest into PP&E in the amount of $3.5 million compared to $6.3 million in 2018.

Depreciation expense was $30.5 million, $29.3 million and $23.7 million for the years ended December 31, 2019, 2018 and 2017, respectively.

## Note 7 — Financing Arrangements

### Term Loans

During 2014, in order to finance its acquisitions of Hi-Tech Pharmacal Co Inc. and VersaPharm Inc., Akorn, Inc., together with certain of its subsidiaries (Akorn, Inc., together with such subsidiaries, the "Akorn Loan Parties"), entered into two term loan agreements (the "Term Loan Agreements" and the loans outstanding thereunder, the "Term Loans") with certain lenders (the "Lenders") and with JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent (the "Term Loan Administrative Agent"). The aggregate principal amount of the Term Loans was $1,045.0 million. As of December 31, 2019, outstanding debt under the Term Loan Agreements was $852.0 million. As of December 31, 2019, the Term Loan has a market price of $956 per $1,000 of principal amount.

The Company believes it was in compliance with all applicable covenants in the Term Loan Agreements, which included customary limitations on indebtedness, distributions, liens, acquisitions, investments, and other activities, as of December 31, 2019. As of December 31, 2019, the Term Loans were scheduled to mature on April 16, 2021.

On May 6, 2019, Akorn, Inc. (the "Company") with an ad hoc group of Lenders (the "Ad Hoc Group") and certain other Lenders (together with the Ad Hoc Group, the "Standstill Lenders") entered into a Standstill Agreement and First Amendment (the "Original Standstill Agreement") to the Company's Loan Agreement, dated as of April 17, 2014, (as amended, supplemented or otherwise modified, the "Term Loan Agreement") among the Company and certain of its subsidiaries (collectively, the "Loan Parties"), the lenders thereunder (the "Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"). Pursuant to the terms of the Original Standstill Agreement, the Company was required to enter into a comprehensive amendment to the Term Loan Agreement (the "Comprehensive Amendment"). If the Company did not enter into a Comprehensive Amendment by December 13, 2019 or refinance or otherwise address the outstanding loans, an event of default would occur under the Term Loan Agreement.

On December 15, 2019, the Loan Parties entered into a First Amendment to Standstill Agreement and Second Amendment to Credit Agreement (the "First Amended Standstill Agreement") with certain Standstill Lenders. Pursuant to the terms of the First Amended Standstill Agreement, the maximum duration of the "Standstill Period" was extended from December 13, 2019 to February 7, 2020 (the "Extended Standstill Period").

The First Amended Standstill Agreement provides that, for the duration of the Extended Standstill Period, among other matters, neither the Administrative Agent nor the Lenders may (i) declare any Event of Default or (ii) otherwise seek to exercise any rights or remedies, in each case of clauses (i) and (ii) above, to the extent directly relating to any alleged Event of Default arising from any alleged breach of certain covenants contained in the Term Loan Agreement, to the extent the facts and circumstances giving rise to any such breach have been (x) publicly disclosed by the Company or (y) disclosed in writing by the Company to private side Lenders or certain advisors to the Ad Hoc Group (collectively, the "Specified Matters").

In exchange for the agreement of the Standstill Lenders to standstill during the Extended Standstill Period, the First Amended Standstill Agreement provides, among other matters, that:

- during the Extended Standstill Period:

  ◦ the Company must deliver certain financial and other information to the Lenders or their advisors, including without limitation, monthly financial statements with agreed upon adjustment, monthly operational statistics

broken down by facility, pipeline reporting, 13-week cash flow forecasts, weekly variance reports, certain valuation reports, weekly status updates with respect to certain capital raising and certain regulatory information, and participate in various update calls with the Lenders and their advisors (the "Affirmative Covenants and Milestones");

◦ the Company and its subsidiaries are restricted, among other matters, from (i) consummating certain asset sales and investments, (ii) making certain restricted payments, (iii) engaging in sale and leaseback transactions, (iv) incurring certain liens and indebtedness, (v) reinvesting any proceeds received from certain asset sales, and (vi) without the consent of the Required Lenders at such time, (A) designating any Restricted Subsidiary as an Unrestricted Subsidiary, or otherwise creating or forming any Unrestricted Subsidiary, (B) transferring any assets of the Company or any of its Restricted Subsidiaries to any Unrestricted Subsidiary, except as otherwise permitted under the Term Loan Agreement (after giving effect to the First Amended Standstill Agreement), and/or (C) releasing any existing Loan Guarantors or security interest granted under the Term Loan Agreement outside of the ordinary course of business (collectively, the "Negative Covenants");

◦ the Company must pay a fee in an amount equal to 1.5% of the outstanding principal of any Loans prepaid or repaid during the Extended Standstill Period (other than as a result of any asset sale, condemnation event, incurrence of non-permitted indebtedness or excess cash flow);

◦ the Company and the Standstill Lenders will negotiate in good faith, and the Company will make a proposal with respect to the Comprehensive Amendment by January 10, 2020, reach an agreement in principle with respect to the Comprehensive Amendment by February 5, 2020, and enter into the Comprehensive Amendment by February 7, 2020;

◦ on the Second Amendment Effective Date, the Company must pay a one-time fee in an amount equal to 1.5% of the aggregate principal amount of the Loans of the Standstill Lenders (which fee must be paid in cash); and

◦ on the Second Amendment Effective Date, the interest margin payable by the Company with respect to outstanding Loans shall be increased by 3% (i.e., to LIBOR plus 1000 basis points), with LIBOR plus 9.25% payable in cash and 0.75% payable in kind, with interest payable monthly.

Subject to a five business day cure period (the "Cure Period"), the Company's failure to comply with the Affirmative Covenants and Milestones (other than certain enumerated Milestones related to the Comprehensive Amendment and perfection of the Lenders' security interests (the "Excluded Milestones")) during the Standstill Period would permit the Required Lenders to terminate the Standstill Period and exercise any rights and remedies under the Term Loan Agreement with respect to the Specified Matters or a Standstill Event of Default. The Company's failure to comply with the Negative Covenants and Excluded Milestones during the Standstill Period would permit the Required Lenders to terminate the Standstill Agreement and constitute an immediate Event of Default under the Term Loan Agreement. The Company's failure to comply with any Affirmative Covenants and Milestones (subject to the Cure Period), the Excluded Milestones, Negative Covenants or other covenants in the First Amended Standstill Agreement would also result in a further increase of the interest margins payable with respect to outstanding Loans by 0.50%.

In addition, the Company agreed (1) not to make any payments in respect of judgments or settlements of certain ongoing litigation matters without the prior written consent of the Required Lenders, and (2) to make payment of fees and expenses to the advisors of Ad Hoc Group, and (3) to negotiate in good faith to enter into a Comprehensive Amendment on or prior to February 7, 2020 (collectively, the "Other Covenants"). The failure to comply with any of the Other Covenants would constitute an immediate Event of Default under the Term Loan Agreement. If an Event of Default occurred, the Lenders could accelerate the obligations under the Term Loan Agreement, foreclose upon the collateral securing the debt and exercise other rights and remedies.

The execution of the First Amended Standstill Agreement should not be construed as (and does not constitute an admission as to) any right, remedy, claim, defense, liability or wrongdoing or responsibility on the part of any Standstill Party. Entry into the First Amended Standstill Agreement also should not be construed as (and does not constitute an admission as to) the occurrence of a Default or Event of Default.

On February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the

duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of a default under the loan agreement, or a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement. See to Note 21 - "*Subsequent Events*" for further details on our Term Loans and Second Amended Standstill Agreement.

As of December 31, 2019, the $852.0 million outstanding principal amount of the Term Loans includes aggregate paid-in-kind fee and non-cash interest of $16.4 million and $3.6 million, respectively that are related to the Original Standstill Agreement and First Amended Standstill Agreement.

During the year ended December 31, 2019, the Company amortized $31.5 million of the total Term Loans-related costs, and added $28.7 million of deferred financing costs related to the Original Standstill Agreement and First Amended Standstill Agreement, resulting in $8.6 million of unamortized deferred financing costs as of December 31, 2019. The Company will amortize this balance using the straight-line method over the life of the Original Standstill Agreement and First Amended Standstill Agreement. During the years ended December 31, 2018 and 2017, the Company amortized $5.0 million and $5.0 million, respectively, of Term Loans-related costs. The increase in amortization of deferred financing fees in 2019 as compared to 2018 and 2017 was primarily the result of the Original Standstill Agreement and First Amended Standstill Agreement.

The Company's effective rate for 2019 was 9.03%. During the year ended December 31, 2019, the Company's spread was based upon the Ratings Level as documented below:

(a) prior to the First Amendment Effective Date, with respect to any Eurodollar Loan or any ABR Loan, as the case may be, the applicable rate per annum set forth below under the caption "Eurodollar Spread" or "ABR Spread", as the case may be, based upon the Ratings Level applicable on such date:

| Ratings Level | Index Ratings (Moody's/S&P) | Adjusted LIBOR (Eurodollar) Spread | Adjusted Base Rate (ABR) Spread |
|---|---|---|---|
| Level I | B1/B+ or higher | 4.25% | 3.25% |
| Level II | B2/B | 4.75% | 3.75% |
| Level III | B3/B- or lower | 5.50% | 4.50% |

(b) commencing on (and including) the First Amendment Effective Date and ending on (but excluding) the Second Amendment Effective Date , with respect to any Eurodollar Loan or any ABR Loan, as the case may be, the applicable rate per annum set forth below under the caption "Eurodollar Spread" or "ABR Spread", as the case may be, based upon the Ratings Level applicable on such date; provided that 0.75% (i.e., 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date):

| Ratings Level | Index Ratings (Moody's/S&P) | Adjusted LIBOR (Eurodollar) Spread | Adjusted Base Rate (ABR) Spread |
|---|---|---|---|
| Level I | B1/B+ or higher | 5.75% | 4.75% |
| Level II | B2/B | 6.25% | 5.25% |
| Level III | B3/B- or lower | 7.00% | 6.00% |

(c) commencing on (and including) the Second Amendment Effective Date and ending on (but excluding) the date of a Standstill Event of Default (i) 9.00% per annum for any ABR Loan, and (ii) 10.00% per annum for any Eurodollar Loan irrespective of Ratings Level on such date; provided that 0.75% (i.e., 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date).

For the years ended December 31, 2019, 2018 and 2017, the Company recorded interest expense of $76.0 million, $56.9 million and $45.5 million, respectively in relation to the Term Loans. The increase in interest expense is related to higher interest rates, in part due to the Original Standstill Agreement and First Amended Standstill Agreement, during 2019, compared to 2018 and 2017.

*JPMorgan Credit Facility*

On April 17, 2014, the Akorn Loan Parties entered into a Credit Agreement (the "JPM Credit Agreement") with JPMorgan, as administrative agent, Bank of America, N.A., as syndication agent, and the lenders party thereto (at closing, JPMorgan, Bank of America, N.A. and Wells Fargo Bank, N. A.) for a $150.0 million revolving credit facility (the "JPM Revolving Facility").

On April 16, 2019, the Akorn Loan Parties, entered into an Amended and Restated Credit Agreement (the "A&R Credit Agreement") governing the JPM Revolving Facility with the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent. The A&R Credit Agreement provided for a revolving line of credit of up to $150.0 million on an uncommitted basis, and amended the JPM Credit Agreement in certain other respects, including, among other things;

- extended the maturity date by 90 days to July 16, 2019; and
- decreased the undrawn fee from 0.25% to 0.05%.

The JPM Revolving Facility, as amended by the A&R Credit Agreement, was fully uncommitted and discretionary with each lender under the A&R Credit Agreement permitted to make revolving loans or issue letters of credit in its sole discretion. The A&R Credit Agreement expired on July 16, 2019, with no amounts outstanding as of such date.

***Debt Maturities Schedule***

Aggregate cumulative maturities of debt obligations as of December 31, 2019 are:

| *(In thousands)* | | **2021 (1)** |
|---|---|---|
| Maturities of debt | $ | 851,957 |

(1) Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of a default under the loan agreement, or a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement.

**Note 8 — Earnings per Share**

Basic net (loss) per common share is based upon the weighted average number of common shares outstanding during the period. Diluted net (loss) per common share is based upon the weighted average number of common shares outstanding, including the dilutive effect, if any, of potentially dilutive securities using the treasury stock method.

The Company's potentially dilutive shares consist of: (i) vested and unvested stock options that are in-the-money and (ii) unvested RSUs and PSUs.

A reconciliation of the (loss) per share data from a basic to a fully diluted basis is detailed below (amounts in thousands, except per share data):

| | | **2019** | | **2018** | | **2017** |
|---|---|---|---|---|---|---|
| Net (Loss) | $ | (226,770) | $ | (401,909) | $ | (24,550) |
| Net (Loss) per Common Share: | | | | | | |
| Net (Loss) Basic and Diluted | $ | (1.80) | $ | (3.21) | $ | (0.20) |
| Shares used in computing net (loss) per common share: | | | | | | |
| Weighted average basic and diluted shares outstanding | | 125,977 | | 125,383 | | 124,790 |
| Shares subject to stock options omitted from the calculation of (loss) per common share as their effect would have been antidilutive | | 4,736 | | 3,686 | | 3,035 |
| Shares subject to unvested RSUs and PSUs omitted from the calculation of (loss) per common share as their effect would have been anti-dilutive | | 2,305 | | 1,296 | | 527 |

**Note 9 — Leasing Arrangements**

The Company leases real and personal property in the normal course of business under various operating leases and other insignificant finance leases, including non-cancelable and immaterial month-to-month agreements. Rent expense is recognized on a straight-line basis over the lease term. Rental expense under these leases was $6.5 million, $6.5 million and $5.9 million for the years ended December 31, 2019, 2018 and 2017, respectively.

The following table sets forth the Company's lease cost components (in thousands):

|  | Year Ended December 31, 2019 |
|---|---|
| Operating lease cost | $ 4,816 |
| Amortization of finance lease assets | 60 |
| Interest on finance lease liabilities | 10 |
| Short-term lease cost | 91 |
| Variable lease cost | 1,605 |
| Sublease income | (43) |
| Total lease cost (1) | $ 6,539 |

    (1) Of the total lease cost of $6.5 million during the year ended December 31, 2019, $3.5 million was included within selling, general and administrative expenses, $1.5 million was including within cost of sales, and $1.5 million was included in research and development expenses in the consolidated statement of comprehensive (loss).

The following table sets forth the Company's supplemental cash flow information related to leases (in thousands):

|  | Year Ended December 31, 2019 |
|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: |  |
| Operating cash flows from operating leases | $ 4,701 |
| Operating cash flows from finance leases | 9 |
| Financing cash flows from finance leases | 352 |
|  |  |
| Right-of-use assets, net obtained in exchange for new lease obligations: |  |
| Operating leases | 24,764 |
| Finance leases | $ 71 |

The following table sets forth the Company's supplemental balance sheet information related to leases (in thousands):

| | December 31, 2019 |
|---|---|
| Right-of-use assets, net: | |
| Operating leases, gross | $ 24,564 |
| Accumulated reduction | (2,119) |
| Operating leases, net | $ 22,445 |
| Finance leases (included in "Other non-current assets"), gross | 72 |
| Accumulated depreciation | (21) |
| Finance leases (included in "Other non-current assets"), net | $ 51 |
| Total Right-of-use assets, net | $ 22,496 |
| | |
| Lease liabilities: | |
| Current portion of Operating lease liability | $ 2,290 |
| Long-term Operating lease liability | 22,021 |
| Total Operating lease liability | $ 24,311 |
| Current portion of Finance lease (included in "Accrued expenses and other liabilities") liability | $ 20 |
| Long-term Finance lease (included in "Pension obligations and other liabilities") liability | 34 |
| Total Finance lease liability | $ 54 |
| Total Lease liabilities | $ 24,365 |

The following table sets forth the Company's Weighted-average lease terms and discount rates (lease term in years):

| | December 31, 2019 |
|---|---|
| Weighted-average remaining lease terms: | |
| Operating leases | 8.4 years |
| Finance leases | 2.6 years |
| | |
| Weighted-average discount rates: | |
| Operating leases | 10.0% |
| Finance leases | 5.5% |

The following table sets forth the Company's scheduled maturities of lease liabilities as of December 31, 2019 (in thousands):

| Year ending December 31, | Operating leases | Finance leases |
|---|---|---|
| 2020 | $ 4,596 | $ 23 |
| 2021 | 4,775 | 22 |
| 2022 | 4,520 | 13 |
| 2023 | 3,862 | — |
| 2024 | 3,557 | — |
| 2025 and beyond | 15,345 | — |
| Total lease payments (1) | $ 36,655 | $ 58 |
| Less: Imputed interest | $ 12,344 | $ 4 |
| Total lease liabilities | $ 24,311 | $ 54 |

(1) Under ASC 842, the Company is required to take into consideration contractual lease renewal options that are reasonably assured to be exercised when determining the lease liability.  As of December 31, 2019, the Company has approximately $11.4 million of reasonably assured renewal option payments included in the total lease payments.

The following table sets forth the Company's schedule of future minimum rental payments for operating leases under ASC 840 as of December 31, 2018 (in thousands):

| Year ending December 31, | | |
|---|---|---|
| 2019 | $ | 4,564 |
| 2020 | | 4,647 |
| 2021 | | 4,283 |
| 2022 | | 3,724 |
| 2023 | | 2,673 |
| 2024 and thereafter | | 6,976 |
| Total | $ | 26,867 |

**Note 10 — Equity Compensation Plans**

***Stock Option Plan***

The Company maintains equity compensation plans that allow the Company's Board of Directors to grant stock options and other equity awards to eligible employees, officers, directors and consultants.  On April 27, 2017, the Company's shareholders voted to approve the Akorn, Inc. 2017 Omnibus Incentive Compensation Plan (the "Omnibus Plan"), setting aside 8.0 million shares of the Company's common stock for issuance pursuant to equity awards. Subsequently, at the 2019 Annual Meeting of Shareholders on May 1, 2019, the Company's shareholders approved a 4.4 million increase to the shares available for awards granted under the Omnibus Plan, raising the overall total to 12.4 million shares. The Omnibus Plan replaced the Akorn, Inc. 2014 Stock Option Plan (the "2014 Plan"), which was approved at the Company's 2014 Annual Meeting of Shareholders on May 2, 2014 and subsequently amended by proxy vote of the Company's shareholders on December 16, 2016. The 2014 Plan had reserved 7.5 million shares for issuance upon the grant of stock options, restricted stock units ("RSUs"), performance share unit awards ("PSUs") or various other instruments to employees, officers, directors and consultants.  Following shareholder approval of the Omnibus Plan, no new awards could be granted under the 2014 Plan, although previously granted awards remain outstanding pursuant to their original terms.

As of December 31, 2019, there were approximately 2.1 million stock options and thirty-three thousand two hundred RSU shares outstanding under the 2014 Plan.

Under the Omnibus Plan, there were approximately 4.5 million RSU shares, 1.0 million PSU shares and 2.7 million stock option award shares outstanding as of December 31, 2019. As of December 31, 2019, approximately 3.3 million shares remained available for future award grants under the Omnibus Plan.

Also granted in, and outstanding as of the year ended December 31, 2019, were inducement awards consisting of 0.5 million RSU shares, 0.3 million PSU shares and 0.4 million stock option award shares.

The Company accounts for stock-based compensation in accordance with *ASC Topic 718 - Compensation — Stock Compensation*. Accordingly, stock-based compensation cost for stock options and RSUs is estimated at the grant date based on the fair value of the award, and the cost is recognized as expense ratably over the vesting period. The Company uses the Black-Scholes model for estimating the grant date fair value of stock options. Determining the assumptions that enter into the model is highly subjective and requires judgment. The Company uses an expected volatility that is based on the historical volatility of its stock. The expected life assumption is based on historical employee exercise patterns and employee post-vesting termination behavior. The risk-free interest rate for the expected term of the option is based on the market rates on U.S. Treasury securities in effect during the quarter in which the options were granted. The dividend yield reflects historical experience as well as future expectations over the expected term of the option. The Company estimates forfeitures at the time of grant and revises in subsequent periods, as necessary, if actual forfeitures differ from those estimates.

All RSUs are valued at the closing market price of the Company's common stock on the day of grant and the total value of the units is recognized as expense ratably over the vesting period of the grant. PSU awards granted with vesting subject to market conditions are valued at date of grant through a Monte Carlo simulation model. The calculated grant-date fair value is recognized ratably over the vesting period, subject to forfeiture estimates. PSU awards granted with vesting subject to, and determined based on achievement of, performance conditions are valued at date of grant based on the closing price of the Company's stock and anticipated vesting level at grant date. The awards are re-evaluated quarterly to determine the vesting level that is more likely than not to be achieved, and cumulative expense is adjusted accordingly.

The Company recorded stock-based compensation expense of approximately $21.3 million, $21.5 million and $21.0 million during the years ended December 31, 2019, 2018 and 2017, respectively.

<u>Stock Option Awards</u>

From time to time, the Company has granted stock option awards to certain employees, executives and directors. The assumptions used in estimating the fair value of the stock options granted during the period, along with the weighted-average grant date fair values, were as follows:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Expected volatility | 56.5% | —% | 49.5% |
| Expected life (in years) | 6.3 | 0 | 4.8 |
| Risk-free interest rate | 2.3% | —% | 1.7% |
| Dividend yield | — | N/A | — |
| Weighted-average grant date fair value per stock option | $2.33 | N/A | $9.25 |
| Forfeiture rate | 8.0% | —% | 8.0% |

The table below sets forth a summary of stock option activity within the Company's stock-based compensation plans for the years ended December 31, 2019, 2018 and 2017:

| | Number of Shares (in thousands) | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value (in thousands) (1) |
|---|---|---|---|---|
| Outstanding at December 31, 2016 | 4,766 | $ 27.27 | | |
| Granted | 66 | 21.28 | | |
| Exercised | (623) | 15.53 | | |
| Forfeited or expired | (156) | 28.2 | | |
| Outstanding at December 31, 2017 | 4,053 | $ 28.95 | | |
| Granted | — | — | | |
| Exercised | (22) | 24.99 | | |
| Forfeited or expired | (613) | 31.28 | | |
| Outstanding at December 31, 2018 | 3,418 | $ 28.55 | | |
| Granted | 3,237 | 4.24 | | |
| Exercised | — | — | | |
| Forfeited or expired | (1,451) | 25.31 | | |
| Outstanding at December 31, 2019 | 5,204 | $ 14.33 | 6.8 | $ — |
| Exercisable at December 31, 2019 | 1,808 | $ 30.20 | 3.0 | $ — |

(1) Includes only those options that were in-the-money as of December 31, 2019. Stock options for which the exercise price exceeded the market price have been omitted. Fluctuations in the intrinsic value of both outstanding and exercisable options may result from changes in underlying stock price and the timing and volume of option grants, exercises and forfeitures.

The aggregate intrinsic value for stock options outstanding and exercisable is defined as the difference between the market value of the Company's common stock at the end of the period and the exercise price of stock options. No stock options were exercised during the year ended December 31, 2019. The total intrinsic value of stock options exercised during the years ended December 31, 2018 and 2017, was approximately $0.2 million and $9.8 million, respectively. As a result of the stock options exercised, the Company received cash and recorded additional paid-in-capital of approximately $0.5 million and $9.7 million during the years ended December 31, 2018 and 2017, respectively.

As of December 31, 2019, the total amount of unrecognized compensation cost related to non-vested stock options was approximately $7.2 million, which is expected to be recognized as expense over a weighted-average period of 2.9 years.

Restricted Stock Unit Awards

From time to time, the Company has granted RSUs to certain employees, executives and directors. Historically, the majority of RSU grants to employees and executives have been pursuant to the Company's long-term incentive plans (the "LTIPs"), which allow for annual grants of RSUs to all eligible employees and executives. The RSU awards vest 25% per year on each of the first four anniversaries of the grant date. During the year ended December 31, 2019, the Company granted 4.4 million RSUs to certain employees, executives and directors. Of this total, 2.4 million RSUs were granted to certain employees as a retention incentive under the Omnibus Plan, and vest in full two years after grant date. Another 1.0 million RSUs were granted as LTIP and annual Director awards under the Omnibus Plan, 0.5 million RSUs were granted to executive new hires and 0.5 million RSUs were granted as an inducement award to the Company's new President and Chief Executive Officer ("CEO").

Set forth below is a summary of unvested RSU activity for the three years ended December 31, 2019, 2018 and 2017:

| | Number of Shares (in thousands) | | Weighted Average per Share Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2016 | 416 | $ | 31.52 |
| Granted | 666 | | 33.10 |
| Vested | (137) | | 32.55 |
| Forfeited | (57) | | 31.34 |
| Unvested at December 31, 2017 | 888 | $ | 32.55 |
| Granted (1) | 1,711 | | 16.07 |
| Vested | (408) | | 30.22 |
| Forfeited (1) | (548) | | 24.00 |
| Unvested at December 31, 2018 | 1,643 | $ | 19.85 |
| Granted | 4,432 | | 4.10 |
| Vested | (631) | | 24.10 |
| Forfeited | (370) | | 14.11 |
| Unvested at December 31, 2019 | 5,074 | $ | 7.07 |

(1) RSUs granted and forfeited during 2018 include 0.4 million RSUs held by the Company's former CEO and COO that were modified to accelerate vesting. This modification was treated as forfeiture of the old awards and granting of new awards with modified vesting terms.

As of December 31, 2019, the total amount of unrecognized compensation cost related to RSU awards was approximately $24.9 million which is expected to be recognized as expense over a weighted-average period of 2.1 years.

Performance Share Unit awards

As of December 31, 2019, 1.2 million PSU award shares were granted to certain executives. Of this total, 1.0 million vest two years after grant with vesting level contingent upon meeting various performance conditions, while the remaining 0.2 million vest four years after grant with vesting level contingent on various market conditions. No PSU awards were granted by the Company prior to 2019.

Set forth below is a summary of unvested PSU activity for the year ended December 31, 2019:

| | Total Number of Units (in thousands) | Weighted Average Grant Date Fair Value per Unit | Vesting Based on Performance Conditions | Weighted Average Grant Date Fair Value per Unit | Vesting Based on Market Conditions | Weighted Average Grant Date Fair Value per Unit |
|---|---|---|---|---|---|---|
| Unvested at December 31, 2018 | — | $ — | — | $ — | — | $ — |
| Granted | 1,239 | $ 3.99 | 985 | $ 4.06 | 254 | $ 3.73 |
| Vested | — | $ 3.99 | — | $ — | — | $ — |
| Forfeited | (21) | $ 4.06 | (21) | $ 4.06 | — | $ 3.73 |
| Unvested at December 31, 2019 | 1,218 | $ 3.99 | 964 | $ 4.06 | 254 | $ 3.73 |

As of December 31, 2019, the total amount of unrecognized compensation cost related to PSU awards was approximately $2.6 million which is expected to be recognized as expense over a weighted-average period of 1.6 years.

Set forth below is a summary of the valuation inputs for PSUs granted with vesting subject to market conditions for the year ended December 31, 2019:

| Valuation Inputs for PSUs with Vesting Subject to Market Conditions: | |
|---|---|
| PSUs Issued (units in thousands) | 254 |
| Risk Free Rate | 2.6% |
| Volatility | 55.1% |
| Dividend | — |
| Valuation per Share | $ 3.73 |
| Total Fair Value (in thousands) | $ 947 |
| Expected Term | 4 years |
| Forfeiture Rate Assumed | 8.0% |

LTIP Cash awards

In May 2019, the Company awarded $9.7 million in cash-based awards to certain non-executive employees in lieu of the customary RSUs as part of its 2019 LTIP grants. The cash awards are equivalent to the value of RSUs that would have been granted under the previous program design and will vest over two years and be paid in two equal installments after each of the first two anniversaries of the grant date. During the year ended December 31, 2019, the Company recorded $2.8 million in expense, net of forfeitures.

Employee Stock Purchase Plan

The 2016 Akorn, Inc. Employee Stock Purchase Plan (the "ESPP") permits eligible employees to acquire shares of the Company's common stock through payroll deductions.  The ESPP has been structured to qualify under Section 423 of the Internal Revenue Code ("IRC").  Employees who elect to participate in the ESPP may withhold from 1% to 15% of eligible wages toward the purchase of stock.  Shares will be purchased at a 15% discount off the lesser of the market price at the beginning or the ending of the applicable offering period.  The ESPP is designed with two offering periods each year, one running from January 1st to December 31st and the other running from July 1st to December 31st.  In a given year, employees may enroll in only one offering period, not both.  Per IRC rules, annual purchases per employee are limited to $25,000 worth of stock, valued as of the beginning of the offering period.  Accordingly, with the 15% discount, employees may withhold no more than $21,250 per year toward the purchase of stock under the ESPP. Employees are further limited to purchasing no more than 15,000 shares of stock per year. A total of 2.0 million shares of the Company's stock have been set aside for issuance under the ESPP. The ESPP was approved by vote of the Company's shareholders on December 16, 2016.

The initial offering period under the ESPP began in January 2017 and ran through the end of 2017. The Company did not have an ESPP offering period starting on July 1, 2017 and did not have any offering periods in 2018 pursuant to terms of the

Merger Agreement. During the year ended December 31, 2017, participants contributed approximately $2.8 million through payroll deductions toward the purchase of shares under the ESPP. The Company recorded stock-based compensation expense of $1.1 million during the year ended December 31, 2017 related to the ESPP.

The Company initiated two offering periods during 2019, one starting on February 1, 2019 and the second starting on July 1, 2019. However, the Company suspended the ESPP during the quarter ended December 31, 2019 and refunded all accumulated contributions.

For the year ended December 31, 2019, the Company recorded approximately $1.3 million in stock-based compensation expense related to the ESPP. In accordance with ASC 718, *Compensation - Stock Compensation*, the suspension of an ESPP does not result in reversal of previously recorded stock-based compensation expense, but rather an acceleration of the remaining unrecognized expense.

A total of 2.0 million shares of stock were set aside for issuance under the ESPP. Participants in the 2017 offering period acquired a total of 0.1 million shares. As of December 31, 2019, 1.9 million shares remain available for future issuance under the ESPP.

**Note 11 — Income Taxes**

Income taxes are accounted for under the asset and liability method.  Deferred income tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities, and net operating loss and other tax credit carry-forwards.  These items are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse.  The Company records a valuation allowance to reduce the deferred income tax assets to the amount that is more likely than not to be realized.  On December 22, 2017, the Tax Cuts and Jobs Act (the "Tax Act") was enacted and included additional requirements effective for the Company in 2019. Those provisions include a tax on global intangible low-taxed income ("GILTI"), a tax determined by base erosion and anti-abuse tax benefits (BEAT) from certain payments between a U.S. corporation and foreign subsidiaries, a limitation of certain executive compensation, a deduction for foreign derived intangible income ("FDII"), and interest expense limitations.  The Company's foreign subsidiaries do not have accumulated earnings.

