**Civil Action No. 20-cv-1254 (MN); BAP No. 20-29**

# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

1199SEIU NATIONAL BENEFIT FUND, 1199SEIU GREATER NEW YORK BENEFIT FUND, 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS, 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND, AFSCME DISTRICT COUNCIL 47 HEALTH AND WELFARE FUND, AND SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND,

*Creditors/Appellants*,

v.

AKORN, INC., 10 EDISON STREET LLC, 13 EDISON STREET LLC, ADVANCED VISION RESEARCH, INC., AKORN (NEW JERSEY), INC., AKORN ANIMAL HEALTH, INC., AKORN OPTHALMICS, INC., AKORN SALES, INC., CLOVER PHARMACEUTICALS CORP., COVENANT PHARMA, INC., HI-TECH PHARMACAL CO., INC., INSPIRE PHARMACEUTICALS, INC., OAK PHARMACEUTICALS, INC. AND OLTA PHARMACEUTICALS CORP., VERSAPHARM INCORPORATED, VPI HOLDINGS CORP., AND VPI HOLDINGS SUB, LLC,

*Debtors/Appellees*.

On Appeal from the United States Bankruptcy Court for the District of Delaware No. 20-11177 (KBO), Judge Karen B. Owens

## BRIEF FOR DEBTORS/APPELLEES

GEORGE W. HICKS, JR.*
ANDREW C. LAWRENCE*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
george.hicks@kirkland.com
andrew.lawrence@kirkland.com

PAUL N. HEATH (No. 3704)
AMANDA R. STEELE (No. 5530)
BRETT M. HAYWOOD (No. 6166)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
heath@rlf.com
steele@rlf.com
haywood@rlf.com

*admitted pro hac vice*
*Counsel for Debtors/Appellees Akorn, Inc. et al.*
April 30, 2021

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8014(b), Debtors/Appel-lees make the following disclosures:

1.    Akorn, Inc. has no parent corporation, and no publicly traded corporation owns any equity of Akorn, Inc.

2.    One hundred percent (100%) of the equity of 10 Edison Street LLC is directly owned by Hi-Tech Pharmacal Co., Inc., and no publicly traded corporation directly owns any equity of 10 Edison Street LLC.

3.    One hundred percent (100%) of the equity of 13 Edison Street LLC is directly owned by Hi-Tech Pharmacal Co., Inc., and no publicly traded corporation directly owns any equity of 13 Edison Street LLC.

4.    One hundred percent (100%) of the equity of Advanced Vision Re-search, Inc. is directly owned by Akorn, Inc, and no publicly traded corporation di-rectly owns any equity of Advance Vision Research, Inc.

5.    One hundred percent (100%) of the equity of Akorn (New Jersey), Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Akorn (New Jersey), Inc.,

6.    One hundred percent (100%) of the equity of Akorn Animal Health, Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Akorn Animal Health, Inc.

i

7.     One hundred percent (100%) of the equity of Akorn Ophthalmics, Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Akorn Ophthalmics, Inc.

8.     One hundred percent (100%) of the equity of Akorn Sales, Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Akorn Sales, Inc.

9.     One hundred percent (100%) of the equity of Clover Pharmaceuticals Corp. is directly owned by Covenant Pharma, Inc., and no publicly traded corporation directly owns any equity of Clover Pharmaceuticals Corp.

10.     One hundred percent (100%) of the equity of Covenant Pharma, Inc. is directly owned by VPI Holdings Sub, LLC, and no publicly traded corporation directly owns any equity of Covenant Pharma, Inc.

11.     One hundred percent (100%) of the equity of Hi-Tech Pharmacal Co., Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Hi-Tech Pharmacal Co., Inc.

12.     One hundred percent (100%) of the equity of Inspire Pharmaceuticals, Inc. is directly owned by Oak Pharmaceuticals, Inc., and no publicly traded corporation directly owns any equity of Inspire Pharmaceuticals, Inc.

13.     One hundred percent (100%) of the equity of Oak Pharmaceuticals, Inc. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of Oak Pharmaceuticals, Inc.

14.     One hundred percent (100%) of the equity of Olta Pharmaceuticals Corp. is directly owned by Versapharm Incorporated, and no publicly traded corporation directly owns any equity of Olta Pharmaceuticals Corp.

15.     One hundred percent (100%) of the equity of Versapharm Incorporated is directly owned by VPI Holdings Sub, LLC, and no publicly traded corporation directly owns any equity of Versapharm Incorporated.

16.     One hundred percent (100%) of the equity of VPI Holdings Corp. is directly owned by Akorn, Inc., and no publicly traded corporation directly owns any equity of VPI Holdings Corp.

17.     One hundred percent (100%) of the equity of VPI Holdings Sub, LLC is directly owned by VPI Holdings Corp., and no publicly traded corporation directly owns any equity of VPI Holdings Sub, LLC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ...................................................................... vi

INTRODUCTION ................................................................................. 1

STATEMENT OF THE CASE .................................................................... 3

    A.    Legal Framework ................................................................ 3

    B.    Factual and Procedural Background .................................... 6

SUMMARY OF ARGUMENT .................................................................. 19

ARGUMENT ....................................................................................... 20

The Bankruptcy Court Properly Confirmed Akorn's Chapter 11 Plan .................. 20

    A.    Akorn Met Its Burden of Proof ......................................... 20

    B.    The Plan Properly Classifies Substantially Similar Claims .............. 24

    C.    The Plan Properly Designates Impaired Classes ................................ 26

    D.    An Impaired Class Voted for the Plan ................................. 30

    E.    The Plan Provides Equal Treatment to Claims in the Same Class ........................................................................ 30

    F.    The Plan Provides Adequate Means to Implement its Provisions ...................................................................... 33

    G.    Akorn Sought to Maximize the Value of the Estate for Creditors ....................................................................... 36

    H.    Akorn Proposed the Plan in Good Faith ............................. 39

    I.    The Plan Passes the "Best Interest of the Creditors" Test ................. 46

    J.    The Plan Is Fair and Equitable and Does Not Discriminate Unfairly ........................................................................ 49

    K.    The Releases, Exculpation, and Injunction Are Proper .................... 53

iv

CONCLUSION ..................................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) ................................................................ 49, 51

*Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*,
    877 F.3d 136 (3d Cir. 2017) ........................................................19

*Czyzewski v. Jevic Holding Corp.*,
    137 S.Ct. 973 (2017) ............................................................3, 4

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) ........................................................39

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) .................................................. 20, 34, 50

*In re Atl. Gulf Communities Corp.*,
    369 B.R. 156 (Bankr. D. Del. 2007) ................................................33

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ........................................................4

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007).................................................56

*In re Cont'l Airlines*,
    203 F.3d 203 (3d Cir. 2000) ........................................................56

*In re Dwellco I Ltd. P'ship*,
    219 B.R. 5  (Bankr. D. Conn. 1998) ................................................28

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004) .................................................... 3, 13

*In re J&S Props., LLC*,
    872 F.3d 138 (3d Cir. 2017) .................................................. 41, 46, 47

*In re L&J Anaheim Assocs.*,
    995 F.2d 940 (9th Cir. 1993).......................................................27

*In re Millennium Lab Holdings II, LLC.*,
945 F.3d 126 (3d Cir. 2019) ......................................................................57

*In re PPI Enters. (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003) ......................................................................27

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ....................................................... 32, 40, 46

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ........................................................56

*In Re Trans World Airlines, Inc.*,
No. 01-00056 (PJW), 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) ...............25

*In re Trib. Co.*,
972 F.3d 228 (3d Cir. 2020) ....................................................... 49, 52, 53

*In re TTS, Inc.*,
158 B.R. 583 (D. Del. 1993) .....................................................................32

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013) ....................................................... 24, 26, 30

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................55

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993) ......................................................................49

*Jones v. Barnes*,
463 U.S. 745 (1983) ....................................................................................2

*Luo v. Melinta Therapeutics, Inc.*,
No. CV 20-600 (MN), 2021 WL 965614 (D. Del. Mar. 15, 2021) ................... 39, 42

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988) ....................................................................................4

*Off. Comm. of Unsecured Creditors of Cybergenics Corp.
ex rel. Cybergenics Corp. v. Chinery*,
330 F.3d 548 (3d Cir. 2003) ......................................................................36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ........................................................................................3, 5

*Talarico v. Ultra Petroleum Corp.*,
   No. 20-32631, 2020 WL 8361996 (S.D. Tex. Dec. 29, 2020) ................................54

*Westmoreland Hum. Opportunities, Inc. v. Walsh*,
   246 F.3d 233 (3d Cir. 2001) ...............................................................................37

**Statutes**

11 U.S.C. §326 ...................................................................................................48

11 U.S.C. §363 ...................................................................................................11

11 U.S.C. §365 ...................................................................................................26

11 U.S.C. §503 ...................................................................................................48

11 U.S.C. §701 *et seq.* ........................................................................................3

11 U.S.C. §1102 ............................................................................................ 14, 43

11 U.S.C. §1106 ..................................................................................................36

11 U.S.C. §1107 ....................................................................................................5

11 U.S.C. §1121 ....................................................................................................3

11 U.S.C. §1122 .................................................................................................3, 5

11 U.S.C. §1123 ............................................................................................. *passim*

11 U.S.C. §1124 ......................................................................................... 5, 27, 30

11 U.S.C. §1126 ..................................................................................................27

11 U.S.C. §1129 ............................................................................................. *passim*

11 U.S.C. §1141 ....................................................................................................3

**Rules**

Fed. R. Bankr. P. 1019 .........................................................................................48

Fed. R. Bankr. P. 3002 ..................................................................................................48

Fed. R. Bankr. P. 3016 ..................................................................................................58

**Treatises**

3 *Collier on Bankruptcy* ¶363 (16th ed. 2020) ............................................................11

3 *Norton Bankr. L. & Prac.* §49 (3d ed. 2020) ..............................................................4

7 *Collier on Bankruptcy* ¶1123 (16th ed. 2020)................................................... 32, 34

7 *Collier on Bankruptcy* ¶1124 (16th ed. 2020)...........................................................27

7 *Collier on Bankruptcy* ¶1129 (16th ed. 2020)........................................... 4, 20, 46, 52

*Chapter 11 Reorganizations* §12 (2d ed. 2021) ............................................................34

**Other Authorities**

Akorn, Inc., Annual Report (Form 10-K) (Feb. 26, 2020) ...................................... 9, 44

Akorn, Inc., Quarterly Report (Form 10-Q) (May 11, 2020).................................. 10, 44

*Booth Family Trust v. Kapoor*, 2019CH12793 (Ill. Cir. Ct.) ............................................8

*Claim*, Black's Law Dictionary, (11th ed. 2019) ..........................................................45

*In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR
    (E.D. Pa. Aug. 5, 2016)...........................................................................................7

*Kogut v. Akorn, Inc.*, No. 646,174 (La. 19th. Dist. Ct.) .................................................8

Official Form 204.........................................................................................................42

*Pulchinski v. Abramowitz et al.*, 2019CH11186 (Ill. Cir. Ct.)........................................8

*Trsar v. Akorn, Inc.*, No. 18-cv-7374 (N.D. Ill.) ...........................................................8

## INTRODUCTION

This bankruptcy appeal involves a quixotic effort by a small, dissenting group of unsecured creditors to overturn a confirmed Chapter 11 plan of reorganization. For nearly two years, the debtors in this case—the generic pharmaceutical company Akorn, Inc. and its affiliates (collectively, Akorn)—sought to address hundreds of millions of dollars of debt that it could no longer service. To that end, Akorn engaged in exhaustive negotiations with dozens of prospective investors, and it held *68* board meetings between November 2018 and August 2020. In the end, Akorn's best— indeed, *only*—actionable offer came from its secured lenders, who agreed to purchase the vast majority of Akorn's assets while assuming tens of millions of dollars in other liabilities.

