IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: AKORN, INC., *et al.,* | ) Chapter 11 |
| | ) Case No. 20-11177 (KBO) |
| Debtors. | ) (Jointly Administered) |
| | |
| 1199SEIU NATIONAL BENEFIT FUND, *et al.,* | ) |
| | ) |
| | ) |
| Appellants, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 20-1254 (MN) |
| AKORN, INC., *et al.,* | ) |
| | ) |
| Appellees. | ) |

## MEMORANDUM OPINION

Leslie B. Spoltore, Obermayer Rebmann Maxwell & Hippel LLP, Wilmington, DE; Edmond M. George, Turner N. Falk, Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, PA – Counsel to 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, 1199SEIU Licensed Practical Nurses Welfare Fund, AFSCME District Council 47 Health and Welfare Fund, and Sergeants Benevolent Association Health and Welfare Fund.

Paul N. Heath, Amanda R. Steele, Brett M. Haywood, Richards Layton & Finger, P.A., Wilmington, DE; George W. Hicks, Jr., Andrew C. Lawrence, Kirkland & Ellis LLP, Washington DC – Counsel to Akorn, Inc.

September 22, 2021
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

Pending before the Court is an appeal by 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, 1199SEIU Licensed Practical Nurses Welfare Fund, AFSCME District Council 47 Health and Welfare Fund, and Sergeants Benevolent Association Health and Welfare Fund ("Appellants") from the Bankruptcy Court's September 4, 2020 *Order Confirming the Modified Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates* (B.D.I. 673) (Ex. P)[1] ("Confirmation Order"). Appellants hold unsecured, unliquidated litigation claims against debtor Akorn, Inc and certain affiliates ("Akorn" or "Debtors") which depend on the outcome of contested antitrust claims pending in multidistrict litigation.  Seeking to reverse the Confirmation Order, and presumably overturn the plan *in toto*, Appellants have asserted no less than fifteen errors on appeal.  (*See* D.I. 26 at 7-9).  Although it is unfortunate that Appellants may not receive a distribution under the confirmed plan, their attacks on the plan confirmation process are unavailing.  For the reasons set forth herein, the Court will affirm the Confirmation Order.

I.     **BACKGROUND**

   A.     **Events Leading to Chapter 11**

Akorn is a specialty generic pharmaceutical company that develops, manufactures, and markets various generic and branded prescription pharmaceuticals, over-the-counter consumer health products, and animal health pharmaceuticals.  (*See* Ex. J at 1).  Originally founded in 1971, through strategic mergers and acquisitions Akorn grew into a company worth hundreds of millions of dollars.  (*See id.*).  In April 2017, Akorn agreed to merge with a German corporation, Fresenius Kabi AG ("Fresenius") in a transaction that would make Akorn a wholly-owned subsidiary of

---

[1]     The docket of the chapter 11 cases, captioned *In re Akorn, Inc., et al.*, Case No.  20-11177 (KBO) (Bankr. D. Del.) is cited herein as "B.D.I. __."  "Ex." refers to the exhibits filed with Appellants' opening brief (D.I. 26).

Fresenius.  (*See id.* at 30).  Fresenius pursued the transaction notwithstanding that certain parties, including Appellants, had named Akorn as one of dozens of defendants in antitrust litigation.  *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa. Aug. 5, 2016). The Fresenius transaction would have provided substantial value to Akorn shareholders.  (*See id.* at 30, 37).  The agreement authorized Fresenius to terminate the merger in specified circumstances, including if Akorn suffered a "material adverse effect" on its business.  (*See id.* at 30).

Following the announcement of the Fresenius merger, Akorn's financial performance began to deteriorate.  (*See id.* at 30-31).  In November 2017, Fresenius informed Akorn that it had received anonymous letters alleging data-integrity- and regulatory-related deficiencies at certain Akorn facilities.  (*See id.* at 31).  Fresenius publicly revealed in February 2018 that it had initiated an investigation into the matter, and in April 2018, Fresenius informed Akorn that it would terminate the merger. (*See id.*)  In response, Akorn filed suit against Fresenius in Delaware, seeking performance of the merger agreement.  (*See id.*)  Fresenius counterclaimed, and in October 2018, the Delaware Chancery Court concluded that Fresenius validly terminated the agreement because Akorn had suffered a "material adverse effect."  (*See id.* at 32-33).  Akorn faced related litigation from its shareholders.  Some brought class-action securities claims alleging that Akorn and its management had misstated or omitted material information about its data-integrity controls and compliance with FDA regulations.  (*See id.* at 33).  The parties reached a settlement agreement. (*See id.* at 34; *see also* Ex. A, Ex. B).  As part of the settlement agreement, Akorn placed into escrow approximately $30 million in proceeds from its directors and officers ("D&O") insurance policies, a certain number of shares of Akorn common stock, and certain "contingent value rights."[2]  (*See* Ex. J at 34-35).

---

[2]     Other shareholders brought class-action derivative lawsuits, including in Louisiana state court.  *See Kogut v. Akorn, Inc.*, No. 646,174 (La. 19th. Dist. Ct.).  That Louisiana class-action lawsuit ended with a settlement, which includes a broad release provision that

In November 2018, soon after the Delaware Chancery Court issued its decision in the Fresenius litigation, Akorn received notices from several of its secured lenders stating that the court's "material adverse effect" determination could have consequences under Akorn's loan agreements – including a declaration by the lenders of an event of default, which would have authorized them to cancel the credit facilities and to demand immediate repayment of outstanding balances (approximately $850 million). (*See id.* at 37; Ex. L (9/1/2020 Tr.) at 13, 19). Akorn negotiated a standstill agreement with the lenders to give the Debtors breathing room to explore their options. (*See* Ex. J. at 37; *see also* Ex. C (original term-loan credit agreement); Ex. D (original standstill agreement); Ex. E (first amendment to standstill agreement); Ex. F (second amendment to standstill agreement).

In 2019, with the standstill in effect, Akorn worked with an investment bank to identify parties with sufficient capital to fully refinance or to pay down Akorn's loans. (*See* Ex. J at 38). During that period, Akorn began to stabilize its business and earn revenue. (*See id.* at 39). The Debtors credited the efforts of senior executives who then received bonuses. (*See* Ex. M (9/2/2020 Tr.) at 36-43). In total, 32 prospective investors were contacted and 22 of them expressed interest. (*See* Ex. J at 38). Those prospective investors conducted due diligence, and Akorn held board meetings with its investment bank on a weekly or bi-weekly basis to discuss the options. (*See id.*; 9/1/2020 Tr. at 18 (Debtors' investment banker explaining: "I would say we probably had the most number of board meetings in this case that I've ever had in my career."). Ultimately, none of the prospective investors could refinance Akorn's capital structure to the degree required. (*See* Ex. J at 38; 9/1/2020 Tr. at 13-38).

---

applies to the named plaintiff, Akorn, and every Akorn shareholder. (*See* D.I. 5-29). In light of that provision, other courts have dismissed derivative claims related to the events that led to the failed Fresenius merger. *See Trsar v. Akorn, Inc*., No. 18-cv-7374 (N.D. Ill.); *Pulchinski v. Abramowitz et al*., 2019CH11186 (Ill. Cir. Ct.); *Booth Family Trust v. Kapoor*, 2019CH12793 (Ill. Cir. Ct.); *see also* D.I. 5-30; D.I. 5-31; D.I. 5-32).

Beginning in December 2019, Akorn pivoted toward pursuing a sale of its business. (*See* Ex. J at 39).  Akorn's investment bank contacted 72 potential buyers with the goal of obtaining a sale price that could satisfy Akorn's aggregate debt to the secured lenders.  (*See id.* at 40).  In total, 37 expressed interest in a purchase, leading to due diligence and more board meetings. (*See id*. at 39-40).  But by the March 2020 bidding deadline, Akorn had "received no bids that were above the debt," and "no bids that were binding."  (9/1/2020 Tr. at 43; *see also id*. at 38-43).