The income tax (benefit) provision consisted of the following (in thousands):

| | Current | | Deferred | | Total | |
|---|---|---|---|---|---|---|
| **Year ended December 31, 2019** | | | | | | |
| Federal | $ | (61,951) | $ | 195 | $ | (61,756) |
| State | | 509 | | 30 | | 539 |
| Foreign | | — | | 209 | | 209 |
| | $ | (61,442) | $ | 434 | $ | (61,008) |
| **Year ended December 31, 2018** | | | | | | |
| Federal | $ | 2,768 | $ | (40,345) | $ | (37,577) |
| State | | (1,677) | | (2,093) | | (3,770) |
| Foreign | | 32 | | 5,042 | | 5,074 |
| | $ | 1,123 | $ | (37,396) | $ | (36,273) |
| **Year ended December 31, 2017** | | | | | | |
| Federal | $ | 78,806 | $ | (105,006) | $ | (26,200) |
| State | | 1,706 | | (9,785) | | (8,079) |
| Foreign | | 89 | | (458) | | (369) |
| | $ | 80,601 | $ | (115,249) | $ | (34,648) |

The income tax provision differs from the "expected" tax expense computed by applying the U.S. Federal corporate income tax rates of 21% to loss before income taxes, as follows (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Computed "expected" tax provision | $ (60,433) | $ (92,018) | $ (20,719) |
| Change in income taxes resulting from: | | | |
| State income taxes, net of Federal income tax | (7,402) | (11,667) | (537) |
| Change in state income tax rate, net of Federal income tax | 728 | (16) | (4,714) |
| Foreign income tax (benefit) provision | (2,623) | (1,658) | 2,206 |
| Deduction for domestic production activities | — | — | (2,527) |
| Stock compensation | 4,565 | 2,480 | (1,316) |
| R&D tax credits | (1,428) | (750) | (1,200) |
| Nondeductible acquisition fees | — | (1,165) | 1,974 |
| Uncertain tax positions | (47,357) | 7,935 | 15,650 |
| Federal rate change | — | (3,027) | (26,902) |
| Lapse of statute of limitations | (16,034) | 570 | 1,561 |
| Taxes receivable true up | 2,651 | — | — |
| Deferred tax adjustment | 17,578 | — | — |
| 162(m) Officers Compensation Limitation | 340 | 1,483 | — |
| Other expense, net | 408 | 934 | 1,201 |
| Valuation allowance change | 47,999 | 60,626 | 675 |
| Income tax (benefit) | $ (61,008) | $ (36,273) | $ (34,648) |

The geographic allocation of the Company's income before income taxes between U.S. and foreign operations was as follows (in thousands):

| | **2019** | **2018** | **2017** |
| --- | --- | --- | --- |
| Pre-tax (loss) from U.S. operations | $ (237,474) | $ (428,299) | $ (49,572) |
| Pre-tax (loss) from foreign operations | (50,304) | (9,883) | (9,626) |
| Total pre-tax (loss) | $ (287,778) | $ (438,182) | $ (59,198) |

Net deferred income taxes at December 31, 2019 and 2018 include (in thousands):

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2019 | | 2018 | |
| Deferred tax assets: | | | | |
| Net operating loss carry-forward | $ | 51,125 | $ | 48,766 |
| Stock-based compensation | | 8,912 | | 9,071 |
| Chargeback reserves | | 3,336 | | 14,173 |
| Reserve for product returns | | 8,001 | | 8,012 |
| Inventory valuation reserve | | 8,423 | | 9,688 |
| Legal reserve | | 15,294 | | — |
| Long-term debt | | 56,117 | | 16,156 |
| Other | | 16,793 | | 16,444 |
| Total deferred tax assets | $ | 168,001 | $ | 122,310 |
| Valuation allowance | | (119,156) | | (71,157) |
| Net deferred tax assets | $ | 48,845 | $ | 51,153 |
| Deferred tax liabilities: | | | | |
| Prepaid expenses | $ | (2,190) | $ | (2,137) |
| Right of Use Asset | | (5,311) | | — |
| Depreciation & amortization – tax over book | | (41,534) | | (49,547) |
| Other | $ | (35) | $ | (35) |
| Total deferred tax liabilities | $ | (49,070) | $ | (51,719) |
| Net deferred income tax (liability) | $ | (225) | $ | (566) |

The Company records a valuation allowance to reduce net deferred income tax assets to the amount that is more likely than not to be realized. In performing its analysis of whether a valuation allowance to reduce the deferred income tax asset was necessary, the Company evaluated the data and believes that it is not more likely than not that the deferred tax assets in the US, India, and Switzerland will be realized. Accordingly, the Company has recorded a full valuation allowance against US, India, and Switzerland deferred tax assets. The Company has a valuation allowance of $119.2 million, $71.2 million and $10.5 million against its deferred tax assets as of December 31, 2019, 2018 and 2017, respectively.

The deferred tax balances have been reflected gross on the balance sheet and are netted only if they are in the same jurisdiction.

The Company's net operating loss ("NOL") carry-forwards as of December 31, 2019 consist of four component pieces: (i) U.S. Federal NOL carry-forwards valued at $21.2 million, (ii) State NOL carry-forwards valued at $1.1 million (iii) foreign (Indian) NOLs of $26.4 million and (iv) foreign (Swiss) NOLs of $2.4 million.  The U.S. Federal NOL carry-forwards were obtained through the Merck Acquisition completed in the fourth quarter of 2013, the 2018 tax loss and the current year loss generated. State NOL carry-forwards are from the 2018 tax loss. The Company has established a full valuation allowance against U.S. Federal and State NOL carry-forwards due to uncertainty related to future earnings projections. The Indian NOL carry-forwards of $26.4 million relate to operating losses by the Company's subsidiary in India, which was acquired in 2012. The Company has established a valuation allowance against this entire amount. A portion of the Swiss NOL was obtained through the Akorn AG acquisition completed in the first quarter of 2015 in addition to the loss generated in 2018 and 2019. The NOL carry-forwards begin to expire in 2023 and, accordingly, the Company has established a valuation allowance against the entire amount of NOL.

During 2019, the Company entered into the Original and First Amended Standstill Agreements, modifying its outstanding debt instruments to adjust interest and other provisions.  For income tax purposes, these debt modifications were treated as taxable exchanges of debt instruments, which created cancellation of debt income, current interest expense, and deferred interest expense under the original issue discount rules.  The Company's NOL and deferred interest carryovers were adjusted to reflect the impact of these transactions.

The Company's U.S. Federal income tax returns filed for years 2016 through 2018 are open for examination by the Internal Revenue Service.  The majority of the Company's state and local income tax returns filed for years 2016 through 2018 remain open for examination as well.

In accordance with ASC 740-10-25, *Income Taxes - Recognition*, the Company reviews its tax positions to determine whether it is "more likely than not" that its tax positions will be sustained upon examination, and if any tax positions are deemed to fall short of that standard, the Company establishes reserves based on the financial exposure and the likelihood that its tax positions would not be sustained.

Based on its review as of December 31, 2019, the Company determined that it would not recognize tax benefits as follows (in thousands):

| | | |
|---|---|---:|
| Balance at December 31, 2016 | $ | 1,301 |
| Additions relating to 2017 | | 416 |
| Additions relating to prior years | $ | 24,297 |
| Reductions of exposures relating to prior years | | (619) |
| Balance at December 31, 2017 | $ | 25,395 |
| Additions relating to 2018 | | 269 |
| Additions relating to prior years | | 4,425 |
| Reductions of exposures relating to prior years | | (702) |
| Balance at December 31, 2018 | $ | 29,387 |
| Reductions of exposures relating to prior years | | (26,992) |
| Lapse of statute of limitations | $ | (33) |
| Balance at December 31, 2019 | $ | 2,362 |

If recognized, $2.4 million of the above positions will impact the Company's effective rate. The Company released approximately $27.1 million of the uncertain tax position that was reflected in the 2018 financial statements, due to the IRS acceptance of the non-automatic accounting method change related to chargebacks and rebate reserves in 2019. Due to the uncertainty of both timing and resolution of potential income tax examinations, the Company is unable to determine whether the remaining December 31, 2019 balance of uncertain tax positions could significantly change during the next twelve months.  The Company accounts for interest and penalties as income tax expense. In the year ended December 31, 2019, the Company released $8.6 million of penalties and $12.0 million of interest that was accrued in the prior year. During 2019, the Company recorded $0.2 million of interest related to uncertain tax positions resulting in a total accrued interest balance of approximately $0.3 million as of December 31, 2019.

**Note 12 — Segment Information**

The Company has two operating segments, which constitute the Company's two reportable segments and the Company's CEO is the CODM, as defined in *ASC Topic 280 - Segment Reporting.* Our performance is assessed and resources allocated by the CODM based on the following two reportable segments:

- Prescription Pharmaceuticals
- Consumer Health

The Company's Prescription Pharmaceuticals segment principally consists of generic and branded prescription pharmaceuticals products which span a broad range of indications as well as a variety of dosage forms including: sterile ophthalmics, injectables and inhalants, and non-sterile oral liquids, topicals and nasal sprays. The Company's Consumer Health segment principally consists of animal health and over-the-counter ("OTC") products, both branded and private-label.  OTC products include, but are not limited to, a suite of products for the treatment of dry eye sold under the TheraTears® brand name.

Financial information about the Company's reportable segments is based upon internal financial reports that aggregate certain operating information. The Company's CODM oversees operational assessments and resource allocations based upon the results of the Company's reportable segments, which have available and discrete financial information.

Selected financial information by reportable segment is presented below (in thousands):

| | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| REVENUES, NET: | | | | | | |
| Prescription Pharmaceuticals | $ | 604,212 | $ | 620,669 | $ | 772,524 |
| Consumer Health | | 78,217 | | 73,349 | | 68,521 |
| Total revenues, net | $ | 682,429 | $ | 694,018 | $ | 841,045 |
| GROSS PROFIT: | | | | | | |
| Prescription Pharmaceuticals | $ | 217,767 | $ | 213,560 | $ | 402,082 |
| Consumer Health | | 34,939 | | 32,456 | | 30,124 |
| Total gross profit | $ | 252,706 | $ | 246,016 | $ | 432,206 |

The Company manages its business segments to the gross profit level and manages its operating and other costs on a company-wide basis. Inter-segment activity at the gross profit level is minimal. The Company does not have discrete assets by segment, as certain manufacturing and warehouse facilities support more than one segment, and therefore does not report assets by segment. Financial information including revenues and gross profit by product or product line is not provided, as to do so would be impracticable.

During the years ended December 31, 2019, 2018 and 2017, approximately $13.2 million, $16.4 million and $25.5 million of the Company's net revenue, respectively, was from customers located in foreign countries. All of the net revenue was related to our Prescription Pharmaceutical segment.

The carrying amounts of Goodwill by segment were as follows (in thousands):

| | Prescription Pharmaceuticals | | Consumer Health | | Total | |
|---|---|---|---|---|---|---|
| December 31, 2017 | $ | 268,593 | $ | 16,717 | $ | 285,310 |
| Acquisitions and other adjustments | | — | | — | | — |
| Impairments | | — | | — | | — |
| Dispositions | | — | | — | | — |
| Foreign currency translations | | (1,431) | | — | | (1,431) |
| December 31, 2018 | $ | 267,162 | $ | 16,717 | $ | 283,879 |
| Acquisitions and other adjustments | | — | | — | | — |
| Impairments | | (15,955) | | — | | (15,955) |
| Dispositions | | — | | — | | — |
| Foreign currency translations | | (1) | | — | | (1) |
| December 31, 2019 | $ | 251,206 | $ | 16,717 | $ | 267,923 |

**Note 13 — Commitments and Contingencies**

The Company has entered into strategic business agreements for the development and marketing of pharmaceutical products with companies.

Each strategic business agreement generally includes a future payment schedule for contingent milestone payments and in certain agreements, minimum royalty payments.  The Company will be responsible for contingent milestone payments and minimum royalty payments to these strategic business partners based upon the occurrence of future events.  Each strategic business agreement defines the triggering event of its future payment schedule, such as meeting product development progress timeline, successful product testing and validation, successful clinical studies, U.S. Food and Drug Administration ("FDA") or other regulatory approvals and other factors as negotiated in each agreement.  None of the contingent milestone payments or minimum royalty payments is individually material to the Company.

The Company is engaged in various supply agreements with third parties that obligate the Company to purchase various active pharmaceutical ingredients or finished products at contractual minimum levels. None of these agreements is individually or in aggregate material to the Company. Further, the Company does not believe at this time that any of the purchase obligations represent levels above that of normal business demands.

The table below summarizes contingent, potential milestone payments that would become due to strategic partners in the years 2020 and beyond, assuming all such contingencies occur (in thousands):

| Year ending December 31, | Milestone Payments |
|---|---|
| 2020 | $ 1,151 |
| 2021 | 46 |
| 2022 | 250 |
| 2023 | 250 |
| Total | $ 1,697 |

The Company is a party in legal proceedings and potential claims arising in the ordinary course of its business. The amount, if any, of ultimate liability with respect to such matters cannot be determined. Legal proceedings which may have a material effect on the Company have been further disclosed in Note 19 - "*Legal Proceedings*".

**Note 14 — Supplemental Cash Flow Information**

The following table sets forth the Company's supplemental cash flow (in thousands):

| | Year ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Amount paid for interest | $ 64,536 | $ 57,144 | $ 45,472 |
| Standstill related aggregate paid-in-kind interest | 16,394 | — | — |
| Accrued capital expenditures | $ 6,333 | $ 6,492 | $ 13,824 |
| Standstill related non-cash interest | 3,626 | — | — |
| Amount (refund) paid for income taxes, net | (14,530) | 9,261 | 42,003 |

**Note 15 — Recently Issued and Adopted Accounting Pronouncements**

*Recently Issued Accounting Pronouncements*

In August 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") No. 2018-15 — *Intangibles — Goodwill and Other—Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract (a consensus of the FASB Emerging Issues Task Force).* The amendments in this ASU are effective for public business entities for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption of the amendments in this Update is permitted, including adoption in any interim period, for all entities. The amendments in this Update should be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The Company believes that the adoption of this ASU will not have a material impact on its financial position, results of operations or cash flows.

In August 2018, the FASB issued ASU No. 2018-13—*Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement.* The amendments in this ASU are effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial fiscal year of adoption. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted upon issuance of this Update. An entity is permitted to early adopt any removed or modified disclosures upon issuance of this ASU and delay adoption of the additional disclosures until their effective date. The Company believes that the adoption of this ASU will not have a material impact on its financial position, results of operations or cash flows.

In June 2016, the FASB issued ASU No. 2016-13—*Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments.* Topic 326 amends guidance on reporting credit losses for financial assets held at amortized cost. For assets held at amortized cost basis, Topic 326 eliminates the probable initial recognition threshold in current GAAP and, instead, requires an entity to reflect its current estimate of all expected credit losses. The allowance for credit losses is a valuation account that is deducted from the amortized cost basis of the financial assets to present the net amount expected to be collected. This ASU is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted for interim and annual reporting periods beginning after December 15, 2018. This ASU is required to be adopted using the modified retrospective basis, with a cumulative-effect adjustment to retained earnings as of the beginning of the first reporting period in which the guidance of this ASU is effective. Based upon the level and makeup of our financial asset portfolio, the Company does not expect that the adoption of this ASU will have a material impact on its financial position, results of operations or cash flows.

### *Recently Adopted Accounting Pronouncements*

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") No. 2018-07, *Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting.* The amendments in this ASU expand the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. Under this ASU, an entity should apply the requirements of Topic 718 to nonemployee awards except for specific guidance on inputs to an option pricing model and the attribution of cost (that is, the period of time over which share-based payment awards vest and the pattern of cost recognition over that period). The amendments specify that Topic 718 applies to all share-based payment transactions in which a grantor acquires goods or services to be used or consumed in a grantor's own operations by issuing share-based payment awards. The amendments also clarify that Topic 718 does not apply to share-based payments used to effectively provide (1) financing to the issuer or (2) awards granted in conjunction with selling goods or services to customers as part of a contract accounted for under Topic 606, Revenue from Contracts with Customers. The standard was adopted on January 1, 2019, and did not have a material impact on the Company's financial statements or financial statement disclosures.

In February 2016, FASB issued ASU No. *2016-02 - Leases* (Topic 842), as modified by subsequently issued ASUs 2019-01, 2018-10, 2018-11 and 2018-20 (collectively ASU 2016-02). ASU 2018-02 establishes a comprehensive new lease accounting model. The new standard clarifies the definition of a lease and causes lessees to recognize leases on the balance sheet as a lease liability with a corresponding right-of-use asset for leases with a lease term of more than one year. The new standard initially required a modified retrospective transition for capital or operating leases existing at or entered into after the beginning of the earliest comparative period presented in the financial statements, but it does not require transition accounting for leases that expire prior to the date of initial application. In July 2018, the FASB decided to provide another transition method in addition to the existing transition method by allowing entities to initially apply the new leases standard at the adoption date and recognize a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. This additional transition method changes only when an entity is required to initially apply the transition requirements of the new leases standard; it does not change how those requirements apply. We elected the practical expedient to not separate non-lease components, to not provide comparative reporting periods and the 'package of practical expedients', which permits us to forgo reassessment of our prior conclusions about lease identification, lease classification and initial direct costs for leases entered into prior to the effective date. We did not elect the use-of-hindsight practical expedient. We adopted the ASC on January 1, 2019, using the modified retrospective method and did not restate comparative periods. At adoption, we recorded Total Lease liabilities of $24.7 million and Total Right-of-use assets, net of $23.0 million in our consolidated statement of financial position. The impact on the Company's results of operations did not materially differ from recorded amounts under ASC 840. The impact of the adoption of this ASU is non-cash in nature and therefore did not materially affect the Company's cash flows. See Note 9 - "*Leasing Arrangements*" for additional disclosures.

In May 2017, the FASB issued ASU No. *2017-09, Compensation — Stock Compensation (Topic 718): Scope of Modification Accounting*, which provides guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting in Topic 718. Per the ASU, an entity should account for the effects of a modification unless all the following are met: (1) The fair value (or calculated value or intrinsic value, if such an alternative measurement method is used) of the modified award is the same as the fair value (or calculated value or intrinsic value, if such an alternative measurement method is used) of the original award immediately before the original award is modified. If the modification does not affect any of the inputs to the valuation technique that the entity uses to value the award, the entity is not required to estimate the value immediately before and after the modification, (2) The vesting conditions of the modified award are the same as the vesting conditions of the original award immediately before the original award is modified, and (3) The classification of the modified award as an equity instrument or a liability instrument is the same as the classification of the original award immediately before the original award is modified. The current disclosure requirements in Topic 718 apply regardless of whether an entity is required to apply modification accounting under the amendments in this ASU. The standard

was adopted on January 1, 2018, and did not have a material impact on the Company's consolidated financial statements or financial statement disclosures.

In March 2017, the FASB issued ASU No. 2017-07 — *Compensation — Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost*, which apply to all employers, including not-for-profit entities, that offer to their employees defined benefit pension plans, other postretirement benefit plans, or other types of benefits accounted for under Topic 715. The amendments in this ASU require that an employer report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. The other components of net benefit cost as defined in paragraphs 715-30-35-4 and 715-60- 35-9 are required to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. If a separate line item or items are used to present the other components of net benefit cost, that line item or items must be appropriately described. If a separate line item or items are not used, the line item or items used in the income statement to present the other components of net benefit cost must be disclosed. The amendments in this ASU also allow only the service cost component to be eligible for capitalization when applicable (for example, as a cost of internally manufactured inventory or a self-constructed asset). The standard was adopted on January 1, 2018, and did not have a material impact on the Company's consolidated financial statements or financial statement disclosures.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash (a consensus of the FASB Emerging Issues Task Force)*, which addresses classification and presentation of changes in restricted cash on the statement of cash flows. The standard requires an entity's reconciliation of the beginning-of-period and end-of-period total amounts shown on the statement of cash flows to include in cash and cash equivalents amounts generally described as restricted cash and restricted cash equivalents. The ASU does not define restricted cash or restricted cash equivalents, but an entity will need to disclose the nature of the restrictions. The standard was adopted on January 1, 2018, and did not have a material impact on the Company's consolidated financial statements or financial statement disclosures.

In August 2016, the FASB issued *ASU 2016-15, Statement of Cash Flows (Topic 230) Classification of Certain Cash Receipts and Cash Payments*. The standard was adopted on January 1, 2018, and did not have a material impact on the Company's consolidated financial statements or financial statement disclosures.

In May 2014, FASB issued *ASU 2014-09 - Revenue from Contracts with Customers (Topic 606)*, as modified by subsequently issued *ASUs 2015-14, 2016-08, 2016-10, 2016-12 and 2016-20 (collectively ASU 2014-09)*. *ASU 2014-09* superseded the revenue recognition requirements in *ASC (Topic 605) Revenue Recognition*, and most industry specific guidance. This ASU also supersedes some cost guidance included in *ASC 605-35 Revenue Recognition Construction Type and Production Type Contracts*. Similar to the previous guidance, the Company makes significant estimates related to variable consideration at the point of sale, including chargebacks, rebates, product returns, and other discounts and allowances. Revenue is recognized at a point in time upon the transfer of control of the Company's products, which occurs upon delivery for substantially all of the Company's sales. The Company has adopted the practical expedient to exclude all sales taxes and contract fulfillment costs from the transaction price. The Company adopted the standard effective January 1, 2018, using the modified retrospective approach. The adoption of *ASU 2014-09* did not have a material impact on the Company's consolidated financial position, results of operations, equity or cash flows as of the adoption date or for the year ended December 31, 2018. See Note 16 - "*Customer, Supplier and Product Concentration*" for the disaggregation of net revenues by major customers.

**Note 16 — Customer, Supplier and Product Concentration**

*Customer Concentration*

In the years ended December 31, 2019, 2018 and 2017, a significant portion of the Company's gross and net revenues reported were to three large wholesale drug distributors, and a significant portion of the Company's accounts receivable as of December 31, 2019, 2018 and 2017 were due from these wholesale drug distributors as well. AmerisourceBergen Health Corporation ("Amerisource"), Cardinal Health, Inc. ("Cardinal") and McKesson Drug Company ("McKesson") collectively referred to herein as the "Big 3 Wholesalers", are all distributors of the Company's products, as well as suppliers of a broad range of health care products.  Aside from these three wholesale drug distributors, no other individual customer accounted for 10% or more of gross sales, net revenue or gross trade receivables for the indicated dates and periods.

If sales to the Big 3 Wholesalers were to diminish or cease, the Company believes that the end users of its products would find little difficulty obtaining the Company's products from another distributor. The Company is subject to credit risk from its accounts receivable, heavily weighted to the Big 3 Wholesalers, but as of and for the years ended December 31, 2019, 2018 and 2017, the Company has not experienced significant losses with respect to its collection of these gross accounts receivable balances.

The following table sets forth the Company's gross trade accounts receivable, gross sales and net revenue disaggregated by major customers for the periods indicated:

| Gross Accounts Receivable as of December 31, | | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Disaggregation of gross A/R by major customers | Gross Accounts Receivable | Gross Accounts Receivable % | Gross Accounts Receivable | Gross Accounts Receivable % | Gross Accounts Receivable | Gross Accounts Receivable % |
| Amerisource | $ 56,945 | 22.0% | $ 55,160 | 17.9% | $ 99,771 | 26.3% |
| Cardinal | 40,158 | 15.6% | 59,443 | 19.3% | 79,731 | 21.1% |
| McKesson | 118,258 | 45.8% | 149,000 | 48.3% | 146,321 | 38.6% |
| Combined Total | 215,361 | 83.4% | 263,603 | 85.5% | 325,823 | 86.0% |
| Other | 42,812 | 16.6% | 44,702 | 14.5% | 52,936 | 14.0% |
| Grand Total | $ 258,173 | 100.0% | $ 308,305 | 100.0% | $ 378,759 | 100.0% |

| Gross Sales | | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Disaggregation of gross sales by major customers | Gross Sales | Gross Sales % | Gross Sales | Gross Sales % | Gross Sales | Gross Sales % |
| Amerisource | $ 348,030 | 20.8% | $ 386,543 | 20.5% | $ 554,690 | 23.6% |
| Cardinal | 354,253 | 21.2% | 390,438 | 20.7% | 411,458 | 17.5% |
| McKesson | 680,478 | 40.6% | 789,620 | 41.8% | 918,157 | 39.1% |
| Combined Total | 1,382,761 | 82.6% | 1,566,601 | 83.0% | 1,884,305 | 80.2% |
| Other | 291,435 | 17.4% | 321,261 | 17.0% | 466,766 | 19.8% |
| Grand Total | $ 1,674,196 | 100.0% | $ 1,887,862 | 100.0% | $ 2,351,071 | 100.0% |

| Net Revenue | | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Disaggregation of net revenues by major customers | Net Revenue | Net Revenue % | Net Revenue | Net Revenue % | Net Revenue | Net Revenue % |
| Amerisource | $ 138,667 | 20.3% | $ 144,776 | 20.9% | $ 160,671 | 19.1% |
| Cardinal | 115,489 | 16.9% | 109,747 | 15.8% | 150,257 | 17.9% |
| McKesson | 157,572 | 23.1% | 173,363 | 25.0% | 222,715 | 26.5% |
| Combined Total | 411,728 | 60.3% | 427,886 | 61.7% | 533,643 | 63.5% |
| Other | 270,701 | 39.7% | 266,132 | 38.3% | 307,402 | 36.5% |
| Grand Total | $ 682,429 | 100.0% | $ 694,018 | 100.0% | $ 841,045 | 100.0% |

Sales to the Big 3 Wholesalers primarily represent purchases of products in the Prescription Pharmaceuticals segment and generate the majority of the Prescription Pharmaceuticals segment revenue. The Prescription Pharmaceuticals segment revenue represented 88.5%, 89.4% and 91.9%, of the net revenue for the years ended December 31, 2019, 2018 and 2017, respectively. Chain pharmacies are the major customers in the Consumer Health segment. For more information, see Note 12 - "*Segment Information*".

*Supplier Concentration*

The Company requires a supply of quality raw materials and components to manufacture and package pharmaceutical products for its own use and for third parties with which it has contracted. The principal components of the Company's products are active and inactive pharmaceutical ingredients and certain packaging materials. Certain of these ingredients and components are available from only a single source and, in the case of certain of the Company's abbreviated new drug applications and new drug applications, only one supplier of raw materials has been identified. Because FDA approval of drugs requires manufacturers to specify their proposed suppliers of active ingredients and certain packaging materials in their applications, FDA approval of any new supplier would be required if active ingredients or such packaging materials were no longer available from the specified supplier. The qualification of a new supplier could delay the Company's development and marketing efforts. In addition, certain of the pharmaceutical products marketed by the Company are manufactured by a third party manufacturer, which serves as the Company's sole source of that finished product. If for any reason the Company is unable to obtain sufficient quantities of any of the raw materials or components required to produce and package its products, it may not be able to manufacture its products as planned, which could have a material adverse effect on the Company's business, financial condition and results of operations. Likewise, if the Company's manufacturing partners experience any similar difficulties in obtaining raw materials or in manufacturing the finished product, the Company's results of operations would be negatively impacted.

No individual supplier represented 10% or more of the Company's purchases in any of the years ended December 31, 2019, 2018 and 2017.

*Product Concentration*

In the years ended December 31, 2019 and 2018, none of the Company's products represented 10% or more of total net revenue, while in the year ended December 31, 2017, Ephedrine Sulfate Injection represented approximately 10% of the Company's total net revenue. The Company attempts to minimize the risk associated with product concentration by continuing to acquire and develop new products to add to its portfolio.

### Note 17 — Related Party Transactions

During the years ended December 31, 2019, 2018 and 2017, the Company obtained legal services from Polsinelli PC, a law firm for which the spouse of the Company's Executive Vice President, General Counsel and Secretary is an attorney and shareholder, totaling $6.5 million, $4.1 million and $0.8 million, respectively. As of December 31, 2019, 2018 and 2017, $0.9 million, $1.3 million and $0.1 million, respectively, was payable to the firm.

The Company also obtained and paid legal services totaling $0.1 million and $0.5 million during the years ended December 31, 2019 and 2018, respectively from Segal McCambridge Singer & Mahone, a firm for which the brother in law of the Company's Executive Vice President, General Counsel and Secretary is a partner.

### Note 18 — Selected Quarterly Financial Data (Unaudited)

| | | | | | Net (Loss) Income | | |
|---|---|---|---|---|---|---|---|
| (In thousands, except per share amounts) | Revenues | Gross Profit | Operating (Loss) Income (2) | | Amount | Per Basic Share | Per Diluted Share |
| Year Ended December 31, 2019: | | | | | | | |
| 4th Quarter | $ 162,257 | $ 59,807 | $ (43,980) | $ | (80,660) | $ (0.64) | $ (0.64) |
| 3rd Quarter (1) | 176,244 | 71,402 | 8,768 | | 47,670 | 0.38 | 0.38 |
| 2nd Quarter | 178,057 | 67,984 | (87,366) | | (111,599) | (0.89) | (0.89) |
| 1st Quarter | $ 165,871 | $ 53,513 | $ (65,483) | $ | (82,181) | $ (0.65) | $ (0.65) |
| Year Ended December 31, 2018: | | | | | | | |
| 4th Quarter | $ 153,386 | $ 25,247 | $ (195,865) | $ | (215,038) | $ (1.71) | $ (1.71) |
| 3rd Quarter | 165,625 | 57,262 | (75,980) | | (70,140) | (0.56) | (0.56) |
| 2nd Quarter | 190,944 | 81,279 | (91,166) | | (87,984) | (0.70) | (0.70) |
| 1st Quarter | 184,063 | 82,228 | (25,415) | | (28,747) | (0.23) | (0.23) |

(1) The third quarter 2019 net income was primarily due to a higher operating income and income tax (benefit). See Note 11 - "*Income Taxes*" for further details.

(2) The significant increase in operating loss in the fourth quarter of 2018 compared to the prior 2018 quarters, was primarily due to impairments of intangibles assets, net. See Note 5 - "*Goodwill and Other Intangible Assets*" for further details.

## Note 19 — Legal Proceedings

### Akorn, Inc. v. Fresenius Kabi AG

On April 22, 2018, Fresenius Kabi AG delivered to Akorn a letter purporting to terminate the Merger Agreement. On April 23, 2018, Akorn filed a complaint entitled Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius SE & Co. KGaA, in the Court of Chancery of the State of Delaware for breach of contract and declaratory judgment, alleging among other things, that the defendants anticipatorily breached their obligations under the Merger Agreement and knowingly and intentionally engaged in a series of actions designed to hamper and ultimately block the Merger. The complaint sought, among other things, a declaration that Fresenius Kabi AG's termination was invalid, an order enjoining the defendants from terminating the Merger Agreement, and an order compelling the defendants to use reasonable best efforts to consummate and make effective the Merger. On April 30, 2018, the defendants filed a verified counterclaim alleging that, due primarily to purported data integrity deficiencies, the Company had breached representations, warranties and covenants in the Merger Agreement, and that it had experienced a material adverse effect. The verified counterclaim sought, among other things, a declaration that defendants' purported termination of the Merger Agreement was valid and that defendants were not obligated to consummate the transaction, and damages.

Following expedited discovery, the Court of Chancery held a trial on the parties' claims (the "Delaware Action"). On October 1, 2018, following the conclusion of post-trial briefing, the Court of Chancery issued an opinion (the "Opinion") denying Akorn's claims for relief and concluding, among other things, that Fresenius Kabi AG had validly terminated the Merger Agreement. The Court of Chancery concluded that Akorn had experienced a material adverse effect due to its financial performance following the signing of the Merger Agreement; that Akorn had breached representations and warranties in the Merger Agreement and that those breaches would reasonably be expected to give rise to a material adverse effect; that Akorn had materially breached covenants in the Merger Agreement; and that Fresenius was materially in compliance with its own contractual obligations. On October 17, 2018, the Court of Chancery entered partial final judgment against Akorn on its claims and in favor of the Fresenius parties on their claims for declaratory judgment, but held proceedings on the Fresenius parties' damages claims in abeyance pending the resolution of any appeal from the partial final judgment.

On December 7, 2018, the Delaware Supreme Court affirmed the Court of Chancery's opinion denying Akorn's claims and granting the defendants' counterclaim for a declaration that the termination was valid. On December 27, 2018, the Delaware Supreme Court issued a mandate returning the case to the Court of Chancery for consideration of all remaining issues.

After having sought from the Court of Chancery thirty days to discuss the potential resolution of the Fresenius parties' damages, on February 19, 2019, the parties filed a joint letter advising the Court that they have been unable to resolve the Fresenius parties' damages claims. The Fresenius parties stated their intention to seek leave to amend their counterclaims to assert a new claim for fraud and that they would seek an expedited trial on such claim purportedly due to Akorn's financial condition. The Fresenius parties' motion for leave to amend and supplement their counterclaim and the proposed amended and supplemented counterclaim was filed on February 20, 2019. It sought damages of approximately $102 million. After Akorn filed an opposition to the motion and the Fresenius parties filed a reply, the Court of Chancery denied the Fresenius parties' motion on February 28, 2019.

On August 16, 2019, the Fresenius parties filed a motion for summary judgment seeking damages of approximately $123 million. On September 30, 2019, Akorn filed a cross-motion for summary judgment and opposition to the Fresenius parties' motion. On November 14, 2019, Fresenius adjusted its claim to seek damages of approximately $117 million. Briefing on the motions was completed on December 9, 2019. The Court of Chancery has scheduled a hearing on the cross-motions for summary judgment for April 22, 2020.

### In re Akorn, Inc. Data Integrity Securities Litigation

On March 8, 2018, a purported shareholder of the Company filed a putative class action complaint entitled Joshi Living Trust v. Akorn, Inc. et al., in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The complaint named as defendants the Company, Chief Executive Officer Rajat Rai, Chief Financial Officer Duane Portwood and Chief Accounting Officer Randall Pollard. The complaint alleged that defendants made materially false or misleading statements and/or material omissions by failing to disclose sooner the existence of investigations into data integrity at the Company. The complaint sought, among other things, an award of damages, attorneys' fees and expenses. The Company disputes these claims.