As relevant here, Akorn also devised a plan to resolve other creditor claims and to implement the wind-down of its estate. Under the Bankruptcy Code, a court may confirm a plan only after concluding that various statutory requirements are satisfied. Here, after receiving extensive briefing and holding a multi-day hearing, the Bankruptcy Court determined that Akorn met those requirements with considerable room to spare. The court therefore confirmed the plan in September 2020, and it took effect the following month, thereby bringing an end to a reorganization process that hundreds of parties supported.

The appellants here—a handful of general unsecured creditors whose unsecured, unliquidated claims against Akorn hinge on the outcome of hotly contested antitrust litigation involving most of the generic pharmaceutical industry (collectively, Appellants)—would have this Court send Akorn back to square one with its plan. Although no other party to this bankruptcy case is contesting the validity of the plan, Appellants nevertheless contend, in one of the more extraordinary submissions to ever grace an appellate docket, that the Bankruptcy Court committed some *two dozen* errors in confirming the plan, any one of which supposedly requires this Court to scrap the plan *in toto*.

Appellants' submission suffers from all manner of problems and confirms that the Bankruptcy Court got it right. As the Supreme Court has observed, asserting a "[m]ultiplicity" of errors on appeal "hints at lack of confidence in any one." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). That teaching perfectly describes Appellants' submission here, which is teeming with uniformly meritless arguments. Indeed, Appellants' arguments are often so perfunctory that they are hardly even coherent; others fail to wrestle with the demanding standard of review; others involve issues that do not even arguably implicate Appellants' interests; others do not even remotely concern the Bankruptcy Code provisions that Appellants invoke; others contain mystifying accusations of intentional misconduct; and all have precisely zero support in

law or fact.  Accordingly, rather than granting Appellants' reckless request to over-turn Akorn's plan, this Court should instead affirm the court below, which carefully considered—and thoroughly rejected—all of the specious arguments that Appellants are pressing here.

## STATEMENT OF THE CASE

### A.     Legal Framework

The Bankruptcy Code permits companies to file for bankruptcy under either Chapter 7 or Chapter 11.  In a Chapter 7 bankruptcy, the company's pre-petition assets are liquidated and distributed to creditors.  *See* 11 U.S.C. §701 *et seq.*[1]  In a Chapter 11 bankruptcy, the objective is different.  Instead of liquidation, the "basic purposes" of a Chapter 11 bankruptcy are (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors."  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004).  Consistent with those purposes, "[a] Chapter 11 bankruptcy is implemented according to a 'plan,' typically proposed by the debtor, which divides claims against the debtor into separate 'classes' and specifies the treatment each class will receive," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 641 (2012), and which "often" aims to "keep the business operating as a going concern," *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017); *see also* §§1121, 1122, 1123, 1141.

---

[1] All further statutory references in this brief are to Title 11 of the U.S. Code.

In the absence of creditor consent, distributions under a Chapter 11 plan are governed by the "absolute priority rule," which provides that junior classes of claims cannot obtain any recovery until senior classes of claims are paid in full and that equity-holders cannot retain any value unless all creditors are paid in full. *See, e.g.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).  As a general matter, secured creditors "are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts." *Czyzewski*, 137 S.Ct. at 979.  By contrast, the claims of unsecured creditors—whose claims are not secured by collateral—are typically lower in priority than secured claims and may receive only partial (or no) payment. *See id.* at 979-80; *see also* 3 *Norton Bankr. L. & Prac.* §49:1 (3d ed. 2020) (explaining that it is the "rare case in which the debtor has enough assets to pay all creditors in full").

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case." 7 *Collier on Bankruptcy* ¶1129.01 (16th ed. 2020) (*Collier*).  Before confirming a plan, a court must determine (subject to one notable exception explained below) that "all … of the requirements" of §1129(a) of the Bankruptcy Code are satisfied. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 n.59 (3d Cir. 2004).  Section 1129(a) contains 16 separate requirements, and six of them are particularly relevant to this appeal, *see* Br.7-9:

- Sections 1129(a)(1) and 1129(a)(2) require the court to determine that the "plan" and the "proponent of the plan" have complied with

4

the "applicable provisions" of Title 11—*e.g.*, §1107 (governing the "duties" of the debtor-in-possession), §1122 (governing the "classification of claims or interests" in a plan), and §1123 (governing the "contents" of a plan).  §§1129(a)(1), (2); *see* Br.7-8;

- Section 1129(a)(3) requires the court to determine that "[t]he plan has been proposed in good faith and not by any means forbidden by law."  §1129(a)(3); *see* Br.8;

- Section 1129(a)(7) requires the court to determine, "with respect to each impaired class of claims or interests," that individual holders of such impaired claims or interests have either "accepted the plan" or, at the time of the plan's "effective date," "will receive or retain under the plan … a value … that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7" on the effective date.[2]  §1129(a)(7); *see* Br.8;

- Section 1129(a)(8) requires the court to determine that "each class of claims or interests" has either "accepted the plan" or that "such class is not impaired under the plan."  §1129(a)(8); and

- Section 1129(a)(10) requires the court to determine that, "[i]f a class of claims is impaired under the plan," "at least one" such impaired class "has accepted the plan, … without including any acceptance of the plan by any insider."  §1129(a)(10); *see* Br.8.

As noted, §1129 authorizes a departure from strict adherence to the §1129(a) requirements in one circumstance, which is codified in §1129(b)—often referred to as the "cramdown" provision.  *See RadLAX*, 566 U.S. at 641-42.  That provision states that, so long as all §1129(a) requirements are satisfied except for

---

[2]  "[A] class of claims or interests is impaired under a plan unless … the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  §1124(1).

§1129(a)(8)—which, as just described, requires the court to determine that each creditor class has either accepted the plan or is otherwise unimpaired by the plan—then the court may still confirm a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  §1129(b)(1).

### B.    Factual and Procedural Background

1.    Akorn is a specialty pharmaceutical company that develops, manufactures, and markets various generic and branded prescription pharmaceuticals, over-the-counter consumer health products, and animal health pharmaceuticals.  *See* Ex.J.at.1.[3]  Originally founded in Louisiana in 1971, Akorn later relocated its headquarters to Illinois and, as a result of strategic mergers and acquisitions, grew into a company worth hundreds of millions of dollars.  *See* Ex.J.at.1.

As relevant here, in April 2017, Akorn agreed to merge with a German corporation named Fresenius Kabi AG (Fresenius) in a transaction that would make Akorn a wholly owned Fresenius subsidiary.  *See* Ex.J.at.30.  That transaction, which Fresenius sought to consummate notwithstanding that certain parties (including Appellants here[4]) had named Akorn as one of dozens of defendants in antitrust litigation

---

[3]    "Ex." refers to the exhibits filed with Appellants' opening brief.

[4]    Appellants are AFSCME District Council 47 Health and Welfare Fund, 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, 1199SEIU Licensed

involving the bulk of the generic pharmaceutical industry, *see In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa. Aug. 5, 2016), also promised to provide substantial value to Akorn shareholders. *See* Ex.J.at.30,37. Significantly, however, the terms of the agreement authorized Fresenius to terminate the merger in specified circumstances, including if Akorn suffered a "material adverse effect" on its business. *See* Ex.J.at.30.

Akorn's business outlook worsened after the announcement of the Fresenius merger. To begin, Akorn's financial performance began to deteriorate due to an assortment of different factors, including increased competition and lower drug prices. *See* Ex.J.at.30-31. Moreover, in November 2017, Fresenius informed Akorn that it had received anonymous letters alleging data-integrity- and regulatory-related deficiencies at certain Akorn facilities. *See* Ex.J.at.31. Fresenius publicly revealed in February 2018 that it had initiated an investigation into the matter, with which Akorn fully cooperated, but in April 2018, Fresenius informed Akorn that it would terminate the merger. *See* Ex.J.at.31. In response, Akorn filed suit against Fresenius in Delaware, seeking performance of the merger agreement. *See* Ex.J.at.31. Fresenius counterclaimed, and in October 2018, the Delaware Chancery Court concluded

---

Practical Nurses Welfare Fund and Sergeants Benevolent Association Health and Welfare Fund.

that Fresenius validly terminated the agreement because Akorn had suffered a "material adverse effect." *See* Ex.J.at.32-33.

Akorn also faced related litigation from its shareholders. Some brought class-action securities claims alleging that Akorn and its management had misstated or omitted material information about its data-integrity controls and compliance with FDA regulations. *See* Ex.J.at.33. Akorn disputed those claims, but the parties eventually reached a settlement agreement. *See* Ex.J.at.34; *see also* Ex.A, Ex.B. As part of that settlement agreement, Akorn placed into escrow approximately $30 million in proceeds from its directors and officers (D&O) insurance policies, a certain number of shares of Akorn common stock, and certain "contingent value rights." *See* Ex.J.at.34-35.[5]

2.   In November 2018, soon after the Delaware Chancery Court issued its decision in the Fresenius litigation, Akorn received notices from several of its secured lenders stating that the court's "material adverse effect" determination could

---

[5]   Other shareholders brought class-action derivative lawsuits, including in Louisiana state court. *See Kogut v. Akorn, Inc.*, No. 646,174 (La. 19th. Dist. Ct.). That Louisiana class-action lawsuit ended with a settlement agreement, which includes a broad release provision that applies to the named plaintiff, Akorn, and every Akorn shareholder. *See* D.I.5-29. In light of that provision, other courts have dismissed derivative claims related to the events that led to the failed Fresenius merger. *See Trsar v. Akorn, Inc.*, No. 18-cv-7374 (N.D. Ill.); *Pulchinski v. Abramowitz et al.*, 2019CH11186 (Ill. Cir. Ct.); *Booth Family Trust v. Kapoor*, 2019CH12793 (Ill. Cir. Ct.); *see also* D.I.5-30; D.I.5-31; D.I.5-32.

have significant consequences under Akorn's loan agreements—including a declaration by the lenders of an event of default, which would have authorized them to cancel the credit facilities and to demand immediate repayment of outstanding balances (approximately $850 million). *See* Ex.J.at.37; Ex.L.at.13,19. Akorn disagreed with that view, but rather than exposing itself to potentially ruinous litigation on another front, it instead negotiated a standstill agreement with the lenders, which, in light of extensions in 2019 and early 2020, gave the parties significant breathing room to develop a comprehensive solution to Akorn's finances. *See* Ex.J.at.37; *see also* Ex.C (original term-loan credit agreement); Ex.D (original standstill agreement); Ex.E (first amendment to standstill agreement); Ex.F (second amendment to standstill agreement).