The secured lenders were unwilling to extend the standstill period any further, and informed the Debtors that – although they had the right under the still-operative loan agreement to take possession of their collateral and to conduct a public or private sale of it out-of-court (*see* D.I. 5-8 at 9-10) – they were willing to serve as the "stalking horse" bidder in a Chapter 11 bankruptcy proceeding and "credit bid" under 11 U.S.C. § 363(k) the Debtors' outstanding debt with the aim of preserving Akorn's business as a going-concern.  (*See* Ex. J at 40-41; 9/1/2020 Tr. at 38-57).[3]

### B.    The Chapter 11 Cases

Akorn filed for Chapter 11 bankruptcy on May 20, 2020.  Thereafter the Debtors and their advisors searched for a purchaser that could exceed the secured lenders' stalking-horse bid, again leading to lengthy periods of due diligence.  (*See* 9/1/2020 Tr. at 57-62).  None of the 18 parties that expressed interest in the whole business and none of the 27 parties that expressed interest in particular assets presented a "qualified" or "actionable" bid.  (*See* 9/1/2020 Tr. at 59-62; *see also id*. at 62 (Debtors' investment banker explaining that Debtors received only "one bid that's qualified" and "actionable," which is "the term loan credit bid").  As a result, Debtors moved

---

[3]    A "stalking horse" bidder is "a prospective buyer who commits to an initial bid."  3 Collier on Bankruptcy ¶363.02[e][7] (16th ed.).  A "credit bid" allows a creditor to "offset its claim against the purchase price of the property" – *i.e.*, it enables the creditor to purchase property "without having to part with new funds."  *Id.* ¶363.09.

forward with the secured lenders' stalking-horse bid, which envisioned that the lenders would acquire substantially all of the Debtors' assets except for ones that they did not wish to acquire – *e.g.*, Debtors' D&O insurance policies, certain estate causes of action, and an interest in a nasal-spray product co-owned with a company named Rising Pharmaceuticals ("Rising"). (*See* Ex. H ("Plan") at 9 (defining "Retained Assets")). Aside from the consideration reflected in the credit bid, the lenders proposed to contribute another $150 million, including $35 million in cash to fund the Debtors' wind-down and over $100 million in assumed trade liabilities (*i.e.*, liabilities involving substantially all of Debtors' unsecured creditors). (*See* 9/1/2020 Tr. at 51-52).

Debtors developed a plan and a disclosure statement explaining the sale. (*See* Plan; Ex. J). The plan divided creditors into eight different classes, five of which the plan deemed "impaired": Class 3, which includes the secured lenders; Class 4, which includes holders of general unsecured claims (including Appellants); Class 5, which includes "intercompany claims"; Class 7, which includes certain subordinated claims (known as § 510(b) claims);[4] and Class 8, which includes "Akorn interests." (*See* Plan at 16-19). Four impaired classes voted to reject the plan, with Class 3 voting to accept. (*See* Ex. X ("Voting Decl.") at Ex. A).

The plan also included other provisions pertinent to this appeal, including a third-party-release provision. Under that provision, each "releasing party" released each "released party" (*e.g.*, Debtors and secured lenders) from various causes of action. (*See* Plan at 9, 35-36). But the "releasing parties" include only those who consent to the provision. (*See id.* at 9 (defining "releasing party" to include "all Holders of Claims or Interests that . . . vote to reject the Plan and who opt into the releases in the Plan"). Although many parties consented, Appellants elected not

---

[4]     Section 510(b) of the Bankruptcy Code "subordinates claims for damages arising from the purchase or sale of a security of the debtor to all claims and interests that are senior or equal to the claim or interest represented by such security." *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 117 n.2 (3d Cir. 2004).

to do so.  (*See* D.I. 26 at 65 ("Appellants did not opt into the Releases.")).  The plan includes an exculpation provision, under which certain "exculpated parties" are exculpated from various restructuring-related activities performed after the petition date but before the plan's effective date. (Plan at 36).  The "exculpated parties" are defined to include Debtors and the Unsecured Creditors Committee ("Committee") – a collection of unsecured creditors, selected by the U.S. Trustee, who advocate in a fiduciary capacity for the body of unsecured creditors as a whole – along with their "current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals." (*Id.* at 5).  The provision does not protect parties from "claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence." (*Id*. at 36).

In addition, the plan contains various provisions governing its implementation.  For example, to implement the third-party-release and exculpation provisions, the plan includes an injunction provision, which provides that "all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking" specified actions inconsistent with those provisions. (*Id*.).  The plan further includes a lengthy provision governing "Means for Implementation of the Plan," which states that, upon Debtors' emergence from bankruptcy, a plan administrator is authorized to "implement the Plan" and "make distributions thereunder," such as by "liquidating" any remaining assets – including those assets that the secured lenders did not purchase and that Debtors retained. (*Id*. at 21-22).

## C.    Sale Hearing and Confirmation Hearing

Appellants filed an objection to the proposed sale and to plan confirmation. (*See* Ex. K). The Bankruptcy Court bifurcated the hearings addressing those two issues by consent of the

parties.  (*See* B.D.I. 624).  At the September 1, 2020 sale hearing, the Bankruptcy Court heard several hours of witness testimony from Debtors' investment banker (Mark Buschmann of PJT Partners) and admitted 24 exhibits submitted in support of Debtors' pre- and post-petition efforts to address their debt and the reality that the secured lenders' stalking-horse bid was ultimately the only actionable offer.  (*See generally* 9/1/2020 Tr.).  After considering the evidence, the court approved the sale and overruled Appellants' objections.  (*Id.* at 224).  The court explained that "[t]he evidence . . . is overwhelming and uncontroverted . . . that the proposed sale to the stalking horse is based on a sound exercise of the debtors' business judgment"; that "[t]here simply has been no evidence presented to counter these findings to challenge the debtors' business judgment and to support the alternative narrative that has been posited by [Appellants]"; and that it "would be a complete failure of these proceedings and the efforts made to date by the various stakeholders in these cases" if the sale did not move forward.  (*Id.* at 222-24).  The court later entered an order approving the sale, which Appellants did not appeal.  (B.D.I. 656).

On September 2-4, 2020, the Bankruptcy Court held a plan confirmation hearing which incorporated the record from the sale hearing.  The Bankruptcy Court heard testimony from Debtors' general counsel (Joseph Bonaccorsi), financial advisor (William Kocovski of Alix Partners), and chief financial officer (Duane Portwood) and admitted 35 additional exhibits. (*See* 9/2/2020 Tr.); Ex. N (9/3/2020 Tr.); Ex. O (9/4/2020 Tr.).  The confirmation hearing again examined Debtors' pre- and post-petition efforts to find the most value-maximizing transaction for all stakeholders, and included discussion of the plan and its contents, including why the plan is superior to a Chapter 7 liquidation.  (*See, e.g.*, 9/2/2020 Tr. at 7-177; 9/3/2020 Tr. at 8-37). Appellants examined and cross-examined witnesses, and the Committee voiced its support for the plan.  (*See* D.I. 5-13 (Committee's statement in support of plan confirmation, which the court below admitted into the record with no objection)).  Committee's counsel explained that, over

several months in 2020, it conducted an independent investigation to determine whether causes of action retained by Debtors had value (*e.g.,* causes of actions related to the shareholder settlement that followed the failed Fresenius merger), but the Committee ultimately determined the causes of action were "speculative."  (9/1/2020 Tr. at 193; *id.* at 193 ("We . . . reject the argument that there is some great pot of litigation claims that could be realized here that are sufficient to overturn a sale that pays the lion's share of debt in this case.").  The Committee thus entered into a settlement agreement with Debtors and the secured lenders, pursuant to which the lenders agreed to assume an additional $5 million in undisputed unsecured claims.  (*See* D.I. 5-13).

Following the three-day evidentiary hearing, the Bankruptcy Court confirmed the plan, finding "all applicable provisions of the Bankruptcy Code" satisfied.  (*See* 9/4/2020 Tr. at 4).  From the bench, the Bankruptcy Court addressed four of the "primary" objections to the plan.  (*Id.*).  Among other things, the court stated that Class 3, which includes the secured lenders, is an "impaired" class, for the plan provides the "sole[]" basis for them to recover against Akorn and thus alters rights that they would otherwise enjoy.  (*Id.* at 5).  The court explained that "the series of allegations" made by Appellants regarding Debtors' purported bad faith "are not supported by the record," observing that "the record developed during both the sale and confirmation proceedings[] indicates that . . . the debtors sought to and did, in fact, maximize value to stakeholders" and that the plan "simply reflects the outcome of those efforts."  (*Id.* at 8).  Finally, the court stated that, "[t]o the extent" that there are "other objections" that it did not specifically address, "they are overruled following consideration of the record and the legal briefing."  (*Id.* at 5).  Accordingly the Bankruptcy Court entered the Confirmation Order.  (Ex. P).  On October 1, 2020, the plan took effect.