On May 31, 2018, the Court appointed Gabelli & Co. Investment Advisors, Inc. and Gabelli Funds, LLC as lead plaintiffs pursuant to the Private Securities Litigation Reform Act ("PSLRA"), approved their selection of lead counsel and liaison counsel and amended the case caption to In re Akorn, Inc. Data Integrity Securities Litigation (the "Securities Class Action Litigation"). On June 26, 2018, the Court denied a motion to lift the PSLRA stay, subject to entry of a preservation order.

On September 5, 2018, lead plaintiffs filed an amended complaint asserting (i) claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Fraud Claims") against Defendants Akorn, Rajat Rai, Duane Portwood, Mark Silverberg, Alan Weinstein, Ronald Johnson and Brian Tambi; and (ii) claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Proxy Claims") against defendants Akorn, Rajat Rai, John Kapoor, Alan Weinstein, Kenneth Abramowitz, Adrienne Graves, Ronald Johnson, Steven Meyer, Terry Rappuhn and Brian Tambi. The amended complaint alleged that, from November 3, 2016, to April 20, 2018, defendants knew or recklessly disregarded widespread institutional data integrity problems at Akorn's manufacturing and research and development facilities, while making or causing Akorn to make contrary misleading statements and omissions of material fact concerning the Company's data integrity at its facilities. The amended complaint alleged that corrective information was provided to the market on two separate dates, causing non-insider shareholders to lose over $1.07 billion and $613 million in value respectively. The amended complaint sought an award of equitable relief and damages.

On October 29, 2018, the parties filed a stipulation and joint motion providing for the dismissal of certain claims and defendants. On October 30, 2018, the Court granted the parties' joint motion, dismissing the Proxy Claims without prejudice; dismissing defendants Kapoor, Abramowitz, Graves, Meyer and Rappuhn without prejudice; and dismissing Defendant Silverberg with prejudice.

On February 21, 2019, plaintiff Johnny Wickstrom, a purported shareholder of the Company, filed a putative class action complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Wickstrom Action"). The complaint named as defendants the Company, Rai and Portwood. The complaint alleged that defendants made materially false or misleading statements and/or material omissions concerning its compliance with U.S. Food and Drug Administration ("FDA") regulations and that those misstatements were corrected when the Company disclosed its receipt from the FDA of a warning letter at the Company's facility in Decatur, IL. The complaint sought, among other things, an award of damages, attorneys' fees and expenses.

On March 8, 2019, the parties in the Securities Class Action Litigation filed a proposed stipulation which sought, among other things: (i) leave to file a second amended class action complaint, which would extend the end date of the alleged class period from November 3, 2016, through September 28, 2018; (ii) to consolidate the Wickstrom complaint into the Securities Class Action Litigation for all purposes; and (iii) to extend the existing discovery schedule in order to permit time to mediate lead plaintiffs' claims and to conduct additional discovery related to the expanded class period.

Following a conference, the Court entered an order finding the Securities Class Action Litigation and Wickstrom Action to be related and requesting the reassignment of the Wickstrom Action. The Court also extended the discovery and pretrial deadlines.

On April 22, 2019, plaintiff Vicente Juan, a purported shareholder of the Company, filed a putative class action complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Juan Action"). The complaint named as defendants the Company, Rai and Portwood. The complaint alleged that defendants made or caused the Company to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations and that those misstatements were corrected when the Company disclosed its receipt from the FDA of a warning letter at the Company's facility in Decatur, IL. The complaint sought, among other things, an award of damages, attorneys' fees and expenses.

Also on April 22, 2019, lead plaintiffs, by and through their attorneys, filed a second amended complaint against the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The second amended complaint asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The second amended complaint alleges that, during a class period from November 3, 2016, to January 8, 2019, defendants knew or recklessly disregarded widespread institutional data integrity problems at Akorn's manufacturing and research and development facilities, while making or causing Akorn to make contrary misleading statements and/or omissions of material fact concerning the Company's data integrity at its facilities. The second amended complaint alleges that corrective information was provided to the market on three separate dates. The second amended complaint seeks an award of equitable relief and damages. On April 23, 2019, the Court entered an order finding the Securities Class Action Litigation and Juan Action to be related and requesting reassignment of the Juan Action.

On May 3, 2019, the Company and lead plaintiffs commenced mediation. On May 9, 2019, the Court entered an order consolidating both the Wickstrom Action and the Juan Action with and into the Securities Class Action Litigation. The Court also extended the discovery and pretrial deadlines.

On May 31, 2019, plaintiffs Twin Master Fund, Ltd., Twin Opportunities Fund, LP and Twin Securities, Inc., purported shareholders of the Company, filed a complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934, and common law fraud (the "Twin Master Fund Action"). The complaint names as defendants the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The complaint alleges that defendants made or caused Akorn to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations, among other things. The complaint seeks, among other things, an award of damages, punitive damages and expenses.

On June 11, 2019, the Court entered an order finding the Securities Class Action Litigation and Twin Master Fund Action to be related and requesting reassignment of the Twin Master Fund Action. The Court later disassociated the Twin Master Fund Action from the Securities Class Action Litigation.

On July 5, 2019, lead plaintiffs filed a motion seeking certification of a proposed class of all persons or entities that purchased or otherwise acquired Akorn's common stock between November 3, 2016 and January 8, 2019, inclusive, and were damaged thereby.

On July 10, 2019, plaintiffs Manikay Master Fund, LP and Manikay Merger Fund, LP, purported shareholders of the Company, filed a complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934, and common law fraud (the "Manikay Master Fund Action") against the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The complaint alleges that defendants made or caused Akorn to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations, among other things. The complaint seeks, among other things, an award of damages, punitive damages and expenses. At a July 30, 2019 conference, the Court entered a finding of relatedness with respect to the Manikay Master Fund Action, and requested reassignment of that action. The Court later disassociated the Manikay Master Fund Action from the Securities Class Action Litigation. On September 13, 2019, defendants moved to dismiss the complaints in the Twin Master Fund Action and Manikay Master Fund Action. Briefing on defendants' motions to dismiss was completed on November 5, 2019.

At a July 30, 2019, conference, the parties to the Securities Class Action Litigation disclosed to the Court that they had reached a non-binding agreement in principle, to settle the action that, if consummated, would provide for, among other things, the dismissal of that action and the release of all claims asserted by or on behalf of the putative class in that action.

Under the terms of the non-binding agreement in principle, the putative class would release its claims in exchange for a combination of (i) up to $30 million in insurance proceeds from the Company's D&O insurance policies (the "D&O Proceeds Payment"), (ii) the issuance by the Company of approximately 6.5 million shares of the Company's common stock and any additional shares of Company common stock that are released as a result of the expiration of out of the money options through December 31, 2024 and (iii) the issuance by the Company of contingent value rights ("CVR") with a five year term, subject to an extension of up to two years under certain circumstances. Under the terms of the non-binding agreement in principle, holders of the CVR would be entitled to receive an annual cash payment from the Company of 33.3% of "Excess EBITDA" (i.e., earnings before interest, taxes, depreciation and amortization ("EBITDA") above the amount of EBITDA required to meet a 3.0x net leverage ratio, assuming a $100 million minimum cash cushion, before any such CVR payment is triggered). To the extent any such annual payments are triggered under the CVR, they are capped at an aggregate of $12 million per year and $60 million in the aggregate during the term of the CVR.

Upon certain change of control transactions during the term of the CVR, if the Company's first lien term loan lenders and holders of the Company's other debt are repaid in full, CVR would entitle the holders to a cash payment in the aggregate amount of $30 million (the "Change of Control Payment"). If the Company is the subject of a voluntary or involuntary bankruptcy filing during the term of the CVR, the CVR agreement would provide that holders of the CVR would receive in the aggregate a $30 million unsecured claim (which unsecured claim will be subordinated to any deficiency claim of the Company's first lien term loan lenders and holders of the Company's other secured debt in any such bankruptcy case) (the "Bankruptcy Claim"). The $60 million cap on annual payments would not apply to the Change of Control Payment or the Bankruptcy Claim, if any. No further amounts would be payable under the CVR following such a change of control transaction or bankruptcy event.

The Company and the other defendants in the Securities Class Action Litigation have denied and continue to deny each and all of the claims alleged in the action, and the entry into the non-binding agreement in principle is not an admission of wrongdoing or acceptance of fault by the Company or any of the other defendants.

On August 9, 2019, the lead plaintiffs filed a motion for preliminary approval of the proposed settlement, approval of the form of class notice and a hearing date for final settlement approval (the "Final Approval Hearing"), with supporting papers, including the executed Stipulation of Settlement setting forth the agreed terms and conditions of the settlement. On August 26, 2019, the Court formally entered an order (the "Preliminary Approval Order") preliminarily approving the proposed settlement, approving the form of class notice, and setting a hearing on final approval of the settlement for December 3, 2019. Pursuant to the Preliminary Approval Order: lead plaintiffs were required to file a motion for final approval of the proposed settlement, the proposed plan of allocation and lead counsel's motion for attorneys' fees and litigation expenses no later than thirty-five (35) calendar days prior to the Final Approval Hearing, or October 29, 2019; any potential class members seeking to exclude themselves from or object to the proposed settlement were required to file requests for exclusion or objections no later than twenty-one (21) calendar days prior to the Final Approval Hearing, or November 12, 2019; and lead plaintiffs were required to file reply papers, if any, in further support of lead plaintiffs' motion for final approval of the proposed settlement, the proposed plan of allocation and lead counsel's motion for attorneys' fees and litigation expenses no later than seven (7) calendar days prior to the Final Approval Hearing, or November 26, 2019.

The settlement is subject to numerous terms and conditions including, among other things, (i) the unilateral right of the Company and the other defendants in the action to terminate the settlement if persons who purchased a number of shares exceeding an agreed threshold opt out of and elect not to participate in or be bound by the proposed settlement and (ii) final approval by the Court. There can be no guarantee that the Company and the other defendants will not exercise their termination right or that the settlement will receive final Court approval.

On September 16, 2019, the Securities Class Action Litigation was reassigned to the Honorable Steven Seeger.

Between October 21, 2019, and November 11, 2019, entities affiliated with six institutional investors delivered requests for exclusion from the Securities Class Action Litigation settlement.

On November 8, 2019, plaintiff Fir Tree Value Master Fund, L.P., a purported shareholder of the Company, filed a complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934, and common law fraud (the "Fir Tree Master Fund Action"). The complaint names as defendants the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The complaint alleges that defendants made or caused Akorn to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations, among other things. The complaint seeks, among other things, an award of damages, punitive damages and expenses.

On November 12, 2019, Dale Trsar, a purported shareholder of the Company, filed an objection to the proposed settlement in the Securities Class Action Litigation on the basis that the proposed settlement, among other things, risked unfairly and unreasonably releasing shareholder derivative claims.

On November 22, 2019, the parties to the Securities Class Action Litigation filed a joint emergency motion requesting a sixty-day adjournment of the Final Approval Hearing, which had been set for December 3, 2019. The motion explained that the requests for exclusion from the settlement substantially exceeded the threshold necessary to give the Company and the other defendants the unilateral right to terminate the settlement. The motion further explained that an adjournment was necessary in order to afford the court time to rule on the motions to dismiss the Twin Master Fund and Manikay Master Fund complaints, which ruling was likely to provide important clarity to the Company and the other defendants in their assessment of whether to exercise their termination right. On November 26, 2019, the court in the Securities Class Action Litigation adjourned the Final Approval Hearing without date and set a status conference for January 28, 2020.

On December 17, 2019, the judge before whom the Twin Master Fund and Manikay Master Fund Actions are pending entered a finding of relatedness as between the Fir Tree Master Fund Action and the Twin Master Fund and Manikay Master Fund Actions, causing the Fir Tree Master Fund Action to be reassigned to his docket.

On December 24, 2019, plaintiff Magnetar Constellation Fund II-PRA LP and affiliated entities, purported shareholders of the Company, filed a complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Magnetar Constellation Fund Action"). The complaint names as defendants the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The complaint alleges that defendants made

or caused Akorn to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations, among other things. The complaint seeks, among other things, an award of damages and expenses.

At a status conference on January 10, 2020, the judge before whom the Twin Master Fund and Manikay Master Fund Actions are pending entered a finding of relatedness as between the Magnetar Constellation Fund Action and the Twin Master Fund and Manikay Master Fund Actions, causing the Magnetar Constellation Fund Action to be reassigned to his docket.

Also on January 10, 2020, defendants in the Fir Tree Master Fund Action moved to dismiss the complaint. On January 17, 2020, plaintiff Fir Tree Value Master Fund, L.P., filed oppositions to defendants' motions to dismiss the complaint.

On January 20, 2020, plaintiff AQR Funds - AQR Multi-Strategy Alternative Fund and affiliated entities, purported shareholders of the Company, filed a complaint in the United States District Court for the Northern District of Illinois alleging violations of Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934, and common law fraud (the "AQR Funds Action" and, together with the Twin Master Fund, Manikay Master Fund and Fir Tree Master Fund Actions, the "Opt-Out Actions"). The complaint names as defendants the Company, Rai, Portwood, Weinstein, Johnson and Tambi. The complaint alleges that defendants made or caused Akorn to make materially false or misleading statements and/or material omissions concerning the Company's compliance with FDA regulations, among other things. The complaint seeks, among other things, an award of damages, punitive damages and expenses.

On February 5, 2020, the judge before whom the Twin Master Fund and Manikay Master Fund Actions are pending entered orders denying defendants' motions to dismiss those cases. At a status conference on February 13, 2020, the parties stipulated that the decision on defendants' motions to dismiss the Twin Master Fund and Manikay Master Fund Actions applies equally to the Fir Tree Master Fund and Magnetar Constellation Fund Actions. The Court entered an order finding that the Fir Tree Master Fund and Magnetar Constellation Fund Actions state a claim. The judge also entered a finding of relatedness as between the AQR Funds Action and the Twin Master Fund and Manikay Master Fund Actions, causing the AQR Funds Action to be reassigned to his docket. The judge ordered the parties to meet and confer concerning a schedule for further proceedings in the Opt-Out Actions.

**Kogut v. Akorn, Inc. et. al.**

On March 8, 2016, a purported shareholder of the Company filed a putative derivative suit entitled Kogut v. Akorn, Inc., et al., in the Parish of East Baton Rouge (the "Kogut Action"), which was amended later that year to assert shareholder derivative claims alleging breaches of fiduciary duty in connection with the Company's accounting for its acquisition and the restatement of its financials. On September 23, 2016, the Company filed a motion to dismiss the case. The case was subsequently stayed. On September 21, 2018, the plaintiff filed a second amended complaint, which added claims for shareholder derivative claims alleging breaches by certain present and former officers and directors of Akorn of fiduciary duties related to, among other matters, Akorn's compliance with FDA regulations and requirements regarding data integrity. On December 3, 2018, the Company and certain individual defendants moved to dismiss the complaint. Briefing on the motion to dismiss was completed on January 31, 2019.

On February 4, 2019, the court instructed the parties to confer concerning retaining a special master to resolve the pending motions to dismiss and to oversee any proceedings thereafter. After conferring, the parties jointly proposed a candidate for special master, and the Court appointed the candidate as special master on March 6, 2019.

On May 13, 2019, the special master recommended dismissing from the case the Company and all named defendants other than Mark Silverberg.

On July 11, 2019, the plaintiff filed a third amended complaint naming as defendants former Akorn officers Rajat Rai, Bruce Kutinsky, Steven Lichter and Mark Silverberg, as well as nominal defendant Akorn. The third amended complaint purported to allege derivatively on behalf of the Company that the named former Akorn officers: (i) breached their fiduciary duties to the Company by intentionally causing Akorn to not comply with FDA regulations; and (ii) were unjustly enriched thereby. The third amended complaint sought an award of damages and injunctive relief.

On October 7, 2019, the Court entered an order adopting the findings of the special master, dismissing without prejudice all named individual defendants other than Mark Silverberg, granting plaintiffs leave to file their third amended complaint and granting defendants 30 days to move to dismiss the third amended complaint.

On December 12, 2019, the parties to the Kogut Action executed a Stipulation and Agreement of Settlement (the "Kogut Settlement"). The proposed settlement required the Company to adopt certain corporate governance reforms, including (i) establishing a Quality Compliance Committee as a standing committee of the Company's Board pursuant to the adoption of a formal committee charter; (ii) certain changes to the Company's incentive compensation arrangements for calendar years 2020 and 2021 in order to allocate weight to corporate performance metrics tied to quality and/or FDA compliance; and (iii) certain amendments to the Company's clawback policy in order to add severe or intentional violations of FDA regulatory standards leading to an FDA warning letter or enforcement action to the list of covered events permitting potential clawback of incentive compensation. In consideration for these reforms, the Kogut Settlement provides that the Company, and every Company shareholder claiming by, through, in the right of, derivatively, or on behalf of the Company, or otherwise pursuant to the internal affairs doctrine under the law of the State of Louisiana, releases, among others, the defendants in the Kogut Action, and their past and present directors, officers, agents, advisors (including financial and legal advisors), affiliates, predecessors, successors and parents ("Released Persons"), from any and all claims that have been or might have been asserted by plaintiff in the Kogut Action and/or any Company shareholder against any such Released Persons derivatively, or otherwise pursuant to the internal affairs doctrine under the law of the State of Louisiana, based upon or related to the facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act which were alleged in the Kogut Action. The defendants have denied and continue to deny each and all of the claims alleged in the Kogut Action.

On December 16, 2019, the Court entered an order preliminarily approving the settlement and approving the parties' proposed form of notice. On December 20 and 23, 2019, the Company issued the court-approved Notice of Proposed Settlement. On January 22, 2020, the Court entered a Final Order and Judgment granting final approval of the settlement.

**Pulchinski v. Abramowitz et al.**

On September 26, 2019, Dennis Pulchinski, a purported shareholder of the Company, filed a putative derivative suit captioned Pulchinski v. Abramowitz et al., in the Circuit Court of Cook County, IL (the "Pulchinski Action"), alleging breaches by certain present and former officers and directors of Akorn of fiduciary duties related to, among other matters, Akorn's compliance with FDA regulations and requirements regarding data integrity.

On January 30, 2020, plaintiff Pulchinski filed a notice voluntarily dismissing the Pulchinski Action.

**Booth Family Trust v. Kapoor et al.**

On November 1, 2019, the Booth Family Trust, a purported shareholder of the Company, filed a putative derivative suit captioned Booth Family Trust v. Kapoor et al., in the Circuit Court of Cook County, IL (the "Booth Family Trust Action"). The suit alleges breaches by certain present and former officers and directors of Akorn of fiduciary duties related to, among other matters, Akorn's compliance with FDA regulations and requirements regarding data integrity.

On January 30, 2020, plaintiff Booth Family Trust filed a notice voluntarily dismissing the Booth Family Trust Action.

**In re Akorn, Inc. Shareholder Derivative Litigation**

On August 6, 2018, Dale Trsar, a purported shareholder of the Company, filed a putative derivative complaint captioned Trsar v. Kapoor, et al. against defendants John N. Kapoor, Rajat Rai, Duane A. Portwood, Mark M. Silverberg, Alan Weinstein, Kenneth S. Abramowitz, Steven J. Meyer, Terry Allison Rappuhn, Adrienne L. Graves, Ronald M. Johnson and Brian Tambi in the United States District Court for the Northern District of Illinois (the "Trsar Action"). The complaint purports to allege derivatively on behalf of the Company that the defendants breached their fiduciary duties to the Company and its shareholders by failing to address the Company's alleged non-compliance with FDA regulations; and the defendants violated Section 14(a) of the Securities Exchange Act of 1934, and SEC Rule 14a-9 promulgated thereunder, by making false or misleading statements in proxy statements issued to Akorn shareholders on November 14, 2016 and March 20, 2017. The complaint seeks an award of equitable relief and damages.

On December 10, 2018, Felix Glaubach, a purported shareholder of the Company, filed a putative derivative complaint captioned Glaubach v. Kapoor, et al. against John N. Kapoor, Rajat Rai, Mark M. Silverberg, Duane A. Portwood, Alan Weinstein, Kenneth S. Abramowitz, Steven J. Meyer, Terry Allison Rappuhn, Adrienne L. Graves, Ronald M. Johnson, and Brian Tambi in the United States District Court for the Northern District of Illinois (the "Glaubach Action"). The complaint purported to allege derivatively on behalf of the Company that (i) the defendants breached their fiduciary duties to the Company and its shareholders by failing to address the Company's alleged non-compliance with FDA regulations; (ii) John N. Kapoor and Brian Tambi breached their fiduciary duties to the Company and its shareholders by misappropriating inside information in connection with sales of the Company's stock; (iii) Rajat Rai and Duane A. Portwood were unjustly enriched; (iv) the Defendants wasted the Company's assets; and (v) the Defendants violated Section 14(a) of the Securities Exchange Act

of 1934, and SEC Rule 14a-9 promulgated thereunder, by making false or misleading statements in proxy statements issued to the Company's shareholders. The complaint sought an award of equitable relief and damages.

On January 11, 2019, the Glaubach Action was consolidated with the Trsar Action, with the complaint filed in the Trsar Action designated as operative, and the case caption was amended to In re Akorn, Inc. Shareholder Derivative Litigation.

On January 14, 2019, defendants filed a motion to dismiss the operative complaint in the consolidated action. Plaintiffs filed an opposition to defendants' motion to dismiss on February 14, 2019. Defendants filed a reply memorandum of law in further support of their motion to dismiss on February 28, 2019.

On March 29, 2019, defendants filed a motion to amend their motion to dismiss to reflect the appointment of a special master by the court in the Kogut Action.

On April 1, 2019, the Court entered an order granting defendants' motion to amend their motion to dismiss.

On May 24, 2019, defendants filed a motion to defer the Court's ruling on defendants' motion to dismiss in light of the special master's recommendation and report in the Kogut Action.

On June 10, 2019, the Court entered an order denying defendants' motion to defer the Court's ruling on defendants' motion to dismiss.

On February 11, 2020, the parties filed a joint motion for leave to submit supplemental briefing on defendants' motion to dismiss. On February 12, 2020, the Court entered an order granting the parties' joint motion and defendants filed a supplemental memorandum of law in support of their motion to dismiss. Plaintiff's memorandum of law in opposition to Defendants' is due March 3, 2020, and Defendants' reply memorandum of law is due March 13, 2020.

**State of Louisiana v. Hi-Tech, et. al**

The Louisiana Attorney General filed suit, Number 624,522, State of Louisiana v. Abbott Laboratories, Inc., et al., in the Nineteenth Judicial District Court, Parish of East Baton Rouge, Louisiana state court, including Hi-Tech Pharmacal, which Akorn acquired in 2014, and other defendants. Louisiana's complaint alleges that the defendants violated Louisiana state laws in connection with Medicaid reimbursement for certain vitamins, dietary supplements, and DESI products that were allegedly ineligible for reimbursement. After extensive motion and appellate practice, on October 3, 2017, the trial court issued a judgment holding that for the one remaining claim, brought under Louisiana's unfair trade practices claim, Louisiana could not seek civil penalties for conduct pre-dating June 2, 2006. The defendants filed an application for supervisory writs with the Court of Appeal for the First Circuit on October 24, 2017, seeking reversal of the trial court's denial of their no cause of action exception with respect to the unfair trade practices claim, which the First Circuit denied on July 24, 2018. On December 21, 2018, the defendants filed their answer to the unfair trade practices claim, the sole remaining claim in the amended petition. On January 31, 2019, Louisiana filed a motion with the trial court raising a procedural argument that the other claims originally pled in the amended petition, including a common law claim for fraud and a statutory claim for fraud against the Louisiana Medicaid agency, had been improperly dismissed. The trial court denied the State's motion. The State filed a writ application with the appellate court, which is pending. There is no overall case schedule in place, and active discovery has not yet commenced.

===========================================================================================

The legal matters discussed above and others could result in losses, including damages, fines and civil penalties, and criminal charges, which could be substantial. The Company records accruals for these contingencies to the extent that they conclude that a loss is both probable and reasonably estimable. Regarding the 2018 labeling verdict related to Methylene Blue Injection, the Company had recorded a $20.5 million liability as of December 31, 2018 for which a corresponding insurance receivable of $8.8 million was also recorded. As of December 31, 2019, the Company's primary insurance carrier reimbursed Akorn the $8.8 million, the remaining limits available on that policy, which partially offset the approximately $24 million, inclusive of interest, Akorn paid to plaintiffs. The Company maintains product liability insurance coverage in excess of the amount of the verdict, and is currently involved in litigation with its excess insurer to recover the remainder of the judgment amount. Regarding the matters disclosed above, the Company has determined that contingent liabilities associated with the legal matters (other than the Securities Class Action Litigation, described further below) are reasonably possible but they cannot be reasonably estimated.

The Company recorded a $74 million charge and corresponding liability as of June 30, 2019 associated with the settlement agreement related to the Securities Class Action Litigation. As described further above under "In re Akorn, Inc. Data Integrity Securities Litigation", the charge and corresponding liability is expected to be settled through issuances of Company common stock and the contingent value rights. Accordingly, long-term portion of accrued legal fees and contingencies includes a $30

million liability with respect to an estimate of the contingent cash payments under the contingent value rights and an $8.5 million liability with respect to the Company common stock that would be issued to the plaintiffs in the future in connection with the settlement. The remaining $35.5 million of the liability recorded also relates to the issuance of Company common stock to the plaintiffs under the settlement, but is considered short term and included in Current portion of accrued legal fees and contingencies because it is expected to be issued within the next year. The settlement could result in a loss of up to approximately $30 million in excess of the charge and corresponding liability the Company has recorded as a result of the $60 million aggregate payment cap under the terms of the contingent value rights.

In addition to the Company common stock and the contingent value rights, up to $30 million in insurance proceeds from the Company's D&O insurance policies would be remitted by the Company's D&O insurers to the plaintiffs in the Securities Class Action Litigation in connection with the settlement. Such settlement would only require the Company to use its best efforts to cause the D&O insurers to make such payments, and would not impose any obligation upon the Company to make any such payment out of its own funds. Accordingly, this amount from insurance was not included within the $74 million charge and corresponding liability.

The equity component of the settlement estimate is sensitive to changes in the Company's common stock price. Holding all other assumptions constant, a 10% change in the Company's common stock price would have approximately a $1.3 million effect on the reserve estimate. As the settlement is not final and subject to the final approval by the court, the recorded estimate and range is subject to change. During 2019, the Company recorded a $31.0 million benefit, representing a reduction to accrued legal fees and contingencies in order to adjust for the impact of the decrease in the Company's stock price since June 30, 2019. As of December 31, 2019, the Company had a reserve balance of $43.0 million relating to this matter.

Given the nature of the other litigation and investigations and the complexities involved, the Company is unable to reasonably estimate a possible loss for such matters until the Company knows, among other factors, (i) what claims, if any, will survive dispositive motion practice, (ii) the extent of the claims, including the size of any potential class, particularly when damages are not specified or are indeterminate, (iii) how the discovery process will affect the litigation, (iv) the settlement posture of the other parties to the litigation and (v) any other factors that may have a material effect on the litigation or investigation. However, we could incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could have a material adverse effect on our results of operations in the period in which the amounts are accrued or our cash flows in the period in which the amounts are paid.

**Note 20 — Pension plan and 401(k) Program**

**Akorn AG Pension Plan**

The Company maintains a pension plan for its employees in Switzerland as required by law. The pension plan is funded by contributions by both employees and employers, with the sum of the contributions made by the employer required to be at least equal to the sum of the contributions made by employees. The Company contributes the necessary amounts required by local laws and regulations. Plan assets for the pension plan are held in a retirement trust fund with investments primarily in publicly traded securities and assets.

The purpose of this pension plan is to provide old age pensions. Some of the pension funds also provide benefits in case of disability and to the next of kin in case of premature death. Additionally, the pension funds can be used before retirement to buy a principal residence, to start an independent activity, or when leaving Switzerland permanently. If a participant leaves the company, accumulated pension funds are transferred either into a savings account or into the pension fund of a new employer.

The following table sets forth a summary of the defined benefit pension plan funded status:

| Consolidated Financial Statement Position: | ($ in thousands) | |
|---|---|---|
| | December 31, | |
| | 2019 | 2018 |
| Fair value of plan assets | $ 25,911 | $ 23,610 |
| Less: Benefit obligation | 36,406 | 30,772 |
| Funded status - Benefit obligation in excess of plan assets | $ (10,495) | $ (7,162) |

The following table sets forth the change in plan assets:

| Change in plan assets: | ($ in thousands) | |
| --- | --- | --- |
| | 2019 | 2018 |
| Fair value of plan assets, beginning of year | $ 23,610 | $ 24,281 |
| Actual return on plan assets | (332) | (409) |
| Participant contributions | 832 | 753 |
| Employer contributions | 2,055 | 1,503 |
| Benefits paid | (707) | (2,446) |
| Translation adjustments and other | 453 | (72) |
| Fair value of plan assets, end of year | $ 25,911 | $ 23,610 |

The following table sets forth the change in benefit obligation:

| Change in benefit obligation: | ($ in thousands) | |
| --- | --- | --- |
| | 2019 | 2018 |
| Benefit obligation, beginning of year | $ 30,772 | $ 30,185 |
| Service cost | 2,535 | 2,166 |
| Interest cost | 244 | 197 |
| Actuarial losses (gains) | 2,904 | 771 |
| Benefits paid | (707) | (2,446) |
| Translation adjustments and other | 658 | (101) |
| Benefit obligation, end of year | $ 36,406 | $ 30,772 |

The following table sets forth the changes in items not yet recognized as a component of net periodic cost:

| Changes in Unrecognized pension cost, pre-tax | ($ in thousands) | |
| --- | --- | --- |
| | 2019 | 2018 |
| Unrecognized pension cost, pre-tax, beginning of year | $ (4,479) | $ (2,561) |
| Amortization during year | 160 | (19) |
| Actuarial (losses) gains | (2,904) | (771) |
| Asset (losses) gains | (1,034) | (1,140) |
| Translation adjustments and other | $ 1 | $ 12 |
| Unrecognized pension cost, pre-tax, end of year | $ (8,256) | $ (4,479) |

The following table sets forth the estimated amounts that will be amortized from accumulated other comprehensive (loss) into net periodic benefit cost in 2020:

| | ($ in thousands) |
| --- | --- |
| Estimated amortization from Other Comprehensive Income into net periodic benefit cost in 2020: | |
| Amortization of actuarial (losses) | $ 573 |
| Amortization of prior service credit | (19) |
| Estimated net (loss) | $ 554 |

The following table sets forth the aggregated information for the pension plan:

| | ($ in thousands) | |
|---|---|---|
| | December 31, | |
| | **2019** | **2018** |
| **Projected benefit obligation** | $ 36,406 | $ 30,772 |
| **Accumulated benefit obligation** | 36,149 | 30,583 |
| **Fair value of plan assets** | $ 25,911 | $ 23,610 |

The following table sets forth the components of net periodic cost for our pension plan:

| Components of net periodic benefit cost | ($ in thousands) | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Service cost | $ 2,535 | $ 2,166 | $ 1,982 |
| Interest cost | 244 | 197 | 253 |
| Expected return on plan assets | (702) | (731) | (773) |
| Amortization of: | | | |
| Prior service cost (benefit) | (19) | (19) | (19) |
| Net actuarial loss | 179 | — | 139 |
| Participant contributions | (832) | (753) | (625) |
| **Net periodic benefit cost** | $ **1,405** | $ **860** | $ **957** |

We estimate the discount rate for our pension benefit obligation based on AA-AAA rated Swiss bonds. The expected rate of return on plan assets takes into consideration expected long-term returns based upon the weighted-average allocation of equities, fixed income and other asset components comprising the plan's assets at the plan's measurement date.

The following tables set forth the key assumptions used to determine the net periodic cost for each fiscal year and the benefit obligation at fiscal year-end:

| Key assumptions used to determine the net periodic cost: | | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Discount rate | 0.80% | 0.80% | 0.65% |
| Expected rate of return on plan assets | 3.00% | 3.00% | 3.00% |
| Rate of increase in compensation levels | 0.75% | 0.75% | 0.75% |

| Key assumptions used to determine the benefit obligation: | | |
|---|---|---|
| | **2019** | **2018** |
| Discount rate | 0.25% | 0.80% |
| Rate of increase in compensation levels | 0.75% | 0.75% |

The pension plan's assets are invested with the objective of being able to meet current and future benefit payment needs, while maximizing total investment returns within the constraints of a prudent level of portfolio risk and diversification. The assets of the plan are diversified across asset classes to achieve an optimal balance between risk and return, and between income and growth of assets through capital appreciation.