In 2019, with the standstill in effect, Akorn worked with an investment bank to identify parties (*e.g.*, private-equity groups and hedge funds) with sufficient capital to either fully refinance or pay down Akorn's loans. *See* Ex.J.at.38. During that period, Akorn began to stabilize its business and earn meaningful revenue, *see* Ex.J.at.39—in substantial part because of the exhaustive efforts of its senior executives, which ultimately earned them bonuses,[6] *see* Ex.M.at.36-43; *see also* Akorn, Inc., Annual Report (Form 10-K) (Feb. 26, 2020); Akorn, Inc., Quarterly Report

---

[6]   These bonuses also incentivized Akorn's senior management to remain with Akorn and thereby continue its turnaround. *See* Ex.M.at.41-42.

(Form 10-Q) (May 11, 2020).  Unsurprisingly, after Akorn and its investment bank contacted 32 prospective investors, 22 of them expressed interest.  *See* Ex.J.at.38. Those prospective investors conducted substantial due diligence, and Akorn held board meetings with its investment bank on a weekly or bi-weekly basis to discuss the options.  *See* Ex.J.at.38; Ex.L.at.20; *see also* Ex.L.at.18 (Akorn's investment banker explaining:  "I would say we probably had the most number of board meetings in this case that I've ever had in my career."). Ultimately, however, none of the prospective investors could refinance Akorn's capital structure to the degree that Akorn required.  *See* Ex.J.at 38; *see also* Ex.L.at.13-38.

Beginning in December 2019, Akorn therefore pivoted toward pursuing a sale of its business.  *See* Ex.J.at.39.  To do so, Akorn's investment bank contacted 72 potential buyers with the goal of obtaining a sales price that could satisfy Akorn's aggregate debt to the secured lenders.  *See* Ex.J.at.40.  Again, numerous parties (37 this time) expressed interest in a purchase, leading to even more extensive due diligence and more board meetings.  *See* Ex.J.at.39-40.  But by the March 2020 bidding deadline, Akorn had "received no bids that were above the debt," and "no bids that were binding."  Ex.L.at.43; *see also* Ex.L.at.38-43.

Unwilling to extend the standstill period any further, the secured lenders subsequently informed Akorn that—although they had the right under the still-operative

loan agreement to take possession of their collateral and to conduct a public or private sale of it out-of-court, *see* D.I.5-8.at.9-10[7]—they would instead serve as the "stalking horse" bidder in a Chapter 11 bankruptcy proceeding and "credit bid" the outstanding amount of Akorn's debt, all with the aim of preserving Akorn as a going-concern.[8]  *See* Ex.J.at.40-41; Ex.L.at.38-57; *see also* §363(k).

3.     Akorn thus filed for Chapter 11 bankruptcy on May 20, 2020.[9]  For months after that petition date, Akorn and its advisors continued to labor to find a purchaser that could exceed the secured lenders' stalking-horse bid, again leading to lengthy periods of due diligence.  *See* Ex.L.at.57-62.  Although Akorn informed parties that it would entertain offers even for particular assets as opposed to the whole business, none of the 18 parties that expressed interest in the whole business and none of the 27 parties that expressed interest in particular assets presented a "qualified" or "actionable" bid.  *See* Ex.L.at.59-62; *see also* Ex.L.at.62 (Akorn's investment banker explaining that Akorn received only "one bid that's qualified" and "actionable," which is "the term loan credit bid").

---

[7]     "D.I." refers to this Court's docket.

[8]     A "stalking horse" bidder is "a prospective buyer who commits to an initial bid."  3 *Collier* ¶363.02[e][7].  A "credit bid" allows a creditor to "offset its claim against the purchase price of the property"—*i.e.*, it enables the creditor to purchase property "without having to part with new funds."  3 *Collier* ¶363.09.

[9]     The Bankruptcy Court jointly administered the various Chapter 11 cases filed by Akorn and its affiliates.  *See* Bankr.D.I.57.

As a result, the parties moved forward with the secured lenders' stalking-horse bid, which envisioned that the lenders would acquire substantially all of Akorn's assets except for certain ones that they did not wish to acquire—*e.g.*, Akorn's D&O insurance policies, certain estate causes of action, and an interest in a nasal-spray product co-owned with a company named Rising Pharmaceuticals (Rising).  *See* Ex.H.at.9 (defining "Retained Assets").  Further, aside from the consideration reflected in the credit bid, the lenders also proposed to contribute another $150 million, including $35 million in cash to fund Akorn's wind-down and over $100 million in assumed trade liabilities (*i.e.*, liabilities involving substantially all of Akorn's unsecured creditors).  *See* Ex.L.at.51-52.

As particularly relevant here, to accompany the asset purchase agreement, Akorn also developed a plan and a disclosure statement explaining it.  *See* Ex.H; Ex.J.  The plan divided creditors into eight different classes in light of substantial differences among them, five of which the plan deemed "impaired":  Class 3, which includes the secured lenders; Class 4 which includes holders of general unsecured claims (including Appellants[10]); Class 5, which includes "intercompany claims";

---

[10]   As noted above, Appellants' general unsecured claim arises from their antitrust claims against Akorn in another jurisdiction.  Because those antitrust claims are unresolved and highly contested, Appellants' claim is a "contingent," "unliquidated," and "disputed" general unsecured claim.  *See* Ex.H.at.31-33.

Class 7, which includes certain subordinated claims (known as §510(b) claims[11]); and Class 8, which includes "Akorn interests." *See* Ex.H.at.16-19. Four of those impaired classes voted on the plan, with Class 3 voting to accept it on a unanimous basis. *See* Ex.X.at.Ex.A.

The plan also included other provisions pertinent to this appeal, including a third-party-release provision. Under that provision, each "releasing party" released each "released party" (*e.g.*, Akorn and the secured lenders) from various causes of action. *See* Ex.H.at.9,35-36. But the "releasing parties" include only those who consent to the provision. *See* Ex.H.at.9 (defining "releasing party" to include "all Holders of Claims or Interests that … vote to reject the Plan *and* who opt into the releases in the Plan"). Although many parties offered such consent, others—including Appellants here—elected not to do so. *See* Br.65 ("Appellants did not opt into the Releases.").

The plan also includes an exculpation provision. Under that provision, certain "exculpated parties" are exculpated from various restructuring-related activities performed after the petition date but before the plan's effective date. Ex.H.at.36. The

---

[11]   Section 510(b) "subordinates claims for damages arising from the purchase or sale of a security of the debtor to all claims and interests that are senior or equal to the claim or interest represented by such security." *Integrated Telecom*, 384 F.3d at 117 n.2.

"exculpated parties" are defined to include Akorn and the Unsecured Creditors Committee—a collection of unsecured creditors, selected by the U.S. Trustee, who advocate in a fiduciary capacity for the body of unsecured creditors as a whole, *see* §1102(a)(1)—along with their "current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals." Ex.H.at.5. This provision, however, does not protect those parties from "claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence." Ex.H.at.36.

In addition, the plan contains various provisions governing its implementation. For instance, to implement the third-party-release and exculpation provisions, the plan includes an injunction provision, which provides that "all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking" specified actions inconsistent with those provisions. *See* Ex.H.at.36. More broadly, the plan includes a multi-page article entitled "Means for Implementation of the Plan." *See* Ex.H.at.20. Among other things, that article states that, upon Akorn's emergence from bankruptcy, a plan

administrator is authorized to "implement the Plan" and "make distributions there-under," such as by "liquidating" any remaining assets—including those assets that the secured lenders did not purchase and that Akorn retained.  *See* Ex.H.at.21-22.

4.     Appellants filed an objection to the proposed sale and to plan confirma-tion.  *See* Ex.K.  By the parties' consent, the Bankruptcy Court bifurcated the hear-ings addressing those two issues.  *See* Bankr.D.I.624.[12]

At the sale hearing—which occurred on September 1, 2020—the Bankruptcy Court heard several hours of witness testimony from Akorn's investment banker (Mark Buschmann of PJT Partners) and admitted 24 exhibits, all of which explained Akorn's exhaustive pre- and post-petition efforts to address its debt and the reality that Akorn ultimately had only one actionable offer on the table:  the secured lenders' stalking-horse bid.  *See generally* Ex.L.  After considering all of the evidence, the court approved the sale and overruled Appellants' objections.  *See* Ex.L.at.224.  In so doing, the court explained that "[t]he evidence … is overwhelming and uncontro-verted … that the proposed sale to the stalking horse is based on a sound exercise of the debtors' business judgment"; that "[t]here simply has been no evidence presented to counter these findings to challenge the debtors' business judgment and to support the alternative narrative that has been posited by [Appellants]"; and that it "would

---

[12]   "Bankr.D.I." refers to the Bankruptcy Court docket.

be a complete failure of these proceedings and the efforts made to date by the various stakeholders in these cases" if the sale did not move forward. *See* Ex.L.at.222-24. The court later entered an order approving the sale, *see* Bankr.D.I.656, which Appellants never appealed.

At the plan confirmation hearing—which occurred from September 2-4, 2020 and which incorporated the record from the sale hearing—the Bankruptcy Court heard testimony from, among others, Akorn's general counsel (Joseph Bonaccorsi), Akorn's financial advisor (William Kocovski of Alix Partners), and Akorn's chief financial officer (Duane Portwood) and admitted 35 additional exhibits. *See* Ex.M; Ex.N; Ex.O. The confirmation hearing again examined Akorn's pre- and post-petition efforts to find the most value-maximizing transaction for all stakeholders, and it extensively discussed the plan and its contents, including why the plan is superior to a Chapter 7 liquidation. *See, e.g.*, Ex.M.at.7-177; Ex.N.at.8-37. Appellants themselves examined[13] and cross-examined witnesses for hours, and other interested parties participated in the hearing too, including the Unsecured Creditors Committee, which voiced strong support for the plan. *See* D.I.5-13 (Committee's statement in support of plan confirmation, which the court below admitted into the record with no objection). As relevant here, the Committee's counsel explained that, over the

---

[13]  Appellants called Akorn's chief financial officer as their own witness.

course of several months in 2020, the Committee had conducted an independent investigation to determine whether the causes of action that Akorn had retained had any value (*e.g.*, causes of actions related to the shareholder settlement that followed the failed Fresenius merger), but the Committee ultimately found those causes of action "speculative." Ex.L.at.193; *see also* Ex.L.at.193 ("We … reject the argument that there is some great pot of litigation claims that could be realized here that are sufficient to overturn a sale that pays the lion's share of debt in this case."). The Committee thus entered into a settlement agreement with Akorn and the secured lenders, pursuant to which the lenders agreed to assume an additional $5 million in undisputed unsecured claims. *See* D.I.5-13.