**D.      Post-Confirmation Settlement with Rising**

Approximately two months after issuing the Confirmation Order, the Bankruptcy Court held a hearing to approve a settlement between Debtors and Rising – the company with which Debtors co-owned an interest in a nasal-spray product.   During that hearing, Debtors' representative testified that, although Debtors could potentially realize a $750,000 revenue stream from the product, Debtors would first have to invest nearly $3 million, with no guarantee of eventual success.   (*See* Ex. W at 18-22).   Following cross-examination of the witness by Appellants, the Bankruptcy Court approved the settlement agreement, pursuant to which Rising agreed to waive multi-million-dollar claims against Debtors' in exchange for Debtors' interest in the product: "[T]the Debtors have met the standard and, in fact, exceeded it.  The settlement is fair, reasonable and in the best interest of the estate given that there is limited to no value of the product in its current form[.]" (*Id.* at 38).  The Bankruptcy Court subsequently entered an order approving the settlement, which Appellants did not appeal.  (B.D.I. 800).

**E.      Appeal**

On September 18, 2021, Appellants filed a timely notice of appeal of the Confirmation Order. (D.I. 1).  The appeal is fully briefed.  (D.I. 26, 29, 31).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

**II.      <u>JURISDICTION AND STANDARD OF REVIEW</u>**

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).  The Confirmation Order is a final, appealable order.  The Bankruptcy Court's legal conclusions are reviewed *de novo*, its factual findings for clear error, and its exercises of discretion for abuse.  *See In re Michael*, 699 F.3d 305, 308 n.2 (3d Cir. 2012).

### III.    PARTIES' CONTENTIONS

Appellants assert that Debtors were required to prove each necessary element for confirmation contained in § 1129(a) and (b), but "[f]or a number of these elements, the Debtors offered no admissible evidence whatsoever" and "[f]or others, the only actual evidence in the record showed that the element had not been met." (*See* D.I. 26 at 22; 25-28). Appellants further assert that the plan improperly designated impaired classes, improperly classified claims, and provided unequal treatment (i) to members of the Class 4 general unsecured claims by "improperly remov[ing]" certain vendors from that class and paying their claims in full outside of the plan, and (ii) to members of Class 7 § 510(b) subordinated claims by providing unequal treatment among members. (*See id*. at 28-33). Appellants further assert "[t]he Plan did not provide adequate means for its own implementation in that [it] retained certain assets and passed them over to an Administrator without any power to monetize" those assets (*see id*. at 23; 33-36), and that Debtors "did not act to maximize the value of the estate" but rather "buried, waived or sold valuable causes of action for no consideration" (*see id*. at 36-40). Appellants contend that the plan was not proposed in good faith because it relied upon "improper deals and agreements" including the agreement to pay vendors and the prepetition shareholder settlement. (*Id*. at 40-51). Appellants further assert that the plan did not meet the "best interests of creditors" test, which requires that a plan treat creditors better than liquidation on the effective date would, because "a liquidating trustee would have been able to pursue the retained avoidance causes of action, value related to insurance policies and sale value for a retained pharmaceutical product" and "any one of these sources" would have provided better treatment than the plan, which paid general unsecured creditors nothing. (*See id*. at 51-52). Finally, Appellants challenge the plan's releases and exculpation provisions. (*See id*. at 60-66).

Conversely, Debtors argue that their successful chapter 11 plan was a monumental achievement in light of the substantial challenges facing the company in recent years, and that scores of stakeholders worked tirelessly to effectuate sales, forge settlements, make trade-offs, and ultimately craft a restructuring solution that resolved Debtors' significant obligations while maintaining the company as a going concern, preserving jobs, and avoiding liquidation.  (*See* D.I. 29 at 19).  According to Debtors, the Bankruptcy Court carefully considered voluminous briefing and evidentiary material and correctly concluded that there was no valid objection to the plan, which satisfied all of the Bankruptcy Code's requirements for confirmation.  (*See id.*).  Debtors urge the Court to reject each of Appellants' approximately two dozen arguments or sub-arguments and affirm the Confirmation Order.

## IV.   <u>ANALYSIS</u>

The "basic purposes" of a chapter 11 bankruptcy are (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors."  *Integrated Telecom*, 384 F.3d at 119.  Consistent with those purposes, "[a] Chapter 11 bankruptcy is implemented according to a 'plan,' which divides claims against the debtor into separate 'classes' and specifies the treatment each class will receive," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 641 (2012), and which "often" aims to "keep the business operating as a going concern," *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017); *see also* 11 U.S.C. §§ 1121, 1122, 1123, 1141.

In the absence of creditor consent, distributions under a chapter 11 plan are governed by the "absolute priority rule," which provides that junior classes of claims cannot obtain any recovery until senior classes of claims are paid in full and that equity holders cannot retain any value unless all creditors are paid in full.  *See, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).  As a general matter, secured creditors "are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts."  *Czyzewski*, 137 S.Ct. at 979.  By contrast,

the claims of unsecured creditors – whose claims are not secured by collateral – are typically lower in priority than secured claims and may receive only partial (or no) payment. *See id*. at 979-80.

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case." 7 Collier on Bankruptcy ¶1129.01 (16th ed. 2020). Before confirming a plan, a court must determine (subject to one notable exception explained below) that "all . . . of the requirements" of § 1129(a) of the Bankruptcy Code are satisfied. *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 243 n.59 (3d Cir. 2004). Section 1129(a) contains 16 requirements; six are relevant to this appeal.

First, §§ 1129(a)(1) and (a)(2) of the Bankruptcy Code require the court to determine that the "plan" and the "proponent of the plan" have complied with the "applicable provisions" of Title 11 – *e.g.*, § 1107 (governing the "duties" of the debtor-in-possession), § 1122 (governing the "classification of claims or interests" in a plan), and § 1123 (governing the "contents" of a plan). Next, § 1129(a)(3) requires the court to determine that "[t]he plan has been proposed in good faith and not by any means forbidden by law." Section 1129(a)(7) requires the court to determine, "with respect to each impaired class of claims or interests," that individual holders of such impaired claims or interests have either "accepted the plan" or, at the time of the plan's "effective date," "will receive or retain under the plan . . . a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7" on the effective date. Section 1129(a)(8) requires the court to determine that "each class of claims or interests" has either "accepted the plan" or that "such class is not impaired under the plan." Finally, § 1129(a)(10) requires the court to determine that, "[i]f a class of claims is impaired under the plan," "at least one" such impaired class "has accepted the plan, . . . without including any acceptance of the plan by any insider."

Section 1129 authorizes a departure from strict adherence to these requirements in one circumstance, which is codified in § 1129(b) and often referred to as the "cramdown" provision.

*See RadLAX*, 566 U.S. at 641-42.  That provision states that, as long as all § 1129(a) requirements are satisfied except for §1129(a)(8) – which requires the court to determine that each creditor class has either accepted the plan or is otherwise unimpaired by the plan – the court may confirm a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

### A.    The Debtors Met Their Burden of Proof

In a chapter 11 case, a plan proponent bears the burden of establishing the § 1129 factors by a "preponderance of the evidence."  *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006).  Here, the Bankruptcy Court determined that "[t]he Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."  (Confirmation Order at 7).

Appellants assert that, apart from testimony from Debtors' general counsel (Bonaccorsi), the record contains "no evidence" regarding absolute priority, the best interest of creditors test (which compares the outcome in a Chapter 11 bankruptcy to a Chapter 7 liquidation), the propriety of consideration for releases and exculpations, the classification or impairment of certain claims, or the equality of treatment within classes.  (*See* D.I. 26 at 25-26).  Appellants assert that "[i]t is a straightforward abuse of discretion or clear error for a court to find that a party has met its burden of proof if, as here, there is no admissible evidence in the record on a particular issue."  (*Id.* at 26).