The following table sets forth the asset allocation of our pension plan assets, by category:

| Plan assets by category: | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Debt securities | 25.7% | 37.9% |
| Equity securities | 33.5% | 33.2% |
| Real estate | 18.8% | 15.4% |
| Other | 20.4% | 12.9% |
| Cash and cash equivalents | 1.6% | 0.6% |
| Total Plan Assets | 100.0% | 100.0% |

This pooled pension fund is held in a trust. This fund is comprised of various publicly traded securities and assets (equity, fixed income, reits, direct real estate and alternative investments). The trust does not have a separate portfolio for Akorn. Akorn is entitled to a proportion of the total assets of the trust. The fair value amounts were provided by the fund administrator who values at market the total portfolio in accordance with ASC 820 - Fair Value of Financial Instruments. The $25.9 million and $23.6 million represents the fair values of the plan assets as of December 31, 2019 and 2018, respectively. The fair value hierarchy of the plan assets for 2019 and 2018 was level II.

The Company expects to contribute approximately $1.7 million to the pension plan in 2020.

The following table sets forth the Company's estimated future benefit payments:

| Year | ($ in thousands) | |
|---|---|---|
| 2020 | $ | 1,866 |
| 2021 | | 1,487 |
| 2022 | | 1,514 |
| 2023 | | 1,455 |
| 2024 | | 1,563 |
| Years 2025 - 2029 | $ | 8,254 |

**Smart Choice! Akorn's 401(k) Program**

All U.S. full-time Akorn employees are eligible to participate in the Company's 401(k) Plan. The Company matches the employee contribution to 50% of the first 6% of an employee's eligible compensation.  Company matching contributions vest 50% after two years of credited service and 100% after three years of credited service. During the years ended December 31, 2019, 2018 and 2017, plan-related expenses totaled approximately $3.0 million, $2.6 million and $2.6 million, respectively. The Company's matching contribution is funded on a current basis.

**Note 21— Subsequent Events**

*Term Loans and Second Amended Standstill Agreement*

On February 12, 2020, the Loan Parties entered into the Comprehensive Amendment in the form of the Second Amended Standstill Agreement with certain Standstill Lenders. Pursuant to the terms of the Second Amended Standstill Agreement, the duration of the "Standstill Period" was extended from February 7, 2020 until the earliest of the delivery of a notice of termination of the Standstill Period by the Standstill Lenders upon the occurrence of a default under the loan agreement, or a breach of, or non-compliance with certain provisions of the Second Amended Standstill Agreement.

The Second Amended Standstill Agreement provides that, for the duration of the Extended Standstill Period, among other matters, neither the Administrative Agent nor the Lenders may (i) declare any Event of Default or (ii) otherwise seek to exercise any rights or remedies, in each case of clauses (i) and (ii) above, to the extent directly relating to any alleged Event of Default arising from any alleged breach of certain covenants, to the extent the facts and circumstances giving rise to any such breach have been (x) publicly disclosed by the Company or (y) disclosed in writing by the Company to private side Lenders or certain advisors to the Ad Hoc Group (collectively, the "Specified Matters").

The Second Amended Standstill Agreement provides, among other matters, that:

- during the Extended Standstill Period:
  - the Company must deliver certain financial and other information to the Lenders or their advisors, including without limitation, monthly financial statements with agreed upon adjustment, monthly operational statistics broken down by facility, pipeline reporting, 13-week cash flow forecasts, weekly variance reports, certain valuation reports, weekly status updates with respect to the Sale Process (as defined below) and certain regulatory information, and participate in various update calls with the Lenders and their advisors (the "Affirmative Covenants and Milestones"); and
  - the Company and its subsidiaries are restricted, among other matters, from (i) consummating certain asset sales and investments, (ii) making certain restricted payments, (iii) engaging in sale and leaseback transactions, (iv) incurring certain liens and indebtedness, (v) reinvesting any proceeds received from certain asset sales and (vi) without the consent of the Required Lenders at such time, (A) designating any Restricted Subsidiary as an Unrestricted Subsidiary, or otherwise creating or forming any Unrestricted Subsidiary, (B) transferring any assets of the Company or any of its Restricted Subsidiaries to any Unrestricted Subsidiary, except as otherwise permitted under the Term Loan Agreement (after giving effect to the Second Amended Standstill Agreement), and/or (C) releasing any existing Loan Guarantors or security interest granted under the Term Loan Agreement outside of the ordinary course of business (collectively, the "Negative Covenants");
- the Company will market and conduct a sale process for substantially all of its assets in accordance with the milestones set forth in the Second Amended Standstill Agreement (the "Sale Process"), which milestones will depend upon whether the bids submitted and then in effect in connection with the Sale Process are sufficient to pay all obligations under the Term Loan Agreement;
- the Sale Process will be consummated on either an out-of-court or in-court basis (potentially through the filing of Chapter 11 cases under the U.S. Bankruptcy Code in order to effectuate the Sale Process);
- if at any time during the Sale Process, no third party bids exist that are sufficient to pay all obligations under the Loan Agreement (taking into account available cash) there shall be an immediate Event of Default under the Term Loan Agreement (a "Toggle Event");
- the milestones with respect to the Sale Process include:
  - subject to the alternative milestones described below upon the occurrence of a Toggle Event:
    - on or before March 27, 2020, binding bids in connection with the Sale Process shall be due;
    - on or before April 5, 2020, the Company shall select a stalking horse bidder and commence the Chapter 11 cases to effectuate the Sale Process; and
    - thereafter, certain additional milestones shall be applicable during the Chapter 11 cases;
  - upon the occurrence of a Toggle Event, the following alternative milestones will apply:
    - on or before twenty-six (26) days after a Toggle Event, the Company and the Ad Hoc Group Advisors shall reach an agreement in principle with respect to a restructuring support agreement ("RSA") (such agreement not to be unreasonably withheld, conditioned or delayed);
    - on or before thirty (30) days after a Toggle Event, the Company shall commence the Chapter 11 cases to consummate either (A) a sale transaction pursuant with the Lenders serving as a stalking horse, and entering into a stalking horse asset purchase agreement (the "Credit Bid APA") in order to exercise their rights to credit bid under the Loan Documents or (B) a transaction backstopped by an executed RSA; and
    - thereafter, certain additional milestones shall be applicable during the Chapter 11 cases;
- To the extent either (i) a Toggle Event exists or (ii) the Company commences the Chapter 11 cases without a stalking horse asset purchase agreement with a bid sufficient to pay all obligations under the Term Loan Agreement (taking into account available cash in the case of cash fee, debt free bids), the Company shall prepay, on a ratable basis, within five (5) days prior to the commencement of the Chapter 11 cases all outstanding Loans under the Term Loan Agreement in an amount that, after giving effect to such prepayment, leaves the Company's pro forma cash balance at an amount not to exceed $87.5 million.
- the following exit payments will be paid in cash to each Lender on a pro rata basis in connection with repayment of the Loans under the Term Loan Agreement:
  - if the Sale Process is approved by the Bankruptcy Court on or prior to July 15, 2020, then:
    - if the Sale Process is consummated on or prior to July 15, 2020, 0.50% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 50 basis points); or
    - if the Sale Process is consummated after July 15, 2020, 0.75% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 75 basis points); and
  - if the Sale Process is not approved by the Bankruptcy Court on or prior to July 15, 2020, then:

- ▪ if the Sale Process is consummated on or prior to August 15, 2020, 1.00% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 100 basis points); or
- ▪ if the Sale Process is consummated after August 15, 2020, 2.00% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 200 basis points);
- ○ upon the earlier to occur of (i) entry into the RSA, (ii) entry into the Credit Bid APA, and one day prior to the Company commencing the Chapter 11 Cases without a Stalking Horse APA, 2.50% of the aggregate principal amount of the Loans of such Lender then outstanding (i.e., 250 basis points);
- • if at any time during the Sale Process no third-party bids exist which are sufficient to pay all obligations (net of available cash), then from the occurrence of such date until the date of a Standstill Event of Default, the interest margin payable in cash shall be further increased by 2.5% to LIBOR plus 12.50%.

Subject to a five business day cure period (the "Cure Period"), the Company's failure to comply with the Affirmative Covenants and Milestones (other than perfection of the Lenders' security interests (the "Excluded Milestones")) during the Standstill Period would permit the Required Lenders to terminate the Standstill Period and exercise any rights and remedies under the Term Loan Agreement with respect to the Specified Matters or a Standstill Event of Default. The Company's failure to comply with the Negative Covenants and Excluded Milestones during the Standstill Period would permit the Required Lenders to terminate the Standstill Agreement and constitute an immediate Event of Default under the Term Loan Agreement. The Company's failure to comply with any Affirmative Covenants and Milestones (subject to the Cure Period), the Excluded Milestones, Negative Covenants or other covenants in the Second Amended Standstill Agreement would also result in a further increase of the interest margins payable with respect to outstanding Loans by 0.50%, payable in kind.

In addition, the Company agrees (1) not to make any payments in respect of judgments or settlements of certain ongoing litigation matters without the prior written consent of the Required Lenders and (2) to make payment of fees and expenses to the advisors of Ad Hoc Group (collectively, the "Other Covenants"). The failure to comply with any of the Other Covenants would constitute an immediate Event of Default under the Term Loan Agreement.

If an Event of Default occurs, the Lenders may accelerate the obligations under the Term Loan Agreement, foreclose upon the collateral securing the debt and exercise other rights and remedies. If the Lenders take this action, the Company may not be able to repay the obligations under the Term Loan Agreement. If the Company does not have sufficient funds on hand to pay its debt when due, it may be required to seek Chapter 11 protection, refinance the debt, incur additional debt, sell assets, sell additional securities, and/or consummate the Sale Process. There can be no assurance that the Company will be able to consummate any of these transactions on commercially reasonable terms or at all. The failure to repay or refinance the obligations under the Term Loan Agreement when due and the uncertainties relating to the Company's outstanding litigation may have a material adverse impact on the Company's business, financial condition and results of operations.

***Retention programs for the Company's executive officers and all other U.S. salaried exempt employees for 2020***

As a result of the Company's ongoing exploration of strategic alternatives, on February 4, 2020, the compensation committee of the board of directors (the "Board") of the Company recommended, and the Board approved, retention programs for the Company's executive officers and all other U.S. salaried exempt employees for 2020.

The 2020 retention program for the Company's executive officers (the "Participants") provides a prepaid retention payment (the "Retention Bonus") to each Participant, subject to the terms of a letter agreement (the "Letter Agreement"). Pursuant to the Letter Agreement, a portion of or all of the Retention Bonus is subject to repayment by the Participant in certain circumstances, including if certain metrics are not satisfied or employment is terminated for certain reasons by December 31, 2020.

A total aggregate of approximately $39.4 million was approved for payment under the retention programs for the Company's U.S. salaried exempt employees for 2020. The amount of the Retention Bonuses paid to date is $13.8 million, and remainder will be paid on a quarterly basis. The retention programs for the Company's executive officers and other U.S. salaried exempt employees replace the traditional incentive compensation programs for 2020.

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.***

None.

**Item 9A.** ***Controls and Procedures.***

**(i) Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2019, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures are effective as of December 31, 2019.

**(ii) Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). The Company's internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Management, including our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework (2013)*. It is Management's assessment that the Company did maintain, in all material respects, effective internal control over financial reporting as of December 31, 2019.

**(iii) Remediation Plan for Material Weakness in Internal Control over Financial Reporting**

In prior filings, we identified and reported a material weakness in the Company's internal control over financial reporting related to our internal controls over accounting for Stock Award Modifications. As reported in our Form 10-Q filed on August 2, 2019, we have now executed our remediation plan and testing procedures. We have designed, implemented, and tested the appropriate controls to fully remediate the material weakness. These controls include additional procedures related to the interpretation and calculation of stock award modifications with respect to accelerated vesting in conjunction with separation packages and other non-routine performance awards granted. Therefore, all remedial actions as described fully in our 2018 Form 10-K, as filed on March 1, 2019, are fully completed.

**(iv) Changes in Internal Control over Financial Reporting**

Other than the control improvements described in the above "Remediation Plan for Material Weakness in Internal Control over Financial Reporting," there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B. *Other Information.***

None.

**PART III**

**Item 10.** ***Directors, Executive Officers and Corporate Governance.***

Incorporated by reference to the material under the caption "Information about our Executive Officers" in Part I of this Report on Form 10-K and the sections entitled "Corporate Governance and Related Matters" and "Proposal 1 - Election of Directors" in the definitive proxy statement for the 2020 annual meeting.

**Item 11.** ***Executive Compensation.***

Incorporated by reference to the sections entitled "Executive Compensation and Other Information" in the definitive proxy statement for the 2020 annual meeting.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.***

Incorporated by reference to the section entitled "Security Ownership of Certain Beneficial Owners and Management" in the definitive proxy statement for the 2020 annual meeting.

**Item 13.** ***Certain Relationships and Related Transactions and Director Independence.***

Incorporated by reference to the section entitled "Corporate Governance and Related Matters – Certain Relationships and Related Transactions" in the definitive proxy statement for the 2020 annual meeting.

**Item 14.** ***Principal Accounting Fees and Services.***

Incorporated by reference to the section entitled "Proposal 2 - Ratification of the Appointment of BDO USA, LLP as the Company's Independent Registered Public Accounting Firm for the Fiscal Year Ending December 31, 2020" in the definitive proxy statement for the 2020 annual meeting.

**PART IV**

**Item 15.** *Exhibits, Financial Statement Schedules.*

(a)   Documents filed as part of this report.

(1)   *Financial Statements*. The consolidated financial statements listed on the index to Item 8 of this Annual Report on Form 10-K are filed as a part of this Annual Report.

(2)   *Financial Statement Schedules.* All financial statement schedules have been omitted since the information is either not applicable or required or is included in the financial statements or notes thereof.

(3)   *Exhibits*. Those exhibits marked with a (*) refer to exhibits filed or furnished herewith. The other exhibits are incorporated herein by reference, as indicated in the following list. Those exhibits marked with a (†) refer to management contracts or compensatory plans or arrangements. Portions of the exhibits marked with a (Ω) are the subject of a Confidential Treatment Request under 17 C.F.R. §§ 200.80(b)(4), 200.83 and 240.24b-2.  Omitted material for which confidential treatment has been requested has been filed separately with the SEC.

**Exhibit Index**

Incorporated by reference to the material under the caption "Exhibits" in this Report on Form 10-K.

**Item 16.** *Form 10-K Summary.*

None.

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of August 26, 2013, by and among Akorn, Inc., Akorn Enterprises, Inc., and Hi-Tech Pharmacal Co., Inc., incorporated by reference to Exhibit 2.1 to Akorn's report on Form 8-K filed on August, 28, 2013. |
| 2.2 Ω | Stock and Asset Purchase and License Agreement dated as of November 15, 2013 by and among Oak Pharmaceuticals, Inc., a wholly-owned subsidiary of Akorn, Inc., Merck & Co., Inc., Merck Sharp & Dohme Corp., and Inspire Pharmaceuticals, Inc., incorporated by reference to Exhibit 2.1 to Akorn's report on Form 8-K filed on November 21, 2013. |
| 2.3 | Agreement and Plan of Merger dated as of May 9, 2014 by and among Akorn Enterprises II, Inc., a wholly-owned subsidiary of Akorn, Inc., VPI Holdings Corp., and Tailwind Management LP, incorporated by reference to Exhibit 2.1 to Akorn's report on Form 8-K filed on May 12, 2014. |
| 2.4 Ω | Product Acquisition Agreement dated as of September 30, 2014 by and among Oak Pharmaceuticals, Inc., a wholly-owned subsidiary of Akron, Inc., and Sunovion Pharmaceuticals, Inc., incorporated by reference to Exhibit 2.1 to Akorn's report on Form 8-K filed on October 1, 2014. |
| 2.5 | Agreement and Plan of Merger By and Among Fresenius Kabi AG, Quercus Acquisition, Inc., Akorn, Inc. and Fresenius SE & Co. KGAA dated as of April 24, 2017, incorporated by reference to Exhibit 2.1 to the report on Form 8-K filed by Akorn, Inc. on April 24, 2017. |
| 2.6 | Voting Agreement dated as of April 24, 2017, among Fresenius Kabi AG, Dr. John N. Kapoor and certain affiliates of Dr. Kapoor that are shareholders of Akorn, Inc., incorporated by reference to Exhibit 2.2 to the report on Form 8-K filed by Akorn, Inc. on April 24, 2017. |
| 2.7 | Voting Agreement dated as of April 24, 2017, among Fresenius Kabi AG, Rajat Rai and an affiliate of Mr. Rai that is a shareholder of Akorn, Inc., incorporated by reference to Exhibit 2.3 to the report on Form 8-K filed by Akorn, Inc. on April 24, 2017. |

2.8     Voting Agreement dated as of April 24, 2017, between Fresenius Kabi AG and Joseph Bonaccorsi, incorporated by reference to Exhibit 2.4 to the report on Form 8-K filed by Akorn, Inc. on April 24, 2017.

2.9     Voting Agreement dated as of April 24, 2017, between Fresenius Kabi AG and Dr. Bruce Kutinsky, incorporated by reference to Exhibit 2.5 to the report on Form 8-K filed by Akorn, Inc. on April 24, 2017.

3.1     Restated Articles of Incorporation of Akorn, Inc. dated September 16, 2004, incorporated by reference to Exhibit 3.1 to Akorn, Inc.'s Registration Statement on Form S-1 filed on September 21, 2004 (Commission file No. 001-32360).

3.2     By-Laws of Akorn, Inc., as amended on April 24, 2017, incorporated by reference to Exhibit 3.1 to Akorn's report on Form 10-Q filed by Akorn, Inc. on May 4, 2017.

3.3     Form T-3, Application for Qualification of Indenture Under the Trust Indenture Act of 1939, filed by Akorn, Inc. on August 26, 2019.

4.1     Modification, Warrant and Investor Rights Agreement, dated April 13, 2009, among Akorn, Inc., Akorn (New Jersey), Inc., and EJ Funds LP, incorporated by reference to Exhibit 4.2 to Akorn, Inc.'s report on Form 8-K filed on April 17, 2009.

4.2     Indenture dated as of June 1, 2011 by and between Akorn, Inc. and Wells Fargo Bank, National Association, as trustee, including the form of 3.50% Convertible Senior Note due 2016 (included as Exhibit A to the Indenture), incorporated by reference to Exhibit 4.1 to Akorn, Inc.'s report on Form 8-K filed on June 2, 2011.

4.3*     Description of Akorn, Inc.'s Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934.

10.1†     Form of Akorn, Inc. Non-Qualified Stock Option Agreement (May 2016), incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016.

10.2†     Form of Akorn, Inc. Incentive Stock Option Agreement (May 2016), incorporated by reference to Exhibit 10.2 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016.

10.3†     Form of Akorn, Inc. Restricted Stock Unit Award Agreement (May 2016), incorporated by reference to Exhibit 10.3 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016.

10.4†     Amended and Restated Akorn, Inc. 2003 Stock Option Plan, as amended, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on March 8, 2012.

10.5†     Amended and Restated Akorn, Inc. 2014 Stock Option Plan incorporated by reference to Appendix B to Akorn, Inc.'s Definitive Proxy Statement filed on November 14, 2016.

10.6†     Akorn, Inc. 2016 Employee Stock Purchase Plan incorporated by reference to Appendix A to Akorn, Inc.'s Definitive Proxy Statement filed on November 14, 2016.

10.7†     Akorn, Inc. Omnibus Incentive Compensation Plan, incorporated by reference to Appendix A to the Definitive Proxy Statement on Schedule 14A filed by Akorn, Inc. on March 20, 2017.

10.8†     Akorn, Inc. 2017 Omnibus Incentive Compensation Plan - Form of Restricted Stock Unit Award Agreement, incorporated by reference to Exhibit 10.2 to the report on Form 10-Q filed by Akorn, Inc. on May 4, 2017.

| 10.9† | Akorn, Inc. 2017 Omnibus Incentive Compensation Plan - Form of Restricted Stock Unit Award (non-employee director), incorporated by reference to Exhibit 10.3 to the report on Form 10-Q filed by Akorn, Inc. on May 4, 2017. |
| 10.10† | Akorn, Inc. 2017 Omnibus Incentive Compensation Plan, as amended, incorporated by reference to Appendix A of the Akorn, Inc. Definitive Proxy Statement on Schedule 14A filed on March 22, 2019. |
| 10.11† | Form of Inducement Award - Non-qualified Options granted to Douglas Boothe on January 8, 2019, incorporated by reference to Exhibit 4.3 to the Akorn Inc. registration statement on Form S-8 on January 8, 2019. |
| 10.12† | Form of Inducement Award - Performance Stock Units granted to Douglas Boothe on January 8, 2019, incorporated by reference to Exhibit 4.4 to the Akorn Inc. registration statement on Form S-8 filed on January 8, 2019. |
| 10.13† | Form of Inducement Award - Restricted Stock Units granted to Douglas Boothe on January 8, 2019, incorporated by reference to Exhibit 4.5 to the Akorn Inc. registration statement on Form S-8 filed on January 8, 2019. |
| 10.14† | Form of Employment Agreement, dated December 22, 2010, between Akorn, Inc. and Joe Bonaccorsi, its Secretary, incorporated by reference to Exhibit 10.3 to Akorn, Inc.'s report on Form 8-K filed on December 28, 2010. |
| 10.15† | Form of Employment Agreement, dated April 11, 2014, between Akorn, Inc. and Raj Rai, its Chief Executive Officer, effective January 1, 2014, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on April 16, 2014. |
| 10.16† | Form of Employment Agreement, dated April 11, 2014, between Akorn, Inc. and Bruce Kutinsky, its Chief Operating Officer, incorporated by reference to Exhibit 10.2 to Akorn, Inc.'s report on Form 8-K filed on April 16, 2014. |
| 10.17† | Letter Offer Agreement, dated October 13, 2014, as amended December 18, 2014, between Akorn, Inc. and Steve Lichter, incorporated by reference to Exhibit 10.13 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016 |
| 10.18† | Letter Offer Agreement, dated March 5, 2015, between Akorn, Inc. and Jonathan Kafer, incorporated by reference to Exhibit 10.14 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016. |
| 10.19† | Letter Executive Employment Agreement, dated December 11, 2018, between Akorn, Inc. and Jonathan Kafer, its Chief Commercial Officer, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on December 17, 2018. |
| 10.20† | Letter Offer Agreement, dated March 26, 2015, between Akorn, Inc. and Randall Pollard, incorporated by reference to Exhibit 10.15 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016. |
| 10.21† | Letter Agreement, dated August 25, 2015, between Akorn, Inc. and Randall Pollard, incorporated by reference to Exhibit 10.16 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016. |
| 10.22† | Letter Agreement, dated September 4, 2015, between Akorn, Inc. and Randall Pollard, incorporated by reference to Exhibit 10.17 to Akorn, Inc.'s report on Form 10-K for the fiscal year ended December 31, 2015, filed on May 10, 2016. |
| 10.23† | Form of Employment Agreement, dated October 5, 2015, between Akorn, Inc. and Duane A. Portwood, its Chief Financial Officer, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on October 13, 2015. |
| 10.24† | Form of Letter Agreement, dated December 27, 2018, between Akorn, Inc. and Rajat Rai incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on December 28, 2018. |

| 10.25† | Form of Amendment #1 to Employment Agreement, dated April 11, 2014, between Akorn, Inc. and Raj Rai, its Chief Executive Officer, effective December 31, 2018, incorporated by reference to Exhibit 10.23 to Akorn, Inc's report on Form 10-K filed on March 1, 2019. |
| 10.26† | Form of Letter Agreement, dated January 7, 2019, between Akorn, Inc. and Bruce Kutinsky incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on January 7, 2019. |
| 10.27† | Form of Offer Letter Agreement, dated January 28, 2019, between Akorn, Inc. and Christopher Young, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on January 28, 2019. |
| 10.28† | Form of Separation and Consulting Agreement, dated February 5, 2019, between Akorn, Inc. and Rajat Rai, incorporated by reference to Exhibit 10.26 to Akorn, Inc.'s report on Form 10-K filed on March 1, 2019. |
| 10.29† | Form of Separation and Consulting Agreement, dated February 5, 2019, between Akorn, Inc. and Bruce Kutinsky, incorporated by reference to Exhibit 10.27 to Akorn, Inc's report on Form 10-K filed on March 1, 2019. |
| 10.30† | Form of Offer Letter Agreement, dated December 20, 2018, between Akorn, Inc. and Douglas S. Boothe, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on December 20, 2018. |
| 10.31† | Form of Executive Agreement, dated December 20, 2018, between Akorn, Inc. and Douglas S. Boothe, its President and Chief Executive Officer, effective January 1, 2019, incorporated by reference to Exhibit 10.2 to Akorn, Inc.'s report on Form 8-K filed on December 20, 2018. |
| 10.32† | Form Letter Agreement, dated as of February 4, 2020, in regards to Retention Bonus awards offered to the Executive Officers of the Company, incorporated by reference to Exhibit 10.1 to Akorn Inc.'s current report on Form 8-K filed on February 10, 2020. |
| 10.33†* | Akorn, Inc. Clawback Policy revised November 6, 2019. |
| 10.34 | Series A-2 Preferred Stock Purchase Agreement dated as of August 1, 2011 by and between Akorn, Inc. and Aciex Therapeutics, Inc., incorporated by reference to Exhibit 10.2 to Akorn Inc.'s report on Form 10-Q filed on November 9, 2011. |
| 10.35 | Amendment #1 to Series A-2 Preferred Stock Purchase Agreement dated as of September 30, 2011 by and between Akorn, Inc. and Aciex Therapeutics, Inc., incorporated by reference to Exhibit 10.1 to Akorn Inc.'s report on Form 10-Q filed on November 9, 2011. |
| 10.36 | Lease Agreement dated July 15, 2010, by and between Veronica Development Associates, a New Jersey general partnership, and Akorn (New Jersey), Inc., an Illinois corporation, for the Company's 50,000 square foot manufacturing facility at 72-6 Veronica Avenue, Somerset, New Jersey, incorporate by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on July 30, 2010. |
| 10.37 | Loan Agreement dated as of April 17, 2014 among Akorn, Inc., with certain financial institutions as lenders (Lenders), and JPMorgan Chase Bank as administrative agent (Agent) for the Lenders, incorporated by reference to Exhibit 10.1 to Akorn Inc.'s report on Form 8-K filed on April 23, 2014. |
| 10.38 | Credit Agreement dated as of April 17, 2014 among Akorn, Inc., with certain financial institutions as lenders (Lenders), and JPMorgan Chase Bank as administrative agent (Agent) for the Lenders, incorporated by reference to Exhibit 10.2 to Akorn Inc.'s report on Form 8-K filed on April 23, 2014. |
| 10.39 | Incremental Facility Joinder Agreement dated as of August 12, 2014 among Akorn, Inc., with certain financial institutions as lenders (Lenders) and JPMorgan Chase Bank as administrative agent (Agent) for the Lenders, incorporated by reference to Exhibit 10.1 to Akorn Inc.'s report on Form 8-K filed on August 15, 2014. |
| 10.40 | ABL Consent Memorandum, dated as of May 19, 2015, among Akorn, Inc., the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on May 20, 2015. |

| 10.41 | Term Loan Consent Memorandum, dated as of May 19, 2015, among Akorn, Inc., the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, incorporated by reference to Exhibit 10.2 to Akorn, Inc.'s report on Form 8-K filed on May 20, 2015. |
| --- | --- |
| 10.42 | ABL Consent Memorandum, dated as of November 13, 2015, among Akorn, Inc., the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on November 13, 2015. |
| 10.43 | Term Loan Consent Memorandum, dated as of November 13, 2015, among Akorn, Inc., the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, incorporated by reference to Exhibit 10.2 to Akorn, Inc.'s report on Form 8-K filed on November 13, 2015. |
| 10.44 | Amended and Restated Credit Agreement dated as of April 16, 2019 among Akorn, Inc., with The Other Loan Parities, The Lenders Party, JPMorgan Chase Bank, N.S., as Administrative Agent, and Bank of America, N.A., as Syndication Agent, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on April 17, 2019. |
| 10.45 | Standstill Agreement and First Amendment to Loan Agreement, dated as of May 6, 2019, by and among Akorn, Inc., certain of its subsidiaries, the Lenders party thereto and JPMorgan Chase, N.A., as Administrative Agent, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s report on Form 8-K filed on May 7, 2019. |
| 10.46 | First Amendment to Standstill Agreement and Second Amendment to Loan Agreement, dated as of December 15, 2019, by and among Akorn, Inc., the other Loan Parties under the Loan Agreement, the Ad Hoc Group of Lenders, as defined, and the Administrative Agent, incorporated by reference to Exhibit 10.1 to Akorn, Inc.'s current report on Form 8-K filed on December 16, 2019. |
| 10.47* | Second Amendment to Standstill Agreement and Third Amendment to Loan Agreement, dated as of February 12, 2020, by and among Akorn, Inc., the other Loan Parties under the Loan Agreement, the Ad Hoc Group of Lenders, as defined, and the Administrative Agent. |
| 10.48 | Stipulation and Agreement of Settlement, dated as of August 9, 2019, in regards to the class action litigation captioned In re Akorn, Inc. Data Integrity Securities Litigation, incorporated by reference to the Exhibit 10.1 to the current report on Form 8-K filed by the Company on August 12, 2019. |
| 21.1 * | Listing of Subsidiaries of Akorn, Inc. |
| 23.1 * | Consent of BDO USA, LLP, Independent Registered Public Accounting Firm |
| 31.1 * | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a). |
| 31.2 * | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a). |
| 32.1 * | Certification of the Chief Executive Officer pursuant to 18 USC Section 1350. |
| 32.2 * | Certification of the Chief Financial Officer pursuant to 18 USC Section 1350. |
| 101 | The financial statements and footnotes from the Akorn, Inc. Annual Report on Form 10-K for the year ended December 31, 2019, filed on February 20, 2020 formatted in XBRL: (i) Consolidated Balance Sheets, (ii) Consolidated Statements of Operations, (iii) Consolidated Statement of Shareholders' Equity, (iv) Consolidated Statements of Cash Flows and (v) Notes to Consolidated Financial Statements. |

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Exchange Act, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

AKORN, INC.

By:   /s/ DOUGLAS S. BOOTHE

Douglas S. Boothe
President and Chief Executive Officer

Date: February 26, 2020

103

Pursuant to the requirements of the Exchange Act, this report has been signed below by the following persons on behalf of the Registrant, and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ DOUGLAS S. BOOTHE<br>Douglas S. Boothe | President and Chief Executive Officer and Director | February 26, 2020 |
| /s/ DUANE A. PORTWOOD<br>Duane A. Portwood | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | February 26, 2020 |
| /s/ RANDALL E. POLLARD<br>Randall E. Pollard | Senior Vice President, Finance and Chief Accounting Officer<br>(Principal Accounting Officer) | February 26, 2020 |
| /s/ ALAN WEINSTEIN<br>Alan Weinstein | Director, Chairman of the Board | February 26, 2020 |
| /s/ KENNETH S. ABRAMOWITZ<br>Kenneth S. Abramowitz | Director | February 26, 2020 |
| /s/ ADRIENNE L. GRAVES<br>Adrienne L. Graves | Director | February 26, 2020 |
| /s/ STEVEN J. MEYER<br>Steven J. Meyer | Director | February 26, 2020 |
| /s/ THOMAS G. MOORE<br>Thomas G. Moore | Director | February 26, 2020 |
| /s/ TERRY ALLISON RAPPUHN<br>Terry Allison Rappuhn | Director | February 26, 2020 |
| /s/ BRIAN TAMBI<br>Brian Tambi | Director | February 26, 2020 |

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| 4.3* | Description of Akorn, Inc.'s Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934. |
| 10.33†* | Akorn, Inc. Clawback Policy revised November 6, 2019. |
| 10.47* | Second Amendment to Standstill Agreement and Third Amendment to Loan Agreement, dated as of February 12, 2020, by and among Akorn, Inc., the other Loan Parties under the Loan Agreement, the Ad Hoc Group of Lenders, as defined, and the Administrative Agent. |
| 21.1 | Listing of Subsidiaries of Akorn, Inc. |
| 23.1 | Consent of BDO USA, LLP, Independent Registered Public Accounting Firm |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a). |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a). |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 USC Section 1350. |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 USC Section 1350. |

Exhibit 4.3

## DESCRIPTION OF AKORN, INC.'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

As of December 31, 2019, Akorn, Inc. (the "company," "we," "our" or "us") has one class of securities registered under Section 12(b) of the Securities Exchange Act of 1934, as amended: common stock, no par value per share (the "common stock"). Our common stock is traded on the NASDAQ Global Select Market under the ticker symbol "AKRX".

The following summary description of our common stock is qualified in its entirety by reference to our restated articles of incorporation and our by-laws, copies of which are filed as exhibits to this Annual Report on Form 10-K, of which this Exhibit 4.3 is a part.