After hearing all of the evidence, the Bankruptcy Court confirmed the plan, finding "all applicable provisions of the Bankruptcy Code" satisfied. *See* Ex.O.at.4. From the bench, the court specifically addressed four of the "primary" objections to the plan. *See* Ex.O.at.4. Among other things, the court stated that Class 3, which includes the secured lenders, is an "impaired" class, for the plan provides the "sole[]" basis for them to recover against Akorn and thus alters rights that they would otherwise enjoy. *See* Ex.O.at.5. The court also explained that "the series of allegations" made by Appellants regarding Akorn's purported bad faith "are not supported by the record," observing that "the record developed during both the sale and confirmation proceedings[] indicates that … the debtors sought to and did, in fact, maximize value

17

to stakeholders" and that the plan "simply reflects the outcome of those efforts." *See* Ex.O.at.8.  Finally, the court stated that, "[t]o the extent" that there are "other objections" that it did not specifically address, "they are overruled following consideration of the record and the legal briefing." *See* Ex.O.at.5.  The court then entered its order confirming the plan, which Appellants appealed. *See* Ex.P.  Later, on October 1, 2020, the plan took effect.

     5.    Approximately two months after issuing the plan confirmation order, the Bankruptcy Court held a hearing to approve a settlement between Akorn and Rising—the company with which Akorn co-owned an interest in a nasal-spray product.  During that hearing, an Akorn representative testified that, although Akorn could potentially realize a $750,000 revenue stream from the product, Akorn would first have to invest nearly $3 million, with no guarantee of eventual success. *See* Ex.W.at.18-22.  After Appellants cross-examined the witness, the court approved the settlement agreement, under which Rising agreed to waive multi-million-dollar claims against Akorn in exchange for Akorn's interest in the product:  "[T]the Debtors have met the standard and, in fact, exceeded it.  The settlement is fair, reasonable and in the best interest of the estate given that there is limited to no value of the product in its current form[.]" *See* Ex.W.at.38.  The court later entered an order approving the settlement, which Appellants never appealed. *See* Bankr.D.I.800.

## SUMMARY OF ARGUMENT

Akorn's successful Chapter 11 plan was a monumental achievement given the substantial challenges facing the company in recent years. Scores of stakeholders worked tirelessly to effectuate sales, forge settlements, make trade-offs, and ultimately craft a restructuring solution that resolved Akorn's significant obligations while maintaining the company as a going concern, preserving jobs, and avoiding liquidation. As the Bankruptcy Court correctly recognized after considering a voluminous amount of briefing and evidentiary material, there is no valid objection to the plan, which satisfies all Bankruptcy Code requirements with ease. And the other parties whose interests are affected by the plan evidently agree, as no one except Appellants is pursuing an appeal. This Court should heed that consensus and affirm the court below.

None of Appellants' approximately two dozen arguments or sub-arguments challenging the plan counsels in favor of a different conclusion on appeal. At the outset, in light of the sheer volume of arguments that Appellants present and the necessarily skeletal development of each, it is debatable whether all are even properly before the Court. *See, e.g.*, *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017) ("[W]e have consistently refused to consider ill-developed arguments[.]"). But even assuming that Appellants clear that threshold, all of Appellants' arguments fail on the merits. Indeed, as Appellants

acknowledge, this Court must review approximately half of the issues here under a lenient abuse-of-discretion standard, and they fall well short of presenting any error that rises to that level. As to the remaining issues, Appellants either ignore the meaning of the relevant Bankruptcy Code provisions or the evidentiary record in this case—or they otherwise lack standing to press their arguments. In sum, nothing in Appellants' sprawling submission warrants disturbing the Bankruptcy Court's sensible determination that the plan satisfies every applicable requirement. Accordingly, this Court should affirm.

## ARGUMENT

**The Bankruptcy Court Properly Confirmed Akorn's Chapter 11 Plan.**

### A.   Akorn Met Its Burden of Proof.

Appellants start off on the wrong foot in contending that Akorn did not meet its "burden of proof" when seeking plan confirmation. *See* Br.25-28. In a Chapter 11 case, a plan proponent bears the burden of establishing the §1129 factors by a "preponderance of the evidence." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006); 7 *Collier* ¶1129.05[1][d]. Here, the Bankruptcy Court determined that "[t]he Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence." Ex.P.at.7.

That determination is correct, and each of Appellants' four fleeting arguments disputing it misses the mark. *See* Br.25-28. Appellants begin by cursorily asserting

that, aside from testimony from Akorn's general counsel (Bonaccorsi), the record contains "no evidence" regarding a number of elements: "absolute priority, the best interest of creditors test, the propriety of consideration for releases and exculpations, the classification or impairment of certain claims, or the equality of treatment within classes."[14]  Br.25-26 (quotation marks omitted; capitalization altered).  Even setting aside the numerous other infirmities with Appellants' arguments on these issues, *see infra*, that sweeping assertion is easily dispatched, for the record contains ample evidence on these issues, which Appellants utterly ignore.  *See, e.g.*, Ex.H.at.12,21-23 (relevant evidence pertaining to absolute priority); Ex.N.at.8-40, D.I.5-56 (relevant evidence pertaining to best interests of creditors); Ex.M.at.51-60 (relevant evidence pertaining to release and exculpation provisions); Ex.H.at.16-20, Ex.L.at.46-57, D.I.5-12 (relevant evidence pertaining to classification and impairment); Ex.H.at.20-21, Ex.C, Ex.D, Ex.E, Ex.F, Ex.L.at.56-57,65-66, Ex.M.at.46, D.I.5-11, D.I.5-13 (relevant evidence pertaining to equal treatment within classes).  In light of all of this (and other) evidence, there is no plausible basis for claiming that the Bankruptcy Court "abused its discretion" in confirming the plan based on insufficient evidence (much less no evidence at all).  Br.9,26.

---

[14]  As further explained below, the "best interest of the creditors" test compares the outcome in a Chapter 11 bankruptcy to a Chapter 7 liquidation.  *See* pp.46-48, *infra*.

Apparently recognizing that Akorn did, in fact, present substantial evidence—including hours and hours of testimonial evidence from multiple witnesses—Appellants shift to complaining that "[e]ach witness testified solely as a fact witness," not as an "expert."  Br.26.  But contrary to Appellants' protestations, Akorn's witnesses (Buschmann and Bonaccorsi) did not need to satisfy *Daubert* to highlight the fact that the Unsecured Creditors Committee conducted an independent investigation into the retained causes of action, *see* Ex.L.at.65-66, or the fact that Akorn did not conduct a duplicative investigation, *see* Ex.M.at.50-51, or other relevant factual matters within their personal knowledge.  Nor do Appellants ever substantiate their opposing view with any case law.  Appellants simply provide no rationale why that testimony is improper or why it warrants a do-over of the plan, offering instead only speculation that this testimony "appears to have played a large role in convincing the Bankruptcy Court to confirm the Plan."  Br.26.

Appellants' even-more-perfunctory argument that Akorn's financial advisor (Kocovski) offered "unsupported valuation testimony" regarding "certain" retained assets—namely, the "litigation claims" and the nasal-spray product—is likewise unavailing.  Br.26-27 (capitalization altered).  Although their argument is hardly clear, and is likewise unadorned by any citation to precedent, Appellants seemingly contend that Kocovski could have validly offered "valuation testimony" only if he qual-

ified as an expert witness.  *See* Br.27.  But Kocovski never offered "valuation testimony" in the first place:  Because Akorn determined value through the marketing and sale process, it had no need for a "valuation expert" to determine value as a purely theoretical matter.

In reality, Kocovski provided a *liquidation analysis—i.e.*, what Akorn could recover through a hypothetical Chapter 7 liquidation, otherwise known as the "best interest of the creditors" test under §1129(a)(7).  *See* pp.46-48, *infra*.  Appellants present no authority suggesting that only "expert witnesses" may present such a liquidation analysis, and regardless, they never objected to the admissibility of Kocovski's testimony or to his written report.  *See* Ex.N.at.19; D.I.5-56.  Nor would such objections have gotten Appellants far, as other evidence in the record reveals that Akorn would not have received anything for the retained assets at issue—as demonstrated, for example, by the fact that no one had any interest in purchasing them.

Finally, Appellants fall flat in asserting that the Bankruptcy Court improperly relied on "statements of counsel" that described the retained causes of actions as speculative and of uncertain value.  Br.27-28.  Those verbal statements, made by counsel for the Unsecured Creditors Committee, simply mirrored the Committee's written statement in support of plan confirmation, which the court below admitted into evidence after nobody (including Appellants) objected to it.  *See* D.I.5-13.at.2-

3 (statement of support describing recovery on the retained causes of action as "un-certain," "costly," and "highly contested"); *see also* Ex.L.at.67 (admitting statement of support into record without objection).  Appellants do not dispute that the court below could legitimately rely on that record evidence, and once that much is con-ceded, there is nothing left of Appellants' objection.  Simply put, Appellants' asser-tion that Akorn failed to meet its burden of proof is a complete non-starter.

## B.   The Plan Properly Classifies Substantially Similar Claims.

Appellants fare no better with their next argument.  *See* Br.28-29.  Under §1123(a)(1) of the Bankruptcy Code, "a plan shall[] designate … classes of claims … and classes of interests," §1123(a)(1), and under §1122 of the Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class," §1122; *see also* §1129(a)(1).  A bankruptcy court exercises "'broad discretion' to decide if a plan satisfies that [classification] requirement."  *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013).  And in this case, the Bankruptcy Court acted well within its discretion in concluding that the plan does so.  *See* Ex.P.at.11 ("The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code. … Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.").

Appellants—who fall into Class 4, which includes general unsecured claims—do not dispute the overwhelming majority of the Bankruptcy Court's determination.  Instead, in a few sentences, they advance the narrow and novel argument that the plan improperly created "a kind of 'shadow class.'"  Br.29.  That is so, Appellants' assert, because Akorn removed from Class 4 certain "vendors" "whose claims apparently totaled $5 million," and these vendors then received payment in full.  Br.29.