Debtors argue that Appellants' sweeping argument is contradicted by the record.  (*See* D.I. 29 at 21).  The Court agrees.  (*See* Plan at 12, 21-23 (relevant evidence pertaining to absolute priority); 9/3/2020 Tr. at 8-40, D.I. 5-56 (hypothetical liquidation analysis relevant to best interests of creditors); 9/2/2020 Tr. at 51-60 (relevant evidence pertaining to release and exculpation provisions); Plan at 16-20, 9/1/2020 Tr. at 46-57, D.I. 5-12 (relevant evidence pertaining to classification and impairment); Plan at 20-21, Ex. C, Ex. D, Ex. E, Ex. F, 9/1/2020 Tr. at 56-57,

65-66, 9/2/2020 Tr. at 46, D.I. 5-11, D.I. 5-13 (relevant evidence pertaining to equal treatment within classes)).  In light of the record, there is no basis for Appellants' claim that the Bankruptcy Court "abused its discretion" in confirming the plan based on insufficient evidence – much less no evidence at all.  (*See* D.I. 26 at 9, 26).

Appellants argue generally that "[e]ach witness testified solely as a fact witness," not as an "expert," and speculate that this testimony "appears to have played a large role in convincing the Bankruptcy Court to confirm the Plan."  (D.I. 26 at 26).  Contrary to Appellants' arguments, however, Debtors' witnesses (Buschmann and Bonaccorsi) did not need to satisfy *Daubert* to highlight the fact that the Committee conducted an independent investigation into the retained causes of action (*see* 9/1/2020 Tr. at 65-66), or the fact that Debtors did not conduct a duplicative investigation (*see* 9/2/2020 Tr. at 50-51), or other relevant factual matters within their personal knowledge.  Appellants cite no authority to support their opposing view nor do they provide any rationale why the cited testimony is improper or warrants reversal of the Confirmation Order.

Appellants further assert that Akorn's financial advisor (Kocovski) offered unsupported valuation testimony regarding the litigation claims and the nasal-spray product, but the argument is unclear.  (*See* D.I. 26 at 26-27).  Appellants contend that Kocovski could have offered valid "valuation testimony" only if he qualified as an expert witness.  (*See id*. at 27).  But as the Debtors correctly point out, Kocovski never offered "valuation testimony" in the first place.  Because Akorn determined value through the marketing and sale process, it had no need for a "valuation expert" to determine value as a theoretical matter.  Kocovski provided a liquidation analysis – *i.e.,* what Akorn could recover through a hypothetical Chapter 7 liquidation – otherwise known as the "best interest of the creditors" test under § 1129(a)(7).  Appellants cite no authority suggesting that only "expert witnesses" may present such a liquidation analysis, and they did not object to the admissibility of Kocovski's testimony or to his written report.  (*See* 9/3/2020 Tr. at 19; D.I. 5-56).

Appellants further contend that the Bankruptcy Court improperly relied on "statements of counsel" that described the retained causes of actions as speculative and of uncertain value. (*See* D.I. 26 at 27-28). As Debtors point out, those verbal statements, made by counsel for the Committee, merely reiterated the Committee's written statement in support of plan confirmation, which the Bankruptcy Court admitted into evidence after nobody (including Appellants) objected to it. (*See* D.I. 5-13 at 2-3 (statement of support describing recovery on the retained causes of action as "uncertain," "costly," and "highly contested"); *see also* 9/1/2020 Tr. at 67 (admitting statement of support into record without objection)). Appellants do not dispute that the Bankruptcy Court could rely on record evidence. In sum, the Court finds no basis to conclude that the Debtors failed to meet their burden of proof on any element and rejects Appellants' evidentiary arguments.

### B.     The Plan Properly Classifies Substantially Similar Claims

Appellants argue that the plan originally included in Class 4 (holders of general unsecured claims, including Appellants) certain vendors whose business relationship was not being assumed in the sale. According to Appellants, Debtors later "remov[ed] the general unsecured claims altogether," and they were "paid in full" outside of the plan. (9/2/2020 Tr. at 109; 9/3/2020 Tr. at 99, 127). Appellants argue that there was no evidence presented at the hearing about this settlement, and that "removal of these creditors from the appropriate class and their placement into a kind of 'shadow class' permitted them to receive payment outside the Plan without the necessity of the Debtors explaining the specifics of that payment." (D.I. 26 at 28-29).

Under § 1123(a)(1), "a plan shall[] designate . . . classes of claims . . . and classes of interests," and under § 1122, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." A bankruptcy court exercises "'broad discretion' to decide if a plan satisfies that [classification] requirement." *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013). The Bankruptcy Court

here concluded that the plan met this requirement.  (*See* Confirmation Order at 11 ("The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.  . . . Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.").

A chapter 11 purchaser may assume some of the debtor's liabilities.  *See, e.g., In Re Trans World Airlines, Inc.*, 2001 WL 1820326, at *11-12 (Bankr. D. Del. Apr. 2, 2001).  Pursuant to the settlement agreement involving the Committee, which the Bankruptcy Court approved, the secured lenders agreed to assume the additional $5 million in unsecured claims as part of the overall consideration provided by their credit bid.  (*See, e.g.*, Plan at 20-21; D.I. 5-13).  As a result of the assumption of those claims, the relevant vendors no longer "held claims against" Debtors, as Appellants assert, but rather held claims against the purchaser (*i.e.,* a newly-formed company owned by the lenders).  (*See* Plan at 21 ("[F]or the avoidance of doubt, any obligations that were assumed by the Purchaser shall cease to be Claims against the Debtors following such assumption.").  As a result, the plan had no need to classify these particular vendor claims in a class alongside general unsecured claims that the lenders did not assume.  The Bankruptcy Court acted well within its discretion in concluding that the plan satisfied the classification requirement.

## C.   The Plan Properly Designates Impaired Classes

Appellants argue that the Class 3 secured lenders were not an impaired class, as they were already bound to support the plan by the terms of the prepetition standstill agreement and they received all of the benefits they were entitled to under the standstill agreement.  Appellants further assert that because Class 3 was not impaired, its vote in favor of the plan did not satisfy the requirement that at least one class impaired by the plan voted to accept it under §1129(a)(10) and (b)(1) of the Bankruptcy Code.  (*See* D.I. 26 at 30-31).

Under § 1123(a)(2) of the Bankruptcy Code, a plan must "specify any class of claims or interests that is ***not*** impaired," and under §1123(a)(3), the plan must "specify the treatment of any class of claims or interests that ***is*** impaired." 11 U.S.C. §§ 1123(a)(2), (3) (emphases added). As the Third Circuit has explained, "'[i]mpairment' is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans." *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003). The Bankruptcy Code states that "a class of claims or interests is impaired under a plan" – a status that entitles the creditor to vote on the plan, *see* § 1126 – "unless . . . the plan[] leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). The Bankruptcy Code "creates a presumption of impairment," and that presumption is rebutted only if it is demonstrated that the plan "leave[s] the creditor's rights entirely 'unaltered.'" *PPI*, 324 F.3d at 202-03. The objector to an impairment-related designation bears the burden of rebutting the presumption. *Id*. It is well established that any alteration of a creditor's rights constitutes impairment. *See* 7 Collier on Bankruptcy ¶1124.03 (16th ed.) ("Any alteration of these rights constitutes impairment, even if the value of the rights is enhanced. There is no 'suggestion . . . that only alterations of a particular kind or degree can constitute impairment.'" (footnotes omitted)).

Here, the plan designates as "impaired" the secured lenders in Class 3. (*See* Plan at 16-18). Absent the chapter 11 cases, the secured lenders would have authority to take possession of their collateral upon default and to unilaterally conduct a public or private sale of such collateral without judicial involvement. (*See* D.I. 5-8 ("Term Loan Pledge Agreement") at 10 (permitting the secured lenders' administrative agent – through self-help and without judicial process – to (among other things) "collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon" collateral at public

or private sale or sales "for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable")).   But here, Debtors have conducted a sale transaction that provides the secured lenders with their plan treatment.   Additionally, the secured lenders contributed cash (including $35 million of their cash collateral) to the Debtors' estate to fund wind-down expenses, and further provided significant recoveries for holders of general unsecured claims – including assuming over $150 million in trade liabilities.   (*See* 9/1/2020 Tr. at 51-52; D.I. 5-13).