### Authorized Capitalization

Our restated articles of incorporation authorize us to issue up to 150,000,000 shares of common stock, no par value per share, and up to 5,000,000 shares of preferred stock, $1.00 par value per share.

### Common Stock

#### *Voting Rights*

The holders of our common stock vote on all matters submitted to a shareholder vote. Each holder of our common stock is entitled to one vote for each share of common stock held of record on all matters as to which our common shareholders are entitled to vote.

The holders of our common stock may not cumulate votes for the election of directors.

#### *Dividends*

Holders of our common stock are entitled to dividends at such times and amounts as our board of directors may determine, subject to any similar or other rights accorded to, or obligations with respect to, any additional series of preferred stock that are issued from time to time by our board of directors.

#### *Other Rights*

In the event of a voluntary or involuntary liquidation, dissolution or winding up of our company, prior to any distributions to the holders of our common stock, our creditors will receive any payments they are entitled along with any liquidation preferences granted to any future holders of preferred stock. After those payments, the holders of our common stock will share ratably, according to the number of shares held by them, in our remaining assets, if any. Shares of our common stock are fully paid and non-assessable once they are issued and paid for.

Shares of our common stock are not redeemable; have no redemption, sinking fund, conversion or preemptive rights; and are not subject to further calls or assessments by the company under state statutes or otherwise.

{N3964422.3}

Our certificate of incorporation authorizes our board of directors, subject to any limitations prescribed by law, without further shareholder approval, to establish and to issue from time to time one or more classes or series of preferred stock, par value $1.00 per share, covering up to an aggregate of 5,000,000 shares of preferred stock. Each class or series of preferred stock that we may designate in the future will cover the number of shares and will have the powers, preferences, rights, qualifications, limitations and restrictions determined by the board of directors, which may include, among others, dividend rights, liquidation preferences, voting rights, conversion rights, preemptive rights and redemption rights, and such rights may be senior to, or limit rights of, the common stock.

## Anti-Takeover Effect of Governing Documents and Applicable Law

Our restated articles of incorporation and by-laws as well as the Louisiana Business Corporation Act ("LBCA") contain certain provisions that may make it more difficult to acquire control of our company by means of a merger, tender offer, proxy contest or otherwise. These provisions, which are summarized below, are designed to encourage persons seeking to acquire control of us to negotiate with our directors. The following descriptions are abbreviated summaries of detailed and complex governing documents and statutes. For a complete understanding of these governing documents and statutes, you should read them in their entirety.

### *Effect of Authorized and Unissued Capital Stock*

Subject to requirements of the LBCA and applicable exchange rules, our board of directors is able to issue any authorized but unissued shares of our common stock and undesignated shares of our preferred stock without shareholder approval. To the extent that capital stock is available for such issuance, our board of directors could issue shares to prevent or make more difficult or costly the completion of a takeover transaction it determined was not in our company's best interest. Such an issuance could, among other things, dilute the voting or other rights of the proposed acquiror or insurgent shareholder group, create a substantial voting block in institutional or other hands that might undertake to support the position of our incumbent board of directors or effect an acquisition that might complicate or preclude the takeover. Furthermore, our restated articles of incorporation grant our board of directors broad power to establish the rights and preferences of our authorized and unissued preferred stock. The issuance of shares of preferred stock pursuant to our board of directors' authority may adversely affect the rights of the holders of our common stock.

### *Vacancies on the Board of Directors*

Our bylaws enable the board of directors to increase the size of the board between annual meetings and fill the vacancies created by the increase by a majority of the remaining directors. Furthermore, even though our shareholders have the right to fill any such vacancies at a special meeting, such action is subject to the limitations on our shareholders' ability to call a special meeting, described below.

### *Special Meetings of Shareholders*

A special meeting can only be called upon a written request from a shareholder if such request is signed by at least one-fifth in interest of the shareholders entitled to vote.

***No Cumulative Voting***

The LBCA does not permit cumulative voting in the election of directors, unless expressly provided in a corporation's articles of incorporation, and our restated articles of incorporation do not provide for such authority. In the absence of cumulative voting, the holders of a majority of the shares of our common stock may elect all of the directors standing for election, if they should so choose.

***By-law Amendments***

Although our shareholders have the right to change or repeal any by-laws made or amended by the directors, our board of directors can amend our by-laws without shareholder approval.

{N3964422.3}

**Akorn, Inc. Clawback Policy**

This Clawback Policy (this "***Policy***") has been adopted by the Compensation Committee of the Board of Directors (the "***Committee***") and the Board of Directors (the "***Board***") of Akorn, Inc. (the "***Company***") effective as of February 19, 2016. The U.S. Securities and Exchange Commission is expected to adopt final rules directing NASDAQ to issue listing requirements (the "***Final Listing Requirements***") that would implement the incentive-based compensation recovery requirements set forth in Section 10D of the Securities Exchange Act of 1934 (the "***Exchange Act***"), as added by Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Upon issuance of the Final Listing Requirements, the Company will make any changes to this policy as may be required to comply with those requirements.

### 1. Coverage

**A.** ***Covered Employees***. All Executive Officers are designated as "***Covered Employees***". In addition, the Committee may designate other employees as "***Covered Employees***" (or remove such designation) from time to time, including without limitation any employee who receives equity or equity-based awards. For purposes of this Policy, the term "***Executive Officer***" means any current or former executive officer of the Company for purposes of the Exchange Act.

**B.** ***Covered Compensation Arrangements***. This Policy will apply to any performance or incentive based bonus, equity or equity-based award or other incentive compensation granted (1) to any Covered Employee who is an Executive Officer, and (2) to any other Covered Employee, during the period in which he or she is designated as a Covered Employee (such compensation, "***Incentive-Based Compensation***"). For the avoidance of doubt, the following will not be considered Incentive-Based Compensation: salary, wholly time-based equity awards, tax-qualified retirement benefits, "other" compensation arising from reasonable relocation or expatriate expenses, elective deferrals of salary, programs provided to salaried employees generally in which the level of benefits is not determined by the employee's level of compensation and programs that provide a *de minimis* amount of compensation, as determined by the Committee in its sole discretion. Discretionary bonuses may be considered Incentive-Based Compensation, as determined by the Committee in its sole discretion.

**C.** ***Covered Events***. For purposes of this policy, a "***Covered Event***" means the occurrence of any of the following events for a Covered Employee who is an Executive Officer:

1.  The Company is required to prepare an accounting restatement due to the Company's material noncompliance with any financial reporting requirement under the U.S. federal securities laws (a "***Material Restatement Event***");

2.  Incentive-Based Compensation was awarded to, or received by, the Covered Employee based on materially inaccurate financial statements or on performance metrics that are materially inaccurately determined (regardless of whether the Covered Employee was responsible for the inaccuracy) (an "***Inaccurate Metrics Event***");

3.  An action or omission by the Covered Employee results in material financial or reputational harm to the Company.

4.  A determination by the Board, in good faith and in accordance with the terms and conditions of this Policy, that a Covered Employee has (i) engaged in a felony or engaged in conduct which is in the good faith judgment of the Board, applying reasonable standards of personal and professional conduct, injurious to the Company, its customers, employees, suppliers, or shareholders, financially, reputationally or otherwise, or (ii) violated any non-competition or non-solicitation provision of any award, plan or agreement applicable to the Covered Employee (a "***Misconduct Event***").

5.  A severe or intentional violation of FDA regulatory standards by a Covered Employee that results in an FDA warning letter or enforcement action (a "***Regulatory Event***").

For any Covered Employee who is not an Executive Officer, a Covered Event shall mean the occurrence of any event described in clauses (1) through (4) above, or any combination thereof, that the Committee, in its sole discretion, has determined to be a Covered Event for the purposes of this Policy.

### 2. Exercise of Clawback Authority

If the Committee determines that a Covered Event has occurred, the Committee may require the forfeiture and/or repayment of all or any portion of the following:

1.  Any outstanding and unpaid Incentive-Based Compensation, whether vested or unvested, that was awarded to the Covered Employee, and

2.  Any Incentive-Based Compensation that was paid to and received by the Covered Employee (including gains realized through the exercise of stock options or stock appreciation rights) during the thirty-six (36) month period preceding the date of the Covered Event, or such longer period of time as required by any applicable statute or government regulation. This may include the recoupment of any shares issued in connection with such Incentive-Based Compensation, and may require payment of net proceeds resulting from the sale or other disposition of shares issued upon the exercise of options or the settlement or vesting of equity awards.

The existence and date of a Covered Event and the amount of any forfeiture and/or repayment will be determined by the Committee in its sole discretion; *provided* that, notwithstanding the foregoing, if a Material Restatement Event or Inaccurate Metrics Event occurs, the Committee will consider all facts and circumstances that the Committee determines relevant, including whether anyone responsible engaged in misconduct, and considering issues of accountability, and the amount of the Incentive-Based Compensation repaid by the Covered Employee or cancelled by the Company shall not exceed the amount of Incentive-Based Compensation awarded by the Company or any subsidiary of the Company to a Covered Employee on or after February 19, 2016 (the "***Effective Date***") in excess of what would have been awarded to that Covered Employee under the circumstances reflected by the accounting restatement (the "***Excess Incentive-Based Compensation***"). In no event will such Excess Incentive-Based Compensation exceed the total amount of such Incentive-Based Compensation originally awarded to that Covered

Employee on or after the Effective Date. Additionally, for the avoidance of doubt, a restatement of the Company's financial statements due solely to a change in accounting policies or principles shall not be deemed a Material Restatement Event for purposes of this Policy.

Upon any recoupment determination by the Committee, the Committee shall notify the Covered Employee in writing of its determination and the Covered Employee shall promptly repay the amount of Incentive-Based Compensation so determined.

Any forfeiture and/or recoupment under this Policy will be in addition to any other remedies that may be available under applicable law or Company policy, including termination of employment.

### 3. Process

If the Committee determines that a Covered Event has occurred, the Committee will review the Incentive-Based Compensation and Excess Incentive-Based Compensation, with respect to each Covered Employee or former Covered Employee who is impacted by such Covered Event and will take prompt and reasonable action in accordance with this Policy to determine whether to seek, and if so, to seek recovery of appropriate Incentive-Based Compensation and/or Excess Incentive-Based Compensation in accordance with Section 2 of this Policy. In addition to any recoupment provided hereunder, the Committee may reduce, in its sole discretion, future Incentive-Based Compensation payable to a Covered Employee following a Covered Event to offset any amount that the Committee deems appropriate to recover under this Policy, *provided* that the Committee may not seek recovery of any amount by reducing any future amount that is payable and/or to be provided to the Covered Employee and that is considered "non-qualified deferred compensation" under Section 409A of the Internal Revenue Code of 1986, as amended and the regulations and guidance promulgated thereunder. To the extent feasible, in order to effectuate a recoupment under this Policy, the Committee will first consider reducing amounts otherwise due from the Company that have not yet been paid to the Covered Employee. There shall be no duplication of recovery under this Policy and any of 15 U.S.C. Section 7243 (Section 304 of the Sarbanes-Oxley Act of 2002) or Section 10D of the Exchange Act.

4. **Interpretation of this Policy; Determinations by the Committee and the Board:** The Committee and the Board may at any time in their sole discretion supplement or amend any provision of this Policy in any respect, repeal this Policy in whole or part or adopt a new policy relating to recovery of Incentive-Based Compensation with such terms as the Committee and the Board determine in their sole discretion to be appropriate. The Committee and the Board have the exclusive power and authority to administer this Policy, including, without limitation, the right and power to interpret the provisions of this Policy and to make all determinations deemed necessary or advisable for the administration of this Policy, including, without limitation, any determination as to: (a) whether a Covered Event has occurred; (b) whether any current or former Covered Employee has engaged in a Misconduct Event; and (c) what constitutes Excess Incentive-Based Compensation and Incentive-Based Compensation. All such actions, interpretations and determinations that are taken or made by the Committee and the Board in good faith will be final, conclusive and binding for all purposes.

5. **Due Process**: Before the Committee determines to seek recovery pursuant to this Policy, it shall provide, where feasible, the Covered Employee or former Covered Employee with written notice and the opportunity to be heard at a meeting of the Committee (which may be in-person or telephonic, as determined by the Committee).

6. **Application of Policy**: This Policy will not apply if or to the extent prohibited by or unenforceable under applicable law or if application of the Policy would result in the breach of the terms of any award or the terms of any existing employment agreement (or any award provided for under such agreement). In addition, the exercise by the Board or Committee of any rights pursuant to this Policy shall be without prejudice to any other rights that the Company may have with respect to any Covered Employee subject to this Policy (it being understood that the Company maintains the rights that it has at law to cancel or recover any compensation or award if applicable law or circumstances so warrant, and as otherwise consistent with this Policy). Additionally, the authority set forth in this Policy shall be limited to the extent that it would (a) result in substantial adverse tax or accounting consequences for the Company, (b) prejudice the Company's interests in any related proceeding or investigation or (c) reasonably result in expenses that exceed the amount that would be forfeited and/or recouped in exercising such authority. In each case, the Committee will determine the extent of such limit in its sole discretion.

7. **Indemnification**: No member of the Board or employee of the Company (excluding any Covered Employee with respect to any Covered Event for such Covered Employee) exercising such person's responsibilities under this Policy (each such person, an "*Indemnitee*") will have liability to any person for any action taken or omitted to be taken or any determination made in good faith with respect to this Policy. Each Indemnitee will be indemnified and held harmless by the Company against and from any loss, cost, liability or expense (including attorneys' fees) that may be imposed upon or incurred by such Indemnitee in connection with or resulting from any action, suit or proceeding to which such Indemnitee may be a party or in which such Indemnitee may be involved by reason of any action taken or omitted to be taken under this Policy and against and from any and all amounts paid by such Indemnitee, with the Company's approval, in settlement thereof, or paid by such Indemnitee in satisfaction of any judgment in any such action, suit or proceeding against such Indemnitee, *provided* that the Company will have the right, at its own expense, to assume and defend any such action, suit or proceeding and, once the Company gives notice of its intent to assume the defense, the Company will have sole control over such defense with counsel of the Company's choice. The foregoing right of indemnification will not be available to an Indemnitee to the extent that a court of competent jurisdiction in a final judgment or other final adjudication, in either case, not subject to further appeal, determines that the acts or omissions of such Indemnitee giving rise to the indemnification claim resulted from such Indemnitee's bad faith, fraud or willful misconduct. The foregoing right of indemnification will not be exclusive of any other rights of indemnification to which Indemnitees may be entitled under the Company's Articles of Incorporation or By-laws (each as may be amended and or restated from time to time), as a matter of law, or otherwise, or any other power that the Company may have to indemnify such persons or hold them harmless.

*Revised November 06, 2019*

This SECOND AMENDMENT TO STANDSTILL AGREEMENT AND THIRD AMENDMENT TO LOAN AGREEMENT (this "**Amendment**") is dated as of February 12, 2020, by and among AKORN, INC., a Louisiana corporation (the "**Company**"), the other Loan Parties under the Loan Agreement (as defined below), an ad hoc group of Lenders (as defined below) identified on **Exhibit A** hereto, which constitute "Required Lenders" under the Loan Agreement (collectively, the "**Ad Hoc Group**"), and the Administrative Agent (as defined below). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement or the Standstill Agreement (each, as defined below).

WHEREAS, reference is hereby made to that certain Loan Agreement dated as of April 17, 2014 (as the same shall have been amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), by and among the Company, the other Loan Parties, the financial institutions from time to time parties thereto as "Lenders" (collectively, the "**Lenders**" and each, a "**Lender**") and JPMorgan Chase Bank, N.A., as administrative agent (the "**Administrative Agent**"), pursuant to which, among other things, the Lenders have made certain loans, advances, and other financial accommodations to the Company;

WHEREAS, reference is hereby made to: (a) that certain Standstill Agreement and First Amendment to Loan Agreement dated as of May 6, 2019 (the "**Standstill Agreement**"), by and among the Company, the other Loan Parties, the Administrative Agent, the Ad Hoc Group, certain other Lenders (collectively, with the Ad Hoc Group, the "**Standstill Lenders**"), as amended by (b) that certain First Amendment to Standstill Agreement and Second Amendment to Loan Agreement Dated as of December 13, 2019, by and among the Company, the other Loan Parties, the Administrative Agent and the Standstill Lenders, pursuant to which, among other things: (a) the Standstill Lenders agreed to standstill from exercising certain remedies under the Loan Agreement in connection with the Specific Covenants and Specific Matters (each, as defined in the Standstill Agreement); and (b) the Company, the other Loan Parties, and the Standstill Lenders, amended the Loan Agreement as set forth therein;

WHEREAS, Section 13(a) of the Standstill Agreement and Section 9.02 of the Loan Agreement permit amendment of the Standstill Agreement by the Company with consent of Required Lenders; and

WHEREAS, the Company and the Lenders party hereto (constituting Required Lenders) agree to the amendments to the Standstill Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained and for other valuable considerations, the parties hereto agree as follows:

Section 1.      <u>Definitions</u>. Each capitalized term used herein and not otherwise defined in this Amendment shall be defined in accordance with the Loan Agreement and Standstill Agreement, as applicable.

Section 2.      <u>Amendments to the Standstill Agreement</u>. The Standstill Agreement (including the schedules and exhibits thereto) is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>underlined text</u>) as set forth in the marked blacklined copy of the Standstill Agreement attached as Annex I hereto (which shall be the Standstill Agreement). Said Annex I has been blacklined to show all changes from the Standstill Agreement as in effect immediately prior to the date hereof, it being agreed that, by virtue of this Amendment upon the effectiveness hereof, any amendments or other modifications to the Standstill Agreement prior to the date hereof that are not reflected in said Annex I shall cease to be in effect or, as the case may be, shall be modified as set forth in said Annex I, and Annex I shall for all purposes be deemed to constitute the Standstill Agreement.

Section 3.   <u>Effectiveness</u>. This Amendment shall be effective on the date (the "**Amendment Effective Date**") on which:

3.1      <u>Delivery of Agreement</u>. This Amendment, duly authorized and executed by the Company, the Administrative Agent and the Standstill Lenders (constituting the Required Lenders at such time), shall have been delivered to each of the Company, the Administrative Agent, and the Standstill Lenders;

3.2      <u>No Default</u>. Except for any Default or Event of Default with respect to the Specified Matters, both immediately before and after giving effect to this Amendment, no Default or Event of Default would then exist or would result therefrom;

3.3      <u>Representations and Warranties</u>. Except with respect to the Specified Matters, all representations and warranties of the Company and the other Loan Parties set forth herein, in the Standstill Agreement, in the Loan Agreement, and in any other Loan Document shall be true and correct in all material respects (or, with respect to those representations and warranties expressly limited by their terms by materiality or material adverse effect qualifications, in all respects) as of the Amendment Effective Date as if made on such date (except to extent that such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such date);

3.4      <u>No Material Adverse Effect</u>. Both immediately before and after giving effect to this Amendment, no Material Adverse Effect shall have occurred and be continuing or would result therefrom, excluding a Material Adverse Effect (if any) relating to any of the Specified Matters;

3.5      <u>Closing Certificates</u>. The Administrative Agent shall have received a certificate, dated as of the date hereof, of a duly authorized officer of the Company, to the effect that, at and as of the Amendment Effective Date, both before and after giving effect to this Amendment, (x) the conditions specified in this Section 3 have been satisfied or waived and (y) all Material Subsidiaries that

are Domestic Subsidiaries are Loan Parties as of the Amendment Effective Date (it being understood and agreed that the Administrative Agent may conclusively rely on such certificates as evidence of such satisfaction of the conditions specified in this Section 3);

3.6    Fees and Expenses. The Company shall (i) pay or reimburse all reasonable and documented fees and expenses for Gibson Dunn, as legal advisor to the Ad Hoc Group, and Greenhill, as financial advisor to the Ad Hoc Group, on the terms set forth in the Standstill Agreement to the extent invoiced at least one (1) Business Day prior to the Amendment Effective Date and (ii) pay or reimburse all reasonable and documented out-of-pocket fees and expenses of the Administrative Agent in connection with this Amendment and the other Loan Documents (including reasonable out-of-pocket fees, costs, and expenses of outside counsel for the Administrative Agent) to the extent invoiced at least one (1) Business Day prior to the Amendment Effective Date;

For the avoidance of doubt, the Administrative Agent is hereby authorized to and shall post this Agreement to all Public-Side Lenders and Private-Side Lenders on the Amendment Effective Date (or as soon as practicable thereafter).

Section 4.    Entire Agreement. This Amendment, the Standstill Agreement, the Loan Agreement, and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

Section 5.    Governing Law; Jurisdiction; Consent to Service of Process.

5.1    THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK.

5.2    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Amendment, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Company or its properties in the courts of any jurisdiction.

5.3    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph 5.2 of this Section 5. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

5.4    Each party to this Amendment irrevocably consents to service of process in the manner provided for notices in Section 16(r) of the Standstill Agreement. Nothing in any Loan Document will affect the right of any party to this Amendment to serve process in any other manner permitted by law.

Section 6.    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AMENDMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AMENDMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.

Section 7.    Severability. Any term or provision of this Amendment which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Amendment or affecting the validity or enforceability of any of the terms or provisions of this Amendment in any other jurisdiction. If any provision of this Amendment is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as would be enforceable.

Section 8.    Loan Document. This Amendment constitutes a "Loan Document" for all purposes of the Standstill Agreement, the Loan Agreement, and the other Loan Documents.

Section 9.    Reaffirmation. Each of the undersigned Loan Parties acknowledges (i) all of its obligations under the Standstill Agreement, the Loan Agreement, and the other Loan Documents to which it is a party are hereby reaffirmed and remain in full

force and effect on a continuous basis and (ii) the execution of this Amendment shall not operate as a waiver of any right, power or remedy of the Administrative Agent, the Standstill Lenders, or the other Lenders, constitute a waiver of any provision of any of the Loan Documents, or serve to effect a novation of the Loan Document Obligations.

Section 10.   <u>Lender Representations and Warranties</u>. Each of the undersigned Lenders hereby represents and warrants that the representations and warranties and acknowledgements set forth herein and in the Standstill Agreement (as amended hereby) are true and correct as of the Amendment Effective Date.

Section 11.   <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which when taken together shall constitute a single instrument. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or any other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Section 12.   <u>Headings</u>. The headings of this Amendment are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

Section 13.   <u>Effect of Amendment</u>. Each reference that is made in the Standstill Agreement or the Loan Agreement or any other Loan Document to the Standstill Agreement or the Loan Agreement shall hereafter be construed as a reference to the Standstill Agreement and/or Loan Agreement, as amended hereby. Except as herein otherwise specifically provided, all provisions of the Standstill Agreement and the Loan Agreement shall remain in full force and effect and be unaffected hereby and this Amendment will not by implication or otherwise alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Standstill Agreement or the Loan Agreement or any other provision of the Standstill Agreement, the Loan Agreement, or any other Loan Document, all of which are ratified and affirmed in all respects and will continue in full force and effect. For the avoidance of doubt, on and after the Amendment Effective Date, this Amendment shall for all purposes constitute a Loan Document.

Section 14.   <u>Direction to the Administrative Agent; Indemnity</u>. Each Lender party hereto hereby consents, authorizes and directs the Administrative Agent to execute and deliver this Amendment and to take the actions contemplated herein. Each Standstill Party confirms and agrees that (i) the Administrative Agent is only entering into this Amendment at the direction of the Required Lenders, (ii) subject to the terms of the Loan Agreement and the other Loan Documents (including this Amendment), any action or inaction taken hereunder by the Administrative Agent shall be at the express direction of the Required Lenders (including, without limitation, any determination that a Default, Event of Default, and/or Standstill Event of Default has occurred and/or that the Standstill Period has ended) and (iii) the indemnification provisions set forth in the Loan Agreement and the other Loan Documents (including, without limitation, the indemnification provisions set forth in Sections 9.03(b) and 9.03(c) of the Loan Agreement) shall apply to actions taken by the Administrative Agent in connection with this Amendment.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto as of the date first written above.

**THE COMPANY:**

AKORN, INC.

By:   <u>/s/ Duane Portwood   </u>
   Name: Duane Portwood
   Title: Chief Financial Officer

**OTHER LOAN PARTIES:**

ADVANCED VISION RESEARCH, INC.

By:   <u>/s/ Joseph Bonaccorsi   </u>
   Name: Joseph Bonaccorsi
   Title: Secretary

AKORN (NEW JERSEY), INC.

By:   <u>/s/ Joseph Bonaccorsi   </u>

Name: Joseph Bonaccorsi
Title: Secretary

AKORN ANIMAL HEALTH, INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

AKORN OPHTHALMICS, INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

AKORN SALES, INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

INSPIRE PHARMACEUTICALS, INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

OAK PHARMACEUTICALS, INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

HI-TECH PHARMACAL CO., INC.

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

10 EDISON STREET LLC

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary of Hi-Tech Pharmacal Co., Inc. its
member

13 EDISON STREET LLC

By:    /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary of Hi-Tech Pharmacal Co., Inc. its
member

VPI HOLDINGS CORP.

By:    /s/ Joseph Bonaccorsi

Name: Joseph Bonaccorsi
Title: Secretary

VPI HOLDINGS SUB, LLC


By:   /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

VERSAPHARM INCORPORATED


By:   /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

COVENANT PHARMA INC.


By:   /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

OLTA PHARMACEUTICALS CORP.


By:   /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary

CLOVER PHARMACEUTICALS CORP.


By:   /s/ Joseph Bonaccorsi
    Name: Joseph Bonaccorsi
    Title: Secretary


JPMORGAN CHASE BANK, N.A.,
as Administrative Agent


By:   /s/ Justin Martin
    Name: Justin Martin
    Title: Authorized Officer

[LENDERS]


Magnetite VII, Limited
BY: BlackRock Financial Management Inc., Its Collateral Manager
By: /s/ Rob Jacobi
      Name: Rob Jacobi
      Title: Authorized Signatory


Magnetite VIII, Limited
BY: BlackRock Financial Management Inc., Its Collateral Manager
By: /s/ Rob Jacobi
      Name: Rob Jacobi
      Title: Authorized Signatory

Magnetite XII, LTD

BY: BlackRock Financial Management, Inc., its Collateral Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XIV-R, Limited
By: BlackRock Financial Management, its Investment Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

MAGNETITE XIX, LIMITED
By: BlackRock Financial Management, Inc. as Asset Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XV, Limited
By: BlackRock Financial Management, Inc., as Investment Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XVI, Limited
By: BlackRock Financial Management, Inc., as Portfolio Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XVII, Limited
By: BLACKROCK FINANCIAL MANAGEMENT, INC., as Interim Investment Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XVIII, Limited
By: BlackRock Financial Management, Inc., its Collateral Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi
 Title: Authorized Signatory

Magnetite XX, Limited
By: BlackRock Financial Management, Inc., as Portfolio Manager
By: /s/ Rob Jacobi
 Name: Rob Jacobi

**BlackRock Financial Management, Inc.**, on behalf of funds and accounts listed below:

- Magnetite XII, LTD.
- Magnetite XIV-R, Limited
- Magnetite XV, Limited
- Magnetite XVI, Limited
- Magnetite XVII, Limited
- Magnetite XVIII, Limited
- Magnetite XIX, Limited
- Magnetite XX, Limited
- Magnetite VIII, Limited

By: /s/ AnnMarie Smith
   Name: AnnMarie Smith
   Title: Authorized Signatory

BlueMountain CLO XXII Ltd.
By: BlueMountain Capital Management, LLC, its
portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer and Deputy GC

BlueMountain CLO 2012-2 Ltd.
By: BlueMountain Capital Management, LLC, its portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer and Deputy GC

BlueMountain CLO 2013-1 Ltd.
By: BlueMountain CLO Management, LLC, its portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer and Deputy GC

BlueMountain CLO 2014-2 Ltd.
By: BlueMountain Capital Management, LLC, its portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer and Deputy GC

BlueMountain Fuji US CLO I Ltd.
By: BlueMountain Fuji Management, LLC, its portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer

BlueMountain Fuji US CLO II Ltd.
By: BlueMountain Fuji Management, LLC, its portfolio manager
By: /s/ Eric Albert
   Name: Eric Albert
   Title: Chief Compliance Officer

BlueMountain Fuji US CLO III Ltd.
By: BlueMountain Fuji Management, LLC, its portfolio manager
By: /s/ Eric Albert

Name: Eric Alban
Title: Chief Compliance Officer

**CANYON-ASP FUND, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON BALANCED MASTER FUND, LTD.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON DISTRESSED OPPORTUNITY
MASTER FUND II, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON DISTRESSED OPPORTUNITY
MASTER FUND III, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON-SL VALUE FUND, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON DISTRESSED TX (A), LLC**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By:/s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**THE CANYON VALUE REALIZATION MASTER FUND, L.P.**

its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON-EDOF (MASTER) L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON-GRF MASTER FUND II, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON NZ-DOF INVESTING, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**EP CANYON, LTD**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON VALUE REALIZATION MAC 18, LTD.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON VALUE REALIZATION FUND, L.P.**

By:    Canyon Capital Advisors LLC,
      its investment advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory

**CANYON BLUE CREDIT INVESTMENT FUND L.P.**

By:     Canyon Capital Advisors LLC,
        its Co-Investment Advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory


By:     Canyon Partners Real Estate LLC,
        its Co-Investment Advisor

By: /s/ Jonathan M. Kaplan
    Name: Jonathan M. Kaplan
    Title: Authorized Signatory


CARLYLE INVESTMENT MANAGEMENT LLC


Signed for and on behalf of:


Carlyle Global Market Strategies CLO 2012-3, Ltd.
Carlyle Global Market Strategies CLO 2012-4, Ltd.
Carlyle Global Market Strategies CLO 2013-1, Ltd.
Carlyle Global Market Strategies CLO 2013-2, Ltd.
Carlyle Global Market Strategies CLO 2013-3, Ltd.
Carlyle Global Market Strategies CLO 2013-4, Ltd.
Carlyle Global Market Strategies CLO 2015-2, Ltd.
Carlyle Global Market Strategies CLO 2015-3, Ltd.
Carlyle Global Market Strategies CLO 2015-4, Ltd.
Carlyle Global Market Strategies CLO 2015-5, Ltd.
Carlyle Global Market Strategies CLO 2016-1, Ltd.
Carlyle C17 CLO, Ltd.
Carlyle Global Market Strategies CLO 2014-2-R, Ltd.
Carlyle Global Market Strategies CLO 2014-3-R, Ltd.
Carlyle Global Market Strategies CLO 2014-4R, Ltd.