But the premise of Appellants' "shadow class" theory, which apparently no court has ever embraced—Appellants cite no cases in support of it—is mistaken. Pursuant to the settlement agreement involving the Unsecured Creditors Committee, which the Bankruptcy Court approved, the secured lenders agreed to *assume* the additional $5 million in unsecured claims as part of the overall consideration provided by their credit bid.[15]  *See, e.g.*, Ex.H.at.20-21; D.I.5-13.  As a result of the assumption of those claims, the relevant vendors no longer "held claims against" Akorn, as Appellants state, Br.29, but rather held claims against the purchaser (*i.e.*,

---

[15]   Appellants do not dispute that a Chapter 11 purchaser may assume some of the debtor's liabilities.  *See, e.g.*, *In Re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001).

a newly-formed company owned by the lenders).  *See* Ex.H.at.21 ("[F]or the avoid-
ance of doubt, any obligations that were assumed by the Purchaser shall cease to be
Claims against the Debtors following such assumption."); *see also* §365(k).

As a result, the plan had no need to classify these particular vendor claims in
a class alongside general unsecured claims that the lenders did not assume.  And it
could hardly be otherwise, as a contrary conclusion would give double recovery to
parties holding purchaser-assumed claims—first, a recovery from the debtor, and
second, a recovery from the purchaser.  Accordingly, Appellants offer no basis to
overturn the Bankruptcy Court's determination regarding the classification of
claims, which is already insulated by a forgiving standard of review.  *See W.R.
Grace*, 729 F.3d at 326 (explaining that an appellate court must "uphold a plan's
classification scheme so long as it is 'reasonable' and does not 'arbitrarily designate
classes'").

### C.    The Plan Properly Designates Impaired Classes.

Appellants' assertion that the plan fails to properly designate impaired clas-
ses—or, more accurately, that the plan improperly designates the secured lenders as
impaired—is likewise incorrect.  *See* Br.29-31.  Under §1123(a)(2) of the Bank-
ruptcy Code, a plan must "specify any class of claims or interests that is *not* im-
paired," and under §1123(a)(3) of the Code, the plan must "specify the treatment of
any class of claims or interests that *is* impaired."  §§1123(a)(2), (3) (emphases

added).  As the Third Circuit has explained, "'[i]mpairment' is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans." *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003).  Specifically, the Bankruptcy Code states that "a class of claims or interests is impaired under a plan"—a status that entitles the creditor to vote on the plan, *see* §1126— "unless … the plan[] leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  §1124(1).  Put another way, the Code "creates a presumption of impairment," and that presumption is rebutted only if it is demonstrated that the plan "leave[s] the creditor's rights entirely 'unaltered.'"  *PPI Enters.*, 324 F.3d at 202-03.

The person objecting to an impairment-related designation bears the burden of rebutting that presumption, *id.*, and that burden is formidable.  It is well-established that *any* alteration of a creditor's rights constitutes impairment.  *See* 7 *Collier* ¶1124.03 ("Any alteration of these rights constitutes impairment, even if the value of the rights is enhanced.  There is no 'suggestion … that only alterations of a particular kind or degree can constitute impairment.'" (footnotes omitted)).  Thus, for instance, a creditor is impaired if a plan requires the sale of a debtor's collateral at a public auction and precludes the creditor from exercising its remedies under otherwise-applicable loan documents.  *See In re L&J Anaheim Assocs.*, 995 F.2d 940, 941-43 (9th Cir. 1993).  And a creditor is likewise impaired if the plan provides the

creditor with its cash collateral but requires the creditor to use it to satisfy various claims.  *See In re Dwellco I Ltd. P'ship*, 219 B.R. 5, 7, 13 (Bankr. D. Conn. 1998).

As relevant here, the plan designates as "impaired" the secured lenders in Class 3.  *See* Ex.H.at.16-18.  And for obvious reason:  Absent these Chapter 11 cases, the secured lenders would have authority to take possession of their collateral upon default and to unilaterally conduct a public or private sale of such collateral without judicial involvement.[16]  But here, Akorn—operating under the supervision of the Bankruptcy Court and pursuant to the Bankruptcy Code and related rules—has conducted the sale transaction that provides the secured lenders with their plan treatment.  On top of that, the secured lenders contributed cash (including $35 million of their own cash collateral) to Akorn's estate to fund various expenses associated with the wind-down process, and they are providing significant recoveries for holders of general unsecured claims—including assuming over $150 million in trade liabilities.  *See* Ex.L.at.51-52; D.I.5-13.  As other courts have concluded, these are textbook

---

[16]   The "Term Loan Pledge Agreement" between the secured lenders and Akorn permits the secured lenders' administrative agent—through self-help and without judicial process—to (among other things) "collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon" collateral at public or private sale or sales "for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable." D.I.5-8.at.10.

examples of impairment, and the court below did not err in agreeing.  *See* Ex.O.at.5; Ex.P.at.12.

Appellants nevertheless argue that the secured lenders are not impaired because they received "100% of [their] due under the Standstill Agreement" and that, in all events, the plan itself did not cause the lenders' asserted impairments.  *See* Br.30-31.  But the lenders' claims do not arise under the standstill agreement; they arise under the antecedent loan agreement—which, among other things, entitled the lenders to "[p]ayment of [o]bligations" in full.  *See* Ex.H.at.10-11 (defining "Term Loan Claim" and "Term Loan Credit Agreement"); *see also* Ex.C.at.65.  Appellants do not and cannot identify anything in the standstill agreement that negates the lenders' rights in the loan agreement.  Hence, Appellants' assertion that the lenders have received all material benefits of the standstill agreement is beside the point, *see* Br.31, as the lenders plainly did not receive all material benefits of the loan agreement.

At any rate, even if the standstill agreement were the relevant baseline, Appellants are still wrong.  Among other things, the standstill agreement expressly provides that, at the secured lenders' direction, their agent could "exercise any rights and remedies … under the Loan Documents or at law or equity."  Ex.F.at.27.  But the plan does not preserve those rights; instead, it fundamentally "[]altered" them.

§1124(1). As such, even crediting Appellants' erroneous suggestion that the stand-still agreement is all that matters here, the plan still impaired the secured lenders' rights. Accordingly, Appellants' insistence that the plan improperly designates the secured lenders as impaired is not just incorrect, but doubly so.

### D.   An Impaired Class Voted for the Plan.

Once it is recognized that the secured lenders' rights are impaired, Appellants' next objection—that no impaired class voted for the plan, as required by the Bankruptcy Code, *see* §§1129(a)(10), (b)(1)—falls by the wayside. *See* Br.31. Those lenders are classified in Class 3, and Class 3 voted to accept the plan unanimously. *See* Ex.X.at.Ex.A. The Bankruptcy Code requires nothing more.

### E.   The Plan Provides Equal Treatment to Claims in the Same Class.

Appellants continue to stumble in asserting that the plan provides "unequal treatment" to creditors. *See* Br.31-33. Under §1123(a)(4) of the Bankruptcy Code, "a plan shall[] provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." §1123(a)(4). That provision "further[s]" a "central policy of the Bankruptcy Code": "equality of distribution among creditors." *W.R. Grace*, 729 F.3d at 327. As the Bankruptcy Court correctly determined below, the plan here amply satisfies this equal-treatment principle. *See*

Ex.P.at.12 ("The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.  The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.").

Appellants barely dispute that conclusion.  Rather, they advance the limited objection that the plan "provided two … kinds of unequal treatment" in two of the eight classes.  Br.32.  But the plan does no such thing.

The first allegation of unequal treatment is familiar, as it concerns the so-called "shadow class" of vendors in Appellants' own class (Class 4, which includes holders of general unsecured claims).  *See* Br.32.  But that argument is no more persuasive the second time around.  As explained, the class of general unsecured claims expressly *excludes* claims assumed by the purchaser, *see* Ex.H.at.6, and Appellants present no authority hinting that a Chapter 11 purchaser is precluded from assuming some claims but not others.  *See* pp.25-26, *supra*.  Put simply, because the parties in the purported "shadow class" no longer hold claims against Akorn—meaning that the plan did not (and need not) classify them at all—it follows that the plan did not treat Appellants differently from those parties.

The second allegation of unequal treatment concerns the Akorn shareholders who opted into the settlement agreement following the failed Fresenius merger.  *See* Br.33; *see also* p.8, *supra*.  According to Appellants, those settling shareholders will

31

receive a greater recovery under the plan as compared to other creditors in the share-holders' class (Class 7) because—prior to the petition date and pursuant to the court-approved settlement agreement—Akorn placed various proceeds into escrow for their benefit. *See* Br.33.

That argument is flawed on multiple levels, beginning with the fact that Appellants lack standing to press it. As just explained, Appellants are in Class 4, so they have no basis to argue about supposed unequal treatment that implicates an entirely different class—especially when no one in that different class is asserting such an argument. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("Third-party standing is of special concern in the bankruptcy context where … one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan."); 7 *Collier* ¶1123.01[4][b] ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests[.]"). That lack of standing thus suffices to dispose of Appellants' second objection.

Regardless, the problems with Appellants' position run much deeper. The proceeds in the *escrow* accounts at issue are not *estate* property; thus, any distributions from those accounts do not qualify as distributions of property *under the plan*—a prerequisite to a §1123(a)(4) objection. *See, e.g.*, *In re TTS, Inc.*, 158 B.R. 583, 587 (D. Del. 1993); *In re Atl. Gulf Communities Corp.*, 369 B.R. 156, 163-64

(Bankr. D. Del. 2007).  And while Appellants suggest that the settling shareholders are retaining the "fruits" of "transfers" that are "clearly" "avoidable preferences pursuant to 11 U.S.C. §547," Br.33, any preference claim is exceedingly unlikely to provide meaningful value for creditors, even assuming for the sake of argument that such a claim exists.[17]  These considerations presumably explain why no actual Class 7 member has raised this unequal-treatment argument—only Appellants.

## F.    The Plan Provides Adequate Means to Implement its Provisions.

Appellants' next objection is equally unpersuasive.  Under §1123(a)(5) of the Bankruptcy Code, "a plan shall[] provide adequate means for [its] implementation." §1123(a)(5).  That provision expressly identifies some such means—*e.g.*, "retention by the debtor of all or any part of the property of the estate" and "transfer of all or

---

[17]  For example, the escrowed proceeds are comprised substantially of D&O insurance-policy proceeds.  Although Appellants apparently believe that Akorn's estate can obtain those proceeds through litigation and then distribute them to creditors, that is not so.  That is because the insurance policies are available to Akorn only to pay certain "Company Loss[es]," which includes certain "settlements."  D.I.5-36.at.58,60.  If, as Appellants seem to advocate, Akorn's estate were to unwind the settlement, the insurer—not Akorn creditors—will acquire the proceeds.