Appellants argue that the secured lenders are not impaired because they received "100% of [their] due under the Standstill Agreement" and that, in all events, the plan itself did not cause the lenders' asserted impairments.   (*See* D.I. 26 at 30-31).   As the Debtors correctly point out, however, the lenders' claims do not arise under the standstill agreement; they arise under the antecedent loan agreement – which, among other things, entitled the lenders to "[p]ayment of [o]bligations" in full.   (*See* Plan at 10-11 (defining "Term Loan Claim" and "Term Loan Credit Agreement"); *see also* Ex. C at 65).   Appellants have not identified anything in the standstill agreement that negates the lenders' rights under the loan agreement, so the assertion that the secured lenders have received all material benefits of the standstill agreement misses the mark. (D.I. 31).   The lenders did not receive all material benefits of the loan agreement under the plan, so their class of secured claims was properly designated as impaired.   As Class 3 was properly designated as impaired, and as it voted unanimously to accept the plan (*see* Voting Decl. at Ex. A), Appellants' argument that Debtors failed to satisfy §§ 1129(a)(10) and (b)(1) with respect to confirmation must also be rejected.

### D.    The Plan Provides Equal Treatment to Claims in the Same Class

Appellants assert that the plan provides "unequal treatment" to creditors.   (*See* D.I. 26 at 31-33).   Under § 1123(a)(4) of the Bankruptcy Code, "a plan shall[] provide the same treatment

for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." That provision "further[s]" a "central policy of the Bankruptcy Code": "equality of distribution among creditors." *W.R. Grace*, 729 F.3d at 327. The Bankruptcy Court determined that the plan satisfied this principle. (*See* Confirmation Order at 12 ("The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.").

Appellant's "unequal treatment" argument implicates two of the plan's eight classes. The first allegation of unequal treatment concerns the so-called "shadow class" of vendors in Appellants' class – Class 4 (general unsecured claims). But the class of general unsecured claims logically excluded claims assumed by the purchaser (*see* Plan at 6). As a result of the sale, the vendors in the so-called "shadow class" held claims against the purchaser, not the Debtors, and the plan need not classify them at all. It follows, therefore, that the plan did not treat Appellants differently from those vendors. Appellants present no authority in support of their suggestion that the purchaser was precluded from assuming some claims but not others.

The second allegation of unequal treatment concerns shareholders who opted into the settlement agreement following the failed Fresenius merger. (*See* D.I. 26 at 33). According to Appellants, those settling shareholders will receive a greater recovery under the plan as compared to other creditors in the shareholders' class (Class 7) because – prior to the petition date and pursuant to the court-approved settlement agreement – Debtors placed various proceeds into escrow for their benefit. (*See id.*). As an initial matter, Appellants lack standing to press this argument. The plan designates Appellants as part of Class 4, so Appellants have no basis to allege unequal treatment that implicates an entirely different class. *See, e.g., In re PWS Holding Corp.*,

228 F.3d 224, 248 (3d Cir. 2000) ("Third-party standing is of special concern in the bankruptcy context where . . . one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan") (quoting *Kane v. Johns-Manville Corp.,* 843 F.2d 636, 643 (2d Cir. 1988); 7 Collier ¶1123.01[4][b] (16th ed. 2020) ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests[.]").  This argument also must be rejected.

### E.    The Plan Provides Adequate Means for Implementation

Appellants further assert that "[t]he Plan did not provide adequate means for its own implementation."  (*Id*. at 23).  Appellants refer to § 1123(a)(5) of the Bankruptcy Code, which provides that "a plan shall[] provide adequate means for [its] implementation." § 1123(a)(5).  That provision expressly identifies some means – *e.g.*, "retention by the debtor of all or any part of the property of the estate" and "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan, *see* §§ 1123(a)(5)(A)-(B) – but those means "are merely illustrative rather than exclusive," 7 Collier ¶1123.01[5] (16th ed. 2020).  Plan proponents "enjoy substantial discretion in choosing an adequate means of implementation."  Chapter 11 Reorganizations § 12:8 (2d ed. 2021).

The Bankruptcy Court determined that "[t]he Plan satisfies the requirements of section 1123(a)(5)."  (*See* Confirmation Order at 13).  This determination is clearly supported by the record.  A detailed section of the plan – titled "Means for Implementation of the Plan" – sets forth the "general settlement of claims," "the UCC settlement," "sources of plan consideration," "restructuring transactions," "vesting of assets," the "plan administrator," the "wind-down," the "wind-down amount," "plan administrator exculpation, indemnification, insurance, and liability limitation," "tax returns," the "cancellation of notes, instruments, certificates, and other documents," "corporate action," the "dissolution of the Board of the Debtors," the "release of

liens," "effectuating documents" and "further transactions," "exemption from certain taxes and fees," "causes of action," and "closing the Chapter 11 cases."  (*See* Plan at 20-25).  The plan contains another section titled "Procedures for Resolving Contingent, Unliquidated, and Disputed Claims," which sets forth the process for Debtors or the plan administrator, as applicable, to liquidate unliquidated claims.  (*See id.* at 31-33).

Appellants insist that "[t]he Plan was unconfirmable because it could not be implemented in a manner that actually delivered a recovery to unsecured creditors," as the plan "does not provide any mechanism for the liquidation of" unliquidated claims, and the plan administrator "had no power to . . . realize value from" the assets that the estate retained, such as "litigation claims." (D.I. 26 at 34-36).  But § 1123(a)(5) does not provide that a debtor must "actually deliver[] a recovery to unsecured creditors," and the plan provides "mechanisms" to liquidate unliquidated claims and to allow the estate to "realize value" from the retained assets.  The plan provides that, once it becomes effective, the plan administrator shall serve as the Debtors' sole representative to "implement the Plan and to make distributions thereunder . . . including:  (i) liquidating . . . the assets of the Debtors remaining after consummation of the Sale Transaction . . . and (ix) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan." (*See id*. at 22).  Thus, the plan administrator has had authority since October 2020 to pursue the causes of action that the estate retained and to realize value for the other retained assets. (*See* Plan at 9, 21-22; 9/4/2020 Tr. at 7-8).  The Court finds no basis for Appellants' argument that plan lacks adequate means of implementation.

## F.    The Bankruptcy Court Properly Concluded that Debtors Sought to Maximize the Value of the Estate for Creditors

"In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers that would otherwise vest in the

bankruptcy trustee," which include the "duty to maximize the value of the bankruptcy estate." *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*); *see* § 1106(a)(1).  The Bankruptcy Court determined that Debtors fulfilled that duty, stating "the record developed during both the sale and confirmation proceedings[] indicates that . . . the debtors sought to and did, in fact, maximize value to stakeholders," and the plan "simply reflects the outcome of those efforts."  (9/4/2020 Tr. at 8). Appellants argue only that Debtors failed to maximize the value of the retained assets – namely, the estate causes of action, the D&O insurance policies, and the co-ownership interest in the nasal-spray product.  (D.I. 26 at 18, 37-40).  Appellants acknowledge that determination is reviewed for abuse of discretion.  (*Id.* at 8).

With respect to the retained causes of action, the record supports their lack of value.  As noted, the Committee – which owes a fiduciary duty to all unsecured creditors, including Appellants, *see Westmoreland Hum. Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) – conducted an independent investigation into those causes of action over the course of several months.  (*See* 9/1/2020 Tr. at 193; D.I. 5-13).  The Committee ultimately determined "that these potential claims are subject to defenses, that litigation would be costly and recovery uncertain, and that litigation might upset the sale and place the continuation of the Debtors' business in jeopardy, harming those creditors the Term Loan Lenders proposed to pay."  (D.I. 5-13 at 2; *see* 9/1/2020 Tr. at 193 (Committee "reject[ing] the argument that there is some great pot of litigation claims that could be realized here"); 9/3/2020 Tr. at 157 ("Your Honor can take some comfort in . . . that [the Committee] performed kind of a quasi-trustee role here and we walked away confident that the plan was not pouring significant litigation value down the drain.").  The Debtors reached this same conclusion in the exercise of their business judgment.  Appellants assert the potential claims

are "valuable" (D.I. 26 at 37) but presented no evidence below in support of their value and offer none here.