By: /s/ Glori Graziano
    Name: Glori Graziano
    Title: Managing Director


CIFC Event Driven Opportunities Master Fund, LP By: CIFC Asset Management
LLC, as Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research


CIFC Funding 2012-II-R, Ltd.
By: CIFC VS Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2013-I, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2013-II, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2013-III-R Ltd.
By: CIFC VS Management LLC, as Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2013-IV, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2014, Ltd.
By: CIFC Asset Management LLC, its Portfolio Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2014-III, Ltd.
BY: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2014-II-R, Ltd.
By: CIFC Asset Management LLC, as Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2014-IV-R, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2014-V, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2015-I, Ltd.
BY: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2015-II, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2015-III, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2015-IV, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2015-V, Ltd
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2016-I, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2017-I, Ltd
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2017-II, Ltd.
By: CIFC CLO Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2017-III, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2017-IV, Ltd.
By: CIFC CLO Management LLC, its Collateral Manager, by and on behalf of each of
its series, Series M-1, Series O-1 and Series R-1
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2017-V, Ltd.
By: CIFC CLO MANAGEMENT II LLC, as Collateral Manager
By and on behalf of each of its series, SERIES M-1, SERIES O-1, and SERIES R-1
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2018-I, Ltd.
By: CIFC CLO MANAGEMENT II LLC, as Collateral Manager
By and on behalf of each of its series, SERIES M-1, SERIES O-1, and SERIES R-1
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2018-II, Ltd.
By: CIFC CLO Management II LLC, its Collateral Manager, by and on behalf of each
of its series, Series M-1, Series O-1 and Series R-1
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2018-III, Ltd.
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Funding 2018-IV, Ltd.
By: CIFC CLO Management II LLC, as Collateral Manager By and on behalf of each
of its series, SERIES M-1, SERIES O-1, and SERIES R-1
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Loan Opportunity Fund II, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

CIFC Loan Opportunity Fund, Ltd.
By: CIFC Asset Management LLC, its Collateral Manager
By: /s/ Robert Mandery
    Name: Robert Mandery
    Title: Co-Head of Investment Research

**CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM**
By: Credit Suisse Asset Management, LLC, as investment manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**CREDIT SUISSE FLOATING RATE HIGH INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**CREDIT SUISSE ASSET MANAGEMENT INCOME FUND, INC.**
By: Credit Suisse Asset Management, LLC, as investment advisor
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**BENTHAM SYNDICATED LOAN FUND**
By: Credit Suisse Asset Management, LLC, as agent (sub-advisor) for Challenger
Investment Services Limited, the Responsible Entity for Bentham Syndicated Loan
Fund
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**BENTHAM STRATEGIC LOAN FUND**
By: Credit Suisse Asset Management, LLC, as Sub Advisor for Bentham Asset

Management Pty Ltd, the agent and investment manager to Eidanto Partners Limited, the trustee for Bentham Strategic Loan Fund

By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**THE CITY OF NEW YORK GROUP TRUST**
By: Credit Suisse Asset Management, LLC, as its manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**CREDIT SUISSE NOVA (LUX)**
By: Credit Suisse Asset Management, LLC or Credit Suisse Asset Management Limited, each as Co-Investment Adviser to Credit Suisse Fund Management S.A., management company for Credit Suisse Nova (Lux)
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**CREDIT SUISSE STRATEGIC INCOME FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**CREDIT SUISSE HIGH YIELD BOND FUND**
By: Credit Suisse Asset Management, LLC, as investment advisor
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**MADISON PARK FUNDING X, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**MADISON PARK FUNDING XI, LTD**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director


**MADISON PARK FUNDING XII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**MADISON PARK FUNDING XIII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XIV, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XV, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XVII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XIX, LTD.**
By: Credit Suisse Asset Management, LLC, as collateral manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XL, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XLI, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**MADISON PARK FUNDING XLIII, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
   Name: Thomas Flannery
   Title: Managing Director


**Maryland State Retirement and Pension System**
By: Credit Suisse Asset Management, LLC as manager

By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**ONE ELEVEN FUNDING I, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**ONE ELEVEN FUNDING II, LTD.**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**ONE ELEVEN FUNDING III, LTD**
By: Credit Suisse Asset Management, LLC, as portfolio manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**DOLLAR SENIOR LOAN FUND, LTD.**
By: Credit Suisse Asset Management, LLC, as investment manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**DOLLAR SENIOR LOAN MASTER FUND II, LTD.**
By: Credit Suisse Asset Management, LLC, as investment manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**DOLLAR SENIOR LOAN INCOME FUND, LTD.**
By: Credit Suisse Asset Management, LLC, as investment manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**COPPERHILL LOAN FUND I, LLC**
By: Credit Suisse Asset Management, LLC, as investment manager
By: /s/ Thomas Flannery
    Name: Thomas Flannery
    Title: Managing Director

**WIND RIVER FUND LLC**
By: Credit Suisse Asset Management, LLC, as Investment Manager
By: /s/ Thomas Flannery

Name: Thomas Flannery
Title: Managing Director


AGF FLOATING RATE INCOME FUND
BY: EATON VANCE MANAGEMENT AS PORTFOLIO MANAGER
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Brighthouse Funds Trust I -
Brighthouse/Eaton Vance Floating Rate Portfolio By: Eaton Vance Management as
Investment Sub-Advisor

By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Eaton Vance CLO 2013-1 LTD.
By: Eaton Vance Management
Portfolio Manager
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Eaton Vance CLO 2014-IR, Ltd.
By: Eaton Vance Management
As Investment Advisor
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Eaton Vance CLO 2015-1 Ltd.
By: Eaton Vance Management Portfolio Manager
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Eaton Vance CLO 2018-1, Ltd.
By: Eaton Vance Management
Portfolio Manager
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President


Eaton Vance CLO 2019-1, Ltd.
By: Eaton Vance Management
As Investment Advisor
By: /s/ Michael B. Botthof
   Name: Michael B. Botthof
   Title: Vice President

Eaton Vance Floating-Rate
Income Plus Fund
By: Eaton Vance Management
as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

Eaton Vance Floating-Rate
2022 Target Term Trust
By: Eaton Vance Management
as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

EATON VANCE SENIOR
FLOATING-RATE TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

EATON VANCE FLOATING-RATE
INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio
By: Eaton Vance Management as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

EATON VANCE SENIOR INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

Eaton Vance Short Duration
Diversified Income Fund
By: Eaton Vance Management
As Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

**Eaton Vance Institutional Senior Loan Plus Fund**
By: Eaton Vance Management as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

**EATON VANCE**
**LIMITED DURATION INCOME FUND**
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

**Eaton Vance Floating Rate Portfolio**
By: Boston Management and Research
as Investment Advisor

By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

**SENIOR DEBT PORTFOLIO**
By: Boston Management and Research as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

**Eaton Vance VT Floating-Rate Income Fund**
By: Eaton Vance Management as Investment Advisor
By: /s/ Michael B. Botthof
    Name: Michael B. Botthof
    Title: Vice President

GTAA PineBridge LP

By: PineBridge Investments LLC
As Investment Advisor
By: /s/ Andrew Meissner
    Name: Andrew Meissner
    Title: Authorized Signatory

**South Carolina Retirement Systems Group Trust**

By: PineBridge Investments LLC
As Investment Manager
By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

CSAA Insurance Exchange

By: PineBridge Investments LLC
As Investment Advisor
By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

PineBridge Global Opportunistic DM Credit
Master Fund LP

By: PineBridge Investments LLC
As Investment Manager

By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

Galaxy XV CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

Galaxy XIX CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

Galaxy XX CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner

Name: Andrew Meissner
Title: Authorized Signatory

Galaxy XXI CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXII CLO Ltd
By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXIII CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXIV CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXVII CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXVIII CLO Ltd

By: PineBridge Investments LLC
As Collateral Manager
By:/s/ Andrew Meissner
        Name: Andrew Meissner
        Title: Authorized Signatory

Galaxy XXIX CLO Ltd
By: PineBridge Investments LLC
As Collateral Manager

By:/s/ Andrew Meissner
Name: Andrew Meissner
Title: Authorized Signatory

SunAmerica Income funds- AIG Strategic Bond Fund

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

Fire and Police Pension Fund, San Antonio

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

RLI Insurance Company

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

Portico Benefit Services
By: PineBridge Investments LLC
As Investment Advisor
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

PineBridge Senior Floating Rate Income Fund

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

PBI-K US Loan Master Fund 2017-7 a Series
Trust of Global Cayman Investment Trust

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter

Title: Managing Director

PBI Stable Loan Fund a series trust of MYL Investment Trust

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

PineBridge Senior Secured Loan Fund Ltd

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

PineBridge SARL

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

Teachers' Retirement System of the City of New York

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

New York City Police Pension Fund

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

Valic Company II – Strategic Bond Fund

By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
Name: W. Jeffrey Baxter
Title: Managing Director

IA Clarington Global Bond Fund


By: PineBridge Investments LLC
Its Investment Sub-Advisor
By:/s/ W. Jeffrey Baxter
                   Name: W. Jeffrey Baxter
                   Title: Managing Director


Stichting Blue Sky Active Fixed Income US Leveraged Loan Fund


By: PineBridge Investments LLC
As Investment Manager
By:/s/ W. Jeffrey Baxter
                   Name: W. Jeffrey Baxter
                   Title: Managing Director


American International Group, Inc. Retirement Plan Master Trust, Trust for Defined Benefit
By: PineBridge Investments LLC
As Investment Manager


By:/s/ W. Jeffrey Baxter
                   Name: W. Jeffrey Baxter
                   Title: Managing Director


Transamerica Unconstrained Bond
By: PineBridge Investments LLC
Its Subadvisor
By:/s/ W. Jeffrey Baxter
                   Name: W. Jeffrey Baxter
                   Title: Managing Director


**UAW Retiree Medical Benefits Trust (Chrysler Separate Retiree Account)**


**By: State Street Bank and Trust Company, solely in its capacity as Trustee for UAW Retiree Medical Benefits Trust (solely for the benefit of the Chrysler Separate Retiree Account), as directed by PineBridge Investments LLC as Investment Manager, and not in its individual capacity**
By:/s/ Chris Hunter
                   Name: Chris Hunter
                   Title: Vice President


UAW Retiree Medical Benefits Trust (GM Separate Retiree Account)


By: State Street Bank and Trust Company, solely in its capacity as Trustee for UAW Retiree Medical Benefits Trust (solely for the benefit of the GM Separate Retiree Account), as directed by PineBridge Investments LLC as Investment Manager, and not in its individual capacity
By:/s/ Chris Hunter
                   Name: Chris Hunter

Title: Vice President

UAW Retiree Medical Benefits Trust (Ford Separate Retiree Account)

By: State Street Bank and Trust Company, solely in its capacity as Trustee for UAW Retiree Medical Benefits Trust (solely for the benefit of the Ford Separate Retiree Account), as directed by PineBridge Investments LLC as Investment Manager, and not in its individual capacity

By: /s/ Chris Hunter
                    Name: Chris Hunter
                    Title: Vice President

**STONEHILL MASTER FUND LTD.**

By: Stonehill Capital Management LLC,
its Investment Adviser
By: /s/ Steven Nelson
                    Name: Steven Nelson
                    Title: CFO

**STONEHILL INSTITUTIONAL PARTNERS, L.P.**
By: Stonehill Capital Management LLC,
its Investment Adviser
By: /s/ Steven Nelson
                    Name: Steven Nelson
                    Title: CFO

BayCity Alternative Investment Funds SICAV — SIF — BayCity US Senior Loan Fund
By: Symphony Asset Management LLC
By: /s/ Judith MacDonald
                    Name: Judith MacDonald
                    Title: General Counsel/Authorized Signature

BayCity Senior Loan Master Fund, LTD.
BY: Symphony Asset Management LLC
By: /s/ Judith MacDonald
                    Name: Judith MacDonald
                    Title: General Counsel/Authorized Signature

California Street CLO IX, Limited Partnership
BY: Symphony Asset Management LLC
By: /s/ Judith MacDonald
                    Name: Judith MacDonald
                    Title: General Counsel/Authorized Signature

Menard, Inc.
By: Symphony Asset Management LLC
By: /s/ Judith MacDonald
                    Name: Judith MacDonald

Title: General Counsel/Authorized Signature

Nuveen Floating Rate Income Fund
BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Nuveen Floating Rate Income Opportunity Fund BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Nuveen Senior Income Fund
BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Nuveen Short Duration Credit Opportunities Fund BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Nuveen Symphony Floating Rate Income Fund
BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

PENSIONDANMARK
PENSIONSFORSIKRINGSAKTIESELSKAB
By: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Principal Diversified Real Asset CIT
By: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

Principal Funds Inc, — Diversified Real Asset Fund BY: Symphony Asset Management LLC
By:/s/ Judith MacDonald
        Name: Judith MacDonald
        Title: General Counsel/Authorized Signature

SCOF-2 LTD.
By: Symphony Asset Management LLC
By: /s/ Judith MacDonald
       Name: Judith MacDonald
       Title: General Counsel/Authorized Signature


Symphony CLO XVIII, Ltd
By: Symphony Asset Management LLC
By: /s/ Judith MacDonald
       Name: Judith MacDonald
       Title: General Counsel/Authorized Signature


Symphony Floating Rate Senior Loan Fund
By: Symphony Asset Management LLC
By: /s/ Judith MacDonald
       Name: Judith MacDonald
       Title: General Counsel/Authorized Signature


**BOWMAN PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney
     Name: Marisa J. Beeney
     Title: Authorized Signatory

**BRISTOL PARK CLO LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney
     Name: Marisa J. Beeney
     Title: Authorized Signatory

**BURNHAM PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney
     Name: Marisa J. Beeney
     Title: Authorized Signatory

**BUTTERMILK PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney
     Name: Marisa J. Beeney
     Title: Authorized Signatory

**CATSKILL PARK CLO LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney
     Name: Marisa J. Beeney
     Title: Authorized Signatory

**CHENANGO PARK CLO, LTD.**

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**COLE PARK CLO LIMITED**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**COOK PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**CUMBERLAND PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**DEWOLF PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**DORCHESTER PARK CLO DAC**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**EMERSON PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**GILBERT PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___
    Name: Marisa J. Beeney
    Title: Authorized Signatory

**GREENWOOD PARK CLO, LTD.**

By:  GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:  /s/ Marisa J. Beeney___

Name: Marisa J. Beeney
Title: Authorized Signatory

**GRIPPEN PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**JAY PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**MYERS PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**SENECA PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**STEWART PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**THACHER PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**THAYER PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**TREMAN PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney____
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**TRYON PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney___
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**WEBSTER PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney___
      Name: Marisa J. Beeney
      Title: Authorized Signatory

**WESTCOTT PARK CLO, LTD.**

By:   GSO / Blackstone Debt Funds Management LLC, as Collateral Manager

By:   /s/ Marisa J. Beeney___
      Name: Marisa J. Beeney
      Title: Authorized Signatory

Western Asset Management Company, LLC, as investment manager and agent on behalf of certain of its accounts and/or funds

By    /s/ Adam Wright___
        Name: Adam Wright
        Title: Manager, U.S. Legal Affairs

MidOcean Credit Fund Management, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By:    /s/ Damion Brown___
        Name: Damion Brown
        Title: Director

**Exhibit A**

**Ad Hoc Group**

1. Eaton Vance Management
2. CIFC Asset Management
3. The Carlyle Group
4. Funds, accounts, and other investment vehicles managed, advised, or sub-advised by Credit Suisse Asset Management, LLC
5. Certain funds and accounts under management by BlackRock Financial Management, Inc. and its affiliates
6. Western Asset Management
7. GSO Capital Partners
8. PineBridge Investments
9. Stonehill Capital Management
10. BlueMountain Capital Management
11. Canyon Capital
12. Symphony Asset Management
13. MidOcean Partners

**ANNEX I**

**STANDSTILL AGREEMENT AND FIRST AMENDMENT TO LOAN AGREEMENT**

THIS STANDSTILL AGREEMENT AND FIRST AMENDMENT TO LOAN AGREEMENT (this "**Agreement**")[1] is made as of May 6, 2019, by and among AKORN, INC., a Louisiana corporation (the "**Company**"), the other Loan Parties under the Loan Agreement (as defined below), an ad hoc group of Lenders (as defined below) identified on <u>Exhibit A</u> hereto, which constitute the "Required Lenders" under the Loan Agreement (collectively, the "**Ad Hoc Group**"), certain other Lenders, and the Administrative Agent (as defined below). The Administrative Agent, the Ad Hoc Group, the other Lenders party hereto (collectively, with the Ad Hoc Group, the "**Standstill Lenders**"), the Company and the other Loan Parties shall be referred to collectively as the "**Standstill Parties**", and each shall be referred to individually as a "**Standstill Party**." Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

## RECITALS

**WHEREAS**, the Company, the other Loan Parties, the financial institutions from time to time parties thereto as "Lenders" (collectively, the "**Lenders**" and each, a "**Lender**") and JPMorgan Chase Bank, N.A., as administrative agent (the "**Administrative Agent**"), have entered into that certain Loan Agreement dated as of April 17, 2014 (as the same shall have been amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), pursuant to which, among other things, the Lenders have made certain loans, advances, and other financial accommodations to the Company;

**WHEREAS**, the Standstill Lenders constitute "**Required Lenders**" as that term is defined under the Loan Agreement;

**WHEREAS**, the Standstill Lenders and the Company have engaged in good faith, arm's-length negotiations regarding a proposed standstill agreement solely with respect to the Lenders' rights and remedies under the Loan Agreement or the other Loan Documents as a result of any alleged Event of Default arising from any: (1) alleged breach of any of the covenants contained in Sections 5.01, 5.02, 5.03, 5.06 or 5.07 of the Loan Agreement (the "**Specified Covenants**"), to the extent the facts and circumstances giving rise to any such breach (i) are publicly available as of the First Amendment Effective Date (as defined herein), or (ii) are not publicly available but have been disclosed in writing (x) to private side Lenders via IntraLinks; or (y) to Gibson Dunn & Crutcher LLP ("**Gibson Dunn**")[2] and/or Greenhill & Co. ("**Greenhill**"), as legal counsel and financial advisor, respectively, to the Ad Hoc Group (collectively, the "**Ad Hoc Group Advisors**"); and (2) failure to enter into a Comprehensive Amendment (as defined ~~herein~~in the Second Amendment) under the First Amendment (as defined herein) ~~on or before December 13, 2019~~or to reach an agreement in principle with respect thereto (such facts and circumstances described in clauses (1) and (2), (including, for the avoidance of doubt, the existence of this Agreement) the "**Specified Matters**");

**WHEREAS**, as a result of these negotiations (and in the case of the Administrative Agent, as a result of the direction of the Required Lenders to the Administrative Agent set forth in Section 12 hereof), the Company and the other Loan Parties have requested, and the Standstill Lenders have agreed, solely with respect to the Specified Matters, to enter into this Agreement solely for the Standstill Period (as defined below), subject to and in accordance with the terms and conditions set forth herein; and

**WHEREAS**, the Company and the other Loan Parties have further requested, and the Standstill Lenders have agreed, subject to the terms and conditions set forth in this Agreement, to amend the Loan Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Standstill Party, intending to be legally bound hereby, agrees as follows:

1. ~~1.~~ Incorporation of Recitals; No Waiver; No Admission of Liability.

    (a) ~~(a)~~ Incorporation of Recitals. The Recitals to this Agreement are hereby incorporated by reference as fully set forth herein and the Company, the other Loan Parties, the Administrative Agent, and the Lenders acknowledge these Recitals to be true and correct.

    (b) ~~(b)~~ No Waiver. Nothing in this Agreement should in any way be deemed a waiver of any Default or Event of Default relating to any Specified Matter or any other Default, Event of Default, or term or provision of the Loan Agreement or any of the other Loan Documents. The Administrative Agent and the Lenders have not waived or released, are not by this Agreement waiving or releasing, and have no present intention of waiving or releasing, any Defaults or Events of Default relating to the Specified Matters, or any other Defaults or Events of Default that may have occurred prior to the date hereof or that may occur after the date hereof, or any remedies or rights of the Administrative Agent or the Lenders with respect thereto, all of which are hereby reserved. Any waiver of any Defaults or Events of Default relating to the Specified Matters or any other Default or Event of Default shall only be effective if set forth in a written instrument executed and delivered in accordance with the provisions of Section 9.02 of the Loan Agreement.

    (c) ~~(c)~~ No Admission of Liability. The execution of this Agreement and the fulfillment of its terms is not to be construed as and does not constitute an admission or absence of any right, remedy, claim, defense, liability or wrongdoing or responsibility on the part of any Standstill Party. Entry into this Agreement shall not constitute an admission by the Company or any other Loan Party to the occurrence or non-occurrence of a Default or Event of Default, including with respect to the

Specified Matters. The Standstill Lenders hereby acknowledge that as of the Second Amendment Effective Date, to the best of their knowledge, they are not aware of any potential Defaults or Events of Default other than with respect to the Specified Covenants relating to the Specified Matters.

2. ~~2.~~ <u>Standstill Period</u>. The "**Standstill Period**" shall mean the period of time from the Effective Date through the earliest of (i) ~~February 7, 2020 (such date, the "Termination Date") (*provided* that up to and including the Termination Date, the Company, the Ad Hoc Group, and the Ad Hoc Group Advisors shall negotiate in good faith with respect to the terms of a Comprehensive Amendment),~~ <u>upon the delivery of a notice of termination of the Standstill Period by the Required Lenders (which may be delivered in their sole discretion), the occurrence of a Default or Event of Default under the Loan Agreement or the other Loan Documents or</u> (ii) upon the delivery of a notice of termination of the Standstill Period by the Required Lenders (which may be delivered in their sole discretion), the ~~occurrence of a Default or Event of Default under the Loan Agreement or the other Loan Documents, or (iii) upon the delivery of a notice of termination of the Standstill Period by the Required Lenders (which may be delivered in their sole discretion), the~~ termination of this Agreement as a result of any breach of, or non-compliance with, any provision of this Agreement by the Company or any other Loan Party, including without limitation any such breach or non-compliance of or with any Affirmative Covenant, Negative Covenant, Milestone, or Other Covenant (each as defined herein) by the Company or any other Loan Party, subject, in each case, to any applicable cure period expressly set forth herein (each, a "**Standstill Event of Default**"), excluding with respect to clause (ii), for the avoidance of doubt, any Default or Event of Default relating to a Specified Matter (the foregoing period, the "**Standstill Period**"). The occurrence of any one of the events described in clauses (i)~~,~~ and (ii)~~, and (iii)~~ of this Section 2 shall constitute a "**Termination Event**" hereunder.

3. <u>Sale Process. During the Standstill Period, the Company will market and conduct a sale process for substantially all of its assets, free and clear of liabilities (subject to customary exceptions), and in accordance with the Milestones set forth herein (the "**Sale Process**"). The Sale Process will be consummated on either an out-of-court or in-court basis (including through the filing of chapter 11 cases (the "**Chapter 11 Cases**") in a United States Bankruptcy Court (the "**Bankruptcy Court**") in order to effectuate the Sale Process pursuant to 11 U.S.C. § 101-1532 (the "**Bankruptcy Case**," and such transaction the "**Sale Transaction**")).</u>

4. ~~3.~~ <u>Standstill</u>. Subject to the terms and conditions herein set forth and in reliance upon the Company's and the other Loan Parties' representations, acknowledgments, agreements and warranties herein contained, including, without limitation, the satisfaction of the conditions precedent set forth in Section ~~9~~11 herein, the Standstill Parties agree that during the Standstill Period, neither the Administrative Agent nor the Lenders shall (i) declare, and such parties shall be prohibited from declaring, any Event of Default under the Loan Agreement or the other Loan Documents or (ii) otherwise seek to exercise any rights or remedies under the Loan Agreement or the other Loan Documents, in each case of clauses (i) and (ii) above, to the extent directly relating to any Specified Matter. The Administrative Agent's and the Lenders' agreement to standstill is temporary and limited in nature and shall not be deemed: (i) to preclude or prevent the Administrative Agent or the Standstill Lenders from exercising any rights and remedies under the Loan Documents, applicable law or otherwise arising on account of (A) any Default or Event of Default other than those with respect to the Specified Matters, (B) the Specified Matters from and after the termination of the Standstill Period following the occurrence of a Standstill Event of Default, (C) the Specified Matters from and after the Termination Date, or (D) the right to seek payment of attorneys' fees, financial advisor fees, and other costs and expenses in connection with the preparation, negotiation, execution and delivery of this Agreement and the exercise of the rights and remedies described herein or otherwise in connection with the Loan Documents; (ii) to effect any amendment of the Loan Agreement or any of the other Loan Documents, all of which shall remain in full force and effect in accordance with their respective terms, as modified hereby; (iii) to constitute a waiver of any Default or Event of Default relating to the Specified Matters or any other Default or Event of Default (whether now existing or hereafter occurring) or any term or provision of the Loan Agreement or any of the other Loan Documents; or (iv) to establish a custom or course of dealing among any Loan Party, the Administrative Agent and the Standstill Lenders.

5. ~~4.~~ <u>Termination of Agreement</u>. Except as expressly set forth herein, this Agreement and all provisions herein, shall terminate upon the occurrence of a Termination Event.

6. ~~5.~~ <u>Affirmative Covenants</u>. Until the occurrence of a Termination Event, the Company and the other Loan Parties covenant and agree that during the Standstill Period, the Company will (the "**Affirmative Covenants**"):

    (a) ~~(a)~~ furnish monthly 3-statement financials and Key Performance Indicators ("**KPI**") reporting included in the Company's management reporting to the Ad Hoc Group Advisors (which reporting shall include volume and pricing for the top 30 products), in each case no later than thirty (30) days after the end of each month; *provided* that, commencing in January 2020, the 3-statement financials shall be retroactively adjusted to be in a format comparable to

the Business Plan and the 2019 budget on a monthly basis, beginning as of September 30, 2019, shall include a breakdown of manufacturing costs by key components and by manufacturing facility; for the avoidance of doubt, the retroactively adjusted financials shall be delivered no later than January 30, 2020; *provided further* that, beginning in January 2020, the 3-statement financials shall be reported in a format comparable to the existing Business Plan, the 2020 Budget (as defined herein), and the updated Business Plan;

(b)    ~~(b)~~    provide the Ad Hoc Group Advisors operating statistics broken down by facility (*e.g.*, production levels, capacity utilized, etc.) and plant KPIs on a monthly basis, in each case no later than thirty (30) days after the end of each month;

(c)    ~~(c)~~    beginning in January 2020 with respect to December 2019 results, provide the Ad Hoc Group Advisors pipeline reporting for each product under development, which reports shall include information with respect to (i) manufacturing facility, (ii) product category, ~~,~~ (iii) estimate of filing and launch dates, (iv) estimated market size, (v) estimated competitors at launch, (vi) projected research and development expenses, (vii) commentary on stage of development, with the Company to use reasonable efforts to provide key open workstreams and estimated milestones for FDA filing, and (viii) primary development facility, if applicable; *provided* that projected revenue for products under development shall be provided with the Business Plan; *provided further* that any molecules names appearing therein may be redacted;

(d)    ~~(d)~~    beginning with the first month following the delivery of the Business Plan (as defined herein), furnish, by the tenth (10) Business Day of each month, monthly reports regarding pending Abbreviated New Drug Applications ("**ANDAs**") to the Ad Hoc Group Advisors, which reports shall include ANDAs submitted to the FDA (as defined below) and the status of FDA approvals with respect thereto, estimated market size and known competitor information for each such ANDA, and a good faith estimate of the timing of the approval of each such ANDA and related competitive approvals; *provided* that any molecules names appearing therein may be redacted; *provided further* that, commencing in January 2020, such reports shall also include information with respect to (i) manufacturing facility, (ii) product category, (iii) estimate of filing and launch dates, and (iv) commentary on outstanding requirements for FDA approval status; *provided* that projected revenue for filed ANDAs shall be provided with the Business Plan;

(e)    on or prior to the 10th calendar day of each month (or the first Business Day thereafter), conduct monthly telephone conferences with all Lenders and permit questions from such Lenders and answers, with such telephone conferences being split into (1) a Public-Siders and non-Public-Siders portion and (2) a solely non-Public-Siders portion; *provided* that (i) questions from the Lenders shall be provided to the Company in writing no later than two (2) Business Days in advance and (ii) for the avoidance of doubt, the Company shall not be obligated to disclose any material non-public information during the Public-Siders and non-Public-Siders portion of such telephone conferences;

(f)    ~~(f)~~    on or prior to the 10th calendar day of each month (or the first Business Day thereafter), conduct monthly telephone conferences solely with the Ad Hoc Group Advisors and any Lenders which have become "restricted" and are then subject to non-disclosure agreements in customary form reasonably satisfactory to the Company (collectively, the "**Restricted Lenders**") with the Company and permit questions from the Ad Hoc Group Advisors and Restricted Lenders and answers; *provided* that, to the extent the Restricted Lenders monthly telephone conference is combined with the Public-Siders/non-Public-Siders telephone conference outlined in Section ~~5~~6(~~e~~e) hereof, such telephone conference will include a separate portion solely for Restricted Lenders; *provided further that* questions from the Ad Hoc Group Advisors and Restricted Lenders shall be provided to the Company in writing no later than two (2) Business Days in advance;

(g)    ~~(g)~~    require its advisors (including, for the avoidance of doubt, PJT Partners and AlixPartners) (collectively, the "**Company Advisors**") to continue conducting weekly status calls with the Ad Hoc Group Advisors, <u>which weekly status calls, commencing on the Third Amendment Effective Date, shall, for the avoidance of doubt, also include litigation updates from Cravath, Swaine & Moore, with respect to ongoing material litigations, including the Fresenius litigation and the shareholder litigation and updates with respect to the Sale Process</u>; *provided* that, in addition to the Company Advisors, such status calls will be attended at least every other week by Jennifer Bowles or Duane Portwood; *provided further* that a representative of the investment banker engaged with respect to the Akorn India Private Ltd. sale process shall provide an email update every week to the Ad Hoc Group Advisors on the status of such sale process (or email confirmation that there have been no material updates to such sale process);

(h)    ~~(h)~~    promptly, but in no event later than 48 hours after receipt, provide the Ad Hoc Group Advisors with copies of any material (i) correspondence received from the United States Food and Drug Administration ("**FDA**"), and (ii) cover letters to reports delivered to the FDA, in each case solely with regard to any FDA Form 483 or warning letter;

(i) ~~(i)~~ promptly, but in no event later than 48 hours after receipt by the Company or the other Loan Parties, provide to the Ad Hoc Group Advisors copies of any warning letter(s), Official Action Indicated, or OAI, statuses, or similar regulatory actions by Swissmedic or the Central Drugs Standard Control Organization, or CDSCO, regarding those certain manufacturing facilities operated by the Company and its Subsidiaries in Amityville, New York, Hettlingen, Switzerland, and Paonta Sahib, Himachal Pradesh, India, and those certain research and development centers operated by the Company and its Subsidiaries in Vernon Hills, Illinois and Cranbury, New Jersey;

(j) ~~(i)~~ promptly, but in no event later than 48 hours after preparation or receipt, provide to the Ad Hoc Group Advisors formal minutes for any FDA meeting or call to the extent made available to, or prepared by, the Company or the other Loan Parties; *provided* that the Company will be entitled to redact confidential or privileged information contained therein;

(k) ~~(k)~~ ~~(i)~~ on or before the 3rd Business Day of each month, provide the Ad Hoc Group Advisors with monthly Quality System Corrective Action Plan, or QSCAP, update reports, (ii) arrange for monthly update calls between the Ad Hoc Group Advisors and the Company's regulatory counsel, and (iii) arrange for (A) monthly update calls with (1) NSF Pharma Biotech ("**NSF**") and (2) The Quantic Group ("**Quantic**"), and (B) any other calls with the Company's cGMP consultants to be scheduled at the reasonable request of the Ad Hoc Group Advisors; *provided* that the Company shall use commercially reasonable efforts to organize expedited calls among the Company's third-party cGMP consultants and the Ad Hoc Group Advisors when reasonably requested by the Ad Hoc Group Advisors;

(l) ~~(l)~~ ~~to the extent any third party~~ The Company shall commission its own Quality of Earnings ("**QoE**") ~~or valuation work is~~ report to be completed~~, the Company~~ on or before March 15, 2020, and shall (i) provide the Ad Hoc Group Advisors regular, but in no event less frequently than weekly, updates during the drafting of ~~such work product~~ the same and (ii) promptly, but in no event later than 48 hours after receipt, provide a copy of ~~any~~ the final QoE ~~or valuation~~ report~~s~~ to the Ad Hoc Group Advisors; ~~*provided* that the Company's obligations with respect to clauses (i) and (ii) hereof, shall be subject to approval of the third parties conducting and/or commissioning the applicable analysis; *provided further* that, to the extent the Company is paying for any such analysis, the Company shall require the applicable third party to agree to share the analysis with the Ad Hoc Group prior to any retention or work being commenced;~~

(m) ~~(m)~~ ~~(i) provide a weekly status update on the junior capital raise process (the "**Junior Capital Process**") or any other capital raise or other formal processes run by the Company ("**Other Process**") to the Ad Hoc Group Advisors and (ii) p~~Promptly, but in no event later than 48 hours after receipt (subject to any confidentiality obligations therein), deliver copies to the Ad Hoc Group Advisors of all (A) formal process or offering materials provided generally to participants in the ~~Junior Capital~~ Sale Process ~~or Other Process, as applicable~~ (which, for the avoidance of doubt, shall not be required to include individual Q&A responses to diligence requests, unless required by the following proviso), (B) written proposals, term sheets, commitment letters, and any other similar materials received in connection with the ~~Junior Capital Process or Other Process, as applicable;~~ *provided* that, to the extent there are material developments (as determined in good faith by the Company) in the ~~Junior Capital Process or Other~~ Sale Process, as applicable, and (C) all bidding materials on a redacted basis, including, but not limited to marketing materials; *provided* that (1) the Company shall ~~provide~~ share with the Ad Hoc Group Advisors ~~with an update within 24 hours of such~~ all binding bids received in connection with the Sale Process on an un-redacted basis when, and if, received, and (2) the Company shall otherwise communicate any material developments with respect to the Sale Process to the Ad Hoc Group Advisors, in good faith; and

(n) ~~(n)~~ continue to retain PJT Partners and AlixPartners consistent with the terms of their respective engagement agreements as in effect on the date hereof, or, if PJT Partners and AlixPartners are no longer retained by the Company, such other financial and restructuring advisors reasonably acceptable to the Ad Hoc Group.