Further, although Appellants may believe that Akorn's estate should pursue derivative claims related to the failed Fresenius merger—and that the D&O insurance policies should provide a payout in that circumstance too—that gambit is also doomed for failure.  As noted, plaintiffs asserted such derivative claims, including in Louisiana state court.  But that lawsuit ended in a settlement agreement that includes a broad release provision, which almost certainly precludes any conceivable derivative lawsuit related to the failed Fresenius merger.  *See* p.8 n.5, *supra*; *see also* Ex.O.at.6.

any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." §§1123(a)(5)(A)-(B).  But those means "are merely illustrative rather than exclusive," 7 *Collier* ¶1123.01[5], and plan proponents ultimately "enjoy substantial discretion in choosing an adequate means of implementation," *Chapter 11 Reorganizations* §12:8 (2d ed. 2021).

The Bankruptcy Court determined here that "[t]he Plan satisfies the requirements of section 1123(a)(5)."  *See* Ex.P.at.13  And it is little wonder why.  *Cf. Armstrong World Indus.*, 348 B.R. at 160.  The plan includes an entire section devoted to the "Means for Implementation of the Plan," which exhaustively discusses the "general settlement of claims," "the UCC settlement," "sources of plan consideration," "restructuring transactions," "vesting of assets," the "plan administrator," the "wind-down," the "wind-down amount," "plan administrator exculpation, indemnification, insurance, and liability limitation," "tax returns," the "cancellation of notes, instruments, certificates, and other documents," "corporate action," the "dissolution of the Board of the Debtors," the "release of liens," "effectuating documents" and "further transactions," "exemption from certain taxes and fees," "causes of action," and "closing the Chapter 11 cases."  *See* Ex.H.at.20-25 (capitalization altered). Moreover, the plan contains another section titled "Procedures for Resolving Contingent, Unliquidated, and Disputed Claims," which sets forth a detailed process for Akorn or the plan administrator, as applicable, to liquidate unliquidated claims.  *See*

Ex.H.at.31-33.  And the plan also makes clear that, once it becomes effective (and it now is), the plan administrator shall serve as Akorn's sole representative to "implement the Plan and to make distributions thereunder … including:   (i) liquidating … the assets of the Debtors remaining after consummation of the Sale Transaction … and (ix) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan." *See* Ex.H.at.22.  Thus, for example, the plan administrator has had authority since October 2020 to pursue the causes of action that the estate retained (and to realize value for the other retained assets).  *See* Ex.H.at.9,21-22; Ex.O.at.7-8.

In their quest to overturn the plan, Appellants ignore every one of these features.  Instead, in a lengthy discourse almost entirely devoid of any citation to case law or the record, they insist that "[t]he Plan was unconfirmable because it could not be implemented in a manner that actually delivered a recovery to unsecured creditors," for the plan "does not provide any mechanism for the liquidation of" unliquidated claims, and the plan administrator "had no power to … realize value from" the assets that the estate retained, such as "litigation claims."  Br.34-36.  But Appellants are demonstrably wrong both legally and factually.  For one thing, Appellants' objection has nothing to do with §1123(a)(5), which nowhere says that a debtor must

"actually deliver[] a recovery to unsecured creditors."  For another thing, it is questionable whether Appellants have even read the plan, for as just explained, it self-evidently provides "mechanisms" to liquidate unliquidated claims and to allow the estate to "realize value" from the retained assets.  Appellants cannot overturn a plan on the ground that it lacks adequate means of implementation by pretending as though every adequate means to implement it does not exist.

### G.   Akorn Sought to Maximize the Value of the Estate for Creditors.

Appellants also misfire in arguing that Akorn failed to maximize the value of the estate.  "In Chapter 11 cases where no trustee is appointed, §1107(a) provides that the debtor-in-possession, *i.e.,* the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee," which include the "duty to maximize the value of the bankruptcy estate."  *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (en banc); *see* §1106(a)(1).  The Bankruptcy Court correctly determined that Akorn fulfilled that duty here.  As the court emphasized at the conclusion of the confirmation hearing, "the record developed during both the sale and confirmation proceedings[] indicates that … the debtors sought to and did, in fact, maximize value to stakeholders," and the plan "simply reflects the outcome of those efforts." Ex.O.at.8.

Appellants (again) do not dispute the bulk of that conclusion and instead place their chips on the more-tailored argument that Akorn failed to maximize the value of the retained assets—namely, the estate causes of action, the D&O insurance policies, and the co-ownership interest in the nasal-spray product.  Br.18,37-40.  As the Bankruptcy Court's conclusion illustrates, however, that limited objection already faced an uphill battle given the record in this case, and as Appellants acknowledge, their task is even more daunting now given the abuse-of-discretion standard of review.  *See* Br.8.

As to the estate causes of action, the record here shows that they did not, in fact, have any value for Akorn to maximize.  As noted, the Unsecured Creditors Committee—which owes a fiduciary duty to all unsecured creditors, including Appellants, *see Westmoreland Hum. Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001); Br.32—conducted a thorough and independent investigation into those causes of action over the course of several months.  *See* Ex.L.at.193; D.I.5-13. The Committee then determined "that these potential claims are subject to defenses, that litigation would be costly and recovery uncertain, and that litigation might upset the sale and place the continuation of the Debtors' business in jeopardy, harming those creditors the Term Loan Lenders proposed to pay."  D.I.5-13.at.2; *see* Ex.L.at.193 (Committee "reject[ing] the argument that there is some great pot of litigation claims that could be realized here"); Ex.N.at.157 ("Your Honor can take

some comfort in … that [the Committee] performed kind of a quasi-trustee role here and we walked away confident that the plan was not pouring significant litigation value down the drain.").  Akorn reached this same conclusion in the exercise of its business judgment.  On the other side of the ledger, Appellants never presented any evidence below confirming that the retained causes of action *do* have any value— and aside from their *ipse dixit* assertion here that those causes of action are "valuable," Br.37, they still have not done so.  It thus cannot seriously be disputed that Akorn's actions vis-à-vis the retained causes of action provide no basis to disturb the plan, especially in light of the demanding standard of review.

Appellants' arguments regarding the other retained assets do not move the needle either.  As to the D&O insurance policies, Appellants' arguments again reflect a fundamental misunderstanding of how those policies actually operate (and why creditors are unlikely to recover under them).  *See* p.33 n.17, *supra*.  And as to the nasal-spray product, while Appellants trumpet certain "testimony" suggesting that the product "could produce an annual net revenue of $750,000.00," Br.40—testimony that came many weeks after the confirmation hearing—they conveniently omit that this same testimony also demonstrated that, by a "conservative estimate," Akorn would have had to invest at least $3 million even before the potential for that revenue (not income) stream materialized, Ex.W.at.22.  Instead of entertaining such risk, Akorn instead opted for certainty:  It entered into a settlement agreement in which it

conveyed its ownership interest in the nasal-spray product to Rising in exchange for eliminating a multi-million-dollar claim against its estate. *See* Bankr.D.I.691; Bankr.D.I.800. The notion that the Bankruptcy Court abused its discretion in confirming the plan because Akorn chose not to embark on the multi-year gamble that Appellants advocate is as wrong as it sounds.

### H.   Akorn Proposed the Plan in Good Faith.

Appellants' slump continues when they argue that Akorn proposed the plan in bad faith. Under §1129(a)(3) of the Bankruptcy Code, a bankruptcy court may not confirm a plan unless "[t]he plan has been proposed in good faith and not by any means forbidden by law." §1129(a)(3). "In analyzing whether a plan has been proposed in good faith," the "important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code,'" like "'preserving going concerns and maximizing property available to satisfy creditors.'" *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012). These standards establish a low bar. As this Court recently explained, "denial of confirmation for failure to satisfy section 1129(a)(3) should be reserved for only the most extreme of cases." *Luo v. Melinta Therapeutics, Inc.*, No. CV 20-600 (MN), 2021 WL 965614, at *7 (D. Del. Mar. 15, 2021) (Noreika, J.). And reversing a plan confirmation order on appeal under §1129(a)(3) is rarer still, for good-faith-related factual findings are reviewed only for "clear error," *PWS*, 228

F.3d at 242; *see* Br.8 (Appellants acknowledging "abuse of discretion" standard of review).

Here, the Bankruptcy Court concluded that Akorn "proposed the Plan in good faith" with "the legitimate and honest purpose [of] maximizing the value of [its] Estates and to effectuate a successful reorganization of [its] business." Ex.P.at.21. The court recognized that Appellants had made a "series of allegations" in an attempt to sow doubt about Debtors' good faith, and while it found it "unfortunate" that Appellants "are unlikely to receive anything on account of their claims and interest[s] under the plan," it stated (with considerable understatement) that Appellants' allegations about Akorn's purported bad faith "are not supported by the record." Ex.O.at.8-9.

In so holding, the Bankruptcy Court did not err, much less commit clear error or abuse its discretion. Appellants initially claim that "[t]he Plan was proposed in bad faith because it was the culmination of a process begun by the Debtors with the ulterior motive of artificially increasing the amount of secured debt to provide a friendly, unbeatable credit bidder to purchase all Debtor assets." Br.42; *see* Br.42-45. But Appellants "ha[ve] not presented anything but innuendo in support of [their] argument that the Debtors failed to act in good faith." *PWS*, 228 F.3d at 243. And that innuendo is simply inconsistent with the actual record, as the Bankruptcy Court correctly recognized.

Indeed, due to the adverse ruling in the Fresenius litigation, Akorn had a credible fear that the secured lenders could assert an event of default under the parties' loan agreement, which could potentially mire Akorn in further litigation that its business could not withstand.  *See, e.g.*, Ex.L.at.17-18.  And having only just emerged from the Fresenius litigation, Akorn—in its business judgment—elected to pursue a more constructive approach that would preserve the value of its business while giving it and its advisors breathing room to develop more comprehensive solutions.  To that end, as the record here confirms, Akorn labored over the course of nearly two years to find an investor that could pay off its loans, but no such investor ever emerged, leading Akorn to file for bankruptcy as a last resort.  *See* Ex.L.at.20-22,24,26,32-33,38,43-47,64.  That is the very opposite of bad faith.  Appellants disagree with that view, but the proper way to manifest that disagreement is to present concrete evidence that Akorn "manufactured" this bankruptcy.  *See* Ex.L.at.70-179.  Appellants have simply never done so—because no such evidence exists.  Suffice it to say, then, the record here does not leave anyone "with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court in finding no bad faith, which is the proposition that Appellants must establish under the operative standard of review.  *In re J&S Props., LLC*, 872 F.3d 138, 142 (3d Cir. 2017).

The same is true when it comes to Appellants' next argument, which is actually comprised of five subsidiary arguments. *See* Br.45-51. Each of those five arguments is more incoherent and incorrect than the last.