      With respect to the D&O policies, Appellants argued below that because the Debtors failed to investigate whether there was a possibility of "unwinding" the shareholder settlement related to the Fresenius merger – which was consummated nine months prior to the chapter 11 filing, and placed $30 million of D&O policy insurance proceeds into escrow – the Bankruptcy Court should deny confirmation of the plan preserving an ongoing business so that the case might be converted to chapter 7.  In such an event, Appellants theorized, an estate fiduciary might investigate whether the shareholder settlement might be unwound, and if so, whether additional claims against the directors and officers might exist, and if so, whether they might be asserted to obtain a greater recovery for holders of unliquidated litigation claims, and if so, whether a law firm might be willing to pursue recovery on a contingency basis – all in the event that the D&O insurance proceeds had not been entirely dissipated, which remained uncertain.  (*See* 9/3/2020 Tr. at 126:7-141:18).  Asked by the Bankruptcy Court to identify what additional claims, if any, were left that could be asserted on behalf of the estate against directors and officers arising from the Fresenius settlement, counsel had no answer other than to point to the "wide-ranging misconduct" cited by the Delaware Chancery Court in finding the Fresenius transaction was properly terminated upon the occurrence of a material adverse effect.  Not surprisingly, this argument failed to persuade the Bankruptcy Court that Debtors had failed to maximize the D&O proceeds or that plan confirmation should be denied on this basis.

      On appeal, Appellants argue that the settling shareholders are retaining the "fruits" of "transfers" that are "clearly" "avoidable preferences" pursuant to 11 U.S.C. § 547.  (D.I. 26 at 33).  According to Debtors, this line of argument reflects a fundamental misunderstanding of how those policies operate and why creditors are unlikely to recover under them.  (D.I. 29 at 33 n.7).  "The

escrowed proceeds are comprised substantially of D&O insurance-policy proceeds. Although Appellants apparently believe that the estate can obtain those proceeds through litigation and then distribute them to creditors, that is not so. That is because the insurance policies are available to debtors only to pay certain "Company Loss[es]," which includes certain 'settlements.'" (*Id.* at 33). So if, as Appellants seem to advocate, the Debtors' estate were to unwind the settlement, the insurer – not the Debtors' creditors – will acquire the proceeds. The record supports Debtors' argument here. (*See* D.I. 5-36 at 58, 60; 9/2/2020 Tr. at 34:17-36:14; 144:11-16).[5]

As to the nasal-spray product, Appellants cite certain testimony suggesting that the product "could produce an annual net revenue of $750,000.00" (D.I. 26 at 40), but as Debtors point out, that testimony that came many weeks after the confirmation hearing. Additionally, the very same hearing testimony showed that, by a "conservative estimate," the Debtors would have had to invest at least $3 million even before the potential for that revenue (not income) stream materialized. (*See* Ex. W at 22). Instead of entertaining such risk, the Debtors opted for certainty, entering into a settlement agreement which conveyed their ownership interest in the product to Rising in exchange for eliminating a multi-million-dollar claim against the estates. (*See* B.D.I. 691; B.D.I. 800). Appellants argue that the Debtors "can point to no preconfirmation valuation evidence" and "their speculation about the impact of start-up costs on the ultimate valuation of the product is not evidence." (D.I. 31 at 9). According to Appellants, Debtors' $3 million required investment estimate is merely a "*post-hoc* rationalization." (*Id.* at 10). But Appellants presented no evidence below to controvert the value of the nasal spray product, and in light of their

---

[5]     Although Appellants assert that the Debtors' estate should pursue derivative claims related to the failed Fresenius merger – and that the D&O insurance policies may provide a payout in that circumstance too – that avenue is likely blocked. Plaintiffs asserted such derivative claims, including in Louisiana state court. The resulting settlement agreement includes a broad release, which appears to preclude any derivative lawsuit related to the failed Fresenius merger. (*See* 9/4/2020 Tr. at 6).

circumstances in chapter 11 (or having just emerged), it is hardly surprising that Debtors chose not to engage in a multi-year gamble.  The Court finds no abuse of discretion in the Bankruptcy Court's confirmation of the plan notwithstanding this asset's potential value.

> G.   **The Plan Was Proposed in Good Faith**

Appellants argue that the plan was not proposed in good faith.  Pursuant to § 1129(a)(3) of the Bankruptcy Code, a bankruptcy court may not confirm a plan unless "[t]he plan has been proposed in good faith and not by any means forbidden by law."  "In analyzing whether a plan has been proposed in good faith," the "important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code," like "preserving going concerns and maximizing property available to satisfy creditors." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  As this Court has explained, "denial of confirmation for failure to satisfy section 1129(a)(3) should be reserved for only the most extreme of cases."  *Luo v. Melinta Therapeutics, Inc.*, 2021 WL 965614, at \*7 (D. Del. Mar. 15, 2021).  As Appellants acknowledge, factual findings related to good faith are reviewed only for "clear error," *PWS*, 228 F.3d at 242.  (D.I. 26 at 8).

The Bankruptcy Court concluded that Akorn "proposed the Plan in good faith" with "the legitimate and honest purpose [of] maximizing the value of [its] Estates and to effectuate a successful reorganization of [its] business."  (Confirmation Order at 21).  The Bankruptcy Court observed that although Appellants had made a "series of allegations" in an attempt to sow doubt about Debtors' good faith, the allegations regarding the Debtors' purported bad faith "are not supported by the record."  (9/4/2020 Tr. at 8-9).  Appellants challenge this determination on appeal claiming that "[t]he Plan was proposed in bad faith because it was the culmination of a process begun by the Debtors with the ulterior motive of artificially increasing the amount of secured debt to provide a friendly, unbeatable credit bidder to purchase all Debtor assets."  (D.I. 26 at 42-45).

But Appellants "ha[ve] not presented anything but innuendo in support of [their] argument that the Debtors failed to act in good faith." *PWS*, 228 F.3d at 243.

The adverse ruling in the Fresenius litigation predicated the Debtors' concern that the secured lenders could assert an event of default under the parties' loan agreement, which had the potential to place the Debtors in further litigation that their business could not withstand. (*See, e.g.*, 9/1/2020 Tr. at 17-18). The Debtors elected to pursue an approach that would preserve the value of their business while giving them and their advisors breathing room to develop a more comprehensive solution. The record supports a finding that the Debtors spent two years searching for an investor that could pay off their loans, but no such investor emerged, leading the Debtors to file for bankruptcy as a last resort. (*See* 9/1/2020 Tr. at 20-22, 24, 26, 32-33, 38, 43-47, 64). These actions are not consistent with a lack of good faith. Appellants disagree but have presented no evidence that the Debtors "manufactured" this bankruptcy. This record does not leave the Court "with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court in finding no bad faith, which is the proposition that Appellants must establish under the operative standard of review. *In re J&S Props., LLC*, 872 F.3d 138, 142 (3d Cir. 2017).

Appellants argue that the Debtors' initial list of its largest unsecured creditors did not include them and that, as a result, they "did not receive notice of the bankruptcy in time to seek appointment to" the Committee. (D.I. 26 at 45). Consistent with customary practice, Debtors listed their thirty largest unsecured claims, and Appellants identify no authority requiring a debtor to list every unliquidated, contingent, and disputed claim. Nor do Appellants suggest that this issue resulted in any concrete harm. Appellants stated that they had no trouble requesting participation on the Committee during the first week of the Chapter 11 cases, but the U.S. Trustee did not grant their request, and they elected not to challenge that determination. (*See* 9/1/2020 Tr. at 213 (Appellants' counsel stating, "[w]e had requested that we be put on [the Committee] in

the first week of this case," and conceding "we could have filed a motion to reconstitute while the U.S. Trustee was considering it" but did not); *see also* §§1102(a)(1), (4).  Although Appellants complaint about being "fr[ozen] . . . out of meaningful participation in the bankruptcy process," the record reflects robust participation in the proceedings.  (D.I. 26 at 45).