The failure to comply with any of the Affirmative Covenants shall not constitute a Default or Event of Default under the Loan Agreement or the other Loan Documents, but shall, following the Cure Period (defined below), constitute a Standstill Event of Default that permits the Required Lenders to declare a Termination Event. "**Cure Period**" shall mean five (5) Business Days after the earlier of (x) the Company's knowledge of its breach or failure to comply or (y) notice thereof from the Administrative Agent (which notice shall be given solely at the request of the Required Lenders).

7. ~~6.~~ Negative Covenants. Until the occurrence of a Termination Event, the Company and the other Loan Parties covenant and agree that during the Standstill Period the Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly (the "**Negative Covenants**"):

(a) ~~(a)~~ create, incur, assume, or suffer to exist any Permitted Ratio Indebtedness pursuant to Section 6.01(l) of the Loan Agreement (including, for the avoidance of doubt, any asset based lending facility or cash flow supported revolver), any Indebtedness pursuant to Section 6.01(f) of the Loan Agreement, or any Incremental Term Facilities pursuant to Section 2.09 of the Loan Agreement, Incremental Term Loans pursuant to Section 2.09 of the Loan Agreement or Incremental Notes pursuant to Section 2.09 of the Loan Agreement or in each case, create, incur, assume or suffer to exist, any Lien in connection with the foregoing; *provided*, *however*, that any such Indebtedness (excluding, other than with respect to any Loans outstanding under the Loan Agreement as of the date hereof, any refinancing of any such Indebtedness) created, incurred, assumed or in existence prior to the Effective Date pursuant to, and in reliance on, such sections shall be permitted to remain outstanding. For the avoidance of doubt, the Company shall not be permitted to incur any new Indebtedness that

is contractually senior in right of payment or that is secured by Liens that would rank senior to the Liens securing the existing Loans, or that primes existing Loans in any manner whatsoever (other than ordinary course (i) Capital Lease Obligations, (ii) trade obligations, and (iii) similar obligations);

(b) ~~(b)~~ create, incur, assume, or permit to exist any Liens:

(i) ~~(i)~~ pursuant to Section 6.02(l) of the Loan Agreement securing Indebtedness or other obligations in excess of $10 million in the aggregate; or

(ii) ~~(ii)~~ pursuant to Section 6.02(k) of the Loan Agreement or with respect to any Incremental Term Facilities, Incremental Term Loans or Incremental Notes; and

(iii) ~~(iii)~~ arising out of Sale and Leaseback Transactions (as defined in the Loan Agreement) permitted by Section 6.06 of the Loan Agreement in excess of $10,000,000 pursuant to Section 6.02(h) of the Loan Agreement~~.~~;

*provided*, *however*, that any such Liens (excluding, for the avoidance of doubt, any Liens in respect of refinancing Indebtedness prohibited under Section 6(a) hereof) created, incurred, assumed or in existence prior to the Effective Date pursuant to, and in reliance on, such sections shall be permitted to remain in effect;

(c) ~~(c)~~ purchase, hold, or acquire any investment:

(i) ~~(i)~~ in Equity Interests in a non-Loan Party pursuant to Section 6.04(c) of the Loan Agreement;

(ii) ~~(ii)~~ constituting a loan or advance to a non-Loan Party pursuant to Section 6.04(d) of the Loan Agreement;

(iii) ~~(iii)~~ constituting a Guarantee of Indebtedness of a non-Loan Party pursuant to Section 6.04(e) of the Loan Agreement;

(iv) ~~(iv)~~ pursuant to Section 6.04(j) of the Loan Agreement; *provided* that such investment shall be permissible (x) if limited to all cash consideration or (y) in the case of any (A) out-licensing transactions or other sale of revenue stream rights, up-front payments, milestones, royalties, profit shares, distribution fees, or similar arrangements with respect to core assets, if consummated with the prior written consent of the Required Lenders at such time (which may be withheld in their sole discretion), or (B) out-licensing transactions or other sale of revenue stream rights, up-front payments, milestones, royalties, profit shares, distribution fees, or similar arrangements with respect to non-core assets if consummated with the prior written consent of Required Lenders at such time (which consent shall not be unreasonably withheld or delayed); *provided*, *however*, that no consent of the Required Lenders shall be required in connection with out-licensing transactions or other sales of revenue stream rights, up-front payments, milestones, royalties, profit shares, distribution fees, or similar arrangements, with fair market value not in excess of $5 million in the aggregate, with respect to dormant or not fully developed ANDAs and/or products;

(v) ~~(v)~~ constituting a Permitted Acquisition pursuant to Section 6.04(l) of the Loan Agreement; *provided* that (x) the Company and its Restricted Subsidiaries may consummate Drug Acquisitions in an amount not exceeding $7.5 million in the aggregate, and (y) the Company and its Restricted Subsidiaries may consummate Permitted Acquisitions other than Drug Acquisitions in an amount not exceeding $7.5 million in the aggregate (or, with respect to any such Permitted Acquisitions by non-Loan Parties, not exceeding $2.5 million in the aggregate);

(vi) ~~(vi)~~ constituting Permitted Foreign Loans pursuant to Section 6.04(m) of the Loan Agreement; or

(vii) ~~(vii)~~ utilizing the Available Amount pursuant to Section 6.04(n) of the Loan Agreement~~.~~;

*provided*, *however*, that any investments purchased, held or acquired (or made pursuant to contractual commitments in effect) prior to the Effective Date pursuant to, and in reliance on, such sections shall not be limited by this Section ~~6~~7(c);

(d) ~~(d)~~ utilize any asset sale reinvestment rights pursuant to Section 2.11(c) of the Loan Agreement;

(e) ~~(e)~~ make a Discounted Voluntary Prepayment pursuant to Section 2.11(g) of the Loan Agreement or acquire any Loans pursuant to Section 9.04(e) of the Loan Agreement; *provided that* such Discounted Voluntary Prepayments and acquisitions shall be permissible if offered to all Lenders at such time;

(f) ~~(f)~~ make any Extension Offers to any Lenders or enter into any Extensions with any Lenders, in each case pursuant to Section 2.23 of the Loan Agreement; *provided that* such Extension Offers and Extensions shall be permissible if offered to all Lenders at such time;

(g) ~~(g)~~ declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment or prepayment of any Specified Indebtedness pursuant to Section 6.08 of the Loan Agreement other than pursuant to Sections 6.08(a)(ii) or (a)

(iii); *provided* that any Restricted Payments under Section 6.08(a)(ii) shall not be permitted to be paid from Loan Parties to non-Loan Parties;

(h) ~~(h)~~ other than with respect to assets owned by Akorn India Private Limited (or the Equity Interests therein), sell, transfer, lease, or otherwise dispose of assets pursuant to Section 6.05(h) of the Loan Agreement with an aggregate book value in excess of $15 million; *provided* that, any Net Proceeds from the sale of Akorn India Private Limited shall be utilized to prepay outstanding Loans on a pro rata basis;

(i) ~~(i)~~ sell, transfer, lease, or otherwise dispose of assets pursuant to Section 6.05(e) of the Loan Agreement or engage in Sale and Leaseback Transactions pursuant to Section 6.06 of the Loan Agreement;

(j) ~~(j)~~ without prior written consent of the Required Lenders at such time, (i) designate any Restricted Subsidiary as an Unrestricted Subsidiary pursuant to Section 5.12 of the Loan Agreement, or otherwise create or form any Unrestricted Subsidiary, and/or (ii) transfer any assets of the Company or any of its Restricted Subsidiaries to any Unrestricted Subsidiary, except as otherwise permitted under the Loan Agreement (after giving effect to this Agreement); or

(k) ~~(k)~~ without the prior written consent of the Required Lenders at such time, release any existing Loan Guarantors from their Guarantee, otherwise release any existing Loan Guarantors from their Obligations, or release any Lien or security interest granted by such Loan Guarantors under the Loan Documents outside of the ordinary course of business.

Notwithstanding the foregoing, the Company and its Restricted Subsidiaries may incur Indebtedness of the type set forth in Section 6.01(f) of the Loan Agreement and make investments in Equity Interests of non-Loan Parties of the type set forth in Section 6.04(c) of the Loan Agreement in an aggregate amount not exceeding $~~15,000,000 in order to fund capital expenditures and operations of non-Loan Party Subsidiaries.~~30,000,000, which amount shall be limited to $15,000,000 after the Third Amendment Effective Date (the "**Additional Non-Loan Party Investment Amount**"), with (x) $7,500,000 of such Additional Non-Loan Party Investment Amount being available to the Company as of the Third Amendment Effective Date and (y) the remaining $7,500,000 of the Additional Non-Loan Party Investment Amount being available to the Company (absent reasonable objection from the Ad Hoc Group Advisors) one week after providing the Ad Hoc Group Advisors with additional materials and other information with respect to the use of the proceeds of any such Additional Non-Loan Party Investment Amount.

For the avoidance of doubt, any breach of, or failure to comply with any of the Negative Covenants set forth above shall result in an immediate Event of Default under the Loan Agreement and the Loan Documents.

8. ~~7.~~ <u>Milestones</u>. Until the occurrence of a Termination Event, the Company shall, or shall cause, the following to occur by the times and dates set forth below, during the Standstill Period (the "**Milestones**"); *provided that* any "delivery" required under the Milestones shall only require delivery to the Ad Hoc Group Advisors, and shall be in form and scope reasonably satisfactory to the Ad Hoc Group Advisors.

(a) ~~(a)~~ ~~(i)~~ Commencing on April 18, 2019, and continuing until December 18, 2019, the Company shall deliver a 13-week cash flow forecast on a monthly basis, with each subsequent 13-week cash flow forecast delivered on or prior to the tenth Business Day of each month. The Company shall deliver monthly variance reporting concurrently with each delivery of the 13-week cash flow forecast, starting in May 2019.

(ii) ~~(ii)~~ Beginning on January 17, 2020, the Company shall deliver 13-week cash flow forecasts every other week (with respect to the period ending during the immediately preceding week). Beginning with the week of January 6, 2020, the Company shall deliver variance reporting every week; *provided* that variance reporting subsequent to the Second Amendment Effective Date should be compared to both the 13-week cash flow forecast provided to the Ad Hoc Group Advisors in December 2019, as well as the new cash flow forecast provided every other week. Variances shall be measured on both a weekly and cumulative basis and the variance report shall include an MD&A indicating which variances are permanent and which are temporary / timing oriented.

(iii) ~~(iii)~~ For the avoidance of doubt, under no circumstances shall any variance reported constitute a Default, an Event of Default, a Termination Event, or otherwise permit termination of this Agreement.

(b) ~~(b)~~ The Company shall deliver a five-year business plan (the "**Business Plan**") by May 3, 2019, which business plan shall include a balance sheet, statement of cash flow, and income statement (including material assumptions) on a monthly basis for the first year and on a quarterly basis thereafter.

(c) ~~(c)~~ On or before January 6, 2020, the Company shall deliver to the Ad Hoc Group Advisors a detailed 2020 budget in a format consistent with the 2019 budget, including all underlying schedules (the "**2020 Budget**"), with an updated version of such 2020 Budget to be provided within 24 hours of board approval to the extent the 2020 Budget differs from what has been previously provided to the Ad Hoc Group Advisors.

(d) ~~(d)~~ On or before January 6, 2020, the Company shall deliver to the Ad Hoc Group Advisors an updated Business Plan in a format consistent with the Business Plan delivered on May 3, 2019, with an updated version to be provided

within 24 hours of board approval of such Business Plan, to the extent the updated Business Plan differs from what has been previously provided to the Ad Hoc Group Advisors; provided that, for the avoidance of doubt, the updated Business Plan shall be accompanied by (i) the rationale behind the inclusion of each new product included in updated Business Plan, and (ii) the rationale behind the exclusion of each new product excluded from the updated Business Plan.

(e)     ~~(e)~~     PJT Partners shall provide a strategic alternatives report (the "**Strategic Alternatives Report**") by May 31, 2019 to the Ad Hoc Group Advisors, which report shall include detailed alternatives to reduce the Lenders' exposure.

~~(f)     On or before January 10, 2020, the Company shall make a proposal to the Ad Hoc Group with respect to the Comprehensive Amendment (as defined herein).~~

~~(g)     On or before February 5, 2020, the Company and the Ad Hoc Group shall reach an agreement in principle with respect to the Comprehensive Amendment.~~

(a)     ~~(h)~~     On or before January 8, 2020 (or such later date as agreed by the Ad Hoc Group), the Company shall execute customary control agreements with the applicable depository banks and the Administrative Agent establishing control over all deposit accounts, securities accounts, and investment accounts of each Loan Party (subject to certain excluded accounts to be agreed), in each case, in form and substance reasonably acceptable to the Administrative Agent and the Ad Hoc Group.

(b)     ~~(i)~~     On or before January 8, 2020, the Company shall use commercially reasonable efforts to take all necessary actions to effect the perfection of any lien on or security interest in any of the Collateral that is not perfected as of the Second Amendment Effective Date, in each case to the extent the Company, the Administrative Agent, or the Required Lenders have identified any required actions, including filing or recording necessary statements, filings, agreements, mortgages, or other instruments (which, in each case, shall be in form and substance reasonably acceptable to the Administrative Agent and the Ad Hoc Group). For the avoidance of doubt, the use of the term "commercially reasonable efforts" in this Section ~~7~~8(~~i~~g) shall in no way limit, replace, or otherwise affect the Company's existing obligations under the Loan Agreement or other Loan Documents, including, but not limited to, the Company's obligations under Section 5.11 of the Loan Agreement with respect to "Further Assurances."

The failure to comply with any of the Milestones (with the exception of the Milestones contained in Sections ~~7~~8(f), (g), (h), and (i)) shall not constitute a Default or Event of Default under the Loan Agreement or the other Loan Documents, but shall, following the Cure Period, constitute a Standstill Event of Default that permits the Required Lenders to declare a Termination Event. Notwithstanding the foregoing, failure to comply with the Milestones in Sections ~~7~~8(f), (g), (h), and (i) shall constitute an immediate Event of Default under the Loan Agreement.

9.     <u>Sale Process Milestones. Upon the commencement of and during the Sale Process, until the occurrence of a Termination Event, the Company shall, or shall cause, the following to occur by the times and dates set forth below, during the Standstill Period, except as otherwise extended or modified in writing (including via e-mail) by counsel to the Company and the Required Lenders (the "**Sale Process Milestones**"); *provided that* any "delivery" required under the Milestones shall be in form and scope reasonably satisfactory to the Ad Hoc Group Advisors or the Ad Hoc Group, as applicable.</u>

(a)     <u>To the extent that the bids submitted by third parties (which have not been withdrawn) in connection with the Sale Process are sufficient to pay all Obligations under the Loan Agreement (taking into account available cash in the case of cash free, debt free bids), including for the avoidance of doubt, the Call Protection, the Exit Payments, and principal and accrued interest under the Loans (the "**Par Plus Accrued Milestones**"), then:</u>

(i)     <u>On or before February 17, 2020, the Company shall submit</u> <u>a proposal to the Ad Hoc Group for the consensual use of cash collateral in the Chapter 11 Cases (the "**Cash Collateral Term Sheet**").</u>

(ii)     <u>On or before February 21, 2020, the Company shall provide the Ad Hoc Group Advisors a debtor in possession budget , together with a weekly forecast through August 31, 2020 (the "**DIP Budget**") and a wind-down budget the "**Wind-Down Budget**").</u>

(iii)     <u>On or before February 21, 2020, the Company shall provide a draft of the bid procedures that will be implemented pursuant to a Sale Transaction in the Chapter 11 Cases (the "**Bid Procedures**") and accompanying draft order (the "**Bidding Procedures Order**").</u>

(iv)     <u>On or before February 28, 2020, the Company shall provide the Ad Hoc Group Advisors a copy of the Asset Purchase Agreement shared (or to be shared) with the final bidders in connection with the Sale Process (the "**APA**").</u>

(v)     <u>On or before March 6, 2020, the Company</u> <u>and the Ad Hoc Group Advisors shall</u> <u>have agreed to the form of</u>

(vi)     On or before March 6, 2020, the Company and Ad Hoc Group shall reach an agreement in principle with respect to the Cash Collateral Term Sheet, which term sheet shall provide for no additional economic consideration (other than default interest); *provided* that financial covenant testing to be included in the Cash Collateral Term Sheet shall be determined once the DIP Budget is delivered to the Ad Hoc Group Advisors, which financial covenant testing shall be in form and substance acceptable to the Ad Hoc Group Group.

(vii)    The Company shall provide a deadline for refreshed bids from all second round bidders taking part in the Sale Process (the "**Second Round Bids**") of March 9, 2020.

(viii)   On or before March 12, 2020, the Company shall provide to the Ad Hoc Group Advisors with a waterfall analysis based on all Second Round Bids received.

(ix)     On or before March 27, 2020, binding bids (the "**Binding Bids**") in connection with the Sale Process shall be due, provided that Company shall require that, such Binding Bids shall (A) not be subject to any diligence out or financing condition, and (B) include an agreement to provide a deposit not less than 5% of the Company's total enterprise value ("**TEV**"), which deposit shall only be due if such Binding Bid is selected by the Company, as specified in the applicable binding bid upon selection as the "Stalking Horse" bid in the Sale Process.

(x)      On or before March 30, 2020, the Company shall provide to the Ad Hoc Group Advisors a summary of all Binding Bids, including, but not limited to, for each Binding Bid (to the extent provided by the applicable bidder), (A) applicable markups of the APA against the form APA, (B) the applicable purchase price for the Company on a cash free / debt free basis, (C) the financing sources and proposed capital structure backing up each Binding Bid, (D) if applicable, commitment letters for any proposed financing of the purchase price for any Binding Bids, (E) if applicable, outstanding conditions in connection with the Binding Bids and detail surrounding internal approvals required to satisfy the same, and (F) information related to the time remaining until closing on account of any pending Binding Bids; *provided* that, all information provided pursuant this Section 9(a)(x) shall be un-redacted.

(xi)     On or before April 5, 2020, the Company shall (A) select the Stalking Horse Bidder (and unless the Company and the Ad Hoc Group Advisors determine that the Sale Process may be effectuated on an out-of-court basis) and (B) commence the Chapter 11 Cases with a stalking horse APA (the "**Stalking Horse APA**") and the Bid Procedures; *provided* that, upon commencement of the Chapter 11 Cases, all versions of the Stalking Horse APA shall be shared with the Ad Hoc Group Advisors.

(xii)    On or before May 6, 2020, the Bankruptcy Court shall enter the Bidding Procedures Order (in form and substance reasonably acceptable to the Ad Hoc Group) approving the Bidding Procedures and the Stalking Horse APA in connection with the Sale Transaction.

(xiii)   Binding bids in connection with the Sale Transaction under the Chapter 11 Cases shall be due on or before June 26, 2020.

(xiv)    If required as set forth in the Bidding Procedures Order, the Company shall conduct an auction for a Sale Transaction by no later than June 30, 2020.

(xv)     On or before July 15, 2020, the Court shall enter an order (in form and substance reasonably acceptable to the Ad Hoc Group) approving the proposed sale of the Company's assets in connection with the Sale Process (the "**Sale Order**").

If at any time during the Sale Process, no bids exist sufficient to pay all Obligations under the Loan Agreement (taking into account available cash in the case of cash free, debt free bids), including, for the avoidance of doubt, the Call Protection, the Exit Payments, and all principal and accrued interest, there shall be an immediate Event of Default under the Loan Agreement, and within three Business Days of such occurrence, the Company must toggle into the Non-Par Plus Accrued Milestones (defined below) (a "**Toggle Event**"); *provided* that, Required Lenders may consent to the modification of any applicable Sale Process Milestones or other Milestone hereunder or Toggle Event, which consent can be communicated in writing by the Ad Hoc Group Advisors (for which, email communication will be sufficient).

The failure to comply with any of the Par Plus Accrued Milestones shall not constitute a Default or Event of Default under the Loan Agreement or the other Loan Documents, but shall, following the Cure Period, constitute a Standstill Event of Default that permits the Required Lenders to declare a Termination Event.

(b)    Upon the occurrence of a Toggle Event, then the following Sale Milestones shall immediately come into effect (the "**Non-Par Plus Accrued Milestones**"):

(i) 20-day (20) days after a Toggle Event, the Company shall provide the Ad Hoc Group Advisors with a standalone restructuring proposal.

(ii) On or before February 17, 2020, the Company shall provide to the Ad Hoc Group Advisors with a Cash Collateral Term Sheet.

(iii) On or before the date that is nineteen (19) days after a Toggle Event, the Company shall provide the Ad Hoc Group Advisors with a draft restructuring support agreement (the "**RSA**"), an analysis of general unsecured claims (the "**GUC Analysis**"), and an exit/emergence analysis (the "**Exit/Emergence Analysis**").

(i) On or before February 21, 2020, the Company shall provide to the Ad Hoc Group Advisors, the proposed Bid Procedures and the Bid Procedures Order.

(ii) On or before February 21, 2020 (or March 6, 2020, should a Toggle Event occur after February 21, 2020), the Company and the Ad Hoc Group Advisors shall reach an agreement in principle with respect to the Cash Collateral Term Sheet, which term sheet shall provide for no additional economic consideration (other than default interest); *provided* that financial covenant testing to be included in the Cash Collateral Term Sheet shall be determined once the DIP Budget is delivered to the Ad Hoc Group Advisors, which financial covenant testing shall be in form and substance acceptable to the Ad Hoc Group.

(iii) On or before the date that is twenty-six (26) days after a Toggle Event, the Company and the Ad Hoc Group Advisors shall reach an agreement in principal with respect to the RSA.

(iv) On or before the date that is twenty-six (26) days after a Toggle Event, the Company shall deliver to the Ad Hoc Group Advisors drafts of any customary first day pleadings for the Chapter 11 Cases, a proposed plan of reorganization (the "**Plan**"), and a proposed disclosure statement (the "**Disclosure Statement**").

(v) On or before February 26, 2020 (or March 6, 2020, should a Toggle Event occur after February 26, 2020), the Company and the Ad Hoc Group Advisors shall reach an agreement in principle on the Bidding Procedures and the Bidding Procedures Order.

(vi) On or before the date that is thirty (30) days after a Toggle Event, the Company shall commence the Chapter 11 Cases to consummate either (A) a Sale Transaction pursuant with the Lenders serving as a stalking horse, and entering into a stalking horse APA (the "**Credit Bid APA**") in order to exercise their rights to credit bid under the Loan Documents or (B) a transaction backstopped by an executed RSA; *provided* that, to the extent the Company is pursuing a Sale Transaction, the Company will file a motion seeking approval of the Bidding Procedures, the Bidding Procedures Order, and the Sale Order on the petition date.

(vii) On or before the date that is thirty-eight (38) days after a Toggle Event, the Company shall file the Plan and Disclosure Statement, which, for the avoidance of doubt, shall be in form and substance reasonably acceptable to the Ad Hoc Group.

(viii) On or before the date that is the sixty-one (61) days after a Toggle Event, the Bankruptcy Court shall enter the Bidding Procedures Order in form and substance reasonably acceptable to the Ad Hoc Group.

(ix) On or before the date that is seventy-three (73) days after a Toggle Event, the Bankruptcy Court shall, subject to the court availability, hold a hearing on the adequacy of the Disclosure Statement and enter an order approving the same as well as solicitation of the Plan within one (1) Business Day.

(x) On or before the date that is one hundred and five (105) days after a Toggle Event, bids for the Sale Transaction shall be due.

(xi) On or before the date that is one hundred and twelve (112) days after a Toggle Event, the Company shall conduct the auction for the 363 Sale.

(xii) On or before the date that is one hundred and eighteen (118) days after a Toggle Event, the Bankruptcy Court shall, subject to court availability, hold a confirmation hearing with respect to the Plan and enter an order on the same, which order shall be in form and substance reasonably acceptable to the Ad Hoc Group, within two (2) Business Days.

(xiii) On or before the date that is one hundred and nineteen (119) days after a Toggle Event, the Bankruptcy Court shall approve the Sale Transaction and enter the Sale Order.

(xiv) On or before the date that is one hundred and nineteen (119) days after a Toggle Event, the effective date of the Plan shall occur; *provided*, that, if regulatory approvals associated with a Sale Transaction remain

pending as of such date, this date shall be automatically extended to the date that is the first Business Day following receipt of all necessary regulatory approvals.

(xv)    On or before the date that is one hundred and thirty-three (133) days after a Toggle Event, the Sale Transaction shall close; *provided*, that, if regulatory approvals associated with a Sale Transaction remain pending as of such date, this date shall be automatically extended to the date that is the first Business Day following receipt of all necessary regulatory approvals.

The failure to comply with any of the Non-Par Plus Accrued Milestones shall not constitute a Default or Event of Default under the Loan Agreement or the other Loan Documents, but shall, following the Cure Period, constitute a Standstill Event of Default that permits the Required Lenders to declare a Termination Event; *provided* that, Required Lenders may consent to the modification of any applicable Sale Process Milestones or other Milestone hereunder or Toggle Event, which consent can be communicated in writing by the Ad Hoc Group Advisors (for which, email communication will be sufficient).

10.    ~~8.~~    <u>Other Covenants</u>. The Company covenants and agrees that (the "**Other Covenants**"):

(a)    ~~(a)~~    <u>Judgment or Damages Claims</u>. During the Standstill Period, the Company shall not make any payment (whether individually or in the aggregate, but excluding any Permitted Equity Issuance) above the amount covered or coverable by third-party insurance (from a creditworthy insurer that has agreed in writing to provide coverage) in respect of a final, unappealable judgment, award or settlement in, or in order to pay, post, or obtain a bond related to an appeal in, the Specified Litigation Matters (as defined below) without the prior written consent of the Required Lenders; *provided* that the Company shall be permitted to make payments in respect of the Kogut Matter (as defined below) for attorney fees and related costs not to exceed two million dollars ($2,000,000). For the avoidance of doubt, the failure to comply with the Other Covenant contained in this Section ~~8~~10(a) during the Standstill Period shall result in an immediate Event of Default under the Loan Agreement; *provided* that, the Other Covenant and other provisions of this Section ~~8~~10(a) shall terminate upon the occurrence of a Termination Event. The "**Specified Litigation Matters**" shall mean the following litigation, and any litigation related to the following litigation that arises out of substantially the same facts and circumstances: *Akorn, Inc. v. Fresenius Kabi AG*, 2018-0300-JTL (Del. Ch.), *In re Akorn, Inc. Data Integrity Securities Litigation*, No. 18-cv-01713 (N.D. Ill.), *In re Akorn, Inc. Derivative Litigation*, No. 18-cv-07374 (N.D. Ill.), *Kogut v. Akorn, Inc.*, No. 646,174 (La. Dist. Ct.) (the "**Kogut Matter**"), and *In re: Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).

(b)    Mandatory Prepayment. To the extent either (i) a Toggle Event exists or (ii)  the Company commences the Chapter 11 Cases without an executed Stalking Horse APA with a bid sufficient to pay all Obligations under the Loan Agreement (taking into account available cash in the case of cash free, debt free bids), including, for the avoidance of doubt, the Call Protection, the Exit Payments, and all principal and accrued interest, the Company shall prepay, on a ratable basis, within five (5) days prior to the commencement of the Chapter 11 Cases all outstanding Loans under the Loan Agreement in an amount that, after giving effect to such prepayment, leaves the Company's pro forma cash balance at an amount not to exceed $87,500,000. Notwithstanding anything to the contrary contained herein, the Other Covenant contained in this Section 10(b) shall survive any Termination Event.

~~(b)    Comprehensive Amendment. The Company and the Required Lenders shall each negotiate in good faith to enter into a comprehensive amendment of the Loan Agreement (the "**Comprehensive Amendment**") on or prior to the Termination Date, which comprehensive amendment shall be in form and substance acceptable to the Required Lenders at such time, and which, in any event, shall include a modification to require affected Lender consent for modifications to the pro rata sharing and waterfall provisions of the Loan Agreement. If a Comprehensive Amendment is not entered into by:~~

~~(i)November 15, 2019, then the Company shall (x) pay the Lenders a one-time fee of 0.625% of the principal amount of the Loans outstanding on the date thereof, which fee shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans, and (y) pledge to the Administrative Agent (for the benefit of the Secured Parties) all Equity Interests of any CFC or FSHCO held by any Loan Parties that are not pledged as of such date; and~~

~~(ii)February 7, 2020 (the "**Comprehensive Amendment Deadline**"); *provided* that (A) until the Comprehensive Amendment Deadline, the Company shall negotiate in good faith with the Ad Hoc Group Advisors and/or the Ad Hoc Group with respect to the terms of the Comprehensive Amendment, (B) the Company shall make a proposal to the Ad Hoc Group Advisors with respect to the Comprehensive Amendment by January 10, 2020, and (C) the Company and the Ad Hoc Group Advisors and/or the Ad Hoc Group will reach an agreement in principle with respect to the Comprehensive Amendment by February 5, 2020. Failure to enter into a Comprehensive Amendment or to meet any of the other requirements of this Section 8(b) shall constitute an immediate Event of Default under the Loan Agreement.~~

~~Notwithstanding anything to the contrary contained herein, the Other Covenant contained in this Section 8(b) shall survive any Termination Event.~~

(c)    ~~(c)~~    <u>Payment of Ad Hoc Group Advisors' Fees and Expenses</u>. During the Standstill Period, the Company shall pay

(a) the fees and expenses of Gibson Dunn, as counsel to the Ad Hoc Group, in accordance with that certain Fee and Expense Reimbursement Agreement dated November 15, 2019, and (b) the fees and expenses of Greenhill, as financial advisor to the Ad Hoc Group, in accordance with that certain engagement letter dated January 29, 2019. For the avoidance of doubt, the failure to comply with the Other Covenant contained in this Section 8<u>10</u>(c) during the Standstill Period shall result in an immediate Event of Default under the Loan Agreement.

11.    ~~9.~~    <u>Conditions to the Effectiveness of this Agreement</u>. The effectiveness of this Agreement is subject to the satisfaction (or waiver in accordance with the terms hereof) of each of the following conditions (the date on which such conditions are satisfied or waived, the "**Effective Date**"):

(a)    ~~(a)~~    <u>Delivery of Agreement</u>. This Agreement, duly authorized and executed by the Company, the Administrative Agent and the Standstill Lenders (constituting the Required Lenders at such time), shall have been delivered to each of the Company, the Administrative Agent, and the Standstill Lenders.

(b)    ~~(b)~~    <u>No Default</u>. Except for any Default or Event of Default with respect to the Specified Matters, both immediately before and after giving effect to this Agreement, no Default or Event of Default would then exist or would result therefrom.

(c)    ~~(c)~~    <u>Representations and Warranties</u>. Except with respect to the Specified Matters, all representations and warranties of the Company and the other Loan Parties set forth herein, in the Loan Agreement and in any other Loan Document shall be true and correct in all material respects (or, with respect to those representations and warranties expressly limited by their terms by materiality or material adverse effect qualifications, in all respects) as of the Effective Date as if made on such date (except to extent that such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such date).

(d)    ~~(d)~~    <u>No Material Adverse Effect</u>. Both immediately before and after giving effect to this Agreement, no Material Adverse Effect shall have occurred and be continuing or would result therefrom, excluding a Material Adverse Effect (if any) relating to any of the Specified Matters.

(e)    ~~(e)~~    <u>Closing Certificate</u>. The Administrative Agent shall have received a certificate, dated as of the date hereof, of a duly authorized officer of the Company, to the effect that, at and as of the Effective Date, both before and after giving effect to this Agreement, the conditions specified in this Section 9<u>11</u> (including clauses (b), (c), and (d) hereof) have been satisfied or waived.

(f)    ~~(f)~~    <u>Standstill Fee</u>. The Company shall have paid, and the Administrative Agent shall have received, for the ratable benefit of each Standstill Lender, a one-time fee equal to 1.75% of the aggregate principal amount of the Loans of such Lender on the date hereof (the "**Standstill Fee**"), which Standstill Fee shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the Effective Date, and shall be deemed fully earned when paid, shall not be refundable for any reason, and shall be payable without setoff, defense or counterclaim of any kind (and the provisions of Section 2.18(d) of the Loan Agreement are hereby waived in connection with the payment of the Standstill Fee).

(g)    ~~(g)~~    <u>Fees and Expenses</u>. The Company shall (i) pay or reimburse all reasonable and documented fees and expenses for Gibson Dunn, as legal advisor to the Ad Hoc Group, and Greenhill, as financial advisor to the Ad Hoc Group, on the terms set forth herein to the extent invoiced at least one (1) Business Day prior to the Effective Date and (ii) pay or reimburse all reasonable and documented out-of-pocket fees and expenses of the Administrative Agent in connection with this Agreement and the other Loan Documents (including reasonable out-of-pocket fees, costs, and expenses of outside counsel for the Administrative Agent) to the extent invoiced at least one (1) Business Day prior to the Effective Date.