First, Appellants protest that Akorn's initial list of its largest unsecured creditors (which Akorn filed on the petition date) did not include them and that, apparently as a result, they "did not receive notice of the bankruptcy in time to seek appointment to" the Unsecured Creditors Committee. Br.45; *see* Official Form 204. But consistent with customary practice, Akorn listed its thirty largest unsecured claims, and Appellants identify no authority requiring a debtor to list every *unliquidated*, contingent, and disputed claim. Nor do Appellants explain why such a trivial issue, which not even they suggest resulted in any concrete harm, reflects bad faith "extreme" enough to overturn a confirmed plan that hundreds of other parties support. *Luo*, 2021 WL 965614, at *7. Furthermore, as Appellants themselves told the Bankruptcy Court, they had no trouble requesting participation on the Committee during the very first week of the Chapter 11 cases; the U.S. Trustee simply did not grant their request, and Appellants elected not to challenge that determination. *See* Ex.L.at.213 (Appellants' counsel stating that "[w]e had requested that we be put on [the Committee] in the first week of this case," and conceding that "we could have filed a motion to reconstitute while the U.S. Trustee was considering it" but did not);

*see also* §§1102(a)(1), (4).  And at any rate, as evidenced by their robust participation in these proceedings, Appellants can hardly complain about being "fr[ozen] … out of meaningful participation in the bankruptcy process."  Br.45.

Second, Appellants assert that, although Akorn disclosed various assets and liabilities in its disclosure statement and schedules (or amendments to those items), Akorn did not "accurately" do so.  Br.45 (capitalization altered and emphasis omitted).  But in some instances, Appellants do not deign to identify what the purported inaccuracies are, *see* Br.46 ("[T]he Disclosure Statement … asserted that there were no excess proceeds to distribute to creditors."); in others, Appellants merely restate groundless objections that they have already raised, *see* Br.45 ("The Amended Disclosure explicitly valued all avoidance and other causes of action as worthless[.]"); and in still others, Appellants cannot even bring themselves to claim that the disclosures are wrong, *see* Br.47 ("The Appellants do not know whether all affiliates were disclosed.").  Those deficiencies are bad enough, but they are worse given that Appellants suggest that Akorn "intentionally" sought to "mislead[]" and "confuse interested parties" through these supposed inaccuracies.  Br.45.  One would expect a litigant making such pernicious accusations in an Article III court to present at least *some* evidence to corroborate them, but here, Appellants offer none.

Third, Appellants contend that Debtors "intentionally omitted required material disclosures regarding director bonuses." Br.47 (capitalization altered and emphasis omitted). But that argument is hard to take seriously when Appellants acknowledge that "Debtors were required to disclose the bonuses to securities regulators, *and did so*." Br.48 (emphasis added). That begrudging concession is wise: On two occasions *before the petition date*, Akorn disclosed the bonus payments at issue in publicly available SEC filings. *See* Akorn, Inc., Annual Report (Form 10-K) (Feb. 26, 2020); Akorn, Inc., Quarterly Report (Form 10-Q) (May 11, 2020). And as Appellants also concede (at least in part), Akorn "disclosed" its bonus program in post-petition bankruptcy filings too. Br.47; *see also* Bankr.D.I.4. Perhaps recognizing that such disclosures negate the idea of intentional nondisclosure, Appellants shift to arguing that the bonuses amounted to a "smash-and-grab" job that unduly enriched company insiders. Br.49; *see also* Br.50 (contending that bonuses were "unjustifiable"). But that has nothing to do with nondisclosure, and regardless, the only evidence in the record refutes that proposition. *See, e.g.*, Ex.M.at.38-43 (explaining, among other things, that the relevant Akorn officers earned the bonuses, that Akorn could recoup the bonuses if the officers left, and that an independent consultant market-tested the bonuses).

Fourth, Appellants contend that, in its disclosure statement, Akorn "knowingly misrepresented" certain claims. Br.50 (capitalization altered and emphasis

omitted).  Although Appellants never actually spell out their argument in the single paragraph devoted to it, they appear to take issue with the fact that the disclosure statement did not disclose the precise values of certain "unliquidated" claims.  Br.50. But it makes little sense to describe these purported oversights as "misrepresenta- tions" given that an unliquidated claim is, by definition, "[a] claim in which the amount owed has not been determined."  *Claim* (3), Black's Law Dictionary, (11th ed. 2019).  And again, it is even more puzzling to describe these so-called misrepre- sentations as "knowing" misrepresentations when there is no supporting evidence.

Appellants' fifth and final argument suffers all the same problems as the pre- vious four.  Appellants contend that Akorn made "intentionally misleading" disclo- sures about sales involving affiliates in India and Mauritius, all in an allegedly ne- farious plot to "avoid paying something to Appellants."  Br.50-51.  But yet again, that argument collapses for the basic reason that Appellants provide no evidence to substantiate it, instead cherry-picking various marginalia and spinning unsubstanti- ated conspiracy theories from them.  Appellants' submission therefore goes a long way toward proving the wisdom of the Bankruptcy Court's conclusion that "[n]othing in the record suggests" that Akorn "behaved improperly, pre- or post- petition."  Ex.O.at.8-9.

## I.     The Plan Passes the "Best Interest of the Creditors" Test.

Appellants' claim that the plan is not in the best interests of creditors is also a
dead-end. *See* Br.51-52. Under §1129(a)(7) of the Bankruptcy Code, "[w]ith respect
to each impaired class of claims or interests," each creditor in the impaired class
must either "accept[] the plan" or "receive or retain under the plan on account of
such claim or interest property of a value, as of the effective date of the plan, that is
not less than the amount that such holder would so receive or retain if the debtor
were liquidated under chapter 7 … on such date." §1129(a)(7). More succinctly, if
a creditor is in an impaired class and does not vote to accept the plan, that creditor
must "receive at least as much in reorganization as it would in liquidation." 7 *Collier*
¶1129.02. "Liquidation values will often be proved through the testimony of auc-
tioneers or other liquidators as to what the assets will yield under more or less 'fire-
sale' conditions," *id.*, and because the issue is inherently factual in nature, an appel-
late court reviews a §1129(a)(7) finding only for clear error, *see PWS*, 228 F.3d at
250; *see also J&S Props.*, 872 F.3d at 142.

In this case, in keeping with standard practice, Akorn and its advisors prepared
a thorough liquidation analysis. *See, e.g.*, Ex.II; Ex.N.at.12-18. As relevant here,
that liquidation analysis, which Akorn introduced into evidence at the confirmation
hearing, revealed that holders of unsecured claims (like Appellants) would recover
nothing in a Chapter 7 liquidation, *see* Ex.II.at.4—*i.e.*, the same amount that they

are projected to recover under the plan.   The Bankruptcy Court thus correctly reached the straightforward conclusion that Appellants will receive "as much" under the plan as they "would have received if the Debtors were liquidated under chapter 7." Ex.P.at.22.

Appellants see things differently.   They complain that Akorn's liquidation analysis attributed no value to the retained assets and contend that, "if even one of these assets was valuable, that value would have inured to the benefit of the next class down the distributional waterfall:  the general unsecured class containing Appellants." Br.52.  But Appellants' naked speculation about the potential value of the retained assets—they concede that they offered no contradictory evidence "about the consequences of a liquidation," Br.51—does not demonstrate error, much less create a "definite and firm conviction that a mistake has been committed," *J&S Props.*, 872 F.3d at 142, especially in light of the record evidence demonstrating that these assets did *not*, in fact, have any value (which explains why the secured lenders, and dozens of other prospective investors, did not want to purchase them).

Nor do Appellants ever come to terms with the reality that the Chapter 7 process itself has considerable costs, which only further reduces the chances that they would recover anything in a liquidation.  For instance:

- The delay in familiarizing a Chapter 7 trustee with the assets could lead to the loss of bids already obtained;

- A Chapter 7 trustee would lack the technical expertise and knowledge of Akorn's business that facilitates asset sales;

- Distributable proceeds in a Chapter 7 liquidation would shrink due to the trustee's fees and expenses and other necessary costs, *see* §§326(a), 503(b)(2);

- The conversion to Chapter 7 would require entry of a new bar date for filing claims, thereby raising the risk of further payouts that reduce creditor recoveries, *see* Fed. R. Bankr. P. 1019(2), 3002(c);

- A Chapter 7 liquidation would trigger a termination event under the purchase agreement with the secured lenders *see* Ex.G.at.69, and it is unclear whether the lenders would maintain interest in Akorn's assets in a liquidation;

- Even if the secured lenders remained interested, it is unlikely that they would agree to fund secured, administrative, and priority claims in a Chapter 7 proceeding, requiring the Chapter 7 trustee to either renegotiate the terms of the current purchase agreement or to pursue another sale process;

- In a Chapter 7 liquidation, Akorn would not have access to the wind-down funds that pay operational and administrative expenses; and

- Various claims that the secured lenders have assumed under the plan would revert to general unsecured claims, alongside Appellants' claims and further reducing the prospect that Appellants would ever recover anything.

As all of this underscores, Appellants' insistence that "it was error to confirm the Plan" under §1129(a)(7) is patently incorrect. Br.52. In fact, all that a Chapter 7 liquidation would accomplish is to imperil recoveries for other creditors.

**J.     The Plan Is Fair and Equitable and Does Not Discriminate Unfairly.**

Appellants' next contention—that the plan is unfair and inequitable and unfairly discriminatory—is flawed from start to finish.  *See* Br.52-60.   Section 1129(b)(1) of the Bankruptcy Code provides that, if a plan satisfies all applicable requirements of §1129(a) except for §1129(a)(8)—the latter of which "mandate[s] that all classes either vote to accept the plan or recover their debt in full under it," *In re Trib. Co.*, 972 F.3d 228, 237 (3d Cir. 2020)—a court may still confirm a plan if the plan proponent demonstrates that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the non-accepting impaired classes.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993).  The plan here readily satisfies both requirements.

1.     As the Supreme Court has explained, with respect to a non-accepting class of impaired unsecured creditors, a plan "may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full" or (more pertinent here) "if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property.'"  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999); *see also* §1129(b)(2)(B).  This latter rule—"that a plan cannot give property to junior claimants over the objection of a

more senior class that is impaired," *Armstrong World Indus.*, 432 F.3d at 513—is known as the "absolute priority rule."

In this case, three impaired classes voted not to accept the plan—Class 4 (which includes Appellants), Class 7, and Class 8.  *See* Ex.X.at.Ex.A.  But the Bankruptcy Court determined that, under §1129(b)(2)(B), "the Plan is fair and equitable with respect to each of the Rejecting Classes" because "[t]he Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest and no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest."  Ex.P.at.24-25.