Appellants assert that, although the Debtors disclosed various assets and liabilities in its disclosure statement and schedules (or amendments thereto), they did not "accurately" do so.  (*See id.*).  Appellants complain that "the Disclosure Statement . . . asserted that there were no excess proceeds to distribute to creditors"), but do not identify any purported inaccuracies.  Appellants complain that "the Amended Disclosure explicitly valued all avoidance and other causes of action as worthless," but never presented any contrary evidence of their worth.  Appellants complain that they "do not know whether all [Debtor] affiliates were disclosed" but nowhere claim that the disclosures are wrong.  Although Appellants argue that the Debtors "intentionally" sought to "mislead[]" and "confuse interested parties" through these supposed inaccuracies (*id*. at 45), they offer no support for these claims.

Additionally, although Appellants contend that Debtors intentionally omitted required material disclosures regarding director bonuses, they acknowledge that "Debtors were required to disclose the bonuses to securities regulators, and did so."  (*Id*. at 47-48).  Indeed, the Debtors disclosed the bonus payments in publicly available SEC filings prior to the petition date.  *See Akorn, Inc., Annual Report* (Form 10-K) (Feb. 26, 2020); *Akorn, Inc., Quarterly Report* (Form 10-Q) (May 11, 2020).  The record reflects that the Debtors "disclosed" its bonus program in post-petition bankruptcy filings too.  (*See* B.D.I. 4).  Appellants argue that the "unjustifiable" bonuses amounted to a "smash-and-grab" job that unduly enriched company insiders, but that has nothing to do with nondisclosure.  (D.I. 26 at 49-50).  Moreover, as Debtors correctly point out, the only evidence in the record refutes that proposition.  (*See* 9/2/2020 Tr. at 38-43 (explaining that the

relevant officers earned the bonuses, that Debtors could recoup the bonuses if the officers left, and that an independent consultant market-tested the bonuses)).

Next, Appellants contend that, in their disclosure statement, the Debtors knowingly misrepresented certain claims.  (D.I 26 at 50).  Although it is not entirely clear from their briefs, Appellants appear to take issue with the fact that the disclosure statement did not disclose the precise values of certain "unliquidated" claims.  (*See id*.).  As Debtors point out, it makes little sense to describe these purported oversights as "knowing misrepresentations" given that an unliquidated claim is, by definition, "[a] claim in which the amount owed has not been determined."  Claim (3), Black's Law Dictionary, (11th ed. 2019).  Finally, Appellants contend that Debtors made "intentionally misleading" disclosures about sales involving affiliates in India and Mauritius, in a plot to "avoid paying something to Appellants" (D.I. 26 at 50-51), but Appellants provide no evidence to substantiate this argument.

Appellants' arguments do not leave the Court with a definite and firm conviction that a mistake has been committed.  The Court agrees with the Bankruptcy Court that "[n]othing in the record suggests" that Debtors "behaved improperly, pre- or post-petition."  (9/4/2020 Tr. at 8-9).

## H.    The Plan Satisfies the "Best Interest of the Creditors" Test

Appellants argue that the plan was not in the best interests of creditors.  (*See* D.I. 26 at 51-52).  Under § 1129(a)(7), "[w]ith respect to each impaired class of claims or interests," each creditor in the impaired class must either "accept[] the plan" or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 . . . on such date."  Thus, if a creditor is in an impaired class and does not vote to accept the plan, that creditor must "receive at least as much in reorganization as it would in liquidation."  7 Collier ¶1129.02 (16th ed. 2020).  "Liquidation values will often be proved through

the testimony of auctioneers or other liquidators as to what the assets will yield under more or less 'fire-sale' conditions," *id.*, and because the issue is factual in nature, the Court reviews the § 1129(a)(7) finding only for clear error. *See PWS*, 228 F.3d at 250; *J&S Props.*, 872 F.3d at 142.

Debtors and their advisors prepared a liquidation analysis, which was introduced into evidence at the confirmation hearing. (Ex. II; 9/3/2020 Tr. at 12-18). The liquidation analysis revealed unsecured claimholders (like Appellants) would recover nothing in a Chapter 7 liquidation (*see* Ex. II at 4) – *i.e.*, the same amount they are projected to recover under the plan). The Bankruptcy Court concluded that Appellants will receive "as much" under the plan as they "would have received if the Debtors were liquidated under chapter 7." (Confirmation Order at 22). Appellants complain that the liquidation analysis attributed no value to the retained assets and that, "if even one of these assets was valuable, that value would have inured to the benefit of the next class down the distributional waterfall: the general unsecured class containing Appellants." (D.I. 26 at 52). But Appellants' mere speculation about the potential value of the retained assets – they concede that they offered no contradictory evidence "about the consequences of a liquidation," (*id.* at 51) – does not demonstrate error, much less create a "definite and firm conviction that a mistake has been committed," *J&S Props.*, 872 F.3d at 142, especially in light of the record evidence demonstrating no party wanted to purchase these assets.[6]

---

[6]   As Debtors correctly point out, Appellants further ignore that the Chapter 7 process has considerable costs, further reducing the chance that they would recover anything in a liquidation. Debtors list the substantial costs and risks that may arise with a Chapter 7 liquidation, including: delay in familiarizing a Chapter 7 trustee with the assets; potential loss of bids already obtained as a result of the delay; reduced creditor recoveries based on the trustee's fees, expenses, and other necessary costs and additional claims filed pursuant to a new bar date; triggering a termination event under the purchase agreement with the secured lender; loss of the secured lenders' funding of secured, administrative, and priority claims along with the wind-down funds to pay operational and administrative expenses; reversion of the claims assumed by secured lenders under the plan to general unsecured claims, alongside Appellants' claims, which would further reduce the prospect of recovery by the Appellants. Appellants offer no reply regarding these risks and costs. (*See* D.I. 31).

The Court finds no support for Appellants' insistence that "it was error to confirm the Plan" under § 1129(a)(7).

## I.   The Plan Is Fair and Equitable and Does Not Discriminate Unfairly

Appellants assert that the plan is unfair and inequitable and unfairly discriminatory. *See* (D.I. 26 at 52-60). Section 1129(b)(1) of the Bankruptcy Code provides that, if a plan satisfies all applicable requirements of § 1129(a) except for § 1129(a)(8) – the latter of which "mandate[s] that all classes either vote to accept the plan or recover their debt in full under it," *In re Tribune Co.*, 972 F.3d 228, 237 (3d Cir. 2020) – a court may still confirm a plan if the plan proponent demonstrates that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the non-accepting impaired classes. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993). As the Supreme Court has explained, with respect to a non-accepting class of impaired unsecured creditors, a plan "may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full" or (relevant here) "if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property.'" *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999); *see also* § 1129(b)(2)(B). This latter rule – "that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired," *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005) – is known as the "absolute priority rule."

In this case, three impaired classes voted not to accept the plan – Class 4 (which includes Appellants), Class 7, and Class 8. (*See* Voting Decl. at Ex. A). But the Bankruptcy Court determined that, under § 1129(b)(2)(B), "the Plan is fair and equitable with respect to each of the Rejecting Classes" because "[t]he Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of any Claim or Interest that is junior to each such Class will

receive or retain any property under the Plan on account of such junior Claim or Interest and no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest." (Confirmation Order at 24-25).

Appellants return to their retained assets argument, asserting that the Debtors will "forego [sic] pursuing them for value" and that they cannot do so without contributing "new value" to the reorganized entity here. (*See* D.I. 26 at 56-60). Setting aside the incorrect premise that the retained assets are valuable and the Debtors did not pay "new value" for them, the relevant question here is whether any claimants junior to Appellants will receive this property over Appellants' objection on account of those junior claimants' claims or interests. *See* §1129(b)(2)(B)(ii). Appellants do not address that question. Here, the plan contemplates the orderly wind-down of the Debtors' estates by the plan administrator, and that wind-down process includes "liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the Sale Transaction" – *i.e.,* disposing of the retained assets and distributing any recoveries to creditors consistent with the waterfall scheme. (Plan at 22). This is simply not a situation where creditors subordinate to Appellants are slated to receive value under the plan while Appellants are not. With respect to Appellants' "new value" argument, they rely heavily on the Supreme Court's *Bank of America* decision, which addressed the question "whether a debtor's prebankruptcy equity holders may, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity holders under a plan adopted without consideration of alternatives." 526 U.S. at 460. Appellants do not argue, however, that the Debtors' former equity holders are contributing new capital and receiving ownership interests in the reorganized entity over Appellants' objections (or anything remotely similar).