(h)    ~~(h)~~    <u>Material Subsidiary Refresh</u>. The Company shall (i) deliver duly executed Joinder Agreements from all Material Subsidiaries that were not Loan Parties prior to the Effective Date, and (ii) to the extent any or all Domestic Subsidiaries that were not Material Subsidiaries prior to the Effective Date exceed ten percent (10%) of EBITDA for the four consecutive fiscal quarter period most recently ended or ten percent (10%) of Total Assets as of the end of such period, certify that the Company has designated Domestic Subsidiaries as Material Subsidiaries to eliminate such excess, and any Domestic Subsidiaries so designated shall thereafter constitute Material Subsidiaries for all purposes under the Loan Agreement and the other Loan Documents.

12.    ~~10.~~    <u>Representations and Warranties</u>.

(a)    ~~(a)~~    Each of the Company and the other Loan Parties hereby represents and warrants to the Administrative Agent and the Lenders that as of the Effective Date:

(i)    ~~(i)~~    the execution, delivery and performance of this Agreement and the Company's and Loan Parties' obligations hereunder have been duly authorized by all necessary corporate or limited liability company action (as applicable);

constitutes, when executed and delivered by the other parties hereto, a legal, valid and binding obligation of the Company and such Loan Party, enforceable against the Company or such Loan Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(iii)   ~~(iii)~~   no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure to obtain or make which could not reasonably be expected to have a Material Adverse Effect or (b) the exercise by any Lender of its rights under this Agreement;

(iv)   ~~(iv)~~   except with respect to the Specified Matters, each of the representations and warranties made by any Loan Party set forth in Article III of the Loan Agreement or in any other Loan Document is true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect, in which case such representation and warranty is true and correct in all respects) as of the date hereof with the same effect as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to earlier dates; and

(v)   ~~(v)~~   no Default or Event of Default has occurred and is continuing other than any Default or Event of Default with respect to the Specified Matters.

(b)   ~~(b)~~   Each of the Standstill Parties hereby represents and warrants that each of the following statements is true, accurate and complete as to such party as of the date hereof:

(i)   ~~(i)~~   such Standstill Party has carefully read and fully understands all of the terms and conditions of this Agreement;

(ii)   ~~(ii)~~   such Standstill Party has consulted with, or had a full and fair opportunity to consult with, an attorney regarding the terms and conditions of this Agreement;

(iii)   ~~(iii)~~   such Standstill Party has had a full and fair opportunity to participate in the drafting of this Agreement;

(iv)   ~~(iv)~~   such Standstill Party is freely, voluntarily and knowingly entering into this Agreement; and

(v)   ~~(v)~~   in entering into this Agreement, such Standstill Party has not relied upon any representation, warranty, covenant or agreement not expressly set forth herein or in the other Loan Documents.

1.   ~~11.~~   <u>Amendments to the Loan Agreement</u>. Effective as of the Effective Date, the Loan Agreement is hereby amended as set forth below:

(a)   ~~(a)~~   Section 1.01 of the Loan Agreement is hereby amended to add the definitions of "**<u>Exit Payments," "</u>First Amendment**," "**First Amendment Effective Date**," "**<u>Sale Process</u>**," "**Second Amendment**," "**Second Amendment Effective Date**," "**Standstill Event of Default**," ~~and~~ "**Standstill Period**,**<u>" "Third Amendment</u>**," "**<u>Third Amendment Effective Date</u>**" as follows:

(i) <u>Ad Hoc Group: as defined in the Third Amendment.</u>

(ii) <u>Ad Hoc Group Advisors: as defined in the Third Amendment.</u>

(iii) <u>Exit Payment: (a) If the Sale Process is approved by the Bankruptcy Court on or prior to July 15, 2020, then (i) if the Sale Process is consummated on or prior to July 15, 2020, 0.50% of the aggregate principal amount of the Loans of the applicable Lender then outstanding (*i.e.*, 50 basis points), or (ii) if the Sale Process is consummated after July 15, 2020, 0.75% of the aggregate principal amount of the Loans of the applicable Lender then outstanding (*i.e.*, 75 basis points); and (b) If the Sale Process is not approved by the Bankruptcy Court on or prior to July 15, 2020, then (i) if the Sale Process is consummated on or prior to August 15, 2020, 1.00% of the aggregate principal amount of the Loans of such Lender then outstanding (*i.e.*, 100 basis points), or (ii) if the Sale Process is consummated after August 15, 2020, 2.00% of the aggregate principal amount of the Loans of such Lender then outstanding (*i.e.*, 200 basis points).</u>

(ii)   ~~(i)~~   <u>First Amendment</u>: that certain Standstill Agreement and First Amendment to Loan Agreement dated as of May 6, 2019, among the Borrower, the Lenders party thereto, and the Administrative Agent.

(ii) ___ First Amendment Effective Date: the date on which the conditions precedent specified in Section 9 of the First Amendment have been satisfied or waived in accordance with the terms thereof.

(iv) Sale Process: as defined in the Third Amendment.

(v) ~~(iii)~~ Second Amendment: that certain First Amendment to Standstill Agreement and Second Amendment to Loan Agreement dated as of December 15, 2019, among the Borrower, the Lenders party thereto, and the Administrative Agent.

(vi) ~~(iv)~~ Second Amendment Effective Date: the date on which the conditions precedent specified in Section 3 of the Second Amendment have been satisfied or waived in accordance with the terms thereof.

(vii) ~~(iii)~~ Standstill Event of Default: as defined in the First Amendment.

(viii) ~~(iv)~~ Standstill Period: as defined in the ~~Second~~Third Amendment.

(ix) Third Amendment: that certain Second Amendment to Standstill Agreement and Third Amendment to Loan Agreement dated as of February 12, 2019, among the Borrower, the Lenders party thereto, and the Administrative Agent.

(x) Third Amendment Effective Date: the date on which the conditions precedent specified in Section 3 of the Third Amendment have been satisfied or waived in accordance with the terms thereof.

(b) ~~(b)~~ Section 1.01 of the Loan Agreement is hereby amended:

(i) ~~(i)~~ by amending and restating the definition of "**Applicable Rate**" to read as follows:

(a) ~~(a)~~ prior to the First Amendment Effective Date, with respect to any Eurodollar Loan or any ABR Loan, as the case may be, the applicable rate per annum set forth below under the caption "Eurodollar Spread" or "ABR Spread", as the case may be, based upon the Ratings Level applicable on such date:

| Ratings Level | Index Ratings (Moody's/S&P) | Eurodollar Spread | ABR Spread |
|---|---|---|---|
| Level I | B1/B+ or higher | 4.25% | 3.25% |
| Level II | B2/B | 4.75% | 3.75% |
| Level III | B3/B- or lower | 5.50% | 4.50% |

(b) ~~(b)~~ commencing on (and including) the First Amendment Effective Date and ending on (but excluding) the Second Amendment Effective Date, with respect to any Eurodollar Loan or any ABR Loan, as the case may be, the applicable rate per annum set forth below under the caption "Eurodollar Spread" or "ABR Spread", as the case may be, based upon the Ratings Level applicable on such date:

| Ratings Level | Index Ratings (Moody's/S&P) | Eurodollar Spread | ABR Spread |
|---|---|---|---|
| Level I | B1/B+ or higher | 5.75% | 4.75% |
| Level II | B2/B | 6.25% | 5.25% |
| Level III | B3/B- or lower | 7.00% | 6.00% |

*provided that* 0.75% (i.e., 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date);

(c) ~~(c)~~ commencing on (and including) the Second Amendment Effective Date and ending on (but excluding) the date of a Standstill Event of Default (i) 9.00% per annum for any ABR Loan, and (ii) 10.00% per annum for any Eurodollar Loan; *provided that* 0.75% (*i.e.*, 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date); ~~and~~

(d) if at any time during the Sale Process, (i) no bids exist which are sufficient to pay all Obligations (including, for the avoidance of doubt, the Call Protection and Exit Payments) or (ii) no further third-party bids exist, then then from the occurrence of such date until the date of a Standstill Event of Default, (A) 11.50% per annum for any ABR Loan, and (B) 12.50% per annum for any Eurodollar Loan; *provided that*

0.75% (*i.e.*, 75 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date);

(e)   ~~(d)~~ commencing on (and including) the date of a Standstill Event of Default, ~~(i) 9~~0.50% ~~for~~shall be added to the then in effect Applicable Rate of any ABR Loan~~, and (ii) 10.50% for any~~ or Eurodollar Loan; *provided* that 1.25% (*i.e.*, 125 basis points) of such Applicable Rate shall be payable in kind by capitalizing and adding such amount to the outstanding principal balance of the Loans on the applicable Interest Payment Date); *provided further* that the Applicable Rate pursuant to this section (~~d~~e) shall remain payable and continue to accrue following a Termination Event and the Termination Date~~.~~; and

(f)   upon the occurrence of any of the events described in sections (d)(i), (d)(ii), and (e) above, Required Lenders shall give notice to the Agent, and upon receipt of such notice, the Agent shall be authorized to accrue and pay such additional amounts to the Lenders, as and when applicable.

(ii)   by amending and restating the definition of "**Interest Payment Date**" by adding the following proviso to the end of the definition:

"*provided* that, commencing on the Second Amendment Effective Date, the Interest Payment Date for ABR Loans and Eurodollar Loans shall be the first Business Day of each month."

(c)   Section 2.09(b)(i) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(i) no Event of Default shall have occurred and be continuing or would result therefrom, except in the case of an Incremental Term Facility incurred to finance a Permitted Acquisition or other Permitted Investment, such requirement shall be subject to customary "certain funds provisions" if otherwise agreed by the Lenders providing such Incremental Term Facility (but in any event shall be subject to no Event of Default as described in clause (a), (b), (h), (i), (j), or (r) of Article VII having occurred or be continuing);"

(d)   ~~(c)~~   Section 2.11(a) of the Loan Agreement is hereby amended by deleting the word "and," prior to clause (3) and adding the following as clause (4):

"and (4) notwithstanding anything in this Agreement to the contrary, ~~in the event of any~~upon maturity, acceleration, termination, conversion, and/or payment, prepayment, or repayment for any reason ~~(but excluding any mandatory prepayments under Section 2.11(c) or 2.11(d))~~ of the Loans ~~during the Standstill Period~~ (including, without limitation, upon or after the maturity or acceleration of the Loans as a result of the occurrence of any Event of Default or otherwise, to the extent any such acceleration is not prohibited by the terms of ~~Section 3 of~~ the First Amendment (as amended by the Second Amendment and the Third Amendment)), the Company shall pay the Lenders (a) a premium of ~~1.500%~~(i) on or prior to June 1, 2020, 1.500%, (ii) after June 1, 2020, but on or prior to July 30, 2020, 1.00%, and (iii) after July 30, 2020, 0.500%, in each case of clauses (i), (ii), and (iii) above, of the outstanding principal amount of ~~the~~such Loans ~~so prepaid~~on the date of such maturity, acceleration, termination, conversion, or payment, prepayment, or repayment (such premium, the "**Call Protection**") *plus* (b) any Exit Payments, calculated as of the date ~~of any such prepayment, repayment, or acceleration."~~thereof; *provided* that, for the avoidance of doubt, the Call Protection and Exit Payments shall constitute Obligations under the Loan Agreement, including without limitation, in connection with the Lenders' right to credit bid in any proceeding under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**")."

(e)   ~~(d)~~   Section 2.13(c) of the Loan Agreement is hereby amended and restated as follows:

"(c) Notwithstanding the foregoing, upon the occurrence of any Event of Default; for avoidance of doubt, to include the right to accelerate on account of an Event of Default under Article VII(r), the Loans and all other Obligations, shall bear interest at a rate per annum equal to 2.00% plus the Applicable Rate then in effect."

(a)   Section 5.01(a) is hereby amended to add the following proviso at the end of the Section:

"*provided* that, the Borrower shall not be required to deliver any items in connection with this Section 5.01(a) without a "going concern" or like qualification or exception for such year to the extent the Borrower has delivered a Quality of Earnings report to the Ad Hoc Group Advisors;"

(b)   Article V is hereby amended by adding a new Section 5.13 as follows:

"Prior Written Notice of Bankruptcy Filing. The Loan Parties and Restricted Subsidiaries, as applicable, shall provide the Ad Hoc Group Advisors with written notice at least seven (7) Business Days' prior to commencing any proceedings under Chapter 7 or Chapter 11 of the Bankruptcy Code; *provided* that, following receipt of such written notice by the Ad Hoc Group Advisors, the Required Lenders shall be

entitled to accelerate the Obligations then outstanding under this Agreement one (1) Business Day prior to the date of commencement of such proceedings as specified in such notice."

(c)   Article VII is hereby amended as follows:

(i)   by deleting the word "or" at the end of Article VII(p);

(ii)   by adding the word "or" at the end of Article VII(q);

(iii)   by adding a new Article VII(r) as follows:

"any Loan Party or Restricted Subsidiary shall fail to observe or perform any covenant, condition, or agreement contained in Section 5.13."

(iv)   by amending and restating the final paragraph of Article VII as follows:

"then, and in every such event (other than an event with respect to the Borrower described in clause (h), (i) or (r) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take the following action: declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Loans at the time outstanding, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in the case of any event with respect to the Borrower described in clause (h), (i), or (r) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

(d)   ~~(e)~~   Section 8.06 of the Loan Agreement is hereby amended to delete the second sentence in its entirety and replace it with the following sentence:

Upon any such resignation, the Required Lenders shall have the right to appoint a successor.

(e)   ~~(f)~~   Section 9.04(b)(i)(A) is amended and restated as follows:

"[Reserved]; and"

(f)   ~~(g)~~   Section 9.04(e) is amended and restated in its entirety as follows:

"(e) Notwithstanding anything to the contrary contained herein, (x) no Lender may assign all or a portion of its rights and obligations under this Agreement in respect of its Loans to the Borrower, any Restricted Subsidiary, or any Unrestricted Subsidiary without the prior written consent of the Required Lenders and (y) the Borrower, any Restricted Subsidiary, or any Unrestricted Subsidiary may not purchase or prepay Loans without the prior written consent of the Required Lenders in each case in accordance with Section 2.11(g); *provided* that (i) any Loans acquired by the Borrower, any Restricted Subsidiary, or any Unrestricted Subsidiary shall be automatically retired and cancelled concurrently with the acquisition thereof, and (ii) no Default or Event of Default shall have occurred and be continuing at the time of such assignment or sale, nor would result therefrom."

(g)   ~~(f)~~   For the avoidance of doubt, the amendments set forth in this Section 1~~4~~ shall survive any termination of this Agreement.

2.   ~~12.~~   Direction to the Administrative Agent; Indemnity. Each Lender party hereto hereby consents, authorizes and directs the Administrative Agent to execute and deliver this Agreement and to take the actions contemplated herein. Each Standstill Party confirms and agrees that (i) the Administrative Agent is only entering into this Agreement at the direction of the Required Lenders, (ii) subject to the terms of the Loan Agreement and the other Loan Documents (including this Agreement), any action or inaction taken hereunder by the Administrative Agent shall be at the express direction of the Required Lenders (including, without limitation, any determination that a Default, Event of Default, and/or Standstill Event of Default has occurred and/or that the Standstill Period has ended) and (iii) the indemnification provisions set forth in the Loan Agreement and the other Loan Documents (including, without limitation, the indemnification provisions set forth in Sections 9.03(b) and 9.03(c) of the Loan Agreement) shall apply to actions taken by the Administrative Agent in connection with this Agreement.

3.   ~~13.~~   Miscellaneous.

(a) instrument in writing, specifying the same, duly executed by the requisite parties in accordance with Section 9.02 of the Loan Agreement. For the avoidance of doubt, any extension of the Termination Date hereunder shall not constitute a postponement of any scheduled date of payment of the principal amount of any Loan, or the date for the payment of any interest, fees or other Obligations, or a waiver or excuse of any such payment, in each case for purposes of Section 9.02(b)(iii) of the Loan Agreement.

(b) ~~(b)~~ GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Standstill Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in any U.S. Federal (or, if such court lacks subject matter jurisdiction, New York State) court sitting in New York, New York (or court of proper appellate jurisdiction) (the "Chosen Courts"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Courts are an inconvenient forum or does not have personal jurisdiction over any Standstill Party hereto or constitutional authority to finally adjudicate the matter; *provided that*, for the avoidance of doubt, this Section 13~~5~~(b) does not supersede, amend or modify the provisions of Section 9.09 of the Loan Agreement, which shall continue to apply in accordance with its terms, including with respect to any Defaults or Events of Default asserted under the Loan Agreement.

(c) ~~(c)~~ Trial by Jury Waiver. EACH STANDSTILL PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(d) ~~(d)~~ Entire Agreement. This Agreement, inclusive of its schedule, represents the entire understanding and agreement among the Standstill Parties with respect to the subject matter hereof, and supersedes all prior agreements, if any, among them with respect thereto. Each of the Standstill Parties acknowledges that it has not relied upon any representations by any other Standstill Party or anyone acting on behalf of any Standstill Party in entering into this Agreement.

(e) ~~(e)~~ Counterparts. This Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature set of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. Signatures to this Agreement, any amendment hereof and any notice given hereunder, transmitted by telecopy or PDF, and the photocopy of any signature page, shall be valid and effective to bind the Standstill Party so signing. All such counterparts shall collectively constitute a single instrument.

(f) ~~(f)~~ Waiver. Any provision hereof may be waived only by written instrument making specific reference to this Agreement signed by the requisite parties in accordance with Section 9.02 of the Loan Agreement. The waiver by any Standstill Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Standstill Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Standstill Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(g) ~~(g)~~ Interpretation. This Agreement is the result of negotiation and, accordingly, no presumption or burden of proof will arise with respect to any ambiguity or question of intent concerning this Agreement favoring or disfavoring any party to this Agreement by virtue of the authorship of any provision of this Agreement.

(h) ~~(h)~~ Reliance.

(i) ~~(i)~~ The Loan Parties acknowledge and agree that, notwithstanding anything to the contrary set forth in this Agreement, the Administrative Agent and the Standstill Lenders do not have, nor shall have, an obligation to: (A) subject to the obligations set forth in Section 8~~10~~(b) hereof, amend the Loan Agreement or any other Loan Document or otherwise restructure the Obligations; (B) other than with respect to any continuation of outstanding Eurodollar Loans or any conversion of outstanding ABR Loans into Eurodollar Loans, make any further loans, advances or extension of credit to or for the benefit of the Loan Parties, (C) extend the Standstill Period; (D) refrain from terminating the Standstill Period upon the occurrence of any Standstill Event of Default or (E) enter into any other instruments, agreements or documents regarding any of the same with the Loan Parties, and that neither the Administrative Agent nor the Lenders, nor any of their respective representatives, have made any agreements with, or commitments or representations or warranties to, the Loan Parties (either in writing or orally), other than as expressly stated in this Agreement.

(ii)    ~~(ii)~~    The Loan Parties expressly understand and further agree that the Administrative Agent and the Lenders are relying on all terms, covenants, conditions, warranties and representations set forth in this Agreement as a material inducement to the Administrative Agent and the Lenders to enter into this Agreement and to standstill from exercising the Administrative Agent's and the Lenders' rights and remedies as specifically set forth herein.

(i)    ~~(i)~~    <u>Cumulative Remedies</u>.

(i)    ~~(i)~~    Except as otherwise specifically provided in this Agreement, the rights, powers, authorities, remedies, interests and benefits conferred upon the Administrative Agent and the Lenders by and as provided in this Agreement are intended to supplement, and be in addition to (and, except as expressly set forth herein, shall not in any way replace, supersede, amend, limit or restrict), the rights, powers, authorities, remedies, interests, and benefits conferred by the Loan Agreement and the other Loan Documents.

(ii)    ~~(ii)~~    No delay on the part of the Administrative Agent or the Lenders in the exercise of any power, right or remedy under this Agreement, the Loan Agreement or any other Loan Document at any time shall operate as a waiver thereof, and no single or partial exercise by the Administrative Agent or the Standstill Lenders of any power, right or remedy shall preclude other or further exercise thereof or the exercise of any other power, right or remedy.

(j)    ~~(j)~~    <u>Relationship</u>. The Loan Parties agree that the relationship between the Administrative Agent and the Lenders, on one hand, and the Loan Parties, on the other hand, is that of creditor and debtor and not that of partners or joint venturers. This Agreement does not constitute a partnership agreement, or any other association between the Administrative Agent, the Lenders and the Loan Parties. The Loan Parties acknowledge that the Administrative Agent and the Lenders have acted at all times only as a creditor to the Loan Parties within the normal and usual scope of the activities normally undertaken by a creditor and in no event have the Administrative Agent and the Lenders attempted to exercise any control over the Company or any other Loan Party or their respective businesses or affairs. The Loan Parties further acknowledge that the Administrative Agent and Lenders have not taken or failed to take any action under or in connection with their rights under the Loan Agreement and the other Loan Documents that in any way or to any extent have interfered with or adversely affected the Loan Parties' ownership of the Collateral.

(k)    ~~(k)~~    <u>Ad Hoc Group Actions and Composition</u>.

(i)    ~~(i)~~    Any action by the Ad Hoc Group with respect to this Agreement (which, for the avoidance of doubt, is limited to actions under Section ~~5~~6(k) and Section ~~8~~10(a) hereof) may be taken by members of the Ad Hoc Group with Credit Exposures representing more than fifty percent (50%) of the Aggregate Credit Exposures of the Ad Hoc Group taken as a whole (the "**Required Ad Hoc Group Members**"). Any action taken hereunder by the Required Ad Hoc Group Members shall bind all members of the Ad Hoc Group.

(ii)    ~~(ii)~~    In the event that, at any time on or after the Effective Date, the Ad Hoc Group does not act on behalf of the Required Lenders, all references to the "Ad Hoc Group" in this Agreement shall be deemed to refer to the Required Lenders.

(l)    ~~(l)~~    <u>No Third Party Beneficiaries</u>. This Agreement is made and entered into for the sole protection and benefit of the parties hereto and no other person or entity shall have any right of action hereon, right to claim any right or benefit from the terms contained herein, or be deemed a third party beneficiary hereunder.

(m)    ~~(m)~~    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, it being the parties' intention that each and every provision of this Agreement be enforced to the fullest extent permitted by applicable law.

(n)    ~~(n)~~    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and shall inure to the benefit of the Lenders, the Company, and the other Loan Parties and their respective successors and assigns, except that the Company and the other Loan Parties may not assign their rights under this Agreement without the prior written consent of the Required Lenders.

(o)    ~~(o)~~    <u>Voluntary Agreement</u>. The Loan Parties, the Administrative Agent and the Standstill Lenders represent and warrant that they are represented by legal counsel of their choice, that they have consulted with such counsel regarding this Agreement, that they are fully aware of the terms and provisions contained herein and of their effect and that they have voluntarily and without coercion or duress of any kind entered into this Agreement.

(p)    ~~(p)~~    <u>Integration</u>. This Agreement and the instruments, agreements and documents referred to in this Agreement

shall be deemed incorporated into and made a part of the Loan Agreement and the other Loan Documents. This Agreement shall be deemed to be a Loan Document as that term is defined in the Loan Agreement. All such instruments, agreements and documents, and this Agreement, shall be construed as integrated and complementary of each other, and, except as otherwise specifically provided in this Agreement, as augmenting and not restricting the Administrative Agent's or the Lenders' rights, remedies, benefits and security. If after applying the foregoing an inconsistency still exists, the provisions of this Agreement shall constitute an amendment to the Loan Agreement and shall control; *provided, however*, that, for the avoidance of doubt, the provisions hereof that do not survive termination of this Agreement or the Standstill Period shall not be deemed to amend the terms of the Loan Agreement following such termination. References in the Loan Agreement to this "Agreement," "herein," "hereof" or "hereunder" or references to the Loan Agreement in any other agreement or document shall, in each case, be deemed to refer to the Loan Agreement as amended hereby.

(q) ~~(q)~~ <u>No Novation</u>. This Agreement shall not extinguish the Loans or other Obligations outstanding under the Loan Agreement and/or any of the other Loan Documents as in effect prior to the effectiveness of this Agreement. Nothing herein contained shall be construed as a substitution, novation or repayment of the Loans or other Obligations outstanding under the Loan Agreement and/or any of the other Loan Documents as in effect prior to the effectiveness of this Agreement, all of which shall remain outstanding in full force and effect after the effectiveness of this Agreement, as amended hereby.

(r) ~~(r)~~ <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

        i. ~~i.~~  if to the Company:

        Akorn, Inc.
        1925 West Field Court, Suite 300
        Lake Forest, IL 60045
        Attention: Duane Portwood, Chief Financial Officer
        Email address: <u>duane.portwood@akorn.com</u>
        Copies to:
        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022
        Attention: Patrick J. Nash; Nicole L. Greenblatt
        Email address: patrick.nash@kirkland.com; nicole.greenblat@kirkland.com

        ii. ~~ii.~~  if to the Ad Hoc Group:

        Gibson, Dunn & Crutcher LLP
        200 Park Avenue
        New York, NY 10166
        Attention: Scott J. Greenberg
        Email address: sgreenberg@gibsondunn.com

        iii. ~~iii.~~  if to any other Lender party hereto, to such address as may be furnished by such Lender from time to time to each of the Standstill Parties.

        iv. ~~iv.~~  if to the Administrative Agent:

        JPMorgan Chase Bank, N.A.
        10 S. Dearborn Street
        , 9th Floor~~,~~
        Chicago, IL 60603
        Attention: Justin Martin
        Email address: justin.2.martin@jpmorgan.com
        Copy to:
        Latham & Watkins LLP
        330 North Wabash Avenue, Suite 2800
        Chicago, IL 60611
        Attention: Zulf Bokhari
        Email address: <u>zulf.bokhari@lw.com</u>

Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

[*Signature Pages to Follow*]

     IN WITNESS WHEREOF, each of the undersigned, intending to be legally bound hereby, has executed this Agreement below effective as of the Effective Date.

                 **THE COMPANY:**
                 AKORN, INC.


                 By   __
                   Name: Duane Portwood
                   Title: Chief Financial Officer

                 **OTHER LOAN PARTIES:**

                 ADVANCED VISION RESEARCH, INC.


                 By   __
                   Name:
                   Title:
                 AKORN (NEW JERSEY), INC.


                 By   __
                   Name:
                   Title:
                 AKORN ANIMAL HEALTH, INC.


                 By   __
                   Name:
                   Title:
                 AKORN OPHTHALMICS, INC.


                 By   __
                   Name:
                   Title:
                 AKORN SALES, INC.


                 By   __
                   Name:
                   Title:

                 INSPIRE PHARMACEUTICALS, INC.


                 By   __
                   Name:
                   Title:
                 OAK PHARMACEUTICALS, INC.


                 By   __
                   Name:
                   Title:
                 HI-TECH PHARMACAL CO., INC.


                 By   __
                   Name:
                   Title:
                 10 EDISON STREET LLC


                 By   __

13 EDISON STREET LLC

By   __
    Name:
    Title:

VPI HOLDINGS CORP.

By   __
    Name:
    Title:

VPI HOLDINGS SUB, LLC

By   __
    Name:
    Title:

VERSAPHARM INCORPORATED

By   __
    Name:
    Title:

COVENANT PHARMA INC.

By   __
    Name:
    Title:

OLTA PHARMACEUTICALS CORP.

By   __
    Name:
    Title:

CLOVER PHARMACEUTICALS CORP.

By   __
    Name:
    Title:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

By   __
    Name:
    Title:

[LENDERS]

By   __
    Name:
    Title:

<u>Exhibit A</u>
<u>Ad Hoc Group</u>

1. ~~1.~~ Eaton Vance Management
2. ~~2.~~ CIFC Asset Management
3. ~~3.~~ The Carlyle Group

4. Funds, accounts, and other investment vehicles, managed, advised, or sub-advised by Credit Suisse Asset Management, LLC
5. Certain funds and accounts under management by BlackRock Financial Management, Inc. and its affiliates
6. Western Asset Management
7. GSO Capital Partners
8. PineBridge Investments
9. Stonehill Capital Management
10. BlueMountain Capital Management
11. Canyon Capital
12. Symphony Asset Management
13. MidOcean Partners

EXHIBIT 21.1

**AKORN, INC.**
**LISTING OF SUBSIDIARIES OF THE REGISTRANT**
**As of December 31, 2019**

| Legal Entity Name | Incorporation | Ownership |
|---|---|---|
| **Registrant / Parent Corporation:** | | |
| Akorn, Inc. | Louisiana | Shareholders (NASDAQ: AKRX) |
| | | |
| **U.S. subsidiaries of Akorn, Inc.:** | | |
| Advanced Vision Research, Inc. | Delaware | Akorn, Inc. (LA) |
| Akorn (New Jersey), Inc. | Illinois | Akorn, Inc. (LA) |
| Akorn Animal Health, Inc. | Delaware | Akorn, Inc. (LA) |
| Akorn Ophthalmics, Inc. | Delaware | Akorn, Inc. (LA) |
| Akorn Sales, Inc. | Delaware | Akorn, Inc. (LA) |
| Inspire Pharmaceuticals, Inc. | Delaware | Oak Pharmaceuticals, Inc. (DE) |
| Oak Pharmaceuticals, Inc. | Delaware | Akorn, Inc. (LA) |
| Hi-Tech Pharmacal Co., Inc. | Delaware | Akorn, Inc. (LA) |
| 10 Edison Street LLC | Delaware | Hi-Tech Pharmacal Co., Inc. (DE) |
| 13 Edison Street LLC | Delaware | Hi-Tech Pharmacal Co., Inc. (DE) |
| VPI Holdings Corp. | Delaware | Akorn, Inc. (LA) |
| VPI Holdings Sub, LLC. | Delaware | VPI Holdings Corp. (DE) |
| VersaPharm Incorporated | Georgia | VPI Holdings Sub, LLC. (DE) |
| Covenant Pharma, Inc. | Georgia | VPI Holdings Sub, LLC. (DE) |
| Olta Pharmaceuticals Corp. | Delaware | VersaPharm Incorporated (GA) |
| Clover Pharmaceuticals Corp. | Delaware | VersaPharm Incorporated (GA) |
| | | |
| **Foreign subsidiaries of Akorn, Inc.:** | | |
| WorldAkorn Pharma Mauritius | Mauritius | Akorn, Inc. (LA) |
| Akorn India Private Limited | India | WorldAkorn Pharma Mauritius |
| Akorn Canada, Inc. | Canada | Akorn, Inc. (LA) |
| Akorn International S.à r.l. | Luxembourg | Oak Pharmaceuticals, Inc. (DE) |
| Akorn AG (formerly Excelvision AG) | Switzerland | Akorn International S.à r.l. (LUX) |

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Akorn, Inc.
Lake Forest, Illinois

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-195673, 333-215507, 333-217666, 333-229166, and 333-231317) of Akorn, Inc. of our reports dated February 26, 2020, relating to the consolidated financial statements, and the effectiveness of Akorn, Inc.'s internal control over financial reporting, which appear in this Form 10-K. Our report contains an explanatory paragraph regarding the Company's ability to continue as a going concern.

/s/ BDO USA, LLP
Chicago, Illinois

February 26, 2020

EXHIBIT 31.1

### CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, Douglas S. Boothe, certify that:

1. I have reviewed this report on Form 10-K of Akorn, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2020

/s/ DOUGLAS S. BOOTHE

Douglas S. Boothe

*President and Chief Executive Officer*

EXHIBIT 31.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

I, Duane A. Portwood, certify that:

1. I have reviewed this report on Form 10-K of Akorn, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2020

/s/ DUANE A. PORTWOOD
Duane A. Portwood
*Executive Vice President and Chief Financial Officer*

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. 1350**

In connection with the Annual Report of Akorn, Inc. (the "Company") on Form 10-K for the period ended December 31, 2019, as filed with the Securities and Exchange Commission and to which this Certification is an exhibit (the "Report"), the undersigned officer of Akorn, Inc. does hereby certify, pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and Rule 13a-14(b) promulgated under the Securities Exchange Act of 1934, that to my knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 26, 2020

/s/ DOUGLAS S. BOOTHE
Douglas S. Boothe
*President and Chief Executive Officer*

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. 1350**

In connection with the Annual Report of Akorn, Inc. (the "Company") on Form 10-K for the period ended December 31, 2019, as filed with the Securities and Exchange Commission and to which this Certification is an exhibit (the "Report"), the undersigned officer of Akorn, Inc. does hereby certify, pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and Rule 13a-14(b) promulgated under the Securities Exchange Act of 1934, that to my knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 26, 2020

/s/ DUANE A. PORTWOOD

Duane A. Portwood
*Executive Vice President and Chief Financial Officer*