Unsatisfied with that conclusion, Appellants again lean on the retained assets, asserting that Akorn will "forego [*sic*] pursuing them for value" and that it cannot do so without contributing "new value" to the reorganized entity here.  *See* Br.56-60.  But even setting aside the incorrect premise that the retained assets are valuable and that Akorn did not pay "new value" for them, the relevant question here is whether any claimants junior to Appellants will receive this property over Appellants' objection on account of those junior claimants' claims or interests.  *See* §1129(b)(2)(B)(ii).  Appellants never address that question, and understandably so:

50

The plan contemplates the orderly wind-down of Akorn's estate by the plan administrator, and that wind-down process includes "liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the Sale Transaction"—*i.e.*, disposing of the retained assets and distributing any recoveries to creditors consistent with the waterfall scheme. Ex.H.at.22. Accordingly, this is plainly not a situation where creditors subordinate to Appellants are slated to receive value under the plan while Appellants are not.[18]

Appellants additionally contend that—separate and apart from the "absolute priority rule" codified in §1129(b)(2)(B)(ii)—the plan is not "fair and equitable in a general sense." Br.53. In their view, "[w]hen all the legal technicalities and jargon are stripped away" here, an "unassociated outsider" would agree that the plan is unfair and inequitable. Br.54-55. But in advancing this argument, which is citation-free, Appellants merely rehash a litany of their previous unsuccessful arguments—*e.g.*, the plan "pays unsecured creditors less than they would receive in a Chapter 7

---

[18]   Appellants' "new value" argument also has additional flaws. To support their position, Appellants rely heavily on the Supreme Court's *Bank of America* decision, which addressed the question "whether a debtor's prebankruptcy equity holders may, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity holders under a plan adopted without consideration of alternatives." 526 U.S. at 460. Here, however, Appellants are not arguing that Akorn's former equity holders are contributing new capital and receiving ownership interests in the reorganized entity over Appellants' objections (or anything remotely similar).

liquidation," the plan places "all valuable assets … beyond any possible execution," and the plan is the result of "collusion."  Br.53-55.  These assertions are no more persuasive when presented in an even more "general" fashion, and—again—they fall woefully short of establishing that the Bankruptcy Court abused its discretion in confirming the plan.  *See* Br.9 (acknowledging abuse-of-discretion standard).

2.     Appellants' argument that the plan unfairly discriminates under §1129(b)(1) is equally wrong.  "Generally speaking," the unfair-discrimination standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes."  *Trib.*, 972 F.3d at 240.  That standard does not mean that *any* discrimination is prohibited; rather, it means that a debtor "can treat" classes "differently (discriminate)" "but not so much as to be unfair."  *Id.* at 242; *see* 7 *Collier* ¶1129.03[3] ("There can be 'discrimination,' so long as it is not 'unfair.'").

Here, there is no class discrimination of any kind, much less unfair discrimination.  As noted, this bankruptcy involves various different dissenting classes, including Appellants' class (Class 4).  *See* Ex.H.at.16-20.  But each class is materially different, with each reflecting factors such as the applicable Akorn entity, claims against such entity, each entity's assets, and the creditors' legal rights.  In light of these considerable differences, no two classes are "similarly situated," which necessarily means that no class is receiving less "value" as compared to "similarly situated

classes." *Trib.*, 972 F.3d at 240.  Hence, the Bankruptcy Court correctly concluded that the plan "does not discriminate unfairly with respect to the Rejecting Classes." Ex.P.at.25.

Appellants barely dispute any of this.  Rather, in a single paragraph, Appellants insist (for a third time) that the "shadow class[]" of vendors is receiving preferential treatment as compared to other general unsecured creditors in Class 4.  *See* Br.55-56.  But this is not an instance where the third time is the charm.  As already described, the secured lenders agreed to *assume* those vendor claims, and the plan makes clear that such assumed claims are no longer claims against the estate (and so Akorn had no need to classify those claims in the plan).  *See* pp.25-26, *supra*.  Meanwhile, every general unsecured claim in Class 4 is treated in the exact same manner, as Appellants do not dispute.  Quite obviously, equal treatment does not amount to unfair discrimination.

### K.    The Releases, Exculpation, and Injunction Are Proper.

Appellants' exercise in prolixity closes with an argument that the plan's release, exculpation, and injunction provisions are all improper.  *See* Br.60-66.  Like the rest of Appellants' flyspecking of the plan, these contentions are baseless.

1.    The plan here includes a third-party-release provision stating that each "releasing party" will release each "Debtor" and "released party" from various

causes of action.  *See* Ex.H.at.35 (capitalization altered).  The "released parties" include seven defined groups, as well as "current and former" persons associated with them.  Ex.H.at.9.  And the "releasing parties" include, among others, "all Holders of Claims or Interests that … vote to reject the Plan *and* who opt into the releases in the Plan."  Ex.H.at.9.  In other words, as the Bankruptcy Court recognized, the release is "*consensual* with respect to the Releasing Parties" and does not apply to anyone who opts out.  Ex.P.at.17 (emphasis added).

Appellants quibble that the plan should not have granted releases to "former officers and similar parties," who purportedly provided insufficient "consideration" to receive them.  Br.61.  But as Appellants concede, they "*did not opt into the Releases*."  Br.65 (emphasis added).  As such, Appellants unquestionably lack standing to challenge those releases.  *See, e.g.*, *Talarico v. Ultra Petroleum Corp.*, No. 20-32631, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020) ("[I]t is clear that [the appellant] lacks standing to bring and maintain this appeal based on the 'third-party-release' provision[] of the Plan" because he "opted out of the provision.").

2.      Appellants likewise falter when it comes to the exculpation provision.  Under that provision, certain "exculpated parties" are exculpated from various restructuring-related activities performed after the petition date but before the plan's effective date, but not with respect to "claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence."  Ex.H.at.36.

54

Those "exculpated parties" are defined to include Akorn and the Unsecured Creditors Committee, along with their "current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals."  Ex.H.at.5.  And as the Bankruptcy Court recognized, the provision "was formulated following extensive good-faith, arm's-length negotiations with key constituents," "is appropriately limited in scope," and "is consistent with established practice in this jurisdiction and others."  Ex.P.at.18-19; *see, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (deeming exculpation provision appropriate when it pertained "to the fiduciaries who have served during the chapter 11 proceeding:  estate professionals, the Committees and their members, and the Debtors' directors and officers").

Appellants nevertheless argue that the exculpation provision violates "[d]ue [p]rocess."  Br.62.  But they concede that "[i]t is common practice to exculpate estate fiduciaries (the debtor-in-possession, any committees and their agents and professionals) for the work done during the reorganization."  Br.62.  And that concession

ends the debate here:  After all, the text of the provision reveals that it is fully con-

sistent with this "common practice," and Appellants never argue that this "common

practice" is unconstitutional.[19]

Nor do any of Appellants' authorities suggest otherwise.  In fact, Appellants'

cases all involve provisions whose scope is orders of magnitude broader than the

exculpation provision at issue here.  *See, e.g.*, *In re Cont'l Airlines*, 203 F.3d 203,

206 (3d Cir. 2000) (involving release of all possible claims against the debtors' pre-

sent or former directors that arose before release date); *In re Spansion, Inc.*, 426 B.R.

114, 143 (Bankr. D. Del. 2010) (involving release of "any and all claims existing as

of the Plan's Effective Date"); *In re Congoleum Corp.*, 362 B.R. 167, 190 (Bankr.

D.N.J. 2007) (involving exculpation provision pertaining to "any act or omission in

connection with or arising out of" various restructuring-related activities).  And even

as to those much broader provisions, even some of Appellants' authorities recognize

that courts should not disturb them when they are "integral to the restructuring of the

debtor-creditor relationship."  *In re Millennium Lab Holdings II, LLC.*, 945 F.3d

---

[19]   To be sure, Appellants complain that the exculpation provision protects some "former employees, directors and agents of the Debtors."  Br.64.  But the "exculpated parties" include only those persons who actually contributed to the plan and to Akorn's reorganization.  *See, e.g.*, Ex.P.at.18 ("[E]ach Exculpated Party has participated in these Chapter 11 Cases[.]").  Given that Appellants agree that individuals who did "work … during the reorganization" may receive the benefit of an exculpation provision, Br.62, it is not clear why their complaint is relevant.

126, 129 (3d Cir. 2019); *see id.* at 129-132 (explaining that the release pertained to "any claims" implicating certain activity that occurred 19 months before petition date).

That is precisely the situation here, as the Bankruptcy Court recognized. *See, e.g.*, Ex.P.at.21 (plan confirmation order describing exculpation provision as "necessary for the Debtors to consummate a value-maximizing conclusion to these Chapter 11 Cases"); Ex.M.at.60 (Akorn's general counsel describing the "expectation" that the exculpated parties would receive exculpation in exchange for their contributions to the reorganization process).[20]  Accordingly, even if the exculpation provision here were not narrowly tailored (and it plainly is), the court below *still* would not have abused its discretion in confirming a plan with that indispensable provision. *See* Br.9 (acknowledging abuse-of-discretion standard).

3.      Finally, Appellants' objection to the injunction provision requires little comment.  Under Federal Rule of Bankruptcy Procedure 3016(c), "[i]f a plan provides for an injunction … , the plan … shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the

---

[20] Appellants' suggestion that the exculpated parties failed to give "consideration" in exchange for exculpation therefore misses the mark.  Br.64.  Regardless, Appellants' blithe assertion that the consideration "simply cannot be valid," Br.64, does not suffice to overturn the plan.

entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c). Consistent with that command, the injunction provision in the plan here states (in bold text) that "all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking" enumerated actions. Ex.H.at.36.

Appellants insist that this provision is best interpreted to enjoin actions beyond the scope of the release and exculpation provisions, and so they say that "confirmation of the Plan containing the Injunction was error." Br.64-66. But there is no reason to embrace Appellants' wildly atextual interpretation. Indeed, as the Bankruptcy Court explained, "[t]he injunction provision … is necessary to implement, preserve, and enforce … the Third-Party Release[] and the Exculpation, and *is narrowly tailored to achieve these purposes*"—and no other purpose. Ex.P.at.19 (emphasis added). At bottom, this Court should not overturn the plan simply because, unlike everyone else involved in this bankruptcy, Appellants have chosen to turn a blind eye to its actual terms.

## CONCLUSION

For the reasons set forth above, this Court should affirm the Bankruptcy Court's order confirming Akorn's plan of reorganization.

Respectfully submitted,

/s/ *Paul N. Heath*

GEORGE W. HICKS, JR.*
ANDREW C. LAWRENCE*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
george.hicks@kirkland.com
andrew.lawrence@kirkland.com

PAUL N. HEATH (No. 3704)
AMANDA R. STEELE (No. 5530)
BRETT M. HAYWOOD (No. 6166)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
heath@rlf.com
steele@rlf.com
haywood@rlf.com

*admitted pro hac vice*

*Counsel for Debtors/Appellees Akorn, Inc. et al.*

April 30, 2021