The Court also must disagree with Appellants' contention that – separate and apart from the "absolute priority rule" codified in § 1129(b)(2)(B)(ii) – the plan is not "fair and equitable in a general sense." (D.I. 26 at 53). Appellants contend that, "[w]hen all the legal technicalities and jargon are stripped away," an "unassociated outsider" would agree that the plan is unfair and inequitable. (*Id*. at 54-55). In support, Appellants have merely rehashed their previous arguments – *e.g.*, the plan "pays unsecured creditors less than they would receive in a Chapter 7 liquidation," the plan places "all valuable assets . . . beyond any possible execution," and the plan is the result of "collusion." (*Id*. at 53-55). These assertions are no more persuasive when presented in "a general sense" and fall short of establishing that the Bankruptcy Court abused its discretion in confirming the plan.

Finally, the Court must reject Appellants' argument that the plan unfairly discriminates under § 1129(b)(1). "Generally speaking," the unfair-discrimination standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *Tribune*, 972 F.3d at 240. That standard does not mean that any discrimination is prohibited; rather, it means that a debtor "can treat" classes "differently (discriminate)" "but not so much as to be unfair." *Id*. at 242; *see* 7 Collier ¶ 1129.03[3] (16th ed. 2020) ("There can be 'discrimination,' so long as it is not 'unfair.'"). As noted, these chapter 11 cases involve different dissenting classes, including Appellants' class (Class 4). (*See* Plan at 16-20). The record supports that each class is materially different, based on factors such as the applicable Debtor entity, claims against such Debtor, each entity's assets, and the creditors' legal rights. In light of these differences, no two classes are "similarly situated," which means that no class is receiving less "value" as compared to "similarly situated classes." *Tribune*, 972 F.3d at 240. The Bankruptcy Court correctly concluded that the plan "does not discriminate unfairly with respect to the Rejecting Classes." (Confirmation Order at 25).

Appellants do not dispute differences among the rejecting classes; rather, Appellants return to their argument that the "shadow class[]" of vendors is receiving preferential treatment as compared to other general unsecured creditors in Class 4. (*See* D.I. 26 at 55-56). This argument is unavailing, as it is clear from the record that the secured lenders agreed to assume those vendor claims in the sale, and the plan makes clear that such assumed claims are no longer claims against the estate (and so the Debtors had no need to classify those claims in the plan). As a result, every general unsecured claim in Class 4 is treated in the same manner. Equal treatment does not amount to unfair discrimination.

### J.       The Releases, Exculpation, and Injunction Are Proper

Finally, Appellants assert that the plan's release, exculpation, and injunction provisions are all improper. (D.I. 26 at 60-66). The plan includes a third-party release provision stating that each "releasing party" will release each "Debtor" and "released party" from various causes of action. (*See* Plan at 35) (capitalization altered). The "released parties" include seven defined groups, as well as "current and former" persons associated with them. (*Id.* at 9). The "releasing parties" include, among others, "all Holders of Claims or Interests that . . . vote to reject the Plan and who opt into the releases in the Plan." (*Id.*). In other words, as the Bankruptcy Court recognized, the release is "consensual with respect to the Releasing Parties" and does not apply to anyone who opts out. (Confirmation Order at 17). Appellants complain that the plan should not have granted releases to "former officers and similar parties," who purportedly provided insufficient "consideration" to receive them. (D.I. 26 at 61). But Appellants concede that they "did not opt into the Releases." (*Id.* at 65). As such, Appellants lack standing to challenge those releases. *See, e.g., Talarico v. Ultra Petroleum Corp.*, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020) ("[I]t is clear that [the appellant] lacks standing to bring and maintain this appeal based on the 'third-party-release' provision[] of the Plan" because he "opted out of the provision.").

Under the exculpation provision, certain "exculpated parties" are exculpated from various restructuring-related activities performed after the petition date but before the plan's effective date, but not with respect to "claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence." (Plan at 36). Those "exculpated parties" are defined to include the Debtors and the Committee, along with their "current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals." (*Id*. at 5). As the Bankruptcy Court recognized, the provision "was formulated following extensive good-faith, arm's-length negotiations with key constituents," "is appropriately limited in scope," and "is consistent with established practice in this jurisdiction and others." (Confirmation Order at 18-19; *see, e.g., In re Wash. Mut., Inc*., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (deeming exculpation provision appropriate when it pertained "to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers").

Although Appellants argue that the exculpation provision violates "[d]ue [p]rocess," they concede that "[i]t is common practice to exculpate estate fiduciaries (the debtor-in-possession, any committees and their agents and professionals) for the work done during the reorganization." (D.I. 26 at 62). The text of the provision reveals that it is fully consistent with this "common practice," and Appellants never argue that the practice is unconstitutional. Appellants complain that the exculpation provision protects some "former employees, directors and agents of the Debtors" (*id*. at 64), but the "exculpated parties" include only those persons who actually contributed to the plan and to the Debtors' reorganization. (*See* Confirmation Order at 18 ("[E]ach Exculpated Party has participated in these Chapter 11 Cases[.]"). Given that Appellants agree that

34

individuals who did "work . . . during the reorganization" may receive the benefit of an exculpation provision, their argument is unclear.

The authorities cited by Appellants shed no light on their argument, as those cases involve provisions far broader in scope than the exculpation provision at issue here.[7]  Even as to those much broader provisions, some of Appellants' authorities recognize that courts should not disturb them when they are "integral to the restructuring of the debtor-creditor relationship."  *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 129 (3d Cir. 2019); *see id.* at 129-132 (explaining that the release pertained to "any claims" implicating certain activity that occurred 19 months before petition date).  That is the situation here, as the Bankruptcy Court recognized.  (*See, e.g.*, Confirmation Order at 21 (describing exculpation provision as "necessary for the Debtors to consummate a value-maximizing conclusion to these Chapter 11 Cases"); 9/2/2020 Tr. at 60 (Debtors' general counsel describing the "expectation" that the exculpated parties would receive exculpation in exchange for their contributions to the reorganization process).  So even assuming the exculpation provision here is not narrowly tailored, the Bankruptcy Court still would not have abused its discretion in confirming a plan with that indispensable provision.

Appellants' objection to the injunction provision must be rejected as well.  Under Bankruptcy Rule 3016(c), "[i]f a plan provides for an injunction . . ., the plan . . . shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction."  Consistent with that command, the injunction provision in the plan here states (in bold text) that "all Entities that have held, hold, or

---

[7]     *See, e.g., In re Cont'l Airlines*, 203 F.3d 203, 206 (3d Cir. 2000) (involving release of all possible claims against the debtors' present or former directors that arose before release date); *In re Spansion, Inc*., 426 B.R. 114, 143 (Bankr. D. Del. 2010) (involving release of "any and all claims existing as of the Plan's Effective Date"); *In re Congoleum Corp*., 362 B.R. 167, 190 (Bankr. D.N.J. 2007) (involving exculpation provision pertaining to "any act or omission in connection with or arising out of" various restructuring-related activities).

may hold Claims or Interests that have been released pursuant to the Plan or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking" enumerated actions.  (Plan at 36).  Appellants insist this provision enjoins actions beyond the scope of the release and exculpation provisions, and on this basis "confirmation of the Plan containing the Injunction was error."  (D.I. 26 at 64-66).  As the Bankruptcy Court explained, "[t]he injunction provision . . . is necessary to implement, preserve, and enforce . . . the Third-Party Release[] and the Exculpation, and is narrowly tailored to achieve these purposes." (Confirmation Order at 19).  The Court finds no textual support for Appellants' argument that the scope of injunction extends beyond these purposes.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, the Confirmation Order is affirmed.  An appropriate order will be entered.

36